**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ABRAHAM FRAENKEL, individually, and for the estate of YAAKOV FRAENKEL, RACHELLE FRAENKEL, AVIGAIL FRAENKEL, AYALA FRAENKEL, N.F. by and through her next friend Abraham Fraenkel, NOGA FRAENKEL, S.F. by and through his next friend Abraham Fraenkel, TZVI FRAENKEL, SAMUEL BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, CHANA BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, ESTHER BRAUN, MURRAY BRAUN, SARA HALPERIN, SHIMSHON HALPERIN, MICAH LAKIN, individually, and for the estate of RICHARD LAKIN, MANYA LAKIN, RONEN BOROCHOV, DEVORA BOROCHOV, JOSEF BOROCHOV, ELI BOROCHOV, AVRAHAM BOROCHOV, SHIRA BOROCHOV, SHARI BOROCHOV, YOAV GOLAN, ROTEM GOLAN, YEHUDIT GREEN-GOLAN, RAPHAEL GOLAN, MATAN GOLAN, MENACHEM RIVKIN, BRACHA RIVKIN, M.R. by and through her next friend Menachem Rivkin, R.R. by and through her next friend Menachem Rivkin, S.R. by and through his next friend Menachem Rivkin, S.Z.R. by and through his next friend Menachem Rivkin, STERNA RIVKIN, STUART FORCE JR., individually, and for the estate of TAYLOR FORCE, ROBBI FORCE, KRISTEN BOSWELL, RAPHAEL LISKER, SHOSHANA LISKER, TAMAR GUTMAN, AVITAL LEJZOR, DANIEL LISKER, JONATHAN LISKER, STEPHANIE ZOBAY, individually, and for the estate of STEPHEN EVERHART, HANNAH EVERHART, LINDSAY EVERHART, and HAYDEN EVERHART, <br><br> Plaintiffs, <br><br> v. <br><br> STANDARD CHARTERED BANK, <br><br> Defendant. | Case No. 24-cv-4484 <br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE PARTIES..................................................................................................................... 5

    A.    Plaintiffs ............................................................................................................. 5

    B.    Standard Chartered Bank ................................................................................ 5

JURISDICTION AND VENUE .......................................................................................... 6

SOURCING ......................................................................................................................... 7

NOMENCLATURE ............................................................................................................ 8

FACTUAL ALLEGATIONS .............................................................................................. 13

I.    The IRGC Led A Global Terrorist Alliance Called The "Axis Of Resistance,"
Each Member Of Which Committed IRGC-Sponsored Terrorist Attacks ..................... 13

    A.    Islamic Revolutionary Guard Corps ............................................................ 16

    B.    Hezbollah ....................................................................................................... 35

    C.    Hamas ............................................................................................................. 38

    D.    Jaysh al-Mahdi............................................................................................... 41

II.    Since 1979, The IRGC Sponsored Terrorism In The Middle East Through Proxy
Attacks Targeting The United States Directly And Through Attacks On U.S. Allies,
Including Israel And Iraq ............................................................................................... 42

III.    The Supreme Leader's Office And IRGC Seized Sector-Wide Monopolies In Key
Iranian Markets To Power The Terrorist Attacks Of IRGC Proxies ............................. 67

    A.    The Energy Sector: Oil, Gas, and Petroleum-Based Products........................... 71

    B.    The Construction Sector ................................................................................ 80

    C.    The Sanctions Evasion Sector: Black Market, Smuggling, and Shipping........... 81

    D.    The Financial Sector: Banks, Currency Exchanges, And Hawalas ..................... 82

    E.    The Import/Export Sector .............................................................................. 86

    F.    The Communications Sector: Telecoms, Internet, And Related
Technology ..................................................................................................... 87

IV.     The IRGC And Supreme Leader Relied Upon IRGC-Controlled Fronts' Ability To Access The International Financial System To Fund, Staff, Arm, And Logistically Support Terrorist Attacks Committed By IRGC Proxies .................................................. 89

    A.     The Supreme Leader's Office .............................................................. 90

    B.     Khatam al-Anbiya Construction Headquarters (aka GHORB) ............................ 98

    C.     Foundation for the Oppressed (aka Bonyad Mostazafan) .................................. 102

    D.     National Iranian Oil Company .............................................................. 112

    E.     National Iranian Tanker Company .......................................................... 119

    F.     Caspian Petrochemical FZE ................................................................. 123

V.      SCB Engaged In A Multi-Decade Illegal Scheme To Provide Banking Services To The IRGC And Its Fronts—Resulting In Over $2 Billion In Penalties ......................... 124

VI.     SCB's Scheme Involved Willful, Systemic, Company-Wide Efforts To Hide Its Provision Of Banking Services To The IRGC And Its Fronts ........................................ 128

    A.     The OFAC Sanctions Regime .............................................................. 128

    B.     SCB's Willful Subversion Of OFAC Sanctions ................................................. 130

        1.     SCB's Systemic Wire Stripping ................................................................. 130

        2.     After Being Penalized For Wire-Stripping, SCB Lied To Regulators About Winding-Down Its Iran Business .............................. 138

        3.     SCB Dubai Knowingly Helped IRGC Fronts Evade Iran-Related Counterterrorism Sanctions And Controls .............................................. 140

            a.     SCB Dubai Helped IRGC Front Caspian Petrochemical FZE Access the U.S. Financial System to Finance IRGC Operations ................................................................. 141

            b.     SCB Dubai Helped IRGC Agent Mahmoud Reza Elyassi Access the U.S. Financial System to Fund IRGC Operations ................................................................. 145

            c.     SCB Dubai Helped Other IRGC Agents and Fronts Access the U.S. Financial System to Finance IRGC Operations ............ 150

        4.     SCB Allowed IRGC Agents And Fronts To Access The U.S. Financial System Through SCB Dubai's "Right Fax" System ............... 152

5.    SCB Allowed IRGC Agents And Fronts To Access The U.S. Financial System Through Its Online Banking Platforms ..................... 154

C.    SCB Used A "Sundry Account" To Hide Transactions With IRGC Agents And Fronts ............................................... 157

D.    SCB Both Enabled And Concealed Its Ongoing Assistance To The IRGC, Hezbollah, And Their Proxies By Maintaining A Deliberately Ineffective Anti-Money Laundering/Combating The Financing Of Terrorism Sanctions Function ............................................... 158

E.    SCB Repeatedly Misled U.S. Financial Regulators............................................ 161

1.    SCB Willfully Misled NYDFS About Its Anti-Money Laundering/Combating the Financing of Terrorism Practices................ 161

2.    SCB Willfully Misled NYDFS About Its Sanctions Compliance Efforts ............................................... 163

F.    SCB Promoted A Culture of Illegality By Retaliating Against Whistleblowers ............................................... 165

VII.    SCB's Culpable Conduct Substantially Assisted The Terrorist Groups That Killed And Injured Plaintiffs ............................................... 166

A.    SCB Received Voluminous Warnings That Transacting With IRGC Fronts Supported IRGC-Sponsored Terrorism ............................................... 167

B.    SCB Knew That Performing Atypical Banking Services For Caspian Petrochemical Substantially Assisted IRGC-Supported Terrorism.................... 173

C.    SCB Knew That Performing Atypical Banking Services For Elyassi Substantially Assisted IRGC-Supported Terrorism............................................ 210

D.    SCB's Other Schemes ............................................... 220

VIII.    Plaintiffs' Claims Are Timely............................................... 221

IX.    Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, or Authorized By Foreign Terrorist Organizations That The IRGC Supported ............................................... 222

A.    The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family) ................... 222

B.    The October 22, 2014 Vehicle Attack in Israel (Braun Family)........................ 223

C.    The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family)............................................... 225

D.    The November 6, 2015 Sniper Attack in Israel (Borochov Family).................. 226

E.    The December 14, 2015 Vehicle Attack in Israel (Golan Family) .................... 228

F.    The January 27, 2016 Stabbing Attack in Israel (Rivkin Family) ..................... 229

G.    The March 8, 2016 Stabbing Attack in Israel (Force Family)............................ 230

H.    The December 23, 2016 Stabbing Attack in Israel (Lisker Family).................. 231

I.    The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family)...................... 233

CLAIM FOR RELIEF ..................................................................................................... 235

JURY DEMAND .............................................................................................................. 237

PRAYER FOR RELIEF ................................................................................................... 237

**INTRODUCTION**

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, specifically the aiding-and-abetting cause of action created by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). As Congress explained when enacting JASTA, this statute seeks "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

2.      Plaintiffs are American civilians, and their families, who were killed or wounded in terrorist attacks committed, planned, or authorized by Hezbollah and Hamas, both of which were foreign terrorist organizations ("FTOs") and proxies for the Islamic Revolutionary Guard Corps ("IRGC"). The attacks occurred in Israel and Iraq from 2011 through 2016.

3.      Plaintiffs seek to hold Standard Chartered Bank ("SCB") accountable for aiding and abetting the terrorists' attacks. From at least 2001 until at least late 2014 or early 2015, SCB systematically enabled known IRGC fronts and agents to finance terrorist operations by evading anti-terrorism sanctions designed to prevent the IRGC from accessing U.S. dollars. Through a prolonged campaign of deception, SCB helped IRGC fronts and agents access billions of dollars while the IRGC was providing critical financial and logistical support to anti-American terrorists worldwide. SCB thus enabled the IRGC to supply money, weapons, training, technology, and safe haven to terrorists, who used that support to attack Americans in Israel and Iraq. Given the IRGC's stockpiling of assets, volume of SCB's aid, and qualitative nature of the IRGC fronts that partnered with SCB, the bank's conduct continued powering IRGC-sponsored attacks through at least 2018.

4.      SCB's schemes played out over two phases. The first occurred through 2007, when SCB laundered billions of dollars for major IRGC-affiliated banks, including the Central Bank of Iran (aka Bank Markazi) ("CBI/Markazi"), Bank Saderat, and Bank Melli, all of which the United States has identified as instrumental to terrorist finance. In flagrant violation of U.S. sanctions, SCB facilitated these banks' access to New York's financial system and U.S. dollar clearing. This required SCB to engage in deceptive conduct including wire stripping, *i.e.*, removing information from wire transfer messages that would have caused U.S. banks to freeze or reject the transfer. All together, SCB moved hundreds of billions of dollars for prohibited banks this way.

5.      This phase of SCB's misconduct was exposed by enforcement actions that became public in 2012. These included a deferred prosecution agreement with the U.S. Department of Justice ("DOJ"); a settlement agreement with the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("Treasury"); a settlement with the Board of Governors of the Federal Reserve; and a consent order with the New York Department of Financial Services ("NYDFS"). Pursuant to these agreements, SCB agreed to pay hundreds of millions of dollars and promised that its offending conduct had ceased in 2007.

6.      The enforcement actions revealed that SCB's misconduct was brazen. Indeed, when SCB's New York bankers raised concerns about criminal and reputational exposure from SCB's unlawful activity, one of SCB's executive directors in London responded caustically and dismissively: "***You fucking Americans.  Who are you to tell us, the rest of the world, that we're not going to deal with Iranians.***"[1] Consistent with those sentiments, NYDFS concluded in its

---

[1] NYDFS, *In re Standard Chartered Bank, New York Branch*, Order Pursuant to Banking Law §39 ¶8 (Aug. 6, 2012) (emphasis added) ("2012 NYDFS Consent Order").

2012 Consent Order that: "SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran—dealings that indisputably helped sustain a global threat to peace and stability."

7.     Once caught, SCB promised that it had cleaned up its act. That promise was false. Subsequent investigations showed that SCB—especially its Dubai branch—continued to covertly move money for IRGC fronts and agents. Most significantly, SCB moved approximately $150 million for Caspian Petrochemical FZE, an IRGC front that allowed the IRGC to monetize the reserves in Iran's extremely rich South Pars gas field. Thus, even after multiple public warnings—including many from authoritative U.S. government sources—blared that the IRGC had effectively seized control of Iran's petroleum sector, SCB bankers coached Caspian Petrochemical about how to evade U.S. counterterrorism sanctions, moving money through the U.S. financial system and providing access to prohibited U.S. dollar services. This misconduct allowed the IRGC, and by extension its terrorist proxies, to access the resources they needed to carry out vicious terrorist attacks on Americans.

8.     SCB also provided prohibited financial services to IRGC agent Mahmoud Reza Elyassi and his companies. Elyassi claimed to operate an import-export business, but in fact operated a currency exchange that allowed money to flow in and out of Iran in tremendous quantities. All-in, SCB's bankers, acting within the scope of their employment, helped Elyassi conduct thousands of transactions worth over $240 million during a four-year period. They did this by coaching Elyassi and his businesses about ways to evade sanctions, deceiving their own compliance personnel into approving prohibited transactions, and obscuring who the bank was

dealing with. Elyassi's business activities—all of which occurred in sectors over which the IRGC had monopolies—likewise fueled terrorist violence against Americans.

9.      These additional violations resulted in additional enforcement actions against SCB, which became public in 2019. In that settlement, SCB agreed to pay approximately $1.1 billion for violations of multiple sanctions programs running from June 2009 until May 2014.

10.      As these stiff penalties show, SCB's violations were not the actions of a few bad apples. Instead, the employees who committed these violations were acting fully within the scope of their employment. What is more, SCB's violations were only possible because the bank maintained a corporate culture that actively discouraged compliance. Indeed, time and again, SCB's business units stymied any efforts within the bank to implement effective controls, thus opening the door to exactly the sorts of prohibited transactions that had become the bank's stock in trade. Plaintiffs thus believe that the severe misconduct exposed in the public enforcement actions constitutes only part of the picture, and that a full investigation of SCB's business with Iran will reveal even more misconduct that assisted the IRGC and its terrorist proxies.

11.      Such misconduct easily constitutes aiding and abetting under JASTA. SCB acted in a highly culpable manner, committing multiple crimes and violating clear sanctions rules. It did so *for over a decade* despite warnings from law enforcement agencies, financial regulators, the United Nations, European governments, terrorism experts, the media, and others—all of which made it crystal-clear that providing the IRGC (as well as its agents and fronts) access to the U.S. financial system would fuel anti-American terrorist violence, including *specifically* attacks by Hezbollah and Hamas, which were engaged in ongoing campaigns of violence against Americans in the Middle East. SCB's misconduct allowed millions of dollars to flow through to these designated foreign terrorist organizations, enabling them to access the weapons and other

resources they needed to carry out deadly terrorist attacks. Plaintiffs and their families suffered as a result. Congress enacted JASTA to address exactly this misconduct.

## THE PARTIES

### A. Plaintiffs

12.     Plaintiffs are 53 direct and indirect victims of eight terrorist attacks committed in Israel from 2014 to 2016, and one attack committed in Iraq in 2011. In this terminology, direct attack victims are those who were physically injured or killed in the attack. These include American civilians who were in Israel, as well as an American consulting for the U.S. Agency for International Development in Iraq. Indirect attack victims are the direct attack victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims.

13.     Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[2]

### B. Standard Chartered Bank

14.     Non-party Standard Chartered PLC ("SC PLC") is an international bank with more than 1,700 branches operating in over 60 countries. SC PLC's principal place of business is London, England.

15.     Defendant Standard Chartered Bank ("SCB") is a wholly owned subsidiary of SC PLC. SCB's principal place of business is London, England.

---

[2] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

16.     Pursuant to a license from NYDFS, SCB operates a foreign bank branch in the State of New York. The main corporate office of SCB in the United States is 1095 Avenue of the Americas, New York, New York 10036.  SCB's New York branch is referred to in this Complaint as the "NY Branch."

17.     Among other services, the NY Branch provides U.S. dollar clearing services for international wire payments, which can involve the conversion of payments from a foreign currency into U.S. dollars. The NY Branch processes approximately $195 billion per day on the Clearing House Interbank Payments System ("CHIPS").

18.     SCB also has licensed branches in the United Arab Emirates, serving customers throughout the UAE, the Middle East, and North Africa. As of the events detailed in this Complaint, SCB's UAE presence consisted of 14 branches, with its main office in Dubai ("SCB Dubai").

19.     During the relevant period, nearly all of SCB's relevant transactions were denominated in U.S. dollars and therefore cleared and settled in New York through the NY Branch.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

21.     SCB is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

22.     SCB entered the United States voluntarily and has maintained a branch in New York since 1976.

23.     As explained below, SCB's substantial assistance to the IRGC and its terrorist proxies was facilitated by the NY Branch because of the latter's central role in providing U.S. dollar clearing, foreign exchange, and trade financing services for SCB's Iranian customers.

24.     SCB purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including processing financial transactions through the NY Branch for the benefit of its Iranian customers, knowing those transactions were enabling the IRGC and its terrorist proxies to carry out terrorist attacks that killed or injured U.S. citizens in the Middle East, including Plaintiffs.

25.     Moreover, SCB made several misrepresentations to New York authorities—principally NYDFS—about its conduct, and subsequently about its compliance and remediation efforts. SCB's deceptive conduct in this District thereby provided substantial ongoing assistance to the terrorists that killed and injured Plaintiffs by preventing law enforcement from discovering and putting an end to the full extent of SCB's malfeasance.

26.     Venue in this District is proper pursuant to 18 U.S.C. § 2334(a) because SCB's NY Branch is here.

27.     Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of SCB's activity occurred within the District.

**SOURCING**

28.     The allegations herein concerning SCB's behavior are based primarily on settlement agreements that SCB entered with regulatory authorities to resolve several enforcement actions against the bank. Those settlement agreements include Deferred Prosecution Agreements ("DPAs") with DOJ, Settlement Agreements and Consent Orders entered by NYDFS and OFAC, and a detailed Decision Notice from the United Kingdom's Financial Conduct Authority ("U.K. FCA"). Each settlement document contains lengthy and detailed

factual recitations regarding SCB's illegal, sanctions-evading conduct. SCB, moreover, has stipulated to the truth of the factual allegations and has promised to not dispute those allegations in subsequent litigation.[3]

29.      To resolve those enforcement actions, SCB paid U.S., New York, and U.K. law enforcement and financial authorities nearly $2 billion in penalties and forfeitures and has been ordered to substantially overhaul its regulatory compliance efforts.

30.      SCB always actively monitored every official United States sanction designation, press release, report, and findings, including those relating to American sanctions targeting the IRGC, the Supreme Leader's Office, Hezbollah, Hamas, and Jaysh al-Mahdi, including those published by Treasury (including OFAC) and the U.S Department of State ("State"). SCB did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and SCB's thousands of employees and agents in the United States, United Kingdom, United Arab Emirates, Iran, and elsewhere, each of whose knowledge is imputed to SCB. Accordingly, SCB had actual knowledge, in real-time, of each United States sanctions designation, press release, report, and findings that any component of the U.S. government published when SCB engaged in the conduct alleged herein.

## NOMENCLATURE

31.      This Complaint often features nomenclature known to be deployed by the IRGC and its proxies, as well as terms that have a widely understood specific meaning in the terrorism setting like "operation." Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC revolutionized

---

[3] *See* Am. Deferred Prosecution Agreement ¶ 29, *United States v. Standard Chartered Bank*, No. 12-cv-262 (S.D.N.Y. Apr. 9, 2019), ECF 16-1 ("2019 Amended DPA"); *id.* Ex. B ¶ 2 (Supplemental Statement of Facts) ("SOF"); U.K. FCA, Decision Notice to Standard Chartered Bank § 7.1 (Feb. 5, 2019) ("SCB agreed to settle in relation to all relevant facts and all issues as to whether those facts constitute breaches") ("2019 U.K. FCA Decision Notice").

propaganda and strategic communications as practiced by radical Islamists and terrorist

organizations. Since 1979, under a strategy and nomenclature developed and practiced by

Ayatollah Khomeini himself, the Ayatollahs, regime clerics, and IRGC relied upon an extremely

limited universe of core propaganda nomenclature comprising about 2,000 words, and

consequently, each term assumed outsized, specific meaning as used by such Iranian actors.

Thus, words and phrases, as used by the IRGC and its clerical masters, regularly had a well-

known, talismanic-like, IRGC-connoted meaning. That was because the IRGC directly served

the Ayatollah, and both the IRGC and its associated clerics and imams broadly mimicked

Ayatollah Khomeini's 2,000-word approach.

32.    The United States has emphasized the importance of understanding IRGC

ideology and nomenclature—for example, key concepts like the United States as the

"Oppressor," Muslim populations as the "Oppressed," and "Resistance" as the preferred

euphemism for anti-American terrorist operations—when analyzing the Ayatollahs, IRGC, and

their proxies. In 2010, for example, the U.S. Department of Defense ("DoD") publicly reported:

> **Goals of Iranian Strategy**
>       Since the revolution, Iran's first priority has consistently remained the
> survival of the regime. Iran also seeks to become the strongest and most
> influential country in the Middle East and to influence world affairs. The
> theocratic leadership's ideological goal is to be able to export its theocratic form
> of government, its version of Shia Islam, and stand up for the "[O]ppressed"
> according to their religious interpretations of the law. …
>       To ensure regime survival, Iran's security strategy is based first on … its
> asymmetric warfare doctrine [*i.e.*, IRGC-sponsored proxy terrorist attacks outside
> Iran] … [and] [the IRGC's] outreach and support to governments and dissident
> groups that oppose U.S. interests … [through] … active sponsorship of terrorist
> … groups [as] tools [the IRGC] uses to drive its aggressive foreign policy. In
> particular, it uses terrorism to pressure or intimidate other countries …. The most
> notable example of this strategy includes Iran's support for Lebanese Hizballah as
> well as its influence over proxy groups in Iraq. …

**Trends in Iranian Strategy**

Iran seeks to increase its stature by countering U.S. influence and
expanding ties with regional actors while advocating Islamic solidarity. It also
seeks to demonstrate to the world its "[R]esistance" to the West. Iran is
attempting to secure political, economic, and security influence in Iraq … by …
furnishing lethal aid to Iraqi Shia militants … [via, *inter alia*, the IRGC Qods
Force and Hezballah]. In an attempt to increase influence in the Levant, Iran
provides weapons, training and money to Lebanese Hizballah, its strategic
partner.

33.     In 2019, similarly, the Office of the Chairman of the Joint Chiefs of Staff reported

that the IRGC was like "[a]ll … revolutionary visions of history – from Marx through Shariati to

Khomeini – [Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC] need an exploitative or

oppressing adversary …[,] [and] the [Iranian] clerical regime's historical frameworks … [were]:

an 'Oppressed' Iranian nation of true Muslims fighting against an 'Oppressor' … within a larger

oppressive bipolar international order," which, in the IRGC's eyes and under its ideological and

communications narrative, was always led by the United States government (which the IRGC

called the "Great Satan" and the "Global Arrogance") and U.S. allies, including Israel (which

nation the IRGC, like Iran's regime, refused to recognize, instead describing it as the "Little

Satan" to America's "Great Satan") and U.S.-supported governments in the Middle East that did

not submit to the Ayatollah (which the IRGC invariably described as U.S. "puppets").

34.     Below, Plaintiffs identify nine specific words and phrases that had a specifically

understood meaning when used by Ayatollah- and/or IRGC-affiliated speakers in Iran since

1979. Each such word and phrase had a similar meaning from 1979 through today, as each was

one of the words or phrases that Ayatollah Khomeini deployed, which was modeled throughout

IRGC and clerical ranks ever since. Plaintiffs' definitions below track regularly published

proclamations, speeches, sermons, and commentaries by the Ayatollah, clerics, and/or the IRGC

since 1979, as published by both Iranian and Western media. SCB knew the below meanings

because they were regularly published, and SCB was a sophisticated multinational corporation with extensive experience in the Middle East, including local agents in Iran, whose knowledge is imputed to SCB. Unless otherwise indicated, Plaintiffs' use of the above-identified terms in this Complaint comports with the definitions in this section.

35.     **"Jihad"** refers to the Ayatollah's and the IRGC's purportedly religiously authorized objective of expelling America from the Middle East through IRGC acts of terrorism. As used by the Ayatollah and the IRGC, the concept of jihad is inextricably intertwined with terrorist violence and closely related to the concept of "Resistance" (defined below).

36.     **"Liberation"** refers to any country or community that (a) shared the IRGC's hostility towards America and (b) submitted to the Ayatollah's rule as enforced by the IRGC.

37.     **"Operation"** and **"Operations"** refer to terrorist attacks. The U.S. government, United Nations, U.K., E.U., and terrorism scholars agree and follow the same nomenclature.

38.     **"Oppressed"** and **"Downtrodden"**, including such words' longer or related versions—"Oppressed on Earth"; "Oppressed of Earth"; "Downtrodden"; "The Downtrodden on Earth"; and "The Downtrodden of Earth"—refers to the Muslim populations of any community that had not submitted to the Ayatollah's rule and/or maintains normal relations with the United States. As Ayatollah Khomeini famously instructed the IRGC, when it came to Iran's "Foreign Policy": "We have a duty to support the Oppressed and be inimical to the Oppressors."

39.     He famously decreed in 1979: "We should try to export our revolution to the world. We should set aside the thought that we do not export our revolution, because Islam does not regard various Islamic countries differently and is the supporter of all the [O]ppressed peoples of the world. On the other hand, … the [United States government, and other foreign

governments] … have risen to destroy us. If we remain in an enclosed environment, we shall definitely face defeat."

40.    **"Oppressor"** and related concepts longer versions—the "Great Satan" and the "Global Arrogance"—refers to the United States government, which the Ayatollah and IRGC maintained were responsible for oppressing the Islamic community around the world by denying the rule of the Ayatollah.

41.    **"Resistance"** refers to terrorist attacks targeting the United States (including through its allies like Israel and Iraq) under the IRGC's constitutional mandate to export Iran's Islamic Revolution. "Resistance" is the preferred euphemism of the IRGC and every IRGC proxy, many of which, including Hezbollah and Hamas, literally feature the word "Resistance" in the Arabic version of their "external operations wing" (in the case of Hezbollah) and name itself (in the case of Hamas).

42.    **"Resistance Movements"**—including its alternative variants, "Jihad Movements" and "Liberation Movements"—refers to the IRGC's terrorist proxy members in its "Axis of Resistance."

## FACTUAL ALLEGATIONS

**I.    The IRGC Led A Global Terrorist Alliance Called The "Axis Of Resistance," Each Member Of Which Committed IRGC-Sponsored Terrorist Attacks**

43.    The IRGC, also known as the "Sepah," "Pasdaran," and "Guardians of the Islamic Revolution," has operated as a global terrorist organization since 1979. Since 1979, the IRGC, including the Qods Force (or "IRGC-QF," meaning "Jerusalem Force") has led an alliance of anti-American terrorist organizations, united by their shared mission of conducting terrorist attacks targeting the United States—directly, by targeting Americans, or indirectly, by targeting United States allies—to coerce U.S. government decisionmakers in Washington, D.C. and elsewhere to choose to withdraw from the Middle East. Since 1990, that effort has been directly assisted by Ayatollah Khamenei's Supreme Leader's Office (or "SLO").

44.    The IRGC's and SLO's global terrorist alliance functioned as a jihadist analogue to NATO and similar western alliances. It included, among others: (1) Lebanese terrorist group Hezbollah, a global terrorist organization that has been an FTO since 1997, which was founded by the IRGC in 1982 and has been its most reliable and notorious proxy ever since; (2) Palestinian terrorist group Harakat al-Muqawama al-Islamiya ("Hamas"), a global terrorist organizations that has been an FTO since 1997; and (3) Iraqi terrorist group Jaysh al-Mahdi (or "JAM"), which was founded by Hezbollah, publicly identified as Hezbollah's "striking arm in Iraq," operated in Baghdad through a joint Hezbollah-JAM cell, and led by Muqtada al-Sadr, including notorious JAM cells known as Jaysh al-Mahdi Special Groups (sometimes abbreviated "JAM-SG"), the most infamous of which were Jaysh al-Mahdi Special Group Kataib Hezbollah

13

(or "KH"), and Jaysh al-Mahdi Special Group Asa'ib Ahl al-Haq (or "AAH"), FTOs since 2009 and 2020, respectively.

45.    Since 2003, the IRGC's and SLO's terrorist alliance has proudly called itself the "Axis of Resistance." According to the Defense Intelligence Agency ("DIA"),

> Throughout its 40-year history, the Islamic Republic of Iran has remained implacably opposed to the United States [and] our presence in the Middle East … Tehran has committed itself to becoming the dominant power in the turbulent and strategic Middle East. … It leads a cohesive if informal bloc of Shia and Alawi state and nonstate actors—its 'Axis of Resistance' against the West.

46.    Ayatollah Khamenei was a direct—and key—financial sponsor of each Axis of Resistance member. As he publicly stated in 2015, "we will never stop supporting our friends in the region and the people of Palestine, Yemen, Syria, Iraq, Bahrain, and Lebanon." "Basically," Congressman Duncan observed on May 12, 2016, Khamenei meant IRGC proxies like "Hezbollah [and] Hamas."

47.    The Axis of Resistance was not merely a slogan: it had nearly every jihadist function that would parallel a western alliance, including joint attacks—which the terrorists, U.S., U.N., and E.U. all called "operations"—that were committed through the work of joint cells in which two or more FTOs were co-located with one another for a common anti-American purpose, supported by joint training, procurement, financial support, logistics, basing, and intelligence. In Iran, for example, the regime maintained multiple complexes in which the IRGC, Qods Force, Hezbollah, Hamas, and JAM trained, studied, and plotted together as one coordinated syndicate of terrorists who worked together to target the United States and sought to coerce the U.S. government to withdraw from the Middle East.

48.    According to a graphic published by the DIA in a 2019 report to Congress, Hamas and JAM were part of the "Axis of Resistance," as shown by the DIA's map of IRGC arms

14

shipments intended to sponsor attacks to drive the United States out of the Middle East, inclusive of Muslim-majority parts of Africa and Southwest Asia:



49.    Notably, the name "Axis of Resistance" itself targeted the United States because its members "resist" the U.S. presence in the Middle East. Part of this "resistance" included sponsoring waves of terrorist attacks against Israelis. But even that targeted the United States because the terrorists believed Israel to be an agent of the United States and believed that the United States was key to whether they could overthrow the Israeli government and replace it with their shared goal of an Islamic caliphate that governed Jerusalem, which they called "Qods."

50.    Each Plaintiff was injured in an attack in Israel or Iraq from 2011 through 2017 that was funded by the IRGC, and committed, planned, or authorized by Hezbollah, Hamas,

15

and/or JAM. Some attacks were committed jointly by Hezbollah and Hamas (in Israel), or by Hezbollah and JAM (in Iraq).

A.    **Islamic Revolutionary Guard Corps**

51.    The IRGC had several divisions, led by an overall command under Mohammad Ali Jafari and his co-equal leadership partner, IRGC-QF leader Qasem Soleimani. Both reported directly to Ayatollah Khamenei, shared similar stakes in the same front companies, and relied upon the front companies alleged herein to finance their operations.

52.    From 2007 through 2017, the components of the IRGC led by Jafari comprised one of the IRGC's primary Iran-based terrorist operations arms. While these regular IRGC units occasionally acted abroad—always by seconding personnel and resources to the Qods Force or Hezbollah so that they acted under the Qods Force's or Hezbollah's banner—they usually operated principally inside Iran, supporting IRGC acts of terrorism targeting the United States outside Iran and U.S. citizens within Iran.

53.    From 1979 through the present, the IRGC's Qods Force comprised the IRGC's primary Iran-based external terrorist operations arm. While the Qods Force often operated inside Iran, it usually focused on external terrorist attacks even while operating inside Iran. (Although the Qods Force was technically not created until the late 1980s, its predecessor organization, the IRGC Office of Liberation Movements, served a substantially similar role. IRGC-QF and IRGC members and Iran scholars alike often conflate the two.)

54.    From 1979 through 2024, the IRGC and its members scrupulously followed the teachings of Ayatollah Khomeini, such that they took his instructions as literal, eternal, and religiously obligatory upon them. This continued even after Ayatollah Khamenei assumed leadership of the IRGC.

55.     Ayatollah Khomeini was the IRGC's founder and leader, but was never an IRGC "member" who was himself responsible for IRGC-sponsored attacks. In contrast, Ayatollah Khamenei was always a sworn brother of the IRGC, with the rank of Brigadier General, who led IRGC forces during the Iran-Iraq war, before he became leader of the Islamic Revolution and overall commander of the IRGC as the Supreme Leader. As a lifelong IRGC member and supporter, Khamenei, among other things, previously served as Supervisor of the IRGC, as Ayatollah Khomeini's Representative in the High Security Council, and as an active IRGC commander at the frontlines of the Iran-Iraq War.

56.     At all times, Khamenei was a prominent, and important, direct sponsor of acts of terrorism in his capacity as leader of the IRGC. To that end, Khamenei appointed representatives who served in key IRGC divisions and the IRGC's leadership.

57.     Khamenei was a key, direct sponsor of Hamas attacks in Israel—and proud of it. On February 27, 2010, for example, *Agence France Presse*'s reporting about Hamas noted that "Iranian supreme leader Ayatollah Ali Khamenei told Palestinian militant chiefs that sustained resistance was the key to liberating their land." On August 4, 2014, similarly, IRGC-operated *Fars News Agency* reported: "A few days ago and following first-time remarks by Supreme Leader of the Islamic Revolution Ayatollah Seyed Ali Khamenei, a large number of Iranian Army and IRGC Commanders underlined the necessity for all Islamic countries to supply weapons and military tools and equipment to the Palestinians to help them defend themselves against the Israeli attacks." As Jeffrey Goldberg of *The Atlantic* observed on March 9, 2015:

> [A]s a reminder to those who argue that Jews should stop worrying so much about people who threaten to kill them, here is some (just some) of what [Ayatollah Ali Khamenei] … ha[s] said about Israel: ...
>
> • "It is the mission of the Islamic Republic of Iran to erase Israel from the map of the region." (2001) ...

17

- "The Zionist regime is a cancerous tumor and it will be removed." (2012) …

- "This barbaric, wolf like & infanticidal regime of Israel which spares no crime has no cure but to be annihilated." (2014) ....

58.    Unsurprisingly given his IRGC pedigree, Khamenei was widely known as a staunch supporter of terrorism. On June 29, 2009, for example, *Newsweek* reported:

> Since his early days immersed in scripture and poetry, [Khamenei] had loved to identify with "the [O]ppressed," and he built his base of support in those institutions—the clergy, the military and the bureaucracy …. Since the war years in the 1980s, he had also forged close relations with the intelligence apparatus, perhaps convincing himself, as many a revolutionary has done, that the best way to prevent oppression is to eliminate enemies. In an article published [in 2008] in *Foreign Affairs*, Iranian dissident Akbar Ganji claimed that at Khamenei's very first meeting with cabinet leaders after taking his post as Supreme Leader in 1989, he put forth a 'theory of terror' that would define his approach to security issues. "The majority of the people in the state are silent," he is supposed to have said. But "a selfless group of individuals can make the state endure by using terror."

59.    Khamenei, like Khomeini, emphasized that "Resistance"—code for IRGC-sponsored acts of terrorism targeting the United States—was the foundation of the IRGC's mission and associated ideology. At a widely covered June 4, 2007 event honoring Khomeini, for example, Khamenei emphasized that, although "Resistance against bullying powers in order to attain one's rights has a price … You should not beg others for your rights. As long as you retreat and show leniency, the hegemonic nature of the bullying powers will increase their intimidation. Rights must be achieved through resistance."

60.    IRGC members directly swore allegiance to the Ayatollah, not to the Iranian regime, and were therefore "solely controlled and commanded by Vali-e-Faqih," *i.e.*, the Ayatollah's exclusive rule, which "ma[de the] IRGC … strongly akin to ISIS."

61.    Nobody ever actually "retires" from the IRGC. Instead, IRGC officials who "retire" are typically simply moved from uniform-wearing positions into ostensibly civilian-

facing roles that serve as fronts for key IRGC operations, including fundraising and logistics. For example, according to an analysis of the IRGC published by NATO in 2020: "The IRGC acts as a business fraternity within which members of the Guard can progress along a prescribed career path. Following active service, IRGC members are offered senior positions in state-affiliated [] organisations and [] networks … Accordingly, 'no one ever leaves the IRGC'; its senior officers are viewed as an Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC exceeds ideological devotion."

62.      Unlike most terrorist groups, the IRGC was specifically established to target the United States as its primary enemy. The IRGC's doctrinal and institutional targeting of the United States was a product of Iran's history with America, and the IRGC founders' understanding that the United States posed a direct threat to the viability of their nascent terrorist enterprise. In 2011, for example, the DoD published a declassified analysis about the IRGC and its proxies that warned: "The terrorism pillar of [IRGC Commander] Jafari's strategy relies on intimidating potential adversaries and their supporters through the threat of terrorist activities against non-military targets in their territories … [through] an attack [committed by IRGC proxy] … [t]errorist organizations like … Lebanese Hezballah [and] Khattab Hezballah in Iraq, … [which] act[ed] on behalf of Iran's [*i.e.*, the IRGC's] interests." As Qasem Soleimani publicly enthused in his posthumous autobiography, "All of you loved Imam [*i.e.*, Ayatollah Khomeini] and believed in his path. [Ayatollah Khomeini's] path was the path of fighting against the U.S. and supporting the Islamic Republic and the Muslims, who are [O]ppressed by the Arrogant Powers [*i.e.*, the United States government and its allies, including Israel], under the flag of *Wilayat-e-Faqih* [*i.e.*, Ayatollah Khomeini's system of rule of the jurisprudent]."

63.     Ayatollah Khomeini established the IRGC to target the United States, in line with

his own view that the U.S. government posed the greatest threat to the IRGC's transnational

terrorist agenda. Representative examples of Ayatollah Khomeini's pronouncements to that

effect included, but were not limited to, as follows:

a.      "America is the archenemy of the Oppressed people of the world."

b.      "Today, America is the number one enemy."

c.      "Let brotherly Arab nations and the Palestinian and Lebanese brothers know that all their
        miseries are caused by America."

d.      "The criminal hands of the world arrogant states [*i.e.*, the United States and its "puppets"]
        will not be severed off the Islamic lands unless the Muslim nations and the oppressed
        people rise up against them [*i.e.*, the United States] and their offspring especially Israel."

e.      "Cold and warm weapons, that is, pens, words and machineguns should all be aimed at
        the enemies of mankind, headed by America."

f.      "We believe that the Muslims should unite and together slap America, and know that
        they can do it!"

g.      "O the Oppressed people of the world! From whatever country you come and from
        whatever stratum you come, arise and do not fear the yelling and ruckus of America and
        other powers, and make the world too narrow and tight for them."

h.      "Confronting America is presently above all our problems. If today our forces become
        divided, it benefits America. Right now, America is the enemy and all our equipment
        should be aimed at this enemy."

64.     As the United States has confirmed, the IRGC was always a terrorist organization

that serially violated the laws of war through the terrorist attacks it sponsored. On April 8, 2019,

Secretary of State Pompeo observed: "[t]he IRGC masquerades as a legitimate military

organization, but none of us should be fooled. It regularly violates the laws of armed conflict; it

plans, organizes, and executes terror campaigns all around the world."

65.     Under Iran's constitution, as interpreted by the Ayatollah and the IRGC, the

IRGC interprets its sole responsibility for protecting and exporting the Islamic Revolution as the

IRGC's specific responsibility to sponsor terrorist attacks targeting the United States, which the

IRGC always understood to be the top threat to the Islamic Revolution. For the IRGC, exporting the revolution meant one thing: IRGC-sponsored terrorist attacks, usually committed by notorious IRGC proxies, targeting the United States in the Middle East.

66.     The IRGC practices terrorism as a matter of doctrine. On October 12, 2011, for example, DoD published an analysis of the IRGC that confirmed as follows:

> In … 2005, when he was the commander of the IRGC Center for Strategy, [Mohammad Ali] Jafari stated, 'As the enemy [*i.e.*, the United States] is far more advanced technologically than we are, we have been using what is called asymmetric warfare methods [*i.e.*, acts of terrorism targeting the United States]… The tenets of this doctrine include, but are not limited to …: incorporation of … terrorism …. In May 2004, Hassan Abbasi, the Director of the Center for Doctrinal Studies at the IRGC's Imam Hussain University bluntly summarized the IRGC's intent to employ terrorist tactics, "The Islamic world needs suicide bombers… I am a theoretician of terror and violence… We are proud of terrorism, which makes the foundations of unbelief tremble… We have identified the US' Achilles heel and have coordinated with terrorist organizations… We caused the US economic growth to drop and we will cause its disintegration."

67.     The IRGC always targeted the United States for terrorist violence. Iran's 1979 revolution was militantly anti-American, and Iran's regime continued such approach ever since. Since 1979, the IRGC regularly engaged in and supported acts of terrorism directed at the United States, which targeted the U.S. government in Washington, D.C. by seeking to coerce it into changing U.S. policy as sought by the IRGC, including the United States's exit from the Middle East and abandonment of its allies there, including Israel.

68.     The IRGC exercised programmatic control over the profits and technologies generated by its fronts to maximize the IRGC's ability to convert such value into acts of terrorism targeting the United States. For starters, as *Radio Free Europe* reported on September 18, 2009, "all the IRGC's economic activities are monitored only by internal IRGC auditors." Among other ways, it accomplished this through the Logistics Policy Directive that governed since 2003, which mandated that IRGC profits be spent on its operations. *See infra* at ¶ 149.

69.     At all relevant times, the IRGC provided key weapons-related support to its

proxies, which directly enhanced the ability of the IRGC and its proxies to target and kill

Americans throughout the world. The IRGC's aid to JAM in Iraq was typical of how it aided

other close proxies, including Hamas. As DoD reported to Congress in April 2010:

> [T]he IRGCQF posts its officers in Iran's diplomatic missions throughout Iraq,
> including Iran's … Ambassador to Iraq … [and] continues to provide money,
> weapons and training to select Iraqi Shia militants and terrorists despite pledges
> by senior Iranian officials to stop such support. The weapons include:
>
> • Explosively Formed Penetrators (EFPs) with radio-controlled, remote
>   arming and passive infrared detonators
>
> • Improvised Explosive Devices (IED)
>
> • Anti-aircraft weapons
>
> • mortars
>
> • 107 and 122 millimeter rockets
>
> • rocket-propelled grenades and launchers
>
> • explosives
>
> • small arms.
>
> [The IRGC-QF ...] also offers strategic and operational guidance to militias and
> terrorist groups to target U.S. Forces in Iraq and undermine U.S. interests. In
> addition to providing arms and support, IRGC-QF is responsible for training Iraqi
> insurgents in Iran, sometimes using Lebanese Hizballah instructors. Lebanese
> Hizballah provides insurgents with the training, tactics and technology to conduct
> kidnappings, small unit tactical operations and employ sophisticated IEDs.

70.     These trends continued through the present day, throughout which period the

IRGC used Hezbollah to provide the same weapons-related tactics, techniques, and procedures

for its proxies throughout the Middle East, including Hamas and JAM. In April 2010, for

example, DIA reported to Congress that "Iran provides Lebanese Hizballah and Palestinian

terrorist groups" including "HAMAS . . . with funding, weapons, and training to oppose Israel

and disrupt the Middle East Peace Process." In 2019, DIA reported to Congress:

> The IRGC-QF maintains a wide and varied network of nonstate partners, proxies, and affiliates primarily in the Middle East. Iran provides a range of financial, political, training, and materiel support to these groups. Iran's provision of military hardware has included small arms, ammunition, explosives, improvised explosive devices (IEDs), explosively formed penetrators (EFPs), vehicles, antitank guided missiles (ATGMs), man-portable air defense systems (MANPADS), artillery, rockets, UAVs, and some more-advanced systems, such as ASCMs and ballistic missiles, despite UN resolutions prohibiting Iranian arms exports. Tehran's partners, proxies, and affiliates include Hizballah, Iraqi Shia militias, … [and] Palestinian groups.

At all relevant times, the IRGC provided similar such weapons-related assistance to Hezbollah,

Hamas, and JAM.

71.    From 2007 through the present, the IRGC was always a United States-designated

terrorist organization. On October 25, 2007, the United States designated the IRGC-QF as a

Specially Designated Global Terrorist, designated the broader IRGC for non-proliferation-related

sanctions, observed that the IRGC had seized a monopolistic share of Iran's oil sector,

emphasized that banks must follow the guidance of the Financial Action Task Force ("FATF"),

and warned banks and companies contemplating doing business in Iran, or with Iranian

counterparties, that the IRGC-QF used the money it obtained from commercial activities to

finance IRGC-sponsored acts of terrorism targeting the United States and committed by IRGC

proxies, including Hezbollah, Hamas, and Shiite terrorists in Iraq:

> The U.S. Government is taking several major actions today to counter Iran's … support for terrorism by exposing Iranian banks, companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S. financial system.
>
> Today, … State designated under Executive Order 13382 [a] key Iranian entit[y] of proliferation concern: the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) …

The Treasury Department also designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to … other terrorist organizations …

Elements of the IRGC … were listed in the Annexes to UN Security Council Resolutions 1737 and 1747. All UN Member States are required to freeze the assets of entities and individuals listed in the Annexes of those resolutions, as well as assets of entities owned or controlled by them, and to prevent funds or economic resources from being made available to them.

[FATF], the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. Last week, … Treasury … issued a warning to U.S. banks setting forth the risks posed by Iran. … Today's actions are consistent with this warning, and provide additional information to help financial institutions protect themselves from deceptive financial practices by Iranian entities and individuals engaged in or supporting … terrorism. …

## **Proliferation Finance – Executive Order 13382 Designations**

E.O. 13382, signed by the President on June 29, 2005, is an authority aimed at freezing the assets of proliferators of weapons of mass destruction and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the Order prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

The Islamic Revolutionary Guard Corps (IRGC): … [T]he Islamic Revolutionary Guard Corps ... is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747. …

IRGC-owned or -controlled companies: Treasury is designating the companies listed below under E.O. 13382 on the basis of their relationship to the IRGC. These entities are owned or controlled by the IRGC and its leaders. The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya

24

secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others. … [Such IRGC fronts include:]

- Khatam al-Anbya Construction Headquarters
- Oriental Oil Kish
- Ghorb Nooh
- Sahel Consultant Engineering
- Ghorb-e Karbala
- Sepasad Engineering Co
- Omran Sahel
- Hara Company
- Gharargahe Sazandegi Ghaem …

**Support for Terrorism -- Executive Order 13224 Designations**

E.O. 13224 is an authority aimed at freezing the assets of terrorists and their supporters, and at isolating them from the U.S. financial and commercial systems. Designations under the E.O. prohibit all transactions between the designees and any U.S. person, and freeze any assets the designees may have under U.S. jurisdiction.

IRGC-Qods Force (IRGC-QF): The Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to … Hizballah [and] Hamas ….

The Qods Force has had a long history of supporting Hizballah's … terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

Treasury's October 25, 2007 IRGC sanctions rollout was a momentous event in world news, and received widespread media coverage.

72. On October 25, 2007, as part of the U.S. government's public rollout of its designation of the IRGC-QF as an SDGT and of the IRGC (in its entirety) for weapons proliferation, Secretary of the Treasury Henry M. Paulson, Jr. publicly warned, *inter alia*:

a.    "Today, we are taking additional steps to combat Iran's dangerous conduct and to engage financial institutions worldwide to make the most informed decisions about those with whom they choose to do business. The Iranian regime's ability to pursue … missile programs in defiance of UN Security Council Resolutions depends on its access to the international commercial and financial systems. Iran also funnels hundreds of millions of dollars each year through the international financial system to terrorists."

b.    "Iran's banks aid this conduct, using a range of deceptive financial practices intended to evade even the most stringent risk-management controls."

c.    "In dealing with Iran, it is nearly impossible to know one's customer and be assured that one is not … facilitating the regime's reckless conduct."

d.    "The recent warning by [FATF], the world's premier standard-setting body for countering terrorist financing and money laundering, confirms the extraordinary risks that accompany doing business with Iran."

e.    "We have been working closely and intensely with our international partners to prevent one of the world's most dangerous regimes from developing the world's most dangerous weapons. Part of that strategy involves denying supporters of Iran's illicit conduct access to the international financial system; these actors should find no safe haven in the reputable world of finance and commerce."

f.    "We are also designating the Islamic Revolutionary Guard Corps for proliferation activities and its Qods Force for providing material support to … terrorist organizations. The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC."

g.    "We call on responsible banks and companies around the world to terminate any business with … all companies and entities of the IRGC."

h.    "As awareness of Iran's deceptive behavior has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be the bankers for this dangerous regime."

73.    On July 17, 2017, the United States announced new IRGC-related sanctions, and

warned that "[t]he United States remains deeply concerned about" how the "Islamic

Revolutionary Guard Corps (IRGC)" enabled "Iran's malign activities across the Middle East,"

because the IRGC "continues to support terrorist groups such as Hizballah."

74.    On August 2, 2017, Congress enacted, and the President signed, the Countering

America's Adversaries Through Sanctions Act, an amendment to the U.S. Code that formally

codified that "Congress makes the following findings: ... (2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the ''IRGC–QF'') … support[s] terrorist and insurgent groups [by] … provid[ing] material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia"; and "(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of … support for acts of international terrorism …." § 105, 22 U.S.C. § 9404, Pub. L. No. 115-44, 131 Stat. 892 (2017). Moreover, the updated U.S. Code noted "the IRGC, including the Quds Force … [provided] support, including funding, lethal and nonlethal contributions, and training, … to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East." § 103(b)(5), 22 U.S.C. § 9402, Pub. L. No. 115-44, 131 Stat. 889 (2017).

75.     On October 13, 2017, the United States designated the entirety of the IRGC as a Specially Designated Global Terrorist, and stated, in part, as follows:

a.     <u>Treasury</u>: "OFAC … designated [the] Islamic Revolutionary Guard Corps (IRGC) pursuant to the global terrorism Executive Order (E.O.) 13224 and consistent with the Countering America's Adversaries Through Sanctions Act. OFAC designated the IRGC today for its activities in support of the IRGC-Qods Force (IRGC-QF), which was designated pursuant to E.O. 13224 on October 25, 2007, for providing support to a number of terrorist groups, including Hizballah and Hamas …. The IRGC has provided material support to the IRGC-QF, including by providing training, personnel, and military equipment."

b.     <u>Treasury</u>: "'The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. … Treasury will continue using its authorities to disrupt the IRGC's destructive activities,' said Treasury Secretary Steven T. Mnuchin. 'We are designating the IRGC for providing support to the IRGC-QF, the key Iranian entity enabling … the lethal activities of Hizballah, Hamas, and other terrorist groups. We urge the private sector to recognize that the IRGC permeates much of the Iranian economy, and those who transact with IRGC-controlled companies do so at great risk.'"

c.     <u>Treasury</u>: "The IRGC was designated today for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."

d.    <u>White House</u>: "[T]he Iranian regime continues to fuel … terror … throughout the Middle East and beyond" through "[t]he Revolutionary Guard['s]" deployment as "the Iranian Supreme Leader's corrupt personal terror force."

e.    <u>White House</u>: "In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to … Hezbollah, Hamas, and other terrorist networks."

f.    <u>White House</u>: "The Revolutionary Guard … has hijacked large portions of Iran's economy and seized massive religious endowments [*i.e.*, bonyads or foundations, *e.g.*, the Foundation for the Oppressed] to fund … terror abroad. This includes … supplying proxies and partners with missiles and weapons to attack civilians in the region[] and even plotting to bomb a popular restaurant right here in Washington, D.C."

g.    <u>White House</u>: "I am authorizing … Treasury … to further sanction the entire [IRGC] for its support for terrorism and to apply sanctions to its officials, agents, and affiliates."

76.    On October 16, 2017, Treasury Under Secretary Sigal Mandelker publicly

confirmed how the entire IRGC was involved in supporting terrorist attacks in the Middle East

committed by Hezbollah, Hamas, and JAM:

a.    "[T]here are few more pressing national security concerns for the United States and the international community right now than the growing threat posed by … [t]he Iranian regime," which was "wreaking havoc on the Middle East and beyond" and providing "state support of terrorism" that was "second-to-none" by "financ[ing] and support[ing] Hizballah, Hamas, and … Iraqi … militant groups" by "seed[ing] these terror groups with increasingly destructive weapons as they try to establish footholds from Iran to Lebanon and Syria" and such "aid [was] primarily delivered by … the IRGC[] and its Quds Force, which … [existed as] vehicles to cultivate and support terrorists abroad."

b.    "The IRGC has even threatened terrorist attacks right here in the United States, plotting the murder of Saudi Arabia's Ambassador to the United States on American soil in 2011. Such an attack—if not thwarted by our terrific law enforcement and intelligence officers—would have not only killed a Saudi diplomat, but likely innocent bystanders here in Washington, DC."

c.    "[The United States's] Iran strategy … is designed to neutralize Iran's destabilizing influence and support for terrorists and militants. It includes four strategic objectives: First, we must neutralize Iran's destabilizing activities and constrain Iran's aggression, particularly its support for terrorism and militants with a focus on its activities in the Middle East …[,] includ[ing] its actions in Syria, which threatens Israel, and its support to terrorism through groups like Hizballah, Hamas, Iraqi Shia militant groups and others. Second, we must work to deny Iran and especially the IRGC funding for its malign activities, including its funding for terrorists and militant proxies …"

d.      "On [October 13, 2017], OFAC designated the IRGC for support to terrorism under Executive Order 13224, consistent with section 105 of the Countering America's Adversaries Through Sanctions Act passed in August. The President also authorized us to take additional action against the IRGC's officials, agents, and affiliates later this month. The IRGC designation … further increases the pressure on the IRGC. It also highlights the nefarious nature of the organization. Beyond being a proliferator of weapons and a supplier of militants and military equipment – actions for which it has been previously sanctioned by the United States – the IRGC has helped make Iran the world's leading state sponsors of terrorism."

e.      "The IRGC provides the organizational structure that allows them to export their militant extremism across the globe. It has been the Iranian regime's main weapon in pursuit of its radical goals and is a lifeline for Hizballah, … Shia militant groups in Iraq, and others. The IRGC's control over large portions of the Iranian economy furthers its ability to support these groups and enrich its members. In order to deny the IRGC the resources and financing it needs to spread instability, we must and we have been engaging our allies and partners, including those in the private sector."

f.      "[T]o deny the IRGC the resources and financing it needs to spread instability, we … have been engaging … the private sector. We have consistently raised concerns regarding the IRGC's malign behavior, the IRGC's level of involvement in the Iranian economy, and its lack of transparency. We have pointed out that the IRGC continues to be an integral part of the Iranian economy, including in the energy, construction, mining, and defense sectors. And as we have urged the private sector to recognize that the IRGC permeates much of the Iranian economy, we have told them that those who transact with IRGC-controlled entities do so at their own risk."

77.    On May 8, 2018, the United States announced new sanctions against the IRGC confirming:

> The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles … and supports terrorist proxies and militias such as Hezbollah [and] Hamas …. Over the years, [the IRGC] and its proxies have bombed American embassies and military installations, murdered hundreds of American servicemembers, and kidnapped, imprisoned, and tortured American citizens. The Iranian regime has funded [the IRGC's] long reign of chaos and terror by plundering the wealth of its own people.

78.    On October 1, 2018, the United States published its counterterrorism strategy, confirming that the IRGC continued to seek to leverage its global networks of financiers, logisticians, and recruits, including persons in the United States, to sponsor acts of terrorism targeting the United States:

Iran remains the most prominent state sponsor of terrorism, supporting militant and terrorist groups across the Middle East and cultivating a network of operatives that pose a threat in the United States and globally. These groups, most notably Lebanese Hizballah (Hizballah), use terrorism … in partnership with Iran to expand their influence in Iraq, Lebanon, [and] the Palestinian territories …. Hizballah fields powerful military and intelligence elements, possesses large stocks of sophisticated arms, and maintains extensive networks of operatives and sympathizers overseas, including individuals in the [United States] homeland.

79.    On October 11, 2018, Treasury's Financial Crimes Enforcement Network

("FinCEN") published its *Advisory On The Iranian Regime's Illicit And Malign Activities And*

*Attempts To Exploit The Financial System*, in which FinCEN warned multinational companies

and banks, including SCB, that whenever a company or bank enables the IRGC's "Abuse of the

International Financial System … to access the financial system through covert means and to

further [the IRGC's] malign activities [by] … misusing banks and exchange houses, operating

procurement networks that utilize front or shell companies, exploiting commercial shipping, and

masking illicit transactions using senior officials, … ***[o]ften, these efforts serve to fund the***

***regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard***

***Corps (IRGC) and its Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), as well to***

***Lebanese Hizballah, … and other [IRGC proxy] terrorist groups.***" Treasury's rollout

confirmed, *inter alia*:

a.    "[T]he Iranian regime has masked illicit transactions using senior officials of the CBI, who used their official capacity to procure hard currency and conduct transactions for the benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised to exercise appropriate due diligence when dealing with transactions involving exchange houses that may have exposure to the Iranian regime and/or designated Iranian persons, and the advisory details examples of exchange house-related schemes. Iran-related actors use front and shell companies around the world in procurement networks through which the Iranian regime has gained goods and services related to currency counterfeiting, dual-use equipment, and the commercial aviation industry."

b.    "In order to help financial institutions identify deceptive activity potentially linked to the Iranian regime, FinCEN has included red flags in its advisory. For example, CBI officials' routing transactions to personal accounts rather than central bank or

government-owned accounts, and individuals or entities with no central bank or government affiliation withdrawing funds from such accounts, may be a red flag for financial institutions to investigate. Similarly, wire transfers or deposits that do not contain any information on the source of funds, contain incomplete information about the source of funds, do not match the customer's line of business, or that involve jurisdictions where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions."

80.    On April 8, 2019, the U.S. announced its intention to formally designate the entire

IRGC—including Regular IRGC, the Qods Force, and the Basij—as an FTO, which the U.S. did

on April 15, 2019. During the rollout, U.S. officials warned, in part, as follows:

a.    <u>President Donald J. Trump, April 2019</u>: "Today, I am formally announcing my Administration's plan to designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act. This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign. This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. … If you are doing business with the IRGC, you will be bankrolling terrorism."

b.    <u>Secretary of State Michael R. Pompeo, April 2019</u>: "I'm here to make an important foreign policy announcement concerning the Islamic Republic of Iran. Today the United States is continuing to build its maximum pressure campaign against the Iranian regime. I am announcing our intent to designate the Islamic Revolutionary Guard Corps, including its Qods Force, as a foreign terrorist organization in accordance with Section 219 of the Immigration and Nationality Act. … This is the first time that the United States has designated a part of another government as an FTO. We're doing because the Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government. This historic step will deprive the world's leading state sponsor of terror the financial means to spread misery and death around the world. … Our [IRGC FTO] designation makes clear to the world that Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. He is the commander of the Qods Force and oversees Iran's forces deployed to advance the Islamic Revolution through terrorism and other forms of violence. He doles out the regime's profits to terrorist groups across the region and around the world. … [T]he mission of this [U.S.] designation [of the IRGC as a Foreign Terrorist Organization is] … to achieve the outcomes that we laid out back in May [2018] to … [stop the IRGC from] … risking American lives each and every day."

c.  State, April 2019: "The IRGC – primarily through its Qods Force – is the primary arm of the Iranian government that carries out and directs Tehran's dangerous and destabilizing global terrorist campaign. The IRGC provides funding, equipment, training and logistical support to a broad range of terrorist and militant organizations, totaling approximately one billion dollars annually in assistance. The IRGC has also been directly involved in terrorist plotting and related activity in many countries … The IRGC is integrally woven into the Iranian economy, operating front companies and institutions around the world that engage in both licit and illicit business activity. The profits from what appear to be legitimate business deals could end up … supporting Iran's terrorist agenda."

81.    On April 15, 2019, the United States designated the entire IRGC, including Regular IRGC, the Qods Force, and the Basij, as an FTO for, *inter alia*, "provid[ing] financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas …, Kata'ib Hizballah in Iraq, … and other terrorist group[s]…." In support, State concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Announcing the designation, Secretary of State Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks . . . alongside the terror group it midwifed, Lebanese Hizballah." Secretary Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors." As State reported to Congress in 2020, its "designat[ion]" of the "IRGC as an FTO in April 2019" was a "historic action" and "unprecedented step," which "reflected the Iranian regime's unique place among the governments of the world in its use of terrorism as a central tool of its statecraft."

82.    On January 14, 2020, President Trump implemented Executive Order 13,902, which imposed additional counterterrorism sanctions on the IRGC, and found, *inter alia*:

a.    "[The President] find[s] that Iran continues to be the world's leading sponsor of terrorism and that Iran has threatened United States military assets and civilians through the use of military force and support to Iranian-backed militia groups. It remains the policy of the United States to …counter the totality of Iran's malign influence in the region. In furtherance of these objectives, it is the policy of the United States to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and terrorist proxy networks …."

b.    "[The President] hereby determine[s] that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair the President's ability to deal with the national emergency declared in Executive Order 12957 [*i.e.*, the IRGC's sponsorship of acts of terrorism targeting the United States]."

83.    On March 26, 2020, Treasury announced new counterterrorism sanctions against the IRGC pursuant to E.O. 13,324 and reported findings as follows:

a.    "OFAC … today designated 20 Iran- and Iraq-based front companies, senior officials, and business associates that provide support to or act for or on behalf of the Islamic Revolutionary Guards Corps-Qods Force (IRGC-QF) in addition to transferring lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah (KH) and Asa'ib Ahl al-Haq (AAH). Among other malign activities, these entities and individuals perpetrated or supported: smuggling through the Iraqi port of Umm Qasr; money laundering through Iraqi front companies; selling Iranian oil to the Syrian regime; smuggling weapons to Iraq …; promoting propaganda efforts in Iraq on behalf of the IRGC-QF and its terrorist militias …. The terrorist militias supported by the Iranian regime such as KH and AAH have continued to engage in attacks on U.S. and Coalition forces in Iraq."

b.    "'Iran employs a web of front companies to fund terrorist groups across the region, siphoning resources away from the Iranian people and prioritizing terrorist proxies over the basic needs of its people,' said Treasury Secretary Steven T. Mnuchin."

84.    On May 1, 2020, the United States announced new counterterrorism sanctions against the IRGC and confirmed that "senior officials of [the] Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)" were "involved in IRGC-QF efforts to generate revenue and smuggle weapons abroad" through an IRGC front "company owned, controlled, or directed by" an IRGC member, thereby "violat[ing] [U.S.] sanctions and money laundering laws" by committing "crimes" that caused valuable "assets" to flow to "a foreign terrorist organization."

85.     The IRGC was unique amongst every FTO in at least one respect: the stability of its senior leadership. Aside from Ayatollah Khomeini, the IRGC's founding generation comprised men who were largely in their late teens and early 20s when the Islamic Revolution began in 1979. Most survived, and their relationships endured, throughout the period at issue here, including, but not limited to, Ali Khamenei, Qasem Soleimani, Mohammad Ali Jafari, Mohsen Rafiqdoost, Parviz Fattah, and Rostam Ghasemi. Indeed, the U.S. strike against Qasem Soleimani was the only time since 1979 that a Western power targeted and killed a senior IRGC leader. Consequently, from 2007 through 2017, every senior IRGC leader was either an IRGC Founding Father or part of the IRGC's first generation, *i.e.*, they were part of the IRGC when it was established in 1979. As Dr. Saeid Golkar (Professor, University of Tennessee at Chattanooga) and Kasra Aarabi (Tony Blair Institute) explained in 2021, "42 years after the Guard's establishment, all top [IRGC] commanders belong to the first [IRGC] generation, which is regarded as the most ideologically zealous cohort."

86.     Iran was without peer as a nation in which a transnational terrorist group operated in support of the government's terrorist objectives.[4] United States policy therefore "simply recogniz[es]" the "basic reality" that "[t]he IRGC" has a "rightful place on the same [terrorist] list as terror groups its supports: Lebanese Hizballah, … Hamas, Kata'ib Hizballah, among others, all of which are already designated as foreign terrorist organizations."

---

[4] Indeed, Iran and Afghanistan are the only two nations in which a transnational terrorist group currently exercises sovereignty, joined only by the Islamic State of Iraq and Syria ("ISIS" during its caliphate era from 2014-2017. In Afghanistan, that terrorist group is the Taliban (a Specially Designated Global Terrorist), including its Haqqani Network (a Foreign Terrorist Organization), which have asserted sovereignty over the entire country since 2021. In Iran, that terrorist group is the IRGC, including its subordinate parts, the IRGC Qods Force ("Qods Force" or "IRGC-QF") and the IRGC's Lebanese Hezbollah Division, which have asserted sovereignty since 1979.

**B.    Hezbollah**

87.    In 1982, the IRGC founded Hezbollah (Arabic for "Party of God"). Ever since, Hezbollah has served as the IRGC's most important terrorist proxy.

88.    From 1982 through 1989, Hezbollah members swore their loyalty to Ayatollah Khomeini. Ever since, Hezbollah members have sworn their loyalty to Ayatollah Khamenei.

89.    From 1982 through 1985, Hezbollah did not call itself Hezbollah. Instead, it called itself the name the IRGC gave it: "The Organization of the Oppressed on Earth."

90.    In 1985, Hezbollah published what it entitled an "Open Letter Addressed by Hezbollah to the Oppressed in Lebanon and the World," which is commonly referred to as Hezbollah's Manifesto. In it, Hezbollah announced, among other things:

a.    "We, the sons of Hezbollah's nation, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single, wise, and just command represented by the guardianship of the jurisprudent (*vali-e faqih*), currently embodied in the supreme Ayatollah … Khomeini. …"

b.    "No one can imagine the importance of our military potential as our military apparatus is not separate from our overall social fabric."

c.    "[The] first root of vice is America. … Imam Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."

After this, the group primarily called itself Hezbollah, although it continued to refer to itself as the Organization for the Oppressed as well as the Islamic Resistance, among other euphemisms.

91.    In 2011, Hezbollah General Secretary Hassan Nasrallah publicly stated: "We must not confuse the enemy with the friend. The enemy is the U.S. administration, and Zionist regime is its tool in the Middle East. … [T]he regional resistance movements [including Hezbollah] and deterrent states such [as] Iran … stopped the U.S. government plan for creating a new Middle East."

92.    Hezbollah, like its IRGC patrons, viewed attacks targeting Israel and Israeli civilians as inextricably connected to its efforts to target the ***United States*** to withdraw from the Middle East. Among other reasons, Hezbollah believed that the United States controlled Israel, that the United States could be punished, in effect, through attacks against its ally, and that—as Khomeini and Khamenei both emphasized—Israel comprised the "Little Satan" to the America's "Great Satan."

93.    Hezbollah General Secretary Nasrallah has publicly admitted, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." As the U.N. Security Council's panel of experts reported on December 30, 2016: "In a televised speech broadcast by Al-Manar television on 24 June 2016, the Secretary-General of Hizbullah [Hassan Nasrallah] stated that the budget of Hizbullah, its salaries, expenses, weapons and missiles all came from the Islamic Republic of Iran. … [T]hat statement … suggests that transfers of arms and related materiel from the Islamic Republic of Iran to Hizbullah may have been undertaken contrary to the provisions of annex B to resolution 2231 (2015)."

94.    Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were vital to financing Hezbollah's attacks. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress as follows:

> Iran is the 'central banker' of terrorism and a primary funding source for Hizballah. Because money is a terrorist group's oxygen, attacking terrorist financing is an essential element to combating terrorism. In that regard, we have made progress in impeding Iran's financial support for Hizballah and in undermining Hizballah's own financial network. …
>     The USG has long assessed that Iran provides technological, operational, and financial support and guidance to Lebanese Hizballah. The Iranian regime has for 27 years used its connections and influence with terrorist groups to combat U.S. interests it perceives as at odds with its own, and Hizballah has acted as a willing partner.

95.     On May 27, 2009, Treasury imposed sanctions targeting Hezbollah and confirmed

the Iranian regime's, including the IRGC's, continued key role in financing Hezbollah attacks:

> Treasury [] designated … supporters of … Hizballah …, under E.O. 13224.
> E.O. 13224 targets terrorists and those providing support to terrorists or acts of
> terrorism by … prohibiting U.S. persons from engaging in any transactions with
> them. "We will continue to take steps to protect the financial system from the
> threat posed by Hizballah and those who support it," said Under Secretary for
> Terrorism … Stuart Levey. … Iran … provide[s] significant support to Hizballah,
> giving money, weapons and training to the terrorist organization. In turn,
> Hizballah is closely allied with and has an allegiance to [Iran]. Iran is Hizballah's
> main source of weapons and uses its Islamic Revolutionary Guard Corps to train
> Hizballah operatives in Lebanon and Iran. Iran provides hundreds of millions of
> dollars per year to Hizballah.

96.     The IRGC and the SLO provided most of Hezbollah's budget, and directly

financed Hezbollah attacks through a range of vehicles, including salary and bonus payment to

Hezbollah leaders and attack cells, bounties for successful attacks, and martyr payments to the

families of dead Hezbollah terrorists. The Iranian regime funded acts of terrorism committed by

Hezbollah through an array of channels, including the SLO, IRGC (including Qods Force),

Foundation for the Oppressed (controlled by the IRGC and the SLO), the National Iranian Oil

Company ("NIOC"), the National Iranian Tanker Company ("NITC"), and Khatam al-Anbiya

("KAA"), including KAA's fronts. From 2007 through 2020, the Iranian regime did so by

collectively routing at least $200-$300 million per year—and sometimes much more than that—

to Hezbollah, most of which flowed through the above organs.

97.     Hezbollah's various subunits were closely interconnected, worked in tandem,

shared common sources of financing, and were run by the same people. There was never any

meaningful firewall between the intertwined components of Hezbollah. As Hezbollah spokesman

Ibrahim Mussawi publicly stated in 2013: "Hezbollah is a single large organization, we have no

wings that are separate from one another."

98.    Hezbollah ordinarily acted as the IRGC's interlocutor with its terrorist proxies, including Hamas in Israel and JAM in Iraq. Hezbollah provided expert training, technical assistance, and in-country support, often through joint cells co-located with Hamas (in Gaza, Lebanon, and Syria, among other places) and with JAM (in Baghdad and Basra, among other places).

99.    Hezbollah pioneered several signature attacks, including kidnapping, roadside bomb attacks using sophisticated devices known as explosively formed penetrators, and rocket attacks using 107mm rockets. The IRGC relied upon Hezbollah's experience and technical expertise to train other proxies, including Hamas and JAM, with respect to how to effectively conduct such attacks.

100.    Hezbollah also jointly committed some attacks alongside other Axis of Resistance members. For example, a joint Hezbollah-JAM cell committed the attack in Iraq in 2011 that killed Dr. Stephen Everhart, whose family members are Plaintiffs.

101.    Hezbollah played a vital planning role for IRGC proxies, including Hamas and JAM. Hezbollah had vast experience that the other groups lacked, and it drew on such experience to help such groups devise specific attack types, locations, and tactics. For example, Hezbollah taught Hamas and JAM how to effectively kidnap targets.

102.    Hezbollah has been an FTO since 1997.

**C.    Hamas**

103.    Hamas established itself in or about 1989 as a violent, global, Sunni Islamist group dedicated to destroying Israel and killing every Jewish person there.

104.    In or about 1990, Khamenei and the IRGC cemented a deep bond with Hamas. Ever since, Hamas has been the IRGC's second most notorious proxy, behind only Hezbollah.

105.    Hamas, like Hezbollah, viewed the United States and Israel as two inextricably connected enemies. For example, Hamas leaders regularly blamed Israeli counterterrorism operations targeting Hamas on the United States by pointing out that Israel buys most of its advanced weapons from America.

106.    Hamas needed money to conduct the attacks alleged herein. As a Hamas financial appeal in 2019 admitted: "The reality of jihad is the expenditure of effort and energy, and money is the backbone of war."

107.    The IRGC and the SLO provided most of Hamas's budget, and directly financed Hamas attacks through a range of vehicles, including salary and bonus payments to Hamas leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hamas terrorists.

108.    The Iranian regime funded acts of terrorism committed by Hamas through an array of channels, including the Qods Force, Hezbollah, the SLO, the Foundation for the Oppressed, and Bank Saderat. From 2007 through 2020, the Iranian regime did so by collectively routing between $50 million and $250 million per year to Hamas through the above organs.

109.    The Iranian regime's financial support was vital to Hamas's ability to conduct terrorist attacks. In 2007, for example, former Treasury official Dr. Matthew Levitt observed that "Hamas … is also a massive beneficiary of support from … Iran, [which] provide[s] direct state funding" to "sponsor" "terrorism" committed by Hamas. He continued:

> Iran is described by the CIA as "the foremost state sponsor of terrorism" and is Hamas' most important and explicit state sponsor. Israeli, British, Canadian, and Palestinian intelligence all concur with the U.S. conclusion that Iran directly aids Hamas with money, training camps, and logistical support. Estimates of Iran's financial assistance to Hamas vary, but there is unanimity on one score: the sum is significant.

110.     Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were

vital to financing Hamas's attacks—usually routing their aid through their most trusted proxy,

Hezbollah. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy

Coordinator at State, testified before Congress as follows:

> Hizballah supports … Palestinian terrorist organizations … [through] the covert
> provision of weapons, explosives, training, funding, and guidance, as well as
> overt political support … since at least 2000 … Hizballah actively foments
> terrorist activity that directly undermines [the peace process].

111.     Notably, the IRGC and the SLO had a famous "pay for performance" approach

with Hamas, under which the Iranians would ramp up their financial support for such groups to

reward them for successful attacks and incentivize future attacks at the same time. As Dr. Levitt

explained in 2007, "the specific sum [] fluctuates given circumstances on the ground; Iran is

known to employ a performance-based approach to determining the level of funding it is willing

to provide terrorist groups. As a U.S. court noted in *Weinstein v. Iran*, the period of 1995-1996

'was a peak period for Iranian economic support of Hamas because Iran typically paid for

results, and Hamas was providing results by committing numerous bus bombings."

112.     When the IRGC and SLO funded Hamas, they earmarked the money they

provided for use by Hamas's attack cells. In this way, Iranian money was uniquely lethal. As Dr.

Levitt explained in 2007:

> Unlike much of the [non-Iranian sources of Hamas] financing …, Iranian funding
> of Hamas is generally … ***directed straight to operational units***. According to a
> December 2000 Palestinian intelligence report confiscated by Israeli authorities,
> Iran had transferred $400,000 directly to Hamas' Qassam Brigades to specifically
> support "the Hamas military arm in Israel and encouraging suicide operations,"
> and another $700,000 to other Islamic organizations opposed to the PA.
>      According to a former Jordanian prime minister, "grassroots fundraising is
> really not enough for big Hamas operations. Most of the support [for such
> operations] is from Iran. Iran's money is more influential." A senior Fatah official
> and member of the Palestinian Legislative Council offered a similar assessment,
> saying that while "some of Tehran's money over the past three years [2001- 2004]

may go to supporting health and humanitarian services in Gaza," the bottom line
is that the "money from Tehran that goes to Hamas is for the political leaders of
Hamas and for the bombings, not for the Palestinians." (Emphasis added.)

113.    The IRGC also provided vital training to Hamas, often using both Hezbollah and

the Qods Force to provide extensive, multi-month, multi-location training to Hamas operatives.

The IRGC's and Hezbollah's provision of training to Hamas made Hamas more lethal and had a

direct impact on Hamas's ability to conduct attacks in Israel.

114.    The IRGC was also Hamas's most important source of weapons, for which the

IRGC usually used Hezbollah as its interlocutor with Hamas. For example, Hezbollah smuggled

IRGC-supplied weapons to Hamas and trained Hamas terrorists how to use them. The IRGC's

and Hezbollah's provision of weapons to Hamas made Hamas more lethal and had a direct

impact on Hamas's ability to conduct attacks in Israel.

115.    Hamas and Hezbollah have long cooperated on shared operations. Hamas jointly

planned some attacks with Hezbollah. For example, Hamas heavily leveraged Hezbollah's

technical skills, experience, training, and in-country operatives to plan and execute its

kidnapping operations.

116.    Like its IRGC patron, Hamas regularly violated the laws of war when it

committed its barbaric attacks. As Hamas scholar Jonathan Schanzer observed in 2021: "Hamas

was a brutal enemy" that routinely engaged in "'extra-judicial and willful killing,' including

incidents in which Hamas fighters pushed [captured rivals] off tall buildings."

117.    Hamas has been an FTO since 1997.

**D.    Jaysh al-Mahdi**

118.    Hezbollah and Muqtada al-Sadr established JAM in 2003 to serve as Hezbollah's

"striking arm in Iraq" (as Sadr put it) and provide an Iraqi face to Hezbollah-directed terrorist

attacks targeting Americans there.

119.    The IRGC and SLO provided a substantial percentage of JAM's budget, and directly financed JAM attacks through a range of vehicles, including payment to JAM leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead JAM terrorists.

120.    JAM served as Hezbollah's notorious terrorist agent in Iraq. JAM terrorists also publicly swore fealty to Hezbollah in two marches in Baghdad in 2006, during both of which thousands of JAM fighters publicly marched under Hezbollah's banners and photos of Hezbollah General Secretary Nasrallah while loudly chanting "We are Hezbollah" and "Jaysh al-Mahdi and Hezbollah are one." Sadr's decree that JAM was Hezbollah's "striking arm" and the two JAM marches described above were widely covered, in real-time, by the media.

121.    JAM jointly committed some attacks alongside Hezbollah, like the one that killed Dr. Everhart. It did so as part of joint Hezbollah-JAM cells in Iraq, which were directly funded by Hezbollah and the Qods Force.

122.    On July 2, 2009, the United States designated JAM Special Group Kata'ib Hezbollah as an FTO, designated Abu Mahdi al-Muhandis as an SDGT, and published detailed findings that Hezbollah and the Qods Force had played a vital role directing attacks committed by JAM in Iraq. This U.S. designation was widely reported worldwide.

123.    On January 3, 2020, the United States designated JAM Special Group Aas'ib Ahl al-Haq as an FTO, designated two of its leaders as SDGTs, and published detailed findings confirming AAH's close operational relationship with Hezbollah and the Qods Force.

II.    **Since 1979, The IRGC Sponsored Terrorism In The Middle East Through Proxy Attacks Targeting The United States Directly And Through Attacks On U.S. Allies, Including Israel And Iraq**

124.    In 2018, the United States found that, since "the early days of the revolution …, the one constant is that the Iranian regime will do whatever it takes to … spread its revolutionary

ideology … primar[ily] … [through] the Islamic Revolutionary Guard Corps (IRGC)." In 2018, State found that, through the IRGC, "[s]ince 1979, Iran's Islamic Republic has made it a policy of state to actively direct, facilitate, and carry out terrorist activity globally." Thus, as State found in 2018, "[f]or 40 years, the … Revolutionary Guard Corps has actively engaged in terrorism and created, supported, and directed other terrorist groups." As U.S. official Brian Hook explained on April 8, 2019: "When you study their 40-year history, it's impossible to allow the IRGC to continue to operate under this fiction that it's a benign part of the Iranian Government …, and it has been that way for decades." Equally unmistakable: that such terrorism increased alongside the IRGC's control of Iran's economy; as the DIA reported in 2019, "[t]he past 40 years have seen a growth in … increased IRGC political influence and control of key economic sectors."

125.    In 2015, Suzanne Maloney of the Brookings Institution observed: "It is tempting to view the Islamic Republic in isolation from its antecedents. … However, … [t]he salience of Iranian history requires that" even a "primary focus on the postrevolutionary era" in Iran should "begin as any serious analysis of contemporary Iran must, with an examination … of the long history of the Iranian state and the evolution of the economic and political conditions." To that end, Plaintiffs briefly identify key events in Iranian history that, among other things, confirm the plausibility of Plaintiffs' allegations, demonstrate a longstanding IRGC pattern and practice relevant to Plaintiffs' claims, or specifically alerted SCB as to the nature of their counterparties and/or the ultimate beneficial owners of the transactions SCB facilitated.

126.    The Axis of Resistance was birthed in Palestinian terrorist camps in south Lebanon throughout the 1970s, during which period radical Shiite and Sunni Islamist groups comprised of Iranians, Iraqis, Lebanese, and Palestinians lived, trained, and fought together. Future leaders of the IRGC and Hezbollah, including future IRGC founder and senior leader

Mohsen Rafiqdoost, future Hezbollah global attack cell leader Imad Mugniyeh, future senior JAM leader Abu Mahdi al-Muhandis, and a coterie of future leaders of Hamas were all co-located in the same camps, at which they built lifelong relationships that integrated these four strains of jihadists into one alliance. For example, infamous Hezbollah operations mastermind Imad Mugniyeh was originally Palestinian terrorist leader Yassir Arafat's personal bodyguard before he was successfully recruited by the IRGC to join Hezbollah. From these camps, Iranian terrorists supported Ayatollah Ruhollah Khomeini's—who was exiled in France—campaign to overthrow the U.S.- and Israel-supported Shah of Iran.

127.    On February 1, 1979, Khomeini and his followers returned to Tehran and commenced their Islamic Revolution. Ten days later, Khomeini had effectively secured power. Upon seizing power, Khomeini set to work creating the instruments of power upon which his Islamic Revolution would depend.

128.    On March 5, 1979, as one of his first moves, Khomeini seized the Pahlavi Foundation—which was the Shah's global charitable foundation that had assets and facilities all over the world—and renamed it "The Foundation for the Oppressed on Earth" also known as the Bonyad Mostazafan. This was no accident. For Khomeini, the "Oppressed on Earth" comprised Muslims in countries who needed to be "liberated" through Khomeini-sponsored terrorist violence, and his newly seized Foundation was specifically intended for that purpose. To that end, Khomeini installed his most trusted terrorist henchmen on the board of the Foundation for the Oppressed from inception, including Ali Khamenei. From inception, and ever since, the Foundation for the Oppressed has been inextricably connected to, and a vehicle for, the senior terrorist leaders who provided the muscle for Khomeini's terrorist agenda.

129.    On April 22, 1979, Khomeini ordered his personal bodyguard and key terrorist

leader, Mohsen Rafiqdoost, to organize the various terrorist militia that had supported him into

one integrated organization that was purpose-built to help Khomeini secure his Islamic

Revolution through terrorist violence. As Rafiqdoost himself later boasted in an interview with

Iranian state media in 2016:

> I wrote on a piece of paper: "The Islamic Revolution Guards Corps has been
> formed" and then wrote my name and asked everyone else to write down their
> names if they wanted to join the corps[] … Then I realized that three other groups
> have also formed their own IRGC. I invited their leaders to my office, locked the
> door, took out my gun and told them I would kill them and myself if they did not
> join the corps[] I had formed. We held meetings for several days, … [after which
> the] IRGC was officially formed.

Thereafter, by his own hand, Rafiqdoost authored the document creating the IRGC:



130.    Amongst Khomeini's and the IRGC's first order of business was to create an

external operations group that would sponsor terrorist attacks outside of Iran to "liberate" the

"Oppressed of the Earth" to "export the Islamic Revolution," which Khomeini and the IRGC

called the "Office of Liberation Movements." (In 1989, the Iranian regime restructured this effort by replacing the OLM with the Qods Force.)

131.    On November 4, 1979, Iranian students loyal to Khomeini took over the U.S. Embassy in Tehran, taking 52 Americans hostage and leading the U.S. to sever diplomatic relations with Iran. The crisis lasted 444 days before Khomeini released the hostages. Rafiqdoost later publicly admitted to having played a key role in this attack.

132.    The Iranian regime perceived that it won its hostage standoff with the United States—which formed the basis for all future regime strategy towards America. As Khomeini argued at the time, "this action," *i.e.*, the seizure of the U.S. embassy and American hostages, "has many benefits" given that "taking hostages has increased our credibility" and "we will get many concessions." As Secretary of State Pompeo observed four decades later on November 4, 2019: "Forty years later, the revolutionary regime in Tehran has proven, time and again, that its first acts after gaining power were a clear indication of its evil character. The regime continues to unjustly detain Americans and to support terrorist proxy groups like Hizballah that engage in hostage taking."

133.    By 1980, Khomeini and his IRGC praetorian guard had secured their power base and set out to murder their enemies, real and imagined. To that end, Khomeini signed a decree— which has been in force ever since—instructing the IRGC that purported enemies of the Ayatollah and the IRGC "are infidels and worse than blasphemers" who "have no right to life."

134.    On September 22, 1980, Saddam Hussein's regime in Iraq attacked Iran, launching the Iran-Iraq war, which the IRGC often called "The Imposed War." During the Iran-Iraq war, Khomeini appointed two of his most loyal terrorist lieutenants to command IRGC

forces: IRGC Brigadier General Ali Khamenei had a battlefield command, and IRGC

Commander Mohsen Rafiqdoost was appointed Minister of the IRGC.

135.    As an IRGC Brigadier General, Khamenei notoriously sponsored horrific attacks

that were themselves a form of terrorism against children. Under his notorious strategy, the

IRGC deployed hundreds of thousands of children as human mine sweepers, in effect, dressing

them in white (for their funeral) and marching them across minefields to their likely death. As

was widely reported, tens of thousands Iranian children brutally died. As Khomeini said, "Our

leader is that 12-year old boy: who, with his small heart, which is greater than hundreds of our

tongues and pens, with grenade in hand, threw himself under enemy tank and destroyed it and

himself, and thus drank the nectar of martyrdom." (SCB knew about this because, *inter alia*, the

Iranian regime plastered imagery of its child "martyrs" on Iran's currency, the rial, while SCB

had a branch there.)

136.    Throughout the Iran-Iraq war's eight-year duration, Khamenei and Rafiqdoost

served as the IRGC's two most prominent public faces, became infamous for their close

association with terrorism (including the use of children), and were the subjects of iconic

photographs that were widely displayed throughout Iran, and known to SCB through its presence

there. For example, below (at left), Khamenei visited his IRGC brothers while serving as a

battlefield commander, (at right) Khamenei "blessing" an IRGC-drafted Iranian child "martyr"

who was about to be sent to his likely death:

 

137.    Even while it fought Saddam Hussein's army, the Iranian regime remained singularly dedicated to exporting the Islamic Revolution through acts of terrorism targeting the United States, including by targeting America's closest ally in the Middle East: Israel.

138.    In 1982, Khomeini dispatched a team of his most trusted IRGC terrorists to Lebanon, which was led by Mohsen Rafiqdoost, supported by Khomeini's personal representatives, and funded by the Foundation for the Oppressed. Their mission: to organize a loyal Lebanese Shiite terrorist proxy for the IRGC so that the IRGC could sponsor attacks targeting the United States (inclusive of its allies like Israel) throughout the Arab world while having both an Arab face on the attack and plausible deniability for the Iranians. Khomeini, the IRGC, and the Foundation succeeded; they birthed Hezbollah in 1982 as their loyal proxy.

139.    On October 23, 1983, Hezbollah detonated a massive bomb provided by the IRGC, which killed 241 U.S. military personnel in a terrorist attack against the Marine Corps barracks in Beirut, Lebanon. On July 21, 1987, while discussing this attack in Iranian media, Rafiqdoost famously boasted that he and the IRGC directly enabled this attack: "The U.S. felt our power and knows the explosives mixed with that ideology that sent 400 officers and soldiers to Hell. Both the TNT and the ideology came from Iran. This is very much obvious for the U.S."

140.    On December 12, 1983, Hezbollah and the IRGC jointly committed another audacious attack targeting the United States, this time by bombing America's embassy in Kuwait. For this attack, Hezbollah and the IRGC worked closely with Abu Mahdi al-Muhandis, a dual Iranian-Iraqi national, and Hezbollah/IRGC asset, who would later play a key leadership role in Jaysh al-Mahdi.

141.    On August 20, 1988, the Iran-Iraq War ended. On June 3, 1989, Khomeini died, leaving the Islamic Republic without a Supreme Leader and the IRGC without an overall commander. These two rapid-fire events produced a power contest in Iran, in which there was no clear successor. In this mix, IRGC Brigadier General Ali Khamenei emerged as the IRGC's and hardline clerics' preferred candidate to succeed Khomeini. There was only one hitch: Khamenei did not have Khomeini's religious credentials, while the competition did. Khamenei had a simple solution: he threw his lot in with the IRGC, leaned heavily on them, and effectively promised a partnership with the IRGC if they backed his play. The IRGC did, and Khamenei succeeded Khomeini as Supreme Leader and overall commander of the IRGC and Hezbollah, a role that Khamenei has held ever since.

142.    During this period in 1989, Khamenei wooed the IRGC by promising several structural changes in how the Iranian regime would sponsor terrorism when he was Supreme Leader. *First*, Khamenei would direct a massive expansion of the IRGC's role in Iran's economy, as a vehicle for allowing the IRGC to self-finance its operations. (As part of this effort, Khamenei later approved the creation of IRGC megafirm Khatam al-Anbiya in or about late 1989 or early 1990.) *Second*, Khamenei would greatly expand the share of Iranian regime resources devoted to IRGC sponsorship of terrorism abroad, including through the IRGC's newly created (in 1989) Qods Force. *Third*, Khamenei would greatly expand the Iranian regime's

alliance with Palestinian terrorists, including the newly created group Hamas. Khamenei

delivered on each of these promises and has enjoyed an ironclad, inseparable bond with the

IRGC ever since.

143.    In 1990, Khamenei determined that the IRGC was not spending enough of the

money its fronts and charities raised on the IRGC's mission, *i.e.*, sponsoring terrorist attacks to

drive the United States out of the Middle East. To remedy this, and optimize the amount of cash

the Iranian regime could supply to its proxies, including Hezbollah and Hamas, Khamenei

created a new organization: the Supreme Leader's Office.

144.    Throughout the 1990s, the IRGC and the SLO gradually expanded their role in

Iran's economy while, in parallel, the IRGC intensified its attacks targeting the United States

worldwide, including in Europe, the Middle East, and Africa, among other places.

145.    In 1999, Khamenei tripled down on his support for Palestinian terrorists,

including Hamas, by greatly expanding the already sizeable aid the SLO and IRGC sent them; by

some estimates, the Iranian regime was supplying Hamas with $50 million annually by 2000. By

2001, Hamas leadership regularly visited Iran, had their own offices provided by the IRGC, and

coordinated Hamas operations in Israel from Iran by collaborating with representatives of the

SLO, IRGC, and Hezbollah who were based there.

146.    In June 2002, Khamenei met with Palestinian terrorists on the sidelines of an

Iranian-sponsored conference in Tehran explicitly designed to support Palestinian terrorist

attacks against Israelis that were known as the *intifada*. As Dr. Matthew Levitt reported in his

2007 book on Hamas:

> Khamene'i pledged to … increase … funding by 70 percent "to cover the expense
> of recruiting young Palestinians for suicide operations." U.S. officials note that in
> the period following the onset of violence in September 2000, Tehran instituted
> an incentive system in which millions of dollars in cash bonuses … were

conferred … for successful attacks. Tehran often demands of its terrorist beneficiaries videotapes or other evidence of successful attacks.

147.    By the fall of 2002, Khamenei and the IRGC correctly anticipated a U.S. military intervention in Iraq the following year. Accordingly, on September 9, 2002, Khamenei convened Iran's Supreme National Security Council in Tehran, which concluded, "It is necessary to adopt an active policy in order to prevent long-term and short-term dangers to Iran" from the imminent American occupation of Iraq next door. Thereafter, the IRGC, including its Qods Force, and the SLO worked closely with Hezbollah to stand up a Shiite terrorist organization in Iraq that was modeled after Hezbollah, trained by Hezbollah, and functioned as Hezbollah's notorious Iraqi branch, in effect.

148.    By late April 2003, the United States had invaded Iraq and deposed Saddam's regime. By then, Hezbollah had already worked with Muqtada al-Sadr to create JAM, which always tightly collaborated with Hezbollah thereafter.

149.    To finance this escalated campaign of terrorism, on June 8, 2003, the Iranian regime published an official directive ordering the IRGC to dedicate the profits it earned from its commercial fronts to its core mission, *i.e.*, protecting and exporting the Islamic Revolution through acts of terrorism ("Logistics Policy Directive"). The Logistics Policy Directive provided that with respect to the profits derived from whenever "any unit" of "the Islamic Revolutionary Guard Corps … and related organizations … sign[ed] contract agreements for civil projects," "[t]he monies received from any [such IRGC-related] contract … shall be deposited to the Chancery, and its equivalent shall be placed at authority of the [IRGC] from the credit determined in the annual budget, so that it would be used for the costs related to the [IRGC-related] contract, also the strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for its operations, *i.e.*, terrorism. Moreover, under the Directive, the

IRGC "can, proportionally to [the IRGC's] needs, exchange or sell excess material, and equipment and machinery" to finance IRGC operations.

150.    At bottom, the Logistics Policy Directive established—and was known by SCB to establish—an ironclad rule: the IRGC was authorized and encouraged to act as contractors in development schemes, subject to the requirement that any profit would be used to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, the IRGC's central anti-American terrorist mission under Iran's constitution. As a result, IRGC profits were required under Iranian law to be reinvested in the IRGC's specific lanes of activity that supported terrorism. The Logistics Policy Directive, in effect, mandated that IRGC profits derived from IRGC fronts be used primarily to enable IRGC-sponsored terrorism by providing off-the-books funding sources for key IRGC weapons programs—the entire point of the Logistics Policy Directive in the first place.

151.    From June 2003 through the present, the Logistics Policy Directive was always in force, always applied to profits generated for IRGC front companies by SCB, and always required that such IRGC profits be dedicated to sponsoring acts of terrorism.

152.    SCB knew about the Logistics Policy Directive because, among other reasons, SCB's Iranian personnel knew about it, SCB's in-house compliance and intelligence personnel knew about it, SCB was familiar with basic Iranian government pronouncements as part of its country-related diligence, and because media reports from at least 2007 onward alerted SCB to such fact because such reports regularly described the Directive as a potential IRGC-related compliance challenge for companies contemplating partnerships with IRGC-controlled entities.

153.    In October 2007, for example, Iran scholar Ali Alfoneh reported the sum and substance of Logistics Policy Directive and explained that the Directive was intended to help the

IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, IRGC-sponsored acts of terrorism.

154.    On May 25, 2010, likewise, Iranian expatriate media outlet *Peyk-e Iran* reported (as translated from Farsi) that "the IRGC … gradually expanded its power and influence since 1979" through fronts like "Khatam ol-Anbiya['s] … projects extended across weapons manufacturing, petrochemical plant, dams and bee-keeping, reflecting Iranian economy's dominance by a military-mafia institution," for which "the Logistics Directive" served "as a component of this expansion" because the Directive was an "'order that all IRGC units … must participate in civil projects as contractors,'" upon which the IRGC relied to assert the "IRGC's dominance in security … institutions, and IRGC companies' influence" through "IRGC-controlled companies" that controlled Iran's energy and communication sectors.

155.    Returning to the timeline, in 2005, while Khamenei and the IRGC were sponsoring the murder of Americans in Iraq, they also seized an opportunity in Israel. Specifically, by September 22, 2005, the Israeli government had fully withdrawn Israeli forces from their positions inside Gaza, ceding administration of the area to Palestinians. Khamenei, the IRGC, and SLO wasted no time: working through Hezbollah, they sponsored a massive surge of resources to Hamas to ensure that it could seize control of Gaza and turn it into an Iranian striking base directly under what the regime perceived to be Israel's soft underbelly. Within a year, the pace of Hamas attacks against Israeli civilians escalated dramatically, as a direct result of the Iranian regime's sponsorship.

156.    On June 7, 2007, Hamas launched a terrorist campaign to seize control of the Gaza Strip. Seven days later, Hamas's killings had done their job, and Hamas assumed clear control of all of Gaza. Immediately, it was apparent to the U.S. government—and SCB—that the

Iranian regime was behind Hamas's attacks. In 2021, for example, Hamas scholar Jonathan

Schanzer observed, in looking back on this era, that:

> Iran was widely suspected of being behind the orchestrated assault in Gaza. Iranian assistance had likely helped Hamas build tunnels and train fighters. Authors Beverly Milton-Edwards and Stephen Farrell were able to establish that Iranian support increased "exponentially" after the 2006 elections. Senior Hamas leader Mahmoud al-Zahar later admitted that Iran had given him $22 million in cash in 2006. Months before the Gaza takeover, Yuval Diskin, the head of Israel's Shin Bet, noted, "We know that Hamas has started to dispatch people to Iran, tens with the promise of hundreds, for months and maybe years of training." … Hamas leaders also later admitted that the group's fighters received training in Iran.
>
> During this time, the US government strove to prevent the flow of cash from Iran to Hamas. In July 2007, the US Treasury Department issued sanctions against Iran's Martyr's Foundation for funneling money from Iran to Hamas, among other groups. Later that year, Treasury targeted Iran's Quds Force and Bank Saderat for funding Hamas, along with Hezbollah and PIJ. Through these designations, Treasury's message was clear: Iran was providing Hamas with significant financial support.

157.    Meanwhile, in Iraq in 2007, the IRGC and SLO worked closely with Hezbollah—which served as their face, agent, and primary interlocutor with JAM—to intensify terrorist attacks targeting the United States there. Among other things, they intensified JAM's deployment—under Hezbollah's in-country supervision—of explosively formed penetrators, a bomb type that the U.K. government concluded in 2005 was associated "exclusively" with Hezbollah, meaning that Hezbollah played a direct role in every attack in Iraq that involved an EFP, which was based on Hezbollah designs and had been field-tested at scale by Hezbollah for the first time during its 2006 hostilities with Israel. On January 20, 2007, a joint cell comprised of Hezbollah and JAM that was funded and logistically aided by the IRGC, including the Qods Force, attacked the Karbala Provincial Joint Coordination Center in Iraq, which resulted in the kidnapping and murder of five U.S. soldiers, and was quickly confirmed by the U.S. and media outlets to have been an example of IRGC-sponsored, Hezbollah/JAM-committed attacks in Iraq. More broadly, the U.S. government conducted a "surge" in Iraq in 2007, which was focused

most of all on preventing Hezbollah and JAM attacks in Baghdad, during which Hezbollah and JAM escalated their use of EFP attacks against the United States in Iraq.

158.    In October 2007, the United States responded to the IRGC's and Hezbollah's twinned escalation of IRGC-sponsored terrorism by Hezbollah and Hamas in Israel and by Hezbollah and JAM in Iraq by formally recognizing the Qods Force for its direct, lethal support to acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, and JAM.

159.    On November 6, 2008, Treasury published a fact sheet intended to alert banks, including SCB, to the extreme risk that illicit Iran-related transactions processed through the U.S. banking system funded IRGC-sponsored acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, and Iraqi Shiite terrorists:

**<u>Iran Misuses the International Financial System to Support Terrorism</u>**

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas [and] Hizballah … maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups**. Elements of [the] … IRGC … have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East …. The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to … terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: … Hizballah; Palestinian terrorists; [and] certain Iraqi Shi'a militant groups …. The Qods Force is especially active in the Levant, providing … Hizballah with funding, weapons and training. It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. …

• **Iran Uses its Banks to Finance Terrorism**. … Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat . … Treasury … designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah [and] Hamas. . . . Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

• **Iran Lacks a Counter-Terrorist Financing Legal Regime**. In addition to its regime-directed support to terrorist organizations, Iran continues to lack a legal framework to counter the risk of terrorist financing and has not indicated a willingness to address this deficiency. The FATF's October statement on Iran notes that, while Iran has taken some steps towards implementing an anti-money laundering regime, there is a lack of even such a minimal corresponding effort by Iran in the area of counter-terrorist financing.

160.    On February 10, 2010, the United States imposed substantial additional sanctions on the IRGC and its economic fronts, including new sanctions targeting KAA, and stated, *inter alia*:

a.    "Treasury today took further action to implement existing U.S. sanctions against [the] IRGC … by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters."

b.    "Khatam al-Anbiya …, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … Treasury also today designated [] companies that are owned or controlled by, or that act on behalf of, [KAA]."

c.    "'As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. 'Today's action … will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.'"

d.    "The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in [*inter alia*] the … construction, and oil industries, controlling billions of dollars of business. The profits from these activities … support the full range of the IRGC's illicit activities, including … support for terrorism."

e.    "Elements of the IRGC have also been designated for UN sanctions pursuant to UN Security Council Resolutions (UNSCRs) 1737 and 1747. … The European Union has also designated IRGC-affiliated companies, including [KAA]…."

Treasury's February 10, 2010 IRGC sanctions rollout received widespread media coverage.

161.    On June 9, 2010, the U.N. Security Council adopted Resolution 1929, which the Council enacted only after formally: "[n]oting with serious concern the role of elements of the … IRGC … in Iran's proliferation sensitive … activities" and "noting the potential connection between Iran's revenues derived from its energy sector and the funding of Iran's proliferation-sensitive … activities." As SCB knew, Resolution 1929, like every other U.N. Security Council-related sanction targeting Iran, was primarily about halting the IRGC's ability to use its commercial fronts, including KAA, to finance and logistically support IRGC operations. Resolution 1929 imposed sweeping sanctions that specifically targeted the IRGC and its use of KAA, the IRGC's monopoly over Iran's oil and gas sector, and IRGC-controlled Iranian banks, to finance IRGC-sponsored international operations conducted by the Qods Force, including the Qods Force's acquisition and distribution of weapons of mass destruction, including missiles and nuclear weapons. Resolution 1929 created a comprehensive sanctions regime, which was directly based upon, referred to, and targeted, among others, Iran and the IRGC.

162.    Paragraph 8 of Resolution 1929 prohibited a wide array of IRGC weapons exports relating to missiles: "[A]ll States shall prevent the direct or indirect supply, sale or transfer to Iran, from or through their territories or by their nationals or individuals subject to their jurisdiction, or using their flag vessels or aircraft, and whether or not originating in their territories, of any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts, or items as determined by the Security Council or the Committee established pursuant to resolution

1737 (2006) ('the Committee'), decides further that all States shall prevent the provision to Iran

by their nationals or from or through their territories of technical training, financial resources or

services, advice, other services or assistance related to the supply, sale, transfer, provision,

manufacture, maintenance or use of such arms and related materiel, and, in this context, calls

upon all States to exercise vigilance and restraint over the supply, sale, transfer, provision,

manufacture and use of all other arms and related materiel."

163.    Resolution 1929's sanctions primarily targeted the IRGC and the IRGC's use of

Iran's oil sector and banks to finance weapons purchases and exports. As the U.K. House of

Commons observed on October 13, 2010, for example, Resolution 1929 was understood to focus

"especially on the Islamic Revolutionary Guard Corps (IRGC)." Paragraph 12 of Resolution

1929, for example, provided: "The Security Council … *Decides* that the measures specified in

paragraphs 12, 13, 14 and 15 of resolution 1737 (2006) shall apply also to the Islamic

Revolutionary Guard Corps (IRGC, also known as 'Army of the Guardians of the Islamic

Revolution") individuals and entities specified in Annex II, and to any individuals or entities

acting on their behalf or at their direction, and to entities owned or controlled by them, including

through illicit means, and calls upon all States to exercise vigilance over those transactions

involving the IRGC that could contribute to Iran's proliferation-sensitive … activities …."

164.    Annex II of Resolution 1929, in turn, alerted SCB that "Entities owned,

controlled, or acting on behalf of the Islamic Revolutionary Guard Corps" included KAA and a

broad array of IRGC oil fronts that SCB knew were participants in the same transactions it

financed by servicing IRGC fronts like Caspian Petrochemical, such as Oriental Oil Kish.

165.    Paragraph 22 of Resolution 1929 provided: "The Security Council … *Decides*

that all States shall require their nationals, persons subject to their jurisdiction and firms

incorporated in their territory or subject to their jurisdiction to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC …, and any individuals or entities acting on their behalf or at their direction, and entities owned or controlled by them, including through illicit means …."

166.    Resolution 1929 also targeted the IRGC's use of Iranian banks to finance IRGC operations. Paragraph 21, for example, provided: "The Security Council … *Calls upon* all States, in addition to implementing their obligations pursuant to resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, to prevent the provision of financial services, including insurance or re-insurance, or the transfer to, through, or from their territory, or to or by their nationals or entities organized under their laws (including branches abroad), or persons or financial institutions in their territory, of any financial or other assets or resources …." Paragraph 23, similarly, provided: "The Security Council … *Calls upon* States to take appropriate measures that prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also that prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction to prevent the provision of financial services …". Paragraph 24, likewise, provided: "The Security Council …*Calls upon* States to take appropriate measures that prohibit financial institutions within their territories or under their jurisdiction from opening representative offices or subsidiaries or banking accounts in Iran …."

167.    Resolution 1929 also created continuing reporting structures, such as paragraph 36, which mandated reports from the International Atomic Energy Agency.

168.    On June 16, 2010, Treasury sanctioned a wide swath of IRGC-controlled oil and gas firms—which Treasury described as its "First Set of Actions in Response to President

Obama's Call for Vigorous Enforcement of … Resolution 1929" and *inter alia*, sought to inhibit the IRGC's acquisition, redistribution, and use of some of the world's most dangerous weapons"—and warned SCB:

> Treasury announced … designations [comprising] … the first set of measures from the United States implementing UNSCR 1929 and building upon the actions mandated by the Security Council. … [and] highlight[ed] for the international community Iran's use of its financial sector, shipping industry and [IRGC] to carry out and mask its … activities, and respond to the Council's call for all states to … prevent their own financial systems from being abused by Iran. …

> <u>Islamic Revolutionary Guard Corps (IRGC)</u>
> Treasury today is targeting … [two] [o]il and [g]as … subsidiaries of Khatam al-Anbiya …, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. KAA [is] owned or controlled by the IRGC and is involved in the construction … [sector]. KAA was designated by Treasury under E.O. 13382 in October 2007 and most recently under UNSCR 1929. [The KAA oil and gas companies] were also sanctioned on June 9, 2010 by the United Nations with the adoption of UNSCR 1929.
> The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … construction[] and the oil industry … [including] … PETROPARS LTD …[,] [which] is an entity that is wholly-owned by NICO. On November 26, 2008, NICO, a subsidiary of NIOC, was identified by OFAC as an entity that is owned or controlled by the Government of Iran..

169.    A wide array of subsequent U.S. and U.N. reports and statements confirmed the tight nexus between violations of Resolution 1929 and IRGC-sponsored acts of terrorism. True, the U.S., U.N., and E.U. promulgated sanctions targeting the IRGC under several separate authorities, including based upon the IRGC's state sponsorship of terrorism through IRGC proxies, proliferation of lethal weapons like rockets and drones to IRGC proxies, and hostage-taking, kidnapping, and other similar abuses. At all times, however, SCB knew that all such U.S., U.N., and E.U. sanctions against the IRGC were intended to, and did in fact, reduce the risk of IRGC-committed acts of terrorism, and that SCB's violations of the applicable U.S., U.N., and

E.U. sanctions targeting IRGC weapons and human rights violations also enabled IRGC-sponsored acts of terrorism. At all relevant times, SCB knew that its illicit financial services that helped Iranian persons evade U.N. sanctions under Resolution 1929 directly enabled IRGC sponsored terrorist attacks in the Middle East.

170.    On June 22, 2010, for example, Under Secretary Levey testified before Congress that any bank's violations of UNSCR 1929 directly supported IRGC-sponsored terrorism:

a.    "With the adoption of [Resolution] 1929 …, the international community made clear that Iran's continued failure to meet its international obligations will have increasingly serious consequences. … [With respect to] the so-called pressure track of [United States] strategy [to deter IRGC-backed violence] … is intended to hold Iran accountable for its continued refusal to address the international community's concerns regarding its nuclear program, *as well as its support for terrorism* …. The adoption of Resolution 1929 marks an inflection point in this strategy, as it broadens and deepens existing sanctions programs on Iran and creates an opportunity for us to further sharpen Iran's choices."

b.    "Resolution 1929 … broadens the existing UN sanctions framework, and it is important to remember that each resolution builds upon earlier resolutions. Resolution 1929 enhances the international community's obligation to impose measures on Iran's financial sector, businesses owned or controlled by the … IRGC … Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to avoid the risks associated with business that supports the Iranian government's proliferation activity *and support for terrorism*."

c.    "[P]aragraph 22 of the Resolution [1929] obliges all states [to] require their nationals, persons subject to their jurisdiction and firms incorporated in their territory…to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC …. Treasury … today published a public advisory that explains the financial provisions of UNSCR 1929 and provides guidance on steps that can be taken to mitigate the tremendous risks underscored by the Security Council. Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to *avoid the risks associated with business that supports* the Iranian government's proliferation activity a*nd support for terrorism.*"

d.    "Resolution 1929 highlights. . . . the risks associated with providing financial services to Iran, makes it nearly impossible for financial institutions and governments to assure themselves that transactions with Iran could not contribute to [illegal IRGC] activities."

e.  "[P]aragraph 23 of the Resolution calls upon states to prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also [to] prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction [and] to prevent the provision of financial services if they have information that provides reasonable grounds to believe that these activities could contribute to Iran's proliferation-sensitive nuclear activities. Consistent with this, governments are to take steps to be certain that correspondent relationships with Iran cannot be used for illicit conduct. Given the information described above regarding Iranian banks' involvement in Iran's proliferation-sensitive activities, coupled with well-known information about Iranian banks' use of a range of deceptive conduct – such as concealing their identity by stripping their names from transactions – it is nearly impossible for governments to ensure that correspondent relationships with Iran are not abused for illicit purposes."

Terrorism scholars also publicly warned the world, including SCB, in real-time.

171.    Moreover, on June 22, 2010, FinCEN published an advisory—titled "*Update On The Continuing Illicit Finance Threat Emanating From Iran*"—that further alerted SCB (on pages 1-2) that its transactions designed to help Iranian customers evade UNSCR 1929 also supported IRGC-sponsored terrorism:

a.  "FinCEN[] is issuing this advisory to supplement information previously provided on the serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran, and to provide guidance to financial institutions regarding [Resolution] 1929, adopted on June 9, 2010."

b.  "UNSCR 1929 contains a number of new provisions which build upon and expand the financial sanctions imposed in previous resolutions (UNSCRs 1737, 1747, and 1803) and which are designed to prevent Iran from abusing the international financial system to facilitate its illicit conduct … [and it] … requires States to ensure their nationals exercise vigilance when doing business with any Iranian firm, including the … IRGC …."

c.  "These Security Council actions, in addition to [FATF] statements regarding the risks posed by Iran and calling for countries to impose countermeasures, illustrate the increasing risk to the integrity of the international financial system posed by:
    • the Iranian financial sector, including the Central Bank of Iran;
    • commercial enterprises that are owned or controlled by the IRGC, which was designated by the State Department under Executive Order 13382 in 2007; and
    • other Iranian entities supporting proliferation-related activities …"

d.  "Iran's record of illicit and deceptive activity, coupled with its extensive integration into the global financial system, increases the risk that responsible financial institutions will … become involved in Iran's illicit activities. Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian

banks, leaving Iran's financial institutions increasingly isolated. Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally."

e.     "Public sources indicate that Iranian banks operate globally, including seven state-owned commercial banks, four specialized government banks, and six privately owned Iranian financial institutions with more than four dozen overseas branches and subsidiaries in Asia, Europe, South America, and the Middle East. Many of these banks report significant relationships in key global financial centers. … Treasury is also concerned that Iranian banks (both designated and non-designated) are seeking to expand their international presence in order to circumvent the impact of sanctions on Iran's state-owned banks, presenting a risk that Iran's illicit conduct will shift to those banks that are able to maintain ties to the international financial sector."

172.    The U.N.'s real-time public reports pursuant to Resolution 1929 also alerted SCB that SCB's transactions with Iranian customers designed to evade Resolution 1929 directly enabled Qods Force and Hezbollah-sponsored proxy attacks. On June 4, 2012, for example, the Security Council reported that—with respect to the IRGC's oil- and gas-related entities subject to sanctions under Resolution 1929—that:

Some Member States have informed the Panel that the [Islamic Revolutionary Guard] Corps also controls informal economic channels. In particular, some Iranian charitable organizations (foundations) controlled by the Corps are believed to support the Corps' economic activities, including provision of informal channels for business transactions. Such foundations include the Islamic Revolutionary Guards Corps Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the Foundation of the Oppressed (Bonyad-e Mostazafan), both of which include incumbent and/or former officers of the Corps as board members.

As SCB always knew, the Foundation for the Oppressed and the IRGC Cooperative Foundation were both notorious IRGC fronts; the former was a notorious, and direct, front for Hezbollah and Qods Force operations, *infra* at Part IV.C, while the latter was a well-known, notorious front for the IRGC's other elements that also served to finance Hezbollah, the Qods Force, and their proxies. On June 1, 2015, similarly, the Security Council reported pursuant to Resolution 1929 that, with respect to the sanctioned persons targeted by UNSCR 1929, "media reports point[ed]

to continuing [Iranian, including Qods Force] military support and alleged arms transfers to the

Syrian Arab Republic, Lebanon, Iraq, … and to Hizbullah and Hamas" and "further note[d] that

Iranian officials … [did] not deny[]" providing such "military support" to any of the above-

identified IRGC terrorist proxies.

173.    Contemporaneous warnings from terrorism scholars and Members of Congress

also alerted SCB that violations of sanctions under U.S. and U.N. counterproliferation

authorities, including UNSCR 1929, that targeted the IRGC foreseeably enabled IRGC-

sponsored acts of terrorism committed by IRGC proxies, including Hezbollah and Hamas,

because even though the U.S. government's sanctions announcements distinguished between

terrorism and proliferation, SCB knew, as did any other sophisticated participant in the Iranian,

financial services, and U.S. markets, that the on-the-ground realities in Iran, Dubai, Lebanon, and

throughout the geographies in which where the IRGC and Hezbollah fronts engaged in

transactions to fund terrorism, both groups used all firms designated under the proliferation

sanctions to enable terrorist attacks. On February 16, 2007, for example, former Treasury official

Dr. Matthew Levitt warned:

> Last week, … Ayatollah Khamenei threatened to hit back at U.S. interests
> "worldwide" if attacked … [through the] IRGC ….
>     The question of the day is how to … confront[] [Iran] over its … support
> for terrorist groups and its involvement in improvised explosive device (IED)
> networks in Iraq. U.S. officials are pressing their European counterparts to
> discourage investment and financial transactions with Iran … and to work with
> the private sector to deny Iran access to outside financial services. …
>     And therein lies the answer. The most robust and effective non-military
> tool available to the international community is to apply Resolution 1737 in full.
> While many pundits blasted UNSCR 1737 as toothless and ineffective, its full
> implementation would employ travel bans and targeted financial sanctions against
> the very tool of Iranian foreign policy responsible for the regime's unacceptable
> conduct: the IRGC.
>     The annex to the resolution listing entities involved in Iranian proliferation
> activity does not include the IRGC. But two key leaders, IRGC commander Major
> Gen. Yahya Rahim Safavi and IRGC air force chief General Hosein Salimi, are

listed …. Under the resolution, … by virtue of listing the overall head of the IRGC …, the U.N. empowered a strict reading suggests it requires member states to freeze IRGC funds and financial assets.

The IRGC … provid[es] funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq. …

Moreover, the IRGC controls vast financial assets and economic resources. While most of the actual funds and assets are in Iran and beyond seizure, the IRGC's business and industrial activities especially those connected to the oil and gas industries are heavily dependent on the international financial system. Consider, for example, the $2.09 billion contract to develop parts of the South Pars natural-gas field, or the $1.3 billion contract to build parts of a pipeline, both meted out to the IRGC's engineering arm, the Khatam-ol-Anbia. …

A simple reading of Resolution 1737 requires member states to apply financial measures against the financial assets and economic resources controlled by the head of the IRGC. Moreover, targeted financial measures against the IRGC … pulls at the purse strings of the specific element of the Iranian bureaucracy responsible for the regime's most egregious behavior.

174.    A colloquy between Dr. Levitt and Representative Ted Deutsch during the

former's testimony before Congress on March 4, 2014 was instructive of SCB's knowledge

throughout the era from 2007 through 2017:

REP. DEUTCH: "[I]n the area of banking sanctions, … can you contrast sanctions that exist with respect to the nuclear area and sanctions that exist for terror funding? … [D]o the sanctions that are in place with respect to Hezbollah and terror funding go as far as in the … nuclear area [*e.g.*, U.S. counterproliferation sanctions and UNSCR 1929]? And if not, why not?"

DR. LEVITT: "… [I]n a nutshell, the vast majority … of the banking sanctions are technically proliferation sanctions. Saderat is the … only one I can think of right now, that's actually a terrorism basis. ***But it's not like Hezbollah uses this bank for terrorism and this bank for proliferation.*** And whatever the reason, ***it has the impact across the board***. … ***I'm less concerned with which executive order is used -- terrorism or proliferation or others -- to effect the change***. …"

REP. DEUTCH: "… You said most of the banking sanctions that exist now are focused on proliferation. … [W]hy would we draw that distinction between proliferation and terror financing, … Dr. [Levitt]?"

DR. LEVITT: "More often than not, it just has to do with what information is most readily available, without declassifying really sensitive stuff, that can underscore the designation. So if there's a bad bank, one of the things that will be

looked at is, what's the world of information that's available and what can be most easily made public and available?"

175.    On July 1, 2010, President Obama signed the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"), Pub. L. No. 111-195, 22 U.S.C. § 8501, *et seq.*, which provided, *inter alia*:

a.    22 U.S.C. § 8501(1): "Congress makes the following findings: (1) The … Government of Iran['s] … support for international terrorism[] represent a threat to the security of the United States."

b.    22 U.S.C. § 8513(a): "Congress makes the following findings: (1) [FATF] is an intergovernmental body whose purpose is to develop and promote national and international policies to combat money laundering and terrorist financing. … (4) The [FATF] has repeatedly called on members—(A) to advise financial institutions in their jurisdictions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions; (B) to apply effective countermeasures to protect their financial sectors from risks relating to money laundering and financing of terrorism that emanate from Iran; (C) to protect against correspondent relationships being used by Iran and Iranian companies and financial institutions to bypass or evade countermeasures and risk-mitigation practices; and (D) to take into account risks relating to … financing of terrorism when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions. (5) At a February 2010 meeting of [FATF], [FATF] called on members to apply countermeasures 'to protect the international financial system from the ongoing and substantial … terrorist financing … risks' emanating from Iran."

c.    22 U.S.C. § 8519: "SENSE OF CONGRESS REGARDING IRAN'S REVOLUTIONARY GUARD CORPS AND ITS AFFILIATES. It is the sense of Congress that the United States should—(1) persistently target Iran's Revolutionary Guard Corps and its affiliates with economic sanctions for its support for terrorism …; (2) identify, as soon as possible—(A) any foreign individual or entity that is an agent, alias, front, instrumentality, official, or affiliate of Iran's Revolutionary Guard Corps; (B) any individual or entity that—(i) has provided material support to any individual or entity described in subparagraph (A); or (ii) has conducted any financial or commercial transaction with any such individual or entity; and (C) any foreign government that—(i) provides material support to any such individual or entity; or (ii) conducts any commercial transaction or financial transaction with any such individual or entity; and (3) immediately impose sanctions, including travel restrictions, sanctions authorized pursuant to this Act or the Iran Sanctions Act of 1996, as amended by section 102 of this Act, and the full range of sanctions available to the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), on the individuals, entities, and governments described in paragraph (2)."

176.    The sum and substance of this avalanche of sanctions between late 2007 and the end of 2010 was simple: the entire landscape of U.S. policy towards Iran was transformed through a series of new findings concerning the inextricable connection between a bank that transacts with IRGC fronts and the latter's ability to sponsor attacks.

## III.    The Supreme Leader's Office And IRGC Seized Sector-Wide Monopolies In Key Iranian Markets To Power The Terrorist Attacks Of IRGC Proxies

177.    From 2007 through 2020, the IRGC, Supreme Leader's Office, and their associated Foundations and fronts, notoriously controlled well over half of the entire Iranian economy, and some estimates ranged as high as 85%. Indeed, the U.S. government has concluded similarly. In 2021, for example, Treasury observed that the Supreme Leaders's and IRGC's collaborative post-2007 economic takeover alerted banks, like SCB, that such IRGC- and Supreme Leader-related entities were collectively "said to control more than half of the Iranian economy." This provided the context for the Supreme Leader's and IRGC's shared strategy to support violence by funneling profits from monopolies to IRGC proxies.

178.    Between 2005 and 2009, using fronts they controlled, the IRGC and SLO orchestrated a monopolistic takeover of key components of Iran's economy. Contemporaneous reports confirmed as much. For example, per a DoD analysis published on October 12, 2011:

> The IRGC's expansion beyond the roles and tasks traditionally associated with military or security services is most pronounced in its dominant role in Iran's economy. Speaking at the change of command at the *Khatam ol-Anbia* Base Complex, IRGC commander [Mohammad Ali] Jafari bluntly summarized his position, "The IRGC must play a leading role in the nation's economic fronts." Referencing the IRGC's role in the Iran-Iraq war, Jafari further rationalized the IRGC's economic responsibilities, "The IRGC actually goes into areas of activity the other sectors cannot do, as in [Iran-Iraq] war where … the IRGC had the duty to go on the battlefield with all its being. We are doing the same thing today in economic areas." …
>
> Through [the IRGC's] complex network of foundations and their subsidiary banks, assisted by generous subsidies, the IRGC has diligently expanded its business holdings at a deep discount. The true private sector only gained 19% of the "privatized" public assets, while the cooperatives consumed

68% of the resources. The IRGC has systematically militarized rather than privatized the Iranian economy.

179.    After the U.S. inaugurated the new era of sanctions targeting IRGC-sponsored terrorism with its designations of the IRGC, Bank Saderat, Bank Melli, and associated persons in October 2007, the SLO and the IRGC responded to the new sanctions era by leaning heavily into Iran's longstanding tolerance of monopolies, by seizing entire economic sectors and awarding them to the IRGC. Ayatollah Khamenei's strategy was simple: keep the IRGC loyal through industrial sector-scale bribes in the form of the Ayatollah's provision of monopolies to the IRGC in key Iranian industrial sectors that overlapped with the IRGC's terrorist mission. As the *Christian Science Monitor* reported in 2009, "[Ayatollah] Khamenei … had to pay dearly for such [IRGC] backup, however, says [Ali] Alfoneh [of the American Enterprise Institute]. 'The IRGC's support for [Ayatollah] Khamenei does not come cheap, and he has had to bribe the IRGC with economic monopolies,' [said Alfoneh] … The result has been a 'very deep and symbiotic relationship with the supreme leader, and [the IRGC] have used the Ahmadinejad administration to not just solidify their hold on power, but to enrich themselves at the same time,' says [Alireza] Nader of RAND." Others reported similar findings. Ayatollah Khamenei's strategy leveraged a pre-existing feature of Iran's economy: the heavy tendency towards monopolies dating back to the Shah, which trend continued at all relevant periods. As the *Economist* alerted SCB in 2011, "Iran's economy" was "[a]lmost entirely reliant on oil receipts, unproductive and monopolistic" at the same time "the Revolutionary Guard's commercial divisions [took] over ever larger bits of the economy."

180.    From 2007 through 2009, the SLO and the IRGC rapidly seized monopolistic shares of key sectors of Iran's economy, which seizures were all complete by the end of 2009.

181.    U.S. government-published statements alerted SCB to such risks in real time. On July 26, 2006, for example, Dr. Kenneth Katzman, a Middle East Specialist, Congressional Research Service, testified before Congress that "key [Iranian] leaders and factions have gained a substantial measure of control over major segments of the Iranian economy, avoiding virtually any official transparency or accountability," which allowed "Iran's leaders … to steer the proceeds of parts of the economy to provide patronage." In 2009, similarly, seven (U.S. government-funded) RAND Corporation Iran scholars publicly observed "the IRGC's … monopolization of key business sectors" in Iran. Likewise, in 2009, a State report about Iran warned that its "hard-line clerical establishment … grew wealthy through its control of bonyads … that monopolize[d] many sectors of [Iran's] economy …."

182.    Such real-time warnings also directly warned SCB that the IRGC's ability to leverage its control of entire sectors of Iran's economy directly funded IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and other IRGC proxies. On October 6, 2009, for example, Treasury Under Secretary for Terrorism Stuart Levey testified before Congress that:

> In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects, including developing the South Pars gas field …. Furthermore, the IRGC seeks to monopolize black-market trade of popular items, funneling the proceeds from these transactions through a patronage system and using them to help subsidize the government's support for terrorist groups.

On June 22, 2010, Treasury Under Secretary Levey testified before Congress that "the Revolutionary Guards … has provided material support to … Lebanese Hizballah, Hamas, … and others," the needed funding for which compelled the IRGC to "assume[] control over broad areas of the Iranian economy."

183.    Terrorism scholars also concluded that the IRGC seized monopolies during this period to support its proxies' acts of terrorism.

184.    The Supreme Leader and IRGC strategy for monopolization focused on key sectors: they did not seek to control the entire economy, just those sectors that were inextricably connected to the IRGC's ability to sponsor terrorism. Consequently, from 2007 through 2020, the IRGC notoriously exercised a monopoly over certain IRGC "exclusive sectors" of Iran's economy, including Iran's oil, gas, construction, import/export, and communications sectors. As Dr. Michael Rubin testified on April 19, 2016:

> [T]he IRGC … maintains a stranglehold over trade and the economy and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. Here the problem is … Khatam al-Anbiya, the IRGC's economic wing. To understand what Khatam al-Anbiya is, picture the U.S. Army Corps of Engineers combined with Bechtel, Halliburton, KBR, Shell, Exxon, Boeing, and Northrop-Grumman, all rolled up into one. Today, Khatam al- Anbiya monopolizes heavy industry, shipping, electronics, manufacturing as well as import-export. All together, it controls perhaps 40 percent of the Iranian economy. …
>
> Under former President Mahmoud Ahmadinejad, IRGC-linked companies received upwards of $50 billion in no-bid contracts in the oil industry alone. In short, even if President Hassan Rouhani were to take the IRGC's official budget to zero, it would be facing less of a budget cutback proportionately than the U.S. military has through sequestration. …
>
> Iran today has at its disposal a hard currency windfall which will enable it to support proxies to pursue its ideological goals with an ease that it has not enjoyed in decades.
>
> Against this backdrop of Iranian empowerment, it is important that the United States recognize that responding to Iranian bluster and complaints with incentive and greater access to the U.S. and European investment and financial markets is counterproductive to regional security. It is also essential to recognize the depth of IRGC involvement in almost every sector to which U.S. and European firms might consider investing. To bolster both U.S. security and that of Israel and other American regional allies requires draining rather than augmenting IRGC coffers. This will ultimately mean ... greater vigilance absent diplomatic subjectivity to IRGC commercial involvement and terror finance …

185.    On October 22, 2017, the *New York Times* likewise reported that "Khatam Al Anbiya … is the most important economic arm of Iran's elite Islamic Revolutionary Guards

Corps." It is, the *New York Times* reported, "a giant construction company [that] direct[ed] its operations across Iran, building mosques, airports, oil and gas installations, hospitals and skyscrapers," "led by a military commander" (*i.e.*, IRGC Commander Mohammad Ali Jafari), and was part of the IRGC's "monopoly on large sectors of the economy."

186.    Despite the substantial nature of the IRGC's and SLO's involvement throughout Iran's economy from 2007 through present, Plaintiffs do not allege that the IRGC monopolized every—or even most—segments of Iran's economy. While the IRGC and SLO had substantial interests in every Iranian economic sector, they only exercised a monopoly in certain sectors, including the six sectors alleged herein. Among other Iranian market sectors, the IRGC exercised influence but **did not** have a monopoly in, *inter alia*: (1) Accounting; (2) Agriculture; (3) Domestic Retail; (4) Foodstuffs and Groceries; (5) Legal Services; (6) Music; (7) Publishing; (8) Real Estate; (9) Restaurants and Hookah Bars; (10) Textiles; and (11) Utilities.

187.    Below, plaintiffs identify six relevant IRGC market segment monopolies that provided the context for SCB's transactions alleged herein: (1) Energy; (2) Construction; (3) Sanctions Evasion; (4) Finance; (5) Import/Export; and (6) Communications.

**A.    The Energy Sector: Oil, Gas, and Petroleum-Based Products**

188.    The Supreme Leader's provision of monopolies to the IRGC began in the energy sector, and for good reason: as a U.S. government-published analysis of the IRGC later warned, "[b]y far, the IRGC's greatest economic instrument is its influence over the energy sector, which accounts for over 80% of the regime's revenue."

189.    In June 2006, the Supreme Leader and the IRGC effectively announced their intention to monopolize Iran's energy sector when they caused the awarding of the largest energy project in Iranian history—its South Pars field, which connected to Caspian routes via pipeline—to notorious IRGC firm Khatam al-Anbiya.

71

190.    Indeed, an IRGC general signed for the cameras on behalf of Khatam al-Anbiya, which photo was then circulated throughout global media by the IRGC's Mehr News Agency:



191.    Public testimony by U.S. officials confirmed that the IRGC seized South Pars as part of its plan to monopolize Iran's oil sector. On July 26, 2006, for example, Dr. Kenneth Katzman, a Middle East Specialist, Congressional Research Service, testified before Congress that "the Revolutionary Guard['s] … motivations for expanding its economic role are apparently to provide rewards for senior officers, and to generate revenue to supplement the budget allocated to the Guard by the government. The Guard has formed contracting firms to bid on government projects, using its strong political influence to win business. In one recent example, one of the firms owned by the Guard, called 'Ghorb,' [*i.e.*, Khatam al-Anbiya] is being awarded a $2.3 billion deal to develop two phases of Iran's large South Pars gas field. Most of the other phases have been awarded to well-known multi-national energy firms, and the work given to Ghorb [KAA] had originally been awarded to Norway's Aker Kvaerner, but was re-tendered.

This suggests that the Guard exerted political influence to win the [South Pars] contract and take it away from what most industry experts would consider a more capable firm."

192.    In June 2008, the SLO and IRGC further cemented their monopoly over all Iranian petroleum-related assets when Ayatollah Khamenei decreed that the Foundation for the Oppressed—which was a front shared by the SLO and IRGC—would be responsible for negotiating, collecting, and redistributing all funds associated with Iranian petroleum exports.

193.    When SCB deliberately helped Iranian entities evade sanctions targeting their sponsorship of terrorism, SCB knew that the Supreme Leader and IRGC had seized a monopoly in Iran's energy sector, operationalized through, *inter alia*, the SLO, the Foundation for the Oppressed, and Khatam al-Anbiya (including their respective agents and affiliates). Having seized their energy monopoly in 2006, the SLO and the IRGC aggressively sought to expand their respective reach into their newfound monopoly from 2007 through 2011 by vertically integrating the SLO's and IRGC's fronts, operatives, and agents throughout all energy firms and projects in Iran or subject to Iranian investment outside of Iran.

194.    By spring of 2011, the SLO's and IRGC's shared monopoly over Iran's entire oil and gas industry—including associated construction, financing, shipping, and logistics—was officially enshrined in a new joint SLO/IRGC entity that had full control, supervision, and ownership of all Iranian companies operating in Iran's oil and gas sector.

195.    On March 10, 2011, Ayatollah Khamenei decreed that **all** oil and gas contracts would be awarded by Petro Nahad, a newly created front established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC, including IRGC leaders like Commander of the Qods Force Qasem Soleimani (who received a direct cut of SLO/IRGC oil profits) and Soleimani's counterpart, Commander of the IRGC Mohammad Ali Jafari (who was a

direct, and publicly identified, beneficiary of SLO/IRGC oil profits derived from trades routed through the UAE, necessarily including all of SCB's UAE-related oil and gas-related transactions alleged herein). They did so by creating Petro Nahad, which was a supervisory entity under the SLO's auspices that was assigned complete authority over all energy projects, deals, companies, and decisions in Iran. Simply put, on March 10, 2011, Ayatollah Khamenei made official the SLO's and IRGC's previously understood effective monopoly on the Iranian oil and gas sector, which the IRGC and SLO had fully accomplished by 2006.

196.    Real-time reports by the United States, terrorism scholars, human rights groups, and Iranian media outlets alerted SCB that the SLO and IRGC created Petro Nahad and used it to exercise a full monopoly over Iran's energy sector, and directly financed the activities of overall IRGC commander—and notorious Hezbollah, Hamas, and JAM supporter—Mohammad Ali Jafari. On May 3, 2011, for example, *Iran Press News* reported:

> On March 10, 2011, Khamenei decreed that all oil field projects, contracts and oil purchase agreements must be made exclusively by Petro Nahad. All existing companies and organizations responsible for such deals – Petro Sina Arya, Petro Pars, National Iranian Drilling Company (a subsidiary of the National Iranian Oil Company), and the Industrial Development and Renovation Organization (IDRO) – would henceforth operate under Petro Nahad's direct control.
>
> All contracts relating to gas and oil would now be awarded solely by Petro Nahad. All revenues would be deposited exclusively into an account belonging to Petro Nahad.
>
> Khamenei further directed that all of Petro Nahad's financial and administrative affairs be assigned to a three-man board of directors, two of whom are members of his family. Those members are: Mojtaba Khamenei, the Supreme Leader's son; Gholamali Haddad Adel, a member of the regime's Expediency Council who happens to be Mojtaba Khamenei's father-in-law; and Majid Hedayatzadeh.
>
> Fazel Larijani, a member of the famous family allied with the Supreme Leader and former diplomat in Ottawa, and Hojatollah Ghanimi Fard, a deputy oil minister since 1997 in charge of marketing for crude oil and NIOC's overseas divisions, were appointed as international affairs directors for Petro Nahad. …
>
> Any Petro Nahad contract is considered confidential, with strict prohibitions against their disclosure. Even though Petro Nahad is a government entity, the contracts are not available to parliament's budget committee.

<u>Revolutionary Guards commander gets some of the spoils</u>
        Fazel Larijani recently brought Revolutionary Guards (IRGC) Commander Mohammad Ali Jafari in on Petro Nahad deal with the United Arab Emirates. The deal reportedly would sell the UAE oil products below market price in exchange for $89 billion in cash and $89 billion in imported consumer goods from Dubai over a 23-year period.

<u>Opportunity for the opposition</u>
        The upside to this opaque, corrupt, nepotistic control of Iran's oil wealth is that the scheme makes it easier for Western democracies to impose sanctions on the regime's oil sector. All they have to do is embargo Petro Nahad and its subsidiaries.

197.     On May 24, 2012, State publicly warned that "The oil sector was embroiled in financial scandal throughout the year." In so doing, State effectively vouched for the *Iran Press New*'s May 3, 2011 report above:

> In May [2011,] [Iranian] opposition Web sites reported that on March 10, [2011,] [Ayatollah] Khamenei decreed that all oil and gas contracts would be awarded by Petro Nahad, a new entity established within his office and not subject to parliamentary or regulatory oversight. All revenues would be deposited into an account belonging to that organization. Further, according to these reports, all administrative and financial decisions of Petro Nahad were to be controlled by a three-person board of directors, whose members included Khamenei's son, Mojtaba Khamenei, and Gholamali Haddad Adel, a member of the Expediency Council and Mojtaba's father-in-law.

198.     Terrorism scholars also publicly reported, in real-time, that the SLO and IRGC used Petro Nahad to deepen and optimize their extraction of cash from their energy monopoly in order to finance acts of terrorism. On June 4, 2013, for example, IRGC scholars Emanuele Ottolenghi and Saeed Ghasseminejad warned that the Supreme Leader had appointed "Gholam Ali Haddad Adel, … the father-in-law of the Supreme Leader's son, Mojtaba Khamenei …[,]to the board of directors of Petro Nahad alongside his son Mojtaba" when "Khamenei himself recently established Petro Nahad to control all energy-sector contracts, thereby evading any

parliamentary oversight or public scrutiny" throughout "[t]he country's energy sector" in response to "the weight of [United States counterterrorism] sanctions."

199.    The United States publicly confirmed the SLO's and IRGC's seizure of a monopoly over the Iranian energy sector as a tool for financing terrorism. On October 13, 2011, for example, Treasury Under Secretary Levey publicly warned:

> Sanctions have also led to the IRGC taking over key aspects of Iran's economy, exacerbating the cronyism and corruption that pervades the Iranian regime. We have seen this in a number of areas. Khatam al-Anbiya, the U.S.-, EU-, and [U.N. Security Council]-designated engineering arm of the IRGC, has been recruited to develop key energy resources. The IRGC, through its sanctioned affiliates Bonyad Tavon Sepah and Mehr Bank, took over Tidewater, a port operator that until a few years ago had been privately owned. And President Ahmadinejad recently appointed Rostam Ghasemi, a U.S. and EU-designated IRGC commander and former leader of Khatam al-Anbiya, as Minister of Oil. This appointment was applauded by the IRGC, which characterized Ghasemi's new role as a "meaningful and critical response to the attacks against the [IRGC] from the west[] …." … Furthermore, the inclusion of the IRGC throughout the Iranian [energy] economy has opened up Iran to greater pressure through sanctions.

200.    Looking back on this era in 2019, Iran scholar Khosrow Semnani observed that Khamenei's sponsored "power and money grab by the … IRGC" was completed by "2009":

> Under the guise of evading sanctions, an oil mafia with ties to the IRGC, and acting with the blessing of Iran's supreme leader, consolidated its grip over the Iranian state. Billions in no-bid contracts were awarded to the IRGC by the Petroleum Council … established in the Oil Ministry in 2006. Yet, despite the significance, scale and volume of these contracts, Iran's oil and gas sector operated as a closed and incestuous system rigged in favor of insiders. Under the guise of 'destroying Israel' …, IRGC cronies positioned themselves to benefit from sanctions. All they had to do was to sell Iran's oil, in unknown quantities, at a discount and pocket the difference by importing goods at a premium. For these thieves of state, … the shadow of sanctions … served as both the excuse and opportunity for pillaging Iran's oil sector.

201.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's petroleum sector and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order

13,846, which imposed sector-wide sanctions targeting the energy sector in Iran based on a

formal finding that all revenue generated by Iran's petroleum industry funded Iranian regime-

sponsored terrorist attacks committed by IRGC proxies in the Middle East:

a.    "[T]o advance the goal of applying financial pressure on the Iranian regime in pursuit of a comprehensive and lasting solution to the full range of the threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates, [I] hereby order as follows: …"

b.    "Sec. 2. Correspondent and Payable-Through Account Sanctions Relating to Iran's Automotive Sector; Certain Iranian Persons; and Trade in Iranian Petroleum, Petroleum Products, and Petrochemical Products. (a) The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to impose on a foreign financial institution the sanctions described in subsection (b) of this section upon determining that the foreign financial institution has knowingly conducted or facilitated any significant financial transaction: (i) on or after August 7, 2018, for the sale, supply, or transfer to Iran of significant goods or services used in connection with the automotive sector of Iran; (ii) on or after November 5, 2018, on behalf of any Iranian person included on the SDN List (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599) or any other person included on the SDN List whose property and interests in property are blocked pursuant to subsection 1(a) of this order or Executive Order 13599 (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599); (iii) on or after November 5, 2018, with NIOC or NICO, except for a sale or provision to NIOC or NICO of the products described in section 5(a)(3)(A)(i) of ISA provided that the fair market value of such products is lower than the applicable dollar threshold specified in that provision; (iv) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran; or (v) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petrochemical products from Iran."

202.    Since 2006, reports and statements published by the United States, Iranian regime,

Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its energy sector-

related transactions concerning an Iranian deal, project, and/or counterparty (including oil, gas,

and associated financing, construction, shipping, and logistics) that participated in the IRGC's

monopoly over the oil and gas sector, including South Pars, supported IRGC-sponsored terrorist

violence committed by IRGC proxies given the IRGC's monopoly on the sector. Such warnings

included, but were not limited to (emphases added):

a.   *Sharq* (Iranian Newspaper), June 30, 2006: "Some members of [Iran's parliament] … sent a written note to [President Ahmadinejad] with regard to the reason for the award of a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars… to the [IRGC] . This note was read out at yesterday's open session of [parliament]. Recently, a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars …, was signed between the Petroleum Ministry and the IRGC, without inviting any tenders. The [Iranian parliamentarians] … called for an inquiry into the manner of the award of the above contract, and its financial sources. ... ***In conclusion, the members of [parliament] … have elaborated: Will not the delegation of economic projects, be construed as a monopoly of oil-sector projects in the hands of the IRGC, and the awarding of political privileges by the government?***"

b.   *Inter Press Service*, December 29, 2009: "News that [the] … Revolutionary Guard Corps is withdrawing a billion dollars from the country's Foreign Reserve Fund in order to complete Phases 15 and 16 of the gigantic South Pars gas project has generated concern among Iranian analysts, who believe the move reveals the [IRGC]'s excessive power over Iran's economy. In view of looming sanctions from the United States and the United Nations Security Council … , the IRGC's control over the country's sensitive oil, and gas and nuclear industries could provoke a serious crisis, they warn. … In 2006, … [Khatam al-Anbiya] took on the National Gas Company's 90-kilometre Asalouyeh-Iranshahr pipeline project in Iran's Sistan and Baluchistan provinces, a contract worth 1.3 billion dollars. Another large project the Oil Ministry awarded to IRGC is the South Pars Gas Field Development Project's Phases 15 and 16. At 2.97 billion dollars, the contracts were awarded to [KAA] two years ago, bypassing the tender process. However, the IRGC firm was unable to finish the project in time. Jamshid Asadi, an economics professor at the American University in Paris, said that the latest action by IRGC culminates its aggressive efforts to monopolise key state projects over the last six years. … [KAA] … is currently under sanctions by the European Union and the United States. 'The economic dominance of the IRGC over gigantic gas and oil projects has made Iran's economy extremely vulnerable towards [a] new round of sanctions on the country's financial institutions and oil industry,' the source said."

c.   *Economist Intelligence Unit*, April 30, 2010: "Under President Ahmadinejad, the … IRGC … has enjoyed a substantial increase of its economic power. On several occasions, the IRGC won lucrative contracts in fields ranging from oil and gas to telecommunications. For example, … in 2005, [Ahmadinejad] granted a no-bid development contract for Phases 15 and 16 of South Pars …, the world's largest gasfield. The contract amounted to over US$7bn, to [KAA], the construction arm of the IRGC. The contract was in violation of government norms that require a competitive process. … [Iran's] Foreign Investment Promotion and Protection Act (FIPPA) specifically prohibits foreign investors from having a monopoly over any specific sector or market … [but grants] state monopolies in such industries as oil, defence, … and [the] state-sanctioned monopolies of bonyads …."

d.   *APS Diplomat News Service*, January 9, 2012: "[T]he IRGC runs its own economy which is totally independent and booming. … IRGC's Khatem ul-Anbia' …, a huge engineering and construction company, now has a quasi monopoly on key sector[s] such as that of

petroleum. … Petroleum Minister Gen Rustam Qassemi is a former IRGC chief and until he took up the oil portfolio he was the head of [KAA]."

e.  Ali Alfoneh (American Enterprise Institute), April 1, 2013: "The IRGC … has become a moneymaking machine … [in part through] Iran's oil and gas sector, which has hitherto been the monopoly of the National Iranian Oil Company, [and] has become the ultimate prize of the IRGC."

f.  *Australian*, March 25, 2014: "[The IRGC's energy monopoly extends] beyond petroleum production to [encompass] all aspects of the Iranian energy sector, which is fully controlled by the congressionally blacklisted Islamic Revolutionary Guards Corps."

g.  *Iran Briefing*, September 22, 2014: "Oil and Gas Sectors: The IRGC has a major stake in the petrochemical industry, including oil refineries, drilling companies, the National Iranian Oil Company (aka 'NIOC'), Arvandan Oil & Gas Company, and the National Iranian Tanker Company. It has almost full control over the oil ministry and oil trading, and most aspects of the wider oil industry. Khamenei's immediate family members own a major portion of this sector."

h.  *APS Review Downstream Trends*, December 22, 2014: "[Iranian President Hassan] Rowhani added: 'Continuation of corruption and the spread of corruption [in Iran] would mean the system and fundamentals of the revolution are in danger'. Iran … [was] a country where state institutions such as the IRGC exert control in businesses [transacting] … oil sales. Rowhani went on to say: 'Monopoly is the cause of corruption and we must fight against monopolies. Anything which does not have rivalry or whose management is monopolised is flawed'."

i.  Barak Seener (Jerusalem Center for Public Affairs), December 2018: "The IRGC stands to benefit [from transactions with Western companies and banks] … due to its monopoly of [] Iranian econom[ic] …… sectors including oil and gas [and] petrochemicals …."

203.    Additional public reports subsequently confirmed what had already been clear,

*i.e.*, that the IRGC had a complete monopoly over Iran's energy sector, including oil and gas.

204.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously,

exercised their monopoly over all Iran-related energy transactions, including every such

transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew

were on behalf of Iran-related persons, and concerned energy, SCB knew, or was willfully blind,

that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC

could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

### B.    The Construction Sector

205.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's construction sector, operationalized through, *inter alia*, the SLO, Foundation for the Oppressed, and KAA (including their respective agents and affiliates). Having seized their linked monopolies in these sectors by 2007, the SLO and the IRGC aggressively sought to expand their respective reach into these monopolies from 2007 through 2011 by vertically integrating the SLO's and IRGC's fronts, operatives, and agents throughout every significant construction firm and project in Iran or subject to Iranian investment outside of Iran.

206.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's construction sector and used such monopoly to fund terrorist attacks by IRGC proxies. On January 10, 2020, for example, President Trump signed Executive Order 13,902, imposing sector-wide sanctions targeting Iran's construction sector based on a formal finding that all revenue generated by the "construction … sector[] of the Iranian economy" funded Iranian regime-sponsored attacks by IRGC proxies in the Middle East.

207.    Beginning in 2007, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related construction transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned construction, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

C.    **The Sanctions Evasion Sector: Black Market, Smuggling, and Shipping**

208.    In Iran, sanctions evasion was an industrial sector with dedicated practitioners, firms, strategies and the like and primarily comprised three sub-sectors: (1) the black market; (2) smuggling and port operations; and (3) transnational shipping and logistics. The SLO and IRGC always exercised a monopoly over the sanctions evasion sector of Iran's economy, as Plaintiffs define it herein, which they operationalized through, *inter alia*, the SLO, IRGC (which controlled many ports), Foundation for the Oppressed (which controlled many ports), and every IRGC front alleged herein.

209.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's inextricably linked sanctions evasion, smuggling, and black market sectors, and used such monopoly to fund terrorist attacks by IRGC proxies. On April 8, 2011, for example, State reported to Congress that "[t]he IRGC is [] widely considered to control the vast majority of [Iran's] underground and black market economy" and "[u]p to 80 percent of illegal goods enter [Iran] through unregistered ports and jetties controlled by the IRGC."

210.    Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its Iranian black market- and smuggling-related transactions supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's monopoly on the Iranian black market and smuggling. As RAND scholars reported in 2009, "the IRGC" exercised "control of Iran's shadow economy" including "the illicit smuggling networks." Other such warnings included, but were not limited to:

a.    *CNBC*, December 8, 2010: "One third of all imported goods in Iran are delivered through the IRGC controlled illegal black market according to [a] member of [Iran's parliament]. The IRGC cuts out all competition in this field, jailing and intimidating Iranians dealing in black market goods so the Guard itself has a virtual monopoly."

b.     <u>Dr. Michael Rubin, April 19, 2016</u>: "[T]he IRGC … maintains a stranglehold over trade … and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. … Today, Khatam al-Anbiya monopolizes … shipping …"

c.     <u>*DT News*, August 14, 2018</u>: "[D]espite the accumulation of international sanctions after 2005, Iran's paramilitary spending similarly mushroomed; partly because the Islamic Revolutionary Guard Corps filled its coffers through monopolizing sanctions-evading networks in oil, heavy arms, narcotics and basic goods."

211.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related black market, smuggling, and shipping transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned black market, smuggling, or shipping, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

### D.    The Financial Sector: Banks, Currency Exchanges, And Hawalas

212.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's financial sector, which comprised Iranian banks, currency exchanges, and hawalas, operationalized through, *inter alia*, the SLO, the Foundation for the Oppressed, Khatam al-Anbiya (including their respective agents and affiliates), and the Central Bank of Iran. These entities, collectively, owned and/or exercised direct or indirect control over all banks, currency exchanges, and hawalas in Iran.

213.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's banks and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13,846 based upon the Executive branch's finding that U.S. dollar-denominated transactions with any person

supervised by "the Central Bank of Iran"—Iran's financial regulator, which always controlled all Iranian banks—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

214.    On September 20, 2019, similarly, Treasury sanctioned the Central Bank of Iran, and confirmed its findings that the Qods Force and Hezbollah controlled CBI and used it to finance their attacks as well as those of their proxies, including Hamas:

> [OFAC] … act[ed] against the Central Bank of Iran (CBI) … under its counterterrorism authority, Executive Order (E.O.) 13224. Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah. …
> "Treasury's action targets a crucial funding mechanism that the Iranian regime uses to support its terrorist network, including the Qods Force, Hizballah, and other militants that spread terror and destabilize the region. … Iran's repressive regime … attempts to achieve its revolutionary agenda through regional aggression while squandering the country's oil proceeds," said Treasury Secretary Steven T. Mnuchin. "Iran's Central Bank … [was] ostensibly intended to safeguard the welfare of the Iranian people, but have been used instead by this corrupt regime to move Iran's foreign currency reserves for terrorist proxies." …
>
> **CENTRAL BANK OF IRAN FUNDS THE IRGC, ITS QODS FORCE AND HIZBALLAH**
> Today's action targets the CBI for its financial support to the IRGC-QF and Hizballah. In May 2018, OFAC designated the CBI's then-Governor Valiollah Seif, and the Assistant Director of the International Department Ali Tarzali, for facilitating financial transfers for the IRGC-QF and Hizballah. Also, in November 2018 and as part of Treasury's disruption of an international oil-for-terror network, OFAC designated the CBI's International Department Director Rasul Sajjad, and the CBI's International Department Director, Hossein Yaghoobi, for conducting financial transactions for the IRGC-QF.
> Since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC-QF to facilitate CBI's financial support to the IRGC-QF. In 2017, the IRGC-QF oversaw the transfer of tens of millions of euros to Iraq from the CBI. Then-Governor of the CBI Valiollah Seif directed the transfer. …
> CBI has [] coordinated with the IRGC-QF to transfer funds to Hizballah.
> OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF and Hizballah.

> The IRGC-QF, … is … responsible for [the IRGC's] external operations and has provided material support to numerous terrorist groups, including … Hizballah [and] HAMAS ….

215.    On February 14, 2024, similarly, Treasury imposed additional counterterrorism sanctions against the Central Bank of Iran pursuant to E.O. 13,324, and confirmed, *inter alia*:

> OFAC … sanctioned a procurement network responsible for facilitating the illegal export of goods and technology from over two dozen U.S. companies to end-users in Iran, including the Central Bank of Iran (CBI), which is designated for its role in providing financial support to the … [Qods Force] and Hizballah. …
> "The Central Bank of Iran has played a critical role in providing financial support to the IRGC-QF and Hizballah, two key actors intent on further destabilizing the Middle East," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "The United States will continue to use all available means to disrupt the Iranian regime's illicit attempts to procure sensitive U.S. technology and critical inputs."

216.    From 2009 through 2020, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its transactions with Iranian banks supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of total control over all Iranian banks after 2007. In 2009, for example, seven RAND scholars warned, in a U.S. government funded research paper, of "the IRGC's … monopolization of key financial sectors." Other such warnings to SCB included, but were not limited to:

a.    *Al Arabiya*, August 19, 2010: "Iran's Supreme National Security Council has granted the … Revolutionary Guards more powers to expand and maintain its control of the economy, Al Arabiya TV reported, stating informed sources. …[,] [and] issued a resolution stipulating the appointment of a representative of the [IRGC] … in the Board of Directors of Iran's Central Bank, [per] reliable government sources … According to the resolution, no decisions can be taken at the bank without the approval of the [IRGC] representative. … The decisions also coincide with harsh criticism by leading reformist and presidential candidate Mehdi Karroubi against Khatam al-Anbiya, the construction unit of the [IRGC], and its monopoly over the most substantial of business transactions in the industry and economy sectors. … 'The private sector is no longer able to compete as the economy is monopolized by the Revolutionary Guard,' he said."

b.      <u>Dr. Majid Rafizadeh (Harvard International Review), August 12, 2016</u>: "[T]he IRGC and the office of the Supreme Leader, Ayatollah Khamenei [*i.e.*, the SLO], maintains [a] monopoly over [Iran's] wealth and financial system."

c.      <u>Perviz S. Khazai (National Council of Resistance of Iran), April 22, 2019</u>: "[IRGC] members … loot[] … [Iran]'s wealth to support their policy of exporting the 'Islamic revolution' and destabilization in the Middle East. … The IRGC … has monopolized the lion's share of the Iranian economy since 2005 [including] … finance, speculation, [and] banking … This entity … is the financier and gunsmith of Hezbollah in Lebanon [and] barbaric militias in Iraq …."

d.      <u>National Council of Resistance of Iran, April 2022</u>: "The consequent economic configuration is defined by at least 14 major economic powerhouses [including the Foundation for the Oppressed and Khatam al-Anbiya] either directly or indirectly controlled by Khamenei, the IRGC, or a combination of their affiliates. When it comes to banks, financial and credit institutions, insurance, the stock market, domestic and foreign commerce, real estate, and the financial instruments market, Khamenei's office [*i.e.*, the SLO] (along with the IRGC) has taken control of virtually everything that matters. … [T]he astronomical profits … end[] up funding … IRGC mercenaries and [IRGC] terror operations in … Iraq … and … around the world. Foreign investors cannot in practical terms avoid entanglement by affiliation in the Iranian regime's support for terrorism …. In reality, the back-breaking control of the Supreme Leader and the IRGC, over the economic system … [means that even though] Western companies engaged in economic and financial deals with Iran would like to portray their activities as transactions with the 'private sector[]' …, behind the official banks and companies lies a web of institutions controlled by the theocracy, and specifically the IRGC. Western companies … cannot avoid the reality that today the gatekeepers to Iran's economy are those who … export the very terrorism … that threaten[s] the West."

217.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related bank, currency exchange, and hawala transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned banks, currency exchanges, or hawalas, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

### E.    The Import/Export Sector

218.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's import/export sector, which was comprised of Iranian importers and exporters who typically had affiliated entities outside of Iran, operationalized through, *inter alia*, the SLO, Foundation for the Oppressed, Khatam al-Anbiya (including their respective agents and affiliates), and the Central Bank of Iran. These entities, collectively, owned and/or exercised direct or indirect control over all banks, currency exchanges, and hawalas in Iran.

219.    Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its import- and export-related transactions concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's and SLO's assumption of a monopoly over Iran's import/export sector. Such warnings included, but were not limited to:

a.    *Economist*, February 2, 2013: "[T]he Revolutionary Guard … enjoys … a virtual monopoly over imports."

b.    Dr. Michael Rubin, April 19, 2016: "IRGC … maintains a stranglehold over trade and the economy and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. … Today, Khatam al-Anbiya monopolizes … import-export."

c.    Perviz S. Khazai (National Council of Resistance of Iran), April 22, 2019: "[IRGC] members … loot[] … [Iran]'s wealth to support their policy of exporting the 'Islamic revolution' … in the Middle East. … The IRGC … has monopolized the lion's share of the Iranian economy since 2005 … [including] … import and export … [and] … is the financier and gunsmith of Hezbollah … [and] barbaric militias in Iraq …."

d.    *Eurasia Review*, August 15, 2020: "The drop in foreign currency revenue [shows] … the plundering [of Iranian wealth] by corrupt bands affiliated to the … IRGC … and Khamenei himself. … This mafia band [comprised of] … the IRGC and The Executive Headquarters of Imam [*i.e.*, the SLO], which belongs to Khamenei, is clinging on to Iran's import and export trade like an octopus, with exclusive control over it, causing immense corruption. … The wealth of bodies and institutions under the control of Iran's Supreme Leader, Ali Khamenei, is estimated at hundreds of billions of dollars. Today the majority of banks, industries, mines, communication enterprises, and financial institutions are under the exclusive ownership of Khamenei and the [IRGC]. Each year tens of billions of dollars are drained out of the country through the mullahs' and IRGC's

corruption and looting, being spent on the regime's terrorism and its proxies in Iraq, Syria, … and Lebanon. This has gone so far that the United States has issued an ultimatum that it will close its embassy in Baghdad unless the regime's proxies are brought to account for their consecutive attacks on [U.S.] embassies and convoys."

e.    National Council of Resistance of Iran, April 2022: "When it comes to … domestic and foreign commerce … Khamenei's office (along with the IRGC) has taken control of virtually everything that matters. … [T]he astronomical profits … end[] up funding … IRGC … terror operations in … Iraq … and … around the world."

220.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related import/export companies, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned imports to Iran and/or exports from Iran, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

**F.    The Communications Sector: Telecoms, Internet, And Related Technology**

221.    The SLO and IRGC began their seizure of the communications sector when it seized control of Irancell—Iran's most important internet and telecoms company—in 2005. The SLO and IRGC completed their seizure of the communications sector in 2009, when they collaborated to help the IRGC purchase the Telecommunications Company of Iran. By 2009, the Supreme Leader and IRGC had seized a monopoly in Iran's communications sector, which was comprised of Iranian telecoms, internet, social media, and computing, and communications technologies firms, operationalized through, *inter alia*, the SLO, Foundation for the Oppressed, and Khatam al-Anbiya (including their respective agents and affiliates). These entities, collectively, owned and/or exercised direct or indirect control over all communications companies in Iran.

222.    From 2009 through 2020, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its communications-related transactions (including landline and mobile telecoms, internet, computing, social media, and associated technologies) concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of a monopoly over the Iranian communications sector. Such warnings to SCB included, but were not limited to:

a.    Ali Alfoneh (American Enterprise Institute), October 22, 2007: "The IRGC rooted its rhetoric on [seizing telecoms companies] in national security. … the IRGC expects to maintain its dominant position not only on the battlefield, but in civilian sectors as well. … Because some of the Iranian economy's most advanced technological undertakings occur under the aegis of the IRGC and within the framework of the Iranian arms industry, the IRGC can monopolize the transfer and adaptation of high technology to civilian applications … … The homepage of [IEI] … display[s] many consumer goods produced by the arms industry for sale in the Iranian market. The list includes personal computers, scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These purchases support … IRGC operations …."

b.    *APS Diplomat News Service*, November 23, 2009: "[T]he IRGC now monopolises Iran's huge communications sector."

c.    *UPI*, November 24, 2009: "[A] company tied to the Revolutionary Guards acquired a majority share in the nation's telecommunications monopoly, essentially giving the [IRGC] control of Iran's land lines, Internet providers and cellphone companies."

d.    *Guardian*, November 25, 2009: "[U]nofficial spokesman for the opposition Green Movement … Mohsen Makhmalbaf … called for 'smart' sanctions targeting the Islamic Revolutionary Guard Corps and their extensive business interests – including a communications monopoly – that are often described as constituting a parallel economy. 'The Revolutionary Guards are terrorists. They are in Iraq … and Lebanon.'"

e.    Dr. Monika Gill, October 2020: "[W]hilst the Guard relied on the communications economy to propagate their ideology, they also acquired and monopolised communications infrastructure as a source of capital gain. The Guard's involvement with the communications economy moved beyond the projection of revolutionary ideology, becoming equally a matter of realpolitik and of accruing military capital."

223.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related telecoms, internet, social media, computing, and

communications technology-related transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned Iran's communications sector, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

## IV.    The IRGC And Supreme Leader Relied Upon IRGC-Controlled Fronts' Ability To Access The International Financial System To Fund, Staff, Arm, And Logistically Support Terrorist Attacks Committed By IRGC Proxies

224.    The SLO and the IRGC operated fronts—including companies, banks, and charities—to conduct their terrorist finance, logistics, illicit technology acquisition, and intelligence activities, which directly enabled acts of international terrorism through their practice of transferring such value to the Qods Force, Hezbollah, Hamas, and JAM.

225.    The Qods Force depended upon the financial, logistical, operational, and intelligence value created by the SLO, IRGC, and Hezbollah, including through their associated front companies. To that end, the Qods Force operated front companies for the sole purpose of routing finance, logistics, illicit technology acquisition, and intelligence to Hezbollah, Hamas, and JAM, which directly enabled acts of international terrorism through the Qods Force's practice of transferring such value to all such groups for use in acts of terrorism targeting the United States—including attacks in Israel that the terrorists themselves connected to the United States through their stated intent that America leave the region, or else.

226.    The IRGC itself has publicly admitted that transactions with IRGC fronts directly funded the Qods Force, Hezbollah, and such FTOs' proxies. For example, on June 6, 2017, IRGC-controlled newspaper *Kayhan* admitted:

> This law seeks to accuse the Revolutionary Guards of terrorism and limit the Islamic Revolutionary Guard Corps and its affiliates around the world by blocking property and prohibition. . . . Since various individuals and institutions do transactions with the IRGC, whether inside Iran, including government, broadcasters, universities, corporations, and outside Iran, and are affiliated with the Revolutionary Guards, the imposition of sanctions actually damages Iran's national economic interests.

On November 2, 2019, *Iran News Update* reported that the above constituted a direct "[c]onfession by the Revolutionary Guards about the Iranian economy" that transactions with IRGC fronts enabled IRGC activities and those of IRGC proxies "outside Iran [that] [were] linked to the Revolutionary Guards," such as "Hezbollah."

### A.    The Supreme Leader's Office

227.    The SLO was a front for the Qods Force and Hezbollah. Ayatollah Khamenei created the SLO in or about 1990 to optimize the Iranian regime's financial and logistical support for terrorism. He did so in direct response to concerns that the IRGC was not spending enough of its profits on its mission of exporting the revolution. As such, the SLO's primary purpose was always to maximize the amount of money spent on terrorism committed by the Qods Force, Hezbollah, and their shared proxies. It did so by embedding the Supreme Leader's eyes and ears into every organization of consequence (government and business alike) in Iran, including all components of the IRGC and Hezbollah through the Supreme Leader's "representatives." The SLO also owned firms and foundations, which it usually owned and/or operated jointly with the IRGC, Qods Force, and Hezbollah. The IRGC, Qods Force, and Hezbollah, likewise, had embeds within the SLO. These factors, and others, distinguished the SLO from nearly all other national-level Iranian groups.

228.    The SLO has regularly, and publicly, touted its close relationship with Qods Force terrorists, such as poster depicting Qassem Soleimani as a "freedom fighter" leading protestors:



229.    The IRGC, Qods Force, and Hezbollah leveraged the SLO to provide a financial slush fund for their terrorist activities by, for example, financing attack cells, martyr payments, bounty payments, weapons purchases, and payments to the leadership of IRGC proxies, including leadership of Hezbollah, Hamas, and JAM.

230.    From at least 2000 through present, the Qods Force and Hezbollah used the SLO to finance terrorist attacks in Israel that were committed by Hezbollah and Hamas. From 2003 through present, the Qods Force and Hezbollah used the SLO to finance terrorist attacks in Iraq committed by Hezbollah and JAM. Throughout, the SLO was always controlled by a member of the IRGC for the benefit of the Qods Force and Hezbollah, and used by the IRGC, Qods Force, and Hezbollah to route money directly to Hezbollah and Hamas attack cells, as well as indirectly to Hamas (through Hezbollah) and JAM (through Hezbollah) attack cells, to finance terrorist attacks in Israel and Iraq committed by such groups. At all relevant times, the SLO provided key

financial support to Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies, including Hamas and JAM.

231.    On June 26, 2019, the United States issued Executive Order 13,876, which formally found that the SLO directly facilitated IRGC-sponsored acts of "international terrorism committed by "Iranian-backed proxies" in the "Middle East."

232.    On November 5, 2019, the United States imposed IRGC counterterrorism-related sanctions against the SLO to target its sponsorship of terrorist attacks committed by the Qods Force, Hezbollah, and their proxies, based upon findings that included as follows:

> OFAC … act[ed] … against … individuals who are appointees of, or have acted for or on behalf of, Ali Khamenei, the Iranian regime's unelected Supreme Leader whose office is responsible for advancing Iran's radical agenda. This action seeks to block funds from flowing to a shadow network of Ali Khamenei's military and foreign affairs advisors who have for decades oppressed the Iranian people, exported terrorism, and advanced destabilizing policies around the world. Specifically, the action targets Ali Khamenei's appointees in the Office of the Supreme Leader ….
>
> "Today the Treasury Department is targeting the unelected officials who surround Iran's Supreme Leader, Ayatollah Khamenei, and implement his destabilizing policies," said Treasury Secretary Steven T. Mnuchin. "These individuals [in the SLO] are linked to a wide range of malign behaviors by the regime, including bombings of the U.S. Marine Barracks in Beirut in 1983 and the Argentine Israelite Mutual Association in 1994, as well as torture, extrajudicial killings, and repression of civilians. This action further constricts the Supreme Leader's ability to execute his agenda of terror and oppression."
>
> This action is being taken pursuant to President Donald J. Trump's Executive Order (E.O.) 13876, signed on June 24, 2019. The E.O. imposed sanctions on the Supreme Leader of the Islamic Republic of Iran and the Supreme Leader's Office (SLO), and authorized sanctions on others associated with the Supreme Leader or the SLO. …
>
> Mojtaba Khamenei, the second son of [Khamenei], is designated today for representing the Supreme Leader in an official capacity despite never being elected or appointed to a government position aside from work in the office of his father. The Supreme Leader has delegated a part of his leadership responsibilities to Mojataba [sic] Khamenei, who worked closely with the commander of the … Qods Force [i.e., Qasem Soleimani] … to advance [Ayatollah Khamenei]'s destabilizing regional ambitions ….
>
> Also designated today is Gholam-Ali Hadad-Adel, father-in-law of Mojtaba Khamenei, a member of the Expediency Council and also an advisor to

Ali Khamenei. Hadad-Adel is known to be among those in the Supreme Leader's inner circle. … Gholam-Ali Hadad-Adel is being designated [pursuant to E.O. 13876] for having acted or purported to act for or on behalf of, directly or indirectly, the Supreme Leader of Iran.

233.    Notably, Mojtaba Khamenei and Gholam-Ali Hadad-Adel both operated through Petro Nahad, and thus, the above findings also confirm the tight nexus between Petro Nahad and Qods Force-sponsored attacks supported by Qasem Soleimani, which describes every attack against Plaintiffs and their loved ones.

234.    On November 3, 2022, the United States imposed additional IRGC counterterrorism-related sanctions against the SLO to target its direct and indirect sponsorship of acts of terrorism committed by the Qods Force, Hezbollah, and their proxies, based upon findings that included as follows:

[OFAC] designated members of an international oil smuggling network that facilitated oil trades and generated revenue for Hizballah and the … Qods Force … in support of Hizballah and the IRGC-QF.
    "The individuals running this illicit network use a web of shell companies and fraudulent tactics including document falsification to obfuscate the origins of Iranian oil, sell it on the international market, and evade sanctions," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "Market participants should be vigilant of Hizballah and the IRGC-QF's attempts to generate revenue from oil smuggling to enable their terrorist activities around the world." …
    [An] Iranian national … oversaw … the network's illegal … exportation of Iranian oil in support of Hizballah and the IRGC-QF … [and] received orders from high-ranking Iranian officials associated with the U.S.-designated [] Supreme Leader's Office to direct the network's oil smuggling operation profits to companies and bank accounts associated with Hizballah and the IRGC-QF.

235.    That same day, Secretary of State Antony J. Blinken confirmed that the U.S. had sanctioned this SLO-directed, Hezbollah- and Qods Force-operated "sanctions evasion network" and "11 vessels" because the United States determined that they "provid[ed] support to Hizballah and the Islamic Revolutionary Guard Corps-Qods Force" when they "facilitate[d] the sale of hundreds of millions of dollars' worth of oil for these organizations [*i.e.*, Hezbollah and the Qods

Force]" through the use of "shell and front companies established to facilitate the illegal blending and exportation of Iranian oil around the world," which the United States determined "provid[ed] support to terrorists or acts of terrorism" by Hezbollah and the Qods Force.

236.    The SLO played a direct operational role in terrorist attacks and associated decision making, including with respect to IRGC proxies. For example, according to an analysis by Dr. Michael Knights as published in 2023 by the U.S. Army's Combatting Terrorism Center, the SLO played a direct leadership role with respect to the direction and support that the Iranian regime provided to JAM Special Group Kataib Hezbollah. The SLO played a similar role with respect to Hezbollah and Hamas.

237.    The U.S. government statements confirming the SLO's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that the SLO was closely intertwined with terrorist violence because the Qods Force and Hezbollah used the SLO's profits to finance terrorist attacks.

238.    Given the SLO's status as a front for the Qods Force, Hezbollah, and those organizations' proxies, any funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by the SLO through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, the SLO inevitably flowed through the SLO to the Qods Force and Hezbollah and, through them, to Hamas and JAM. Thus, the SLO underwrote the finance, weapons, intelligence, and logistics of enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

239.    SCB always knew the above facts. Among other reasons, decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted SCB that its transactions with, and value flow-through to, the SLO fueled IRGC-sponsored acts of terrorism, including attacks by Hezbollah, Hamas, and JAM. Such reports included, but were not limited to:

a.    Ahmad Rezai, Son of IRGC Commander Mohsen Rezai (*Reuters*), July 5, 1998: "Ahmad Rezaei, … son of former Revolutionary Guards commander Major-General Mohsen Rezaei, told the [*L.A.*] *Times* he fled to the United States so he would be free to talk about Iranian-sponsored terrorism …[, including how] the Iranian government gave extremist groups, such as … Hizbollah, money to purchase weapons, and sometimes it simply sent weaponry to the groups …[;] [and] the office of supreme leader Ayatollah Ali Khamenei [*i.e.*, the SLO] was responsible for ordering attacks …".

b.    *New Yorker*, October 2002: "Until [9/11], [Imad] Mugniyah was considered by American officials to be the world's most dangerous terrorist, and many terrorism experts still believe this to be true. … Mugniyah's operation—known as the external security apparatus—is Hezbollah's most lethal weapon. It is commonly believed that Mugniyah is behind nearly every major act of terrorism that has been staged by Hezbollah during the last two decades … It is believed that Mugniyah takes orders from the office of Iran's supreme leader, Ayatollah Khamenei [*i.e.*, the SLO], but that he reports to a man named [Qasem] Soleimani, the chief of a branch of the [Qods Force]—the arm of the [IRGC] responsible for sponsoring terror attacks on Israeli targets."

c.    *BBC*, April 29, 2003: "[SLO-funded Iraqi] radio[] coverage … featured protesters chanting 'No to colonialism, no to occupation' and 'Death to America, death to Israel.' … In its commentaries, the radio has contrasted the US-led presence with the popularity of Iraqi leaders who 'merge with the people (and) do not have guards and protectors like the tyrants,' noting that the Iraqi people will oppose the 'hirelings, liars, hypocrites and traitors' … On 19 April, the [SLO-funded] radio warned that the Iraqi people would teach the 'usurper Americans' a lesson; it stated two days later that 'cooperation with the invading forces is prohibited and rejected'. The new station frequently leads its news summaries with positive items on Iran's relationship with Iraq. The lead item in the 18 April bulletin reported a 'cable of gratitude' from Abd al-Aziz al-Hakim, chief of SCIRI's Jihadist Office, to Iran's Supreme Leader Khamene'i for 'his call to the Iranian people to stand by the Iraqi people and extend assistance to them'."

d.    *Islamic Republic News Agency*, March 2004: "A memorial ceremony was held for the martyred founder and spiritual leader of the Islamic Resistance Movement of Palestine (Hamas) Shaykh Ahmad Yasin at Tehran Ark Mosque on Sunday … Speaking at the ceremony, the deputy head of the international department of the supreme leader's [Khamene'i's] office, Hojjat ol-Eslam Mohammad Hasan Akhtari said that Shaykh Yasin's martyrdom would reinforce the Palestinians popular uprising (*intifadah*)."

e.    <u>Dr. Michael Rubin (Senior Lecturer, Naval Postgraduate School), July 23, 2009</u>: "Iran's … terrorist sponsorship … [is] the purview of the Islamic Revolutionary Guard Corps and the Office of the Supreme Leader."

f.    <u>Mohammad Hassan Rahimian (SLO), 2010</u>: "We have manufactured missiles that allow us, when necessary to replace [sic] Israel in its entirety with a big holocaust."

g.    *Investor's Business Daily*, <u>September 23, 2010</u>: "Tehran has trained Shiite Iraqi militants to attack American combat forces [and] supplied Iraqi insurgents with advanced IED technology …. The [] Revolutionary Guards have even partnered with Hezbollah terrorists to kill U.S. soldiers, as in Karbala, Iraq, in 2007. … The examples of Iranian-guided or financed attacks against the U.S. are legion. The late Lebanese-born Imad Mughniyah, for instance, took orders 'from the office of Iran's supreme leader, Ayatollah Khamenei,' according to Jeffery Goldberg, writing in the *New Yorker* in 2002."

h.    <u>Department of Defense, October 12, 2011</u>: "Even though the IRGC is constitutionally directed to coordinate with Iran's conventional military forces and is nominally subordinate to a joint headquarters that oversees [sic] the security services and Law Enforcement Forces (LEF), the [IRGC] answers directly only to Ali al Khamenei, [Iran]'s Supreme Leader. This direct access to the Supreme Leader and his consistent and considerable support for the IRGC makes the [IRGC] peerless among military, intelligence, law enforcement, intelligence, and security services in Iran. … The IRGC answers only to the Supreme Leader rather than an elected official, a higher military command, or any other political or clerical entity within the government of Iran. The IRGC supports and advocates for the Supreme Leader and Khamenei responds in kind. During the height of the 1997 student riots, twenty-four senior IRGC officers sent a letter to reformist president Mohammad Khatami, issuing an ultimatum that he take action against the protestors, or the IRGC would take matters into their own hands."

i.    <u>IRGC General Mohsen Rezai, October 12, 2011</u>: "Once someone had asked Imam [Khomeini] as to why he lends so much support to the IRGC. The Imam had answered 'why not?' and the interlocutor had warned him that it may result in staging a coup [if the IRGC became too strong]. The Imam had answered, 'It doesn't matter; it stays in the family [if they stage a coup]; as they are our own guys.'"

j.    *Israel National News*, <u>December 30, 2011</u>: "Hizbullah … is using American banks … U.S. Attorney Preet Bhara noted, 'It puts into start relief the nexus … [to] terrorism.' … The money is allegedly laundered through a complex chain of accounts around the globe using pseudonyms. Millions of dollars are periodically funneled from the accounts of Hizbullah leaders or those of their wives, to those of senior members of the Iranian Revolutionary Guards, the sources said. The money is then transferred back to Hizbullah from the office of Supreme Leader Ayatollah Ali Khameini."

k.    <u>Hojateleslam Alireza Panahian (SLO), 2013</u>: "The day will come when the Islamic people in the region will destroy Israel and save the world from this Zionist base."

l.    *Islamic Republic of Iran Broadcasting*, July 25, 2014: "[A] [r]eport on participation of people in Quds Day rallies [in Iran] … shows demonstrators marching on the streets and chanting 'Death to Israel' and 'Death to America'. … Commenting on the International Quds Day, Deputy Head for the Cultural and Publicity Affairs of Iranian Supreme Leader's office at the [IRGC] Mohammad Ali Asudi said that 'the Zionist regime' has been crippled by Hamas as well as Palestinians' resistance."

m.    *Radio Farda* (*Voice of America*), April 8, 2019: "[T]he IRGC … structure … [includes] important offices in IRGC … that belong[] to the Supreme Leader's representative to the corps (a trusted cleric) and the counter-intelligence office which operates under direct supervision by Khamenei's office."

n.    Hossein Abedini (National Council of Resistance of Iran), August 23, 2019: "The Iranian regime … [has] become more involved in continuing mass killings inside Iran as well as their aggressive foreign policy in different countries. For example, … supporting … Hezbollah … The IRGC has to be prescribed as a terrorist organisation … And also, the supreme leader of the regime, and the office of the supreme leader of the regime, which is the centre of all these terrorist activities. ... The IRGC is the main force carrying all these terrorist attacks … in the region."

o.    Secretary of State Michael R. Pompeo, November 4, 2019: "Treasury … act[ed] … against nine appointees and representatives of Ali Khamenei, the Iranian regime's unelected Supreme Leader, whose office is responsible for advancing Iran's radical agenda. The designation seeks to block funds from flowing to a shadow network of Khamenei's military and foreign affairs advisors who have for decades oppressed … supported terrorism … around the world. The action specifically targets Ali Khamenei's appointees in the Office of the Supreme Leader … Two of the Supreme Leader's appointees, who are designated today, have also been linked to the 1983 U.S. Marine barrack bombing in Beirut that killed 241 U.S. personnel and the 1994 bombing of Argentine Israelite Mutual Association (AMIA). As recently as October 2019, a representative of the Supreme Leader directly called on regional Iran-backed militias to capture Western embassies."

p.    *Voice of America*, November 18, 2019: "Two days of intense fighting [in] Israel … once again highlights Iran's expansionist ambitions in the Middle East, experts say. … Iran has managed to sponsor both [Hamas and PIJ] at the same time, 'because both groups are committed to Israel's destruction — a goal cherished by … Ayatollah Khamenei and the … IRGC,' said Sam Bazzi, director of the Islamic Counterterrorism Institute in Washington. ... 'The arrangement in Gaza [for] Hamas … suits Tehran and fits into the mold it had frequently applied in the region: Iran-friendly governments accountable in front of the international community and secretive striking arms directly controlled by the … Quds Force and the Supreme Leader's Office,' said Bazzi."

q.    *BBC*, May 21, 2020: "[A] poster by the Supreme Leader's office drew comparisons with Nazi Germany. The poster, published online on 19 May by Khamenei.ir, contains the message: 'Palestine will be free. The final solution: resistance until referendum.' The

97

term 'final solution' was used by the Nazis to refer to the extermination of Europe's Jewish population, and the reference prompted condemnation from US … officials."

240.    The SLO was never a normal Iranian state entity: it was fully captured by avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers to exit the Middle East and abandon its allies there, including Israel and Iraq.

### B.    Khatam al-Anbiya Construction Headquarters (aka GHORB)

241.    Khatam al-Anbiya was an IRGC front. Ostensibly a construction company, Ayatollah Khamenei created KAA in 1990 to serve as a vehicle for the IRGC, Qods Force, and their proxies, to be financially self-sustaining and in direct response to concerns that the Iranian state could not, on its own, afford to rebuild after the Iran-Iraq war while simultaneously funding terrorist proxies outside Iran. Per its charter, KAA's purpose was to "efficiently utilize the available construction and economic resources, capacities and talents of the IRGC to continue the Islamic Revolution"—*i.e.*, IRGC-sponsored acts of terrorism targeting the United States. KAA's primary purpose was always to maximize the amount of money spent on terrorism committed by the Qods Force, Hezbollah, and their shared proxies. KAA did so through its wide array of companies, personnel, agents, deals, and facilities inside and outside of Iran. KAA operations inside Iran were controlled by the IRGC, while operations outside Iran were controlled by the Qods Force and Hezbollah. These factors, and others, distinguished KAA from nearly all other Iranian firms, aside from fronts controlled by the IRGC or the SLO.

242.    KAA notoriously owned a wide array of companies in the Iranian oil, gas, construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such notorious fronts included, but were not limited to: (1) Oil Industries Engineering & Construction

(Sherkat-e Sakhteman-e Sanaye' Naft); (2) Iranian Offshore Engineering & Construction

Company (Sherkat-e Mohandesi Va Sakht-e Ta'sisat-e Daryayi) ("IOEC"); (3) Persian Gulf

Petrochemical Industries Company ("PGPIC"); and (4) Bandar Imam Petrochemical Company.

(KAA jointly owned IOEC alongside fellow IRGC front NIOC.)

243.    The IRGC, Qods Force, and Hezbollah, and their proxies, including Hamas,

leveraged KAA resources, including KAA profits, to serve as a source of funds, logistical aid,

cover, and safe houses in Iraq, Lebanon, Syria, and Gaza, among other places. KAA was the

ideal cover because it had extensive offices, projects, and facilities inside and outside of Iran,

including in Lebanon, Syria, Iraq, and Gaza. Among other uses, the Qods Force, Hezbollah,

Hamas, and JAM used KAA to stockpile and pre-position weapons earmarked for attacks,

including EFPs, rockets, and communications technologies. KAA also worked closely with other

IRGC fronts, including the SLO, Foundation for the Oppressed, NIOC, and NITC.

244.    From at least 2000 through present, the Qods Force and Hezbollah used KAA to

finance terrorist attacks in Israel that were committed by Hezbollah and Hamas, and funded and

supplied by the Qods Force. From 2003 through present, the Qods Force and Hezbollah used

KAA to finance terrorist attacks in Iraq that were committed by Hezbollah and JAM and were

funded and supplied by Hezbollah and the Qods Force. At all relevant times, KAA was

controlled by the Qods Force and Hezbollah, and used by the Qods Force and Hezbollah to flow

funds, logistics, and weapons; provide safe houses for forward-deployed operatives; and conceal

terrorist funds, weapons, and supplies moved through transnational construction-related

shipments. KAA support flowed from Iran to recipients in Iraq, Lebanon, Syria, and Gaza,

among other places, including directly to Hezbollah and Hamas attack cells, as well as indirectly

to Hamas (through Hezbollah) and JAM (through Hezbollah) attack cells, to finance terrorist attacks in Israel and Iraq committed by such groups.

245.    On October 25, 2007, the United States sanctioned KAA under U.S. weapons-related sanctions targeting the IRGC and concerning, *inter alia*, missiles and drones; listed KAA as an "IRGC-owned or -controlled compan[y]"; and warned banks contemplating doing business with Iranian counterparties—including SCB—that the IRGC had seized a monopolistic share of Iran's oil sector, the IRGC used KAA to operationalize such tactics, and the IRGC used some of the resulting profits to finance IRGC-sponsored weapons programs that threatened the United States. (The latter finding was needed to impose U.S. weapons sanctions against the IRGC.)

246.    On March 28, 2012, Treasury imposed additional sanctions against KAA and reiterated that KAA's profits funded IRGC-sponsored terrorism:

> Today's actions further expose IRGC … continued involvement in illicit activities and deceptive behavior.
> Pursuant to Executive Order (E.O.) 13382 – an authority aimed at freezing the assets of proliferators of weapons of mass destruction (WMD) and their supporters and thereby isolating them from the U.S. financial and commercial systems – Treasury today designated the following entities and individuals.
> Iran Maritime Industrial Company SADRA (SADRA), an entity owned by the IRGC's Khatam al-Anbiya …
> "By designating the individuals and entities today, Treasury is sending a clear signal to the international community that Iran's attempts to evade international sanctions will not go unnoticed. We will continue to target the Iranian regime and specifically the IRGC as it attempts to continue its nefarious infiltration of the Iranian economy," said Adam Szubin, Director of [OFAC].
> The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in … [*inter alia*] Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the defense production, construction, and oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct.

247.    On May 31, 2013, Treasury sanctioned KAA affiliate Bandar Imam Petrochemical Company as part of a package that, per Treasury, comprised "Actions [that]

Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade

Sanctions and Support Terrorism."

248.    On June 7, 2019, the United States imposed IRGC counterterrorism-related

sanctions that targeted, *inter alia*, KAA, KAA affiliate PGPIC (also an IRGC front), and the

IRGC's monopoly on Iran's oil and gas sector:

> OFAC … act[ed] … against Iran's largest and most profitable petrochemical
> holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for
> providing financial support to Khatam al-Anbiya …, the engineering
> conglomerate of the [IRGC]. In addition to PGPIC, OFAC is designating
> PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-
> based sales agents. PGPIC and its group of subsidiary petrochemical companies
> hold 40 percent of Iran's total petrochemical production capacity and are
> responsible for 50 percent of Iran's total petrochemical exports.
>     "By targeting this network we intend to deny funding to key elements of
> Iran's petrochemical sector that provide support to the IRGC," said Treasury
> Secretary Steven T. Mnuchin. "This action is a warning that we will continue to
> target holding groups and companies in the petrochemical sector and elsewhere
> that provide financial lifelines to the IRGC."
>     "The IRGC systemically infiltrates critical sectors of the Iranian economy
> to enrich their coffers, while engaging in a host of other malign activities," said
> Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker.
>     The IRGC and its major holdings, such as … Khatam al-Anbiya, have a
> dominant presence in Iran's commercial and financial sectors, controlling multi-
> billion dollar businesses and maintaining extensive economic interests in the
> defense, construction, aviation, oil, banking, metal, automobile and mining
> industries, controlling multi-billion dollar businesses. The profits from these
> activities support the IRGC's full range of nefarious activities, including …
> support for terrorism ….
>     In 2018, Iran's Ministry of Petroleum awarded the IRGC's Khatam al-
> Anbiya ten projects in oil and petrochemical industries worth the equivalent of 22
> billion dollars, a value four times the official budget of the IRGC.

249.    The U.S. government and U.N. statements confirming KAA's direct connection to

IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a

consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the

IRGC and Hezbollah. These sources show that KAA was closely intertwined with terrorist

violence because the Qods Force and Hezbollah used KAA's profits to finance terrorist attacks.

250.    KAA was a front for the Qods Force, Hezbollah, and such FTOs' proxies. Thus, funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by KAA through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, KAA inevitably flowed through KAA to reach the Qods Force and Hezbollah and, through them, to Hamas and JAM, to provide the funding, weapons, intelligence, and logistics that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

251.    SCB always knew the above facts. Among other reasons, Treasury sanctions designations alerted financial institutions, like SCB, that its transactions with, and value flow-through to, KAA fueled IRGC-sponsored acts of terrorism.

252.    KAA was never a normal company: it was fully captured by the IRGC, led by, and comprised of, avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

C.    **Foundation for the Oppressed (aka Bonyad Mostazafan)**

253.    The Foundation for the Oppressed of the Earth and the Disabled, also known as the Bonyad Mostazafan or Mostazafan Foundation ("Foundation for the Oppressed" or "Foundation") was a front for the Qods Force and for Hezbollah. The IRGC created the Foundation for the Oppressed in 1979. It did so by seizing the Pahlavi Foundation and immediately converting it into one of the Qods Force's primary transnational funding and logistics fronts: a custom-built foundation specifically designed to provide funding, weapons, intelligence support, logistical aid, and a vast transnational footprint of corporate fronts, shell

companies, and real estate to the Qods Force and Hezbollah.[5] This was part of the IRGC's early efforts to build the financial and logistical networks needed to export the Islamic Revolution through IRGC-funded terrorist attacks targeting the United States and its allies, including Israel. Such terrorists controlled the Foundation for the Oppressed for the same primary purpose: to help the Qods Force, Hezbollah, and such FTOs' proxies acquire funds, weapons (including weapons components), intelligence, cover, concealment, and logistical aid, so that such terrorists could commit terrorist attacks, enabled by the global resources and charity-cover provided by the Foundation.

254.    From at least 1979 (in the case of the IRGC), 1982 (in the case of Hezbollah), and 1990 (in the case of the SLO), the Qods Force, Hezbollah, and the SLO have jointly used the Foundation for the Oppressed to fund, logistically arm, source intelligence for, and provide cover to, terrorist attacks—including attacks in Israel that were committed by Hezbollah and Hamas and funded and supplied by the Qods Force, and attacks in Iraq that were committed by Hezbollah and JAM and funded and supplied by Hezbollah and the Qods Force. Throughout, the Foundation was always controlled by the Qods Force and Hezbollah, under the supervision of the SLO, and used by the Qods Force and Hezbollah to route money directly to Hezbollah and

---

[5] For the avoidance of all doubt, the Qods Force and Hezbollah did not gradually take control of the Foundation, nor was the Foundation originally a noble charity that these FTOs eventually corrupted. Instead, the Foundation was designated as the specific-purpose-built foundation to enable Qods Force and Hezbollah acts of terrorism targeting the United States. Accordingly, from day one—and ever since—the Qods Force has structured the Foundation to operate as the Qods Force's and Hezbollah's transnational terrorist operations slush fund. To that end, the Foundation had a wide global footprint (which facilitated movement of goods and personnel across borders), thousands of real estate holdings (which provided safe houses and logistics sites), hundreds of corporate holdings (which offered cover and concealment for Qods Force and Hezbollah operatives and transactions), and a presence in every strategic industry relevant to the Qods Force's and Hezbollah's transnational jihadist mission to "export the Islamic Revolution" by sponsoring acts of terrorism targeting the United States.

Hamas attack cells, as well as indirectly to Hamas (through Hezbollah) and JAM (through Hezbollah) attack cells, in order to finance terrorist attacks in Israel and Iraq committed by such groups. At all relevant times, the Foundation provided key financial support to Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas and JAM.

255.    The Qods Force and Hezbollah always controlled the leadership of the Foundation for the Oppressed. The Qods Force and Hezbollah accomplished this through, *inter alia*, their appointment of notorious Hezbollah and/or Qods Force leaders to officially, or unofficially, run the Foundation and its Board of Trustees, also known as its Board of Directors, including, but not limited to, Mohsen Rafiqdoost (*supra* ¶¶ 85, 126, 129, 134, 138), Mohammad Forouzandeh, and Parviz Fattah (*supra* ¶ 85; *infra* ¶ 260). The IRGC always had at least two senior members installed as leaders of the Foundation, in effect: (1) Mohsen Rafiqdoost (as the senior most Board of Trustees member); and (2) whomever was appointed as the then-current director, *e.g.*, Parviz Fattah in 2020.

256.    Because the IRGC created the Foundation for the Oppressed to serve as its transnational corporate base, the IRGC (including the Qods Force) always had veto rights—based upon Iranian "law" and practice—over any Foundation-related issue if Ayatollah Khamenei did not disagree with them. This was accomplished, among other means, through the Ayatollah's practice of always appointing a trusted member of the IRGC's leadership network (and Ayatollah's inner circle) to head the Foundation for the Oppressed.

257.    The Qods Force and Hezbollah notoriously embedded their operatives throughout the Foundation for the Oppressed. Such IRGC embeds ensured the Qods Force's and Hezbollah's ability to extract maximum financial, operational, intelligence, and logistical value from the Foundation.

258.    In 2006, Treasury counterterrorism personnel conducted a roadshow throughout Europe and the Middle East where they warned banks, including on information and belief SCB, about prominent IRGC, Hezbollah, and Qods Force fronts. During this period, the United States warned European firms—memorialized in a cable, as published by *WikiLeaks*—that transacting with the Foundation for the Oppressed was tantamount to transacting with an entity that was "fully owned by the IRGC:"

> Treasury Under Secretary for Terrorism … Stuart Levey … stressed that the U.S. is trying to … persuade its allies to target [the IRGC's] bad conduct through targeted financial measures against supporters of destabilizing policies (such as terrorism and weapons of mass destruction programs) … [Levey discussed] U.S. thinking on combating Iran's use of the international financial system to transfer funds to terrorists … [A Turkish official] described the important role of Bonyads, state-linked foundations. He said that the Revolutionary Guard's share of Bonyad-controlled business was increasing but that the Revolutionary Guard did not control the entire economy. Stating increased USG concern about the IRGC's resurgence under Ahmadinejad's authority, U/S Levey cautioned that the IRGC's growing role in the Iranian economy was not limited to the public sector, but included the private sector as well. Levey recalled the IRGC's interference with [] major … deals [through the Foundation, including] …the IRGC's involvement in … [a] deal … [for] Irancell [controlled by the Foundation and therefore] … fully owned by the IRGC …

259.    On November 18, 2020, the United States designated the Foundation for the Oppressed, confirmed that it served as a "bridge to the IRGC," and announced:

> OFAC … act[ed] … against a key patronage network for the Supreme Leader of Iran, the … Bonyad Mostazafan [Foundation for the Oppressed] … While Bonyad Mostazafan is *ostensibly* a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to … enrich his office, reward his political allies, and persecute the regime's enemies. … "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the pretense of charity," said Secretary Steven T. Mnuchin. …

> **PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
> Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah. Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counterterrorism authorities in 2010

for being owned or controlled by, and for providing financial and material support to, Hizballah. Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials. According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . . The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

260.    In the same designation, Treasury confirmed that the Foundation for the Oppressed served primarily as a front for terror and performs little legitimate charitable work: "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

261.    On January 13, 2021, Treasury imposed additional sanctions on Iranian bonyads, and again noted the Foundation for the Oppressed's direct role in IRGC-sponsored terrorism:

[P]urportedly charitable organizations (bonyads) …control large swaths of the Iranian economy … to the benefit of Supreme Leader Ali Khamenei and senior Iranian … officials. Alongside the previously designated Bonyad Mostazafan, itself controlled by the Supreme Leader, and the IRGC-owned Khatam al-Anbiya, bonyads are said to control more than half of the Iranian economy.

"These institutions enable Iran's elite to sustain a corrupt system of ownership over large parts of Iran's economy," said Secretary Steven T. Mnuchin. "The United States will continue to target those who enrich themselves while claiming to help the Iranian people." …

This action follows Treasury's November 2020 designation of the Bonyad Mostazafan [Foundation for the Oppressed], an immense conglomerate with holdings in key sectors of Iran's economy. … Bonyad Mostazafan has been the beneficiary of favorable treatment by Iran's corrupt leadership, and its assets have been used by the Supreme Leader Ali Khamenei to enrich his office, reward his political allies, and persecute the regime's perceived enemies.

**IRANIAN BONYADS**

Bonyads are opaque, quasi-official organizations generally controlled by current and former government officials and clerics that report directly to the Supreme Leader. Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly

approved. This lack of accountability has enabled the bonyads to expand their economic activities far beyond their original remit and has led to the accumulation of vast amounts of wealth without …benefit to the people of Iran.

262.    The U.S. government statements confirming the Foundation for the Oppressed's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that the Foundation was closely intertwined with terrorist violence because the Qods Force and Hezbollah used Foundation revenues to finance terrorist attacks.

263.    The Foundation for the Oppressed was a front for the Qods Force, Hezbollah, and such FTOs' proxies. Thus, funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by the Foundation through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, the Foundation inevitably flowed through the Foundation to reach the Qods Force and Hezbollah and, through them, to Hamas and JAM, to provide the funding, weapons, intelligence, and logistics that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

264.    SCB always knew the above facts about the Foundation for the Oppressed. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien testified publicly that the "Iran [] actively sponsors terrorism and violence across the Middle East … [through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf," which "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of

support that fuel terrorist activities" for which the IRGC's "money flows" from "a large network

of state-owned banks and parastatal companies"—*i.e.*, bonyads or foundations. (As SCB knew,

the Foundation for the Oppressed was always Iran's largest and most notorious bonyad).

265.    IRGC admissions also confirmed that the Foundation for the Oppressed's support

enabled acts of terrorism by Hezbollah and the Qods Force and their proxies, including Hamas.

On November 3, 2012, for example, a "reporter" for IRGC-controlled media outlet *Aftab*

acknowledged that the Foundation supported IRGC proxies "[i]n countries like Syria and

Palestine, where Iran's interests are outside the country... that means the activities of the

Foundation [for the Oppressed] to help [IRGC proxies like] Bashar al-Assad's government."

266.    Decades of reports and statements published by the United States, Iranian regime,

Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted SCB that its

transactions with, and value flow-through to, the Foundation for the Oppressed fueled IRGC-

sponsored acts of terrorism, including attacks by Hezbollah, Hamas, and JAM. Such reports

included, but were not limited to:

a.    <u>*Washington Post*, May 29, 1989</u>: "Ayatollah Ruhollah Khomeini …[,] [who] does the
      devil's work but calls America the 'Great Satan,' …. has established a terrorist network
      inside the United States. It … is financed by the Foundation of the Oppressed, according
      to Federal Bureau of Investigation intelligence. The FBI believes that Hezbollah, acting
      for Iran, contracted with an Islamic student/terrorist to blow up Sharon Rogers' van in
      San Diego. She is the wife of Navy Capt. Will Rogers III, who commanded the warship
      that shot down the Iranian airliner after mistaking it for a jet fighter."

b.    <u>*Washington Post*, August 3, 1993</u>: "Israelis estimate that … million[s] [of] dollars ha[ve]
      been reaching Hamas annually from Iran, channeled through Tehran's overseas Islamic
      propagation organizations. Considerably larger sums, as well as training and logistical
      support, are thought to reach Hezbollah … Iran's many-faceted foundations, known as
      bonyads, are one key aspect of its institutional and financial support for these groups. …
      The foundations were established as charity organizations to help the downtrodden
      [Oppressed] and to propagate the ideals of the revolution. Now they are multibillion-
      dollar conglomerates owning real estate and hundreds of companies, industries and hotels
      around the country. They say they need the money to keep caring for the … families of
      war victims. Yet not all their work is charitable. Foundation leaders often travel with
      diplomatic passports, and Western analysts see their overseas offices, particularly in

Lebanon, as a vehicle for transferring money to groups such as Hezbollah. Their budgets are enormous. An official in the Bonyad Mustazaafan [Foundation for the Oppressed], the largest, said his foundation's budget amounts to one-quarter of Iran's gross national product. … The nominal line of authority for the foundations runs through structures devoted to Islamic propaganda worldwide that report ultimately to Iran's supreme spiritual leader, Ayatollah Ali Khamenei. Israeli analysts believe this is the structure that sends money to its radical Islamic movement, Hamas."

c.    _Montreal Gazette_, June 4, 1994: "The United States, most crucially, continues to classify Iran as a state sponsoring terrorism. It makes no distinction between official and unofficial Iranian actions, though there is strong reason to believe that directing many of Iran's more dubious overseas activities - including support for the Hezbollah in Lebanon - is not the core of government but the 'bonyads.' These are semi-private and ostensibly charitable foundations in command of billions of dollars derived from the hundreds of companies they own inside Iran and private property confiscated after the revolution. Behind the bonyads stand the politicized wing of the clergy. And behind them, stands the still powerful ghost of Khomeini."

d.    _Christian Science Monitor_, February 1, 1995: "Mohsen Rafiqdoost has one of the safest jobs in the world - despite corruption allegations. … General Rafiqdoost is the managing director of Iran's Foundation of the Oppressed, a nominally charitable organization ... In reality, the foundation, one of several known as bonyads, has become a huge investment vehicle, the most powerful economic organization in Iran outside the government. … Rafiqdoost took over the fund after commanding [the] Revolutionary Guards during the Iran-Iraq war. … [M]any analysts hold that Rafiqdoost's interests go beyond helping the poor of Iran. Western security sources believe the bonyads are used by Iran's religious authorities as deniable vehicles to finance anything from … Hizbollah … to the bounty on the head of … Salman Rushdie. The Foundation of the Oppressed has been accused of sidestepping a Western embargo on high-technology exports to Iran; some say it may be scouting … for weapons … Money for political ends[.] In a country where economic information is as sensitive as military secrets, few know the true state of the foundation's operations. Allegations of political involvement are difficult to prove. 'There is bonyad money going to Lebanon, for sure,' said one source in Iran, 'but you won't find a trace of it in Tehran.' 'Look, the bonyad works in harmony with the government,' explained Rafiqdoost. 'At times we go to their aid.'"

e.    _Newsday_, May 28, 1995: "[The Foundation for the Oppressed] served as a front … for the placement of agents from the [IRGC], dedicated zealots who … spy and obtain military technology from the United States and abroad. [The Foundation] finances [entities] in the United States that support Iran's militant version of Islam and provides safe haven for groups and individuals supporting the Islamic terrorist group[] … Hezbollah. … In 1989, Oliver Revell, then the No. 2 official at the FBI, told the Senate terrorism subcommittee that some of the 'students' receiving [Foundation] grants were in fact [IRGC] agents. … Revell … said much of [the Foundation]'s funds go to 'a great number of mosques (in the United States) . . . where there are organizations which directly support Hezbollah…[,]' an Iranian-supported militant group … that has launched terrorist attacks under the tutelage of the Revolutionary Guards."

f.   *Newsday*, December 8, 1998: "[T]he … Mostazafan Foundation [Foundation for the Oppressed] controls billions of dollars of investments in Iran and around the world … [and] has been accused by western intelligence services of … supporting terrorism … Newsday disclosed in 1995 that several officers and directors … had been implicated in arms and technology shipments to Iran, that it was controlled by Iran's clerical leadership and that the FBI believed it had served as a front for placement in the United States of Revolutionary Guards [Qods Force], Iranian zealots who conducted espionage and stole military technology."

g.   *BBC*, March 27, 2001: "[T]he Foundation for the Oppressed … is an organization that gives financial support to Iran's … acts of terrorism abroad. … The organization is supervised by the spiritual leader (Ayatollah Khamene'i) and is a subsidiary of the IRGC [and its investments are] … under the control of Hezbollah like other large commercial enterprises in Iran. These are organizations operating under the supervision of the IRGC … [and are] engaged in controlling people visiting Iran, selecting and training people for Iran, financing pro-Iranian people and so on. It is a fact that these things are being done under the guise of cultural centres and humanitarian structures."

h.   *BBC*, June 14, 2002: "Iran has been financing the Islamic Jihad Organization … since the group's establishment but its budget reached it through Hezbollah. The latter's budget is paid by Iranian establishments [*i.e.*, foundations aka bonyads], the *vali-e faqih* office [*i.e.*, the SLO], the Revolutionary Guards' liberation movements' office, in addition to the Qods Forces and exceeds 200m dollars. … Regarding the increase in Hezbollah's budget, the source said the party receives aid from various sources in addition to its annual budget and these come from religious, economic, and government establishments in Iran. Other establishments like … [the] 'Mostaza'fin' (Foundation for the Oppressed) give every month vast amounts of financial aid to the families of Hezbollah's martyrs, injured and handicapped members."

i.   Zaki Chehab (Former London Bureau Chief, *Al Hayat*), 2007: "Khomeini … [and] [t]he new Iranian government lavished financial support on [terrorist] groups opposing Israel and its state television described suicide bombings as 'martyrdom operations'. … This … was Hamas' gain. Several years later, in 1994, I became reacquainted … Mohsen Rafiq Doust [*i.e.*, Mohsen Rafiqdoost], in his grand office in Tehran. He had moved on from his early responsibilities as head of the Revolutionary Guard to become the head of a powerful multi-billion-dollar foundation called …'the Foundation of the Oppressed and War Veterans' … in charge of a third of the Iranian budget. Described as 'a state within the State', the foundation is one of the richest organizations in the world, controlling more than six hundred key industrial complexes, and some of the country's biggest and most lucrative businesses … [The Foundation] now owns airline and shipping companies, deals in oil and arms, export and import and above all, claims the *Iran Free Press*, 'facilitates Iranian funding of some Islamic organizations such as the Lebanese Hezbollah [and] … Palestinian [terrorists]' … In a speech to a [Palestinian] conference in 1981, which earned [Rafiqdoost] a rousing reception, he told the assembled delegates: 'The Iranian Revolution learned a lot from the Palestinian Revolution and because of our belief in God we were capable of defeating the might of the imperialist Shah.' Turning to

110

Arafat he chided: 'Carrying an olive branch is the beginning of your downfall, because Palestine can only be liberated through the barrel of the gun.'"

j.    Jonathan Schanzer (Foundation for Defense of Democracies), 2008: "[Hamas's] Saudi spigot began to dry up beginning in 2004. … Without the same stream of Saudi money, Hamas soon turned to Iran to fill the void. Iran became even more vital to the group's finances after Hamas's January 2006 electoral victory and the western embargo that followed. Indeed, a Hamas spokesman confirmed that Iran 'was prepared to cover the entire deficit in the Palestinian budget, and [to do so] continuously.' The Bonyad-e Mostazafan za Janbaza (Foundation of the Oppressed and War Veterans), a splinter of the Iranian Revolutionary Guards Corps, is believed to provide Hamas with critical financial support. During a visit by Hamas leader Ismael Haniyeh to Tehran in December 2006, Iran pledged $250 million in aid to compensate for the western boycott."

k.    *Christian Science Monitor*, July 20, 2009: "Iranian-backed militancy in Iraq …. [was sponsored by] the al-Quds Brigades of Iran's Revolutionary Guard Corps (IRGC), responsible for operations outside Iran, [which] will maintain its ability to target US military personnel, diplomats and private citizens in Iraq … [to threaten] a nightmare scenario for US generals and diplomats in Iraq. In Iraq's economy, Iran has … arguably benefited from a 'whole-of-government' approach in which government-owned industries and IRGC-influenced religious foundations (bonyads) are used as tools of statecraft … [which enabled] Iran to provide … paramilitary support to armed groups [targeting Americans in Iraq]."

l.    Kerry Patton (Combat-Disabled Veteran; Senior Analyst, Wikistrat), 2012: "Bonyads assist in fueling world terror, enhanced military might, and promotion of propaganda and "comfort for the oppressed." … Tactically, Bonyads are often interrelated to the Iranian Revolutionary Guard Corp (IRGC). Operatives from the IRGC along with members founded in Al Quds and Hezbollah go undercover portraying themselves as employees or officials of trading companies, banks, cultural centers or as representatives of the Foundation of the Oppressed and Dispossessed (Bonyad-e- Mostazafan) …."

m.    Steven O'Hern (Former Director - Strategic Counterintelligence Directorate of Multi-National Forces-Iraq), 2012: "[T]he Foundation of the Oppressed … used wealth seized from the shah and his supporters to fund Hezbollah's early … network [and] … recruitment. Mohsen Rafiqdust … accompanied the IRGC troops for a reason. Rafiqdust had formed extensive ties in Lebanon when he received guerilla training there before the revolution. … Rafiqdust used and expanded those contacts as he supervised logistics for the Guard and the overall presence of the IRGC in Lebanon. … Foundation of the Oppressed and Dispossessed [was]… [r]un for years by Mohsen Rafiqdust, a founder of the IRGC, and used by the Revolutionary Guard to fund off-the-books operations."

n.    *The Atlantic*, March 2015: "[A]s a reminder to those who argue that Jews should stop worrying so much about people who threaten to kill them, ... Mohammad Hassan Rahimian, [Ayatollah] Khamenei's [Supreme Leader Office] representative to the Moustazafan Foundation [Foundation for the Oppressed said in 2010]: 'We have

manufactured missiles that allow us, when necessary to replace [sic] Israel in its entirety with a big holocaust.'"

o.   Dr. Farhad Rezaei (Association for the Study of the Middle East and Africa), 2018: "Iran would use the influx of capital which it would receive from the sanction relief to invest in what is known as 'revolutionary export,'" that is a program to destabilize neighboring countries through direct or proxy involvement in … terror activities. … [T]here are indications that the regime has spent part of it on its foreign adventurism, … [and] that the regime has spent some money on other proxies like … Hezbollah in Lebanon and Hamas in Gaza strip, to expand its Shiite influence. … Some of the money comes from … the foundations like Bonyad-e Mostazafan-e Enghelab-e Eslami [Foundation for the Oppressed]. ... However, the evidence supports the [] concern that Iran would utilize the money it had received from the sanctions relief to sponsor terrorism … Iran has been using the influx of capital which it has received … to invest in what is known as 'revolutionary export,' a code name for spreading the ideology of [Iran] in the region."

267.    The Foundation for the Oppressed was never a normal charity: it was fully captured by the Qods Force and Hezbollah, led and staffed by outspoken, virulent supporters of such organization's terrorist attacks, and operated for the benefit of their shared mission to sponsor attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

**D.    National Iranian Oil Company**

268.    The National Iranian Oil Company ("NIOC") was the entity responsible for exploring and exporting Iran's oil. It was a government-owned business overseen by the Iranian Ministry of Petroleum, and it exercised a monopoly over the petroleum trade in Iran and with respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas). NIOC had affiliates, including the Naftiran Intertrade Company Ltd. ("NICO"), to handle much of its overseas trade.

269.    By no later than 2007, the IRGC seized NIOC and converted it to an IRGC front. Since the IRGC seized NIOC, NIOC's express purpose has always been the same: to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. From 2009

onward, NIOC was a notorious front for Hezbollah and the Qods Force, which relied upon NIOC

to help finance acts of terrorism committed by Hezbollah, Hamas, and other IRGC proxies.

Accordingly, NIOC was not a normal oil company: it was fully captured by the IRGC and

operated for the benefit of the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the

United States.

270.    At all relevant times, NIOC provided key financial and logistical aid to acts of

terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies

including Hamas and JAM. NIOC did so by directing funds to the IRGC through a web of

contracting arrangements with other IRGC businesses. NIOC's revenues thus flowed through to

the IRGC, the Qods Force, and Hezbollah—and, at those organizations' direction, to the IRGC's

terrorist proxies elsewhere, including to JAM in Iraq and to Hamas in Israel.

271.    NIOC notoriously owned a wide array of companies in the Iranian oil, gas,

construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such

notorious IRGC fronts, through NIOC, included, but were not limited to: (1) NICO; (2) Petropars

Ltd. ("Petropars"); and (3) IOEC, which was a joint venture between NIOC and Idro, a

subsidiary of the Iranian Ministry of Heavy Industry, in which KAA also had a stake. As such,

the IRGC fully controlled IOEC like it did NIOC.

272.    On November 26, 2008, Treasury "identified the National Iranian Oil Company

(a.k.a. NIOC), Naftiran Intertrade Company Ltd. (a.k.a. NICO), and Naftiran Intertrade Co. Sarl

as entities owned or controlled by the Government of Iran," and warned (emphases added):

> The inclusion of the National Iranian Oil Company, Naftiran Intertrade Company
> Ltd., and Naftiran Intertrade Co. Sarl marks the first non-financial institutions to
> be added to the appendix. Moving forward, OFAC will continue to list both
> financial institutions and other entities that are determined to be owned or
> controlled by the Government of Iran.

While the ITR do not impose an asset freeze, they do prohibit most commercial and financial transactions with entities owned or controlled by the Government of Iran, regardless of where such entities are located or incorporated. ***Most transactions with any branches or subsidiaries of these entities are also prohibited***, regardless of where such branches or subsidiaries are located and incorporated.

This appendix serves as a tool to ***assist U.S. persons in complying*** with the ITR. The identified entities are considered to be owned or controlled by the Government of Iran when they operate not only from the locations listed in the appendix, but also from any other location. The ITR prohibitions apply to all entities owned or controlled by the Government of Iran, regardless of where they are located or incorporated, even if they are not listed in the appendix. The prohibitions in the ITR also apply to transactions with entities located in Iran that are not owned or controlled by the Government of Iran.

Naftiran Intertrade Company Ltd. is a subsidiary of the National Iranian Oil Company that is registered in the United Kingdom and located in Jersey, Channel Islands, United Kingdom. NICO, in turn, has a subsidiary, called Naftiran Intertrade Co. (NICO) Sarl, which is incorporated and located in Switzerland. The ITR prohibit most transactions with NIOC, NICO and NICO Sarl, in any locations worldwide, because these companies are entities owned or controlled by the Government of Iran.

273.     On June 16, 2010, Treasury sanctioned NIOC's subsidiaries, and their associated investments, including Petropars, again warning that the IRGC seized Iran's energy sector.

274.     On November 15, 2011—the same day SCB helped the IRGC evade imminent U.S. sanctions targeting its oil sector—terrorism experts testified to Congress that "NIOC operates as the ultimate front company obscuring the role of the IRGC in the oil trade," and warned of deepening ties between NIOC and the IRGC. Expert organization United Against Nuclear Iran ("UANI") wrote that "working with NIOC and the IRGC" would "directly contribut[e] to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs"—for example, by bankrolling "groups in Iraq … that execute attacks against American and NATO servicemen" while "being actively supported by Iran." The United States responded by increasing sanctions pressure on the IRGC to prevent the IRGC from using oil revenues to support terrorism.

275.    On December 31, 2011, Congress in the 2012 National Defense Authorization Act blacklisted CBI/Markazi. Congress also, with limited exceptions, subjected to sanctions foreign financial institutions doing any significant financial transactions with CBI/Markazi, as well as several other IRGC-affiliated financial institutions. These sanctions were imposed because CBI/Markazi—which was a principal repository of Iranian oil revenue—was participating actively in the IRGC's illicit transactions, including transferring funds used to support IRGC-backed terrorism. Through this legislation, Congress reaffirmed the connection between Iranian oil revenue and IRGC terrorism.

276.    In August 2012, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), Section 312 of which directed Treasury to determine whether NIOC was acting as an agent or affiliate of the IRGC. A month later, Treasury publicly announced that the answer was "yes."

277.    The finding that NIOC was effectively a front for the IRGC triggered additional sanctions on NIOC. Specifically, under the ITRSHRA, NIOC was sanctioned for providing support to the IRGC. And under CISADA and the Iranian Financial Sanctions Regulations, foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC were subject to sanctions, including the prohibition or imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States.

278.    NIOC was also listed on the Specially Designated Nationals ("SDN") list (a list of sanctioned entities), specifically with an "IRGC" identifier after its name. As the Foundation for Defense of Democracies explained on September 23, 2012 after Treasury's determination, "U.S.

law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization and nuclear proliferator."

279.    By threatening to cut foreign financial institutions off from the U.S. financial system if they continued to deal in any significant way with CBI/Markazi and NIOC, these sanctions essentially forced foreign financial institutions to choose between dealing with IRGC fronts, or maintaining access to U.S. dollar trading—and prompted most financial institutions to curtail their services for IRGC companies. This made it extremely difficult for the IRGC to access revenue from its oil sales, and also to access the international financial system.

280.    On September 24, 2012, Treasury sanctioned NIOC as an "agent or affiliate" of the IRGC.

281.    On May 31, 2013, Treasury sanctioned NIOC subsidiaries as part of a package that "Target[ed] the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> As part of its ongoing efforts to intensify sanctions pressure on Iran, … Treasury took a series of related actions to disrupt efforts to evade sanctions on the Iranian regime … [and] sanctioned a company that has aided Iran's efforts to evade sanctions by attempting to conceal oil transactions with the Government of Iran … These actions, which were taken under a number of different authorities, apply sanctions to companies operating in several countries that are aiding Iran's support for terrorism ….
>
> Treasury…, acting in concert with … State, … act[ed] … to target Iran's petrochemical industry. As Iran's oil revenues continue to fall due to international sanctions, the Iranian government has increasingly turned to other industries to make up for lost profits. One of these sectors is the petrochemical industry, which is now the second largest source of revenue for the Iranian Government. The Administration is taking action today to target this revenue stream by both designating companies involved in transactions with the sector and identifying several petrochemical companies as subject to sanctions because they are controlled by the Iranian government.
>
> "We are committed to intensifying the pressure against Iran, not only by adopting new sanctions, but also by actively enforcing our sanctions and preventing sanctions evasion. Today's actions take aim at revenues from Iran's petrochemical sector, as well as deceptive schemes Iran has employed in an effort

> to evade sanctions on its oil sales and its airlines," said Treasury Under Secretary for Terrorism … David S. Cohen. …
>
> Treasury … is also identifying eight Iranian petrochemical companies that are owned or controlled by the Government of Iran, including Bandar Imam Petrochemical Company, Bou Ali Sina Petrochemical Company, Mobin Petrochemical Company, Nouri Petrochemical Company, Pars Petrochemical Company, Shahid Tondgooyan Petrochemical Company, Shazand Petrochemical Company, and Tabriz Petrochemical Company. These identifications made pursuant to E.O. 13599, which targets the government of Iran.

282.    The United States has confirmed that the Iranian regime used profits from NIOC and its affiliates, including NICO, to fund terrorist attacks by IRGC proxies. For example, in 2018, Executive Order 13,846 included the finding that "financial, material, or technological support for, or goods or services in support of, the National Iranian Oil Company" and "Naftiran Intertrade Company" directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

283.    In 2020, Treasury reiterated its 2012 finding that NIOC was an IRGC agent, and commercial transactions with NIOC foreseeably enabled IRGC-sponsored terrorist attacks committed by its proxies. On January 23, 2020, for example, OFAC described NIOC as "instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) and its terrorist proxies," necessarily including Hezbollah, Hamas, and JAM. In that same release, the Treasury Secretary commented that "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities," *i.e.*, IRGC-sponsored acts of terrorism targeting the United States and committed by one or more IRGC proxy.

284.    On October 26, 2020, OFAC designated NIOC's related Ministry, the Iranian Ministry of Petroleum, and NIOC's subsidiary, NICO, among others, under E.O. 13,324

(counterterrorism) "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil," and the Treasury Secretary observed that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF," *i.e.*, acts of terrorism targeting the United States, which was a required finding for the legal designation announced. Treasury justified the counterterrorism sanctions against NIOC under E.O. 13,324 by observing that NIOC services were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States, finding, *inter alia*, that: (1) "Senior NIOC … personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF" through, inter alia, IRGC-controlled "front companies"; and (2) "NIOC" facilitated "oil deals used to generate revenue for the IRGC-QF and Hizballah" through its "coordination" with such terrorists by working with the IRGC-QF, Hezbollah, and NITC to route IRGC-QF oil to Hezbollah through trades in other Middle Eastern countries to raise funds for Hezbollah and the Qods Force to distribute to IRGC proxies to sponsor acts of terrorism targeting the United States.

285.    The U.S. government statements confirming NIOC's direct connection to IRGC sponsored, proxy-committed acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources confirm that NIOC was closely intertwined with terrorist violence because the IRGC used revenues from NIOC oil sales to finance terrorist attacks.

286.    Given NIOC's status as a front for the Qods Force, Hezbollah, and such FTOs'

proxies, funds obtained by NIOC through its or its controlled companies' and/or investments'

(including Petropars') commercial transactions, resources, and profits with, or generated by,

NIOC inevitably flowed through NIOC to reach the Qods Force and Hezbollah and, through

them, to Hamas and JAM, to finance Hezbollah and the Qods Force's provision of fighters,

funds, and weapons that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah

and/or Hamas) and Iraq (committed by Hezbollah and JAM).

287.    NIOC ceased to be a normal oil company by 2007, when the IRGC completed its

capture of NIOC and thereafter operated NIOC for the benefit of the IRGC's mission to sponsor

terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the

United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### E.    National Iranian Tanker Company

288.    The National Iranian Tanker Company ("NITC") was responsible for transporting

NIOC's oil. It was a government-owned business overseen by the Iranian Ministry of Petroleum,

and it exercised a monopoly over the transportation aspects of petroleum trade in Iran and with

respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas).

289.    By 2007, the IRGC took control of NITC by seizing its sole customer, NIOC, and

the IRGC has controlled NITC as an IRGC front ever since. Since the IRGC seized NITC in

2007, NITC's purpose—like NIOC's—has been to source funds and weapons (including

weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of

terrorism targeting the United States. From 2009 onward, NITC has been a notorious front for

Hezbollah and the Qods Force, which relied upon NITC to help finance acts of terrorism

committed by Hezbollah, Hamas, and other IRGC proxies. Accordingly, NITC was not a normal

oil tanker company: it was fully captured by the IRGC, and operated for the benefit of, the IRGC's mission, *i.e.*, sponsoring acts of terrorism targeting the United States.

290.    At all relevant times, NITC provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas and JAM. NITC did so by coordinating oil shipments with NIOC, the Qods Force, and Hezbollah to flow funds to the Qods Force, Hezbollah, and their proxies through NIOC's web of contracting arrangements with other IRGC businesses, all of which depended upon NIOC's ability to reliably export IRGC-QF owned oil, in contravention of U.S. counterterrorism sanctions, to customers outside of Iran. NITC's conduct was thus intended to, and did, flow tens of millions in revenues through NIOC to the IRGC, the IRGC-QF, and Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas).

291.    On May 31, 2013, Treasury imposed sanctions on NITC to "Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> Treasury imposed sanctions on [a European firm] because it has facilitated deceptive transactions for or on behalf of the [NITC], which was identified by Treasury as a Government of Iran entity in July 2012. This Treasury action is the first use of sanctions pursuant to Executive Order (E.O.) 13608, which targets Foreign Sanctions Evaders, including those that facilitate deceptive transactions for or on behalf of persons sanctioned in connection with Iran …
> In March 2013, Ferland and NITC cooperated in a scheme to sell Iranian crude oil deceptively in order to help Iran evade international sanctions …. The scheme involved ship-to-ship transfers of oil between three oil tankers … working on behalf of Iran in March 2013. …

292.    The United States has confirmed that the Iranian regime used profits generated by NITC to fund terrorist attacks by Hezbollah, Hamas, and JAM. On August 6, 2018, for example, Executive Order 13,846 included findings that "financial, material, or technological support for,

or goods or services in support of, the National Iranian Oil Company (NIOC)" including services provided by any "person" who was "a part of the energy, shipping, or shipbuilding sectors of Iran"—all of which described NITC—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

293.    In 2020, Treasury confirmed that NITC, like NIOC, was an IRGC agent, and commercial transactions with NITC foreseeably enabled IRGC-sponsored terrorist attacks committed by IRGC proxies. On October 26, 2020, for example, OFAC designated NITC "for [its] financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he cooperation and coordination between the IRGC-QF and [NITC] extends well beyond the simple sale of oil," and the Treasury Secretary himself observed that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF"—*i.e.*, acts of terrorism targeting the United States, which was a required finding for the legal designation announced. Treasury justified the counterterrorism sanctions against NITC by observing that NITC services were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States by finding, *inter alia*, that: (1) "Senior … NITC personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF" through, *inter alia*, IRGC-controlled "front companies"; and (2) "NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on

logistics and pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group

representative Viyan Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the

shipment of millions of dollars of oil by NITC."

294.    Treasury's decision to not characterize NITC as an IRGC "agent or affiliate" 2012

was based on its narrow definition of "agent or affiliate," for which only direct agency mattered.

Treasury thus deemed NIOC an IRGC agent, but it did not deem NITC an IRGC agent. In

practice, however, transacting with NITC was no different than transacting with NIOC directly:

NITC was always a known NIOC agent, and NIOC was always NITC's only customer.

Accordingly, when Treasury declined to formally confirm that NITC was an IRGC "agent or

affiliate" for purposes of complying with an edict from Congress, SCB knew that such decision

did not authorize its NITC-related transactions because SCB understood that NITC was an agent

for NIOC and NIOC was an agent for the Qods Force and Hezbollah.

295.    The U.S. government statements confirming NITC's direct connection to IRGC

sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent

pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and

Hezbollah. These sources show that NITC was closely intertwined with terrorist violence

because the IRGC used revenues from NITC shipments, including but not limited to the profits

NITC itself realized as well as the income NITC helped other IRGC fronts, including NIOC,

earn, to finance terrorist attacks.

296.    Given NITC's status as a front for the Qods Force, Hezbollah, and such FTOs'

proxies, including Hamas, funds obtained by NITC through its or its controlled companies'

and/or investments' commercial transactions, resources, and profits inevitably flowed through

NITC to reach the Qods Force and Hezbollah and, through them, to Hamas and JAM, to finance

Hezbollah and the Qods Force's provision of fighters, funds, and weapons that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

297.    NITC was no longer a normal company by 2007, when the IRGC had completed its capture of NITC's only customer, NIOC, and the IRGC thereafter operated NIOC, and by extension NITC, to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### F.    Caspian Petrochemical FZE

298.    Caspian Petrochemical FZE, inclusive of its predecessor entity, Iranian Petroleum Company (collectively, "Caspian Petrochemical") helped ship petroleum products, including oil and gas, that IRGC energy fronts extracted from IRGC-controlled areas, including the IRGC's South Pars field and the IRGC's energy claims in the Caspian Sea. (Unless otherwise indicated, all references to Caspian Petrochemical in this Complaint are inclusive of its predecessor entity, and inclusive of such entity's conduct from at least 2007 through 2011, when the IRGC rebranded it as "Caspian Petrochemical.")

299.    Caspian Petrochemical was subordinate to the Supreme Leader's Office, via SLO entity Petro Nahad, and handled much of the Iranian regime's overseas oil and gas shipments.

300.    By no later than 2007, the SLO and IRGC seized Caspian Petrochemical's predecessor when they seized their monopoly in the Iranian energy sector. The SLO and IRGC have controlled Caspian Petrochemical as an IRGC front ever since. Since being seized by the SLO and IRGC, Caspian Petrochemical's express purpose has always been to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. From 2007 onwards,

Caspian Petrochemical was a known front for Hezbollah and the Qods Force (given Caspian Petrochemical's responsibility for shipping the IRGC's most lucrative financial asset). Hezbollah and the Qods Force relied upon Caspian Petrochemical to help finance acts of terrorism committed by Hezbollah, Hamas, and other IRGC proxies. Caspian Petrochemical was not a normal energy or shipping company: it was fully captured by the IRGC, and it supported the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the United States to export the Islamic Revolution.

301.    At all relevant times, Caspian Petrochemical provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas and JAM. Caspian Petrochemical did so by directing funds to the IRGC through a web of contracting arrangements with other IRGC businesses. Caspian Petrochemical's revenues thus flowed through to the IRGC, the Qods Force, and Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas).

302.    Caspian Petrochemical was never a normal company: it was fully captured by the IRGC, led by, and comprised of, avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

## V.    SCB Engaged In A Multi-Decade Illegal Scheme To Provide Banking Services To The IRGC And Its Fronts—Resulting In Over $2 Billion In Penalties

303.    SCB has long considered itself a "frontier bank" that was unafraid—indeed, eager—to pursue business opportunities in emerging markets that other large financial

institutions avoided due to reputational, regulatory, and geopolitical risks.[6] Consistent with
SCB's pursuit of such high-risk, high-reward opportunities, SCB for decades aggressively
pursued business in Iran and with Iranian companies and individuals doing business in nearby
countries, particularly the United Arab Emirates.

304.    The cornerstone of SCB's business strategy to grow its presence in the Middle
East was its willingness to offer customers U.S. dollar clearing services. U.S. dollar clearing is
the process by which U.S. dollar-denominated transactions are satisfied between counterparties
through a U.S. bank; payments are converted from a foreign currency into U.S. dollars.
Participation in global commerce depends on access to U.S. dollars and dollar clearing services.

305.    U.S. dollar clearing was particularly important to the Iranian government, Iranian
state-owned banks, IRGC front companies, and other Iranian businesses for several reasons.
First, the persistent weakness of Iran's currency, the Rial, led to a desire for access to a more
stable, globally accepted currency. Second, Iran's economy has long depended on exporting oil
and gas—a commodities market denominated primarily in U.S. dollars. Third, the IRGC and its
terrorist proxies have long depended on access to U.S. dollars to fund anti-American violence.

306.    After September 11th, the United States and most other Western nations markedly
expanded their anti-money laundering and anti-terror financing sanctions, while bolstering
related enforcement activities. As a result, Iran—and in particular its IRGC, which was the
principal target of many sanctions directed at Iran—became increasingly isolated from the
international financial community, and its access to U.S. dollars became constricted.

---

[6] Decl. of Robert G. Marcellus ¶ 39 ("Marcellus Decl."), *U.S. ex rel. Brutus Trading, LLC v.
Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-1.

307.    SCB saw this as a money-making opportunity. SCB knew that Iran—including its IRGC—needed access to U.S. dollars, and SCB was willing to facilitate that access. SCB was aware of the heightened regulatory scrutiny and risks associated with banking with Iranian entities. But SCB was not scared. To the contrary: SCB thought the heightened regulatory risks would discourage SCB's competition and allow SCB to monopolize the market—while extracting a higher premium for its U.S. dollar clearing services.

308.    From at least 2001 through at least late 2014 or early 2015, SCB engaged in a deceptive and illegal scheme to provide its Iranian customers with robust and largely unfettered back-door access to the U.S. financial system. In doing so, SCB violated U.S. sanctions and other laws and regulations—despite knowing, or at least being aware of a high probability, that several of its Iranian customers were agents and fronts for the world's most notorious terrorist group: the IRGC, including its Quds Force. SCB's sanctions-evasion scheme caused hundreds of millions—if not **billions**—to flow to these prohibited Iranian customers.

309.    That staggering sum is a conservative estimate. One former SCB employee-turned-whistleblower estimated, based on a forensic analysis of internal SCB data, that SCB's illicit U.S. dollar transactions with sanctioned Iranian customers totaling **tens of billions**.[7]

310.    SCB knew, or was at least deliberately ignorant of the fact, that its sanctions evasion would directly and indirectly benefit the IRGC and help finance anti-American terrorist attacks committed by the IRGC, including its Hezbollah branch, and its terrorist proxies,

---

[7] *See* Decl. of Julian M. Knight ¶¶ 2, 12, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.*, No. 18-cv-11117 (S.D.N.Y. May 31, 2024), Dkt. 105; *see also* Decl. of Julian M. Knight ¶¶ 40, 44, 67, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Jan. 10, 2020), ECF 48-2.

including Hamas. Those anti-American terrorist attacks included the ones that killed and injured Plaintiffs and their loved ones.

311.    SCB's culpable assistance to the IRGC lasted until at least late 2014 or early 2015, from which the Qods Force, Hezbollah, and their shared proxies Hamas and JAM continued to finance their terrorist attacks through at least 2018.

312.    SCB's conduct resulted in multiple criminal and civil proceedings that SCB settled by paying massive penalties to regulators, including the DOJ, OFAC, Federal Reserve, NYDFS, and the U.K. FCA.

313.    Between 2012 and 2019, SCB paid nearly $2 billion in forfeitures and penalties to U.S., New York, and United Kingdom authorities for the illegal conduct described herein. In evaluating SCB's conduct, those agencies described the bank's conduct as "intentional,"[8] its violations "egregious,"[9] and the bank itself as a "rogue institution"[10] whose persistent misconduct left the United States "vulnerable to terrorists."[11]

314.    SCB went to great lengths to disguise the magnitude of its sanctions-evasion efforts. Throughout the life of the scheme, SCB actively concealed its illegal conduct from governmental authorities in the United States and United Kingdom to keep its profits flowing—regardless of the cost in American lives.

---

[8] N.Y. State Dep't of Financial Services ("NYDFS"), *In re Standard Chartered Bank*, Consent Order Under New York Banking Law §§ 39, 44 ¶ 1 (Apr. 9, 2019) ("2019 NYDFS Consent Order").
[9] Office of Foreign Assets Control ("OFAC"), Settlement Agreement with Standard Chartered Bank ¶¶ 3,4 (Apr. 9, 2012) ("2019 OFAC Settlement").
[10] *See* 2019 Amended DPA ¶ 29 & SOF ¶ 2.t
[11] 2012 NYDFS Consent Order at 1.

**VI.    SCB's Scheme Involved Willful, Systemic, Company-Wide Efforts To Hide Its Provision Of Banking Services To The IRGC And Its Fronts**

315.    For more than a decade, SCB conspired with IRGC-affiliated clients to perform massive volumes of financial transactions for those clients in violation of the U.S. sanctions regime, and to conceal those transactions from U.S. and U.K. regulators via systematic stripping of Iran-related information from wire transactions, assisting Iranian customers' own efforts to evade sanctions and anti-terrorism controls, lying to government regulators, employing deliberately ineffective compliance regimes, and retaliating against whistleblowers who tried to expose or otherwise stop the scheme. Plaintiffs learned of the specific instances of misconduct below without access to SCB's files; discovery is likely to reveal additional examples of SCB's deliberate facilitation of U.S. sanctions evasion by IRGC fronts and affiliated customers similar to the ones alleged herein.

**A.    The OFAC Sanctions Regime**

316.    Financial transactions with Iran have been subject to U.S. economic sanctions since 1979. These measures were strengthened by Executive Orders in 1995, which set strict requirements for U.S. banks to follow in clearing U.S. dollar transactions involving Iran.[12]

317.    The sanctions regime aims to identify and block those who attempt to use the U.S. financial system in contravention of U.S. foreign policy, as well as foreign countries, entities, and individuals who may present a threat to national security. In particular, the sanctions are intended to prevent U.S. dollars from being used to finance terrorist organizations, proliferators of weapons of mass destruction, drug traffickers, and other hostile enterprises.

318.    The sanctions regime is primarily administered by OFAC. During all relevant periods, OFAC required U.S. financial institutions to filter and freeze all dollar clearing

---

[12] 2012 NYDFS Consent Order ¶ 13.

transactions involving sanctioned entities—including, as relevant here, Iranian entities—pending investigation.  Compliance with these requirements could (a) significantly delay transaction processing; (b) require that OFAC be advised of information surrounding a transaction; and (c) ultimately result in the rejection of a transaction.

319.    Until November 2008, OFAC rules permitted U.S. financial institutions, under limited circumstances and with close regulatory supervision, to process certain transactions for Iranian banks, individuals, and other entities.   These were called "U-Turn" transactions because such transactions originated and terminated with foreign banks, passing through U.S. banks as part of the clearing process. U-Turn clearing transactions, although legal, were subject to exceedingly stringent regulatory standards. For example, OFAC regulations required that "*[b]efore* a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, ***the United States depository institution must determine that the underlying transaction is not prohibited by this part***."[13]  The obligation to determine that a U-Turn complied with U.S. law thus fell squarely on U.S. clearing banks. In satisfying this obligation, U.S. clearing banks relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches. When such information was properly provided to clearing banks, it became available to law enforcement agencies to use in tracking suspicious conduct.[14]

320.    When an Iran-related wire transfer instruction did not provide sufficient information to determine that a potential U-Turn transaction was permissible under federal law, OFAC required that the assets be frozen until such information was provided to the U.S. bank or

---

[13] 31 C.F.R. § 560.516(c) (emphasis added).
[14] 2012 NYDFS Consent Order ¶ 15.

the U.S. bank rejected the transaction. If an Iranian transaction was not a permissible U-Turn, a U.S. bank could release the funds only if OFAC granted a special license.[15]

321.    By 2008 it was clear that this system had been abused, and that permitting U-Turns to continue could compromise U.S. national security. In November 2008, Treasury revoked authorization for U-Turn transactions because it suspected Iran of using its banks— including at least three of SCB's customers, discussed below—to finance its nuclear weapons and missile programs. The U.S. also suspected that Iran was using its banks to finance designated foreign terrorist organizations—including Hezbollah and Hamas—and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.[16]

### B.    SCB's Willful Subversion Of OFAC Sanctions

#### 1.    SCB's Systemic Wire Stripping

322.    Beginning no later than 2001, SCB programmatically engaged in deceptive and fraudulent misconduct to move **at least $250 billion** through the NY Branch on behalf of client Iranian financial institutions ("Iranian Banks") that were subject to U.S. economic sanctions, and then to cover up its transgressions. The Iranian Banks included at least CBI/Markazi, as well as Bank Saderat and Bank Melli, both of which were (and still are) Iranian State-owned

---

[15] 2012 NYDFS Consent Order ¶ 16.
[16] 2012 NYDFS Consent Order ¶ 17.

institutions.[17] All three of these banks have been sanctioned by the United States for their connections with the IRGC's anti-American terrorism.

323.    SCB conspired with the Iranian Banks to route nearly 60,000 different U.S. dollar payments through the NY Branch after first stripping data from wire transfer messages used to identify sanctioned countries, individuals and entities—a practice known as "wire stripping".[18]

324.    SCB ensured the anonymity of IRGC-related U.S. dollar clearing activities through the NY Branch by falsifying SWIFT wire payment directions.[19] When SCB employees reviewed transactions involving Iranian counterparties, they would strip the message of unwanted identifying data and replace it with false entries or return the payment message to the Iranian Bank for wire stripping and resubmission—a process that SCB, conscious of its illegality, euphemistically called "repairing" the wire.

325.    SCB utilized such schemes to "cloak the dollar clearing activities of Iranian [Banks]" and thereby "shield those transactions from regulatory scrutiny," ensuring  the automatic and unobstructed clearance of Iranian transactions in New York.[20]

326.    Although SCB executives identified the opportunity as early as 1995,[21] the scheme began in earnest no later than 2001, when CBI/Markazi approached SCB to act as its

---

[17] 2012 NYDFS Consent Order ¶ 1.
[18] 2012 NYDFS Consent Order ¶ 3. According to SCB's independent consultant, this figure represents about 30,000 messages that were sent to the NY Branch by SCB's London office, mainly on behalf of state-owned Iranian banks, and approximately 30,000 messages from SCB Dubai to the NY Branch on behalf of Iranian-owned banks, corporations and other unknown entities. *Id.* n.2.
[19] The Society of Worldwide Interbank Financial Telecommunications ("SWIFT") is a vehicle through which banks exchange wire transfer messages.
[20] 2012 NYDFS Consent Order ¶ 5.
[21] That year, SCB's  General  Counsel  embraced  a framework for regulatory evasion.  He strategized with SCB's regulatory compliance staff by advising that "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge

recipient bank for U.S. dollar proceeds from daily oil sales made by NIOC.  SCB viewed this engagement as "very prestigious" because "in essence, SCB would be acting as Treasurer to the CBI."[22]

327.    A "critical component" of the deal between SCB and CBI/Markazi was the timing of $500 million in daily U.S. dollar payments. A senior manager of SCB's Iranian business noted that "the most important aspect to CBI/Markazi of this relationship with SCB" was SCB's "willingness to pay away funds in advance of receipts (intraday of up to USD 200m)." He stressed that providing rapid U.S. dollar payments for CBI/Markazi "could lead to increased business activity with [other Iranian] banks."[23]

328.    In March 2001, SCB's Group Legal Advisor counseled several of SCB's officers that "our payment instructions [for Iranian Banks] should not identify the client or the purpose of the payment."[24]

329.    Indeed, the Iranian Banks apparently pressured SCB by warning that disclosure of their identities to U.S. banks would cause unacceptable delays in clearing funds. SCB well understood that "given that these are large wholesale sums they are worried by any delay." The Iranian Banks were concerned "not only [with] what delays would be caused by [the NY Branch], but also what delays could be caused by any other U.S. institution through which the payment was routed."[25]

---

of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCBLondons [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."  He also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."
2012 NYDFS Consent Order ¶ 20.
[22] 2012 NYDFS Consent Order ¶ 22.
[23] 2012 NYDFS Consent Order ¶ 23.
[24] 2012 NYDFS Consent Order ¶ 24.
[25] 2012 NYDFS Consent Order ¶ 25.

330.    SCB sought outside legal advice regarding its U-Turn policy and was apparently instructed that compliance with U.S. law required a process by which the NY Branch received "foreknowledge of such authorized [U-Turn] payments" so as to "otherwise ascertain that the payments are authorized." SCB was advised that its NY branch needed to "assure itself that it is making permissible payments."[26]

331.    Rather than install any such procedure, SCB succumbed to Iranian pressure—and the lure of profits. SCB conspired with the Iranian Banks to transmit misinformation to the NY Branch by removing and otherwise misrepresenting wire transfer data that could identify Iranian parties. For example, regarding necessary wire transfer documentation, SCB instructed CBI/Markazi to "send in their MT 202's"—a standardized SWIFT payment message for transfers between banks—"with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank." SCB also accomplished this subterfuge by: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of requested information that would identify the Iranian Banks; and (c) employing a system known as SCB's "repair procedure," whereby SCB overseas employees screened payment messages—before they were communicated to its NY branch—to ascertain whether any messages contained information that identified the Iranian Banks, and if so, remove it.[27]

332.    SCB understood that simply omitting Iranian client information on SWIFT MT 202 payment messages going to New York was insufficient because the electronic payment

---

[26] 2012 NYDFS Consent Order ¶ 26.
[27] 2012 NYDFS Consent Order ¶ 27.

system would automatically fill in blank data fields, identifying the Iranian Bank.  Consequently, to disguise the transactions effectively and thereby avoid regulatory scrutiny, SCB deliberately made false and misleading entries in SWIFT "field 52," a data field that would otherwise identify the Iranian party.[28]

333.    SCB documents show that its attorney in charge of Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance knew that "the process for effecting Bank Markazi's "payment instructions" was wire-stripping. He was specifically told that "field 52 (ordering institution) is quoted by Bank Markazi in their MT202  as [SCB London]" or SCB would manually "repair" or "over-type field 52 as [SCB London]."  He knew that these actions would leave "no reference to Bank Markazi," and would  thus "send[] incorrect information."[29]

334.    Senior SCB management memorialized many of these procedures in formal operating manuals. One such manual entitled, "Quality Operating Procedure Iranian Bank Processing," directed SCB's London-based employees to "repair payment[s] by making appropriate changes" to transacting party codes. It provided step-by-step wire stripping instructions for any payment messages containing information that would identify the Iranian Banks. An example directive read:  "[e]nsure that if the field 52 of the payment is blank or displays [sic] any  SWIFT code that it is overtyped at the repair stage to a '.'  This will change the outgoing field 52 on the MT103 to a field 52D of '.'  Or, in the case of a 'normal MT202 instruction change the field 52 on the outgoing MT202 to [SCB's New York branch] to a '.' (Note: if this is not done then the Iranian Bank SWIFT code may appear – depending on routing – on the payment message being sent to [the New York branch])."[30]

---

[28] 2012 NYDFS Consent Order ¶ 28.
[29] 2012 NYDFS Consent Order ¶ 29.
[30] 2012 NYDFS Consent Order ¶ 30 (brackets in original).

335.    The chief lawyer in charge of Legal & Compliance for SCB's Wholesale Bank division commented to other senior legal and compliance staff that the document, "read in isolation, is clearly . . . designed to hide, deliberately, the Iranian connection of payments."[31]

336.    These masking procedures evolved to meet SCB's growing volume demands. When SCB anticipated that its business with the Iranian Banks would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.[32]

337.    As SCB vigorously cultivated U.S. dollar clearing business from the Iranian Banks, SCB's outside counsel continuously admonished SCB to not evade regulatory requirements. In 2003, one of SCB's outside legal counsel in the U.S. warned that the bank's system for executing U-Turns anonymously through the NY Branch did "not comport with the law or the spirit of OFAC rules, which lay out explicit details on how such transactions are to be conducted." She further instructed that "OFAC insists on full disclosure of all parties in transactions to ensure that transactions meet the terms of the rule."[33]

338.    Prompted by this guidance, one SCB executive observed that, "historically, [for Iranian U-Turns] we have not transparently declared the remitting/receiving entity details, and of course this past practice makes it harder for internal and external parties to accept our views now." An executive SCB compliance attorney made the point more sharply, observing that

---

[31] 2012 NYDFS Consent Order ¶ 31.
[32] 2012 NYDFS Consent Order ¶ 32.
[33] 2012 NYDFS Consent Order ¶ 33.

SCB's London staff believed "that any payment that could conceivably give rise to an OFAC problem should always be dealt with [in a way to avoid detection]."[34]

339.    Beginning in 2003, other banks with significant Iran portfolios began exiting the U-Turn business. For instance, SCB's business managers learned that Lloyds TSB London was "withdrawing their services" with one of its Iranian client banks "primarily for reputational risk reasons."[28] Rather than follow suit, and despite concerns regarding reputational risk and OFAC sanctions, SCB positioned itself to take the abandoned market share.[35]

340.    As described in a December 2005 internal memorandum written by the CEO of SCB's United Arab Emirates region and the Group Head of Compliance and Regulatory Risk, SCB's "short to medium term strategy [was] to grow the wholesale business by growing our wallet share from existing relationships with Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."[36] That memorandum, entitled *Project Gazelle, Report on Iranian Business*, was circulated among SCB's key legal, compliance, and Iranian client business managers.

341.    Consistent with its historical views, SCB apparently decided that regulatory compliance would impede any such business expansion. Summarizing the bank's linchpin consideration, SCB's chief legal and compliance officer for its wholesale banking business explained that SCB wire stripped because "there would be a delay in the OFAC que [sic] if an Iranian name was spotted by the OFAC filter in New York and the payment would get held up."

---

[34] 2012 NYDFS Consent Order ¶ 34.
[35] 2012 NYDFS Consent Order ¶ 35.
[36] 2012 NYDFS Consent Order ¶ 36.

Any such delay, he concluded, would be "a deal-breaker" in SCB's efforts to develop new business with Iranian entities.[37]

342.    To avoid such deal-breakers, SCB instituted a system of so-called "offshore OFAC due diligence."  The entire concept was a sham. Any offshore substitute for OFAC compliance would have necessarily caused the exact delay threatened by OFAC compliance at the NY Branch. Under the law governing at the time, any legitimate due diligence was premised on investigative delay. SCB undertook its offshore due diligence program, however, specifically to escape OFAC's watchful eye, not to be examined by it.[38]

343.    SCB's overseas due diligence staff members were responsible for both SCB's U-Turn "repair procedures" and OFAC "compliance"—a paradoxical task to say the least. SCB personnel did not know the elements of a lawful U-Turn transaction other than that the payment "had to be offshore to offshore," and they were not trained to determine whether the underlying transactions were valid according to the Iranian Trade Regulations. In fact, as late as August 2006, SCB's operations staff still "resolve[d] 'hits' on sanctioned names *directly with the customer*"—a method designed to facilitate, not prevent, client misconduct.[39]

344.    Senior SCB management knowingly embraced the bank's fraudulent U-Turn procedures with full awareness that (as one internal report put it) "the current process under which some SWIFT messages are manually 'repaired' to remove reference to Iran could . . . be perceived by OFAC as a measure to conceal the Iranian connections from [the NY Branch], and therefore evade their controls for filtering Iranian related payments. Unless transactions are repaired they face delays caused by investigations in the U.S. banking system, subjecting SCB to

---

[37] 2012 NYDFS Consent Order ¶ 37.
[38] 2012 NYDFS Consent Order ¶ 38.
[39] 2012 NYDFS Consent Order ¶ 39 (emphasis added).

interest claims."[40]   An SCB executive described SCB's repair procedures as a "process to check that a payment is, prima facie, an acceptable U-turn transaction (*i.e.* offshore to offshore)," and fully acknowledged that  "they do not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."[41]

345.    The executive's concern was prophetic. Multiple regulatory and law enforcement agencies concluded that SCB's conduct posed serious sanctions risks, interfered with their ability to perform  effective safety and soundness examinations, and prevented them from identifying suspicious activity that could assist them in effectively supervising other licensed institutions and from assisting other law enforcement authorities.

346.    SCB's systemic misconduct was the basis for the violations of law set forth in SCB's 2012 DPA with DOJ and the 2012 NYDFS Consent Order—in connection with which SCB paid more than $550 million in penalties and forfeitures.

347.    As NYDFS concluded: "SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped sustain a global threat to peace and stability."[42]

### 2.    After Being Penalized For Wire-Stripping, SCB Lied To Regulators About Winding-Down Its Iran Business

348.    In the settlement agreements that resolved investigations into SCB's rampant wire-stripping and evasions of Iran sanctions, SCB represented that it had exited its Iran business as of 2007. In its 2012 DPA with DOJ, for example, SCB professed that, given the potential for

---

[40] 2012 NYDFS Consent Order ¶ 21.
[41] 2012 NYDFS Consent Order ¶ 21 (emphasis removed).
[42] 2012 NYDFS Consent Order at 22 ("Conclusion").

"very serious or even catastrophic reputational damage" "and/or serious criminal liability," SCB "made the decision to *exit the Iranian business*" in October 2006.[43] SCB claimed to have "ended" its "U.S.-dollar clearing activity for all the Iranian banks" by March 2007.[44] And SCB claimed that "[f]rom August 2007, SCB *suspended* all new Iranian business in any currency."[45]

349.    Not only that, but SCB also claimed that as part of its efforts to remediate its decade-long sanctions evasion, SCB had also "taken voluntary steps to enhance and optimize its sanctions compliance programs"—including by "*[t]erminating relationships with sanctioned banks and entities* and closing its Iranian representative office and branch," "[s]ubstantially increasing personnel and resources devoted to sanctions compliance," and "[e]nhancing its global sanctions compliance policies and procedures, including a *general prohibition* on new transactions on behalf of U.S. designated terrorists … or WMD proliferators in all currencies."[46]

350.    Criminal and regulatory investigations—by DOJ, OFAC, NYDFS, and the U.K. FCA—revealed that SCB's stated commitment to winding-down its Iran business in 2007 was a lie. From 2008 through at least 2014 or early 2015, SCB *continued* to actively assist individuals and entities connected to Iran—including agents and fronts for the IRGC—evade sanctions.[47] SCB's culpable assistance to the IRGC lasted until at least late 2014 or early 2015, from which

[43] Deferred Prosecution Agreement ¶¶ 101-102, *U.S. v. Standard Chartered Bank*, No. 12-cr-262 (D.D.C. Dec. 10, 2012), ECF 2 (emphasis added) (hereinafter, "2012 DPA").
[44] 2012 DPA ¶ 103.
[45] 2012 DPA ¶ 104 (emphasis added).
[46] 2012 DPA ¶ 107 (emphasis added).
[47] Allegations from whistleblowers further undercut SCB's representations that it had exited its Iran business in 2007. *See* Marcellus Decl. ¶ 21; *see id.* ¶ 17 (describing post-2007 invitations from SCB Dubai employees to "meet[] some of SCB's Iranian customers . . . in Iran"); *id.* ¶¶ 25-26 (identifying an "enormous volume of transactions by SCB with Iranian persons after 2007" on SCB transaction spreadsheets).

the Qods Force, Hezbollah, and their shared proxies Hamas and JAM continued to finance their attacks through at least 2018.

351.    Indeed, as one whistleblower put it, SCB's "representations denying Iranian business to the US authorities in 2012 were likely completely false."[48]

### 3.    SCB Dubai Knowingly Helped IRGC Fronts Evade Iran-Related Counterterrorism Sanctions And Controls

352.    Despite SCB's purported commitment to winding down business with Iran-linked customers, SCB—particularly SCB Dubai—continued to knowingly help its IRGC front customers evade Iran-related counterterrorism sanctions and controls.

353.    SCB Dubai was a rogue financial institution. Several employees worked closely with IRGC agents and fronts to help them evade U.S. sanctions on Iran. SCB Dubai employees coached their customers on how to avoid suspicion, lied to compliance officials and other banks about the fronts' Iran connections, and even helped open new accounts to help fronts for the Qods Force, Hezbollah, and their proxies escape detection.

354.    Beyond that, SCB Dubai permitted sanctioned IRGC-affiliated parties to transact in U.S. dollars by offering virtually unregulated access to fax-based and internet-based banking services. When it became clear that these fax and internet services were being used to evade sanctions, SCB Dubai refused to implement simple technical fixes that would have cut off Iranian customers' access.

355.    SCB Dubai's actions caused at least ***hundreds of millions*** of U.S. dollars to flow through the U.S. financial system to IRGC agents and fronts.

---

[48] Marcellus Decl. ¶ 21.

a.  **SCB Dubai Helped IRGC Front Caspian Petrochemical FZE Access the U.S. Financial System to Finance IRGC Operations**

356.    Throughout the relevant period, SCB Dubai employees consciously and culpably helped IRGC agents and fronts evade U.S. sanctions on Iran.[49]

357.    As one example, SCB "process[ed] a significant volume of [U.S. dollar] payments" for "a front company for a prohibited Iranian entity"—an "Iranian petrochemical company in the business of shipping liquefied petroleum gas."[50] That "Iranian petrochemical company" was IRGC front Caspian Petrochemical FZE (inclusive of its predecessor), for which SCB served as a key banker from at least 2007 through at least 2012.

358.    NYDFS discovered that, between November 2008 and June 2012, SCB "processed more than $150 million in incoming and outgoing [U.S. dollar] transactions" for Caspian Petrochemical. The "majority" of those transactions "were transmitted through the [NY] Branch."[51] OFAC's investigation corroborated those findings.[52]

359.    SCB Dubai willfully helped Caspian Petrochemical conduct "prohibited business" through both active assistance and "glaring compliance deficiencies."[53]

360.    SCB knew that Caspian Petrochemical's account was connected to Iran. Caspian Petrochemical's sole beneficial owner was an Iranian national who (falsely) represented that

---

[49] *See* 2019 Amended DPA ¶¶ 18-32.
[50] 2019 NYDFS Consent Order ¶ 30.
[51] 2019 NYDFS Consent Order ¶ 31.
[52] 2019 OFAC Settlement ¶7 ("SCB Dubai maintained an account for the petrochemical company, a company owned by an Iranian national ordinarily resident in Iran, which engaged in the sale of petroleum products to, from. or through Iran. Following OFAC's revocation of the U-Tum authorization on November 10, 2008, SCB, beginning no later than June 27, 2009, and, continuing through June 24, 2012, processed 190 transactions totaling $151,269,725 to or through the United States that were for or on behalf of the petrochemical company—the benefit of which services were received in Iran—in apparent violation of § 560.204 of the [Iranian Transactions and Sanctions Regulations].").
[53] 2019 NYDFS Consent Order ¶¶ 32-33, 37.

Caspian Petrochemical was being operated from Dubai.[54] Nonetheless, as OFAC found, SCB "maintained an account relationship for [Caspian Petrochemical] even though it had information in its possession regarding [Caspian Petrochemical]'s Iranian ownership and business-related activities, and despite numerous warning signs over a period of several years regarding [Caspian Petrochemical]'s Iranian connections, including direct communications with [Caspian Petrochemical], the receipt of emails and faxes from Iranian companies and/or telephone numbers, and the rejection of transactions involving [Caspian Petrochemical] by U.S. financial institutions."[55]

361.    SCB Dubai performed illicit and atypical banking services for Caspian Petrochemical. An SCB Dubai employee, for example, coached Caspian Petrochemical on how to evade sanctions.[56] As documented by NYDFS, an SCB employee explained that Caspian Petrochemical could "evade detection as a sanctioned entity": "*if you change the company name then we can reopen another account with Standard Chartered.*"[57]

362.    Moreover, when originating transactions for Caspian Petrochemical, SCB Dubai employees stripped references to Iran in transmittal references. "Although the payment messages that SCB Dubai processed to or through the United States involving the petrochemical company identified the company by its name, they did not include references to Iran, the petrochemical company's Iranian ownership, or any affiliated Iranian entities."[58] As a result of SCB Dubai's transmission of stripped or misleading payment messages, "[m]ost of the transactions originated

---

[54] 2019 NYDFS Consent Order ¶ 31.
[55] 2019 OFAC Settlement ¶ 8.
[56] This was a "different relationship manager" from the one who coached Elyassi. 2019 NYDFS Consent Order ¶ 37.
[57] 2019 NYDFS Consent Order ¶ 37.
[58] 2019 OFAC Settlement ¶ 16.

by SCB Dubai on behalf of the petrochemical company were processed successfully and reached their intended beneficiary."[59]

363.    SCB even lied to OFAC on behalf of Caspian Petrochemical when it attempted a transaction. In April 2010, another global financial institution, acting as a beneficiary bank, rejected a large U.S. dollar payment processed by SCB on behalf of the petrochemical front company. The other bank told the NY Branch's compliance staff that its rejection was based on its own research; it found the front to be an Iranian entity and warned the NY Branch that it had "contacted OFAC, and was advised by OFAC to reject [USD] payments" from SCB's front customer.[60] The NY Branch transmitted these warnings about to Caspian Petrochemical to the Senior U.K. Sanctions Officer "immediately"—but he "*did nothing*."[61]

364.    Following the rejected payment, an operational risk manager at SCB Dubai researched Caspian Petrochemical. The manager found, through a simple Google search, that Caspian Petrochemical's customer was an Iranian entity. The manager determined that Caspian Petrochemical's sole beneficial owner was an Iranian national whose UAE visa had expired two years earlier, and a document in Caspian Petrochemical's account file from 2008 confirmed that its representative office was in Tehran. The operational risk manager conveyed his findings to SCB Dubai's senior AML officer and warned that he "strongly believe[d] that the subject customer is an Iranian."[62]

365.    The senior AML officer, in turn, escalated the findings to the senior U.K. sanctions officer. That senior U.K. officer, however, "rejected this warning" and "allow[d] the

---

[59] 2019 OFAC Settlement ¶ 16.
[60] 2019 NYDFS Settlement ¶ 32 (brackets in original); *see* 2019 OFAC Settlement ¶ 18.
[61] 2019 NYDFS Settlement ¶ 32 (emphasis in original).
[62] 2019 NYDFS Settlement ¶ 32.

payment to be made by relying on an undocumented" denial of any link between Caspian Petrochemical and Iran.[63] The U.K. officer also ignored a fax communication located in Caspian Petrochemical's account file that contained correspondence from Iran. The fax, sent to the Bank in September 2011, bore Iran's country prefix (+98).[64]

366.    Despite the mountain of evidence to the contrary, SCB proceeded to (falsely) represent to OFAC that Caspian Petrochemical had "no direct or indirect involvement with Iran."[65] SCB "inexplicably" gave Caspian Petrochemical the "benefit of the doubt" and "allowed it to continue conducting business through the Bank – including transactions processed through the New York Branch."[66]

367.    Thus, despite the numerous payments rejected by other U.S. financial institutions involving Caspian Petrochemical, as well as the concerns raised internally within SCB regarding Caspian Petrochemical's Iranian ownership and connections—"both SCB Dubai and SCB NY continued to process [U.S. dollar] payments on the company's behalf."[67]

368.    In total, following SCB's lie to OFAC, "SCB Dubai and SCB NY processed 133 funds transfers totaling $140,310,539 that were for or on behalf of the petrochemical company to or through the United States in apparent violation of the [Iranian Transactions and Sanctions Regulations]."[68] That "petrochemical company" was Caspian Petrochemical, and the above-described transactions directly and indirectly flowed at least tens of millions of dollars each year to the Qods Force, Hezbollah, Hamas, and JAM.

---

[63] 2019 NYDFS Settlement ¶ 32.
[64] 2019 NYDFS Settlement ¶ 32.
[65] 2019 OFAC Settlement ¶ 24.
[66] 2019 NYDFS Settlement ¶ 32.
[67] 2019 OFAC Settlement ¶ 25.
[68] 2019 OFAC Settlement ¶ 25.

369.    At bottom, SCB's decision to continue to process payments for Caspian

Petrochemical was a "significant compliance failure" by SCB that directly assisted the IRGC and

its proxies; as NYDFS found, however, "this series of events was not isolated."[69]

###    b.  SCB Dubai Helped IRGC Agent Mahmoud Reza Elyassi Access
       the U.S. Financial System to Fund IRGC Operations

370.    Another example of SCB's knowing provision of banking services to the IRGC

involved an Iranian national—and, as explained in Part VII.B *infra*, likely IRGC agent—named

Mahmoud Reza Elyassi. He was indicted by the DOJ in 2019 for evading sanctions on Iran,

aided by SCB Dubai employees.[70] Since Elyassi's indictment, he has escaped prosecution.

371.    From late 2006 through at least September 2011, Elyassi controlled multiple

companies that held accounts with SCB Dubai. The Amended DPA and Elyassi's indictment

highlight two such companies, identified by the United States as Company C-1 and Company

C-2.[71] The Complaint adopts the Government's terminology.

372.    Company C-1 and Company C-2 were "general trading companies" that were

used as "fronts" for a "money exchange business located in Mashhad, Iran," in order to "provide

services to Iranian individuals and companies seeking to conduct U.S. dollar transactions through

the United States in violation of U.S. economic sanctions."[72]

373.    Between November 2007 and August 2011, SCB "willfully" and illegally

processed approximately 9,500 dollar-denominated transactions through the United States,

---

[69] 2019 NYDFS Settlement ¶ 33.
[70] *See generally* Indictment, *U.S. v. Elyassi*, No. 19-cr-117 (D.D.C. Apr. 5, 2019), available at: https://www.justice.gov/d9/press-releases/attachments/ 2019/04/11/elyassi_indictment_filed_0.pdf ("Elyassi Indictment").
[71] SOF ¶ 10; Elyassi Indictment ¶ 1. These companies are referred to as Company A and Company B, respectively, in the 2019 OFAC Settlement. *See* 2019 OFAC Settlement ¶ 31.
[72] Elyassi Indictment ¶ 12.

including through the NY Branch, for Company C-1 and Company C-2.[73] Those transactions

totaled approximately $240 million.[74]

374.    SCB employees helped Elyassi consummate these illegal transactions. At all

relevant times, at least two SCB Dubai employees—a Relationship Manager (Person A) and a

Treasury Sales Manager (Person B)—worked closely with Elyassi to provide him access to the

U.S. financial system and U.S. dollars.[75] At all relevant times, these employees were acting

within the scope of their employment for SCB, *i.e.*, performing the role they were hired to

perform, for the type of customer SCB Dubai was happy to have.[76]

375.    SCB knew that Elyassi and his companies were linked to Iran and operated in

industries known to be dominated by the IRGC. *See infra* Part VII.B. SCB's records were replete

with evidence that confirmed the connection: (a) SCB's banking system listed Elyassi as an

Iranian person and contained both UAE and Iranian contact information for him—including

telephone and fax numbers that began with Iran's country code prefix (+98); (b) SCB's records

contained a copy of Elyassi's Iranian passport; (c) SCB's records contained a Know Your

Customer ("KYC") form for Company C-1 from 2007 stating that the company had a facility in

Iran and exported materials from Iran to various countries; (d) contact information for Company

C-1 in SCB's records included at least two Iranian phone numbers (as evidenced by +98 country

code prefix); and (e) SCB Dubai personnel recorded phone calls in 2008 between Elyassi and his

---

[73] SOF ¶ 31.
[74] SOF ¶ 31.
[75] Amended DPA ¶¶ 8-9 (referring to Relationship Manager as "Person A" and Treasury Sales Manager as "Person B"); *see also* Elyassi Indictment ¶¶ 3-4.
[76] SOF ¶ 30.

Treasury Sales Manager at SCB (Person B), during which Elyassi admitted that he was based in Iran and invited the Treasury Sales Manager to visit him there.[77]

376.    Knowledge of Elyassi's Iran connections was not cabined to these two employees, however. Several SCB employees knew that Elyassi's businesses were operated from Iran and conducted U.S. dollar transactions through the United States for the benefit of Iranian entities. Moreover, SCB employees knew that several outgoing payments made from Company C-1 in 2008, 2010, and 2011 (which SCB did not block) were rejected by beneficiary and correspondent banks due to Company C-1's Iranian connections.[78]

377.    SCB did not respond to this information by severing its relationship with Elyassi and his companies. Instead, SCB employees also *actively facilitated* Elyassi's malfeasance by showing him how to navigate the bank's processes to avoid further detection. Thus, the SCB Dubai employees executed illicit U.S. dollar transactions for Elyassi's companies by providing "false and misleading information" to "disguise [Elyassi's] Iranian connections."[79]

378.    In August 2008, for example, in response to an internal compliance inquiry, the Relationship Manager (Person A) falsely stated that Company C-1 operated exclusively in the UAE—even though that was materially false, and even though SCB's KYC form confirmed that Company C-1 operated out of Iran.[80] And when "other financial institutions rejected payment requests from SCB on behalf of Company C-1 and Company C-2," the Relationship Manager

---

[77] SOF ¶ 24; *see* 2019 OFAC Settlement ¶¶ 34-35.
[78] SOF ¶ 25; 2019 OFAC Settlement ¶ 33 ("Several U.S. banks rejected or returned payments initiated from Company A's account with SCB Dubai as early as July 2008.").
[79] SOF ¶ 26.
[80] SOF ¶ 26.

(Person A) and the Treasury Sales Manager (Person B) helped "conceal the transactions' Iranian connections through lies and omissions."[81]

379.    In December 2010, after "numerous payment requests" involving Company C-1 were "stopped" due to "Iranian sanctions concerns," SCB decided to exit its banking relationship with Company C-1.[82]

380.    But before Company C-1's accounts were closed, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "helped [Elyassi] open a new business account under a new name, Company C-2, so that [Elyassi] could continue conducting U.S. dollar transactions through the United States without suffering similar rejections."[83]

381.    SCB Dubai thus employees "knew" that Elyassi controlled Company C-2 in all meaningful respects, even though "a non-Iranian co-conspirator of [Elyassi] was the nominal owner."[84] Indeed, SCB's account records for Company C-2 identified Elyassi "as an authorized signatory/dealer on Company C-2's account," and "[d]ocuments contained in SCB's records also show[ed] that much of the contact information (telephone number, mobile phone number, fax number, and mailing address) for Company C-2 was the same as Company C-1."[85]

382.    SCB thus ensured that Elyassi had unfettered access to SCB-facilitated U.S. dollar transactions: Company C-2's account with SCB Dubai was opened "on or about February 14, 2011, and Company C-1's account with SCB Dubai was closed on or about February 13, 2011."[86]

---

[81] SOF ¶ 26.
[82] SOF ¶ 27.
[83] SOF ¶ 27.
[84] SOF ¶ 27.
[85] SOF ¶ 27.
[86] SOF ¶ 27.

383.    After opening Company C-2's account, SCB Dubai employees coached Elyassi "on how to structure financial transactions that would not raise suspicion of an Iranian connection or other illegality."[87]

384.    On or about March 9, 2011, for example, in a telephone call recorded by SCB Dubai, the Relationship Manager (Person A) told Elyassi "not to send payments to Iranian individuals directly from Company C-2's account, but rather, to have a co-conspirator transfer the funds from Company C-2's account to his personal account at SCB Dubai and then send the payments to the Iranian individuals in order to avoid having Company C-2's account closed."[88] The Amended DPA reflects the following transcribed conversation between Elyassi (Person C) and the Relationship Manager (Person A):

> Person A:  "I am telling you once these go there will be no next time then you'll come back and they will say we will need to close the account [be]cause now even one payment is going [to an individual who] is Iranian."
>
> Person C:  "Mm"
>
> Person A:  "[The payment] will be stuck.  And once it is stuck . . . then you will come to me when no no don't close the account then nothing left and I am telling you."
>
> Person C:  "Mm"
>
> Person A:  "[The second individual payee] is Iranian, I know [the third individual payee] is Iranian, [and the first individual payee] is Iranian."
>
> Person C: "Mmm how we can do this?"

---

[87] SOF ¶ 27; *see* 2019 OFAC Settlement ¶ 41 ("In or around this time, the [Relationship Manager] held several phone calls with [Elyassi] regarding these transactions. The [Relationship Manager] appears to have referenced prior discussions in which he had coached [Elyassi] how to process certain types of transactions.").
[88] SOF ¶ 28.

Person A: "I am telling you, ask ask [co-conspirator] to transfer funds from [Company C-2's account at SCB-Dubai] to his personal account [at SCB-Dubai]. From [his] personal account he can make these five payments."[89]

385.    It was not until September 2011 that SCB Dubai closed Company C-2's account "due to sanctions concerns."[90] Before closing the account, however, SCB Dubai "processed 210 [U.S. dollar]-denominated funds transfers to or through the United States based on payment instructions it received from Iran."[91]

386.    At all times, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "willfully engaged in this misconduct knowing that it was in violation of U.S. law"—all to "generate revenue for SCB."[92]

### c.  SCB Dubai Helped Other IRGC Agents and Fronts Access the U.S. Financial System to Finance IRGC Operations

387.    SCB Dubai's misconduct extended beyond the petrochemical front company and Elyassi's companies. Documents that resolved investigations into SCB either state directly or permit the reasonable inference that SCB Dubai employees helped additional IRGC agents and fronts to evade U.S. sanctions.

388.    Throughout the relevant period, SCB had—as the U.K. FCA put it—a "culture" problem, where SCB Dubai employees were "colluding to evade controls and knowledge by other [SCB] employees of accounts operated for financial sanctions evasion."[93] SCB Dubai's "compliance infrastructure" was "woefully inadequate" and "no match for even unsophisticated evasion efforts."[94]

---

[89] SOF ¶ 28.
[90] SOF ¶ 28.
[91] 2019 OFAC Settlement ¶ 42.
[92] SOF ¶ 30.
[93] 2019 U.K. FCA Decision Notice § 5.16.
[94] 2019 NYDFS Consent Order ¶ 43.

389.    SCB admitted as part of the 2019 Amended DPA that multiple SCB Dubai employees "willfully conspired with *several people and entities* to help Iran-connected customers of SCB Dubai conduct U.S. dollar transactions and cause U.S. financial services to be exported to Iran through SCB."[95] That included assisting "Iranian nationals located in Dubai" who were opening "commercial bank accounts" for "commercial entities" that "were fronts for Iranian businesses."[96]

390.    OFAC, similarly, explained that, in "*several instances* two employees within SCB Dubai—including a Relationship Manager associated with *several general trading company accounts*—actively worked with the account holders to obfuscate the sanctions nexus associated with the parties and/or their transactions . . . ."[97] Those SCB Dubai employees "conspired with other Iran-connected individuals and business organizations during their employment with SCB Dubai during much of the same period and using many of the same tactics as they used with [Elyassi]."[98]

391.    The U.K. FCA echoed that conclusion: "Two employees in SCB's UAE branches had, in fact, colluded with customers in order to evade financial sanctions against Iran,"[99] and other "SCB employees in the UAE were aware that accounts were opened for financial sanctions evasion purposes."[100]

392.    It is clear SCB's bad behavior extended beyond assisting the petrochemical front company and Elyassi to evade sanctions. NYDFS confirmed as much in the Consent Order.

---

[95] SOF ¶ 22.
[96] SOF ¶ 22 (emphasis added).
[97] 2019 OFAC Settlement ¶ 31.
[98] SOF ¶ 29 (emphasis added).
[99] 2019 U.K. FCA Decision Notice § 4.84.
[100] 2019 U.K. FCA Decision Notice § 4.84.

NYDFS found that SCB Dubai employees had warned "***another*** Iranian front company's owner" to close its account before SCB reported it as suspicious: "before [the Bank] report[s] to [the local bank regulator] ... please can you send me a closure notice before [the Bank] raise question on you?"[101]

393.    SCB Dubai's flagrant Iran-related misconduct permeated SCB's provision of financial services in Dubai from at least the early 2000s through at least late 2014 or early 2015. SCB Dubai helped one or more other IRGC agents launder at least several million dollars on behalf of IRGC and SLO money through at least late 2014 or early 2015, including in connection with oil trades.

394.    Thus, throughout the relevant period, there was a pattern of malfeasance at SCB Dubai. And SCB Dubai employees knew at the time of their misconduct that they were violating U.S. and U.N. sanctions, and other laws, that were specifically designed to thwart violent IRGC-sponsored terrorist attacks—all while acting within the scope of their employment for SCB.[102]

### 4.    SCB Allowed IRGC Agents And Fronts To Access The U.S. Financial System Through SCB Dubai's "Right Fax" System

395.    SCB allowed IRGC agents and fronts to transact in U.S. dollars by allowing Iran-based customers to fax payment instructions to SCB Dubai using the latter's "Right Fax" system—with virtually no oversight.

396.    In late 2009, a Senior SCB Dubai AML Officer discovered that the Right Fax system could facilitate U.S. dollar payments initiated by Iran-based entities.[103]  SCB knew this risk: Faxed payment instructions frequently bore a digital header containing the originating fax machine's telephone number, which—in Iran's case—would include the "+98" Iranian

---

[101] 2019 NYDFS Consent Order ¶ 36 (emphasis modified).
[102] SOF ¶ 30.
[103] 2019 NYDFS Consent Order ¶ 36.

country code.[104] In other words, the face of the fax made clear it was sent from Iran. Upon

making this discovery, SCB Dubai's Senior AML Officer alerted nearly all sanctions and

compliance managers responsible for the UAE region—including SCB's senior U.K. sanctions

officer—to advise: "[w]e can receive [payment] instructions via [R]ight [F]ax ... *a check will*

*have to be done here [to discover] whether these fax numbers begin with the Iran [country]*

*code +98.*"[105]

397.    Even though this entire issue could have been addressed simply by checking the

country codes on originating fax numbers, SCB Dubai chose instead to look the other way. Thus,

when a senior SCB Dubai AML officer proposed a policy that would screen for faxed requests

sent from Iran, SCB business staff refused to implement it.[106] As a result, use of the Right Fax

system by IRGC fronts and agents continued to go unmonitored and unabated.[107] Other attempts

to prevent sanctioned Iranian entities from using Right Fax were similarly shot down,[108] despite

the "high risk" involved in customers "sending payment instructions from Iran."[109]

398.    The Right Fax system remained available for effectuating illegal payments from

Iran until as late as May 2014.[110] This resulted in the bank processing **tens of millions** of U.S.

dollar transactions for hundreds of Iranian entities. OFAC's investigation "identified 11,809

faxed payment instructions from 176 distinct SCB Dubai customers, all of which were corporate

---

[104] 2019 NYDFS Consent Order ¶ 36.
[105] 2019 NYDFS Consent Order ¶ 24.
[106] *See* 2019 NYDFS Consent Order ¶ 25.
[107] *See* 2019 NYDFS Consent Order ¶¶ 26-28.
[108] *See* 2019 NYDFS Consent Order ¶¶ 26-28.
[109] 2019 U.K. FCA Decision Notice § 4.119.
[110] *See* 2019 NYDFS Consent Order ¶ 28. SCB's inexplicable delay was not due to any technical complexity; once SCB began the process to block such fax transmissions in May 2014, it took less than a week to fully implement. *See* 2019 NYDFS Consent Order ¶ 29.

or commercial entities."[111] At its "peak" in August 2010, "the number of faxed payment

instructions received by SCB's UAE branches in a single month from Iran[] reached 635."[112]

399.    While SCB has not revealed the full roster of sanctioned Iranian entities that used

its Right Fax system, U.S. regulators found that Elyassi's front companies (Company C-1 and

Company C-2), standing alone, used Right Fax to "request more than $104 million in U.S. dollar

transactions from SCB Dubai,"[113] and his companies "generated the majority of the transaction

volume" resulting from faxed-payment requests from Iran.[114]

### 5.    SCB Allowed IRGC Agents And Fronts To Access The U.S. Financial System Through Its Online Banking Platforms

400.    Through its "iBanking" and "Straight-to-Bank" (or "S2B") online banking

platforms, SCB permitted customers in Iran to originate U.S. dollar-denominated transactions—

"despite multiple supervisory and management personnel [at SCB] in various business lines

having actual knowledge of, and having discussions pertaining to, the sanctions risks associated

with these specific products and services."[115]

401.    As early as May 2010, SCB compliance officials knew that Iranian entities were

using SCB's online platforms to evade sanctions.[116] As a senior SCB AML officer in Dubai

wrote to colleagues: "the added risk that we have to live with that if the transactions were

originated through iBanking [where] ***there is no way of us knowing whether the issuer of such***

***transactions was in Iran*** when he [e]ffected [the payment]."[117]

---

[111] 2019 OFAC Settlement ¶ 29.
[112] 2019 U.K. FCA Decision Notice § 4.77.
[113] SOF ¶ 33.
[114] 2019 OFAC Settlement ¶ 31.
[115] 2019 OFAC Settlement ¶ 44.
[116] SOF ¶ 35.
[117] 2019 NYDFS Consent Order ¶ 16 (emphasis modified)

402.     This was not an isolated warning. Over the next two years, SCB compliance officers repeatedly alerted senior SCB personnel—including a senior financial crime risk officer for the UAE, a senior sanctions officer in the United States, and a senior member of SCB's executive management team who reported directly to the CEO—that SCB was at risk of "***infiltration by Iranian parties*** through its online banking platform."[118] Despite those known risks, SCB allowed Iranian customers to continue to use these online banking systems.

403.     SCB's decision to allow continued online banking from Iran was deliberate. SCB's information technology personnel discovered a technical fix that could block IP addresses from Iran.[119] But "business" personnel at SCB scuttled that initiative.[120] SCB determined to ***not*** implement such a block—instead, it "proceeded 'in a business-as-usual' fashion, undertaking a sluggish effort to persuade business managers to implement blocking of access to the S2B platform from IP addresses located in Iran."[121] Yet again, SCB prioritized profits—and the customer experience of IRGC agents and fronts—over compliance with U.S. laws.

404.     Moreover, SCB personnel made no attempt to identify which Iran-based customers had accessed its online banking platforms, as any reasonable, responsible financial institution would have.[122] Nor did SCB promptly report the multitude of illegal transactions to financial regulators.[123]

---

[118] 2019 NYDFS Consent Order ¶ 18 (emphasis added).
[119] 2019 NYDFS Consent Order ¶ 20.
[120] 2019 NYDFS Consent Order ¶ 21.
[121] 2019 NYDFS Consent Order ¶ 22.
[122] 2019 NYDFS Consent Order ¶ 21.
[123] 2019 NYDFS Consent Order ¶¶ 21-22.

405.    SCB instead waited two years—until it was under ***active investigation*** by NYDFS and other agencies—to review the illegal transactions. And it was not until July 2014 that SCB comprehensively disabled access to internet-based U.S. dollar banking channels from Iran.[124]

406.    As a result of SCB's online banking services—and deliberate delay in blocking Iran-based customers' access to those services—from November 2008 to 2012, SCB permitted "more than 100 customers" to use SCB's online platforms to conduct thousands of U.S. dollar transactions from Iran and other sanctioned countries.[125]

407.    Estimates of the transaction volume vary, but all financial regulators agree that SCB processed at least ***tens of millions of U.S. dollars*** for Iran-based customers through its online banking platforms:

a.    <u>NYDFS</u>: "[B]etween June 2009 and mid-2014, the Bank processed more than $275 million in online banking transactions from Iran, Myanmar, Sudan, Syria and Cuba, in direct violation of OFAC regulations."[126]

b.    <u>OFAC</u>: "Between June 2009 and May 2014, SCB processed . . . 705 [U.S. dollar]-denominated online payments to or through the United States with a total value of $46,911,754" in violation of Iranian sanctions.[127]

c.    <u>U.K. FCA</u>: The "aggregate value" of "payments from SCB's UAE customers that appear to have originated in Iran through online banking systems" and "processed by SCB" was "tens of millions of US dollars."[128]

408.    SCB's decision benefitted IRGC agents and fronts, in particular. IRGC agent Elyassi's front companies directed more than $15 million in U.S. dollar transactions during that time by using SCB's online platforms from Iran-assigned IP addresses.[129] Additionally, Bank Saderat—a notorious IRGC Quds Force front and direct conduit of funding for anti-American

---

[124] 2019 NYDFS Consent Order ¶ 23.
[125] 2019 NYDFS Consent Order ¶ 19.
[126] 2019 NYDFS Consent Order ¶ 19.
[127] 2019 OFAC Settlement ¶ 55.
[128] 2019 U.K. FCA Decision Notice § 4.105.
[129] SOF ¶ 33.

terrorism throughout the Middle East—had full "always execute" access to SCB's online

currency trading platform at least through 2008 and beginning again in April 2013.[130]

### C.    SCB Used A "Sundry Account" To Hide Transactions With IRGC Agents And Fronts

409.    Similar to SCB's "wire stripping" tactic, SCB also used temporary holding or

error accounts—referred to as "sundry accounts"—to book revenues for illegal Iran-linked

transactions instead of SCB's account in the Iranian client's name. In SCB's regular course of

business, sundry accounts would typically be used to book transactions for which the true

counterparty had not been identified. But for SCB's illegal Iran-linked U.S. dollar-denominated

transactions, SCB had identified the correct counterparty but instead intentionally dropped a

word or changed a letter from that party's name to prevent the transactions from being booked to

the correct client account where it could be detected by SCB's NY Branch or by U.S. law

enforcement personnel. Instead, the transaction would go to the sundry account where it could no

longer be discovered by a computer search performed by regulators and correspondents involved

in the dollar clearing process. One experienced banker described this practice as "highly

irregular" and noted that it appeared to him that this flaw was "purposefully designed and

intended to facilitate evasion by SCB of U.S. sanctions on transactions with certain Iran-related

persons."[131] This practice also made it nearly impossible to determine whether SCB was

transacting with individuals or entities designed by OFAC.

410.    Unlike SCB's wire stripping, however, on information and belief, SCB continued

to employ its strategy of using sundry accounts to mask its ongoing business transactions with

---

[130] Decl. of Julian Knight ¶ 71, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Jan. 10, 2020), ECF 48-2.
[131] Marcellus Decl. ¶ 22.

Iranian parties well after 2007 and to the tune of at least several billion dollars in illegal Iran-linked transactions that were concealed from law enforcement and regulatory agencies.

411.    One SCB whistleblower against whom the bank retaliated for his attempts to assist the United States's investigation by providing details about SCB's use of sundry accounts to engage in and conceal illegal Iran-linked transactions concluded that "the revenues derived from SCB's scheme to evade U.S. sanctions contributed to funds made available to Iran-related parties and ultimately used to support terrorist activities that killed and wounded soldiers serving in the U.S.-led coalition and many innocent civilians."[132]

D.    **SCB Both Enabled And Concealed Its Ongoing Assistance To The IRGC, Hezbollah, And Their Proxies By Maintaining A Deliberately Ineffective Anti-Money Laundering/Combating The Financing Of Terrorism Sanctions Function**

412.    SCB both enabled and concealed its ongoing sanctions evasion by maintaining a deliberately ineffective compliance regime. This was not merely a function of SCB "failing to do more" to stop Iranian entities, including terrorist fronts and financiers, from accessing and misusing its financial services. SCB, particularly SCB Dubai, wanted to have its cake—*i.e.*, lucrative banking relationships with Iranian customers, including sanctioned persons and entities—and eat it too—*i.e.*, by avoiding any resulting regulatory or law enforcement consequences.

413.    SCB established a built-to-fail system that ensured it remained willfully blind about its highest-risk customers, in one of its highest-risk geographies for terrorist finance. Put another way, SCB's management unlawfully enabled its employees to pursue lucrative-but-illegal business with terrorist customers that no responsible bank would have served.

---

[132] Decl. of Anshuman Chandra ¶ 8, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-3.

414.    SCB's actions contravened its extensive obligations under U.S., U.K., and New York laws and regulations regarding customer due diligence, transaction monitoring, anti-money laundering, countering the financing of terrorism, and sanctions compliance.

415.    Even after the 2012 Consent Order that resolved the investigation into its wire-stripping misconduct, the NYDFS monitor identified multiple "serious flaws" in the NY Branch's "transaction monitoring system which had a direct and negative impact on the efficacy of the New York Branch's compliance  function." SCB's systems completely failed to detect, much less prevent, "a significant number of potentially high-risk transactions that should have been subjected to further review" internally.[133] Those high-risk transactions included illegal Iran-linked transactions between 2008 and 2014—totaling at least several hundreds of millions U.S. dollars—most of which were routed through the NY Branch.[134]

416.    NYDFS also found that SCB Dubai's compliance function was even worse. It lacked the resources needed to implement and enforce its stated policies.[135] The handful of compliance staff were poorly trained, and SCB Dubai personnel writ large neither understood nor cared about U.S. sanctions on Iran. Many SCB Dubai customer due diligence files were "wholly inadequate, missing for example, critical information and key documents such as a valid UAE residency visa." SCB Dubai's compliance regime was "no match for even unsophisticated evasion efforts."[136]

417.    The U.K. FCA reached similar conclusions. SCB Dubai did not collect sufficient information from customers to allow them to understand the nature and purpose of their

---

[133] 2019 NYDFS Consent Order ¶ 13.
[134] 2019 NYDFS Consent Order ¶¶ 5-6.
[135] 2019 U.K. FCA Decision Notice §§ 4.36-4.39.
[136] 2019 NYDFS Consent Order ¶ 43.

accounts, businesses, and sources of funds. This "impeded SCB's ability to manage its money laundering and terrorist financing risks effectively, and establish a basis for monitoring customer activity and transactions."[137]

418.    In the rare circumstances where SCB determined that a customer should be subject to enhanced monitoring, SCB Dubai either did not conduct such monitoring adequately *or at all*—even after certain preset "trigger events" calling into question the verity or adequacy of documents previously obtained for diligence, material changes to the nature of a business or its beneficial ownership, the rejection of a customer's transactions by counterparty banks due to sanctions risks, or even the filing/reporting of a suspicious activity report ("SAR") due to suspicious activity on that customer's account.[138] SCB Dubai repeatedly and willfully disregarded and/or ignored its own red flags.

419.    For example, in May 2011, a senior compliance officer at the NY Branch recommended that SCB Dubai undertake a limited review of 19 specific small-to-medium enterprises ("SMEs") due to an identified sanctions risk based on the SMEs all being general trading companies. A senior manager of SME Banking for the Middle East confirmed this risk, stating in early 2012 in an e-mail to a very senior SME banker, ***"[M]any of our [Dubai branch] customers are (a) Iranian nationals (owners of SMEs), (b) Selling to Iran ... (c) Supplying to local buyers who have customers in Iran.... 814 SME customers have Iranian owners.  They may or may not have any direct/indirect exposure to Iran."***[139]

420.    However, the Senior Financial Crime Risk Officer for SCB's UAE operations dismissed the request, stating, "All accounts where there is an Iranian national involvement

---

[137] 2019 U.K. FCA Decision Notice §§ 4.23-4.31.
[138] 2019 U.K. FCA Decision Notice §§ 4.65-4.77.
[139] 2019 NYDFS Consent Order ¶ 44.

conform with our policy that if they are resident in the UAE then we are able to deal with them . . . ." SCB Dubai ultimately reviewed only five SMEs.  Of the 14 companies unreviewed companies, two were responsible for approximately $100 million in illegal Iranian transactions that SCB conducted between November 2008 and 2012.[140]

421.    SCB's deliberately "inadequate sanctions compliance program" was, in the words of NYDFS, "a root cause" of its years-long, multi-million dollar sanctions evasion.[141] SCB's failings were "particularly serious because they occurred against a background of heightened awareness within SCB of issues with its global financial crime controls arising from action taking by US regulators and prosecutors, direct feedback from the [U.K. FCA], and through its own internal assessments,"[142] including its acknowledgment that SCB Dubai was a particularly "high financial crime risk environment" given its "geographic proximity to . . . Iran."[143]

## E.    SCB Repeatedly Misled U.S. Financial Regulators

### 1.    SCB Willfully Misled NYDFS About Its Anti-Money Laundering/Combating the Financing of Terrorism Practices

422.    In 2003, following an investigation into significant anti-money laundering/combating the financing of terrorism ("AML/CFT") violations—violations that were distinct from SCB's wire-stripping scheme—NYDFS ordered SCB to improve its AML/CFT practices with respect to foreign bank correspondent accounts. That agreement (the "Written Agreement") also required SCB to hire an independent consultant to conduct a retrospective

---

[140] 2019 NYDFS Consent Order ¶ 45.
[141] 2019 NYDFS Consent Order ¶ 45.
[142] 2019 U.K. FCA Decision Notice § 2.7.
[143] 2019 U.K. FCA Decision Notice § 4.5.

transaction review for suspicious activity involving the NY Branch.[144] SCB "vowed to regulators" that it would "comply" with the Written Agreement.[145]

423.    To that end, SCB retained Deloitte & Touche, LLP ("Deloitte") to perform an independent review of suspicious activity and report its findings to NYDFS.[146]

424.    SCB skewed Deloitte's nominally independent investigation. SCB pressured Deloitte to hide from regulators any references that "could ultimately reveal SCB's Iranian U-Turn practices"—*i.e.*, references that could reveal SCB's sanctions-evasion scheme.[147] Deloitte succumbed to SCB's pressure, and ultimately submitted a "***watered-down***" report to NYDFS.[148]

425.    Around that same time, SCB's CEO of the Americas failed to disclose SCB's wire stripping to the NYDFS Deputy Superintendent for Foreign Banks. Instead, SCB "lied" to NYDFS and claimed that the "bank was compliant in all matters related to Iran."[149]

426.    In September 2006, NYDFS requested from SCB statistics on Iranian U-Turns, including the number and dollar volume of such transactions for a 12-month period.[150]

427.    In response, SCB searched its records for 2005 and 2006, and uncovered 2,626 transactions totaling over $16 billion.[151] SCB's Head of Compliance at the NY Branch provided the data to SCB's CEO for the Americas, who in turn, sent it to the SCB Group Executive Director in London. In his memorandum to the Executive Director, the CEO expressed concern that this data would be the "wildcard entrant" in the ongoing review of U-Turns by regulators

---

[144] 2012 NYDFS Consent Order ¶ 41.
[145] 2012 NYDFS Consent Order ¶ 43.
[146] 2012 NYDFS Consent Order ¶ 50.
[147] 2012 NYDFS Consent Order ¶ 45.
[148] 2012 NYDFS Consent Order ¶ 45.
[149] 2012 NYDFS Consent Order ¶ 46.
[150] 2012 NYDFS Consent Order ¶ 48.
[151] 2012 NYDFS Consent Order ¶ 48.

and could lead to "catastrophic reputational damage to the [bank]."[152] SCB's Head of Compliance in New York ultimately provided only **four days** of data to regulators.[153]

428.    The combined effect of SCB's deceptive acts—a watered-down report from Deloitte, lying about their compliance with Iran regulations, and misleading data—ultimately convinced NYDFS to lift the Written Agreement in 2007.[154]

429.    Years later, in the 2012 Consent Order, NYDFS excoriated SCB for its deception. According to NYDFS, "SCB successfully misled New York regulators to believe that it had corrected serious flaws" in its AML/CFT program.[155] In reality, however, "the opposite was true." "SCB's actions prevented regulators from doing their job in detecting potential threats to the U.S. financial system and other national security interests."[156] Had NYDFS known the truth—*i.e.*, "had SCB not meticulously disguised its willful misconduct"—NYDFS "would have kept the Written Agreement rigidly in place."[157]

430.    SCB's documented willingness to mislead financial regulators further suggests that its decision to provide atypical, illegal banking services for IRGC agents and fronts was deliberate.

### 2.    SCB Willfully Misled NYDFS About Its Sanctions Compliance Efforts

431.    SCB also misled NYDFS about the quality of its sanctions compliance efforts.

432.    In 2009, SCB engaged Promontory Financial Group LLC ("Promontory"), a reputable financial consultancy, to provide advice on sanctions compliance and regulatory issues, and to identify and collect SCB's historical records for cross-border transactions.

---

[152] 2012 NYDFS Consent Order ¶ 48.
[153] 2012 NYDFS Consent Order ¶ 48.
[154] 2012 NYDFS Consent Order ¶ 50.
[155] 2012 NYDFS Consent Order ¶ 50.
[156] 2012 NYDFS Consent Order ¶ 51.
[157] 2012 NYDFS Consent Order ¶ 52.

433.    In 2010, SCB broadened Promontory's mandate to identifying, collecting, and analyzing historical transaction records with sanctioned countries and persons.[158] SCB ostensibly ordered Promontory to be "independent and transparent" in how it evaluated SCB's behavior because, at the conclusion of the project, Promontory was to submit factually accurate reports to financial regulators.[159]

434.    Between 2010 and 2011, Promontory did indeed produce and transmit several reports and made several presentations to NYDFS (and other governmental authorities). Those reports, however, were materially inaccurate. SCB exploited its relationship with Promontory to improperly manipulate Promontory's reports.

435.    SCB knew that the engagement was lucrative for Promontory—with a contract worth approximately $54.5 million[160]—and SCB knew that Promontory wanted to avoid "jeopardizing [its] relationship" with SCB. So SCB's in-house and outside counsel and other SCB employees provided extensive markups and comments on Promontory's draft reports to: (i) make categories of illegal transactions appear more innocuous; (ii) conceal willful compliance failures (such as when SCB's sanctions filters correctly identified illegal transactions that SCB processed anyway); (iii) remove branch-identifying information concerning the illegal transactions; (iv) selectively remove certain timelines showing increases in violations during the relevant period at some branches while keeping in others that portrayed SCB in a more positive light; and (v) minimize the number of "violations" reported.[161]

---

[158] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 2-3.
[159] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5.
[160] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 3 n.1; *id.* at 6.
[161] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.

436.    Promontory implemented all SCB's comments—whitewashing SCB's bad behavior, and in effect, serving as a *de facto* advocate for SCB's interests with regulatory authorities—even though Promontory was expected to exercise "independent judgment" reporting SCB's behavior to authorities.[162]

437.    By essentially puppeteering Promontory, SCB managed to hide from NYDFS the true extent of its illegal Iran-related transactions, undermining NYDFS's enforcement efforts.[163]

438.    SCB's willingness to submit manipulated data to New York financial regulators is further evidence that its decision to provide atypical, illegal banking services for IRGC agents and fronts was deliberate.

**F.    SCB Promoted A Culture of Illegality By Retaliating Against Whistleblowers**

439.    SCB promoted a culture of illegality throughout the institution. Not only did SCB "fail[] to take reasonable steps to ensure a positive culture towards AML compliance was embedded" throughout the Bank,[164] but SCB also retaliated against multiple employees who tried to blow the whistle on SCB's illegal provision of financial services to customers affiliated with the IRGC and other terrorist groups.

440.    Between 2011 and 2016, two SCB employees reported to U.S. and New York State authorities that, based on their own observations and experience and informed by reams of SCB transaction data: (i) SCB was facilitating U.S. dollar-denominated transactions for Iranian customers suspected of funding terrorist groups; and (ii) when it was under investigation, SCB drastically underreported the volume of illegal Iran-linked transactions it facilitated.[165]

---

[162] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.
[163] NYDFS, Agreement, *In the Matter of Promontory Financial Group, LLC* (Aug. 18, 2015). Promontory paid a $15 million penalty to NYDFS for its role in hiding SCB's malfeasance. *Id.*
[164] 2019 U.K. FCA Decision Notice § 5.16.
[165] First Am. Compl. ¶¶ 9-13, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

441.    The first whistleblower was Julian Knight, SCB's Global Head of Transaction Banking Foreign Exchange Sales for SCB Dubai and SCB's branches in Singapore. Knight internally reported concerns about SCB's Iranian transactions and proposed reforms to remedy them. SCB responded by terminating him. Subsequently, after Knight reported his concerns to NYDFS and other government regulators, SCB embarked on a retaliatory smear campaign against him that essentially led to Knight being blacklisted in the financial services industry.[166]

442.    The second whistleblower was Anshuman Chandra, who worked for SCB in Dubai as the head of eCommerce Client Services, Financial Markets for the MENA region. After Chandra reported concerns about SCB's post-2013 Iran-related transactions to U.S. authorities through an intermediary, SCB retaliated against him at work via harassing conduct, followed by a layoff, and then harsher treatment of Chandra than other laid off employees who had not engaged in whistleblowing.[167]

443.    SCB's willingness to retaliate against whistleblowers in an effort to conceal the true scope of its transactions with IRGC agents and fronts is further evidence that SCB's *hundreds of millions* in transactions with those entities was both conscious and culpable.

## VII.    SCB's Culpable Conduct Substantially Assisted The Terrorist Groups That Killed And Injured Plaintiffs

444.    From the early 2000s through at least late 2014 or early 2015, SCB's behavior culpably flowed hundreds of millions of dollars from the U.S. financial system into the coffers of the Qods Force, Hezbollah, Hamas, and JAM, from which those groups financed their terrorist

---

[166] First Am. Compl. ¶¶ 43-46, 78-93, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.
[167] First Am. Compl. ¶¶ 47-59, 64-77, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

attacks through at least 2018. To set the stage for representative examples of SCB's culpability, Plaintiffs first survey official U.S. warnings that SCB received and disregarded.

A.    **SCB Received Voluminous Warnings That Transacting With IRGC Fronts Supported IRGC-Sponsored Terrorism**

445.    The United States regularly warned that Iran-related sanctions were designed to reduce Iranian support for, and the incidence of, Hezbollah-committed acts of terrorism targeting the United States, like when OFAC Director Adam Szubin did on September 13, 2006. Moreover, the United States regularly emphasized that American counterterrorism sanctions targeting the IRGC were effective and directly reduced the threat of IRGC-sponsored terrorist attacks, like when Treasury Under Secretary Stuart Levey did on September 8, 2006.

446.    On information and belief, the United States directly warned SCB, including the NY Branch and SCB Dubai, that transacting with Iranian banks and IRGC fronts risked financing IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, and Iraqi Shiite terrorist groups. Among other reasons, a legion of press reports and testimony describe Treasury road shows to that effect.

447.    As Treasury Under Secretary Levey publicly explained before Congress on October 6, 2009, when the United States took actions against Iran, the IRGC, or its Qods Force—including, for example, through sanctions designations—the U.S. government "combined these government actions with ***unprecedented, high-level outreach to scores of banks***, banking associations, and other private sector leaders around the world" during which the United States "discussed the risks of doing business with Iran and shared information about Iran's illicit and deceptive practices":

> [T]he international private sector has amplified the impact of [U.S., U.N., and E.U.] government actions, as ***banks and companies around the world have come to understand that, if they are dealing with Iran, it is nearly impossible to protect themselves against becoming entangled in [the IRGC]'s illicit conduct***

… [because] [IRGC] companies, some of which have been designated by the United States and the UN Security Council …, operate under names that obscure their IRGC affiliation, so many unwitting non-Iranians are in fact doing business with the IRGC.

In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects …

There is broad acknowledgment that the Iranian government engages in a range of deceptive financial and commercial conduct in order to obscure … and facilitate ***its support for terrorism***. International understanding of these practices – underscored by the UN Security Council resolutions on Iran and six warnings issued by the [FATF] about the risks Iran poses to the financial system – has been brought about in part by our efforts to share information about Iran's deception with governments and the private sector around the world.

These deceptive practices taint all Iranian business because they make it difficult to determine whether any Iranian transaction is licit. Iranian banks request that their names be removed from transactions so that their involvement cannot be detected; the government uses front[s] … and intermediaries to engage in ostensibly innocent commercial business to obtain prohibited … goods …

To a greater extent than ever, private companies across industries are now alert to these kinds of risks. ***Banks worldwide have been repeatedly warned*** by regulatory and standard-setting bodies to regard Iranian transactions with caution. Traders and shippers know that transactions with innocent-sounding Iranian counterparts can expose them to risk – both reputational and legal. Energy companies have put Iranian investments on indefinite hold, cautious of the political risk of investing too heavily in Iran. And exporters of sensitive and dual-use technologies know that supplying Iran can lead to severe sanctions and even prosecution. Across the board, then, transactions with Iran are already handled differently than transactions with any other country … engendering either heightened suspicion or outright refusal to engage in them. (Emphasis added.)

448.    The United States warned financial institutions such as SCB to watch for Iranian banks performing atypical actions (such as wire stripping) when conducting cross-border transactions, as that practice allows the Iranian regime to fund terrorist attacks by the IRGC and its proxies. On April 17, 2008, for example, Daniel Glaser, Treasury's Deputy Assistant Secretary for Terrorist Financing and Financial Crimes, testified as follows:

[The] Threat of Iran's Support of Terrorism … [includes] its provision of financial and material support to terrorist groups. Iran has long been a state sponsor of terrorism and continues to support an unparalleled range of terrorist activities. For example, Tehran arms, funds, and advises Hizballah, an organization that has killed more Americans than any terrorist network except for

al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guard Corps. In addition, Iran provides extensive support to Palestinian terrorist organizations, including … Hamas. … And we are all familiar with Iran's funding, training, and equipping of select Shi'a extremist groups in Iraq, further destabilizing that country and resulting in deaths of Americans. …

Iran utilizes the international financial system as a vehicle to fund these terrorist organizations. As Under Secretary Levey has previously testified, the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism. …

Iran uses its global financial ties to pursue [] the threat of terrorism … through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community. Iran uses its state-owned banks for … for financing terrorism. …

[One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system. This practice is intended to elude the controls put in place by responsible financial institutions and has the effect of potentially involving those institution [sic] in transactions they would never engage in if they knew who, or what, was really involved. This practice allows Iran's banks to remain undetected as they move money through the international financial system to pay for the Iranian regime's … terrorist-related activities.

449.    SCB knew about decades of U.S. reporting that the IRGC, through its provision of critical resources, directly enabled international acts of terrorism targeting the United States. In 2006, for example, the White House reported that "Iran remains the most active state sponsor of international terrorism. Through its Islamic Revolutionary Guard Corps and Ministry of Intelligence and Security, the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah."

450.    SCB knew that IRGC fronts played a direct role in sponsoring acts of terrorism. As Treasury Under Secretary Levey warned on June 16, 2010: Because "[t]he IRGC plays a key role in Iran's … support for terrorism and [the IRGC] has taken over broad portions of the Iranian economy, … *[n]o IRGC entity should have any place in the world's legitimate financial system*."

169

451.    SCB knew that doing business with IRGC fronts supported IRGC-sponsored

terrorist attacks. As Treasury Under Secretary Levey warned on March 7, 2007, "concern[ing] …

how Iran does business," the:

> IRGC[] is used by the regime to provide a "train and equip program" for terrorist organizations like Hizballah … The IRGC's control and influence in the Iranian economy is growing exponentially … More and more IRGC-associated companies are being awarded important government contracts. … **When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism**. …
>
>       As the evidence of Iran's deceptive practices has mounted, financial institutions and other companies worldwide have begun to reevaluate their business relationships with Iran. Many leading financial institutions have either scaled back dramatically or even terminated their Iran-related business entirely. They have done so of their own accord, many concluding that they did not wish to be the banker for a regime that deliberately conceals the nature of its business – **too often the business of funding terrorism** …
>
>       Iran sends hundreds of millions of dollars each year to terrorist groups like Hizballah and other organizations. When a country has a nine-digit line item in its budget for support to terrorist organizations …, there is no way to know how the regime will use its revenues. Corporations are in the process of reconsidering their investments in Iran because they **do not want revenue generated from their projects diverted towards … terrorism**. (Emphasis added.)

452.    SCB knew that its anti-terrorism, anti-money laundering, and anti-corruption due

diligence operated as a one-way ratchet to SCB's detriment because SCB knew enough to know

that its customers—or their ultimate beneficial owners, principals, or joint venture partners—

were controlled by the IRGC while simultaneously not having any credible information to

contradict the conclusion. Thus—as contemporaneous reports by the media, IRGC scholars, and

others warned—the IRGC's opacity made it impossible for SCB's diligence to "clear" their

transactions relating to IRGC fronts.

453.    SCB knew that, given the IRGC's monopolization of large sectors of Iran's

economy, it was reckless to operate in Iran if one could not identify all their counterparty's

ultimate beneficial owners and affirmatively exclude the possibility that any were owned, controlled, or otherwise operated for the benefit of, the IRGC.

454. SCB knew that if designated terrorist groups, like Hamas and Hezbollah, received money because of SCB's conduct, it was a near certainty that those groups would kill and injure innocent victims, as happened here against Plaintiffs.

455. Terrorism scholars, for example, confirmed that Hamas used money it received to conduct acts of terrorism. On September 9, 2014, for example, Hamas scholar Jonathan Schanzer testified before Congress that "Hamas's finances need to be countered" because "Hamas" relied on money to commit "violent attacks" that "have killed hundreds."

456. The significance of SCB-facilitated transactions with IRGC agents and fronts was especially pronounced when viewed in light of the low marginal cost of Hezbollah's and Hamas's individual attacks. As Dr. Daniel Byman of Georgetown University observed in 2005, an "advantage of terrorism over conventional force is that it is cheap. Small numbers of terrorists can wreak havoc."

457. Individual Hamas attacks fit this pattern. As Dr. Matthew Levitt observed in his 2007 book, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*:

> [In] a 2002 interview, Salah Shehada, the founder of [Hamas's] Izz al-Din al-Qassam Brigades, claimed an operation could cost from $3,500 to $50,000. A Hezbollah member has put the figure of a terror attack at $665-$1,105 …. Another terrorist from Palestinian Islamic Jihad, Ahmad Sari Hussein, received $2,210 … for his terrorist activity, while Wael Ghanam, a Tanzim activist from the Tulkarem refugee camp, said he received $7,000 to manufacture explosive charges. Others have claimed that a suicide bombing mission could be set up for as little as $150, consisting essentially of a bomb of chemicals (sugar or fertilizer), a battery, a light switch, wire, and a belt. Still others figure the cost of each bomb belt at $1,500 to $4,300.

458. Studies consistently confirmed that the cost of nearly all attacks in by terrorist groups in the Middle East in the post-9/11 era ranged from around $2,000 per attack to around

$20,000 per attack, with the price of most attacks falling on the low end of that spectrum. IEDs, for example, usually cost around $100 per bomb. Generally, Hamas and Hezbollah fighters were paid around $200 per month, while leaders were paid around twice that. As terrorism scholars Jessica Stern and J. M. Berger explained in 2016:

> Asymmetrical warfare is defined by asymmetry. Any terrorist ideology that can attract five recruits and the contents of their checking accounts can make headlines for months. A terrorist group with twenty willing recruits and half a million dollars can make headlines for years.

459.    At those rates, even a single SCB transaction that flowed $5,000 to Hezbollah or Hamas would have financed substantial terrorist violence. At the time, a $5,000 payment would have put 10 terrorists (at $200 per fighter) and two commanders (at $400 per commander) in the field for a month and would have supplied them with about 20 IEDs. Or the terrorists could have spent the $5,000 to purchase dozens of bomb components or to finance multiple complex attacks. SCB's payments were orders of magnitude higher. Those payments materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs.

460.    U.S. government studies confirmed the dramatic impact of even marginal financial contributions to Islamists operating in the Middle East. For example, one DoD study of al-Qaeda-in-Iraq—which followed a substantially similar organizational approach as Hezbollah and Hamas when it came to attack logistics—found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack in Iraq required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every $2,700 (or its rough equivalent) SCB flowed to the IRGC, Hezbollah, Hamas, and JAM, they financed roughly one new terrorist attack. Consequently, even a handful of transactions involved in the schemes detailed herein,

*e.g.*, transactions related to the Caspian Petrochemical scheme or the Elyassi scheme, were more than enough to fund thousands of attacks—enough to kill and injure every Plaintiff in this case hundreds of times over. SCB knew all of this when it provided the services alleged herein.

461.    Given these facts, SCB knew that its provision of sanctions-busting services to Iranian customers risked violent, real-world consequences. On December 31, 2017, for example, SCB admitted that "terrorist financing" and "sanctions compliance breaches" comprised "[f]inancial crime" that SCB knew "harm[ed] communities."

## B.    SCB Knew That Performing Atypical Banking Services For Caspian Petrochemical Substantially Assisted IRGC-Supported Terrorism

462.    From 2007 through at least June 2012, SCB helped the IRGC evade U.S. counterterrorism sanctions by facilitating illicit transactions for Caspian Petrochemical (from 2011 through at least 2012), and Caspian Petrochemical's predecessor shell entity (from at least 2007 through 2011). Throughout the scheme, SCB used atypical—and illegal—mechanisms and tactics to transact for Caspian Petrochemical.

463.    By providing financial services to Caspian Petrochemical from 2007 through at least 2012, SCB provided direct and indirect assistance to the Qods Force, Hezbollah, Hamas, and JAM from at least 2007 through at least 2017. For example, facilities that Caspian Petrochemical built with SCB's services continued flowing value to these terrorist groups until at least 2017.

464.    Every transaction that SCB conducted for Caspian Petrochemical was unlawful, and SCB used various illegal tactics, techniques, and procedures (as detailed *supra* at Part VI.B to Part VI.C) to perform transactions for Caspian Petrochemical.

465.    SCB's financial services were essential to Caspian Petrochemical's ability to profit from the oil and gas it sold. Access to the U.S. financial system was essential because

nearly all oil and gas transactions are denominated in U.S. dollars. Similarly, giving Caspian Petrochemical access to New York banks allowed it to maintain its cover as an IRGC front; transacting through New York imbued its transaction with legitimacy.

466.    SCB knew that, by helping Caspian Petrochemical transact, the bank was providing the IRGC—through Caspian Petrochemical's revenue—the seed capital to allow it to grow, operationalize, and monetize its factory in the South Pars field, both at the time SCB provided the services and for years thereafter. SCB's services provided long-lasting financial benefits to the IRGC, even years after SCB stopped providing them. As SCB knew at the time it helped Caspian Petrochemical, financial services provided to oil and gas producers, and their associated market contracts, usually have a long "tail"—*i.e.*, if a bank helps an oil producer finance a big facility or transaction, the customer will benefit from the financing facility for years thereafter. Accordingly, when SCB helped Caspian Petrochemical access the U.S. financial system to support its transactions, SCB knew that it would be helping Caspian Petrochemical—and, in turn, the IRGC—realize sustainable profits for years after SCB processed its final transaction.

467.    SCB knew that Caspian Petrochemical was an IRGC front. When SCB Dubai serviced Caspian Petrochemical, SCB knew, among other things: (1) it was owned by an Iranian person; (2) for work in Iran; (3) relating to the oil and gas sector, which had been monopolized by the IRGC and SLO; (4) specifically concerning both South Pars and the Caspian Sea projects, both of which also featured IRGC monopolies; while (5) operating as a sanctions evasion scheme (another IRGC monopoly) that leveraged shipping and smuggling (two more IRGC monopolies). Armed with such knowledge, only a willfully blind SCB Dubai could have proceeded with these transactions. As SCB did.

468.    SCB's services for Caspian Petrochemical were highly culpable. SCB's decision to bank for Caspian Petrochemical ranks amongst the most shocking betrayals of any bank's counterterrorism obligations in the history of U.S. law enforcement. The chronology shows why. During the six days from November 8, 2011 through November 14, 2011, twelve events alerted SCB (and its IRGC front customers) that the United States, United Kingdom, United Nations, and European Union would imminently impose major new sanctions targeting the Iranian regime's use of Iranian fronts and banks to finance IRGC operations.

469.    On November 8, 2011, the International Atomic Energy Agency ("IAEA") published a bombshell report exposing the Iranian regime's comprehensive nuclear weapons program, including its lies and cheating while promising that such program was peaceful.

470.    On November 9, 2011, the Israeli government responded to the IAEA report by publicly messaging that it was preparing for a potential military strike targeting Iran, which Israel warned could come as early as the following month.

471.    On November 10, 2011, Ayatollah Khamenei—in a speech before the IRGC, which was then posted to his official website—directly threatened IRGC-sponsored attacks against the United States and Israel: "The firm Iranian nation is not one to sit back and observe threats by fragile and material-minded powers … The enemies, especially America and its stooges and the Zionist regime (Israel), should know that … Iran[] … will respond with full force to any aggression or even threats in a way that will demolish the aggressors from within. … The Revolutionary Guards ... will answer attacks with strong slaps and iron fists."

472.    On November 10, U.K., French, and other E.U. member state diplomats also warned that, *inter alia*, the United Kingdom, France, and European Union were preparing to impose "new powerful sanctions" at the European Union's scheduled meeting on December 1,

2011, which would likely forbid direct interactions with the Central Bank of Iran and/or any Iranian person involved in the Iranian regime's monopoly in the petroleum trade.

473.    On November 11, 2011, IRGC-controlled *Press TV* publicly taunted Israel and messaged that "the Israeli regime will never have the courage to … attack … Iran" because "Israel … has suffered humiliating defeats in Lebanon and … Gaza."

474.    On November 12, 2011, Hezbollah leader Hassan Nasrallah threatened that Hezbollah and its Axis of Resistance allies—which SCB knew included Hamas and JAM— were prepared to launch a wave of devastating attacks in the Middle East in support of Hezbollah's (and its Axis allies') patron, the IRGC, stating: "Whoever dares to launch a war against Iran will be met with double that force. Iran is strong; Iran is powerful and has a leader unique to the whole world. … They [*i.e.*, the United States and Israel] must understand well that a war on Iran and a war on Syria will not be confined to Iran or Syria. This war will roll over throughout the entire region."

475.    On November 12 and 13, 2011, the U.S. government hosted the annual Asia Pacific Economic Cooperation summit, during which President Obama and other leaders indicated that the United States would likely work with other nations to impose severe new sanctions in response to both the IAEA news as well as the Iranian regime's support for proxy terror violence in the Middle East.

476.    On November 13, 2011, during the Republican Party presidential primary debate, the leading candidates all promised to impose unprecedented additional sanctions targeting the Iranian regime's support for terrorism, if they became president.

477.    On November 14, 2011, U.S. and E.U. officials confirmed that significant new sanctions targeting the IRGC's use of banks and Iran's energy sector were imminent:

a.      U.S. Senator John McCain—widely known as a key American thought leader regarding Iran sanctions—appeared on global media outlet CNN and urged powerful new sanctions targeting the Iranian regime: "We have to make it clear to the Iranians that they cannot and will not have a nuclear weapon. And one of the greatest conundrums that we face today is whether Israel will take unilateral action in order to remove that possibility, as well [*i.e.*, an Israeli military strike]. …[T]his … situation … cries out for American leadership and we should lay down a marker on the Iranians … because we can squeeze them harder with sanctions on their banking system and their oil exports, as well."

b.      U.K. Foreign Secretary William Hague publicly stated that the U.K. government would "look over the coming months … to placing more pressure on Iran through sanctions" and pointedly declined to rule out a British military strike against the Iranian regime by observing that "all options … remain[ed] on the table."

c.      French Foreign Minister Alain Juppe publicly urged all governments to impose "a very firm" round of newly toughened sanctions "to avoid an irreparable intervention," *i.e.*, an armed conflict involving the western world and the Iranian regime.

d.      E.U. member states' foreign ministers coordinated a united front and released this draft statement to the western media: "Iran [was] in violation of international regulations … We urge Iran to address international concerns ... Strong new restrictive measures will be taken at a next meeting taking into account Iran's actions."

Media outlets widely reported each of these events in real-time.

478.    SCB—and its IRGC customer, the Iranian Petroleum Company (the predecessor to Caspian Petrochemical)—knew about all the above. Among other reasons, each event from November 8 to 14, 2011 received widespread, real-time coverage in the global media, including in the United States, Europe, and the Middle East. SCB and its IRGC customers knew that the imminent round of sanctions telegraphed during the period from November 8 to 14, 2011 would directly target IRGC operations for a simple reason: the two factors motivating the sanctions were the Iranian regime's sponsorship of proxy terrorism in the Middle East and its pursuit of weapons of mass destruction. As SCB well knew, the IRGC had sole, or primary, responsibility for each of these areas, and therefore SCB intended to help SCB's Iranian customers circumvent anticipated ***IRGC-related sanctions*** that would imminently be adopted by the United States, United Kingdom, United Nations, and European Union because SCB knew it was ***the IRGC***—

and no one else—who had sole or primary responsibility for each of the categories of Iranian regime bad behavior that prompted the tidal wave of worldwide warnings from November 10 to 14, 2011.

479.     SCB and its IRGC customer, the "Iranian Petroleum Company" (the predecessor to Caspian Petrochemical), knew the new round of sanctions would target the manner and means that the IRGC used to finance its operations. In response to that risk, on November 15, 2011, the IRGC reincorporated Iranian Petroleum Company under the new shell, Caspian Petrochemical FZE, which it registered in Dubai, UAE and London, U.K. that same day by using cut-outs who incorporated Caspian Petrochemical and, in their corporate filings, publicly identified the "Objects of the company," *i.e.*, Caspian Petrochemical, as "Trade of gas, oil and petrochemicals." The IRGC did so at SCB's direct suggestion. *See supra* Part VI.B.3.a (SCB Dubai suggested new entity and name to circumvent U.S. sanctions).

480.     Soon after Caspian Petrochemical was incorporated, on November 25, 2011, Treasury determined that Iran was a Jurisdiction of Primary Money Laundering Concern. This determination represented the Department's conclusion that it was impossible for any bank, including SCB, to conduct any Iran-related financial transaction without running a substantial risk of financing IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, or other IRGC proxies. Among other things, Treasury's finding alerted SCB that (emphases added):

a.     "Iran's banking sector comprises Iranian state-owned commercial banks, specialized Iranian government banks, and privately owned Iranian financial institutions. Some of these Iranian financial institutions operate multiple overseas branches and subsidiaries in Asia, Europe, and the Middle East and maintain relationships in key global financial centers."

b.     "In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for terrorism …. This illicit conduct by Iranian banks and companies has been highlighted in a series of … UN Security Council … resolutions related to Iranian proliferation sensitive

activities. [FATF] has also warned publicly of the risks that Iran's deficiencies in countering money laundering *and, particularly, terrorism finance*, pose to the international financial system, and has called on FATF members and all jurisdictions to implement counter measures to protect against these risks. Despite the resulting reduction in Iranian financial institutions' access to correspondent and other financial relationships with major financial institutions, both designated and non-designated Iranian banks continue to maintain a presence in the international financial system."

c.   "Based upon a review and analysis of the administrative record in this matter, consultations with relevant Federal agencies and departments, and after consideration of the factors enumerated in section 311, the Director of FinCEN has determined that reasonable grounds exist for concluding that Iran is a jurisdiction of primary money laundering concern. While FinCEN has considered all potentially relevant factors set forth in Section 5318A, a discussion of those most pertinent to this finding follows. *FinCEN has reason to believe that Iran directly supports terrorism* … and uses deceptive financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities."

d.   "**Support for Terrorism**: The Department of State designated Iran as a state sponsor of international terrorism in 1984, and has reiterated this designation every year since 2000 in its annual Country Reports on Terrorism. *Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas …. In fact, Hamas … and Hizballah have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.*

Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external [8] threats. Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure. *In addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.*

In particular, Iran has used the IRGC-Qods Force ('Qods Force') to cultivate and support terrorists and militant groups abroad. *The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's … terrorist activities*, and provides Hizballah with as much as $200 million in funding per year. … [O]n October 11, 2011, the Department of Justice charged two individuals for their ... participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States. …

Finally, *Iran is known to have used state-owned banks to facilitate terrorist financing.* In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its [10] financial support of terrorist organizations, noting that *from 2001 to 2006 Bank Saderat*

> *transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.*"

e.    "As a result of the strengthened U.S. sanctions and similar measures taken by the [U.N.] and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. ***This conduct puts any financial institution involved with Iranian entities at risk of [] facilitating transactions related to terrorism*** …".

f.    "**<u>The IRGC</u>**: The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007, owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy. For example, ***the IRGC established Khatam al-Anbiya, the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company working on civilian projects.***"

g.    "***The IRGC has continued to expand its control over commercial enterprises within Iran. … [T]he IRGC and the IRGC-QF engage in seemingly legitimate activities that … support terrorist groups such as Hizballah [and] Hamas …***".

h.    "Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ('AML/CFT') controls has long been highlighted by numerous international bodies and government agencies. Starting in October 2007, the FATF has issued a series of public statements expressing its concern that Iran's lack of a comprehensive AML/CFT regime represents a significant vulnerability within the international financial system. The statements further called upon Iran to address those deficiencies with urgency, and called upon FATF-member countries to advise their institutions to conduct enhanced due diligence with respect to the risks associated with Iran's deficiencies."

i.    "***The FATF has been particularly concerned with Iran's failure to address the risk of terrorist financing, and starting in February 2009, the FATF called upon its members and urged all jurisdictions to apply effective counter-measures to protect their financial sectors from the terrorist financing risks emanating from Iran.*** In addition, the FATF advised jurisdictions to protect correspondent relationships from being used to bypass or evade counter-measures and risk mitigation practices, and to take into account money laundering and financing of terrorism risks when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions. ***The FATF also called on its members and other jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions. Over the past three years, the FATF has repeatedly reiterated these concerns and reaffirmed its call for FATF-member countries and all jurisdictions to implement countermeasures to protect the international financial system from the terrorist financing risk emanating from Iran.***

In response, numerous countries, including all G7 countries, have issued advisories to their financial institutions."

j.    "The FATF's most recent statement in October 2011 reiterated, with a renewed urgency, its concern regarding Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity to the international financial system. The FATF reaffirmed its February 2009 call to apply effective countermeasures to protect their financial sectors from ML/FT risks emanating from Iran, and further called upon its members to consider the steps already taken and possible additional safeguards or strengthen existing ones. In addition, the FATF stated that, if Iran fails to take concrete steps to improve its AML/CFT regime, the FATF will consider calling on its members and urging all jurisdictions to strengthen countermeasures in February 2012. ***The numerous calls by FATF for Iran to urgently address its terrorist financing vulnerability, coupled with the extensive record of Iranian entities using the financial system to finance terrorism, proliferation activities, and other illicit activity, raises significant concern over the willingness or ability of Iran to establish adequate controls to counter terrorist financing.***"

481.    On November 28, 2011, Treasury published its proposed final designation of Iran as a Jurisdiction of Primary Money Laundering Concern, which made a "finding" that a complete U.S. prohibition on all Iranian banks' and oil companies' access to the U.S. financial system was necessary to protect the United States from IRGC-sponsored acts of terrorism, including attacks committed by Hezbollah, Hamas, and other IRGC proxies:

> The Effect of the Proposed Action on United States National Security …[.] The exclusion from the U.S. financial system of jurisdictions that serve as conduits for … the financing of terrorism … enhances U.S. national security by making it more difficult for terrorists … to access the substantial resources of the U.S. financial system. To the extent that this action serves as an additional tool in preventing Iran from accessing the U.S. financial system, the proposed action supports and upholds U.S. national security … goals. More generally, the imposition of the fifth special measure would complement the U.S. Government's worldwide efforts to expose and disrupt international … terrorist financing.

482.    Treasury's November 28, 2011 publication further alerted SCB as follows:

a.    "On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), Public Law 107-56. Title III of the USA PATRIOT Act amends the anti-money laundering provisions of the Bank Secrecy Act ("BSA"), codified at 12 U.S.C. 1829b and 1951-1959, and 31 U.S.C. 5311-5314, and 5316-5332, to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing the BSA appear at

31 CFR Chapter X. The authority of the Secretary of the Treasury (the "Secretary") to administer the BSA and its implementing regulations has been delegated to the Director of FinCEN."

b.      "Section 311 of the USA PATRIOT Act ("section 311") added section 5318A to the BSA, granting the Secretary the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, institution, class of transaction, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" against the primary money laundering concern. Section 311 identifies factors for the Secretary to consider and Federal agencies to consult before the Secretary may conclude that a jurisdiction, institution, class of transaction, or type of account is of primary money laundering concern. The statute also provides similar procedures, *i.e.*, factors and consultation requirements, for selecting the specific special measures to be imposed against the primary money laundering concern."

c.      "Taken as a whole, section 311 provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively. These options give the Secretary the authority to bring additional pressure on those jurisdictions and institutions that pose money laundering threats. Through the imposition of various special measures, the Secretary can gain more information about the jurisdictions, institutions, transactions, or accounts of concern; can more effectively monitor the respective jurisdictions, institutions, transactions, or accounts; or can protect U.S. financial institutions from involvement with jurisdictions, institutions, transactions, or accounts that are of money laundering concern."

d.      "Before making a finding that reasonable grounds exist for concluding that a jurisdiction is of primary money laundering concern, the Secretary is required to consult with both the Secretary of State and the Attorney General. The Secretary is also required by section 311, as amended, to consider "such information as the Secretary determines to be relevant, including the following potentially relevant factors," which extend the Secretary's consideration beyond traditional money laundering concerns to issues involving, inter alia, terrorist financing and weapons proliferation:

- Evidence that organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles, have transacted business in that jurisdiction;

- The extent to which that jurisdiction or financial institutions operating in that jurisdiction offer bank secrecy or special regulatory advantages to nonresidents or nondomiciliaries of that jurisdiction;

- The substance and quality of administration of the bank supervisory and counter-money laundering laws of that jurisdiction;

- The relationship between the volume of financial transactions occurring in that jurisdiction and the size of the economy of the jurisdiction;

- The extent to which that jurisdiction is characterized as an offshore banking or secrecy haven by credible international organizations or multilateral expert groups;

- Whether the United States has a mutual legal assistance treaty with that jurisdiction, and the experience of United States law enforcement officials and regulatory officials in obtaining information about transactions originating in or routed through or to such jurisdiction; and

- The extent to which that jurisdiction is characterized by high levels of official or institutional corruption."

e.      "[B]ased upon a review and analysis of the administrative record in this matter, consultations with relevant Federal agencies and departments, and after consideration of the factors enumerated in section 311, the Director of FinCEN has determined that reasonable grounds exist for concluding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern. … As a result of that finding, and based upon the additional consultations and the consideration of all relevant factors discussed in the finding and in this notice of proposed rulemaking, the Director of FinCEN has determined that reasonable grounds exist for the imposition of the fifth special measure authorized by section 5318A(b)(5). That special measure authorizes a prohibition against the opening or maintaining of correspondent accounts by any domestic financial institution or agency for or on behalf of a foreign banking institution, if the correspondent account involves the targeted jurisdiction."

f.      "Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ("AML/CFT") controls have long been highlighted by numerous international bodies and government agencies. Starting in October 2007, the [FATF] has issued a series of public statements expressing its concern that Iran's lack of a comprehensive AML/CFT regime represents a significant vulnerability within the international financial system. The statements further called upon Iran to address those deficiencies with urgency, and called upon FATF-member countries to advise their institutions to conduct enhanced due diligence with respect to the risks associated with Iran's deficiencies."

g.      "The FATF has been particularly concerned with Iran's failure to address the risk of terrorist financing, and starting in February 2009, the FATF called upon its members and urged all jurisdictions to apply effective counter-measures to protect their financial sectors from the terrorist financing risks emanating from Iran. In addition, the FATF advised jurisdictions to protect correspondent relationships from being used to bypass or evade counter-measures and risk mitigation practices, and to take into account money laundering and financing of terrorism risks when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions. The FATF also called on its members and other jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including

Iranian companies and financial institutions. Over the past three years, the FATF has repeatedly reiterated these concerns and reaffirmed its call for FATF-member countries and all jurisdictions to implement countermeasures to protect the international financial system from the terrorist financing risk emanating from Iran. In response, numerous countries, including all G7 countries, have issued advisories to their financial institutions."

h.   "The FATF's most recent statement in October 2011 reiterated, with a renewed urgency, its concern regarding Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity to the international financial system. The FATF reaffirmed its February 2009 call to apply effective countermeasures to protect their financial sectors from ML/FT risks emanating from Iran, and further called upon its members to consider the steps already taken and possible additional safeguards or strengthen existing ones. In addition, the FATF stated that, if Iran fails to take concrete steps to improve its AML/CFT regime, the FATF will consider calling on its members and urging all jurisdictions to strengthen countermeasures in February 2012. The numerous calls by the FATF for Iran to urgently address its terrorist financing vulnerability, coupled with the extensive record of Iranian entities using the financial system to finance terrorism, proliferation activities, and other illicit activity, raises significant concern over the willingness or ability of Iran to establish adequate controls to counter terrorist financing."

i.   "The fifth special measure sought to be imposed by this rulemaking would prohibit covered financial institutions from opening and maintaining correspondent accounts for, or on behalf of, Iranian banking institutions. As a corollary to this measure, covered financial institutions also would be required to take reasonable steps to apply special due diligence, as set forth below, to all of their correspondent accounts to help ensure that no such account is being used indirectly to provide services to an Iranian banking institution. FinCEN does not expect the burden associated with these requirements to be significant given that U.S. financial institutions have long been subject to sanctions regulations prohibiting the provision of correspondent account services for banking institutions in Iran. There is a minimal burden involved in transmitting a one-time notice to certain correspondent account holders concerning the prohibition on indirectly providing services to Iranian banking institutions. In addition, U.S. financial institutions generally apply some degree of due diligence in screening their transactions and accounts, often through the use of commercially available software such as that used for compliance with the economic sanctions programs administered by [OFAC]. As explained in more detail in the section-by-section analysis below, financial institutions should, if necessary, be able to easily adapt their current screening procedures to comply with this special measure. Thus, the special due diligence that would be required by this rulemaking is not expected to impose a significant additional burden upon U.S. financial institutions."

j.   "The proposed rule would prohibit covered financial institutions from establishing, maintaining, or managing in the United States any correspondent account for, or on behalf of, banking institutions in Iran. As a corollary to this prohibition, covered financial institutions would be required to apply special due diligence to their correspondent accounts to guard against their improper indirect use by Iranian banking institutions. At a

minimum, that special due diligence must include two elements. First, a covered financial institution must notify those correspondent account holders that the covered financial institution knows or has reason to know provide services to Iranian banking institutions, that such correspondents may not provide Iranian banking institutions with access to the correspondent account maintained at the covered financial institution. Second, a covered financial institution must take reasonable steps to identify any indirect use of its correspondent accounts by Iranian banking institutions, to the extent that such indirect use can be determined from transactional records maintained by the covered financial institution in the normal course of business. A covered financial institution should take a risk-based approach when deciding what, if any, additional due diligence measures it should adopt to guard against the improper indirect use of its correspondent accounts by Iranian banking institutions, based on risk factors such as the type of services it offers and the geographic locations of its correspondents."

k.    "Iranian Banking Institution[.] Section 1010.657(a)(3) of the proposed rule defines a foreign bank as that term is defined in 1010.100(u). An Iranian banking institution shall mean any foreign bank chartered by Iran, including any branches, offices, or subsidiaries of such bank operating in any jurisdiction, and any branch or office within Iran of any foreign bank licensed by Iran. In addition, the Central Bank of Iran (Bank Markazi Iran), as well as any foreign bank of which more than 50 percent of the voting stock or analogous interest is owned by two or more foreign banks chartered by Iran, shall be considered an Iranian banking institution. For purposes of this rule, a subsidiary shall mean a company of which more than 50 percent of the voting stock or analogous interest is directly or indirectly owned by another company."

483.    SCB knew about Treasury's determination that Iran was a Jurisdiction of Primary Money Laundering Concern, as well as Treasury's rationale for that determination, yet SCB continued to provide illicit banking services for Caspian Petrochemical.

484.    Later, on March 28, 2012, Treasury imposed additional sanctions against KAA and reiterated that KAA and its oil profits funded IRGC-sponsored terrorism. *Supra* ¶ 246. While SCB knew about these additional sanctions, SCB nonetheless continued to provide illicit banking services for Caspian Petrochemical.

485.    Even after all the dramatic developments between November 2011 and March 2012, SCB continued helping Caspian Petrochemical access the U.S. financial system until at least June 2012.

486.    SCB knew that providing illegal atypical banking services to Caspian Petrochemical would directly facilitate terrorist attacks funded, supplied, and encouraged by the SLO and IRGC, including attacks by Hezbollah, Hamas, and JAM; SCB knew that its Caspian Petrochemical transactions flowed funds to the SLO and IRGC, and that the SLO and the IRGC used such funds to sponsor attacks by Hezbollah, Hamas, and JAM.

487.    SCB knew that the IRGC had seized the Ministry of Petroleum and awarded IRGC front KAA multi-billion-dollar contracts to develop South Pars. As explained *supra*, Treasury sanctioned KAA and Ghasemi in February 2010, highlighting that the IRGC controlled substantial parts of Iran's oil industry, and explicitly noting that "[t]he profits from these activities are available to support the full range of the IRGC's illicit activities, including . . . support for terrorism."

488.    SCB knew that the Supreme Leader ordered that the Foundation for the Oppressed be given a substantial role in the negotiation for, and receipt of payment relating to, Iranian oil exports in 2008. This further alerted SCB that any Iran-related energy transactions directly aided the Qods Force, Hezbollah, Hamas, and JAM because the Supreme Leader's decision inextricably connected the Foundation to Iran's oil sector. SCB knew about the Supreme Leader's decision for several reasons, including its knowledge derived from SCB's Iran branch and contemporaneous media reports that discussed the decision and its implications. On April 30, 2010, for example, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported that the "political influence" of the "Bonyad-e Mostazafan (Foundation of the Oppressed)" "among [Iranian] decision-makers" who were "accountable only to the Supreme Leader" was "exemplified by the extension of a lucrative privilege to this entity:

the minister of oil announced in June 2008 Bonyad-e Mostazafan's newly acquired right as

Iran's oil seller on international markets."

489.    SCB also knew that the Caspian Petrochemical transactions concerned, among

other things, South Pars-related petroleum deals, which SCB knew was fully controlled by the

IRGC and a direct funding source for Hezbollah, Hamas, and JAM. Terrorism scholars warned

that facilitating transactions for Iranians that involved South Pars directly financed IRGC-

sponsored terrorist attacks committed by Hezbollah, Hamas, and JAM. On March 15, 2007, for

example, former Treasury official Dr. Matthew Levitt testified before Congress that:

> [T]he IRGC is precisely the element within Iran that should be targeted. … The
> IRGC is … responsible for providing funds, weapons, improvised-explosive-
> device technology and training to terrorist groups like Hezbollah and Hamas and
> insurgents attacking coalition and Iraqi forces in Iraq. …
>     [T]he IRGC's business and industrial activities -- especially those
> connected to the oil and gas industries -- are heavily dependent on the
> international financial system. Consider, for example, the $2.09 billion contract to
> develop parts of the South Pars natural-gas field, or the $1.3 billion contract to
> build parts of a pipeline, both meted out to the IRGC's engineering arm, the
> Khatam-ol-Anbia. …
>     Treasury should continue to take action to safeguard the U.S. financial
> system from abuse by targeting Iranian financial institutions knowingly
> facilitating financial transactions in support of terrorism ...

490.    Public admissions by IRGC leaders directly involved with Caspian Petrochemical

confirm the key role that SCB's financial services played to the operationalization of this IRGC

front. On December 22, 2009, for example, an IRGC-controlled news agency reported (as

summarized by the BBC):

> [IRGC] Commander of Khatam al-Anbia base informed about the delay in
> completing phases 15 and 16 of South Pars oil field …
>     Commenting on the latest updates on the development of phases 15 and 16
> of common South Pars field, Islamic Revolution Guards Corps [IRGC] General
> Rostam Qasemi said that the level of progress in both phases in the sea and land is
> about 43 per cents. He added: Inability of the Ministry of Oil in providing
> necessary financial resources in proper time was one of the most important
> difficulties faced with regard to phases of South Pars field. Expressing hopes for

rapid resolution of the project's financial troubles, he clarified: Employer (Pars Oil and Gas Company) has not succeeded in injecting financial resources to the project in accordance with its pace. …

According to [IRGC-controlled] *Mehr* news agency, at the moment the construction of five phases of South Pars - 12, 15, 16, 17 and 18 - are in progress and due to lack of financial resources, the operation has been delayed.

491.    On August 6, 2011, similarly, *Reuters* reported that:

Iran will need some $40 billion this year to spur the development of oil and gas fields it shares with neighbouring countries, Oil Minister Rostam Qasemi said in his first interview since being appointed …

Qasemi, a Revolutionary Guards commander … vow[ed] to prioritise jointly owned fields, notably the giant South Pars gas reservoir …

"In order to launch the announced development plans (on the joint fields) there is need for more than $40 billion in investment in the current (Iranian) year (ending late March 2012)," Qasemi said in an interview with *Iran*, a state-owned daily newspaper.

While Iran might seek foreign capital to finance energy projects, it did not need foreign know-how, he said.

"There are currently very competent contractors domestically on which we can rely for the development of oil and gas can be done ... For the development of oil and gas fields we don't need foreign contractors."

One of those domestic companies is Khatam al-Anbia itself, which took over parts of the South Pars development when European firms Royal Dutch Shell and Total SA pulled out due to sanctions on Iran.

Both Khatam al-Anbia and Qasemi himself are under U.S. and European Union sanctions …

Qasemi said Iran would seek foreign capital … for the energy projects, as well as tapping … Iranian banks …

"We will be pursuing an active diplomacy to absorb foreign capital as they form part of the required financial resources for the projects to be developed," Qasemi said.

492.    Media reports about South Pars alerted SCB that U.S. sanctions were crushing the IRGC's ability to maximize the cash flow the IRGC received from South Pars and alerted SCB that its South Pars-related sanctions evasion directly aided IRGC efforts to raise money to finance IRGC operations. On June 29, 2006, for example, *Reuters* reported that while "Iran ha[d] awarded the Revolutionary Guards corps a contract to develop two phases of the … giant South Pars gas field," industry analysts confirmed that the Iranian regime could not "develop" its "oil

and gas industry," including at South Pars, "without foreign companies' help." Moreover, on

May 28, 2010, *Agence France Presse* reported:

> Iran [] awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field …
> Guards unit Khatam al-Anbiya would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. … [P]hases 22, 23 and 24 were [also] to be awarded to Khatam al-Anbiya. …
> The development of the giant offshore field has been delayed amid a lack of investment …
> Khatam al-Anbiya … is under US and UN sanctions related to Iran's refusal to abide by UN Security Council resolutions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] ….

493.    SCB also knew that Caspian Petrochemical transactions were NIOC-related—yet

another reason why SCB knew it was aiding IRGC-sponsored terrorist attacks. Media reports

alerted SCB that its transactions with, and value flow-through to, the NIOC enabled IRGC-

sponsored acts of terrorism by Hezbollah, Hamas, and Iraqi Shiite terrorists. On April 26, 2010,

for example, *IHS Global Insight* reported that IRGC companies were "increasingly being

awarded tenders by NIOC and its subsidiaries . . . creating potential significant problems for . . .

foreign firms" dealing with NIOC and its subsidiaries "given the specific international sanctions

against dealing with Revolutionary Guards affiliates and the U.S. classification of the outfit as a

terrorist organisation." As SCB knew, the referenced IRGC terrorism sanctions namechecked,

inter alia, Hezbollah, Hamas, and IRGC Shiite terrorist proxies. *See*, *e.g.*, ¶ 71 (IRGC-QF SDGT

designation).

494.    IRGC commander Ghasemi's August 2011 appointment to be Minister of

Petroleum, and his associated control of the agency that controls NIOC, also alerted SCB that its

transactions with, and for the benefit of, NIOC directly enabled IRGC-sponsored terrorism.

Public sources reported that Ghasemi was "under US and EU sanctions," and, speaking in

parliament, described himself as a "soldier[] of the Islamic Republic's Revolutionary Guards." President Ahmadinejad similarly described Ghasemi as a "child of the revolution," who would "transform" the oil industry "in line with national interests."

495.    Terrorism scholars confirmed the point. For example, an article published in early 2012 by Ali Alfoneh, a fellow at the American Enterprise Institute, entitled *Iran's Revolutionary Guards Strike Oil*, explained that Ghasemi's appointment was tantamount to "the IRGC's seizure of the Oil Ministry," which "could have far reaching economic, political, and strategic implications." The article opined that for Ghasemi, "the interests of the IRGC outweigh the interests of the Iranian state," and that "[t]he IRGC lobbied hard for the candidacy of [Ghasemi]," in part so that the IRGC could achieve "its main goal: access to Iran's foreign exchange reserve," *i.e.*, Iran's oil revenue.

496.    Congressional testimony alerted SCB that NIOC-related transactions directly enabled IRGC-sponsored terrorist attacks. On November 15, 2011, for example, Mark Dubowitz, president of the Foundation for Defense of Democracies, testified in front of the House Subcommittee on National Security, Homeland Defense, and Foreign Operations. Dubowitz advocated for stronger sanctions against Iran, specifically targeting the IRGC's control of the oil industry. Dubowitz testified that the IRGC was "unquestionably the dominant force throughout Iran's energy sector, including the sale of Iran's oil," and that "the United States should also consider designating Iran's state-owned National Iranian Oil Company (NIOC). NIOC is a party to every Iranian oil transaction. Leveraging its position as a state-owned institution, NIOC operates as the ultimate front company in obscuring the role of the IRGC in the oil trade." Dubowitz further testified that "[t]he Central Bank of Iran, like the National Iranian Oil Company, and other IRGC entities discussed above—are critical links in the IRGC-dominated

oil supply chain and key enablers of the IRGC's proliferation activities, terrorist operations and human rights abuses."

497.    NGO public pressure campaigns also alerted SCB that its NIOC-related transactions enabled IRGC-sponsored terrorist attacks. In November 2011, for example, UANI publicly called on Italian energy company Edison SpA to stop doing business in Iran, and stated that "[t]he IRGC is a known terrorist entity in control of Iran's oil, gas, and petrochemical sectors. . . . The IRGC also 'bankrolls' groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen. . . . By working with NIOC and the IRGC to develop Iran's oil sector, Edison is directly contributing to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs."

498.    These public disclosures were part of a broader public discourse about the role that Iran's petroleum sector, and NIOC specifically, played in the IRGC's support for terrorism. Based on these and similar sources, the United States stepped up its sanctions targeting the IRGC's use of Iranian petroleum exports, including by imposing specific sanctions on businesses providing services to NIOC, as well as secondary sanctions on foreign financial institutions.

499.    U.S. government findings alerted SCB that its NIOC-related transactions enabled IRGC-sponsored terrorist attacks. In August 2012, Congress enacted the ITRSHRA. *See supra* ¶ 276. Section 312 expressed "the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates." 126 Stat. 1249. The statute ordered the Treasury Secretary to determine within 45 days whether NIOC was an agent or affiliate of the IRGC, and to impose additional sanctions under CISADA and the ISFR if the answer was "yes."

500.    In September 2012, Treasury presented a report to Congress concluding that NIOC was an agent or affiliate of the IRGC. Although full details of the report were not published, the bottom-line conclusion was. Treasury publicly announced that that "the IRGC's influence has grown within NIOC" under the current regime, and that "the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions." Reacting to Treasury's determination, Dubowitz publicly commented that "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization," *i.e.*, the IRGC.

501.    Over time, public information linking NIOC and its subsidiaries to the IRGC only became more robust. In 2013, for example, Treasury designated Iranian businessman Babak Morteza Zanjani as well as NIOC's affiliate NICO for their connection to NIOC. Public reports throughout the 2010s continued to alert SCB to the direct link between NIOC transactions and IRGC-sponsored acts of terrorism.

502.    SCB also knew that its Caspian Petrochemical transactions were NITC-related; this is yet another reason SCB knew it was aiding IRGC-sponsored terrorist attacks. Media reports alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, *Reuters* reported that "[s]upporters of tougher Iran sanctions measures are aiming to get NITC on a U.S. blacklist for what they say are links to the Iranian Revolutionary Guards Corps (IRGC)." In 2014, *Iran Briefing* reported that "[t]he IRGC has a major stake in the petrochemical industry, including … the National Iranian Tanker Company."

503.    Terrorism scholars alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, Mark Dubowitz, of the Foundation for Defense of Democracies, warned that

"NITC is a critical element of the IRGC-controlled oil supply chain. Its tankers enjoy free access to global ports around the world despite the IRGC's reputation as an international outlaw."

504.    Congressional hearings alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, Congresswoman Ileana Ros-Lehtinen and Mark Dubowitz confirmed in an exchange that NITC played a key role in the logistics chain upon which the IRGC relied to sponsor acts of terrorism:

> ROS-LEHTINEN: Now, Iranian tankers [operated by the NITC] have been turning off their outbound/onboard vessel tracking system even though the International Maritime Organization requires that those systems stay on. Can multilateral actions be taken against the National Iranian Tanker Company to penalize Iran for its activities? And what specific role does the National Iranian Tanker Company play within the IRGC supply chain? ...
> DUBOWITZ: We -- we've -- there already is existing authority under U.S. law. The president has the power to really crack down on the Iranian economy, on the Iranian oil sector.
> We should be designating the National Iranian Oil Company and all its subsidiaries. We should be designating the National Iranian Tanker Company and make it very difficult for the Iranians to ship [oil].

505.    Decades of reports by the media, United States, United Nations, NGOs, terrorism scholars, and others confirmed that SCB's transactions on behalf of, or for the benefit of, NITC directly enabled IRGC-sponsored acts of terrorism targeting the United States and committed by the Qods Force, Hezbollah, and their proxies.

506.    For example, the international news agency *Reuters* consistently warned about such risk since the 1990s, as it did in 1995:

> Iran has minimised the impact of a U.S. trade ban by finding alternative markets for its crude oil in Europe, Asia and South America, an Iranian oil source said ...
> "We have had a general policy of trying to diversify our customers and only a few months after the ban was imposed we have been successful to a large extent in lowering the effects of the embargo," the source told Reuters.
> "The National Iranian Oil Company (NIOC) has done its best to seek other markets in countries such as South Asia, Europe and South America. The feedback has been good," said the source ...

> "We have been successful in selling our crude oil and keeping its price almost intact and competitive. This shows that NIOC has been able to tolerate the situation," the source said.
>
> **Washington accuses Iran of sponsoring international terrorism** …
>
> The trade ban has pushed Iran … to … resort to the international shipping market.
>
> **The source said the efforts to offset the U.S. trade ban was reflected in the fact that Iran's National Iranian Tanker Co. (NITC) has ordered new tankers … and accelerated chartering activity.**
>
> "[NITC] has ordered new vessels such as double hull tankers and other types of ships. NITC has also been scrapping its old vessels and chartering tankers," the source said. (Emphasis added.)

Other *Reuters* reports similarly warned about NITC's direct enabling of Iranian evasion of U.S. counterterrorism sanctions targeting Iran. *Reuters* even specifically warned that NITC-related transactions in Dubai were designed to evade U.S. counterterrorism sanctions.

507.    Terrorism scholars also alerted SCB that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2011, for example, Mark Dubowitz warned "IRGC companies that are part of the crude oil supply chain" included "National Iranian Tanker Company (NITC)" such that transactions with such IRGC companies furnished "Iran's oil revenues" and provided "the regime the hard currency it needs to operate" by financing "companies doing business with Islamic Revolutionary Guard Corps (IRGC) entities in the crude oil trade" that directly enabled Iranian efforts "supporting … terrorism."

508.    Public advocacy campaigns also alerted SCB that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2012, for example, UANI sponsored a public campaign alerting European entities that the IRGC had seized NITC and was using it to sponsor terrorism.

509.    American prosecutors also directly warned SCB that helping Iran-related oil and gas firms evade U.S. sanctions directly financed IRGC sponsored terrorism. On February 14, 2013, for example, Manhattan District Attorney Cyrus Vance Jr. spoke at a high-profile event

covered by the media, at which, on information and belief, one or more SCB employees or agents were present. In that speech, Vance alerted companies that with respect to U.S. "sanctions enforcement" targeting "ships" that "transported Iran's oil" recognized that such vessels were the "same ships also transported weaponry intended for Hamas and Hezbollah, and components intended for Iran's military." Vance also emphasized that such firms' ability to access the New York financial system was vital to their ability to turn sanctions evasion into terrorist violence: "The sanctions are potentially devastating, because the international shipping industry runs on U.S. dollars. … The companies consisted of the same people, same addresses, same ships, and same business. The defendants in this case did this with the express purpose of fooling OFAC filters. And for a while they succeeded, causing Manhattan banks to process over 60 million dollars worth of illegal payments until we were successful in shutting them down."

510.    Beyond that, SCB knew that Ayatollah Khamenei and the IRGC followed a pattern and practice of earmarking a certain percentage of *all* Iran's oil revenue for redistribution to IRGC proxies, including Hezbollah, Hamas, and JAM. From 2000 through 2020, Ayatollah Khamenei regularly publicly touted his and the IRGC's effective monopoly over Iran's oil and gas sector—and attendant lucrative export base—and that this control comprised one of the Ayatollah's and IRGC's greatest strategic weapons to finance their shared effort to "export the Islamic Revolution" through IRGC-sponsored acts of terrorism committed by IRGC proxies. In this context, the Supreme Leader, the SLO, the IRGC, and Iranian officials who had to toe their line, always treated all Iran-based oil revenues uniquely amongst all Iranian industry sectors by specifically earmarking a fixed percentage of revenue from *every* oil-related transaction in Iran to directly flow to Hezbollah, Hamas, and the IRGC's other proxies in the Middle East.

511.    SCB knew this for a host of reasons, including, but not limited to, because SCB

employees and agents in Iran were aware of such facts and because media outlets reported on the

Iranian regime's efforts to get other potential Hamas-oil-financiers to follow the Ayatollah's and

IRGC's lead. For example, a *Reuters* report published on May 30, 2006—after Hamas seized

control of the Gaza Strip—alerted SCB that former Iranian President Khatami publicly called for

every oil-producing Muslim government to follow Iran's lead and earmark a fixed percentage of

every oil dollar that their regime's own respective oil monopoly generated for Hamas, which the

Iranians would help ensure reached Hamas notwithstanding U.S. counterterrorism sanctions

seeking to deprive Hamas of the funds to pay for attacks:

> Former Iranian President Mohammad Khatami called on Muslim oil-producing
> countries to give 1 percent of their oil revenues to the cash-strapped Palestinian
> government led by Hamas. …
>     Khatami said the [U.S.] and Israel were depriving Palestinians of their
> rights by withholding funds and that Islamic states needed to do more to help. ….
>     Hamas … is cash-strapped because the United States and its allies have
> cut off aid to the body to pressure Hamas to renounce violence and recognise
> Israel. Hamas's charter calls for the destruction of the Jewish state.
>     "Given the rise in oil prices the producer countries should expect to
> deposit 1 percent of their oil revenues," Khatami said.
>     Iran [is among the countries that] … have pledged funds totalling more
> than $200 million. But the [Hamas] cannot access the money because local,
> regional and international banks have balked at making the transfers, fearing
> sanctions by Washington, which considers Hamas a terrorist group.

512.    On December 20, 2006, similarly, Iranian President Ahmadinejad—whom SCB

knew was an outspoken supporter of Hamas's terrorist attacks in Israel—gave a speech broadcast

on Iranian state TV, which BBC then annotated as follows: "[Mahmoud Ahmadinejad:] The

believers and worshippers of God, who are in charge of the oil resources, put aside their own

personal needs, to present and donate their assets in order to help others, to elevate society and to

bring comfort to other people who share their faith [[BBC:] presumably, he is trying to justify

donating Iran's oil money to the Palestinians and the Lebanese Hezbollah]."

513.    Even the name "Caspian Petrochemical" alerted SCB to the terrorist connection because it connected the matters to (a) "Caspian" and (b) "petrochemical," which SCB knew meant "SLO" and "IRGC." Ayatollah Khamenei specifically, and regularly, touted that Iran was inextricably connected to all things relating to Caspian Sea-related petroleum issues. On May 3, 2001, for example, Iranian state TV covered a speech by Khamenei, contemporaneously reported upon by BBC, as follows:

> Ayatollah Khamenei, … [said] "[T]he Islamic Republic of Iran will defend its rights and the rights of the Iranian nation on every front. … The Caspian Sea is a[n] enclosed sea which belongs to its littoral states. No power from anywhere in the world has the right to interfere in or exert influence on … the affairs of that sea. According to international laws there are five littoral states. The fate of that sea lies in the hands of those five countries. And, here and now, I take this opportunity to declare that the legal status of the Caspian Sea and the balance between the various activities of the five countries in that sea should be maintained between those five countries - all the five countries. It cannot be done through bilateral contacts and agreements."
>     Stressing the importance of realizing Iran's rights in the Caspian Sea in the fields of oil and gas, … Khamenei added: "Everybody knows that the Iranian nation and the Islamic system do not permit their right be undermined in the slightest, whether on land or at sea."

On May 4, 2001, similarly, media outlets reported that Ayatollah Khamenei repeated this message, and underscored Iran's—and Khamenei's—direct connection to all issues relating to the development, extraction, and trade of petrochemical products in the Caspian.

514.    Regular reports of IRGC terrorist activity in the vicinity of, and connected to the IRGC's desire to dominate, the Caspian also alerted SCB that Caspian petroleum-related transactions foreseeably involved the IRGC. On February 10, 2008, for example, the *L.A. Times* reported that the IRGC had been conducting operations in the area near the Caspian as part of the Ayatollah's strategy to dominate the region.

515.    SCB also knew that Caspian Petrochemical was involved in the South Pars-related petroleum trade. Decades of reports confirm that this one fact alone alerted SCB that its

transactions likely funded IRGC operations. From 2005 through 2020, reports and statements by the United States, terrorists, media outlets, due diligence resources, terrorism scholars, and ordinary citizens alerted SCB that the IRGC had seized control of Iran's interests in the South Pars petroleum and that everything relating to any Iran-related party's direct or indirect involvement in South Pars was inextricably connected to, and ultimately financially benefited, the IRGC. Such reports included, but were not limited to:

a.  *Islamic Republic News Agency*, January 5, 2005: "A consortium … has won the tender for Phases 15 and 16 of the giant South Pars gas field development project, … [which] consortium [] includes Sadra and Khatam ol-Anbiya … companies of Iran."

b.  *Agence France Presse*, June 27, 2006: "[T]he Revolutionary Guards ... is set to enter the oil and gas sectors in a move that would increase their stake in [Iran]'s economy. 'The Revolutionary Guards have obtained the contract to develop phases 15 and 16 of South Pars,' … General Abdolreza Abed said in an interview with the Shargh newspaper. Abed, who heads up [KAA], said the contract was worth 2.09 billion dollars. The deal would be a major boost to the operations of the [IRGC] .... It comes on the back of a string of advances into Iran's economy: several weeks ago ... the [IRGC] ... were awarded a 1.3-billion-dollar contract to construct a 900-kilometre (570-mile) pipeline between South Pars and southeastern Iran. In both South Pars cases, the projects were awarded after the usual tendering process was abandoned. For the South Pars development deal, the [IRGC] -- under the name of their economic nerve centre of [KAA] -- entered a partnership with [a] Norwegian firm …, although this firm subsequently pulled out. The oil ministry then moved to open another tender process, but this was cut short. ... For many observers, the wave of lucrative deals going to the [IRGC] is connected to last year's shock presidential election win by hardliner Mahmoud Ahmadinejad -- a veteran of the [IRGC] -- who promised to favour domestic entrepreneurs. ... [IRGC] General Abed [head of KAA] told the centrist Shargh newspaper that there was nothing wrong with the [IRGC] … branching out. 'Since when do the [IRGC] have to stick to building roads, dams, small tunnels or short pipelines?" he argued. "If we take on big projects we can put small entrepreneurs to work.' ... [W]ith foreign investment in the oil sector limited, the Guards appear ready to shift into top gear by filling the gap -- with General Abed also revealing [the IRGC]'s involvement in a new petrochemical port. 'Thirty percent of the [IRGC]'s engineering capacity is dedicated to economic activities, and 70 percent to military,' [IRGC General Abed] said."

c.  *Reuters*, June 29, 2006: "Iran has awarded the Revolutionary Guards corps a contract to develop two phases of [Iran]'s giant South Pars gas field … The two phases were originally awarded to a consortium of international and domestic companies led by Norway's Aker Kvaerner, which quit the deal in May 2005. 'It is a $2.09 billion contract. Phases 15 and 16 will produce 56.6 million cubic meters of natural gas,' state radio said. … Khatam al-Anbia firm, the engineering arm of the [IRGC], will take charge of the

onshore work for the two phases. Iran is in dispute with the international community over its nuclear programme and Tehran could face United Nations sanctions, which would make operating there even more difficult for foreign companies. Signing big contracts with foreign firms is politically toxic in Iran, which sits on the world's second largest reserves of natural gas but has been slow to develop it for export. … Earlier this month, the [IRGC] won a $1.3 billion project to build a … pipeline from South Pars to the eastern province of Sistan-Baluchestan, the route for Iran's gas export to Pakistan."

d.   _Economist Intelligence Unit_, July 21, 2006: "The engineering arm of the … IRGC … has made further inroads into the oil and gas sector, having been selected as the main contractor for the development of Phases 15 and 16 of the South Pars gas scheme. Sharg, a local newspaper, quoted General Abdolreza Abed, head of the IRGC's [KAA], as saying that the order will be worth some US$2bn. The order follows a US$1.3bn contract to build a … pipeline linking South Pars fields to southeastern Iran. … IRGC will be working with local partners on the two South Pars phases, which envisage production of some 1.8bn cu ft/day of natural gas, 1m tonnes/year of liquefied petroleum gas, a similar quantity of ethane and 80,000 barrels/day of condensates. … Much of the work in Iran's oil and gas sector is now being allocated to local firms, because of the difficulty facing foreign companies in concluding financial and commercial terms."

e.   _Economist Intelligence Unit_, August 3, 2006: "Evidence of any direct consequences of the changed political and economic environment on the amount of foreign trade and investment in Iran is hard to come by. The re-awarding of contracts such as those related to the giant South Pars gasfield … [by] the Revolutionary Guards … ha[s] undoubtedly made foreign companies cautious. … [T]here have been reports in the Western press that four European banks, under pressure from the US government, have reduced their presence in Iran (May 2006, Foreign trade and payments) … It is expected that bank charges for doing business in or with Iran will have risen, possibly in response to a perceived increase in the complications of doing trade."

f.   _Economist Intelligence Unit_, August 3, 2006: "Mahmoud Ahmadinejad … appears to be increasingly favouring domestic companies when awarding government contracts, and giving a growing role to those linked to the … IRGC … in particular. In June a US$1.3bn contract for a gas pipeline linking Assalouyeh, Bandar Abbas and Iranshah was awarded to the [KAA]. The pipeline is to supply gas from the South Pars field to Sistan-Baluchestan, Hormuzgan and Kerman, and the contract was signed in the uniformed presence of Major-General Yahya Rahim-Safavi, the IRGC's commander. In June the IRGC also scooped the main exploration contract for phases 15 and 16 of South Pars. The deal was originally made in January 2005 with a consortium of Aker Kvaerner (Norway), Sadra (Iran) and the [IRGC]. It now seems—the news emerged from an interview given by General Abdolreza Abed to Shargh, a reformist daily, before a signing ceremony at South Pars—that the IRGC has edged out Aker Kvaerner. [KAA] will lead a local consortium that includes Saaf Offshore, Isolco (the Iran Shipbuilding and Offshore Industries Company) and IOEC (the Iran Offshore Engineering and Construction Company). Phases 15 and 16 are scheduled to involve the production of 50m cu metres/day of treated gas for domestic use, 1m tonnes/year (t/y) of liquefied petroleum gas for export, 80,000 barrels/day (b/d) of condensates for export and 1m t/y of ethane for

domestic petrochemical works. The news prompted fears among local contractors that the government would award other contracts to [KAA]."

g.   *Investor's Business Daily*, November 8, 2006: "Mahmoud Ahmadinejad's terrorist regime needs billions in foreign investment in the coming years to compete with other OPEC countries. That means serious international sanctions can be a powerful weapon. The Islamofascists … have repeatedly made it clear they're … the backers of terrorist outfits like Hezbollah …. Iran may have lots of oil and natural gas in the ground, but if it doesn't get ahold of tens of billions of dollars in outside capital in the years ahead, it won't be able to extract and refine those commodities. … The world has plenty of leverage available: … European and Asian companies run gas and petrochemical plants in South Pars …, the largest natural gas field in the world. Shut all that down, along with all energy-related exports and imports, and Ahmadinejad and supreme leader Ayatollah Ali Khamenei just might find themselves fighting for survival."

h.   *Washington Times*, August 16, 2007: "The [U.S.] … decision to designated [the] … IRGC [Qods Force] … as a 'specially designated global terrorist' (SDGT) organization strikes a huge blow against one of the world's most deadly jihadist groups. The IRGC, through its longstanding relationship with Hezbollah, has the blood of hundreds of Americans on its hands … Earlier this year, [Dr.] Matthew Levitt … (a former deputy assistant secretary of the treasury specializing in terrorism-finance issues) wrote in *The] Washington Times* that … 'the IRGC's business and industrial activities - especially those connected to the oil and gas industries - are heavily dependent on the international financial system.' In other words, these are precisely the kind of projects where Iranian regime elites are vulnerable to American and international economic pressure. These [IRGC projects include a contract worth $1.3 billion to build parts of a pipeline and another worth more than $2 billion to develop part of [] South Pars …. [R]ecently, the IRGC - and in particular, a section known as the Quds Force - has been heavily involved in aiding Hezbollah, as well as … Hamas …. At a press conference last month, U.S. military officials in Iraq said that the Quds Force is bringing groups of up to 60 Iraqi insurgents at a time to training facilities near Tehran, where they are taught how to carry out kidnappings and use rockets and improvised explosive devices to kill and maim American troops. American officials also say that the IRGC is responsible for smuggling explosively formed penetrators (EFPs) into Iraq. The EFPs, which can penetrate the armor of a Humvee and are used almost exclusively by Shi'ite militias, accounted for one-third of the combat deaths suffered by coalition forces last month. The 99 strikes that occurred with EFPs in July were the highest total since the war began. Earlier this year, Mr. Khamenei vowed to hit back at U.S. interests worldwide if Iran were attacked. … By hitting the Revolutionary Guards with sanctions, the Bush administration is weakening their capacity to finance more terror, and clearly it hopes to shame the Europeans and the Japanese in cutting their financial ties to these serial killers of Americans."

i.   *Washington Times*, August 16, 2007: "[The] Revolutionary Guard Corps, which faces the prospect of severe U.S. financial sanctions as a 'terrorist organization,' represents a tempting target given its multibillion-dollar commercial empire ranging from oil fields to honeybee farms. … The U.S. terrorist designation would freeze any U.S. assets of the IRGC, but financial analysts say its greater practical effect would be to discourage

companies and banks from other nations from working with the corps' various subsidiaries. … the IRGC's financial scope has expanded dramatically with the election of Islamic hard-liner Mahmoud Ahmadinejad as president in 2005. According to a survey by the … International Crisis Group, [KAA] won a string of major contracts from the Ahmadinejad government, including … a $1.3 billion oil pipeline contract, and a no-bid $2.09 billion commission to develop parts of the vast South Pars natural gas field. … U.S. officials say such profits matter because it is IRGC's foreign military arm, known as the Quds Force, that is suspected of providing funds, training and equipment to anti-U.S. forces in Iraq, … Lebanon and the Palestinian territories."

j.    *Christian Science Monitor*, August 6, 2009: "The Bush administration regularly accused the Guards of supplying advanced explosives to insurgents in Iraq … In a rare disclosure, businesses were put at 30 percent of IRGC 'capacities' in a 2006 interview by Brig. Gen. Abdol-Reza Abed, an IRGC deputy commander and head of Khatam-ol-Anbia, one of its many companies. The IRGC's economic role has clearly increased with projects awarded by Ahmadinejad. Within a year of his taking office, [KAA] won a $1.3 billion contract for a gas pipeline …, and … for developing part of the South Pars gas field."

k.    *Economist Intelligence Unit*, August 19, 2009: "The [Iranian regime] has approved an additional US$1bn investment to be allocated to [KAA], a company owned by the [IRGC], to develop Phases 15 and 16 of the giant South Pars gasfield. … Total said in 2008 that it could not proceed …, in the face of increased costs and the tense international situation over Iran."

l.    Rasool Nafisi (IRGC Scholar and Author), September 18, 2009: "Symbiotic Relationship[:] Upon becoming president, Ahmadinejad wasted no time in awarding the juiciest government contracts to the IRGC. [KAA], the industrial and construction wing of the IRGC, was given no-bid contracts to develop the 15th and 16th phases of the South Pars Gas Field, and to build a … pipeline to Pakistan and India. It was also allowed to take over the Kish Oil Company. These deals turned the already massive [KAA] into one of the largest conglomerates in the Middle East."

m.    *Mehr News Agency*, April 18, 2010: "[A]n all-Iranian consortium will be vested with developing the South Pars … phases 22-24. … The consortium is consisted of [KAA], Industrial Development and Renovation Organization of Iran (IDRO), and some offshore contractors such as Iran Shipbuilding & Offshore Industries Complex Co (ISOICO), Sadaf, Sadra, and Iranian Offshore Engineering and Construction Company … Iran, having the world's second largest gas reserves and third largest oil reserves, is trying to play a more active role in oil and petrochemical transactions in international markets."

n.    *Agence France Presse*, May 28, 2010: "Iran has awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field, the *Mehr* news agency … Guards unit [KAA] would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. He also confirmed reports earlier this week that phases 22, 23 and 24 were to be awarded to [KAA]. … The development of the giant offshore field has been delayed amid a lack of investment in a country faced with severe

gas needs of its own and because of difficulties in procuring the technology to develop these fields. [KAA] … is under US and UN sanctions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] ….”

o.  *Agence France Presse*, June 15, 2010: “Iran … signed contracts worth 21 billion dollars with local firms to develop six gas fields, some of them awarded to the [IRGC], state media reported. The state television website said the ‘contracts to develop the South Pars gas fields -- phases 13, 14, 19, 22, 23 and 24 -- were inked with three consortia including [KAA],’ the [IRGC’s] industrial conglomerate. … Iran previously discussed handing over phases 13 and 14 to Royal Dutch-Shell and Spain’s Repsol YPF, but the two giants held off on a final decision as new UN sanctions loomed against Tehran … The [IRGC] … has been targeted in the fresh UN sanctions … Last month the [IRGC] said it was ready to take over energy projects in Iran if Western firms stayed away ….”

516.    Indeed, SCB needed only know—as SCB did know—that Caspian Petrochemical was a company that sought to help the Iranian regime generate more oil revenue. Decades of reports confirm that such fact alone—and nothing else—alerted SCB that its transactions likely facilitated IRGC-sponsored terrorism by groups like Hezbollah and Hamas. Decades of reports and statements by the United States, terrorists, media outlets, terrorism scholars, and ordinary citizens alerted SCB that every time it provided illicit financial services to any customer in connection with Iranian oil- or gas-related transaction, it ran an extreme risk that the other side was funding the Qods Force, Hezbollah, Hamas, and JAM and, moreover, even if such person was not, the end revenues would likely flow to such terrorists, given the Iranian regime’s long-standing and unique treatment of the revenues it realized from its oil and gas monopoly. Such reports included, but were not limited to:

a.  *Agence France Presse English Wire*, February 6, 2006: “Iran … formally notified the [IAEA] of its decision to restart sensitive nuclear work at the centre of international concerns the hardline regime could acquire nuclear weapons. Senior [Iranian] officials also played down the threat of sanctions … emphasising [Iran]’s vast oil wealth … in an interview with *Handelsblatt*, US Defence Secretary Donald Rumsfeld said the United States does not rule out using military force against Iran. ‘All options, including the military one, are on the table,’ Rumsfeld [said], repeating his fears that weapons of mass destruction could fall into the hands of terrorists and branding Iran ‘the main sponsor of terrorist organisations such as Hezbollah and Hamas.’ But [regime spokesman Gholam Hossein] Elham said oil-rich Iran still had the upper hand when it came to enduring any

eventual sanctions. … 'Any decision in this regard [*i.e.*, for the United States to impose sanctions targeting the IRGC, responsible for Iran's nuclear program] will not hurt us. It will hurt the consumers and not the producers. We are in a position of power when it comes to energy, and it will not have any affect on our budget,' he said."

b.   <u>White House Press Secretary Scott McClellan, February 22, 2006</u>: "[Reporter:] Iran, as you probably know, has now said that it would help fund Hamas, has said that its oil revenues ... will help amply pay for Hamas as needed. What's the U.S. reaction? And does this undercut any sanctions against Iran? [McClellan:] Well, … the regime in Iran … [has] been a destabilizing force in the … Middle East. Our views are very clear when it comes to the regime. ... And in terms of Hamas, ... we've made it very clear that ... they continue to engage in terrorism and continue to advocate the destruction of Israel."

c.   <u>President of Israel Shimon Peres, March 18, 2008</u>: "Iranian oil money is funding world terror, including Hamas and Hezbollah terror."

d.   *Agence France Presse English Wire*, March 18, 2008: "After meeting [German Chancellor Angela] Merkel, [Israeli President Shimon] Peres stressed that … 'the money earned from oil enables Iran to finance international terrorism, particularly the terrorism of Hezbollah and Hamas.'"

e.   *Jerusalem Post*, March 19, 2008: "German Chancellor Angela Merkel told the Knesset ... 'I say it in a clear voice - the [Hamas and PIJ] Kassam [rocket] fire [targeting Israeli civilians] must stop,' Merkel said. 'Terror attacks are a crime, and do not resolve political disputes.' Prime Minister Ehud Olmert praised Merkel's 'strong and determined position against the horrific calls from the president of Iran to wipe Israel off the map ….' ... Merkel, … also met with President Shimon Peres, who said … that Iranian oil revenue was funding world terrorism - including Hamas and Hizbullah."

f.   *Reuters*, May 5, 2008: "Israeli President Shimon Peres … said … 'Oil ... is [] promoting terror,' said the 84-year-old Nobel Peace Prize winner … Peres argued that manifold increases in oil prices in recent years had contributed to a rise in financing for terrorism in the Middle East … Peres took particular aim at Iran, repeating recent comments that Tehran's nuclear programme and its rhetoric against Israel may pose a greater threat than the Nazis in the 1930s and 40s. Israel accuses Iran, a major oil and gas producer, of financing Hezbollah, the Lebanese guerrilla movement, and Hamas, which controls the Palestinian Gaza Strip, both of which are sworn enemies of Israel."

g.   *Joplin Globe*, January 17, 2009: "Make no mistake; Iran is a strong and tenacious adversary. Fueled with petro dollars from their abundance of oil reserves, Iran supports strong anti-Israeli and anti-Western militias such as Hamas and Hezbollah. Iran is responsible for many thousands of American and Iraqi deaths."

h.   <u>Senator John Kerry, May 12, 2009</u>: "[A] massive continuous transfer of American wealth to oil exporting nations ... [flowed] revenues and power and sustained … global terror funded indirectly by our expenditures on oil … Too often the presence of oil multiplies threats ... Iran uses petrol dollars to fund Hamas and Hezbollah ...."

i.  *Newsweek*, June 29, 2009: "In 2005 … Khamenei backed Ahmadinejad …, a veteran of the … Revolutionary Guards and willing to kiss the Supreme Leader's feet. Ahmadinejad won. In the four years since, taking advantage of billions in windfall revenues from high oil prices, Iran has … funded Hamas as it took over Gaza, and supported and armed Lebanon's Hizbullah in its 2006 war with Israel."

j.  *APS Review Oil Market Trends*, April 5, 2010: "Without money from oil, [Israeli Infrastructure Minister Uzi] Landau argued, Iran would fade as a regional power and 'terror groups' such as Hamas … and Hizbullah … would cease to exist."

k.  Dr. Abdallah al-Nafisi (Academic; *Al Jazeera* Commentator), June 16, 2010: "Iran gets on every boat to reach power and influence in the Arab region. A country very rich with … oil revenues, Iran uses its establishment of and support for Hezbollah … and its support for Hamas and … as bridges to get to its objectives. What harms Iran if it gives Hamas $23 million monthly to run things in Gaza? What harms Iran if it gives the Islamic Jihad $5 million or so to maintain the Palestinian gun? But in return, Iran gains much. It is as if Iran is telling Israel: My border is in Gaza, not in Tehran, and my border is in Al-Urqub [in south Lebanon] through Hezbollah, not in Tehran. So, Iran is gaining a great deal of ... physical influence through its support for Hezbollah and Hamas. ... We welcome Iran's support for [Hezbollah] and its support for Hamas and others."

l.  Elliot Bartky and Allon Friedman (Jewish American Affairs Committee of Indiana), August 1, 2011: "[D]eprive Iran of the oil revenue they've used to support terrorist groups such as Hezbollah and Hamas, … and … kill American troops in Iraq."

m.  *Jerusalem Post*, May 28, 2013: "[E]ntrenched oil interests … [in] Iran … and the downstream industries their petro-dollars support worldwide [mean that] … [a]s long as Iran … can export oil profitably, Hamas [and] Hezbollah … can have their weapons underwritten by the oil addictions of the regular oil consumers of the world."

n.  Kevin McGee (Univ. of Wisconsin-Oshkosh), September 13, 2015: "[Acts] that will allow Iran to sell much more oil [are inextricably connected to the IRGC's] … use [of] some of the [resulting oil] revenue to support Hamas, Hezbollah and its other cronies."

517.    SCB's transactions on behalf of Caspian Petrochemical fueled Hezbollah's and Hamas's acts of terrorism against Plaintiffs. Decades of government reports and speeches published by the United States, United Kingdom, European Union, and United Nations confirmed the IRGC's oil-related financial transactions that benefited the IRGC were inextricably connected with IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah,

Hamas, and JAM. From the 2010 through the present, such U.S., U.K., E.U., and/or U.N.

government findings, reports, statements, and warnings included, but were not limited to:

a.  Treasury, June 16, 2010: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b.  State, April 8, 2011: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c.  Treasury, March 28, 2012: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the … oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

d.  State, May 24, 2012: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

e.  Treasury, May 23, 2013: "'As long as Iran continues [its] … defiance of multiple UN Security Council Resolutions, the U.S. will target and disrupt those involved in Iran's illicit activities,' said Treasury Under Secretary for Terrorism … David S. Cohen. 'We will continue to work with our international partners to intensify this pressure and tighten sanctions on Iran's energy sector as it provides much needed financial support for the Iranian regime's proliferation activity.'"

f.  DOJ, July 1, 2020: "In 2014, … Treasury further noted that under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of [KAA], a construction and development wing of the IRGC that generates income and funds operations for the IRGC. … On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism. On April 15, 2019, the Secretary of State designated the IRGC, including the IRGC-QF, as Foreign Terrorist Organization.

According to … Treasury, the IRGC and its major holdings have a dominant presence in Iran's … oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including … support for terrorism … abroad. … "[IRGC] profits from [commercial] activities support the IRGC's full range of nefarious activities, including … support for terrorism… abroad. 'The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities,' said then-Under Secretary for Terrorism … Sigal Mandelker."

518.    Terrorism scholars also confirmed that KAA-related profits—which described those of Caspian Petrochemical—directly financed IRGC-sponsored attacks committed by IRGC proxies, including Hezbollah and Hamas, and alerted SCB to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele Ottolenghi publicly warned:

[KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. …

Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …

[B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence.

No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. … And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad.

The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

519.    In 2017, Matthew McInnis, of the American Enterprise Institute, publicly testified before Congress that KAA profits funded IRGC-sponsored acts of terrorism committed by IRGC proxies throughout the Middle East, including by Hezbollah and JAM:

Iran seeks to … assert its regional hegemony by displacing the United States as the dominant regional power. … Iran has utilized its "Resistance Network" of partners, proxies, and terrorist groups, including … Lebanese Hezbollah, and Iraqi groups like the Badr Corps, Khataib Hezbollah, and Asaib Ahl al-Haq. …

Iran continues to invest in training and arming its proxies and partners with increasingly advanced equipment, with its most trusted groups receiving the best weaponry. Lebanese Hezbollah acquired unmanned aerial vehicles and an estimated 100,000 to 150,000 rockets and missiles through Iranian assistance, including advanced air-to-ground and ground-to-sea missiles. Iran's Iraqi proxies employed the QFs' signature improvised explosive device, the explosively formed projectiles against coalition forces in the last decade….

How do we then stand up to Iran's destabilizing activities in the region and begin to dismantle Tehran's global terror network?

A re-invigorated economic warfare campaign against the [IRGC] should be one component - along with well-coordinated political, military, intelligence and information campaigns - of a larger U.S. strategy against Iran's malign influence in the region. Since the end of the Iran-Iraq War, the IRGC slowly expanded its role in the Iranian economy with at least 20 percent estimated to be now under the [IRGC]'s control. The IRGC owns the state's largest construction firm, Khatam al-Anbiya, and has major stakes in the banking, energy, extractive, and manufacturing sectors. This is how the Guard is able to fuel so much of its operations, …[including] weapons production [and] … proxy support worldwide. The United States has also often designated IRGC front companies that help Iran evade sanctions, acquire illicit technologies and transport weapons to partners. The [IRGC] also operates most Iranian ports and is deeply involved in the commercial shipping … sectors, which are critical elements in building and sustaining its proxy and terror networks in the Middle East.

520.    A wide array of terrorism scholars concluded that KAA profits directly financed IRGC-sponsored acts of terrorism committed by IRGC proxies like Hezbollah. For example, Ambassador Mark D. Wallace, CEO of UANI, observed that "Iran's aviation and engineering sectors are dominated by the Islamic Revolutionary Guards Corps ("IRGC") … the main instrument used in Iran's … global terrorist activities. The IRGC widely operates in these sectors through its engineering arm, Khatam al-Anbiya, which is also blacklisted by the EU, the U.S. and the United Nations. Surely, the risks associated with potential (even inadvertent) partnership with the IRGC and IRGC-affiliated entities are much too great for any responsible and law-abiding company." Mehran Riazaty, a former Iran Analyst for Multi-National Forces, Iraq (*i.e.*,

the U.S. military), observed that key Qods Force terrorists—who were direct beneficiaries of Khatam al-Anbiya profits—were tasked with using such profits to help the Qods Force and Hezbollah support IRGC-sponsored, JAM-involved attacks targeting the United States in Iraq after 2003. Saeed Ghasseminejad and Richard Goldberg, of the Foundation for Defense of Democracies, observed that "Khatam al-Anbiya is controlled by the IRGC … and helps finance Iran's … terrorist activities."

521.    When the IRGC priced its black market oil, liquefied petroleum gas ("LPG"), and other petroleum products, it took a simple approach: take the then-existing, publicly reported global market price for such commodity, and then haggle with their black market buyer over the size of a discount from that prevailing price to reflect the IRGC's inability to sell to any customer. At all times, the average price for LPG imports ranged between from $600 - $1,200 per ton, IRGC fronts that sold LPG to black market buyers reportedly offered discounts for around $100 per ton for large shipments. Thus, for example, if the price of LPG was $1,000 per ton, the IRGC would offer to sell the LPG at a discounted price of $900 per ton. On that sales price, the IRGC kept around 75% of that sum as the profit. Accordingly, from 2007 through 2020 *each ton* of IRGC LPG sold by the IRGC likely caused, at least, $300 in terrorist finance to flow through the transaction to the IRGC (including its Qods Force) and SLO and, through the Qods Force and SLO, to Hezbollah, Hamas, and JAM to finance their terrorist attacks in the Middle East.

522.    Given the IRGC's oil- and gas-production-related profit margins, SCB's facilitation of the IRGC's sales of oil and gas through SCB's transactions on behalf of, or otherwise involving, Caspian Petrochemical produced a financial windfall for the Qods Force, Hezbollah, and proxies, including Hamas and JAM.

523.    Representative transactions involving Caspian Petrochemical-related sales in 2017 and 2018—the direct product of SCB's years of illegal aid—confirms the point:

a.    In or about July 2017, Caspian Petrochemical coordinated with other IRGC fronts described herein to deliver about 44,000 tons of LPG produced by IRGC front PGPIC (affiliated with IRGC front KAA)—which PGPIC extracted from the IRGC's crown jewel, the South Pars gas field—and was shipped to a customer outside of Iran aboard the aboard the *Gas Commerce*.

b.    In or about December 2017, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at the IRGC's South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Commerce*, to a buyer in Asia.

c.    In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Pacific Rizhao*, to a buyer in Asia.

d.    In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Dignity*, to a buyer in Asia.

At the IRGC's prevailing profit margins, ***each*** of these four transactions likely yielded more than $10 million in funds that the SLO and IRGC caused to be distributed to Hezbollah, the Qods Force, Hamas, and JAM to finance their terrorist attacks in the Middle East.

524.    Indeed, the total scale of Caspian Petrochemical's terrorist finance likely exceeded $300 million between 2011 and 2017 alone. Plaintiffs' review of market data suggests that Caspian Petrochemical was likely involved in at least five or more transactions, analogous to each of the four described above, each year from 2011 through 2017—and likely substantially more than that. For example, just one of Caspian Petrochemical's strategic partners, Oriental Oil, reportedly exported more than 300,000 tons of LPG during one six-month stretch in 2017, which is equal to about seven of the above-described shipments, and Oriental Oil likely used Caspian Petrochemical for all or nearly all such transactions.

525.    From 2007 through at least 2017, SCB's provision of financial services to Caspian Petrochemical flowed at least several hundred million dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezbollah, Hamas, and JAM.

### C.    SCB Knew That Performing Atypical Banking Services For Elyassi Substantially Assisted IRGC-Supported Terrorism

526.    From 2007 through at least 2011, SCB helped the IRGC evade U.S. counterterrorism sanctions through its transactions with Mahmoud Reza Elyassi and his businesses.

527.    Elyassi was an agent for the IRGC and SLO. Elyassi operated a sophisticated, transnational, U.S.-dollar denominated currency exchange that was connected to essentially every major sector in which the IRGC and SLO exercised a monopoly on behalf of the Qods Force and Hezbollah, including, but not limited to, import/export, communications, construction, and energy. Elyassi also had essentially no public profile, was based in Iran but frequently traveled to Dubai, and attempted to recruit one or more SCB-related persons by inviting them to visit him in Tehran. Only one thing explains all these features: Elyassi's status as an agent for the IRGC and SLO. Simply put, as SCB knew, no Iranian national could have displayed the profile, or engaged in the transactions, like Elyassi, without the IRGC's and SLO's knowledge. The enduring nature of the scheme, combined with its cross-border (Qods Force domain) conduct permits only one conclusion: that his conduct was blessed by the IRGC (including the Qods Force). And that conclusion, in turn, requires—at a minimum—the conclusion that Elyassi was acting at the IRGC's (and Qods Force's) behest because the IRGC did not simply permit Iranians to launder vast sums of U.S. dollars for years while in contact with westerners without Qods Force involvement.

528.    SCB Dubai knew these facts, employed personnel with sophisticated regional knowledge, and benefited from the knowledge of SCB's office in Tehran through SCB's "One Bank" approach in which its various branches shared information and knowledge with one another seamlessly across borders. On March 3, 2009, for example, SCB stated: "Standard Chartered is a rather different bank and we want to keep it like that. We run as one bank across geographies and businesses."

529.    Regardless of whether SCB Dubai personnel connected the "Elyassi was an IRGC and SLO agent" dots in real time—and, on information and belief, SCB Dubai employees and agents did, in fact, figure it out—SCB Dubai knew that the *subject matter* of the Elyassi-related transactions was exclusively indicative of IRGC and SLO involvement. That was enough to alert SCB that its role in the transactions would flow funds to the terrorist proxies sponsored by the IRGC and SLO, the two most notorious of which always being Hezbollah and Hamas.

530.    When SCB Dubai serviced Elyassi, SCB knew, among other things: (1) Elyassi was an Iranian national; (2) Elyassi worked from Iran, but also traveled to Dubai; (3) Elyassi was running a sophisticated sanctions evasion scheme, which SCB knew was an exclusive province of the IRGC's monopoly; (4) Elyassi was operating a currency exchange, which SCB knew was also subject to an IRGC monopoly; (5) Elyassi held himself out as an import/export business, which was yet another IRGC monopoly; and (6) Elyassi's currency exchange activities likely involved energy and communications technology-related transactions—two more areas of IRGC monopoly. Simply put, SCB knew that every industry sector in which Elyassi purportedly transacted was one for which the IRGC held a monopoly. When SCB helped Elyassi evade U.S. counterterrorism sanctions, it helped flow money into all these IRGC monopolies, which directly funded the Qods Force, Hezbollah, Hamas, and JAM.

531.    Statements by U.S. and U.K. prosecutors and regulators confirm that Elyassi was an agent for the IRGC and/or the SLO. This is ineluctable for a simple reason: in connection with SCB's mine run of 2019 resolutions, every government authority that issued a statement emphasized, in sum and substance, that SCB's Elyassi-related conduct threatened the national security of the United States and/or United Kingdom. Such statements could **only** have been true if Elyassi was an agent for the IRGC and/or SLO for a simple reason that SCB knew given its sophistication and employment of in-house and outside intelligence professionals: the IRGC and SLO were the only two organizations in Iran that (a) directly threatened the United States and United Kingdom, while (b) playing a large role in the international financial system and having an insatiable need for U.S. dollars to conduct their operations. As SCB well knew, no other Iranian organizations fit that description.[168] For another simple reason, this conclusion would not change even if one were to infer (incorrectly) that such officials were only describing the Iranian regime's acquisition of weapons of mass destruction, like ballistic missiles: that program was entirely within the purview of the IRGC. Accordingly, no matter how one explains the official statements described above, they necessarily confirm that the IRGC and/or SLO benefited from Elyassi's transactions with SCB because the government's statements would be false if Elyassi had been acting for anyone else.

---

[168] Iran's Ministry of Intelligence and Security ("MOIS") provided intelligence to support IRGC operations, and on occasion participated in attacks alongside the IRGC, *e.g.*, kidnapping attempts targeting enemies of the Iranian regime. Unlike the IRGC and SLO, however, MOIS does not operate a vast network of terrorist fronts requiring U.S. dollars to operate. Moreover, MOIS generally financed its activities through official Iranian budget processes, while the IRGC and SLO, in contrast, drew all or nearly all the funds for their operations from off-budget sources, most of all, their network of commercial fronts.

532.    Every transaction that SCB conducted for Elyassi was atypical. SCB Dubai used all or nearly all its illegal tactics, techniques, and procedures as alleged in the previous section when it provided services to Elyassi. *See, e.g.*, *supra* Part VI.B.3.b.

533.    SCB's financial services were essential to the IRGC's ability to profit from the Elyassi-related transactions because the IRGC needed access to New York's financial system for his currency exchange to work and for the ultimate IRGC beneficiaries to receive their money in the most valuable form possible: U.S. dollars.

534.    Simply put, SCB defied decades of direct U.S. government warnings about the consequences that occur when a bank helps the IRGC obtain U.S. dollars through the American financial system in violation of U.S. sanctions targeting Iran. Decades of U.S. government statements confirmed the tight nexus between IRGC-facing sanctions violations and IRGC-sponsored acts of international terrorism targeting the United States. With respect to sanctions targeting IRGC support for terrorism, decades of public U.S. government findings, reports, statements, and warnings (often, all four in one item) alerted SCB that U.S. sanctions against Iran—like the ones SCB deliberately helped the IRGC evade—existed to protect Americans from IRGC-sponsored acts of international terrorism that targeted the United States, and persons who helped IRGC fronts evade such sanctions foreseeably enabled IRGC-sponsored acts of terrorism that targeted the United States. From 1990 through the present, such U.S. government findings, reports, statements, and warnings included, but were not limited to:

a.      <u>State, April 1990</u>: "In its various forms -- direct involvement, instigation and encouragement, support to terrorist groups through provision of safehaven, financial resources, arms, technical expertise, and documentation -- state sponsorship makes a significant contribution to international terrorism. … Support in its various forms enhances the capabilities of a … radical Shia groups throughout Western Europe, the Middle East, and Africa; … Iran was the most active state sponsor … The United States … designat[ed] … [Iran] … as [a] state supporter[] of terrorism … pursuant to Section 6 (j) of the Export Administration Act of 1979, which imposes certain trading restrictions

on countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism."

b.  <u>State, April 1998</u>: "The Secretary of State has designated [the Iranian] government[] as [a] state sponsor[] of terrorism … by providing arms, training, safehaven, diplomatic facilities, financial backing, logistic and/or other support to terrorists. The US policy of bringing maximum pressure to bear on state sponsors of terrorism and encouraging other countries to do likewise … [depends upon] [a] broad range of bilateral and multilateral sanctions [that] serves to discourage state sponsors of terrorism from continuing their support for international acts of terrorism, but continued pressure is essential. ... Iran remains the most active state sponsor of terrorism … Iran continues both to provide significant support to terrorist organizations."

c.  <u>White House, <i>National Strategy for Combating Terrorism</i>, September 2006</u>: "State sponsors are a critical resource for our terrorist enemies, often providing funds, weapons, training, safe passage, and sanctuary. Some of these countries have developed or have the capability to develop WMD and other destabilizing technologies that could fall into the hands of terrorists. The United States currently designates [Iran as a] state sponsor[] of terrorism … We will maintain sanctions against [Iran] and promote [the Iranian regime's] international isolation until they end their support for terrorists …. To further isolate these regimes and persuade other states not to sponsor terror, we will use a range of tools and efforts to delegitimate terrorism as an instrument of statecraft. Any act of international terrorism, whether committed by a state or individual, is reprehensible, a threat to international peace and security, and should be unequivocally and uniformly rejected. Similarly, states that harbor and assist terrorists are as guilty as the terrorists, and they will be held to account. Iran remains the most active state sponsor of international terrorism. Through its Islamic Revolutionary Guard Corps …, the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah [and] Hamas …. Most troubling is the potential WMD-terrorism nexus that emanates from Tehran. … We will continue to stand with the people of Iran … against the regime[] that oppress[es] them at home and sponsor[s] terror abroad."

d.  <u>Treasury (OFAC), February 2012</u>: "What activities by foreign financial institutions can subject them to CISADA sanctions? As described in the Iranian Financial Sanctions Regulations, the sanctionable activities of a foreign financial institution are: Facilitating the efforts of the Government of Iran (GOI) to acquire or develop Weapons of Mass Destruction (WMD) or delivery systems for WMD or to provide support for terrorist organizations or acts of international terrorism; Facilitating the activities of a person subject to financial sanctions pursuant to UNSCRs 1737, 1747, 1803, or 1929, or any other Security Council resolution that imposes sanctions with respect to Iran; Engaging in money laundering, or facilitating efforts by the Central Bank of Iran or any other Iranian financial institution, to carry out either of the facilitating activities described above; or Facilitating a significant transaction or transactions or providing significant financial services for: (i) the Islamic Revolutionary Guard Corps or any of its agents or affiliates whose property and interests in property are blocked pursuant to the International Emergency Economic Powers Act (IEEPA), or (ii) a financial institution whose property and interests in property are blocked pursuant to IEEPA in connection

with Iran's proliferation of WMD, Iran's proliferation of delivery systems for WMD, or Iran's support for international terrorism."

e.  State, April 2014: "In 2013, Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) … and Tehran's ally Hizballah, which remained a significant threat to the stability of Lebanon and the broader region. The U.S. government continued efforts to counter Iranian and proxy support for terrorist operations via sanctions and other legal tools. The United States also welcomed the EU's July 2013 designation of Hizballah's military wing as a terrorist organization. … Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity, including support for Palestinian terrorist groups in Gaza, and for Hizballah. … Iran used the [Qods Force] and its regional proxy groups to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is the regime's primary mechanism for cultivating and supporting terrorists abroad."

f.  Representative Ted Poe (Chairman of the House Subcommittee on Terrorism, Non-Proliferation and Trade), October 2015: "[The] Islamic Revolutionary Guard Corps (IRGC) has funded, planned and executed terrorist attacks against the United States … for decades … Treasury … has repeatedly cited the IRGC's support for terrorism and destabilizing activity throughout the Middle East and beyond. …There is also growing concern that the IRGC is engaging in financial evasion practices that erode the efficacy of the sanctions currently in place. Treasury currently sanctions companies that are 50% owned or controlled by the Iranian government or in which Iran wields a controlling interest. However, through control of a company's board of directors, the IRGC can exercise the same level of power over a company without meeting Treasury's designation trigger. By exploiting this … legal loophole, the IRGC has managed to become so deeply entrenched in the Iranian economy to the point that, as former Treasury Secretary Henry Paulson pointed out, 'it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC.'"

g.  Treasury (FinCEN), September 2018: "Treasury has consistently underscored the risks of conducting business with entities associated with Iran. Iran continues to use deceptive tactics including front and shell companies to exploit markets in numerous countries to fund its nefarious activities. Iran's tactics include forging documents, obfuscating data, and hiding illicit activities under official cover of government entities, among many others. For instance, Treasury sanctioned high-level officials of the Central Bank of Iran (CBI), including the CBI Governor at the time, for collaborating with the [Qods Force] to conceal the movement of millions of dollars to fund Hizballah. In addition, Treasury targeted a currency exchange network that Iran was using in Iran and the United Arab Emirates to procure and move millions of dollars to the IRGC-QF, which the CBI also enabled. To combat Iran's malign activities, including its efforts to deceive the international business community, since February 2017, OFAC has designated 146 Iran-related persons in 18 rounds of sanctions for Iran's support for terrorism, WMD proliferation, cyberattacks, transnational criminal activity, censorship, and human rights abuses. Additionally, financial institutions should be familiar with the requirements and prohibitions contained in UNSCR 2231 related to Iran. The continued suspension of

countermeasures against Iran keeps Iran on the FATF Public Statement. This action does not remove or alter any obligation of U.S. persons, including financial institutions, regarding a broad range of restrictions and prohibitions on engaging in transactions with or involving Iran given the large number of illicit finance risks associated with Iran, including … terrorist financing ….”

h.   Treasury (FinCEN), October 2018: “Iran's Abuse of the International Financial System[.] Some of the methods used by the Iranian regime to access the financial system through covert means and to further its malign activities include misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran (CBI). Iran also has a history of using precious metals to evade sanctions and gain access to the financial system and may seek to use virtual currencies in the future. Often, these efforts serve to fund the regime's nefarious activities, including providing funds to the [IRGC] and its [Qods Force], as well to Lebanese Hizballah, Hamas, and other terrorist groups.”

i.   Treasury (FinCEN), November 2018: “U.S. sanctions on the Iranian regime … are designed to greatly reduce Iran's capacity to continue its support for terrorism … Sanctions have included designations of the then-Governor of the Central Bank of Iran for conspiring with the [Qods Force] to conceal the movement of millions of dollars to enrich and support Hizballah … [which strategy relied upon] Iran's efforts to deceive legitimate businesses, including through the use of front and shell companies, to fund its malign activities.”

j.   Sigal Mandelker (Under Secretary for Terrorism and Financial Intelligence, Treasury), July 2019: “Our [sanctions] actions targeting Hizballah and its financial facilitators are also having real financial impact, which means Hizballah has less revenue to fund its destructive activities. In a January media report, employees of Hizballah's media and military systems complained of deep pay cuts and in March, Hizballah leader Hassan Nasrallah made an unprecedented call to his supporters to increase donations, pleading that fundraising efforts must be 'stepped up.' This is the direct result of our [sanctions] pressure on Iran and its proxies.”

k.   Sigal Mandelker (Under Secretary for Terrorism and Financial Intelligence, Treasury), September 2019: “[W]e have [] concentrated our efforts on combatting Hizballah's global financial networks. Since 2017, we have sanctioned Hizballah supporters in more than 20 countries, including in Europe, West Africa, and across the Middle East. … These sanctions are demonstrably working. Hizballah, which historically relied on upwards of $700 million per year in support from the Iranian regime, is now begging for donations. In March, their leader, Hassan Nasrallah, made an unprecedented call to his supporters pleading for fundraising efforts to be 'stepped up' after highlighting the financial pressure caused by our sanctions. Employees of Hizballah's media and military systems are also complaining of deep pay cuts. This lack of funding ultimately degrades their malign influence, and is the direct result of our pressure on Iran and its terror proxies.”

l.      Marshall Billingslea (Assistant Secretary for Terrorist Financing, Treasury), September 2019: "As a result of the [sanctions] pressure [the U.S. government] ha[s] been able to impose on Iran, Hizballah is also feeling the squeeze. Hizballah fighters have been furloughed or assigned to the reserves where they earn lower salaries; media employees have been laid off; and payments to the families of fighters have been slashed. In March, Hizballah leader Hassan Nasrallah bemoaned Hizballah's financial situation and called on his supporters to increase donations, echoing his previous call for a 'jihad of money'. Nasrallah has since increased his exploitation of charitable donations, diverting that funding to pay for militants."

m.      DIA, November 2019: "Since its establishment, the IRGC-QF has become an increasingly professional unit trusted by the supreme leader to conduct operations outside Iran, provide support to Islamic militants, and collect intelligence against Iran's enemies. … Tehran uses the IRGC-QF to provide financial, training, and materiel support—including facilitating terrorist attacks—mainly to regional Shia militant groups ideologically aligned with Iran. … The IRGC-QF receives official funding from Iran's defense budget, but it augments its operating budget through a network of IRGC-QF-affiliated companies worldwide. The IRGC-QF and some affiliated companies have come under international sanctions because of their involvement in terrorist activities and weapons proliferation."

n.      State, June 2020: "The Iranian regime and its proxies continued to plot and commit terrorist attacks on a global scale. In the past, Tehran has spent as much as $700 million per year to support terrorist groups, including Hizballah and Hamas, though its ability to provide financial support in 2019 was constrained by crippling U.S. sanctions. The regime was directly involved in plotting terrorism through its IRGC …, including plots in recent years in … the Middle East …. …Finally, the Iranian regime continued to foment violence, both directly and through proxies, in … Iraq, Lebanon, [and] Syria …. Through the IRGC-QF, Iran continued its support to several U.S.-designated terrorist groups, providing funding, training, weapons, and equipment. Among the groups receiving support from Iran [include] Hizballah [and] … Kata'ib Hizballah (KH) in Iraq, … [and other] Shia militant groups in Iraq."

o.      Treasury, September 2021: "Today, … OFAC … is designating members of a network of … financial conduits that fund Hizballah. Additionally, OFAC is designating members of an international network of financial facilitators and front companies that operate in support of Hizballah and [the Qods Force]. Together, these networks have laundered tens of millions of dollars through regional financial systems … for the benefit of both Hizballah and the IRGC-QF. Hizballah, with the support of the IRGC-QF, uses the revenues generated by these networks to fund terrorist activities, as well as to perpetuate instability in Lebanon and throughout the region. 'Hizballah and the IRGC-QF continue to exploit the international financial system to finance acts of terrorism,' said [OFAC] Director Andrea M. Gacki. 'The United States will not hesitate to take action to disrupt networks that provide financial support to Hizballah and IRGC-QF.' … Today's actions underscore the direct ties between Hizballah's global financial network and terrorist activities. Hizballah continues to exploit the legitimate commercial sector for financial and material support, which enables the group to carry out acts of

217

terrorism … Treasury's ongoing efforts [] target Hizballah and the essential support provided to it by Iran's IRGC-QF."

535.    Moreover, decades of reports published and re-published throughout the United States, Europe, and the Middle East by media outlets, scholars, NGOs, and IRGC victims themselves confirmed the tight nexus between IRGC-facing sanctions violations and IRGC-sponsored acts of international terrorism targeting the United States. Such reports included, but were not limited to (all emphases added):

a.    _Cleveland Plain Dealer_, May 23, 1996: "Secretary of State Warren Christopher is publicly flaying U.S. allies for not doing enough to isolate Tehran. … In preparation for [a] … meeting of the 'Group of Seven' …, Christopher … urged Congress to tighten economic sanctions against Iran, charging Tehran' s ayatollahs are behind the terrorist attacks in the Middle East. 'The United States believes Iran will change its behavior when the world makes it pay a sufficiently high … economic price,' Christopher said."

b.    _Independent_, October 26, 2007: "Washington justified the new sanctions by accusing the elite Quds division of the Revolutionary Guard Corps of the devastating campaign of roadside bombs by Shia militias against its troops in Iraq [and] supporting [JAM] in Iraq and [other] terrorist[] [groups] in … Lebanon and the Palestinian territories, and denying the existence of a fellow member of the United Nations, threatening to wipe Israel off the map. … The sweeping new US sanctions affect Iranian banks, companies, officials and government agencies which the White House says … **support[ed] acts of terrorism abroad**. The sanctions specifically targeted [IRGC] finances and eight affiliated companies. They also named five [IRGC] officials as well as the Quds Force …. The US hopes to cripple Iranian trade by isolating the banks from the world financial system."

c.    Prof. Raymond Tanter (University of Michigan), December 6, 2007: "I strongly concur in the sanctioning for proliferation activities of IRGC-affiliated entities and individuals as derivatives of the IRGC … The raison d'etre of the Islamic Revolutionary Guards Corps is to … **export the regime's revolutionary ideology via acts of terrorism** … [through] the Islamic Revolutionary Guards Corps."

d.    Danny Eisen (Canadian Coalition Against Terror), February 10, 2010: "[T]he IRGC is anything but a normal military body or state entity. The IRGC is hardly a conventional branch of the military. … [T]he IRGC's primary constitutional duty is not to protect Iran from conventional military threats but to 'protect the revolution and its ideals.' This amorphous and borderless mandate allows the IRGC to take on any … terrorist role is that is required to ensure the continued export of Khomeini's Islamic revolution. Given its unconventional mandate and its extraordinary level of operational independence from government hierarchy, the Guards are too autonomous to be a considered a normal state agency. It therefore can and must be held accountable for its own actions like any other

218

terrorist body that ***commits acts of terrorism on its own initiative*** … [and there was no] doubt as to the value of sanctioning the IRGC [to prevent acts of terrorism]."

536.    SCB also knew about U.N. and E.U. sanctions targeting the IRGC, and knew that such sanctions were designed to, and did, prevent IRGC-sponsored violence by impeding the IRGC's ability to develop, sell, and deploy sophisticated weapons like missiles, rockets, drones, and next-generation RPGs. For example, the United Nations, European Union and their member states sanctioned the IRGC and KAA from 2007 through 2024. From the 2000s through 2024, examples of reports of such sanctions included, but were not limited to:

a.    U.K. House of Commons, October 13, 2010: "[O]n 24 March 2007 the Security Council broadened the sanctions. It imposed an embargo on all of Iranian arms exports and an asset freeze and travel ban on further people it considered to be involved in the nuclear programme, including top members of the [IRGC], listed in an annex to the Resolution. … On 9 June 2010, the UN Security Council passed Resolution 1929 imposing a fourth round of sanctions on Iran. … The Resolution decides that: … • All states shall prevent the supply, sale or transfer to Iran of battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems. • States will take all necessary measures to prevent the transfer to Iran of technology or technical assistance related to ballistic missiles capable of delivering nuclear weapons. • Steps will be taken to block Iran's use of the international financial system, particularly its banks when they may be used to fund proliferation and nuclear activities. …. At least 15 of the companies and groups named in the new sanctions list are linked to the [IRGC]. Most of the remainder are associated with the nuclear and ballistic missile programmes, which are directly controlled by the Revolutionary Guard. … EU sanctions[:] Some UN sanctions against Iran are partly implemented through EU law. Like the US, however, the EU went further than the latest Security Council resolution demanded. … On 26 July [2010], the new [E.U. Iran-related sanctions] measures were announced. They consisted of: … [inter alia] restrictions in the financial sector, including additional asset freezes against banks and restrictions on banking and insurance …[;] trade restrictions, including a broad-ranging ban on dual use goods … [;] [and] new visa bans and asset freezes, especially on the [IRGC]."

b.    U.N. Security Council, June 4, 2012: "[A] number of key [IRGC] figures have been identified by the Security Council as involved in … missile programmes and are subject to asset freeze[s] … Activities related to the [IRGC] are also made subject to vigilance exercised by States and their nationals, persons and firms if they have information that provides reasonable grounds to believe that such business could contribute to the [Iranian regime]'s proliferation-sensitive … activities … Such vigilance over business activities extends to entities and individuals acting on behalf of the [IRGC] or at its direction, and entities owned or controlled by it, including through illicit means."

c.    U.K. House of Commons, December 8, 2020: "Although no part of the IRGC has been proscribed under this Act, its members and activities have more broadly been the targets of UK and EU sanctions. Qasem Soleimani was designated under the terrorism and terrorist financing regime and, as the Minister for the Middle East and North Africa noted in correspondence to us, there are more than 200 sanctions in place through the EU targeting Iran's ballistic missiles and nuclear activities, many of which cover the activities of the IRGC."

537.    From 2007 through at least 2011, SCB's provision of financial services to Elyassi flowed millions of dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezbollah, Hamas, and JAM.

### D.    SCB's Other Schemes

538.    While Caspian Petrochemical and Elyassi were SCB's two most shocking long-term relationships with the IRGC, they were hardly the only ones. As described in Part VI.B.1, SCB engaged in years of misconduct on behalf of Iranian banks with clear ties to the IRGC and the SLO—*i.e.*, wire-stripping through the year 2007 involving billions of dollars.

539.    That misconduct did not cease in 2007. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the SLO access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the SLO directly sponsored Hezbollah and Hamas, and that its transactions would enable the Foundation to finance attacks by Hezbollah and Hamas.

540.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped KAA access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the KAA was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah and Hamas.

541.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the Foundation for the Oppressed access millions of dollars from New

York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the Foundation was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah and Hamas.

542.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped NIOC access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that NIOC was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah and Hamas.

## VIII.   Plaintiffs' Claims Are Timely

543.    The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all ATA claims, including claims for aiding and abetting under JASTA. JASTA, however, was not enacted until September 28, 2016, and was expressly made retroactive. Accordingly, Plaintiffs' claims could not have accrued before that date, and Plaintiffs' claims are all timely because they are being brought within 10 years after September 28, 2016, the date they accrued.

544.    If the Court concludes that Plaintiffs' causes of action accrued earlier (*e.g.*, on the date of the terrorist attacks that injured them), and to the extent tolling is required for any particular Plaintiff's claim, Plaintiffs are entitled to tolling because SCB fraudulently concealed its misconduct, and no plaintiff exercising reasonable diligence could have discovered that misconduct prior to April 9, 2019, when the United States publicly filed the Amended DPA that revealed SCB's knowing and willful processing of U.S. dollar transactions for IRGC agents and fronts from 2007 to 2011.

545.    SCB's misconduct—which involved providing IRGC agents and fronts back-door access to the U.S. financial system, while deceiving financial regulators and financial

institutions—was inherently self-concealing. Indeed, the entire point of SCB's misconduct was to help IRGC agents and fronts transact in U.S. dollars, through U.S. financial institutions, in ways that would not reveal those entities' connections to the IRGC or Iran. None of the transactions were visible to third parties, let alone to individuals in Plaintiffs' position.

546.    SCB went to extreme lengths to conceal its wrongdoing. Among other things, SCB misled several financial regulators and law enforcement agencies about its sanctions compliance and AML practices, lied to other financial institutions for its IRGC-connected clients, and retaliated against whistleblowers who threatened to reveal the bank's misconduct. *See supra* Part VI.

547.    Accordingly, to the extent the statute of limitations began running before April 9, 2019, it must be tolled prior to that date because no plaintiff exercising diligence could have uncovered SCB's support for terrorists prior to that date.

## IX.    Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, or Authorized By Foreign Terrorist Organizations That The IRGC Supported

### A.    The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family)

548.    On June 12, 2014, Hamas committed a kidnapping attack in Gush Etzion, Israel, which was jointly planned by Hamas and Hezbollah, and funded by Hezbollah with money supplied by the SLO and IRGC (the "June 12, 2014 Attack").

549.    The June 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

550.    Sixteen-year-old **Yaakov Fraenkel** was traveling with two other teenaged friends in Gush Etzion in the West Bank of Israel when all three were abducted. Yaakov Fraenkel's

remains were discovered on June 30, 2014, and it was determined that he was murdered shortly after abduction.

551.    Yaakov Fraenkel was a U.S. national at the time of the attack and his death.

552.    Plaintiff Abraham Fraenkel is the father of Yaakov Fraenkel and an Israeli national. He brings claims in both his personal capacity and representative capacity on behalf of Yaakov Fraenkel's estate.

553.    Plaintiff Rachelle Fraenkel is the mother of Yaakov Fraenkel and a U.S. national.

554.    Plaintiff Avigail Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

555.    Plaintiff Ayala Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

556.    Plaintiff N.F., by and through her next friend Abraham Fraenkel, is the minor sister of Yaakov Fraenkel. She is a U.S. national.

557.    Plaintiff Noga Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

558.    Plaintiff S.F., by and through his next friend Abraham Fraenkel, is the minor brother of Yaakov Fraenkel. He is a U.S. national.

559.    Plaintiff Tzvi Fraenkel is the brother of Yaakov Fraenkel and a U.S. national.

560.    As a result of the June 12, 2014 Attack and Yaakov Fraenkel's injuries and death, each member of the Fraenkel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Yaakov Fraenkel's society, companionship, and counsel.

561.    As a result of the June 12, 2014 Attack, Yaakov Fraenkel was injured in his person and/or property. The Plaintiff members of the Fraenkel Family are the survivors and/or heirs of Yaakov Fraenkel and are entitled to recover for the damages Yaakov Fraenkel sustained.

### B.    The October 22, 2014 Vehicle Attack in Israel (Braun Family)

562.    On October 22, 2014 Hamas committed a vehicle attack in Jerusalem, Israel (the "October 22, 2014 Attack").

563.    The October 22, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

564.    Three-month-old **Chaya Braun** was traveling in Israel with her parents during the October 22, 2014 Attack. Chaya Braun was injured in the October 22, 2014 Attack. Chaya Braun died on October 22, 2014 as a result of injuries sustained during the attack.

565.    Chaya Braun was a U.S. national at the time of the attack and her death.

566.    Plaintiff Samuel Braun is the father of Chaya Braun and a U.S. national. He brings claims in both his personal capacity and co-representative capacity, with Chana Braun, on behalf of Chaya Braun's estate.

567.    Plaintiff Chana Braun is the mother of Chaya Braun and a U.S. national. She brings claims in both her personal capacity and co-representative capacity, with Sameul Braun, on behalf of Chaya Braun's estate.

568.    As a result of the October 22, 2014 Attack and Chaya Braun's injuries and death, each member of the Braun Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Chaya Braun's society, companionship, and counsel.

569.    As a result of the October 22, 2014 Attack, Chaya Braun was injured in her person and/or property. The Plaintiff members of the Braun Family are the survivors and/or heirs of Chaya Braun and are entitled to recover for the damages Chaya Braun sustained.

570.    **Samuel Braun** was traveling in Israel with his wife and baby daughter during the October 22, 2014 Attack. The attack severely wounded Mr. Braun who suffered from broken ribs and a torn ligament in his knee. Mr. Braun's knee continues to be painful to this day.

571.    Plaintiff Samuel Braun was a U.S. national at the time of the attack and remains one today.

572.    Plaintiff Chana Braun is the wife of Mr. Braun and a U.S. national.

573.    Plaintiff Esther Braun is the mother of Mr. Braun and a U.S. national.

574.    Plaintiff Murray Braun is the father of Mr. Braun and a U.S. national.

575.    As a result of the October 22, 2014 Attack and Mr. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

576.    **Chana Braun** was traveling in Israel with her husband and baby daughter during the October 22, 2014 Attack. The attack severely wounded Ms. Braun who suffered from severe psychological and emotional trauma.

577.    Plaintiff Chana Braun was a U.S. national at the time of the attack and remains one today.

578.    Plaintiff Samuel Braun is the husband of Ms. Braun and a U.S. national.

579.    Plaintiff Sara Halperin is the mother of Ms. Braun and a U.S. national.

580.    Plaintiff Shimshon Halperin is the father of Ms. Braun and a U.S. national.

581.    As a result of the October 22, 2014 Attack and Ms. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

**C.    The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family)**

582.    On October 13, 2015, Hamas committed a shooting and stabbing attack in Jerusalem, Israel (the "October 13, 2015 Attack").

583.    The October 13, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

584.    **Richard Lakin** was riding a bus in Israel returning from a doctor's appointment during the October 13, 2015 Attack. Mr. Lakin was shot and stabbed during the October 13, 2015 Attack, which resulted in a series of invasive surgeries. Mr. Lakin died on October 27, 2015 as a result of injuries sustained during the attack.

585.    Mr. Lakin was a U.S. national at the time of the attack and his death.

586.    Plaintiff Micah Lakin is the son of Mr. Lakin and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Lakin's estate.

587.    Plaintiff Manya Lakin is the daughter of Mr. Lakin and a U.S. national.

588.    As a result of the October 13, 2015 Attack and Mr. Lakin's injuries and death, each member of the Lakin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Lakin's society, companionship, and counsel.

589.    As a result of the October 13, 2015 Attack, Mr. Lakin was injured in his person and/or property. The Plaintiff members of the Lakin Family are the survivors and/or heirs of Mr. Lakin and are entitled to recover for the damages Mr. Lakin sustained.

**D.    The November 6, 2015 Sniper Attack in Israel (Borochov Family)**

590.    On November 6, 2015, Hamas committed a sniper attack in Mearas Hamachpela, Israel (the "November 6, 2015 Attack").

591.    The November 6, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

592.    **Mr. Ronen Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack caused Mr. Borochov

to fear for his life as well as his sons' lives. Mr. Borochov suffers from psychological and emotional trauma as a result of the November 6, 2015 Attack.

593.    Plaintiff Ronen Borochov was a U.S. national at the time of the attack and remains one today.

594.    Plaintiff Devora Borochov is the wife of Mr. Borochov and a U.S. national.

595.    Plaintiff Josef Borochov is the son of Mr. Borochov and U.S. national.

596.    Plaintiff Eli Borochov is the son of Mr. Borochov and a U.S. national.

597.    Plaintiff Avraham Borochov is the son of Mr. Borochov and a U.S. national.

598.    Plaintiff Shira Borochov is the daughter of Mr. Borochov and a U.S. national.

599.    As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

600.    **Mr. Eli Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr. Borochov who suffered from gunshot wounds to the thigh and testicles, which resulted in surgery and months of severe pain. Mr. Borochov also suffers from psychological trauma and nightmares as a result of the November 6, 2015 Attack.

601.    Plaintiff Eli Borochov was a U.S. national at the time of the attack and remains one today.

602.    Plaintiff Shari Borochov is the wife of Mr. Borochov and a U.S. national.

603.    Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

604.    Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

605.    Plaintiff Josef Borochov is the brother of Mr. Borochov and U.S. national.

606.    Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

607.    Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

608.    As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

609.    **Mr. Josef Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr. Borochov who suffers from severe psychological and emotional trauma. Mr. Borochov was only sixteen years old at the time of the attack.

610.    Plaintiff Josef Borochov was a U.S. national at the time of the attack and remains one today.

611.    Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

612.    Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

613.    Plaintiff Eli Borochov is the brother of Mr. Borochov and U.S. national.

614.    Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

615.    Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

616.    As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

**E.    The December 14, 2015 Vehicle Attack in Israel (Golan Family)**

617.    On December 14, 2015, Hamas committed a vehicle attack in Jerusalem, Israel (the "December 14, 2015 Attack").

618.    The December 14, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the

attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

619.    **Mr. Yoav Golan** was waiting at a bus stop in Israel at the time of the December 14, 2015 Attack. The attack severely wounded Mr. Golan who suffered injuries to his leg and shoulder. The leg injury caused him to be wheelchair-bound for a substantial period after the attack. Mr. Golan continues to suffer from psychological and emotional trauma as a result of the December 14, 2015 Attack.

620.    Plaintiff Yoav Golan was a U.S. national at the time of the attack and remains one today.

621.    Plaintiff Rotem Golan is the wife of Mr. Golan and an Israeli national.

622.    Plaintiff Yehudit Green-Golan is the mother of Mr. Golan and a U.S. national.

623.    Plaintiff Raphael Golan is the father of Mr. Golan and an Israeli national.

624.    Plaintiff Matan Golan is the brother of Mr. Golan and a U.S. national.

625.    As a result of the December 14, 2015 Attack and Mr. Golan's injuries, each member of the Golan Family has experienced severe mental anguish as well as emotional pain and suffering.

**F.    The January 27, 2016 Stabbing Attack in Israel (Rivkin Family)**

626.    On January 27, 2016, Hamas committed a stabbing attack in Givat Ze'ev, Israel (the "January 27, 2016 Attack").

627.    The January 27, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

628.    **Menachem Rivkin** was walking to a restaurant in Givat Ze'ev, Israel during the January 27, 2016 Attack. The attack severely wounded Mr. Rivkin who suffered from a stab wound to his neck.

629.    Plaintiff Menachem Rivkin was a U.S. national at the time of the attack and remains one today.

630.    Plaintiff Bracha Rivkin is the wife of Mr. Rivkin and an Israeli national.

631.    Plaintiff M.R., by and through her next friend Menachem Rivkin, is the minor daughter of Mr. Rivkin. She is a U.S. national.

632.    Plaintiff R.R., by and through her next friend Menachem Rivkin, is the minor daughter of Mr. Rivkin. She is a U.S. national.

633.    Plaintiff S.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

634.    Plaintiff S.Z.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

635.    Plaintiff Sterna Rivkin is the daughter of Mr. Rivkin and a U.S. national.

636.    As a result of the January 27, 2016 Attack and Mr. Rivkin's injuries, each member of the Rivkin Family has experienced severe mental anguish as well as emotional pain and suffering.

G.    **The March 8, 2016 Stabbing Attack in Israel (Force Family)**

637.    On March 8, 2016, Hamas committed a stabbing attack in Tel Aviv, Israel (the "March 8, 2016 Attack").

638.    The March 8, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

639. **Taylor Force** was in Israel for a graduate school trip through Vanderbilt University. Mr. Force was injured in the March 8, 2016 Attack. Mr. Force died on March 8, 2016, resulting from injuries sustained during the attack.

640. Mr. Force was a U.S. national at the time of the attack and his death.

641. Plaintiff Stuart Force Jr. is the father of Mr. Force and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Force's estate.

642. Plaintiff Robbi Force is the mother of Mr. Force and a U.S. national.

643. Plaintiff Kristen Boswell is the sister of Mr. Force and a U.S. national.

644. As a result of the March 8, 2016 Attack and Mr. Force's injuries and death, each member of the Force Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Force's society, companionship, and counsel.

645. As a result of the March 8, 2016 Attack, Mr. Force was injured in his person and/or property. The Plaintiff members of the Force Family are the survivors and/or heirs of Mr. Force and are entitled to recover for the damages Mr. Force sustained.

**H.    The December 23, 2016 Stabbing Attack in Israel (Lisker Family)**

646. On December 23, 2016, Hamas committed a stabbing attack in Efrat, Israel (the "December 23, 2016 Attack").

647. The December 23, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

648.    **Raphael Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Mr. Lisker who suffered from stab wounds to his neck.

649.    Plaintiff Raphael Lisker was a U.S. national at the time of the attack and remains one today.

650.    Plaintiff Shoshana Lisker is the wife of Mr. Lisker and a U.S. national.

651.    Plaintiff Tamar Gutman is the daughter of Mr. Lisker and a U.S. national.

652.    Plaintiff Avital Lejzor is the daughter of Mr. Lisker and a U.S. national.

653.    Plaintiff Daniel Lisker is the son of Mr. Lisker and a U.S. national.

654.    Plaintiff Jonathan Lisker is the son of Mr. Lisker and a U.S. national.

655.    As a result of the December 23, 2016 Attack and Mr. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

656.    **Shoshana Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Ms. Lisker who suffers from severe emotional and psychological trauma.

657.    Plaintiff Shoshana Lisker was a U.S. national at the time of the attack and remains one today.

658.    Plaintiff Raphael Lisker is the husband of Ms. Lisker and a U.S. national.

659.    Plaintiff Tamar Gutman is the daughter of Ms. Lisker and a U.S. national.

660.    Plaintiff Avital Lejzor is the daughter of Ms. Lisker and a U.S. national.

661.    Plaintiff Daniel Lisker is the son of Ms. Lisker and a U.S. national.

662.    Plaintiff Jonathan Lisker is the son of Ms. Lisker and a U.S. national.

663.    As a result of the December 23, 2016 Attack and Ms. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

**I.    The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family)**

664.    On June 23, 2011, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "June 23, 2011 Attack").

665.    The June 23, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

666.    **Dr. Stephen Everhart** was in Iraq on a short-term consultancy to the U.S. Agency for International Development, introducing entrepreneurship education in schools of business and commerce at Iraqi universities. Dr. Everhart was injured in the June 23, 2011 Attack. Dr. Everhart died on June 23, 2011, resulting from injuries sustained during the attack.

667.    Dr. Everhart was a U.S. national at the time of the attack and his death.

668.    Plaintiff Stephanie Zobay is the widow of Dr. Everhart and a U.S. national. She brings claims in both her personal capacity and representative capacity on behalf of Dr. Everhart's estate.

669.    Plaintiff Hannah Everhart is the daughter of Dr. Everhart and a U.S. national.

670.    Plaintiff Lindsay Everhart is the daughter of Dr. Everhart and a U.S. national.

671.    Plaintiff Hayden Everhart is the son of Dr. Everhart and a U.S. national.

672.     As a result of the June 23, 2011 Attack and Dr. Everhart's injuries and death, each member of the Everhart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

673.     As a result of the June 23, 2011 Attack, Dr. Everhart was injured in his person and/or property. The Plaintiff members of the Everhart Family are the survivors and/or heirs of Dr. Everhart and are entitled to recover for the damages Dr. Everhart sustained.

**CLAIM FOR RELIEF**

**Aiding and Abetting Under the Anti-Terrorism Act
18 U.S.C. § 2333(d)(2)**

674.    Plaintiffs incorporate their factual allegations above.

675.    To establish a claim for aiding and abetting under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that SCB was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that SCB knowingly provided substantial assistance.

676.    Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

677.    The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a.    the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use,

in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

b. the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence the policy of the U.S., Israeli, Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Israeli, Iraqi, and other governments by mass destruction, assassination, and kidnapping; and

c. the attacks occurred primarily outside the territorial jurisdiction of the United States, in Iraq and Israel.

678.    Each attack was committed, planned, or authorized by one or more FTOs. Every attack was committed by one or more of Hezbollah and Hamas, both of which were always FTOs.

679.    Every attack, regardless of who committed it, was planned or authorized by Hezbollah and/or Hamas, each of which was always an FTO.

680.    SCB was generally aware that it was playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity. *See, e.g.*, *supra* Part VII.

681.    SCB provided assistance knowingly, and not innocently or inadvertently. SCB did so with knowledge that it was aiding terrorist organizations carrying out attacks on Americans. *See, e.g.*, *supra* Part VII.

682.    SCB's assistance was substantial. *See, e.g.*, *supra* Part VII.

242 of 243

683.    SCB's assistance was pervasive and systemic, involving the highest levels of SCB's management, years of willful misconduct, and tremendous sums of money that provided critically important assistance to the IRGC and its terrorist proxies.

684.    As a result of SCB's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

685.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

686.    Wherefore, Plaintiffs pray this Court:

a.    Enter judgment against SCB finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b.    Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c.    Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d.    Award Plaintiffs prejudgment interest; and

e.    Award Plaintiffs any such further relief the Court deems just and proper.

Dated: June 11, 2024

Respectfully submitted,

SPARACINO PLLC

*/s/* Adam J. Goldstein

Ryan R. Sparacino (*pro hac vice* forthcoming)
Geoffrey P. Eaton (*pro hac vice* forthcoming)
Tejinder Singh
Adam J. Goldstein
Matthew J. Fisher (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com
matt.fisher@sparacinopllc.com

*Counsel for Plaintiffs*

238