## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRAHAM FRAENKEL, individually, and for the estate of YAAKOV FRAENKEL, RACHELLE FRAENKEL, AVIGAIL FRAENKEL, AYALA FRAENKEL, N.F. by and through her next friend Abraham Fraenkel, NOGA FRAENKEL, S.F. by and through his next friend Abraham Fraenkel, TZVI FRAENKEL, KATHLEEN ALT, individually, and for the estate of KRISTINE LUKEN, LAWRENCE LUKEN, GERALD LUKEN, MARGARET LUKEN, SAMUEL BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, CHANA BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, ESTHER BRAUN, MURRAY BRAUN, SARA HALPERIN, SHIMSHON HALPERIN, MICAH LAKIN, individually, and for the estate of RICHARD LAKIN, MANYA LAKIN, RONEN BOROCHOV, DEVORA BOROCHOV, JOSEF BOROCHOV, ELI BOROCHOV, AVRAHAM BOROCHOV, SHIRA BOROCHOV, SHARI BOROCHOV, YOAV GOLAN, ROTEM GOLAN, YEHUDIT GREEN-GOLAN, RAPHAEL GOLAN, MATAN GOLAN, MENACHEM RIVKIN, BRACHA RIVKIN, M.R. by and through her next friend Menachem Rivkin, R.R. by and through her next friend Menachem Rivkin, S.R. by and through his next friend Menachem Rivkin, S.Z.R. by and through his next friend Menachem Rivkin, STERNA RIVKIN, STUART FORCE JR., individually, and for the estate of TAYLOR FORCE, ROBBI FORCE, KRISTEN BOSWELL, RAPHAEL LISKER, SHOSHANA LISKER, TAMAR GUTMAN, AVITAL LEJZOR, DANIEL LISKER, JONATHAN LISKER, STEPHANIE ZOBAY, individually, and for the estate of STEPHEN EVERHART, HANNAH EVERHART, LINDSAY EVERHART, and HAYDEN EVERHART,<br><br>                       Plaintiffs,<br><br>     v.<br><br>STANDARD CHARTERED BANK,<br><br>                       Defendant. | Case No. 24-cv-4484-RA-RWL<br><br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 7

THE PARTIES..................................................................................................... 13

    A.    Plaintiffs ................................................................................... 13

    B.    Standard Chartered Bank .................................................... 13

JURISDICTION AND VENUE ......................................................................... 14

SOURCING ........................................................................................................ 15

NOMENCLATURE ........................................................................................... 16

FACTUAL ALLEGATIONS ............................................................................. 23

I.    Since 1979, Several Elements Within The Iranian Government Served As The Regime's Primary Terrorist Sponsors To Facilitate Terrorist Attacks On Americans By Iran's Proxies In The Middle East.................................................................. 23

    A.    Historical Background ......................................................... 24

    B.    Ayatollah Khamenei and the Supreme Leader's Office (SLO) ........................... 41

    C.    The Foundation for the Oppressed (Bonyad Mostazafan)................................... 62

    D.    The Islamic Revolutionary Guard Corps (IRGC)................................................. 77

    E.    Hezbollah ............................................................................... 87

II.    The Iranian Regime's Terrorist Sponsors Led A Global Terrorist Alliance Called The "Axis Of Resistance," Each Member Of Which Committed Terrorist Attacks Targeting The United States ...................................................................... 90

    A.    Hamas ..................................................................................... 93

    B.    Palestinian Islamic Jihad.................................................... 96

    C.    Jaysh Al-Mahdi..................................................................... 99

    D.    North Korean Reconnaissance General Bureau (RGB)...................................... 100

III.    Iran's Terrorist Sponsors and Proxies Used Multiple Coordination Mechanisms To Orchestrate Their Attacks Targeting The United States ................................................. 113

    A.    Joint Cells.............................................................................. 113

1. The Khamenei Cell: A Joint IRGC-Hezbollah Leadership Cell in Iran, Iraq, and Lebanon ........................................................................ 117

2. The Joint Axis of Resistance Logistics Cells (IRGC-LH-Hamas-PIJ-JAM-RGB) in Iran, Lebanon, Syria, the Palestinian Territories, and North Korea ........................................................................ 119

3. Joint Hezbollah-Hamas Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories ................................................ 122

4. Joint Hezbollah-PIJ Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories ........................................................ 124

B. Terrorist Fronts ........................................................................................ 125

1. Khatam al-Anbiya Construction Headquarters (aka GHORB) .............. 125

2. National Iranian Oil Company (NIOC) .................................................. 131

3. National Iranian Tanker Company (NITC) ............................................ 140

4. Caspian Petrochemical ........................................................................ 144

5. Euro African Group Ltd. (EAGL) and the Bazzi Network .................... 145

6. Tajco, Ltd. and the Tajideens ............................................................... 147

IV. Since 1982, Iran's Terrorist Sponsors Have Partnered With Their Lebanese, Palestinian, And Iraqi Proxies To Target The United States ........................................... 148

V. Iran's Terrorist Sponsors Seized Sector-Wide Monopolies In Key Iranian Markets To Fund Terrorist Attacks ............................................................................. 167

A. The Energy Sector: Oil, Gas, and Petroleum-Based Products ........................... 172

B. The Construction Sector ........................................................................... 181

C. The Sanctions Evasion Sector: Black Market, Smuggling, and Shipping .......... 182

D. The Financial Sector: Banks, Currency Exchanges, and Hawalas .................... 183

E. The Import/Export Sector ........................................................................ 187

F. The Communications Sector: Telecoms, Internet, and Related Technology ...... 188

VI. For More Than A Decade, SCB Engaged In An Illegal Scheme To Help Iran's Terrorist Sponsors And Their Fronts Access The U.S. Financial System ..................... 190

VII.  SCB's Scheme Involved Willful, Systemic, Company-Wide Efforts To Provide
      Banking Services To Iran's Terrorist Sponsors And Their Associated Fronts While
      Helping Them Evade Counterterrorism Controls ............................................................ 195

      A.    The U.S. Government's Counterterrorism Controls ........................................... 196

            1.    OFAC's Iran Sanctions ........................................................................... 196

            2.    Transaction Review and Reporting ......................................................... 205

            3.    The Terrorist Finance Tracking Program ................................................ 212

      B.    Between 2001 and 2007, SCB Made a Series of Business Decisions to
            Serve Customers with Close Connections to Iran's Terrorist Sponsors by
            Helping Them Subvert Counterterrorism Controls ............................................... 214

      C.    SCB Lied to Regulators about Winding-Down Its Iran Business and
            Continued to Process Transactions Through 2015 for Iran's Terrorist
            Sponsors and Their Fronts While Helping Them Evade Counterterrorism
            Controls .............................................................................................................. 227

            1.    SCB's Dubai Branch ............................................................................... 230

            2.    SCB Dubai Helped an Iranian Petrochemical Company Operating
                  as a Front for Iran's Terrorist Sponsors to Covertly Access the U.S.
                  Financial System .................................................................................... 233

            3.    SCB Dubai Helped IRGC Agent Mahmoud Reza Elyassi Access
                  the U.S. Financial System to Fund Iran's Terrorist Sponsors ................. 240

            4.    SCB Dubai Helped Numerous Other Agents and Fronts for Iran's
                  Terrorist Sponsors Access the U.S. Financial System to Finance
                  Their Operations in Several Other Ways ................................................. 245

      D.    SCB Employed Other Methods to Disguise Its Misconduct and Thwart
            Counterterrorism Controls .................................................................................. 252

            1.    SCB Used a "Sundry Account" to Hide Transactions with Agents
                  and Fronts for Iran's Terrorist Sponsors ................................................ 252

            2.    SCB Maintained a Deliberately Ineffective Anti-Money
                  Laundering/Combating the Financing of Terrorism Program ................ 254

      E.    SCB Facilitated Hezbollah Financing in Gambia ................................................ 257

            1.    SCB Gambia Helped Hezbollah's Bazzi Network Access the U.S.
                  Financial System to Finance Terrorist Attacks ....................................... 259

2. SCB Dubai Helped Hezbollah Front Tajco Ltd. Access the U.S. Financial System to Finance Terrorist Attacks ........................................ 268

F. SCB Repeatedly Misled and Obstructed U.S. Regulators .................................. 272

1. SCB Willfully Misled NYDFS About Its Anti-Money Laundering/Combating the Financing of Terrorism Program ............... 272

2. SCB Willfully Misled NYDFS About Its Sanctions Compliance Efforts ................................................................................................ 274

3. SCB Promoted a Culture of Illegality by Retaliating Against Whistleblowers ..................................................................................... 276

G. Plaintiffs' Allegations Are Corroborated by SCB's Pattern of Engaging in a Variety of Other Illicit Behavior ........................................................ 277

VIII. SCB Knew That Iran-Sponsored Terrorist Attacks Committed By Hezbollah, Hamas, PIJ, and JAM Were A Foreseeable Result Of Its Culpable Acts .................................... 280

A. SCB Defied Numerous Warnings That Transacting with Fronts for Iran's Terrorist Sponsors Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM ............................................................................................................ 280

B. SCB Knew That Its Assistance to the Iranian Petrochemical Company Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM .................... 296

1. SCB Knew That a Petrochemical Company Owned by the Iranian Government Would Fund Terrorism ........................................................ 297

2. Other Evidence Further Shows SCB's Awareness That the Petrochemical Company Funded Terrorism ........................................... 316

C. SCB Knew That Its Assistance to Elyassi Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM ....................................................... 331

D. SCB's Other Schemes ................................................................................ 334

IX. SCB Substantially Assisted The Terrorist Attacks By Hezbollah, Hamas, PIJ, and JAM That Caused Plaintiffs' Injuries .......................................................... 337

A. SCB's Conduct Flowed Hundreds of Millions of Dollars from the U.S. Financial System to the Qods Force, Hezbollah, Hamas, PIJ, and JAM ............ 341

1. Foundation for the Oppressed ................................................................. 341

2. The Iranian Petrochemical Company ..................................................... 351

|   |   | 3. | Khatam al-Anbiya ....................................................................... | 360 |

|   |   | 4. | Elyassi ......................................................................................... | 362 |

|   |   | 5. | Other Fronts ................................................................................ | 365 |

|   | B. | | SCB's Conduct Made a Vital Contribution to IRGC-Sponsored Attacks by Hezbollah, JAM (Including Kataib Hezbollah), Hamas, and PIJ In Iraq and Israel ............................................................................................... | 367 |

|   |   | 1. | SCB's Conduct Enabled Key Lanes of Iranian Regime Financial Support for Hezbollah's, Hamas's, PIJ's, and JAM's Attacks .............. | 367 |

|   |   | 2. | SCB's Conduct Financed Thousands of Iranian-Sponsored Attacks Committed by Hezbollah, Hamas, PIJ, and JAM .................................. | 376 |

|   | C. | | SCB's Conduct Contributed to the Individual Attacks That Targeted Plaintiffs and Their Family Members .................................................. | 379 |

|   | D. | | SCB's Conduct Supplied Long-Lasting Assistance That Continued Aiding Iranian Regime-Sponsored Terrorist Attacks Committed by Hezbollah, Hamas, PIJ, and JAM Until at Least 2019 ........................................ | 382 |

|   | E. | | The Iranian Regime Used Most of the Profits Generated by SCB's Schemes to Directly and Indirectly Sponsor Attacks Committed, Planned, or Authorized by the IRGC, Hezbollah, Hamas, PIJ, JAM, and Their Axis of Resistance Allies ............................................................................. | 383 |

|   | F. | | U.S. Government Findings from 2017 through 2024 Confirm That SCB's Illicit Services Funded Iranian Regime-Sponsored Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM .................................................... | 388 |

| X. | | | Plaintiffs' Claims Are Timely ............................................................ | 401 |

| XI. | | | Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, Or Authorized By Iran-Sponsored Foreign Terrorist Organizations ..................................................................................... | 403 |

|   | A. | | The December 18, 2010 Kidnapping Attack in Israel (Luken Family) ............. | 403 |

|   | B. | | The August 19, 2011 Rocket Attack in Israel (Brauner Family) ...................... | 404 |

|   | C. | | The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family) .................. | 405 |

|   | D. | | The October 22, 2014 Vehicle Attack in Israel (Braun Family) ....................... | 407 |

|   | E. | | The October 29, 2014 Assassination Attack in Israel (Glick Family) .............. | 409 |

F. The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family) ................................................................................................ 411

G. The November 6, 2015 Sniper Attack in Israel (Borochov Family).................. 412

H. The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families) ............................................................................................. 414

I. The January 27, 2016 Stabbing Attack in Israel (Rivkin Family) ..................... 416

J. The March 8, 2016 Stabbing Attack in Israel (Force Family)........................... 417

K. The December 23, 2016 Stabbing Attack in Israel (Lisker Family).................. 418

L. The May 5, 2019 Rocket Attack in Israel (Przewozman Family) ..................... 420

M. The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family)...................... 422

CLAIM FOR RELIEF ................................................................................................. 423

JURY DEMAND ........................................................................................................ 425

PRAYER FOR RELIEF .............................................................................................. 425

## INTRODUCTION

1. This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, specifically the aiding-and-abetting cause of action created by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). As Congress explained when enacting JASTA, this statute seeks "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

2. Plaintiffs are American civilians, and their families, who were killed or wounded in terrorist attacks committed, planned, or authorized by Hezbollah, Hamas, Jaysh Al-Mahdi, and Palestinian Islamic Jihad, all of which were foreign terrorist organizations ("FTOs") and proxies for elements of the Iranian government committed to financing terrorist attacks ("Iran's Terrorist Sponsors"), including the Islamic Revolutionary Guard Corps ("IRGC"). The attacks occurred in Israel and Iraq from 2010 through 2019.

3. Plaintiffs seek to hold Standard Chartered Bank ("SCB") accountable for aiding and abetting the terrorists' attacks. From at least 2001 until at least late 2014 or early 2015, SCB systematically and knowingly enabled fronts and agents for Iran's Terrorist Sponsors to finance terrorist operations by transferring billions of dollars on their behalf while helping them evade counterterrorism controls, including sanctions designed to prevent Iran's Terrorist Sponsors from accessing U.S. dollars and mechanisms designed to alert U.S. law enforcement and intelligence agencies to terrorist activity. Throughout this period, SCB received numerous direct warnings from U.S. government officials and others that Iran's Terrorist Sponsors were using fronts and

agents, particularly in its oil and gas sector, to provide critical financial and logistical support to anti-American terrorists worldwide. But SCB chose to prioritize its own profits over American lives. Through a prolonged campaign of deception over more than a decade, SCB served customers it knew were fronts for Iran's Terrorist Sponsors and went to shocking lengths to help them hide their identities. SCB thus enabled Iran's Terrorist Sponsors to leverage the U.S. financial system to supply money, weapons, training, technology, and safe haven to terrorists, who used that support to attack Americans in Israel and Iraq. Given the stockpiling of assets by Iran's Terrorist Sponsors, the volume of SCB's aid, and the nature of the fronts that partnered with SCB, the bank's conduct continued powering Iran-sponsored attacks through at least 2019.

4.      SCB's schemes played out over two phases. The first occurred through 2007, when SCB laundered billions of dollars for major banks affiliated with Iran's Terrorist Sponsors, including the Central Bank of Iran (a/k/a Bank Markazi) ("CBI/Markazi"), Bank Saderat, and Bank Melli, each of which the United States identified as instrumental to Iran's terrorist financing. In flagrant violation of U.S. counterterrorism controls, SCB facilitated these banks' access to New York's financial system and U.S. dollar clearing while laundering their transactions to hide Iran's role. This deceptive conduct involved an extraordinary offshore system established within the bank to falsify and remove information from tens of thousands of wire transfer messages (*i.e.*, wire stripping) in order to disable compliance functions that would have caused U.S. banks or SCB's own New York branch to scrutinize, report, or block the transfers. Altogether, SCB moved hundreds of billions of dollars for the terrorists' favored banks this way.

5.      This phase of SCB's misconduct was exposed by enforcement actions that became public in 2012. These included a deferred prosecution agreement with the U.S.

Department of Justice ("DOJ"); a settlement agreement with the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("Treasury"); a settlement with the Board of Governors of the Federal Reserve; and a consent order with the New York Department of Financial Services ("NYDFS").

6.     The enforcement actions revealed in vivid detail SCB's brazen disregard of the U.S. government's counterterrorism warnings and controls when they stood in the way of the lucrative business SCB sought to develop in Iran. Indeed, when SCB's New York bankers raised concerns in 2006 that SCB's Iran business risked "very serious or even catastrophic reputational damage" to the bank, SCB's Group Executive Director in London, Richard Meddings, conveyed SCB's prevalent attitude, responding: "***You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians.***"[1]

7.     Consistent with those sentiments, NYDFS concluded in its 2012 Consent Order that: "SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran—dealings that indisputably helped sustain a global threat to peace and stability." In its settlements with DOJ, Treasury, the Federal Reserve, and NYDFS, SCB agreed to pay hundreds of millions of dollars and promised that its offending conduct had ceased in 2007.

8.     That promise was false. SCB relocated its Iran business to Dubai, and in the second phase of SCB's schemes occurring between 2008 and 2015, SCB—especially its Dubai

---

[1] NYDFS, *In re Standard Chartered Bank, New York Branch*, Order Pursuant to Banking Law §39 ¶¶ 7-8 (Aug. 6, 2012) (emphasis added) ("2012 NYDFS Consent Order").

branch—continued to covertly move money for fronts and agents of Iran's Terrorist Sponsors. As a second wave of enforcement actions revealed, the wire stripping and evasion tactics SCB had pioneered were put to new use by its Dubai branch, and SCB's corporate culture of disregard for U.S. counterterrorism warnings and controls persisted. But SCB's conduct during this period was even more shocking, due to the close connection between the petroleum transactions SCB facilitated for Iran's Terrorist Sponsors and their consistent funding of terrorist attacks against Americans—all while the U.S. government was intensifying its warnings to banks that terrorist attacks were a foreseeable result of such transactions.

9.    Most significantly, as U.S. government warnings blared that Iran was using its oil and gas sector to fund terrorism, and that Iran's Terrorist Sponsors had effectively seized control of the sector, SCB moved at least $150 million for an Iranian petrochemical company (a/k/a Caspian Petrochemical FZE), which SCB knew was a front for Iran's Terrorist Sponsors. Well aware of the U.S. government's warnings about exactly that activity, SCB bankers falsified customer due diligence documents, stripped wires, lied to OFAC, and coached the company about how to evade counterterrorism controls, enabling it to move money through the U.S. financial system and providing covert access to prohibited U.S. dollar services. This extraordinary and extensive misconduct enabled Iran's Terrorist Sponsors and its terrorist proxies to access the resources they needed to carry out vicious terrorist attacks on Americans, including the attacks that injured Plaintiffs.

10.    SCB also provided evasion advice and prohibited financial services to IRGC agent Mahmoud Reza Elyassi and his companies. Elyassi claimed to operate an import-export business, but in fact operated a currency exchange that allowed money to flow in and out of Iran in tremendous quantities. All-in, SCB's bankers, acting within the scope of their employment,

helped Elyassi conduct thousands of transactions worth over $240 million during a four-year period. They did this by coaching Elyassi and his businesses about ways to evade sanctions, deceiving their own compliance personnel into approving prohibited transactions, and obscuring who the bank was dealing with. Elyassi's business activities—all of which occurred in sectors over which the IRGC had monopolies—likewise fueled terrorist violence against Americans.

11.     These additional violations resulted in additional enforcement actions against SCB, which became public in 2019. In that settlement, SCB agreed to pay approximately $1.1 billion for violations of multiple sanctions programs running from June 2009 until May 2014. The SCB employee who managed SCB's relationships with the Iranian petrochemical company and Elyassi also pleaded guilty to criminal charges, and Elyassi was indicted.

12.     As these stiff penalties show, SCB's violations were not the actions of a few bad apples. Instead, the employees who committed these violations were acting fully within the scope of their employment, and SCB admitted in its settlement that it was responsible for all of their relevant conduct. What is more, SCB's violations were only possible because the bank maintained a corporate culture that actively flouted U.S. counterterrorism warnings and controls. Indeed, time and again, SCB's business units stymied efforts within the bank, and especially by its New York branch, to implement even the most basic controls, and SCB's management fostered a culture for more than a decade that treated Iranian terrorist financing risk as an acceptable cost of doing business. Plaintiffs thus believe that the severe misconduct exposed in the public enforcement actions constitutes only part of the picture, and that a full investigation of SCB's business will reveal even more misconduct through which SCB knowingly assisted terrorist fronts.

13.     The nexus between SCB's misconduct and the terrorist attacks that killed or injured Plaintiffs and their loved ones is tight and irrefutable. Iran's Terrorist Sponsors are—and SCB knew them to be—the world's foremost sponsors of anti-American terrorism, and they are adept at converting their financial resources into American casualties—both directly and through a robust network of terrorist proxies including Hezbollah, Hamas, Jaysh Al-Mahdi, and Palestinian Islamic Jihad. By allowing Iran's Terrorist Sponsors and their fronts to make, move, and spend hundreds of millions of dollars, SCB willfully enabled terrorist violence against Americans.

14.     In sum, SCB's misconduct easily constitutes aiding and abetting under JASTA. SCB acted in a highly culpable manner, committing multiple crimes and thwarting counterterrorism controls. It did so *for over a decade* despite warnings from law enforcement agencies, financial regulators, the United Nations, European governments, terrorism experts, the media, and others—all of which made it crystal-clear that providing Iran's Terrorist Sponsors and their fronts access to the U.S. financial system would fuel anti-American terrorist violence, including *specifically* attacks by Hezbollah, Hamas, Jaysh Al-Mahdi, and Palestinian Islamic Jihad, which were engaged in ongoing campaigns of violence against Americans in the Middle East. SCB's misconduct enabled millions of dollars to flow from Iran's Terrorist Sponsors to these designated foreign terrorist organizations, arming them with the weapons and other resources they needed to carry out deadly terrorist attacks. Plaintiffs and their families suffered enormously as a result. Congress enacted JASTA to address exactly this misconduct.

## THE PARTIES

**A.    Plaintiffs**

15.    Plaintiffs are 90 direct and indirect victims of 12 terrorist attacks committed in Israel from 2010 to 2019, and one attack committed in Iraq in 2011. In this terminology, direct attack victims are those who were physically injured or killed in the attack. Indirect attack victims are the direct attack victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims.

16.    Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[2]

**B.    Standard Chartered Bank**

17.    Non-party Standard Chartered PLC ("SC PLC") is an international bank with more than 1,700 branches operating in over 60 countries. SC PLC's principal place of business is London, England.

18.    Defendant Standard Chartered Bank ("SCB") is a wholly owned subsidiary of SC PLC. SCB's principal place of business is London, England.

19.    Pursuant to a license from NYDFS, SCB operates a foreign bank branch in the State of New York. The main corporate office of SCB in the United States is 1095 Avenue of the

---

[2] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

Americas, New York, New York 10036. SCB's New York branch is referred to in this Complaint as the "NY Branch."

20.     Among other services, the NY Branch provides U.S. dollar clearing services for international wire payments, which can involve the conversion of payments from a foreign currency into U.S. dollars. The NY Branch processes approximately $195 billion per day on the Clearing House Interbank Payments System ("CHIPS").

21.     SCB also has licensed branches in the United Arab Emirates and The Gambia, serving customers throughout the UAE, the Middle East, and Africa. As of the events detailed in this Complaint, SCB's UAE presence consisted of 14 branches, with its main office in Dubai ("SCB Dubai"). During the relevant period, SCB's Gambia presence included several branches, with its main office in Banjul ("SCB Gambia").

22.     During the relevant period, nearly all of SCB's relevant transactions were denominated in U.S. dollars and therefore cleared and settled in New York through the NY Branch.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

24.     SCB is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

25.     SCB entered the United States voluntarily and has maintained a branch in New York since 1976.

26. As explained below, SCB's substantial assistance to the IRGC and its terrorist proxies was facilitated by the NY Branch because of the latter's central role in providing U.S. dollar clearing, foreign exchange, and trade financing services for SCB's Iranian customers.

27. SCB purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including processing financial transactions through the NY Branch for the benefit of its Iranian customers, knowing those transactions were enabling the IRGC and its terrorist proxies to carry out terrorist attacks that killed or injured U.S. citizens in the Middle East, including Plaintiffs.

28. Moreover, SCB made several misrepresentations to New York authorities— principally NYDFS—about its conduct, and subsequently about its compliance and remediation efforts. SCB's deceptive conduct in this District thereby provided substantial ongoing assistance to the terrorists that killed and injured Plaintiffs by preventing law enforcement from discovering and putting an end to the full extent of SCB's malfeasance.

29. Venue in this District is proper pursuant to 18 U.S.C. § 2334(a) because SCB's NY Branch is here.

30. Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of SCB's activity occurred within the District.

**SOURCING**

31. The allegations herein concerning SCB's behavior are based in part on settlement agreements that SCB entered with regulatory authorities to resolve several enforcement actions against the bank. Those settlement agreements include Deferred Prosecution Agreements ("DPAs") with DOJ, Settlement Agreements and Consent Orders entered by NYDFS and OFAC, and a detailed Decision Notice from the United Kingdom's Financial Conduct Authority ("U.K.

FCA"). Each settlement document contains lengthy and detailed factual recitations regarding SCB's illegal, sanctions-evading conduct. SCB, moreover, has stipulated to the truth of the factual allegations and has promised to not dispute those allegations in subsequent litigation.[3]

32.     To resolve those enforcement actions, SCB paid U.S., New York, and U.K. law enforcement and financial authorities nearly $2 billion in penalties and forfeitures and has been ordered to substantially overhaul its regulatory compliance efforts.

33.     SCB always actively monitored every official United States warning, sanction designation, press release, report, advisory, and finding, including those relating to American sanctions and terrorist financing risks regarding Iran, the IRGC, the Supreme Leader's Office, Hezbollah, Hamas, and Jaysh al-Mahdi, including those published by Treasury (including OFAC and FinCEN), and the U.S Department of State ("State"). SCB did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and SCB's thousands of employees and agents in the United States, United Kingdom, United Arab Emirates, Iran, and elsewhere, each of whose knowledge is imputed to SCB. Accordingly, SCB had actual knowledge, in real-time, of each United States warning, sanctions designation, press release, report, advisory, and finding that any component of the U.S. government published when SCB engaged in the conduct alleged herein.

## NOMENCLATURE

34.     This Complaint often features nomenclature known to be deployed by Iran's Terrorist Sponsors and their proxies, as well as terms that have a widely understood specific

---

[3] *See* Am. Deferred Prosecution Agreement ¶ 29, *United States v. Standard Chartered Bank*, No. 12-cv-262 (S.D.N.Y. Apr. 9, 2019), ECF 16-1 ("2019 Amended DPA"); *id.* Ex. B ¶ 2 (Supplemental Statement of Facts) ("SOF"); U.K. FCA, Decision Notice to Standard Chartered Bank § 7.1 (Feb. 5, 2019) ("SCB agreed to settle in relation to all relevant facts and all issues as to whether those facts constitute breaches") ("2019 U.K. FCA Decision Notice").

meaning in the terrorism setting like "operation." Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC revolutionized propaganda and strategic communications as practiced by radical Islamists and terrorist organizations. Since 1979, under a strategy and nomenclature developed and practiced by Ayatollah Khomeini himself, the Ayatollahs, regime clerics, and IRGC relied upon an extremely limited universe of core propaganda nomenclature comprising about 2,000 words, and consequently, each term assumed outsized, specific meaning as used by such Iranian actors. Thus, words and phrases, as used by the Iran's Terrorist Sponsors and their clerical masters, regularly had a well-known, talismanic-like, IRGC-connoted meaning. That was because Iran's Terrorist Sponsors directly served the Ayatollah, and both the IRGC and its associated clerics and imams broadly mimicked Ayatollah Khomeini's 2,000-word approach.

35.     The United States has emphasized the importance of understanding Iran's terrorist ideology and nomenclature—for example, key concepts like the United States as the "Oppressor," Muslim populations as the "Oppressed," and "Resistance" as the preferred euphemism for anti-American terrorist operations—when analyzing the Ayatollahs, IRGC, their associates, and their proxies. In 2010, for example, the U.S. Department of Defense ("DoD") publicly reported:

> **Goals of Iranian Strategy**
> Since the revolution, Iran's first priority has consistently remained the survival of the regime. Iran also seeks to become the strongest and most influential country in the Middle East and to influence world affairs. The theocratic leadership's ideological goal is to be able to export its theocratic form of government, its version of Shia Islam, and stand up for the "[O]ppressed" according to their religious interpretations of the law. …
> To ensure regime survival, Iran's security strategy is based first on … its asymmetric warfare doctrine [*i.e.*, IRGC-sponsored proxy terrorist attacks outside Iran] … [and] [the IRGC's] outreach and support to governments and dissident groups that oppose U.S. interests … [through] … active sponsorship of terrorist … groups [as] tools [the IRGC] uses to drive its aggressive foreign policy. In particular, it uses terrorism to pressure or intimidate other countries …. The most

notable example of this strategy includes Iran's support for Lebanese Hizballah as well as its influence over proxy groups in Iraq. …

**Trends in Iranian Strategy**

Iran seeks to increase its stature by countering U.S. influence and expanding ties with regional actors while advocating Islamic solidarity. It also seeks to demonstrate to the world its "[R]esistance" to the West. Iran is attempting to secure political, economic, and security influence in Iraq … by … furnishing lethal aid to Iraqi Shia militants … [via, *inter alia*, the IRGC Qods Force and Hezbollah]. In an attempt to increase influence in the Levant, Iran provides weapons, training and money to Lebanese Hizballah, its strategic partner.

36.     In 2019, similarly, the Office of the Chairman of the Joint Chiefs of Staff reported that the IRGC was like "[a]ll … revolutionary visions of history – from Marx through Shariati to Khomeini – [Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC] need an exploitative or oppressing adversary …[,] [and] the [Iranian] clerical regime's historical frameworks … [were]: an 'Oppressed' Iranian nation of true Muslims fighting against an 'Oppressor' … within a larger oppressive bipolar international order," which, in the IRGC's eyes and under its ideological and communications narrative, was always led by the United States government (which the IRGC called the "Great Satan" and the "Global Arrogance") and U.S. allies, including Israel (which nation the IRGC, like Iran's regime, refused to recognize, instead describing it as the "Little Satan" to America's "Great Satan") and U.S.-supported governments in the Middle East that did not submit to the Ayatollah (which the IRGC invariably described as U.S. "puppets").

37.     Below, Plaintiffs identify nine specific words and phrases that had a specifically understood meaning when used by Ayatollah- and/or IRGC-affiliated speakers in Iran since 1979. Each such word and phrase had a similar meaning from 1979 through today, as each was one of the words or phrases that Ayatollah Khomeini deployed, which was modeled throughout IRGC and clerical ranks ever since. Plaintiffs' definitions below track regularly published proclamations, speeches, sermons, and commentaries by the Ayatollah, clerics, and/or the IRGC

18

since 1979, as published by both Iranian and Western media. SCB knew the below meanings because they were regularly published, and SCB was a sophisticated multinational financial institution with extensive experience in the Middle East, including local agents in Iran, whose knowledge is imputed to SCB. Unless otherwise indicated, Plaintiffs' use of the above-identified terms in this Complaint comports with the definitions in this section.

38. **"Asymmetric Warfare"**, including analogues like "proxy warfare", refers to IRGC-sponsored terrorist attacks targeting the United States. Such nomenclature tracks both Iranian and U.S. government custom and practice. For example, as one DOD-published analysis of the IRGC noted in 2011: "The IRGC's strategy of asymmetric warfare and its open advocacy of terrorism as a pillar of this strategy have cost Iran in the international political sphere. The U.S. Department of State, in its 2010 annual country reports on terrorism, re-designated Iran as a state sponsor of terrorism. This is in keeping with its designation since 1984."

39. **"Jihad"** refers to the Ayatollah's and the IRGC's purportedly religiously authorized objective of expelling America from the Middle East through IRGC acts of terrorism. As used by the Ayatollah and the IRGC, the concept of jihad is inextricably intertwined with terrorist violence and closely related to the concept of "Resistance" (defined below).

40. **"Liberation"** refers to any country or community that (a) shared the IRGC's hostility towards America and (b) submitted to the Ayatollah's rule as enforced by the IRGC.

41. **"Operation"** and **"Operations"** refer to terrorist attacks. The U.S. government, United Nations, U.K., E.U., and terrorism scholars agree and follow the same nomenclature.

42. **"Oppressed"** and **"Downtrodden"**, including such words' longer or related versions—"Oppressed on Earth"; "Oppressed of Earth"; "Downtrodden"; "The Downtrodden on Earth"; and "The Downtrodden of Earth"—refers to the Muslim populations of any community

that had not submitted to the Ayatollah's rule and/or maintains normal relations with the United States. As Ayatollah Khomeini famously instructed the IRGC, when it came to Iran's "Foreign Policy": "We have a duty to support the Oppressed and be inimical to the Oppressors."

43.     He famously decreed in 1979: "We should try to export our revolution to the world. We should set aside the thought that we do not export our revolution, because Islam does not regard various Islamic countries differently and is the supporter of all the [O]ppressed peoples of the world. On the other hand, … the [United States government, and other foreign governments] … have risen to destroy us. If we remain in an enclosed environment, we shall definitely face defeat."

44.     **"Oppressor"** and related concepts longer versions—the "Great Satan" and the "Global Arrogance"—refers to the United States government, which the Ayatollah and IRGC maintained were responsible for oppressing the Islamic community around the world by denying the rule of the Ayatollah.

45.     **"Resistance"** refers to terrorist attacks targeting the United States (including through its allies like Israel and Iraq) under the IRGC's constitutional mandate to export Iran's Islamic Revolution. "Resistance" is the preferred euphemism of the IRGC and every IRGC proxy, many of which, including Hezbollah, Hamas, and Palestinian Islamic Jihad, literally feature the word "Resistance" in the Arabic version of their "external operations wing" (in the case of Hezbollah) and name itself (in the case of Hamas). For example, as the Investigative Project on Terrorism observed on December 3, 2012, the term "'resistance'" was an infamous "code word for terrorism."

46.     **"Resistance Economy"**—including its alternative variant, "Economic Jihad"—referred to IRGC-related economic activities that inextricably aided the IRGC's "Resistance"

against America, *i.e.*, its acts of terrorism targeting the United States. Since the 1990s, a wide array of terrorist groups has embraced the concept of an "Economic Jihad" as a means through which such group's supporters can enable the group's attacks even if such supporters themselves do not want to, or cannot, fight for the group. In or about 2011, Ayatollah Khamenei coined the phrase "Resistance Economy" as a short-hand or euphemism for economic activities that help the Iranian regime continue to fund and arm Iranian-sponsored proxy terrorist attacks that were in "resistance" to the United States and it allies in the region, including Israel. From 2012 through present, Iranian actors affiliated with the Supreme Leader, SLO, and IRGC have routinely emphasized the inextricable connection between "Resistance Economy" activities and IRHC-sponsored jihadist attacks targeting the United States. On May 27, 2016, for example, the SLO- and IRGC-controlled Iranian state media network IRIB reported (as re-reported by BBC) that an IRGC-linked cleric sermonized on IRIB during Friday Prayers –a key vehicle for the Ayatollah's and IRGC's propaganda—that that those "focused on implementation of [the IRGC's] Resistance Economy … described [the IRGC's] Resistance Economy as 'a support' for the 'jihad'" against "America and its mercenaries," who "are exerting pressure on Iran…; therefore, people's resistance and Jihad are aimed against such pressures'" from the United States. On January 14, 2019, similarly, U.S. government-published Radio Farda reported: "The IRGC has been one of Iran's main economic engines for decades, controlling important sectors," and the "IRGC is also an important tool by the regime to implement its 'Resistance Economy' doctrine – aimed at increasing self-reliance of the Iranian economy and decreasing its vulnerability to external pressures" from the United States, which helped "the IRGC [] fulfill[] its number one goal – … exporting its revolution to Lebanon, Iraq, Syria, Yemen, and beyond"—*i.e.*, IRGC-sponsored attacks targeting the United States.

47.     **"Resistance Movements"**—including its alternative variants, "Jihad Movements" and "Liberation Movements"—refers to the IRGC's terrorist proxy members in its "Axis of Resistance."

48.     **"Wilayat-e-Faqih"**, including its short-hand or slang variant, **"Wilayat"**, refers to two related concepts: (1) the rule of pious Muslims around the world who submit to the rule of the jurisprudent in the form of the Supreme Leader of the Islamic Republic of Iran as supported by the IRGC as commanded by the Supreme Leader; and (2) the organizations and individuals who operationalized the Supreme Leader's and IRGC's implementation of such rule, including the Supreme Leader, Supreme Leader's Office, IRGC, and individuals or entities under the control of such persons where such individuals' or entities' function includes exporting the Islamic Revolution to expand the reach of the Supreme Leader and IRGC.

# FACTUAL ALLEGATIONS

I. **Since 1979, Several Elements Within The Iranian Government Served As The Regime's Primary Terrorist Sponsors To Facilitate Terrorist Attacks On Americans By Iran's Proxies In The Middle East**

49.     Since 1979, radical Shia terrorists of Iranian origin throughout the Middle East pledged, before Allah, their personal oath of allegiance not to their own nation, but instead to a Shiite Ayatollah who would eventually, in February 1979, become the first Supreme Leader of the Islamic Revolution: Ayatollah Ruhollah Khomeini.[4] When they did so, one of the things they pledged was to support the Ayatollah's embrace of violent jihadist attacks targeting the enemies of the "Islamic Revolution"—most of all, the United States (the "Great Satan") and its allies in the Middle East, including Israel (the "Little Satan"). Their shared objective was to force the Great Satan to exit the Middle East and abandon its allies there through an unrelenting campaign of terrorist attacks against Americans.

50.     To advance this core objective of the Revolution, the Iranian regime developed something previously unheard of: a vast infrastructure of institutions organized within the government to facilitate terrorist attacks by proxies throughout the region. Although these elements permeated Iran's government and society in many ways, Plaintiffs focus on certain key institutions, which Plaintiffs refer to collectively as Iran's Terrorist Sponsors. These institutions include (but are not limited to) (1) the Foundation for the Oppressed; (2) the Supreme Leader

---

[4] In this Complaint, Plaintiffs refer to certain religious concepts and describe those concepts from the perspective of Iran's Terrorist Sponsors and their supporters and proxies. The terrorists' understanding of, and use of, religious concepts is vital to understanding their actions, strategies, ideology, doctrine, motivations, linguistic choices, financial practices, rules, tactics, techniques, and procedures. For the avoidance of all doubt, however, Plaintiffs wish to emphasize that nothing in this Complaint should be interpreted as suggesting that the terrorists' interpretations of their Islamic faith is correct as a matter of theological doctrine or representative of the views of the vast majority of Muslims around the world who oppose terrorist violence.

Ayatollah Ali Khamenei and The Supreme Leader's Office (SLO); (3) the Islamic Revolutionary Guard Corps (IRGC); (4) Hezbollah; and (5) the Friday Prayer Leader Organization.

51. To provide context for SCB's conduct and its consequences, Plaintiffs first provide a summary of some of the most important historical events, persons, and decisions that shaped the development of Iran's terror apparatus during its formative period from the mid-1970s through the mid-1980s. Plaintiffs then explain the role of each of Iran's Terrorist Sponsors.

### A. Historical Background

52. In the mid-1970s—years before Iran's Islamic Revolution—Ayatollah Ali Khamenei set out to use terrorism to engineer a series of victories, beginning with using attacks to secure an Islamic safe haven (an "Islamic Republic") that, in turn, would serve as the geographic safe haven from which Khamenei and his allies could safely, securely, methodically, and patiently launch attack after attack against the United States and its allies in the Muslim world. Through such attacks from their safe haven, Khamenei and his allies would build a terrorist movement centered on martyrdom, violence, and the promise that martyrs who die while attacking the United States secure heavenly rewards for themselves and their entire families, immediate and extended alike. By marrying martyrdom with a messianic Shia narrative and emphasis on terrorism as the foundational tactic through which the revolution could be secured, Khamenei hoped to build an alliance of like-minded Islamist terrorists who would, working together, conduct so many successful attacks targeting the United States that the U.S. government would elect to withdraw the United States from the Middle East, after which Khamenei would eventually bring about the final collapse of the United States as a nation,

followed by the eventual collapse of every other nation-state that would not yield to the terrorism he sponsored to bring about his global Islamic Revolution.

53. Ayatollah Khamenei's desired end-state was the formation of what he termed the "Islamic State": a single, global, Shia Islam-derived, Shia-led government ruled by a single (Shia) Supreme Leader, of which his eventual "Islamic Republic of Iran" would be but one province, and for which all the citizens of the world converted to the Shia faith, swore an oath of loyalty to the Islamic State, and agreed to sacrifice their own lives for the Leader—or would be summarily executed as infidels and blasphemers. Khamenei's desired Islamic State was intended to topple the entire international nation-state system and erase the borders between national governments that Khamenei regarded as a creation of infidels.

54. In Ayatollah Khamenei's violent and fanatical vision, a single sect (Shiism) of a single faith (Islam) would establish a single government (the Islamic State) that would rule the entire globe, even though most Shia Muslims rejected such views, Shias were a tiny fraction of the globe's population and outnumbered even within the Islamic faith, for which Sunnis were always the dominant sect. Once Khamenei's imagined "Islamic State" ruled the world, Khamenei intended to implement a global genocide in which the only humans anywhere in the world who would be allowed to live would be those who were "faithful," *i.e.*, who were Shia Muslims who swore allegiance to the Supreme Leader of the Islamic State. Infidels, blasphemers, and those who "corrupted" the world—an Islamic concept that Khamenei transmogrified into, essentially, anything that was contrary to his views—would be summarily executed if they refused to convert to Shia Islam.

55. Although Ayatollah Khamenei's vision sounds absurd to Western ears—and to the vast majority of Muslims outside his circle of influence—it became a powerful ideological

motor and organizing doctrine for his followers, as well as a deeply rooted justification for terrorist attacks. This was so for three reasons.

56.     *First*, the fact that Ayatollah Khamenei's scheme contemplated revolutionary stages (first destroy the United States, then take over the world) meant that Khamenei believed, and taught all who followed him, that no act of terrorist violence that targeted the United States (directly or through its allies like Israel) was ever out of bounds as long as the attack in question helped intimidate the U.S. government—the condition precedent to Khamanei's desired end state of an Islamic world government.

57.     *Second*, the primacy of terrorist violence to achieving Ayatollah Khamenei's end-state meant that Khamenei—and those he controlled—***always*** prioritized sponsoring acts of terrorism targeting the United States (including though its allies) above every other consideration as a matter of tactics (use of terrorism), doctrine (belief that attacking the United States was the single most important variable to the success or failure of the enterprise), and religious faith (the heavy emphasis on martyrdom). Thus, under Khamenei's approach—and ideology taught to his followers—every other consideration was subordinate to bringing about the revolution necessary to birth a global Islamic State. Accordingly, as a matter of first principles, Khamenei and any terrorist faithfully following his approach would ordinarily be expected to devote at least the majority—if not all—of their time, money, work, and even family members to supporting Khamenei's efforts to sponsor attacks targeting the United States.

58.     *Third*, Ayatollah Khamenei knew that his ability to sponsor terrorist attacks targeting the United States that would be so effective as to compel America to leave the Middle East would require a cross-cutting combination of terrorist groups, tactics, operatives, skill sets, attack types, geographies, professions, relationships, languages, and more. Khamenei knew, and

taught his followers, that to meet these conditions precedent to their ability to effectively terrorize the United States into submission, Khamenei's terrorist alliance needed vast stores of money, weapons, recruits, intelligence, safe havens, and networked relationships with prospective allies and partners. And, Khamenei knew—and taught his followers—that such operational needs, in turn, meant that his terrorist attacks could only bring about his desired Islamic State if Khamenei and his allies could sustainably raise, store, move, and spend money— most of all, U.S. dollars—needed to pay for the fighters, weapons, logistics, and intelligence upon which every successful attack targeting the United States relied.

59.     Ayatollah Khamenei also knew, however, that even with the best of efforts, he and his terrorist allies would always be outmatched financially and technologically by the United States and its allies like Israel. Khamenei addressed both challenges with a programmatic emphasis on the glory of martyrs and martyrdom, which informed the entire terrorist architecture he built. Khamenei thus sought to change the world through terrorist tactics, and he spent decades developing, nurturing, financing, arming, and leading a transnational, cross-sectarian, alliance of anti-American Islamist terrorists in which sworn terrorist "brothers" from Iran, Iraq, Lebanon, Palestinian territories, Syria, and elsewhere sought to overthrow any government in the Muslim world that was opposed to their vision.

60.     To convert his fantastical ideas into reality, Khamenei would eventually sponsor proxy terrorist attacks targeting the United States to coerce the U.S. government into fleeing the Middle East and abandoning its allies there, most of all, Israel. To accomplish this objective, Khamenei sought to help sworn followers of the Islamic Revolution from Iran, Iraq, Lebanon, and around the world source the funds, weapons, logistical support, training, haven, intelligence, and cover and concealment required to attack and kill Americans around the world. This, in turn,

required that Khamenei build, grow, and sustain a global terrorist coalition united in two objectives that were inextricably linked in the eyes (and demands) of the terrorists: the withdrawal of the United States from the Middle East and the destruction of the State of Israel and forced expulsion and/or murder of any Jews that remained.

61. Ayatollah Khamenei always believed that the U.S. and Israeli governments' roles in the Middle East were inextricably linked. Most of all, Khamenei deployed two primary tactics to accomplish his strategic objective to force the United States out of the Middle East so that the Islamic Revolution would not wilt under the threat of U.S. intervention and would be free to overthrow the dozens of U.S. allies and partners throughout the Muslim world. His first tactic was to sponsor shockingly violent terrorist attacks to kill enough Americans to intimidate the U.S. government and persons in the United States into exiting the Middle East and abandoning Israel. His second tactic was to sponsor similarly brutal terrorist attacks specifically designed to intimidate the U.S. government and U.S. population at large by inflicting unspeakable violence on America's closest Middle Eastern ally: Israel.

62. Khamenei believed that what he scorned as the "Zionist regime" (or worse) was merely an artificial creation of, and an ongoing arm of, the U.S. government such that attacks that hurt Israel would also terrify U.S. government decisionmakers, demonstrating the inevitability of Khamenei's triumph over what he believed to be a figurative organ of the U.S. government.

63. Ayatollah Khamenei's grand terrorist ambitions required an equally grand architecture of terrorist sponsors. In this Complaint, Plaintiffs refer to the network of terrorist sponsors that Khamenei built and led as the "Iranian Terrorist Sponsors" or "Terrorist Sponsors." Among the grandest of Khamenei's insights was the recognition that the only possible way for

the terrorists to succeed against the might of the U.S. and Israeli governments was by working together regardless of their sectarian or ideological differences as long as they were (a) Muslim; and (b) committed to killing, maiming, kidnapping, raping, torturing, and summarily executing enough Americans, and victims from nations allied to the United States, to force the U.S. out.

64. What would eventually become Ayatollah Khamenei's "Axis of Resistance" was birthed in Palestinian terrorist camps in south Lebanon throughout the 1970s, during which period radical Shiite and Sunni Islamist groups comprised of Iranians, Iraqis, Lebanese, and Palestinians lived, trained, and fought together. Future leaders of the IRGC and Hezbollah, including future IRGC founder and senior leader Mohsen Rafiqdoost, future Hezbollah global attack cell leader Imad Mugniyeh, future senior JAM leader Abu Mahdi al-Muhandis, and a coterie of future leaders of Hamas were all co-located in the same camps, at which they built lifelong relationships that integrated these four terrorist groups into one coordinated alliance. For example, infamous Hezbollah operations mastermind Imad Mugniyeh was originally Palestinian terrorist leader Yassir Arafat's personal bodyguard before he was successfully recruited by the IRGC to join Hezbollah. From these camps, Iranian terrorists supported Ayatollah Ruhollah Khomeini's—who was exiled in France—campaign to overthrow the U.S.- and Israel-supported Shah of Iran.

65. By 1978, Ayatollah Khamenei's plan for global conquest through terrorism had begun to be put in motion: the U.S. government-backed Shah of Iran, Reza Pahlavi, was being rocked by a wave of Islamist terrorist attacks, kidnappings, assassinations, and acts of intimidation. In 1978, unlike now, such effective, and frequent, attacks by organized radical Islamist terrorists against a sitting U.S.-backed Muslim regime in the Middle East were virtually unheard of. And yet, the attacks that Khamenei and his allies continuously sponsored throughout

1978 worked. Khamenei and his allies therefore elected to intensify the violence. In coordination with notorious fanatics like Mohsen Rafiqdoost (who had recently been released from prison for murder) and Mohsen Rezai (who likely masterminded a sophisticated cross-border assassination of his own son out of devotion to the Supreme Leader after his son had defected to the United States and criticized the regime), Khamenei helped spearhead a successful wave of attacks that accelerated the demise of the Shah's government.

66. Throughout this period, Ayatollah Khamenei served a single master: Ayatollah Ruhollah Khomeini, who led what purported to be a broad, democratic, and inclusive movement in opposition to the Shah while Khomeini was exiled in France. That was, however, a fiction. Khomeini schemed the entire time to seize power and impose a radical Islamist vision upon everyone as soon as he could, backed by a robust commitment to terrorism as a first principle for which Ayatollah Khamenei was Khomeini's top lieutenant, most committed evangelist, and lead relationship manger with terrorists inside, and outside, of Iran.

67. Khomeini led his revolution from France, for which he recruited and deployed jihadists from Iran, Iraq, Lebanon, Palestinian territories, and throughout most of the Middle East, who were trained in Lebanon by Palestinian Sunni terrorists at camps run by a allied militias comprising a mix of Lebanese, Syrian, Palestinian, Iranian, and Iraqi terrorists, among others, including Lebanese militias that Khamenei and his IRGC henchmen would eventually construct into Hezbollah, which also shared a common theological (Shia), national (mixed-Lebanese-Iraqi), and familial connection (the Sadr clan), from which future Jaysh al-Mahdi leader Muqtada al-Sadr would later emerge in 2003. During this pre-revolutionary period in the late 1970s, cross-pollination between groups was the order of the day. For example, Khamenei's lieutenants recruited legendary Hezbollah operations mastermind—and dual-hatted IRGC

operative—Imad Mugniyeh away from iconic Palestinian Sunni terrorist (and Khamenei ally) Yassir Arafat, the iconic decades-long leader of the Palestinian Liberation Organization. Khamenei's emphasis on extreme violence, martyrdom, and cross-cutting collaboration with other groups throughout the Middle East worked.

68.     On February 1, 1979, Ayatollah Khomeini and his followers returned to Tehran and commenced their Islamic Revolution. When Khomeini landed, he was accompanied by his top operations, logistics, and security operative—his personal bodyguard, driver, and assassin, Mohsen Rafiqdoost. As Khomeini (who was frail) gingerly walked down the stair of the plane, Rafiqdoost (black turban to Khomeini's left) physically supported him as he set foot on Iranian soil, producing what is regularly described as the most iconic—and widely displayed—photo of the Islamic Revolution:



This ubiquitous image instantly and permanently cemented Mohsen Rafiqdoost's intimate connection to—and key trust from—Khomeini and, by extension, Khamenei.[5] Simply put, it vividly showed Rafiqdoost as the man most trusted to keep Khomeini physically safe in the literal moment when he was about to return to Iranian soil to launch his revolution. It therefore ensured that Rafiqdoost was a terrorist with universal name identification in Iran who was immediately understood—and always known thereafter—to be a key member of both Ayatollahs' inner circles. (Rafiqdoost is alive today, and continued directly sponsoring Iranian-sponsored attacks his entire life, including the attacks that killed and injured Plaintiffs.)

69.     On February 11, 1979, ten days after returning to Iran, Khomeini had effectively secured power. Upon doing so, he and his allies, including Khamenei, Rafiqdoost, and Rezai, set to work creating the instruments of terror upon which his Islamic Revolution would depend. At this time, Khamenei was, *inter alia*, Khomeini's then-personal representative to external, anti-American, Islamist, terrorist groups throughout the world, including Lebanese, Palestinian, and Iraqi terrorist groups and most ideologically zealous proponent of terrorism; simply put, Khamenei was the first ever Iranian terrorist to whom the regime assigned the role later made famous by Qasem Soleimani: the Iranian regime's lead relationship-manager with leadership elements in other terrorist groups, including Iranian proxies. Similarly, Mohsen Rafiqdoost served at the time as the Supreme Leader's then-most senior operations-facing operative with

---

[5] These photos were reportedly two of the most famous, mostly widely viewed, images in Iranian history. One or both were prominently displayed in most Iranian regime offices, buildings, markets, and the like, and were sometimes offered, in terms of ubiquity, as the Iranian regime's analogue to the United States' iconic photo of Marines raising the American flag at Iwo Jima during World War II. That widespread comparison, while offensive to the memory of American heroes, accurately reflected the universal knowledge of these photos in Iran as well as how, and where, the Iranian regime deployed the photo. For all these reasons, Mohsen Rafiqdoost was always – literally, from Day 1 of the Islamic Revolution – an internationally famous (and infamous) member of Khomeini's and Khamenei's inner circle.

strong pre-existing financial, personal, recruiting, and logistical networks Lebanon, Iraq, and the Palestinian territories, and Mohsen Rezai served at the time as the Supreme Leader's then-most senior ideologically zealous advocate in favor of using intelligence organizations and processes to power terrorist attacks.

70.     Khomeini, Khamenei, Rafiqdoost, and Rezai sought to develop a terrorist arm to launch attacks outside of Iran from day one because they believed that their Islamic Revolution would always be in mortal danger if they simply sat back and played defense against what they expected to be the inevitable pressure from the U.S. and its allies, including Israel. Moreover, their revolution was only months old, they feared that the forces of the "Great Satan" (*i.e.*, the United States) could—and likely were about to—invade Iran at any moment to destroy their Islamic Revolution before it could take root, and replace it with either another monarch like the freshly deposed Shah or—even worse—securing the birth of an American-style liberal democracy that was the antithesis of everything that their Islamic Revolution espoused. The survival of their nascent Islamic Revolution—and potentially, their own life or liberty— depended on building a robust terrorist capability.

71.     Accordingly, Khomeini, Khamenei, Rafiqdoost, and Rezai all believed—and taught their followers—that protecting the Islamic Revolution ***required*** propagating terrorist violence outside of Iran to prevent the United States from having the space and time to devote its resources to toppling the regime, as the U.S. previously had done in 1953. Their identified strategic imperative to attack the United States to protect their Islamic Revolution from being toppled was ***in addition to*** their recognized need to also attack the United States to compel it to abandon the Middle East so that Khomeini, Khamenei and their allies could then topple other governments one by one throughout the region.

72.     To that end, Khomeini installed Khamenei as, in effect, his leader for terrorist coordination, planning, and recruitment: a role that was substantially like that which Khamenei would assign to Qasem Soleimani about 20 years later. And Khomeini complemented that choice by installing Rafiqdoost as his top "security" (code for operations) operative and Rezai as his lead intelligence operative, with Rafiqdoost and Rezai both doing double-duty, in effect, as Khomeini's and Khamenei's two most important logisticians as well. Instructed by Khomeini, Khamenei, Rafiqdoost, and Rezai set out to build an integrated, sustainable, and effective infrastructure that addressed each of the three key nodes upon which the Iranian regime relied to sponsor terrorist attacks by proxies outside of Iran, which Khamenei had identified years earlier.

73.     *First*, Khamenei, Rafiqdoost, and Rezai needed to build an organization that enabled them to leverage the power of their monopolistic control of the Shia faith in Iran to imbue their entire terrorist enterprise with religious fervor. They thus used Friday Prayers to plainly declare Khomeini's, Khamenei's, and their allies' terrorist intentions, issue religious-based calls for violence, celebrate martyrdom, and source donations and recruits for attacks.

74.     *Second*, Khamenei, Rafiqdoost, and Rezai needed to build a reliable, large, diverse, and globally distributed terrorist operations system to supply the funds, logistics, weapons, fronts, and cover needed to plan and execute attacks. This infrastructure required (1) fighters, including both their person and their budgets, salaries, and martyr payments; (2) operations budgets; (3) weapons; (4) transportation to the attack site; (5) pre-attack intelligence expenditures; (6) smuggling operations to facilitate attacks, *e.g.*, moving, securing, and/or hiding illicit vehicles, vessels, or goods; (7) a global network of fronts comprised of the Foundation's offices, charities, affiliates, safe houses, real estate, and business organization, among other forms of support, to enable the Iranian Terrorist Sponsors to effectively conduct lethal attacks

targeting the United States and its allies while maintaining plausible deniability to avoid the risk that such attacks eventually prompt an armed conflict between the nations of the United States and Iran.[6] Accordingly, Khamenei, Rafiqdoost, and Rezai were responsible for building the Islamic Revolution's very first purpose-built terrorist operations organization.

75.     *Third*, Khamenei, Rafiqdoost, and Rezai needed to make its terrorist organization cohesive. This required they consolidate the variety of militant Islamist militias who supported the Revolution into a single, organized, ideologically zealous, tactically proficient, terrorist group.

76.     From February 1979 through April 1979, Khamenei, Rafiqdoost, and Rezai—along with a litany of others—knocked out each of Khomeini's three tasks in rapid order. In so doing, they built three of the key organizations that the Iranian regime deployed as Terrorist Sponsors: the Friday Prayer Leader Organization, Foundation for the Oppressed, and IRGC.

77.     In or about the February 1979, and befitting Khomeini's and Khamenei's emphasis on leveraging religious faith for terrorist violence, Khamenei, Rafiqdoost, and Rezai moved to rapidly seize—in Khomeini's name—control of all Friday Prayers in Iran. In the Islamic faith, Friday is when the devout attend Mosque for their most important message of the week from the Imam. Before the shah fell, regime opponents used Friday prayers to mobilize fighters and funds against him. Having seen the effectiveness of the tactic that they used to devastating effect, Khomeini and Khamenei understood the critical need to shut the door behind them, as well as the opportunity afforded by their monopoly on the delivery of, marketing of, donations sourced, and recruits found, through such services.

---

[6] This aspect of the Iranians' strategy succeeded: from 1979 through 2024, as there has never been a direct armed conflict between the nations of the United States and Iran.

78.     After having seized control, in effect, of Iran's most important venue for fundraising and recruitment at the time, Khamenei, Rafiqdoost, and Rezai moved onto their second task: standing up a purpose-built external operations front they could use to sponsor attacks targeting the United States and its allies, in order to export (and protect) their Islamic Revolution.

79.     On March 5, 1979, Khomeini, Khamenei, Rafiqdoost, and Rezai birthed their operations front, which Khomeini operationalized through a simple scheme devised by Khamenei, Rafiqdoost, and Rezai under which the Supreme Leader's Office and terrorist militias (that would eventually become the IRGC) seized the Pahlavi Foundation—which was the Shah's global charitable foundation that had assets and facilities all over the world—as well as the assets of Jews, Bahais, and other religious minorities, which they pooled together and renamed "The Foundation for the Oppressed on Earth" also known as the Bonyad Mostazafan ("Foundation for the Oppressed").

80.     That name was not a coincidence, but rather, a deliberate choice by Khomeini, Khamenei, Rafiqdoost, and Rezai to boldly announce the new purpose to which they were devoting the Shah's vast commercial, financial, and real estate holdings: exporting their Islamic Revolution to benefit the "Oppressed of the Earth"—*i.e.*, terrorist attacks targeting the United States and its allies. For Khomeini, the "Oppressed on Earth" comprised Muslims in countries who needed to be "liberated" through Khomeini-sponsored terrorist violence, and his newly seized Foundation was specifically intended for that purpose. To that end, Khomeini installed his most trusted terrorist henchmen on the board of the Foundation for the Oppressed from inception, including Ali Khamenei. From inception, and ever since, the Foundation for the

Oppressed has been inextricably connected to, and a vehicle for, the senior terrorist leaders who provided the muscle for Khomeini's terrorist agenda.

81.     Accordingly, Khomeini, Khamenei, Rafiqdoost, and Rezai created the Foundation for the Oppressed to sponsor external terrorist attacks by Iranian proxies ***before they had even created the IRGC***. Simply put, the Foundation for the Oppressed was as important as the IRGC to the regime's ability to sponsor violence, and neither could function without the other. But before one builds a well-armed transnational terrorist force capable of launching attacks throughout the world, one first needs stable income streams, corporate fronts to provide cover and concealment, weapons, logistics, and more. Thus, Khomeini, Khamenei, Rafiqdoost, and Rezai established their lead external terrorism front—the Foundation for the Oppressed—***before*** they even established the IRGC.

82.     About two months after Khomeini, Khamenei, Rafiqdoost, and Rezai established the Foundation for the Oppressed as their first terrorist front, they followed up by creating the organized terrorist group that would be one of—but not the only—intended terrorist groups to be the beneficiary of the Foundation's activities: the IRGC.

83.     On April 22, 1979, Khomeini ordered Rafiqdoost to organize the various terrorist militia that had supported him into one integrated organization that was purpose-built to help Khomeini secure his Islamic Revolution through terrorist violence; Khomeini had his terrorist front (the Foundation for the Oppressed), and now he wanted the organized terrorist group to go with it. As Rafiqdoost himself later boasted in an interview with Iranian state media in 2016:

> I wrote on a piece of paper: "The Islamic Revolution Guards Corps has been formed" and then wrote my name and asked everyone else to write down their names if they wanted to join the corps[] … Then I realized that three other groups have also formed their own IRGC. I invited their leaders to my office, locked the door, took out my gun and told them I would kill them and myself if they did not

join the corps[] I had formed. We held meetings for several days, … [after which the] IRGC was officially formed.

Thereafter, by his own hand, Rafiqdoost authored the document creating the IRGC:



84.     Amongst Khomeini's, Khamenei's, Rafiqdoost's, and the freshly created IRGC's first order of business was to create an external operations group that would sponsor terrorist attacks outside of Iran to secure the "liberation" of the "Oppressed of the Earth" through the "export" of their "Islamic Revolution," which Khomeini, Khamenei, and Rafiqdoost dubbed the "Office of Liberation Movements."[7]

85.     On November 4, 1979, Iranian students loyal to Khomeini took over the U.S. Embassy in Tehran, taking 52 Americans hostage and leading the U.S. to sever diplomatic relations with Iran. Notably, the hostage takers were widely credited with having been instructed to act by violent calls to action issued by Friday Prayer Leaders in Tehran before the attack. The

---

[7] In 1989, after his ascension to Supreme Leader, Khamenei restructured this effort by replacing the Office of Liberation Movements with the Qods Force and installing his own inner circle allies to lead it, including Qasem Soleimani.

crisis lasted 444 days before Khomeini released the hostages. Rafiqdoost later publicly admitted to having played a key role in this attack.

86.     The Iranian regime perceived that it won its hostage standoff with the United States—which formed the basis for all future regime strategy towards America. As Khomeini argued at the time, "this action," *i.e.*, the seizure of the U.S. Embassy and American hostages, "has many benefits" given that "taking hostages has increased our credibility" and "we will get many concessions." As Secretary of State Pompeo observed four decades later on November 4, 2019: "Forty years later, the revolutionary regime in Tehran has proven, time and again, that its first acts after gaining power were a clear indication of its evil character. The regime continues to unjustly detain Americans and to support terrorist proxy groups like Hizballah that engage in hostage taking."

87.     By 1980, Khomeini and his IRGC praetorian guard had secured their power base and set out to murder their enemies, real and imagined. To that end, Khomeini signed a decree—which has been in force ever since—instructing the IRGC that purported enemies of the Ayatollah and the IRGC "are infidels and worse than blasphemers" who "have no right to life."

88.     On September 22, 1980, Saddam Hussein's regime in Iraq attacked Iran, launching the Iran-Iraq war, which the IRGC often called "The Imposed War." During the Iran-Iraq war, Khomeini appointed two of his most loyal terrorist lieutenants to command IRGC forces: IRGC Brigadier General Ali Khamenei had a battlefield command, and IRGC Commander Mohsen Rafiqdoost was appointed Minister of the IRGC.

89.     The Iran-Iraq war solidified the Iranian regime's enduring alliance with North Korea, in particular, the tight relationship between North Korea's Reconnaissance General Bureau ("RGB"), which functioned as the North Korean regime's terrorist arm and was highly

analogous to the Qods Force. By 1982, Khomeini, Khamenei, Rafiqdoost, Rezai, the IRGC, the Foundation for the Oppressed, and Iran's national oil monopoly, NIOC, among others, were all involved in the booming bilateral trade between the Iranian regime (led by the Foundation for the Oppressed, NIOC, and the IRGC) and the RGB in which the Iranians and North Koreans maintained what was widely described as an "oil for weapons" partnership in which the Iranian regime engaged in barter trade with the RGB: the Iranians had lots of gas, the North Koreans had lots of weapons, and they could both meet the others' needs without expending precious currency on the purchase price. Accordingly, their barter relationship furnished a reliable, efficient, means of converting Iranian oil into North Korean-supplied weapons, training, and services to the Iranian regime's terrorist proxies, with the IRGC acting as the intermediary.

90. As an IRGC Brigadier General, Khamenei notoriously sponsored horrific attacks that were themselves a form of terrorism against children. Under his notorious strategy, the IRGC deployed hundreds of thousands of children as human mine sweepers, in effect, dressing them in white (for their funeral) and marching them across minefields to their likely death. As was widely reported, tens of thousands Iranian children brutally died. As Khomeini said, "Our leader is that 12-year old boy: who, with his small heart, which is greater than hundreds of our tongues and pens, with grenade in hand, threw himself under enemy tank and destroyed it and himself, and thus drank the nectar of martyrdom." (SCB knew about this because, *inter alia*, the Iranian regime plastered imagery of its child "martyrs" on Iran's currency, the rial, while SCB had a branch there.)

91. Throughout the Iran-Iraq war's eight-year duration, Khamenei and Rafiqdoost served as the IRGC's two most prominent public faces, became infamous for their close association with terrorism (including the use of children), and were the subjects of iconic

photographs that were widely displayed throughout Iran, and known to SCB through its presence there. For example, below (at left), Khamenei visited his IRGC brothers while serving as a battlefield commander, (at right) Khamenei "blessing" an IRGC-drafted Iranian child "martyr" who was about to be sent to his likely death:

 

92.    Even while it fought Saddam Hussein's army, the Iranian regime remained singularly dedicated to exporting the Islamic Revolution through acts of terrorism targeting the United States, including by targeting America's closest ally in the Middle East: Israel.

93.    In 1982, Khomeini dispatched a team of his most trusted IRGC terrorists to Lebanon, which was led by Mohsen Rafiqdoost, supported by Khomeini's personal representatives, and funded by the Foundation for the Oppressed. Their mission: to organize a loyal Lebanese Shiite terrorist proxy for the IRGC, so that the IRGC could sponsor attacks targeting the United States (inclusive of its allies like Israel) throughout the Arab world while having both an Arab face on the attack and plausible deniability for the Iranians. Khomeini, the IRGC, and the Foundation succeeded; they birthed Hezbollah in 1982 as their loyal proxy.

**B.    Ayatollah Khamenei and the Supreme Leader's Office (SLO)**

94.    **Ayatollah Khamenei.** From the outset of the Islamic Revolution in 1979 – and always since – Ali Khamenei has been a notorious IRGC terrorist. After the IRGC was created,

Ayatollah Khomeini installed Ali Khamenei to supervise the IRGC. Thereafter, Khamenei was Khomeini's personal representative to the IRGC and associated bodies. From 1979 onward, Khamenei intensely cultivated his relationship with IRGC leaders. Khamenei also seized the spotlight in high-profile events that tightly connected him to the IRGC, like when he – not the Iran's president – announced the start of the Iran-Iraq War.

95. Since 1989, Ayatollah Khamenei's official title has been "Supreme Leader of the Islamic Revolution," which reflected his – and the SLO's – transnational scope. As Iran scholar Hooman Majd reported in 2008: "The Supreme Leader of the Islamic Revolution, not Republic, is his official title, but in Iran he is known simply as Rahbar, or 'Leader.'"

96. On October 3, 2024, for example, BBC reported that Ayatollah Khamenei's official title included the designation "Tehran Friday prayer leader."

97. Ayatollah Khomeini was the IRGC's founder and leader, but was never an IRGC "member" who was himself responsible for IRGC-sponsored attacks. In contrast, Ayatollah Khamenei was always a sworn brother of the IRGC, with the rank of Brigadier General, who led IRGC forces during the Iran-Iraq war, before he became leader of the Islamic Revolution and overall commander of the IRGC as the Supreme Leader. As a lifelong IRGC member and supporter, Khamenei, among other things, previously served as Supervisor of the IRGC, as Ayatollah Khomeini's Representative in the High Security Council, and as an active IRGC commander at the frontlines of the Iran-Iraq War. For example, as *Iran Briefing* reported on September 22, 2014: "Khamenei himself is a former IRGC member. His son Mujtaba is the main link between his office [i.e., the Supreme Leader's Office] and the IRGC, as well as dozens of Khamenei's advisors and [SLO] office staff."

98.     Unsurprisingly given his IRGC pedigree, Khamenei was widely known as a staunch supporter of terrorism. On June 29, 2009, for example, *Newsweek* reported:

> Since his early days immersed in scripture and poetry, [Khamenei] had loved to identify with "the [O]ppressed," and he built his base of support in those institutions—the clergy, the military and the bureaucracy …. Since the war years in the 1980s, he had also forged close relations with the intelligence apparatus, perhaps convincing himself, as many a revolutionary has done, that the best way to prevent oppression is to eliminate enemies. In an article published [in 2008] in *Foreign Affairs*, Iranian dissident Akbar Ganji claimed that at Khamenei's very first meeting with cabinet leaders after taking his post as Supreme Leader in 1989, he put forth a 'theory of terror' that would define his approach to security issues. "The majority of the people in the state are silent," he is supposed to have said. But "a selfless group of individuals can make the state endure by using terror."

99.     Khamenei, like Khomeini, emphasized that "Resistance"—code for IRGC-sponsored acts of terrorism targeting the United States—was the foundation of the IRGC's mission and associated ideology. At a widely covered June 4, 2007 event honoring Khomeini, for example, Khamenei emphasized that, although "Resistance against bullying powers in order to attain one's rights has a price … You should not beg others for your rights. As long as you retreat and show leniency, the hegemonic nature of the bullying powers will increase their intimidation. Rights must be achieved through resistance."

100.    At all times, Khamenei was a prominent, and important, direct sponsor of acts of terrorism in his capacity as leader of the Foundation for the Oppressed, Hezbollah, the IRGC, and the SLO. To that end, Khamenei appointed representatives who served in key IRGC divisions and the IRGC's leadership.

101.    Ayatollah Khamenei also had a close, decades-long, inner-circle, personal relationship with Qassem Soleimani.

102.    Ayatollah Khamenei was an infamous supporter of Hezbollah, who personally met with – and financially supported – Hezbollah's leadership, including very close, decades-

long, direct-access relationship with Hassan Nasrallah. As Hezbollah Secretary General Hassan Nasrallah publicly admitted on October 1, 2019 in an on-the-record interview with an IRGC media outlet: the "Leader" – *i.e.*, Khamenei – "focused on the issue of resistance and its progress. He always insisted that resistance should progress, grow, and ultimately take back occupied lands. Hence, he always diligently encouraged the Resistance to persist on the path it had taken. … Even inside Hezbollah, there were some of our brothers who were inclined to get involved with domestic politics. But the Leader always emphasized the need to give priority to the mission of resistance and Jihadi tasks."

103.     Moreover, Khamenei – and the financial resources he commanded – played an especially pivotal role sponsoring attacks by Hezbollah and, through Hezbollah.

104.     Ayatollah Khamenei was bonded at the hip with Hassan Nasrallah, and went to great lengths to continually signal that they were fighting America together as one. In 2019, for example, the Defense Intelligence Agency reported a similar observation to Congress, as reflected into SLO-funded mobilization rallies featuring imagery of Khamenei and Nasrallah:



Supporters wave Hizballah flags in front of portraits of Hizballah Secretary General Hassan Nasrallah (left) and Supreme Leader Khamenei (right).

105.     Khamenei was also key, and direct, sponsor of attacks committed by Hamas and PIJ in Israel—and proud of it. On February 27, 2010, for example, *Agence France Presse*'s reporting about Hamas noted that "Iranian supreme leader Ayatollah Ali Khamenei told Palestinian militant chiefs that sustained resistance was the key to liberating their land." On August 4, 2014, similarly, IRGC-operated *Fars News Agency* reported: "A few days ago and following first-time remarks by Supreme Leader of the Islamic Revolution Ayatollah Seyed Ali Khamenei, a large number of Iranian Army and IRGC Commanders underlined the necessity for all Islamic countries to supply weapons and military tools and equipment to the Palestinians to help them defend themselves against the Israeli attacks." As Jeffrey Goldberg of *The Atlantic* observed on March 9, 2015:

> [A]s a reminder to those who argue that Jews should stop worrying so much about people who threaten to kill them, here is some (just some) of what [Ayatollah Ali Khamenei] … ha[s] said about Israel: ...
>
> - "It is the mission of the Islamic Republic of Iran to erase Israel from the map of the region." (2001) ...
>   106.
> - "The Zionist regime is a cancerous tumor and it will be removed." (2012) …

107.

- "This barbaric, wolf like & infanticidal regime of Israel which spares no crime has no cure but to be annihilated." (2014) ....

108.     **The Supreme Leader's Office.** While Ayatollah Khomeini created the Supreme Leader's Office in 1979, prior to 1989, the SLO's terrorism-facing portfolio was focused primarily on helping Khamenei manage his relationship with Hezbollah and operating the Friday Prayer Leader Organization, which Khomeini and Khamenei used on a weekly basis to raise funds and source results to for the stated purpose of helping Hezbollah conduct attacks (after they helped establish Hezbollah in 1982).

109.     The Supreme Leader's Office was a front for the Qods Force. Among other reasons, Qods Force operatives worked under cover of SLO employment, Qods Force operatives used SLO facilities for their operations, and the Qods Force was an indirect beneficiary of the profits derived by the SLO through the Qods Force's (including Qasem Soleimani's) close relationship with Ayatollah Khamenei.

110.     The Supreme Leader's Office was a front for Hezbollah. Among other reasons, Hezbollah operatives worked under cover of SLO employment, Hezbollah operatives used SLO facilities for their operations, and Hezbollah was an indirect beneficiary of the profits derived by the SLO through the Hezbollah's (including Hassan Nasrallah's) close relationship with Ayatollah Khamenei.

111.     In or about 1989 and 1990, Ayatollah Khamenei revolutionized the SLO, turning it into a behemoth far larger and more powerful than it was under Khomeini, but continuing the prior roles concerning Hezbollah and the Friday Prayer Leader Organization. Khamenei did so to optimize the Iranian regime's financial and logistical support for Hezbollah-sponsored attacks, including in Israel. Khamenei did so in direct response to concerns that the Iranian regime (most

of all, the IRGC) was not spending most of its profits on its mission of exporting the revolution. As such, Khamenei sought to dramatically tighten his personal group on each of the core Terror Sponsors he controlled: the Foundation for the Oppressed, Hezbollah, the IRGC, and the SLO, including its Friday Prayer Leader Organization.

112.    Accordingly, Khamenei cross-pollinated all the foregoing Terrorist Sponsors through his newly expanded SLO. For example, he had SLO operatives (who were simultaneously members of the IRGC) serve as his representatives to Hezbollah, the Foundation for the Oppressed, and the IRGC, among others. Under Khamanei's control – exercised through his IRGC terrorist son, Mojtaba Khamenei, the Ayatollah ordinarily operated the SLO to maximize the amount of money spent on terrorism committed by Hezbollah, the Qods Force, Hamas, and PIJ, reflecting Khamenei's twin obsessions with maximizing his ties to Hezbollah and the amount of violence he helped inflict on innocent Americans in the Middle East.

113.    Ayatollah Khamenei, Mojtaba Khamenei, and the SLO associates did so by embedding the Supreme Leader's eyes and ears into every organization of consequence (government and business alike) in Iran, including all components of the IRGC and Hezbollah through the Supreme Leader's "representatives." The SLO also owned firms and foundations, which it usually owned and/or operated jointly with the IRGC, Qods Force, and Hezbollah. The IRGC, Qods Force, and Hezbollah, likewise, had embeds within the SLO. These factors, and others, distinguished the SLO from nearly all other national-level Iranian groups.

114.    At least three differences between the Ayatollahs explains their diametrically different approached vis-à-vis the SLO. *First*, While Khomeini embraced terrorism as well, he had a more fatalistic attitude about the possibility of being killed by his enemies, famously saying it would not be a big deal because a brother of the IRGC would likely take the reins,

Khamenei was a paranoid, battle-hardened, sworn brother of the IRGC who believed there were plots everywhere and sought to apply terrorist tactics as a solution. *Second*, most of Khomeini's tenure was marked by Iran's catastrophic war with Iraq. Khamenei, in contrast, did not preside over any armed conflict but, instead, led an unprecedented expansion of the Foundation for the Oppressed's, SLO's, and IRGC's respective shares of the Iranian economy, which was driven by Khamenei's insatiable desire to spend even more money on proxy terrorism year after year. *Third*, Khomeini and Khamenei occupied different political positions: the former was revered by the IRGC from Day 1, while the latter had to buy their trust through sector-wide bribes, operationalized through the Foundation for the Oppressed, NIOC, NITC, KAA, among others.

115.     As a member of the IRGC who built its power to insulate his own, and actively sponsored its terrorist attacks, Ayatollah Khamenei always emphasized the global nature of his terrorism, and infamously led the "Axis of Resistance."

116.     Ayatollah Khamenei was an infamous sponsor of Hezbollah and JAM attacks targeting the United States in Iraq and Afghanistan.

117.     Ayatollah Khamenei was an infamous sponsor of Hezbollah, Hamas, and PIJ attacks targeting the United States in Israel.

118.     Ayatollah Khamenei was an infamous supporter of IRGC-sponsored hostage-taking attacks targeting the United States.

119.    Ayatollah Khamenei was a famous micro-manager, especially with respect to attacks targeting the United States.[8] Among other reasons, Khamenei was obsessed with America and viewed the U.S. government as the source of all the Iranian regime's problems.[9]

120.    From the 1990s through the 2015, reports regularly confirmed the Ayatollah's personal support of terrorism, including, but not limited to:

a.    <u>Blaise Misztal (Bipartisan Policy Center), July 9, 2013</u>: "The Supreme Leader strongly supports the IRGC and has elevated it to the most powerful entity in the political, military, and intelligence arenas."

b.    <u>Rep. Ed Royce (Chair, House Committee on Foreign Affairs), April 24, 2015</u>: "Earlier this month, the Administration and our negotiating partners announced the framework of a final agreement that is to be hammered out by the end of June [to ease certain sanctions as part of the JCPOA]. … So today, the ink isn't even dry on this month's announcement, but we saw two weeks ago … the [chants] led by the supreme leader in Iran. Yes -- he said, 'Yes, death to America.', and then later asserted that Iran would not allow international inspectors access to Iran's military facilities. This [past] weekend [i.e., on April 18-19, 2015], the deputy head of the Iranian Revolutionary Guard Corps reiterated, 'They will not even be permitted to inspect the most normal military site in their -- in their dreams.'"

c.    <u>U.S. Department of State, June 2015</u>: "Although Hamas's ties to Tehran have been strained due to the Syrian civil war, in a November 25 speech, Supreme Leader Khamenei highlighted Iran's military support to 'Palestinian brothers' in Gaza and called for the West Bank to be similarly armed. In December, Hamas Deputy Leader Moussa Abu Marzouk announced bilateral relations with Iran and Hamas were 'back on track.'"

---

[8] *See*, *e.g.*, Alex Vatanka, *The Battle Of The Ayatollahs In Iran: The United States, Foreign Policy, And Political Rivalry Since 1979*, at 146 (I.B. Tauris 2021) ("Khamenei is a micro-manager and no other issue has mattered to him as much as relations with the United States.")

[9] *See*, *e.g.*, Alex Vatanka, *The Battle Of The Ayatollahs In Iran: The United States, Foreign Policy, And Political Rivalry Since 1979*, at 97 (I.B. Tauris 2021) ("the United States was again at the heart of Khamenei's case for Iran's problems whether at home or abroad. ['Fifteen years ago the Imam said "America cannot do a damn thing." Some disagreed and feared America. But if we look at where we are today, we see that indeed America could not do a damn thing! Fifteen years later, we have proof. What have they been able to do? So far they were unable to do a damn thing!][')"]

121.    The SLO has regularly, and publicly, touted its close relationship with Qods Force

terrorists, such as a poster depicting Qasem Soleimani as a "freedom fighter" leading protestors:



122.    The SLO regularly touted its direct support for Hamas and PIJ sponsored terrorist

attacks in the Middle East. An SLO graphic billboard in Tehran in 2017 – depicting a digital

clock offering a real time "Countdown To Israel's Destruction" on a main thoroughfare – was

typical of how the SLO loudly and proudly advertised its embrace of terrorism:



123.     The SLO publicly advertised its direct support of terrorist attacks targeting the

United States and its allies, including Israel. In 2019, for example, the SLO published a billboard

in Tehran – and on Ayatollah Khamenei's official website – depicting a successful IRGC Navy

attack targeting U.S. and Israeli vessels, with the latter ablaze:



124.     The SLO also regularly touted its role uniting Hezbollah, Hamas, and PIJ in a

joint cause targeting the United States and its allies, including Israel. In 2020, for example, at the

SLO=organized and sponsored Qods Day – in which the SLO, IRGC, and Hezbollah coordinate anti-American and anti-Israeli rallies, recruitment, and fundraising calls in a dedicated day of action – the SLO's official English-language poster directly invoked the Holocaust with the tag line, "Palestine Will Be Free. The final solution: Resistance until referendum":



125.    The SLO also helped coordinate recruitment efforts for the IRGC and Hezbollah. For example, the SLO sponsored advertisements on behalf of the IRGC that promoted martyrdom and the deployment of child terrorists, such as the Tehran billboard below from 2008, which stated, "Our mission is to raise a generation of committed basijis" – i.e., pious Muslim warriors who have been mobilized to fight for the Ayatollah:



126. The SLO's representatives also routinely alerted SCB that they intended to our their profits into terrorist attacks by Hezbollah, Hamsa, PIJ, and Hamas in the Palestinian territories and Iraq. In 2012, for example, Ayatollah Khamenei's personal representative to IRGC leadership Ali Saeedi Shahroudi publicly stated, as reported by IRGC-controlled *Fars News Agency*: "The enemy intends to drag us into its own café, but we have lots of strategic differences of opinion with the United States, including [Lebanese] Hezbollah, Palestine, the Shiite governance in Iraq, and the Bahrain issue, none of which can be resolved in the framework of negotiations."

127. To optimize its terrorist agenda, the SLO had agents embedded throughout the IRGC. The SLO relied upon notorious IRGC terrorists like Mohammad Mokhber to personally support terrorist operations sponsored by the IRGC and its proxies. Mokhber was a sanctioned IRGC terrorist notorious for his involvement in violence.

128. Like the IRGC, the SLO depended upon the profits it generated from fronts it controlled to finance the IRGC violence it sponsored. Indeed, the United States made the same determination when it imposed counterterrorism sanctions against the SLO.

129.     The IRGC, Qods Force, and Hezbollah leveraged the SLO to provide a financial slush fund for their terrorist activities by, for example, financing attack cells, martyr payments, bounty payments, weapons purchases, and payments to the leadership of IRGC proxies, including leadership of Hezbollah, Hamas, PIJ, and JAM.

130.     From at least 2000 through present, the Qods Force and Hezbollah used the SLO to finance terrorist attacks in Israel that were committed by Hezbollah, Hamas, and PIJ. From 2003 through present, the Qods Force and Hezbollah used the SLO to finance terrorist attacks in Iraq committed by Hezbollah and JAM. Throughout, the SLO was always controlled by a member of the IRGC for the benefit of the Qods Force and Hezbollah, and used by the IRGC, Qods Force, and Hezbollah to route money to Hamas and PIJ (through Hezbollah) and JAM (through Hezbollah) attack cells, to finance terrorist attacks in Israel and Iraq committed by such groups. At all relevant times, the SLO provided key financial support to Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies, including Hamas, PIJ, and JAM.

131.     On March 24, 2012, the European Union sanctions that targeted the close cooperation between the SLO and "members of the … IRGC" to facilitate the use of telecoms, internet, and social media data to enable the SLO's and IRGC's ability to target regime enemies for kidnapping, torture, and murder, and confirmed (last name first name), *inter alia*:

a.     "MIRHEJAZI Ali ... Deputy Chief of the Supreme Leader's Office and Head of Security. Part of the Supreme Leader's inner circle, responsible for planning the suppression of protests which has been implemented since 2009."

b.     "SAEEDI Ali ... Representative of the Guide for the Pasdaran [IRGC] since 1995 after spending his whole career within the institution of the military, and specifically in the Pasdaran [IRGC] intelligence service. This official role makes him the key figure in the transmission of orders emanating from the Office of the Guide [Supreme Leader's Office] to the Pasdaran's [IRGC's] repression apparatus."

132. The SLO played a direct operational role in terrorist attacks and associated decision making, including with respect to IRGC proxies. For example, according to an analysis by Dr. Michael Knights as published in 2023 by the U.S. Army's Combatting Terrorism Center, the SLO played a direct leadership role with respect to the direction and support that the Iranian regime provided to JAM Special Group Kataib Hezbollah. The SLO played a similar role with respect to Hezbollah, Hamas, and PIJ.

133. Given the SLO's status as a front for the Qods Force, Hezbollah, and those organizations' proxies, any funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by the SLO through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, the SLO inevitably flowed through the SLO to the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM. Thus, the SLO underwrote the finance, weapons, intelligence, and logistics of enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

134. SCB always knew the above facts. Among other reasons, decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted SCB that its transactions with, and value flow-through to, the SLO fueled IRGC-sponsored acts of terrorism, including attacks by Hezbollah, Hamas, PIJ, and JAM. Such reports included, but were not limited to:

a. <u>Ahmad Rezai, Son of IRGC Commander Mohsen Rezai (*Reuters*), July 5, 1998</u>: "Ahmad Rezaei, … son of former Revolutionary Guards commander Major-General Mohsen Rezaei, told the [*L.A.*] *Times* he fled to the United States so he would be free to talk about Iranian-sponsored terrorism …[, including how] the Iranian government gave extremist groups, such as … Hizbollah, money to purchase weapons, and sometimes it simply sent weaponry to the groups …[;] [and] the office of supreme leader Ayatollah Ali Khamenei [*i.e.*, the SLO] was responsible for ordering attacks."

b. _New Yorker_, October 2002: "Until [9/11], [Imad] Mugniyah was considered by American officials to be the world's most dangerous terrorist, and many terrorism experts still believe this to be true. … Mugniyah's operation—known as the external security apparatus—is Hezbollah's most lethal weapon. It is commonly believed that Mugniyah is behind nearly every major act of terrorism that has been staged by Hezbollah during the last two decades. … It is believed that Mugniyah takes orders from the office of Iran's supreme leader, Ayatollah Khamenei [_i.e._, the SLO], but that he reports to a man named [Qasem] Soleimani, the chief of a branch of the [Qods Force]—the arm of the [IRGC] responsible for sponsoring terror attacks on Israeli targets."

c. _BBC_, April 29, 2003: "[SLO-funded Iraqi] radio[] coverage … featured protesters chanting 'No to colonialism, no to occupation' and 'Death to America, death to Israel.' … In its commentaries, the radio has contrasted the US-led presence with the popularity of Iraqi leaders who 'merge with the people (and) do not have guards and protectors like the tyrants,' noting that the Iraqi people will oppose the 'hirelings, liars, hypocrites and traitors.' … On 19 April, the [SLO-funded] radio warned that the Iraqi people would teach the 'usurper Americans' a lesson; it stated two days later that 'cooperation with the invading forces is prohibited and rejected'. The new station frequently leads its news summaries with positive items on Iran's relationship with Iraq. The lead item in the 18 April bulletin reported a 'cable of gratitude' from Abd al-Aziz al-Hakim, chief of SCIRI's Jihadist Office, to Iran's Supreme Leader Khamene'i for 'his call to the Iranian people to stand by the Iraqi people and extend assistance to them.'"

d. _Islamic Republic News Agency_, March 2004: "A memorial ceremony was held for the martyred founder and spiritual leader of the Islamic Resistance Movement of Palestine (Hamas) Shaykh Ahmad Yasin at Tehran Ark Mosque on Sunday. … Speaking at the ceremony, the deputy head of the international department of the supreme leader's [Khamene'i's] office, Hojjat ol-Eslam Mohammad Hasan Akhtari said that Shaykh Yasin's martyrdom would reinforce the Palestinians popular uprising (_intifadah_)."

e. Dr. Michael Rubin (Senior Lecturer, Naval Postgraduate School), July 23, 2009: "Iran's … terrorist sponsorship … [is] the purview of the Islamic Revolutionary Guard Corps and the Office of the Supreme Leader."

f. Mohammad Hassan Rahimian (SLO), 2010: "We have manufactured missiles that allow us, when necessary to replace [sic] Israel in its entirety with a big holocaust."

g. _Investor's Business Daily_, September 23, 2010: "Tehran has trained Shiite Iraqi militants to attack American combat forces [and] supplied Iraqi insurgents with advanced IED technology …. The [] Revolutionary Guards have even partnered with Hezbollah terrorists to kill U.S. soldiers, as in Karbala, Iraq, in 2007. … The examples of Iranian-guided or financed attacks against the U.S. are legion. The late Lebanese-born Imad Mughniyah, for instance, took orders 'from the office of Iran's supreme leader, Ayatollah Khamenei,' according to Jeffery Goldberg, writing in the _New Yorker_ in 2002."

h. DoD, October 12, 2011: "Even though the IRGC is constitutionally directed to coordinate with Iran's conventional military forces and is nominally subordinate to a joint

headquarters that overseas [sic] the security services and Law Enforcement Forces (LEF), the [IRGC] answers directly only to Ali al Khamenei, [Iran]'s Supreme Leader. This direct access to the Supreme Leader and his consistent and considerable support for the IRGC makes the [IRGC] peerless among military, intelligence, law enforcement, intelligence, and security services in Iran. … The IRGC answers only to the Supreme Leader rather than an elected official, a higher military command, or any other political or clerical entity within the government of Iran. The IRGC supports and advocates for the Supreme Leader and Khamenei responds in kind. During the height of the 1997 student riots, twenty-four senior IRGC officers sent a letter to reformist president Mohammad Khatami, issuing an ultimatum that he take action against the protestors, or the IRGC would take matters into their own hands."

i.  <u>IRGC General Mohsen Rezai, October 12, 2011</u>: "Once someone had asked Imam [Khomeini] as to why he lends so much support to the IRGC. The Imam had answered 'why not?' and the interlocutor had warned him that it may result in staging a coup [if the IRGC became too strong]. The Imam had answered, 'It doesn't matter; it stays in the family [if they stage a coup]; as they are our own guys.'"

j.  <u>*Israel National News*, December 30, 2011</u>: "Hizbullah … is using American banks … U.S. Attorney Preet Bhara noted, 'It puts into stark relief the nexus … [to] terrorism.' … The money is allegedly laundered through a complex chain of accounts around the globe using pseudonyms. Millions of dollars are periodically funneled from the accounts of Hizbullah leaders or those of their wives, to those of senior members of the Iranian Revolutionary Guards, the sources said. The money is then transferred back to Hizbullah from the office of Supreme Leader Ayatollah Ali Khameini."

k.  <u>Hojateleslam Alireza Panahian (SLO), 2013</u>: "The day will come when the Islamic people in the region will destroy Israel and save the world from this Zionist base."

l.  <u>*Islamic Republic of Iran Broadcasting*, July 25, 2014</u>: "[A] [r]eport on participation of people in Quds Day rallies [in Iran] … shows demonstrators marching on the streets and chanting 'Death to Israel' and 'Death to America'. … Commenting on the International Quds Day, Deputy Head for the Cultural and Publicity Affairs of Iranian Supreme Leader's office at the [IRGC] Mohammad Ali Asudi said that 'the Zionist regime' has been crippled by Hamas as well as Palestinians' resistance."

m.  <u>National Council of Resistance of Iran, 2018</u>: "The regime's decision-making and executive agencies for terrorist operations[:] All decisions on terrorist attacks abroad, particularly those targeting Iranian dissidents, are made at the highest levels of the Iranian regime. Such sensitive and sophisticated operations require high levels of intelligence, coordination, logistics, and operational skills, as well as the political and diplomatic cover terrorist operatives need. Here are key decision-making and executive agencies involved for terrorist operations. [28] The Special Affairs Office of the Supreme Leader: Following the death of the regime's former Supreme Leader, Ruhollah Khomeini, Ali Khamenei appointed mullah Ali-Asghar Mirhejazi, then-head of the foreign office of the Foreign Ministry, to establish a special intelligence and security apparatus called the "Special Affairs Office" to operate out of Khamenei's office. The Special Affairs Office

coordinates the regime's intelligence, security and terrorist organs within Khamenei's office. All terrorist operations are conducted under the supervision of the Special Affairs Office after Khamenei's personal approval."

n.  *Radio Farda* (*Voice of America*), April 8, 2019: "[T]he IRGC … structure … [includes] important offices in IRGC … that belong[] to the Supreme Leader's representative to the corps (a trusted cleric) and the counter-intelligence office which operates under direct supervision by Khamenei's office."

o.  Hossein Abedini (National Council of Resistance of Iran), August 23, 2019: "The Iranian regime … [has] become more involved in continuing mass killings inside Iran as well as their aggressive foreign policy in different countries. For example, … supporting … Hezbollah … The IRGC has to be prescribed as a terrorist organisation … And also, the supreme leader of the regime, and the office of the supreme leader of the regime, which is the centre of all these terrorist activities. ... The IRGC is the main force carrying all these terrorist attacks … in the region."

p.  Secretary of State Michael R. Pompeo, November 4, 2019: "Treasury … act[ed] … against nine appointees and representatives of Ali Khamenei, the Iranian regime's unelected Supreme Leader, whose office is responsible for advancing Iran's radical agenda. The designation seeks to block funds from flowing to a shadow network of Khamenei's military and foreign affairs advisors who have for decades oppressed … supported terrorism … around the world. The action specifically targets Ali Khamenei's appointees in the Office of the Supreme Leader … Two of the Supreme Leader's appointees, who are designated today, have also been linked to the 1983 U.S. Marine barrack bombing in Beirut that killed 241 U.S. personnel and the 1994 bombing of Argentine Israelite Mutual Association (AMIA). As recently as October 2019, a representative of the Supreme Leader directly called on regional Iran-backed militias to capture Western embassies."

q.  *Voice of America*, November 18, 2019: "Two days of intense fighting [in] Israel … once again highlights Iran's expansionist ambitions in the Middle East, experts say. … Iran has managed to sponsor both [Hamas and PIJ] at the same time, 'because both groups are committed to Israel's destruction — a goal cherished by … Ayatollah Khamenei and the … IRGC,' said Sam Bazzi, director of the Islamic Counterterrorism Institute in Washington. ... 'The arrangement in Gaza [for] Hamas and PIJ suits Tehran and fits into the mold it had frequently applied in the region: Iran-friendly governments accountable in front of the international community and secretive striking arms directly controlled by the … Quds Force and the Supreme Leader's Office,' said Bazzi."

r.  *BBC*, May 21, 2020: "[A] poster by the Supreme Leader's office drew comparisons with Nazi Germany. The poster, published online on 19 May by Khamenei.ir, contains the message: 'Palestine will be free. The final solution: resistance until referendum.' The term 'final solution' was used by the Nazis to refer to the extermination of Europe's Jewish population, and the reference prompted condemnation from US … officials."

135.    The SLO was never a normal Iranian state entity: it was fully captured by avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, PIJ, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers to exit the Middle East and abandon its allies there, including Israel and Iraq.

136.    As SCB well knew, Ayatollah Khomeini and Ayatollah Khamenei always notoriously used their control of Friday Prayers in Iran to sponsor terrorist attacks committed by their followers. SCB's employees in Iran, like all other Iranians, were intimately familiar with the content of Ayatollah Khomeini's seminal guide, *The Little Green Book.* Given that, SCB had actual knowledge that Friday Prayer Leaders in Iran had one mission: promote terrorism. As Ayatollah Khomeini himself explained at pages 1-2 of *The Little Green Book*:

> Our one and only remedy is to bring down these corrupt and corrupting systems of government, and to overthrow the traitorous, repressive, and despotic gangs in charge. This is the duty of Muslims in all Islamic countries; this is the way to victory for all Islamic revolutions.
>
> Muslims have no alternative, if they wish to correct the political balance of society, and force those in power to conform to the laws and principles of Islam, to an ***armed Jihad against profane governments.* …**
>
> Jihad means the conquest of all non-Muslim territories. Such a war may well be declared after the formation of an Islamic government worthy of that name, at the direction of the Imam or under his orders. It will then be the duty of every able-bodied adult male to volunteer for this war of conquest, the final aim of which is to put Qur'anic law in power from one end of the earth to the other. But the [2] whole world should understand that the universal supremacy of Islam is considerably different from the hegemony of other conquerors. It is therefore necessary for the Islamic government first to be created under the authority of the Imam in order that he may undertake this conquest, which will be distinguishable from all other wars of conquest, which are unjust and tyrannical and disregard the moral and civilizing principles of Islam. …
>
> There are some of us who aren't concerned with developing an Islamic movement, but, instead, of making the pilgrimage to Mecca with the Muslim brothers, in peace and understanding. It certainly wasn't that way in the time of the Prophet. ***The Friday prayers were the means of mobilizing the people, inspiring them to battle. The man who goes to war straight from the mosque is***

***afraid of only one thing - Allah. Dying, poverty, and homelessness mean nothing to him; an army of men like that is a victorious army.*** **(Emphasis Added.)**

Islamic faith and justice demand that within the Muslim world, anti-Islamic governments not be allowed to survive. The installation of lay public power is equivalent to actively opposing the progress of Islamic order. Any nonreligious power, whatever form or shape it may take, is necessarily an atheistic power, the tool of Satan; it is part of our duty to stand in its path and to struggle against its effects. Such Satanic power can engender nothing but corruption on earth, the supreme evil which must be pitilessly fought and rooted out. To achieve that end, we have no recourse other than to overthrow all governments that do not rest on pure Islamic principles, and are thus traitorous, rotten, unjust, and tyrannical administrative systems that server them. That is not only our duty in Iran, but it is also the duty of all Muslims in the world, in all Muslim countries, to carry the Islamic political revolution to its final victory.

137.    In another message, Ayatollah Khomeini also emphasized the violent nature of his approach to Friday Prayers: "The Friday prayers were an opportunity to ***bring people together and call them to arms.*** The man who goes to war straight from the mosque fears only one thing: the Almighty. Death, material needs and homelessness are insignificant to him. ***An army of such men is an army of heroes.***" (Emphasis added.)

138.    Moreover, in his 1975 treatise, *Velayat-e Faqeeh: Governance Of The Jurist*, Khomeini explained that the purpose of Friday Prayers – as he saw it – was to encourage jihadists to fight on the battlefield:

The Friday sermon was more than a surah from the Qur'an and a prayer followed by a few brief words. ***Entire armies used to be mobilized by Friday sermon and proceed directly from the mosque to the battlefield—and a man who sets out from the mosque to go into battle will fear only God, not poverty, hardship, or his army will be victorious and triumphant.*** When you look at the Friday sermons given in that age and the sermons of the Commander of the Faithful ('a), you see that their purpose was to set people in motion, to arouse them to fight and sacrifice themselves for Islam, to resolve the sufferings of the people of this world. If the Muslims before us had gathered every Friday and reminded themselves of their common problems, and solved them or resolved to solve them, we would not be in the position we find ourselves in today. Today we must start organizing these assemblies in earnest and make use of them for the sake of propagation and instruction. The ideological and political movement of Islam will thus develop and advance toward its climax. (Emphasis added.)

139.     The Supreme Leader, SLO, and Hezbollah all had a long and notorious history of leveraging their control over Friday Prayers to raise money, source recruits, and even launch attacks. In 1979, for example, Khomeini-backed terrorists seized the U.S. Embassy after having been encouraged to do by the Tehran Friday Prayer Leader at the time. Similarly, Hezbollah famously used Friday Prayers as a main tool to grow their ranks and raise funds.

140.     The U.S. government has also confirmed that the Ayatollah used his Friday Prayer Leader Organization to incite attacks targeting American sin Iraq. In 2004, for example, State reported to Congress: "Shortly after the fall of Saddam Hussein, individuals with ties to the Revolutionary Guard may have attempted to infiltrate southern Iraq, and elements of the Iranian Government have helped members of Ansar al-Islam transit and find safehaven in Iran. In a Friday Prayers sermon in Tehran in May, Guardian Council member Ayatollah Ahmad Jannati publicly encouraged Iraqis to follow the Palestinian model and participate in suicide operations against Coalition forces." As Dr. Ronen Bergman reported in 2011, "The moment the Iranians reached the conclusion that the U.S. invasion of Iraq was inevitable, they began making preparations of their own, in a number of spheres. … Supreme Leader Khamenei declared that Iran would not allow 'the American highway robbers and savages in civilized clothing to rule our country again.' Ayatollah Ahmad Janati, a close associate of Khamenei, whose many roles include that of Tehran's Friday prayer leader, attacked the American administration in a sermon in February 2003, saying, 'A number of naive people in Congress support the moves of their administration, which is acting like Stalin and Hitler and Genghis…the people will soon take care of them.'"

### C. The Foundation for the Oppressed (Bonyad Mostazafan)

141. From 1979 through at least 2019, the Foundation for the Oppressed was the Iranian regime's oldest, largest, and most purpose-built terrorist operations front. It was the first terrorist operations front established by Ayatollah Khomeini and his newly created IRGC in 1979, and has been notorious ever since.

142. When Khamenei, Rafiqdoost, and Rezai created the Foundation for the Oppressed in 1979, they did so by seizing the Pahlavi Foundation and immediately converting it into one of the Qods Force's primary transnational funding and logistics fronts: a custom-built foundation specifically designed to provide funding, weapons, intelligence support, logistical aid, and a vast transnational footprint of corporate fronts, shell companies, and real estate to the Qods Force and Hezbollah.[10] This was part of the IRGC's early efforts to build the financial and logistical networks needed to export the Islamic Revolution through IRGC-funded terrorist attacks targeting the United States and its allies, including Israel. Such terrorists controlled the Foundation for the Oppressed for the same primary purpose: to help the Qods Force, Hezbollah, and such FTOs' proxies acquire funds, weapons (including weapons components), intelligence,

---

[10] For the avoidance of all doubt, the Qods Force and Hezbollah did not gradually take control of the Foundation, nor was the Foundation originally a noble charity that these FTOs eventually corrupted. Instead, the Foundation was designated as the specific-purpose-built foundation to enable Qods Force and Hezbollah acts of terrorism targeting the United States. Accordingly, from day one—and ever since—the Qods Force has structured the Foundation to operate as the Qods Force's and Hezbollah's transnational terrorist operations slush fund. To that end, the Foundation had a wide global footprint (which facilitated movement of goods and personnel across borders), thousands of real estate holdings (which provided safe houses and logistics sites), hundreds of corporate holdings (which offered cover and concealment for Qods Force and Hezbollah operatives and transactions), and a presence in every strategic industry relevant to the Qods Force's and Hezbollah's transnational jihadist mission to "export the Islamic Revolution" by sponsoring acts of terrorism targeting the United States.

cover, concealment, and logistical aid, so that such terrorists could commit terrorist attacks, enabled by the global resources and charity-cover provided by the Foundation.

143. Most of all, the Foundation for the Oppressed served as—and was known for serving as—the primary global external operations front that Ayatollah Khomeini, Ayatollah Khamenei (who ran the Foundation in the 1980s while also managing the IRGC's proxy terrorist portfolio), the SLO, and the IRGC used to provide every relevant category of assistance necessary for an Iranian proxy terrorist in Lebanon or Gaza to successfully attack and kill Americans. As a result, the Foundation for the Oppressed was fundamentally different from most other fronts controlled by Ayatollahs, SLO, and IRGC: while most such fronts were operated by such Iranian Terrorist Sponsors for the benefit of (as indirect beneficiary) of Iranian proxies like Hezbollah and Hamas, the Foundation was different—and known to be so.

144. In short, the Ayatollahs, SLO, IRGC—*and Hezbollah*—jointly managed the Foundation for the Oppressed for Hezbollah's direct benefit because the Ayatollahs', SLO's, and IRGC's Foundation-related custom and practice, and such Terrorist Sponsors' Foundation-related tactics, techniques, and procedures, ordinarily called for the Foundation to be operated for the substantial, if not primary, benefit of the Ayatollah's, SLO's, and IRGC's ability to promote proxy terrorist groups that comprised the jihadists' analogue to the French foreign legion: a program to support foreign fighters from all over the world who, instead of serving their own nation, choose to serve the Supreme Leader of the Islamic Revolution (*i.e.*, Ayatollahs Khomeini and Khamenei) and his designated revolution-propagation agents (*i.e.*, the IRGC and SLO).

145. Ever since, the Terrorist Sponsors have embedded Hezbollah operatives throughout the corporate superstructure of the Foundation for the Oppressed, disguised as agents

and employees of the Foundation.[11] From at least 1983 through at least 2019, the Ayatollahs', SLO's, and IRGC's Foundation-related custom and practice and Foundation-related tactics, techniques, and procedures ordinarily called for the deployment of Hezbollah operations, logistics, intelligence, and financial operatives inside of the Foundation as embedded, covert, terrorists, whom the Terrorist Sponsors caused, as a matter of ordinary practice, to be comprehensively embedded throughout the organizational structure of the Foundation, including its affiliates. In so doing, Ayatollah's, SLO's, and IRGC's custom and practice when dealing with the Foundation was to embed Hezbollah operatives both *vertically*, *i.e.*, Hezbollah operatives were embedded throughout the Foundation's seniority scale, and *horizontally*, *i.e.*, Hezbollah operatives were spread throughout the Foundations geographic, industrial, and corporate footprint.

146.    From 1979 through at least 2019, the Foundation for the Oppressed was always the most important global operations front in the world for the Qods Force. The Foundation was always operated for the primary purpose of providing financial, logistical, cover, concealment, intelligence, and safe haven/ratline support for the Iranian regime's external terrorist operatives, including, but not limited to, the IRGC-QF (inclusive of its predecessor, the Office of Liberation Movements) and IRGC-IO (inclusive of its predecessor, the IRGC Intelligence Bureau), with the IRGC-IO deployed under the Qods Force's umbrella when outside Iran.

147.    From 1982 through at least 2019, the Foundation for the Oppressed was **also** a front for Hezbollah, and always serving as one of Hezbollah's most important global operations nodes throughout the world, including, but not limited to, in Lebanon, the Palestinian territories,

---

[11] True, such Hezbollah embeds were, in fact, employed by the Foundation; but they were engaged in sponsoring and conducting terrorist attacks, not licit commercial activities.

Iraq, Syria and everywhere else the Foundation had an outpost. Once Hezbollah established itself as the Iranian Terrorist Sponsors' lead external terrorist proxy, Khamenei, Rafiqdoost, Rezai, and others further embedded Hezbollah operatives, finances, logistics, and weapons supply in the Foundation—on its org chart, in its warehouses, at its ports, on its ships, and in its bank accounts. During Hezbollah's first decade of existence, the Iranian Terrorist Sponsors used the Foundation's resources to, inter alia: (1) establish Hezbollah in 1982; (2) finance Hezbollah's rapid growth thereafter; (3) facilitate Hezbollah's 1982 suicide bomb attack in Lebanon that killed 241 Marines; (4) facilitate the Iranian regime's oil-for-weapons, services, and tunnels barter agreements throughout the decade from 1982 through 1992, in which the Foundation for the Oppressed likely facilitated more than $1 billion (in 1980s dollars) worth of weapons, services, and tunnel construction assistance from the RGB, for which the SLO, Foundation, NIOC, and IRGC coordinate with RGB, on behalf of Hezbollah in Lebanon, to whom the RGB's weapons and services were directly provided as facilitated by the Iranians. All while sheltering the entire terrorist enterprise through the triple cover provided by Hezbollah and Qods Force operatives supervision of (as Khamenei's representative or inner circle confidante), and coordination with: (1) the SLO, which was completely opaque; (2) the Foundation for the Oppressed, which was also completely opaque and was, pretextually, held out as a religious foundation that sought to leverage economic investments to fight poverty economic conglomerate that serves charitable ends; (3) and NIOC (which provided excellent cover and concealment for such weapons shipments until the mid-2000s, when a series of high-profile, highly embarrassing (for Hezbollah and the Qods Force), weapons seizures that revealed, effectively, NIOC's then-bumbling concealment tradecraft when it came to weapons.

148.     As explained *infra*, SCB helped the Foundation for the Oppressed generate at least several billion dollars in likely profits between 2000 and at least 2019, including at least several hundred of millions in profits—and likely far more—from 2007 through 2012.

149.     As explained *infra*, SCB's assistance also directly aided attacks by supplying the money to fully fund—multiple times over—all five types of the Iranian Terrorist Sponsor's attack incentive and reward payments, which powered every category of terrorist attack committed by Hezbollah, Hamas, PIJ, and JAM as necessary for each such groups to conduct every attack targeting the United States in Israel, the Palestinian territories, and Iraq that Hezbollah committed, planned, or authorized from 2010 through 2019 (as all were here), when every Plaintiff was attacked.

150.     Notably, the Foundation for the Oppressed publicly admitted its provision of three of the five: martyr payments, disability payments, and orphan payments. For example, the Foundation long stated that one of its main lines of effort was to finance payments to honor Hezbollah, Hamas, PIJ, JAM, and IRGC martyrs and their families. Similarly, the Foundation referenced the fact that it provided comprehensive support to Resistance fighters and their families, or similar such concepts, where the language used, and context of the statements, compelled the conclusion that the Foundation was describing, at least, Hezbollah, Hamas, PIJ, and IRGC martyrs and disabled terrorists.

151.     With respect to the last two—salary payments and bounty payments—the Foundation for the Oppressed strained to avoid publicly addressing or admitting its long-standing role in enabling such payments, but that was merely the Foundation's ineffective attempt to maintain cover and concealment. From the 1980s through 2024, government investigations, NGOs, whistleblowers, and press reports regularly confirmed that the Foundation played a key

role in the network of Iranian Terrorist Sponsors that coordinated their efforts to meet the enormous financial burden that such attack incentive and reward payments imposed each year. Given Hezbollah's, Hamas's, PIJ's, and JAM's custom and practice, terrorist TTP, and programmatic emphasis on such payments consistent with their functionally identical IRGC and Hezbollah training regime, it is highly likely that *more than half* of all the value of all financial transfers from the Foundation to Hezbollah, Hamas, and PIJ from 2000 through at least 2019, and JAM from 2003 through at least 2019.

152.    The impact of Foundation money was amplified by the Foundation's long-standing coordinating role in facilitating NIOC-RGB oil-for-weapons, services, and tunnels barter trades, which began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars *per year* in bartered oil-for-weapons, services, and tunnels that the Terrorist Sponsors caused to flow through to were then supplied to Hezbollah, Hamas, PIJ, and JAM to directly enable such groups' attacks. This freed up precious U.S. dollars that the Terrorist Sponsors could—and did, as a matter of each group's custom and practice, and tactics, techniques, and procedures—supply to Hezbollah, Hamas, PIJ, and JAM to finance each of their five types of attack incentive and reward payments.

153.    By the mid-1990s, Hezbollah, in turn, operated for the primary purpose of providing financial, logistical, cover, concealment, intelligence, and safe haven/ratline support for the Iranian regime's external terrorist operatives, including, but not limited to, the IRGC-QF (inclusive of its predecessor, the Office of Liberation Movements) and IRGC-IO (inclusive of its predecessor, the IRGC Intelligence Bureau), with the IRGC-IO under the Qods Force's umbrella while outside Iran.

154.     The Foundation for the Oppressed was the cornerstone of the Iranian regime's sponsorship of attacks by Hezbollah from 1983 through at least 2019. To understand why, start with history. In 1979, Ayatollah Khomeini, Ayatollah Khamenei, Mohsen Rafiqdoost, and Mohsen Rezai established the Iranian regime's very first dedicated external terrorist operations front a month after seizing power, which they named the Foundation for the Oppressed of the Earth and the Disabled—a direct reference to, and recognition of, the Foundation's core terrorist mission. In 1982, likewise, Khomeini, Khamenei, Rafiqdoost, and Rezai collaborated with the Foundation for the Oppressed to stand up the Iranian Terrorist Sponsors' first dedicated foreign terrorist proxy—a Iranian-built, Shia Arabic terrorist group in Lebanon that was comprised of an Iranian-selected assortment of then-existing radical Islamist Lebanese militias operating in Lebanon. Once again, they loudly and proudly involved the same naming convention for another first-of-its-kind terrorist creation: the Lebanese-terrorist-Frankenstein they created and dubbed "the Organization for the Oppressed of the Earth"—which added an additional brand name (Hezbollah) in 1985 while never abandoning its original name.

155.     Although the Foundation's inner workings were notoriously opaque, its opacity only confirmed its terrorist operations purposes; it was the single blackest hole in the entire Iranian regime, controlled exclusively by the Supreme Leader and his inner circle. U.S. government reports confirm the point. As Treasury explained when it sanctioned the Foundation for the Oppressed in 2020: "Bonyads [foundations] are opaque, quasi-official organizations controlled by current and former government officials and clerics that report directly to the Supreme Leader. . . . Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly approved." Similarly, as U.S.-government-published *Radio Farda* reported on February 18, 2022, "The [Iranian regime's]

foundations [*i.e.*, bonyads] are widely believed to be used to funnel revenue to groups that support the regime, including mercenaries working closely with the IRGC's Quds Force, … for [] operations abroad." Likewise, as scholars Engin Sune and Gazi Baki noted in 2019, "commentators claim[ed] that bonyads assist[ed] in fueling international terrorism," such as how "Mohsen Rafiqdoost, who was the minister of the Revolutionary Guards in the 1980s and served as the head of several bonyads, as a key player in sponsoring Hezbollah in Lebanon." Indeed, bonyads—as a category—were amongst the absolute most notorious of all the Iranian regime's terrorist fronts. As State publicly warned in a report to Congress on March 1, 2007:

> Iran's "bonyads," or charitable religious foundations, … stifle entrepreneurs not affiliated with them due to the bonyads' favored status, which includes exemption from taxes, the granting of favorable exchange rates, and lack of accounting oversight by the Iranian government. … ***Bonyads have been involved in funding terrorist organizations and serving as fronts for the procurement of*** nuclear capacity and ***prohibited weapons and technology***.
> Iran … has not signed the UN International Convention for the Suppression of the Financing of Terrorism.
> The Government of Iran should construct and implement a viable anti-money laundering and terrorist finance regime that adheres to international standards. Iran should be more active in countering regional smuggling. Iran should implement meaningful reforms in bonyads that promote transparency and accountability. … ***Iran should not support terrorism or the funding of terrorism.***
> (Emphasis added.)

156.  The Foundation for the Oppressed was the most notorious Iranian bonyad.

157.  From 2000 through 2020, the IRGC and SLO directly routed the Foundation for the Oppressed's profits to Ayatollah Khamenei's inner-circle allies—each of whom had a direct, personal relationship with Khamenei, swore fealty to him, and was directly funded by the IRGC and Khamenei—including, but not limited: (1) Qasem Soleimani; (2) Mohammad Ali Jafari; (3) Parviz Fattah; (4) Hassan Nasrallah; (5) Hossein Taeb; (6) Abu Mahdi al-Muhandis; (7) Mohsen Rafiqdoost; and (8) Mojtaba Khamenei.

158. As Treasury confirmed in 2020, the Foundation was "an economic conglomerate controlled by the Supreme Leader" and "presided over by former … IRGC" leaders, and maintained "subsidiaries in key sectors such as … information technology." Accordingly, as Treasury found in 2020, the "Foundation" was "a source of power, wealth, and influence for the Supreme Leader and his inner circle" that served as "a key patronage network for the Supreme Leader … used by … Khamenei to enrich" the SLO and "reward" his "allies" in the IRGC.

159. From at least 1979 (in the case of the IRGC), 1982 (in the case of Hezbollah), and 1990 (in the case of the SLO), the Qods Force, Hezbollah, and the SLO have jointly used the Foundation for the Oppressed to fund, logistically arm, source intelligence for, and provide cover to, terrorist attacks—including attacks in Israel that were committed by Hezbollah, Hamas, and PIJ, and funded and supplied by the Qods Force, and attacks in Iraq that were committed by Hezbollah and JAM and funded and supplied by Hezbollah and the Qods Force. Throughout, the Foundation was always controlled by the Qods Force and Hezbollah, under the supervision of the SLO, and used by the Qods Force and Hezbollah to route money to Hamas and PIJ (through Hezbollah) and JAM (through Hezbollah) attack cells, in order to finance terrorist attacks in Israel and Iraq committed by such groups. At all relevant times, the Foundation provided key financial support to Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM.

160. The Qods Force and Hezbollah always controlled the leadership of the Foundation for the Oppressed. The Qods Force and Hezbollah accomplished this through, *inter alia*, their appointment of notorious Hezbollah and/or Qods Force leaders to officially, or unofficially, run the Foundation and its Board of Trustees, also known as its Board of Directors, including, but not limited to, Mohsen Rafiqdoost, Mohammad Forouzandeh, and Parviz Fattah.

The IRGC always had at least two senior members installed as leaders of the Foundation, in effect: (1) Mohsen Rafiqdoost (as the senior most Board of Trustees member); and (2) whomever was appointed as the then-current director, *e.g.*, Parviz Fattah in 2020.

161. Because Khomeini, Rafiqdoost, and Rezai created the Foundation for the Oppressed to serve as the Terrorist Sponors' transnational corporate base, the SLO and IRGC (including the Qods Force) always had veto rights—based upon Iranian "law" and practice— over any Foundation-related issue if Ayatollah Khamenei did not disagree with them. This was accomplished, among other means, through the Ayatollah's practice of always appointing a trusted member of the IRGC's leadership network (and Ayatollah's inner circle) to head the Foundation for the Oppressed.

162. The Qods Force and Hezbollah notoriously embedded their operatives throughout the Foundation for the Oppressed. Such IRGC embeds ensured the Qods Force's and Hezbollah's ability to extract maximum financial, operational, intelligence, and logistical value from the Foundation.

163. The Foundation for the Oppressed helped the IRGC and SLO operationalize their shared control over key monopolies in Iran's economy, including their monopolies over the energy, communications, import/export, and financial sectors. In 2008 and 2009, for example, State reported to Congress: "Iran's 'bonyads,' or charitable religious foundations, were originally established at the time of the Iranian revolution to help the poor. They have rapidly expanded beyond their original mandate. Although still funded, in part, by Islamic charitable contributions, today's bonyads monopolize Iran's import-export market as well as major industries including petroleum, automobiles, hotels, and banks."

164.     In 2006, Treasury counterterrorism personnel conducted a roadshow throughout Europe and the Middle East where they warned banks, including on information and belief SCB, about prominent IRGC, Hezbollah, and Qods Force fronts. During this period, the United States warned European firms—memorialized in a cable, as published by *WikiLeaks*—that transacting with the Foundation for the Oppressed was tantamount to transacting with an entity that was "fully owned by the IRGC":

> Treasury Under Secretary for Terrorism … Stuart Levey … stressed that the U.S. is trying to … persuade its allies to target [the IRGC's] bad conduct through ***targeted financial measures*** against supporters of destabilizing policies (***such as terrorism*** and weapons of mass destruction programs) … [Levey discussed] U.S. thinking on combating Iran's use of the international financial system ***to transfer funds to terrorists*** … [A Turkish official] described the important role of Bonyads, state-linked foundations. He said that the Revolutionary Guard's share of Bonyad-controlled business was increasing but that the Revolutionary Guard did not control the entire economy. Stating increased USG concern about the IRGC's resurgence under Ahmadinejad's authority, U/S Levey cautioned that the IRGC's growing role in the Iranian economy was not limited to the public sector, but included the private sector as well. ***Levey recalled the IRGC's interference with [] major … deals [through the Foundation, including] …the IRGC's involvement in … [a] deal … [for] Irancell [controlled by the Foundation and therefore] … fully owned by the IRGC*** … (Emphasis added.)

165.     The Foundation for the Oppressed was a front for the Qods Force, Hezbollah, and such FTOs' proxies. Thus, funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by the Foundation through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, the Foundation inevitably flowed through the Foundation to reach the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM, to provide the funding, weapons, intelligence, and logistics that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

166.    SCB always knew the above facts about the Foundation for the Oppressed. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien testified publicly that the "Iran [] actively sponsors terrorism and violence across the Middle East … [through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf," which "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of support that fuel terrorist activities" for which the IRGC's "money flows" from "a large network of state-owned banks and parastatal companies"—*i.e.*, bonyads or foundations. (As SCB knew, the Foundation for the Oppressed was always Iran's largest and most notorious bonyad).

167.    U.S. Government enforcement actions confirmed, and alerted SCB, that the Foundation for the Oppressed on Earth was a direct front for Hezbollah and the Qods Force and, through them, an indirect front for Hezbollah's and the Qods Force's proxies, including Hamas, PIJ, and Jaysh al-Mahdi. On December 17, 2008, for example, the U.S. government reinforced its messaging that the Foundation for the Oppressed on Earth was a terrorist front that served to raise money and source weapons for Hezbollah and the Qods Force. On that date, the U.S. Departments of Justice, Treasury, and State all announced enforcement actions and sanctions against the Bonyad Mostazafan, and the U.S. Department of State's Counterterrorism Office issued a press release calling attention to U.S. sanctions against entities affiliated with Bonyad Mostazafan. The heightened U.S. crackdown on the Foundation for the Oppressed on Earth caused a new round of media coverage drawing attention to its status as a front for terrorists like the Qods Force and Hezbollah. For example, the *Washington Post* reported the next day that:

> A Fifth Avenue building … is secretly co-owned by an Iranian bank …, Iran's Bank Melli …[,] [which] was previously designated by the Treasury Department

as a key financier of … the *[IRGC] and the Quds Force, which has been linked to terrorist groups*. … "This *scheme to use a front company … to funnel money from the United States to Iran is yet another example of Iran's duplicity*," said Stuart Levey, the Treasury Department's undersecretary for terrorism ….

168.    On April 17, 2014, similarly, the U.S. Attorney for the Southern District of New York announced the resolution of its investigation into Foundation holdings, and again called attention to Ayatollah Khamenei's use of Foundation assets to persecute IRGC enemies.

169.    U.S. Government-funded reports confirmed that the Foundation for the Oppressed served as a front for Hezbollah and the Qods Force, and alerted SCB to the same. In 2001, for example, RAND published a U.S. government-funded study confirming that "actors" who "play[ed] a role in formulating and implementing Iran's security policy" "include[d] … parastatal organizations, the bonyads, [which …] play[ed] a role in foreign policy" through "bonyad leaders [who] ha[d] ties to the security institutions," "[t]he archetypal example [of which was] the former head of the Bonyad-e Mostazafan, Mohsen Rafiqdoust, who went from being Khomeini's driver to assuming a leading IRGC position before heading the Bonyad-e Mostazafan." On October 12, 2011, likewise, an analysis published by DOD warned:

> The IRGC's overt activity in the Iranian economy is only one of the Pasdaran's tools for implementing the economic instrument of power. The IRGC influences or controls a vast network of bonyads, or foundations though which it exerts its economic and social influence. These foundations account for 20% of Iran's Gross Domestic Product. In the regime's post revolutionary consolidation, it assumed control of the multiple foundations the Shah had established as informal and extra-legal networks. While officially a non-governmental organization, the Foundation for the Oppressed, Bonyad Mostazafan, is the nation's largest and is chaired by Mohammad Forouzandeh, a former IRGC officer. This massive foundation has over 350 subordinate companies and is diversified throughout the agricultural, transportation, tourism, and industrial sectors of the economy.

170.    U.N. Security Council reports confirmed, and alerted SCB, that the Foundation for the Oppressed was a front used to finance IRGC-sponsored operations. On June 4, 2012, for example, the U.N. Security Council's panel of experts relating to the IRGC reported:

The Islamic Revolutionary Guards Corps is an ***overwhelmingly important actor in the Iranian economy*** and has expanded into various sectors, mainly through its civilian arms. Although experts find it difficult to determine the extent of its influence on the economy, conservative estimates suggest that it exercises control of between 25 and 40 per cent of the Iranian gross domestic product. … Some Member States have informed the Panel that the Corps a***lso controls informal economic channels. In particular, some Iranian charitable organizations (foundations) controlled by the Corps are believed to support the Corps' economic activities***, including provision of informal channels for business transactions. Such foundations include the [IRGC] Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the ***Foundation of the Oppressed (Bonyad-e Mostazafan)***, both of which include ***incumbent and/or former officers of the Corps as board members***. (Emphasis added.)

171.    On June 1, 2015, similarly, the U.N.'s panel of IRGC experts reported: "It is well-known that IRGC is a complex amalgam of military, political and economic forces and has large financial resources that influence the Islamic Republic of Iran's economy. Financial wings of IRGC, IRGC Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the Mostazafan Foundation (Bonyad-e Mostazafan), are actively pursuing investments in a variety of sectors."

172.    The Foundation for the Oppressed's public website confirmed that the Foundation served as a front that sponsored jihadist violence. In 2018, the official website of the Foundation alerted Defendants, inter alia, as follows:

a.    The Foundation's **"Characteristics"** were "based on the principles and strategic objectives derived from the Resistance Economy" and "focus[ed] on empowering the Oppressed."

b.    The Foundation's **"Slogan"** emphasized "commit[ment] to … Jihadi [ideology] in social and economic arena by relying on [Jihadi] ideals and its existential goals."

c.    The Foundation's **"Outlook"** emphasized "the path of achieving the existential goals of the Foundation for the Oppressed … and the implementation of Resistance Economy policies and Statutes, the Foundation for the Oppressed [will follow a] Template in the Landscape [*i.e.*, wherever the Foundation does business] [that] is Institutional" and emphasized, inter alia, "reducing material, social and cultural deprivations of the Oppressed," and "Jihadist … exploit[ation of] human and material capital for the effectiveness and sustainable growth in scientific and cultural arenas."

d.     The Foundation's **"Main Strategies"** included, *inter alia*, "providing services to help the empowerment of the Oppressed," and "improving organizational skills and culture by empowering," "developing," and "emphasizing … Jihadi spirit."

173.     The Foundation for the Oppressed's published bylaws, which it published by no later than 2018, confirmed that the Foundation served to support IRGC operations. Such Foundation bylaws, included, but were not limited to, as follows:

a.     **Article 5** purported to govern the Foundation's "Investment Projects" and provided, *inter alia*: "At least 33% of the projected profit share in the budget of the Foundation Group annually as 100% allocated in capital Social transitions are used to … provide services to the Oppressed," *i.e.*, fund Hezbollah, the IRGC-QF, and their proxies.

b.     **Article 12** purported to govern the Foundation's "Development of Organizational Culture" and provided, *inter alia*: "To achieve the fundamental goals and ideals, methods for improving organizational culture based on the values of work and Jihadi efforts including the performance of the commitment, accountability, trustworthiness, order, precision, speed, partnership, creativity, innovation, and flexibility, and after approval [by] the head of the Foundation [then such methods] will be implemented."

c.     **Article 13** purported to govern the Foundation's "Development of Human Capital" and provided, *inter alia*: "Selecting and applying competent, committed managers and employees in accordance with organizational culture and Jihadi spirit in companies and the main unit of the Foundation should be [ensured through] approval of the head of the Foundation."

d.     **Article 15** purported to govern the Foundation's "Monitoring" of the Foundation-related activities and provided, *inter alia*: "The responsibility for the implementation of the program is the responsibility of the head of the Foundation and it is necessary to present the program and budget based on an annual basis. The mid-term plan should report the progress of the program to the [Foundation's] Board of Trustees. In this regard, to measure the strength, capacity and effort of the [Foundation's progress under its Fifth Medium-Term Program, the Foundation's] Jihadi units should prepare the relevant method and be executed after approval of the head of the Foundation."

174.     IRGC admissions also confirmed that the Foundation for the Oppressed's support enabled acts of terrorism by Hezbollah and the Qods Force and their proxies, including Hamas. On November 3, 2012, for example, a "reporter" for IRGC-controlled media outlet *Aftab* acknowledged that the Foundation supported IRGC proxies "[i]n countries like Syria and

Palestine, where Iran's interests are outside the country... that means the activities of the Foundation [for the Oppressed] to help [IRGC proxies like] Bashar al-Assad's government."

175.     The Foundation for the Oppressed was never a normal charity: it was fully captured by the Qods Force and Hezbollah, led and staffed by outspoken, virulent supporters of such organization's terrorist attacks, and operated for the benefit of their shared mission to sponsor attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### D.     The Islamic Revolutionary Guard Corps (IRGC)

176.     The IRGC, also known as the "Sepah," "Pasdaran," and "Guardians of the Islamic Revolution," has operated as a global terrorist organization since 1979.

177.     Since 1979, the imagery and text of the IRGC's flag and logo (below) always boldly confirmed the IRGC's primary mission to conduct terrorist attacks to export the Islamic Revolution in service of the Supreme Leader of the Islamic Revolution, *i.e.*, Ayatollah Ruhollah Khomeini from 1979 through 1989, and Ayatollah Ali Khamenei from 1989 through present:



IRGC Flag                    IRGC Logo

178.     With respect to the imagery, the IRGC's flag and logo depicted a clenched fist grasping an AK-47—the iconic weapon of choice for anti-American groups, including every Islamist terrorist group in the world, since the 1960s—against the backdrop of a globe. The

IRGC's unmistakable message communicated to everyone who saw its flag or logo—including SCB from at least the 1990s through 2014, through SCB's agents and employees in Iran, the United Kingdom, the United States—was that the IRGC would use violence to ensure the Islamic Revolution it served conquered the entire globe.

179.    Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC they commanded were not subtle in their messaging. Their terrorist propaganda, often featured dramatic, violent, messianic, anti-American imagery paired with explicit textual calls for terrorist attacks (sometimes, but not always, using "resistance" or similar euphemisms). Accordingly, and as SCB always knew, the textual references in the IRGC's flag and logo were generally translated and interpreted to mean, in sum and substance: (1) "Islamic Revolutionary Guard Corps"; (2) "Allah loves those who kill them"—*i.e.*, "unbelievers" who do not submit to the rule of the Supreme Leader (most of all, Americans, Israelis, and their allies in the Muslim world)—"for the sake of peace"; (3) "Praise be to Allah"; (4) "Allah will recognize believers as martyrs who die in the line of jihad against unbelievers"; (5) "He [*i.e.*, Allah] likes them"—*i.e.*, followers of the Supreme Leader who killed while fighting a jihad and thus became "martyrs"—"very much"; and (6) "May Allah work against the unbelievers."

180.    The IRGC always targeted the United States for terrorist violence. Iran's 1979 revolution was militantly anti-American, and Iran's regime continued such approach ever since. Since 1979, the IRGC regularly engaged in and supported acts of terrorism directed at the United States, which targeted the U.S. government in Washington, D.C. by seeking to coerce it into changing U.S. policy as sought by the IRGC, including by prompting the United States's exit from the Middle East and abandonment of its allies there, including Israel.

181.     The IRGC was specifically established to target the United States as its primary enemy. The IRGC's doctrinal and institutional targeting of the United States was a product of Iran's history with America, and the IRGC founders' understanding that the United States posed a direct threat to the viability of their nascent terrorist enterprise. In 2011, for example, the DoD published a declassified analysis about the IRGC and its proxies that warned: "The terrorism pillar of [IRGC Commander] Jafari's strategy relies on intimidating potential adversaries and their supporters through the threat of terrorist activities against non-military targets in their territories … [through] an attack [committed by IRGC proxy] … [t]errorist organizations like … Lebanese Hezballah [and] Khattab Hezballah in Iraq, … [which] act[ed] on behalf of Iran's [*i.e.*, the IRGC's] interests." As Qasem Soleimani publicly enthused in his posthumous autobiography, "All of you loved Imam [*i.e.*, Ayatollah Khomeini] and believed in his path. [Ayatollah Khomeini's] path was the path of fighting against the U.S. and supporting the Islamic Republic and the Muslims, who are [O]ppressed by the Arrogant Powers [*i.e.*, the United States government and its allies, including Israel], under the flag of *Wilayat-e-Faqih* [*i.e.*, Ayatollah Khomeini's system of rule of the jurisprudent]."

182.     Ayatollah Khomeini established the IRGC to target the United States, in line with his own view that the U.S. government posed the greatest threat to the IRGC's transnational terrorist agenda. Representative examples of Ayatollah Khomeini's pronouncements to that effect included, but were not limited to, as follows:

a.      "Today, America is the number one enemy."

b.      "America is the archenemy of the Oppressed people of the world."

c.      "Let brotherly Arab nations and the Palestinian and Lebanese brothers know that all their miseries are caused by America."

d.  "Cold and warm weapons, that is, pens, words and machineguns should all be aimed at the enemies of mankind, headed by America."

e.  "Confronting America is presently above all our problems. If today our forces become divided, it benefits America. Right now, America is the enemy and all our equipment should be aimed at this enemy."

183.    With respect to the IRGC, the preamble of Iran's constitution—as translated and interpreted by the Defense Intelligence Agency in a 2019 report to Congress—provided that the IRGC was "An Ideological Army" and further provided:

> In establishing and equipping the defense forces of the country, it shall be taken into consideration that faith and ideology are the basis and criterion. Therefore, the Army of the Islamic Republic of Iran and the Revolutionary Guards Corps will be formed in conformity with the above objective, and will be responsible not only for protecting and safeguarding the frontiers [of the Islamic Revolution] but also for the ideological mission, that is, Jihad, for God's sake and struggle for promoting the rule of God's law in the world ("And prepare against them whatever you are able of power and of steeds of war by which you may terrify the enemy of Allah and your enemy and others besides them whom you do not know but whom Allah knows." [Quran 8:60]).

184.    Under Iran's constitution, as interpreted by the Ayatollah and the IRGC, the IRGC interprets its sole responsibility for protecting and exporting the Islamic Revolution as the IRGC's specific responsibility to sponsor terrorist attacks targeting the United States, which the IRGC always understood to be the top threat to the Islamic Revolution. For the IRGC, exporting the revolution meant one thing: IRGC-sponsored terrorist attacks, usually committed by IRGC proxies, targeting the United States in the Middle East. As an analysis of the IRGC published by DOD in 2011 confirmed: "The Pasdaran [IRGC] derives its legal authority from Article 150 of the Islamic Republic of Iran's constitution. In accordance with Ayatollah Khomeini's intent, Iran's Revolutionary Council tasked the IRGC in [] broad categories [that included, *inter alia*]: [1] Apprehending or liquidating counter-revolutionary elements[;] [2] Battling armed counterrevolutionaries[;] [3] Defending against attacks and the activities of foreign forces inside

Iran[;] … [4] Training subordinate IRGC personnel in moral, ideological, and politico-military matters[;] [5] Assisting the Islamic Republic in the implementation of the Islamic Revolution[;] [6] Supporting liberation movements and their call for justice of the oppressed people of the world under the tutelage of the leader of the Revolution of the Islamic Republic[;] [and] [7] Utilizing the human resources and expertise of the IRGC to deal with national calamities and unexpected catastrophes and supporting the developmental plans of the Islamic Republic to completely maximize the IRGC's resources."

185.     The IRGC openly touted its desire to attack America in the most confrontational, ways possible—all of which were known to SCB given its on-the-ground presence in Iran through 2012. On November 2, 2009, for example, the IRGC publicly stated, as published by IRGC-controlled *Fars News Agency*, as follows: "The honorable nation of the Islamic Iran considers the U.S.—the Great Satan—as the main contributor to problems in the Muslim world and source of plots and conspiracies against the Islamic Republic and the Islamic Revolution."

186.     The IRGC also festooned its key buildings with anti-American imagery for any pedestrians walking by, including SCB's employees in Tehran through 2012, to see. The Qods Force, for example, located its headquarters on the former site of the U.S. Embassy in Tehran. For decades, the IRGC plastered the walls around the Qods Force's headquarters with anti-American messages, like the one below (English and Farsi), "WE WILL MAKE AMERICA FACE A SEVERE DEFEAT":



187. The IRGC's targeting of the U.S. government in the United States through IRGC-sponsored acts of terrorism against U.S.-linked targets throughout the world continued at all relevant times. As State reported in 2023, for example, "[t]hroughout 2022, … the IRGC-QF … provided funding, training, weapons, and equipment to several U.S.-designated terrorist groups in the region [and] Iran-backed militias continued sporadic attacks on bases hosting U.S. … forces in Iraq … [while the IRGC] … plotted attacks against dissidents and other perceived enemies of the regime based abroad."

188. The IRGC was an integrated terrorist organization. The IRGC had several divisions, led by an overall command under Mohammad Ali Jafari and his co-equal leadership partner, IRGC-QF leader Qasem Soleimani. Both reported directly to Ayatollah Khamenei, shared similar stakes in the same front companies, and relied upon the front companies alleged herein to finance IRGC terrorist operations.

189. From 2009 through April 2019, Mohammad Ali Jafari served IRGC Commander-in-Chief. In April 2019, Ayatollah Khamenei appointed Hossein Salami to succeed Jafari as IRGC Commander-in-Chief, and has served in such role ever since. While in such roles, Jafari

and Salami were the equal to the Commander of the Qods Force and reported directly to Ayatollah Khamenei.

190.    From 2007 through 2017, the components of the IRGC led by Jafari comprised one of the IRGC's primary Iran-based terrorist operations arms. While these regular IRGC units occasionally acted abroad—always by seconding personnel and resources to the Qods Force or Hezbollah so that they acted under the Qods Force's or Hezbollah's banner—they usually operated principally inside Iran, supporting IRGC acts of terrorism targeting the United States outside Iran and U.S. citizens within Iran.

191.    From 2011 through 2024, the IRGC had eight branches, all of which were ultimately accountable to Ayatollah Khamenei, and all of which but the Qods Force also reported to IRGC Commander-in-Chief Mohammad Ali Jafari (from 2011 through 2019) and Hossein Salami (from 2019 through present) and their respective deputies (Salami as Jafari's deputy from 2011 through 2019), and Ali Fadavi as Salami's deputy from 2019 through present:

a.    **The IRGC Qods Force** was always the IRGC's primary external operations arm and had lead responsibility for the IRGC's terrorist attacks outside Iran. Qassem Soleimani led the IRGC-QF from 2011 through his death on January 2, 2020, after which Ayatollah Khamenei handed leadership to Esmail Ghaani, who led the IRGC-QF from 2020 through present. From 1979 through the present, the IRGC's Qods Force comprised the IRGC's primary Iran-based external terrorist operations arm. While the Qods Force often operated inside Iran, it usually focused on external terrorist attacks even while operating inside Iran. (Although the Qods Force was technically not created until the late 1980s, its predecessor organization, the IRGC Office of Liberation Movements, served a substantially similar role. IRGC-QF and IRGC members and Iran scholars alike often conflate the two.)

b.    **The IRGC Intelligence Organization** was always the Iranian regime's largest, most powerful, and most lethal intelligence arm and played a key role alongside the Qods Force (for whom it embedded in operations outside of Iran) in IRGC attacks outside Iran, and had lead responsibility for attacks committed, in part, inside Iran, *e.g.*, hostage taking of dual nationals. Hossein Taeb led the IRGC-IO from 2009 through June 23, 2022, when he was transferred to serve as a senior advisor to the SLO and was replaced by Mohammad Kazemi, who has always led it since.

c.   **The IRGC Basij**, meaning "mobilization" was the IRGC's chief recruitment, propaganda, morality police, and mass mobilization arm, and was commanded by Gholamreza Soleimani.

d.   **The IRGC Aerospace Force** (or "IRGC-ASF") was the IRGC's arm jointly responsible (alongside the IRGC-QF and IRGC-IO) for executing IRGC-supported missile and unmanned aerial vehicle attacks, as well as other air attack functions. The IRGC-AF included the IRGC-Aerospace Force Al-Ghadir Missile Command (or "IRGC-ASF-AGMC"), which shared responsibility for missile attacks alongside the IRGC-QF and IRGC-IO. From 2009 through present, Amir Ali Hajizadeh commanded the IRGC-ASF, Mahmud Bagheri commanded the IRGC-ASF-AGMC, and Mohammad Agha Ja'fari served as a senior IRGC-ASF-AGMC who helped lead it alongside Bagheri—who were tasked with optimizing every facet of the IRGC's development of, logistics for, and transfer of, IRGC missiles to IRGC branches and IRGC proxies, including Hezbollah and Hamas.

e.   **The IRGC Ground Resistance Force** was the IRGC's border and internal armored organization, and was commanded by Mohammad Pakpour.

f.   **The IRGC Navy** was the IRGC's naval organization that smuggled terrorists, weapons, and funds, and harassed of U.S. military vessels, in the Persian Gulf, and was commanded by Alireza Tangsiri.

g.   **The IRGC Counterintelligence Organization** was the IRGC's counterintelligence arm tasked with preventing the U.S. intelligence community, including but not limited to the CIA and DIA, from acquiring actionable intelligence that could prevent IRGC-sponsored attacks targeting the United States, and was commanded by Mohammad Kazemi.

h.   **The IRGC Intelligence Protection Organization** (or "IRGC-IPO"), which was sometimes also called the IRGC Security Force, was the IRGC's arm responsible for securing key locations of interest for the IRGC, *e.g.*, airports secured by the IRGC-IPO so that operatives from the IRGC-IO can maximize the ability of the IRGC to use an airport as a location to conduct hostage-taking attacks and gather intelligence in support of the same, and was led by Fathollah Jomeiri.

192.   The IRGC did not comprise Iran's regular armed forces. In 2024, for example, a FinCEN Advisory described the IRGC as "a parallel organization to Iran's regular armed forces" responsible for the Iranian regime's "Support of Terrorism" through the IRGC's "numerous terrorist partners and proxies."

193.   Because the IRGC's only obligation was to protect the Islamic Revolution, the IRGC was structured to operate as a transnational terrorist organization to support the Islamic

Revolution both while the IRGC and its allies controlled the Government and, importantly, if the Ayatollah and IRGC ever lost control of Iran's government, to operate as a global terrorist group armed with the IRGC's pre-existing transnational infrastructure purpose-built to ensure the IRGC could mount a terrorist campaign to retake Iran.

194.     Ayatollah Khomeini's instructions to the IRGC confirm Plaintiffs' allegations. For example, Ayatollah Khomeini was an open critic of the nation-state, and squarely rejected the very concept of "nation" as understood in the West, which Khomeini decreed to be "against the path of Islam and the Qur'an." Accordingly, Ayatollah Khomeini famously explained, "Our movement is Islamic before being Iranian."

195.     The IRGC always expressly disclaimed the notion that it was a part of the armed forces for the nation of Iran. For example, as Qasem Soleimani stated in his autobiography published in 2023, "I wish to address a brief word in my dear, self-sacrificing brothers in the Islamic Revolutionary Guard Corps … Naturally, I do not mention Wilayat [*i.e.*, the Supreme Leader and the IRGC], because Wilayat is not a part or a component of the Armed Forces."

196.     Since 2007, the IRGC was always a U.S.-designated terrorist organization. On October 25, 2007, the United States designated the Qods Force under Executive Order 13224 for its support of terrorism, including its sponsorship of acts of international terrorism. In so doing, the U.S. government confirmed that the Qods Force was "seeking to inflict casualties on U.S. … forces" and, *inter alia*, "had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support" and continued to do so, provided "support to the Taliban to support anti-U.S. … activity in Afghanistan," and also provided ongoing key support to "Iraqi Shi'a militants who target and kill Coalition and Iraqi forces"—all of which efforts relied upon joint Qods Force-Hezbollah

training cells at which the "Qods Force operate[d] training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran." That same day the United States also designated every component of the IRGC for sanctions under Executive Order 13382 for its proliferation-related activities.

197. After 2007, the United States regularly imposed additional sanctions targeting the IRGC as part of the U.S. government's broader strategy to impose targeted sanctions against Iran-related actors to reduce the Iranian regime's ability to sponsor terrorist attacks targeting the United States.

198. On October 13, 2017, the United States designated every other component of the IRGC—including the IRGC Basij and IRGC-IO—as a Specially Designated Global Terrorist (like the IRGC-QF, an SDGT since 2007) "for providing support to a number of terrorist groups, including Hizballah and Hamas, as well as to the Taliban" and for "provid[ing] material support to the IRGC-QF, including by providing training, personnel, and military equipment."

199. On April 15, 2019, the United States designated every component of the IRGC—including the IRGC-QF, IRGC Basij, and IRGC-IO—as an FTO. That designation, per State, was in direct response to, *inter alia*, the Iranian regime's historic and "continue[d]" use of the IRGC to "provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, [and] Kata'ib Hizballah in Iraq," and because "[t]he Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003"—which "accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011."

### E. Hezbollah

200.     In 1982, the IRGC founded Hezbollah (Arabic for "Party of God"). Ever since, Hezbollah has served as the IRGC's most important terrorist proxy.

201.     From 1982 through 1989, Hezbollah members swore their loyalty to Ayatollah Khomeini. Ever since, Hezbollah members have sworn their loyalty to Ayatollah Khamenei.

202.     From 1982 through 1985, Hezbollah did not call itself Hezbollah. Instead, it called itself the name the IRGC gave it: "The Organization of the Oppressed on Earth."

203.     In 1985, Hezbollah published what it entitled an "Open Letter Addressed by Hezbollah to the Oppressed in Lebanon and the World," which is commonly referred to as Hezbollah's Manifesto. In it, Hezbollah announced, among other things:

a.     "We, the sons of Hezbollah's nation, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single, wise, and just command represented by the guardianship of the jurisprudent (*vali-e faqih*), currently embodied in the supreme Ayatollah … Khomeini. …"

b.     "No one can imagine the importance of our military potential as our military apparatus is not separate from our overall social fabric."

c.     "[The] first root of vice is America. … Imam Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."

After this, the group primarily called itself Hezbollah, although it continued to refer to itself as the Organization for the Oppressed as well as the Islamic Resistance, among other euphemisms.

204.     In 2011, Hezbollah General Secretary Hassan Nasrallah publicly stated: "We must not confuse the enemy with the friend. The enemy is the U.S. administration, and Zionist regime is its tool in the Middle East. … [T]he regional resistance movements [including Hezbollah] and deterrent states such [as] Iran … stopped the U.S. government plan for creating a new Middle East."

205.     Hezbollah, like its IRGC patrons, viewed attacks targeting Israel and Israeli civilians as inextricably connected to its efforts to target the **United States** to withdraw from the Middle East. Among other reasons, Hezbollah believed that the United States controlled Israel, that the United States could be punished, in effect, through attacks against its ally, and that—as Khomeini and Khamenei both emphasized—Israel comprised the "Little Satan" to the America's "Great Satan."

206.     Hezbollah General Secretary Nasrallah has publicly admitted, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." As the U.N. Security Council's panel of experts reported on December 30, 2016: "In a televised speech broadcast by Al-Manar television on 24 June 2016, the Secretary-General of Hizbullah [Hassan Nasrallah] stated that the budget of Hizbullah, its salaries, expenses, weapons and missiles all came from the Islamic Republic of Iran. … [T]hat statement … suggests that transfers of arms and related materiel from the Islamic Republic of Iran to Hizbullah may have been undertaken contrary to the provisions of annex B to resolution 2231 (2015)."

207.     Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were vital to financing Hezbollah's attacks. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress as follows:

> Iran is the 'central banker' of terrorism and a primary funding source for Hizballah. Because money is a terrorist group's oxygen, attacking terrorist financing is an essential element to combating terrorism. In that regard, we have made progress in impeding Iran's financial support for Hizballah and in undermining Hizballah's own financial network. …
>      The USG has long assessed that Iran provides technological, operational, and financial support and guidance to Lebanese Hizballah. The Iranian regime has for 27 years used its connections and influence with terrorist groups to combat U.S. interests it perceives as at odds with its own, and Hizballah has acted as a willing partner.

208. On May 27, 2009, Treasury imposed sanctions targeting Hezbollah and confirmed the Iranian regime's, including the IRGC's, continued key role in financing Hezbollah attacks:

> Treasury [] designated … supporters of … Hizballah …, under E.O. 13224. E.O. 13224 targets terrorists and those providing support to terrorists or acts of terrorism by … prohibiting U.S. persons from engaging in any transactions with them. "We will continue to take steps to protect the financial system from the threat posed by Hizballah and those who support it," said Under Secretary for Terrorism … Stuart Levey. … Iran … provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization. In turn, Hizballah is closely allied with and has an allegiance to [Iran]. Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran. Iran provides hundreds of millions of dollars per year to Hizballah.

209. The IRGC and the SLO provided most of Hezbollah's budget, and directly financed Hezbollah attacks through a range of vehicles, including salary and bonus payment to Hezbollah leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hezbollah terrorists. The Iranian regime funded acts of terrorism committed by Hezbollah through an array of channels, including the SLO, IRGC (including Qods Force), Foundation for the Oppressed (controlled by the IRGC and the SLO), the National Iranian Oil Company ("NIOC"), the National Iranian Tanker Company ("NITC"), and Khatam al-Anbiya ("KAA"), including KAA's fronts. From 2007 through 2020, the Iranian regime did so by collectively routing at least $200-$300 million per year—and sometimes much more than that—to Hezbollah, most of which flowed through the above organs.

210. Hezbollah's various subunits were closely interconnected, worked in tandem, shared common sources of financing, and were run by the same people. There was never any meaningful firewall between the intertwined components of Hezbollah. As Hezbollah spokesman Ibrahim Mussawi publicly stated in 2013: "Hezbollah is a single large organization, we have no wings that are separate from one another."

211.     Hezbollah ordinarily acted as the IRGC's interlocutor with its terrorist proxies, including Hamas and PIJ in Israel and JAM in Iraq. Hezbollah provided expert training, technical assistance, and in-country support, often through joint cells co-located with Hamas and PIJ (in Gaza, Lebanon, and Syria, among other places) and with JAM (in Baghdad and Basra, among other places).

212.     Hezbollah pioneered several signature attacks, including kidnapping, roadside bomb attacks using sophisticated devices known as explosively formed penetrators, and rocket attacks using 107mm rockets. The IRGC relied upon Hezbollah's experience and technical expertise to train other proxies, including Hamas, PIJ, and JAM, with respect to how to effectively conduct such attacks.

213.     Hezbollah also jointly committed some attacks alongside other Axis of Resistance members. For example, a joint Hezbollah-JAM cell committed attacks in Iraq in 2011.

214.     Hezbollah played a vital planning role for IRGC proxies, including Hamas and JAM. Hezbollah had vast experience that the other groups lacked, and it drew on such experience to help such groups devise specific attack types, locations, and tactics. For example, Hezbollah taught Hamas, PIJ, and JAM how to effectively kidnap targets.

215.     Hezbollah has been an FTO since 1997.

## II.     The Iranian Regime's Terrorist Sponsors Led A Global Terrorist Alliance Called The "Axis Of Resistance," Each Member Of Which Committed Terrorist Attacks Targeting The United States

216.     Since 1979, the IRGC has led an alliance of anti-American terrorist organizations, united by their shared mission of conducting terrorist attacks targeting the United States—directly, by targeting Americans, or indirectly, by targeting United States allies—to coerce U.S.

government decisionmakers in Washington, D.C. and elsewhere to choose to withdraw from the Middle East. Since 1990, that effort has been directly assisted by the SLO.

217. The IRGC's and SLO's global terrorist alliance functioned as a jihadist analogue to NATO and similar western alliances. It included, among others: (1) Lebanese terrorist group Hezbollah, a global terrorist organization that has been an FTO since 1997, which was founded by the IRGC in 1982 and has been its most reliable and notorious proxy ever since; (2) Palestinian terrorist groups Harakat al-Muqawama al-Islamiya ("Hamas") and Palestinian Islamic Jihad ("PIJ"), global terrorist organizations that have been FTOs since 1997; (3) Iraqi terrorist group Jaysh al-Mahdi (or "JAM"), which was founded by Hezbollah, publicly identified as Hezbollah's "striking arm in Iraq," operated in Baghdad through a joint Hezbollah-JAM cell, and led by Muqtada al-Sadr, including notorious JAM cells known as Jaysh al-Mahdi Special Groups (sometimes abbreviated "JAM-SG"), the most infamous of which were Jaysh al-Mahdi Special Group Kataib Hezbollah (or "KH"), and Jaysh al-Mahdi Special Group Asa'ib Ahl al-Haq (or "AAH"), FTOs since 2009 and 2020, respectively; and (4) the Reconnaissance General Bureau of the Democratic People's Republic of Korea.

218. Since 2003, this terrorist alliance has proudly called itself the "Axis of Resistance." According to the Defense Intelligence Agency ("DIA"):

> Throughout its 40-year history, the Islamic Republic of Iran has remained implacably opposed to the United States [and] our presence in the Middle East … Tehran has committed itself to becoming the dominant power in the turbulent and strategic Middle East. … It leads a cohesive if informal bloc of Shia and Alawi state and nonstate actors—its 'Axis of Resistance' against the West.

219. Ayatollah Khamenei was a direct—and key—financial sponsor of each Axis of Resistance member. As he publicly stated in 2015, "we will never stop supporting our friends in the region and the people of Palestine, Yemen, Syria, Iraq, Bahrain, and Lebanon." "Basically,"

Congressman Duncan observed on May 12, 2016, Khamenei meant IRGC proxies like "Hezbollah [and] Hamas."

220. The Axis of Resistance was not merely a slogan: it had nearly every jihadist function that would parallel a western alliance, including joint attacks—which the terrorists, U.S., U.N., and E.U. all called "operations"—that were committed through the work of joint cells in which two or more FTOs were co-located with one another for a common anti-American purpose, supported by joint training, procurement, financial support, logistics, basing, and intelligence. In Iran, for example, the regime maintained multiple complexes in which the IRGC, Qods Force, Hezbollah, Hamas, PIJ, and JAM trained, studied, and plotted together as one coordinated syndicate of terrorists who worked together to target the United States and sought to coerce the U.S. government to withdraw from the Middle East.

221. Notably, the name "Axis of Resistance" itself targeted the United States because its members "resist" the U.S. presence in the Middle East. Part of this "resistance" included sponsoring waves of terrorist attacks against Israelis. But even that targeted the United States because the terrorists believed Israel to be an agent of the United States and believed that the United States was key to whether they could overthrow the Israeli government and replace it with their shared goal of an Islamic caliphate that governed Jerusalem, which they called "Qods."

222. Each Plaintiff was injured in an attack that was funded by the IRGC, and committed, planned, or authorized by Hezbollah, Hamas, PIJ, and/or JAM. Some attacks were

committed jointly by Hezbollah and/or Hamas and/or PIJ (in Israel), or by Hezbollah and JAM (in Iraq).

### A.    Hamas

223.    Hamas established itself in or about 1989 as a violent, global, Sunni Islamist group dedicated to destroying Israel and killing every Jewish person there.

224.    In or about 1990, Khamenei and the IRGC cemented a deep bond with Hamas. Ever since, Hamas has been the IRGC's second most notorious proxy, behind only Hezbollah.

225.    Hamas, like Hezbollah, viewed the United States and Israel as two inextricably connected enemies. For example, Hamas leaders regularly blamed Israeli counterterrorism operations targeting Hamas on the United States by pointing out that Israel buys most of its advanced weapons from America.

226.    Hamas needed money to conduct the attacks alleged herein. As a Hamas financial appeal in 2019 admitted: "The reality of jihad is the expenditure of effort and energy, and money is the backbone of war."

227.    The IRGC and the SLO provided most of Hamas's budget, and directly financed Hamas attacks through a range of vehicles, including salary and bonus payments to Hamas leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hamas terrorists.

228.    The Iranian regime funded acts of terrorism committed by Hamas through an array of channels, including the Qods Force, Hezbollah, the SLO, the Foundation for the Oppressed, and Bank Saderat. From 2007 through 2020, the Iranian regime did so by collectively routing between $50 million and $250 million per year to Hamas through the above organs.

229. The Iranian regime's financial support was vital to Hamas's ability to conduct terrorist attacks. In 2007, for example, former Treasury official Dr. Matthew Levitt observed that "Hamas … is also a massive beneficiary of support from … Iran, [which] provide[s] direct state funding" to "sponsor" "terrorism" committed by Hamas. He continued:

> Iran is described by the CIA as "the foremost state sponsor of terrorism" and is Hamas' most important and explicit state sponsor. Israeli, British, Canadian, and Palestinian intelligence all concur with the U.S. conclusion that Iran directly aids Hamas with money, training camps, and logistical support. Estimates of Iran's financial assistance to Hamas vary, but there is unanimity on one score: the sum is significant.

230. Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were vital to financing Hamas's attacks—usually routing their aid through their most trusted proxy, Hezbollah. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress as follows:

> Hizballah supports … Palestinian terrorist organizations … [through] the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support … since at least 2000 … Hizballah actively foments terrorist activity that directly undermines [the peace process].

231. Notably, the IRGC and the SLO had a famous "pay for performance" approach with Hamas, under which the Iranians would ramp up their financial support for such groups to reward them for successful attacks and incentivize future attacks at the same time. As Dr. Levitt explained in 2007, "the specific sum [] fluctuates given circumstances on the ground; Iran is known to employ a performance-based approach to determining the level of funding it is willing to provide terrorist groups. As a U.S. court noted in *Weinstein v. Iran*, the period of 1995-1996 'was a peak period for Iranian economic support of Hamas because Iran typically paid for results, and Hamas was providing results by committing numerous bus bombings.'"

232.     When the IRGC and SLO funded Hamas, they earmarked the money they

provided for use by Hamas's attack cells. In this way, Iranian money was uniquely lethal. As Dr.

Levitt explained in 2007:

> Unlike much of the [non-Iranian sources of Hamas] financing …, Iranian funding
> of Hamas is generally … ***directed straight to operational units***. According to a
> December 2000 Palestinian intelligence report confiscated by Israeli authorities,
> Iran had transferred $400,000 directly to Hamas' Qassam Brigades to specifically
> support "the Hamas military arm in Israel and encouraging suicide operations,"
> and another $700,000 to other Islamic organizations opposed to the PA.
>     According to a former Jordanian prime minister, "grassroots fundraising is
> really not enough for big Hamas operations. Most of the support [for such
> operations] is from Iran. Iran's money is more influential." A senior Fatah official
> and member of the Palestinian Legislative Council offered a similar assessment,
> saying that while "some of Tehran's money over the past three years [2001- 2004]
> may go to supporting health and humanitarian services in Gaza," the bottom line
> is that the "money from Tehran that goes to Hamas is for the political leaders of
> Hamas and for the bombings, not for the Palestinians." (Emphasis added.)

233.     The IRGC also provided vital training to Hamas, often using both Hezbollah and

the Qods Force to provide extensive, multi-month, multi-location training to Hamas operatives.

The IRGC's and Hezbollah's provision of training to Hamas made Hamas more lethal and had a

direct impact on Hamas's ability to conduct attacks in Israel.

234.     The IRGC was also Hamas's most important source of weapons, for which the

IRGC usually used Hezbollah as its interlocutor with Hamas. For example, Hezbollah smuggled

IRGC-supplied weapons to Hamas and trained Hamas terrorists how to use them. The IRGC's

and Hezbollah's provision of weapons to Hamas made Hamas more lethal and had a direct

impact on Hamas's ability to conduct attacks in Israel.

235.     Hamas and Hezbollah have long cooperated on shared operations. Hamas jointly

planned some attacks with Hezbollah. For example, Hamas heavily leveraged Hezbollah's

technical skills, experience, training, and in-country operatives to plan and execute its

kidnapping operations.

236.     Like its IRGC patron, Hamas regularly violated the laws of war when it committed its barbaric attacks. As Hamas scholar Jonathan Schanzer observed in 2021: "Hamas was a brutal enemy" that routinely engaged in "'extra-judicial and willful killing,' including incidents in which Hamas fighters pushed [captured rivals] off tall buildings."

237.     Hamas has been an FTO since 1997.

## B.     Palestinian Islamic Jihad

238.     Palestinian Islamic Jihad established itself in 1979 as a violent, global, Sunni Islamist group dedicated to destroying Israel.

239.     In or about 1990, Khamenei and the IRGC cemented a deep bond with PIJ. Ever since, PIJ has been one of the IRGC's most notorious proxies, and was regularly mentioned by U.S. and Israeli officials alongside Hamas as a well-known IRGC proxy.

240.     The Iranian regime's relationship with PIJ was substantially like its relationship with Hamas. In short, anything the Iranian regime did for Hamas, it likewise did for PIJ. Accordingly, and as SCB knew, the United States regularly described Iranian support for Hamas and PIJ in the same public warnings, and often collectively referred to both as "Palestinian terrorist groups" or something similar.

241.     The Iranian regime has spent decades promoting the close collaboration between Hezbollah, Hamas, and PIJ. In 1998, for example, State reported to Congress:

> Iran continued to provide support—in the form of training, money, and/or weapons—to a variety of terrorist groups, such as Lebanese Hizballah, HAMAS, and the PIJ. The Iranian Government continues to oppose recognition of Israel and to encourage violent rejection of the Middle East Peace Process. In the fall of 1997, Tehran hosted numerous representatives of terrorist groups—including HAMAS, Lebanese Hizballah, [and] the PIJ…—at a conference of "Liberation Movements." Participants reportedly discussed the jihad, establishing greater coordination between certain groups, and an increase in support for some groups.

In the decades since, the Iranian regime continued similar efforts. In 2010, for example, State reported to Congress that the "Qods Force" was "the regime's primary mechanism for cultivating and supporting terrorists abroad" and "provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ)."

242.    PIJ, like Hezbollah and Hamas, viewed the United States and Israel as two inextricably connected enemies.

243.    PIJ needed money to conduct the attacks alleged herein.

244.    The IRGC and the SLO provided most of PIJ's budget, and directly financed PIJ attacks through a range of vehicles, including salary and bonus payments to PIJ leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead PIJ terrorists.

245.    The Iranian regime funded acts of terrorism committed by PIJ through an array of channels, including the Qods Force, Hezbollah, the SLO, the Foundation for the Oppressed, and Bank Saderat. From 2007 through 2020, the Iranian regime did so by collectively routing at least tens of millions of dollars per year to PIJ through the above organs.[12]

246.    The Iranian regime's financial support was vital to PIJ's ability to conduct terrorist attacks.

247.    Senior U.S. officials confirmed that the Iranian regime, including the IRGC, was vital to financing PIJ's attacks—usually routing its aid through its most trusted proxy, Hezbollah. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State,

---

[12] True, the Iranian regime provided less aggregate money to PIJ than it did to FTOs like Hezbollah and Hamas. As SCB knew, however, such distinction between PIJ funding levels, on the one hand, and funding levels for Hezbollah and Hamas, on the other, was based simply on the fact that PIJ was a substantially smaller organization than Hezbollah and Hamas.

testified before Congress that "Hezbollah supports … Palestinian terrorist organizations"—which, as SCB knew, referred to both Hamas and PIJ—"[through] the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support . . . since at least 2000 . . . Hizballah actively foments terrorist activity that directly undermines [the peace process]."

248.     Notably, the IRGC and the SLO had a famous "pay for performance" approach with PIJ (substantially like the IRGC's and SLO's support for Hamas), under which the Iranians would ramp up their financial support for such groups to reward them for successful attacks and incentivize future attacks at the same time.

249.     The IRGC also provided vital training to PIJ, often using both Hezbollah and the Qods Force to provide extensive, multi-month, multi-location training to PIJ operatives. The IRGC's and Hezbollah's provision of training to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel.

250.     The IRGC was also PIJ's most important source of weapons, for which the IRGC usually used Hezbollah as its interlocutor with PIJ. For example, Hezbollah smuggled IRGC-supplied weapons to PIJ and trained PIJ terrorists how to use them. The IRGC's and Hezbollah's provision of weapons to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel.

251.     PIJ and Hezbollah have long cooperated on shared operations.

252.     Like its IRGC patron, PIJ regularly violated the laws of war when it committed its barbaric attacks.

253.     PIJ has been an FTO since 1997

### C.     Jaysh Al-Mahdi

254.     Hezbollah and Muqtada al-Sadr established JAM in 2003 to serve as Hezbollah's "striking arm in Iraq" (as Sadr put it) and provide an Iraqi face to Hezbollah-directed terrorist attacks targeting Americans there.

255.     The IRGC and SLO provided a substantial percentage of JAM's budget, and directly financed JAM attacks through a range of vehicles, including payment to JAM leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead JAM terrorists.

256.     JAM served as Hezbollah's notorious terrorist agent in Iraq. JAM terrorists also publicly swore fealty to Hezbollah in two marches in Baghdad in 2006, during both of which thousands of JAM fighters publicly marched under Hezbollah's banners and photos of Hezbollah General Secretary Nasrallah while loudly chanting "We are Hezbollah" and "Jaysh al-Mahdi and Hezbollah are one." Sadr's decree that JAM was Hezbollah's "striking arm" and the two JAM marches described above were widely covered, in real-time, by the media.

257.     JAM jointly committed some attacks alongside Hezbollah, like the one that killed Dr. Everhart. It did so as part of joint Hezbollah-JAM cells in Iraq, which were directly funded by Hezbollah and the Qods Force.

258.     On July 2, 2009, the United States designated JAM Special Group Kata'ib Hezbollah as an FTO, designated Abu Mahdi al-Muhandis as an SDGT, and published detailed findings that Hezbollah and the Qods Force had played a vital role directing attacks committed by JAM in Iraq. This U.S. designation was widely reported worldwide.

259.    On January 3, 2020, the United States designated JAM Special Group Asa'ib Ahl al-Haq as an FTO, designated two of its leaders as SDGTs, and published detailed findings confirming AAH's close operational relationship with Hezbollah and the Qods Force

**D.    North Korean Reconnaissance General Bureau (RGB)**

260.    From 1980 through 2019, the RGB of the Democratic People's Republic of Korea ("DPRK" or "North Korea") always comprised the North Korean regime's primary external terrorist operations arm. The RGB specialized in the full panoply of terrorist operations, weaponry, tactics, techniques, and procedures associated with modern terrorist organizations, including, but not limited to, hostage-taking, bombings, assassinations, rocket attacks, and tunnel fortifications.

261.    The RGB, and the North Korean security services for which it committed its terrorist acts, enjoyed a close, high-level partnership with the Iranian Terrorist Sponsors for decades—which was cemented by contacts by key Iranian and IRGC leaders. For example, as scholars Dr. Victor Cha and Gabriel Scheinmann observed in 2014: "In 1989, just prior to becoming Iran's Supreme Leader, Ali Khamenei also visited Pyongyang. Even with the U.S. Navy in hot pursuit after the first Gulf War, missile-laden ships from North Korea still made their way to Iranian ports."

262.    The RGB was a founding member of the Axis of Resistance. The RGB's Joint Logistics Cells with the IRGC and Hezbollah, *see infra*, pre-date the Ayatollah Khamenei's public proclamation of the Axis's existence, which occurred in 2003. The RGB had operated its Joint Logistics Cells with the IRGC and Hezbollah since the 1980s, which expanded in the late 1990s to include Hamas and PIJ, and in 2003 to include JAM. Every one of these relationships pre-dated the Axis. While North Korea's terrorist apparatus was occasionally omitted from

public discussions about Axis membership, an avalanche of contemporaneous reports confirmed both North Korea's membership in the Axis and vital role powering terrorist attacks targeting the United States committed by Axis FTOs.

263.     The RGB was strikingly similar to the IRGC, Hezbollah, Hamas, PIJ, and JAM with respect to the profile of operations (types and threats), history of conducting high-profile mass casualty attacks (*e.g.*, shooting down a civilian airliner), training regimen, terrorist tactics, techniques, and procedures, sanctions evasion techniques, use of barter trade, cash equivalents, and black market trade to finance operations, and—most importantly of all—their shared status as notorious anti-American terrorist organizations. Indeed, the IRGC, Hezbollah, and RGB have, essentially, identical strategic doctrine regarding the United States: all see it as their foundational enemy; all were specially built to target the United States; and all regularly publicly threatened to inflict unspeakable violence against Americans throughout the world.

264.     Despite not sharing a common religion with the Terrorist Sponsors, the RGB and the Iranian Terrorist Sponsors overcame that difference to advance their shared goal of sponsoring terrorist violence against the United States and its allies. For example, even though the DPRK banned all religions, the RGB allowed the IRGC, Hezbollah, the Foundation for the Oppressed, and the SLO to build and operate a Mosque in a multi-building joint logistics cell compound in Pyongyang—the only mosque in North Korea. The Terrorist Sponsors, in turn, regularly worked to facilitate travel by RGB agents throughout the Middle East, which was both in the Terrorist Sponsors' own self-interest (since the RGB was helping them prepare for attacks) and a valuable service to the RGB.

265.     Why? Because North Korean-based cover and concealment was much harder for the RGB to obtain when it operated in the Middle East, which was its most important weapons

export market from 2000 through at least 2019. So the Terrorist Sponsors worked with the RGB to secure fake Chinese passports and then hired the RGB operatives on their own corporate fronts' payrolls with the doubly false cover and concealment provided by: (a) concealing their terrorist identity through the cover of a false janitorial, housekeeper, or other similar fake work persona designed to minimize suspicion (which was textbook IRGC-developed, Hezbollah-enhanced tradecraft); and (b) concealing their North Korean nationality—which was an unmistakable, if not almost conclusive indicator of RGB terrorist operative identity in the Middle East from 2000 through at least 2019—through the use of a false Chinese persona.[13]

266.     The RGB was always an internationally infamous terrorist organization—a reputation it acquired through a series of catastrophic terrorist attacks.

267.     On November 29, 1987, the RGB helped the North Korean regime target and destroy Korean Air flight 858, which exploded midair killing all 115 passengers on board, most of whom were South Korean civilian workers returning from assignments in the Middle East. Thereafter, the United States continuously designated the DPRK as a State Sponsor of Terrorism from 1988 until 2008.

---

[13] From 2000 through at least 2019, North Korea did not permit its citizens to travel outside of the country, other than for very limited purposes to parts of China. The only North Korean citizens who were permitted to travel were, in effect: (1) RGB operatives; (2) Foreign Ministry personnel; and (3) RGB-managed victims of human trafficking, whom the RGB effectively leased for pennies on the dollar to certain friendly regimes. The first category reflected—by far—the most economic activity, security activity, and intelligence activity for the regime, and therefore, the highest concentration of personnel deployed outside of North Korea. The second category was about the same size in most regions, but smaller than the first in the Middle East owing to the outsized presence of RGB operatives scattered throughout the Joint Logistics Cells located in Iran, Syria, Lebanon, and Egypt. And the third category necessarily involved the RGB. Accordingly, from 2000 through at least 2019, an observer with any knowledge of North Korean security and economic practices could conclude, based on nothing more than a person's North Korean identity, that if such person was in Lebanon, the Palestinian territories, Syria, Iran, Iraq, or Egypt, such person was likely an RGB operative or reporting to one.

268.    In 2008, the United States rescinded the DPRK's State Sponsor of Terrorism designation for diplomatic reasons related to an attempted nuclear deal with the North Korean regime. At no point, however, did the U.S. government ever clear the RGB, *i.e.*, assert it did not propagate terrorist attacks, nor did the U.S. government contradict the abundant evidence in the public domain from 2008 through 2017 that RGB support for Hezbollah and Hamas had dramatically intensified from 2009 through 2019 in comparison to previous eras. Indeed, a flood of real-time reports and criticisms confirmed that the rescission decision did not in any way reflect the nature, impact, or duration of RGB-supplied weapons, training, and tunnels to Hezbollah, Hamas, PIJ, JAM, and the IRGC throughout the period from 2000 through 2019.

269.    On May 8, 2008, for example, the Minority Staff of the House Foreign Affairs Committee published a confidential analysis of the Iran-North Korean- Hezbollah relationship by Larry Niksch, who worked for the Congressional Research Service at the time:

> **Terrorist Groups ... Hezbollah.** French, Israeli, and South Korean sources have reported ***an extensive program by North Korea to provide arms and training to Hezbollah.*** The French publication, Paris Intelligence Online, published a report on North Korean training of Hezbollah in September 2006. Paris Intelligence Online reported that North Korean training of Hezbollah cadre reportedly began in the late 1980s and early 1990s, including training in North Korea. ***Three current top Hezbollah officials were said to have received training in North Korea: Hassan Nasrallah, Hezbollah's secretary-general and head of Hezbollah's military organization; Ibrahim Akil, the head of Hezbollah's security and intelligence service, and Mustapha Badreddine, Hezbollah's counter-espionage chief.*** According to Paris Intelligence Online, the North Korean program reportedly expanded after 2000 when Israeli forces withdrew from southern Lebanon and Hezbollah forces [2] occupied the area. North Korea is said to have dispatched trainers to southern Lebanon where they instructed Hezbollah cadre in the development of extensive underground military installations (North Korea is believed to have constructed extensive military facilities inside North Korea) One such North Korean-assisted facility in southern Lebanon reportedly was a 25 kilometer underground tunnel that Hezbollah used to move troops. Hezbollah's underground facilities, according to reports, significantly improved Hezbollah's ability to fight the Israelis during the 2006 Israel-Lebanon war.

In November 2007, Professor Moon Chung-in, a professor at South Korea's Yonsei University and adviser to the Roh Moo-hyun Administration, reported assessments from the Israeli intelligence agency, Mossad, that **"vital missile components" of Hezbollah missiles fired into Israel during the 2006 war came from North Korea.** Dr. Moon stated that Mossad believes that the missiles with North Korean components were assembled in Iran and were transported to Hezbollah in Lebanon via Syria. According to Professor Moon, Mossad **"partially blames North Korea" for the effectiveness of Hezbollah's missile strikes into Israel.** …

In 2008, it has been reported that Hezbollah has received new missiles from Iran with longer ranges than the missiles that Hezbollah used in the 2006 war. The Israeli government reported that Hezbollah now has an arsenal that includes 10,000 long-range missiles and 20,000 short-range rockets in southern Lebanon. … If the Israeli estimate is correct and if the reported Mossad assessment of North Korea's role in providing components to missiles supplied to Mossad prior to the 2006 war is correct, **it would appear possible that North Korea is continuing to supply parts to the missiles that Iran is supplying to Hezbollah.** (Emphasis added.)

270.     On July 28, 2015, similarly, Mr. Niksch testified before Congress that:

Secretary of Defense Robert Gates stated in San Francisco on August 12, 2010, that "North Korea continues to smuggle missiles and weapons to other countries around the world Burma, Iran, Hezbollah, Hamas." Hezbollah and Hamas are designated by the U.S. Government as international terrorist organizations. In 2014, there were new reports that North Korea was negotiating with Hamas to provide missiles and communications equipment to Hamas. …

[W]ith [respect to] the issue of Iran-North Korea collaboration[:] Numerous reports describe the Iranian Revolutionary Guards as the main foreign supporter of Hezbollah and Hamas and the facilitator of North Korean assistance to these groups.

271.     On November 20, 2017, after about nine years of continued North Korean support for its Axis of Resistance partners—most of all the IRGC, Hezbollah, and Hamas—the United States reinstated the DPRK's designation as a State Sponsor of Terrorism. In 2017, State reported to Congress in *Country Reports on Terrorism 2019*, that the "the Secretary of State" had determined that the DPRK, *inter alia*: (1) "repeatedly provided support for acts of international terrorism, as the DPRK was implicated in assassinations on foreign soil"; (2) "repeatedly provided support for acts of international terrorism since its State Sponsor of Terrorism

designation was rescinded in 2008"; and (3) " failed to take action to address historical support for acts of international terrorism," including decades-long unresolved hostage-taking and hijacking attacks.

272.    From the early 1980s through at least 2019, the Foundation for the Oppressed always helped coordinate the Iranian Terrorist Sponsors' decades long partnership with RGB, including through the efforts of Foundation leaders (and Khamenei Cell members) Mohsen Rafiqdoost and Parviz Fattah, among others. Throughout, the Terrorist Sponsors and their RGB allies engaged in a consistent custom and practice, and used the same general tactics, techniques, and procedures: in sum and substance, the Terrorist Sponsors ordinarily traded (as barter) their NIOC-supplied, NITC-transported, Foundation-financed, SLO-supervised, Hezbollah and Qods Force-smuggled, petroleum products to the RGB and, in exchange, the RGB provided the following to Hezbollah, Hamas, PIJ, and JAM:

a.      **weapons**, including, but not limited to, rockets, missiles, mortars, explosives, small arms, and communications equipment;

b.      **terrorist training and equipment maintenance services**, including, but not limited to, services provided in the country in which the terrorist group was based (*e.g.*, Lebanon for Hezbollah), in addition to related training and technical support services provided at the Joint Logistics Cell locations in North Korea, Iran, and Syria; and

c.      **construction of state-of-the-art, military-grade, attack tunnels** modeled after the RGB's tunnel network adjacent to the DPRK's border with South Korea.[14]

---

[14] On information and belief, the Iranian Terrorist Sponsors engaged in substantially similar trades, for substantially similar weapon types, training, and technical support services, and attack tunnel construction with the RGB on behalf of JAM in a similar manner as they did with respect to Hezbollah, Hamas, PIJ, and JAM. In Iraq, JAM's attack-related operations sites relied upon JAM's control of the Ministry of Health and attendant ability to benefit from the copious German-engineered, military-grade, command-and-control bunkers that Saddam installed in the basements of most major hospitals throughout Iraq from 1990 through 2003. Hezbollah's commitment to tunneling is so foundational and the utility of attack tunnels in Iraq so obvious, that it is likely that the RGB provided substantial attack-tunnel related services to JAM in Iraq,

This shared logistics partnership began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars **per year** in bartered oil-for-weapons, services, and tunnels that the Terrorist Sponsors caused to flow through to Hezbollah, Hamas, PIJ, and JAM to directly enable such groups' attacks.

273.    Since the 1980s, NIOC has been notoriously close to its North Korean customer and strategic partner. On January 15, 1980, for example, the *Associated Press* reported that "North Korea's vice-premier Kong Chin-Tai" was "in Iran with an economic delegation," where he "met Iranian Oil Minister Ali Akbar Moinfar" and confirmed that "National Iranian Oil Co." was "ready to supply part of North Korea's oil requirements." On April 11, 1989, similarly, *Reuters* reported that "National Iranian Oil Co [] has close relations with North Korea."

274.    Indeed, the U.S. government directly warned banks—including, on information and belief, SCB—that Iran-facing sanctions violations foreseeably enabled IRGC-sponsored arms purchases from North Korea. In 2005 and 2006, for example, media outlets in the United States (*e.g.*, the *New York Times*) and Asia (*e.g.*, *Xinhua News Agency*), reported that U.S. officials had met with foreign bankers to warn them about the related risks posed by the IRGC and North Korea.

275.    Those warnings were well founded: RGB-supplied weapons and services comprised a substantial percentage of all weapons that Iranian Terrorist Sponsors delivered to Hezbollah, Hamas, PIJ, and JAM throughout this period. Indeed, numerous high-profile weapons seizures and intelligence reports since the early 2000s confirmed that Iranian Terrorist Sponsors used their oil-for-barter deals with the RGB (sometimes directly, sometimes routed through

---

even if it did so on a smaller scale as compared to its services to Hezbollah in Lebanon and Hamas and PIJ in the Palestinian territories.

China) to pay for around half of all weapons and technical training they provided to Hezbollah, Hamas, and PIJ, which services were ordinarily coordinated with the Qods Force and Hezbollah, paid for by oil-based barter trading, and complementary to previous training supplied by the IRGC. Indeed, much of IRGC field tactics and tradecraft, and therefore the tactics that govern Hezbollah, Hamas, and PIJ doctrine, were ripped straight from the RGB's playbook, which had decades of relevant operational experience that it eagerly shared with the IRGC and Hezbollah as such organizations grew.

276.    From 2009 through 2019, the Iranian Terrorist Sponsors likely engaged in at least more than $1 billion per year in oil-for-weapons, services, and tunnels trades on behalf of Hezbollah, Hamas, PIJ, JAM, the IRGC, the Foundation for the Oppressed, NIOC, NITC, and KAA; indeed, some estimates place the Hezbollah- and Hamas-related oil-for-weapons expenditures at several billion per year (which was primarily conducted through the oil-for-guns barter arrangement rather than cash).

277.    Why did the Foundation for the Oppressed, NIOC, NITC, and KAA need to purchase industrial-scale quantities of weapons, training, and tunnels supplied by the RGB and paid for with NIOC oil barter trade as facilitated by the Foundation for the Oppressed and NITC? Because their conduct makes plain, they knew two facts. *First*, the Terrorist Sponsors knew that the Foundation for the Oppressed, NIOC, NITC, and KAA were terrorist fronts that maintained vital stores of key operations-facing assets that keyed Hezbollah's, the Qods Force's, Hamas's, PIJ's, and JAM's ability to conduct terrorist attacks targeting the United States, including by attacking U.S. ally Israel. Such vital attack power for Hezbollah and its proxies included the Foundation's, NIOC's, NITC's, and KAA's substantial terrorist assets—in personnel (embedded for cover), cash, financial accounts, petroleum, cash equivalents, ships, ports, storage facilities,

and more—upon which Hezbollah and the Qods Force relied to conduct attacks targeting the United States, and for which Hezbollah and the Qods Force played a direct day-to-day role in their de facto role as the General Managers of the Terrorist Sponsors' turnkey enterprise to smuggle oil to China and North Korea as part of a packaged deal in which the RGB provides direct arms, training, and tunnel construction assistance to Hezbollah, Hamas, and their allies. *Second*, the Terrorist Sponsors also knew that the U.S. and Israeli Armed Forces also believed that the Foundation for the Oppressed, NIOC, NITC, and KAA contained key assets that powered attacks. Such fact was obvious given decades of on-the-record quotes from both governments' counterterrorism personnel, intelligence services, and law enforcement.

278.     Armed with these two data points, the Foundation for the Oppressed, KAA, NIOC, and NITC invested heavily in RGB-supplied weapons and services including, but not limited to, surface-to-air missile batteries, anti-aircraft guns, small arms, military-grade communications equipment, and other weapons designed to harden such sites against a potential airstrike or special operations raid by the U.S. or Israeli militaries. Accordingly, the mere presence of such weapons at facilities owned and/or operated by the Foundation for the Oppressed, KAA, NIOC, and NITC was powerful evidence that each such Terrorist Sponsor (in the case of the Foundation) or front (in the case of KAA, NIOC, and NITC) **was** an operational front for both Hezbollah and the Qods Force (given their shared ground-level management of the operations-related aspects of the Iranian Terrorists Sponsors' overall network structure, including its petroleum smuggling) **and** that such fact was sufficiently obvious that the Foundation, KAA, NIOC, and NITC elected to spend the oil necessary to purchase such weapons, services, and tunnels from the RGB.

279.     U.S. government findings have confirmed the RGB's intimate partnership with the IRGC—including the Qods Force and IRGC-IO. In 2021, for example, the Department of Commerce tightened controls on U.S. technologies to prevent, *inter alia*, intelligence sharing activities between the intelligence arms of terrorist groups "in terrorist-supporting countries" like Iran and North Korea, highlighting "Iran's Islamic Revolutionary Guard Corps Intelligence Organization (IRGC-IO)" and "North Korea's Reconnaissance General Bureau (RGB)," and stated:

> "We cannot allow the foreign military-intelligence organizations of our adversaries in … Iran, and other ***terrorist-supporting nations*** to benefit from U.S. technology or U.S. services to support their destabilizing activities," said Secretary of Commerce Wilbur Ross. "We must ensure our controls prevent U.S. persons, wherever located, from supporting unauthorized WMD activities around the globe … and [support export controls that] enhance our national security." (Emphasis added.)

280.     Israeli government findings confirmed the nexus. On February 28, 2008, for example, during a joint press conference with Japan's Prime Minister, then-Israeli Prime Minister Ehud Olmert directly warned about burgeoning cooperation between Iran, North Korea, Syria, Hezbollah, and Hamas, and the direct threat raised by such efforts:

> My judgment is that there is an axis of evil which ***combines both North Korea, Iran, the Syrians, Hezbollah and the Hamas -- all these countries and organizations which are joining forces*** together in order to upset the balance to develop non-conventional weapons and to threaten the moderate countries … Israel is naturally one of them. (Emphasis added.)

281.     Decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted SCB that its Iranian oil- and gas-related transactions with, and value flow-through to, the Iranian regime's oil monopoly, *i.e.*, NIOC, directly financed IRGC weapons purchased from North Korea's RGB. Such reports included, but were not limited to:

a. _New York Times_, December 19, 1982: "North Korea has become the leading supplier of arms to Iran in an arrangement that has helped Iran finance its continuing war with Iraq, according to a high-ranking American defense official. The official, Francis J. West . . . said Iran had been paying North Korea partly in cash and partly in oil. Military analysts, who provided details at Mr. West's request, said North Korea had provided about 40 percent of the approximately $2 billion worth of weapons, ammunition and equipment Iran acquired abroad this year. . . . To pay for the arms imports, oil industry analysts said, Iran has increased its oil production beyond the limits set by the Organization of Petroleum Exporting Countries. They said it had also cut prices below those of OPEC and established the **guns-for-oil bartering arrangement** with North Korea. … Intelligence officials said earlier that arms obtained by Iran from North Korea [and others] enabled Iran to continue the war with Iraq. Iran appears to have paid for the weapons from a $4.2 billion special military budget . . . . [thanks to] a resurgence of Iranian oil production." (Emphasis added.)

b. _Chicago Tribune_, August 31, 1989: "The story … is an **open secret** among the local foreign community. ... North Korea … sold [missiles] to Iran during the Gulf War. Teheran paid with oil, thus liberating the North Korean bars of gold set aside to purchase petroleum on the world market." (Emphasis added.)

c. _Chicago Tribune_, April 1, 1990: "North Korea served as an intermediary in the shipment of Chinese missiles to Iran. That caper earned North Korea **a year's supply of petroleum from the grateful mullahs in Tehran**." (Emphasis added.)

d. _Reuters_, November 19, 1992: "Impoverished North Korea bartered Scud missiles for Iranian oil last year, a South Korean government-funded trade organisation said …. The Korea Trade Promotion Corp (KOTRA) said North Korea traded 100 remodelled Scuds for $120 million of crude oil. **Pyongyang also signed a treaty with Tehran pledging to barter arms for $300 million worth of oil** a year in the future but further details were unavailable. Iran is now North Korea's fourth largest trading partner after China, Japan and the Commonwealth of Independent States (CIS), the KOTRA report said." (Emphasis added.)

e. _Associated Press_, April 8, 1993: "Mohaddessin is a member of the opposition coalition's largest group, the Peoples Mujahedeen, which has a widespread network of supporters and sources in Iran and has given accurate information in the past on Iranian military developments. … Mohaddessin said the **Iranians are repaying North Korea for the missiles and other arms purchases with oil shipments now running at a level of 100,000 barrels a day. … Iran and North Korea … [were in] a marriage of convenience: Iran gets offensive weapons not available from advanced Western nations and North Korea gets critical oil shipments which it lacks the dollars to buy. North Korea gets 40 percent of its oil needs from Iran. Mohaddessin said the current delegation is the fifth to visit North Korea in the past year, resulting in arms purchases of more than $3 billion to be delivered over the next five years.**" (Emphasis added.)

f. _St. Paul Pioneer Press_, April 9, 1993: "An Iranian military delegation is in North Korea to complete the purchase of 150 missiles that have a 600-mile range. **The Iranians are**

*paying North Korea for the missiles and other arms purchases in a barter arrangement with oil shipments now running at 100,000 barrels a day*." (Emphasis added.)

g.   *USA Today*, August 18, 1993: "***The next time a terrorist bomb explodes in New York, Berlin or Cairo, expect to trace its origins to one or more of a half-dozen countries scattered across three continents***. Western intelligence agencies say a loose alliance of outlaw nations is slowly coming together. … 'It's a threat that we're not well prepared to meet,' says Vincent Cannistraro, former CIA chief of counterterrorism operations. 'There are more ties and more connections than actually have been made public so far.' These 'outlaw' nations - such as Libya, Sudan, Iran … and North Korea - have trade links, some dating to the 1960s. But because of their isolation from most of the world, they have increased cooperation by exchanging data, weapons and technology. … The links are numerous: … ***North Korea is dangling its latest version of the Scud missile before Iran … in exchange for hard currency and oil***." (Emphasis added.)

h.   *Globe and Mail*, September 13, 1993: "North Korea has resorted to bartering arms to Iran in exchange for oil."

i.   *Washington Post*, December 25, 1993: "***Now, North Korea gets as much as half of its oil from Iran, probably in exchange for weapons***, according to recent estimates, and that traffic might well continue or even increase in defiance of a U.S.-led campaign to impose U.N. sanctions. … '***To have maximum impact, you would have to intercept the oil shipments from Iran*** …,' said Selig S. Harrison, a longtime Korea specialist at the Carnegie Endowment for International Peace. …Iranian oil … [was a] key import for North Korea." (Emphasis added.)

j.   *Deutsche Presse-Agentur*, November 26, 2005: "Iran is seeking to strengthen its ties with North Korea by offering Pyongyang a comprehensive economic aid programme as part of co-operation between the two countries on rocket development, the weekly Spiegel reported Saturday. ***Teheran wants to work together with North Korea on the development of … rockets, Spiegel reported citing western intelligence sources. An Iranian envoy has already promised North Korea substantial supplies of free oil*** and natural gas that could help the country through the winter. Teheran hopes to pursue two interests with its trade offer to the North Koreans, Spiegel said. Firstly, to ensure that it would have technical advantages, because the Iranian medium-range missile Schahab-3-Rakete [rocket] is based on North Korean technology." (Emphasis added.)

k.   *Deutsche Welle*, December 8, 2015: "***Thanks to historical ties between Tehran and Pyongyang, both countries are likely to be in favor of resuming the trade in oil, possibly in a barter arrangement for weapons, according to some analysts. 'Iran and North Korea have generally been allies, in part because both have been considered by the United States and its allies as 'outcasts' or 'pariah states,' subjected to wide-ranging international sanctions,' Middle East analyst Kenneth Katzman*** wrote in the CRS report on Iranian foreign policy. … ***With limited hard currency of its own, Pyongyang may be willing to trade knowledge for desperately needed oil. … Rah Jong-yil, a former head of South Korean intelligence and an expert on the regime in Pyongyang, told DW …[:] 'The North has limited resources and other ways to pay for***

*oil, so the opening up of Iran again gives Pyongyang an opportunity to barter weapons for oil,' … This has been the case in the past, analysts say, with a North Korean aircraft seized in Thailand in December 2009 carrying an undeclared cargo of 35 tons of North Korean made rocket-propelled grenades, missile and rocket launchers, missile tubes, surface-to-air missile launchers and spare parts. The manifest claimed the cargo was oil-drilling equipment and it subsequently emerged that it was bound for Iran.* 'There has been a lot of cooperation in hardware, software and nuclear technology in the past, but I would assume the Iranians will be extremely cautious this time about trying to bring in nuclear technology,' Rah added." (Emphasis added.)

282.     The specific IRGC-North-Korea-IRGC proxy nexus was equally infamous. Decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted SCB that its Iranian oil- and gas-related transactions with, and value flow-through to, the Iranian regimes oil monopoly, *i.e.*, NIOC, fueled IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and PIJ that leveraged IRGC-purchased North Korean weapons and services for delivery (by the IRGC, or directly by the RGB) to IRGC proxies Hezbollah, Hamas, and PIJ. Such reports included, but were not limited to:

a.     <u>*Guardian (UK)*, December 13, 2009</u>: "A lethal cargo of rocket launchers, grenades and other weapons seized in Thailand at the weekend may be just a glimpse of what US and UN investigators say is a global North Korean illegal arms smuggling network … *[S]uspicion immediately fell on Iran*, the destination of a previous illegal weapons shipment impounded in the United Arab Emirates in July. …The cargo, declared in the plane's manifest as oil-drilling equipment, was said to include rocket-propelled grenades, missile and rocket launchers, missile tubes, surface-to-air missile launchers, spare parts and other heavy weapons. … The Bangkok arms seizure followed several similar recent incidents. In July, the French-owned, Bahamian-flagged ANL Australia bound for Iran was intercepted in the UAE after a US tip-off. The ship was found to be carrying *containers of small arms made in North Korea, military hardware and sufficient explosive powder to arm thousands of short-range rockets. Also uncovered was a cache of 2,030 detonators for 122mm rockets and other rocket components. The manifest also detailed the cargo as oil drilling supplies*. …US officials said the ANL Australia was one of *five vessels caught this year carrying large consignments of weapons apparently intended for Iran's militia clients such as Hezbollah and Hamas*." (Emphasis added.)

b.     <u>Dr. Christina Y. Lin (Former Director, China Affairs, Policy Planning, DoD), March 2010</u>: "[N]umerous public reports have appeared since 1993 describing elements of DPRK-Iranian collaboration …. Cooperation reportedly began at the same time DPRK

negotiated with Iran's Islamic Revolutionary Guard Corps (IRGC) for cooperation in developing and manufacturing Nodong missiles in Iran. …The next stage of cooperation, from 2003 onwards, appears to have been influenced by the joint advancement of the Nodong (Shahab) [rocket] program in Iran … [for which Iran] ***offered oil and gas shipments as payment***."

c.   U.N. Security Council, November 5, 2010: "In August 2009, the United Arab Emirates reported to the Committee that it had seized on 22 July 2009 ***military shipment*** aboard ANL Australia. … The shipper of the cargo was the Pyongyang representative office of OTIM SPA, an Italian shipping company. T***he cargo was falsely described on the shipping documents as oil boring machine (spare parts). The cargo was custom sealed and loaded on a Democratic People's Republic of Korea ship*** in the port of Nampo, Democratic People's Republic of Korea, and trans-shipped multiple times on its way to the ***declared destination, Bandar Abbass, Islamic Republic of Iran***."

283.   Summing it all up, former Congressional Research Service Korea specialist Larry

Niksch testified before Congress on July 28, 2015 that "Iranian Money" was the "Lubricant for

the Wheels of Iran-North Korean Collaboration":

> Iran has paid North Korea huge sums of money for cooperative projects related to missiles … and Pyongyang's assistance to Hezbollah and Hamas. … It seems to me that North Korea may receive from Iran upwards of $2 to $3 billion annually from Iran for the various forms of collaboration between them. … There should be no doubt that North Korea drives a hard financial bargain with Iran for the benefits it provides to Iran. As the collaboration has deepened and North Korea has expanded its programs, North Korea's asking price no doubt has risen. … Iranian money appears to be the lubricant for North Korea[] … Iran's greed for benefits from North Korea's … terrorist-supporting assistance also appears to be growing, so the match likely will continue despite the Iran nuclear agreement.

## III.   Iran's Terrorist Sponsors and Proxies Used Multiple Coordination Mechanisms To Orchestrate Their Attacks Targeting The United States

### A.   Joint Cells

284.   From 2000 through 2024, Hezbollah, the IRGC, and the proxies they trained,

including Jamas, PIJ, and JAM, relied heavily on a "joint cell" model of terrorist attacks, under

which two or more terrorist groups combine one or more of their cells in a certain location, or for

a certain competency, to optimize the lethality of their shared attacks.

285.    U.N. Security Council reports confirmed the Iranian Terror Sponsor's emphasis on using joint cells to manage terrorist operations. On July 12, 2016, for example, the Council's Panel of Experts reported that "an Iranian news agency reproduced photographs showing the Commander of the Quds Force . . . Qasem Soleimani in a joint cell's "'Fallujah operations room' in Iraq" in which triple-hatted IRGC, Hezbollah, and JAM (Kataib Hezbollah) terrorist operative "Abu Mahdi al-Muhandis . . . appeared in the same photograph":



General Soleimani in the "Fallujah operations room"

286.    Hezbollah and IRGC terrorists have regularly confirmed their joint cell approach. For example, as State informed Congress in *Country Reports on Terrorism 2014*: "In late November" 2014, IRGC "General Amir Ali Hajizadeh … admitted that 'The IRGC and Hizballah are a single apparatus jointed together.'" On November 9, 2017, similarly, an IRGC- and SLO-controlled media outlet published an interview with Hezbollah Deputy Secretary General Sheikh Naim Qassem in which Qassem boasted about the combined attack power of Hezbollah's Iranian-backed joint cells, which he credited for terrorizing the United States.

287.    U.S. government reports to Congress, publications, and studies also confirmed Hezbollah's, the IRGC's, and their proxies' programmatic reliance on the joint cell model of

terrorism. As a U.S. Army officer warned in an analysis published by the Joint Special Operations University in 2019:

> Too often, the USG pigeonholes terrorists as members of one group or another, as if operatives carry membership cards around in their wallets. Today's terrorists are better defined as belonging to a network of networks, which is both informal and unstructured. For instance, not every Al Qaeda operative has pledged an oath of allegiance (bayat) to Osama bin Laden, and many terrorists maintain affiliations with members of other terrorist groups and facilitate one another's activities. Even though terrorist organizations tend to maintain the cellular structure at the tactical level for security purposes, one of their critical vulnerabilities at the operational and strategic level lies in the area of terrorist financing and logistical support due to the overlap and cooperation between terrorist groups and facilitators within their network of networks.

288. Nowhere was this warning more appropriate than with respect to Hezbollah. In January 2019, for example, Colonel Joel D. Rayburn (U.S. Army, ret.) and Colonel Frank K. Sobchak (U.S. Army, ret.), published the official DoD history of the U.S. Army's experiences in Iraq, which observed: "The Qods Force used members of Lebanese Hizballah, the Badr Corps, and, later, Jaysh al-Mahdi to establish Iranian surrogate military cells throughout Iraq that could increase or reduce violent attacks against the coalition on order." On May 9, 2019, for example, an analysis released by U.S. government-published *Radio Farda* observed that the "Quds Force, led by Qassem Soleimani" served as a "'command' and headquarters for [IRGC] and Shia forces operating throughout the [Middle East] region" and was "[r]esponsible for dozens of terror attacks in the region and beyond." On September 16, 2019, similarly, Marine Corps University published Dr. Mark D. Silinsky's observation that the "Qods Force maintains a joint command-and-control structure with Hezbollah, in which Hezbollah assists the Qods Force in its program to advise, support, and train other Shia militia groups." In 2023, likewise, State reported to Congress that: "Hizballah is closely allied with Iran, and the two often work together on shared initiatives."

289.     Terrorism scholars also confirmed Hezbollah's, the IRGC's, and their proxies' widespread reliance on a joint cell approach and combined command-and-control. On July 9, 2013, for example Bipartisan Policy Center scholar Blaise Misztal testified to Congress that the "Quds Force … is heavily linked to Hezbollah, engaging in joint activities all over the world. In 2018, likewise, Iran scholar Nader Uskowi testified to Congress:

> ***The Quds Force maintains a joint command-and-control structure with Hezbollah.*** The Quds Force commander, General Qasem Soleimani, frequently meets with the Hezbollah's leader, Hassan Nasrallah, and his senior aides. The Quds Force senior officers also participate in Hezbollah's decision-making process at its highest levels regarding all … terrorist operations carried out by the organization, almost certainly as part of Quds Force's larger campaigns. This practice began in the first days of the founding of Hezbollah. (Emphasis added.)

290.     In 2021, similarly, scholar and former Treasury official Dr. Matthew Levitt observed that Hezbollah's and the Qods Force's share tradecraft, and custom and practice, emphasized that the use of joint cells involving, at least, Hezbollah and one other Qods Force proxy, *e.g.*, Hamas or JAM, was vital to such groups' ability to maximize the lethality, and operational tempo, of their attacks targeting the United States. Among other things, Dr. Levitt noted:

a.     "Iranian 'auxiliaries' were even embedded in Hezbollah units in the Bekaa Valley, with the IRGC sharing Hezbollah's communications and support network."

b.     "Deploying key commanders to priority conflict zones facilitated [Hezbollah]'s ability to commit significant added value to its and Iran's allies in these conflicts. Hezbollah's contributions vary from large and small military deployments, training local militias, capacity building efforts focused on weapons or technology transfers, propaganda and disinformation, cyber training and campaigns, illicit financial activities, intelligence collection efforts, and even terrorist plots and preoperational surveillance in the region."

c.     "Soleimani became the one leading Hezbollah deployments and activities across the region. Indeed, it was because of his dual-hatted role as head of the IRGC-QF and director of Iran's sub-state proxies that U.S. government lawyers concluded Soleimani was a legitimate target for a targeted assassination in January 2020. The extent of his personal leadership of these proxies became clear as U.S. analysts tracked his movements and mapped out his 'pattern of life.'"

291.     The widespread prevalence of dual-hatted Hezbollah/Qods Force terrorists further reinforced the centrality of joint cells. In 2005, for example, Dr. Daniel Byman, of Georgetown University, explained:

> Iran's ties are particularly strong to Hizballah's terrorist wing … [C]ertain Lebanese clans that are prominent in Hizballah's terrorist operations, such as the Musawis and the Hamiyehs, work directly with the Iranians as well as affiliating with Hizballah. Similarly, … Imad Mugniyah, Hizballah's terrorist mastermind, reports directly to the Iranians. Such individuals are thus both members of Hizballah and terrorists who report directly to the Iranians. Unlike many senior Hizballah members, some of Iran's favored Hizballah terrorists hold Iranian diplomatic passports.

### 1.     The Khamenei Cell: A Joint IRGC-Hezbollah Leadership Cell in Iran, Iraq, and Lebanon

292.     From 2000 through 2020, Ayatollah Khamenei directly funded, logistically supported, and organized the **Joint IRGC/Hezbollah Khamenei Cell** that coordinated the deployment of operatives, weapons, logistics, pre-attack intelligence, and associated finances and fronts to keep everything off-books as was the Ayatollah Khamenei's, the SLO's, Qods Force's, and Hezbollah's common tradecraft with respect to their role in attacks intended to intimidate the United States and potentially kill or maim Americans (the "Khamenei Cell"). That attack qualifier mattered because any such contemplated attack posed unique and potentially life- and group-ending consequences that few (if any) other attacks raised. Accordingly, such attacks were the most carefully coordinated, vetted, and planned by Khamenei, the SLO, the Qods Force, and Hezbollah. To that end, the Khamenei Cell operated a shared Hezbollah/IRGC/SLO Leadership Cell with respect to Iranian regime-sponsored terrorist attacks targeting the United States, including U.S. ally Israel, that were committed, planned, or authorized by Hezbollah in the Palestinian territories and Iraq.

293.     The Khamenei Cell included around 20-25 Hezbollah and/or IRGC operatives based in Iran, Iraq, and Lebanon, and was remarkably stable, with every member being a senior terrorist who had sworn allegiance to the Supreme Leader, was a long-standing ally of Khamenei and part of his "inner circle" or a key lieutenant of such person, and who had directly sponsored successful attacks targeting the United States in the past.[15] During this period, the IRGC's Leadership Cell included, but was not limited to:

a.     **Ali Khamenei**, Supreme Leader of the IRGC and Hezbollah from 1989 through 2020;

b.     **Mojtaba Khamenei**, de facto leader of SLO and IRGC-IO from 2004 through 2020;

c.     **Qasem Soleimani**, IRGC-QF Commander from 1998 through 2020;

d.     **Hassan Nasrallah**, Hezbollah Secretary General and Khamenei's Top Hezbollah Ally from 1993 through 2020;

e.     **Imad Mugniyeh**, dual-hatted member of the IRGC-QF and Hezbollah, who served as Khamenei's, Hezbollah's, and the IRGC's lead terrorist attack planner from the 1980s through his death in 2008, and was responsible for establishing the joint Hezbollah-local proxy cells in Iraq (*i.e.*, joint Hezbollah-JAM cells) and Gaza (*i.e.*, joint Hezbollah-Hamas and Hezbollah-PIJ cells);

f.     **Esmail Ghaani**, IRGC-QF Deputy Commander from 1998 through 2020;

g.     **Rostum Qasemi**, Deputy Commander of IRGF-QF, Director of IRGC front KAA from 2007 through 2011, Minister of Oil and/or de facto leader of Qods Force and Hezbollah petroleum smuggling from 2011 through 2020;

h.     **Parviz Fattah**, Deputy Commander of IRGF-QF, Director or Board Member the Foundation for the Oppressed from at least 2010 through at least 2020, and other fronts operated for the benefit of the IRGC and/or SLO;[16]

i.     **Mohammad Ali Jafari**, IRGC Commander from September 2017 through April 2019;

---

[15] Some Khamenei Cell members were dual-hatted terrorists, meaning they were members of two allied groups, *e.g.*, Abu Mahdi al-Muhandis.

[16] Some Hezbollah fronts alleged herein were entities for which both the IRGC and SLO extracted substantial value for their shared sponsorship of attacks by Hezbollah, Hamas, PIJ, and JAM, *e.g.*, the Foundation the Oppressed, NIOC, and Petro Nahad.

j.    **Abu Mahdi al-Muhandis**, dual-hatted member of IRGC-QF (since the 1980s) and JAM (since 2003), and Khamenei's and Qasem Soleimani's longest serving Iraqi asset;

k.    **Mohsen Rafiqdoost**, former personal bodyguard and driver of Khomeini, largest bazaar network in Iran, founder of IRGC, co-founder of Hezbollah, decades-long de-facto leader of the Foundation for the Oppressed, key IRGC/Supreme Leader liaison for arms purchases from DPRK RGB;

l.    **Mohsen Rezai**, IRGC Commander (1981 through 1999), co-founder Hezbollah, founder IRGC Intelligence Bureau (predecessor to IRGC-IO), Senior "Security" Advisor to Ali Khamenei;

m.    **Hossein Taeb**, IRGC Basij Commander (2007 through 2009) and IRGC-IO Commander (2009 through 2022).

294.    The Khamenei Cell played a direct role in every attack against Plaintiffs, which typically featured multiple separate touchpoints with the Khamenei Cell.

295.    When Ayatollah Khamenei flowed financial support to members of the Khamenei Cell, he relied upon, *inter alia*, the Foundation for the Oppressed, the IRGC, and the SLO.

> **2.    The Joint Axis of Resistance Logistics Cells (IRGC-LH-Hamas-PIJ-JAM-RGB) in Iran, Lebanon, Syria, the Palestinian Territories, and North Korea**

296.    From 2000 through at least 2020, the IRGC, Hezbollah, Hamas, PIJ, JAM, and North Korea's RGB maintained a **Joint Logistics Cell** that coordinated the development, distribution, testing, and training of the common terrorist weapons, tactics, and objective that united the Axis of Resistance, including, but not limited to: (1) rocket and missile research, development, and deployment; (2) specialized training by the RGB to the other Axis members concerning kidnapping, rocket attacks, and tunnel attacks – three of the RGB's signature attack types; (3) shared ratlines, safehouses, and sites for meetings and operational planning; and (4) collaboration to promote weapons-related interoperability between all the members of the Axis of Resistance ("Joint Logistics Cell"). Each of these features benefit all members of the Joint Logistics Cell.

297.     The IRGC, Hezbollah, Hamas, PIJ, JAM, and North Korea's RGB Joint Logistics

Cell had cell locations in at least the following locations:

a.     **Iran.** The Joint Logistics Cell operates in Tehran out of a massive, multi-building complex that Iranian regime built out to promote cross-pollination amongst allies and logistics cooperation at a vast scale. Indeed, the RGB deployed up to 1,000 people at a time to the Joint Logistics Cell in Tehran – so many North Korean terrorists were on site that the Iranian regime at one point elected to procure ***an entire resort on the Caspian Sea*** to accommodate them all.

b.     **North Korea.** The Joint Logistics Cell's oldest site in Pyongyang, which has hosted trilateral logistics and training efforts with the Hezbollah, the IRGC, and the RGB for decades. Prior to 2024, Hezbollah's top leadership trained there, including Hassan Nasrallah.

c.     **Syria.** The Joint Logistics Cell's newest location is in Syria, near the Syrian/Iraqi border. While the other two locations primarily emphasize logistics cooperation and training, the Joint Logistics Cell's Syria location also served as a key transit node for Axis terrorists seeking to travel to, or from, Lebanon, Gaza, and Iraq, because the Syrian site was ideally located for all such uses. Moreover, Axis terrorists sometimes launched rocket attacks directly from the Joint Logistics Cell location, as the IRGC-QF did in 2018, when they fired rockets at Israel from Syria.

d.     **Egypt.** The Joint Logistics Cell leveraged the RGB's long-standing presence in Egypt, which allowed Hezbollah to flow funds and weapons to Hezbollah and Hamas operations cells in Gaza.

298.     The Joint Logistics Cell reflected a simple truth: terrorists cannot kill people

without a robust logistics network behind them. In 2005, for example, Dr. Daniel Byman, or

Georgetown University, explained how logistics drive lethality:

299.

A successful terrorist act is often the culmination of months, at times even years, of planning and preparation. For understandable reasons, the world focuses on the man who seizes a hostage or the woman who plants a bomb. These people, however, are often only part of a larger organization. Such operatives are often supported by a vast apparatus of people who are false documents, run safe houses, offer training on explosives and procure surveillance, and take care of the terrorist's family should they die or go to prison. Indeed, the actual attacker may be far more replaceable than the other specialized cogs in the terrorist group's machine. As Colonel Yves Godard … contended, "the man who places the bomb is but an arm that tomorrow will be replaced by another arm." Shattering this

logistics organization is often vital to successful counterterrorism. … Bruce Hoffman and Kim Cragin, in their summary of successful counterterrorism practices, emphasized the importance of stopping logistics. French officials found that only by going after logistics networks were they able to … [achieve] the successful prevention of attacks in the long term. Simply put, it is far harder for the terrorist group to replace logisticians than operatives.

300.     In 2019, for likewise, an analysis authored by a U.S. Army officer and published by DOD's Joint Special Operations University observed:

The 9/11 attacks could never have been executed without the logistical assistance of a sophisticated and well-entrenched support network. … Accordingly, an individual, group, or state that provides funds, travel documents, training, or other support for terrorist activity is no less important to a terrorist network than the operative who executes the attack. A key lesson learned from 9/11 is that counterterrorism efforts must target financial and logistical cells with the same vigor as operational cells.

301.     Indeed, logistics are also an area where state sponsorship has an outsized impact on the lethality of terrorist attacks. As Dr. Byman explained in 2005: "States can also help a group conduct operations indirectly through logistical assistance" by "fund[ing] front companies or non-government organizations that offer jobs and legitimate documentation for terrorists masquerading as employees."

302.     The Joint Logistics Cell was a decades-long construct for which there were media reports as early as the 1990s. In 1993, for example, the Washington Post reported: "Across from the Foreign Ministry in north Tehran is an old government building housing protocol offices for foreign diplomats and branch offices for two radical Islamic movements -- Hezbollah, from Lebanon, and Hamas, from the Israeli-occupied West Bank and Gaza Strip."

303.     Such practices endured throughout the relevant period. In 2008, for example, Treasury reported as to the substantial activities at the Joint Logistics Cell's site in Tehran: "Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and

the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups."

304.     On information and belief, the Joint Logistics Cell played a direct role in every attack against Plaintiffs, each of which featured one or both of (a) weapons that were likely supplied by the RGB to Hamas and/or PIJ (*e.g.*,, rockets); and/or (b) an attack that was directly or indirectly enabled by RGB-construction terror tunnels for Hamas and PIJ in Gaza and Hezbollah in South Lebanon.

### 3.     Joint Hezbollah-Hamas Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories

305.     From 2000 through 2020, Hezbollah and Hamas often collaborated on attacks targeting the United States (including through attacking its ally, Israel) through a **Joint Hezbollah/Hamas Operations Cell** with sites located in Lebanon, Syria, and the Palestinian territories (collectively, the "Joint Hezbollah/Hamas Operations Cell").

306.     Throughout, Hezbollah's role in the Joint Hezbollah/Hamas Operations Cell was substantially like Hezbollah's role in similar joint cells with JAM in Iraq. In both areas, Hezbollah terrorists embedded with the local Iranian proxy, served as a liaison between the proxy and, *inter alia*, Ayatollah Khamenei, the IRGC, and the SLO, and helped direct proxy attacks to align such activities with Khamenei's objectives.

307.     Hamas and Hezbollah have long cooperated on shared operations. Hamas jointly planned some attacks with Hezbollah. For example, Hamas heavily leveraged Hezbollah's technical skills, experience, training, and in-country operatives to plan and execute its kidnapping operations.

308.     Terrorism scholars concurred. As Dr. Matthew Levitt summed-up in 2007, "Hamas has long cooperated with Hezbollah operationally."

309.    The Iranian regime has spent decades promoting the close collaboration between

Hezbollah, Hamas, and PIJ. In 1993, for example, State reported to Congress: "Iran was the

principal sponsor of extremist Islamic and Palestinian groups. Besides providing funding,

training, and weapons to groups that conduct terrorist acts, Iran also hosted a series of high-

profile meetings with Hizballah and HAMAS that had the stated goal of coordinating efforts

against Israel and bringing the Arab-Israeli peace process to a halt." In 1998, likewise, State

reported to Congress:

> Iran continued to provide support—in the form of training, money, and/or
> weapons—to a variety of terrorist groups, such as Lebanese Hizballah, HAMAS,
> and the PIJ. The Iranian Government continues to oppose recognition of Israel
> and to encourage violent rejection of the Middle East Peace Process. In the fall of
> 1997, Tehran hosted numerous representatives of terrorist groups—including
> HAMAS, Lebanese Hizballah, [and] the PIJ…—at a conference of "Liberation
> Movements." Participants reportedly discussed the jihad, establishing greater
> coordination between certain groups, and an increase in support for some groups.

310.    In 2001, similarly, State reported to Congress: "Iran has long provided Lebanese

Hizballah and the Palestinian rejectionist groups--notably HAMAS [and] the Palestine Islamic

Jihad, … Iran continued to encourage Hizballah and the Palestinian groups to coordinate their

planning and to escalate their activities against Israel."

311.    Moreover, on September 19, 2006, Under Secretary of State R. Nicholas Burns

testified to Congress: "We have no illusions about the nature and objectives of the Iranian

regime. … In their foreign policy, they are pursuing a course of aggressive behavior from their

arming of Hizballah with long-range rockets to strike Israel to their work to create a nexus of

terrorism encompassing Hizballah, Hamas, Palestinian Islamic Jihad, the Popular Front for the

Liberation of Palestine General Command, and Syria."

312.    The Joint Hezbollah/Hamas Operations Cell played a direct role in every Hamas-

committed hostage-taking and rocket attack that killed and injured Plaintiffs. That is because

kidnapping and rocket attacks were Hezbollah's specialty, for which Hezbollah provided in-country direction to Hamas, as well as coordination for things like resupply.

### 4.    Joint Hezbollah-PIJ Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories

313.    From 2000 through 2020, Hezbollah and PIJ often collaborated on attacks targeting the United States (including through attacking its ally, Israel) through a **Joint Hezbollah/PIJ Operations Cell** with sites located in Lebanon, Syria, and the Palestinian territories (collectively, the "Joint Hezbollah/PIJ Operations Cell").

314.    Throughout, Hezbollah's role in the Joint Hezbollah/PIJ Operations Cell was substantially like Hezbollah's role in similar joint cells with Hamas in Gaza and JAM in Iraq. In all areas, Hezbollah terrorists embedded with the local Iranian proxy, served as a liaison between the proxy and, inter alia, Ayatollah Khamenei, the IRGC, and the SLO, and helped direct proxy attacks to align such activities with Khamenei's objectives.

315.    PIJ and Hezbollah have long cooperated on shared operations. Indeed, State regularly reported to Congress—including, but not limited to, in 2015, 2017, 2018, and 2020—that "PIJ has partnered with Iranian- and Syrian-sponsored Hizballah to carry out joint operations."

316.    Indeed, per a UANI analysis published on December 8, 2020: "In 2019, … Iran's supreme leader reportedly proposed PIJ form a joint operations room in Gaza with Hezbollah and Iraqi militias," which was among recent "signs of increased coordination within Iran's broader Axis of Resistance in furtherance" of IRGC-sponsored terrorist attacks in Israel.[17]

---

[17] Jordan Steckler (Research Analyst, United Against a Nuclear (UANI)), *How Iran Exports Its Ideology*, at 45 (UANI Dec. 8, 2020), https://tinyurl.com/4yrd8xcf.

317.    The Joint Hezbollah/PIJ Operations Cell played a direct role in every PIJ-committed rocket attack that killed and injured Plaintiffs. That is because rocket attacks were a Hezbollah specialty, for which Hezbollah provided in-country direction to PIJ, as well as coordination for things like resupply.

**B.    Terrorist Fronts**

**1.    Khatam al-Anbiya Construction Headquarters (aka GHORB)**

318.    Khatam al-Anbiya (or "KAA"), Persian for "Seal of the Prophet," was a front for the IRGC, including the Qods Force.

319.    Khatam al-Anbiya was a front for Hezbollah.

320.    Ostensibly a construction company, Ayatollah Khamenei created Khatam al-Anbiya in 1990 to serve as a vehicle for the IRGC, Hezbollah and their proxies to be financially self-sustaining and in direct response to concerns that the Iranian state could not, on its own, afford to rebuild after the Iran-Iraq war while simultaneously funding terrorist proxies outside Iran. Per its charter, KAA's purpose was to "efficiently utilize the available construction and economic resources, capacities and talents of the IRGC to continue the Islamic Revolution"—*i.e.*, IRGC-sponsored acts of terrorism targeting the United States. KAA's primary purpose was always to maximize the amount of money spent on terrorism committed by the Qods Force, Hezbollah, and their shared proxies. KAA did so through its wide array of companies, personnel, agents, deals, and facilities inside and outside of Iran. KAA operations inside Iran were controlled by the IRGC, while operations outside Iran were controlled by the Qods Force and Hezbollah. These factors, and others, distinguished KAA from nearly all other Iranian firms, aside from fronts controlled by the IRGC or the SLO.

321.	KAA notoriously owned a wide array of companies in the Iranian oil, gas, construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such notorious fronts included, but were not limited to: (1) Oil Industries Engineering & Construction (Sherkat-e Sakhteman-e Sanaye' Naft); (2) Iranian Offshore Engineering & Construction Company (Sherkat-e Mohandesi Va Sakht-e Ta'sisat-e Daryayi) ("IOEC"); (3) Persian Gulf Petrochemical Industries Company ("PGPIC"); and (4) Bandar Imam Petrochemical Company. (KAA jointly owned IOEC alongside fellow IRGC front NIOC.)

322.	The IRGC, Qods Force, and Hezbollah, and their proxies, including Hamas and PIJ, leveraged KAA resources, including KAA profits, to serve as a source of funds, logistical aid, cover, and safe houses in Iraq, Lebanon, Syria, and Gaza, among other places. KAA was the ideal cover because it had extensive offices, projects, and facilities inside and outside of Iran, including in Lebanon, Syria, Iraq, and Gaza. Among other uses, the Qods Force, Hezbollah, Hamas, PIJ, and JAM used KAA to stockpile and pre-position weapons earmarked for attacks, including EFPs, rockets, and communications technologies. KAA also worked closely with other IRGC fronts, including the SLO, Foundation for the Oppressed, NIOC, and NITC.

323.	From at least 2000 through present, the Qods Force and Hezbollah used KAA to finance terrorist attacks in Israel that were committed by Hezbollah, Hamas, and PIJ, and funded and supplied by the Qods Force. From 2003 through present, the Qods Force and Hezbollah used KAA to finance terrorist attacks in Iraq that were committed by Hezbollah and JAM and were funded and supplied by Hezbollah and the Qods Force. At all relevant times, KAA was controlled by the Qods Force and Hezbollah, and used by the Qods Force and Hezbollah to flow funds, logistics, and weapons; provide safe houses for forward-deployed operatives; and conceal terrorist funds, weapons, and supplies moved through transnational construction-related

shipments. KAA support flowed from Iran to recipients in Iraq, Lebanon, Syria, and Gaza, among other places, including to Hamas and PIJ (through Hezbollah) and JAM (through Hezbollah) attack cells, to finance terrorist attacks in Israel and Iraq committed by such groups.

324.    Indeed, KAA profits provided a key funding source for the IRGC's tunnel-related support to IRGC proxies throughout the world, including Hezbollah in Lebanon and Hamas and PIJ in Israel and Gaza. Moreover, KAA activities also provided valuable intelligence benefits to the IRGC and SLO in every geography in which KAA operated, including Iran, Iraq, Afghanistan, Lebanon, and Yemen, among others.

325.    On October 25, 2007, the United States sanctioned KAA under U.S. weapons-related sanctions targeting the IRGC and concerning, *inter alia*, missiles and drones; listed KAA as an "IRGC-owned or -controlled compan[y]"; and warned banks contemplating doing business with Iranian counterparties—including SCB—that the IRGC had seized a monopolistic share of Iran's oil sector, the IRGC used KAA to operationalize such tactics, and the IRGC used some of the resulting profits to finance IRGC-sponsored weapons programs that threatened the United States. (The latter finding was needed to impose U.S. weapons sanctions against the IRGC.)

326.    On June 24, 2008, the E.U. sanctioned "Khatem-ol Anbiya Construction Organisation" (*i.e.*, KAA) for direct facilitation of illicit IRGC weapons acquisition and proliferation efforts, which focused on IRGC acquisition, development, and export of weapons like missiles, rockets, and UAVs (drones), and in recognition of KAA's role as a vital supporter of the IRGC's ballistic missile operations.

327.    On July 27, 2010, the E.U. announced sanctions that targeted, *inter alia*, IRGC ballistic missiles, proxy terrorism, and fundraising through KAA:

a.      "Islamic Revolutionary Guard Corps (IRGC) … Reasons: Has operational control for Iran's ballistic missile programme" and "[h]as undertaken procurement attempts for to support Iran's ballistic missiles";

b.       "Parviz FATAH … Reasons: Deputy Commander of Khatam al Anbiya";

c.      "Rostam QASEMI (a.k.a. Rostam GHASEMI) … Reasons: Commander of Khatam al-Anbiya"; [and]

d.      "IRGC Qods Force … Reasons: Iran's Islamic Revolutionary Guard Corps (IRGC) Qods Force is responsible for operations outside Iran and is Tehran's principal foreign policy tool for special operations and support to terrorists and Islamic militants abroad. Hizballah used Qods Force-supplied rockets, anti-ship cruise missiles (ASCMs), man-portable air defense systems (MANPADS), and unmanned aerial vehicles (UAVs) in the 2006 conflict with Israel and benefited from Qods Force training on these systems, according to press reporting. According to a variety of reporting, the Qods Force continues to re-supply and train Hizballah on advanced weaponry, anti-aircraft missiles, and long-range rockets. The Qods Force continues to provide limited lethal support, training, and funding to Taliban fighters in southern and western Afghanistan including small arms, ammunition, mortars, and short-range battlefield rockets. Commander [*i.e.*, Qasem Soleimani] has been sanctioned under UNSCR[.]"

328.    On March 28, 2012, Treasury imposed additional sanctions against KAA and

reiterated that KAA's profits funded IRGC-sponsored terrorism:

Today's actions further expose IRGC … continued involvement in illicit activities and deceptive behavior.
    Pursuant to Executive Order (E.O.) 13382 – an authority aimed at freezing the assets of proliferators of weapons of mass destruction (WMD) and their supporters and thereby isolating them from the U.S. financial and commercial systems – Treasury today designated the following entities and individuals.
    Iran Maritime Industrial Company SADRA (SADRA), an entity owned by the IRGC's Khatam al-Anbiya …
    "By designating the individuals and entities today, Treasury is sending a clear signal to the international community that Iran's attempts to evade international sanctions will not go unnoticed. We will continue to target the Iranian regime and specifically the IRGC as it attempts to continue its nefarious infiltration of the Iranian economy," said Adam Szubin, Director of [OFAC].
    The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in … [*inter alia*] Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the defense production, construction, and oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct.

329.	On May 31, 2013, Treasury sanctioned KAA affiliate Bandar Imam Petrochemical Company as part of a package that, per Treasury, comprised "Actions [that] Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism."

330.	On November 17, 2017, the United States designated KAA (inclusive of KAA's alter egos) as an SDGT when it also designated the entire IRGC as an SDGT.

331.	On June 7, 2019, the United States imposed IRGC counterterrorism-related sanctions that targeted, *inter alia*, KAA, KAA affiliate PGPIC (also an IRGC front), and the IRGC's monopoly on Iran's oil and gas sector:

> OFAC … act[ed] … against Iran's largest and most profitable petrochemical holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for providing financial support to Khatam al-Anbiya …, the engineering conglomerate of the [IRGC]. In addition to PGPIC, OFAC is designating PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-based sales agents. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports.

> "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC," said Treasury Secretary Steven T. Mnuchin. "This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

> "The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities," said Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker.

> The IRGC and its major holdings, such as … Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses. The profits from these activities support the IRGC's full range of nefarious activities, including … support for terrorism ….

> In 2018, Iran's Ministry of Petroleum awarded the IRGC's Khatam al-Anbiya ten projects in oil and petrochemical industries worth the equivalent of 22 billion dollars, a value four times the official budget of the IRGC.

332. On July 6, 2022, the United States imposed additional counterterrorism sanctions targeting the IRGC through KAA, PGPIC, and their affiliates under Executive Order 13,846.

333. On September 15, 2023, Treasury imposed counterterrorism sanctions "pursuant to E.O. 13224" upon "Abdolreza Abedzadeh" who was "the newly appointed Commander" of KAA, and confirmed that KAA continued to enable IRGC attacks through at least 2022 when it observed that "the U.S.-designated Khatam ol Anbia Gharargah Sazandegi Nooh (Khatam al-Anbiya Construction Headquarters) [is] an IRGC-controlled construction conglomerate that undertakes multi-billion-dollar projects in the oil, petrochemical, and various infrastructure sectors, generating revenue for the IRGC and expanding its control across multiple industries."

334. From 2009 through 2024, senior Qods Force leader Rostam Qasemi led, or helped lead, KAA. On November 17, 2017, the United States designated Qasemi as an SDGT when it also designated the entire IRGC as an SDGT.

335. The U.S. government and U.N. statements confirming KAA's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that KAA was closely intertwined with terrorist violence because the Qods Force and Hezbollah used KAA's profits to finance terrorist attacks.

336. KAA was a front for the Qods Force, Hezbollah, and such FTOs' proxies. Thus, funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by KAA through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, KAA inevitably flowed through KAA to reach the Qods Force and Hezbollah and, through them, to Hamas and JAM, to provide the funding, weapons, intelligence, and logistics that enabled IRGC-

sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

337. SCB always knew the above facts. Among other reasons, Treasury sanctions designations alerted financial institutions, like SCB, that its transactions with, and value flow-through to, KAA fueled IRGC-sponsored acts of terrorism.

338. KAA was never a normal company: it was fully captured by the IRGC, led by, and comprised of, avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, PIJ, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq

## 2. National Iranian Oil Company (NIOC)

339. NIOC was the entity responsible for exploring and exporting Iran's oil. It was a government-owned business overseen by the Iranian Ministry of Petroleum, and it exercised a monopoly over the petroleum trade in Iran and with respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas). NIOC had affiliates, including the Naftiran Intertrade Company Ltd. ("NICO"), to handle much of its overseas trade.

340. By no later than 2007, the IRGC seized NIOC and converted it to an IRGC front. Since the IRGC seized NIOC, NIOC's express purpose has always been the same: to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. From 2009 onward, NIOC was a notorious front for Hezbollah and the Qods Force, which relied upon NIOC to help finance acts of terrorism committed by Hezbollah, Hamas, PIJ, and other IRGC proxies. Accordingly, NIOC was not a normal oil company: it was fully captured by the IRGC and

operated for the benefit of the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the United States.

341. At all relevant times, NIOC provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM. NIOC did so by directing funds to the IRGC through a web of contracting arrangements with other IRGC businesses. NIOC's revenues thus flowed through to the IRGC, the Qods Force, and Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including to JAM in Iraq and to Hamas and PIJ in Israel.

342. The nexus between NIOC and IRGC-sponsored attacks committed by Hezbollah, Hamas, and PIJ was especially tight because NIOC's shipments, oil, gas, and profits comprised one of the IRGC's primary means of paying their North Korean allies in the RGB so that the IRGC could trade such NIOC goods and services to the RGB and, in return, receive North Korean weapons, training, and technical support for delivery to, and on behalf of, IRGC proxies Hezbollah, Hamas, and PIJ.

343. NIOC notoriously owned a wide array of companies in the Iranian oil, gas, construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such notorious IRGC fronts, through NIOC, included, but were not limited to: (1) NICO; (2) Petropars Ltd. ("Petropars"); and (3) IOEC, which was a joint venture between NIOC and Idro, a subsidiary of the Iranian Ministry of Heavy Industry, in which KAA also had a stake. As such, the IRGC fully controlled IOEC like it did NIOC.

344. NIOC's investment in South Pars was a notorious front for Iran-backed proxy attacks committed by Hezbollah, Hamas, and PIJ. On November 3, 1997, for example, Senator

Sam Brownback, who chaired the Senator Foreign Relations Subcommittee relating to Iran at the time, publicly warned:

> In the foreign policy arena, there are few hard and fast rules. One of them is this: American investors should not fund Iranian ballistic … missile development. And yet, that is essentially the deal that the Russian company Gazprom will be offering to unsuspecting American investors when it launches a new convertible bond … to invest $2 billion in Iran's South Pars gas field.
>
> The South Pars deal poses two big problems. First, by providing a steady stream of new revenues, it will help finance Tehran's … terrorist activities. Iran is a terrorist nation. It is committed to undermining the Middle East peace process [between Israel and Palestinians], wreaking death and destruction in Lebanon and on the South Lebanese border, and acquiring a nuclear capability. By exploiting Iran's South Pars field and helping Tehran foot the bill for terrorist activities, Gazprom will be squarely on the side of the terrorists.
>
> Second, the deal runs afoul of the Iran-Libya Sanctions Act (ILSA). ILSA limits investment in the Iranian energy sector to $40 million a year and provides sanctions for companies that exceed the limit. ILSA's underlying premise is simple: Assisting Iran's energy sector means financing a campaign against Mideast peace and stability. …
>
> If there is money to be made on such a venture, it is blood money. Gazprom is short on the cash it needs for investments such as South Pars. The company is planning to get U.S. investors to pony up by selling convertible bonds on Wall Street. …
>
> We should not stand by and watch U.S. … dollars bankroll an enterprise that subsidizes barbarism in the Middle East and is a threat to world peace. Trading peace for profit is a lousy investment.

345.    High-profile investigations confirmed in real-time that the Qods Force used NIOC-related transactions to provide cover for IRGC weapons purchases, and alerted SCB to the same. In 2004 and 2005, for example, the Ukrainian government brought high-profile charges that targeted IRGC weapons purchases routed through Ukrainian middlemen in which the IRGC used NIOC, which prompted a wave of reports by the global press alerting SCB to the risk. On March 26, 2005, for example, the BBC reported that prominent Ukrainian member of parliament Hryhoriy Omelchenko publicly "point[ed] out … that 'a bogus contract between the Iranian company SATAK Co. Ltd of NIOC [*i.e.*, National Iranian Oil Company] and Hyder Sarfraz's S.H. Heritage Holding Limited for the supply of gas turbine equipment for oil refineries was

used to cover the accounts for the missiles smuggled into Iran'." In 2009, similarly, authorities in Thailand interdicted an aircraft transporting a shipment containing 35 tons of explosives and weapons, including RPGs, which the IRGC – through NIOC oil – had purchased from the RGB, and which the IRGC was subsequently smuggling – through an aircraft cloaked with the cover of a NIOC-related purported end user from Iran that was ostensibly purchasing oil drilling equipment, which was ultimately destined for delivery to Hezbollah, Hamas, and PIJ. The foregoing was major international news from 2009 through 2011, and prompted waves of reporting both years concerning the above facts.

346.    United States designations and reports repeatedly confirmed that NIOC-related transactions powered IRGC-sponsored violence. On November 26, 2008, Treasury "identified the National Iranian Oil Company (a.k.a. NIOC), Naftiran Intertrade Company Ltd. (a.k.a. NICO), and Naftiran Intertrade Co. Sarl as entities owned or controlled by the Government of Iran," and warned (emphases added):

> The inclusion of the National Iranian Oil Company, Naftiran Intertrade Company Ltd., and Naftiran Intertrade Co. Sarl marks the first non-financial institutions to be added to the appendix. Moving forward, OFAC will continue to list both financial institutions and other entities that are determined to be owned or controlled by the Government of Iran.
>
> While the ITR do not impose an asset freeze, they do prohibit most commercial and financial transactions with entities owned or controlled by the Government of Iran, regardless of where such entities are located or incorporated. ***Most transactions with any branches or subsidiaries of these entities are also prohibited***, regardless of where such branches or subsidiaries are located and incorporated.
>
> This appendix serves as a tool to ***assist U.S. persons in complying*** with the ITR. The identified entities are considered to be owned or controlled by the Government of Iran when they operate not only from the locations listed in the appendix, but also from any other location. The ITR prohibitions apply to all entities owned or controlled by the Government of Iran, regardless of where they are located or incorporated, even if they are not listed in the appendix. The prohibitions in the ITR also apply to transactions with entities located in Iran that are not owned or controlled by the Government of Iran.

Naftiran Intertrade Company Ltd. is a subsidiary of the National Iranian Oil Company that is registered in the United Kingdom and located in Jersey, Channel Islands, United Kingdom. NICO, in turn, has a subsidiary, called Naftiran Intertrade Co. (NICO) Sarl, which is incorporated and located in Switzerland. The ITR prohibit most transactions with NIOC, NICO and NICO Sarl, in any locations worldwide, because these companies are entities owned or controlled by the Government of Iran.

347.     On June 16, 2010, Treasury sanctioned NIOC's subsidiaries, and their associated investments, including Petropars, again warning that the IRGC seized Iran's energy sector.

348.     On November 15, 2011—the same day SCB helped the IRGC evade imminent U.S. sanctions targeting its oil sector—terrorism experts testified to Congress that "NIOC operates as the ultimate front company obscuring the role of the IRGC in the oil trade," and warned of deepening ties between NIOC and the IRGC. Expert organization United Against Nuclear Iran ("UANI") wrote that "working with NIOC and the IRGC" would "directly contribut[e] to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs"—for example, by bankrolling "groups in Iraq … that execute attacks against American and NATO servicemen" while "being actively supported by Iran." The United States responded by increasing sanctions pressure on the IRGC to prevent the IRGC from using oil revenues to support terrorism.

349.     On December 31, 2011, Congress in the 2012 National Defense Authorization Act blacklisted CBI/Markazi. Congress also, with limited exceptions, subjected to sanctions foreign financial institutions doing any significant financial transactions with CBI/Markazi, as well as several other IRGC-affiliated financial institutions. These sanctions were imposed because CBI/Markazi—which was a principal repository of Iranian oil revenue—was participating actively in the IRGC's illicit transactions, including transferring funds used to

support IRGC-backed terrorism. Through this legislation, Congress reaffirmed the connection between Iranian oil revenue and IRGC terrorism.

350.    In August 2012, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), Section 312 of which directed Treasury to determine whether NIOC was acting as an agent or affiliate of the IRGC. A month later, Treasury publicly announced that the answer was "yes."

351.    The finding that NIOC was effectively a front for the IRGC triggered additional sanctions on NIOC. Specifically, under the ITRSHRA, NIOC was sanctioned for providing support to the IRGC. And under CISADA and the Iranian Financial Sanctions Regulations, foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC were subject to sanctions, including the prohibition or imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States.

352.    NIOC was also listed on the Specially Designated Nationals ("SDN") list (a list of sanctioned entities), specifically with an "IRGC" identifier after its name. As the Foundation for Defense of Democracies explained on September 23, 2012 after Treasury's determination, "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization and nuclear proliferator."

353.    By threatening to cut foreign financial institutions off from the U.S. financial system if they continued to deal in any significant way with CBI/Markazi and NIOC, these sanctions essentially forced foreign financial institutions to choose between dealing with IRGC fronts, or maintaining access to U.S. dollar trading—and prompted most financial institutions to

curtail their services for IRGC companies. This made it extremely difficult for the IRGC to access revenue from its oil sales, and also to access the international financial system.

354.    On September 24, 2012, Treasury sanctioned NIOC as an "agent or affiliate" of the IRGC.

355.    On May 31, 2013, Treasury sanctioned NIOC subsidiaries as part of a package that "Target[ed] the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> As part of its ongoing efforts to intensify sanctions pressure on Iran, … Treasury took a series of related actions to disrupt efforts to evade sanctions on the Iranian regime … [and] sanctioned a company that has aided Iran's efforts to evade sanctions by attempting to conceal oil transactions with the Government of Iran … These actions, which were taken under a number of different authorities, apply sanctions to companies operating in several countries that are aiding Iran's support for terrorism ….
>
> Treasury…, acting in concert with … State, … act[ed] … to target Iran's petrochemical industry. As Iran's oil revenues continue to fall due to international sanctions, the Iranian government has increasingly turned to other industries to make up for lost profits. One of these sectors is the petrochemical industry, which is now the second largest source of revenue for the Iranian Government. The Administration is taking action today to target this revenue stream by both designating companies involved in transactions with the sector and identifying several petrochemical companies as subject to sanctions because they are controlled by the Iranian government.
>
> "We are committed to intensifying the pressure against Iran, not only by adopting new sanctions, but also by actively enforcing our sanctions and preventing sanctions evasion. Today's actions take aim at revenues from Iran's petrochemical sector, as well as deceptive schemes Iran has employed in an effort to evade sanctions on its oil sales and its airlines," said Treasury Under Secretary for Terrorism … David S. Cohen. …
>
> Treasury … is also identifying eight Iranian petrochemical companies that are owned or controlled by the Government of Iran, including Bandar Imam Petrochemical Company, Bou Ali Sina Petrochemical Company, Mobin Petrochemical Company, Nouri Petrochemical Company, Pars Petrochemical Company, Shahid Tondgooyan Petrochemical Company, Shazand Petrochemical Company, and Tabriz Petrochemical Company. These identifications made pursuant to E.O. 13599, which targets the government of Iran.

356. The United States has confirmed that the Iranian regime used profits from NIOC and its affiliates, including NICO, to fund terrorist attacks by IRGC proxies. For example, in 2018, Executive Order 13,846 included the finding that "financial, material, or technological support for, or goods or services in support of, the National Iranian Oil Company" and "Naftiran Intertrade Company" directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

357. In 2020, Treasury reiterated its 2012 finding that NIOC was an IRGC agent, and commercial transactions with NIOC foreseeably enabled IRGC-sponsored terrorist attacks committed by its proxies. On January 23, 2020, for example, OFAC described NIOC as "instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) and its terrorist proxies," necessarily including Hezbollah, Hamas, PIJ, and JAM. In that same release, the Treasury Secretary commented that "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities," *i.e.*, IRGC-sponsored acts of terrorism targeting the United States and committed by one or more IRGC proxy.

358. On October 26, 2020, OFAC designated NIOC's related Ministry, the Iranian Ministry of Petroleum, and NIOC's subsidiary, NICO, among others, under E.O. 13,324 (counterterrorism) "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil," and the Treasury Secretary observed that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF," *i.e.*, acts of terrorism targeting the United States, which was a required finding for

the legal designation announced. Treasury justified the counterterrorism sanctions against NIOC under E.O. 13,324 by observing that NIOC services were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States, finding, *inter alia*, that: (1) "Senior NIOC … personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF" through, inter alia, IRGC-controlled "front companies"; and (2) "NIOC" facilitated "oil deals used to generate revenue for the IRGC-QF and Hizballah" through its "coordination" with such terrorists by working with the IRGC-QF, Hezbollah, and NITC to route IRGC-QF oil to Hezbollah through trades in other Middle Eastern countries to raise funds for Hezbollah and the Qods Force to distribute to IRGC proxies to sponsor acts of terrorism targeting the United States.

359.    The U.S. government statements confirming NIOC's direct connection to IRGC sponsored, proxy-committed acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources confirm that NIOC was closely intertwined with terrorist violence because the IRGC used revenues from NIOC oil sales to finance terrorist attacks.

360.    Given NIOC's status as a front for the Qods Force, Hezbollah, and such FTOs' proxies, funds obtained by NIOC through its or its controlled companies' and/or investments' (including Petropars') commercial transactions, resources, and profits with, or generated by, NIOC inevitably flowed through NIOC to reach the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM, to finance Hezbollah and the Qods Force's provision of fighters,

funds, and weapons that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

361. NIOC ceased to be a normal oil company by 2007, when the IRGC completed its capture of NIOC and thereafter operated NIOC for the benefit of the IRGC's mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 3. National Iranian Tanker Company (NITC)

362. NITC was responsible for transporting NIOC's oil. It was a government-owned business overseen by the Iranian Ministry of Petroleum, and it exercised a monopoly over the transportation aspects of petroleum trade in Iran and with respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas).

363. By 2007, the IRGC took control of NITC by seizing its sole customer, NIOC, and the IRGC has controlled NITC as an IRGC front ever since. Since the IRGC seized NITC in 2007, NITC's purpose—like NIOC's—has been to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of terrorism targeting the United States. From 2009 onward, NITC has been a notorious front for Hezbollah and the Qods Force, which relied upon NITC to help finance acts of terrorism committed by Hezbollah, Hamas, PIJ, and other IRGC proxies. Accordingly, NITC was not a normal oil tanker company: it was fully captured by the IRGC, and operated for the benefit of, the IRGC's mission, *i.e.*, sponsoring acts of terrorism targeting the United States.

364. At all relevant times, NITC provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM. NITC did so by coordinating oil shipments with NIOC, the

Qods Force, and Hezbollah to flow funds to the Qods Force, Hezbollah, and their proxies through NIOC's web of contracting arrangements with other IRGC businesses, all of which depended upon NIOC's ability to reliably export IRGC-QF owned oil, in contravention of U.S. counterterrorism sanctions, to customers outside of Iran. NITC's conduct was thus intended to, and did, flow tens of millions in revenues through NIOC to the IRGC, the IRGC-QF, and Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas and PIJ).

365. On May 31, 2013, Treasury imposed sanctions on NITC to "Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> Treasury imposed sanctions on [a European firm] because it has facilitated deceptive transactions for or on behalf of the [NITC], which was identified by Treasury as a Government of Iran entity in July 2012. This Treasury action is the first use of sanctions pursuant to Executive Order (E.O.) 13608, which targets Foreign Sanctions Evaders, including those that facilitate deceptive transactions for or on behalf of persons sanctioned in connection with Iran …
> In March 2013, Ferland and NITC cooperated in a scheme to sell Iranian crude oil deceptively in order to help Iran evade international sanctions …. The scheme involved ship-to-ship transfers of oil between three oil tankers … working on behalf of Iran in March 2013. …

366. The United States has confirmed that the Iranian regime used profits generated by NITC to fund terrorist attacks by Hezbollah, Hamas, PIJ, and JAM. On August 6, 2018, for example, Executive Order 13,846 included findings that "financial, material, or technological support for, or goods or services in support of, the National Iranian Oil Company (NIOC)" including services provided by any "person" who was "a part of the energy, shipping, or shipbuilding sectors of Iran"—all of which described NITC—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

367.     In 2020, Treasury confirmed that NITC, like NIOC, was an IRGC agent, and commercial transactions with NITC foreseeably enabled IRGC-sponsored terrorist attacks committed by IRGC proxies. On October 26, 2020, for example, OFAC designated NITC "for [its] financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he cooperation and coordination between the IRGC-QF and [NITC] extends well beyond the simple sale of oil," and the Treasury Secretary himself observed that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF"—*i.e.*, acts of terrorism targeting the United States, which was a required finding for the legal designation announced. Treasury justified the counterterrorism sanctions against NITC by observing that NITC services were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States by finding, *inter alia*, that: (1) "Senior … NITC personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF" through, *inter alia*, IRGC-controlled "front companies"; and (2) "NITC has also played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on logistics and pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group representative Viyan Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC."

368.     Treasury's decision to not characterize NITC as an IRGC "agent or affiliate" 2012 was based on its narrow definition of "agent or affiliate," for which only direct agency mattered.

Treasury thus deemed NIOC an IRGC agent, but it did not deem NITC an IRGC agent. In practice, however, transacting with NITC was no different than transacting with NIOC directly: NITC was always a known NIOC agent, and NIOC was always NITC's only customer. Accordingly, when Treasury declined to formally confirm that NITC was an IRGC "agent or affiliate" for purposes of complying with an edict from Congress, SCB knew that such decision did not authorize its NITC-related transactions because SCB understood that NITC was an agent for NIOC and NIOC was an agent for the Qods Force and Hezbollah.

369. The U.S. government statements confirming NITC's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that NITC was closely intertwined with terrorist violence because the IRGC used revenues from NITC shipments, including but not limited to the profits NITC itself realized as well as the income NITC helped other IRGC fronts, including NIOC, earn, to finance terrorist attacks.

370. Given NITC's status as a front for the Qods Force, Hezbollah, and such FTOs' proxies, including Hamas and PIJ, funds obtained by NITC through its or its controlled companies' and/or investments' commercial transactions, resources, and profits inevitably flowed through NITC to reach the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM, to finance Hezbollah and the Qods Force's provision of fighters, funds, and weapons that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

371. NITC was no longer a normal company by 2007, when the IRGC had completed its capture of NITC's only customer, NIOC, and the IRGC thereafter operated NIOC, and by

extension NITC, to sponsor terrorist attacks targeting the United States to coerce U.S.

government decisionmakers in the United States to exit the Middle East and abandon its allies

there, including Israel and Iraq.

### 4. Caspian Petrochemical

372.     Caspian Petrochemical FZE, inclusive of its predecessor entity, the Iranian

Petrochemical Company (collectively, "Caspian Petrochemical") helped ship petroleum

products, including oil and gas, that IRGC energy fronts extracted from IRGC-controlled areas,

including the IRGC's South Pars field and the IRGC's energy claims in the Caspian Sea. (Unless

otherwise indicated, all references to Caspian Petrochemical in this Complaint are inclusive of its

predecessor entity, and inclusive of such entity's conduct from at least 2007 through 2011, when

the IRGC rebranded it as "Caspian Petrochemical.")

373.     Caspian Petrochemical was subordinate to the Supreme Leader's Office, via SLO

entity Petro Nahad, and handled much of the Iranian regime's overseas oil and gas shipments.

374.     By no later than 2007, the SLO and IRGC seized Caspian Petrochemical's

predecessor when they seized their monopoly in the Iranian energy sector. The SLO and IRGC

have controlled Caspian Petrochemical as an IRGC front ever since. Since being seized by the

SLO and IRGC, Caspian Petrochemical's express purpose has always been to source funds and

weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to

use to commit acts of international terrorism targeting the United States. From 2007 onwards,

Caspian Petrochemical was a known front for Hezbollah and the Qods Force (given Caspian

Petrochemical's responsibility for shipping the IRGC's most lucrative financial asset). Hezbollah

and the Qods Force relied upon Caspian Petrochemical to help finance acts of terrorism

committed by Hezbollah, Hamas, and other IRGC proxies. Caspian Petrochemical was not a

normal energy or shipping company: it was fully captured by the IRGC, and it supported the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the United States to export the Islamic Revolution.

375. At all relevant times, Caspian Petrochemical provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM. Caspian Petrochemical did so by directing funds to the IRGC through a web of contracting arrangements with other IRGC businesses. Caspian Petrochemical's revenues thus flowed through to the IRGC, the Qods Force, and Hezbollah— and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas and PIJ).

376. Caspian Petrochemical was never a normal company: it was fully captured by the IRGC, led by, and comprised of, avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 5. Euro African Group Ltd. (EAGL) and the Bazzi Network

377. The Bazzi network, and its primary holding company, Euro African Group Ltd. (EAGL) is a group of individuals and companies led by Muhammad Bazzi that leveraged Hezbollah's West African presence, which dates back to the group's inception. Bazzi developed a partnership with the then-President of Gambia, Yahya Jammeh. By the time Bazzi arrived in Gambia in the early 2000's, Jammeh was a notoriously corrupt and brutal dictator. All told, they extracted nearly $1 billion from Gambia, one of the poorest countries in the world.

378.     While telling the public they were free-market entrepreneurs, Bazzi network entities would provide bribes and side-payments to Jammeh, who would force Gambian agencies to give contracts and privatization deals to Bazzi's firms. These sham privatizations also allowed Hezbollah to convert illicit cash into licit, state-sanctioned corporate holdings. Within just a few months of their incorporation, Bazzi's previously unheard-of companies had secured monopolies on essential imports like oil, fuel, and electrical generator equipment.

379.     Even with public disclosure of these dealings, clear evidence of massive corruption, and Bazzi's role in Hezbollah, Jammeh and Bazzi became more brazen—and banks, including Standard Chartered—continued to enable their schemes. Bazzi introduced other members of his network to Jammeh and brokered similar deals. This enabled Bazzi and other Hezbollah financiers to take over the country's public utilities, as well as its telecommunications sector. Hundreds of millions of dollars in taxes, utility payments, and cash from pension funds vanished into the Bazzi network's companies.

380.     Despite readily available public information documenting Bazzi's role in organized crime, corruption, and terrorist finance, SCB provided banking services to Bazzi network entities until at least 2012, and made rent payments to Bazzi's Gambian business partner, a Jammeh henchman, until at least 2017. OFAC designated Bazzi's associate Ali Youssef Charara and his telecoms companies as SDGTs on January 7, 2016. Bazzi, EAGL, and its subsidiaries were designated SDGTs on May 17, 2018, confirming both his corrupt dealings with Jammeh, and his longstanding ties to Hezbollah's narcotics and money laundering operations. On September 20, 2024, in the Eastern District of New York, Bazzi pleaded guilty to conspiracy to conduct and to cause United States persons to conduct unlawful transactions with an SDGT.

### 6. Tajco, Ltd. and the Tajideens

381. According to Treasury's designation of Tajco on December 9, 2010, Tajco is a "multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen. As of February 2007, Kassim Tajideen owned Tajco and used proceeds from this business to provide millions of dollars in financial support to Hizballah. Husayn Tajideen, co-owner of Tajco Ltd in The Gambia, serves as the company's managing director. Ali Tajideen and Kassim Tajideen were business partners and co-owners of Tajco Sarl, operating as Tajco Company LLC in Tyre, Lebanon, with Ali Tajideen serving as the managing partner."

382. On May 27, 2009, one of the co-owners, Kassim Tajideen, was designated by Treasury for supporting Hezbollah. The press release explained that "Kassim Tajideen and his brothers run cover companies for Hizballah in Africa." Another one of Tajco's co-owners, Ali Tajideen, was a "major player" in Jihad al-Bina, a Lebanon-based Hezbollah-run construction company designated by Treasury on February 20, 2007. The Tajideen family was also linked to diamond smuggling to launder money for Hezbollah, as well as land purchases in Lebanon for Hezbollah.

383. SCB Gambia and SCB Dubai helped Hezbollah front Tajco Ltd. access the international financial system from at least 2008-2010 to finance terrorist attacks, knowing it was co-owned by the Tajideen brothers, who had multiple businesses acting as fronts to provide funding and resources to Hezbollah.

**IV.    Since 1982, Iran's Terrorist Sponsors Have Partnered With Their Lebanese, Palestinian, And Iraqi Proxies To Target The United States**

384.    When the Iranian Terror Sponsors established Hezbollah in 1982, they inaugurated the IRGC's modern history of anti-American terrorism, for which Hezbollah was always the most important variable. The subsequent history since 1982 was replete with examples of the same terrorists involved in the attacks decades ago also facilitated attacks against Plaintiffs. Indeed, as the United States found in 2018, since "the early days of the revolution …, the one constant is that the Iranian regime will do whatever it takes to … spread its revolutionary ideology … primar[ily] … [through] the Islamic Revolutionary Guard Corps (IRGC)." In 2018, State found that, "[s]ince 1979, Iran's Islamic Republic has made it a policy of state to actively direct, facilitate, and carry out terrorist activity globally." Thus, as State found in 2018, "[f]or 40 years, the … Revolutionary Guard Corps has actively engaged in terrorism and created, supported, and directed other terrorist groups." As U.S. official Brian Hook explained on April 8, 2019: "When you study their 40-year history, it's impossible to allow the IRGC to continue to operate under this fiction that it's a benign part of the Iranian Government …, and it has been that way for decades." Equally unmistakable: that such terrorism increased alongside the IRGC's control of Iran's economy; as the DIA reported in 2019, "[t]he past 40 years have seen a growth in … increased IRGC political influence and control of key economic sectors."

385.    In 2015, Suzanne Maloney of the Brookings Institution observed: "It is tempting to view the Islamic Republic in isolation from its antecedents. … However, … [t]he salience of Iranian history requires that" even a "primary focus on the postrevolutionary era" in Iran should "begin as any serious analysis of contemporary Iran must, with an examination … of the long history of the Iranian state and the evolution of the economic and political conditions." To that end, Plaintiffs briefly identify key events in Iranian history that, among other things, confirm the

plausibility of Plaintiffs' allegations and demonstrate a longstanding IRGC pattern and practice relevant to Plaintiffs' claims. Beyond that, these key events alerted SCB as to the nature of their counterparties and/or the ultimate beneficial owners of the transactions SCB facilitated.

386.    On October 23, 1983, Hezbollah detonated a massive bomb provided by the IRGC, which killed 241 U.S. military personnel in a terrorist attack against the Marine Corps barracks in Beirut, Lebanon. On July 21, 1987, while discussing this attack in Iranian media, Rafiqdoost famously boasted that he and the IRGC directly enabled this attack: "The U.S. felt our power and knows the explosives mixed with that ideology that sent 400 officers and soldiers to Hell. Both the TNT and the ideology came from Iran. This is very much obvious for the U.S."

387.    On December 12, 1983, Hezbollah and the IRGC jointly committed another audacious attack targeting the United States, this time by bombing America's embassy in Kuwait. For this attack, Hezbollah and the IRGC worked closely with Abu Mahdi al-Muhandis, a dual Iranian-Iraqi national and Hezbollah/IRGC asset, who would later play a key leadership role in Jaysh al-Mahdi.

388.    On August 20, 1988, the Iran-Iraq War ended. On June 3, 1989, Khomeini died, leaving the Islamic Republic without a Supreme Leader and the IRGC without an overall commander. These two rapid-fire events produced a power contest in Iran, in which there was no clear successor. In this mix, IRGC Brigadier General Ali Khamenei emerged as the IRGC's and hardline clerics' preferred candidate to succeed Khomeini. There was only one hitch: Khamenei did not have Khomeini's religious credentials, while the competition did. Khamenei had a simple solution: he threw his lot in with the IRGC, leaned heavily on them, and effectively promised a partnership with the IRGC if they backed his play. The IRGC did, and Khamenei succeeded

Khomeini as Supreme Leader and overall commander of the IRGC and Hezbollah, a role that Khamenei has held ever since.

389.     During this period in 1989, Khamenei wooed the IRGC by promising several structural changes in how the Iranian regime would sponsor terrorism when he was Supreme Leader. *First*, Khamenei would direct a massive expansion of the IRGC's role in Iran's economy, as a vehicle for allowing the IRGC to self-finance its operations. (As part of this effort, Khamenei later approved the creation of IRGC megafirm Khatam al-Anbiya in or about late 1989 or early 1990.) *Second*, Khamenei would greatly expand the share of Iranian regime resources devoted to IRGC sponsorship of terrorism abroad, including through the IRGC's newly created (in 1989) Qods Force. *Third*, Khamenei would greatly expand the Iranian regime's alliance with Palestinian terrorists, including the newly created group Hamas. Khamenei delivered on each of these promises and has enjoyed an ironclad, inseparable bond with the IRGC ever since.

390.     In 1990, Khamenei determined that the IRGC was not spending enough of the money its fronts and charities raised on the IRGC's mission, *i.e.*, sponsoring terrorist attacks to drive the United States out of the Middle East. To remedy this, and to optimize the amount of cash the Iranian regime could supply to its proxies, including Hezbollah, Hamas, and PIJ, Khamenei created a new organization: the Supreme Leader's Office.

391.     Throughout the 1990s, the IRGC and the SLO gradually expanded their role in Iran's economy while, in parallel, the IRGC intensified its attacks targeting the United States worldwide, including in Europe, the Middle East, and Africa, among other places.

392.     In 1999, Khamenei tripled down on his support for Palestinian terrorists, including Hamas and PIJ, by greatly expanding the already sizeable aid the SLO and IRGC sent

them; by some estimates, the Iranian regime was supplying Hamas with $50 million annually by 2000. By 2001, Hamas and PIJ leadership regularly visited Iran, had their own offices provided by the IRGC, and coordinated Hamas and PIJ operations in Israel from Iran by collaborating with representatives of the SLO, IRGC, and Hezbollah who were based there.

393.    In June 2002, Khamenei met with Palestinian terrorists on the sidelines of an Iranian-sponsored conference in Tehran explicitly designed to support Palestinian terrorist attacks against Israelis that were known as the *intifada*. As Dr. Matthew Levitt reported in his 2007 book on Hamas:

> Khamene'i pledged to … increase … funding by 70 percent "to cover the expense of recruiting young Palestinians for suicide operations." U.S. officials note that in the period following the onset of violence in September 2000, Tehran instituted an incentive system in which millions of dollars in cash bonuses … were conferred … for successful attacks. Tehran often demands of its terrorist beneficiaries videotapes or other evidence of successful attacks.

394.    By the fall of 2002, Khamenei and the IRGC correctly anticipated a U.S. military intervention in Iraq the following year. Accordingly, on September 9, 2002, Khamenei convened Iran's Supreme National Security Council in Tehran, which concluded, "It is necessary to adopt an active policy in order to prevent long-term and short-term dangers to Iran" from the imminent American occupation of Iraq next door. Thereafter, the IRGC, including its Qods Force, and the SLO worked closely with Hezbollah to stand up a Shiite terrorist organization in Iraq that was modeled after Hezbollah, trained by Hezbollah, and functioned as Hezbollah's notorious Iraqi branch, in effect.

395.    By late April 2003, the United States had invaded Iraq and deposed Saddam's regime. By then, Hezbollah had already worked with Muqtada al-Sadr to create JAM, which always tightly collaborated with Hezbollah thereafter.

396.     To finance this escalated campaign of terrorism, on June 8, 2003, the Iranian regime published an official directive ordering the IRGC to dedicate the profits it earned from its commercial fronts to its core mission, *i.e.*, protecting and exporting the Islamic Revolution through acts of terrorism ("Logistics Policy Directive"). The Logistics Policy Directive provided that with respect to the profits derived from whenever "any unit" of "the Islamic Revolutionary Guard Corps … and related organizations … sign[ed] contract agreements for civil projects," "[t]he monies received from any [such IRGC-related] contract … shall be deposited to the Chancery, and its equivalent shall be placed at authority of the [IRGC] from the credit determined in the annual budget, so that it would be used for the costs related to the [IRGC-related] contract, also the strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for its operations, *i.e.*, terrorism. Moreover, under the Directive, the IRGC "can, proportionally to [the IRGC's] needs, exchange or sell excess material, and equipment and machinery" to finance IRGC operations.

397.     At bottom, the Logistics Policy Directive established—and was known by SCB to establish—an ironclad rule: the IRGC was authorized and encouraged to act as contractors in development schemes, subject to the requirement that any profit would be used to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, the IRGC's central anti-American terrorist mission under Iran's constitution. As a result, IRGC profits were required under Iranian law to be reinvested in the IRGC's specific lanes of activity that supported terrorism. The Logistics Policy Directive, in effect, mandated that IRGC profits derived from IRGC fronts be used primarily to enable IRGC-sponsored terrorism by providing off-the-books funding sources for key IRGC weapons programs—the entire point of the Logistics Policy Directive in the first place.

398.     From June 2003 through the present, the Logistics Policy Directive was always in force, always applied to profits generated for IRGC front companies by SCB, and always required that such IRGC profits be dedicated to sponsoring acts of terrorism.

399.     SCB knew about the Logistics Policy Directive because, among other reasons, SCB's Iranian personnel knew about it, SCB's in-house compliance and intelligence personnel knew about it, SCB was familiar with basic Iranian government pronouncements as part of its country-related diligence, and because media reports from at least 2007 onward alerted SCB to such fact because such reports regularly described the Directive as a potential IRGC-related compliance challenge for companies contemplating partnerships with IRGC-controlled entities.

400.     In October 2007, for example, Iran scholar Ali Alfoneh reported the sum and substance of Logistics Policy Directive and explained that the Directive was intended to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, IRGC-sponsored acts of terrorism.

401.     On May 25, 2010, likewise, Iranian expatriate media outlet *Peyk-e Iran* reported (as translated from Farsi) that "the IRGC … gradually expanded its power and influence since 1979" through fronts like "Khatam ol-Anbiya['s] … projects extended across weapons manufacturing, petrochemical plant, dams and bee-keeping, reflecting Iranian economy's dominance by a military-mafia institution," for which "the Logistics Directive" served "as a component of this expansion" because the Directive was an "'order that all IRGC units … must participate in civil projects as contractors,'" upon which the IRGC relied to assert the "IRGC's dominance in security … institutions, and IRGC companies' influence" through "IRGC-controlled companies" that controlled Iran's energy and communication sectors.

402.     Returning to the timeline, in 2005, while Khamenei and the IRGC were

sponsoring the murder of Americans in Iraq, they also seized an opportunity in Israel.

Specifically, by September 22, 2005, the Israeli government had fully withdrawn Israeli forces

from their positions inside Gaza, ceding administration of the area to Palestinians. Khamenei, the

IRGC, and SLO wasted no time: working through Hezbollah, they sponsored a massive surge of

resources to Hamas to ensure that it could seize control of Gaza and turn it into an Iranian

striking base directly under what the regime perceived to be Israel's soft underbelly. Within a

year, the pace of Hamas attacks against Israeli civilians escalated dramatically, as a direct result

of the Iranian regime's sponsorship.

403.     On June 7, 2007, Hamas launched a terrorist campaign to seize control of the

Gaza Strip. Seven days later, Hamas's killings had done their job, and Hamas assumed clear

control of all of Gaza. Immediately, it was apparent to the U.S. government—and SCB—that the

Iranian regime was behind Hamas's attacks. In 2021, for example, Hamas scholar Jonathan

Schanzer observed, in looking back on this era, that:

> Iran was widely suspected of being behind the orchestrated assault in Gaza.
> Iranian assistance had likely helped Hamas build tunnels and train fighters.
> Authors Beverly Milton-Edwards and Stephen Farrell were able to establish that
> Iranian support increased "exponentially" after the 2006 elections. Senior Hamas
> leader Mahmoud al-Zahar later admitted that Iran had given him $22 million in
> cash in 2006. Months before the Gaza takeover, Yuval Diskin, the head of Israel's
> Shin Bet, noted, "We know that Hamas has started to dispatch people to Iran, tens
> with the promise of hundreds, for months and maybe years of training." … Hamas
> leaders also later admitted that the group's fighters received training in Iran.
>
> During this time, the US government strove to prevent the flow of cash
> from Iran to Hamas. In July 2007, the US Treasury Department issued sanctions
> against Iran's Martyr's Foundation for funneling money from Iran to Hamas,
> among other groups. Later that year, Treasury targeted Iran's Quds Force and
> Bank Saderat for funding Hamas, along with Hezbollah and PIJ. Through these
> designations, Treasury's message was clear: Iran was providing Hamas with
> significant financial support.

404.    Meanwhile, in Iraq in 2007, the IRGC and SLO worked closely with Hezbollah—which served as their face, agent, and primary interlocutor with JAM—to intensify terrorist attacks targeting the United States there. Among other things, they intensified JAM's deployment—under Hezbollah's in-country supervision—of explosively formed penetrators, a bomb type that the U.K. government concluded in 2005 was associated "exclusively" with Hezbollah, meaning that Hezbollah played a direct role in every attack in Iraq that involved an EFP, which was based on Hezbollah designs and had been field-tested at scale by Hezbollah for the first time during its 2006 hostilities with Israel. On January 20, 2007, a joint cell comprised of Hezbollah and JAM that was funded and logistically aided by the IRGC, including the Qods Force, attacked the Karbala Provincial Joint Coordination Center in Iraq, which resulted in the kidnapping and murder of five U.S. soldiers, and was quickly confirmed by the U.S. and media outlets to have been an example of IRGC-sponsored, Hezbollah/JAM-committed attacks in Iraq. More broadly, the U.S. government conducted a "surge" in Iraq in 2007, which was focused most of all on preventing Hezbollah and JAM attacks in Baghdad, during which Hezbollah and JAM escalated their use of EFP attacks against the United States in Iraq.

405.    In October 2007, the United States responded to the IRGC's and Hezbollah's twinned escalation of IRGC-sponsored terrorism by Hezbollah, Hamas, and PIJ in Israel and by Hezbollah and JAM in Iraq by formally recognizing the Qods Force for its direct, lethal support to acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, and JAM.

406.    On November 6, 2008, Treasury published a fact sheet intended to alert banks, including SCB, to the extreme risk that illicit Iran-related transactions processed through the U.S. banking system funded IRGC-sponsored acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, PIJ, and Iraqi Shiite terrorists:

## Iran Misuses the International Financial System to Support Terrorism

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups**. Elements of [the] … IRGC … have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East …. The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to … terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: … Hizballah; Palestinian terrorists; [and] certain Iraqi Shi'a militant groups …. The Qods Force is especially active in the Levant, providing … Hizballah with funding, weapons and training. It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. …

• **Iran Uses its Banks to Finance Terrorism**. … Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat . … Treasury … designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ . . . . Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

• **Iran Lacks a Counter-Terrorist Financing Legal Regime**. In addition to its regime-directed support to terrorist organizations, Iran continues to lack a legal framework to counter the risk of terrorist financing and has not indicated a willingness to address this deficiency. The FATF's October statement on Iran notes that, while Iran has taken some steps towards implementing an anti-money laundering regime, there is a lack of even such a minimal corresponding effort by Iran in the area of counter-terrorist financing.

407. On February 10, 2010, Treasury imposed substantial additional sanctions on the IRGC and its economic fronts, including new sanctions targeting KAA, and stated, *inter alia*:

a. "Treasury today took further action to implement existing U.S. sanctions against [the] IRGC … by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters."

b. "Khatam al-Anbiya …, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … Treasury also today designated [] companies that are owned or controlled by, or that act on behalf of, [KAA]."

c. "'As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. 'Today's action … will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.'"

d. "The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in [*inter alia*] the … construction, and oil industries, controlling billions of dollars of business. The profits from these activities … support the full range of the IRGC's illicit activities, including … support for terrorism."

e. "Elements of the IRGC have also been designated for UN sanctions pursuant to UN Security Council Resolutions (UNSCRs) 1737 and 1747. … The European Union has also designated IRGC-affiliated companies, including [KAA]…."

Treasury's February 10, 2010 IRGC sanctions rollout received widespread media coverage.

408. On June 9, 2010, the U.N. Security Council adopted Resolution 1929, which the Council enacted only after formally: "[n]oting with serious concern the role of elements of the … IRGC … in Iran's proliferation sensitive … activities" and "noting the potential connection between Iran's revenues derived from its energy sector and the funding of Iran's proliferation-sensitive … activities." As SCB knew, Resolution 1929, like every other U.N. Security Council-related sanction targeting Iran, was primarily about halting the IRGC's ability to use its commercial fronts, including KAA, to finance and logistically support IRGC operations. Resolution 1929 imposed sweeping sanctions that specifically targeted the IRGC and its use of

KAA, the IRGC's monopoly over Iran's oil and gas sector, and IRGC-controlled Iranian banks, to finance IRGC-sponsored international operations conducted by the Qods Force, including the Qods Force's acquisition and distribution of weapons of mass destruction, including missiles and nuclear weapons. Resolution 1929 created a comprehensive sanctions regime, which was directly based upon, referred to, and targeted, among others, Iran and the IRGC.

409.     Paragraph 8 of Resolution 1929 prohibited a wide array of IRGC weapons exports relating to missiles: "[A]ll States shall prevent the direct or indirect supply, sale or transfer to Iran, from or through their territories or by their nationals or individuals subject to their jurisdiction, or using their flag vessels or aircraft, and whether or not originating in their territories, of any battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems as defined for the purpose of the United Nations Register of Conventional Arms, or related materiel, including spare parts, or items as determined by the Security Council or the Committee established pursuant to resolution 1737 (2006) ('the Committee'), decides further that all States shall prevent the provision to Iran by their nationals or from or through their territories of technical training, financial resources or services, advice, other services or assistance related to the supply, sale, transfer, provision, manufacture, maintenance or use of such arms and related materiel, and, in this context, calls upon all States to exercise vigilance and restraint over the supply, sale, transfer, provision, manufacture and use of all other arms and related materiel."

410.     Resolution 1929's sanctions primarily targeted the IRGC and the IRGC's use of Iran's oil sector and banks to finance weapons purchases and exports. As the U.K. House of Commons observed on October 13, 2010, for example, Resolution 1929 was understood to focus "especially on the Islamic Revolutionary Guard Corps (IRGC)." Paragraph 12 of Resolution

1929, for example, provided: "The Security Council … *Decides* that the measures specified in paragraphs 12, 13, 14 and 15 of resolution 1737 (2006) shall apply also to the Islamic Revolutionary Guard Corps (IRGC, also known as 'Army of the Guardians of the Islamic Revolution") individuals and entities specified in Annex II, and to any individuals or entities acting on their behalf or at their direction, and to entities owned or controlled by them, including through illicit means, and calls upon all States to exercise vigilance over those transactions involving the IRGC that could contribute to Iran's proliferation-sensitive … activities …."

411.    Annex II of Resolution 1929, in turn, alerted SCB that "Entities owned, controlled, or acting on behalf of the Islamic Revolutionary Guard Corps" included KAA and a broad array of IRGC oil fronts that SCB knew were participants in the same transactions it financed by servicing IRGC fronts like Caspian Petrochemical, such as Oriental Oil Kish.

412.    Paragraph 22 of Resolution 1929 provided: "The Security Council … *Decides* that all States shall require their nationals, persons subject to their jurisdiction and firms incorporated in their territory or subject to their jurisdiction to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC …, and any individuals or entities acting on their behalf or at their direction, and entities owned or controlled by them, including through illicit means …."

413.    Resolution 1929 also targeted the IRGC's use of Iranian banks to finance IRGC operations. Paragraph 21, for example, provided: "The Security Council … *Calls upon* all States, in addition to implementing their obligations pursuant to resolutions 1737 (2006), 1747 (2007), 1803 (2008) and this resolution, to prevent the provision of financial services, including insurance or re-insurance, or the transfer to, through, or from their territory, or to or by their nationals or entities organized under their laws (including branches abroad), or persons or

financial institutions in their territory, of any financial or other assets or resources …." Paragraph 23, similarly, provided: "The Security Council … *Calls upon* States to take appropriate measures that prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also that prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction to prevent the provision of financial services …".

Paragraph 24, likewise, provided: "The Security Council …*Calls upon* States to take appropriate measures that prohibit financial institutions within their territories or under their jurisdiction from opening representative offices or subsidiaries or banking accounts in Iran …."

414.    Resolution 1929 also created continuing reporting structures, such as paragraph 36, which mandated reports from the International Atomic Energy Agency.

415.    On June 16, 2010, Treasury sanctioned a wide swath of IRGC-controlled oil and gas firms—which Treasury described as its "First Set of Actions in Response to President Obama's Call for Vigorous Enforcement of … Resolution 1929" and *inter alia*, sought to inhibit the IRGC's acquisition, redistribution, and use of some of the world's most dangerous weapons"—and warned:

> Treasury announced … designations [comprising] … the first set of measures from the United States implementing UNSCR 1929 and building upon the actions mandated by the Security Council. … [and] highlight[ed] for the international community Iran's use of its financial sector, shipping industry and [IRGC] to carry out and mask its … activities, and respond to the Council's call for all states to … prevent their own financial systems from being abused by Iran. …
>
> Islamic Revolutionary Guard Corps (IRGC)
>     Treasury today is targeting … [two] [o]il and [g]as … subsidiaries of Khatam al-Anbiya …, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. KAA [is] owned or controlled by the IRGC and is involved in the construction … [sector]. KAA was designated by Treasury under E.O. 13382 in October 2007 and most recently under UNSCR

1929. [The KAA oil and gas companies] were also sanctioned on June 9, 2010 by the United Nations with the adoption of UNSCR 1929.

> The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … construction[] and the oil industry … [including] … PETROPARS LTD …[,] [which] is an entity that is wholly-owned by NICO. On November 26, 2008, NICO, a subsidiary of NIOC, was identified by OFAC as an entity that is owned or controlled by the Government of Iran.

416. A wide array of subsequent U.S. and U.N. reports and statements confirmed the tight nexus between violations of Resolution 1929 and IRGC-sponsored acts of terrorism. True, the U.S., U.N., and E.U. promulgated sanctions targeting the IRGC under several separate authorities, including based upon the IRGC's state sponsorship of terrorism through IRGC proxies, proliferation of lethal weapons like rockets and drones to IRGC proxies, and hostage-taking, kidnapping, and other similar abuses. At all times, however, SCB knew that all such U.S., U.N., and E.U. sanctions against the IRGC were intended to, and did in fact, reduce the risk of IRGC-committed acts of terrorism, and that SCB's violations of the applicable U.S., U.N., and E.U. sanctions targeting IRGC weapons and human rights violations also enabled IRGC-sponsored acts of terrorism. At all relevant times, SCB knew that its illicit financial services that helped Iranian persons evade U.N. sanctions under Resolution 1929 directly enabled IRGC sponsored terrorist attacks in the Middle East.

417. On June 22, 2010, for example, Treasury Under Secretary for Terrorism and Financial Intelligence Levey testified before Congress that any bank's violations of Resolution 1929 directly supported IRGC-sponsored terrorism (emphases added):

a. "With the adoption of [Resolution] 1929 …, the international community made clear that Iran's continued failure to meet its international obligations will have increasingly serious consequences. … [With respect to] the so-called pressure track of [United States] strategy [to deter IRGC-backed violence] … is intended to hold Iran accountable for its continued refusal to address the international community's concerns regarding its nuclear program,

*as well as its support for terrorism* …. The adoption of Resolution 1929 marks an inflection point in this strategy, as it broadens and deepens existing sanctions programs on Iran and creates an opportunity for us to further sharpen Iran's choices."

b. "Resolution 1929 … broadens the existing UN sanctions framework, and it is important to remember that each resolution builds upon earlier resolutions. Resolution 1929 enhances the international community's obligation to impose measures on Iran's financial sector, businesses owned or controlled by the … IRGC … Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to avoid the risks associated with business that supports the Iranian government's proliferation activity *and support for terrorism*."

c. "[P]aragraph 22 of the Resolution [1929] obliges all states [to] require their nationals, persons subject to their jurisdiction and firms incorporated in their territory…to exercise vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction, including those of the IRGC …. Treasury … today published a public advisory that explains the financial provisions of UNSCR 1929 and provides guidance on steps that can be taken to mitigate the tremendous risks underscored by the Security Council. Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to *avoid the risks associated with business that supports* the Iranian government's proliferation activity *and support for terrorism.*"

d. "Resolution 1929 highlights. . . . the risks associated with providing financial services to Iran, makes it nearly impossible for financial institutions and governments to assure themselves that transactions with Iran could not contribute to [illegal IRGC] activities."

e. "[P]aragraph 23 of the Resolution calls upon states to prohibit in their territories the opening of new branches, subsidiaries, or representative offices of Iranian banks, and also [to] prohibit Iranian banks from establishing new joint ventures, taking an ownership interest in or establishing or maintaining correspondent relationships with banks in their jurisdiction [and] to prevent the provision of financial services if they have information that provides reasonable grounds to believe that these activities could contribute to Iran's proliferation-sensitive nuclear activities. Consistent with this, governments are to take steps to be certain that correspondent relationships with Iran cannot be used for illicit conduct. Given the information described above regarding Iranian banks' involvement in Iran's proliferation-sensitive activities, coupled with well-known information about Iranian banks' use of a range of deceptive conduct – such as concealing their identity by stripping their names from transactions – it is nearly impossible for governments to ensure that correspondent relationships with Iran are not abused for illicit purposes."

Terrorism scholars also publicly warned the world, including SCB, in real-time.

418.    Moreover, on June 22, 2010, FinCEN published an advisory—titled "*Update On The Continuing Illicit Finance Threat Emanating From Iran*"—that further alerted SCB (on pages 1-2) that its transactions designed to help Iranian customers evade Resolution 1929 also supported IRGC-sponsored terrorism:

a.    "FinCEN[] is issuing this advisory to supplement information previously provided on the serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran, and to provide guidance to financial institutions regarding [Resolution] 1929, adopted on June 9, 2010."

b.    "UNSCR 1929 contains a number of new provisions which build upon and expand the financial sanctions imposed in previous resolutions (UNSCRs 1737, 1747, and 1803) and which are designed to prevent Iran from abusing the international financial system to facilitate its illicit conduct … [and it] … requires States to ensure their nationals exercise vigilance when doing business with any Iranian firm, including the … IRGC …."

c.    "These Security Council actions, in addition to [FATF] statements regarding the risks posed by Iran and calling for countries to impose countermeasures, illustrate the increasing risk to the integrity of the international financial system posed by:
        • the Iranian financial sector, including the Central Bank of Iran;
        • commercial enterprises that are owned or controlled by the IRGC, which was designated by the State Department under Executive Order 13382 in 2007; and
        • other Iranian entities supporting proliferation-related activities …."

d.    "Iran's record of illicit and deceptive activity, coupled with its extensive integration into the global financial system, increases the risk that responsible financial institutions will … become involved in Iran's illicit activities. Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian banks, leaving Iran's financial institutions increasingly isolated. Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally."

e.    "Public sources indicate that Iranian banks operate globally, including seven state-owned commercial banks, four specialized government banks, and six privately owned Iranian financial institutions with more than four dozen overseas branches and subsidiaries in Asia, Europe, South America, and the Middle East. Many of these banks report significant relationships in key global financial centers. … Treasury is also concerned that Iranian banks (both designated and non-designated) are seeking to expand their international presence in order to circumvent the impact of sanctions on Iran's state-owned banks, presenting a risk that Iran's illicit conduct will shift to those banks that are able to maintain ties to the international financial sector."

419. The U.N.'s real-time public reports pursuant to Resolution 1929 also alerted SCB that SCB's transactions with Iranian customers designed to evade Resolution 1929 directly enabled Qods Force and Hezbollah-sponsored proxy attacks. On June 4, 2012, for example, the Security Council reported that, with respect to the IRGC's oil- and gas-related entities subject to sanctions under Resolution 1929:

> Some Member States have informed the Panel that the [Islamic Revolutionary Guard] Corps also controls informal economic channels. In particular, some Iranian charitable organizations (foundations) controlled by the Corps are believed to support the Corps' economic activities, including provision of informal channels for business transactions. Such foundations include the Islamic Revolutionary Guards Corps Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the Foundation of the Oppressed (Bonyad-e Mostazafan), both of which include incumbent and/or former officers of the Corps as board members.

As SCB always knew, the Foundation for the Oppressed and the IRGC Cooperative Foundation were both notorious IRGC fronts; the former was a notorious, and direct, front for Hezbollah and Qods Force operations, *infra*, while the latter was a well-known, notorious front for the IRGC's other elements that also served to finance Hezbollah, the Qods Force, and their proxies. On June 1, 2015, similarly, the Security Council reported pursuant to Resolution 1929 that, with respect to the sanctioned persons targeted by Resolution 1929, "media reports point[ed] to continuing [Iranian, including Qods Force] military support and alleged arms transfers to the Syrian Arab Republic, Lebanon, Iraq, … and to Hizbullah and Hamas" and "further note[d] that Iranian officials … [did] not deny[]" providing such "military support" to any of the above-identified IRGC terrorist proxies.

420. Contemporaneous warnings from terrorism scholars and Members of Congress also alerted SCB that violations of sanctions under U.S. and U.N. counterproliferation authorities, including Resolution 1929, that targeted the IRGC foreseeably enabled IRGC-sponsored acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, and PIJ.

While sanctions announcements distinguished between terrorism and proliferation, SCB knew, as did any other sophisticated participant in the Iranian, financial services, and U.S. markets, that when the IRGC and Hezbollah fronts engaged in transactions to fund terrorism, both groups used all firms designated under the proliferation sanctions to enable terrorist attacks. On February 16, 2007, for example, former Treasury official Dr. Matthew Levitt warned:

> Last week, … Ayatollah Khamenei threatened to hit back at U.S. interests "worldwide" if attacked … [through the] IRGC ….
>
> The question of the day is how to … confront[] [Iran] over its … support for terrorist groups and its involvement in improvised explosive device (IED) networks in Iraq. U.S. officials are pressing their European counterparts to discourage investment and financial transactions with Iran … and to work with the private sector to deny Iran access to outside financial services. …
>
> And therein lies the answer. The most robust and effective non-military tool available to the international community is to apply Resolution 1737 in full. While many pundits blasted UNSCR 1737 as toothless and ineffective, its full implementation would employ travel bans and targeted financial sanctions against the very tool of Iranian foreign policy responsible for the regime's unacceptable conduct: the IRGC.
>
> The annex to the resolution listing entities involved in Iranian proliferation activity does not include the IRGC. But two key leaders, IRGC commander Major Gen. Yahya Rahim Safavi and IRGC air force chief General Hosein Salimi, are listed …. Under the resolution, … by virtue of listing the overall head of the IRGC …, the U.N. empowered a strict reading suggests it requires member states to freeze IRGC funds and financial assets.
>
> The IRGC … provid[es] funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq. …
>
> Moreover, the IRGC controls vast financial assets and economic resources. While most of the actual funds and assets are in Iran and beyond seizure, the IRGC's business and industrial activities especially those connected to the oil and gas industries are heavily dependent on the international financial system. Consider, for example, the $2.09 billion contract to develop parts of the South Pars natural-gas field, or the $1.3 billion contract to build parts of a pipeline, both meted out to the IRGC's engineering arm, the Khatam-ol-Anbia. …
>
> A simple reading of Resolution 1737 requires member states to apply financial measures against the financial assets and economic resources controlled by the head of the IRGC. Moreover, targeted financial measures against the IRGC … pulls at the purse strings of the specific element of the Iranian bureaucracy responsible for the regime's most egregious behavior.

421.     A colloquy between Dr. Levitt and Representative Ted Deutsch during the

former's testimony before Congress on March 4, 2014 was instructive of SCB's knowledge

throughout the era from 2007 through 2017 (emphases added):

> REP. DEUTCH: "[I]n the area of banking sanctions, … can you contrast
> sanctions that exist with respect to the nuclear area and sanctions that exist for
> terror funding? … [D]o the sanctions that are in place with respect to Hezbollah
> and terror funding go as far as in the … nuclear area [*e.g.*, U.S.
> counterproliferation sanctions and UNSCR 1929]? And if not, why not?"

> DR. LEVITT: "… [I]n a nutshell, the vast majority … of the banking sanctions
> are technically proliferation sanctions.
>  is the … only one I can think of right now, that's actually a terrorism basis. ***But
> it's not like Hezbollah uses this bank for terrorism and this bank for
> proliferation.*** And whatever the reason, ***it has the impact across the board***. …
> ***I'm less concerned with which executive order is used -- terrorism or
> proliferation or others -- to effect the change***. …"

> REP. DEUTCH: "… You said most of the banking sanctions that exist now are
> focused on proliferation. … [W]hy would we draw that distinction between
> proliferation and terror financing, … Dr. [Levitt]?"

> DR. LEVITT: "More often than not, it just has to do with what information is
> most readily available, without declassifying really sensitive stuff, that can
> underscore the designation. So if there's a bad bank, one of the things that will be
> looked at is, what's the world of information that's available and what can be
> most easily made public and available?"

422.     On July 1, 2010, President Obama signed the Comprehensive Iran Sanctions,

Accountability, and Divestment Act of 2010 ("CISADA"), Pub. L. No. 111-195, 22 U.S.C.

§ 8501, *et seq.*, which provided, *inter alia*:

a.     22 U.S.C. § 8501(1): "Congress makes the following findings: (1) The … Government of
Iran['s] … support for international terrorism[] represent a threat to the security of the
United States."

b.     22 U.S.C. § 8513(a): "Congress makes the following findings: (1) [FATF] is an
intergovernmental body whose purpose is to develop and promote national and
international policies to combat money laundering and terrorist financing. … (4) The
[FATF] has repeatedly called on members—(A) to advise financial institutions in their
jurisdictions to give special attention to business relationships and transactions with Iran,
including Iranian companies and financial institutions; (B) to apply effective

countermeasures to protect their financial sectors from risks relating to money laundering and financing of terrorism that emanate from Iran; (C) to protect against correspondent relationships being used by Iran and Iranian companies and financial institutions to bypass or evade countermeasures and risk-mitigation practices; and (D) to take into account risks relating to … financing of terrorism when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdictions. (5) At a February 2010 meeting of [FATF], [FATF] called on members to apply countermeasures 'to protect the international financial system from the ongoing and substantial … terrorist financing … risks' emanating from Iran."

c.  <u>22 U.S.C. § 8519</u>: "SENSE OF CONGRESS REGARDING IRAN'S REVOLUTIONARY GUARD CORPS AND ITS AFFILIATES. It is the sense of Congress that the United States should—(1) persistently target Iran's Revolutionary Guard Corps and its affiliates with economic sanctions for its support for terrorism …; (2) identify, as soon as possible—(A) any foreign individual or entity that is an agent, alias, front, instrumentality, official, or affiliate of Iran's Revolutionary Guard Corps; (B) any individual or entity that—(i) has provided material support to any individual or entity described in subparagraph (A); or (ii) has conducted any financial or commercial transaction with any such individual or entity; and (C) any foreign government that—(i) provides material support to any such individual or entity; or (ii) conducts any commercial transaction or financial transaction with any such individual or entity; and (3) immediately impose sanctions, including travel restrictions, sanctions authorized pursuant to this Act or the Iran Sanctions Act of 1996, as amended by section 102 of this Act, and the full range of sanctions available to the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), on the individuals, entities, and governments described in paragraph (2)."

423.    The sum and substance of this avalanche of sanctions between late 2007 and the end of 2010 was simple: the entire landscape of U.S. policy towards Iran was transformed through a series of new findings concerning the inextricable connection between a bank that transacts with IRGC fronts and the IRGC's ability to sponsor attacks.

## V.    Iran's Terrorist Sponsors Seized Sector-Wide Monopolies In Key Iranian Markets To Fund Terrorist Attacks

424.    From 2007 through 2020, Iran's Terrorist Sponsors notoriously controlled well over half of the entire Iranian economy; some estimates ranged as high as 85%. Indeed, the U.S. government has concluded similarly. In 2021, for example, Treasury observed that the Supreme Leader's and IRGC's collaborative post-2007 economic takeover alerted banks, like SCB, that

Iran's Terrorist Sponsors were collectively "said to control more than half of the Iranian economy." This provided the context for the Supreme Leader's and IRGC's shared strategy to support violence by funneling profits from monopolies to IRGC proxies.

425. Between 2005 and 2009, using fronts they controlled, the IRGC and SLO orchestrated a monopolistic takeover of key components of Iran's economy. Contemporaneous reports confirmed as much. For example, per a DoD analysis published on October 12, 2011:

> The IRGC's expansion beyond the roles and tasks traditionally associated with military or security services is most pronounced in its dominant role in Iran's economy. Speaking at the change of command at the *Khatam ol-Anbia* Base Complex, IRGC commander [Mohammad Ali] Jafari bluntly summarized his position, "The IRGC must play a leading role in the nation's economic fronts." Referencing the IRGC's role in the Iran-Iraq war, Jafari further rationalized the IRGC's economic responsibilities, "The IRGC actually goes into areas of activity the other sectors cannot do, as in [Iran-Iraq] war where … the IRGC had the duty to go on the battlefield with all its being. We are doing the same thing today in economic areas." …
>
> Through [the IRGC's] complex network of foundations and their subsidiary banks, assisted by generous subsidies, the IRGC has diligently expanded its business holdings at a deep discount. The true private sector only gained 19% of the "privatized" public assets, while the cooperatives consumed 68% of the resources. The IRGC has systematically militarized rather than privatized the Iranian economy.

426. After the U.S. inaugurated the new era of sanctions targeting Iran's Terrorist Sponsors with its designations of the IRGC, Bank Saderat, Bank Melli, and associated persons in October 2007, the SLO and the IRGC responded to the new sanctions era by leaning heavily into Iran's longstanding tolerance of monopolies, by seizing entire economic sectors and awarding them to the IRGC. Ayatollah Khamenei's strategy was simple: keep the IRGC loyal through industrial sector-scale bribes in the form of the Ayatollah's provision of monopolies to the IRGC in key Iranian industrial sectors that overlapped with the IRGC's terrorist mission. As the *Christian Science Monitor* reported in 2009, "[Ayatollah] Khamenei … had to pay dearly for such [IRGC] backup, however, says [Ali] Alfoneh [of the American Enterprise Institute]. 'The

IRGC's support for [Ayatollah] Khamenei does not come cheap, and he has had to bribe the IRGC with economic monopolies,' [said Alfoneh]. … The result has been a 'very deep and symbiotic relationship with the supreme leader, and [the IRGC] have used the Ahmadinejad administration to not just solidify their hold on power, but to enrich themselves at the same time,' says [Alireza] Nader of RAND." Others reported similar findings. Ayatollah Khamenei's strategy leveraged a pre-existing feature of Iran's economy: the heavy tendency towards monopolies dating back to the Shah, which trend continued at all relevant periods. As the *Economist* alerted SCB in 2011, "Iran's economy" was "[a]lmost entirely reliant on oil receipts, unproductive and monopolistic" at the same time "the Revolutionary Guard's commercial divisions [took] over ever larger bits of the economy."

427.  From 2007 through 2009, the SLO and the IRGC rapidly seized monopolistic shares of key sectors of Iran's economy, which seizures were all complete by the end of 2009.

428.  U.S. government-published statements alerted SCB to such risks in real time. On July 26, 2006, for example, Dr. Kenneth Katzman, a Middle East Specialist at the Congressional Research Service, testified before Congress that "key [Iranian] leaders and factions have gained a substantial measure of control over major segments of the Iranian economy, avoiding virtually any official transparency or accountability," which allowed "Iran's leaders … to steer the proceeds of parts of the economy to provide patronage." In 2009, similarly, seven (U.S. government-funded) RAND Corporation Iran scholars publicly observed "the IRGC's … monopolization of key business sectors" in Iran. Likewise, in 2009, a State report about Iran warned that its "hard-line clerical establishment … grew wealthy through its control of bonyads … that monopolize[d] many sectors of [Iran's] economy …."

429.     Such real-time warnings also directly warned SCB that the IRGC's ability to leverage its control of entire sectors of Iran's economy directly funded IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and other IRGC proxies. On October 6, 2009, for example, Treasury Under Secretary Levey testified before Congress that:

> In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects, including developing the South Pars gas field …. Furthermore, the IRGC seeks to monopolize black-market trade of popular items, funneling the proceeds from these transactions through a patronage system and using them to help subsidize the government's support for terrorist groups.

On June 22, 2010, Treasury Under Secretary Levey testified before Congress that "the Revolutionary Guards … has provided material support to … Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and others," the needed funding for which compelled the IRGC to "assume[] control over broad areas of the Iranian economy."

430.     Terrorism scholars also concluded that the IRGC seized monopolies during this period to support its proxies' acts of terrorism.

431.     The Supreme Leader and IRGC strategy for monopolization focused on key sectors: they did not seek to control the entire economy, just those sectors that were inextricably connected to the IRGC's ability to sponsor terrorism. Consequently, from 2007 through 2020, the IRGC notoriously exercised a monopoly over certain IRGC "exclusive sectors" of Iran's economy, including Iran's oil, gas, construction, import/export, and communications sectors. As Dr. Michael Rubin testified on April 19, 2016:

> [T]he IRGC … maintains a stranglehold over trade and the economy and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. Here the problem is … Khatam al-Anbiya, the IRGC's economic wing. To understand what Khatam al-Anbiya is, picture the U.S. Army Corps of Engineers combined with Bechtel, Halliburton, KBR, Shell, Exxon, Boeing, and Northrop-Grumman, all rolled up into one. Today, Khatam al-Anbiya monopolizes heavy

industry, shipping, electronics, manufacturing as well as import-export. All together, it controls perhaps 40 percent of the Iranian economy. …

Under former President Mahmoud Ahmadinejad, IRGC-linked companies received upwards of $50 billion in no-bid contracts in the oil industry alone. In short, even if President Hassan Rouhani were to take the IRGC's official budget to zero, it would be facing less of a budget cutback proportionately than the U.S. military has through sequestration. …

Iran today has at its disposal a hard currency windfall which will enable it to support proxies to pursue its ideological goals with an ease that it has not enjoyed in decades.

Against this backdrop of Iranian empowerment, it is important that the United States recognize that responding to Iranian bluster and complaints with incentive and greater access to the U.S. and European investment and financial markets is counterproductive to regional security. It is also essential to recognize the depth of IRGC involvement in almost every sector to which U.S. and European firms might consider investing. To bolster both U.S. security and that of Israel and other American regional allies requires draining rather than augmenting IRGC coffers. This will ultimately mean ... greater vigilance absent diplomatic subjectivity to IRGC commercial involvement and terror finance.

432.     On October 22, 2017, the *New York Times* likewise reported that "Khatam Al Anbiya … is the most important economic arm of Iran's elite Islamic Revolutionary Guards Corps." It is, the *New York Times* reported, "a giant construction company [that] direct[ed] its operations across Iran, building mosques, airports, oil and gas installations, hospitals and skyscrapers," "led by a military commander" (*i.e.*, IRGC Commander Mohammad Ali Jafari), and was part of the IRGC's "monopoly on large sectors of the economy."

433.     Despite the substantial nature of the IRGC's and SLO's involvement throughout Iran's economy from 2007 through present, Plaintiffs do not allege that the IRGC monopolized every—or even most—segments of Iran's economy. While the IRGC and SLO had substantial interests in every Iranian economic sector, they only exercised a monopoly in certain sectors, including the six sectors alleged herein. Among other Iranian market sectors, the IRGC exercised influence but **did not** have a monopoly in, *inter alia*: (1) Accounting; (2) Agriculture; (3)

Domestic Retail; (4) Foodstuffs and Groceries; (5) Legal Services; (6) Music; (7) Publishing; (8) Real Estate; (9) Restaurants and Hookah Bars; (10) Textiles; and (11) Utilities.

434.     Below, plaintiffs identify six relevant IRGC market segment monopolies that provided the context for SCB's transactions alleged herein: (1) Energy; (2) Construction; (3) Sanctions Evasion; (4) Finance; (5) Import/Export; and (6) Communications.

**A.     The Energy Sector: Oil, Gas, and Petroleum-Based Products**

435.     The Supreme Leader's provision of monopolies to the IRGC began in the energy sector, and for good reason: as a U.S. government-published analysis of the IRGC later warned, "[b]y far, the IRGC's greatest economic instrument is its influence over the energy sector, which accounts for over 80% of the regime's revenue."

436.     In June 2006, the Supreme Leader and the IRGC effectively announced their intention to monopolize Iran's energy sector when they caused the awarding of the largest energy project in Iranian history—its South Pars field, which connected to Caspian routes via pipeline—to notorious IRGC firm Khatam al-Anbiya.

437.     Indeed, an IRGC general signed for the cameras on behalf of Khatam al-Anbiya, which photo was then circulated throughout global media by the IRGC's *Mehr News Agency*:



438.    Public testimony by U.S. officials confirmed that the IRGC seized South Pars as part of its plan to monopolize Iran's oil sector. On July 26, 2006, for example, Dr. Katzman, a Middle East Specialist at the Congressional Research Service, testified before Congress that "the Revolutionary Guard['s] … motivations for expanding its economic role are apparently to provide rewards for senior officers, and to generate revenue to supplement the budget allocated to the Guard by the government. The Guard has formed contracting firms to bid on government projects, using its strong political influence to win business. In one recent example, one of the firms owned by the Guard, called 'Ghorb,' [*i.e.*, Khatam al-Anbiya] is being awarded a $2.3 billion deal to develop two phases of Iran's large South Pars gas field. Most of the other phases have been awarded to well-known multi-national energy firms, and the work given to Ghorb [KAA] had originally been awarded to Norway's Aker Kvaerner, but was re-tendered. This suggests that the Guard exerted political influence to win the [South Pars] contract and take it away from what most industry experts would consider a more capable firm."

439.     In June 2008, the SLO and IRGC further cemented their monopoly over all Iranian petroleum-related assets when Ayatollah Khamenei decreed that the Foundation for the Oppressed—which was a front shared by the SLO and IRGC—would be responsible for negotiating, collecting, and redistributing all funds associated with Iranian petroleum exports.

440.     When SCB deliberately helped Iranian entities evade sanctions targeting their sponsorship of terrorism, SCB knew that the Supreme Leader and IRGC had seized a monopoly in Iran's energy sector, operationalized through, *inter alia*, the SLO, the Foundation for the Oppressed, and Khatam al-Anbiya (including their respective agents and affiliates). Having seized their energy monopoly in 2006, the SLO and the IRGC aggressively sought to expand their respective reach into their newfound monopoly from 2007 through 2011 by vertically integrating the SLO's and IRGC's fronts, operatives, and agents throughout all energy firms and projects in Iran or subject to Iranian investment outside of Iran.

441.     By spring of 2011, the SLO's and IRGC's shared monopoly over Iran's entire oil and gas industry—including associated construction, financing, shipping, and logistics—was officially enshrined in a new joint SLO/IRGC entity that had full control, supervision, and ownership of all Iranian companies operating in Iran's oil and gas sector.

442.     On March 10, 2011, Ayatollah Khamenei decreed that **all** oil and gas contracts would be awarded by Petro Nahad, a newly created front established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC, including IRGC leaders like Commander of the Qods Force Qasem Soleimani (who received a direct cut of SLO/IRGC oil profits) and Soleimani's counterpart, Commander of the IRGC Mohammad Ali Jafari (who was a direct, and publicly identified, beneficiary of SLO/IRGC oil profits derived from trades routed through the UAE, necessarily including all of SCB's UAE-related oil and gas-related

transactions alleged herein). They did so by creating Petro Nahad, which was a supervisory entity under the SLO's auspices that was assigned complete authority over all energy projects, deals, companies, and decisions in Iran. Simply put, on March 10, 2011, Ayatollah Khamenei made official the SLO's and IRGC's previously understood effective monopoly on the Iranian oil and gas sector, which the IRGC and SLO had fully accomplished by 2006.[18]

443.    Real-time reports by the United States, terrorism scholars, human rights groups, and Iranian media outlets alerted SCB that the SLO and IRGC created Petro Nahad and used it to exercise a full monopoly over Iran's energy sector, and directly financed the activities of overall IRGC commander—and notorious Hezbollah, Hamas, and JAM supporter—Mohammad Ali Jafari. On May 3, 2011, for example, *Iran Press News* reported:

> On March 10, 2011, Khamenei decreed that all oil field projects, contracts and oil purchase agreements must be made exclusively by Petro Nahad. All existing companies and organizations responsible for such deals – Petro Sina Arya, Petro Pars, National Iranian Drilling Company (a subsidiary of the National Iranian Oil Company), and the Industrial Development and Renovation Organization (IDRO) – would henceforth operate under Petro Nahad's direct control.
>
> All contracts relating to gas and oil would now be awarded solely by Petro Nahad. All revenues would be deposited exclusively into an account belonging to Petro Nahad.
>
> Khamenei further directed that all of Petro Nahad's financial and administrative affairs be assigned to a three-man board of directors, two of whom are members of his family. Those members are: Mojtaba Khamenei, the Supreme Leader's son; Gholamali Haddad Adel, a member of the regime's Expediency Council who happens to be Mojtaba Khamenei's father-in-law; and Majid Hedayatzadeh.
>
> Fazel Larijani, a member of the famous family allied with the Supreme Leader and former diplomat in Ottawa, and Hojatollah Ghanimi Fard, a deputy oil minister since 1997 in charge of marketing for crude oil and NIOC's overseas divisions, were appointed as international affairs directors for Petro Nahad. …
>
> Any Petro Nahad contract is considered confidential, with strict prohibitions against their disclosure. Even though Petro Nahad is a government entity, the contracts are not available to parliament's budget committee.

---

[18] To be clear: The IRGC seized control of the energy sector by 2006, and the SLO joined in control by 2008 when the Foundation for the Oppressed—jointly controlled by the IRGC and the SLO—assumed a leadership role in all Iranian oil sales.

<u>Revolutionary Guards commander gets some of the spoils</u>

Fazel Larijani recently brought Revolutionary Guards (IRGC) Commander Mohammad Ali Jafari in on Petro Nahad deal with the United Arab Emirates. The deal reportedly would sell the UAE oil products below market price in exchange for $89 billion in cash and $89 billion in imported consumer goods from Dubai over a 23-year period.

<u>Opportunity for the opposition</u>

The upside to this opaque, corrupt, nepotistic control of Iran's oil wealth is that the scheme makes it easier for Western democracies to impose sanctions on the regime's oil sector. All they have to do is embargo Petro Nahad and its subsidiaries.

444.    On May 24, 2012, State publicly warned that "The oil sector was embroiled in financial scandal throughout the year." In so doing, State effectively vouched for the *Iran Press News* May 3, 2011 report above:

In May [2011,] [Iranian] opposition Web sites reported that on March 10, [2011,] [Ayatollah] Khamenei decreed that all oil and gas contracts would be awarded by Petro Nahad, a new entity established within his office and not subject to parliamentary or regulatory oversight. All revenues would be deposited into an account belonging to that organization. Further, according to these reports, all administrative and financial decisions of Petro Nahad were to be controlled by a three-person board of directors, whose members included Khamenei's son, Mojtaba Khamenei, and Gholamali Haddad Adel, a member of the Expediency Council and Mojtaba's father-in-law.

445.    Terrorism scholars also publicly reported, in real-time, that the SLO and IRGC used Petro Nahad to deepen and optimize their extraction of cash from their energy monopoly in order to finance acts of terrorism. On June 4, 2013, for example, IRGC scholars Emanuele Ottolenghi and Saeed Ghasseminejad warned that the Supreme Leader had appointed "Gholam Ali Haddad Adel, … the father-in-law of the Supreme Leader's son, Mojtaba Khamenei …[,]to the board of directors of Petro Nahad alongside his son Mojtaba" when "Khamenei himself recently established Petro Nahad to control all energy-sector contracts, thereby evading any

parliamentary oversight or public scrutiny" throughout "[t]he country's energy sector" in response to "the weight of [United States counterterrorism] sanctions."

446.    The United States publicly confirmed the SLO's and IRGC's seizure of a monopoly over the Iranian energy sector as a tool for financing terrorism. On October 13, 2011, for example, Treasury Under Secretary David S. Cohen testified before Congress that:

> Sanctions have also led to the IRGC taking over key aspects of Iran's economy, exacerbating the cronyism and corruption that pervades the Iranian regime. We have seen this in a number of areas. Khatam al-Anbiya, the U.S.-, EU-, and [U.N. Security Council]-designated engineering arm of the IRGC, has been recruited to develop key energy resources. The IRGC, through its sanctioned affiliates Bonyad Tavon Sepah and Mehr Bank, took over Tidewater, a port operator that until a few years ago had been privately owned. And President Ahmadinejad recently appointed Rostam Ghasemi, a U.S. and EU-designated IRGC commander and former leader of Khatam al-Anbiya, as Minister of Oil. This appointment was applauded by the IRGC, which characterized Ghasemi's new role as a "meaningful and critical response to the attacks against the [IRGC] from the west[]. . . . " . . . Furthermore, the inclusion of the IRGC throughout the Iranian [energy] economy has opened up Iran to greater pressure through sanctions.

447.    Looking back on this era in 2019, Iran scholar Khosrow Semnani observed that Khamenei's sponsored "power and money grab by the … IRGC" was completed by "2009":

> Under the guise of evading sanctions, an oil mafia with ties to the IRGC, and acting with the blessing of Iran's supreme leader, consolidated its grip over the Iranian state. Billions in no-bid contracts were awarded to the IRGC by the Petroleum Council … established in the Oil Ministry in 2006. Yet, despite the significance, scale and volume of these contracts, Iran's oil and gas sector operated as a closed and incestuous system rigged in favor of insiders. Under the guise of 'destroying Israel' …, IRGC cronies positioned themselves to benefit from sanctions. All they had to do was to sell Iran's oil, in unknown quantities, at a discount and pocket the difference by importing goods at a premium. For these thieves of state, … the shadow of sanctions … served as both the excuse and opportunity for pillaging Iran's oil sector.

448.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's petroleum sector and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order

13,846, which imposed sector-wide sanctions targeting the energy sector in Iran based on a formal finding that all revenue generated by Iran's petroleum industry funded Iranian regime-sponsored terrorist attacks committed by IRGC proxies in the Middle East:

a.    "[T]o advance the goal of applying financial pressure on the Iranian regime in pursuit of a comprehensive and lasting solution to the full range of the threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates, [I] hereby order as follows: …"

b.    "Sec. 2. Correspondent and Payable-Through Account Sanctions Relating to Iran's Automotive Sector; Certain Iranian Persons; and Trade in Iranian Petroleum, Petroleum Products, and Petrochemical Products. (a) The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to impose on a foreign financial institution the sanctions described in subsection (b) of this section upon determining that the foreign financial institution has knowingly conducted or facilitated any significant financial transaction: (i) on or after August 7, 2018, for the sale, supply, or transfer to Iran of significant goods or services used in connection with the automotive sector of Iran; (ii) on or after November 5, 2018, on behalf of any Iranian person included on the SDN List (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599) or any other person included on the SDN List whose property and interests in property are blocked pursuant to subsection 1(a) of this order or Executive Order 13599 (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599); (iii) on or after November 5, 2018, with NIOC or NICO, except for a sale or provision to NIOC or NICO of the products described in section 5(a)(3)(A)(i) of ISA provided that the fair market value of such products is lower than the applicable dollar threshold specified in that provision; (iv) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran; or (v) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petrochemical products from Iran."

449.    Since 2006, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its energy sector-related transactions concerning an Iranian deal, project, and/or counterparty (including oil, gas, and associated financing, construction, shipping, and logistics) that participated in the IRGC's monopoly over the oil and gas sector, including South Pars, supported IRGC-sponsored terrorist

violence committed by IRGC proxies given the IRGC's monopoly on the sector. Such warnings included, but were not limited to (emphases added):

a.  *Sharq* (Iranian Newspaper), June 30, 2006: "Some members of [Iran's parliament] … sent a written note to [President Ahmadinejad] with regard to the reason for the award of a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars… to the [IRGC]. This note was read out at yesterday's open session of [parliament]. Recently, a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars …, was signed between the Petroleum Ministry and the IRGC, without inviting any tenders. The [Iranian parliamentarians] … called for an inquiry into the manner of the award of the above contract, and its financial sources. ... ***In conclusion, the members of [parliament] … have elaborated: Will not the delegation of economic projects, be construed as a monopoly of oil-sector projects in the hands of the IRGC, and the awarding of political privileges by the government?***"

b.  *Inter Press Service*, December 29, 2009: "News that [the] … Revolutionary Guard Corps is withdrawing a billion dollars from the country's Foreign Reserve Fund in order to complete Phases 15 and 16 of the gigantic South Pars gas project has generated concern among Iranian analysts, who believe the move reveals the [IRGC]'s excessive power over Iran's economy. In view of looming sanctions from the United States and the United Nations Security Council … , the IRGC's control over the country's sensitive oil, and gas and nuclear industries could provoke a serious crisis, they warn. … In 2006, … [Khatam al-Anbiya] took on the National Gas Company's 90-kilometre Asalouyeh-Iranshahr pipeline project in Iran's Sistan and Baluchistan provinces, a contract worth 1.3 billion dollars. Another large project the Oil Ministry awarded to IRGC is the South Pars Gas Field Development Project's Phases 15 and 16. At 2.97 billion dollars, the contracts were awarded to [KAA] two years ago, bypassing the tender process. However, the IRGC firm was unable to finish the project in time. Jamshid Asadi, an economics professor at the American University in Paris, said that the latest action by IRGC culminates its aggressive efforts to ***monopolise key state projects*** over the last six years. … [KAA] … is currently under sanctions by the European Union and the United States. 'The economic dominance of the IRGC over gigantic gas and oil projects has made Iran's economy extremely vulnerable towards [a] new round of sanctions on the country's financial institutions and oil industry,' the source said."

c.  *Economist Intelligence Unit*, April 30, 2010: "Under President Ahmadinejad, the … IRGC … has enjoyed a substantial increase of its economic power. On several occasions, the IRGC won lucrative contracts in fields ranging from oil and gas to telecommunications. For example, … in 2005, [Ahmadinejad] granted a no-bid development contract for Phases 15 and 16 of South Pars …, the world's largest gasfield. The contract amounted to over US$7bn, to [KAA], the construction arm of the IRGC. The contract was in violation of government norms that require a competitive process. … [Iran's] Foreign Investment Promotion and Protection Act (FIPPA) specifically prohibits foreign investors from having a monopoly over any specific sector or market … [but

grants] state monopolies in such industries as oil, defence, … and [the] state-sanctioned monopolies of bonyads …."

d. *APS Diplomat News Service*, January 9, 2012: "[T]he IRGC runs its own economy which is totally independent and booming. … IRGC's Khatem ul-Anbia' …, a huge engineering and construction company, now has a quasi monopoly on key sector[s] such as that of petroleum. … Petroleum Minister Gen Rustam Qassemi is a former IRGC chief and until he took up the oil portfolio was the head of [KAA]."

e. Ali Alfoneh (American Enterprise Institute), April 1, 2013: "The IRGC … has become a moneymaking machine … [in part through] Iran's oil and gas sector, which has hitherto been the monopoly of the National Iranian Oil Company, [and] has become the ultimate prize of the IRGC."

f. *Australian*, March 25, 2014: "[The IRGC's energy monopoly extends] beyond petroleum production to [encompass] all aspects of the Iranian energy sector, which is fully controlled by the congressionally blacklisted Islamic Revolutionary Guards Corps."

g. *Iran Briefing*, September 22, 2014: "Oil and Gas Sectors: The IRGC has a major stake in the petrochemical industry, including oil refineries, drilling companies, the National Iranian Oil Company (a/k/a 'NIOC'), Arvandan Oil & Gas Company, and the National Iranian Tanker Company. It has almost full control over the oil ministry and oil trading, and most aspects of the wider oil industry. Khamenei's immediate family members own a major portion of this sector."

h. *APS Review Downstream Trends*, December 22, 2014: "[Iranian President Hassan] Rowhani added: 'Continuation of corruption and the spread of corruption [in Iran] would mean the system and fundamentals of the revolution are in danger'. Iran … [was] a country where state institutions such as the IRGC exert control in businesses [transacting] … oil sales. Rowhani went on to say: 'Monopoly is the cause of corruption and we must fight against monopolies. Anything which does not have rivalry or whose management is monopolised is flawed'."

i. Barak Seener (Jerusalem Center for Public Affairs), December 2018: "The IRGC stands to benefit [from transactions with Western companies and banks] … due to its monopoly of [] Iranian econom[ic] …… sectors including oil and gas [and] petrochemicals …."

450. Additional public reports subsequently confirmed what had already been clear,

*i.e.*, that the IRGC had a complete monopoly over Iran's energy sector, including oil and gas.

451. From 2007 through 2020, the SLO and IRGC continuously, and notoriously,

exercised their monopoly over all Iran-related energy transactions, including every such

transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew

were on behalf of Iran-related persons, and concerned energy, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### B. The Construction Sector

452. By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's construction sector, operationalized through Iran's Terrorist Sponsors. Having seized their linked monopolies in these sectors by 2007, the SLO and the IRGC aggressively sought to expand their respective reach into these monopolies from 2007 through 2011 by vertically integrating Iran's Terrorist Sponsors throughout every significant construction firm and project in Iran or subject to Iranian investment outside of Iran.

453. The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's construction sector and used such monopoly to fund terrorist attacks by IRGC proxies. On January 10, 2020, for example, President Trump signed Executive Order 13,902, imposing sector-wide sanctions targeting Iran's construction sector based on a formal finding that all revenue generated by the "construction … sector[] of the Iranian economy" funded Iranian regime-sponsored attacks by IRGC proxies in the Middle East.

454. Beginning around 2007, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related construction transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned construction, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the

IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### C. The Sanctions Evasion Sector: Black Market, Smuggling, and Shipping

455. In Iran, sanctions evasion was an industrial sector with dedicated practitioners, firms, strategies and the like and primarily comprised three sub-sectors: (1) the black market; (2) smuggling and port operations; and (3) transnational shipping and logistics. The SLO and IRGC always exercised a monopoly over the sanctions evasion sector of Iran's economy, as Plaintiffs define it herein, which they operationalized through Iran's Terrorist Sponsors.

456. The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's inextricably linked sanctions evasion, smuggling, and black market sectors, and used such monopoly to fund terrorist attacks by IRGC proxies. On April 8, 2011, for example, State reported to Congress that "[t]he IRGC is [] widely considered to control the vast majority of [Iran's] underground and black market economy" and "[u]p to 80 percent of illegal goods enter [Iran] through unregistered ports and jetties controlled by the IRGC."

457. Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its Iranian black market- and smuggling-related transactions supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's monopoly on the Iranian black market and smuggling. As RAND scholars reported in 2009, "the IRGC" exercised "control of Iran's shadow economy" including "the illicit smuggling networks." Other such warnings included, but were not limited to:

a. *CNBC*, December 8, 2010: "One third of all imported goods in Iran are delivered through the IRGC controlled illegal black market according to [a] member of [Iran's parliament]. The IRGC cuts out all competition in this field, jailing and intimidating Iranians dealing in black market goods so the Guard itself has a virtual monopoly."

b.   Dr. Michael Rubin, April 19, 2016: "[T]he IRGC … maintains a stranglehold over trade … and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. … Today, Khatam al-Anbiya monopolizes … shipping."

c.   *DT News*, August 14, 2018: "[D]espite the accumulation of international sanctions after 2005, Iran's paramilitary spending similarly mushroomed; partly because the Islamic Revolutionary Guard Corps filled its coffers through monopolizing sanctions-evading networks in oil, heavy arms, narcotics and basic goods."

458.   From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related black market, smuggling, and shipping transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned black market, smuggling, or shipping, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

### D.   The Financial Sector: Banks, Currency Exchanges, and Hawalas

459.   Even before 2007, Iran's major financial institutions—including SCB's customers CBI/Markazi, Bank Saderat, and Bank Melli—played essential roles in facilitating the IRGC's support to terrorist organizations including but not limited to Hezbollah, Hamas, and JAM. Indeed, that is why these institutions were sanctioned by the United States in 2007. Over time, the IRGC's influence over Iran's financial sector only grew.

460.   By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's financial sector, which comprised Iranian banks, currency exchanges, and hawalas, operationalized through, Iran's Terrorist Sponsors. These entities, collectively, owned and/or exercised direct or indirect control over all banks, currency exchanges, and hawalas in Iran.

461.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's banks and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13,846 based upon the Executive branch's finding that U.S. dollar-denominated transactions with any person supervised by "the Central Bank of Iran"—Iran's financial regulator, which always controlled all Iranian banks—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

462.    On September 20, 2019, similarly, Treasury sanctioned the Central Bank of Iran, and confirmed its findings that the Qods Force and Hezbollah controlled CBI and used it to finance their attacks as well as those of their proxies, including Hamas and PIJ:

> [OFAC] … act[ed] against the Central Bank of Iran (CBI) … under its counterterrorism authority, Executive Order (E.O.) 13224. Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah. …
> "Treasury's action targets a crucial funding mechanism that the Iranian regime uses to support its terrorist network, including the Qods Force, Hizballah, and other militants that spread terror and destabilize the region. … Iran's repressive regime … attempts to achieve its revolutionary agenda through regional aggression while squandering the country's oil proceeds," said Treasury Secretary Steven T. Mnuchin. "Iran's Central Bank … [was] ostensibly intended to safeguard the welfare of the Iranian people, but have been used instead by this corrupt regime to move Iran's foreign currency reserves for terrorist proxies." …
>
> **CENTRAL BANK OF IRAN FUNDS THE IRGC, ITS QODS FORCE AND HIZBALLAH**
> Today's action targets the CBI for its financial support to the IRGC-QF and Hizballah. In May 2018, OFAC designated the CBI's then-Governor Valiollah Seif, and the Assistant Director of the International Department Ali Tarzali, for facilitating financial transfers for the IRGC-QF and Hizballah. Also, in November 2018 and as part of Treasury's disruption of an international oil-for-terror network, OFAC designated the CBI's International Department Director Rasul Sajjad, and the CBI's International Department Director, Hossein Yaghoobi, for conducting financial transactions for the IRGC-QF.

Since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC-QF to facilitate CBI's financial support to the IRGC-QF. In 2017, the IRGC-QF oversaw the transfer of tens of millions of euros to Iraq from the CBI. Then-Governor of the CBI Valiollah Seif directed the transfer. …

CBI has [] coordinated with the IRGC-QF to transfer funds to Hizballah. OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF and Hizballah.

The IRGC-QF, … is … responsible for [the IRGC's] external operations and has provided material support to numerous terrorist groups, including … Hizballah, HAMAS, and the Palestinian Islamic Jihad ….

463. On February 14, 2024, similarly, Treasury imposed additional counterterrorism sanctions against the Central Bank of Iran pursuant to E.O. 13,324, and confirmed, *inter alia*:

OFAC … sanctioned a procurement network responsible for facilitating the illegal export of goods and technology from over two dozen U.S. companies to end-users in Iran, including the Central Bank of Iran (CBI), which is designated for its role in providing financial support to the … [Qods Force] and Hizballah. …

"The Central Bank of Iran has played a critical role in providing financial support to the IRGC-QF and Hizballah, two key actors intent on further destabilizing the Middle East," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "The United States will continue to use all available means to disrupt the Iranian regime's illicit attempts to procure sensitive U.S. technology and critical inputs."

464. From 2009 through 2020, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that transactions with Iranian banks supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of total control over all Iranian banks after 2007. In 2009, for example, seven RAND scholars warned, in a U.S. government funded research paper, of "the IRGC's … monopolization of key financial sectors." Other such warnings to SCB included, but were not limited to:

a. *Al Arabiya*, August 19, 2010: "Iran's Supreme National Security Council has granted the … Revolutionary Guards more powers to expand and maintain its control of the economy, Al Arabiya TV reported, stating informed sources. …[,] [and] issued a resolution stipulating the appointment of a representative of the [IRGC] … in the Board

of Directors of Iran's Central Bank, [per] reliable government sources … According to the resolution, no decisions can be taken at the bank without the approval of the [IRGC] representative. … The decisions also coincide with harsh criticism by leading reformist and presidential candidate Mehdi Karroubi against Khatam al-Anbiya, the construction unit of the [IRGC], and its monopoly over the most substantial of business transactions in the industry and economy sectors. … 'The private sector is no longer able to compete as the economy is monopolized by the Revolutionary Guard,' he said."

b.  Dr. Majid Rafizadeh (Harvard International Review), August 12, 2016: "[T]he IRGC and the office of the Supreme Leader, Ayatollah Khamenei [*i.e.*, the SLO], maintains [a] monopoly over [Iran's] wealth and financial system."

c.  Perviz S. Khazai (National Council of Resistance of Iran), April 22, 2019: "[IRGC] members … loot[] … [Iran]'s wealth to support their policy of exporting the 'Islamic revolution' and destabilization in the Middle East. … The IRGC … has monopolized the lion's share of the Iranian economy since 2005 [including] … finance, speculation, [and] banking … This entity … is the financier and gunsmith of Hezbollah in Lebanon [and] barbaric militias in Iraq …."

d.  National Council of Resistance of Iran, April 2022: "The consequent economic configuration is defined by at least 14 major economic powerhouses [including the Foundation for the Oppressed and Khatam al-Anbiya] either directly or indirectly controlled by Khamenei, the IRGC, or a combination of their affiliates. When it comes to banks, financial and credit institutions, insurance, the stock market, domestic and foreign commerce, real estate, and the financial instruments market, Khamenei's office [*i.e.*, the SLO] (along with the IRGC) has taken control of virtually everything that matters. … [T]he astronomical profits … end[] up funding … IRGC mercenaries and [IRGC] terror operations in … Iraq … and … around the world. Foreign investors cannot in practical terms avoid entanglement by affiliation in the Iranian regime's support for terrorism …. In reality, the back-breaking control of the Supreme Leader and the IRGC, over the economic system … [means that even though] Western companies engaged in economic and financial deals with Iran would like to portray their activities as transactions with the 'private sector[]' …, behind the official banks and companies lies a web of institutions controlled by the theocracy, and specifically the IRGC. Western companies … cannot avoid the reality that today the gatekeepers to Iran's economy are those who … export the very terrorism … that threaten[s] the West."

465.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related bank, currency exchange, and hawala transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned banks, currency exchanges, or hawalas, SCB knew, or was willfully blind, that it was directly or

indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### E. The Import/Export Sector

466.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's import/export sector, which was comprised of Iranian importers and exporters who typically had affiliated entities outside of Iran, operationalized through Iran's Terrorist Sponsors.

467.    Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its import- and export-related transactions concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's and SLO's assumption of a monopoly over Iran's import/export sector. Such warnings included, but were not limited to:

a.    *Economist*, February 2, 2013: "[T]he Revolutionary Guard … enjoys … a virtual monopoly over imports."

b.    Dr. Michael Rubin, April 19, 2016: "IRGC … maintains a stranglehold over trade and the economy and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. … Today, Khatam al-Anbiya monopolizes … import-export."

c.    Perviz S. Khazai (National Council of Resistance of Iran), April 22, 2019: "[IRGC] members … loot[] … [Iran]'s wealth to support their policy of exporting the 'Islamic revolution' … in the Middle East. … The IRGC … has monopolized the lion's share of the Iranian economy since 2005 … [including] … import and export … [and] … is the financier and gunsmith of Hezbollah … [and] barbaric militias in Iraq …."

d.    *Eurasia Review*, August 15, 2020: "The drop in foreign currency revenue [shows] … the plundering [of Iranian wealth] by corrupt bands affiliated to the … IRGC … and Khamenei himself. … This mafia band [comprised of] … the IRGC and The Executive Headquarters of Imam [*i.e.*, the SLO], which belongs to Khamenei, is clinging on to Iran's import and export trade like an octopus, with exclusive control over it, causing immense corruption. … The wealth of bodies and institutions under the control of Iran's Supreme Leader, Ali Khamenei, is estimated at hundreds of billions of dollars. Today the majority of banks, industries, mines, communication enterprises, and financial institutions are under the exclusive ownership of Khamenei and the [IRGC]. Each year tens of billions of dollars are drained out of the country through the mullahs' and IRGC's

corruption and looting, being spent on the regime's terrorism and its proxies in Iraq, Syria, … and Lebanon. This has gone so far that the United States has issued an ultimatum that it will close its embassy in Baghdad unless the regime's proxies are brought to account for their consecutive attacks on [U.S.] embassies and convoys."

e.  National Council of Resistance of Iran, April 2022: "When it comes to … domestic and foreign commerce … Khamenei's office (along with the IRGC) has taken control of virtually everything that matters. … [T]he astronomical profits … end[] up funding … IRGC … terror operations in … Iraq … and … around the world."

468.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related import/export companies, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned imports to Iran and/or exports from Iran, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

**F.      The Communications Sector: Telecoms, Internet, and Related Technology**

469.    The SLO and IRGC began their seizure of the communications sector when it seized control of Irancell—Iran's most important internet and telecoms company—in 2005. The SLO and IRGC completed their seizure of the communications sector in 2009, when they collaborated to help the IRGC purchase the Telecommunications Company of Iran. By 2009, the Supreme Leader and IRGC had seized a monopoly in Iran's communications sector, which was comprised of Iranian telecoms, internet, social media, and computing, and communications technologies firms, operationalized through Iran's Terrorist Sponsors. These entities, collectively, owned and/or exercised direct or indirect control over all communications companies in Iran.

470.    From 2009 through 2020, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its communications-related transactions (including landline and mobile telecoms, internet, computing, social media, and associated technologies) concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of a monopoly over the Iranian communications sector. Such warnings to SCB included, but were not limited to:

a.      Ali Alfoneh (American Enterprise Institute), October 22, 2007: "The IRGC rooted its rhetoric on [seizing telecoms companies] in national security. … the IRGC expects to maintain its dominant position not only on the battlefield, but in civilian sectors as well. … Because some of the Iranian economy's most advanced technological undertakings occur under the aegis of the IRGC and within the framework of the Iranian arms industry, the IRGC can monopolize the transfer and adaptation of high technology to civilian applications … … The homepage of [IEI] … display[s] many consumer goods produced by the arms industry for sale in the Iranian market. The list includes personal computers, scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These purchases support … IRGC operations …."

b.      *APS Diplomat News Service*, November 23, 2009: "[T]he IRGC now monopolises Iran's huge communications sector."

c.      *UPI*, November 24, 2009: "[A] company tied to the Revolutionary Guards acquired a majority share in the nation's telecommunications monopoly, essentially giving the [IRGC] control of Iran's land lines, Internet providers and cellphone companies."

d.      *Guardian*, November 25, 2009: "[U]nofficial spokesman for the opposition Green Movement … Mohsen Makhmalbaf … called for 'smart' sanctions targeting the Islamic Revolutionary Guard Corps and their extensive business interests – including a communications monopoly – that are often described as constituting a parallel economy. 'The Revolutionary Guards are terrorists. They are in Iraq … and Lebanon.'"

e.      Dr. Monika Gill, October 2020: "[W]hilst the Guard relied on the communications economy to propagate their ideology, they also acquired and monopolised communications infrastructure as a source of capital gain. The Guard's involvement with the communications economy moved beyond the projection of revolutionary ideology, becoming equally a matter of realpolitik and of accruing military capital."

471.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related telecoms, internet, social media, computing, and

communications technology-related transactions, including every such transaction processed by SCB alleged herein. When SCB facilitated transactions that SCB knew were on behalf of Iran-related persons, and concerned Iran's communications sector, SCB knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

## VI. For More Than A Decade, SCB Engaged In An Illegal Scheme To Help Iran's Terrorist Sponsors And Their Fronts Access The U.S. Financial System

472.    SCB has long considered itself a "frontier bank" that was unafraid—indeed, eager—to pursue business opportunities in emerging markets that other large financial institutions avoided due to reputational, regulatory, and geopolitical risks.[19] Consistent with SCB's pursuit of such high-risk, high-reward opportunities, SCB for decades aggressively pursued business in Iran and with Iranian companies and individuals doing business in nearby countries, particularly the United Arab Emirates.

473.    The cornerstone of SCB's business strategy to grow its presence in the Middle East was its willingness to offer customers U.S. dollar clearing services. U.S. dollar clearing is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank; payments are converted from a foreign currency into U.S. dollars. Participation in global commerce depends on access to U.S. dollars and dollar clearing services.

474.    U.S. dollar clearing was particularly important to the Iranian government, Iranian state-owned banks, Iran's Terrorist Sponsors, their front companies, and other Iranian businesses for several reasons. First, the persistent weakness of Iran's currency, the Rial, led to a desire for

---

[19] Decl. of Robert G. Marcellus ¶ 39 ("Marcellus Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-1.

access to a more stable, globally accepted currency. Second, Iran's economy has long depended on exporting oil and gas—a commodities market denominated primarily in U.S. dollars. Third, Iran's Terrorist Sponsors and their terrorist proxies have long depended on access to U.S. dollars to fund anti-American violence.

475.    After September 11th, the United States and most other Western nations markedly expanded their anti-money laundering and anti-terror financing sanctions, while bolstering related enforcement activities. As a result, Iran—and in particular its IRGC, which was the principal target of many sanctions directed at Iran—became increasingly isolated from the international financial community, and its access to U.S. dollars became constricted.

476.    SCB saw this as a money-making opportunity. SCB knew that Iran—including its Terrorist Sponsors—needed access to U.S. dollars, and SCB was willing to facilitate that access. SCB was aware of the heightened regulatory scrutiny and risks associated with banking with Iranian entities. But SCB was not deterred. To the contrary: SCB thought the heightened regulatory risks would discourage SCB's competition and allow SCB to monopolize the market—while extracting a higher premium for its U.S. dollar clearing services.

477.    From at least 2001 through at least late 2014 or early 2015, SCB engaged in a deceptive and illegal scheme to provide its Iranian customers with covert and largely unfettered back-door access to the U.S. financial system. In doing so, SCB violated U.S. sanctions and other laws and regulations designed to prevent the U.S. financial system from being used to finance terrorism—despite knowing, or at least being aware of a high probability, that several of its Iranian customers were agents and fronts for Iran's Terrorist Sponsors. SCB's scheme caused hundreds of millions—if not ***billions***—to flow to these prohibited Iranian customers.

478.    That staggering sum is a conservative estimate. One former SCB employee-turned-whistleblower estimated, based on a forensic analysis of internal SCB data, that SCB's illicit U.S. dollar transactions with sanctioned Iranian customers totaled ***tens of billions***.[20]

479.    SCB knew, or was at least deliberately ignorant of the fact, that its illegal assistance to Iranian customers would directly and indirectly benefit Iran's Terrorist Sponsors and help finance anti-American terrorist attacks committed by the IRGC, including its Hezbollah branch, and its terrorist proxies, including Hamas. Those anti-American terrorist attacks included the ones that killed and injured Plaintiffs and their loved ones.

480.    SCB's knowledge can be traced to multiple sources. First, as a major financial institution, SCB had and has access to state-of-the-art tools for customer diligence and economic intelligence, which allow it to understand the nature of the markets in which it operates and the customers it serves. SCB also had abundant incentives to employ these tools to their fullest effect—including regulatory requirements and best-practices guidance requiring it to do so, as well as business imperatives to know its customers' business so that it could provide them with financial services that they would appreciate and pay for. These tools alerted SCB to public reports discussing its customers and the sectors in which they operated, as well as non-public information that SCB gathered about its customers while trying to earn and maintain their business.

481.    Second, SCB was in contact with other banks and with regulators, which communicated private information to SCB about its customers and the environment in which

---

[20] *See* Decl. of Julian M. Knight ¶¶ 2, 12, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.*, No. 18-cv-11117 (S.D.N.Y. May 31, 2024), Dkt. 105; *see also* Decl. of Julian M. Knight ¶¶ 40, 44, 67, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Jan. 10, 2020), ECF 48-2.

they operated. For example, NYDFS's 2012 resolution with SCB found its misconduct "especially egregious" because, at the time it occurred, "SCB's New York branch was subject to a formal supervisory action" for other money-laundering and sanctions-related violations, meaning SCB was in direct contact with regulators throughout the relevant time period.[21] News reports also revealed that in the years after September 11, 2001, U.S. Treasury officials conducted road shows to major financial institutions where they explained the risks of taking on customers from jurisdictions like Iran, including explaining that it was highly likely that businesses in sectors that had been taken over by Iran's Terrorist Sponsors were contributing to their terrorist-support mechanisms. SCB was the beneficiary of such briefings. Additionally, when other banks were asked to process transactions for an SCB customer, they would analyze the transaction and, if it raised issues, explain those issues to SCB, providing SCB with further intelligence about its customers and the nature of their transactions.

482. Third, the customers SCB served through its evasion schemes were not individuals with small, simple checking accounts; they were large entities moving millions upon millions of dollars each and every year, and paying hefty commissions to SCB in the process. For business reasons, banks like SCB get to know such customers—including learning the identities of their beneficial owners and understanding the true nature of their businesses. Thus, banks, including SCB, assign relationship managers to learn about the customers and assess how the bank can best serve them. They gather and monitor data about their customers, and find opportunities to expand the banking relationship. They strive to understand, at a deep and fundamental level, what the customer wants from the relationship. When, as here, the customer wants to obscure its identity and covertly move money for Iran's Terrorist Sponsors, SCB would

---

[21] 2012 NYDFS Consent Order ¶ 6.

learn that fact through its relationship with the customer. Indeed, SCB chose to satisfy those illicit needs.

483.     Fourth, SCB had a physical presence in Iran through its office in Tehran, which remained open until May 2012, just before U.S. authorities' first enforcement actions against SCB became public. Through this office, as well as its branch in nearby Dubai, SCB employees and agents observed firsthand major developments in the Iranian economy, including, as discussed in greater detail *infra*, the IRGC's overt and public takeover of key sectors that SCB wanted to serve, which began as early as 2005. The pervasive role that Iran's Terrorist Sponsors and their fronts played in the Iranian economy was a matter of common knowledge within Iran and Dubai, and therefore a matter of knowledge to SCB, which was present there. The bank's presence in Iran and Dubai also created many opportunities for IRGC officers and fronts to interface directly with the bank, free from the prying eyes of Western regulators.

484.     SCB's culpable assistance to Iran's Terrorist Sponsors lasted until at least late 2014 or early 2015, from which Iran's Terrorist Sponsors and their proxies Hezbollah, Hamas, JAM, and PIJ continued to finance their terrorist attacks through at least 2019.

485.     SCB's conduct resulted in multiple criminal and civil proceedings that SCB settled by paying massive penalties to regulators, including the DOJ, OFAC, Federal Reserve, NYDFS, and the U.K. FCA. Between 2012 and 2019, SCB paid nearly $2 billion in forfeitures and penalties to U.S., New York, and United Kingdom authorities for the illegal conduct described herein. In evaluating SCB's conduct, those agencies described the bank's conduct as

"intentional,"[22] its violations "egregious,"[23] and the bank itself as a "rogue institution"[24] whose persistent misconduct left the United States "vulnerable to terrorists."[25]

486.    SCB went to great lengths to disguise the magnitude of its sanctions-evasion efforts. Throughout the life of the scheme, SCB actively concealed its illegal conduct from governmental authorities in the United States and United Kingdom to keep its profits flowing—regardless of the cost in American lives.

## VII.    SCB's Scheme Involved Willful, Systemic, Company-Wide Efforts To Provide Banking Services To Iran's Terrorist Sponsors And Their Associated Fronts While Helping Them Evade Counterterrorism Controls

487.    For more than a decade, SCB conspired with clients owned and/or controlled by Iran's Terrorist Sponsors—Ayatollah Khamenei, the SLO, the Friday Prayer Organization, the IRGC, Hezbollah, and/or the Foundation for the Oppressed—to perform massive volumes of financial transactions for those clients in violation of U.S. sanctions, while simultaneously helping them evade counterterrorism controls. SCB's assistance to its terrorist-sponsor clients included systematically concealing and/or misrepresenting critical Iran-related information from its wire transactions (*i.e.*, wire stripping), which SCB knew would inhibit reporting and surveillance systems that the U.S. and other governments relied upon to combat terrorism. SCB also conspired with front companies to cover their tracks by closing accounts, changing names, and/or submitting transactions in a manner designed to evade scrutiny. SCB's efforts further included lying to government regulators, falsifying internal documents, employing deliberately

---

[22] N.Y. State Dep't of Financial Services ("NYDFS"), *In re Standard Chartered Bank*, Consent Order Under New York Banking Law §§ 39, 44 ¶ 1 (Apr. 9, 2019) ("2019 NYDFS Consent Order").
[23] Office of Foreign Assets Control ("OFAC"), Settlement Agreement with Standard Chartered Bank ¶¶ 3,4 (Apr. 9, 2012) ("2019 OFAC Settlement").
[24] *See* 2019 Amended DPA ¶ 29 & SOF ¶ 2.
[25] 2012 NYDFS Consent Order at 1.

ineffective compliance programs, and retaliating against whistleblowers who tried to expose or

otherwise stop the scheme. SCB helped its clients evade counterterrorism controls not only to

hide its own sanctions violations from U.S. and U.K. regulators, but also to protect its terrorist-

sponsor clients from unwanted scrutiny that might jeopardize their operations and the bank's

lucrative business as the U.S. and other governments were ratcheting up their concern over

terrorism financing by Iran, the IRGC, and Iran's other terrorist sponsors. Plaintiffs learned of

the specific instances of misconduct below without access to SCB's files; discovery is likely to

reveal additional examples of SCB's knowing provision of extraordinary assistance to fronts for

Iran's Terrorist Sponsors, similar to the ones alleged herein.

### A. The U.S. Government's Counterterrorism Controls

488. The U.S. government's counterterrorism controls in the banking system included

three key elements: (1) economic sanctions that prohibited certain transactions at high risk for

terrorism financing; (2) review and reporting of suspicious transactions by financial institutions;

and (3) direct monitoring of transactions by the government. Before discussing SCB's scheme,

Plaintiffs first provide relevant background on these counterterrorism controls.

#### 1. OFAC's Iran Sanctions

489. Financial transactions with Iran have been subject to U.S. economic sanctions

since 1979. The U.S. government's sanctions regime aims to identify and block those who

attempt to use the U.S. financial system in contravention of U.S. foreign policy, as well as

foreign countries, entities, and individuals who may present a threat to national security. In

particular, the sanctions are intended to prevent U.S. dollars from being used to finance terrorist

organizations, proliferators of weapons of mass destruction, drug traffickers, and other hostile

enterprises. With respect to Iran, these measures were strengthened in 1995 when President

Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat." Through the issuance of Executive Order 12957 in March 1995 and Executive Order 12959 in May 1995, President Clinton imposed comprehensive trade and financial sanctions on Iran.

490.     A key purpose of these sanctions was to prevent Iran from using its petroleum resources to fund terrorism. As President William J. Clinton explained in a message to Congress on September 18, 1995, "I issued Executive Order 12957. . . to prohibit the financing, management, or supervision by United States persons of the development of Iranian petroleum resources. This action was in response to actions and policies of the Government of Iran, including support for international terrorism, efforts to undermine the Middle East peace process, and the acquisition of weapons of mass destruction and the means to deliver them." However, "[f]ollowing the imposition of these restrictions with regard to the development of Iranian petroleum resources, Iran continued to engage in activities that represent a threat to the peace and security of all nations, including Iran's continuing support for international terrorism." To "further respond to the Iranian threat," President Clinton explained that he issued Executive Order 12959, which imposed comprehensive sanctions prohibiting exportation from the United States to Iran or to the Government of Iran of goods, technology, or services, as well as prohibiting transactions by United States persons in goods and services of Iranian origin or owned or controlled by the Government of Iran. These comprehensive sanctions were intended in part to limit the flow of funds to terrorism, and thus in the President's words, "advance[d]

important objectives in promoting the nonproliferation and antiterrorism policies of the United States."

491. In a subsequent message to Congress on August 19, 1997, President Clinton explained that he was issuing another Executive Order (E.O. 13059) to "confirm[] that United States persons are prohibited from engaging in any trade- or investment-related activities with Iran." He added, "I want to make clear that this means all direct or indirect involvement in such activities wherever those activities occur."

492. The sanctions regime is primarily administered by OFAC, which implemented the President's Executive Orders through its Iran Transaction Regulations (ITRs) and related guidance. Until November 2008, OFAC rules permitted U.S. financial institutions, under limited circumstances and with close regulatory supervision, to process certain transactions for Iranian banks, individuals, and other entities. These were called "U-Turn" transactions because such transactions originated and terminated with foreign banks, passing through U.S. banks or branches as part of the clearing process. U-Turn clearing transactions, although not categorically prohibited by OFAC's regulations, posed an exceedingly high risk that required stringent scrutiny under applicable regulatory standards. For example, OFAC regulations required that "[b]efore a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part." And beyond OFAC, other regulations required heightened due diligence and reporting of suspicious transactions as part of a bank's Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) program. The obligation to determine that a U-Turn complied with U.S. law, and to review and report suspicious U-Turn transactions to the government, thus fell

squarely on U.S. clearing banks and U.S.-based compliance personnel. In satisfying this obligation, U.S. clearing banks and U.S.-based compliance personnel relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches.

493.    Recognizing that the U-Turn exception was being abused by an Iranian regime whose support to terrorist groups was pervasive, OFAC revoked the U-turn exception for Bank Saderat on September 7, 2006, effectively prohibiting all transactions, directly or indirectly, involving the bank. In announcing this action, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained, "The bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001." Although Treasury acknowledged that Bank Saderat was one of the largest Iranian-owned banks, the bank had been so permeated by terrorist financing and illicit activity that all transactions with the bank were prohibited. As Levey explained, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

494.    The action against Bank Saderat followed a long campaign by the U.S. government and international partners to shine a spotlight on the terrorism risks of doing business with Iran's banks. As former Treasury Assistant Secretary for Terrorist Financing and Financial Crimes Juan C. Zarate explained in his 2013 memoir, *Treasury's War*, Treasury had begun a "Bad Bank Initiative" in early 2003 to target banks that were serving as nodes of illicit

financing and to send "a clear message to others in the banking world." "In 2003," Zarate explains, "we identified Bank Saderat as a principal target in our Bad Bank Initiative." At that time, there was "direct and convincing evidence that Bank Saderat was being used as the bank of choice for transactions taking place between Iran and Hezbollah, with the branch in Beirut serving as the central conduit for support to Hezbollah's activities in Lebanon." Those activities were well-known outside of Treasury.[26] And as part of its Bad Bank Initiative, Treasury sounded the alarm to other financial institutions, including on information and belief, SCB. As Zarate explains, "[a]n argument would be made directly to banks and companies around the world that it was too risky to do business with Iran, since no one really knew who was lurking behind corporate veils, pulling the strings, and accessing bank accounts and funding in Tehran."

495.    Treasury's Bad Bank Initiative also included Banks Melli, Mellat, and Sepah, as well as CBI/Markazi, which "would begin to look like a commercial bank for Iranian interests, and it, too, was willing to serve as a banking hub for Iranian illicit activity."

496.    What remained of the U-Turn exception did not permit U-Turn transactions involving entities or individuals that had been designated by OFAC. As relevant here, OFAC designated numerous Iranian entities on October 25, 2007, for supporting terrorism and proliferation: the IRGC; the IRGC's Qods Force; the MODAFL; nine IRGC-affiliated companies involving the IRGC in a diverse array of activities, including in the petroleum and construction sectors; five IRGC leaders; and three Iranian banks—Bank Saderat, Bank Mellat, and Bank Melli.

---

[26] Zarate explains, "We were not the only ones to focus on Bank Saderat—this was a bank that Israel would consider bombing during its war with Hezbollah in 2006, considering its central importance to Hezbollah's financing."

497.    A fact sheet accompanying Treasury's October 25, 2007, designations contained detailed information about Iran's use of IRGC-affiliated entities and banks to finance terrorism and other illicit activity. According to the fact sheet, "FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards." Bank Melli, Bank Saderat, along with various IRGC-affiliated entities and individuals were designated under E.O. 13382. Bank Melli was cited as using deceptive banking practices to provide banking services for the IRGC, IRGC-QF, as well as entities owned or controlled by them. Bank Saderat was identified as being used by Hezbollah "to send money to other terrorist organizations," as well as being used by the Iranian government to "channel funds to terrorist organizations." The IRGC "has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country." Although OFAC did not formally designate CBI/Markazi until September 20, 2019, Treasury warned in the 2007 fact sheet (and would continue to warn) that CBI/Markazi was facilitating terrorist financing: "For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence."

498.    On November 6, 2008, Treasury revoked authorization for U-Turn transactions in their entirety. In a fact sheet accompanying this action, Treasury explained that it was "revoking the U-turn general license today to protect U.S. financial institutions individually, and the U.S. financial system as a whole, from the significant terrorist financing and proliferation risks posed

by Iran. This regulatory action will close the last general entry point for Iran to the U.S. financial system."

499. Treasury's November 6, 2008, fact sheet provided a detailed explanation and warning about how Iran and the IRGC were using the international financial system to evade counterterrorism controls and finance acts of terrorism by their proxies in the Middle East:

Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. . . .

**Iran Misuses the International Financial System to Support Terrorism**

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups.** Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America. The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: Lebanese Hizballah; Palestinian terrorists; certain Iraqi Shi'a militant groups; and Islamic militants in Afghanistan and elsewhere. The Qods Force is especially active in the Levant, providing Lebanese Hizballah with funding, weapons and training. It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. The Qods Force continues to provide the Taliban in Afghanistan with limited weapons, funding, logistics and training in support of anti-U.S. and anti-coalition activities.

• **Iran Uses its Banks to Finance Terrorism.** In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat as of early 2005. The Treasury Department designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ. Australia has also designated Bank Saderat. Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

500. Treasury's November 6, 2008, fact sheet also provided an additional explanation

and warning about how Iran was seeking to evade counterterrorism controls:

**Iran Uses Deceptive Financial Practices to Evade Sanctions**

• **Iranian Commercial Banks.** It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. For example, Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to determine the true parties to a transaction. Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Bank Sepah in transactions. Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC. In addition, when Iranian assets were targeted in Europe, branches of Iranian state-owned banks in Europe took steps to disguise ownership of assets on their books in order to protect assets from future actions.

• **Central Bank of Iran.** The Central Bank of Iran (CBI), the sole Iranian entity that regulates all Iranian banks, has not only engaged in deceptive practices itself – such as asking for its name to be removed from transactions – but has also encouraged such practices among Iran's state-owned banks. For example, prior to EU and UN sanctions, the CBI attempted to help Banks Sepah and Melli protect their assets from being frozen. Later, the CBI instructed non-sanctioned Iranian state-owned banks to issue payment instructions on behalf of Sepah in order to circumvent sanctions. In the case of Bank Melli, the CBI provided substantive assistance to minimize the impact of sanctions. In fact, between January and March 2008, the CBI handled tens of millions of dollars in transactions to and from the accounts of U.S.- and UN-designated banks held at the CBI.

• **Use of Front Companies and Misuse of Bank Accounts.** Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its nuclear or missile programs. Iranian entities form front companies outside of Iran for the sole purpose of exporting dual-use items to Iran that can be used in these programs. These front companies enable

the regime to obtain materials that the country of origin would typically prohibit from being exported to Iran. Iran also has a history of using accounts set up for one purpose to facilitate activities with designated entities.

501.     In remarks accompanying the revocation of the U-Turn exception, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained that the action was the culmination of a campaign that had been launched in November 2006 "to warn the world about how Iran's threat to our security also posed a threat to the integrity of the international financial system." Since that time, he explained, "we have shared information with foreign governments and financial institutions about how Iran is using its banks to finance its nuclear and missile programs and terrorist groups. We have provided reliable information to back up our words, demonstrating that even seemingly benign business with Iran should be cause for concern." Levey went on to explain that most financial institutions had heeded the warnings:

> At the same time, many private financial institutions and companies worldwide have voluntarily shunned business with Iran. Banks see Iran's behavior as posing an unacceptable risk to their reputations, and they would rather forgo the business and preserve their integrity[.] Back in September 2006, I could count on one hand the major banks that had cut off or dramatically reduced their business with Iran. Now, there are only a few that have not done so.

> There is now a global consensus that Iran poses an unacceptable threat to the international financial system. The Financial Action Task Force (FATF), which has members representing 32 jurisdictions and is the world's premier standard-setting body on combating money laundering and terrorist financing, issued its fourth warning on Iran last month, calling for countries worldwide to strengthen measures to protect their financial sectors from this threat.

> . . .

> As members of the FATF, we are fulfilling our obligation to strengthen measures to protect our financial sector from those risks. Therefore, today we are revoking the U-turn license for Iran, thus terminating the last general entry point for Iranian banks – both state-owned and private – to the U.S. financial system. U-turn transactions allowed U.S. banks to indirectly process payments involving Iran if they began and ended with a non-Iranian foreign bank. Given Iran's conduct, it is necessary to close even this indirect access.

In recent months, many U.S. institutions have refused to host these U-turn transactions for Iran. Still, the exemption was used by Iran as a hook to solicit foreign banks to process transactions through the United States on its behalf, sometimes with requests to substitute another bank or code word for the Iranian institution. With today's action, Iran's potential to manipulate U.S. financial institutions has been significantly curtailed.

502.     The sum and substance of this avalanche of sanctions was simple: the entire landscape of U.S. policy towards Iran was transformed through a series of actions that sought to isolate Iran and its terrorist financing from the U.S. and international financial system.

## 2.     Transaction Review and Reporting

503.     Separate and apart from sanctions, U.S. banks and foreign banks with U.S. branches are subject to an additional set of regulations under the Bank Secrecy Act (BSA) and state and federal banking laws to prevent money laundering and the financing of terrorism. These Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) regulations are administered by Treasury's Financial Crimes Enforcement Network (FinCEN), along with the banking regulators. At the heart of these regulations is an obligation by financial institutions to carefully review the transactions they process, and to promptly report suspicious activity— including terrorist financing—to FinCEN, which disseminates these reports to law enforcement agencies and the intelligence community.

504.     The critical importance of BSA reporting as a counterterrorism control was explained in findings Congress made when it bolstered BSA requirements in the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, part of the USA PATRIOT Act. In the Act, Congress found that "money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks." Such money launderers "subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of

criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend." And in particular, "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions."

505. Among other things, the Act amended the BSA's declaration of purpose (31 U.S.C. 5311) to emphasize counterterrorism: "It is the purpose of this subchapter (except section 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, *or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism*." (emphasis added). Congress also added language in another section (31 U.S.C. 5319) making clear that BSA reports shall be made available to any "United States intelligence agency."

506. To underscore the importance of BSA reporting in countering terrorist attacks, President George W. Bush visited FinCEN on November 7, 2001, and gave a speech to "put the world's financial institutions on notice." He explained that the War on Terrorism was "not a war just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained how certain terrorist financiers "present[ed] themselves as legitimate businesses. But they skim money from every transaction, for the benefit of terrorist organizations. They enable the proceeds of crime in one country to be transferred to pay for terrorist acts in another." President Bush did not mince words in delivering his "clear message to global financial institutions": "you

are with us or you are with the terrorists. And if you're with the terrorists, you will face the consequences."

507.    FinCEN explains on its website that BSA reports have "proven to be of considerable value in money laundering, terrorist financing and other financial crimes investigations by law enforcement."

508.    BSA requirements and regulatory expectations are summarized in the Federal Financial Institutions Examination Council (FFIEC) *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual* (FFIEC Manual), which was developed by federal and state banking agencies, FinCEN, and OFAC to provide guidance to banks and their examiners, and to ensure consistency in the application of BSA/AML requirements. The FFIEC Manual was first released in 2005, but it summarized requirements and expectations in effect since before 2001. The FFIEC Manual was commonly regarded by U.S. bank personnel as an authoritative source of guidance on BSA compliance.

509.    BSA compliance required two principal components. First, banks had to establish and maintain an effective AML/CFT program that assessed the banks' AML/CFT risk and monitored transactions for suspicious activity. Second, banks had to investigate transactions for potential illicit activity and report suspicious transactions to FinCEN.

510.    As part of a bank's risk assessment, according to the FFIEC Manual, a bank had to "first, identify the specific risk categories (*i.e.*, products, services, customers, entities, and geographic locations) unique to the bank; and second, conduct a more detailed analysis of the data identified to better assess the risk within these categories." The FFIEC Manual explained that high-risk products and services included the following:

- funds transfers

- electronic banking

- foreign correspondent accounts

- trade finance

High-risk customers and entities included the following:

- foreign financial institutions

- foreign individuals

- foreign corporations

High-risk geographic locations included the following:

- countries subject to OFAC sanctions, including state sponsors of terrorism

- countries identified as supporting international terrorism under section 6(j) of the Export Administration Act of 1979

- jurisdictions determined to be "of primary money laundering concern" by the Secretary of the Treasury, and jurisdictions subject to special measures imposed by the Secretary of the Treasury, through FinCEN, pursuant to section 311 of the Patriot Act.

- jurisdictions or countries identified as non-cooperative by the Financial Action Task Force on Money Laundering (FATF)

511.    The second step of the risk assessment required considering more specific data regarding the purpose of an account, actual or anticipated activity in the account, the nature of the customer's business, the customer's location, and the types of products and services used by the customer, with the bank's Customer Due Diligence (CDD) information having an important role in the process.

512. The FFIEC Manual further explained that the risk assessment process needed to be "an ongoing process, not a one-time exercise." Banks were expected to update their risk assessments to identify changes in the bank's risk profile, and this required banks to continually monitor information from a variety of sources. The FFIEC Manual included a list of sources, including U.S. Government threat assessments, FinCEN guidance, and FATF publications.

513. A bank's risk assessment was expected to inform its reporting obligations: "For example, the bank's monitoring systems to identify, research, and report suspicious activity should be risk-based, with particular emphasis on high-risk products, services, customers, and geographic locations as identified by the bank's BSA/AML risk assessment."

514. The next step was to establish a set of internal controls reasonably designed to ensure ongoing compliance with BSA requirements. The FFIEC Manual explained that a bank's "board of directors, acting through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting," and the "board of directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes."

515. The FFIEC Manual explained that the "cornerstone of a strong BSA/AML compliance program is the adoption and implementation of comprehensive CDD policies, procedures, and processes for all customers, particularly those that present a high risk for money laundering and terrorist financing." The FFIEC Manual explained that CDD policies, procedures and processes "provide the critical framework that enables the bank to comply with regulatory requirements and to report suspicious activity," as well as aiding the bank in "[a]voiding criminal exposure from persons who use or attempt to use the bank's products and services for illicit

purposes." Where customers pose high risk, the FFIEC Manual contemplates an intensive review of relevant customer information, including:

- Purpose of the account.

- Source of funds and wealth.

- Beneficial owners of the accounts, if applicable.

- Customer's (or beneficial owner's) occupation or type of business.

- Financial statements.

- Banking references.

- Domicile (where the business is organized).

- Proximity of the customer's residence, place of employment, or place of business to the bank.

- Description of the customer's primary trade area and whether international transactions are expected to be routine.

- Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers.

- Explanations for changes in account activity

516.    The final element of BSA compliance, and the culmination of a bank's AML/CFT controls, was suspicious activity reporting, which the FFIEC Manual explained was "critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering, and other financial crimes." Under BSA regulations, banks were required to file a Suspicious Activity Report (SAR) for any transaction conducted or attempted by, at, or through the bank (or an affiliate) and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to suspect that the transaction involves money laundering or illegal

activity. The FFIEC Manual specified that this included any suspected "terrorism financing." Indeed, although SARs were normally required to be filed no more than 60 days after the date of initial detection, the FFIEC Manual instructed banks to act immediately upon any suspected link between a customer and terrorist activity:

> If a bank knows, suspects, or has reason to suspect that a customer may be linked to terrorist activity against the United States, the bank should immediately call FinCEN's Financial Institutions Terrorist Hotline at the toll-free number: 866-556-3974. . . . [T]he bank must also file a SAR.

517.    Under BSA regulations, SARs are highly confidential. No bank, and no director, officer, employee, or agent of a bank, that reports a suspicious transaction may notify any person involved in the transaction that the transaction has been reported.

518.    More generally with respect to terrorist financing, the FFIEC Manual contained an appendix entitled "Money Laundering and Terrorist Financing 'Red Flags,'" wherein examples of potentially suspicious activity that may indicate terrorist financing were listed. The examples included:

- Funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from high-risk countries (*e.g.*, countries designated by national authorities and FATF as non-cooperative countries and territories).

- Funds transfers do not include information on the originator, or the person on whose behalf the transaction is conducted, when the inclusion of such information would be expected.

- Banks from high-risk locations open accounts.

- Funds are sent or received via international transfers from or to high-risk locations.

In explaining these red flags, the FFIEC Manual referenced Guidance for Financial Institutions in Detecting Terrorist Financing that had previously been issued in 2002 by the Financial Action Task Force (FATF) and listed similar red flags.

519.    The FFIEC Manual also explained that terrorist financing can happen through legitimate business activity, even where the transactional activity itself contains no red flags: "Other legitimate sources have also been found to provide terrorist organizations with funding; these legitimate funding sources are a key difference between terrorist financiers and traditional criminal organizations. In addition to charitable donations, legitimate sources include foreign government sponsors, business ownership, and personal employment."

520.    FATF issued a report on Terrorist Financing in February 2008 specifically explaining that "[d]etecting terrorist involvement in otherwise legitimate financial activity requires financial institutions to implement the FATF standards through strong application of the 'know your customer' principle and of customer due diligence (CDD) policies and procedures." This report also clearly stated that "financial information" including "suspicious transaction reporting . . . has a central role in identifying terrorist financing and the movement of terrorist funds through the financial system."

### 3.    The Terrorist Finance Tracking Program

521.    A third key counterterrorism control was the U.S. government's ongoing monitoring of payment messages sent through the Society for Worldwide Interbank Financial Telecommunication (SWIFT) system. The SWIFT system was the primary means by which payments were processed through the international banking system. At all relevant times beginning in 2001, the Treasury Department monitored SWIFT payment messages through the Terrorist Finance Tracking Program (TFTP).

522.    Treasury explains the history and importance of this program on its website: "After the terrorist attacks on September 11, 2001, the United States Department of the Treasury (Treasury) initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue

terrorists — such as Al-Qaida, Hizballah, HAMAS and their networks. This was an important part of Treasury's larger effort to track terrorist money flows and assist in broader U.S. government efforts to uncover terrorist cells and map terrorist networks here at home and around the world."

523.    Since the start of the program in 2001, Treasury's website reports that "the TFTP has provided hundreds of thousands of valuable leads to U.S. government agencies and other governments that have aided in the prevention or investigation of many of the most visible and violent terrorist attacks and attempted attacks of the past decade. . . . SWIFT information greatly enhances our ability to map out terrorist networks, often filling in missing links in an investigative chain. . . . By following the money, the TFTP has allowed the United States and our allies to identify and locate operatives and their financiers, chart terrorist networks, and help keep money out of their hands."

524.    Although the TFTP began as a covert program, it was revealed and widely publicized by the press in June 2006, including in a *New York Times* article by Eric Lichtblau and James Risen. The following month, Treasury Under Secretary for Terrorism and Financial Intelligence Levey confirmed and explained the importance of the program in testimony before the House Financial Services Subcommittee on Oversight and Investigations:

> As this Committee knows well, tracking and combating terrorist financing are critical
> facets of our overall efforts to protect our citizens and other innocents around the world
> from terrorist attacks. This is true for two main reasons. First, when we block the assets
> of a terrorist front company, arrest a donor, or shut down a corrupt charity, we deter other
> donors, restrict the flow of funds to terrorist groups and shift their focus from planning
> attacks to worrying about their own needs. While any single terrorist attack may be
> relatively inexpensive to carry out, terrorist groups continue to need real money. They
> depend on a regular cash flow to pay operatives and their families, arrange for travel,
> train new members, forge documents, pay bribes, acquire weapons, and stage attacks.
> Disrupting money flows stresses terrorist networks and undermines their operations. In
> recent months, we have seen at least one instance of what we look for most - a terrorist

organization indicating that it cannot pursue sophisticated attacks because it lacks adequate funding.

Second, "following the money" is one of the most valuable sources of information that we have to identify and locate the networks of terrorists and their supporters. If a terrorist associate whom we are watching sends or receives money from another person, we know that there's a link between the two individuals. And, while terrorist supporters may use code names on the phone, when they send or receive money through the banking system, they often provide information that yields the kind of concrete leads that can advance an investigation. For these reasons, counter-terrorism officials place a heavy premium on financial intelligence. . . .

The Terrorist Finance Tracking Program has been a key part of these overall efforts. . . . I have on my staff a group of intelligence analysts who spend their days in a secure room poring over information to unmask the key funders and facilitators of terrorist groups. If you spoke with them, they would point to this program as one of the most important and powerful tools they have to follow the money.

**B.      Between 2001 and 2007, SCB Made a Series of Business Decisions to Serve Customers with Close Connections to Iran's Terrorist Sponsors by Helping Them Subvert Counterterrorism Controls**

525.     Beginning no later than 2001 and continuing through at least 2007, SCB moved ***at least $250 billion*** through the NY Branch on behalf of client Iranian financial institutions ("Iranian Banks") with close ties to Iran's Terrorist Sponsors. The Iranian Banks included at least CBI/Markazi, as well as Bank Saderat and Bank Melli, both of which were (and still are) Iranian State-owned institutions.[27] All three of these banks have been sanctioned by the United States for their connections with the IRGC's anti-American terrorism.

526.     Only a few weeks after President Clinton sounded the alarm about Iran's funding of terrorism and imposed comprehensive sanctions in May 1995, SCB began to view those warnings as a business opportunity. In a June 1, 1995, email, SCB's General Counsel strategized with SCB's compliance staff about how to evade the new sanctions, advising, "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no

---

[27] 2012 NYDFS Consent Order ¶ 1.

knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCBLondons [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY." Recognizing the illicit nature of this scheme, he instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."[28]

527.    Despite the U.S. singling out Iran's petroleum sector for particular concern in 1995, SCB viewed it as a source of lucrative business to provide Iranian petroleum companies with access to U.S. dollars. In 2001, CBI/Markazi asked SCB to act as its correspondent bank with respect to international U.S.-dollar payments, including relating to oil sales by NIOC. At that time, the CEO of SCB's Iran representative office wrote a memo in support of expanding the CBI account, noting that "[t]o be the bank handling Iran's oil receipts would be very prestigious for SCB. In essence, SCB would be acting as Treasurer to the CBI/the country."[29] SCB decided to accept this business in 2001.

528.    SCB determined that OFAC's U-turn exception would generally enable SCB to clear CBI/Markazi's U.S.-dollar transactions through its NY Branch without violating OFAC sanctions, but SCB knew that the U.S. government's counterterrorism controls posed a greater obstacle. Not only did U-turn transactions need to be reviewed to ensure that they complied with the U-turn exception, but the NY Branch also had an obligation under the BSA to review and report suspicious transactions. SCB knew that acting as a correspondent bank for an Iranian bank was an activity that would be viewed by U.S. regulators as entailing an extraordinarily high risk of terrorist financing, which would necessitate intensive review by BSA compliance personnel in

---

[28] 2012 NYDFS Consent Order ¶ 20.
[29] 2012 DPA Factual Statement ¶ 22.

the NY Branch. SCB and its Iranian clients also knew that SCB's NY Branch would be required to report suspicious terrorist financing activity to FinCEN for dissemination to law enforcement and the intelligence community.

529.    Those counterterrorism controls had at least two distinct problems from the perspective of SCB and CBI/Markazi.

530.    The first problem was the potential for delay. A "critical component" of the deal between SCB and CBI/Markazi was the timing of $500 million in daily U.S. dollar payments. A senior manager of SCB's Iranian business noted that "the most important aspect to CBI/Markazi of this relationship with SCB" was SCB's "willingness to pay away funds in advance of receipts (intraday of up to USD 200m)." He stressed that providing rapid U.S. dollar payments for CBI/Markazi "could lead to increased business activity with [other Iranian] banks."[30]

531.    But the second problem was the very fact that CBI/Markazi's suspicious activity could be reported. The CEO of SCB's Iran representative office, Mohammed Sarrafzadeh, explained in an interview with federal and state law enforcement authorities that *he believed the Iranians' real concern was that the U.S. government would gain information about the Iranians' business dealings* if the payments were transparent to the NY Branch.[31] In other words, the U.S. government would gain information about how the IRGC's oil business and other activities were funding terrorist attacks. And CBI/Markazi left no doubt that this was of paramount importance to the bank, making clear to SCB that payment processing that showed CBI/Markazi's involvement in the transaction was not an option if SCB was to receive the

---

[30] 2012 NYDFS Consent Order ¶ 23.
[31] 2012 DPA Factual Statement ¶ 23.

business.[32] As one SCB employee wrote about the CBI/Markazi account, "***this account must***

***remain completely secret to the U.S.***"[33]

532.    SCB decided to oblige. It conspired with CBI/Markazi to route U.S. dollar

payments through the NY Branch after first stripping data from SWIFT wire transfer messages

used to identify sanctioned countries, individuals and entities—a practice known as "wire

stripping."[34]

533.    SCB ensured the anonymity of its U.S. dollar clearing activities for Iran's

Terrorist Sponsors through the NY Branch by falsifying SWIFT wire payment directions. SCB

would have employees at SCB London review transactions involving Iranian counterparties,

stripping the message of unwanted identifying data and replacing it with false entries or returning

the payment message to the Iranian Bank for wire stripping and resubmission—a process that

SCB, conscious of its illegality, euphemistically called "repairing" the wire.

534.    SCB utilized such schemes to keep SCB NY in the dark about the true nature of

the U.S. dollar clearing transactions, so that SCB NY would not scrutinize or report these

transactions as suspicious activity.

535.    In March 2001, SCB's Group Legal Advisor counseled several of SCB's officers

that "our payment instructions [for Iranian Banks] should not identify the client or the purpose of

the payment."[35]

---

[32] 2012 DPA Factual Statement ¶ 23.

[33] 2012 DPA Factual Statement ¶ 23 (emphasis added).

[34] 2012 NYDFS Consent Order ¶ 3. According to SCB's independent consultant, this figure
represents about 30,000 messages that were sent to the NY Branch by SCB's London office,
mainly on behalf of state-owned Iranian banks, and approximately 30,000 messages from SCB
Dubai to the NY Branch on behalf of Iranian-owned banks, corporations and other unknown
entities. *Id.* n.2.

[35] 2012 NYDFS Consent Order ¶ 24.

536. SCB went to great lengths to manipulate the SWIFT system to deceive payment message recipients in New York. SCB instructed CBI/Markazi to "send in their MT 202's"—a standardized SWIFT payment message for transfers between banks—"with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank." SCB also accomplished this subterfuge by: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of requested information that would identify the Iranian Banks; and (c) employing a system known as SCB's "repair procedure," whereby SCB overseas employees screened payment messages—before they were communicated to its NY branch—to ascertain whether any messages contained information that identified the Iranian Banks, and if so, remove it.[36]

537. SCB understood that simply omitting Iranian client information on SWIFT MT 202 payment messages going to New York was insufficient because the electronic payment system would automatically fill in blank data fields, identifying the Iranian Bank. Consequently, to disguise the transactions effectively and thereby avoid regulatory scrutiny, SCB deliberately made false and misleading entries in SWIFT "field 52," a data field that would otherwise identify the Iranian party.[37]

538. SCB documents show that its attorney in charge of Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance knew that "the process for effecting Bank Markazi's "payment instructions" was deceptive wire-stripping. He was specifically told that

---

[36] 2012 NYDFS Consent Order ¶ 27.
[37] 2012 NYDFS Consent Order ¶ 28.

"field 52 (ordering institution) is quoted by Bank Markazi in their MT202 as [SCB London]" or SCB would manually "repair" or "over-type field 52 as [SCB London]." He knew that these actions would leave "no reference to Bank Markazi," and would thus "send[] incorrect information."[38]

539.     Senior SCB management memorialized many of these procedures in formal operating manuals. One such manual entitled, "Quality Operating Procedure Iranian Bank Processing," directed SCB's London-based employees to "repair payment[s] by making appropriate changes" to transacting party codes. It provided step-by-step wire stripping instructions for any payment messages containing information that would identify the Iranian Banks. An example directive read:  "[e]nsure that if the field 52 of the payment is blank or displayes [sic] any SWIFT code that it is overtyped at the repair stage to a '.'  This will change the outgoing field 52 on the MT103 to a field 52D of '.'  Or, in the case of a 'normal MT202 instruction change the field 52 on the outgoing MT202 to [SCB's New York branch] to a '.' (Note: if this is not done then the Iranian Bank SWIFT code may appear – depending on routing – on the payment message being sent to [the New York branch])."[39]

540.     The chief lawyer in charge of Legal & Compliance for SCB's Wholesale Bank division commented to other senior legal and compliance staff that the document, "read in isolation, is clearly . . . designed to hide, deliberately, the Iranian connection of payments."[40]

541.     These masking procedures evolved to meet SCB's growing volume demands. When SCB anticipated that its business with the Iranian Banks would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers, SCB

---

[38] 2012 NYDFS Consent Order ¶ 29.
[39] 2012 NYDFS Consent Order ¶ 30 (brackets in original).
[40] 2012 NYDFS Consent Order ¶ 31.

automated the process by building an electronic repair system with "specific repair queues" for each Iranian client.[41]

542. As SCB vigorously cultivated U.S. dollar clearing business from the Iranian Banks, SCB's outside counsel continuously admonished SCB to not evade regulatory requirements. In 2003, one of SCB's outside legal counsel in the U.S. warned that the bank's system for executing U-Turns anonymously through the NY Branch did "not comport with the law or the spirit of OFAC rules, which lay out explicit details on how such transactions are to be conducted." She further instructed that "OFAC insists on full disclosure of all parties in transactions to ensure that transactions meet the terms of the rule."[42]

543. SCB also acutely understood how its wire stripping practices made it impossible for the bank to carry out its AML/CFT obligations to report suspicious activity. In fact, in November 2003, SCB's New York banking regulators conducted an examination of this very matter, in which they concluded that SCB NY's "monitoring of funds transfer activity was found to be ineffective against safeguarding against legal, reputational and compliance risks associated with suspicious and unusual activity in U.S. dollar funds transfer." The regulators warned that the "identification and control of risk exposures is lacking, and considered far below the level expected for a high-risk profile institution such as SCNY."[43] They concluded, "A prompt and satisfactory resolution of the deficiencies is of utmost importance, and we expect both the head office and branch management to assign this situation the highest priority and provide full support to the plan."[44]

---

[41] 2012 NYDFS Consent Order ¶ 32.
[42] 2012 NYDFS Consent Order ¶ 33.
[43] 2012 DPA Factual Statement ¶ 74.
[44] 2012 DPA Factual Statement ¶ 74.

544.     SCB's external counsel provided a similar warning: "I should point out that permissible U-Turn transactions should be done on a fully disclosed basis, that is, SCB (London) . . . should disclose <u>all</u> details of the transaction. Not to do so could place SCB (New York) seriously in harm's way under the law and should be a condition for moving forward with any transaction."[45]

545.     SCB promised its New York regulators in a written agreement that it would correct its AML/CFT compliance failures by "enhanc[ing] due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks" and "implementing industry sound practices designed to identify and effectively manage risks."[46] SCB's CEO and the CEO of SCB Americas signed this written agreement. But the promise was false. As an internal SCB memorandum about its Iran business noted, the agreement to correct AML/CFT compliance failures created negative "implications for [SCB's] growth ambition and strategic freedom that [went] way beyond just the U.S."[47] It stood as a significant obstacle to SCB's growth and evolving business strategies.

546.     Beginning in 2003, other banks with significant Iran portfolios began exiting the U-Turn business. For instance, SCB's business managers learned that Lloyds TSB London was "withdrawing their services" with one of its Iranian client banks "primarily for reputational risk reasons."[28] Rather than follow suit, and despite concerns regarding the terrorist financing risk, SCB positioned itself to take the abandoned market share.[48] It sought to pick up this business and

---

[45] 2012 DPA Factual Statement ¶ 31.
[46] 2012 DPA Factual Statement ¶ 75.
[47] 2012 NYDFS Consent Order ¶ 42.
[48] 2012 NYDFS Consent Order ¶ 35.

add U.S.-dollar accounts for five Iranian banks at SCB London: Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.[49]

547.    As described in a December 2005 internal memorandum written by the CEO of SCB's United Arab Emirates region and the Group Head of Compliance and Regulatory Risk, SCB's "short to medium term strategy [was] to grow the wholesale business by growing our wallet share from existing relationships with Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."[50] That memorandum, entitled *Project Gazelle, Report on Iranian Business*, was circulated among SCB's key legal, compliance, and Iranian client business managers.

548.    As with CBI/Markazi, the other Iranian banks objected to transparency in payment messages sent to the United States.[51] The CEO of SCB Americas expressed concern, explaining, "it is my understanding that we must cease and desist all these current transactions with Iranian customers that don't fully disclose the remitter and beneficiary since it's not a question of interpretation but rather is clearly the law as regards these types of transactions."[52] But SCB's business personnel pushed back, and Mohammed Sarrafzadeh, CEO of SCB's Iran representative office, explained that full transparency "will be a deal breaker" to the Iranian banks.[53]

549.    To avoid such deal-breakers, SCB instituted a system of so-called "offshore OFAC due diligence." The entire enterprise was a sham. Although SCB's offshore operation could do minimal OFAC compliance, it could not substitute for the most critical counterterrorism

---

[49] 2012 DPA Factual Statement ¶ 30.
[50] 2012 NYDFS Consent Order ¶ 36.
[51] 2012 DPA Factual Statement ¶ 30.
[52] 2012 DPA Factual Statement ¶ 32.
[53] 2012 DPA Factual Statement ¶ 33.

controls, which were the AML/CFT compliance and suspicious activity reporting that the BSA required SCB's New York Branch to perform. Thus, the true objective and effect of SCB's offshore scheme was not to relocate meaningful terrorism risk compliance, but to **disable** it. Consistent with the wishes of SCB's Iranian clients, SCB's offshore scheme continued its practice of depriving U.S. personnel responsible for suspicious activity reporting of key information they needed.

550.     SCB's overseas due diligence staff members were responsible for both SCB's U-Turn "repair procedures" and OFAC "compliance"—a paradoxical task to say the least. SCB personnel did not know the elements of a lawful U-Turn transaction other than that the payment "had to be offshore to offshore," and they were not trained to determine whether the underlying transactions were valid according to the Iranian Trade Regulations. In fact, as late as August 2006, SCB's operations staff still "resolve[d] 'hits' on sanctioned names **directly with the customer**"—a method designed to facilitate, not prevent, client misconduct.[54]

551.     Senior SCB management knowingly embraced the bank's fraudulent U-Turn procedures with full awareness that (as one internal report put it) "the current process under which some SWIFT messages are manually 'repaired' to remove reference to Iran could . . . be perceived by OFAC as a measure to conceal the Iranian connections from [the NY Branch], and therefore evade their controls for filtering Iranian related payments. Unless transactions are repaired they face delays caused by investigations in the U.S. banking system, subjecting SCB to interest claims."[55]   An SCB executive described SCB's repair procedures as a "process to check that a payment is, prima facie, an acceptable U-turn transaction (*i.e.* offshore to offshore)," and

---

[54] 2012 NYDFS Consent Order ¶ 39 (emphasis added).
[55] 2012 NYDFS Consent Order ¶ 21.

fully acknowledged that "they do not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."[56]

552.    One of the most pointed internal concerns came from SCB's CEO for the Americas in October 2006. As reported by NYDFS, that executive "sent a panicked message to the Group Executive Director in London" urging the bank to reconsider the Iranian business in light of "the potential to cause *very serious or even catastrophic reputational damage* to the Group," and to subject "management in US and London (*e.g.* you and I) and elsewhere to personal reputational damages and/or *serious criminal liability*."[57] The Group Executive Director responded by belittling the concern and displaying "obvious contempt for U.S. banking regulations," saying in a meeting: "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."[58]

553.    These candid statements are exceptional because people working in banks and in-house legal departments are trained not to leave paper trails admitting wrongdoing. Thus, when executives and attorneys speak in anodyne terms about potential "risk," it is a fair inference that they privately know to a high degree of certainty that their conduct is unlawful. When they spell out, in such stark terms, that they face catastrophic risk and serious criminal liability, the inference is inescapable. Accordingly, SCB's senior executives were aware, as of October 2006 (and likely earlier), that the bank was playing a role in very serious unlawful activities.

554.    The American executive's concern proved true. Multiple regulatory and law enforcement agencies concluded that SCB's conduct posed serious sanctions risks, interfered with its ability to perform effective safety and soundness examinations, and prevented it from

---

[56] 2012 NYDFS Consent Order ¶ 21 (emphasis removed).
[57] 2012 NYDFS Consent Order ¶ 7 (emphasis in the original).
[58] 2012 NYDFS Consent Order ¶ 8.

identifying suspicious activity that could assist them in effectively supervising other licensed institutions and from assisting other law enforcement authorities.

555.    SCB's systemic misconduct was the basis for the violations of law set forth in SCB's 2012 DPA with DOJ and the 2012 NYDFS Consent Order—in connection with which SCB paid more than $550 million in penalties and forfeitures.

556.    SCB was found by regulatory and law enforcement agencies to have processed $23 million in transactions for Iranian customers from 2001 through 2007 that violated OFAC's U-turn rules. No less troubling, however, was the larger bulk of transactions SCB processed through New York for Iranian banks and other Iranian customers with fraudulent and misleading SWIFT messages. Between 2001 and 2007, these transactions included more than $32 billion and at least 2,684 SWIFT messages for CBI/Markazi; more than $79 billion and at least 5,189 SWIFT messages for the five other Iranian banks; and more than $3.9 billion for other Iranian clients of SCB's Dubai Branch.

557.    SCB's deliberately fraudulent and misleading SWIFT messages impeded critical counterterrorism controls by depriving the U.S. government of important information about the transactions, just as SCB's Iranian clients wanted. SCB's scheme made it impossible for SCB's AML/CFT compliance staff to effectively flag and investigate suspicious activity in these transactions, and then to report terrorist financing concerns to the government. SCB's scheme also impeded the effectiveness of the U.S. government's own monitoring of the SWIFT system to track terrorist financing through the TFTP program.

558.    A "lookback review" performed by a consultant at the behest of SCB's New York regulators confirmed the impact of SCB's scheme. The consultant reviewed the dollar clearing activity of SCB's NY Branch between 2002 and 2004 to determine if there was any suspicious

activity which required reporting under state and federal banking regulations. Using a risk-based AML/CFT assessment methodology, the consultant screened SCB's New York wire payment data against criteria indicative of high risk for terrorism finance and other illicit activity. Wire transfers involving "high-risk jurisdictions" like Iran received the highest rating and generated an automatic alert requiring further review. But because SCB's New York data had been stripped of Iranian references by SCB before it was received in New York, *no alerts* were generated for customer transactions involving Iran and *no bank-to-bank transactions* involving Iran were listed as potentially suspicious—despite SCB processing approximately $88 billion in Iranian U.S. dollar transactions during the lookback period.[59] Because the Iranian payments were non-transparent, many were risk-ranked as zero, since they appeared to be coming from SCB London or SCB Dubai.[60] SCB submitted its final report to regulators in October 2005, without disclosing that the data upon which it was based was false.[61]

559.    As NYDFS concluded: "SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped sustain a global threat to peace and stability."[62] In particular, "[b]ecause SCB regularly concealed the names of [its] high risk clients, it could not accurately track and evaluate their risk levels. Nor could SCB effectively screen for suspicious activity and financial transactions—monitoring that is essential to any institution's BSA/AML program. Perhaps worst

---

[59] 2012 DPA Factual Statement ¶¶ 82, 87-88.
[60] 2012 DPA Factual Statement ¶ 89.
[61] 2012 DPA Factual Statement ¶¶ 92-93.
[62] 2012 NYDFS Consent Order at 22 ("Conclusion").

of all, SCB's actions prevented regulators from doing their job in detecting potential threats to the U.S. financial system and other national security breaches."[63] SCB's actions "left the U.S. financial system vulnerable to terrorists, weapons dealers, drug kingpins and corrupt regimes, and deprived law enforcement investigators of crucial information used to track all manner of criminal activity."[64]

C.     **SCB Lied to Regulators about Winding-Down Its Iran Business and Continued to Process Transactions Through 2015 for Iran's Terrorist Sponsors and Their Fronts While Helping Them Evade Counterterrorism Controls**

560.     In the settlement agreements that resolved investigations into SCB's rampant wire-stripping and evasions of Iran sanctions, SCB represented that it had exited its Iran business as of 2007. In its 2012 DPA with DOJ, for example, SCB professed that, given the potential for "very serious or even catastrophic reputational damage" "and/or serious criminal liability," SCB "made the decision to *exit the Iranian business*" in October 2006.[65] SCB claimed to have "ended" its "U.S.-dollar clearing activity for all the Iranian banks" by March 2007.[66] And SCB claimed that "[f]rom August 2007, SCB *suspended* all new Iranian business in any currency."[67]

561.     Not only that, but SCB also claimed that as part of its efforts to remediate its decade-long sanctions evasion, SCB had also "taken voluntary steps to enhance and optimize its sanctions compliance programs"—including by "*[t]erminating relationships with sanctioned banks and entities* and closing its Iranian representative office and branch," "[s]ubstantially increasing personnel and resources devoted to sanctions compliance," and "[e]nhancing its

---

[63] 2012 NYDFS Consent Order ¶ 51.
[64] 2012 NYDFS Consent Order at 1.
[65] Deferred Prosecution Agreement ¶¶ 101-102, *U.S. v. Standard Chartered Bank*, No. 12-cr-262 (D.D.C. Dec. 10, 2012), ECF 2 (emphasis added) (hereinafter, "2012 DPA").
[66] 2012 DPA ¶ 103.
[67] 2012 DPA ¶ 104 (emphasis added).

global sanctions compliance policies and procedures, including a ***general prohibition*** on new transactions on behalf of U.S. designated terrorists … or WMD proliferators in all currencies."[68]

562. Criminal and regulatory investigations—by DOJ, OFAC, NYDFS, and the U.K. FCA—revealed that SCB's stated commitment to winding-down its Iran business in 2007 was a lie. As a whistleblower who had worked in SCB's Dubai branch explained in an interview with federal and state law enforcement authorities, SCB's internal document system contained information about a secret project staffed out of Dubai and overseen by Meddings in London that had been given the codename "Project Green." Multiple SCB Dubai employees explained to the whistleblower in 2009 and 2010 that the purpose of "Project Green" was to "[route] around" or "navigate clients around" sanctions, and that it involved visits by SCB Dubai employees to Iran and to Iranian financial institutions based in Dubai. The whistleblower was told that SCB Dubai employees were "very actively opening Iranian accounts in 2009" for which Mohammed Sarrafzadeh, the CEO of SCB's Iran representative office, would have been listed as the account representative. The whistleblower also shared SCB files, including spreadsheets containing a December 2008 list of "hot" "targets" for SCB's sales team to solicit. The list included Bank Saderat, Bank Mellat, Bank Melli, Bank Sepah, and Bank Tejarat. Similar lists dated December 2007 and February 2008 also included Bank Saderat and Bank Melli as "prospective clients."[69]

---

[68] 2012 DPA ¶ 107 (emphasis added).

[69] FBI Report of Interview with Julian Knight, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. March 8, 2021), ECF 87-1. Allegations from other whistleblowers further undercut SCB's representations that it had exited its Iran business in 2007. *See* Marcellus Decl. ¶ 21; *see id.* ¶ 17 (describing post-2007 invitations from SCB Dubai employees to "meet[] some of SCB's Iranian customers . . . in Iran"); *id.* ¶¶ 25-26 (identifying an "enormous volume of transactions by SCB with Iranian persons after 2007" on SCB transaction spreadsheets). SCB's own presentation to regulators also acknowledged that, even after SCB stopped processing U.S. dollar transactions for certain Iranian clients through its NY Branch, it did not stop serving those clients and profiting from the relationships it had developed over the

563.     From 2008 through at least 2014 or early 2015, SCB *continued* to actively move money for individuals and entities connected to Iran—including agents and fronts for the IRGC—while continuing to engage in wire-stripping and other tactics to help its Iranian clients evade counterterrorism controls. SCB's culpable assistance to the IRGC lasted until at least late 2014 or early 2015, from which the Qods Force, Hezbollah, and their shared proxies Hamas and JAM continued to finance their attacks through at least 2019.

564.     In direct contradiction of its claim to have exited the Iran business, SCB Dubai maintained "at least nine Eurodollar bank accounts for CBI" and processed "at least two trade finance transactions for [C]BI worth a total SCB profit value of $50,679.00 U.S. dollars between December 1, 2009 and December 31, 2009."[70] SCB thus continued to serve CBI/Bank Markazi, even as longstanding terrorist financing concerns about the bank reached a fevered pitch—with the Secretary of the Treasury warning that "the Central Bank of Iran was sending money through Bank Saderat to Hizballah" (CQ-RollCall Political Transcriptions, June 14, 2007), more than 25 members of Congress calling for the bank's designation as a "terrorist entity" (U.S. Congressional News, March 5, 2008), and others in Congress calling it the "central bank of terrorism" (Reuters News, April 17, 2008) that was "heavily involved in the funding of terrorism" (Congressional News, October 22, 2008).

---

years. SCB did not cease business conducted in other currencies for Iranian clients, and in fact invited clients to open accounts in alternative currencies, conducting foreign exchange transactions to convert their U.S. dollar balances to those alternative currencies.

[70] Decl. of David J. Scantling ¶¶ 115-16 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104. Plaintiffs expect discovery to shed more light on these and other SCB transactions identified in the *Brutus Trading* litigation about which complete information is not currently available to Plaintiffs. The Times Media Limited filed a motion in that case for the court to unseal the SCB spreadsheets filed as exhibits by the Relators; SCB opposed that motion, which is currently pending before the court as of the date of this filing (Dkt. No. 146).

565. SCB also continued to serve Bank Saderat—a notorious IRGC Quds Force front and direct conduit of funding for anti-American terrorism throughout the Middle East—which enjoyed full "always execute" access to SCB's online currency trading platform at least through 2008 and beginning again in April 2013.[71]

566. Indeed, as one whistleblower put it, SCB's "representations denying Iranian business to the US authorities in 2012 were likely completely false."[72]

### 1. SCB's Dubai Branch

567. Despite SCB's purported commitment to winding down business with Iran-linked customers, SCB continued to knowingly help numerous IRGC fronts evade counterterrorism controls—particularly through its branch in Dubai, which became the hub for its continuing Iran business.

568. SCB knew that Dubai was a hotbed of IRGC sanctions evasion and terrorist financing. It was well known in the financial industry that Dubai front companies were a primary means for Iran to access the international financial system, and the fronts were often readily apparent to locals on the ground. In the words of the Chairman of the American Business Council of the Gulf Countries, as reported by Forbes Global on April 19, 2004, "[w]hen you blow off the dust, the Dubai region sometimes means Iran and Libya."

569. The New York Post on February 21, 2006 noted a "white-hot spotlight on the UAE, a country long considered the arms-smuggling and money-laundering capital of the Middle East," with "[t]ens of billions of dollars . . . laundered every year through [its] banks" and a "shady" record in the war on terrorism, according to U.S. officials. As the Wall Street

---

[71] Decl. of Julian Knight ¶ 71, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Jan. 10, 2020), ECF 48-2.
[72] Marcellus Decl. ¶ 21.

Journal reported on February 23, 2006, Dubai was "the most free-wheeling of the Emirates," and "Iran uses Dubai to evade U.S. economic sanctions."

570.    On March 7, 2007, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey visited Dubai to deliver a sharp warning to the business community about how "Iran's nuclear program and support for terrorism poses a great threat to our safety and security." Noting that the world is well aware of Iran's "sponsorship of terrorist organizations that maim and murder innocent civilians," Levey warned that "Iran disguises its activities through an array of deceptive techniques specifically designed to evade the controls of responsible financial institutions and avoid suspicion," including requesting that "financial institutions take their names off of transactions when processing them in the international financial system." Levey's message then focused directly on the IRGC:

> In addition, I want to tell you about another area of concern about how Iran does business. Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a `train and equip program' for terrorist organizations like Hizballah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. ***When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism***.

Levey explained that many banks had "conclude[ed] that they did not wish to be the banker for a regime that deliberately conceals the nature of its business"—where it is "too often the business of funding terrorism." He ended with another warning:

> As you make your business decisions, I urge you to consider whether it is wise for your company to focus its efforts on doing business with Iran. I recognize that it may be tempting to step into the void that is being created by other companies pulling back their business in Iran, but they are pulling back for a reason. The world's top financial institutions and corporations are re-evaluating their business with Iran because they are worried about the risk and their reputations. You should worry too and be especially cautious when it comes to doing business with Iran.

571. SCB's leadership recognized those risks, and it knew that they were rife in its Dubai branch. A note to file describing a 2005 meeting attended by SCB's General Counsel, Head of Legal and Compliance, and outside UK counsel, recounted that SCB considered whether the new CEO for the Americas—who was the former CEO for the United Arab Emirates—was obligated to report to U.S. regulators any suspicions he may have had about SCB's Iran business conducted in Dubai and "***whether his physical presence in the USA heightens the prospect of [him] becoming a more available witness of fact for SCB's Iran Business***."[73]

572. Although SCB often told U.S. regulators what they wanted to hear, SCB's London leadership internally viewed the sharp warnings about the immense terrorism risks in Dubai as an "annoyance," according to a July 20, 2007, article from The Guardian, and just a few months after Levey's warning in Dubai, SCB said it "wanted to develop its Dubai office into a regional hub," according to a June 1, 2007, article from Dow Jones International News.

573. SCB Dubai's rank-and-file understood that the bank's revenue took precedence over counterterrorism concerns. Accordingly, as explained below, several SCB Dubai employees worked closely with Iran's Terrorist Sponsors and fronts to help them evade U.S. counterterrorism controls. SCB Dubai employees coached their customers on how to avoid suspicion, lied to compliance officials and other banks about the fronts' Iran connections, and even helped open new accounts to help fronts for the Qods Force, Hezbollah, and their proxies escape detection.

574. Beyond that, SCB Dubai permitted sanctioned IRGC-affiliated parties to transact in U.S. dollars by offering virtually unregulated access to fax-based and internet-based banking

---

[73] 2012 NYDFS Consent Order ¶ 40 (emphasis added).

services. When it became clear that these fax and internet services were being used by high-risk Iranian customers to evade sanctions, SCB Dubai refused to implement simple technical fixes that would have cut off Iranian customers' access.

575.     SCB Dubai's actions caused at least ***hundreds of millions*** of U.S. dollars to flow through the U.S. financial system to Iran's Terrorist Sponsors and fronts between 2008 and 2015.

> **2.     SCB Dubai Helped an Iranian Petrochemical Company Operating as a Front for Iran's Terrorist Sponsors to Covertly Access the U.S. Financial System**

576.     Throughout the relevant period, SCB Dubai employees consciously and culpably helped Iran's Terrorist Sponsors and fronts evade U.S. sanctions and counterterrorism controls.[74]

577.     As one example, SCB "process[ed] a significant volume of [U.S. dollar] payments" for "a front company for a prohibited Iranian entity"—an "Iranian petrochemical company in the business of shipping liquefied petroleum gas."[75] That "Iranian petrochemical company" was a front for Iran's Terrorist Sponsors, for which SCB served as a key banker from at least 2005 through at least June 2012 (hereinafter, the "Iranian Petrochemical Company" a/k/a "Caspian Petrochemical FZE").

578.     NYDFS discovered that, between November 2008 and June 2012, SCB "processed more than $150 million in incoming and outgoing [U.S. dollar] transactions" for the Iranian Petrochemical Company. The "majority" of those transactions "were transmitted through the [NY] Branch."[76] OFAC's investigation confirmed those findings.[77]

---

[74] *See* 2019 Amended DPA ¶¶ 18-32.
[75] 2019 NYDFS Consent Order ¶ 30.
[76] 2019 NYDFS Consent Order ¶ 31.
[77] 2019 OFAC Settlement ¶7 ("SCB Dubai maintained an account for the petrochemical company, a company owned by an Iranian national ordinarily resident in Iran, which engaged in the sale of petroleum products to, from, or through Iran. Following OFAC's revocation of the U-

579.     SCB Dubai willfully helped the Iranian Petrochemical Company conduct

"prohibited business" through both active assistance and "glaring compliance deficiencies."[78]

580.     SCB Dubai opened a U.S. dollar denominated account for the Iranian

Petrochemical Company in May 2005.[79] By at least October 2007, SCB knew that the Iranian

Petrochemical Company was a front company owned by the Government of Iran. Although

documents provided to SCB Dubai purported to show that it was located and operated in the

Dubai Airport Free Zone, SCB Dubai's customer due diligence documents for the Iranian

Petrochemical Company at that time, upon which SCB Dubai relied heavily, were marked

"YES" in answer to the following questions:

- Is the client a sanctioned country government (anywhere in the world)?

- Is the client a sanctioned country ***government-owned bank or other enterprise*** (anywhere in the world), including subsidiaries, branches and offices thereof?

SCB's customer due diligence documents also identified a single individual as the company's

"sole owner"—*i.e.*, the sole nominal owner of an enterprise beneficially owned by the

Government of Iran.[80]

581.     As of October 2007, SCB Dubai's customer due diligence documents for the

Iranian Petrochemical Company's nominal owner identified this individual as "resident in a

[high risk jurisdiction]—Iran."[81] SCB's records listed both Iranian and Dubai contact

---

Tum authorization on November 10, 2008, SCB, beginning no later than June 27, 2009, and, continuing through June 24, 2012, processed 190 transactions totaling $151,269,725 to or through the United States that were for or on behalf of the petrochemical company—the benefit of which services were received in Iran—in apparent violation of § 560.204 of the [Iranian Transactions and Sanctions Regulations].").

[78] 2019 NYDFS Consent Order ¶¶ 32-33, 37.
[79] 2019 OFAC Settlement ¶ 10.
[80] 2019 OFAC Settlement ¶ 13 (emphasis added).
[81] 2019 OFAC Settlement ¶ 13.

information for the individual, including Iranian fax and phone numbers. SCB's records also contained an Iranian passport purportedly for the individual.

582.     Shortly after OFAC revoked its U-Turn exception in November 2008 and warned in urgent detail about the IRGC's funding of terrorism and its frequent use of front companies, SCB Dubai orchestrated a scheme to help the Iranian Petrochemical Company evade counterterrorism controls, while continuing to clear its U.S. dollar transactions through SCB's New York Branch. To this end, SCB provided a variety of illicit and atypical banking services to the Iranian Petrochemical Company between 2009 and 2011.

583.     First, in 2009, SCB Dubai altered the company's customer due diligence file to hide its Iranian beneficial ownership and connections to Iran. Where SCB's records had previously answered "YES" to questions about whether the Iranian Petrochemical Company was owned by the Government of Iran, as well as other questions about its presence in Iran, SCB Dubai changed the "YES" to "NO."[82]

584.     Second, SCB Dubai continued the wire-stripping tactic SCB had pioneered since 2001 to help its Iranian customers evade due diligence and suspicious activity reporting. The payment messages for the Iranian Petrochemical Company omitted all references to Iran, the company's Iranian ownership, or any affiliated Iranian entities. As a result of SCB Dubai's transmission of stripped or misleading payment messages, "[m]ost of the transactions originated by SCB Dubai on behalf of the petrochemical company were processed successfully and reached their intended beneficiary."[83]

---

[82] 2019 OFAC Settlement ¶ 16.
[83] 2019 OFAC Settlement ¶ 16.

585.    Third, in April 2010, when a U.S. bank rejected a large U.S. dollar payment originated by SCB for the Iranian Petrochemical Company, SCB lied to OFAC to hide the source of the funds. The U.S. bank told SCB's New York compliance staff that it found the front company to be an Iranian entity and warned that it had "contacted OFAC, and was advised by OFAC to reject [USD] payments" for it.[84] These warnings were transmitted to SCB's Senior U.K. Sanctions Officer immediately, who did nothing.[85] SCB's compliance staff in Dubai and New York then found numerous obvious reasons to believe the Iranian Petrochemical Company was an Iranian front, including: (i) a simple Google search showed that a company with the same name and email address on file with SCB was "Iranian"; (ii) the identified owner was an Iranian national; (iii) his UAE visa had expired two years earlier; and (iv) a document in the company's account file from 2008 revealed its representative office was located in Tehran.[86] These obvious Iran links caused SCB Dubai's operational risk manager to warn SCB Dubai's senior AML officer that he "strongly believe[d] that the subject customer is an Iranian."[87] The senior AML officer, in turn, escalated the findings to the senior U.K. sanctions officer, who "rejected this warning" and "allow[ed] the payment to be made by relying on an undocumented" denial of any link between the company and Iran, purportedly obtained from the customer by SCB Dubai's Relationship Manager.[88] The U.K. officer also ignored a fax communication located in the Iranian Petrochemical Company's account file that contained correspondence from Iran. The fax, sent to the Bank in September 2011, bore Iran's country prefix (+98).[89]

---

[84] 2019 NYDFS Settlement ¶ 32 (brackets in original); *see* 2019 OFAC Settlement ¶ 18.
[85] 2019 NYDFS Settlement ¶ 32.
[86] 2019 NYDFS Settlement ¶ 32; 2019 OFAC Settlement ¶¶ 20, 23.
[87] 2019 NYDFS Settlement ¶ 32.
[88] 2019 NYDFS Settlement ¶ 32.
[89] 2019 NYDFS Settlement ¶ 32.

586.    Despite the mountain of evidence to the contrary, SCB proceeded to explain to OFAC that the account was used for petroleum purchases from Turkmenistan and sales to Armenia, Pakistan, and Iraq, and to falsely and confidently represent to OFAC that the Iranian Petrochemical Company had "no direct or indirect involvement with Iran."[90] SCB's Relationship Manager knew the representation about no involvement with Iran was false; he would later admit in his own criminal prosecution that he knew the Iranian Petrochemical Company "either operated from Iran, or transacted USD business with Iranian entities."[91] And SCB's senior management in the U.K. was all too willing to rely on the Relationship Manager's dubious and unverified representations in the face of much contrary evidence. SCB's senior U.K. sanctions officer thus "inexplicably" gave the Iranian Petrochemical Company the "benefit of the doubt" and "allowed it to continue conducting business through the Bank – including transactions processed through the New York Branch."[92]

587.    Thus, despite the numerous payments rejected by other U.S. financial institutions involving the Iranian Petrochemical Company, as well as the concerns raised internally within SCB regarding its Iranian ownership and connections—"both SCB Dubai and SCB NY continued to process [U.S. dollar] payments on the company's behalf."[93] In total, following SCB's lie to OFAC, "SCB Dubai and SCB NY processed 133 funds transfers totaling $140,310,539 that were for or on behalf of the petrochemical company to or through the United States in apparent violation of the [Iranian Transactions and Sanctions Regulations]."[94]

---

[90] 2019 OFAC Settlement ¶ 24.
[91] Statement of Offense ¶ 11, *U.S. v. Mobeen Ahmed*, No. 17-cr-190 (D.D.C. Oct. 26, 2017), ECF 12 (hereinafter, "Ahmed Statement of Offense").
[92] 2019 NYDFS Settlement ¶ 32.
[93] 2019 OFAC Settlement ¶ 25.
[94] 2019 OFAC Settlement ¶ 25.

588.     Fourth, after the Iranian Petrochemical Company had proven too easy to identify as Iranian through a Google search, another relationship manager advised it to evade detection by changing its name: "***if you change the company name then we can reopen another account with Standard Chartered.***"[95]

589.     On information and belief, the IRGC took SCB's advice and reincorporated the Iranian Petrochemical Company on November 15, 2011, as a new company named Caspian Petrochemical FZE, which it registered in Dubai, UAE, and London, U.K. that same day by using cut-outs who incorporated Caspian Petrochemical.[96] The company's corporate filings, publicly identified the "Objects of the company" as "Trade of gas, oil and petrochemicals" and listed its officers as Phati Sebua and Seyedasadoollah Emamjomeh (a/k/a Seyed Asadollah Ememjome), who was identified as its Chairman.

590.     The surname "Emamjome" is a religious title in Iran referring to an imam appointed by the Supreme Leader to lead Tehran's Friday prayers, which regularly included slogans condemning the United States, Israel, and other enemies of the Ayatollah's regime. "Seyed" and "Asadollah" are also common religious honorific titles in Iran translating to "Descendant of Prophet Mohammed – Lion of God."

591.     SCB's advice to its IRGC customer to change its name, which it did in November 2011, and SCB's continuing maintenance of accounts for the Iranian Petrochemical Company,

---

[95] 2019 NYDFS Consent Order ¶ 37.

[96] Plaintiffs expect discovery to shed further light on the name used by the Iranian Petrochemical Company and its ownership structure, the precise nature of the entity's relationship with the successor entity incorporated as Caspian Petrochemical FZE, and any subsequent transactions SCB may have processed for that entity after November 15, 2011. Although it has not disclosed the name of the Iranian petrochemical company that was the subject of its enforcement actions against SCB, the government has acknowledged that the name of the company or a corporate affiliate is "somewhat similar" to "Caspian Chemical."

Caspian Petrochemical FZE, and/or their affiliates through at least June 2012 was particularly notable in light of the dramatic developments between November 2011 and March 2012, in which the U.S. government intensified its sanctions on Iran and the IRGC. As explained above, starting around November 8, 2011, when the International Atomic Energy Agency published a bombshell report exposing the Iranian regime's comprehensive nuclear weapons program, the international community, including the United States, Israel, and European allies, signaled that they would impose harsh new sanctions on Iran. Iran and Hezbollah contemporaneously threatened retaliation. Against the backdrop of high-profile statements emphasizing the importance of sanctions, countered by threats of war, SCB assisted the Iranian Petrochemical Company in rebranding itself to Caspian Petrochemical FZE so that it could continue evading sanctions and supplying funds to the IRGC. SCB thus intentionally aided the IRGC in evading counter-terrorism sanctions at the very moment the global community was emphasizing the grave terrorism and national security threats posed by sanctions evasion.

592.    SCB's transactions for the Iranian Petrochemical Company directly and indirectly flowed at least tens of millions of dollars each year to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

593.    SCB's decision to continue to process payments for the Iranian Petrochemical Company was a "significant compliance failure" by SCB that directly assisted the IRGC and its proxies; as NYDFS found, however, "this series of events was not isolated."[97]

———————————
[97] 2019 NYDFS Settlement ¶ 33.

### 3. SCB Dubai Helped IRGC Agent Mahmoud Reza Elyassi Access the U.S. Financial System to Fund Iran's Terrorist Sponsors

594. Another example of SCB's knowing provision of banking services to Iran's Terrorist Sponsors involved an Iranian national—and, as explained *infra*, likely IRGC agent—named Mahmoud Reza Elyassi. He was indicted by the DOJ in 2019 for evading sanctions on Iran, aided by SCB Dubai employees.[98] Since Elyassi's indictment, he has escaped prosecution.

595. From late 2006 through at least September 2011, Elyassi controlled multiple companies that held accounts with SCB Dubai. The Amended DPA and Elyassi's indictment highlight two such companies, identified by the United States as Company C-1 and Company C-2.[99] The Complaint adopts the Government's terminology.

596. Company C-1 and Company C-2 were "general trading companies" that were used as "fronts" for a "money exchange business located in Mashhad, Iran," in order to "provide services to Iranian individuals and companies seeking to conduct U.S. dollar transactions through the United States in violation of U.S. economic sanctions."[100]

597. Between November 2007 and August 2011, SCB "willfully" and illegally processed approximately 9,500 dollar-denominated transactions through the United States, including through the NY Branch, for Company C-1 and Company C-2.[101] Those transactions totaled approximately $240 million.[102]

---

[98] *See generally* Indictment, *U.S. v. Elyassi*, No. 19-cr-117 (D.D.C. Apr. 5, 2019), available at: https://www.justice.gov/d9/press-releases/attachments/ 2019/04/11/elyassi_indictment_filed_0.pdf ("Elyassi Indictment").
[99] SOF ¶ 10; Elyassi Indictment ¶ 1. These companies are referred to as Company A and Company B, respectively, in the 2019 OFAC Settlement. *See* 2019 OFAC Settlement ¶ 31.
[100] Elyassi Indictment ¶ 12.
[101] SOF ¶ 31.
[102] SOF ¶ 31.

598.	SCB employees helped Elyassi consummate these illegal transactions. At all relevant times, at least two SCB Dubai employees—a Relationship Manager (Person A) and a Treasury Sales Manager (Person B)—worked closely with Elyassi to provide him access to the U.S. financial system and U.S. dollars.[103] At all relevant times, these employees were acting within the scope of their employment for SCB, *i.e.*, performing the role they were hired to perform, for the type of customer SCB Dubai was happy to have.[104]

599.	SCB knew that Elyassi and his companies were linked to Iran and operated in industries dominated by Iran's Terrorist Sponsors. *See infra*. SCB's records were replete with evidence that confirmed the connection: (a) SCB's banking system listed Elyassi as an Iranian person and contained both UAE and Iranian contact information for him—including telephone and fax numbers that began with Iran's country code prefix (+98); (b) SCB's records contained a copy of Elyassi's Iranian passport; (c) SCB's records contained a Know Your Customer ("KYC") form for Company C-1 from 2007 stating that the company had a facility in Iran and exported materials from Iran to various countries; (d) contact information for Company C-1 in SCB's records included at least two Iranian phone numbers (as evidenced by +98 country code prefix); and (e) SCB Dubai personnel recorded phone calls in 2008 between Elyassi and his Treasury Sales Manager at SCB (Person B), during which Elyassi admitted that he was based in Iran and invited the Treasury Sales Manager to visit him there.[105]

600.	Knowledge of Elyassi's Iran connections was not cabined to these two employees. Several SCB employees knew that Elyassi's businesses were operated from Iran and conducted

---

[103] Amended DPA ¶¶ 8-9 (referring to Relationship Manager as "Person A" and Treasury Sales Manager as "Person B"); *see also* Elyassi Indictment ¶¶ 3-4.
[104] SOF ¶ 30.
[105] SOF ¶ 24; *see* 2019 OFAC Settlement ¶¶ 34-35.

U.S. dollar transactions through the United States for the benefit of Iranian entities. Moreover, SCB employees knew that several outgoing payments made from Company C-1 in 2008, 2010, and 2011 (which SCB did not block) were rejected by beneficiary and correspondent banks due to Company C-1's Iranian connections.[106]

601.    SCB did not respond to this information by severing its relationship with Elyassi and his companies. Instead, SCB employees also ***actively facilitated*** Elyassi's malfeasance by showing him how to navigate the bank's processes to avoid further detection. Thus, the SCB Dubai employees executed illicit U.S. dollar transactions for Elyassi's companies by providing "false and misleading information" to "disguise [Elyassi's] Iranian connections."[107]

602.    In August 2008, for example, in response to an internal compliance inquiry, the Relationship Manager (Person A) falsely stated that Company C-1 operated exclusively in the UAE—even though that was materially false, and even though SCB's KYC form confirmed that Company C-1 operated out of Iran.[108] And when "other financial institutions rejected payment requests from SCB on behalf of Company C-1 and Company C-2," the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) helped "conceal the transactions' Iranian connections through lies and omissions."[109]

603.    In December 2010, after "numerous payment requests" involving Company C-1 were "stopped" due to "Iranian sanctions concerns," SCB decided to exit its banking relationship with Company C-1.[110]

---

[106] SOF ¶ 25; 2019 OFAC Settlement ¶ 33 ("Several U.S. banks rejected or returned payments initiated from Company A's account with SCB Dubai as early as July 2008.").
[107] SOF ¶ 26.
[108] SOF ¶ 26.
[109] SOF ¶ 26.
[110] SOF ¶ 27.

604.    But before Company C-1's accounts were closed, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "helped [Elyassi] open a new business account under a new name, Company C-2, so that [Elyassi] could continue conducting U.S. dollar transactions through the United States without suffering similar rejections."[111]

605.    SCB Dubai employees thus "knew" that Elyassi controlled Company C-2 in all meaningful respects, even though "a non-Iranian co-conspirator of [Elyassi] was the nominal owner."[112] Indeed, SCB's account records for Company C-2 identified Elyassi "as an authorized signatory/dealer on Company C-2's account," and "[d]ocuments contained in SCB's records also show[ed] that much of the contact information (telephone number, mobile phone number, fax number, and mailing address) for Company C-2 was the same as Company C-1."[113]

606.    SCB thus ensured that Elyassi had unfettered access to SCB-facilitated U.S. dollar transactions: Company C-2's account with SCB Dubai was opened "on or about February 14, 2011, and Company C-1's account with SCB Dubai was closed on or about February 13, 2011."[114]

607.    After opening Company C-2's account, SCB Dubai employees coached Elyassi "on how to structure financial transactions that would not raise suspicion of an Iranian connection or other illegality."[115]

---

[111] SOF ¶ 27.
[112] SOF ¶ 27.
[113] SOF ¶ 27.
[114] SOF ¶ 27.
[115] SOF ¶ 27; *see* 2019 OFAC Settlement ¶ 41 ("In or around this time, the [Relationship Manager] held several phone calls with [Elyassi] regarding these transactions. The [Relationship Manager] appears to have referenced prior discussions in which he had coached [Elyassi] how to process certain types of transactions.").

608.    On or about March 9, 2011, for example, in a telephone call recorded by SCB Dubai, the Relationship Manager (Person A) told Elyassi "not to send payments to Iranian individuals directly from Company C-2's account, but rather, to have a co-conspirator transfer the funds from Company C-2's account to his personal account at SCB Dubai and then send the payments to the Iranian individuals in order to avoid having Company C-2's account closed."[116] The Amended DPA reflects the following transcribed conversation between Elyassi (Person C) and the Relationship Manager (Person A):

> Person A:  "I am telling you once these go there will be no next time then you'll come back and they will say we will need to close the account [be]cause now even one payment is going [to an individual who] is Iranian."
>
> Person C:  "Mm"
>
> Person A:  "[The payment] will be stuck.  And once it is stuck . . . then you will come to me when no no don't close the account then nothing left and I am telling you."
>
> Person C:  "Mm"
>
> Person A:  "[The second individual payee] is Iranian, I know [the third individual payee] is Iranian, [and the first individual payee] is Iranian."
>
> Person C: "Mmm how we can do this?"
>
> Person A: "I am telling you, ask ask [co-conspirator] to transfer funds from [Company C-2's account at SCB-Dubai] to his personal account [at SCB-Dubai]. From [his] personal account he can make these five payments."[117]

609.    It was not until September 2011 that SCB Dubai closed Company C-2's account "due to sanctions concerns."[118] Before closing the account, however, SCB Dubai "processed 210

---

[116] SOF ¶ 28.
[117] SOF ¶ 28.
[118] SOF ¶ 28.

[U.S. dollar]-denominated funds transfers to or through the United States based on payment instructions it received from Iran."[119]

610. At all times, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "willfully engaged in this misconduct knowing that it was in violation of U.S. law"—all to "generate revenue for SCB."[120] At all times, these SCB employees acted within the scope of their employment as they served Elyassi and his companies.

### 4. SCB Dubai Helped Numerous Other Agents and Fronts for Iran's Terrorist Sponsors Access the U.S. Financial System to Finance Their Operations in Several Other Ways

611. SCB Dubai's misconduct extended beyond the specific examples discussed above. Documents that resolved investigations into SCB either state directly or permit the reasonable inference that SCB Dubai employees helped Iran Terrorist Sponsors and fronts to evade U.S. sanctions in other ways.

### i. SCB Dubai Helped Numerous Other Iranian Fronts Evade Counterterrorism Controls

612. It is clear SCB's bad behavior extended beyond assisting the petrochemical front company and Elyassi to evade sanctions, and that its tactics extended beyond wire-stripping, name-changes, and false customer due diligence documents. As NYDFS found, for example, SCB Dubai employees warned "*another* Iranian front company's owner" to close its account before SCB reported it as suspicious: "before [the Bank] report[s] to [the local bank regulator] ... please can you send me a closure notice before [the Bank] raise question on you?"[121] Indeed, NYDFS concluded that "during the period November 2008 through July 2014, the Bank

---

[119] 2019 OFAC Settlement ¶ 42.
[120] SOF ¶ 30.
[121] 2019 NYDFS Consent Order ¶ 36 (emphasis modified).

processed nearly 15,000 illegal payments for the benefit of sanctioned Iranian parties, totaling more than $600 million," a "majority" of which "flowed through the New York Branch."[122]

613.    Throughout the relevant period, SCB had—as the U.K. FCA put it—a "culture" problem, where SCB Dubai employees were "colluding to evade controls and knowledge by other [SCB] employees of accounts operated for financial sanctions evasion."[123] SCB Dubai's "compliance infrastructure" was "woefully inadequate" and "no match for even unsophisticated evasion efforts."[124]

614.    SCB admitted as part of the 2019 Amended DPA that multiple SCB Dubai employees "willfully conspired with ***several people and entities*** to help Iran-connected customers of SCB Dubai conduct U.S. dollar transactions and cause U.S. financial services to be exported to Iran through SCB."[125] That included assisting "Iranian nationals located in Dubai" who were opening "commercial bank accounts" for "commercial entities" that "were fronts for Iranian businesses."[126]

615.    OFAC, similarly, explained that, in "***several instances*** two employees within SCB Dubai—including a Relationship Manager associated with ***several general trading company accounts***—actively worked with the account holders to obfuscate the sanctions nexus associated with the parties and/or their transactions . . . ."[127] Those SCB Dubai employees "conspired with other Iran-connected individuals and business organizations during their

---

[122] 2019 NYDFS Consent Order ¶ 38.
[123] 2019 U.K. FCA Decision Notice § 5.16.
[124] 2019 NYDFS Consent Order ¶ 43.
[125] SOF ¶ 22.
[126] SOF ¶ 22 (emphasis added).
[127] 2019 OFAC Settlement ¶ 31.

employment with SCB Dubai during much of the same period and using many of the same tactics as they used with [Elyassi]."[128]

616.     The U.K. FCA echoed that conclusion: "Two employees in SCB's UAE branches had, in fact, colluded with customers in order to evade financial sanctions against Iran,"[129] and other "SCB employees in the UAE were aware that accounts were opened for financial sanctions evasion purposes."[130]

617.     SCB Dubai's flagrant Iran-related misconduct permeated SCB's provision of financial services in Dubai from at least the early 2000s through at least late 2014 or early 2015. SCB Dubai helped one or more of Iran's Terrorist Sponsors launder at least several million dollars on behalf of IRGC and SLO money through at least late 2014 or early 2015, including in connection with oil trades.

618.     Thus, throughout the relevant period, there was a pattern of malfeasance at SCB Dubai. And SCB Dubai employees knew at the time of their misconduct that they were violating U.S. and U.N. sanctions, and other laws, that were specifically designed to thwart violent IRGC-sponsored terrorist attacks—all while acting within the scope of their employment for SCB.[131]

---

[128] SOF ¶ 29 (emphasis added).
[129] 2019 U.K. FCA Decision Notice § 4.84.
[130] 2019 U.K. FCA Decision Notice § 4.84.
[131] SOF ¶ 30.

ii. **SCB Enabled Agents and Fronts of Iran's Terrorist Sponsors to Access the U.S. Financial System Through SCB Dubai's "Right Fax" System**

619.    SCB enabled Iran's Terrorist Sponsors and fronts to transact in U.S. dollars by allowing Iran-based customers to fax payment instructions to SCB Dubai using the latter's "Right Fax" system—with virtually no oversight.

620.    In late 2009, a Senior SCB Dubai AML Officer discovered that the Right Fax system could facilitate U.S. dollar payments initiated by Iran-based entities.[132]  SCB knew this risk: Faxed payment instructions frequently bore a digital header containing the originating fax machine's telephone number, which—in Iran's case—would include the "+98" Iranian country code.[133] In other words, the face of the fax made clear it was sent from Iran. Upon making this discovery, SCB Dubai's Senior AML Officer alerted nearly all sanctions and compliance managers responsible for the UAE region—including SCB's senior U.K. sanctions officer—to advise: "[w]e can receive [payment] instructions via [R]ight [F]ax ...  *a check will have to be done here [to discover] whether these fax numbers begin with the Iran [country] code +98.*"[134]

621.    Even though this entire issue could have been addressed simply by checking the country codes on originating fax numbers, SCB Dubai chose instead to look the other way. Thus, when a senior SCB Dubai AML officer proposed a policy that would screen for faxed requests sent from Iran, SCB business staff refused to implement it.[135] As a result, use of the Right Fax system by Iran's Terrorist Sponsors continued to go unmonitored and unabated.[136] Other

---

[132] 2019 NYDFS Consent Order ¶ 36.
[133] 2019 NYDFS Consent Order ¶ 36.
[134] 2019 NYDFS Consent Order ¶ 24.
[135] *See* 2019 NYDFS Consent Order ¶ 25.
[136] *See* 2019 NYDFS Consent Order ¶¶ 26-28.

attempts to prevent sanctioned Iranian entities from using Right Fax were similarly shot down,[137] despite the "high risk" involved in customers "sending payment instructions from Iran."[138]

622. The Right Fax system remained available for effectuating illegal payments from Iran until as late as May 2014.[139] This resulted in the bank processing **tens of millions** of U.S. dollar transactions for hundreds of Iranian entities. OFAC's investigation "identified 11,809 faxed payment instructions from 176 distinct SCB Dubai customers, all of which were corporate or commercial entities."[140] At its "peak" in August 2010, "the number of faxed payment instructions received by SCB's UAE branches in a single month from Iran[] reached 635."[141]

623. While SCB has not revealed the full roster of sanctioned Iranian entities that used its Right Fax system, U.S. regulators found that Elyassi's front companies (Company C-1 and Company C-2), standing alone, used Right Fax to "request more than $104 million in U.S. dollar transactions from SCB Dubai,"[142] and his companies "generated the majority of the transaction volume" resulting from faxed-payment requests from Iran.[143]

> ### iii. SCB Enabled Agents and Fronts of Iran's Terrorist Sponsors to Access the U.S. Financial System Through Its Online Banking Platforms

624. Through its "iBanking" and "Straight-to-Bank" (or "S2B") online banking platforms, SCB permitted customers in Iran to originate U.S. dollar-denominated transactions— "despite multiple supervisory and management personnel [at SCB] in various business lines

---

[137] *See* 2019 NYDFS Consent Order ¶¶ 26-28.
[138] 2019 U.K. FCA Decision Notice § 4.119.
[139] *See* 2019 NYDFS Consent Order ¶ 28. SCB's inexplicable delay was not due to any technical complexity; once SCB began the process to block such fax transmissions in May 2014, it took less than a week to fully implement. *See* 2019 NYDFS Consent Order ¶ 29.
[140] 2019 OFAC Settlement ¶ 29.
[141] 2019 U.K. FCA Decision Notice § 4.77.
[142] SOF ¶ 33.
[143] 2019 OFAC Settlement ¶ 31.

having actual knowledge of, and having discussions pertaining to, the sanctions risks associated with these specific products and services."[144]

625.    As early as May 2010, SCB compliance officials knew that Iranian entities were using SCB's online platforms to evade sanctions.[145] As a senior SCB AML officer in Dubai wrote to colleagues: "the added risk that we have to live with that if the transactions were originated through iBanking [where] *there is no way of us knowing whether the issuer of such transactions was in Iran* when he [e]ffected [the payment]."[146]

626.    This was not an isolated warning. Over the next two years, SCB compliance officers repeatedly alerted senior SCB personnel—including a senior financial crime risk officer for the UAE, a senior sanctions officer in the United States, and a senior member of SCB's executive management team who reported directly to the CEO—that SCB was at risk of "*infiltration by Iranian parties* through its online banking platform."[147] Despite those known risks, SCB allowed Iranian customers to continue to use these online banking systems.

627.    SCB's decision to allow continued online banking from Iran was deliberate. SCB's information technology personnel discovered a technical fix that could block IP addresses from Iran.[148] But "business" personnel at SCB scuttled that initiative.[149] SCB determined to *not* implement such a block—instead, it "proceeded 'in a business-as-usual' fashion, undertaking a sluggish effort to persuade business managers to implement blocking of access to the S2B

---

[144] 2019 OFAC Settlement ¶ 44.
[145] SOF ¶ 35.
[146] 2019 NYDFS Consent Order ¶ 16 (emphasis modified)
[147] 2019 NYDFS Consent Order ¶ 18 (emphasis added).
[148] 2019 NYDFS Consent Order ¶ 20.
[149] 2019 NYDFS Consent Order ¶ 21.

platform from IP addresses located in Iran."[150] Yet again, SCB prioritized profits—and the customer experience of Iran's Terrorist Sponsors and fronts—over compliance with U.S. laws.

628.     Moreover, SCB personnel made no attempt to identify which Iran-based customers had accessed its online banking platforms, as any reasonable, responsible financial institution would have.[151] Nor did SCB promptly report the multitude of illegal transactions to financial regulators.[152]

629.     SCB instead waited two years—until it was under ***active investigation*** by NYDFS and other agencies—to review the illegal transactions. And it was not until July 2014 that SCB comprehensively disabled access to internet-based U.S. dollar banking channels from Iran.[153]

630.     As a result of SCB's online banking services—and deliberate delay in blocking Iran-based customers' access to those services—from November 2008 to 2012, SCB permitted "more than 100 customers" to use SCB's online platforms to conduct thousands of U.S. dollar transactions from Iran and other sanctioned countries.[154]

631.     Estimates of the transaction volume vary, but all financial regulators agree that SCB processed at least ***tens of millions of U.S. dollars*** for Iran-based customers through its online banking platforms:

a.     <u>NYDFS</u>: "[B]etween June 2009 and mid-2014, the Bank processed more than $275 million in online banking transactions from Iran, Myanmar, Sudan, Syria and Cuba, in direct violation of OFAC regulations."[155]

---

[150] 2019 NYDFS Consent Order ¶ 22.
[151] 2019 NYDFS Consent Order ¶ 21.
[152] 2019 NYDFS Consent Order ¶¶ 21-22.
[153] 2019 NYDFS Consent Order ¶ 23.
[154] 2019 NYDFS Consent Order ¶ 19.
[155] 2019 NYDFS Consent Order ¶ 19.

b.      OFAC: "Between June 2009 and May 2014, SCB processed . . . 705 [U.S. dollar]-denominated online payments to or through the United States with a total value of $46,911,754" in violation of Iranian sanctions.[156]

c.      U.K. FCA: The "aggregate value" of "payments from SCB's UAE customers that appear to have originated from Iran through online banking systems" and "processed by SCB" was "tens of millions of US dollars."[157]

632.    SCB's decision benefitted Iran's Terrorist Sponsors and fronts, in particular. IRGC agent Elyassi's front companies directed more than $15 million in U.S. dollar transactions during that time by using SCB's online platforms from Iran-assigned IP addresses.[158]

**D.      SCB Employed Other Methods to Disguise Its Misconduct and Thwart Counterterrorism Controls**

**1.      SCB Used a "Sundry Account" to Hide Transactions with Agents and Fronts for Iran's Terrorist Sponsors**

633.    Similar to SCB's "wire stripping" tactic, SCB also used temporary holding or error accounts—referred to as "sundry accounts"—to book revenues for illegal transactions involving Iranian individuals and entities instead of SCB's account in the Iranian client's name. In SCB's regular course of business, sundry accounts would typically be used to book transactions for which the true counterparty had not been identified. But for SCB's illegal Iran-linked U.S. dollar-denominated transactions, SCB had identified the correct counterparty but instead intentionally dropped a word or changed a letter from that party's name to prevent the transactions from being booked to the correct client account where it could be detected by SCB's NY Branch or by U.S. law enforcement personnel. Instead, the transaction would go to the sundry account where it could no longer be discovered by a computer search performed by regulators and correspondents involved in the dollar clearing process. One experienced banker

---

[156] 2019 OFAC Settlement ¶ 55.
[157] 2019 U.K. FCA Decision Notice § 4.105.
[158] SOF ¶ 33.

described this practice as "highly irregular" and noted that it appeared to him that this flaw was "purposefully designed and intended to facilitate evasion by SCB of U.S. sanctions on transactions with certain Iran-related persons."[159] This practice also made it nearly impossible to determine whether SCB was transacting with individuals or entities designed by OFAC.

634.    On information and belief, SCB continued to employ its strategy of using sundry accounts to mask its ongoing business transactions with Iranian parties well after 2007 and to the tune of at least several billion dollars in illegal Iran-linked transactions that were concealed from law enforcement and regulatory agencies.

635.    One SCB whistleblower against whom the bank retaliated for his attempts to assist the United States's investigation by providing details about SCB's use of sundry accounts to engage in and conceal illegal Iran-linked transactions concluded that "the revenues derived from SCB's scheme to evade U.S. sanctions contributed to funds made available to Iran-related parties and ultimately used to support terrorist activities that killed and wounded soldiers serving in the U.S.-led coalition and many innocent civilians."[160]

---

[159] Marcellus Decl. ¶ 22.
[160] Decl. of Anshuman Chandra ¶ 8, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-3.

### 2. SCB Maintained a Deliberately Ineffective Anti-Money Laundering/Combating the Financing of Terrorism Program

636.    SCB both enabled and concealed its ongoing sanctions evasion by maintaining a deliberately ineffective compliance regime. This was not merely a function of SCB "failing to do more" to stop Iranian entities, including terrorist fronts and financiers, from accessing and misusing its financial services. SCB, particularly SCB Dubai, wanted to have its cake—*i.e.*, lucrative banking relationships with Iranian customers, including sanctioned persons and entities—and eat it too—*i.e.*, by avoiding any resulting regulatory or law enforcement consequences.

637.    SCB established a built-to-fail system that ensured it remained willfully blind about its highest-risk customers, in one of its highest-risk geographies for terrorist finance. Put another way, SCB's management unlawfully enabled its employees to pursue lucrative-but-illegal business with terrorist customers that no responsible bank would have served.

638.    SCB's actions contravened its extensive obligations under U.S., U.K., and New York laws and regulations regarding customer due diligence, transaction monitoring, anti-money laundering, countering the financing of terrorism, and sanctions compliance.

639.    Even after the 2012 Consent Order that resolved the investigation into its wire-stripping misconduct, the NYDFS monitor identified multiple "serious flaws" in the NY Branch's "transaction monitoring system which had a direct and negative impact on the efficacy of the New York Branch's compliance  function." SCB's systems completely failed to detect, much less prevent, "a significant number of potentially high-risk transactions that should have been subjected to further review" internally.[161] Those high-risk transactions included illegal Iran-

---

[161] 2019 NYDFS Consent Order ¶ 13.

linked transactions between 2008 and 2014—totaling at least several hundreds of millions U.S. dollars—most of which were routed through the NY Branch.[162]

640.    NYDFS also found that SCB Dubai's compliance function was even worse. It lacked the resources needed to implement and enforce its stated policies.[163] The handful of compliance staff were poorly trained, and SCB Dubai personnel writ large neither understood nor cared about U.S. sanctions on Iran. Many SCB Dubai customer due diligence files were "wholly inadequate, missing for example, critical information and key documents such as a valid UAE residency visa." SCB Dubai's compliance regime was "no match for even unsophisticated evasion efforts."[164]

641.    The U.K. FCA reached similar conclusions. SCB Dubai did not collect sufficient information from customers to allow them to understand the nature and purpose of their accounts, businesses, and sources of funds. This "impeded SCB's ability to manage its money laundering and terrorist financing risks effectively, and establish a basis for monitoring customer activity and transactions."[165]

642.    In the rare circumstances where SCB determined that a customer required enhanced monitoring, SCB Dubai either did not conduct such monitoring adequately *or at all*— even after certain preset "trigger events" calling into question the verity or adequacy of documents previously obtained for diligence, material changes to the nature of a business or its beneficial ownership, the rejection of a customer's transactions by counterparty banks due to sanctions risks, or even the filing/reporting of a suspicious activity report ("SAR") due to

---

[162] 2019 NYDFS Consent Order ¶¶ 5-6.
[163] 2019 U.K. FCA Decision Notice §§ 4.36-4.39.
[164] 2019 NYDFS Consent Order ¶ 43.
[165] 2019 U.K. FCA Decision Notice §§ 4.23-4.31.

suspicious activity on that customer's account.[166] SCB Dubai repeatedly and willfully disregarded and/or ignored its own red flags.

643.    For example, in May 2011, a senior compliance officer at the NY Branch recommended that SCB Dubai undertake a limited review of 19 specific small-to-medium enterprises ("SMEs") due to an identified sanctions risk based on the SMEs all being general trading companies. A senior manager of SME Banking for the Middle East confirmed this risk, stating in early 2012 in an e-mail to a very senior SME banker, *"[M]any of our [Dubai branch] customers are (a) Iranian nationals (owners of SMEs), (b) Selling to Iran … (c) Supplying to local buyers who have customers in Iran…. 814 SME customers have Iranian owners.  They may or may not have any direct/indirect exposure to Iran."*[167]

644.    However, the Senior Financial Crime Risk Officer for SCB's UAE operations dismissed the request, stating, "All accounts where there is an Iranian national involvement conform with our policy that if they are resident in the UAE then we are able to deal with them . . . ." SCB Dubai ultimately reviewed only five SMEs.  Of the 14 unreviewed companies, two were responsible for approximately $100 million in illegal Iranian transactions that SCB conducted between November 2008 and 2012.[168]

645.    SCB's deliberately "inadequate sanctions compliance program" was, in the words of NYDFS, "a root cause" of its years-long, multi-million dollar sanctions evasion.[169] SCB's failings were "particularly serious because they occurred against a background of heightened awareness within SCB of issues with its global financial crime controls arising from action

---

[166] 2019 U.K. FCA Decision Notice §§ 4.65-4.77.
[167] 2019 NYDFS Consent Order ¶ 44.
[168] 2019 NYDFS Consent Order ¶ 45.
[169] 2019 NYDFS Consent Order ¶ 45.

taking by US regulators and prosecutors, direct feedback from the [U.K. FCA], and through its own internal assessments,"[170] including its acknowledgment that SCB Dubai was a particularly "high financial crime risk environment" given its "geographic proximity to . . . Iran."[171]

646.     As set forth *supra*, SCB was intentionally seeking to expand its business with Iranian financial institutions and companies during the relevant time period. SCB knew, however, that each of the most significant clients it could obtain were fronts for the IRGC, which was rapidly expanding its hold over major sectors of the Iranian economy including energy, finance, sanctions evasion, and import-export. In that context, SCB's deliberately anemic compliance system was a feature designed to attract IRGC business because IRGC decision-makers would seek out banks that would take the necessary unlawful steps to willfully facilitate illegal transactions.

### E.     SCB Facilitated Hezbollah Financing in Gambia

647.     SCB Dubai and SCB Gambia knowingly moved millions of dollars for Hezbollah financiers operating in and through Gambia until at least 2012.[172] These funds flowed to Hezbollah in the Middle East, where it used them to finance attacks on Americans.

648.     Gambia is a small country in Western Africa with a population of approximately 1.7 million. Gambia has a well-established Lebanese diaspora community. Hezbollah has notoriously leveraged this community to obtain resources necessary to facilitate its attacks on Americans. This fact was confirmed by U.S. government officials and NGO experts, and was widely reported in news media, including local media reports in Gambia.

---

[170] 2019 U.K. FCA Decision Notice § 2.7.
[171] 2019 U.K. FCA Decision Notice § 4.5.
[172] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

649.     In a 2003 paper, Dr. Matthew Levitt described a "consensus among intelligence professionals" that Hezbollah had "global reach" and conducted "extensive fundraising operations in Africa" through "illicit diamonds" and "the local Shi'a expatriate community."

650.     On April 9, 2004, the U.S. State Department publicly summarized congressional testimony from investigative journalist Douglas Farah citing voluminous evidence that "Hezbollah has operated in West Africa since its inception in the early 1980s" due to "the hundreds of thousands of Lebanese living in the region, 'the vast majority being Shiite Muslims.'" Farah explained that Hezbollah "'collects donations from businesses, runs shakedown operations, operates front companies and is also deeply involved in the 'blood diamond' trade." All of these activities were prevalent in Gambia at the time.

651.     On September 28, 2006, Frank C. Urbancic, the State Department's Principal Deputy Coordinator for Counterterrorism, similarly testified before Congress that Hezbollah "receives a significant amount of financing from the Shiite Muslim diaspora of West and Central Africa," and Lebanese traders there "have significant control over basic imported commodities" and are "very active in diamond exports."

652.     A September evaluation by the Financial Action Task Force (FATF) identified structural risks in the Gambian economy, including lack of risk assessments, absence of an AML strategy, and inability to report suspicious transactions. It noted that "[t]he Gambian financial system remains vulnerable to the activities of organized criminal groups and terrorists." Gambia also ranked 158 out of the 180 countries covered in the 2007 and 2008 Transparency International corruption indices.

653.     SCB maintained a longstanding and deep presence in Gambia. It operated in

Gambia for decades, even playing "the Central Bank role at one point."[173] SCB Gambia's

management was therefore knowledgeable about the local culture, dialect, market conditions,

and politics, and knew the extent to which Hezbollah had penetrated the Gambian economy.

Armed with this knowledge, SCB willfully facilitated Hezbollah's terrorist financing activities in

Gambia.

### 1.     SCB Gambia Helped Hezbollah's Bazzi Network Access the U.S. Financial System to Finance Terrorist Attacks

654.     After helping overthrow the sitting government of Gambia in 1994, Yahya A.J.J.

Jammeh became President in November 1996, remaining in that post until January 2017. For

over twenty years, Jammeh's corruption and willingness to steal state resources facilitated the

diversion of millions of dollars from the Gambian economy to Hezbollah. Indeed, as early as

December 8, 2005, African news outlets described Jammeh's regime as an organized crime

enterprise, referring to Jammeh and his close associates as a "mafia."

655.     One of Jammeh's closest business partners—who banked with SCB—was

Hezbollah financier Mohammad Bazzi. In 2018, the U.S. Treasury Department designated Bazzi

and his business enterprises as SDGTs, describing Bazzi as "a key Hizballah financier who has

provided Hizballah financial assistance for many years and has provided millions of dollars to

Hizballah generated from his business activities," including in "West Africa." Treasury Secretary

Mnuchin stated that "Hizballah uses financiers like Bazzi who are tied to drug dealers, and who

launder money to fund terrorism." He further described Bazzi as "one of Hizballah's most

prominent financiers," engaged in "savage and depraved acts."

---

[173] https://www.sc.com/gm/about-us/.

656. A 2019 report from the Organized Crime and Corruption Reporting Project ("OCCRP"), described Bazzi as Jammeh's "consigliere" as Jammeh ran Gambia "like an organised crime syndicate." Bazzi was "by far the most influential businessman" in Jammeh's inner circle.

657. As high-profile public figures, both Bazzi and Jammeh were known to SCB. Additionally, by the mid-2000s, both Bazzi and Jammeh were notorious, as they were reportedly involved in illegal enterprises that directly supported Hezbollah including drug trafficking, arms sales, and blood diamonds. In addition to direct financial support for Hezbollah, Bazzi also reportedly assisted Jammeh in trading girls from refugee camps for funds to assist Hezbollah.

658. Bazzi and Jammeh's ties to Hezbollah were well-known. In December 2006, Gambia (headed by President Jammeh) and Iran publicly issued a joint statement on mutual cooperation, including support for Hezbollah. On December 19, 2007, the globally syndicated Gambian newspaper Freedom reported that Gambia was "no longer in the hands of the Gambians but Lebanese," that the state's telecom company and energy firms had been "hijacked" by Bazzi, that Hezbollah money was used to purchase the companies from the state, and that profits from these firms were "wired through the Standard Chartered Bank Banjul Branch [in Gambia] to Arab countries." Additional reports in December 2006 and 2007 named Bazzi as a Hezbollah financier, and noted that Jammeh's personal security force was covertly receiving weapons and training from the IRGC. Another Freedom newspaper report on January 21, 2008 noted that Jammeh's Government "has been linked to welcoming Hezbollah terrorists into the country."

659. On March 25, 2011, The Gatestone Institute, citing earlier local media reports, stated that Gambia was procuring weapons from Iran and selling them to Hezbollah, as well as selling drugs through Hezbollah: "President Jammeh is colluding with Lebanese businessman

Mohammad Bazzi, Gambia's Consul General to Lebanon, to buy weapons from Iran to sell to Hezbollah." These and other reports alerted SCB that Bazzi was arming terrorists. According to numerous news reports and U.S. government statements, in 2010, Qods Force Deputy Commander Esmail Ghani used Qods Force agents in West Africa to transfer over 240 tons of weapons, including small arms, large-caliber artillery shells, and Katyusha rockets to Hezbollah and Hamas. The weapons were intercepted in Nigeria awaiting shipment to Gambia.

660.    Against the backdrop of these reports, Jammeh and his associates—including Bazzi and his network—robbed the state of at least hundreds of millions of dollars. OCCRP reported that they used the Gambian Central Bank as their "personal slush fund," looting $363.9 million from the state telecommunications company, $60 million from its pension fund, and $55.2 million from the state-run oil company.

661.    A substantial portion of the looted funds flowed through to Hezbollah. Jammeh, working with Bazzi and others, turned Gambia and its banking system into a Hezbollah laundromat in exchange for multi-million dollar bribes. Specifically, through the companies in his Euro African Group Ltd. ("EAGL"), Bazzi paid bribes to Jammeh in exchange for sham privatizations and government contracts being routed to companies that Bazzi and other known Hezbollah financiers and commanders controlled.

662.    Through these corrupt deals, Bazzi's network monopolized entire sectors of the Gambian economy, such as fuel, telecommunications, and construction between 2002 and 2017 (these dates being approximate and inclusive). For example, between 2010 and 2014, Jammeh diverted $18 million from a state-owned enterprise to Gam-Petroleum Gambia, Co., which was connected to Bazzi. EAGL also received $60 million from Gambia's state oil company in just two years (2015-2017). Bazzi's fuel monopoly continued until at least 2017.

663. Bazzi also paid a multi-million dollar bribe to induce Jammeh to 'privatize' the Gambia's telecommunications companies, and 'sell' them to Ali Charara, another Hezbollah financier, for roughly 22% of their fair-market value. This transaction likely laundered illicit Hezbollah revenues from other ventures. It also routed $150 million to Charara's companies (which were often joint ventures with Bazzi) between 2006 and 2014.

664. EAGL's transactions with Jammeh and his henchmen provided Hezbollah with tremendous political influence in Gambia, making it a safe haven for Hezbollah's terrorist operations. This enabled Hezbollah to profit from other illicit activities in Gambia, without interference from the country's (corrupted) legal and intelligence officials. For example, in 2004, Bazzi and other Hezbollah financiers bribed the country's Director of National Intelligence, who, like Bazzi, banked with SCB. Another Bazzi counterparty was regime official Baba Jobe, who trafficked arms and diamonds in collaboration with another notorious SCB client, Victor Bout. The illicit trade in diamonds was primarily conducted by Lebanese traders, who paid 'taxes' and provided raw gems to Hezbollah in such great quantities that the 2006 war with Israel caused the global price of diamonds to collapse. Hezbollah also extorted legitimate Lebanese diaspora businesses. U.S. government, U.N., and expert reports published well before 2008 indicate that Gambia served as a critical node in Hezbollah's diamond and drug smuggling operations, which were used to fund its terrorist attacks on Americans.

665. SCB played an important role in Jammeh and Bazzi's schemes. OCCRP found that SCB "approved transactions for what would turn out to be Jammeh's seizure of state funds." And whistleblower accounts state that SCB Gambia, between 2008 and 2012, "maintained USD and GMD denominated bank accounts for Euro African Group LTD, identified by SCB group ID number "*****7340", and processed funds transfers worth millions of U.S. dollars through

SWIFT's data center in Virginia, CHIPS in New York, and SCB New York [for Euro African Group LTD]. Further, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "*****7701."[174] Because SCB provided services to both the Bazzi network and state agencies it was pillaging, it had a unique, comprehensive view of the totality of the Jammeh-Hezbollah organized crime enterprise. Jammeh and Bazzi's corrupt schemes were *exclusively* located in Standard Chartered branch buildings. Co-locating with SCB gave the network the same benefits that using the bank's services did: it afforded legitimacy, efficiency, and revenue generation opportunities which would have been unavailable otherwise.

666.    EAGL and SCB Gambia had a close relationship. As early as 2004, EAGL gave its address as the second floor of the Standard Chartered Bank building in Banjul, Gambia. EAGL also listed SCB Gambia as its principal banker. EAGL gave the same address at Standard Chartered for Petroleum Storage Facility, an affiliated company of EAGL. In 2018, OFAC designated Bazzi and EAGL, listing its Gambian address as "Standard Chartered House," and its energy-focused subsidiary, Global Trading Group (GTG)'s location as the second floor of the "Standard Chartered Bank Building." Bazzi and his son conspired to evade those sanctions, and, in 2019, OFAC designated multiple GTG successor entities at the same "Standard Chartered Bank Building" address.

667.    Jammeh and Bazzi's corrupt schemes were literally being carried out under SCB's nose. According to the Gambian commission that investigated Jammeh and Bazzi's

---

[174] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

corrupt enterprises, Jammeh's umbrella holding company and many of his enterprises were co-located with Bazzi's in Standard Chartered House. These companies were entirely dependent on the circular flow of bribes, stolen public assets, and illegal contracts and therefore shared both space and leadership: the managing director of EAGL, Ahmad Hodroj, was simultaneously a signatory on Jammeh's companies' bank accounts. Bazzi and high-ranking regime officials used Standard Chartered House to hold meetings in furtherance of their conspiracy to convert Gambian public property into private wealth and Hezbollah assets.

668.    Similarly, Bazzi took over the state water and electricity company (NAWEC) by inducing Jammeh to contract with a Bazzi-controlled company to oversee it. Bazzi then purged NAWEC's top leadership. He then called a management meeting at Standard Chartered House to intimidate its remaining leaders. Thereafter, Bazzi forced NAWEC's nominal managers to shuttle between his office at Standard Chartered House and their headquarters—about 3 kilometers away—multiple times each day. Bazzi and his co-conspirators thus ensured an uninterrupted flow of NAWEC's funds into the coffers of EAGL's monopolies on fuel and electricity generators.

669.    Indeed, Standard Chartered House as such owes its very existence to SCB's knowing collusion with the Jammeh-Bazzi criminal network. SCB does not own the building, and thus, on information and belief, SCB made regular rent and naming-rights payments. In exchange, SCB received the use of a sparkling, modern location situated on a 27,000 square-foot lot of prime real estate on Gambia's highest-value commercial thoroughfare. SCB, of course, sought the highest possible return on this investment in visibility. Consequently, the OFAC-designated headquarters of one of the 21st century's most destructive state-sponsored crime and

terrorist finance syndicates bears a huge sign: "STANDARD CHARTERED HOUSE." The

slogan on banner reads "You believe – we achieve."[175]



670.    In the ordinary course of business, a sophisticated multinational bank with

knowledgeable local managers would not open a branch without performing thorough diligence

on the location and its owners. But this was an extraordinary lease: SCB negotiated to create a

location on the Gambian equivalent of Wall Street that would literally and figuratively bear its

---

[175] https://maps.app.goo.gl/aoiJFBqzSnpnGyUB9 (June
2007).https://maps.app.goo.gl/aoiJFBqzSnpnGyUB9 (June 2007)

name, and to share said building with its owners—landlords who were, not coincidentally, the most powerful and dangerous actors in Gambia—and, simultaneously, high-value SCB clients.

671. Standard Chartered House is a monument to the synergy of organized crime, torture, and terrorist finance. It does not have a typical numbered street address because it was built on Jammeh illegally converted public parkland. According to the Gambian commission, Jammeh forced the property's prior owner to "sell" the property to Jammeh—and then leased the property to EAGL's co-owner, Jammeh regime official Amadou Samba. Samba, in turn, developed the property. It is therefore unsurprising that EAGL and the president's own companies were headquartered there, and inconceivable that SCB was unaware of the constant stream of corrupt officials and their victims meeting with their landlord and client, Bazzi.

672. True to its signage, SCB did, indeed, help the Bazzi network "achieve." Fully half of its Gambian branch locations housed Bazzi network offices. SCB Gambia, for use as EAGL's headquarters. But the building was named "STANDARD CHARTERED HOUSE," and contained an SCB Gambia branch office, indicating a very close relationship between SCB and EAGL—as well as likely substantial rent payments flowing from SCB to EAGL despite evidence of EAGL's complicity in terrorist finance.

673. Bazzi was also one of the owners and founders of Prime Bank in Gambia. Treasury's February 10, 2011 press release identifying Lebanese Canadian Bank SAL ("LCB") as a financial institution of primary money laundering concern stated that: "LCB's other links to Hizballah include LCB's subsidiary, Gambia-based Prime Bank, which is partially owned by a Lebanese individual known to be a supporter of Hizballah." Local and international media contemporaneously confirmed that this partial owner was Bazzi. The corporate records used in these reports were accessible to SCB at least as early as 2009. LCB was also identified as "the

sole correspondent bank for Prime Bank," and SCB served as a U.S. correspondent bank for LCB.

674.    SCB not only ignored the lack of oversight and counterterrorism controls imposed by the government in Gambia; it actively assisted Bazzi and his business interests by conducting financial transactions worth millions of dollars through the United States so that Bazzi could provide funds to Hezbollah for terrorist attacks. SCB provided accounts and transactional support for Bazzi and his companies so that they could continue to funnel money to Hezbollah, even though Bazzi's Hezbollah connections were known at the time.

675.    Plaintiffs' allegations about Bazzi's activities were confirmed by the U.S. Government when it designated and prosecuted Bazzi and his network. In addition to the 2018 designation of Bazzi, which identified him as "a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities," Treasury also designated Bazzi's co-conspirator in Gambia, Charara, and his telecommunications enterprise as SDGTs on January 7, 2016. That designation said that Charara "has received millions of dollars from Hizballah to invest in commercial projects that financially support the group," including "extensive business interests in the telecommunications industry in West Africa." Adam J. Szubin, acting Under Secretary for Terrorism and Financial Intelligence described how "Hizballah relies upon accomplices in the business community to place, manage, and launder its terrorist funds," explaining that by "exposing and disrupting these networks," the Government sought "to pressure Hizballah's finances and degrade its ability to foment violence in Lebanon, Syria, and across the region."

676.    Bazzi, EAGL, and other companies connected to Bazzi were designated SDGTs on May 17, 2018 (and OFAC listed their Standard Chartered building addresses). OFAC said

that the designation showed the "convergence of Iran's support for terrorism with many facets of illicit criminal activity, including narcotics trafficking. In addition to providing millions of dollars to Hizballah, Mohammad Bazzi is a close associate of Yahya Jammeh, the corrupt former leader of The Gambia who, in addition to ordering targeted assassinations, plundered The Gambia's state coffers for his personal gain." The designation added that Bazzi had "business ties to the Ayman Joumaa Drug Trafficking and Money Laundering Organization," and that Abdallah Safi-al-Din, Hezbollah's highest-ranking representative to Iran, personally "worked with Bazzi to reestablish a political relationship between The Gambia and Iran." "Bazzi and Safi-Al-Din previously worked with the Central Bank of Iran" to "expand banking access between Iran and Lebanon."

677. The upshot is that, for years, SCB, through its Gambia branch, knowingly assisted Bazzi and his confederates as they corruptly extracted millions of dollars from the Gambian state to raise and transfer money for Hezbollah's violent activities.

### 2. SCB Dubai Helped Hezbollah Front Tajco Ltd. Access the U.S. Financial System to Finance Terrorist Attacks

678. SCB Gambia and SCB Dubai helped Hezbollah front Tajco Ltd. access the international financial system to finance terrorist attacks. Treasury identified Tajco Ltd. as a "multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen. As of February 2007, Kassim Tajideen owned Tajco and used proceeds from this business to provide millions of dollars in financial support to Hizballah."

679. SCB Gambia and SCB Dubai maintained relationships with Tajco Ltd. knowing it was co-owned by the Tajideen brothers, who had multiple businesses acting as fronts to provide funding and resources to Hezbollah. Despite overwhelming evidence that Tajideen's African

enterprises were providing enduring infrastructure for Hezbollah's terrorist operations, until at least 2010, "SCB Gambia maintained U.S. dollar ('USD') and Gambian dalasi ('GMD') denominated bank accounts for Tajco LTD, identified by SCB group ID number '*****7865', and processed funds transfers worth millions of U.S. dollars [for Tajco LTD] through SWIFT's Viriginia data center, CHIPS in New York, and SCB New York. Further, in August 2010, SCB Dubai processed a foreign exchange transaction worth a total of $290,803.56 U.S. dollars for the benefit of Tajco's transactional account, number '*****9201.'"[176]

680.    Evidence of Tajco's high-profile connections to Hezbollah was strong and known to SCB. In May 2009, the Treasury Department designated Kassim Tajideen Executive Order 13224 for supporting Hezbollah, explaining that "Kassim Tajideen is an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa."

681.    According to Treasury in 2010, Ali Tajideen, one of Tajco's co-owners, provided cash "in tranches as large as $1 million" to Hezbollah and was a "major player" in Jihad al-Bina, a Lebanon-based Hezbollah-run construction company designated by Treasury in February 2007.

682.    Evidence of the Tajideen family's connections to terrorism was public well before these designations. On February 26, 2007, The Times (London), reported that Ali Tajideen's "connections to Hezbollah are well known in south Lebanon." The Times stated that Ali was purchasing land in Lebanon for Hezbollah, and further highlighted that a member of his family

---

[176] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

was charged with using West African diamonds to launder money for Hezbollah. In its designation of the Tajideen family network, OFAC confirmed that their companies were trading diamonds.

683. SCB knew that the Tajideen family's involvement in diamond smuggling was a red flag for terrorist finance based on numerous articles on the subject published by local and global news media. For example, a regional diamond trade expert quoted in The Concord Times, a Sierra Leonian newspaper, on February 5, 2002, stated that because Gambia produces no diamonds of its own, diamonds sold from Gambia were obviously illicit conflict diamonds—with proceeds going to Lebanese actors active in the West African diamond industry. This report was syndicated globally.

684. Investigative journalist Douglas Farah's reporting on Hezbollah's use of diamonds to finance terrorist violence was cited in African media and research reports available to all SCB branches, including in Gambia. Most pointedly, on December 20, 2002, The Concord Times covered a widely cited paper noting Farah's reports linking Lebanese diamond traders in West Africa—"especially The Gambia" which was "enmeshed in the diamond syndicate—to Hezbollah's attacks on "US installations."

685. In an October 2004 paper, Farah highlighted that "Hezbollah has also been using diamonds from West Africa to finance its activities," becoming sophisticated in its "exploitation of 'grey areas' where states are weak, corruption is rampant, and the rule of law is nonexistent." Farah thus explained that "over the course of more than twenty years," Hezbollah had "successfully embedded its financial structure within the diamond trade." Newspapers published op-eds by Farah and co-authors reiterating these lessons.

686.     Media sources also confirmed the Tajideen family's status as Hezbollah financiers. On August 12, 2007, The Sunday Telegraph reported that Tajideen used the money he earned in Africa to acquire huge amounts of land in Lebanon, for the purpose of replacing communities opposed to Hezbollah with pro-Hezbollah Shi'a. The IRGC and Tajideen's construction company were so successful in this enterprise that Lebanese politicians warned that there was "an extraordinary demographic shift taking place" pursuant to "Hezbollah's plan to create a state within a state." Tajideen, in his role as "a major player" in Jihad al-Bina provided Hezbollah with control of strategic valleys along the Litani River, which borders Israel. This territory was "ideal terrain" for Hezbollah's guerilla tactics and fell outside of U.N. monitors' jurisdiction. This was part of a "a grand scheme to create a strip of Shia-controlled land connecting the south to Hezbollah's other power centre in Lebanon, the Bekaa Valley."

687.     Tajideen's land acquisitions and property developments provided Hezbollah with fortified bases co-located with civilian housing, removed its opponents from strategic areas, and enabled it to covertly build secure command, control, and communications infrastructure directly connected with Syrian and Iranian systems. Discovered in 2008, this was declared Hezbollah's "No. 1 weapon" by its leader Hassan Nasrallah. When Lebanon's Prime Minister demanded its removal, Hezbollah launched an all-out assault on Beirut, overthrew the government, and replaced it with a Hezbollah-controlled coalition.

688.     On information and belief, SCB's industry-standard due diligence, which involved Know Your Customer investigations, flagged Tajco's co-owners and alerted SCB to public reports discussing Tajco and its owners. Despite these warnings, SCB chose to process dollar transactions for these known Hezbollah financiers through at least August 2010. Not only

did SCB maintain accounts in Gambia and process transactions in Dubai, but SCB also enabled these Hezbollah fundraisers to access U.S. dollars through SCB New York.

**F.  SCB Repeatedly Misled and Obstructed U.S. Regulators**

**1.  SCB Willfully Misled NYDFS About Its Anti-Money Laundering/Combating the Financing of Terrorism Program**

689.    In 2003, following an investigation into significant AML/CFT violations—violations that were distinct from SCB's wire-stripping scheme—NYDFS ordered SCB to improve its AML/CFT practices with respect to foreign bank correspondent accounts. That agreement (the "Written Agreement") also required SCB to hire an independent consultant to conduct a retrospective transaction review for suspicious activity involving the NY Branch.[177] SCB "vowed to regulators" that it would "comply" with the Written Agreement.[178]

690.    To that end, SCB retained Deloitte & Touche, LLP ("Deloitte") to perform an independent review of suspicious activity and report its findings to NYDFS.[179]

691.    SCB skewed Deloitte's nominally independent investigation. SCB pressured Deloitte to hide from regulators any references that "could ultimately reveal SCB's Iranian U-Turn practices"—*i.e.*, references that could reveal SCB's sanctions-evasion scheme.[180] Deloitte succumbed to SCB's pressure, and ultimately submitted a "***watered-down***" report to NYDFS.[181]

692.    Around that same time, SCB's CEO of the Americas failed to disclose SCB's wire stripping to the NYDFS Deputy Superintendent for Foreign Banks. Instead, SCB "lied" to NYDFS and claimed that the "bank was compliant in all matters related to Iran."[182]

---

[177] 2012 NYDFS Consent Order ¶ 41.
[178] 2012 NYDFS Consent Order ¶ 43.
[179] 2012 NYDFS Consent Order ¶ 50.
[180] 2012 NYDFS Consent Order ¶ 45.
[181] 2012 NYDFS Consent Order ¶ 45.
[182] 2012 NYDFS Consent Order ¶ 46.

693.     In September 2006, NYDFS requested from SCB statistics on Iranian U-Turns, including the number and dollar volume of such transactions for a 12-month period.[183]

694.     In response, SCB searched its records for 2005 and 2006, and uncovered 2,626 transactions totaling over $16 billion.[184] SCB's Head of Compliance at the NY Branch provided the data to SCB's CEO for the Americas, who in turn, sent it to the SCB Group Executive Director in London. In his memorandum to the Executive Director, the CEO expressed concern that this data would be the "wildcard entrant" in the ongoing review of U-Turns by regulators and could lead to "catastrophic reputational damage to the [bank]."[185] SCB's Head of Compliance in New York ultimately provided only *four days* of data to regulators.[186]

695.     The combined effect of SCB's deceptive acts—a watered-down report from Deloitte, lying about their compliance with Iran regulations, and misleading data—ultimately convinced NYDFS to lift the Written Agreement in 2007.[187]

696.     Years later, in the 2012 Consent Order, NYDFS excoriated SCB for its deception. According to NYDFS, "SCB successfully misled New York regulators to believe that it had corrected serious flaws" in its AML/CFT program.[188] In reality, however, "the opposite was true." "SCB's actions prevented regulators from doing their job in detecting potential threats to the U.S. financial system and other national security interests."[189] Had NYDFS known the

---

[183] 2012 NYDFS Consent Order ¶ 48.
[184] 2012 NYDFS Consent Order ¶ 48.
[185] 2012 NYDFS Consent Order ¶ 48.
[186] 2012 NYDFS Consent Order ¶ 48.
[187] 2012 NYDFS Consent Order ¶ 50.
[188] 2012 NYDFS Consent Order ¶ 50.
[189] 2012 NYDFS Consent Order ¶ 51.

truth—*i.e.*, "had SCB not meticulously disguised its willful misconduct"—NYDFS "would have kept the Written Agreement rigidly in place."[190]

697.    SCB's documented willingness to mislead financial regulators further suggests that its decision to provide atypical, illegal banking services for Iran's Terrorist Sponsors and fronts was deliberate.

### 2.    SCB Willfully Misled NYDFS About Its Sanctions Compliance Efforts

698.    SCB also misled NYDFS about the quality of its sanctions compliance efforts.

699.    In 2009, SCB engaged Promontory Financial Group LLC ("Promontory"), a reputable financial consultancy, to provide advice on sanctions compliance and regulatory issues, and to identify and collect SCB's historical records for cross-border transactions.

700.    In 2010, SCB broadened Promontory's mandate to identifying, collecting, and analyzing historical transaction records with sanctioned countries and persons.[191] SCB ostensibly ordered Promontory to be "independent and transparent" in how it evaluated SCB's behavior because, at the conclusion of the project, Promontory was to submit factually accurate reports to financial regulators.[192]

701.    Between 2010 and 2011, Promontory did indeed produce and transmit several reports and made several presentations to NYDFS (and other governmental authorities). Those reports, however, were materially inaccurate. SCB exploited its relationship with Promontory to improperly manipulate Promontory's reports.

---

[190] 2012 NYDFS Consent Order ¶ 52.
[191] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 2-3.
[192] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5.

702.     SCB knew that the engagement was lucrative for Promontory—with a contract worth approximately $54.5 million[193]—and SCB knew that Promontory wanted to avoid "jeopardizing [its] relationship" with SCB. So SCB's in-house and outside counsel and other SCB employees provided extensive markups and comments on Promontory's draft reports to: (i) make categories of illegal transactions appear more innocuous; (ii) conceal willful compliance failures (such as when SCB's sanctions filters correctly identified illegal transactions that SCB processed anyway); (iii) remove branch-identifying information concerning the illegal transactions; (iv) selectively remove certain timelines showing increases in violations during the relevant period at some branches while keeping in others that portrayed SCB in a more positive light; and (v) minimize the number of "violations" reported.[194]

703.     Promontory implemented all SCB's comments—whitewashing SCB's bad behavior, and in effect, serving as a *de facto* advocate for SCB's interests with regulatory authorities—even though Promontory was expected to exercise "independent judgment" reporting SCB's behavior to authorities.[195]

704.     By essentially puppeteering Promontory, SCB managed to hide from NYDFS the true extent of its illegal Iran-related transactions, undermining NYDFS's enforcement efforts.[196]

705.     SCB's willingness to submit manipulated data to New York financial regulators is further evidence that its decision to provide atypical, illegal banking services for Iran's Terrorist Sponsors and fronts was deliberate.

---

[193] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 3 n.1; *id.* at 6.
[194] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.
[195] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.
[196] NYDFS, Agreement, *In the Matter of Promontory Financial Group, LLC* (Aug. 18, 2015). Promontory paid a $15 million penalty to NYDFS for its role in hiding SCB's malfeasance. *Id.*

### 3. SCB Promoted a Culture of Illegality by Retaliating Against Whistleblowers

706.    SCB promoted a culture of illegality throughout the institution. Not only did SCB "fail[] to take reasonable steps to ensure a positive culture towards AML compliance was embedded" throughout the Bank,[197] but SCB also retaliated against multiple employees who tried to blow the whistle on SCB's illegal provision of financial services to customers affiliated with the IRGC and other terrorist groups.

707.    Between 2011 and 2016, two SCB employees reported to U.S. and New York State authorities that, based on their own observations and experience and informed by reams of SCB transaction data: (i) SCB was facilitating U.S. dollar-denominated transactions for Iranian customers suspected of funding terrorist groups; and (ii) when it was under investigation, SCB drastically underreported the volume of illegal Iran-linked transactions it facilitated.[198]

708.    The first whistleblower was Julian Knight, SCB's Global Head of Transaction Banking Foreign Exchange Sales for SCB Dubai and SCB's branches in Singapore. Knight internally reported concerns about SCB's Iranian transactions and proposed reforms to remedy them. SCB responded by terminating him. Subsequently, after Knight reported his concerns to NYDFS and other government regulators, SCB embarked on a retaliatory smear campaign against him that essentially led to Knight being blacklisted in the financial services industry.[199]

709.    The second whistleblower was Anshuman Chandra, who worked for SCB in Dubai as the head of eCommerce Client Services, Financial Markets for the MENA region. After

---

[197] 2019 U.K. FCA Decision Notice § 5.16.

[198] First Am. Compl. ¶¶ 9-13, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

[199] First Am. Compl. ¶¶ 43-46, 78-93, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

Chandra reported concerns about SCB's post-2013 Iran-related transactions to U.S. authorities through an intermediary, SCB retaliated against him at work via harassing conduct, followed by a layoff, and then harsher treatment of Chandra than other laid off employees who had not engaged in whistleblowing.[200]

710. SCB's willingness to retaliate against whistleblowers in an effort to conceal the true scope of its transactions with Iran's Terrorist Sponsors and fronts is further evidence that SCB's *hundreds of millions* in transactions with those entities was both conscious and culpable.

### G. Plaintiffs' Allegations Are Corroborated by SCB's Pattern of Engaging in a Variety of Other Illicit Behavior

711. SCB's illegal conduct as alleged herein is no aberration; it is a reflection of SCB's corporate culture and business priorities. Plaintiffs' allegations fit SCB's consistent pattern of disregarding red flags, typical banking practices, and, in many cases, legal obligations in service of the bank's appetite for market share and profitability in the geographies it targeted (which were often high-risk, "frontier" markets).[201] This pattern of illegal conduct—including conduct demonstrating, at best, complete indifference to terrorism financing risk—goes well beyond the misconduct complained of herein related to Iran, Hezbollah, and Iran's Terrorist Sponsors.

712. Indeed, SCB has a long, sordid history as a rogue bank that has knowingly providing assistance to money launderers, sanctions evaders, and financers and facilitators of

---

[200] First Am. Compl. ¶¶ 47-59, 64-77, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

To be fair, SCB has exhibited a pattern of engaging in wildly reckless and criminal conduct in established Western countries as well. For example, in 2015, SCB's Swiss subsidiary settled with DOJ and paid millions of dollars in penalties for unlawfully helping certain U.S. persons evade their U.S. tax obligations. Separately, in 2019, NYDFS fined SCB $40 million after an investigation confirmed, among other things, that bankers in SCB's London and New York branches used a range of illegal tactics to attempt to rig transactions in foreign exchange markets between 2007 and 2013.

terrorism. That history encompasses nearly all of its global operations, including those in the Americas, Africa, South and Southeast Asia, and the Middle East.

713.    Over the last few decades, SCB has been fined many millions of dollars by regulators in multiple countries, including India, Japan, Singapore, and Kenya, for illegally facilitating significant money laundering schemes and/or for deliberately maintaining a deficient approach to anti-money laundering and terrorism finance prevention.

714.    For example, SCB was implicated in a multi-billion-dollar bribery scandal in Angola in the early 2000s, was accused by the U.S. government in 2015 of allowing its accounts to be used to launder some of the key bribes in the FIFA/World Cup scandal, and was accused in 2019 by a U.K. lawmaker of culpably facilitating (and concealing) hundreds of millions of dollars' worth of alleged bribes paid to South African officials by the Guptas, an ultrawealthy family of oligarchs. Other examples include when the South African Central Bank fined SCB in 2016 for its weak measures to combat money laundering and the financing of terrorism, and in 2018, when the Monetary Authority of Singapore imposed financial penalties on SCB for for breaking terrorism financing rules.

715.    SCB's pattern of illegal conduct also includes providing financial and banking services to transnational criminal organizations ("TCOs")[202] that were engaged in money laundering and financing terrorism.

---

[202] TCOs are organizations that the United States has determined engage in transnational criminal activities that threaten the security of U.S. nationals or the national security of the United States by, among other things, destabilizing international political and economic systems, weakening democratic institutions, degrading the rule of law, and undermining economic markets. TCOs also facilitate the violent activities of other dangerous persons and organizations. Executive Order 13581.

716.     For example, SCB provided financial services to the Khanani Money Laundering Organization ("Khanani MLO"), a TCO that facilitated the illicit movement of an estimated $14 billion to $16 billion dollars per year through the global financial system. The Khanani money laundering MLO was known to fund the illicit activities of clients that included drug traffickers, organized crime groups, and terrorist organizations, including al-Qaeda and the Haqqani Network (both FTOs). SCB held accounts for at least two front companies that were part of the Khanani MLO, processed a number of suspicious transactions involving those front companies, and failed to report the suspicious transactions contemporaneously to the appropriate government authorities—including, among others, a suspicious payment to an unidentified entity in the UAE that SCB had flagged internally because of its reference to the "purchase of seismic explosives."

717.     SCB also knowingly provided bespoke financial services to a VAT fraud cell operated by Samir Azizi, a teenaged al-Qaeda and Haqqani Network operative who funneled tens of millions of dollars in VAT fraud proceeds to Afghan terror groups from 2009 until 2015 (when he was finally arrested). SCB did so despite the myriad public sources expressly linking VAT fraud to terrorist finance beginning in 2006, including a widely reported statement by the U.K. Home Secretary and a 2007 report from the Financial Action Task Force.

718.     In one of the more shocking examples of SCB's assistance to conduct that posed a clear and obvious risk of terrorist violence, SCB's Pakistan branch knowingly provided term loans, foreign exchange, and export finance services to Fatima Fertilizer, the Pakistani company which produced the overwhelming majority of calcium ammonium nitrate (CAN) fertilizer used by terrorists in Afghanistan to make the bombs responsible for nearly 90 percent of U.S. casualties there. SCB provided those services to Fatima despite years of press coverage and government statements linking its CAN fertilizer to bombs and noting that Fatima was doing

nothing to stop it. Indeed, SCB continued to provide services to Fatima even after a senior Department of Defense official personally visited SCB's New York office to tell the bank that its customer was facilitating the killing and maiming of American troops and to implore SCB to take actions to disrupt the terrorists' bombmaking pipeline. The same DoD official subsequently described SCB's response to his entreaties as "utterly useless."[203] Instead, the bank continued to service Fatima and thereby facilitate the terrorists' bombmaking pipeline.

719.    In sum, SCB has a long track record demonstrating that it will happily assist its customers' conduct even when it knows that acts of terrorism are a foreseeable risk of the enterprises it assists.

## VIII.    SCB Knew That Iran-Sponsored Terrorist Attacks Committed By Hezbollah, Hamas, PIJ, and JAM Were A Foreseeable Result Of Its Culpable Acts

720.    As explained above, SCB engaged for over a decade in an intentional and systematic scheme to move billions of dollars for Iran's Terrorist Sponsors while helping them evade counterterrorism controls. At the time SCB engaged in this culpable conduct, it knew that its conduct financed Iran's Terrorist Sponsors, and that terrorist attacks on Americans by the IRGC's Qods Force, Hezbollah, Hamas, PIJ, and JAM were a foreseeable result.

### A.    SCB Defied Numerous Warnings That Transacting with Fronts for Iran's Terrorist Sponsors Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM

721.    SCB's knowledge was informed by a deafening chorus of U.S. government warnings that SCB received throughout the relevant period—and that increased in intensity as SCB's culpable conduct continued through at least 2015. This chorus reached a crescendo during

---

[203] Adam Luck, *US General Claims He Told Standard Chartered Its Client Helped the Taliban— But the Bank Did Nothing*, Daily Mail.com (Dec. 7, 2019), https://www.dailymail.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

the U.S. government's "financial pressure campaign" to warn banks about Iran's funding of terrorism between 2006 and 2008.

722.     In his memoir of the period, Treasury's former Assistant Secretary for Terrorist Financing and Financial Crimes Juan Zarate explained that the "cornerstone" of the financial pressure campaign was to share information about "Iran's own conduct" with the private sector. Because Iran's economy had become so intertwined with its terrorist activity and other malign conduct, knowledge of that state of affairs would "spur the private sector to stop doing business with Iran." In the U.S. government's estimation, "No reputable bank would want to be caught facilitating Iran's nuclear program or helping it make payments to Hezbollah terrorist cells around the world." The fact that Iran often used front companies and layers of entities to accomplish these goals would only make things worse, as "[t]he more the Iranians tried to hide their identities or evade sanctions, the more suspect their transactions would appear and the riskier it would become for banks and other financial institutions to deal with them."

723.     Zarate elaborated on the state of Iran's intertwined economic and terrorist activity in 2006 (emphasis added):

> [The Iranians] were blending legitimate business transactions with illicit ones by funneling them through similar conduits. The Iranian regime often tried to hide the nature of its transactions and the identities of the Iranian government entities involved. Importantly, the predominant economic player was Iran's Islamic Revolutionary Guard Corps (IRGC), the elite military and security unit founded in 1979. The IRGC had gained more power and influence over time as the protector and exporter of the revolution and reported directly to the Supreme Leader, Ayatollah Ali Khamenei.

> The IRGC—with its vast network—had embedded itself into more industries within Iran, ultimately building what has been called a veritable business empire. . . . The IRGC is an economic juggernaut, with responsibilities relating to the development of weapons of mass destruction, missile systems, and overseas operations. It is deeply involved in the Iranian nuclear program, and its international arm, the Qods Force (IRGC-QF), is responsible for providing support for terrorist proxies and exporting the Iranian Revolution. . . .

From Treasury's perspective, this blend of activities created the ultimate vulnerability, particularly the blurred lines between legitimate industry and support for Iran's nuclear program and terrorist groups. ***The nefarious nature of the activities, tied with the IRGC's attempts to hide its hand in many of its economic dealings and operations, made Iran's financial activity inherently suspect.*** . . .

724.     The fundamental message of the U.S. government's financial pressure campaign could thus be summed up simply: If you did business with Iranian companies in sectors controlled by the IRGC—even ostensibly legitimate transactions with business entities—terrorist attacks by IRGC-funded proxies are a foreseeable result. That sharp warning was emphasized and reiterated repeatedly by the U.S. government throughout the financial pressure campaign.

725.     As a European bank with a major presence in Dubai and a history of serving Iranian clients, SCB was a prime target of the U.S. government's financial pressure campaign, during which SCB received warnings through a variety of means, including public statements by U.S. officials and regulatory agencies and private outreach directly to SCB.

726.     On information and belief, the private warnings that SCB received were even more detailed and urgent than the public ones, and included direct warnings to SCB, including the NY Branch and SCB Dubai, that transacting with Iranian banks, Iranian fronts, or companies in Iran's oil sector would facilitate IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, and Iraqi Shiite terrorist groups. Although Plaintiffs expect discovery to reveal more about these private warnings, Zarate's memoir explains the form they took:

> Treasury—led by [Under Secretary for Terrorism and Financial Intelligence] Levey—would launch the financial pressure campaign . . . in large part by demonstrating to CEOs and compliance officers around the world that the risk of doing business with Iran was too high. Iranian obfuscation was too ubiquitous to be handled through normal compliance efforts. . . . It was better to stop doing business with Iran altogether than to risk facilitating Iran's support for terror or its development of a nuclear program. . . .

> Levey began his meetings with bank officials around the world with a briefing on Iranian illicit activity and how it coursed through the international financial system. He would take this argument from board room to board room, often meeting with bank CEOs

before and after meeting with foreign government counterparts. Steve Hadley called it the 'whisper campaign,' because the mission entailed meeting quietly with bank executives to explain the risks of doing business with Iran. At the heart of these meetings was a presentation on what Iran was doing with front companies and layered financial transactions to facilitate activity that was considered either illegal or risky. . . .

Levey would meet over one hundred times with bank officials around the world. At each stop, he made the case that doing business with Iran was too risky—because the banks could not be sure they knew who they were doing business with. . . . For each country and institution, the Treasury team would provide specific tidbits of data about Iranian transactions through a bank. The briefing packets would have general information about the Iranian economy, structure, and financial system. The packets would contain information about how the Iranian government and the IRGC used front companies and obfuscation to finance and acquire what they needed for their military and nuclear apparatus. The briefing would conclude with an explanation of what was happening in the bank and how the Iranians were hiding their activity. This would inevitably be a surprise to any bank CEO, though some banks would be caught later trying to hide transactions with Iran.

727.　　Treasury Secretary Paulson increased the prominence of the warnings by emphasizing them in his own private meetings with bank executives:

The former Wall Street executive could convincingly make a case to fellow bankers about the danger of doing business with Iran. When Paulson talked, financial leaders around the world listened. . . . [Paulson] made a point of putting the issue of Iran's suspect financial activity on the agenda of his meetings with foreign government officials and banking friends with whom he met. . . . One would expect such talk from the director of the CIA or FBI, but to hear this coming from the former CEO of Goldman Sachs and the treasury secretary caused officials to take notice. The treasury secretary was speaking a new language of national security that resonated with the CEOs of the world's biggest banks and businesses.

728.　　Publicly available warnings were also numerous, even well before the financial pressure campaign began. Decades of U.S. government statements confirmed the tight nexus between transacting with Iranian fronts and IRGC-sponsored acts of international terrorism targeting the United States. In particular, decades of public U.S. government findings, reports, statements, and warnings (often, all four in one item) alerted SCB that: (1) the Government of Iran was a prolific funder and supporter of terrorist attacks against Americans; (2) Iran's Terrorist Sponsors facilitated terrorist attacks by fronts and proxies, including the Qods Force,

Hezbollah, Hamas, PIJ, and JAM; (3) the Government of Iran systematically used a large proportion of its profits from ostensibly ordinary business transactions, especially in its oil sector, to fund those terrorist attacks; (4) the Government of Iran routinely used front companies and layered financial transactions to do so while evading sanctions; and (5) by at least 2006, the IRGC's control and influence over key industries meant that any significant transaction with an Iranian front company, especially in the oil sector, would foreseeably fund those terrorist attacks. The U.S. government's voluminous warnings made explicit what its comprehensive sanctions implied: No country in the world had a major economy as saturated with terrorist finance as Iran.

729.    From 1990 through 2015, such U.S. government findings, reports, statements, and warnings included, but were not limited to:

a.    State, April 1990: "In its various forms -- direct involvement, instigation and encouragement, support to terrorist groups through provision of safehaven, financial resources, arms, technical expertise, and documentation -- state sponsorship makes a significant contribution to international terrorism. … Support in its various forms enhances the capabilities of a … radical Shia groups throughout Western Europe, the Middle East, and Africa; … Iran was the most active state sponsor … The United States … designat[ed] … [Iran] … as [a] state supporter[] of terrorism … pursuant to Section 6 (j) of the Export Administration Act of 1979, which imposes certain trading restrictions on countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism."

b.    The President, 1995: "From the beginning of our administration, we have moved to counter Iran's support of international terrorism and in particular its backing for violent opponents of peace in the Middle East. … Our policy has helped to make Iran pay a price for its actions. The nation has effectively been cut off from receiving credit from international financial institutions. … Even as prospects for the peace in the Middle East have grown, Iran has broadened its role as an inspiration and paymaster to terrorists. … I am convinced that instituting a trade embargo with Iran is the most effective way our Nation can help to curb that nation's drive to acquire devastating weapons and its continued support for terrorism … It would be wrong to stand pat in the face of overwhelming evidence of Tehran's support for terrorists that would threaten the dawn of peace."

c.    State, April 1998: "The Secretary of State has designated [the Iranian] government[] as [a] state sponsor[] of terrorism … by providing arms, training, safehaven, diplomatic facilities, financial backing, logistic and/or other support to terrorists. The US policy of

bringing maximum pressure to bear on state sponsors of terrorism and encouraging other countries to do likewise … [depends upon] [a] broad range of bilateral and multilateral sanctions [that] serves to discourage state sponsors of terrorism from continuing their support for international acts of terrorism, but continued pressure is essential. ... Iran remains the most active state sponsor of terrorism … Iran continues both to provide significant support to terrorist organizations."

d.     <u>White House, *National Strategy for Combating Terrorism*, September 2006</u>: "State sponsors are a critical resource for our terrorist enemies, often providing funds, weapons, training, safe passage, and sanctuary. Some of these countries have developed or have the capability to develop WMD and other destabilizing technologies that could fall into the hands of terrorists. The United States currently designates [Iran as a] state sponsor[] of terrorism … We will maintain sanctions against [Iran] and promote [the Iranian regime's] international isolation until they end their support for terrorists …. To further isolate these regimes and persuade other states not to sponsor terror, we will use a range of tools and efforts to delegitimate terrorism as an instrument of statecraft. Any act of international terrorism, whether committed by a state or individual, is reprehensible, a threat to international peace and security, and should be unequivocally and uniformly rejected. Similarly, states that harbor and assist terrorists are as guilty as the terrorists, and they will be held to account. Iran remains the most active state sponsor of international terrorism. Through its Islamic Revolutionary Guard Corps …, the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah, Hamas, and Palestine Islamic Jihad (PIJ)…. Most troubling is the potential WMD-terrorism nexus that emanates from Tehran. … We will continue to stand with the people of Iran … against the regime[] that oppress[es] them at home and sponsor[s] terror abroad."

e.     <u>Treasury (OFAC), September 2006</u>: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence (TFI). Bank Saderat is one of the largest Iranian-owned banks, with roughly 3400 branch offices. The bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001. … By prohibiting U-turn and all other transactions with Bank Saderat, the bank is denied all direct and indirect access to the U.S. financial system."

f.     <u>Treasury (Levey), March 2007</u>: "Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a `train and equip program' for terrorist organizations like Hizballah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over

management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism. . . . Iran sends hundreds of millions of dollars each year to terrorist groups like Hizballah and other organizations. When a country has a nine-digit line item in its budget for support to terrorist organizations and is actively seeking a WMD program, there is no way to know how the regime will use its revenues. Corporations are in the process of reconsidering their investments in Iran because they do not want revenue generated from their projects diverted towards . . . terrorism."

g.      Treasury (Paulson), June 2007: "It is well known that Iran is pursuing nuclear weapons in violation of international agreements and channeling hundreds of millions of dollars to terrorist groups. . . . We explained how Iran uses front companies and other mechanisms that make it difficult, if not impossible, for businesses dealing with Iran to 'know their customer' or counterparty. We also explained how the Iranian regime uses its state-owned banks to pursue its missile procurement and nuclear programs, as well as fund terrorism. Repeatedly, state-owned Iranian banks, including the Central Bank of Iran, ask other financial institutions to remove their names from global transactions. . . . To those banks that have decided to stop dollar-based business, but continue to transact Iran's business in other currencies, I would say that the risk of transacting Iran's business is present in every currency. . . . The IRGC, a paramilitary arm of the regime, has been directly involved in the planning and support of terrorist acts, as well as funding and training other terrorist groups to pursue the military objectives of the regime. . . . The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC."

h.      Treasury (OFAC), October 2007: "The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. … Bank Melli also provides banking services to the IRGC and the Qods Force. … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions. … The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others.… Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central

Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas."

i.      <u>Treasury (Paulson), October 2007</u>: "Iran also funnels hundreds of millions of dollars each year through the international financial system to terrorists. . . . We are also designating the Islamic Revolutionary Guard Corps for proliferation activities and its Qods Force for providing material support to the Taliban and other terrorist organizations. The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are doing business with the IRGC. We call on responsible banks and companies around the world to terminate any business with Bank Melli, Bank Mellat, Bank Saderat, and all companies and entities of the IRGC. As awareness of Iran's deceptive behavior has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be bankers to this dangerous regime."

j.      <u>Treasury (FinCEN), October 2007</u>: "The Financial Crimes Enforcement Network is issuing this advisory to U.S. financial institutions so that they may guard against threats of illicit Iranian activity related to money laundering, terrorist financing and weapons of mass destruction proliferation financing. . . . [F]inancial institutions should be particularly aware that there may be an increased effort by Iranian entities to circumvent international sanctions and related financial community scrutiny through the use of deceptive practices involving shell companies and other intermediaries or requests that identifying information be removed from transactions. Such efforts may originate in Iran or Iranian free trade zones subject to separate regulatory and supervisory controls, including Kish Island. Such efforts may also originate wholly outside of Iran at the request of Iranian-controlled entities."

k.      <u>Treasury (FinCEN), March 2008</u>: "The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on serious deficiencies present in the anti-money laundering systems of the Islamic Republic of Iran. . . . Iran's AML/CFT deficiencies are exacerbated by the Government of Iran's continued attempts to conduct prohibited proliferation related activity and terrorist financing."

l.      <u>Treasury (Glaser), April 2008</u>: "[The] Threat of Iran's Support of Terrorism … [includes] its provision of financial and material support to terrorist groups. Iran has long been a state sponsor of terrorism and continues to support an unparalleled range of terrorist activities. For example, Tehran arms, funds, and advises Hizballah, an organization that has killed more Americans than any terrorist network except for al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guard Corps. In addition, Iran provides extensive support to Palestinian terrorist organizations, including the Palestinian Islamic Jihad (PIJ) and Hamas. In the case of PIJ, Iran's financial support

has been contingent upon the terrorist group carrying out attacks against Israel. And we are all familiar with Iran's funding, training, and equipping of select Shi'a extremist groups in Iraq, further destabilizing that country and resulting in deaths of Americans. … Iran utilizes the international financial system as a vehicle to fund these terrorist organizations. As Under Secretary Levey has previously testified, the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism. … Iran uses its global financial ties to pursue [] the threat of terrorism … through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community. Iran uses its state-owned banks for … for financing terrorism. … [One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system. This practice is intended to elude the controls put in place by responsible financial institutions and has the effect of potentially involving those institution [sic] in transactions they would never engage in if they knew who, or what, was really involved. This practice allows Iran's banks to remain undetected as they move money through the international financial system to pay for the Iranian regime's … terrorist-related activities."

m.  Treasury (OFAC), November 2008: "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. … Iran is the world's most active state sponsor of terror. … Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America. … In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. … It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. … Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its nuclear or missile programs."

n.  Treasury (FinCEN), July 2009: "On June 26, 2009 the Financial Action Task Force (FATF) issued a statement concerning these jurisdictions that reiterates previous FATF concerns and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website. . . . 'The FATF remains particularly concerned about Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity of the international financial system. . . . The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

o.  Treasury (Levey), October 2009: "[T]he international private sector has amplified the impact of [U.S., U.N., and E.U.] government actions, as banks and companies around

the world have come to understand that, if they are dealing with Iran, it is nearly impossible to protect themselves against becoming entangled in [the IRGC]'s illicit conduct … [because] [IRGC] companies, some of which have been designated by the United States and the UN Security Council …, operate under names that obscure their IRGC affiliation, so many unwitting non-Iranians are in fact doing business with the IRGC. In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects …There is broad acknowledgment that the Iranian government engages in a range of deceptive financial and commercial conduct in order to obscure … and facilitate its support for terrorism. International understanding of these practices – underscored by the UN Security Council resolutions on Iran and six warnings issued by the [FATF] about the risks Iran poses to the financial system – has been brought about in part by our efforts to share information about Iran's deception with governments and the private sector around the world. These deceptive practices taint all Iranian business because they make it difficult to determine whether any Iranian transaction is licit. Iranian banks request that their names be removed from transactions so that their involvement cannot be detected; the government uses front[s] … and intermediaries to engage in ostensibly innocent commercial business to obtain prohibited … goods … To a greater extent than ever, private companies across industries are now alert to these kinds of risks. Banks worldwide have been repeatedly warned by regulatory and standard-setting bodies to regard Iranian transactions with caution. Traders and shippers know that transactions with innocent-sounding Iranian counterparts can expose them to risk – both reputational and legal. Energy companies have put Iranian investments on indefinite hold, cautious of the political risk of investing too heavily in Iran. And exporters of sensitive and dual-use technologies know that supplying Iran can lead to severe sanctions and even prosecution. Across the board, then, transactions with Iran are already handled differently than transactions with any other country … engendering either heightened suspicion or outright refusal to engage in them."

p.  Treasury (FinCEN), October 2009: "On October 16, 2009, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website. . . . 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

q.  Treasury (Levey), June 2010: "Because "[t]he IRGC plays a key role in Iran's … support for terrorism and [the IRGC] has taken over broad portions of the Iranian economy, … [n]o IRGC entity should have any place in the world's legitimate financial system."

r.  Treasury (FinCEN), March 2011: "On February 25, 2011, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The

FATF statement is copied below and can be found on the FATF website. . . . 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

s.  <u>Treasury (OFAC), February 2012</u>: "What activities by foreign financial institutions can subject them to CISADA sanctions? As described in the Iranian Financial Sanctions Regulations, the sanctionable activities of a foreign financial institution are: Facilitating the efforts of the Government of Iran (GOI) to acquire or develop Weapons of Mass Destruction (WMD) or delivery systems for WMD or to provide support for terrorist organizations or acts of international terrorism; Facilitating the activities of a person subject to financial sanctions pursuant to UNSCRs 1737, 1747, 1803, or 1929, or any other Security Council resolution that imposes sanctions with respect to Iran; Engaging in money laundering, or facilitating efforts by the Central Bank of Iran or any other Iranian financial institution, to carry out either of the facilitating activities described above; or Facilitating a significant transaction or transactions or providing significant financial services for: (i) the Islamic Revolutionary Guard Corps or any of its agents or affiliates whose property and interests in property are blocked pursuant to the International Emergency Economic Powers Act (IEEPA), or (ii) a financial institution whose property and interests in property are blocked pursuant to IEEPA in connection with Iran's proliferation of WMD, Iran's proliferation of delivery systems for WMD, or Iran's support for international terrorism."

t.  <u>State, April 2014</u>: "In 2013, Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) … and Tehran's ally Hizballah, which remained a significant threat to the stability of Lebanon and the broader region. The U.S. government continued efforts to counter Iranian and proxy support for terrorist operations via sanctions and other legal tools. The United States also welcomed the EU's July 2013 designation of Hizballah's military wing as a terrorist organization. … Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity, including support for Palestinian terrorist groups in Gaza, and for Hizballah. … Iran used the [Qods Force] and its regional proxy groups to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is the regime's primary mechanism for cultivating and supporting terrorists abroad."

u.  <u>Representative Ted Poe (Chairman of the House Subcommittee on Terrorism, Non-Proliferation and Trade), October 2015</u>: "[The] Islamic Revolutionary Guard Corps (IRGC) has funded, planned and executed terrorist attacks against the United States … for decades … Treasury … has repeatedly cited the IRGC's support for terrorism and destabilizing activity throughout the Middle East and beyond. …There is also growing concern that the IRGC is engaging in financial evasion practices that erode the efficacy of the sanctions currently in place. Treasury currently sanctions companies that are 50% owned or controlled by the Iranian government or in which Iran wields a controlling interest. However, through control of a company's board of directors, the IRGC can exercise the same level of power over a company without meeting Treasury's

designation trigger. By exploiting this … legal loophole, the IRGC has managed to become so deeply entrenched in the Iranian economy to the point that, as former Treasury Secretary Henry Paulson pointed out, 'it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC.'"

730.    On November 25, 2011, Treasury took official action to determine that Iran was a Jurisdiction of Primary Money Laundering Concern. This determination summarized the message that had been delivered to banks throughout the financial pressure campaign and represented the U.S. government's formal conclusion that it was impossible for any bank, including SCB, to conduct any Iran-related financial transaction without running a substantial risk of financing IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, or other proxies of Iran's Terrorist Sponsors. Among other things, Treasury's finding alerted SCB that (emphases added):

a.    "In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for terrorism …. This illicit conduct by Iranian banks and companies has been highlighted in a series of … UN Security Council … resolutions related to Iranian proliferation sensitive activities. [FATF] has also warned publicly of the risks that Iran's deficiencies in countering money laundering and, particularly, terrorism finance . . . . FinCEN has reason to believe that Iran directly supports terrorism … and uses deceptive financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities."

b.    "**Support for Terrorism**: . . . *Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas and the Palestinian Islamic Jihad ("PIJ"). In fact, Hamas, PIJ, and Hizballah have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.*"

"Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external threats. Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure. *In addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.*"

"In particular, Iran has used the IRGC-Qods Force ('Qods Force') to cultivate and support terrorists and militant groups abroad. *The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's … terrorist activities*, and provides Hizballah with as much as $200 million in funding per year. … [O]n October 11, 2011, the Department of Justice charged two individuals for their ... participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States. …"

"Finally, *Iran is known to have used state-owned banks to facilitate terrorist financing.* In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its [10] financial support of terrorist organizations, noting that *from 2001 to 2006 Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.*"

c.    "As a result of the strengthened U.S. sanctions and similar measures taken by the [U.N.] and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. *This conduct puts any financial institution involved with Iranian entities at risk of [] facilitating transactions related to terrorism* …".

d.    "**The IRGC**: The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007, owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy. For example, *the IRGC established Khatam al-Anbiya, the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company working on civilian projects.*"

e.    "*The IRGC has continued to expand its control over commercial enterprises within Iran. … [T]he IRGC and the IRGC-QF engage in seemingly legitimate activities that ... support terrorist groups such as Hizballah [and] Hamas …*".

f.    "Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ('AML/CFT') controls has long been highlighted by numerous international bodies and government agencies. . . ."

731.    On November 28, 2011, Treasury published its proposed special measure under

Section 311 of the USA PATRIOT Act, in which it found that a complete U.S. prohibition on all

Iranian banks' correspondent account access to the U.S. financial system was necessary to

protect the United States from IRGC-sponsored acts of terrorism, including attacks committed by

Hezbollah, Hamas, PIJ, and other IRGC proxies:

a. "The Effect of the Proposed Action on United States National Security …[.] The exclusion from the U.S. financial system of jurisdictions that serve as conduits for … the financing of terrorism … enhances U.S. national security by making it more difficult for terrorists … to access the substantial resources of the U.S. financial system. To the extent that this action serves as an additional tool in preventing Iran from accessing the U.S. financial system, the proposed action supports and upholds U.S. national security … goals. More generally, the imposition of the fifth special measure would complement the U.S. Government's worldwide efforts to expose and disrupt international … terrorist financing."

b. "The fifth special measure sought to be imposed by this rulemaking would prohibit covered financial institutions from opening and maintaining correspondent accounts for, or on behalf of, Iranian banking institutions. As a corollary to this measure, covered financial institutions also would be required to take reasonable steps to apply special due diligence, as set forth below, to all of their correspondent accounts to help ensure that no such account is being used indirectly to provide services to an Iranian banking institution. FinCEN does not expect the burden associated with these requirements to be significant given that U.S. financial institutions have long been subject to sanctions regulations prohibiting the provision of correspondent account services for banking institutions in Iran."

732. Moreover, decades of reports published and re-published throughout the United States, Europe, and the Middle East by media outlets, scholars, NGOs, and IRGC victims themselves confirmed the tight nexus between IRGC-facing sanctions violations and IRGC-sponsored acts of international terrorism targeting the United States. Such reports included, but were not limited to (all emphases added):

a. *Cleveland Plain Dealer*, May 23, 1996: "Secretary of State Warren Christopher is publicly flaying U.S. allies for not doing enough to isolate Tehran. … In preparation for [a] … meeting of the 'Group of Seven' …, Christopher … urged Congress to tighten economic sanctions against Iran, charging Tehran' s ayatollahs are behind the terrorist attacks in the Middle East. 'The United States believes Iran will change its behavior when the world makes it pay a sufficiently high … economic price,' Christopher said."

b. *Independent*, October 26, 2007: "Washington justified the new sanctions by accusing the elite Quds division of the Revolutionary Guard Corps of the devastating campaign of roadside bombs by Shia militias against its troops in Iraq [and] supporting [JAM] in Iraq and [other] terrorist[] [groups] in … Lebanon and the Palestinian territories, and denying the existence of a fellow member of the United Nations, threatening to wipe Israel off the map. … The sweeping new US sanctions affect Iranian banks, companies, officials and government agencies which the White House says … ***support[ed] acts of terrorism abroad***. The sanctions specifically targeted [IRGC] finances and eight affiliated

companies. They also named five [IRGC] officials as well as the Quds Force …. The US hopes to cripple Iranian trade by isolating the banks from the world financial system."

c.   <u>Prof. Raymond Tanter (University of Michigan), December 6, 2007</u>: "I strongly concur in the sanctioning for proliferation activities of IRGC-affiliated entities and individuals as derivatives of the IRGC … The raison d'etre of the Islamic Revolutionary Guards Corps is to … ***export the regime's revolutionary ideology via acts of terrorism*** … [through] the Islamic Revolutionary Guards Corps."

d.   <u>Danny Eisen (Canadian Coalition Against Terror), February 10, 2010</u>: "[T]he IRGC is anything but a normal military body or state entity. The IRGC is hardly a conventional branch of the military. … [T]he IRGC's primary constitutional duty is not to protect Iran from conventional military threats but to 'protect the revolution and its ideals.' This amorphous and borderless mandate allows the IRGC to take on any … terrorist role [] that is required to ensure the continued export of Khomeini's Islamic revolution. Given its unconventional mandate and its extraordinary level of operational independence from government hierarchy, the Guards are too autonomous to be []considered a normal state agency. It therefore can and must be held accountable for its own actions like any other terrorist body that ***commits acts of terrorism on its own initiative*** … [and there was no] doubt as to the value of sanctioning the IRGC [to prevent acts of terrorism]."

733.   SCB also knew about U.N. and E.U. sanctions targeting the IRGC, and knew that such sanctions were designed to, and did, prevent IRGC-sponsored violence by impeding the IRGC's ability to develop, sell, and deploy sophisticated weapons like missiles, rockets, drones, and next-generation RPGs. For example, the United Nations, European Union and their member states sanctioned the IRGC and KAA from 2007 through 2024. Examples of reports of such sanctions included, but were not limited to:

a.   <u>U.K. House of Commons, October 13, 2010</u>: "[O]n 24 March 2007 the Security Council broadened the sanctions. It imposed an embargo on all of Iranian arms exports and an asset freeze and travel ban on further people it considered to be involved in the nuclear programme, including top members of the [IRGC], listed in an annex to the Resolution. … On 9 June 2010, the UN Security Council passed Resolution 1929 imposing a fourth round of sanctions on Iran. … The Resolution decides that: … • All states shall prevent the supply, sale or transfer to Iran of battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems. • States will take all necessary measures to prevent the transfer to Iran of technology or technical assistance related to ballistic missiles capable of delivering nuclear weapons. • Steps will be taken to block Iran's use of the international financial system, particularly its banks when they may be used to fund proliferation and nuclear activities. …. At least 15 of the companies and groups named in the new sanctions list are

linked to the [IRGC]. Most of the remainder are associated with the nuclear and ballistic missile programmes, which are directly controlled by the Revolutionary Guard. … EU sanctions[:] Some UN sanctions against Iran are partly implemented through EU law. Like the US, however, the EU went further than the latest Security Council resolution demanded. … On 26 July [2010], the new [E.U. Iran-related sanctions] measures were announced. They consisted of: … [inter alia] restrictions in the financial sector, including additional asset freezes against banks and restrictions on banking and insurance …[;] trade restrictions, including a broad-ranging ban on dual use goods … [;] [and] new visa bans and asset freezes, especially on the [IRGC]."

b.   U.N. Security Council, June 4, 2012: "[A] number of key [IRGC] figures have been identified by the Security Council as involved in … missile programmes and are subject to asset freeze[s] … Activities related to the [IRGC] are also made subject to vigilance exercised by States and their nationals, persons and firms if they have information that provides reasonable grounds to believe that such business could contribute to the [Iranian regime]'s proliferation-sensitive … activities … Such vigilance over business activities extends to entities and individuals acting on behalf of the [IRGC] or at its direction, and entities owned or controlled by it, including through illicit means."

c.   U.K. House of Commons, December 8, 2020: "Although no part of the IRGC has been proscribed under this Act, its members and activities have more broadly been the targets of UK and EU sanctions. Qasem Soleimani was designated under the terrorism and terrorist financing regime and, as the Minister for the Middle East and North Africa noted in correspondence to us, there are more than 200 sanctions in place through the EU targeting Iran's ballistic missiles and nuclear activities, many of which cover the activities of the IRGC."

734.   As contemporaneous reports by the government, media, terrorism scholars, and others warned, SCB knew that the IRGC's use of front companies and layered transactions, and its pervasive role in major sectors of the Iranian economy, made it impossible to determine with any confidence that an Iranian company in one of those sectors was not funding the IRGC's terrorist activities. Under these circumstances, SCB knew that customer due diligence focused on the company's nominal owners and formal corporate structure would provide no more than a pretext of deniability. It could not provide any reasonable assurance that the company's transactions were insulated from terrorism.

735.    SCB knew that, given the IRGC's monopolization of large sectors of Iran's economy, it was highly likely that any U.S. dollar services it provided to large Iranian businesses operating in those sectors would flow resources through to the IRGC and its terrorist proxies.

736.    SCB knew that if designated terrorist groups, like Hamas and Hezbollah, received money because of SCB's conduct, it was a near certainty that those groups would kill and injure innocent victims, as happened here against Plaintiffs.

737.    Given these facts, SCB knew that its culpable conduct on behalf of its IRGC customers risked violent, real-world consequences. On December 31, 2017, for example, SCB admitted that "terrorist financing" and "sanctions compliance breaches" comprised "[f]inancial crime" that SCB knew "harm[ed] communities."

**B.      SCB Knew That Its Assistance to the Iranian Petrochemical Company Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM**

738.    Specifically with respect to the Iranian Petrochemical Company (a/k/a Caspian Petrochemical FZE), SCB knew that its culpable conduct from at least 2007 through at least June 2012—processing millions of dollars in payments while helping the company evade counterterrorism controls—provided direct and indirect assistance to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

739.    In addition to the extensive warnings about Iran and the IRGC's funding of terrorism discussed above, SCB had specific knowledge that the Iranian Petrochemical Company was generating money to fund terrorist attacks by the IRGC and its proxies. When SCB Dubai serviced the Iranian Petrochemical Company, SCB knew, among other things: (1) the company was beneficially owned by the Government of Iran; (2) the company had substantial operations in Iran's oil and gas sector, which had been monopolized by the IRGC and SLO to fund terrorist attacks; (3) the company was operating as a front with an Iranian individual as its nominal

owner; and (4) the individual used a name associated with the SLO and the Supreme Leader's calls for terrorist violence.

### 1. SCB Knew That a Petrochemical Company Owned by the Iranian Government Would Fund Terrorism

740. The fact that the Iranian Petrochemical Company was a government-owned oil and gas company—a fact SCB recorded in its customer due diligence files as of 2007—was all SCB needed to know in order to see clearly that it was a conduit for funding terrorist attacks. This was made inescapable to SCB in a series of events and warnings over many years relating to Iran's oil and gas industry, of which SCB was aware. These events and warnings included: (1) Iran's own statements about its policy to fund terrorism with oil and gas revenue and its own well-publicized actions demonstrating it was doing so; (2) public reports of how the Iranian government was enshrining its terrorist-financing policy in the structure of the institutions that controlled its oil and gas industry; and (3) numerous warnings from the U.S. government and others specifically singling out Iran's oil and gas industry as a primary source of its terrorist financing.

#### i. Iran's Own Statements and Actions

741. Although Iran's statements of support for terrorism were frequent (and are discussed elsewhere), Iranian leaders publicly explained with great specificity how Iran's most valuable economic resources would be used to finance the Ayatollah's most steadfast objective to "export the Islamic Revolution" through IRGC-sponsored acts of terrorism committed by IRGC proxies. From those statements, SCB knew that Ayatollah Khamenei and the IRGC followed a pattern and practice of earmarking a certain percentage of *all* Iran's oil revenue for redistribution to IRGC proxies, including Hezbollah, Hamas, and JAM. From 2000 through 2020, Ayatollah Khamenei regularly publicly touted his and the IRGC's effective monopoly over

Iran's oil and gas sector—and attendant lucrative export base—and that this control comprised one of the Ayatollah's and IRGC's greatest strategic weapons. In this context, Iran's Terrorist Sponsors, and Iranian officials who had to toe their line, always treated all Iran-based oil revenues uniquely amongst all Iranian industry sectors by specifically earmarking a fixed percentage of revenue from *every* oil-related transaction in Iran to directly flow to Hezbollah, Hamas, and the IRGC's other proxies in the Middle East.

742. SCB knew this for a host of reasons, including, but not limited to, because SCB employees and agents in Iran were aware of such facts and because media outlets reported on them. For example, a *Reuters* report published on May 30, 2006—after Hamas seized control of the Gaza Strip—alerted SCB that former Iranian President Khatami publicly called for every oil-producing Muslim government to follow Iran's lead and earmark for Hamas a fixed percentage of every oil dollar that their regime's own respective oil resources generated, which the Iranians would help ensure reached Hamas notwithstanding U.S. counterterrorism sanctions seeking to deprive Hamas of the funds to pay for attacks:

> Former Iranian President Mohammad Khatami called on Muslim oil-producing countries to give 1 percent of their oil revenues to the cash-strapped Palestinian government led by Hamas. …
> Khatami said the [U.S.] and Israel were depriving Palestinians of their rights by withholding funds and that Islamic states needed to do more to help. ….
> Hamas … is cash-strapped because the United States and its allies have cut off aid to the body to pressure Hamas to renounce violence and recognise Israel. Hamas's charter calls for the destruction of the Jewish state.
> "Given the rise in oil prices the producer countries should expect to deposit 1 percent of their oil revenues," Khatami said.
> Iran [is among the countries that] … have pledged funds totalling more than $200 million. But the [Hamas] cannot access the money because local, regional and international banks have balked at making the transfers, fearing sanctions by Washington, which considers Hamas a terrorist group.

743. On December 20, 2006, similarly, Iranian President Ahmadinejad—whom SCB knew was an outspoken supporter of Hamas's terrorist attacks in Israel—gave a speech broadcast

on Iranian state TV, which BBC then annotated as follows: "[Mahmoud Ahmadinejad:] The believers and worshippers of God, who are in charge of the oil resources, put aside their own personal needs, to present and donate their assets in order to help others, to elevate society and to bring comfort to other people who share their faith [[BBC:] presumably, he is trying to justify donating Iran's oil money to the Palestinians and the Lebanese Hezbollah]."

744.    Iran's words were confirmed by vivid public reports of its deeds. As just one example, on October 17, 2006, the Wall Street Journal reported that "the potent political forces that roil Iranian business, including the heavy hand of elements close to Iran's hard-line president," were exposed when the IRGC—"in a scene like something you . . . see only on television"—raided a Romanian drilling rig off the coast of Iran in August and seized control of the company that holds the rig's lease, Oriental Oil. The Wall Steet Journal reported that this seizure was emblematic of the IRGC's "aggressive push into the backbone of Iran's economy, its oil and gas fields." The Wall Street Journal also reminded its readers in the global business community, including SCB, of the obvious connection between the IRGC's role as "an active player in business" in the oil sector and its sponsorship of terrorist attacks throughout the region:

> The Guard has a long history of activity abroad, having helped set up Lebanon's Hezbollah militia in the early 1980s. More recently, it has reached into neighboring Iraq. There, according to a senior Israeli security official, its quest for influence is spearheaded by a special unit of the Guard called the Ramadan Headquarters, which trains and funds Iraq Shiite fighters.

> The Guard's business activities include engineering, media, trading and energy. 'They are taking positions everywhere,' says Mohsen Sazegara, a former aide to the late Ayatollah Khomeini and a founder of the paramilitary force in 1979. The Guard, says Mr. Sazegara, who broke with Iran's regime a few years ago and now lives in the U.S., is a 'unique organization in the world: a political body, a military force and big, complex company.'

ii.        **Iran's Government Structure**

745.    SCB knew that the elements of Iran's government responsible for facilitating terrorist attacks by the IRGC's proxies—including the SLO, the IRGC, and the Foundation for the Oppressed (collectively, "Iran's Terrorist Sponsors")—were formalizing and institutionalizing their control over petroleum industry profits.

746.    SCB knew that IRGC front KAA had been awarded multi-billion-dollar contracts to develop South Pars in June 2006.

747.    SCB knew that the Supreme Leader ordered that the Foundation for the Oppressed be given a substantial role in the negotiation for, and receipt of payment relating to, Iranian oil exports in 2008. This further alerted SCB that any Iran-related energy transactions directly aided the Qods Force, Hezbollah, Hamas, PIJ, and JAM because the Supreme Leader's decision inextricably connected the Foundation to Iran's oil sector. SCB knew about the Supreme Leader's decision for several reasons, including its knowledge derived from SCB's Iran branch and contemporaneous media reports that discussed the decision and its implications. On April 30, 2010, for example, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported that the "political influence" of the "Bonyad-e Mostazafan (Foundation of the Oppressed)" "among [Iranian] decision-makers" who were "accountable only to the Supreme Leader" was "exemplified by the extension of a lucrative privilege to this entity: the minister of oil announced in June 2008 Bonyad-e Mostazafan's newly acquired right as Iran's oil seller on international markets."

748.    SCB knew that Ayatollah Khamenei decreed in March 2011 that all oil and gas contracts would be awarded to Petro Nahad, an entity established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC.

749.    SCB knew that IRGC commander Ghasemi was appointed in August 2011 to be Minister of Petroleum, with control of the agency that controls NIOC. Public sources reported that Ghasemi, speaking in parliament, described himself as a "soldier[] of the Islamic Republic's Revolutionary Guards." President Ahmadinejad similarly described Ghasemi as a "child of the revolution," who would "transform" the oil industry "in line with national interests"

### iii.    U.S. Government Warnings

750.    In the fact sheet accompanying OFAC's October 25, 2007, designation of the IRGC and its Qods Force, OFAC warned that they used the oil industry to finance terrorism. The fact sheet alerted SCB that the IRGC and its Qods Force provided "material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." The fact sheet also explained that the IRGC "had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701." The fact sheet also specifically alerted SCB that this support contributed to attacks on civilians in Iraq: "In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." At the same time, the fact sheet alerted SCB to how the IRGC used Iran's oil industry to fund its operations: "It . . . has numerous economic interests involving . . . the oil industry. . . . The IRGC has significant political and economic power in Iran, with ties to

companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others." OFAC's designated several companies, including Oriental Oil Kish, "on the basis of their relationship with the IRGC."

751.    In speeches and meetings with government officials during the U.S. government's financial pressure campaign, discussed *supra*, officials routinely emphasized how Iran's oil industry funded terrorism.

752.    Under Secretary of State Nicholas Burns, for example, in March 6, 2007, testimony to Congress explained: "In recent weeks, we have engaged relevant companies and countries about their potential investment in Iran's oil and gas sector," and we have been "making clear our opposition to such deals." Burns emphasized that "[n]o discussion of Iran would be complete without mentioning the regime's record of supporting terrorism." He added, that "Tehran has long been the world's leading state sponsor of terrorism," who is "responsible for the deaths of scores of Americans," that Iran was seeking to "rearm Hizballah," and that "[r]ecognizing Iran's role as the central banker of global terrorism, the Departments of State and the Treasury have enlisted foreign support in efforts to deny suspect Iranian individuals and entities access to the international financial system."

753.    Over the course of 2010 and 2011, the U.S. government issued a clarion call consisting of at least fifteen events that warned SCB specifically about Iran's oil sector, its use of fronts, the dominance of the IRGC, and its funding of terrorism. These 2010-2011 warnings are especially notable because they accompanied the most active period of SCB's assistance to the

Iranian Petrochemical Company, as documented in the government's later enforcement actions. More than $140 million of the approximately $151 million and fully 133 of the 190 transactions SCB processed for the Iranian Petrochemical Company between 2009 and 2012 were processed after the events of May 2010—when the Iranian Petrochemical Company was flagged by other banks, was brought to the attention of SCB's senior management, and was the subject of SCB's lie to OFAC that the company had "no direct or indirect involvement with Iran."[204] Thus, at the same time as they were alerted to specific concerns about the Iranian Petrochemical Company from other banks and their own compliance staff, SCB's senior management was also receiving some of the sharpest and most sustained warnings from the U.S. government about Iran, and specifically about *the IRGC's use of front companies in the petrochemical sector to fund terrorism*. SCB's response was to ignore the warnings and to continue processing the bulk of its transactions for the Iranian Petrochemical Company over the ensuing two years.

754. SCB received the first of these warnings on February 10, 2010, when OFAC designated IRGC General Rostam Qasemi and four companies associated with KAA, explaining (emphasis added):

> As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world, said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities. . . .

> The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and *oil industries*, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and *support for terrorism*.

---

[204] 2019 OFAC Settlement ¶¶ 7, 25.

OFAC also reiterated that the Qods Force had previously been designated in 2007 for "terrorism support activities," as described *supra*.

755. SCB received the second warning on June 16, 2010, when OFAC designated numerous entities and individuals associated with the IRGC and identified 20 companies and 98 vessels in the shipping and petrochemical industries as fronts for the Iranian government. Several entities were located and/or incorporated outside of Iran, including in Dubai, and many used a variety of names to evade scrutiny. Of the vessels, 71 had also changed their names to avoid scrutiny. For example, OFAC identified the following petrochemical company owned by NIOC and using a variety of names:

> **MSP KALA NAFT CO. TEHRAN** (A.K.A. KALA NAFT CO SSK; A.K.A. KALA NAFT COMPANY LTD; A.K.A. KALA NAFT TEHRAN; A.K.A. KALA NAFT TEHRAN COMPANY; A.K.A. KALAYEH NAFT CO; A.K.A. M.S.P.-KALA; A.K.A. MANUFACTURING SUPPORT & PROCUREMENT CO.-KALA NAFT; A.K.A. MANUFACTURING SUPPORT AND PROCUREMENT (M.S.P.) KALA NAFT CO. TEHRAN; A.K.A. MANUFACTURING, SUPPORT AND PROCUREMENT KALA NAFT COMPANY; A.K.A. MSP KALA NAFT TEHRAN COMPANY; A.K.A. MSP KALANAFT; A.K.A. MSP-KALANAFT COMPANY; A.K.A. SHERKAT SAHAMI KHASS KALA NAFT; A.K.A. SHERKAT SAHAMI KHASS POSHTIBANI VA TEHIYEH KALAYE NAFT TEHRAN; A.K.A. SHERKATE POSHTIBANI SAKHT VA TAHEIH KALAIE NAFTE): MSP Kala Naft Co. Tehran is a Tehran-based entity that is responsible, along with other entities, for procurement on behalf of the National Iranian Oil Company ('NIOC'), which is an entity that is owned or controlled by the Government of Iran.

In the same notice, OFAC warned about the IRGC's control of the Iranian economy:

> The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to defense production, construction, and the oil industry.

756. In announcing OFAC's action, Treasury Secretary Geithner personally delivered the clarion call, emphasizing the IRGC's support for terrorism and sanctions evasion (emphasis added):

Our actions today are ***designed to deter*** other governments and ***foreign financial institutions*** from dealing with these entities and thereby supporting Iran's illicit activities. . . .

[W]e are adding two individuals and four entities that are part of Iran's Revolutionary Guard, which plays a key role in Iran's missile programs and support for terrorism. . . .

[W]e are identifying 22 petroleum, ***energy*** and insurance ***companies – located inside and outside Iran – that are owned or controlled by the Iranian government***. . . .

In the coming weeks, we will continue to increase the financial pressure on Iran.

***We will continue to target Iran's support for terrorist organizations.***

***We will continue to focus on Iran's Revolutionary Guard.***

And we will continue to expose Iran's efforts to evade international sanctions. . . .

When major international institutions find out they're actually working with a company that supports Iran's nuclear or missile programs, they realize it's not worth the risk.

They cut off their business.

And over the years, this has made a major difference in limiting Iran's ability to use the global financial system to pursue illicit activities.

We have made important progress. But we cannot stop. Iran will never cease looking for new ways to evade our sanctions. So our efforts must be ongoing and unrelenting.

We will keep working to intensify financial pressure on Iran.

757.    Under Secretary Levey delivered a similarly pointed warning on the same day

(emphasis added):

Second, we are taking action against Iran's national maritime carrier, IRISL. Since we sanctioned IRISL in 2008, it has desperately attempted to evade those sanctions, setting up new front companies, renaming and even repainting vessels to hide their true ownership. Despite its deceptive maneuvers, IRISL has had to struggle to obtain insurance and other services.

Third, we are taking further action against the IRGC, or Islamic Revolutionary Guards Corps. ***The IRGC plays a key role in Iran's*** missile program and ***support for terrorism and it has taken over broad portions of the Iranian economy***, to the detriment of the Iranian people. With today's designations, we have now sanctioned 26 entities and

individuals connected to the IRGC, and we will continue to do so. ***No IRGC entity should have any place in the world's legitimate financial system*** . . . .

Finally, we are identifying 22 ***petroleum***, energy, and insurance ***companies owned or controlled by the Government of Iran, including 17 located outside Iran and many that are not easily identifiable as Iranian***. Americans have long been forbidden to do business with Iranian entities. Companies around the world are increasingly deciding not to do business with the government of Iran because of its illicit conduct and because, as President Obama said last week, it is a government that brutally suppressed dissent and murdered the innocent. . . .

We know that officials in Iran have been anxious about this new round of sanctions. If the Iranian Government holds true to form, it will scramble to identify work-arounds – hiding behind front companies, doctoring wire transfers, falsifying shipping documents. ***We will continue to expose this deception thereby reinforcing the very reasons why the private sector is increasingly shunning Iran.***

758.    SCB received its third warning on June 22, 2010, when Treasury Under Secretary Levey and State Under Secretary Burns testified before Congress. Under Secretary Levey noted that the U.S. government's strategy for addressing "the Iranian threat," including Iran's "support for terrorism" and "abuse of the financial system," was at an "inflection point." He explained (emphasis added):

As you know, we have been working to address Iran's illicit conduct and to protect the international financial system from Iranian abuse for the past several years. . . . Our strategy to hold Iran accountable for its failure to meet its international obligations has two major fronts. . . . The first front is governmental action . . .

Perhaps as important as government action is the second front: private sector action. The steps private sector firms around the world have taken in recent years to protect themselves from Iran's illicit and deceptive activity are extremely important. We have found that when we use reliable financial intelligence to build cases against Iranian actors engaged in illicit conduct, many members of the private sector go beyond their legal requirements regarding their interactions with these and other Iranian actors because they do not want to risk handling illicit business. This behavior is a product of good corporate citizenship and a desire to protect their institutions' reputations. The end result is that the voluntary actions of the private sector amplify the effectiveness of government-imposed measures. Thus, as we have taken action to target illicit Iranian conduct, we have shared some of the information that forms the basis for our action s with our partners in the private sector and, in response, virtually all major financial institutions have either completely cut off or dramatically reduced their ties with Iran . We are now starting to see companies across a range of sectors, including insurance, consulting, ***energy***, and

manufacturing, make similar decisions. Once some in the private sector decide to cut off ties to Iran, it becomes an even greater reputational risk for others not to follow, and so they often do. . . .

The impact of these actions on Iran has been significant, and is deepening as a result of Iran's own conduct. As international sanctions on Iran have increased, Iran's response has been to attempt to evade those sanctions. . . . We have used this conduct to our advantage by exposing it and making it public, reinforcing the private sector's pre-existing fears about doing business with Iran. In this way, Iran's own evasion and deceptive conduct is increasing its isolation.

759.    At the same time as Levey and Burns testified in Congress, SCB received a fourth warning in the form of a June 22, 2010, advisory from FinCEN amplifying the U.S. government's message and directly advising banks about the need for extreme caution in the face of the "serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran." The advisory described the recent UN Security Council Resolution 1929 regarding Iran's proliferation activities and emphasized "the increasing risk to the integrity of the international financial system posed by . . . commercial enterprises that are owned or controlled by the IRGC." The advisory explained (emphasis added):

Iran's record of illicit and deceptive activity, coupled with its extensive integration into the global financial system, increases the risk that responsible financial institutions will unwittingly become involved in Iran's illicit activities. Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian banks, leaving Iran's financial institutions increasingly isolated. Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally. . . . FinCEN continues to advise all U.S. financial institutions to take commensurate risk-mitigation measures to diminish threats emanating from Iran. . . .

As required under 31 CFR § 103.176(a), covered financial institutions [including U.S. branches of foreign banks] should ensure that their due diligence programs, which address correspondent accounts maintained for foreign financial institutions, include appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to detect and report known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered, or managed in the United States.

With respect to correspondent accounts held with financial institutions that maintain relationships with Iran, FinCEN reminds institutions of the ***increasing likelihood that Iran will use its existing correspondent relationships to hide illicit conduct in an attempt to circumvent existing sanctions***. ***Financial institutions should be vigilant in dealing with banks that might have a connection to Iran***. . . .

The increasing infiltration of Iran's legitimate economy by designated entities, including especially the IRGC, exposes . . . international financial institutions and companies to entities owned, controlled, or otherwise affiliated with the IRGC and other designated entities. . . .

Iran's demonstrated use of deceptive practices makes it difficult to determine whether designated entities . . . are associated with any particular transaction involving Iran. . . . FinCEN remains concerned that Iranian financial institutions are seeking to compensate for the loss of access to financial sectors by establishing new financial relationships, including the opening of new foreign branches, subsidiaries, representative offices, or correspondent or other accounts either outside or within Iran, and the pursuit of joint ventures. . . .

Additionally, as required under 31 CFR §§ 103.15 - 103.21, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or another violation or attempted violation of law or regulation, the financial institution shall then file a Suspicious Activity Report.

760.    SCB received its fifth warning on July 1, 2010, when President Obama signed

into law the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010

(CISADA), which passed unanimously in the Senate and near-unanimously in the House (408-

8). CISADA reauthorized the Iran Sanctions Act of 1996, which had passed unanimously in both

houses of Congress, and in which Congress found that Iran's "support for acts of international

terrorism endanger the national security and foreign policy interests of the United States" and

declared it "the policy of the United States to deny Iran the ability to support acts of international

terrorism . . . by limiting the ability to explore for, extract, refine, or transport by pipeline

petroleum resources of Iran." In CISADA, Congress added a number of new provisions targeting

Iran's energy sector and made additional findings that Iran's "support for international terrorism"

is "a threat to the security of the United States" and that Iran was engaged in "ongoing arms

exports to, and support for, terrorists." It also noted "the involvement of Iran's Revolutionary Guard Corps in . . . international terrorism."

761.    Upon CISADA's signing, Secretary Geithner issued a statement emphasizing "Iran's continued . . . support for terrorists" and explaining that the new law would "strengthen Treasury's ongoing efforts to protect the international financial system from abuse." To underscore the message even more, Treasury issued guidance—a sixth warning to SCB— summarizing the new Iran sanctions in *five* languages, including Arabic. The guidance explained that the new law

> strengthened existing U.S. sanctions with respect to the Iranian energy industry, and adds the potential for the imposition of serious limits on foreign financial institutions' access to the U.S. financial system if they engage in certain transactions involving Iran. CISADA is consistent with the global consensus regarding Iranian behavior and is in line with the U.S. Government's core role of protecting its domestic financial system from exposure to Iran's illicit and deceptive financial practices.

762.    In a seventh warning, on July 26, 2010, the European Union and Canada adopted new sanctions against Iran, including measures targeting its trade and energy sectors, as well as the IRGC. Treasury Secretary Geithner and Secretary of State Clinton announced that they welcomed those steps to restrict Iran's ability to use its "energy proceeds" to support its illicit activities, and observed that "companies around the world refuse to do business with Iran rather than risk becoming involved in" those activities.

763.    An eighth warning arrived on August 3, 2010, when OFAC issued a set of designations "targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah, Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine-General Command (PFLP-GC) and the Taliban." The accompanying fact sheet warned that "Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism." It explained how Iran uses "its state apparatus—

including the Islamic Revolutionary Guard Corps-Qods Force—and state-run social service organizations to support terrorism under the guise of providing reconstruction and economic development assistance or social services." It also explained that the IRGC's Qods Force was "the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups" and was providing "material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia."

764.    Also on August 3, 2010, SCB received a ninth warning when OFAC identified another 21 entities in various economic sectors, often located or incorporated outside Iran, that were Iranian fronts. The purpose of identifying these entities, according to the announcement, was to make people "better able to identify Iranian Government entities and protect themselves against the risks posed by such entities." Under Secretary Levey also warned: "As its isolation from the international financial and commercial systems increases, the Government of Iran will continue efforts to evade sanctions, including using government-owned entities around the world that are not easily identifiable as Iranian to facilitate transactions in support of their illicit activities . . . ."

765.    A tenth warning alerted SCB to the urgency when OFAC announced its regulations implementing CISADA on August 16, 2010, well ahead of the 90-day deadline mandated by Congress. Treasury's announcement emphasized that CISADA "buil[t] on continued efforts by the United States and our allies to protect the international financial system from abuse by Iran. We are already seeing the private sector adjusting business practices in response to CISADA in order to ensure that their access to the U.S. financial system is not put at risk."

766.     An eleventh warning, an August 16, 2010, op-ed by Under Secretary Levey in the Financial Times, reminded SCB that "[s]ubstantial attention has already been paid to sanctions in Iran's banking and energy sector," while the latest round of measures focused on shipping. Levey also emphasized that the "broader private sector is restricting business with Iran, rather than risk facilitating Iran's illicit activities."

767.     On information and belief, SCB received a twelfth warning (and likely more) during a three-week August campaign by senior Treasury officials. A Treasury summary published on August 20, 2010, reported that Treasury's three "leading officials on U.S. sanctions crisscrossed the globe" for three weeks to conduct "face-to-face global engagement on Iran with governments and the private sectors" in a number of countries, including the UAE. The officials highlighted the impact of the latest financial pressure on Iran's ability to "develop its oil and gas fields, acquire financial services and maintain financial relationships with the international community." The report added (emphasis added):

> At roundtable discussions with banking associations, Treasury continued its dialogue with the private sector on the need for enhanced vigilance with respect to Iran's continued efforts to engage in a range of deceptive measures to conduct illicit transactions and evade sanctions. U.S. officials also highlighted the need for **intense scrutiny** from both regulators and financial institutions of all transactions involving Iran to combat attempts by Iran to establish new and expand existing financial relationships as sanctions tighten.

768.     SCB received a thirteenth warning on December 21, 2010, when OFAC announced yet another round of designations targeting the IRGC, and again warned (emphasis added): "With the IRGC's expanding influence and control over broader segments of the Iranian economy—including the defense production, construction, and **oil and gas industries**— **increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella** and identified with its illicit conduct." OFAC identified Pars Oil & Gas Company as an entity

controlled by the government of Iran and again highlighted the IRGC's role in development of the South Pars gas field.

769.     SCB received a fourteenth warning on June 20, 2011, when OFAC designated ten shipping companies, including several based in the UAE, highlighting "Iran's continued efforts to evade sanctions and its ongoing creation and use of new front companies, subsidiaries, and affiliates." An accompanying announcement by New York District Attorney Cyrus R. Vance, Jr. explained that, as part of investigations into "the misuse of banks in Manhattan by those seeking to evade sanctions to support terrorism," eleven corporations and five individuals had been indicted for using "alias names and corporate alter egos," including in the UAE, to obscure the Iranian government's involvement in shipping companies.

770.     SCB received a fifteenth warning on November 21, 2011, when OFAC announced expanded sanctions on the development of Iran's petroleum resources and its petrochemical industry, along with Treasury's finding that Iran was a jurisdiction of primary money laundering concern (discussed *supra*).

771.     In sum, over the course of 2010 and 2011—as SCB was receiving no less than fifteen different warnings about the IRGC's use of front companies in the petrochemical sector to fund terrorism—SCB was regularly processing approximately 130 funds transfers amounting to approximately $140 million in transactions for a petrochemical company it knew to be an Iranian front.

772.     In addition, decades of other reports and statements by the United States, terrorists, media outlets, terrorism scholars, and ordinary citizens alerted SCB that every time it provided illicit financial services to any customer in connection with Iranian oil- or gas-related transaction, it ran an extreme risk that the other side was funding the Qods Force, Hezbollah,

Hamas, and JAM and, moreover, even if such person was not, the end revenues would likely flow to such terrorists, given the Iranian regime's long-standing and unique treatment of the revenues it realized from its oil and gas monopoly. Such reports included, but were not limited to:

a. *Agence France Presse English Wire*, February 6, 2006: "Iran … formally notified the [IAEA] of its decision to restart sensitive nuclear work at the centre of concerns the hardline regime could acquire nuclear weapons. Senior [Iranian] officials also played down the threat of sanctions … emphasising [Iran]'s vast oil wealth … in an interview with *Handelsblatt*, US Defence Secretary Donald Rumsfeld said the United States does not rule out using military force against Iran. 'All options, including the military one, are on the table,' Rumsfeld [said], repeating his fears that weapons of mass destruction could fall into the hands of terrorists and branding Iran 'the main sponsor of terrorist organisations such as Hezbollah and Hamas.' But [regime spokesman Gholam Hossein] Elham said oil-rich Iran still had the upper hand when it came to enduring any eventual sanctions. … 'Any decision in this regard [*i.e.*, for the United States to impose sanctions targeting the IRGC, responsible for Iran's nuclear program] will not hurt us. It will hurt the consumers and not the producers. We are in a position of power when it comes to energy, and it will not have any affect [sic] on our budget,' he said."

b. White House Press Secretary Scott McClellan, February 22, 2006: "[Reporter:] Iran, as you probably know, has now said that it would help fund Hamas, has said that its oil revenues ... will help amply pay for Hamas as needed. What's the U.S. reaction? And does this undercut any sanctions against Iran? [McClellan:] Well, … the regime in Iran … [has] been a destabilizing force in the … Middle East. Our views are very clear when it comes to the regime. ... And in terms of Hamas, ... we've made it very clear that ... they continue to engage in terrorism and continue to advocate the destruction of Israel."

c. President of Israel Shimon Peres, March 18, 2008: "Iranian oil money is funding world terror, including Hamas and Hezbollah terror."

d. *Agence France Presse English Wire*, March 18, 2008: "After meeting [German Chancellor Angela] Merkel, [Israeli President Shimon] Peres stressed that … 'the money earned from oil enables Iran to finance international terrorism, particularly the terrorism of Hezbollah and Hamas.'"

e. *Jerusalem Post*, March 19, 2008: "German Chancellor Angela Merkel told the Knesset ... 'I say it in a clear voice - the [Hamas and PIJ] Kassam [rocket] fire [targeting Israeli civilians] must stop,' Merkel said. 'Terror attacks are a crime, and do not resolve political disputes.' Prime Minister Ehud Olmert praised Merkel's 'strong and determined position against the horrific calls from the president of Iran to wipe Israel off the map ….' ... Merkel, … also met with President Shimon Peres, who said … that Iranian oil revenue was funding world terrorism - including Hamas and Hizbullah."

f.   *Reuters*, May 5, 2008: "Israeli President Shimon Peres … said … 'Oil ... is [] promoting terror,' said the 84-year-old Nobel Peace Prize winner … Peres argued that manifold increases in oil prices in recent years had contributed to a rise in financing for terrorism in the Middle East … Peres took particular aim at Iran, repeating recent comments that Tehran's nuclear programme and its rhetoric against Israel may pose a greater threat than the Nazis in the 1930s and 40s. Israel accuses Iran, a major oil and gas producer, of financing Hezbollah, the Lebanese guerrilla movement, and Hamas, which controls the Palestinian Gaza Strip, both of which are sworn enemies of Israel."

g.   *Joplin Globe*, January 17, 2009: "Make no mistake; Iran is a strong and tenacious adversary. Fueled with petro dollars from their abundance of oil reserves, Iran supports strong anti-Israeli and anti-Western militias such as Hamas and Hezbollah. Iran is responsible for many thousands of American and Iraqi deaths."

h.   Senator John Kerry, May 12, 2009: "[A] massive continuous transfer of American wealth to oil exporting nations ... [flowed] revenues and power and sustained … global terror funded indirectly by our expenditures on oil … Too often the presence of oil multiplies threats ... Iran uses petrol dollars to fund Hamas and Hezbollah ...."

i.   *Newsweek*, June 29, 2009: "In 2005 … Khamenei backed Ahmadinejad …, a veteran of the … Revolutionary Guards and willing to kiss the Supreme Leader's feet. Ahmadinejad won. In the four years since, taking advantage of billions in windfall revenues from high oil prices, Iran has … funded Hamas as it took over Gaza, and supported and armed Lebanon's Hizbullah in its 2006 war with Israel."

j.   *APS Review Oil Market Trends*, April 5, 2010: "Without money from oil, [Israeli Infrastructure Minister Uzi] Landau argued, Iran would fade as a regional power and 'terror groups' such as Hamas … and Hizbullah … would cease to exist."

k.   Dr. Abdallah al-Nafisi (Academic; *Al Jazeera* Commentator), June 16, 2010: "Iran gets on every boat to reach power and influence in the Arab region. A country very rich with … oil revenues, Iran uses its establishment of and support for Hezbollah … and its support for Hamas and … as bridges to get to its objectives. What harms Iran if it gives Hamas $23 million monthly to run things in Gaza? What harms Iran if it gives the Islamic Jihad $5 million or so to maintain the Palestinian gun? But in return, Iran gains much. It is as if Iran is telling Israel: My border is in Gaza, not in Tehran, and my border is in Al-Urqub [in south Lebanon] through Hezbollah, not in Tehran. So, Iran is gaining a great deal of ... physical influence through its support for Hezbollah and Hamas. ... We welcome Iran's support for [Hezbollah] and its support for Hamas and others."

l.   Elliot Bartky and Allon Friedman (Jewish American Affairs Committee of Indiana), August 1, 2011: "[D]eprive Iran of the oil revenue they've used to support terrorist groups such as Hezbollah and Hamas, … and … kill American troops in Iraq."

773.   Decades of government reports and speeches published by the United States,

United Kingdom, European Union, and United Nations confirmed that Iran's oil industry was

inextricably connected with IRGC-sponsored acts of terrorism targeting the United States that

were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah,

Hamas, and JAM. Such U.S., U.K., E.U., and/or U.N. government findings, reports, statements,

and warnings included, but were not limited to:

a. <u>Treasury, June 16, 2010</u>: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b. <u>State, April 8, 2011</u>: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c. <u>Treasury, March 28, 2012</u>: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the … oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

d. <u>State, May 24, 2012</u>: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

774. Terrorism scholars also confirmed that KAA-related directly financed IRGC-

sponsored attacks committed by IRGC proxies, including Hezbollah, Hamas, and PIJ, and alerted

SCB to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele

Ottolenghi publicly warned:

[KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in

nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. …

Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …

[B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence.

No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. … And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad.

The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

## 2. Other Evidence Further Shows SCB's Awareness That the Petrochemical Company Funded Terrorism

775.    As explained *supra*, the name of the individual purporting to be the Iranian Petrochemical Company's nominal owner, on information and belief, was the name for Iran's Friday Prayer Leader, Imam Jomeh—a role closely associated with the SLO and Ayatollah Khamenei himself.

776.    SCB Dubai also received organization charts and other customer due diligence information about the Iranian Petrochemical Company's corporate structure, affiliates, facilities, offices, business activities, personnel, and organization. On information and belief, SCB knew based on this material and its knowledge from public sources that the Iranian Petrochemical Company was directly connected to South Pars, NIOC, and/or NITC.

777.    On information and belief, SCB knew that the Iranian Petrochemical Company's transactions concerned, among other things, petroleum deals relating to the South Pars project,

which SCB knew was fully controlled by the IRGC and a direct funding source for Hezbollah, Hamas, PIJ, and JAM. Terrorism scholars warned that facilitating transactions for Iranians that involved South Pars directly financed IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and JAM. On March 15, 2007, for example, former Treasury official Dr. Matthew Levitt testified before Congress that:

> [T]he IRGC is precisely the element within Iran that should be targeted. … The IRGC is … responsible for providing funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq. …
>
> [T]he IRGC's business and industrial activities -- especially those connected to the oil and gas industries -- are heavily dependent on the international financial system. Consider, for example, the $2.09 billion contract to develop parts of the South Pars natural-gas field, or the $1.3 billion contract to build parts of a pipeline, both meted out to the IRGC's engineering arm, the Khatam-ol-Anbia. …

778.    Public admissions by IRGC leaders confirm the key role that funding from fronts like the Iranian Petrochemical Company played in the South Pars project. On December 22, 2009, for example, an IRGC-controlled news agency reported (as summarized by the BBC):

> [IRGC] Commander of Khatam al-Anbia base informed about the delay in completing phases 15 and 16 of South Pars oil field …
>
> Commenting on the latest updates on the development of phases 15 and 16 of common South Pars field, Islamic Revolution Guards Corps [IRGC] General Rostam Qasemi said that the level of progress in both phases in the sea and land is about 43 per cents. He added: Inability of the Ministry of Oil in providing necessary financial resources in proper time was one of the most important difficulties faced with regard to phases of South Pars field. Expressing hopes for rapid resolution of the project's financial troubles, he clarified: Employer (Pars Oil and Gas Company) has not succeeded in injecting financial resources to the project in accordance with its pace. …
>
> According to [IRGC-controlled] *Mehr* news agency, at the moment the construction of five phases of South Pars - 12, 15, 16, 17 and 18 - are in progress and due to lack of financial resources, the operation has been delayed.

779.    On August 6, 2011, similarly, *Reuters* reported that:

Iran will need some $40 billion this year to spur the development of oil and gas fields it shares with neighbouring countries, Oil Minister Rostam Qasemi said in his first interview since being appointed …

Qasemi, a Revolutionary Guards commander … vow[ed] to prioritise jointly owned fields, notably the giant South Pars gas reservoir …

"In order to launch the announced development plans (on the joint fields) there is need for more than $40 billion in investment in the current (Iranian) year (ending late March 2012)," Qasemi said in an interview with *Iran*, a state-owned daily newspaper.

While Iran might seek foreign capital to finance energy projects, it did not need foreign know-how, he said.

"There are currently very competent contractors domestically on which we can rely for the development of oil and gas can be done ... For the development of oil and gas fields we don't need foreign contractors."

One of those domestic companies is Khatam al-Anbia itself, which took over parts of the South Pars development when European firms Royal Dutch Shell and Total SA pulled out due to sanctions on Iran.

Both Khatam al-Anbia and Qasemi himself are under U.S. and European Union sanctions …

Qasemi said Iran would seek foreign capital … for the energy projects, as well as tapping … Iranian banks …

"We will be pursuing an active diplomacy to absorb foreign capital as they form part of the required financial resources for the projects to be developed," Qasemi said.

780.     Media reports about South Pars alerted SCB that U.S. sanctions were crushing the

IRGC's ability to maximize the cash flow the IRGC received from South Pars and alerted SCB

that South Pars-related sanctions evasion directly aided IRGC efforts to raise money to finance

IRGC operations. On June 29, 2006, for example, *Reuters* reported that while "Iran ha[d]

awarded the Revolutionary Guards corps a contract to develop two phases of the … giant South

Pars gas field," industry analysts confirmed that the Iranian regime could not "develop" its "oil

and gas industry," including at South Pars, "without foreign companies' help." Moreover, on

May 28, 2010, *Agence France Presse* reported:

Iran [] awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field …

Guards unit Khatam al-Anbiya would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime

installation companies to undertake the work. … [P]hases 22, 23 and 24 were [also] to be awarded to Khatam al-Anbiya. …

The development of the giant offshore field has been delayed amid a lack of investment …

Khatam al-Anbiya … is under US and UN sanctions related to Iran's refusal to abide by UN Security Council resolutions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] ….

781. From 2005 through 2020, reports and statements by the United States, terrorists, media outlets, due diligence resources, terrorism scholars, and ordinary citizens alerted SCB that the IRGC had seized control of Iran's interests in the South Pars petroleum and that everything relating to any Iran-related party's direct or indirect involvement in South Pars was inextricably connected to, and ultimately financially benefited, the IRGC. Such reports included, but were not limited to:

a. *Islamic Republic News Agency*, January 5, 2005: "A consortium … has won the tender for Phases 15 and 16 of the giant South Pars gas field development project, … [which] consortium [] includes Sadra and Khatam ol-Anbiya … companies of Iran."

b. *Agence France Presse*, June 27, 2006: "[T]he Revolutionary Guards ... is set to enter the oil and gas sectors in a move that would increase their stake in [Iran]'s economy. 'The Revolutionary Guards have obtained the contract to develop phases 15 and 16 of South Pars,' … General Abdolreza Abed said in an interview with the Shargh newspaper. Abed, who heads up [KAA], said the contract was worth 2.09 billion dollars. The deal would be a major boost to the operations of the [IRGC] .... It comes on the back of a string of advances into Iran's economy: several weeks ago ... the [IRGC] ... were awarded a 1.3-billion-dollar contract to construct a 900-kilometre (570-mile) pipeline between South Pars and southeastern Iran. In both South Pars cases, the projects were awarded after the usual tendering process was abandoned. For the South Pars development deal, the [IRGC] -- under the name of their economic nerve centre of [KAA] -- entered a partnership with [a] Norwegian firm …, although this firm subsequently pulled out. The oil ministry then moved to open another tender process, but this was cut short. ... For many observers, the wave of lucrative deals going to the [IRGC] is connected to last year's shock presidential election win by hardliner Mahmoud Ahmadinejad -- a veteran of the [IRGC] -- who promised to favour domestic entrepreneurs. ... [IRGC] General Abed [head of KAA] told the centrist Shargh newspaper that there was nothing wrong with the [IRGC] … branching out. 'Since when do the [IRGC] have to stick to building roads, dams, small tunnels or short pipelines?" he argued. "If we take on big projects we can put small entrepreneurs to work.' ... [W]ith foreign investment in the oil sector limited, the Guards appear ready to shift into top gear by filling the gap -- with General

Abed also revealing [the IRGC]'s involvement in a new petrochemical port. 'Thirty percent of the [IRGC]'s engineering capacity is dedicated to economic activities, and 70 percent to military,' [IRGC General Abed] said."

c. *Reuters*, June 29, 2006: "Iran has awarded the Revolutionary Guards corps a contract to develop two phases of [Iran]'s giant South Pars gas field … The two phases were originally awarded to a consortium of international and domestic companies led by Norway's Aker Kvaerner, which quit the deal in May 2005. 'It is a $2.09 billion contract. Phases 15 and 16 will produce 56.6 million cubic meters of natural gas,' state radio said. … Khatam al-Anbia firm, the engineering arm of the [IRGC], will take charge of the onshore work for the two phases. Iran is in dispute with the international community over its nuclear programme and Tehran could face United Nations sanctions, which would make operating there even more difficult for foreign companies. Signing big contracts with foreign firms is politically toxic in Iran, which sits on the world's second largest reserves of natural gas but has been slow to develop it for export. … Earlier this month, the [IRGC] won a $1.3 billion project to build a … pipeline from South Pars to the eastern province of Sistan-Baluchestan, the route for Iran's gas export to Pakistan."

d. *Economist Intelligence Unit*, July 21, 2006: "The engineering arm of the … IRGC … has made further inroads into the oil and gas sector, having been selected as the main contractor for the development of Phases 15 and 16 of the South Pars gas scheme. Sharg, a local newspaper, quoted General Abdolreza Abed, head of the IRGC's [KAA], as saying that the order will be worth some US$3bn. The order follows a US$1.3bn contract to build a … pipeline linking South Pars fields to southeastern Iran. … IRGC will be working with local partners on the two South Pars phases, which envisage production of some 1.8bn cu ft/day of natural gas, 1m tonnes/year of liquefied petroleum gas, a similar quantity of ethane and 80,000 barrels/day of condensates. … Much of the work in Iran's oil and gas sector is now being allocated to local firms, because of the difficulty facing foreign companies in concluding financial and commercial terms."

e. *Economist Intelligence Unit*, August 3, 2006: "Evidence of any direct consequences of the changed political and economic environment on the amount of foreign trade and investment in Iran is hard to come by. The re-awarding of contracts such as those related to the giant South Pars gasfield … [by] the Revolutionary Guards … ha[s] undoubtedly made foreign companies cautious. … [T]here have been reports in the Western press that four European banks, under pressure from the US government, have reduced their presence in Iran (May 2006, Foreign trade and payments) … It is expected that bank charges for doing business in or with Iran will have risen, possibly in response to a perceived increase in the complications of doing trade."

f. *Economist Intelligence Unit*, August 3, 2006: "Mahmoud Ahmadinejad … appears to be increasingly favouring domestic companies when awarding government contracts, and giving a growing role to those linked to the … IRGC … in particular. In June a US$1.3bn contract for a gas pipeline linking Assalouyeh, Bandar Abbas and Iranshah was awarded to the [KAA]. The pipeline is to supply gas from the South Pars field to Sistan-Baluchestan, Hormuzgan and Kerman, and the contract was signed in the uniformed presence of Major-General Yahya Rahim-Safavi, the IRGC's commander. In June the

IRGC also scooped the main exploration contract for phases 15 and 16 of South Pars. The deal was originally made in January 2005 with a consortium of Aker Kvaerner (Norway), Sadra (Iran) and the [IRGC]. It now seems—the news emerged from an interview given by General Abdolreza Abed to Shargh, a reformist daily, before a signing ceremony at South Pars—that the IRGC has edged out Aker Kvaerner. [KAA] will lead a local consortium that includes Saaf Offshore, Isolco (the Iran Shipbuilding and Offshore Industries Company) and IOEC (the Iran Offshore Engineering and Construction Company). Phases 15 and 16 are scheduled to involve the production of 50m cu metres/day of treated gas for domestic use, 1m tonnes/year (t/y) of liquefied petroleum gas for export, 80,000 barrels/day (b/d) of condensates for export and 1m t/y of ethane for domestic petrochemical works. The news prompted fears among local contractors that the government would award other contracts to [KAA]."

g.    *Investor's Business Daily*, November 8, 2006: "Mahmoud Ahmadinejad's terrorist regime needs billions in foreign investment in the coming years to compete with other OPEC countries. That means serious international sanctions can be a powerful weapon. The Islamofascists … have repeatedly made it clear they're … the backers of terrorist outfits like Hezbollah …. Iran may have lots of oil and natural gas in the ground, but if it doesn't get ahold of tens of billions of dollars in outside capital in the years ahead, it won't be able to extract and refine those commodities. … The world has plenty of leverage available: … European and Asian companies run gas and petrochemical plants in South Pars …, the largest natural gas field in the world. Shut all that down, along with all energy-related exports and imports, and Ahmadinejad and supreme leader Ayatollah Ali Khamenei just might find themselves fighting for survival."

h.    *Washington Times*, August 16, 2007: "The [U.S.] … decision to designate [the] … IRGC [Qods Force] … as a 'specially designated global terrorist' (SDGT) organization strikes a huge blow against one of the world's most deadly jihadist groups. The IRGC, through its longstanding relationship with Hezbollah, has the blood of hundreds of Americans on its hands … Earlier this year, [Dr.] Matthew Levitt … (a former deputy assistant secretary of the treasury specializing in terrorism-finance issues) wrote in *The] Washington Times* that … 'the IRGC's business and industrial activities - especially those connected to the oil and gas industries - are heavily dependent on the international financial system.' In other words, these are precisely the kind of projects where Iranian regime elites are vulnerable to American and international economic pressure. These [IRGC] projects include a contract worth $1.3 billion to build parts of a pipeline and another worth more than $2 billion to develop part of [] South Pars …. [R]ecently, the IRGC - and in particular, a section known as the Quds Force - has been heavily involved in aiding Hezbollah, as well as … Hamas …. At a press conference last month, U.S. military officials in Iraq said that the Quds Force is bringing groups of up to 60 Iraqi insurgents at a time to training facilities near Tehran, where they are taught how to carry out kidnappings and use rockets and improvised explosive devices to kill and maim American troops. American officials also say that the IRGC is responsible for smuggling explosively formed penetrators (EFPs) into Iraq. The EFPs, which can penetrate the armor of a Humvee and are used almost exclusively by Shi'ite militias, accounted for one-third of the combat deaths suffered by coalition forces last month. The 99 strikes that

occurred with EFPs in July were the highest total since the war began. Earlier this year, Mr. Khamenei vowed to hit back at U.S. interests worldwide if Iran were attacked. … By hitting the Revolutionary Guards with sanctions, the Bush administration is weakening their capacity to finance more terror, and clearly it hopes to shame the Europeans and the Japanese in cutting their financial ties to these serial killers of Americans."

i. *Washington Times*, August 16, 2007: "[The] Revolutionary Guard Corps, which faces the prospect of severe U.S. financial sanctions as a 'terrorist organization,' represents a tempting target given its multibillion-dollar commercial empire ranging from oil fields to honeybee farms. … The U.S. terrorist designation would freeze any U.S. assets of the IRGC, but financial analysts say its greater practical effect would be to discourage companies and banks from other nations from working with the corps' various subsidiaries. … the IRGC's financial scope has expanded dramatically with the election of Islamic hard-liner Mahmoud Ahmadinejad as president in 2005. According to a survey by the … International Crisis Group, [KAA] won a string of major contracts from the Ahmadinejad government, including … a $1.3 billion oil pipeline contract, and a no-bid $2.09 billion commission to develop parts of the vast South Pars natural gas field. … U.S. officials say such profits matter because it is IRGC's foreign military arm, known as the Quds Force, that is suspected of providing funds, training and equipment to anti-U.S. forces in Iraq, … Lebanon and the Palestinian territories."

j. *Christian Science Monitor*, August 6, 2009: "The Bush administration regularly accused the Guards of supplying advanced explosives to insurgents in Iraq … In a rare disclosure, businesses were put at 30 percent of IRGC 'capacities' in a 2006 interview by Brig. Gen. Abdol-Reza Abed, an IRGC deputy commander and head of Khatam-ol-Anbia, one of its many companies. The IRGC's economic role has clearly increased with projects awarded by Ahmadinejad. Within a year of his taking office, [KAA] won a $1.3 billion contract for a gas pipeline …, and … for developing part of the South Pars gas field."

k. *Economist Intelligence Unit*, August 19, 2009: "The [Iranian regime] has approved an additional US$1bn investment to be allocated to [KAA], a company owned by the [IRGC], to develop Phases 15 and 16 of the giant South Pars gasfield. … Total said in 2008 that it could not proceed …, in the face of increased costs and the tense international situation over Iran."

l. Rasool Nafisi (IRGC Scholar and Author), September 18, 2009: "Symbiotic Relationship[:] Upon becoming president, Ahmadinejad wasted no time in awarding the juiciest government contracts to the IRGC. [KAA], the industrial and construction wing of the IRGC, was given no-bid contracts to develop the 15th and 16th phases of the South Pars Gas Field, and to build a … pipeline to Pakistan and India. It was also allowed to take over the Kish Oil Company. These deals turned the already massive [KAA] into one of the largest conglomerates in the Middle East."

m. *Mehr News Agency*, April 18, 2010: "[A]n all-Iranian consortium will be vested with developing the South Pars … phases 22-24. … The consortium is consisted of [KAA], Industrial Development and Renovation Organization of Iran (IDRO), and some offshore contractors such as Iran Shipbuilding & Offshore Industries Complex Co (ISOICO),

Sadaf, Sadra, and Iranian Offshore Engineering and Construction Company … Iran, having the world's second largest gas reserves and third largest oil reserves, is trying to play a more active role in oil and petrochemical transactions in international markets."

n.  *Agence France Presse*, May 28, 2010: "Iran has awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field, the *Mehr* news agency … Guards unit [KAA] would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. He also confirmed reports earlier this week that phases 22, 23 and 24 were to be awarded to [KAA]. … The development of the giant offshore field has been delayed amid a lack of investment in a country faced with severe gas needs of its own and because of difficulties in procuring the technology to develop these fields. [KAA] … is under US and UN sanctions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] …."

o.  *Agence France Presse*, June 15, 2010: "Iran … signed contracts worth 21 billion dollars with local firms to develop six gas fields, some of them awarded to the [IRGC], state media reported. The state television website said the 'contracts to develop the South Pars gas fields -- phases 13, 14, 19, 22, 23 and 24 -- were inked with three consortia including [KAA],' the [IRGC's] industrial conglomerate. … Iran previously discussed handing over phases 13 and 14 to Royal Dutch-Shell and Spain's Repsol YPF, but the two giants held off on a final decision as new UN sanctions loomed against Tehran … The [IRGC] … has been targeted in the fresh UN sanctions … Last month the [IRGC] said it was ready to take over energy projects in Iran if Western firms stayed away …."

782.    On information and belief, SCB knew that the Iranian Petrochemical Company's transactions concerned NIOC. Media reports alerted SCB to the key role that funding from fronts like the Iranian Petrochemical Company played in facilitating NIOC's activities. On April 26, 2010, for example, *IHS Global Insight* reported that IRGC companies were "increasingly being awarded tenders by NIOC and its subsidiaries . . . creating potential significant problems for . . . foreign firms" dealing with NIOC and its subsidiaries "given the specific international sanctions against dealing with Revolutionary Guards affiliates and the U.S. classification of the outfit as a terrorist organisation."

783.    Congressional testimony confirmed the well-known fact that NIOC-related transactions directly enabled IRGC-sponsored terrorist attacks. On November 15, 2011, for

example, Mark Dubowitz, president of the Foundation for Defense of Democracies, testified in front of the House Subcommittee on National Security, Homeland Defense, and Foreign Operations. Dubowitz advocated for stronger sanctions against Iran, specifically targeting the IRGC's control of the oil industry. Dubowitz testified that the IRGC was "unquestionably the dominant force throughout Iran's energy sector, including the sale of Iran's oil," and that "the United States should also consider designating Iran's state-owned National Iranian Oil Company (NIOC). NIOC is a party to every Iranian oil transaction. Leveraging its position as a state-owned institution, NIOC operates as the ultimate front company in obscuring the role of the IRGC in the oil trade." Dubowitz further testified that "[t]he Central Bank of Iran, like the National Iranian Oil Company, and other IRGC entities discussed above—are critical links in the IRGC-dominated oil supply chain and key enablers of the IRGC's proliferation activities, terrorist operations and human rights abuses."

784.    NGO public pressure campaigns also alerted SCB that its NIOC-related transactions enabled IRGC-sponsored terrorist attacks. In November 2011, for example, UANI publicly called on Italian energy company Edison SpA to stop doing business in Iran, and stated that "[t]he IRGC is a known terrorist entity in control of Iran's oil, gas, and petrochemical sectors. . . . The IRGC also 'bankrolls' groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen. . . . By working with NIOC and the IRGC to develop Iran's oil sector, Edison is directly contributing to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs."

785.    On information and belief, SCB knew that the Iranian Petrochemical Company's transactions concerned NITC. Media reports alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, *Reuters* reported that "[s]upporters of tougher Iran sanctions

measures are aiming to get NITC on a U.S. blacklist for what they say are links to the Iranian Revolutionary Guards Corps (IRGC)." In 2014, *Iran Briefing* reported that "[t]he IRGC has a major stake in the petrochemical industry, including … the National Iranian Tanker Company."

786.     Terrorism scholars alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, Mark Dubowitz, of the Foundation for Defense of Democracies, warned that "NITC is a critical element of the IRGC-controlled oil supply chain. Its tankers enjoy free access to global ports around the world despite the IRGC's reputation as an international outlaw."

787.     Congressional hearings alerted SCB that the IRGC effectively controlled NITC. In 2012, for example, Congresswoman Ileana Ros-Lehtinen and Mark Dubowitz confirmed in an exchange that NITC played a key role in the logistics chain upon which the IRGC relied to sponsor acts of terrorism:

> ROS-LEHTINEN: Now, Iranian tankers [operated by the NITC] have been turning off their outboard/onboard vessel tracking system even though the International Maritime Organization requires that those systems stay on. Can multilateral actions be taken against the National Iranian Tanker Company to penalize Iran for its activities? And what specific role does the National Iranian Tanker Company play within the IRGC supply chain? ...
> DUBOWITZ: We -- we've -- there already is existing authority under U.S. law. The president has the power to really crack down on the Iranian economy, on the Iranian oil sector.
>      We should be designating the National Iranian Oil Company and all its subsidiaries. We should be designating the National Iranian Tanker Company and make it very difficult for the Iranians to ship [oil].

788.     Decades of reports by the media, United States, United Nations, NGOs, terrorism scholars, and others confirmed that transactions on behalf of, or for the benefit of, NITC directly enabled IRGC-sponsored acts of terrorism targeting the United States and committed by the Qods Force, Hezbollah, and their proxies.

789.     For example, the international news agency *Reuters* consistently warned about such risk since the 1990s, as it did in 1995:

Iran has minimised the impact of a U.S. trade ban by finding alternative markets for its crude oil in Europe, Asia and South America, an Iranian oil source said …

"We have had a general policy of trying to diversify our customers and only a few months after the ban was imposed we have been successful to a large extent in lowering the effects of the embargo," the source told Reuters.

"The National Iranian Oil Company (NIOC) has done its best to seek other markets in countries such as South Asia, Europe and South America. The feedback has been good," said the source …

"We have been successful in selling our crude oil and keeping its price almost intact and competitive. This shows that NIOC has been able to tolerate the situation," the source said.

***Washington accuses Iran of sponsoring international terrorism*** …

The trade ban has pushed Iran … to … resort to the international shipping market.

***The source said the efforts to offset the U.S. trade ban was reflected in the fact that Iran's National Iranian Tanker Co. (NITC) has ordered new tankers … and accelerated chartering activity.***

"[NITC] has ordered new vessels such as double hull tankers and other types of ships. NITC has also been scrapping its old vessels and chartering tankers," the source said. (Emphasis added.)

Other *Reuters* reports similarly warned about NITC's direct enabling of Iranian evasion of U.S. counterterrorism sanctions targeting Iran. *Reuters* even specifically warned that NITC-related transactions in Dubai were designed to evade U.S. counterterrorism sanctions.

790. Terrorism scholars also alerted SCB that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2011, for example, Mark Dubowitz warned "IRGC companies that are part of the crude oil supply chain" included "National Iranian Tanker Company (NITC)" such that transactions with such IRGC companies furnished "Iran's oil revenues" and provided "the regime the hard currency it needs to operate" by financing "companies doing business with Islamic Revolutionary Guard Corps (IRGC) entities in the crude oil trade" that directly enabled Iranian efforts "supporting … terrorism."

791. Public advocacy campaigns also alerted SCB that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2012, for example, UANI sponsored a

public campaign alerting European entities that the IRGC had seized NITC and was using it to sponsor terrorism.

792.    On information and belief, SCB knew that the Iranian Petrochemical Company's transactions concerned the Caspian. Regular reports of IRGC terrorist activity in the vicinity of, and connected to the IRGC's desire to dominate, the Caspian alerted SCB that Caspian petroleum-related transactions foreseeably involved the IRGC. On February 10, 2008, for example, the *L.A. Times* reported that the IRGC had been conducting operations in the area near the Caspian as part of the Ayatollah's strategy to dominate the region.

793.    Ayatollah Khamenei specifically, and regularly, touted that Iran was inextricably connected to all things relating to Caspian Sea-related petroleum issues. On May 3, 2001, for example, Iranian state TV covered a speech by Khamenei, contemporaneously reported upon by BBC, as follows:

> Ayatollah Khamenei, … [said] "[T]he Islamic Republic of Iran will defend its rights and the rights of the Iranian nation on every front. … The Caspian Sea is a[n] enclosed sea which belongs to its littoral states. No power from anywhere in the world has the right to interfere in or exert influence on … the affairs of that sea. According to international laws there are five littoral states. The fate of that sea lies in the hands of those five countries. And, here and now, I take this opportunity to declare that the legal status of the Caspian Sea and the balance between the various activities of the five countries in that sea should be maintained between those five countries - all the five countries. It cannot be done through bilateral contacts and agreements."
>
> Stressing the importance of realizing Iran's rights in the Caspian Sea in the fields of oil and gas, … Khamenei added: "Everybody knows that the Iranian nation and the Islamic system do not permit their right be undermined in the slightest, whether on land or at sea."

On May 4, 2001, similarly, media outlets reported that Ayatollah Khamenei repeated this message, and underscored Iran's—and Khamenei's—direct connection to all issues relating to the development, extraction, and trade of petrochemical products in the Caspian.

794.     Finally, SCB's advice to change the Iranian Petrochemical Company's name, and the company's decision to do so by creating a new entity on November 15, 2011 (on information and belief, Caspian Petrochemical FZE) shows SCB's awareness that it was an IRGC front because it followed on the heels of twelve events over six days from November 8, 2011 through November 14, 2011, that alerted SCB (and its IRGC front customers) that the United States, United Kingdom, United Nations, and European Union would imminently impose major new sanctions targeting the Iranian regime's use of Iranian fronts and banks to finance IRGC operations.

795.     On November 8, 2011, the International Atomic Energy Agency ("IAEA") published a bombshell report exposing the Iranian regime's comprehensive nuclear weapons program, including its lies and cheating while promising that such program was peaceful.

796.     On November 9, 2011, the Israeli government responded to the IAEA report by publicly messaging that it was preparing for a potential military strike targeting Iran, which Israel warned could come as early as the following month.

797.     On November 10, 2011, Ayatollah Khamenei—in a speech before the IRGC, which was then posted to his official website—directly threatened IRGC-sponsored attacks against the United States and Israel: "The firm Iranian nation is not one to sit back and observe threats by fragile and material-minded powers … The enemies, especially America and its stooges and the Zionist regime (Israel), should know that … Iran[] … will respond with full force to any aggression or even threats in a way that will demolish the aggressors from within. … The Revolutionary Guards ... will answer attacks with strong slaps and iron fists."

798.     On November 10, U.K., French, and other E.U. member state diplomats also warned that, *inter alia*, the United Kingdom, France, and European Union were preparing to

impose "new powerful sanctions" at the European Union's scheduled meeting on December 1, 2011, which would likely forbid direct interactions with the Central Bank of Iran and/or any Iranian person involved in the Iranian regime's monopoly in the petroleum trade.

799.    On November 11, 2011, IRGC-controlled *Press TV* publicly taunted Israel and messaged that "the Israeli regime will never have the courage to … attack … Iran" because "Israel … has suffered humiliating defeats in Lebanon and … Gaza."

800.    On November 12, 2011, Hezbollah leader Hassan Nasrallah threatened that Hezbollah and its Axis of Resistance allies—which SCB knew included Hamas, PIJ, and JAM— were prepared to launch a wave of devastating attacks in the Middle East in support of Hezbollah's (and its Axis allies') patron, the IRGC, stating: "Whoever dares to launch a war against Iran will be met with double that force. Iran is strong; Iran is powerful and has a leader unique to the whole world. … They [*i.e.*, the United States and Israel] must understand well that a war on Iran and a war on Syria will not be confined to Iran or Syria. This war will roll over throughout the entire region."

801.    On November 12 and 13, 2011, the U.S. government hosted the annual Asia Pacific Economic Cooperation summit, during which President Obama and other leaders indicated that the United States would likely work with other nations to impose severe new sanctions in response to both the IAEA news as well as the Iranian regime's support for proxy terror violence in the Middle East.

802.    On November 13, 2011, during the Republican Party presidential primary debate, the leading candidates all promised to impose unprecedented additional sanctions targeting the Iranian regime's support for terrorism, if they became president.

803.    On November 14, 2011, U.S. and E.U. officials confirmed that significant new

sanctions targeting the IRGC's use of banks and Iran's energy sector were imminent:

a.    U.S. Senator John McCain—widely known as a key American thought leader regarding Iran sanctions—appeared on global media outlet CNN and urged powerful new sanctions targeting the Iranian regime: "We have to make it clear to the Iranians that they cannot and will not have a nuclear weapon. And one of the greatest conundrums that we face today is whether Israel will take unilateral action in order to remove that possibility, as well [*i.e.*, an Israeli military strike]. …[T]his … situation … cries out for American leadership and we should lay down a marker on the Iranians … because we can squeeze them harder with sanctions on their banking system and their oil exports, as well."

b.    U.K. Foreign Secretary William Hague publicly stated that the U.K. government would "look over the coming months … to placing more pressure on Iran through sanctions" and pointedly declined to rule out a British military strike against the Iranian regime by observing that "all options … remain[ed] on the table."

c.    French Foreign Minister Alain Juppe publicly urged all governments to impose "a very firm" round of newly toughened sanctions "to avoid an irreparable intervention," *i.e.*, an armed conflict involving the western world and the Iranian regime.

d.    E.U. member states' foreign ministers coordinated a united front and released this draft statement to the western media: "Iran [was] in violation of international regulations … We urge Iran to address international concerns ... Strong new restrictive measures will be taken at a next meeting taking into account Iran's actions."

Media outlets widely reported each of these events in real-time.

804.    SCB—and its terrorist-sponsor customer, the Iranian Petrochemical Company—

knew about all the above. Among other reasons, each event from November 8 to 14, 2011

received widespread, real-time coverage in the global media, including in the United States,

Europe, and the Middle East. Yet, upon the culmination all these dramatic developments, SCB's

response was not to cease assisting the Iranian Petrochemical Company, but rather to help it

evade the tightening vise of U.S. sanctions yet again by telling it change its name. SCB then

continued to help the company access the U.S. financial system until at least June 2012.

805.    SCB knew that providing illegal atypical banking services to the Iranian

Petrochemical Company (a/k/a Caspian Petrochemical FZE) would directly facilitate terrorist

attacks funded, supplied, and encouraged by the SLO and IRGC, including attacks by Hezbollah, Hamas, PIJ, and JAM; SCB knew that its Caspian Petrochemical transactions flowed funds to the SLO and IRGC, and that the SLO and the IRGC used such funds to sponsor attacks by Hezbollah, Hamas, PIJ, and JAM.

### C. SCB Knew That Its Assistance to Elyassi Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM

806.    From 2007 through at least 2011, SCB helped the IRGC evade U.S. counterterrorism sanctions through its transactions with Mahmoud Reza Elyassi and his businesses.

807.    Elyassi was an agent for the IRGC and SLO. Elyassi operated a sophisticated, transnational, U.S.-dollar denominated currency exchange in Mashhad, Iran that was connected to essentially every major sector in which the IRGC and SLO exercised a monopoly on behalf of the Qods Force and Hezbollah, including, but not limited to, import/export, communications, construction, and energy.

808.    Elyassi also had essentially no public profile, was based in Iran but frequently traveled to Dubai, and attempted to recruit one or more SCB-related persons by inviting them to visit him in Tehran.

809.    Only one thing explains all these features: Elyassi's status as an agent for the IRGC and SLO. Simply put, as SCB knew, no Iranian national could have displayed the profile, or engaged in the transactions, like Elyassi, without the IRGC's and SLO's knowledge. The enduring nature of the scheme, combined with its cross-border (Qods Force domain) conduct permits only one conclusion: that his conduct was blessed by the IRGC (including the Qods Force). And that conclusion, in turn, requires—at a minimum—the conclusion that Elyassi was acting at the IRGC's (and Qods Force's) behest because the IRGC did not simply permit Iranians

to launder vast sums of U.S. dollars for years while in contact with westerners without Qods Force involvement.

810.    SCB Dubai knew these facts, employed personnel with sophisticated regional knowledge, and benefited from the knowledge of SCB's office in Tehran through SCB's "One Bank" approach in which its various branches shared information and knowledge with one another seamlessly across borders. On March 3, 2009, for example, SCB stated: "Standard Chartered is a rather different bank and we want to keep it like that. We run as one bank across geographies and businesses."

811.    Regardless of whether SCB Dubai personnel connected the "Elyassi was an IRGC and SLO agent" dots in real time—and, on information and belief, SCB Dubai employees and agents did, in fact, figure it out—SCB Dubai knew that the *subject matter* of the Elyassi-related transactions was exclusively indicative of IRGC and SLO involvement. That was enough to alert SCB that its role in the transactions would flow funds to the terrorist proxies sponsored by the IRGC and SLO, the most notorious of which always being Hezbollah, Hamas, and PIJ.

812.    When SCB Dubai serviced Elyassi, SCB knew, among other things: (1) Elyassi was an Iranian national; (2) Elyassi worked from Iran, but also traveled to Dubai; (3) Elyassi was running a sophisticated sanctions evasion scheme, which SCB knew was an exclusive province of the IRGC's monopoly; (4) Elyassi was operating a currency exchange, which SCB knew was also subject to an IRGC monopoly; (5) Elyassi held himself out as an import/export business, which was yet another IRGC monopoly; and (6) Elyassi's currency exchange activities likely involved energy and communications technology-related transactions—two more areas of IRGC monopoly. Simply put, SCB knew that every industry sector in which Elyassi purportedly transacted was one for which the IRGC held a monopoly. When SCB helped Elyassi evade U.S.

counterterrorism sanctions, it helped flow money into all these IRGC monopolies, which directly funded the Qods Force, Hezbollah, Hamas, and JAM.

813. Statements by U.S. and U.K. prosecutors and regulators confirm that Elyassi was an agent for the IRGC and/or the SLO. This is ineluctable for a simple reason: in connection with SCB's mine run of 2019 resolutions, every government authority that issued a statement emphasized, in sum and substance, that SCB's Elyassi-related conduct threatened the national security of the United States and/or United Kingdom. Such statements could ***only*** have been true if Elyassi was an agent for the IRGC and/or SLO for a simple reason that SCB knew given its sophistication and employment of in-house and outside intelligence professionals: the IRGC and SLO were the only two organizations in Iran that (a) directly threatened the United States and United Kingdom, while (b) playing a large role in the international financial system and having an insatiable need for U.S. dollars to conduct their operations. As SCB well knew, no other Iranian organizations fit that description.[205] For another simple reason, this conclusion would not change even if one were to infer (incorrectly) that such officials were only describing the Iranian regime's acquisition of weapons of mass destruction, like ballistic missiles: that program was entirely within the purview of the IRGC. Accordingly, no matter how one explains the official statements described above, they necessarily confirm that the IRGC and/or SLO benefited from Elyassi's transactions with SCB because the government's statements would be false if Elyassi had been acting for anyone else.

---

[205] Iran's Ministry of Intelligence and Security ("MOIS") provided intelligence to support IRGC operations, and on occasion participated in attacks alongside the IRGC, *e.g.*, kidnapping attempts targeting enemies of the Iranian regime. Unlike the IRGC and SLO, however, MOIS does not operate a vast network of terrorist fronts requiring U.S. dollars to operate. Moreover, MOIS generally financed its activities through official Iranian budget processes, while the IRGC and SLO, in contrast, drew all or nearly all the funds for their operations from off-budget sources, most of all, their network of commercial fronts.

814. Every transaction that SCB conducted for Elyassi was atypical. SCB Dubai used all or nearly all its illegal tactics, techniques, and procedures as alleged in the previous section when it provided services to Elyassi.

815. SCB's financial services were essential to the IRGC's ability to profit from the Elyassi-related transactions because the IRGC needed access to New York's financial system for his currency exchange to work and for the ultimate IRGC beneficiaries to receive their money in the most valuable form possible: U.S. dollars.

816. SCB defied decades of direct U.S. government warnings about the consequences that occur when a bank helps the IRGC obtain U.S. dollars through the American financial system in violation of U.S. sanctions targeting Iran.

817. From 2007 through at least 2011, SCB's provision of financial services to Elyassi flowed millions of dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

**D. SCB's Other Schemes**

818. While Caspian Petrochemical and Elyassi were SCB's two most shocking long-term relationships with the IRGC, they were hardly the only ones. As described *supra*, SCB engaged in years of misconduct on behalf of Iranian banks with clear ties to the IRGC and the SLO—*i.e.*, wire-stripping through the year 2007 involving billions of dollars.

819. This misconduct did not cease in 2007. As the subsequent enforcement actions showed, SCB continued its unlawful conduct for several years thereafter.

820. According to public reports, a whistleblower who was employed at SCB from 2009 to 2011 claims to have identified many billions of dollars in additional transactions occurring from 2008 to 2012. According to the whistleblower, data hidden in 53 spreadsheets

reveals that SCB processed at least 500,000 additional transactions, adding up to billions of dollars, for what SCB called its "Iran Group," which included front companies for the IRGC, Hamas, and Hezbollah, as well as other Iran-related entities.

821. Based on these reports as well as SCB's documented willingness to engage in nearly unprecedented sanctions violations, Plaintiffs allege the following facts on information and belief:

822. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the SLO access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the SLO directly sponsored Hezbollah, Hamas, and PIJ, and that its transactions would enable attacks by Hezbollah, Hamas, and PIJ.

823. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped KAA access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that KAA was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

824. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the Foundation for the Oppressed access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the Foundation was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

825. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped NIOC access millions of dollars from New York banks through other

transactions in addition to the ones alleged above, and did so even though it knew that NIOC was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

826. In addition, as explained *supra*, from at least 2008 through at least 2012, SCB Dubai and SCB Gambia knowingly helped Hezbollah access millions of dollars through New York banks, knowing that it would enable Hezbollah to finance attacks committed by Hezbollah or Iran's other terrorist proxies.

**IX.  SCB Substantially Assisted The Terrorist Attacks By Hezbollah, Hamas, PIJ, and JAM That Caused Plaintiffs' Injuries**

827.     SCB substantially assisted attacks against Plaintiffs committed by Hezbollah, Hamas, and PIJ, and JAM. When SCB willfully flowed billions of dollars into the budgets of Iran's Terrorist Sponsors—the Foundation for the Oppressed, Hezbollah, IRGC, SLO, and their fronts NIOC, NITC, and KAA, among others—SCB was pouring money into a well-oiled terrorist finance and logistics machine that ensured most of the profits Iran's Terrorist Sponsors generated would enable the attacks their proxies committed. At least three factors ensured an efficient and ineluctable flow of the profits facilitated by SCB to the terrorists who committed the attacks.

828.     **Logistics Policy Directive.** From 2003 through 2020, the operation of the Logistics Policy Directive, *supra*, meant that the IRGC earmarked most of the funds its fronts generated to directly fund terrorist attacks committed by Hezbollah, Hamas, PIJ, and JAM.

829.     **Mandatory Donations (*Khums*).** From 1979 through 2024, Ayatollah Khamenei, the SLO, IRGC, and Hezbollah relied upon mandatory donations, or *khums*, comprising 20% of all income, which flowed up to Khamenei and then back down to the Khamenei Cell and, through the Khamenei Celll, to IRGC proxies Hamas, PIJ, and JAM, to finance terrorist attacks. Shiite theological traditions call for donations (*khums*), usually equal to 20% of a person's income on every transaction, to support the cause. The IRGC, however, has twisted this religious tradition, like tithing in Christianity, into something far different.

830.     Under the IRGC's approach to *khums*, *zakat*, and other means of raising funds, the IRGC emphasized simplicity in terms of percentages, analogous to terrorist flat taxes.[206]

831.     Per governing IRGC and Hezbollah doctrine, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions—***without exception***—including, but not limited to, profits generated through official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The IRGC's "no exceptions" rule ensures that the terrorist have an administratively simple scheme (analogous to a terrorist flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

832.     Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including Hezbollah and the Qods Force. *First*, if income flows through and IRGC-controlled front (*i.e.*, KAA) to the IRGC shareholders behind that front (*i.e.*, the IRGC and Hezbollah), the respective shareholders provide a donation to the others. Thus, for example, if SCB flowed through $100 million to the IRGC, one may infer that the IRGC would, in turn, donate approximately 20%—$20 million—to Hezbollah and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

---

[206] For example, as Ayatollah Khomeini instructed in his 1975 treatise, "superfluous bureaucracies and the system of file-keeping and paper-shuffling that is enforced in them, all of which are totally alien to Islam, impose further expenditures on our national budget not less in quantity than the illicit expenditures of the first category. This administrative system has nothing to do with Islam. These superfluous formalities, which cause our people nothing but expense, trouble, and delay, have no place in Islam. For example, the method established by Islam for enforcing people's rights, adjudicating disputes, and executing judgments is at once simple, practical, and swift."

833.     *Second*, if a member of the IRGC—or a cutout acting on their behalf—receives a substantial economic benefit, *e.g.*, a profit from a baking transaction, IRGC doctrine mandates that the bribe recipient kickback, mafia-style, 20% of their income to the IRGC.

834.     The IRGC's universal practice of tithing a portion of each IRGC member's income back to the leadership of the IRGC was under the direct, public, widely known, edict of Ayatollah Khomeini. For example, in Ayatollah Khomeini's seminal 1975 instruction-manual-for-terror titled *Velayat-e Faqeeh*—which was always the foundation of all IRGC doctrine—the Ayatollah decreed:

> The taxes Islam levies … khums is a huge source of income that accrues to the treasury and represents one item in the budget. According to our Sh'ia school of thought, khums is to be levied in an equitable manner on all agricultural and commercial profits and all natural resources whether above or below the ground—in short, on all forms of wealth and income. It applies equally to the greengrocer with his stall outside this mosque, and to the shipping or mining magnate. They must all pay one-fifth of their surplus income, after customary expenses are deducted, to the Islamic ruler, so that it enters the treasury. … If an Islamic government is achieved, it will have to be administered on the basis of the taxes that Islam has established—khums, zakat …[,] jizyah, and kharaj. … The provision of such a huge budget … was established with the aim of providing for [inter alia] … defense [*i.e.*, terrorism].[207] … The budget of the Islamic state is constructed in such a way that every source of income is allocated to specific types of expenditures. Zakat, voluntary contributions and charitable donations, and khums are all levied and spent separately. … God Almighty says concerning the khums: "Know that of whatever booty you capture, a fifth belongs to God and His Messenger and to your kinsmen" (8:41). Concerning zakat He says: "Levy a tax on their property" (9:103). There are also other divine commands concerning other forms of taxation. Now the Most Noble Messenger had the duty not only of expounding these ordinances, but also of implementing them; just as he was to proclaim them to the people, he was also to put them into practice. He was to levy taxes, such as khums, zakat and kharj, and spend the resulting income for the

---

[207] While Ayatollah Khomeini referenced the use of khums, zakat, and similar donations to support things like the public's welfare, that was, as Defendants knew, merely code for the "soft" IRGC activities upon which the IRGC relied to facilitate its acts of terrorism—*e.g.*, the IRGC charities that served as fronts for IRGC operatives overseas. Everything the Ayatollah referenced for which *khums* and similar donations were directed had a sole purpose: exporting the Islamic Revolution, *i.e.*, propagating acts of terrorism targeting the United States.

benefit of the Muslims; establish justice among peoples and among the members of the community … God has entrusted to him the task of … command, and accordingly, in conformity with the interests of the Muslims, he [uses such taxes to] arrange[] for the equipping and mobilization of the army.

835.    Indeed, Ayatollah Khomeini specifically decreed that *khums* were mandatory on any oil-related profits. Per Khomeini: "Those who work in oil deposits … must pay the khoms to the Islamic Treasury if the profit made by him from such activities."

836.    **Financial Auditors and Aggregators.** Ayatollah Khamenei, the SLO, the IRGC, and Hezbollah exercised programmatic control over their respective profits generated by their stake in terrorist fronts operated by them or for their benefit, which the Irnaian Terrorist Sponsors used to maximize the IRGC's ability to convert such value into acts of terrorism targeting the United States. For starters, as *Radio Free Europe* reported on September 18, 2009, "all the IRGC's economic activities are monitored only by internal IRGC auditors."

837.    In so doing, the Terrorist Sponsors were comporting with a terrorist version of best financial practices. As FATF reported in 2015:

> Terrorist financial management requires planning and accounting for all resources and assets that the group controls, as well as its liabilities. Analysis of publicly-available financial documents originally from a variety of terrorist organisations demonstrates that financial management practices (such as documenting revenue levels and sources, expenditure reporting, accounting) are particularly important for terrorist groups with advanced capabilities, and particularly those that are territorially based. Large terrorist groups will often rely on terrorist financial managers to accumulate revenue, establish financial shelters (such as bank accounts, front and holding entities), and oversee financial disbursements. Their activities also include provisioning funds to the group's leadership, members, and operators and considering opportunities to invest any excess capital. Groups… have actively recruited … accountants, and other financial professionals, specifically to monitor the activities of financial entities within their areas of control in order to better manage revenues and minimise losses.

838.    Accordingly, FATF concluded that an "area of focus" for counterterrorism practitioners "could include identifying and targeting financial collection/aggregation/accounting points within a terrorist organisation."

### A.    SCB's Conduct Flowed Hundreds of Millions of Dollars from the U.S. Financial System to the Qods Force, Hezbollah, Hamas, PIJ, and JAM

#### 1.    Foundation for the Oppressed

839.    SCB's transactions directly enabled the terrorist attacks that killed or injured Plaintiffs. Among other reasons, the Foundation for the Oppressed's profits, assets, data, real estate, and operatives supplied Hezbollah, Hamas, PIJ, and JAM the violent instruments such terrorists needed to commit its attacks, including, but not limited to: (1) key, off-the-books financing for terrorist operations, *supra*; (2) a transnational logistics infrastructure, including in Iraq, Lebanon, the Palestinian territories, and Syria; and (3) the mechanisms by which Hezbollah and the Qods Force routed attack-related payments that, by their very nature, had a direct connection to each attack against Plaintiffs.

840.    Financial transactions that benefited the Foundation for the Oppressed directly financed Hezbollah, Hamas, PIJ, and JAM terrorist attacks in Israel, the Palestinian territories, and Iraq because that was, always, such Foundation's primary reason for being. Indeed, at least two of its formal and informal leaders have publicly admitted that the Foundation funds the Qods Force and Hezbollah: Fattah, who currently (publicly) runs the Bonyad Mostazafan, did so in 2020, and Rafiqdoost did so, at least, in 2014.

841.    Accordingly, SCB's vast direct and indirect financial assistance that flowed through the Foundation for the Oppressed ultimately reached Hezbollah's, Hamas's, PIJ's, and JAM's operations cells, including such groups Joint Cells in the Lebanon, Syria, and the Palestinian territories. The Foundation was purpose-built specifically to finance Hezbollah by

providing a transnational funding, asset, real estate, corporate, and personnel structure that was tailor-made to access U.S. banks, markets, and institutions and purpose-built for to enable acts of terrorism by Hezbollah and allied proxies like Hamas throughout the footprint of both Hezbollah's and the Qods Force's shared, interlocking, complex, global, terrorist enterprise. The Foundation for the Oppressed was also designed to provide complete financial, logistical, and operational sustenance and cover to the Hezbollah and Qods Force operatives who were embedded inside it by supporting, among other things, the Khamenei Cell, which included key Hezbollah leaders like Hassan Nasrallah, as well as Hezbollah's top attack planners, *e.g.*, Imad Mugniyeh, who was a member of the Khamenei Cell from 1983 until his death in 2008.

842.    Accordingly, from 1979 through at least 2019, whenever a bank, including SCB, directly or indirectly routed substantial value to the Foundation for the Oppressed, such value flowed through the Foundation (including, if necessary, through applicable IRGC fronts, agents, and "orbits") to ultimately reach, among others, the Khamenei Cell. Indeed, such an outcome was the entire reason the IRGC seized the Pahlavi Foundation in 1979 and converted its assets into the Foundation. Accordingly, value transfers to the Foundation ultimately flowed through to, and were deployed by: (1) Qassem Soleimani; (2) Hassan Nasrallah; (3) Rostum Ghasemi; (4) Mohsen Rafiqdoost; (5) Mohsen Rezai; (6) Mohammad Forouzandeh; (7) Parviz Fattah; and (8) Mojtaba Khamenei.

843.    From 1979 through 2024, the Qods Force and Hezbollah notoriously used the Foundation for the Oppressed's profits to finance terrorist attacks committed by the Qods Force, Hezbollah, and such FTOs' proxies. As the BBC reported on March 27, 2001,

> the Foundation for the Oppressed … is an organization that gives financial support to Iran's … acts of terrorism abroad. … The organization is supervised by … Ayatollah Khamene'i …and is a subsidiary of the IRGC [and its investments are] … under the control of Hezbollah like other large commercial enterprises in

Iran. These are organizations operating under the supervision of the IRGC … [and are] engaged in controlling people visiting Iran, selecting and training people for Iran, financing pro-Iranian people and so on …[,] under the guise of cultural centres and humanitarian structures.

844.     United States sanctions against the Foundation for the Oppressed confirmed that the IRGC and SLO used the Foundation's profits, personnel, facilities, and resources to sponsor attacks targeting the United States, including attacks targeting regime enemies. On November 18, 2020, for example, the United States imposed counterterrorism sanctions on the Foundation pursuant to Executive Order 13876. In the same designation, Treasury confirmed that the Foundation for the Oppressed served primarily as a front for terror and performed little legitimate charitable work: "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

845.     As Treasury confirmed in 2020, the Foundation for the Oppressed always served as a "bridge to the IRGC." "As of 2020," per Treasury, "according to [Foundation] President [Parviz] Fattah, Foundation properties have been occupied by the IRGC." Per Treasury, the Foundation's "vast economic wealth is partly the result of … business with … those involved with Iran's support of international terrorism" including trade with "the IRGC and … MODAFL, … which have been previously designated under multiple authorities, including counterterrorism authorities."

846.     As Treasury explained in 2020, the Foundation for the Oppressed "maintain[ed] close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah," who served as a "bridge to the IRGC." In such role, the Foundation always served to "line the pockets of [Ayatollah Khamenei's] allies," including Fattah, who was

appointed to lead the Foundation "in July 2019," after previously serving as, *inter alia*, "managing director of the IRGC-linked Bonyad Taavon Sepah" and "head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counter-terrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah." "Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force … officials," including "former IRGC-QF commander Qassem Soleimani." Indeed, "Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight, … including children as young as 14 years old," which, "like the IRGC-QF itself, is designated pursuant to both counterterrorism and human rights authorities."

847. Treasury also confirmed that the Iranian regime used the Foundation for the Oppressed's "assets" to finance designated terrorists who served in "the Supreme Leader's inner circle" including Gholam-Ali Haddad-Adel, a Khamenei confidant," against whom the U.S. government imposed counterterrorism sanctions pursuant to Executive Order 13876 in November 2019.

848. Per Treasury, the IRGC used Foundation for the Oppressed resources to directly finance attacks targeting the Iranian regime's perceived enemies. While the Foundation was "ostensibly a charitable organization charged with providing benefits to the poor and oppressed, its holdings [were] expropriated from the Iranian people and are used by … Ali Khamenei to … persecute the regime's enemies." As Treasury Secretary Mnuchin observed when the U.S. sanctioned the Foundation in 2020, "Iran's Supreme Leader use[d]" the Foundation "to reward his allies under the pretense of charity" by using it as a "revenue generating source[] that enable[d] the regime's ongoing repression of its own people."

849.    U.S. government statements confirming the Foundation for the Oppressed's direct connection to IRGC- and Hezbollah-sponsored, proxy-committed, terrorist attacks targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout Defendants' scheme with the IRGC and Hezbollah. These sources show that the Foundation for the Oppressed was closely intertwined with terrorist violence because the Qods Force and Hezbollah used Foundation profits to fund attacks.

850.    Hezbollah and the Qods Force used the Foundation's profits to finance terrorist attacks committed by their proxies in at least six ways. Among other ways, the Qods Force and Hezbollah notoriously used the Foundation's profits to finance: **(1) martyr payments** to the families of Qods Force and Hezbollah terrorists who were killed while executing such FTOs' attacks; **(2) bounty payments** directly to Qods Force and Hezbollah proxies Hamas, PIJ, Kataib Hezbollah, the Houthis, and the Taliban to reward successful attacks targeting the United States in which an American was killed or taken hostage; **(3) operations payments** to finance the costs of specific attacks (*e.g.*, pre-attack lodging); **(4) salary payments** paid to Qods Force and Hezbollah leadership, and to the leaders of Qods Force and Hezbollah proxies Hamas, PIJ, Kataib Hezbollah, the Houthis, and the Taliban; **(5) logistics payments** to finance terrorist ratlines and training; and **(6) laundered payments** routed through Foundation-affiliated charities, like the Imam Khomeini Relief Committee, which served as cut-outs for the Qods Force and Hezbollah, and helped such FTOs build their logistics networks in countries like the Palestinian territories, Iraq, Yemen, and Afghanistan.

851.    Contemporaneous reports and findings by U.S. and E.U. counterterrorism officials confirm Plaintiffs' allegations. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien publicly testified that "Iran [] actively sponsors terrorism

and violence across the Middle East … [through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf" as IRGC proxy "terrorist … groups in Lebanon, the Palestinian territories, and Iraq," which in "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of support that fuel terrorist activities" for which the IRGC's "***money flows … draw[] upon a large network of state-owned banks and parastatal companies***," *i.e.*, foundations.

852.    On July 27, 2010, the E.U. found that, *inter alia*: (i) "Bonyad-e Mostazafan" was among the IRGC fronts that "contributes to the financing of the strategic interests of the regime and of the Iranian parallel State"; and (ii) the Iranian regime pursued such strategic interests through IRGC-sponsored terrorist attacks targeting the United States: "[The] … Qods Force is responsible for operations outside Iran and is Tehran's principal foreign policy tool for special operations and support to terrorists and Islamic militants abroad. Hizballah used Qods Force-supplied rockets, anti-ship cruise missiles (ASCMs), man-portable air defense systems (MANPADS), and unmanned aerial vehicles (UAVs) in the 2006 conflict with Israel and benefited from Qods Force training on these systems, according to press reporting. According to a variety of reporting, the Qods Force continues to re-supply and train Hizballah on advanced weaponry, anti-aircraft missiles, and long-range rockets."

853.    Former senior U.S. officials confirmed that U.S. sanctions targeting the Foundation for the Oppressed recognized that the Foundation's profits financed IRGC-sponsored proxy attacks. On March 3, 2022, Gabriel Noronha, Former Special Advisor for Iran at the State Department, publicly observed: "[S]anctions on some of the regime's worst terrorists …

[included] sanctions on Khamenei's personal slush funds known as 'bonyads,' including …

[s]anctions … on Bonyad Mostazafan [Foundation for the Oppressed], a massive conglomerate

that … is enmeshed with the IRGC and is a corruption network used to enrich top Iranian

terrorists. … [U.S. Department of State] lawyers were clear when we released this [Executive

Order sanctioning entities like the Foundation for the Oppressed in November 2020]: it was a

response to actions by Iran & its proxies to …. promote international terrorism … [and sponsor]

attack[s] against US military assets [and] civilian vehicles."

854.     Public decrees by Ayatollah Khamenei confirmed that the Foundation for the

Oppressed served as a front for Hezbollah and the Qods Force, and alerted SCB to the same. For

example, in 1989, 2012, and other occasions when he appointed a new executive director of the

Foundation, the Ayatollah publicly touted how the Foundation promoted "resistance," supported

"martyrs," and helped liberate the "oppressed"—which were all widely known, and infamous,

euphemisms for IRGC-sponsored attacks targeting America.

855.     IRGC admissions confirmed that the Foundation for the Oppressed's support

enabled terrorist attacks by Hezbollah, the Qods Force, and their proxies. On November 3, 2012,

for example, a "reporter" for IRGC-controlled media outlet *Aftab* acknowledged that the

Foundation supported IRGC proxies "[i]n countries like Syria and Palestine, where Iran's

interests are outside the country... that means the activities of the Foundation [for the Oppressed]

to help [IRGC proxies like] Bashar al-Assad's government." Under the same rationale, the IRGC

used the Foundation for the Oppressed to sponsor acts of terrorism in Iraq, Yemen, and

Afghanistan, just as the IRGC did elsewhere.

856.     Terrorism scholars also confirmed, and alerted SCB, that the Foundation for the

Oppressed was a front for Hezbollah and the Qods Force, and its notorious reputation for directly

funding IRGC terrorist proxies in the Middle East continued at all relevant times. In 2016, for example, Mehran Riazaty—who served the U.S. military as an Iran Analyst attached to Multi-National Forces, Iraq—observed that "[t]actically, Bonyads are often connected to the Iranian Revolutionary Guard Corps [and] Operatives from the IRGC [*i.e.*, IRGC-IO], along with members of Al-Qods [*i.e.*, Qods Force] and Hezbollah, and often go undercover, representing themselves as employees or officials of trading companies, banks, and cultural centers, or as representatives of the Bonyad of the Oppressed and Dispossessed [*i.e.*, the Foundation for the Oppressed]."

857.    Decades of other reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs confirmed that the Foundation for the Oppressed was a front for Hezbollah and the Qods Force that enabled such FTOs' attacks, and alerted Defendants that their value flow-through to the Foundation for the Oppressed as one of their counterparties' ultimate beneficial owners fueled Qods Force and Hezbollah-committed terrorist attacks, including, but not limited to:

a.    *Montreal Gazette*, June 4, 1994: "The United States, most crucially, continues to classify Iran as a state sponsoring terrorism. It makes no distinction between official and unofficial Iranian actions, though there is strong reason to believe that directing many of Iran's more dubious overseas activities - including support for the Hezbollah in Lebanon - is not the core of government but the 'bonyads.'"

b.    *Christian Science Monitor*, February 1, 1995: "[D]espite corruption allegations[,] … [IRGC] General [Mohsen] Rafiqdoost is the managing director of Iran's Foundation of the Oppressed … [M]any analysts hold that Rafiqdoost's interests go beyond helping the poor of Iran. Western security sources believe the bonyads are used by Iran's religious authorities as deniable vehicles to finance … Hizbollah … 'There is bonyad money going to Lebanon, for sure,' said one source in Iran …. 'Look, the bonyad works in harmony with the government,' explained Rafiqdoost. 'At times we go to their aid.'"

c.    *Newsday*, May 28, 1995: "[I]n a four-month investigation based on dozens of interviews with law-enforcement officials and U.S. government specialists, knowledgeable Iranians who support the regime as well as dissidents, and public and private documents, Newsday has found that: [The Foundation for the Oppressed] … is controlled by Iran's

clerical leadership, federal officials say. … [The Foundation] finances [entities] in the United States that support Iran's militant … Islam and provides safe haven for groups and individuals supporting the Islamic terrorist group[] … Hezbollah. … In a classified report … the FBI asserted that [the Foundation] was 'entirely controlled by the government of Iran,' which used [the Foundation for the Oppressed] to set up 'covert subbranches disguised as educational centers, mosques and other centers.' … The FBI report, according to a U.S. official, claims that [the Foundation] funds 'fundamentalist extremist groups' and that Iranian students who received scholarships from [the Foundation] to study in the United States 'gather[ed] intelligence' … and collected "technical and scientific information" for the Iranian regime. In 1989, Oliver Revell, then the No. 2 official at the FBI, told the Senate terrorism subcommittee that some of the 'students' receiving [the Foundation's] grants were in fact [IRGC, including Qods Force] agents. … Revell … said much of [the Foundation]'s funds go to 'a great number of mosques (in the United States) . . . where there are organizations which directly support Hezbollah…[,]' an Iranian-supported [] group … that has launched terrorist attacks under the tutelage of the Revolutionary Guards. … The [Foundation] is administered by Mohsen Rafiqdoost, founder of the Revolutionary Guards."

d.  *Financial Times Mandate*, April 23, 1996: "[B]onyad[s] have a reputation for … corruption. The richest and most notorious, according to Iranian analysts, is the Mostazafan (the foundation for the deprived [*i.e.*, the Foundation for the Oppressed]), which is controlled by the Islamic Revolutionary Guard Corps. … Everywhere, … there is talk of greater economic liberalism … But Iran continues to spend money … on exporting Islamic revolution."

e.  *Financial Times Mandate*, July 17, 1997: "Of all the state-vested interests competing for … scarce hard currency, Tehran businessmen say the most formidable are the bonyad, the state foundations set up by the clergy after the revolution and directed by political nominees without regard to business experience … Many economic commentators say it is the opacity and power of such privileged corporations, their reputation for mismanagement, obsessive secrecy and covert operations that are a greater deterrent to foreign investors than the fear of running foul of US sanctions, which Tehran blames. Among the Bonyad, the most notorious is the Bonyad Mostazafan, the 'foundation for the oppressed and disabled'. … The autonomy of the bonyad is not confined to banking, commerce or industry. One of them unilaterally took the initiative in 1989 to offer the Dollars 2m [] 'bounty' for Mr Salman Rushdie, the British author."

f.  *Newsday*, December 8, 1998: "[T]he … Mostazafan Foundation [] controls billions of dollars of investments in Iran and around the world … [and] has been accused by western intelligence services of … supporting terrorism."

g.  *BBC*, June 14, 2002: "Iran has been financing the Islamic Jihad Organization … since the group's establishment but its budget reached it through Hezbollah. The latter's budget is paid by Iranian establishments [*i.e.*, foundations a/k/a bonyads], the *vali-e faqih* office [*i.e.*, the Supreme Leader's Office], the Revolutionary Guards' liberation movements' office, in addition to the Qods Forces and exceeds 200m dollars. … Regarding the increase in Hezbollah's budget, the source said the party receives aid from various

sources in addition to its annual budget and these come from … Iran … [including] [the] 'Mostaza'fin' (Foundation for the Oppressed) …"

h.  *Forbes*, July 21, 2003: "[Under the IRGC's] The Cosa Nostra meets fundamentalism [approach,] [t]heoretically the Mostazafan Foundation is a social welfare organization. … Why does this foundation [*i.e.*, the Foundation for the Oppressed] exist? … A picture emerges from one Iranian businessman who used to handle the foreign trade deals for one of the big foundations. Organizations like the Mostazafan [*i.e.*, Foundation] serve as giant cash boxes, he says, to pay off supporters of the mullahs, … [including] Hezbollah … and, not least, the foundations serve as cash cows for their managers [*i.e.*, the IRGC including the senior IRGC terrorists who ran the Foundation]."

i.  *Newsmax*, June 3, 2009: "Once Iran created Hezbollah in 1983, Mousavi coordinated the financing for it as the head of the Bonyad Mostazafan, which he chaired as prime minister. 'For example, … Mousavi set up a scheme so that Hezbollah would get a share of Iranian [] sales,' Mesbahi said. … Under the scheme, [an agent of the Foundation for the Oppressed] established front companies for the [] transactions in [Europe], 'and the banks would do the rest, putting commissions into the Hezbollah accounts under fictitious names,' [former Iranian intelligence officer, Abdolghassem] Mesbahi said."

j.  Kerry Patton (Combat-Disabled Veteran; Senior Analyst, Wikistrat), January 2, 2012: "Bonyads assist in fueling world terror, enhanced military might, and promotion of propaganda and 'comfort for the oppressed.' … Enforcement of Iran's Bonyads is both strategic and tactical. … Tactically, Bonyads are often interrelated to the Iranian Revolutionary Guard Corp (IRGC). Operatives from the IRGC along with members founded in Al Quds and Hezbollah go undercover portraying themselves as employees or officials of trading companies, banks, cultural centers or as representatives of the Foundation of the Oppressed and Dispossessed (Bonyad-e- Mostazafan) ... Bonyads are funded actively and passively. The Islamic alms giving known as Zakat often serves as a Bonyad contributor."

k.  Robert A. Manning (Atlantic Council), April 30, 2015: "The IRGC … controls much of economy through the Bonyads [the largest of which was the Foundation for the Oppressed]. In addition there is the Qods Force, an elite group in the IRGC that leads interventions abroad – [including by partnering with] … Hezbollah …"

l.  Dr. Hesam Forozan (Middle East Scholar), 2015: "In addition to its internal organization units designed for its personnel, the [IRGC] has at its disposal a host of units and departments, … Many of these units exert an indirect influence on and are in close liaison with other governmental, extra governmental and revolutionary organizations. These include … the Foundation of the Oppressed …. Partly because of their connection with the [IRGC], the directors and managers of these foundations were capable of gaining access to sources of capital and government tender. For example, both the current and former heads of the [Foundation for the Oppressed], Mohammad Forouzandeh and Mohsen Rafiqdust, come from the ranks of former [IRGC] officers. Following the post-war reduction of the military budget, the [IRGC] augmented its ties with clerical-controlled foundations, in particular the [Foundation for the Oppressed]. … the

[F]oundation apparently undertakes international endeavors that transgress the traditional definition of trade – the [Foundation] is commonly cited as a generous supporter and active political patron of the Lebanese Hezbollah terrorist organization."

m.    <u>Dr. Mohammad al-Sulami (PhD, International Relations), August 31, 2020</u>: "Systemic state corruption in Iran … ha[s] reached record-breaking levels within … the … IRGC … Parviz Fattah, the head of the … Foundation for the Oppressed … admitted this month that the IRGC … had used the foundation to engage in projects worth billions. This means the revenues generated from these projects have gone to the IRGC, not the foundation. … Fattah's revelations have once again exposed the Iranian regime's claim that it defends the vulnerable and oppressed, with the regime-backed IRGC profiteering from a foundation that is supposedly dedicated to helping the oppressed."

n.    <u>Cyrus Yaqubi (Iran Scholar), January 24, 2021</u>: "[W]here does the [Foundation for the Oppressed's] revenue go? … Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the [Middle East] region or as the mullahs' call it 'expand its strategic scope'. Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq and Yemen, or its Afghan Fatemiyoun Division … in Syria using its official annual budget. The millions of dollars used to fund these group must be provided from other financial sources. …[B]onyads such as Bonyad-e-Mostazafan [Foundation for the Oppressed], are among the organizations that have directly assisted the Quds Force in this regard. Iranian opposition sources have previously stated that the Quds Force receives most of its funds from [bonyads]. … The US's decision to sanction [bonyads] will definitely be welcomed by Iranians who are tired of having their stolen wealth used for terrorism."

o.    <u>Dr. Mark D. Silinsky (Former DOD Military Intelligence Analyst and Adjunct Professor at the U.S. Army War College), 2021</u>: "Today, bonyads … acquir[e] and distribut[e] wealth to the Guards [*i.e.*, the IRGC]. The operations and business models of bonyads are very opaque because of corruption and mismanagement. One financial analyst snickered, 'Who know how they function? They are like a black hole.' Similar to nonprofit organizations, bonyads are tax-exempt charitable entities. Senior personnel are adept at transferring funds from one element to another to subvert U.S. sanctions and channel funds toward terrorist operations. ... The largest bonyad [*i.e.*, the Foundation for the Oppressed] funds Hezbollah and operates in Europe and Asia."

## 2.    The Iranian Petrochemical Company

858.    By providing financial services to the Iranian Petrochemical Company (a/k/a Caspian Petrochemical FZE) from 2007 through at least June 2012, SCB provided direct and indirect assistance to the Qods Force, Hezbollah, Hamas, and JAM from at least 2007 through at least 2019. For example, facilities that Caspian Petrochemical built with SCB's services continued flowing value to these terrorist groups until at least 2019.

859.     SCB's financial services were essential to the Iranian Petrochemical Company's ability to profit from the oil and gas it sold. Access to the U.S. financial system was essential because nearly all oil and gas transactions are denominated in U.S. dollars. Similarly, giving the Iranian Petrochemical Company access to New York banks allowed it to maintain its cover as front; transacting through New York imbued its transaction with legitimacy.

860.     SCB knew that, by helping the Iranian Petrochemical Company transact, the bank was providing Iran's Terrorist Sponsors—through the Iranian Petrochemical Company's revenue—the seed capital to allow it to grow, operationalize, and monetize its factory in the South Pars field, both at the time SCB provided the services and for years thereafter. SCB's services provided long-lasting financial benefits to the Iran's Terrorist Sponsors and their proxies, even years after SCB stopped providing them. As SCB knew at the time it helped the Iranian Petrochemical Company, financial services provided to oil and gas producers, and their associated market contracts, usually have a long "tail"—i.e., if a bank helps an oil producer finance a big facility or transaction, the customer will benefit from the financing facility for years thereafter. Accordingly, when SCB helped the Iranian Petrochemical Company access the U.S. financial system to support its transactions, SCB knew that it would be helping the Iranian Petrochemical Company—and, in turn, the IRGC—realize sustainable profits for years after SCB processed its final transaction.

861.     The Iranian Petrochemical Company was a company that sought to help the Iranian regime generate more oil revenue. Decades of reports confirm that such fact alone—and nothing else—alerted SCB that its transactions likely facilitated IRGC-sponsored terrorism by groups like Hezbollah, Hamas, and PIJ. Decades of reports and statements by the United States, terrorists, media outlets, terrorism scholars, and ordinary citizens alerted SCB that every time it

provided illicit financial services to any customer in connection with Iranian oil- or gas-related transaction, it ran an extreme risk that the other side was funding the Qods Force, Hezbollah, Hamas, and JAM and, moreover, even if such person was not, the end revenues would likely flow to such terrorists, given the Iranian regime's long-standing and unique treatment of the revenues it realized from its oil and gas monopoly. Such reports included, but were not limited to:

a. *Agence France Presse English Wire*, February 6, 2006: "Iran … formally notified the [IAEA] of its decision to restart sensitive nuclear work at the centre of concerns the hardline regime could acquire nuclear weapons. Senior [Iranian] officials also played down the threat of sanctions … emphasising [Iran]'s vast oil wealth … in an interview with *Handelsblatt*, US Defence Secretary Donald Rumsfeld said the United States does not rule out using military force against Iran. 'All options, including the military one, are on the table,' Rumsfeld [said], repeating his fears that weapons of mass destruction could fall into the hands of terrorists and branding Iran 'the main sponsor of terrorist organisations such as Hezbollah and Hamas.' But [regime spokesman Gholam Hossein] Elham said oil-rich Iran still had the upper hand when it came to enduring any eventual sanctions. … 'Any decision in this regard [*i.e.*, for the United States to impose sanctions targeting the IRGC, responsible for Iran's nuclear program] will not hurt us. It will hurt the consumers and not the producers. We are in a position of power when it comes to energy, and it will not have any affect [sic] on our budget,' he said."

b. White House Press Secretary Scott McClellan, February 22, 2006: "[Reporter:] Iran, as you probably know, has now said that it would help fund Hamas, has said that its oil revenues ... will help amply pay for Hamas as needed. What's the U.S. reaction? And does this undercut any sanctions against Iran? [McClellan:] Well, … the regime in Iran … [has] been a destabilizing force in the … Middle East. Our views are very clear when it comes to the regime. ... And in terms of Hamas, ... we've made it very clear that ... they continue to engage in terrorism and continue to advocate the destruction of Israel."

c. President of Israel Shimon Peres, March 18, 2008: "Iranian oil money is funding world terror, including Hamas and Hezbollah terror."

d. *Agence France Presse English Wire*, March 18, 2008: "After meeting [German Chancellor Angela] Merkel, [Israeli President Shimon] Peres stressed that … 'the money earned from oil enables Iran to finance international terrorism, particularly the terrorism of Hezbollah and Hamas.'"

e. *Jerusalem Post*, March 19, 2008: "German Chancellor Angela Merkel told the Knesset ... 'I say it in a clear voice - the [Hamas and PIJ] Kassam [rocket] fire [targeting Israeli civilians] must stop,' Merkel said. 'Terror attacks are a crime, and do not resolve political disputes.' Prime Minister Ehud Olmert praised Merkel's 'strong and determined position

against the horrific calls from the president of Iran to wipe Israel off the map ....' ... Merkel, … also met with President Shimon Peres, who said … that Iranian oil revenue was funding world terrorism - including Hamas and Hizbullah."

f.   *Reuters*, May 5, 2008: "Israeli President Shimon Peres … said … 'Oil ... is [] promoting terror,' said the 84-year-old Nobel Peace Prize winner … Peres argued that manifold increases in oil prices in recent years had contributed to a rise in financing for terrorism in the Middle East … Peres took particular aim at Iran, repeating recent comments that Tehran's nuclear programme and its rhetoric against Israel may pose a greater threat than the Nazis in the 1930s and 40s. Israel accuses Iran, a major oil and gas producer, of financing Hezbollah, the Lebanese guerrilla movement, and Hamas, which controls the Palestinian Gaza Strip, both of which are sworn enemies of Israel."

g.   *Joplin Globe*, January 17, 2009: "Make no mistake; Iran is a strong and tenacious adversary. Fueled with petro dollars from their abundance of oil reserves, Iran supports strong anti-Israeli and anti-Western militias such as Hamas and Hezbollah. Iran is responsible for many thousands of American and Iraqi deaths."

h.   Senator John Kerry, May 12, 2009: "[A] massive continuous transfer of American wealth to oil exporting nations ... [flowed] revenues and power and sustained … global terror funded indirectly by our expenditures on oil … Too often the presence of oil multiplies threats ... Iran uses petrol dollars to fund Hamas and Hezbollah ...."

i.   *Newsweek*, June 29, 2009: "In 2005 … Khamenei backed Ahmadinejad …, a veteran of the … Revolutionary Guards and willing to kiss the Supreme Leader's feet. Ahmadinejad won. In the four years since, taking advantage of billions in windfall revenues from high oil prices, Iran has … funded Hamas as it took over Gaza, and supported and armed Lebanon's Hizbullah in its 2006 war with Israel."

j.   *APS Review Oil Market Trends*, April 5, 2010: "Without money from oil, [Israeli Infrastructure Minister Uzi] Landau argued, Iran would fade as a regional power and 'terror groups' such as Hamas … and Hizbullah … would cease to exist."

k.   Dr. Abdallah al-Nafisi (Academic; *Al Jazeera* Commentator), June 16, 2010: "Iran gets on every boat to reach power and influence in the Arab region. A country very rich with … oil revenues, Iran uses its establishment of and support for Hezbollah … and its support for Hamas and … as bridges to get to its objectives. What harms Iran if it gives Hamas $23 million monthly to run things in Gaza? What harms Iran if it gives the Islamic Jihad $5 million or so to maintain the Palestinian gun? But in return, Iran gains much. It is as if Iran is telling Israel: My border is in Gaza, not in Tehran, and my border is in Al-Urqub [in south Lebanon] through Hezbollah, not in Tehran. So, Iran is gaining a great deal of ... physical influence through its support for Hezbollah and Hamas. ... We welcome Iran's support for [Hezbollah] and its support for Hamas and others."

l.   Elliot Bartky and Allon Friedman (Jewish American Affairs Committee of Indiana), August 1, 2011: "[D]eprive Iran of the oil revenue they've used to support terrorist groups such as Hezbollah and Hamas, … and … kill American troops in Iraq."

m.   *Jerusalem Post*, May 28, 2013: "[E]ntrenched oil interests … [in] Iran … and the downstream industries their petro-dollars support worldwide [mean that] … [a]s long as Iran … can export oil profitably, Hamas [and] Hezbollah … can have their weapons underwritten by the oil addictions of the regular oil consumers of the world."

n.   Kevin McGee (Univ. of Wisconsin-Oshkosh), September 13, 2015: "[Acts] that will allow Iran to sell much more oil [are inextricably connected to the IRGC's] … use [of] some of the [resulting oil] revenue to support Hamas, Hezbollah and its other cronies."

862.   The U.S. government has directly confirmed that a European bank's decision to finance the transactions related to the Iranian Petrochemical Company from 2008 through 2012 funded IRGC-sponsored terrorist attacks targeting the United States. On June 30, 2014, the United States announced that, per DOJ, "BNP Paribas S.A. (BNPP), a global financial institution headquartered in Paris, agreed to enter a guilty plea to conspiring to violate the International Emergency Economic Powers Act (IEEPA) and the Trading with the Enemy Act (TWEA) by processing billions of dollars of transactions through the U.S. financial system on behalf of Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions." Per DOJ, by "providing dollar clearing services to individuals and entities associated" with "Iran" in "clear violation of U.S. law," the bank "helped [Iran] gain illegal access to the U.S. financial system," and in "doing so," the bank "deliberately disregarded U.S. law of which it was well aware, and placed its financial network at the services of rogue nations" through its "***criminal support of countries and entities engaged in acts of terrorism and other atrocities***." (Emphasis added.) On information and belief, DOJ's statements above were specifically about a European bank's violation of Iran-facing sanctions, including Iran-facing petroleum-related sanctions, on behalf of the same Iranian Petrochemical Company that SCB assisted during the same period. On September 21, 2015, for example, CNBC reported that a "[a]mong the French bank's violations were transactions with Caspian Petrochemical FZE" and "[e]vidence from the BNP probe led

investigators to believe that StanChart [*i.e.*, SCB] may also have breached sanctions in its transactions with Caspian Petrochemical FZE."

863.     SCB's transactions on behalf of the Iranian Petrochemical Company fueled Hezbollah's and Hamas's acts of terrorism against Plaintiffs. Decades of government reports and speeches published by the United States, United Kingdom, European Union, and United Nations confirmed the IRGC's oil-related financial transactions that benefited the IRGC were inextricably connected with IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah, Hamas, and JAM. As Secretary of State Pompeo confirmed in 2020, while describing country-wide oil-related sanctions targeting Iran and the IRGC like the sanctions that SCB schemed to help the IRGC evade years earlier:

> [S]anctions have denied Iran more than 90% of its oil export revenue, depriving the regime access to well over $70 billion in income that could have otherwise gone to fund terror operations …. These actions have saved the lives of innumerable Iranians, Syrians, Iraqis, Yemenis, and other innocent civilians in the regime's crosshairs … [through] the full spectrum of Iran's malign influence [including] its support to Shia militia groups in Iraq, [and] its longstanding sponsorship of Hizballah in Lebanon …
> In September 2019, the U.S. Department of the Treasury exposed a large oil shipping network that was directed by, and financially supported, the IRGC-QF and its partner Hizballah. The network was overseen by senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi and employed an extensive network of ship managers, vessels, and facilitators in order to move oil worth hundreds of millions of dollars or more for the benefit of … Hizballah, and other illicit actors. The networks complex system of intermediaries allowed the IRGC-QF to obfuscate its involvement. The IRGC-QF relied heavily on Hizballah officials and front companies to broker associated contracts.

864.     From the 2010 through the present, such U.S., U.K., E.U., and/or U.N. government findings, reports, statements, and warnings included, but were not limited to:

a.     <u>Treasury, June 16, 2010</u>: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in

Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b.  <u>State, April 8, 2011</u>: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c.  <u>Treasury, March 28, 2012</u>: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the … oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

d.  <u>State, May 24, 2012</u>: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

e.  <u>Treasury, May 23, 2013</u>: "'As long as Iran continues [its] … defiance of multiple UN Security Council Resolutions, the U.S. will target and disrupt those involved in Iran's illicit activities,' said Treasury Under Secretary for Terrorism … David S. Cohen. 'We will continue to work with our international partners to intensify this pressure and tighten sanctions on Iran's energy sector as it provides much needed financial support for the Iranian regime's proliferation activity.'"

f.  <u>DOJ, July 1, 2020</u>: "In 2014, … Treasury further noted that under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of [KAA], a construction and development wing of the IRGC that generates income and funds operations for the IRGC. … On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism. On April 15, 2019, the Secretary of State designated the IRGC, including the IRGC-QF, as Foreign Terrorist Organization. According to … Treasury, the IRGC and its major holdings have a dominant presence in Iran's … oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including … support for terrorism … abroad. … "[IRGC] profits from [commercial] activities support the IRGC's full range of nefarious activities, including … support for terrorism… abroad. 'The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities,' said then-Under Secretary for Terrorism … Sigal Mandelker."

865.     When the IRGC priced its black market oil, liquefied petroleum gas ("LPG"), and other petroleum products, it took a simple approach: take the then-existing, publicly reported global market price for such commodity, and then haggle with their black market buyer over the size of a discount from that prevailing price to reflect the IRGC's inability to sell to any customer. At all times, the average price for LPG imports ranged between $600 - $1,200 per ton, IRGC fronts that sold LPG to black market buyers reportedly offered discounts for around $100 per ton for large shipments. Thus, for example, if the price of LPG was $1,000 per ton, the IRGC would offer to sell the LPG at a discounted price of $900 per ton. On that sales price, the IRGC kept around 75% of that sum as the profit. Accordingly, from 2007 through 2020 each ton of IRGC LPG sold by the IRGC likely caused, at least, $300 in terrorist finance to flow through the transaction to the IRGC (including its Qods Force) and SLO and, through the Qods Force and SLO, to Hezbollah, Hamas, PIJ, and JAM to finance their terrorist attacks in the Middle East.

866.     Given the IRGC's oil- and gas-production-related profit margins, SCB's facilitation of the IRGC's sales of oil and gas through SCB's transactions on behalf of, or otherwise involving, Iranian Petrochemical Company produced a financial windfall for the Qods Force, Hezbollah, and proxies, including Hamas, PIJ, and JAM.

867.     Representative transactions involving Caspian Petrochemical-related sales in 2017 and 2018—the direct product of SCB's years of illegal aid—confirm the point:

868.     In or about July 2017, Caspian Petrochemical coordinated with other IRGC fronts described herein to deliver about 44,000 tons of LPG produced by IRGC front PGPIC (affiliated with IRGC front KAA)—which PGPIC extracted from the IRGC's crown jewel, the South Pars gas field—and was shipped to a customer outside of Iran aboard the Gas Commerce.

a.      In or about July 2017, Caspian Petrochemical coordinated with other IRGC fronts described herein to deliver about 44,000 tons of LPG produced by IRGC front PGPIC

(affiliated with IRGC front KAA)—which PGPIC extracted from the IRGC's crown jewel, the South Pars gas field—and was shipped to a customer outside of Iran aboard the *Gas Commerce*.

b.   In or about December 2017, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at the IRGC's South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Commerce*, to a buyer in Asia.

c.   In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Pacific Rizhao*, to a buyer in Asia.

d.   In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Dignity*, to a buyer in Asia.

869.   At the IRGC's prevailing profit margins, ***each*** of these four transactions likely yielded more than $10 million in funds that the SLO and IRGC caused to be distributed to Hezbollah, the Qods Force, Hamas, PIJ, and JAM to finance their terrorist attacks in the Middle East.

870.   Indeed, the total scale of Iranian Petrochemical Company's terrorist finance likely exceeded $300 million between 2011 and 2017 alone. Plaintiffs' review of market data suggests that Iranian Petrochemical Company was likely involved in at least five or more transactions, analogous to each of the four described above, each year from 2011 through 2017—and likely substantially more than that. For example, just one of Caspian Petrochemical's strategic partners, Oriental Oil, reportedly exported more than 300,000 tons of LPG during one six-month stretch in 2017, which is equal to about seven of the above-described shipments, and Oriental Oil likely used Caspian Petrochemical for all or nearly all such transactions.

871.     From 2007 through at least 2019, SCB's provision of financial services to the Iranian Petrochemical Company flowed at least several hundred million dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

### 3.     Khatam al-Anbiya

872.     Terrorism scholars also confirmed that KAA-related profits—which described those of Caspian Petrochemical—directly financed IRGC-sponsored attacks committed by IRGC proxies, including Hezbollah, Hamas, and PIJ, and alerted SCB to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele Ottolenghi publicly warned:

> [KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. …
> Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …
> [B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence. No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. … And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad. The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

873.     In 2017, Matthew McInnis, of the American Enterprise Institute, publicly testified before Congress that KAA profits funded IRGC-sponsored acts of terrorism committed by IRGC proxies throughout the Middle East, including by Hezbollah and JAM:

> Iran seeks to … assert its regional hegemony by displacing the United States as the dominant regional power. … Iran has utilized its "Resistance Network" of partners,

proxies, and terrorist groups, including … Lebanese Hezbollah, and Iraqi groups like the Badr Corps, Khataib Hezbollah, and Asaib Ahl al-Haq. …

Iran continues to invest in training and arming its proxies and partners with increasingly advanced equipment, with its most trusted groups receiving the best weaponry. Lebanese Hezbollah acquired unmanned aerial vehicles and an estimated 100,000 to 150,000 rockets and missiles through Iranian assistance, including advanced air-to-ground and ground-to-sea missiles. Iran's Iraqi proxies employed the QFs' signature improvised explosive device, the explosively formed projectiles against coalition forces in the last decade….

How do we then stand up to Iran's destabilizing activities in the region and begin to dismantle Tehran's global terror network?

A re-invigorated economic warfare campaign against the [IRGC] should be one component - along with well-coordinated political, military, intelligence and information campaigns - of a larger U.S. strategy against Iran's malign influence in the region. Since the end of the Iran-Iraq War, the IRGC slowly expanded its role in the Iranian economy with at least 20 percent estimated to be now under the [IRGC]'s control. The IRGC owns the state's largest construction firm, Khatam al-Anbiya, and has major stakes in the banking, energy, extractive, and manufacturing sectors. This is how the Guard is able to fuel so much of its operations, …[including] weapons production [and] … proxy support worldwide. The United States has also often designated IRGC front companies that help Iran evade sanctions, acquire illicit technologies and transport weapons to partners. The [IRGC] also operates most Iranian ports and is deeply involved in the commercial shipping … sectors, which are critical elements in building and sustaining its proxy and terror networks in the Middle East.

874. A wide array of terrorism scholars concluded that KAA profits directly financed IRGC-sponsored acts of terrorism committed by IRGC proxies like Hezbollah. For example, Ambassador Mark D. Wallace, CEO of UANI, observed that "Iran's aviation and engineering sectors are dominated by the Islamic Revolutionary Guards Corps ("IRGC") … the main instrument used in Iran's … global terrorist activities. The IRGC widely operates in these sectors through its engineering arm, Khatam al-Anbiya, which is also blacklisted by the EU, the U.S. and the United Nations. Surely, the risks associated with potential (even inadvertent) partnership with the IRGC and IRGC-affiliated entities are much too great for any responsible and law-abiding company." Mehran Riazaty, a former Iran Analyst for Multi-National Forces, Iraq (*i.e.*, the U.S. military), observed that key Qods Force terrorists—who were direct beneficiaries of Khatam al-Anbiya profits—were tasked with using such profits to help the Qods Force and

Hezbollah support IRGC-sponsored, JAM-involved attacks targeting the United States in Iraq after 2003. Saeed Ghasseminejad and Richard Goldberg, of the Foundation for Defense of Democracies, observed that "Khatam al-Anbiya is controlled by the IRGC … and helps finance Iran's … terrorist activities."

### 4. Elyassi

875. From 2007 through at least 2011, SCB helped the IRGC evade U.S. counterterrorism sanctions through its transactions with Mahmoud Reza Elyassi and his businesses.

876. Elyassi was an agent for the IRGC and SLO. Elyassi operated a sophisticated, transnational, U.S.-dollar denominated currency exchange that was connected to essentially every major sector in which the IRGC and SLO exercised a monopoly on behalf of the Qods Force and Hezbollah, including, but not limited to, import/export, communications, construction, and energy. Elyassi also had essentially no public profile, was based in Iran but frequently traveled to Dubai, and attempted to recruit one or more SCB-related persons by inviting them to visit him in Tehran. Only one thing explains all these features: Elyassi's status as an agent for the IRGC and SLO. Simply put, as SCB knew, no Iranian national could have displayed the profile, or engaged in the transactions, like Elyassi, without the IRGC's and SLO's knowledge. The enduring nature of the scheme, combined with its cross-border (Qods Force domain) conduct permits only one conclusion: that his conduct was blessed by the IRGC (including the Qods Force). And that conclusion, in turn, requires—at a minimum—the conclusion that Elyassi was acting at the IRGC's (and Qods Force's) behest because the IRGC did not simply permit Iranians to launder vast sums of U.S. dollars for years while in contact with westerners without Qods Force involvement.

877. SCB Dubai knew these facts, employed personnel with sophisticated regional knowledge, and benefited from the knowledge of SCB's office in Tehran through SCB's "One Bank" approach in which its various branches shared information and knowledge with one another seamlessly across borders. On March 3, 2009, for example, SCB stated: "Standard Chartered is a rather different bank and we want to keep it like that. We run as one bank across geographies and businesses."

878. Regardless of whether SCB Dubai personnel connected the "Elyassi was an IRGC and SLO agent" dots in real time—and, on information and belief, SCB Dubai employees and agents did, in fact, figure it out—SCB Dubai knew that the subject matter of the Elyassi-related transactions was exclusively indicative of IRGC and SLO involvement. That was enough to alert SCB that its role in the transactions would flow funds to the terrorist proxies sponsored by the IRGC and SLO, the most notorious of which always being Hezbollah, Hamas, and PIJ.

879. When SCB Dubai serviced Elyassi, SCB knew, among other things: (1) Elyassi was an Iranian national; (2) Elyassi worked from Iran, but also traveled to Dubai; (3) Elyassi was running a sophisticated sanctions evasion scheme, which SCB knew was an exclusive province of the IRGC's monopoly; (4) Elyassi was operating a currency exchange, which SCB knew was also subject to an IRGC monopoly; (5) Elyassi held himself out as an import/export business, which was yet another IRGC monopoly; and (6) Elyassi's currency exchange activities likely involved energy and communications technology-related transactions—two more areas of IRGC monopoly. Simply put, SCB knew that every industry sector in which Elyassi purportedly transacted was one for which the IRGC held a monopoly. When SCB helped Elyassi evade U.S. counterterrorism sanctions, it helped flow money into all these IRGC monopolies, which directly funded the Qods Force, Hezbollah, Hamas, and JAM.

880. Statements by U.S. and U.K. prosecutors and regulators confirm that Elyassi was an agent for the IRGC and/or the SLO. This is ineluctable for a simple reason: in connection with SCB's mine run of 2019 resolutions, every government authority that issued a statement emphasized, in sum and substance, that SCB's Elyassi-related conduct threatened the national security of the United States and/or United Kingdom. Such statements could only have been true if Elyassi was an agent for the IRGC and/or SLO for a simple reason that SCB knew given its sophistication and employment of in-house and outside intelligence professionals: the IRGC and SLO were the only two organizations in Iran that (a) directly threatened the United States and United Kingdom, while (b) playing a large role in the international financial system and having an insatiable need for U.S. dollars to conduct their operations. As SCB well knew, no other Iranian organizations fit that description. For another simple reason, this conclusion would not change even if one were to infer (incorrectly) that such officials were only describing the Iranian regime's acquisition of weapons of mass destruction, like ballistic missiles: that program was entirely within the purview of the IRGC. Accordingly, no matter how one explains the official statements described above, they necessarily confirm that the IRGC and/or SLO benefited from Elyassi's transactions with SCB because the government's statements would be false if Elyassi had been acting for anyone else.

881. Every transaction that SCB conducted for Elyassi was atypical. SCB Dubai used all or nearly all its illegal tactics, techniques, and procedures as alleged in the previous section when it provided services to Elyassi.

882. SCB's financial services were essential to the IRGC's ability to profit from the Elyassi-related transactions because the IRGC needed access to New York's financial system for

his currency exchange to work and for the ultimate IRGC beneficiaries to receive their money in the most valuable form possible: U.S. dollars.

883. U.S. government findings confirm Plaintiffs' allegations. In 2024, for example, FinCEN published an advisory that confirmed that sanctions violations by self-styled Iran-related "general trading companies" had a tight nexus to attacks by Hezballah, Hamas, PIJ, and JAM:

> Iranian government agencies, such as the Central Bank of Iran (CBI) and the IRGC-QF, as well as state-sponsored organizations such as Hizballah, play a key role in channeling funds to terrorist proxies using overseas front companies and financial institutions. Financial institutions located outside Iran can—wittingly or unwittingly—become intermediaries for the IRGC-QF's illicit transactions. IRGC-QF officials have been known to collect funds in various currencies from CBI-held accounts at financial institutions in neighboring countries and transfer those funds back to Iran or to terrorist organizations. According to BSA analysis, third-country front companies—often incorporated as "trading companies" or "general trading companies"—and exchange houses act as a global "shadow banking" network that processes illicit commercial transactions and channels money to terrorist organizations on Iran's behalf. Exchange houses and front companies rely on banks with correspondent accounts with U.S. financial institutions, especially to process dollar-denominated transactions. In such cases, Iranian banking customers may omit or falsify identifying details connecting themselves or the transfers to Iran or attempt to pass the transactions off as remittances.

884. Simply put, SCB defied decades of direct U.S. government warnings about the consequences that occur when a bank helps the IRGC obtain U.S. dollars through the American financial system in violation of U.S. sanctions targeting Iran.

885. From 2007 through at least 2011, SCB's provision of financial services to Elyassi flowed millions of dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezballah, Hamas, PIJ, and JAM

### 5. Other Fronts

886. While the Iranian Petrochemical Company and Elyassi were SCB's two most shocking long-term relationships with Iran's Terrorist Sponsors, they were hardly the only ones. As described *supra*, SCB engaged in years of misconduct on behalf of Iranian banks with clear

ties to the IRGC and the SLO—*i.e.*, wire-stripping through the year 2007 involving billions of dollars.

887.    That misconduct did not cease in 2007. On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the SLO access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the SLO directly sponsored Hezbollah, Hamas, and PIJ, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

888.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped KAA access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the KAA was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

889.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped the Foundation for the Oppressed access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that the Foundation was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

890.    On information and belief, from at least 2007 through at least late 2014 or early 2015, SCB Dubai helped NIOC access millions of dollars from New York banks through other transactions in addition to the ones alleged above, and did so even though it knew that NIOC was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

**B.** **SCB's Conduct Made a Vital Contribution to IRGC-Sponsored Attacks by Hezbollah, JAM (Including Kataib Hezbollah), Hamas, and PIJ In Iraq and Israel**

891. From 2000 through at least 2019, SCB's scheme financed Hezbollah's, Hamas's, PIJ's, and JAM's terrorist attacks, including those against Plaintiffs. All such terrorist groups relied on Ayatollah Khamenei, the SLO, IRGC, and Hezbollah to pay for, organize, train, arm, and logistically sustain such Iranian proxies. In that respect, every group participated in a network of joint organizations and entities—*i.e.*, joint cells—not unlike the latticework of joint organizations common to NATO and U.S. coalition-based structures in the Middle East.

**1.** **SCB's Conduct Enabled Key Lanes of Iranian Regime Financial Support for Hezbollah's, Hamas's, PIJ's, and JAM's Attacks**

892. From 2000 through at least 2019, Ayatollah Khamenei, the SLO, the IRGC, and Hezbollah always relied on at least three key types of aid to sponsor attacks committed by Hezbollah, Hamas, PIJ, and JAM targeting the United States in the Middle East, including in Israel and Iraq: (1) attack incentive and reward payments directly to the Hezbollah, Hamas, PIJ, and/or JAM operatives, or their families, responsible for attacks; (2) fundraising and recruitment through Ayatollah Khamenei's, the SLO's, and the IRGC's control (in the event of Khamenei and the SLO) and/or use (all three) of the Iranian regime's Friday Prayers Organization, which was a comprehensive apparatus that Ayatollahs Khomeini and Khamenei notoriously used since 1979 to support terrorist attacks by Hezbollah, Hamas, PIJ, and Iraq; and (3) weapons, training, logistics, and tunnel payments to the RGB – which was such terrorist sponsors' Axis of Resistance ally, as the external terrorist operations arm of their fellow Axis member North Korea, often routed through, or facilitated by, China and/or Russia – by such Iranian terrorist sponsors on behalf of, and to secure the RGB's provision of, such goods and services to

Hezbollah, Hamas, PIJ, and JAM used in their attacks. SCB's criminal scheme powered all; Plaintiffs discuss each in turn.

i.      **Attack Incentive and Reward Payments to Hezbollah, Hamas, PIJ, and JAM**

893.    From 2000 through at least 2019, SCB's schemes enabled hundreds of millions, if not billions, in illicit petroleum-related profits to collectively flow to the SLO, IRGC, Foundation for the Oppressed, KAA, and Bank Saderat and, through such terrorist sponsors, flow on to Hezbollah's, Hamas's, PIJ's, and JAM's respective operations cells to fund – on an expressly, earmarked, basis – each attack committed by such Iranian proxies. Ayatollah Khamenei, the SLO, IRGC, and Hezbollah relied upon petroleum profits – that SCB Helped such terrorist sponsors finance through SCB's illicit support of their U.S.-dollar-denominated, New York bank-blessed petroleum-, Foundation for the Oppressed-, KAA-, and Bank Saderat-related transactions to fund at least five distinct categories of U.S. dollar-denominated attack payments that notoriously, and empirically, incentivized attacks, including, but not limited to:

a.      **U.S. dollar-denominated salary payments** to finance attacks by Hezbollah's, Hamas's, PIJ's, and JAM's relevant attack-related operations, intelligence, logistics, and leadership cell operatives, including Khamenei Cell members, including such groups' attacks against Plaintiffs, which salaries were usually around $200 per month for rank-and-file fighters and $400 per month for cell leaders;[208]

b.      **U.S. dollar-denominated martyr payments** to the families of such Hezbollah, Hamas, PIJ, JAM, and IRGC, including Khamenei Cell, martyrs in attacks targeting the United States in which the attacker died (*i.e.*, was "martyred", including their attacks against Plaintiffs, which always included a lump sum bonus payment to the martyr's family,

_____

[208] For the avoidance of all doubt, while Plaintiffs' salary numbers are applicable to Hezbollah, Hamas, PIJ, and JAM personnel in general, the 25-30 terrorists who comprise the membership of the Khamenei Cell – *i.e.*, Khamenei's closest inner circle allies – were paid salaries that were orders of magnitude higher than the sums paid to everyone else in such groups. For example, Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and the Foundation for the Oppressed likely paid key Khamenei assets like Hassan Nasrallah and Abu Mahdi al-Muhandis salaries of at least several thousand U.S. dollars per month.

usually in amounts like $3,000, $5,000, or $7,000 (depending on the group and year for the martyr), and smaller payments thereafter to the martyr's spouse and parents;

c. **U.S. dollar-denominated bounty payments** to Hezbollah, Hamas, PIJ, JAM, or IRGC operatives for successful attacks targeting the United States or its allies in the Middle East, including Israel, which payments were usually in amounts ranging from $2,000 to $20,000, with most payments being less than $10,000, and calibrated to especially promote such attacks through larger bounties awarded for successful attacks killing, injuring, or capturing a U.S. victim as compared to non-U.S.-victims;

d. **U.S. dollar-denominated disability payments** to Hezbollah, Hamas, PIJ, JAM, or IRGC operatives, and their families, if such operatives were injured while supporting a terrorist attack committed by such group, which often cost at least several thousand U.S. dollars per year, and were thus about as costly as martyr payments in terms of per-capita spend;

e. **U.S. dollar-denominated orphan payments** to the caretakers of the children of Hezbollah, Hamas, PIJ, or JAM operatives who were killed while supporting a terrorist attack committed by such group, which carried a similar cost as martyr and disability payments in terms of per capita spend, and were made to reward and incentivize terrorist attacks (by ensuring that the operative's child will be looked after by the terrorist group), and enable recruitment of child terrorists by all such groups, all of which recruit – and deploy children aged 8-17 to commit attacks by the group.

894. Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and Foundation for the Oppressed financed each of these types of attack incentive and reward payments to support attacks by Hezbollah, Hamas, PIJ, and JAM in the Middle East through means that were both direct (*e.g.*, sponsor-to-terrorist) and indirect (*e.g.*, sponsor-to-Hezbollah-to-terrorist). Throughout this period, all five types of such attack incentive and reward payments were notorious, intended to promote terrorist attacks, and did, in fact, promote such attacks.

895. Ayatollah Khamenei's, the SLO's, the IRGC's, Hezbollah's, and Foundation for the Oppressed's support for, and facilitation of, such attack payments was programmatic because of the custom and practice of each person, and the tactics, techniques, and procedures of the IRGC (which all followed). Throughout, Hezbollah's, Hamas's, PIJ's, and JAM's, use of – and distribution of – such attack payments was equally programmatic because of the custom and practice of Hezbollah, Hamas, OIJ, and JAM, and the IRGC-derived, Hezbollah-exported tactics,

techniques, and procedures common to each group. Simply put, every terrorist sponsor and terrorist group in this paragraph actively, affirmatively, promoted attack payments – they sought to get the word out, were highly effective in doing so, and had a rigorous monitoring, record-keeping, and follow-up process to ensure that attack payments were ordinarily paid for every applicable attack throughout the period from 2000 through 2019.

896.    Accordingly, for each attack against Plaintiffs, the custom and practice, and tactics, techniques, and procedures of Ayatollah Khamenei, the SLO, the IRGC, Hezbollah, the Foundation for the Oppressed, Hamas, PIJ, and JAM meant that a counterterrorism analyst experienced in the field would usually conclude based on nothing more than the fact that Hezbollah, Hamas, PIJ, or JAM committed an attack targeting the United States in Iraq, Israel, or the Palestinian territories in which an American was killed or injured, or a terrorist was killed or injured, that Ayatollah Khamenei, the SLO, the IRGC, Hezbollah, and the Foundation for the Oppressed likely made, and Hezbollah's, Hamas's, PIJ's, and JAM's terrorist attacks were likely aided by, one or more of attack incentive and reward payments as described herein.

897.    SCB provided the key services that powered the terrorists' attack incentive and reward payments. Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and the Foundation for the Oppressed relied upon, *inter alia*, U.S. dollar-denominated transactions on behalf of Iranian regime-owned or beneficiary customers and accounts relating to Iran's petroleum sector (including NIOC, NITC, and Iranian government-owned companies affiliated with either), the Foundation for the Oppressed (including affiliated entities and persons), and Bank Saderat to underwrite all five types of attack payments to Hezbollah, Hamas, PIJ, JAM, and the IRGC.

898.    When SCB helped finance Iranian Terrorist Sponsors' martyr payments to Hezbollah, Hamas, PIJ, and JAM terrorists, SCB provided direct support to terrorist attacks by

such groups. Decades of government reports and speeches published by the United States, United Kingdom, European Union ("E.U.") and United Nations ("U.N."), confirmed the IRGC's programmatic emphasis on "martyrs," "martyrdom," "martyr attacks," and compensating the families of martyrs as key tools that facilitated IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah, Ka'taib Hezbollah, the Houthis, al-Qaeda, and the Taliban. As Ayatollah Khomeini wrote in 1979, "the … Islamic Revolutionary Guard Corps … [is] armed with the divine power. [The IRGC's] weapon is the '*Allāhu akbar*' and there is no weapon like it in the world. … The … Päsdar [*i.e.*, IRGC member] who says his night prayers in the trench … fights as a lion."

899. The U.S. government has confirmed the inextricable connection between martyr payments and terrorist attacks. In 2015, for example, Treasury reported to Congress:

> Evidence suggests that terrorists and their support networks are aware of the ways in which charitable organizations can be abused as a cover to raise, move, and use funds and actively seek to exploit them. … U.S. prosecutors demonstrated at trial that [a religious foundation] intentionally cloaked its financial support for Hamas by funneling money through Zakat Committees and Charitable Societies in the West Bank and Gaza. In some cases, the defendants targeted financial aid specifically for families related to well-known Hamas operatives who had been killed or jailed. In this manner, the defendants effectively rewarded past and encouraged future terrorist activities.

900. Moreover, in *Country Reports on Terrorism* 2020, State observed that, with respect to "transfers to" the "families of terrorists who died in attacks," *i.e.*, "prisoner and 'martyr' payments," the "United States and Israel argue the payments incentivize and reward terrorism, particularly given the higher monthly payments the longer an individual remains imprisoned, which corresponds to more severe crimes."

901. Terrorism scholars also confirmed that financing martyr payments results in more terrorist attacks. In 2006, for example, counterterrorism scholar Boaz Ganor observed:

[T]he family of the shahid (martyr) is given a very tangible reward of thousands of dollars (until the Al Aksa Intifada, the amount that the family of the Palestinian shahid received from the terrorist organization was some $5,000 and during the Intifada, when Iraq allocated huge sums of money for this purpose, the amount awarded to the family of a suicide attacker rose to $25,000—an enormous sum compared with the average yearly salary in the West Bank). From this perspective, perpetrating suicide attacks could be considered by a youngster from a large family as an altruistic act for his family's benefit. … [T]hese rewards are so tangible that they can make an essentially irrational act—the act of suicide— into a rational act whose benefit is many times greater than its cost.

902. In 2017, likewise, Dr. Bruce Hoffman, of Georgetown University, observed:

The Palestinian terrorist organizations have also worked hard to endow suicide operations with a positive social imprimatur and to ensure the support for this tactic by the Palestinian people. They have deliberately created an inverted sense of normality throughout much of Palestinian society whereby suicide—the senseless taking of one's life, an act that is usually negatively regarded as aberrant, if not abnormal—becomes something routinely accepted and applauded, and indeed endowed with demonstrably positive connotations.164 The veneration routinely accorded martyrs reinforces this view. … the terrorist organizations— and their supporters through financial contributions—provide material as well as spiritual encouragement to both the suicide terrorists and their families. According to one authoritative account, until at least 2001, Hamas paid the families of suicide terrorists a death benefit of $3,000 to $5,000—more than double the financial compensation paid to families of terrorists killed in other, non-suicidal attacks. Later, during the al-Aqsa Intifada, this amount increased to $10,000 and then, courtesy of then–Iraqi dictator Saddam Hussein's largesse, to $25,000. There were additional material benefits as well, including nicer living accommodations and gifts of consumer goods—"appliances, rugs and stuffed furniture … gaudy wall clocks, even … [a] bracelet and rings"—bestowed on the families of martyrs.

903. SCB's financial support for martyr payments assisted knife attacks committed by

Hamas and PIJ. In 2016, for example, *Deutsche Presse-Agentur* reported on how the Iranian

regime intensified its support for such payment to accelerate Hamas's and PIJ's "knife intifada":

Iran's ambassador to Lebanon announced … that the families of every Palestinian knife attacker shot dead by Israeli security forces will receive financial assistance from Tehran. "Based on the principles of the Islamic republic and its support of the Palestinian people ... it has been decided to give the families of each martyr 7,000 US dollars," Mohammed Fathali said during a press conference. … Fathali's statement was condemned by Israel, saying it "demonstrates again Iran's role in encouraging terror." "Following the nuclear agreement, Iran continues

being a major player in international terror," Israeli Foreign Ministry spokesman Emmanuel Nahshon said in a statement. Palestinians have launched scores of knife attacks against Israelis since early October, … Israel has blamed the wave of violence on inflammatory rhetoric by radical Muslim leaders who "brainwash" youths and "glorify martyrdom."

904.    SCB's financial support for martyr payments assisted vehicle ramming attacks committed by Hamas and PIJ. In 2016, for example, the *Jerusalem Post* reported that the Iranian regime encouraged "car-ramming attacks against Israelis in recent months" when "Iran [] offered financial assistance to the families of Palestinian terrorists involved in" such "attacks."

905.    From 2000 through at least 2019, Khamenei's, the SLO's, the IRGC's, Hezbollah's and the Foundation for the Oppressed's ability to finance and route such attack payments to Hezbollah, Hamas, PIJ, JAM, and the IRGC depended upon the Iranian regime's ability to find a Global Financial Institution with a branch in New York that would process enormous volumes of U.S. dollar-denominated transactions over more than a decade in direct violation of at least four distinct types of sanctions regimes imposed by actors based in the United States and designed to prevent terrorist attacks:

a.    **U.S. government country-wide sanctions targeting Iran**, which were in force from 1995 through 2019 and always included, and reflected, a unique focus on country-wide mechanisms that were designed to reduce the frequency of Iranian regime-sponsored terrorist attacks committed by Hezbollah, Hamas, and PIJ against the United States in the Middle East, including against U.S. allies like Israel, by making it harder for the Iranian regime to finance, develop, refine, transport, and transact its petroleum resources.

b.    **U.S. government industry-wide sanctions targeting** Iran's petroleum sector, financial, and shipping sectors, which were in force from 1995 through 2019 and always included, and reflected, the U.S. government's focus on the inextricable – and linear – relationship between the Iranian regime's ability to lever the U.S. financial system to transact in, profit from, and redistribute the spoils of, the regime's petroleum monopoly, and associated interests in the banks and shipping sectors.

c.    **U.S. government targeted entity and individual sanctions** specifically linked to Hezbollah, Bank Saderat, the IRGC and KAA, NIOC, and NITC – including their respective fronts, agents, and operatives – which featured a heavy emphasis on such

terrorist sponsors' use of the U.S. financial system to support petroleum-, Foundation for the Oppressed-, and/or other foundation- or charitable front-related transactions.

d. **U.N. Security Council targeted entity and individual sanctions** specifically linked to the IRGC, Hezbollah, Qasem Soleimani, Rostum Ghasemi, Mohammad Ali Jafari, and KAA, which were in force from at least 2006 through at least 2019, and which always prohibited transactions that benefited any such terrorist sponsors.

906. From 2000 through at least 2014, SCB's above-described sanctions violations directly flowed enough money to make tens of thousands, if not more, attack payments as described above. At then-prevailing rates as described above, SCB's conduct was enough to fund every salary payment, martyr payment, bounty payment, disability payment, and orphan underwritten by Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and/or Foundation for the Oppressed for every attack that killed and injured Plaintiffs and their loved ones – many times over. In fact, SCB's conduct would have financed the attack payments for thousands of such attacks, enough to cover every attack against Plaintiffs many times over.

## ii. Weapons, Training, Logistics, and Tunnel Payments to North Korea's RGB on Behalf of Hezbollah, Hamas, PIJ, and JAM

907. From 2000 through 2019, Ayatollah Khamenei, the SLO, IRGC, Hezbollah, Foundation for the Oppressed, and NIOC relied upon their shared, decades-long, partnership with the North Korean regime, as operationalized by the latter's external terror arm, the RGB.

908. SCB's conduct financed at least three distinct types of lethal aid that amplified the killing power of Hezbollah's, Hamas's, and PIJ's attacks against Plaintiffs. *First*, by deliberately helping known petrochemical fronts that SCB knew to be ultimately owned by NIOC, SCB facilitated the enormous volume of annual oil shipments from Iran to North Korea which allowed the Iranian Terrorist Sponsors to avoid spending much of their precious dollars on needed weapons (since they were paying with oil instead of cash), which freed up such funds for more productive purposes form the perspective of the terrorists' desire to kill people. Simply put, a

single oil tanker shipped to North Korea as facilitated by SCB produced enough economic value to finance thousands of attacks. And SCB helped facilitate at least several such deliveries per year given the scale of SCB's assistance and Iranian shipments to North Korea (both large).

909.     *Second*, RGB trainers and technical specialists used SCB's resources to enhance the potency, accuracy, reliability, and range of Hamas's and PIJ's rocket arsenals – directly increasing the lethality of their attacks against Plaintiffs.

910.     *Third*, RGB tunnel experts built terrorist attack tunnels for Hamas, which amplified the effectiveness of every Hamas attack, and were widely viewed as Hamas's single most important terrorist weapon.

911.     Contemporaneous reports confirm the above points. On July 27, 2014 , for example, the *Telegraph*, a U.K. newspaper, reported as follows:

> Hamas is attempting to negotiate a new arms deal with North Korea for missiles and communications commitment that will allow it to maintain its offensive against Israel, according to Western security sources.
> Security officials say the deal between Hamas and North Korea is worth hundreds of thousands of dollars and is being handled by a Lebanese-based trading company with ties to the militant Palestinian organization.
> Hamas officials are believed to have already made an initial cash downpayment to secure the deal and are hoping that North Korea will soon begin shipping extra supplies of weapons to Gaza.
> "Hamas is looking for ways to replenish its stocks of missiles because of the large numbers it has fired at Israel in recent weeks," said a security official. "North Korea is an obvious place to seek supplies because Pyongyang already has close ties with a number of militant Islamist groups in the Middle East."
> Using intermediaries based in Lebanon, Hamas officials are said to be intensifying their efforts to sign a new agreement with Pyongyang to provide hundreds of missiles together with communications equipment that will improve the ability of Hamas fighters to coordinate operations against Israeli forces.
> Like other Islamist terrorist groups in the region such as Hezbollah, Hamas has forged close links with North Korea, which is keen to support groups opposed to Western interests in the region.
> The relationship between Hamas and North Korea first became public in 2009 when 35 tons of arms, including surface-to-surface missiles and rocket-propelled grenades, were seized after a cargo plane carrying the equipment was forced to make an emergency landing at Bangkok airport. Investigators later confirmed that the arms had been destined

for Iran, which then planned to smuggle them to Hezbollah in Lebanon and Hamas in Gaza.

Israeli military commanders supervising operations against Gaza believe North Korean experts have given Hamas advice on building the extensive network of tunnels in Gaza that has enabled fighters to move weapons without detection by Israeli drones.

The North Koreans have one of the world's most sophisticated network of tunnels beneath the demilitarized zone with South Korea, and Israeli commanders believe Hamas has used this expertise to improve their own.

The Hamas arsenal has become increasingly sophisticated with foreign assistance and now boasts five variants of rockets and missiles.

912.    On March 11, 2016 , similarly, the *Jerusalem Post* reported as follows:

In 2014, North Korea and Hamas struck a deal for the sale of 107-mm. and 102- mm. multiple rocket launchers. Hamas installed some of these systems on pickup trucks. "The tunnels that Hamas dug under Gaza into Israel – the concrete reinforcements – those are North Korean characteristics. I don't know whether North Korea got people into Gaza and trained them, or whether that training occurred in Lebanon. But it is a North Korean modus operandi," [Korea scholar Bruce] Bechtol said. The pattern repeats itself all over the region. In Iran, on a much grander scale, North Korea constructed underground nuclear facilities that can withstand bunker- busting bombs. "They built them in such a way that only a suicide commando mission could get to them," the professor said.

### 2.    SCB's Conduct Financed Thousands of Iranian-Sponsored Attacks Committed by Hezbollah, Hamas, PIJ, and JAM

913.    The significance of SCB-facilitated transactions with IRGC agents and fronts was especially pronounced given the low marginal cost of individual attacks. As Dr. Daniel Byman of Georgetown University observed in 2005, an "advantage of terrorism over conventional force is that it is cheap. Small numbers of terrorists can wreak havoc."

914.    Studies consistently confirmed that the cost of nearly all attacks in by terrorist groups in the Middle East in the post-9/11 era ranged from around $2,000 per attack to around $20,000 per attack, mostly on the low end of that spectrum. IEDs, for example, usually cost around $100 per bomb. Generally, Hamas and Hezbollah fighters were paid around $200 per month, while leaders were paid around $400. As terrorism scholars Jessica Stern and J. M. Berger explained in 2016:

Asymmetrical warfare is defined by asymmetry. Any terrorist ideology that can attract five recruits and the contents of their checking accounts can make headlines for months. A terrorist group with twenty willing recruits and half a million dollars can make headlines for years.

915.    At those rates, even a single SCB transaction that flowed $5,000 to Hezbollah or Hamas would have financed substantial terrorist violence. At the time, a $5,000 payment would have put 10 terrorists (at $200 per fighter) and two commanders (at $400 per commander) in the field for a month and with about 20 IEDs. Or the terrorists could have spent the $5,000 to purchase dozens of bomb components or to finance multiple complex attacks. SCB's payments were orders of magnitude higher. Those payments materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs.

916.    U.S. government studies confirmed the dramatic impact of even marginal financial contributions to Islamists operating in the Middle East. For example, one DoD study of al-Qaeda-in-Iraq—which followed a substantially similar organizational approach as Hezbollah, Hamas, and PIJ when it came to attack logistics—found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack in Iraq required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every $2,700 (or its rough equivalent) SCB flowed to the IRGC, Hezbollah, Hamas, and JAM, they financed roughly one new terrorist attack. Consequently, even a handful of transactions involved in the schemes detailed herein, e.g., transactions related to the Caspian Petrochemical scheme or the Elyassi scheme, were more than enough to fund thousands of attacks—enough to kill and injure every Plaintiff in this case hundreds of times over. SCB knew all of this when it provided the services alleged herein.

917.     This effect was linear. Simply put, more money equaled more acts of terrorism.

As Dr. Margaret Sankey of the U.S. Naval Institute and Air University, concluded in 2022:

> With the caveat and reminder that operations don't cost a large amount in proportion to sustainment, VNSAs [Violent Non-State Actors] whose budgets have been reduced have to make hard decisions about maintaining their capabilities. In some cases, [297] ***there's a clear pattern that more money means more attacks, with al-Qaeda in Iraq consistently increasing by one attack for every $2,700 sent*** by the central leadership to sectors. Mustafa Abu al-Yazid, an al-Qaeda financing chief, put it starkly: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. ***So funding is the mainstay of jihad.***" (Emphasis added.)

918.     Moreover, Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and Foundation for the Oppressed spent most of the profits that SCB helped them generate to directly or indirectly sponsor terrorist attacks targeting the United States and its allies in the Middle East. For the avoidance of all doubt, Plaintiffs do not allege that a small percentage of such profits flowed through to the Terrorist Sponsors and their proxies – Plaintiffs allege that more than half of all such dollars foreseeably enabled Iranian-sponsored attacks.

919.     For starters, regardless of the general merits of the view that it is difficult to ascertain whether, or how much, regime profit flowed through SCB and onto support terrorist violence, such considerations have no relevance with respect to Foundation fort the Oppressed profits, given the Foundation's status as the Iranian regime's first purpose-bult terrorist operations front. Especially so given the U.S. government's publicly-stated finding on November 18, 2020 that the Khamenei, the SLO, and their terrorist allied used most of the Foundation's profits to enrich Khamenei's most important inner circle allies – a direct and unmistakable reference to the Iranian regime's programmatic use of the Foundation's profits to finance the operations s of the Khamenei Cell, which was essentially a who's-who of Khamenei's longest-lasting, closest, and most important allies within the IRGC and Hezbollah.

920.    Terrorism scholars have also confirmed the same. In 2018, for example, Dr.

Farhad Rezaei, of the Association for the Study of the Middle East and Africa, observed:

> Iran would use the influx of capital which it would receive from the sanction relief to *invest in what is known as 'revolutionary export," that is a program to destabilize neighboring countries through direct or proxy involvement in … terror activities.* … [T]here are indications that the regime has spent part of it on its foreign adventurism, … [and] that the regime has *spent some money on other proxies like … Hezbollah in Lebanon and Hamas in Gaza strip, to expand its Shiite influence. … Some of the money comes from … the foundations like Bonyad-e Mostazafan-e Enghelab-e Eslami [Foundation for the Oppressed]. ... However, the evidence supports the [] concern that Iran would utilize the money it had received from the sanctions relief to sponsor terrorism* … Iran has been using the influx of capital which it has received … to invest in what is known as 'revolutionary export,' a code name for spreading the ideology of [Iran] in the region. (Emphasis added.)

### C.    SCB's Conduct Contributed to the Individual Attacks That Targeted Plaintiffs and Their Family Members

921.    SCB's illicit conduct aided the specific terrorist cell leaders and operatives who

committed, planned, or authorized the attacks that killed and injured Plaintiffs.

922.    Under their custom and practice, the IRGC and Hezbollah worked hand-in-glove

with the SLO to ensure that the Terrorist Sponsors' financial apparatus was highly centralized,

which enhanced the link between SCB's transactions and the attacks by Hezbollah, Hamas, PIJ

and JAM. Moreover, the application of the Logistics Policy Directive, mandatory donations

(*khums*), and in-house Hezbollah, IRGC, and SLO auditors and accountants ensured that the

terrorists maintained an ironclad grip over their money – and that Khamenei, in particular, could

ensure that funds were being spent on attacks – which was the reason Khamenei revolutionized

the SLO in the first place back in 1989-1990.

923.    SCB's illicit transactions also had a close nexus to the specific terrorist cells and

operatives who killed and injured Plaintiffs. The following Hezbollah, Hamas, PIJ, and JAM

cells used the profits generated by SCB's illicit services payments to help orchestrate the attacks that targeted Plaintiffs and their family members.

924. The **Khamenei Cell** was the most prominent cell that ensured a direct link between Defendants and the attacks that targeted Plaintiffs. Leadership cells can function as the means by which terrorist groups plan, coordinate, and execute attacks. Few groups better embodied that phenomenon than the IRGC and Hezbollah.

925. Consistent with the mandatory donations (*khums*), about 20% of all profits generated by SCB flowed up to the Khamenei Cell as *khums*, before Khamenei (and Soleimani, to whom Khamenei usually delegated such decisions) redistributed the funds back to Khamenei Cell members, *e.g.*, Qasem Soleimani and Hassan Nasrallah, to finance the attacks they sponsored.

926. Senior U.S. government officials have confirmed that Qasem Soleimani was the primary beneficiary of the illicit profits realized by the Iranian regime through sanctions evasion, which Soleimani redeployed to sponsor proxy attacks by Hezbollah, Hamas, PIJ, and JAM. On May 21, 2018, for example, Secretary of State Pompeo publicly observed as follows:

> The JCPOA permitted the Iranian regime to use the money from the JCPOA to boost the economic fortunes of a struggling people, but the regime's leaders refused to do so. Instead, the government spent its newfound treasure fueling proxy wars across the Middle East and lining the pockets of the Islamic Revolutionary Guard Corps, Hizballah, Hamas, and the Houthis. Remember: Iran advanced its march across the Middle East during the JCPOA. ***Qasem Soleimani has been playing with house money that has become blood money. Wealth created by the West has fueled his campaigns.*** …
> ***
> JAMES: It's clear through your comments this morning that you truly want tough sanctions. … [C]an you ***explain for us the sanctions structure and how you intend to target the Iranian regime without hurting our European friends?*** POMPEO: Well, any time sanctions are put in place, countries have to give up economic activity. So the Americans have given up economic activity now for an awfully long time, and ***I'll concede there are American companies who would love to do business with the Islamic Republic of Iran***. There's a huge market

there. It's a big, vibrant, wonderful peoples. ***But everyone is going to have to participate in this. Every country is going to have to understand that we cannot continue to create wealth for Qasem Soleimani. Right, that's what this is. At the end of the day, this money has flowed to him. The economics have permitted them to run roughshod across the Middle East. Our effort is to strangle his economic capacity to do harm to the Middle East and to the world***.

927.     Defendants' payments helped the Khamenei Cell play a key role in the attacks that killed and injured Plaintiffs. From 2000 through 2020, the Khamenei Cell typically captured about 20% of the income generated through any entity he controlled, including the Foundation for the Oppressed, SLO, IRGC, and Hezbollah – including the profits caused by the transactions that SCB illicitly managed. Given this standard practice, and the volume of profits generated by SCB, the Bank's illicit conduct likely delivered well in excess of $20 million per year to the Khamenei Cell.

928.     Khamenei, Soleimani, and the Khamenei Cell directly participated in the attacks that killed and injured Plaintiffs as follows:

a.     Rocket Attacks: Khamenei, Soleimani, and the Khamenei Cell participated in Hezbollah's, Hamas's, and PIJ's rocket attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hezbollah's, Hamas's, PIJ's and JAM's terms for de-escalation; and (3) facilitate the regular re-supply of the rockets from North Korea's RGB; (4) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments; and (5) through Qasem Soleimani's in-person leadership role coordinating the Hezbollah's, Hamas's, and PIJ's rocket operations.

b.     Knife and Vehicle Ramming Attacks: Khamenei, Soleimani, and the Khamenei Cell participated in Hezbollah's, Hamas's, and PIJ's knife and vehicle ramming attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hezbollah's, Hamas's, PIJ's and JAM's terms for de-escalation; and (3) regularly issue calls for additional martyrs and support for the knife and vehicle intifadas; and (4) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

c.     Small Arms/Assassination Attacks: Khamenei, Soleimani, and the Khamenei Cell participated in Hezbollah's, Hamas's, and PIJ's rocket attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2)

help Hezbollah's, Hamas's, PIJ's and JAM's terms for de-escalation; and (3) facilitate the regular re-supply of the small arms, sniper rifles, and ammunition from North Korea's RGB; (4) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

d.   <u>Hostage-Taking Attacks</u>: Khamenei, Soleimani, and the Khamenei Cell participated in Hezbollah's, Hamas's, and PIJ's hostage-taking attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) continue seeking to kidnap American and Israeli hostages; (2) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments; and (3) through Qasem Soleimani's in-person leadership role coordinating the Hezbollah's, Hamas's, and PIJ's rocket operations.

e.   <u>EFP Attacks</u>: Khamenei, Soleimani, and the Khamenei Cell participated in Hezbollah's and JAM's EFP attacks in Iraq in 2011 by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hezbollah's, Hamas's, PIJ's and JAM's terms for de-escalation; (3) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments; and (4) through Qasem Soleimani's in-person leadership role coordinating the Hezbollah's and JAM's EFP attacks.

### D.   SCB's Conduct Supplied Long-Lasting Assistance That Continued Aiding Iranian Regime-Sponsored Terrorist Attacks Committed by Hezbollah, Hamas, PIJ, and JAM Until at Least 2019

929.   SCB's conduct supplied unusually long-lasting assistance to attacks committed by Hezbollah, Hamas, PIJ, and JAM in at least five ways.

930.   *First*, the uniquely long "tail" of petroleum industry investments ensured that projects and contractual relationships that SCB helped the Iranian Terrorist Sponsors secure in 2014 or 2015 continued flowing profits for years thereafter.

931.   *Second*, SCB's assistance allowed key terrorists who sponsored the attacks against Plaintiffs to enhance the personal jihad networks upon which they relied to maximize the power of their attacks. For example, when Qasem Soleimani had more money, he could pay more people to assist on matters like intelligence, logistics, and recruitment. The larger the operatives' network, the more lethal their attacks.

932.     *Third*, SCB's conduct helped Hezbollah, Hamas, PIJ, and JAM stockpile weapons for future attacks years later. Consistent with IRGC and Hezbollah practice, Hezbollah, Hamas, PIJ, and JAM all emphasized long-term logistical planning, and massing weapons stockpiles.

933.     *Fourth*, SCB's conduct helped the Iranian Terrorist Sponsors finance the construction of a latticework of terrorist attack tunnels in Gaza and southern Lebanon, which led to a corresponding increase in terrorist attacks. Among other things, the tunnels facilitated rocket attacks because terrorists fired rockets from inside purpose-bult tunnels, thus maintaining cover, and the tunnel network allowed terrorists to continuously change the location form which they fired, which increased the survivability (for the terrorists) and therefore led to more attacks.

934.     *Fifth*, SCB supplied the terrorists with an impossible-to-overstate sum likely ranging into the billions of dollars. At such amounts, the financial windfall SCB bestowed upon Hezbollah, Hamas, PIJ, and JAM (via the Terrorist Sponsors) continued powering attacks for many years after SCB stopped its conduct.

**E.     The Iranian Regime Used Most of the Profits Generated by SCB's Schemes to Directly and Indirectly Sponsor Attacks Committed, Planned, or Authorized by the IRGC, Hezbollah, Hamas, PIJ, JAM, and Their Axis of Resistance Allies**

935.     Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and Foundation for the Oppressed spent most of the profits that SCB helped them generate to directly or indirectly sponsor terrorist attacks targeting the United States and its allies in the Middle East. For the avoidance of all doubt, Plaintiffs do not allege that a small percentage of such profits flowed through to the Terrorist Sponsors and their proxies – Plaintiffs allege that more than half of all such dollars foreseeably enabled Iranian-sponsored attacks.

936.     For starters, regardless of the general merits of the view that it is difficult to ascertain whether, or how much, regime profit flowed through SCB and onto support terrorist

violence, such considerations have no relevance with respect to Foundation fort the Oppressed profits, given the Foundation's status as the Iranian regime's first purpose-bult terrorist operations front. Especially so given the U.S. government's publicly-stated finding on November 18, 2020 that the Khamenei, the SLO, and their terrorist allied used most of the Foundation's profits to enrich Khamenei's most important inner circle allies – a direct and unmistakable reference to the Iranian regime's programmatic use of the Foundation's profits to finance the operations s of the Khamenei Cell, which was essentially a who's-who of Khamenei's longest-lasting, closest, and most important allies within the IRGC and Hezbollah.

937.    Terrorism scholars have also confirmed the same. In 2018, for example, Dr. Farhad Rezaei, of the Association for the Study of the Middle East and Africa, observed:

> Iran would use the influx of capital which it would receive from the sanction relief to ***invest in what is known as 'revolutionary export," that is a program to destabilize neighboring countries through direct or proxy involvement in … terror activities.*** … [T]here are indications that the regime has spent part of it on its foreign adventurism, … [and] that the regime has ***spent some money on other proxies like … Hezbollah in Lebanon and Hamas in Gaza strip, to expand its Shiite influence. … Some of the money comes from … the foundations like Bonyad-e Mostazafan-e Enghelab-e Eslami [Foundation for the Oppressed]. … However, the evidence supports the [] concern that Iran would utilize the money it had received from the sanctions relief to sponsor terrorism*** … Iran has been using the influx of capital which it has received … to invest in what is known as 'revolutionary export,' a code name for spreading the ideology of [Iran] in the region. (Emphasis added.)

938.    On December 2, 2015, Representative Eliot Engel, publicly warned companies and banks, including Defendants, that "logic says that if the goal of the Iranian regime, the Revolutionary Guards and the entire regime, is to sponsor terrorism to destabilize the region, now that they have money and it is not going to be a sacrifice, they are going to use it for terrorism. When the Rial, their currency was in the toilet, when their people clamored for more freedoms or more things that they needed, Iran, the government, the regime didn't care. The

regime made sure, though, that groups like Hezbollah and even Hamas, which of course is the other side of the Sunni-Shia spectrum, had enough money. So now that Iran has money and it is not going to be so painful, … it is very easy to imagine, and it is not imagination, that [the IRGC] will have more money to support more terrorism."

939.     On December 2, 2015, Representative Ileana Ros-Lehtinen, publicly warned companies and banks, including Defendants, that "the IRGC is one of the major actors in the Iranian economy with a presence in nearly every sector" and given the IRGC's anti-American mission, the IRGC "will use the" money "it gets …. for its terror activities, instead of [choosing] that the [IRGC's additional] money will be used to shore up a failing Iranian economy." Representative Ros-Lehtinen continued:

> [W]hen you think about … whether or not the Iranian Government is going to take [new money it earns] … and direct it into the IRGC[,] … think … about the fact that after the negotiations began in 2014, the IRGC budget went up …, and this was just in anticipation of sanctions relief. This was publicly stated. This was publicly declared. So … if you are asking yourself how the [IRGC] [is] going to spend [new] money [it earns], [the IRGC] ha[s] already been very clear in indicating it. [And remember that] … it is cheap to pull off a terrorist attack.

940.     On December 2, 2015, Ali Alfoneh (Senior Fellow, Foundation for Defense of Democracies), testified before Congress that when complex Iranian transactions produce substantial value transfers to fronts owned or controlled by the IRGC, "[m]uch of the money … is going to be channeled … directly to the military budget of the Revolutionary Guards … [while] … the … Revolutionary Guard is pursuing policy objectives in the Middle East region which are … totally opposed to U.S. objectives."

941.     When the U.S. government announced new counterterrorism sanctions against the IRGC on May 1, 2020, for example, Treasury Secretary Mnuchin warned companies and banks, including Defendants, that "[t]he Iranian regime and its supporters continue to prioritize the

funding of international terrorist organizations over the health and well-being of the Iranian people."

942.     From 2017 through 2024, the U.S. government regularly found—on a bipartisan basis—that the Iranian regime used *most* of the profits resulting from the lack of application of sanctions to sponsor terrorism. Such statements and reports included, but were not limited to:

a.    Amb. Nathan Sales (Coordinator for Counterterrorism, U.S. Dep't of State), November 13, 2018: "And who ultimately pays the price of this support? The Iranian people. The resources Iran uses to fund its global terrorist campaign come directly out of the pockets of ordinary Iranians. The regime robs its own citizens to pay its proxies abroad. Tehran's priorities are clear. It doesn't seek to boost economic growth at home, or to improve Iranian living standards. It doesn't seek to reduce Iran's growing unemployment. What the regime prioritizes, despite the country's increasing economic distress, is buying guns and bombs for foreign terrorists. Tragically, this vast waste of the Iranian people's assets has resulted in bloodshed and instability across the globe."

b.    U.S. Department of the Treasury, November 20, 2018: "'The Iranian regime continues to prioritize spending money on fomenting terror over supporting its own people,' said Undersecretary for Terrorism and Financial Intelligence, Sigal Mandelker. 'This is yet another example of the regime using the proceeds of millions of barrels of its oil to fund terrorists and the murderous Assad regime to the detriment of its own people.'"

c.    Wally Adeyemo (United States Deputy Secretary of the Treasury), April 9, 2024: "Senator, you're right that in democracy, money is fungible. But what we've seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people. That's partially why almost none of the humanitarian money has been used for humanitarian purposes is because they don't care about getting food and drugs for their people but the difference is the United States of American has made, as a values proposition, that we are always going to provide humanitarian relief for people. And that's what we said is the only purpose for this money. So while in our country money is fungible, in Iran, they've proven that any dollar they get that they have direct access to in the country will be used for the IRGC before it's ever used for their people."

d.    U.S. Senate Committee on Banking, Housing, and Urban Affairs (Minority Staff), April 12, 2024: "After U.S. Department of Treasury Deputy Secretary Wally Adeyemo admitted in testimony that any dollar Iran has access to funds terrorism, Ranking Member Tim Scott (R-S.C.) continues to press the Biden administration on U.S. enabled payments to Iran. In a letter to Treasury Secretary Janet Yellen, Ranking Member Scott … wrote, 'As we have previously discussed, I have serious concerns with U.S.-enabled efforts that increase Iran's access to sanctioned funds—funds that directly support Iran's terror proxies throughout the Middle East. Unfortunately, the testimony that was delivered

before the Committee has only elevated those concerns by making it abundantly clear that the current sanctions relief and humanitarian assistance scheme provided to Iran are not viable solutions, and rather deteriorate U.S. national security interests. … Given the proven track-record Iran has on redirecting so-called humanitarian assistance to 'violent activity,' as characterized by Treasury, we must operate under the assumption that every dollar made available to Iran is another dollar that will be used to put U.S. servicemembers in harm's way or threaten our allies, especially Israel…In light of this, I am requesting an accounting of all international high-value Iranian assets around the world that are currently blocked by U.S. sanctions as well as additional steps Treasury will now take to actively account for current funds that have already been released to Iran. Not a single dollar, euro, or dinar, sanctioned by the United States should ever be released to Iran when this Administration actively recognizes that any money to Iran supports terrorism.'"

943. COVID offered a grim case study that confirmed, in real-time, that the IRGC always directed all or nearly all IRGC income from fronts, black markets, and other IRGC sources to the IRGC's primary mission: sponsoring acts of international terrorism targeting the United States as part of the IRGC's "Resistance" on behalf of the "Oppressed." On October 9, 2020, the U.S. government imposed additional counterterrorism sanctions on the IRGC and warned companies and banks, including Defendants, that:

> [W]hile COVID-19 was spreading through Iran, regime officials asked Supreme Leader Khamenei to urgently release funds to respond to the outbreak. Despite Khamenei's assurances to do so, Iran's Health Minister revealed last week that the Health Ministry had received only a small fraction of those funds. The Health Minister asked[,] "What are they using it for that could be more important?" We know the answer. In 2018 and 2019, Khamenei raided $4 billion from the Iranian National Development Fund for military expenses. And while the Health Ministry was pleading for resources to protect the Iranian people from the outbreak, Khamenei instead increased funding for the Islamic Revolutionary Guard Corps, a designated Foreign Terrorist Organization, by a third, and doubled the funding for the regime's Basij forces that terrorize the Iranian people every single day.
>       Our sanctions are directed at the regime and its corrupt officials that have used the wealth of the Iranian people to fuel a radical, revolutionary cause that has brought untold suffering across the Middle East and beyond.

**F.** **U.S. Government Findings from 2017 through 2024 Confirm That SCB's Illicit Services Funded Iranian Regime-Sponsored Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM**

944.     From 2017 through 2024, The U.S. government explicitly confirmed that sanctions-busting transactions like those of SCB directly financed Iranian-sponsored terrorist attacks committed by Hezbollah, Hamas, PIJ, and JAM from 2006 through 2020

945.     Official United States sanctions announcements, legislative findings enshrined by Congress in the U.S. code, and Executive Branch reports to Congress under penalty of perjury operated as one-way ratchet with respect to the plausibility of Plaintiffs' allegations: while such U.S. reports can confirm a point, the absence of a report (or a particular finding) usually means little (if anything) in the sort of counterterrorism analysis that a counterterrorism practitioner following the normal custom and practice of the counterterrorism would follow to offer an opinion as to the likelihood that a particular entity or persons sponsors terrorist violence if other indicators warrant such conclusion. This one-way-ratchet existed for at least four reasons. *First*, to impose sanctions, the Executive Branch follows a standard that is effectively more demanding than a simple "more likely than not" analysis. Accordingly, the mere fact that a person or entity is more likely than not a terrorist is not, on its own, usually enough to cause the U.S. to impose sanctions. *Second*, given the extensive U.S. government interagency process that the United States follows every time it imposes sanctions – which ordinarily takes at least several years, and often longer – U.S. sanctions announcements often reflect a multi-year time-lag as compared to then-publicly known facts about terrorists and associated terrorist finance. *Third*, while the United States government sometimes makes diplomatic decisions to hold off announcing sanctions – or avoid imposing sanctions at all – even when the U.S. government concluded that the subject entity or person sponsors terrorists, Plaintiffs are aware of no reported instance – or

credible allegation – in which the United States imposed counterterrorism sanctions for pretextual purposes.

946. **Foundation for the Oppressed.** On September 25, 2018, President Trump told the U.N. General Assembly in a globally televised address that "Iran's leaders sow chaos, death, and destruction" by "plunder[ing] the nation's resources to enrich themselves and to spread mayhem across the Middle East and far beyond," "seiz[ing] valuable portions of the economy, and loot[ing] the people's religious endowments" – the largest of which was the Foundation for the Oppressed – "all to line their own pockets and send their proxies to wage war."

947. On November 18, 2020, the United States designated the Foundation for the Oppressed, confirmed that it served as a "bridge to the IRGC," and announced:

> OFAC … act[ed] … against a key patronage network for the Supreme Leader of Iran, the … Bonyad Mostazafan [Foundation for the Oppressed] … While Bonyad Mostazafan is *ostensibly* a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to … enrich his office, reward his political allies, and persecute the regime's enemies. … "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the pretense of charity," said Secretary Steven T. Mnuchin. …
>
> **PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
> Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah. Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah. Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials. According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . . The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

948. In the same designation, Treasury confirmed that the Foundation for the Oppressed served primarily as a front for terror and performs little legitimate charitable work:

"[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

949.    On January 13, 2021, Treasury imposed additional sanctions on Iranian bonyads, and again noted the Foundation for the Oppressed's direct role in IRGC-sponsored terrorism:

> [P]urportedly charitable organizations (bonyads) …control large swaths of the Iranian economy … to the benefit of Supreme Leader Ali Khamenei and senior Iranian … officials. Alongside the previously designated Bonyad Mostazafan, itself controlled by the Supreme Leader, and the IRGC-owned Khatam al-Anbiya, bonyads are said to control more than half of the Iranian economy.
>
> "These institutions enable Iran's elite to sustain a corrupt system of ownership over large parts of Iran's economy," said Secretary Steven T. Mnuchin. "The United States will continue to target those who enrich themselves while claiming to help the Iranian people." …
>
> This action follows Treasury's November 2020 designation of the Bonyad Mostazafan [Foundation for the Oppressed], an immense conglomerate with holdings in key sectors of Iran's economy. … Bonyad Mostazafan has been the beneficiary of favorable treatment by Iran's corrupt leadership, and its assets have been used by the Supreme Leader Ali Khamenei to enrich his office, reward his political allies, and persecute the regime's perceived enemies.
>
> **IRANIAN BONYADS**
>           Bonyads are opaque, quasi-official organizations generally controlled by current and former government officials and clerics that report directly to the Supreme Leader. Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly approved. This lack of accountability has enabled the bonyads to expand their economic activities far beyond their original remit and has led to the accumulation of vast amounts of wealth without …benefit to the people of Iran.

950.    The U.S. government statements confirming the Foundation for the Oppressed's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that the Foundation was

closely intertwined with terrorist violence because the Qods Force and Hezbollah used Foundation revenues to finance terrorist attacks.

951. **Supreme Leader's Office.** On June 26, 2019, the United States issued Executive Order 13,876, which formally found that the SLO directly facilitated IRGC-sponsored acts of "international terrorism committed by "Iranian-backed proxies" in the "Middle East."

952. On November 5, 2019, the United States imposed IRGC counterterrorism-related sanctions against the SLO to target its sponsorship of terrorist attacks committed by the Qods Force, Hezbollah, and their proxies, based upon findings that included as follows:

> OFAC … act[ed] … against … individuals who are appointees of, or have acted for or on behalf of, Ali Khamenei, the Iranian regime's unelected Supreme Leader whose office is responsible for advancing Iran's radical agenda. This action seeks to block funds from flowing to a shadow network of Ali Khamenei's military and foreign affairs advisors who have for decades oppressed the Iranian people, exported terrorism, and advanced destabilizing policies around the world. Specifically, the action targets Ali Khamenei's appointees in the Office of the Supreme Leader ….
>
> "Today the Treasury Department is targeting the unelected officials who surround Iran's Supreme Leader, Ayatollah Khamenei, and implement his destabilizing policies," said Treasury Secretary Steven T. Mnuchin. "These individuals [in the SLO] are linked to a wide range of malign behaviors by the regime, including bombings of the U.S. Marine Barracks in Beirut in 1983 and the Argentine Israelite Mutual Association in 1994, as well as torture, extrajudicial killings, and repression of civilians. This action further constricts the Supreme Leader's ability to execute his agenda of terror and oppression."
>
> This action is being taken pursuant to President Donald J. Trump's Executive Order (E.O.) 13876, signed on June 24, 2019. The E.O. imposed sanctions on the Supreme Leader of the Islamic Republic of Iran and the Supreme Leader's Office (SLO), and authorized sanctions on others associated with the Supreme Leader or the SLO. …
>
> Mojtaba Khamenei, the second son of [Khamenei], is designated today for representing the Supreme Leader in an official capacity despite never being elected or appointed to a government position aside from work in the office of his father. The Supreme Leader has delegated a part of his leadership responsibilities to Mojataba [sic] Khamenei, who worked closely with the commander of the … Qods Force [*i.e.*, Qasem Soleimani] … to advance [Ayatollah Khamenei]'s destabilizing regional ambitions ….
>
> Also designated today is Gholam-Ali Hadad-Adel, father-in-law of Mojtaba Khamenei, a member of the Expediency Council and also an advisor to

Ali Khamenei. Hadad-Adel is known to be among those in the Supreme Leader's inner circle. … Gholam-Ali Hadad-Adel is being designated [pursuant to E.O. 13876] for having acted or purported to act for or on behalf of, directly or indirectly, the Supreme Leader of Iran.

953. Notably, Mojtaba Khamenei and Gholam-Ali Hadad-Adel both operated through Petro Nahad, and thus, the above findings also confirm the tight nexus between Petro Nahad and Qods Force-sponsored attacks supported by Qasem Soleimani—which describes every attack against Plaintiffs and their loved ones.

954. On November 3, 2022, the United States imposed additional IRGC counterterrorism-related sanctions against the SLO to target its direct and indirect sponsorship of acts of terrorism committed by the Qods Force, Hezbollah, and their proxies, based upon findings that included as follows:

[OFAC] designated members of an international oil smuggling network that facilitated oil trades and generated revenue for Hizballah and the … Qods Force … in support of Hizballah and the IRGC-QF.

"The individuals running this illicit network use a web of shell companies and fraudulent tactics including document falsification to obfuscate the origins of Iranian oil, sell it on the international market, and evade sanctions," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "Market participants should be vigilant of Hizballah and the IRGC-QF's attempts to generate revenue from oil smuggling to enable their terrorist activities around the world." …

[An] Iranian national … oversaw … the network's illegal … exportation of Iranian oil in support of Hizballah and the IRGC-QF … [and] received orders from high-ranking Iranian officials associated with the U.S.-designated [] Supreme Leader's Office to direct the network's oil smuggling operation profits to companies and bank accounts associated with Hizballah and the IRGC-QF.

955. That same day, Secretary of State Antony J. Blinken confirmed that the U.S. had sanctioned this SLO-directed, Hezbollah- and Qods Force-operated "sanctions evasion network" and "11 vessels" because the United States determined that they "provid[ed] support to Hizballah and the Islamic Revolutionary Guard Corps-Qods Force" when they "facilitate[d] the sale of hundreds of millions of dollars' worth of oil for these organizations [*i.e.*, Hezbollah and the Qods

Force]" through the use of "shell and front companies established to facilitate the illegal blending and exportation of Iranian oil around the world," which the United States determined "provid[ed] support to terrorists or acts of terrorism" by Hezbollah and the Qods Force.

956.     From at least 2021 through 2024, the United States publicly sanctioned "Ali Husseini Khamenei, Supreme Leader, for support of the IRGC, a Foreign Terrorist Organization," and "Mojtaba Khamenei, son of Supreme Leader," which identified Ayatollah Khamenei and Mojtaba Khamenei as persons whom the U.S. had sanctioned pursuant to "Section 221 of the Iran Threat Reduction and Syria Human Rights Act of 2012, Public Law 112-158 (TRA), enacted on August 10, 2012, codified at 22 U.S.C. 8727, requires the President to publish a list of individuals that the President has determined are senior officials of the Government of Iran, as defined in the statute, that are involved in Iran's illicit nuclear activities or proliferation of weapons of mass destruction (WMD) or delivery systems for WMD; support for international terrorism; or the commission of serious human rights abuses against Iranian citizens or their family members."

957.     The U.S. government statements confirming the SLO's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and Hezbollah. These sources show that the SLO was closely intertwined with terrorist violence because the Qods Force and Hezbollah used the SLO's profits to finance terrorist attacks.

958.     **IRGC.** On July 17, 2017, the United States announced new IRGC-related sanctions, and warned that "[t]he United States remains deeply concerned about" how the "Islamic Revolutionary Guard Corps (IRGC)" enabled "Iran's malign activities across the Middle East," because the IRGC "continues to support terrorist groups such as Hizballah."

959.     On August 2, 2017, Congress enacted, and the President signed, the Countering America's Adversaries Through Sanctions Act, an amendment to the U.S. Code that formally codified that "Congress makes the following findings: ... (2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the ''IRGC–QF'') … support[s] terrorist and insurgent groups [by] … provid[ing] material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia"; and "(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of … support for acts of international terrorism …." § 105, 22 U.S.C. § 9404, Pub. L. No. 115-44, 131 Stat. 892 (2017). Moreover, the updated U.S. Code noted "the IRGC, including the Quds Force … [provided] support, including funding, lethal and nonlethal contributions, and training, … to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East." § 103(b)(5), 22 U.S.C. § 9402, Pub. L. No. 115-44, 131 Stat. 889 (2017).

960.     On October 13, 2017, the United States designated the entirety of the IRGC as a Specially Designated Global Terrorist, and stated, in part, as follows:

a.     Treasury: "OFAC … designated [the] Islamic Revolutionary Guard Corps (IRGC) pursuant to the global terrorism Executive Order (E.O.) 13224 and consistent with the Countering America's Adversaries Through Sanctions Act. OFAC designated the IRGC today for its activities in support of the IRGC-Qods Force (IRGC-QF), which was designated pursuant to E.O. 13224 on October 25, 2007, for providing support to a number of terrorist groups, including Hizballah and Hamas …. The IRGC has provided material support to the IRGC-QF, including by providing training, personnel, and military equipment."

b.     Treasury: "'The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. … Treasury will continue using its authorities to disrupt the IRGC's destructive activities,' said Treasury Secretary Steven T. Mnuchin. 'We are designating the IRGC for providing support to the IRGC-QF, the key Iranian entity enabling … the lethal activities of Hizballah, Hamas, and other terrorist groups. We urge the private sector to recognize that the IRGC permeates much of the Iranian economy, and those who transact with IRGC-controlled companies do so at great risk.'"

c. Treasury: "The IRGC was designated today for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."

d. White House: "[T]he Iranian regime continues to fuel … terror … throughout the Middle East and beyond" through "[t]he Revolutionary Guard['s]" deployment as "the Iranian Supreme Leader's corrupt personal terror force."

e. White House: "In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to … Hezbollah, Hamas, and other terrorist networks."

f. White House: "The Revolutionary Guard … has hijacked large portions of Iran's economy and seized massive religious endowments [*i.e.*, bonyads or foundations, *e.g.*, the Foundation for the Oppressed] to fund … terror abroad. This includes … supplying proxies and partners with missiles and weapons to attack civilians in the region[] and even plotting to bomb a popular restaurant right here in Washington, D.C."

g. White House: "I am authorizing … Treasury … to further sanction the entire [IRGC] for its support for terrorism and to apply sanctions to its officials, agents, and affiliates."

961. On October 16, 2017, Treasury Under Secretary Sigal Mandelker publicly

confirmed how the entire IRGC was involved in supporting terrorist attacks in the Middle East

committed by Hezbollah, Hamas, PIJ, and JAM:

a. "[T]here are few more pressing national security concerns for the United States and the international community right now than the growing threat posed by … [t]he Iranian regime," which was "wreaking havoc on the Middle East and beyond" and providing "state support of terrorism" that was "second-to-none" by "financ[ing] and support[ing] Hizballah, Hamas, and … Iraqi … militant groups" by "seed[ing] these terror groups with increasingly destructive weapons as they try to establish footholds from Iran to Lebanon and Syria" and such "aid [was] primarily delivered by … the IRGC[] and its Quds Force, which … [existed as] vehicles to cultivate and support terrorists abroad."

b. "The IRGC has even threatened terrorist attacks right here in the United States, plotting the murder of Saudi Arabia's Ambassador to the United States on American soil in 2011. Such an attack—if not thwarted by our terrific law enforcement and intelligence officers—would have not only killed a Saudi diplomat, but likely innocent bystanders here in Washington, DC."

c. "[The United States's] Iran strategy … is designed to neutralize Iran's destabilizing influence and support for terrorists and militants. It includes four strategic objectives: First, we must neutralize Iran's destabilizing activities and constrain Iran's aggression, particularly its support for terrorism and militants with a focus on its activities in the

Middle East …[,] includ[ing] its actions in Syria, which threatens Israel, and its support to terrorism through groups like Hizballah, Hamas, Iraqi Shia militant groups and others. Second, we must work to deny Iran and especially the IRGC funding for its malign activities, including its funding for terrorists and militant proxies …"

d.  "On [October 13, 2017], OFAC designated the IRGC for support to terrorism under Executive Order 13224, consistent with section 105 of the Countering America's Adversaries Through Sanctions Act passed in August. The President also authorized us to take additional action against the IRGC's officials, agents, and affiliates later this month. The IRGC designation … further increases the pressure on the IRGC. It also highlights the nefarious nature of the organization. Beyond being a proliferator of weapons and a supplier of militants and military equipment – actions for which it has been previously sanctioned by the United States – the IRGC has helped make Iran the world's leading state sponsors of terrorism."

e.  "The IRGC provides the organizational structure that allows them to export their militant extremism across the globe. It has been the Iranian regime's main weapon in pursuit of its radical goals and is a lifeline for Hizballah, … Shia militant groups in Iraq, and others. The IRGC's control over large portions of the Iranian economy furthers its ability to support these groups and enrich its members. In order to deny the IRGC the resources and financing it needs to spread instability, we must and we have been engaging our allies and partners, including those in the private sector."

f.  "[T]o deny the IRGC the resources and financing it needs to spread instability, we … have been engaging … the private sector. We have consistently raised concerns regarding the IRGC's malign behavior, the IRGC's level of involvement in the Iranian economy, and its lack of transparency. We have pointed out that the IRGC continues to be an integral part of the Iranian economy, including in the energy, construction, mining, and defense sectors. And as we have urged the private sector to recognize that the IRGC permeates much of the Iranian economy, we have told them that those who transact with IRGC-controlled entities do so at their own risk."

962.    On May 8, 2018, the United States announced new sanctions against the IRGC

confirming:

The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles … and supports terrorist proxies and militias such as Hezbollah [and] Hamas …. Over the years, [the IRGC] and its proxies have bombed American embassies and military installations, murdered hundreds of American servicemembers, and kidnapped, imprisoned, and tortured American citizens. The Iranian regime has funded [the IRGC's] long reign of chaos and terror by plundering the wealth of its own people.

963.    On October 1, 2018, the United States published its counterterrorism strategy,

confirming that the IRGC continued to seek to leverage its global networks of financiers,

logisticians, and recruits, including persons in the United States, to sponsor acts of terrorism

targeting the United States:

> Iran remains the most prominent state sponsor of terrorism, supporting militant and terrorist groups across the Middle East and cultivating a network of operatives that pose a threat in the United States and globally. These groups, most notably Lebanese Hizballah (Hizballah), use terrorism … in partnership with Iran to expand their influence in Iraq, Lebanon, [and] the Palestinian territories …. Hizballah fields powerful military and intelligence elements, possesses large stocks of sophisticated arms, and maintains extensive networks of operatives and sympathizers overseas, including individuals in the [United States] homeland.

964.     On October 11, 2018, FinCEN published its *Advisory On The Iranian Regime's Illicit And Malign Activities And Attempts To Exploit The Financial System*, in which FinCEN warned multinational companies and banks, including SCB, that whenever a company or bank enables the IRGC's "Abuse of the International Financial System … to access the financial system through covert means and to further [the IRGC's] malign activities [by] … misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, … *[o]ften, these efforts serve to fund the regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), as well to Lebanese Hizballah, … and other [IRGC proxy] terrorist groups.*" (Emphasis added.) Treasury's rollout confirmed, *inter alia*:

a.     "[T]he Iranian regime has masked illicit transactions using senior officials of the CBI, who used their official capacity to procure hard currency and conduct transactions for the benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised to exercise appropriate due diligence when dealing with transactions involving exchange houses that may have exposure to the Iranian regime and/or designated Iranian persons, and the advisory details examples of exchange house-related schemes. Iran-related actors use front and shell companies around the world in procurement networks through which

the Iranian regime has gained goods and services related to currency counterfeiting, dual-use equipment, and the commercial aviation industry."

b.    "In order to help financial institutions identify deceptive activity potentially linked to the Iranian regime, FinCEN has included red flags in its advisory. For example, CBI officials' routing transactions to personal accounts rather than central bank or government-owned accounts, and individuals or entities with no central bank or government affiliation withdrawing funds from such accounts, may be a red flag for financial institutions to investigate. Similarly, wire transfers or deposits that do not contain any information on the source of funds, contain incomplete information about the source of funds, do not match the customer's line of business, or that involve jurisdictions where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions."

965.    On April 8, 2019, the U.S. announced its intention to formally designate the entire

IRGC—including regular IRGC, the Qods Force, and the Basij—as an FTO, which the U.S. did

on April 15, 2019. During the rollout, U.S. officials warned, in part, as follows:

a.    <u>President Donald J. Trump, April 2019</u>: "Today, I am formally announcing my Administration's plan to designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act. This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign. This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. … If you are doing business with the IRGC, you will be bankrolling terrorism."

b.    <u>Secretary of State Michael R. Pompeo, April 2019</u>: "I'm here to make an important foreign policy announcement concerning the Islamic Republic of Iran. Today the United States is continuing to build its maximum pressure campaign against the Iranian regime. I am announcing our intent to designate the Islamic Revolutionary Guard Corps, including its Qods Force, as a foreign terrorist organization in accordance with Section 219 of the Immigration and Nationality Act. … This is the first time that the United States has designated a part of another government as an FTO. We're doing because the Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government. This historic step will deprive the world's leading state sponsor of terror the financial means to spread misery and death around the world. … Our [IRGC FTO] designation makes clear to the world that Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem

Soleimani. He is the commander of the Qods Force and oversees Iran's forces deployed to advance the Islamic Revolution through terrorism and other forms of violence. He doles out the regime's profits to terrorist groups across the region and around the world. … [T]he mission of this [U.S.] designation [of the IRGC as a Foreign Terrorist Organization is] … to achieve the outcomes that we laid out back in May [2018] to … [stop the IRGC from] … risking American lives each and every day."

c.   State, April 2019: "The IRGC – primarily through its Qods Force – is the primary arm of the Iranian government that carries out and directs Tehran's dangerous and destabilizing global terrorist campaign. The IRGC provides funding, equipment, training and logistical support to a broad range of terrorist and militant organizations, totaling approximately one billion dollars annually in assistance. The IRGC has also been directly involved in terrorist plotting and related activity in many countries … The IRGC is integrally woven into the Iranian economy, operating front companies and institutions around the world that engage in both licit and illicit business activity. The profits from what appear to be legitimate business deals could end up … supporting Iran's terrorist agenda."

966.    On April 15, 2019, the United States designated the entire IRGC, including regular IRGC, the Qods Force, and the Basij, as an FTO for, *inter alia*, "provid[ing] financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, … and other terrorist group[s]…." In support, State concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Announcing the designation, Secretary of State Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks . . . alongside the terror group it midwifed, Lebanese Hizballah." Secretary Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors." As State reported to Congress in 2020, its "designat[ion]" of the "IRGC as an FTO in April 2019" was a "historic action" and

"unprecedented step," which "reflected the Iranian regime's unique place among the governments of the world in its use of terrorism as a central tool of its statecraft."

967. On January 14, 2020, President Trump implemented Executive Order 13,902, which imposed additional counterterrorism sanctions on the IRGC, and found, *inter alia*:

a. "[The President] find[s] that Iran continues to be the world's leading sponsor of terrorism and that Iran has threatened United States military assets and civilians through the use of military force and support to Iranian-backed militia groups. It remains the policy of the United States to …counter the totality of Iran's malign influence in the region. In furtherance of these objectives, it is the policy of the United States to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and terrorist proxy networks …."

b. "[The President] hereby determine[s] that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair the President's ability to deal with the national emergency declared in Executive Order 12957 [*i.e.*, the IRGC's sponsorship of acts of terrorism targeting the United States]."

968. On March 26, 2020, Treasury announced new counterterrorism sanctions against the IRGC pursuant to E.O. 13,324 and reported findings as follows:

a. "OFAC … today designated 20 Iran- and Iraq-based front companies, senior officials, and business associates that provide support to or act for or on behalf of the Islamic Revolutionary Guards Corps-Qods Force (IRGC-QF) in addition to transferring lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah (KH) and Asa'ib Ahl al-Haq (AAH). Among other malign activities, these entities and individuals perpetrated or supported: smuggling through the Iraqi port of Umm Qasr; money laundering through Iraqi front companies; selling Iranian oil to the Syrian regime; smuggling weapons to Iraq …; promoting propaganda efforts in Iraq on behalf of the IRGC-QF and its terrorist militias …. The terrorist militias supported by the Iranian regime such as KH and AAH have continued to engage in attacks on U.S. and Coalition forces in Iraq."

b. "'Iran employs a web of front companies to fund terrorist groups across the region, siphoning resources away from the Iranian people and prioritizing terrorist proxies over the basic needs of its people,' said Treasury Secretary Steven T. Mnuchin."

969. On May 1, 2020, the United States announced new counterterrorism sanctions against the IRGC and confirmed that "senior officials of [the] Islamic Revolutionary Guard

Corps-Qods Force (IRGC-QF)" were "involved in IRGC-QF efforts to generate revenue and smuggle weapons abroad" through an IRGC front "company owned, controlled, or directed by an IRGC member, thereby "violat[ing] [U.S.] sanctions and money laundering laws" by committing "crimes" that caused valuable "assets" to flow to "a foreign terrorist organization."

On June 1, 2023, the United States imposed counterterrorism sanctions" pursuant to E.O. 13224 against numerous" members and affiliates of" the "IRGC-QF" and "IRGC-IO" based on Treasury's determination that such persons "participated in a series of terrorist plots including assassination plots targeting former United States government officials, dual U.S. and Iranian nationals, and Iranian dissidents"; with respect to IRGC-IO, Treasury "target[ed] … two senior officials of the IRGC's Intelligence Organization (IRGC-IO)[] who have been involved in plotting [such collaborative IRGC-QF/IRGC-IO] external lethal operations against [U.S. national] civilians including journalists and activists." In the same finding, Treasury also observed: "Treasury has consistently acted to address external terrorist plotting by the IRGC-QF and Iran's intelligence service [*i.e.*, IRGC-IO].

## X.    **Plaintiffs' Claims Are Timely**

970.    The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all ATA claims, including claims for aiding and abetting under JASTA. JASTA, however, was not enacted until September 28, 2016, and was expressly made retroactive. Accordingly, Plaintiffs' claims could not have accrued before that date, and Plaintiffs' claims are all timely because they are being brought within 10 years after September 28, 2016, the date they accrued.

971.    If the Court concludes that Plaintiffs' causes of action accrued earlier (*e.g.*, on the date of the terrorist attacks that injured them), and to the extent tolling is required for any

particular Plaintiff's claim, Plaintiffs are entitled to tolling because SCB fraudulently concealed its misconduct, and no plaintiff exercising reasonable diligence could have discovered that misconduct prior to April 9, 2019, when the United States publicly filed the Amended DPA that revealed SCB's knowing and willful processing of U.S. dollar transactions for Iran's Terrorist Sponsors and fronts from 2007 to 2011.

972.    SCB's misconduct—which involved providing Iran's Terrorist Sponsors and fronts back-door access to the U.S. financial system, while deceiving financial regulators and financial institutions—was inherently self-concealing. Indeed, the entire point of SCB's misconduct was to help Iran's Terrorist Sponsors and fronts transact in U.S. dollars, through U.S. financial institutions, in ways that would not reveal those entities' connections to the IRGC or Iran. None of the transactions were visible to third parties, let alone to individuals in Plaintiffs' position.

973.    SCB went to extreme lengths to conceal its wrongdoing. Among other things, SCB misled several financial regulators and law enforcement agencies about its sanctions compliance and AML practices, lied to other financial institutions for its IRGC-connected clients, and retaliated against whistleblowers who threatened to reveal the bank's misconduct.

974.    Accordingly, to the extent the statute of limitations began running before April 9, 2019, it must be tolled prior to that date because no plaintiff exercising diligence could have uncovered SCB's support for terrorists prior to that date.

**XI.    Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, Or Authorized By Iran-Sponsored Foreign Terrorist Organizations**

**A.    The December 18, 2010 Kidnapping Attack in Israel (Luken Family)**

975.    On December 18, 2010, a joint cell comprised of Hezbollah and Hamas committed a kidnapping attack in Jerusalem, Israel, in which Hamas managed the abduction, which was jointly planned by Hamas and Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "December 18, 2010 Attack").

976.    On information and belief, the Joint Logistics Cell furnished the tunnels that facilitated the December 18, 2010 Attack.

977.    The December 18, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

978.    **Kristine Luken** was in Israel, as a civilian, hiking at the time of attack. Kristine Luken was injured in the December 18, 2010 Attack. She died on December 18, 2010, as a result of injuries sustained during the attack.

979.    Kristine Luken was a U.S. national at the time of the attack and her death.

980.    Plaintiff Kathleen Alt is the twin sister of Kristine Luken and a U.S. national. She brings claims in both her personal and representative capacity on behalf of Kristine Luken's estate.

981.    Plaintiff Lawrence Luken is the father of Kristine Luken and a U.S. national.

982.     Plaintiff Gerald Luken is the brother of Kristine Luken and a U.S. national.

983.     Plaintiff Margaret Luken is the stepmother of Kristine Luken and a U.S. national. Ms. Luken lived in the same household as Kristine Luken for a substantial period of time and considered Kristine Luken the functional equivalent of a biological daughter.

984.     As a result of the December 18, 2010 Attack and Kristine Luken's injuries and death, each member of the Luken family has experienced severe mental anguish, emotional pain and suffering, and the loss of Kristine Luken's society, companionship, and counsel.

985.     As a result of the December 18, 2010 Attack, Kristine Luken was injured in her person and/or property. The Plaintiff members of the Luken Family are the survivors and/or heirs of Kristine Luken and are entitled to recover for the damages Kristine Luken sustained.

**B.     The August 19, 2011 Rocket Attack in Israel (Brauner Family)**

986.     On August 19, 2011, a joint cell comprised of Hezbollah and Hamas committed a rocket attack in Ashdod, Israel, in which a Hamas terrorist detonated a rocket supplied by the IRGC for which Hamas was trained and directed to attack by Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "August 19, 2011 Attack").

987.     On information and belief, the Joint Logistics Cell furnished the rockets and tunnels used in the August 19, 2011 Attack.

988.     The August 19, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

989.     **Shmuel Brauner** was a citizen living in Israel attending Synagogue during the August 19, 2011 Attack. The attack severely wounded Shmuel Brauner, who suffered from shrapnel to his back and stomach, loss of a kidney, loss of partial small intestine, and is permanently disabled.

990.     As a result of the August 19, 2011 Attack and his injuries, Shmuel Brauner has experienced severe physical and emotional pain and suffering.

991.     Plaintiff Shmuel Brauner was a U.S. national at the time of the attack and remains one today.

992.     Plaintiff Nechama Brauner is the wife of Shmuel Brauner and a U.S. national.

993.     Plaintiff C.B., by and through his next friend Shmuel Brauner, is the minor son of Shmuel Brauner and an Israeli national.

994.     Plaintiff Esther Brauner is the mother of Shmuel Brauner and a U.S. national.

995.     Plaintiff Mordechai Brauner is the father Shmuel Brauner and a U.S. national.

996.     As a result of the August 19, 2011 Attack and Shmuel Brauner's injuries, the Plaintiff members of the Brauner family have experienced severe mental anguish as well as emotional pain and suffering.

## C.     The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family)

997.     On June 12, 2014, a joint cell comprised of Hezbollah and Hamas committed a kidnapping attack in Gush Etzion, Israel, in which Hamas managed the abduction, which was jointly planned by Hamas and Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "June 12, 2014 Attack").

998. On information and belief, the Joint Logistics Cell furnished the tunnels that facilitated the June 12, 2014 Attack.

999. The June 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1000. Sixteen-year-old **Yaakov Fraenkel** was traveling with two other teenaged friends in Gush Etzion in the West Bank of Israel when all three were abducted. Yaakov Fraenkel's remains were discovered on June 30, 2014, and it was determined that he was murdered shortly after abduction.

1001. Yaakov Fraenkel was a U.S. national at the time of the attack and his death.

1002. Plaintiff Abraham Fraenkel is the father of Yaakov Fraenkel and an Israeli national. He brings claims in both his personal capacity and representative capacity on behalf of Yaakov Fraenkel's estate.

1003. Plaintiff Rachelle Fraenkel is the mother of Yaakov Fraenkel and a U.S. national.

1004. Plaintiff Avigail Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1005. Plaintiff Ayala Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1006. Plaintiff N.F., by and through her next friend Abraham Fraenkel, is the minor sister of Yaakov Fraenkel. She is a U.S. national.

1007. Plaintiff Noga Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1008. Plaintiff S.F., by and through his next friend Abraham Fraenkel, is the minor brother of Yaakov Fraenkel. He is a U.S. national.

1009. Plaintiff Tzvi Fraenkel is the brother of Yaakov Fraenkel and a U.S. national.

1010.   As a result of the June 12, 2014 Attack and Yaakov Fraenkel's injuries and death, each member of the Fraenkel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Yaakov Fraenkel's society, companionship, and counsel.

1011.   As a result of the June 12, 2014 Attack, Yaakov Fraenkel was injured in his person and/or property. The Plaintiff members of the Fraenkel Family are the survivors and/or heirs of Yaakov Fraenkel and are entitled to recover for the damages Yaakov Fraenkel sustained.

**D.      The October 22, 2014 Vehicle Attack in Israel (Braun Family)**

1012.   On October 22, 2014 Hamas committed a vehicle attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "October 22, 2014 Attack").

1013.   The October 22, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1014.   Three-month-old **Chaya Braun** was traveling in Israel with her parents during the October 22, 2014 Attack. Chaya Braun was injured in the October 22, 2014 Attack. Chaya Braun died on October 22, 2014 as a result of injuries sustained during the attack.

1015.   Chaya Braun was a U.S. national at the time of the attack and her death.

1016.   Plaintiff Samuel Braun is the father of Chaya Braun and a U.S. national. He brings claims in both his personal capacity and co-representative capacity, with Chana Braun, on behalf of Chaya Braun's estate.

1017.   Plaintiff Chana Braun is the mother of Chaya Braun and a U.S. national. She brings claims in both her personal capacity and co-representative capacity, with Sameul Braun, on behalf of Chaya Braun's estate.

1018.   As a result of the October 22, 2014 Attack and Chaya Braun's injuries and death, each member of the Braun Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Chaya Braun's society, companionship, and counsel.

1019.   As a result of the October 22, 2014 Attack, Chaya Braun was injured in her person and/or property. The Plaintiff members of the Braun Family are the survivors and/or heirs of Chaya Braun and are entitled to recover for the damages Chaya Braun sustained.

1020.   **Samuel Braun** was traveling in Israel with his wife and baby daughter during the October 22, 2014 Attack. The attack severely wounded Mr. Braun who suffered from broken ribs and a torn ligament in his knee. Mr. Braun's knee continues to be painful to this day.

1021.   Plaintiff Samuel Braun was a U.S. national at the time of the attack and remains one today.

1022.   Plaintiff Chana Braun is the wife of Mr. Braun and a U.S. national.

1023.   Plaintiff Esther Braun is the mother of Mr. Braun and a U.S. national.

1024.   Plaintiff Murray Braun is the father of Mr. Braun and a U.S. national.

1025.   As a result of the October 22, 2014 Attack and Mr. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

1026.   **Chana Braun** was traveling in Israel with her husband and baby daughter during the October 22, 2014 Attack. The attack severely wounded Ms. Braun who suffered from severe psychological and emotional trauma.

1027.   Plaintiff Chana Braun was a U.S. national at the time of the attack and remains one today.

1028.   Plaintiff Samuel Braun is the husband of Ms. Braun and a U.S. national.

1029.   Plaintiff Sara Halperin is the mother of Ms. Braun and a U.S. national.

1030.   Plaintiff Shimshon Halperin is the father of Ms. Braun and a U.S. national.

1031.   As a result of the October 22, 2014 Attack and Ms. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

**E.      The October 29, 2014 Assassination Attack in Israel (Glick Family)**

1032.   On October 29, 2014, the Palestinian Islamic Jihad committed an assassination attack in Jerusalem, Israel, which was jointly planned by Hezbollah and PIJ, for which PIJ was trained and directed to attack by Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "October 29, 2014 Assassination Attack").

1033.   On information and belief, the Joint Logistics Cell furnished the small arms and ammunition used in the October 29, 2014 Assassination Attack.

1034.   The October 29, 2014 Assassination Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1035.   **Yehudah Glick** was packing up his car after giving a speech at the time of the October 29, 2014 Assassination Attack. Yehudah Glick was shot four times during this attack.

The attack severely wounded Yehudah Glick, who suffered from gunshot wounds injuring his chest, including his throat, lung, and causing multiple broken ribs. Gunshot wounds also injured his liver, spine, one hand, and both intestines.

1036.   As a result of the October 29, 2014 Assassination Attack and his injuries, Yehudah Glick has experienced severe physical and emotional pain and suffering.

1037.   Plaintiff Yehudah Glick was a U.S. national at the time of the attack. He brings claims in his individual capacity and in his representative capacity on behalf of Yaffa Glick's estate. Yaffa Glick is the deceased wife of Yehudah Glick and was an Israeli national at the time of the attack and her death.

1038.   Plaintiff Hallel Glick is the son of Yehudah Glick and a U.S. national.

1039.   Plaintiff Neria Glick is the son of Yehudah Glick and a U.S. national.

1040.   Plaintiff Shahar Glick is the son of Yehudah Glick and a U.S. national.

1041.   Plaintiff Shlomo Glick is the son of Yehudah Glick and a U.S. national.

1042.   Plaintiff Rachel Glick is the foster daughter of Yehudah Glick and an Israeli national. Rachel Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1043.   Plaintiff Tatiana Glick is the foster daughter of Yehudah Glick and an Israeli national. Tatiana Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1044.   Plaintiff Avital Breuer is the stepdaughter of Yehudah Glick and an Israeli national. Avital Breuer lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1045.   As a result of the October 29, 2014 Assassination Attack and Yehudah Glick's injuries, the Plaintiff members of the Glick family have experienced severe mental anguish as well as emotional pain and suffering.

**F.      The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family)**

1046.   On October 13, 2015, Hamas committed a shooting and stabbing attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "October 13, 2015 Attack").

1047.   The October 13, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1048.   **Richard Lakin** was riding a bus in Israel returning from a doctor's appointment during the October 13, 2015 Attack. Mr. Lakin was shot and stabbed during the October 13, 2015 Attack, which resulted in a series of invasive surgeries. Mr. Lakin died on October 27, 2015 as a result of injuries sustained during the attack.

1049.   Mr. Lakin was a U.S. national at the time of the attack and his death.

1050.   Plaintiff Micah Lakin is the son of Mr. Lakin and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Lakin's estate.

1051.   Plaintiff Manya Lakin is the daughter of Mr. Lakin and a U.S. national.

1052.   As a result of the October 13, 2015 Attack and Mr. Lakin's injuries and death, each member of the Lakin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Lakin's society, companionship, and counsel.

1053.   As a result of the October 13, 2015 Attack, Mr. Lakin was injured in his person and/or property. The Plaintiff members of the Lakin Family are the survivors and/or heirs of Mr. Lakin and are entitled to recover for the damages Mr. Lakin sustained.

### G.      The November 6, 2015 Sniper Attack in Israel (Borochov Family)

1054.   On November 6, 2015, Hamas committed a sniper attack in Mearas Hamachpela, Israel, which was jointly planned by Hezbollah and Hamas, for which Hamas was trained and directed to attack by Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "November 6, 2015 Attack").

1055.   On information and belief, the Joint Logistics Cell furnished the small arms and ammunition used in the November 6, 2015 Attack Assassination Attack.

1056.   The November 6, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1057.   **Mr. Ronen Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack caused Mr. Borochov to fear for his life as well as his sons' lives. Mr. Borochov suffers from psychological and emotional trauma as a result of the November 6, 2015 Attack.

1058.   Plaintiff Ronen Borochov was a U.S. national at the time of the attack and remains one today.

1059.   Plaintiff Devora Borochov is the wife of Mr. Borochov and a U.S. national.

1060.   Plaintiff Josef Borochov is the son of Mr. Borochov and U.S. national.

1061.   Plaintiff Eli Borochov is the son of Mr. Borochov and a U.S. national.

1062.    Plaintiff Avraham Borochov is the son of Mr. Borochov and a U.S. national.

1063.    Plaintiff Shira Borochov is the daughter of Mr. Borochov and a U.S. national.

1064.    As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

1065.    **Mr. Eli Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr. Borochov who suffered from gunshot wounds to the thigh and testicles, which resulted in surgery and months of severe pain. Mr. Borochov also suffers from psychological trauma and nightmares as a result of the November 6, 2015 Attack.

1066.    Plaintiff Eli Borochov was a U.S. national at the time of the attack and remains one today.

1067.    Plaintiff Shari Borochov is the wife of Mr. Borochov and a U.S. national.

1068.    Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

1069.    Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

1070.    Plaintiff Josef Borochov is the brother of Mr. Borochov and U.S. national.

1071.    Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

1072.    Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

1073.    As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

1074.    **Mr. Josef Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr.

Borochov who suffers from severe psychological and emotional trauma. Mr. Borochov was only sixteen years old at the time of the attack.

1075. Plaintiff Josef Borochov was a U.S. national at the time of the attack and remains one today.

1076. Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

1077. Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

1078. Plaintiff Eli Borochov is the brother of Mr. Borochov and U.S. national.

1079. Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

1080. Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

1081. As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

### H. The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families)

1082. On December 14, 2015, Hamas committed a vehicle attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "December 14, 2015 Attack").

1083. The December 14, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1084. **Mr. Yoav Golan** was waiting at a bus stop in Israel at the time of the December 14, 2015 Attack. The attack severely wounded Mr. Golan who suffered injuries to his leg and

shoulder. The leg injury caused him to be wheelchair-bound for a substantial period after the attack. Mr. Golan continues to suffer from psychological and emotional trauma as a result of the December 14, 2015 Attack.

1085.   Plaintiff Yoav Golan was a U.S. national at the time of the attack and remains one today.

1086.   Plaintiff Rotem Golan is the wife of Mr. Golan and an Israeli national.

1087.   Plaintiff Yehudit Green-Golan is the mother of Mr. Golan and a U.S. national.

1088.   Plaintiff Raphael Golan is the father of Mr. Golan and an Israeli national.

1089.   Plaintiff Matan Golan is the brother of Mr. Golan and a U.S. national.

1090.   As a result of the December 14, 2015 Attack and Mr. Golan's injuries, each member of the Golan Family has experienced severe mental anguish as well as emotional pain and suffering.

1091.   **Noam Shamba** was waiting at a bus stop in Jerusalem, Israel at the time of the December 14, 2015 Attack. The attack severely wounded Noam Shamba, who suffered from severe pains in his chest. He was taken to the hospital and diagnosed as having a massive heart attack. His doctors concluded that it was a result of the terror attack as he was only 32 years old and had no prior health conditions.

1092.   As a result of the December 14, 2015 Attack and his injuries, Noam Shamba has experienced severe physical and emotional pain and suffering.

1093.   Plaintiff Noam Shamba was a U.S. national at the time of the attack and remains one today.

1094.   Plaintiff Yana Shamba is the wife of Noam Shamba and a U.S. national.

1095.   Plaintiff Hadar Shamba is the daughter of Noam Shamba and a U.S. national.

1096. Plaintiff M.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

1097. Plaintiff N.E.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

1098. Plaintiff N.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1099. Plaintiff O.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1100. Plaintiff T.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1101. As a result of the December 14, 2015 Attack and Noam Shamba's injuries, the Plaintiff members of the Shamba family have experienced severe mental anguish as well as emotional pain and suffering.

## I.       The January 27, 2016 Stabbing Attack in Israel (Rivkin Family)

1102. On January 27, 2016, Hamas committed a stabbing attack in Givat Ze'ev, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "January 27, 2016 Attack").

1103. The January 27, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1104. **Menachem Rivkin** was walking to a restaurant in Givat Ze'ev, Israel during the January 27, 2016 Attack. The attack severely wounded Mr. Rivkin who suffered from a stab wound to his neck.

1105. Plaintiff Menachem Rivkin was a U.S. national at the time of the attack and remains one today.

1106. Plaintiff Bracha Rivkin is the wife of Mr. Rivkin and an Israeli national.

1107. Plaintiff M.R., by and through her next friend Menachem Rivkin, is the minor daughter of Mr. Rivkin. She is a U.S. national.

1108. Plaintiff R.R., by and through her next friend Menachem Rivkin, is the minor daughter of Mr. Rivkin. She is a U.S. national.

1109. Plaintiff S.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

1110. Plaintiff S.Z.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

1111. Plaintiff Sterna Rivkin is the daughter of Mr. Rivkin and a U.S. national.

1112. As a result of the January 27, 2016 Attack and Mr. Rivkin's injuries, each member of the Rivkin Family has experienced severe mental anguish as well as emotional pain and suffering.

**J.    The March 8, 2016 Stabbing Attack in Israel (Force Family)**

1113. On March 8, 2016, Hamas committed a stabbing attack in Tel Aviv, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "March 8, 2016 Attack").

1114. The March 8, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1115. **Taylor Force** was in Israel for a graduate school trip through Vanderbilt University. Mr. Force was injured in the March 8, 2016 Attack. Mr. Force died on March 8, 2016, resulting from injuries sustained during the attack.

1116. Mr. Force was a U.S. national at the time of the attack and his death.

1117. Plaintiff Stuart Force Jr. is the father of Mr. Force and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Force's estate.

1118. Plaintiff Robbi Force is the mother of Mr. Force and a U.S. national.

1119. Plaintiff Kristen Boswell is the sister of Mr. Force and a U.S. national.

1120. As a result of the March 8, 2016 Attack and Mr. Force's injuries and death, each member of the Force Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Force's society, companionship, and counsel.

1121. As a result of the March 8, 2016 Attack, Mr. Force was injured in his person and/or property. The Plaintiff members of the Force Family are the survivors and/or heirs of Mr. Force and are entitled to recover for the damages Mr. Force sustained.

**K.    The December 23, 2016 Stabbing Attack in Israel (Lisker Family)**

1122. On December 23, 2016, Hamas committed a stabbing attack in Efrat, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "December 23, 2016 Attack").

1123.   The December 23, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1124.   **Raphael Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Mr. Lisker who suffered from stab wounds to his neck.

1125.   Plaintiff Raphael Lisker was a U.S. national at the time of the attack and remains one today.

1126.   Plaintiff Shoshana Lisker is the wife of Mr. Lisker and a U.S. national.

1127.   Plaintiff Tamar Gutman is the daughter of Mr. Lisker and a U.S. national.

1128.   Plaintiff Avital Lejzor is the daughter of Mr. Lisker and a U.S. national.

1129.   Plaintiff Daniel Lisker is the son of Mr. Lisker and a U.S. national.

1130.   Plaintiff Jonathan Lisker is the son of Mr. Lisker and a U.S. national.

1131.   As a result of the December 23, 2016 Attack and Mr. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

1132.   **Shoshana Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Ms. Lisker who suffers from severe emotional and psychological trauma.

1133.   Plaintiff Shoshana Lisker was a U.S. national at the time of the attack and remains one today.

1134.   Plaintiff Raphael Lisker is the husband of Ms. Lisker and a U.S. national.

1135.    Plaintiff Tamar Gutman is the daughter of Ms. Lisker and a U.S. national.

1136.    Plaintiff Avital Lejzor is the daughter of Ms. Lisker and a U.S. national.

1137.    Plaintiff Daniel Lisker is the son of Ms. Lisker and a U.S. national.

1138.    Plaintiff Jonathan Lisker is the son of Ms. Lisker and a U.S. national.

1139.    As a result of the December 23, 2016 Attack and Ms. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

**L.    The May 5, 2019 Rocket Attack in Israel (Przewozman Family)**

1140.    On May 5, 2019, a joint cell comprised of Hezbollah, Hamas, and PIJ committed a rocket attack in Ashdod, Israel, in which Hamas and PIJ terrorists detonated a rocket supplied by the IRGC for which Hamas and PIJ were trained and directed to attack by Hezbollah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "May 5, 2019 Attack").

1141.    On information and belief, the Joint Logistics Cell furnished the rockets and tunnels used in the May 5, 2019 Attack.

1142.    The May 5, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1143.    **Pinchas Przewozman** was a civilian living in Israel who was attempting to get to the bomb shelter in his apartment building in Ashdod, Israel at the time of the attack. Pinchas Przewozman paused to allow others to enter the shelter ahead of him when the rocket struck.

Pinchas Przewozman was injured in the May 5, 2019 Attack. He died on May 5, 2019, as a result of injuries sustained during the attack.

1144.   Pinchas Przewozman was a U.S. national at the time of the attack and his death.

1145.   Plaintiff Hadassah Przewozman is the widow of Pinchas Przewozman and an Israeli national. She brings claims in both her personal capacity and representative capacity on behalf of Pinchas Przewozman's estate.

1146.   Plaintiff Y.P., by and through his next friend Hadassah Przewozman, is the minor son of Pinchas Przewozman. He is a U.S. national.

1147.   Plaintiff Chaim Przewozman is the father of Pinchas Przewozman and a U.S. national.

1148.   Plaintiff Chaya Przewozman is the mother of Pinchas Przewozman and an Israeli national.

1149.   Plaintiff Avraohom Przewozman is the brother of Pinchas Przewozman and a U.S. national.

1150.   Plaintiff F.P., by and through her next friend Chaim Przewozman, is the minor sister of Pinchas Przewozman. She is a U.S. national.

1151.   Plaintiff Zvi Przewozman is the brother of Pinchas Przewozman and a U.S. national.

1152.   Plaintiff Sara Rozenbaum is the sister of Pinchas Przewozman and a U.S. national.

1153.   Plaintiff Yafa Shechter is the sister of Pinchas Przewozman and a U.S. national.

1154.   As a result of the May 5, 2019 Attack and Pinchas Przewozman's injuries and death, the Plaintiff members of the Przewozman family have experienced severe mental anguish,

emotional pain and suffering, and the loss of Pinchas Przewozman's society, companionship, and counsel.

1155.   As a result of the May 5, 2019 Attack, Pinchas Przewozman was injured in his person and/or property. The Plaintiff survivors and/or heirs of Pinchas Przewozman are entitled to recover for the damages Pinchas Przewozman sustained.

## M.    The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family)

1156.   On June 23, 2011, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hezbollah with money supplied by the SLO and IRGC (the "June 23, 2011 Attack").

1157.   The June 23, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1158.   **Dr. Stephen Everhart** was in Iraq on a short-term consultancy to the U.S. Agency for International Development, introducing entrepreneurship education in schools of business and commerce at Iraqi universities. Dr. Everhart was injured in the June 23, 2011 Attack. Dr. Everhart died on June 23, 2011, resulting from injuries sustained during the attack.

1159.   Dr. Everhart was a U.S. national at the time of the attack and his death.

1160.   Plaintiff Stephanie Zobay is the widow of Dr. Everhart and a U.S. national. She brings claims in both her personal capacity and representative capacity on behalf of Dr. Everhart's estate.

1161.   Plaintiff Hannah Everhart is the daughter of Dr. Everhart and a U.S. national.

1162.   Plaintiff Lindsay Everhart is the daughter of Dr. Everhart and a U.S. national.

1163.   Plaintiff Hayden Everhart is the son of Dr. Everhart and a U.S. national.

1164.   As a result of the June 23, 2011 Attack and Dr. Everhart's injuries and death, each member of the Everhart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

1165.   As a result of the June 23, 2011 Attack, Dr. Everhart was injured in his person and/or property. The Plaintiff members of the Everhart Family are the survivors and/or heirs of Dr. Everhart and are entitled to recover for the damages Dr. Everhart sustained.

## CLAIM FOR RELIEF

### Aiding and Abetting Under the Anti-Terrorism Act
### 18 U.S.C. § 2333(d)(2)

1166.    Plaintiffs incorporate their factual allegations above.

1167.   To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that SCB was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that SCB knowingly provided substantial assistance.

1168.   Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

1169.   The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a.    the attacks involved violent and dangerous acts that violate the criminal laws of the

United States and many States (or would if committed in the United States). In particular,

each attack constituted one or more of murder, attempted murder, conspiracy to murder,

kidnapping, and arson, in violation of state law; and the destruction of U.S. property by

fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing

of U.S. employees performing official duties, hostage taking, damaging U.S. government

property, killing U.S. nationals abroad, use of weapons of mass destruction, commission

of acts of terrorism transcending national boundaries, and bombing places of public use,

in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a,

2332b, and 2332f, respectively;

b.    the attacks, carried out by terrorists bent on expelling the United States and its allies from

Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the

civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence

the policy of the U.S., Israeli, Iraqi, and other governments by intimidation and coercion,

and (iii) to affect the conduct of the U.S., Israeli, Iraqi, and other governments by mass

destruction, assassination, and kidnapping; and

c.    the attacks occurred primarily outside the territorial jurisdiction of the United States, in

Israel.

1170.   Each attack was committed, planned, or authorized by one or more FTOs. Every

attack was committed by one or more of Hezbollah, Hamas, and PIJ, all of which were FTOs at

all relevant times.

1171.   Every attack, regardless of who committed it, was planned or authorized by

Hezbollah and/or Hamas and/or PIJ, each of which was always an FTO.

1172.   SCB was generally aware that it was playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity.

1173.   SCB provided assistance knowingly, and not innocently or inadvertently. SCB did so with knowledge that it was aiding terrorist organizations carrying out attacks on Americans.

1174.   SCB's assistance was substantial.

1175.   SCB's assistance was pervasive and systemic, involving the highest levels of SCB's management, years of willful misconduct, and tremendous sums of money that provided critically important assistance to the IRGC and its terrorist proxies.

1176.   As a result of SCB's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1177.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1178.   Wherefore, Plaintiffs pray this Court:

a.   Enter judgment against SCB finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b.   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c.   Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d.  Award Plaintiffs prejudgment interest; and

e.  Award Plaintiffs any such further relief the Court deems just and proper.

Dated: November 1, 2024

Respectfully submitted,

SPARACINO PLLC

*/s/ Adam J. Goldstein*

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Geoffrey P. Eaton (*pro hac vice*)
Tejinder Singh
Jacob R. Loshin (*pro hac vice* forthcoming)
Stacey L. Wilson (*pro hac vice* forthcoming)
Matthew J. Fisher (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
tejinder.singh@sparacinopllc.com
jacob.loshin@sparacinopllc.com
stacey.wilson@sparacinopllc.com
matt.fisher@sparacinopllc.com

*Counsel for Plaintiffs*