UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRAHAM FRAENKEL, et al., | |
| *Plaintiffs*, | |
| | Case No. 24-cv-4484 (RA) |
| v. | |
| STANDARD CHARTERED BANK, | |
| *Defendant*. | |
| SHMUEL BRAUNER, et al., | |
| *Plaintiffs*, | |
| | Case No. 24-cv-05788 (RA) |
| v. | |
| STANDARD CHARTERED BANK, | |
| *Defendant*. | |

**DEFENDANT STANDARD CHARTERED BANK'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 3

I.    STATUTORY BACKGROUND ................................................................................. 3

II.   PLAINTIFFS' ALLEGATIONS ................................................................................. 4

     A.    Alleged Illegal Banking "Scheme" ............................................................... 5

     B.    The AC Alleges Attacks By Multiple FTOs Over A Nine-Year Period ................. 9

ARGUMENT ............................................................................................................................ 10

I.    LEGAL STANDARD; RULES 12(b)(6) AND 8 ......................................................... 10

II.   THE AC FAILS TO PLAUSIBLY ALLEGE THAT SCB AIDED AND ABETTED
ACTS OF INTERNATIONAL TERRORISM ............................................................. 10

     A.    Plaintiffs Fail To Allege That SCB Was "Generally Aware" Of Any Role In
Relevant Terrorist Activity ......................................................................... 11

     B.    Plaintiffs Fail To Allege That SCB "Knowingly And Substantially Assisted" The
Particular Acts Of Terrorism That Harmed Plaintiffs ................................... 20

           *1.    Plaintiffs Fail To Allege "Conscious, Voluntary, And Culpable" Participation In
The Attacks* ....................................................................................... 20

           *2.    Plaintiffs Fail To Plausibly Allege The Requisite Nexus To Support An Aiding
And Abetting Claim* ............................................................................ 22

           *3.    Plaintiffs Fail To Plausibly Allege That SCB "Systematically And Pervasively"
Assisted The Terrorist Activities At Issue* ............................................ 24

III.   THE 2010 AND 2011 ATTACKS ARE TIME-BARRED ............................................ 26

IV.   THE AC FAILS TO ALLEGE PERSONAL JURISDICTION OVER SCB ................. 28

CONCLUSION ......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon Servs. LLC v. United States Dep't of Agric.*,
   109 F.4th 573 (D.C. Cir. 2024) ............................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..............................................................................10

*AstraZeneca UK Ltd. v. Atchley*,
   No. 23-9 (U.S. June 24, 2024) ..............................................................22

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) ..................................................... *passim*

*Bonacasa v. Standard Chartered PLC*,
   No. 22 Civ. 3320, 2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) ...........29

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
   566 U.S. 221 (2012) ..............................................................................27

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ..............................................................................28

*Freeman v. HSBC Holdings PLC*,
   465 F. Supp. 3d 220 (E.D.N.Y. 2020) .......................................13–14, 27

*Freeman v. HSBC Holdings PLC*,
   57 F.4th 66 (2d Cir. 2023) ...............................................................25, 27

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019)......................................................6

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ..............................................................................28

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ................................................................4

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ........................................................... *passim*

*Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ......................................................................6

*Knight v. Standard Chartered Bank,*
    531 F. Supp. 3d 755 (S.D.N.Y. 2021).......................................................29

*Koch v. Christie's Int'l PLC,*
    699 F.3d 141 (2d Cir. 2012).....................................................................27

*Komatsu v. City of New York,*
    No. 20 Civ. 7046, 2021 WL 3038498 (S.D.N.Y. July 16, 2021) ............10

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018).....................................................................14

*Mastafa v. Chevron Corp.,*
    770 F.3d 170 (2d Cir. 2014).....................................................................10

*O'Sullivan v. Deutsche Bank AG,*
    No. 17 Civ. 8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ............14

*Pearl v. City of Long Beach,*
    296 F.3d 76 (2d Cir. 2002)....................................................................26–27

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.,*
    712 F.3d 705 (2d Cir. 2013).....................................................................13

*Rotella v. Wood,*
    528 U.S. 549 (2000).................................................................................27

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013).......................................................................15

*Salahuddin v. Cuomo,*
    861 F.2d 40 (2d Cir. 1988)..................................................................10, 11

*Sewell v. Bernardin,*
    795 F.3d 337 (2d Cir. 2015).....................................................................26

*Siegel v. HSBC N. Am. Holdings, Inc.,*
    933 F.3d 217 (2d Cir. 2019)............................................................ *passim*

*SPV Osus Ltd. v. UBS AG,*
    882 F.3d 333 (2d Cir. 2018).....................................................................28

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ........................................................................................ *passim*

*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*,
  No. 18 Civ. 11117, 2020 WL 3619050 (S.D.N.Y. July 2, 2020) ......................................8, 17

*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*,
  No. 18 Civ. 11117, 2024 WL 4766997 (S.D.N.Y. Nov. 13, 2024) ..........................................8

*Wildman v. Deutsche Bank Aktiengesellschaft*,
  No. 21 Civ. 04400, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) ...................12–13, 14, 20

**Rules and Statutes**

18 U.S.C. § 2333 ...................................................................................................... *passim*

18 U.S.C. § 2335 ...........................................................................................................26

Fed. R. Civ. P. 8(a)(2) ...................................................................................................10

National Defense Authorization Act for Fiscal Year 2013,
  Pub. L. No. 112-239, 126 Stat. 1632 (2013) ..........................................................26

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (2016) ..........................................................1, 3

## PRELIMINARY STATEMENT

Plaintiffs' amended complaint (the "AC")[1] alleges injuries to Plaintiffs in attacks by several terrorist groups (the "Attacks").  While those terrorists should be held responsible for their heinous crimes, Standard Chartered Bank ("SCB") did not commit any acts of terrorism and did not support any terrorist or Attack.

The AC, despite adding over 200 pages and 500 paragraphs of extraneous allegations, suffers from the same flaw as its predecessors:  its theory of liability has already been rejected by the Second Circuit, as well as courts in this and other districts, holding that U.S. sanctions violations by banks, including SCB, do not establish secondary liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016).  *See infra* Argument Section II.A.  Here, that same theory of liability—based primarily on SCB's violation of U.S. financial sanctions on Iran—should be rejected as well.  Plaintiffs' claims fail for several independent reasons.

*First,* the AC, like the original complaints, remains devoid of well-pleaded allegations that SCB was "generally aware" of its role as part of "an overall illegal or tortious activity" from which the act that *caused the plaintiff's injury* was foreseeable.  *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496–99 (2d Cir. 2021); 18 U.S.C. § 2333(d)(2).  SCB's past conduct in violating U.S. sanctions involved Iran-linked entities, none of which was a Foreign Terrorist Organization ("FTO"), and there are no well-pleaded allegations that SCB was aware of any connection between its customers and Attacks carried out by the FTOs that injured Plaintiffs.  Rather, Plaintiffs rely on conjecture and loosely asserted "agency" claims that are insufficient under the

---

[1] "AC" refers to the amended consolidated complaints in *Fraenkel* (ECF No. 34) and *Brauner* (ECF No. 25), which have been consolidated through the motion to dismiss stage and are identical with the exception of their captions.

governing law.  Though Plaintiffs have added over 500 new paragraphs of allegations, the AC alleges only generalized terrorist enterprises in Iran, North Korea, Gambia, and elsewhere—without any well-pleaded allegations that SCB knew it was playing a role in those alleged terrorist schemes, let alone the specific Attacks that injured Plaintiffs.

*Second*, allegations about banking services to entities in a speculative chain of intermediaries fall short of a "knowing and substantial" nexus to the specific Attacks.  As recently clarified by the Supreme Court in *Twitter, Inc. v. Taamneh*, the gravamen of a JASTA aiding and abetting claim is that the secondary actor "consciously and culpably" aided "another person in *the commission of the actionable wrong*—here, an act of international terrorism."  598 U.S. 471, 493, 495 (2023) (emphasis added).  The complete disconnect between any SCB-linked banking transaction and any of the Attacks that harmed Plaintiffs means that standard is not satisfied by the AC.  Plaintiffs do not and cannot allege that SCB provided banking services to the FTOs that injured them.  No facts link any banking service provided by SCB (the vast majority of which happened years, and some over a decade, before the Attacks) to the terrorist acts that harmed Plaintiffs.  Courts addressing similar claims have rejected liability based on allegations that banking services provided to Iran-linked entities made funds available to Iran, which in turn promotes terrorism.  *See infra* Argument Section II.A.

*Third*, in addition to the above, Plaintiffs' claims relating to a June 23, 2011 attack in Iraq and December 18, 2010 and August 19, 2011 attacks in Israel are time-barred under the ATA's ten-year statute of limitations.  Plaintiffs' claims accrued, for the purposes of JASTA, at the time of those Attacks, which occurred over thirteen years before the filing of these actions.

Lastly, in the alternative, the AC should be dismissed because it fails to allege claim-related personal jurisdiction over SCB, a foreign bank.  As explained in connection with the

ATA legal standard above, Plaintiffs fail to allege a relationship between the banking services provided by SCB and the Attacks out of which Plaintiffs' claims "arise." There is accordingly no basis for this Court to exercise specific personal jurisdiction over SCB.

## BACKGROUND

### I.   STATUTORY BACKGROUND

The ATA provides a private right of action for damages for U.S. nationals injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Under JASTA, when "an act of international terrorism" has been "committed, planned, or authorized" by an organization designated as a FTO by the U.S. Secretary of State, injured parties may sue anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" the terrorist act. Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)(2)). Unlike other civil liability provisions that simply impose liability for "conspiracy" or "aiding and abetting"—leaving the courts to interpret those standards—Congress in JASTA delineated the scope of secondary liability in three ways.

*First*, Congress limited secondary liability to cases in which plaintiffs have suffered "an injury arising from an act of international terrorism committed, planned, or authorized *by an organization that had been designated as a foreign terrorist organization*" at the time of the attack. 18 U.S.C. § 2333(d)(2) (emphasis added).

*Second*, Congress required plaintiffs to establish a close connection between the secondary-liability defendant and the party that committed the act of international terrorism injuring a plaintiff. It limited liability only to a person "who aids and abets, by *knowingly* providing substantial assistance, or who conspires with *the person who committed such an act of international terrorism*." *Id.* (emphasis added).

-3-

*Third*, in JASTA's "Findings and Purpose" section, Congress stated that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)—a case interpreting the common law of civil secondary liability—"provides the proper legal framework for how such liability should function." 18 U.S.C. § 2333 note. *Halberstam* outlined three elements for aiding and abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

In clarifying the framework for JASTA claims, the Supreme Court in *Twitter* explained that the elements and factors articulated in *Halberstam* are not a test in themselves. 598 U.S. at 497. Instead, they are relevant insofar as they answer the "fundamental question of aiding-and-abetting liability": whether the defendants "consciously, voluntarily, and culpably participate[d] in or support[ed] the relevant wrongdoing." *Id.* at 505. As the Supreme Court explained, that question carries two requirements. First, the defendant's assistance must be "conscious and culpable"—that is, it must possess the requisite "scienter." *Id.* at 492. Second, a defendant must have "participated in [the] wrongful act." *Id.* at 493 (internal quotation omitted).

## II. PLAINTIFFS' ALLEGATIONS

The AC asserts a single claim for relief under JASTA, alleging that SCB aided and abetted the Attacks by providing banking services to Iran-linked entities in violation of U.S. sanctions. Although none of the Iran-linked entities with whom SCB transacted themselves committed any of the Attacks, the AC nonetheless seeks to tie them to the attacks by asserting that certain of those entities should be considered "fronts" or "agents" of "Iran's Terrorist Sponsors," a term Plaintiffs invented in amending their complaints. *See* AC ¶ 3. In addition to

-4-

the Iran Revolutionary Guard Corps ("IRGC"), "Iran's Terrorist Sponsors" allegedly include the Foundation for the Oppressed, the Supreme Leader Ayatollah Ali Khamenei and the Supreme Leader's Office ("SLO"), Hezbollah, and the Friday Prayer Leader Organization.  *See* AC ¶ 50. "Iran's Terrorist Sponsors," and in particular the IRGC and SLO, in turn allegedly funded the groups that carried out the Attacks.  *See, e.g.*, AC ¶¶ 975–1165.  As Plaintiffs acknowledge, the IRGC was not designated an FTO until April 15, 2019, years after all but one of the Attacks and years after the alleged banking services by SCB to Iran-linked entities.  *See* AC ¶ 199.

A.    **Alleged Illegal Banking "Scheme"**

The AC alleges two principal types of activity by SCB that allegedly furthered Iran's support for terrorism:  (1) non-transparent processing of wire transfers on behalf of Iranian banks and commercial customers and (2) the provision of banking services to Iran-linked entities, which Plaintiffs claim were "agents" or "fronts" for "Iran's Terrorist Sponsors."  The allegations in the AC concerning SCB's conduct are primarily drawn from SCB's 2012 and 2019 deferred prosecution agreements ("DPAs") and related resolutions with federal, state, and U.K. authorities addressing violations of U.S. sanctions (together, the "Agreements"), a portion of which involved Iran.  *See* AC ¶¶ 3–14.  Notably, the DPAs and other agreements **did not include any finding that SCB engaged in transactions that facilitated or were in any way connected to any FTO, terrorists, or terrorist activity.**

*2012 Agreements*.  In late 2012, SCB entered into a series of agreements, including a DPA with U.S. authorities.  SCB admitted that "[s]tarting in early 2001 and ending in 2007, [it] violated U.S. and New York State laws by illegally sending payments through the U.S. financial system on behalf of entities subject to U.S. economic sanctions."  Statement of Facts ("SOF")[2] to

---

[2] The SOF is an exhibit to the 2012 DPA, both of which are attached as Exhibit A to the Boccuzzi Declaration.

the 2012 DPA ¶¶ 2–5 (Ex. A).[3]  The sanctions violations consisted of (1) processing payments through SCB's London branch and Dubai affiliate on behalf of Iranian customers, and in particular five Iranian banks, without reference to the payments' origin; (2) eliminating payment data that would have revealed the involvement of Iranian entities; and (3) using alternative payment methods to mask involvement of Iranian entities.  SOF ¶ 5 (Ex. A).

As Plaintiffs concede, for most of the period that SCB provided such services, they were permissible under the U.S. government's "U-Turn" exemption.  AC ¶ 492.  This exemption— which was in place at least until November 2008—allowed U.S. banks to process transactions to and from Iran, so long as (1) non-U.S. and non-Iranian banks acted as intermediaries, so that U.S. banks would not have a direct connection to Iranian banks, and (2) none of the parties to the transaction was individually sanctioned.  *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 387 (7th Cir. 2018).  In the SOF accompanying the DPAs, U.S. authorities acknowledge that "[t]he vast majority of these payments . . . were [] compliant with the then-existent U-turn exemption." SOF ¶ 42 (Ex. A).  The small portion of the transactions that did not fall in this category violated U.S. sanctions because they involved "Iranian entities . . . in the [U.S.], or [] otherwise connected with the United States," not terrorism.  SOF ¶ 43 (Ex. A).

*2019 Supplemental Agreements*.  Following an investigation into additional past sanctions violations, in April 2019 SCB entered into amended DPAs and additional agreements with U.S. authorities.  These agreements reflected that, due to actions by certain low-level employees of SCB Dubai to conceal banking activities from SCB's compliance department and

---

[3] Because the AC relies heavily on and cites repeatedly to the Agreements, they are appropriately considered by the Court.  *See* Declaration of Carmine D. Boccuzzi, Jr. ("Boccuzzi Declaration"), dated December 3, 2024 (attaching certain publicly available documents relied upon in the AC); *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019) (noting that on a motion to dismiss, the court may consider documents attached to, or referenced in, or integral to the complaint, or any other document "upon which [Plaintiffs] relied in bringing the suit").  Unless otherwise noted, all exhibits ("Ex.") referenced here are attached to the Boccuzzi Declaration.

deficiencies in SCB's sanctions monitoring systems for fax and online banking payments, SCB

Dubai continued to provide banking services for certain Iran-linked small and medium

enterprises after 2007 until they were identified and stopped in or before 2014.  Supplemental

Statement of Facts to the 2019 DPA ("Supp. SOF")[4] ¶¶ 8–9 (Ex. B).

    *Caspian and Elyassi*.  The focus of Plaintiffs' allegations regarding SCB's banking

services between 2007 and 2014 is on transactions with a handful of SCB customers, none of

whom was (or is alleged to be) an FTO:

- $150 million in transactions for a petrochemical company, alleged to be Caspian
  Petrochemical FZE ("Caspian," also referred to as "the Iranian Petrochemical
  Company") and an unnamed predecessor entity, which was a UAE corporation owned
  by an Iranian national, AC ¶¶ 577–78 (citing 2019 OFAC Settlement ¶ 7 (Ex. C));
  and

- $240 million in transactions for Mahmoud Reza Elyassi and his companies, AC ¶ 597
  (citing Supp. SOF ¶¶ 10, 31 (Ex. B); Elyassi Indictment ¶¶ 1, 12; *United States v.
  Elyassi*, No. 19-cr-117 (D.D.C. Apr. 5, 2019) (Ex. D)).

    Unable to plead any actual transaction with an FTO or other entity that committed any

Attack, the AC asserts that the banking services supplied to these customers were part of a

"scheme" between SCB and Iran-linked entities allegedly connected to "Iran's Terrorist

Sponsors."  Plaintiffs speculate that Caspian and Elyassi's companies must have been "fronts" or

"agents" for the SLO and IRGC because the SLO and IRGC allegedly had "market segment

monopolies" in the energy, construction, sanctions evasion, finance, import/export and

communications sectors beginning in 2007 and Mr. Elyassi could not have operated his business

unless he was an agent for the IRGC. *See, e.g.*, AC ¶ 809 (speculating that Elyassi must have

been "an agent for the IRGC and SLO" because "no Iranian national could have displayed the

profile, or engaged in the transactions, like Elyassi, without the IRGC's and SLO's knowledge").

---

[4] The Supplemental Statement of Facts is Exhibit B to the 2019 DPA and Exhibit B to the Boccuzzi Declaration.

But the AC does not and cannot allege that Caspian or Elyassi was ever an FTO or sanctioned by OFAC for affiliation with the SLO or the IRGC. Nor does the AC identify a single transaction by SCB that involved the SLO, the IRGC, or the perpetrators of the Attacks.

*Qui Tam Action*. Plaintiffs' Amended Complaint adds claims about supposed links between SCB and terrorist activity made by relators in a *qui tam* action that has been dismissed multiple times by the district court and whose dismissal was affirmed by the Second Circuit. *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18 Civ. 11117, 2020 WL 3619050, at *3–5 (S.D.N.Y. July 2, 2020) (granting government's motion to dismiss relator's claims as "meritless," inconsequential to the government's investigations, and a waste of government resources), *aff'd sub nom. Brutus Trading, LLC v. Standard Chartered Bank*, No. 20-2578, 2023 WL 5344973 (2d Cir. Aug. 21, 2023); *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18 Civ. 11117, 2024 WL 4766997 (S.D.N.Y. Nov. 13, 2024) (denying motion to vacate). Plaintiffs focus in particular on certain alleged banking services involving SCB offices in Gambia and Dubai, none of which was sufficient to support the relator's assertions of additional sanctions violations, much less dealings with an FTO. *See* 2024 WL 4766997 at *4 (finding relator's allegations "threadbare").

According to Plaintiffs, SCB, through its affiliate in Gambia, provided banking services between 2008 and 2012 to Euro African Group Ltd. ("EAGL"), a company allegedly owned by a Lebanese national named Mohammad Bazzi. AC ¶ 665. Plaintiffs allege that SCB should have known of Bazzi's connections to Hezbollah, notwithstanding the fact that Bazzi and EAGL were not designated Specially Designated Global Terrorists ("SDGTs") by OFAC until 2018—***over six years after*** SCB allegedly processed transactions for EAGL. *See* AC ¶ 676. Plaintiffs also allege that between 2008 and 2010, SCB, through its Gambia and Dubai affiliates, provided

banking services to Tajco Ltd., a company supposedly owned by "the Tajideen brothers,"[5] including Husayn Tajideen. AC ¶¶ 383, 679. While the AC alleges in conclusory terms that SCB knew of "the Tajideen family's status as Hezbollah financiers," (AC ¶ 686), only Kassim Tajideen is alleged to have been designated by Treasury during the time that SCB is said to have provided banking services to Tajco Ltd. *See* AC ¶¶ 382, 679–80. And Plaintiffs concede that SCB stopped doing business with Tajco Ltd. in 2010, less than a year after Kassim Tajideen (who is not actually alleged to have co-owned Tajco Ltd.) was designated by Treasury. *See* AC ¶¶ 382–83. The AC does not allege that Tajco Ltd. was designated by OFAC at the time SCB Gambia or SCB Dubai provided any banking services and does not identify a single transaction processed by SCB for these individuals or their companies that involved Hezbollah or the alleged perpetrators of the Attacks.

### B.     The AC Alleges Attacks By Multiple FTOs Over A Nine-Year Period

Plaintiffs allege that they or their family members were killed or wounded in twelve terrorist Attacks in Israel over the nearly nine-year period December 18, 2010 to May 5, 2019, and one Attack in Iraq on June 23, 2011, allegedly "committed, planned, or authorized" by four different FTOs: Hezbollah, Hamas, Palestinian Islamic Jihad ("PIJ"), and/or Jaysh al-Mahdi ("JAM").[6] AC ¶¶ 2, 975–1165. The Attacks involve disparate and disconnected fact patterns across multiple countries, including stabbings, kidnappings, rocket attacks, vehicle attacks, and an assassination. *See* AC ¶¶ 975–1165.

---

[5] The AC appears to conflate multiple "Tajco" entities, all of which have different alleged owners: "Tajco Ltd." (Gambia), co-owned by Husayn Tajideen (AC ¶ 381); "Tajco Sarl" and "Tajco Company LLC" (Lebanon), co-owned by Ali and Kassim Tajideen (*id.*); and "Tajco," owned by Kassim Tajideen (*id.*). The AC's allegations about SCB's banking services relate only to Tajco Ltd., not any other companies. *See* AC ¶ 679.

[6] JAM, one of the alleged perpetrator groups listed in the AC, is not and has never been an FTO. *See* 18 U.S.C. § 2333(d)(2); AC ¶ 217 (alleging in broad terms that "Special Groups" linked with Hezbollah have been designated FTOs, but Plaintiffs do not and cannot assert that JAM is an FTO).

## ARGUMENT

### I.    LEGAL STANDARD; RULES 12(b)(6) AND 8

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff cannot cross the threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557).  In making the plausibility determination, a court may consider only well-pleaded factual allegations and must ignore "legal conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014).

Additionally, Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This is meant "to give the adverse party fair notice of the claim asserted," and to avoid "[u]nnecessary prolixity in a pleading" that "places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (internal quotations omitted); *see also Komatsu v. City of New York*, No. 20 Civ. 7046, 2021 WL 3038498, at *5 (S.D.N.Y. July 16, 2021) (a complaint may violate Rule 8 given "length, redundancy and frequent frolics into seemingly irrelevant materials").

### II.    THE AC FAILS TO PLAUSIBLY ALLEGE THAT SCB AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM

JASTA aiding and abetting requires both that "the defendant [] be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and "the defendant [] knowingly and substantially assist the principal [act of international

-10-

terrorism]." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). Here, the AC fails to allege that SCB had general awareness of any terrorist group or any third party using SCB's banking services to sponsor terrorism, or that SCB knowingly and substantially contributed to any of the Attacks. *See id.* at 506.

Unable to plead any such allegations, in amending their complaints, Plaintiffs have instead added nearly 200 pages, some 500 paragraphs, of allegations with no apparent relevance to their claims against SCB. *See, e.g.*, AC ¶¶ 49–215 (general history of Iranian government's involvement in terrorism); *id.* ¶¶ 260–83 (Iran's alleged terrorist connections to North Korea); *id.* ¶¶ 284–317 (alleged coordination of operations between different terrorist organizations); *id.* ¶¶ 488–524 (history and purpose of United States government's counterterrorism controls). These extraneous allegations violate Rule 8(a), burdening both the Court and SCB with the task of sifting through hundreds of pages of irrelevant information to identify the limited allegations with any potential relevance to Plaintiffs' JASTA claim against SCB. *See Salahuddin*, 861 F.2d at 42. Because the AC fails to state a claim for JASTA aiding and abetting liability, it must be dismissed.

## A.    Plaintiffs Fail To Allege That SCB Was "Generally Aware" Of Any Role In Relevant Terrorist Activity

To plead general awareness, the AC must plausibly allege that: (1) SCB "was aware of [its customers'] connections with [the FTO that committed the attacks] before the relevant attacks," *and* (2) SCB customers "were so closely intertwined with [that terrorist organization's] violent terrorist activities that one can reasonably infer [the bank] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to [the relevant customers]." *Honickman*, 6 F.4th at 501. Plaintiffs fall short on both counts.

*First*, Plaintiffs' citation to reports and articles regarding Iran's (or Gambia's or North Korea's) general connection to terrorism is entirely irrelevant.[7]  None of these reports connects SCB's customers to the FTOs that injured Plaintiffs contemporaneously with SCB's banking services and the dates of the Attacks, and therefore do not support a showing that SCB "was aware of [any customers'] connection" with the FTOs at the relevant time.  *See id.*  Plaintiffs acknowledge that SCB ceased providing banking services to the vast majority of alleged customers many years prior to the Attacks, and years before the vast majority of alleged customers were themselves publicly linked to terrorist activity (if they ever were), making it implausible that SCB knowingly assumed a role in the Attacks.  *See, e.g.*, AC ¶¶ 383, 679. Public sources cited in the AC that are dated *after* the relevant Attacks, sources dated *after* the provision of banking services to an Iran-linked customer ceased and sources unrelated to SCB's customers and banking services do not support general awareness.  *See Honickman*, 6 F.4th at 501–02 (plaintiffs did not satisfy the general awareness element in part because they relied on public sources that post-dated the relevant attacks); *Siegel v. HSBC N. Am. Holdings, In*c., 933 F.3d 217, 224 (2d Cir. 2019) (generalized public reports that bank customer was "believed by some" to have links to terrorist groups and allegations relating to banking services that ceased ten months before the relevant attack failed to establish general awareness); *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21 Civ. 04400, 2022 WL 17993076, at *16–18 (E.D.N.Y. Dec. 29, 2022) (allegations were insufficient to establish general awareness where "[r]ather than providing specific evidence, [the complaint] cite[d] to a plethora of public sources, some of

---

[7] *See, e.g.*, AC ¶¶ 68, 73–84, 155, 158–60, 203–04, 206, 208, 210, 219, 226, 236, 259, 261, 270–71, 279, 282–83, 289–90 (non-exclusive list of cited public sources published after SCB's banking services and/or unrelated to any SCB customer).

which were published after the Relevant Period, and none of which linked Standard Chartered to FTO or FTO affiliates") (emphasis omitted).

*Second*, the AC does not plausibly allege that SCB was aware that, by engaging in financial services that benefited seemingly legitimate entities—some of which are alleged to have ties to Iranian commerce—it was assuming a role in the terrorist activities of other third-party organizations. Plaintiffs' naked assertions of general awareness are plainly insufficient. *See, e.g.*, AC ¶ 477 (conclusory statement that SCB was "aware of a high probability[] that several of its Iranian customers were agents and fronts" for Iran's Terrorist Sponsors); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (explaining that "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement'" must be disregarded on a motion to dismiss (quoting *Iqbal*, 556 U.S. at 678)).

*Third*, Plaintiffs are not helped by their focus on SCB's Agreements in connection with U.S. sanctions violations. *See, e.g.*, AC ¶¶ 4–9, 481, 485, 525–59, 944–45. The Second Circuit and district courts have held that violating U.S. sanctions on Iran, even if such sanctions are characterized as laws designed to prevent terrorist activity, is insufficient to satisfy the general awareness requirement. *See, e.g.*, *Siegel*, 933 F.3d at 224 (OFAC sanctions violations and subsequent DPA entered into with U.S. authorities did not constitute JASTA general awareness, which demands more than awareness "of the organization's connection to terrorism" writ large); *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020) (dismissing ATA claims based on sanctions violations by SCB and other banks because "it is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism—or that the organization or entity to which it is providing financial services supports

-13-

terrorist organizations; the bank must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity"); *O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (dismissing ATA claims based on sanctions violations by SCB and other banks because "[a]llegations regarding Iran's status as a state sponsor of terrorism, as well as allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that Defendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured Plaintiffs").

Nor can Plaintiffs plausibly allege SCB's customers were "closely intertwined" with the FTOs that injured them. Allegations about bank operations in sectors allegedly tied to terrorism funding and based on mere presence in Iran, Gambia or Dubai, are plainly insufficient. *See, e.g.*, AC ¶¶ 474, 477, 479, 580, 599, 647–53 (claiming commercial entities are "agents" of the IRGC or "Iran's Terrorist Sponsors"). Conclusory claims that various terrorist groups are "proxies" of the IRGC or Iranian government (*see, e.g.*, AC ¶¶ 216–83) further attenuate Plaintiffs' allegations. These efforts to conflate separate "persons" do not satisfy JASTA.

These allegations fail because they do not support a connection between *SCB's banking services for its customers* and the Attacks that injured Plaintiffs. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329–30 (2d Cir. 2018) (even where bank provided "material support to a designated terrorist organization" in the form of routine banking services, the mere "knowledge of the organization's connection to terrorism" is insufficient to establish that "the bank was generally aware that it was thereby playing a role" in terrorist activities) (internal quotations omitted); *Wildman*, 2022 WL 17993076, at *7 ("It is not enough for a defendant to be aware "of the organization's connection to terrorism."). Moreover, as the D.C. Circuit explained in *Bernhardt v. Islamic Republic of Iran*, allegations that Iranian customers were on OFAC's list of

-14-

sanctioned entities or that the customers were "nationalized Iranian banks and that Iran has

historically supported terrorist groups, including [the FTO that committed that attack]," are not

sufficient to show that the Iranian customers were "so closely intertwined" with the FTO to infer

general awareness because "sovereign nations invariably maintain legitimate government

activities."  47 F.4th 856, 868 (D.C. Cir. 2022), *cert. denied sub nom. Bernhardt v. HSBC*

*Holdings PLC*, 144 S. Ct. 280 (2023); *see also Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir.

2013) (no proximate causation between terrorist attacks and transfer of funds to Iran because

"the fact remains that Iran is a government, and as such it has many legitimate agencies,

operations, and programs to fund").  Second, and similarly, the AC's conclusory assertion that

the various groups that injured Plaintiffs are IRGC or "Iran's Terrorist Sponsor" "proxies"

cannot support a plausible inference of general awareness.  *See Siegel*, 933 F.3d at 224

(allegations that defendant bank "was aware that [its customer] was believed by some to have

links to [al-Qaeda in Iraq] and other terrorist organizations" were insufficient to "support a

conclusion that [defendant bank] knowingly played a role in the terrorist activities").

In *Siegel*, the plaintiffs alleged that HSBC "provid[ed] financial services to Al Rajhi

Bank, a prominent Saudi bank alleged to have links to terrorist organizations, including [the

terrorist organization responsible for the attacks]," which were worth "billions of U.S. dollars."

933 F.3d at 219–21; *id.* at 223 (describing various media reports connecting HSBC's customer to

terrorist groups, including the group that committed the attacks).  The Second Circuit held that

"[a]t most, the allegations . . . assert that HSBC was aware that [its customer] was believed by

some to have links to . . . terrorist organizations," which is not enough for general awareness.  *Id.*

at 224; *see Honickman*, 6 F.4th at 501 ("the relationship between the defendant and the FTO

should not be so attenuated as in *Siegel*").  Here, there are no well-pleaded allegations that at the

time of SCB's banking services SCB's customers even had reported links to the FTOs that committed the Attacks.  *See Bernhardt*, 47 F.4th at 869 (allegations that HSBC knew customer's accounts "may have been used by terrorists" insufficient for general awareness because "they express only the possibility of a terrorist connection, say nothing about [the relevant FTO] specifically, and focus on conduct occurring years before the bombing").

   None of the references to the various allegedly Iranian or Gambian-linked entities in the AC otherwise satisfies the "general awareness" requirement:

   ***Iranian banks.***  As to SCB's provision of banking services to certain Iranian banks, Plaintiffs principally rely on public sources suggesting in general terms that Iran and Iranian banks have links to terrorist groups.  *See* AC ¶¶ 461–65.  However, the vast majority of those sources date from 2008 or later, which is *after* the banking services for Iranian bank customers that were the subject of the Agreements, which ceased in 2007.  *See* AC ¶¶ 2, 461–65; SOF ¶ 2 (Ex. A).  Until November 2008, the provision of banking services to Iranian entities was permitted under the U-turn exemption provided that the transaction did not involve a U.S. person or end recipient.  *See supra* at 6.  The sources cited in the AC from prior to 2007 refer to Iran's connection to terrorist activity in broad terms that are wholly insufficient to establish SCB's general awareness.  *See, e.g.*, AC ¶¶ 241, 309–11, 396; *see also Bernhardt*, 47 F.4th at 868 (allegations that Bank Melli and Bank Saderat were designated SDGTs for facilitating transfers to the IRGC and to terrorist groups "connect the [Iranian banks] to terrorism generally but fail to support an inference that HSBC had general awareness it was playing a role in *al-Qaeda's* terrorist acts").  The provision of such financial services *three to twelve years* before the Attacks further undercuts any inference of awareness by SCB.  *Siegel*, 933 F.3d at 224.

-16-

Plaintiffs try to rely on declarations from the relators and their witnesses in *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18 Civ. 11117 (S.D.N.Y. Jan. 10, 2020) to argue that SCB allegedly continued providing some limited banking services to Iranian banks between 2008 and 2014 "or early 2015." *See, e.g.*, AC ¶¶ 562–65. However, that case was dismissed by the district court (and the dismissal was upheld on appeal) because of the Government's conclusion that the "relator's allegations did not lead to the discovery of any new [] violations by defendants." *United States ex rel. Brutus Trading, LLC*, 2020 WL 3619050, at *3. Moreover, these allegations do not show any plausible awareness of a link between SCB's banking services and the FTOs that injured Plaintiffs, much less the specific Attacks.

***Caspian and Elyassi.*** The AC also alleges, relying primarily on the 2019 Agreements, that SCB provided banking services to two Iran-linked entities, Caspian (including its predecessor) and Mahmoud Reza Elyassi (including companies he controlled). *See* AC ¶¶ 595, 738. These allegations similarly lack a sufficient connection to the FTOs alleged to have committed the Attacks to establish SCB's general awareness. First, while the AC cites "decades" of governmental reports linking the IRGC to terrorism, *none* is alleged to reference Caspian or Mr. Elyassi. *See, e.g.*, AC ¶¶ 752–55, 758–67, 772, 883. Faced with that insurmountable gap, Plaintiffs allege without support that Caspian was a "front" for the IRGC or had ties to the National Iranian Oil Company ("NIOC"), but no well pleaded facts support that conclusory assertion, much less that SCB had any awareness of any link. AC ¶¶ 777, 782. Similarly, the AC relies on far-fetched speculation and flawed logic to assert that when SCB Dubai provided services to Mr. Elyassi's companies between 2007 and 2011, *see* AC ¶ 595, SCB knew that Mr. Elyassi was an "agent for the IRGC and SLO" seemingly based on his nationality and participation in economic sectors that the IRGC allegedly "monopolized" and thus "the

subject matter of the Elyassi-related transactions was exclusively indicative of IRGC and SLO involvement." AC ¶¶ 807–09, 811 (emphasis omitted).

These barebones assertions fall short of plausibly alleging that SCB was generally aware that Caspian, Mr. Elyassi, or Mr. Elyassi's companies (none of which is alleged to be an SDGT) had any connection to the FTOs that injured Plaintiffs at the time of the banking services or prior to the Attacks, much less were so closely intertwined with the FTOs that the Court could infer that SCB was aware of its supposed role in the FTO's terrorist activities at all, much less the Attacks specifically. *See Bernhardt*, 47 F.4th at 868. The AC does not, and cannot, allege that either Caspian or Mr. Elyassi has been designated for having ties to terrorism. *Cf. Honickman*, 6 F.4th at 491–92, 501 (holding that public sources connecting *the bank's customers* directly to the FTO that committed the Attack "d[id] not support an inference that [defendant bank] was aware of [its customers'] ties with [the FTO] prior to the relevant attacks").[8] Moreover, SCB's banking services for companies affiliated with Mr. Elyassi ceased in 2011, and its banking services for Caspian ceased in 2012, *two years* before all but three of the Attacks (each of which is time-barred in any event, *see infra* Section III).

**Other entities.** Unable to establish that SCB was aware that it was assuming a role in the terrorist activities of third-party organizations with which it had no relationship based on the banking relationships with entirely separate entities outlined in the Agreements, Plaintiffs resort to conclusory allegations about several other entities or organizations that SCB allegedly "knew" played a role in terrorist activities. First, relying on *qui tam* claims that the U.S. Government and the district court held "meritless," *see supra* at 8, the AC alleges that from 2008 to 2012 an SCB office in Gambia provided banking services to EAGL, a company controlled by Mohammad

---

[8] *See also* Elyassi Indictment, *United States v. Elyassi*, No. 19-cr-117 (D.D.C. Apr. 5, 2019) (indicting Mr. Elyassi for violations of U.S. sanctions on Iran, not for contributing to terrorism) (Ex. D).

Bazzi.  AC ¶ 665.  The AC admits that neither Mr. Bazzi nor EAGL was a designated SDGT

until 2018, *six years after* SCB ceased banking services for EAGL (AC ¶ 380), and instead relies

only on generalized reports of a potential connection between Gambia, Mr. Bazzi and terrorism

from the time during which EAGL is alleged to have been an SCB customer (AC ¶¶ 658–59,

673).  These nonspecific allegations are insufficient to establish SCB's awareness of a role in

terrorist activity.  *See supra* at 12; *Bernhardt*, 47 F.4th at 869.  Similarly, relying again on

dismissed *qui tam* claims from *Brutus Trading*, Plaintiffs assert that from 2008 to 2010, SCB's

offices in Gambia and Dubai provided banking services to Tajco Ltd., an entity allegedly co-

owned by Husayn Tajideen and "the Tajideen brothers."  AC ¶¶ 381, 383, 678–79.  As noted

above, Plaintiffs rely on designations of other companies or individuals that are not alleged to be

SCB customers, including a Lebanon-based construction company designated by Treasury for its

funding of Hezbollah in February 2007 (AC ¶ 681) and Kassim Tajideen, who was designated by

Treasury in May 2009 for supporting Hezbollah (AC ¶ 680).  *See supra* 8–9.  Notably, Plaintiffs

do not and cannot cite to any SCB transactions connecting Tajco Ltd. to Hezbollah.  In any

event, as Plaintiffs acknowledge, SCB ceased doing business with Tajco Ltd. shortly after

Kassim Tajideen was designated by OFAC and years before all but one of the Attacks (which is

time barred, *see infra* Section III).  AC ¶ 383.

Finally, the AC makes vague, conclusory allegations regarding SCB's "knowledge" of

the terrorist activities of various non-customers, including the North Korean Reconnaissance

General Bureau ("RGB"), Khatam al-Anbiya ("KAA"), Foundation for the Oppressed, the

NIOC, the National Iranian Tanker Company ("NITC"), Hezbollah, and a Pakistani fertilizer

company.  AC ¶¶ 716–18, 822–26, 908.  The AC contains no well-pleaded allegations that SCB

provided banking services to these entities, let alone banking services relevant to Plaintiffs'

claims or the Attacks.  The AC offers instead conclusory statements that, "[o]n information and belief . . . [SCB] helped [those organizations] access millions of dollars" despite knowledge that they were sanctioned or supported known terrorist groups.  *See* AC ¶¶ 822–26.  These conclusory allegations are plainly insufficient to establish general awareness.  *Wildman*, 2022 WL 17993076, at *18 ("The Complaint additionally alleges that Standard Chartered provided banking services to NIOC and NITC . . . these allegations are conclusory statements that are insufficient to establish general awareness.").

### B. Plaintiffs Fail To Allege That SCB "Knowingly And Substantially Assisted" The Particular Acts Of Terrorism That Harmed Plaintiffs

Plaintiffs' claims fail for the independent reason that the AC does not plausibly allege that SCB "knowingly and substantially assisted" the Attacks.  *Twitter* directs courts to focus on the defendant's actions vis-à-vis the attack that injured Plaintiffs, rather than the terrorist enterprise's broader activities or the value of defendant's services to the enterprise.  598 U.S. at 494–95, 504.  Plaintiffs must plausibly allege (1) that SCB's conduct amounted to "*conscious, voluntary, and culpable participation*" in each Attack, *id.* at 493 (emphasis added), and (2) a sufficient "nexus" between that culpable conduct and "*the commission of the actionable wrong—* here, an act of international terrorism," *id.* at 495 (emphasis added), or (3) "*pervasive, systemic, and culpable assistance* to a series of terrorist activities that could be described as aiding and abetting *each terrorist act*," *id.* at 502 (emphasis added).  The AC contains no well-pleaded allegation that SCB provided any assistance, much less "knowing and substantial" assistance, to any of the FTOs in any manner, let alone in connection with the Attacks.

#### 1. Plaintiffs Fail To Allege "Conscious, Voluntary, And Culpable" Participation In The Attacks

"Knowing" assistance is "not the same general awareness that defines *Halberstam*'s

second element," and requires a more specific showing that evaluates "the defendants' state of mind with respect to their actions and the tortious conduct." *Twitter*, 598 U.S. at 503–04. Plaintiffs' allegations highlight that SCB did *not* consciously, voluntarily, and culpably participate in the Attacks.

*First*, Plaintiffs do not, because they cannot, allege that SCB either processed any transactions relating to the Attacks or transacted any business with Iranian customers that were designated as FTOs—and it follows that they also cannot allege that SCB engaged in any such transactions consciously and culpably. Plaintiffs' conclusory allegations that SCB "knew" that its customers were "fronts" for the IRGC are insufficient under the holding of *Twitter*, which focuses the inquiry on specific attacks or such pervasive and intentional assistance to the FTO that the defendant can be held liable for all of that FTO's attacks. *Id.* at 481–82, 503, 506. Under *Twitter*, a defendant's "lack of intent to support the [FTO]" carries "significant weight" in the analysis. *Amazon Servs. LLC v. United States Dep't of Agric.*, 109 F.4th 573, 583 (D.C. Cir. 2024) (quoting *Twitter*, 598 at 504) (internal quotations omitted). That was so even though the internet-company defendants allegedly "knowingly allow[ed] ISIS and its supporters to use their platforms," "profited from the advertisements placed on ISIS" posts, and "were 'generally aware' of their role in ISIS' overall scheme." *Twitter*, 598 U.S. at 481–82, 503 (citation omitted). Here too, SCB's undisputed "lack of intent to support" terrorism weighs heavily against JASTA aiding and abetting, if not foreclosing liability altogether. *See id.* at 504.

*Second*, the AC tries to bridge the gap between SCB and the Attacks by invoking SCB's allegedly intentional or "willfully blind" provision of banking services to Iran-linked entities in violation of U.S. sanctions. *See, e.g.*, AC ¶¶ 451, 455, 458, 637. But sanctions violations, standing alone, do not establish that SCB affirmatively "induc[ed], encourage[d], solicit[ed], or

-21-

advis[ed] *the commission of the [terrorist act]*," as required to support a JASTA claim. *Twitter*, 598 U.S. at 490 (emphasis added). On the contrary, the "highly attenuated" alleged link between SCB and the terrorists cuts strongly against "conscious and culpable" participation. *Twitter*, 598 U.S. at 506 ("the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort"); *see also Siegel*, 933 F.3d at 224–25 (although plaintiffs alleged that defendant bank provided "nearly $1 billion" in violation of U.S. sanctions to its customer, they "did not advance any non-conclusory allegation that [the terrorist perpetrator] received any of those funds or that [the defendant bank] knew or intended that [the terrorist perpetrator] would receive the funds"); *Bernhardt*, 47 F.4th at 871 ("In light of [plaintiff's] failure to allege a close connection between the [] banks and al-Qaeda, we cannot reasonably infer that [defendant] provided any aid to al-Qaeda.").[9]

### 2. Plaintiffs Fail To Plausibly Allege The Requisite Nexus To Support An Aiding And Abetting Claim

Plaintiffs also fail to allege a concrete "nexus" connecting SCB's supposed assistance and "the *act of international terrorism* that injured [them]." *Twitter*, 598 U.S. at 497 (emphasis added). It is not enough for a plaintiff to allege that a defendant gave "assistance to [the terrorist group's] activities in general." *Id.* at 503. Nowhere in the AC's 427 pages is there a single allegation tying any banking services by SCB to the commission of the Attacks.

*First*, the AC does not contain a single well-pleaded allegation that the Attacks were

---

[9] The Supreme Court recently granted certiorari and summarily reversed and remanded a decision in another JASTA aiding and abetting case for further consideration in light of *Twitter*. *AstraZeneca UK Ltd. v. Atchley*, No. 23-9 (U.S. June 24, 2024). The D.C. Circuit had held that the "knowing and substantial assistance" element was sufficiently established because "defendants' assistance was knowingly provided with a general awareness that it supported the terrorist acts of a notoriously violent terrorist organization that had overrun [Iraq's] Ministry of Health," among other factors. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022). In a brief filed in support of vacating and remanding the D.C. Circuit decision, the Solicitor General explained that when a plaintiff does not allege that the defendant "directly channeled resources" to a terrorist organization, there is reason to doubt the appropriateness of "draw[ing] an inference of conscious and culpable participation." Brief for the United States as Amicus Curiae at 19–20 (ECF No. 11), *Atchley*, No. 23-9.

committed with SCB's assistance.  In *Twitter*, the Court concluded that the connection was

"highly attenuated" because there were no allegations "connecting the Reina attack with ISIS'

use of the[] platforms."  598 U.S. at 500.  And in *Siegel*, the Second Circuit concluded that

substantial assistance was not pleaded, because while "the plaintiffs did allege that HSBC

provided hundreds of millions of dollars to [its customer]," they "did not advance any non-

conclusory allegation that [the FTO] received any of those funds or that HSBC knew or intended

that [the FTO] would receive the funds."  933 F.3d at 225.

The claims here are even more attenuated than those in *Twitter* and *Siegel* because

Plaintiffs do not allege that the perpetrators of the Attacks ever used SCB's banking services or

that SCB's customers had a direct connection to the FTOs, let alone the Attacks.  *Cf. Twitter*,

598 U.S. at 501–07 (determining that there was no "concrete nexus" between defendants and the

attacks, even though defendants provided services directly to ISIS, the actual perpetrator of the

attacks).  There are no plausible allegations that any funds involved in any transaction processed

by SCB ever reached the IRGC or "Iran's Terrorist Sponsors," let alone reached any FTO or

funded any Attack.  Nor does the AC allege anything suggesting that the alleged transactions

rendered SCB "present" during the Attacks.  *Siegel*, 933 F.3d at 225.  And Plaintiffs do not

allege that SCB took some affirmative act with the intent of facilitating the commission of the

Attacks.  *See Twitter*, 598 U.S. at 490.

*Second*, Plaintiffs cannot fill the gap with broad assertions concerning the IRGC's alleged

seizure of "sector-wide monopolies in key Iranian markets."  *See* AC ¶¶ 424–71.  As an initial

matter, the AC contains no well-pleaded allegation that SCB actually knew about such market

monopolies or specific monopoly control of any SCB customers, much less how that control

linked to Hezbollah, Hamas, PIJ, and JAM.  Moreover, this aspect of Plaintiffs' theory is many

additional steps removed from the insufficient allegation, rejected by the Supreme Court in *Twitter*, of purported "substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. at 495. Whereas the *Twitter* plaintiffs had alleged that the defendants had provided services directly to the FTOs, Plaintiffs here rely on vague allegations about banking services to entities multiple steps removed from each other in a speculative chain of intermediaries that is even further removed from the FTOs and the Attacks.

### 3. Plaintiffs Fail To Plausibly Allege That SCB "Systematically And Pervasively" Assisted The Terrorist Activities At Issue

*Twitter* recognized a narrow exception where a defendant gives "pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." 598 U.S. at 502. To meet this exception, Plaintiffs face a "drastically increase[d]" burden to show SCB "affirmatively gave aid that would assist each of [the] terrorist acts" or "formed a near-common enterprise" with the terrorist group. *Id.* at 502–03. Plaintiffs' feeble invocation of the Supreme Court's "pervasive and systemic" phrasing to describe SCB's alleged assistance is no more than conclusory labelling that fails *Twombly*. *See* AC ¶¶ 555, 1175.

The Supreme Court observed that such a theory of liability "begins to blur with conspiracy liability" as it seeks to impose liability for "every wrongful act committed by [the] enterprise." *Twitter*, 598 U.S. at 496. Plaintiffs fail to allege that SCB gave affirmative aid to the terrorist operations of any of the perpetrators, much less that it "formed a near-common enterprise" with them "of the kind that could establish such broad liability." *Id.* at 502. Similarly, in *Freeman*, the Second Circuit concluded that allegations based on Iranian sanctions violations by SCB and other banks did not support conspiracy liability for terrorist attacks by

-24-

alleged proxies of the IRGC.  *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023).  To the extent Plaintiffs try to rely on conspiracy-like aiding and abetting claims for "pervasive and systemic" assistance, the absence of a direct link between any transactions and the attacks that led to dismissal of the JASTA claim in *Freeman* applies here more forcefully.

Plaintiffs' allegations are also nothing like the provision of "dangerous wares" the Supreme Court alluded to in *Twitter* when it contemplated circumstances for "pervasive, systemic, and culpable assistance," 598 U.S. at 502 ("There may be, for example, situations where the provider of routine services . . . provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack.").  Not only do Plaintiffs fail to allege that SCB provided any services whatsoever to the perpetrators of the Attacks or even the IRGC or "Iran's Terrorist Sponsors," but the provision of financial services is different in kind from the specialized, terrorism-related activities discussed as examples in *Twitter*.  Moreover, nothing in the AC suggests that SCB intended to form a terrorist enterprise with any of the alleged perpetrators of the Attacks (all unknown to SCB) or took any active role in their operations or activities.[10]

Nor does the volume of SCB's alleged banking services in violation of U.S. sanctions and generalized claims of the Iranian government funding terrorist groups change the analysis. Courts analyzing similar aiding and abetting claims against SCB and other banks have determined that the plaintiffs did not plead substantial assistance, much less participation in a common enterprise.  *See, e.g.*, *Siegel*, 933 F.3d at 225 (banking services to customer with alleged terrorist links did not establish substantial assistance to FTO's attack); *Bernhardt*, 47 F.4th at 871

---

[10] *See* Brief for the United States as Amicus Curiae at 18–20 (ECF No. 11), *Atchley*, No. 23-9 (noting that *Twitter* "did not approve imposing liability whenever a plaintiff can identify an atypical transaction with an organization that affiliates with terrorists" and that respondents' failure to allege that petitioners "directly channeled" resources to a designated FTO was fatal) (citing *Twitter*, 598 U.S. at 502).

(no substantial assistance where "[plaintiff] alleged that HSBC facilitated over $19 billion in transactions with Iranian institutions and provided almost $1 billion in currency sales to [customer]" without alleging "how much (if any) of that money indirectly flowed to [FTO]").

## III.    THE 2010 AND 2011 ATTACKS ARE TIME-BARRED

"Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness, as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (dismissing time-barred claims) (internal quotations omitted).  The *Fraenkel* Complaint was filed on June 11, 2024, *Fraenkel* (ECF No. 1), and the *Brauner* Complaint on July 30, 2024, *Brauner* (ECF No. 1).  Accordingly, the Attacks on December 18, 2010 (AC ¶¶ 975–85) and August 19, 2011 in Israel (AC ¶¶ 986–96) and on June 23, 2011 in Iraq (AC ¶¶ 1156–65) fall well outside the ten-year limitations period under the ATA.  18 U.S.C. § 2335.

Plaintiffs seek to overcome this threshold defect by claiming that the date their injuries "accrued" should be counted from the date of JASTA's September 28, 2016 enactment.  AC ¶ 970.  Plaintiffs' sweeping argument would mean that no cause of action ever "accrues" until the statute creating the cause of action exists.  This theory has no support in the statutory text or the case law.  Section 2335(a) provides that suits for damages under the ATA must be brought "within 10 years after the date the cause of action accrued."  18 U.S.C. § 2335(a).[11]  It is well established that claims accrue upon discovery of the injury.  *See Pearl v. City of Long Beach*,

---

[11] The relevant statute of limitations is contained in the National Defense Authorization Act, which also provided a limited exception, inapplicable here, that a civil suit under 18 U.S.C. § 2333 arising out of an act that occurred between September 11, 2001, and four years before the passage of the law (*i.e.*, January 2, 2009) could be maintained up to six years after enactment (*i.e.*, January 2, 2019).  *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 1251(c), 126 Stat. 1632, 2017 (2013); 18 U.S.C. § 2333 note.

296 F.3d 76, 80 (2d Cir. 2002) ("accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action") (internal quotations omitted); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("discovery of the injury, not discovery of the other elements of a claim, is what starts the clock"). Here, the claims accrued when Plaintiffs were allegedly injured, meaning claims that accrued in 2010 and 2011 lapsed in 2020 and 2021, respectively.

In the alternative, the AC suggests that Plaintiffs may claim that fraudulent concealment tolls the limitations period until SCB's 2019 Agreements. AC ¶¶ 971–74. Plaintiffs' assertions are insufficient as a matter of law to support the extraordinary remedy of equitable tolling. Here, the original DPA and Agreements relating to SCB's sanctions violations became public in December 2012. Plaintiffs fail to allege any facts showing that, in waiting over twelve years from the 2012 Agreements and eight years from the 2016 enactment of JASTA they "(1) . . . pursue[d][their] rights diligently, and (2) that some extraordinary circumstances stood in [their] way." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012) (internal quotation omitted). This is particularly so given that similar claims were brought against SCB and other banks years ago (in 2014) in *Freeman*, No. 14-cv-6601, for example, and (in 2017) in *O'Sullivan*, No. 17-cv-8709—both of which have been dismissed for failure to state a claim.[12] *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (holding that "[r]easonable diligence is a prerequisite to the applicability of equitable tolling" and concluding that plaintiff did not apply reasonable diligence where he "did not pursue any investigation for over four years after" learning the facts constituting the alleged violation) (internal citations omitted). The AC

---

[12] *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023); *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709, 2019 WL 1409446 (E.D.N.Y. Mar. 28, 2019); *see also, e.g.*, *Freeman v. HSBC Holdings PLC*, 18-cv-7359 (E.D.N.Y.) (filed 2018) ("*Freeman II*"); *O'Sullivan v. Deutsche Bank AG*, 18-cv-12325 (S.D.N.Y.) (filed 2018) ("*O'Sullivan  II*"); *Bowman v. HSBC Holdings PLC*, 19-cv-2146 (E.D.N.Y.) (filed 2019). The operative complaints in *Freeman II* and *Bowman* were also dismissed for failure to state a claim in 2020. *See Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220 (E.D.N.Y. 2020).

does not allege any reason, let alone a plausible particularized reason, for Plaintiffs' protracted delay.

## IV.    THE AC FAILS TO ALLEGE PERSONAL JURISDICTION OVER SCB

This Court can and should "assume jurisdiction" and dismiss the AC on the straightforward substantive grounds detailed above, "as a means of preventing waste of judicial resources." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring).  However, the AC is also subject to dismissal on the ground that it fails to allege sufficient facts to establish a prima facie basis for exercising jurisdiction over SCB.

SCB is a U.K.-based bank, organized under the laws of England and Wales, whose principal place of business is in London, England.  *See* AC ¶ 18; Ex. A at 1.  It is therefore not "at home" in New York for general jurisdiction purposes.  *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (for corporations, "the place of incorporation and principal place of business are paradigm bases for general jurisdiction" (internal quotations and citations omitted)).

Specific jurisdiction is similarly absent.  Specific jurisdiction requires an "affiliation between the forum and the underlying controversy . . . [A] defendant's general connections with the forum are not enough to support the exercise of specific jurisdiction."  *SPV*, 882 F.3d at 344 (internal citation omitted); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("[S]pecific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'").  In order to establish minimum contacts for purposes of specific jurisdiction, therefore, "[t]he defendant's suit-related conduct must create a *substantial connection* with the forum State."  *SPV*, 882 F.3d at 344 (emphasis added) (internal quotations and citations omitted).  Here, because of the lack of a nexus between SCB's banking services and the Attacks, *see supra* at 22, the AC also fails to

meet the basic statutory and constitutional requirements for claim-related minimum contacts even on a prima facie basis.

*First*, the AC alleges generally that SCB maintains a New York branch and provided "substantial assistance to the IRGC and its terrorist proxies" through SCB New York branch "U.S. dollar clearing, foreign exchange and trade financing services for SCB's Iranian customers." AC ¶¶ 25–28. But Plaintiffs do not allege (because none exists) *any* transactions linking any SCB financial services to the FTOs that committed the Attacks, meaning the "necessary connection" for personal jurisdiction to the Attacks is missing. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 865 (D.C. Cir. 2022) (affirming dismissal of foreign HSBC defendants for lack of personal jurisdiction because plaintiffs' allegations showing "possible connections between [clients of HSBC] and terrorism generally" and HSBC's coordination with its U.S. affiliates to violate U.S. sanctions were "not enough to allow [the court] to infer the necessary connection to al-Qaeda specifically, or that the foreign HSBC defendants' conduct was related to [plaintiffs'] injuries at al-Qaeda's hand"); *supra* at 13–16.[13] Here, as in *Bernhardt*, "without allegations supporting a closer connection between the sanctions evasion and [each relevant FTO]'s activities, allowing [Plaintiffs] to sue [SCB] would collapse the core distinction between general and specific personal jurisdiction." *Id.* at 863–66.

Generalized speculations that funds were transferred through the New York branch of a foreign bank without alleging *claim-related* conduct are insufficient for personal jurisdiction. The allegations here stand in stark contrast to *Licci ex rel. Licci v. Lebanese Canadian Bank,*

---

[13] *Compare Bonacasa v. Standard Chartered PLC*, No. 22 Civ 3320, 2023 WL 2390718, at *7–8 (S.D.N.Y. Mar. 7, 2023) (concluding that it had specific personal jurisdiction over SCB based on meeting in New York and New York branch's services to customer that allegedly supplied FTO) *with Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 768 (S.D.N.Y. 2021) (rejecting specific personal jurisdiction over SCB where "vast majority" of alleged acts "occurred abroad" because complaint "d[id] not reveal sufficient 'suit-related conduct' in New York").

*SAL*, where the Second Circuit found minimum contacts for ATA purposes because the defendant allegedly carried out transfers for Hezbollah's financial arm "*in order to assist and advance* [its] terrorist activities," and thus the defendant had selected and repeatedly used New York's banking system "for accomplishing the alleged wrongs for which the plaintiffs [sought] redress." 732 F.3d 161, 170–71 (2d Cir. 2013) (emphasis added). Under *Twitter*, the AC falls far short of establishing a nexus between SCB and the Attacks. *See supra* at 22.

*Second*, allegations that SCB "made several misrepresentations to New York authorities—principally NYDFS"—regarding banking services in violation of U.S. sanctions, and that this "deceptive conduct" substantially assisted the FTOs that injured Plaintiffs "by preventing law enforcement from discovering and putting an end to the full extent of SCB's malfeasance," are also insufficient. AC ¶ 28. SCB's resolutions with U.S. authorities cannot give rise to specific personal jurisdiction because Plaintiffs' claims do not arise from them. In *Bernhardt*, the D.C. Circuit found the terrorist attack that injured plaintiff did not "ar[i]se out of or relate[] to" "HSBC's sanctions evasion on behalf of [Iranian] intermediary banks" and affirmed dismissal of ATA claims against foreign HSBC defendants for lack of personal jurisdiction. 47 F.4th at 864. Similarly here, Plaintiffs' injuries from the Attacks plainly do not "arise out of" SCB's communications with U.S. authorities about sanctions issues or the underlying sanctions-related conduct. In addition, Plaintiffs acknowledge that any such conduct by SCB principally occurred outside the United States. *See, e.g.*, AC ¶¶ 533, 567, 636.

The claims against SCB must be dismissed for lack of personal jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the AC in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6), 8(a), and 12(b)(2).

Dated: December 3, 2024
      New York, New York

Respectfully submitted,


*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Abena Mainoo
Leila Mgaloblishvili
cboccuzzi@cgsh.com
amainoo@cgsh.com
lmgaloblishvili@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

*Attorneys for Defendant Standard Chartered Bank*