**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ABRAHAM FRAENKEL, individually, and for the estate of YAAKOV FRAENKEL, RACHELLE FRAENKEL, AVIGAIL FRAENKEL, AYALA FRAENKEL, N.F. by and through her next friend Abraham Fraenkel, NOGA FRAENKEL, S.F. by and through his next friend Abraham Fraenkel, TZVI FRAENKEL, KATHLEEN ALT, individually, and for the estate of KRISTINE LUKEN, LAWRENCE LUKEN, GERALD LUKEN, MARGARET LUKEN, SAMUEL BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, CHANA BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, ESTHER BRAUN, MURRAY BRAUN, SARA HALPERIN, SHIMSHON HALPERIN, MICAH LAKIN, individually, and for the estate of RICHARD LAKIN, MANYA LAKIN, RONEN BOROCHOV, DEVORA BOROCHOV, JOSEF BOROCHOV, ELI BOROCHOV, AVRAHAM BOROCHOV, SHIRA BOROCHOV, SHARI BOROCHOV, YOAV GOLAN, ROTEM GOLAN, YEHUDIT GREEN-GOLAN, RAPHAEL GOLAN, MATAN GOLAN, MENACHEM RIVKIN, BRACHA RIVKIN, Malka Rivkin, R.R. by and through her next friend Menachem Rivkin, S.R. by and through his next friend Menachem Rivkin, S.Z.R. by and through his next friend Menachem Rivkin, STERNA RIVKIN, STUART FORCE JR., individually, and for the estate of TAYLOR FORCE, ROBBI FORCE, KRISTEN BOSWELL, RAPHAEL LISKER, SHOSHANA LISKER, TAMAR GUTMAN, AVITAL LEJZOR, DANIEL LISKER, JONATHAN LISKER, STEPHANIE ZOBAY, individually, and for the estate of STEPHEN EVERHART, HANNAH EVERHART, LINDSAY EVERHART, and HAYDEN EVERHART, <br><br>     Plaintiffs, <br><br>    v. <br><br>STANDARD CHARTERED BANK, <br><br>    Defendant. | 24-cv-4484-MMG-RWL <br><br><br> JURY TRIAL DEMANDED |

SHMUEL BRAUNER, NECHAMA BRAUNER, C.B. by and through his next friend Shmuel Brauner, ESTHER BRAUNER, MORDECHAI BRAUNER, YEHUDAH GLICK, individually, and for the estate of YAFFA GLICK, HALLEL GLICK, NERIA GLICK, SHAHAR GLICK, SHLOMO GLICK, RACHEL GLICK, TATIANA GLICK, AVITAL BREUER, NOAM SHAMBA, YANA SHAMBA, HADAR SHAMBA, M.S. by and through his next friend Noam Shamba, N.E.S. by and through his next friend Noam Shamba, N.S. by and through her next friend Noam Shamba, O.S. by and through her next friend Noam Shamba, T.S. by and through her next friend Noam Shamba, HADASSAH PRZEWOZMAN, individually, and for the estate of PINCHAS PRZEWOZMAN, Y.P. by and through his next friend Hadassah Przewozman, CHAIM PRZEWOZMAN, CHAYA PRZEWOZMAN, AVRAOHOM PRZEWOZMAN, F.P. by and through her next friend Chaim Przewozman, ZVI PRZEWOZMAN, SARA ROZENBAUM, and YAFA SHECHTER,

       Plaintiffs,

    v.

STANDARD CHARTERED BANK,

       Defendant.

24-cv-5788-MMG-RWL

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT
## FOR VIOLATIONS OF THE ANTI-TERRORISM ACT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 4

THE PARTIES...................................................................................................................... 12

    A.    Plaintiffs............................................................................................................ 12

    B.    Standard Chartered Bank ................................................................................. 13

JURISDICTION AND VENUE ........................................................................................... 14

SOURCING ......................................................................................................................... 15

FACTUAL ALLEGATIONS ............................................................................................... 16

I.      Iranian Terrorists Used Their Oil And Gas Sector Monopoly To Enable Terrorist Attacks By Hizballah, Hamas, Palestinian Islamic Jihad, And Jaysh al-Mahdi............... 16

    A.    Iran's Terrorist Sponsors................................................................................... 16

    B.    The Terrorist Sponsors' Control Over Iran's Oil and Gas Sector ........................ 37

    C.    The Terrorist Sponsors' Tools for Siphoning Value from the Economy.............. 59

    D.    The Terrorist Sponsors' Proxies ........................................................................ 66

    E.    The Mechanics of the Terrorist Sponsors' Support to Their Proxies ................... 77

II.     The U.S. Government Imposed Counterterrorism Controls To Prevent The U.S. Financial System From Being Used To Finance Iranian Terrorism And Repeatedly Warned That Financial Services To Iranian Oil And Gas Fronts Would Facilitate Terrorist Attacks ............................................................................................................. 88

    A.    The U.S. Government's Counterterrorism Controls............................................. 89

    B.    The U.S. and European Governments' Warnings That Iran's Oil and Gas Transactions Caused Terrorist Attacks ................................................................ 106

III.    SCB Knowingly Provided Substantial Assistance By Covertly And Unlawfully Helping Iran's Terrorist Sponsors Extract Billions Of Dollars From Iran's Oil And Gas Industry To Enable Their Terrorist Attacks............................................................ 122

    A.    Determined to Serve Iran's Oil and Gas Sector in Flagrant Defiance of U.S. Counterterrorism Controls and Warnings, SCB Provided Extraordinary, Illegal Services for NIOC and Other Iranian Customers............ 122

    B.    SCB Provided Extraordinary, Illegal Services to IRGC Front Caspian Petrochemical FZE................................................................................................ 137

IV.    SCB's Services For NIOC And Caspian Petrochemical FZE Substantially Assisted The Terrorist Attacks That Injured Plaintiffs.................................................................. 145

A.     SCB's Transactions Flowed Billions of Dollars to the Terrorist Sponsors for Terrorist Attacks ........................................................................... 147

B.     The Terrorist Sponsors Dedicated Most of the Money They Received Through their Fronts' Transactions with SCB to Support Terrorist Attacks by Hizballah, Hamas, PIJ, and JAM in Israel and Iraq ...................................... 149

C.     The Terrorist Attacks on Plaintiffs Benefitted from the Support SCB Financed ........................................................................................................ 210

D.     The Executive's and Congress's Findings from 1996 through 2024 Confirm That SCB's Services Enabled Attacks by Hizballah, Hamas, PIJ, and JAM ................................................................................................... 223

E.     SCB Supplied Long-Lasting Assistance that Continued Aiding Terrorist Attacks Through at Least 2019 ................................................................... 237

V.     SCB Knew That Providing Financial Services To NIOC And Caspian Petrochemical FZE Would Enable Hamas, Hizballah, Palestinian Islamic Jihad, And Jaysh al-Mahdi Terrorist Attacks .................................................................................. 238

A.     Iran's Own Statements and Actions ................................................................. 240

B.     Iran's Government Structure ............................................................................ 243

C.     Warnings by the U.S. Government, Foreign Governments, Media Outlets, and Others ...................................................................................................... 244

D.     Other Evidence ................................................................................................ 258

VI.     SCB Provided Pervasive, Systemic, And Culpable Assistance Over More Than A Decade To Help The Terrorist Sponsors Conceal Their Financial Infrastructure From The U.S. Government ................................................................................................. 268

VII.     SCB Engaged In Other Misconduct That Assisted The Attacks Against Plaintiffs ....... 276

A.     SCB Facilitated Sanctions Evasion for Likely IRGC Agent Mahmoud Reza Elyassi ................................................................................................... 277

B.     SCB Facilitated Hizballah Financing Through Schemes in Gambia ................. 282

C.     SCB's Culture of Defiance Suggests That Additional Violations Occurred ...... 295

D.     SCB Promoted a Culture of Illegality by Retaliating Against Whistleblowers ................................................................................................ 299

VIII.     Plaintiffs' Claims Are Timely ................................................................................. 301

IX.     Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, Or Authorized By Iran-Sponsored Foreign Terrorist Organizations ........................................................................................................ 302

A.     The December 18, 2010 Stabbing Attack in Israel (Luken Family) .................. 302

B.     The August 19, 2011 Rocket Attack in Israel (Brauner Family) ........................ 303

C.     The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family) ................... 305

D.     The October 22, 2014 Vehicle Attack in Israel (Braun Family) ........................ 307

E.     The October 29, 2014 Assassination Attack in Israel (Glick Family) ................ 309

F.     The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family) ................................................................................................................. 311

G.     The November 6, 2015 Sniper Attack in Israel (Borochov Family) .................. 312

H.     The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families) ............................................................................................................. 315

I.     The January 27, 2016 Stabbing Attack in Israel (Rivkin Family) ..................... 317

J.     The March 8, 2016 Stabbing Attack in Israel (Force Family) ........................... 319

K.     The December 23, 2016 Stabbing Attack in Israel (Lisker Family) .................. 320

L.     The May 5, 2019 Rocket Attack in Israel (Przewozman Family) ..................... 322

M.     The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family) ..................... 324

CLAIM FOR RELIEF ................................................................................................... 326

JURY DEMAND ............................................................................................................ 330

PRAYER FOR RELIEF ................................................................................................. 330

3

**INTRODUCTION**

1.  This action seeks damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, specifically the aiding-and-abetting cause of action created by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016), against Standard Chartered Bank ("SCB") for aiding and abetting acts of international terrorism that killed and injured Americans in Israel and Iraq between 2010 and 2019.

2.  It is the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). This case advances these vital national interests.

3.  Since the 1990s, authoritative sources—including statements from the U.S. government, the Iranian government, the United Nations, and knowledgeable experts—have all warned that a specific group of institutions and organizations in the Iranian regime—including the Islamic Revolutionary Guard Corps ("IRGC"), Ayatollah Khamenei and his Supreme Leader's Office ("SLO"), the Foundation for the Oppressed, and Hizballah (collectively "Iran's Terrorist Sponsors")—systematically used Iranian oil and gas revenues to enable terrorist violence by Foreign Terrorist Organizations ("FTOs"), including Hamas, Hizballah (and its proxy Jaysh al-Mahdi ("JAM")), and Palestinian Islamic Jihad ("PIJ"), which acted as proxies of Iran's Terrorist Sponsors for committing terrorist attacks targeting Americans in the Middle East, including the attacks on Plaintiffs in this case. These warnings spiked after the September 11, 2001 attacks, and further escalated in the years that followed.

4

4.    Iran's Terrorist Sponsors captured sectors of Iran's economy, including its oil and gas sector, and turned businesses in those sectors into fronts to finance terrorism. The Terrorist Sponsors did so through specific mechanisms designed to siphon money directly and inexorably from the commercial activities they controlled to the terrorist operations they led and enabled. In its scale, efficiency, and deadly consequences, it amounted to a terrorism machine.

5.    The United States accordingly imposed comprehensive sanctions not only on the Terrorist Sponsors and proxy groups themselves, but also on the Iranian oil and gas enterprises and financial institutions they used to fuel their terrorism machine. The animating principle behind these sanctions—enshrined in factual findings by the political branches—was that facilitating Iranian oil and gas business inexorably caused terrorist violence by the Terrorist Sponsors' proxy groups. Responsible banks heeded these warnings, obeyed the sanctions, and refused to do business with Iranian petrochemical companies and financial institutions.

6.    From at least 2001 until at least early 2015, SCB did the opposite, soliciting and conducting illicit transactions for Iranian banks that facilitated Iran's oil and gas business and for petrochemical companies that were controlled by the Terrorist Sponsors and were conduits for support to the designated FTOs that planned and committed the attacks in this case.

7.    SCB's misconduct began in 2001, when the Central Bank of Iran ("CBI/Markazi") asked SCB to act as its correspondent bank with respect to international U.S.-dollar payments, including relating to oil sales by the National Iranian Oil Company ("NIOC"). This arrangement would make SCB a key intermediary between Iran's oil business and the U.S. financial system, enabling Iran's banks to benefit from the U.S. financial system without accessing it directly. The CEO of SCB's Iran representative office declared that "[t]o be the bank handling Iran's oil receipts would be very prestigious for SCB," and so SCB eagerly

5

pursued that business and then grew it. As an internal SCB memorandum explained in 2005, SCB's "strategy [was] to grow the wholesale business by growing our wallet share from existing relationships with Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."

8. These opportunities, however, were only available to a bank willing to violate U.S. law by giving Iran's Terrorist Sponsors an illicit benefit: secrecy. The Iranians wanted their bankers to help them access the U.S. financial system while without notifying the U.S. government—an arrangement that was anathema under U.S. law. The Bank Secrecy Act ("BSA"), which Congress strengthened shortly after the September 11 attacks to require heightened due diligence on foreign correspondent accounts, required U.S. banks and U.S. branches of foreign banks to carefully review high-risk transactions and report suspicious activity to the U.S. government. In a speech on November 7, 2001, President Bush underscored the importance of these measures in light of the inextricable link between terrorist financing and terrorist attacks. Terrorist financiers "present themselves as legitimate businesses" while they "skim money from every transaction, for the benefit of terrorist organizations," enabling proceeds "in one country to be transferred to pay for terrorist acts in another." A key front in the war on terror was thus fought through the BSA "by gathering intelligence and by cutting off the terrorists' money." President Bush noted, "follow the network to its center and you discover wealthy banks" working "at the service of mass murderers." He delivered "a clear message to global financial institutions: you are with us or you are with the terrorists."

9. SCB sided with the terrorists. SCB won Iranian business by providing the illicit secrecy these customers desired, actively helping them evade legal requirements designed to detect and prevent the flow of money to terrorists. This included doctoring wire transfer

6

messages to conceal that the beneficiaries were Iranian, falsifying customer due diligence documents, lying to regulators, and coaching customers to evade anti-terrorism financial controls. Through these unlawful acts, SCB enabled the Terrorist Sponsors to covertly raise, move, and spend billions of dollars in oil and gas money for terrorist attacks.

10.     Through at least 2007, SCB processed hundreds of billions of dollars in transactions for CBI/Markazi, as well as other notorious terrorist banks including Bank Saderat and Bank Melli. These transactions were executed through the U.S. via extraordinary means to obscure their nature and origin. They were not ordinary or routine banking.

11.     SCB's misconduct was exposed by enforcement actions, the first of which became public in 2012. These included a deferred prosecution agreement with the U.S. Department of Justice ("DOJ"); a settlement agreement with the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("Treasury"); a settlement with the Board of Governors of the Federal Reserve; and a consent order with the New York Department of Financial Services ("NYDFS"). These resolutions make clear just how conscious and culpable SCB's actions were.

12.     NYDFS's 2012 Consent Order concluded: "SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran—dealings that indisputably helped sustain a global threat to peace and stability." Indeed, SCB's contempt for the U.S. government's warnings about terrorist financing was palpable. When SCB's New York bankers raised concerns in 2006 that SCB's Iran business risked "very serious or even catastrophic reputational damage" to the bank and "serious criminal liability" for

its executives, SCB's Group Executive Director in London, Richard Meddings, conveyed SCB's prevalent attitude, responding: "***You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians.***"[1]

13.     To facilitate resolutions of the enforcement actions, SCB agreed to pay hundreds of millions of dollars and promised that its offending conduct had ceased in 2007. That promise was false. SCB relocated its Iran business from Tehran to Dubai, and in the second phase of SCB's schemes occurring between 2008 and 2015, SCB continued to covertly move money for fronts and agents of Iran's Terrorist Sponsors.

14.     Most significantly, as U.S. government warnings blared that Iran was using its oil and gas sector to fund terrorism, and that Iran's Terrorist Sponsors had effectively seized control of the sector, SCB moved at least $150 million for an Iranian petrochemical company (a/k/a Caspian Petrochemical FZE), which SCB knew was a front for Iran's Terrorist Sponsors. SCB bankers falsified customer due diligence documents, stripped wires, lied to OFAC, and coached the company about how to evade counterterrorism controls (including by instructing it to change its name to avoid detection), thus enabling this terrorist front to continue to covertly move money through the U.S. financial system.

15.     These additional violations resulted in additional enforcement actions against SCB, which became public in 2019. SCB agreed to pay approximately $1.1 billion for violations of multiple sanctions programs running from June 2009 until May 2014. As these stiff penalties show, SCB's violations were not the actions of a few bad apples. Instead, the employees who

---

[1] NYDFS, *In re Standard Chartered Bank, New York Branch*, Order Pursuant to Banking Law §39 ¶¶ 7-8 (Aug. 6, 2012) ("2012 NYDFS Consent Order"). Unless otherwise indicated, Plaintiffs have added all emphases contained herein.

committed these violations acted fully within the scope of their employment, and SCB admitted that it was responsible for all of their relevant conduct.

16.    In addition to serving commercial fronts for Iran's Terrorist Sponsors, SCB also assisted notorious Hizballah supporters, including Muhammad Bazzi and his Euro African Group Ltd. ("EAGL") in Gambia, as well as Tajco, Ltd. and its owners, who were sanctioned by the United States for supporting Hizballah.

17.    SCB's violations were only possible because the bank maintained a corporate culture that actively flouted U.S. counterterrorism warnings and controls. Plaintiffs thus believe that the severe misconduct exposed in the public enforcement actions constitutes only part of the picture, and that a full investigation of SCB's business will reveal even more misconduct through which SCB knowingly assisted terrorist fronts.

18.    But the public record of SCB's misconduct is more than enough. Indeed, in parallel JASTA litigation against another European bank—BNP Paribas S.A.—this Court (Judge Clarke) denied the defendant's motion to dismiss when the bank assisted one of the *exact same customers* in an indistinguishable manner. *See Moses v. BNP Paribas, S.A.*, --- F. Supp. 3d ----, 2025 WL 2780803 (S.D.N.Y. Sept. 30, 2025). As the Court explained, it was "a reasonable inference that [the bank] was aware of" Caspian Petrochemical's "connections with the Terrorist Sponsors, and that they were intertwined with the Terrorist Sponsors," and the bank's "provision of financial services that willfully violated sanctions laws and deterred the ability of the United States to identify and ascertain the identities of their customers, despite a wealth of information linking FTOs to front companies in the oil and gas sectors, constitutes the very kind of culpable conduct contemplated by aiding-and-abetting liability." *Id*. at *12, 15.

9

19.     Although SCB paid large fines to the U.S. government in recognition of its immense culpability, SCB has not yet paid its debt to the victims who suffered as a result of its misconduct. The nexus between SCB's misconduct and the terrorist attacks that killed or injured Plaintiffs and their loved ones is concrete. SCB knew that its Iranian customers were not ordinary or innocent businesses, but were instead fronts owned or controlled by Iran's Terrorist Sponsors. SCB recorded in its own due diligence documents that Caspian was beneficially owned by the government of Iran—a state-owned oil and gas enterprise which had been taken over by the elements of the Iranian regime most single-mindedly committed to using oil and gas proceeds to finance terrorism. Those Terrorist Sponsors are—and SCB knew them to be—the world's foremost generators of anti-American terrorism, adept at converting their financial resources into American casualties both directly and through a robust network of terrorist proxies including the specific groups that attacked Plaintiffs and their loved ones.

20.     Here, the Terrorist Sponsors used the revenues from SCB's customers to supply money, arms, training, technology, and safe haven to their proxy FTOs, who used that support to attack Americans in Israel and Iraq. This support was not limited to supplying fungible dollars to innocuous activities. To the contrary, SCB transferred money directly to the specific commercial conduits that the Terrorist Sponsors were actively using to facilitate terrorist operations. Much of the money that flowed into those conduits was earmarked in specific ways for violent purposes— including payments for terrorist salaries, attack bounties, and martyr compensation that powerfully incentivized and enabled proxy groups to commit attacks. In addition to money, the commercial conduits for Iran's Terrorist Sponsors also paid for the weapons and materiel, attack-specific training, and resources for Hamas tunnels that enabled attacks in Israel.

21.     The FTOs used that support to attack Americans, including the Plaintiffs in this case. Plaintiffs are the victims of 12 terrorist attacks committed in Israel from 2010 to 2019, and one attack committed in Iraq in 2011. Most of the attacks in Israel were committed by Hamas, often jointly with Hizballah; one attack was committed jointly by Hamas, Hizballah, and PIJ; and another was committed by PIJ. These attacks included kidnappings, rocket attacks, vehicle attacks, shootings, and stabbings. The attack in Iraq was committed by Hizballah, together with its proxy Jaysh al-Mahdi, and featured an explosively formed penetrator ("EFP"), a weapon designed by the IRGC and Hizballah to penetrate American armor.

22.     For each attack type, support from the Terrorist Sponsors' oil and gas business played a key role. Thus, the Terrorist Sponsors used oil and gas money to provide the incentive payments, logistical support, weapons, training, tunnels, and planning aid that enabled the specific attacks on Plaintiffs. SCB's unlawful acts serving the Terrorist Sponsors made that multifaceted, vital support possible.

23.     Even among corporate criminals, SCB's misconduct stands out as particularly egregious and dangerous. Earlier this year, U.S. Representative Elise Stefanik wrote to the Attorney General to discuss "the ongoing sanctions evasion case of Standard Chartered Bank." Representative Stefanik noted that SCB "made at least $9.6 billion in illicit payments to known terrorists," assisted China in purchasing "sanctioned Iranian oil," and engaged in other misconduct that presents "immediate national security risks," including "the grave risk of additional funds being funneled to terrorist organizations that endanger the United States and the American people."

24.     SCB's misconduct easily constitutes aiding and abetting under JASTA. Congress enacted the statute to provide American "civil litigants with the broadest possible basis … to

11

seek relief against" anybody "wherever acting and wherever they may be found," that "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b). Here, SCB did just that, committing multiple crimes and thwarting counterterrorism controls *for over a decade* despite warnings from law enforcement agencies, financial regulators, the United Nations, European governments, terrorism experts, the media, and others making it crystal-clear that providing Iran's Terrorist Sponsors and their fronts access to the U.S. financial system would fuel anti-American terrorist violence, including *specifically* attacks by Hizballah, Hamas, Jaysh al-Mahdi, and PIJ, which were engaged in ongoing campaigns of violence against Americans in the Middle East. SCB's misconduct enabled at least millions of dollars in support to flow from Iran's Terrorist Sponsors to these designated FTOs, arming them with the weapons and other resources they needed to carry out deadly terrorist attacks. Plaintiffs and their families suffered enormously as a result.

## THE PARTIES

### A.    Plaintiffs

25.    Plaintiffs are 90 direct and indirect victims of 12 terrorist attacks committed in Israel from 2010 to 2019, and one attack committed in Iraq in 2011. Direct victims were physically injured or killed in the attack. Indirect victims are the direct victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims. Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[2]

---

[2] "Estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates

**B.    Standard Chartered Bank**

26.    Non-party Standard Chartered PLC ("SC PLC") is an international bank with more than 1,700 branches operating in over 60 countries. SC PLC's principal place of business is London, England.

27.    Defendant Standard Chartered Bank ("SCB") is a wholly owned subsidiary of SC PLC. SCB's principal place of business is London, England.

28.    Pursuant to a license from NYDFS, SCB operates a foreign bank branch in the State of New York. The main corporate office of SCB in the United States is 1095 Avenue of the Americas, New York, New York 10036.  SCB's New York branch is referred to in this Complaint as the "NY Branch."

29.    Among other services, the NY Branch provides U.S. dollar clearing services for international wire payments, which can involve the conversion of payments from a foreign currency into U.S. dollars. The NY Branch processes approximately $195 billion per day on the Clearing House Interbank Payments System ("CHIPS").

30.    SCB also has licensed branches in the United Arab Emirates and The Gambia, serving customers throughout the UAE, the Middle East, and Africa. As of the events detailed in this Complaint, SCB's UAE presence consisted of 14 branches, with its main office in Dubai ("SCB Dubai"). During the relevant period, SCB's Gambia presence included several branches, with its main office in Banjul ("SCB Gambia").

31. SCB had a branch in Iran during much of the relevant period, which informed SCB's knowledge of all things Iran-related. Indeed, as the U.S Department of State ("State") reported to

---

of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

Congress in 2008, "Standard Chartered Bank became the first foreign bank to be awarded a license to establish a branch in Iran, although this was limited to Kish, a free-zone island."

32.     During the relevant period, nearly all of SCB's relevant transactions were U.S. dollar-denominated and therefore cleared and settled in New York through the NY Branch.

## JURISDICTION AND VENUE

33.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

34.     SCB is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

35.     SCB entered the United States voluntarily and has maintained a branch in New York since 1976.

36.     As explained below, SCB's substantial assistance to the terrorists was facilitated by the NY Branch because of the latter's central role in providing U.S. dollar clearing, foreign exchange, and trade financing services for SCB's Iranian customers.

37.     SCB purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including processing financial transactions through the NY Branch for the benefit of its Iranian customers, knowing those transactions were enabling Iran's Terrorist Sponsors and their terrorist proxies to carry out attacks that killed or injured U.S. citizens, including Plaintiffs.

38.     Moreover, SCB made several misrepresentations to New York authorities—principally NYDFS—about its conduct, and subsequently about its compliance and remediation efforts. SCB's deceptive conduct in this District thereby provided substantial ongoing assistance

to the terrorists that killed and injured Plaintiffs by preventing law enforcement from discovering and putting an end to the full extent of SCB's malfeasance.

39.    Venue in this District is proper pursuant to 18 U.S.C. § 2334(a) because SCB's NY Branch is here, and because the original complaints in these actions were served on SCB in this District through its counsel on July 17, 2024 (*Fraenkel*) and July 31, 2024 (*Brauner*).

40.    Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of SCB's activity occurred within the District.

## SOURCING

41.    The allegations herein are based in part on settlement agreements that SCB entered with regulatory authorities to resolve several enforcement actions against the bank. Those settlement agreements include Deferred Prosecution Agreements ("DPAs") with DOJ, Settlement Agreements and Consent Orders entered by NYDFS and OFAC, and a detailed Decision Notice from the United Kingdom's Financial Conduct Authority ("U.K. FCA"). Each settlement document contains lengthy and detailed factual recitations regarding SCB's illegal, sanctions-evading conduct. SCB, moreover, has stipulated to the truth of the factual allegations and has promised to not dispute those allegations in subsequent litigation.[3]

42.    To resolve those enforcement actions, SCB paid U.S., New York, and U.K. law enforcement and financial authorities nearly $2 billion in penalties and forfeitures and has been ordered to substantially overhaul its regulatory compliance efforts.

---

[3] *See* Am. Deferred Prosecution Agreement ¶ 29, *United States v. Standard Chartered Bank*, No. 12-cv-262 (S.D.N.Y. Apr. 9, 2019), ECF 16-1 ("2019 Amended DPA"); *id.* Ex. B ¶ 2 (Supplemental Statement of Facts) ("SOF"); U.K. FCA, Decision Notice to Standard Chartered Bank § 7.1 (Feb. 5, 2019) ("SCB agreed to settle in relation to all relevant facts and all issues as to whether those facts constitute breaches") ("2019 U.K. FCA Decision Notice").

43.    SCB always actively monitored every official United States warning, sanction designation, press release, report, advisory, and finding, including those relating to American sanctions and terrorist financing risks regarding Iran, the IRGC, the SLO, Hizballah, Hamas, and Jaysh al-Mahdi, including those published by Treasury (including OFAC and FinCEN), and State. SCB did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and SCB's thousands of employees and agents in the United States, United Kingdom, United Arab Emirates, Iran, and elsewhere, each of whose knowledge is imputed to SCB. Accordingly, SCB had actual knowledge, in real-time, of each United States warning, sanctions designation, press release, report, advisory, and finding that any component of the U.S. government published when SCB engaged in the conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.    Iranian Terrorists Used Their Oil And Gas Sector Monopoly To Enable Terrorist Attacks By Hizballah, Hamas, Palestinian Islamic Jihad, And Jaysh al-Mahdi**

44.    Authorities the world over have long understood that Iran's Terrorist Sponsors used their control of Iran's oil and gas sector to facilitate terrorist attacks by proxies against Americans. When Congress enacted the Iran and Libya Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541, for example, it "declare[d] that it is the policy of the United States to ***deny Iran the ability to support acts of international terrorism …*** by limiting the development of Iran's ability to ***explore for, extract, refine, or transport by pipeline petroleum resources of Iran***." In the ensuing years, the Terrorist Sponsors' stranglehold on Iran's oil and gas sector became only more complete and their use of it to fund acts of terrorism became only clearer.

### A.    Iran's Terrorist Sponsors

45.    Since 1979, radical Shia terrorists of Iranian origin throughout the Middle East pledged, before Allah, their personal oath of allegiance not to their own nation, but instead to the

16

first Supreme Leader of the Islamic Revolution: Ayatollah Ruhollah Khomeini.[4] When they did so, these terrorists pledged to support the Ayatollah's embrace of violent jihadist attacks targeting the enemies of the "Islamic Revolution"—most of all, the United States (the "Great Satan") and its allies in the Middle East, including Israel (the "Little Satan"). Their shared objective was to force the Great Satan to exit the Middle East and abandon its allies there through an unrelenting campaign of terrorist attacks against Americans.

46.    To advance this core objective of the Revolution, the Supreme Leader and his allies in the Iranian regime developed a vast infrastructure of institutions organized within the government to facilitate terrorist attacks by proxies throughout the region. Although these elements permeated Iran's government and society in many ways, Plaintiffs focus on certain key institutions, which Plaintiffs refer to as Iran's Terrorist Sponsors. These institutions included (but were not limited to): (1) the Islamic Revolutionary Guard Corps (IRGC); (2) Supreme Leader Ayatollah Ali Khamenei and his Supreme Leader's Office (SLO); (3) the Foundation for the Oppressed; and (4) Hizballah. Collectively, Iran's Terrorist Sponsors seized control over large sectors of Iran's economy, including most importantly the oil and gas sector and the financial sector, using that control to enable terrorist violence against Americans, including the attacks that injured Plaintiffs.

---

[4] In this Complaint, Plaintiffs refer to certain religious concepts and describe those concepts from the perspective of Iran's Terrorist Sponsors and their supporters and proxies. The terrorists' understanding of, and use of, religious concepts is vital to understanding their actions, strategies, ideology, doctrine, motivations, linguistic choices, financial practices, rules, tactics, techniques, and procedures. For the avoidance of all doubt, however, Plaintiffs wish to emphasize that nothing in this Complaint should be interpreted as suggesting that the terrorists' interpretations of their Islamic faith is correct as a matter of theological doctrine or representative of the views of the vast majority of Muslims around the world who oppose terrorist violence.

17

### 1.    Islamic Revolutionary Guard Corps (IRGC)

47.    The Islamic Revolutionary Guard Corps is a terrorist organization (not part of Iran's armed forces) headed by and answerable to the Supreme Leader of Iran. Since its creation in 1979, the IRGC has operated as a global terrorist organization targeting the United States, regularly engaging in and supporting acts of terrorism seeking to coerce the U.S. government into changing U.S. policy, including by prompting the United States's exit from the Middle East and abandonment of its allies there.

48.    The IRGC has multiple divisions, which act as an integrated whole, but each pursue distinct responsibilities. Most relevant here, the IRGC Qods Force ("IRGC-QF" or "Qods Force")—meaning "Jerusalem Force"—is the IRGC's primary external operations arm with lead responsibility for facilitating support to terrorists and terrorist attacks outside Iran. The IRGC-QF was created in the late 1980s, taking up the work of its predecessor, the IRGC's Office of Liberation Movements. At all times, the Qods Force was a notorious exporter of terrorism. Qasem Soleimani led the IRGC-QF from 2011 until his death in 2020.

49.    As described in greater detail *infra*, the IRGC obtained resources for its terrorist activities by taking over large segments of the Iranian economy. A significant share of those resources—at least hundreds of millions annually—were systematically diverted to the Qods Force to use for exporting the Iranian revolution by sponsoring terrorist attacks abroad.

50.    Although IRGC commanders were sometimes characterized as "retired" in an attempt to conceal the IRGC's active involvement in business matters, it was widely known— including by SCB—that "no one ever leaves the IRGC."[5] IRGC (and Hizballah) members take a

---

[5] *See*, *e.g.*, U.S. Attorney's Office for the Dist. of Columbia, United States' Verified Compl. For Forfeiture In Rem, ¶¶15-19, Dkt. 1, *United States v. All Petroleum-Product Cargo Aboard The*

religious oath committing to the IRGC for life, and it was well known that "retired" IRGC commanders continued to serve the IRGC in an ostensibly "civilian" capacity.

51.     On October 25, 2007, the United States designated the Qods Force a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224. 72 Fed. Reg. 65837. In so doing, the United States confirmed that the IRGC was "seeking to inflict casualties on U.S. … forces" and, *inter alia*, provided "material support" to "Hizballah, Hamas, Palestinian Islamic Jihad," and other FTOs; "had a long history of supporting Hizballah's … terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support"; and also provided "weapons, training, funding, and guidance" to "Iraqi Shi'a militants who target and kill Coalition … forces." That same day the United States also designated every component of the IRGC for sanctions under Executive Order 13382 for proliferation-related activities.

52.     After 2007, the United States regularly imposed additional sanctions targeting the IRGC as part of the U.S. government's broader strategy to reduce the regime's ability to sponsor terrorist attacks targeting the United States. On October 13, 2017, the United States designated every component of the IRGC as a SDGT "for providing support to a number of terrorist groups, including Hizballah and Hamas, as well as to the Taliban" and for "provid[ing] material support to the IRGC-QF, including by providing training, personnel, and military equipment." On April 15, 2019, the United States designated every component of the IRGC an FTO. That designation

---

*Bella With Int'l Maritime Org. No. 9208124, et al.*, No. 1:20-cv-01791 (Verified Compl. filed July 1, 2020) ("confidential reliable source … stated that, during planning discussions regarding sanctions evasion, [IRGC member Mahmoud] Madanipour said that … in order to conceal IRGC involvement, … Iran had officially retired numerous IRGC leaders and then placed them at the heads of companies in key Iranian industrial sectors."); Dr. Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Def. Strategic Communications: The Official J. of NATO Strategic Communications Centre of Excellence,111-12 (Autumn 2020) ("'no one ever leaves the IRGC'").

19

was in direct response to what the State Department called the Iranian regime's historic and "continue[d]" use of the IRGC to "provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, [and] Kata'ib Hizballah in Iraq."

### 2. Ayatollah Ali Khamenei and the Supreme Leader's Office (SLO)

53. Ayatollah Ali Khamenei's title is "Supreme Leader of the Islamic Revolution." As the title makes clear, Khamenei's primary allegiance is not principally to the people of Iran, but to the concept of the Islamic Revolution, embodied in violent struggle against what the Ayatollahs describe as the "Oppressors," *i.e.*, the United States and Israel. Thus, the Supreme Leader and the institutions he oversees were devoted to opposition to the United States—which regularly manifested in terrorist violence.

54. Since the Islamic Revolution in 1979, Khamenei has always been a notorious terrorist. Khamenei was always a sworn brother of the IRGC, with the rank of Brigadier General, who helped lead the IRGC during the Iran-Iraq war before he became leader of the Islamic Revolution and overall commander of the IRGC after being named Supreme Leader in 1989.

55. At all relevant times, Ayatollah Khamenei has been an anti-American ideologue, expressing in public word and deed his opposition to the United States' presence in the Middle East, and advocating for terrorist violence against Americans and Israelis. Indeed, the concept of "Resistance"—which is code for IRGC-sponsored acts of terrorism targeting the United States—was the foundation of the IRGC's mission and associated ideology, and a mainstay of Khamenei's rhetoric, philosophy, and approach to governance and leadership.

56.     Ayatollah Khamenei regularly called for terrorists to attack the United States and Israel. Among other outlets, he used regular public Friday Prayer sermons (often delivered by his subordinates) to expressly call for Iranians to take up jihad against the United States and its allies, leveraging his spiritual authority as Supreme Leader to declare his terrorist intentions, issue religious-based calls for violence, celebrate martyrdom, and source donations and recruits for attacks. Khamenei also vocally encouraged Palestinian terrorists to engage in "resistance" to liberate their lands, and expressly called for the annihilation of Israel on many occasions.

57.     Ayatollah Khamenei's support for terrorism went beyond mere words. At all times, Khamenei played a prominent role in overseeing and coordinating Iran-sponsored acts of terrorism, including directing funds and resources to terrorist proxies. To that end, Khamenei appointed representatives who served in key IRGC divisions and the IRGC's leadership. He also had close relationships with Qasem Soleimani, the head of the IRGC-QF, and Hassan Nasrallah, the head of Hizballah. Through these relationships, Khamenei coordinated Iran's terrorist activities, including its support for terrorist proxies in Israel and Iraq.

58.     From 2000 through 2020, Ayatollah Khamenei directly funded, logistically supported, and organized the "Khamenei Cell," a joint leadership group that coordinated the deployment of operatives, weapons, logistics, pre-attack intelligence, and associated finances and fronts with respect to attacks intended to intimidate the United States and potentially kill or maim Americans. Because attacks targeting the United States raised unique risks for the perpetrators and planners, such attacks were the most carefully coordinated, vetted, and planned by Khamenei, the SLO, the Qods Force, and Hizballah through the Khamenei Cell.

59.     The Khamenei Cell included approximately two dozen key Hizballah and/or IRGC operatives based in Iran, Iraq, and Lebanon, and was remarkably stable, with every

21

member being a senior terrorist who had sworn allegiance to the Supreme Leader, was a long-standing ally of Khamenei and part of his "inner circle" or a key lieutenant of such person, and who had directly sponsored successful attacks targeting the United States in the past. During this period, the Khamenei Cell included, but was not limited to:

a. **Ali Khamenei**, Supreme Leader of the Islamic Revolution, and Supreme Commander of the IRGC and Hizballah, from 1989 through 2020;

b. **Qasem Soleimani**, IRGC-QF Commander from 1998 through 2020, and ultimate financial beneficiary of Foundation for the Oppressed, SLO, Caspian Petrochemical, and Petro Nahad profits;

c. **Hassan Nasrallah**, Hizballah Secretary General and Khamenei's top Hizballah ally from 1993 through 2020;

d. **Imad Mugniyeh**, dual-hatted member of the IRGC-QF and Hizballah, who served as Khamenei's, Hizballah's, and the IRGC's lead terrorist attack planner from the 1980s through his death in 2008, and was responsible for establishing the joint Hizballah-local proxy cells in Iraq (*i.e.*, joint Hizballah-JAM cells) and Gaza (*i.e.*, joint Hizballah-Hamas and Hizballah-PIJ cells);

e. **Abu Mahdi al-Muhandis**, dual-hatted member of IRGC-QF (since the 1980s) and JAM (since 2003), and Khamenei's and Qasem Soleimani's longest serving Iraqi asset, who coordinated attacks closely with Soleimani and died alongside him in 2020;

f. **Mohammad Ali Jafari**, IRGC Commander-in-Chief from September 2007 through April 2019;

g. **Rostam Qasemi** (Ghasemi), Deputy Commander of IRGF-QF, Director of IRGC front Khatam al-Anbiya from 2007 through 2011, Minister of Petroleum and de facto leader of Qods Force and Hizballah petroleum smuggling from 2011 through 2020;

h. **Mojtaba Khamenei**, de facto leader of SLO and IRGC Intelligence Organization ("IRGC-IO") from 2004 through 2020, and direct manager and beneficiary of Foundation for the Oppressed, SLO, and Petro Nahad resources;

i. **Gholam-Ali Hadad-Adel** (Gholamali Haddadadel), Ali Khamenei's and Mojtaba Khamenei's right hand (and the latter's father-in-law), Majlis Speaker (2006-2008), de-facto co-leader of SLO and inner circle Khamenei Cell member from 2009 through 2020, and direct manager and beneficiary of Petro Nahad resources;

j. **Mohammed Mokhber**, IRGC officer (1980s through 2000), Vice President of the Foundation for the Oppressed (2000-2007), Head of Executive Staff of Execution of

Imam Khomeini's Order (2007-2021), First Vice President of Iran (2021 to 2024), Acting President of Iran (2022-2024);

k.    **Hossein Taeb**, IRGC Basij Commander (2007 through 2009) and IRGC-IO Commander (2009 through 2022);

l.    **Mohsen Rafiqdoost**, former personal bodyguard and driver of Khomeini, largest bazaar network in Iran, founder of IRGC, co-founder of Hizballah, decades-long de-facto leader of the Foundation for the Oppressed, key IRGC/Supreme Leader liaison for arms purchases from North Korea's Reconaissance General Bureau ("RGB"), and infamous sponsor of Palestinian "resistance" attacks in Israel;

m.    **Mohammad Forouzandeh**, Senior IRGC commander (1979 to the present);

n.    **Mohsen Rezai**, IRGC Commander (1981 through 1999), co-founder Hizballah, founder IRGC Intelligence Bureau (predecessor to IRGC-IO), Senior "Security" Advisor to Ali Khamenei; and

o.    **Parviz Fattah**, Deputy Commander of IRGF-QF, Director or Board Member of the Foundation for the Oppressed from at least 2010 through at least 2020, and other fronts operated for the benefit of the IRGC and/or SLO.

60.    The Khamenei Cell played a role in every attack against Plaintiffs, which typically involved the Khamenei Cell in multiple ways.

61.    In addition to acting through the Khamenei Cell, Khamenei also supervised and acted through his Supreme Leader's Office, which gathered resources, directed them to terrorists, and ordered attacks. The SLO was never a peaceful Iranian state entity. Instead, it was closely intertwined with and acted as a front for the Qods Force and Hizballah. Among other reasons, Qods Force and Hizballah operatives worked under cover of SLO employment, Qods Force and Hizballah operatives used SLO facilities for their operations, and the Qods Force and Hizballah were indirect beneficiaries of the profits derived by the SLO through the Qods Force's (including

23

Qasem Soleimani's) and Hizballah's (through Hassan Nasrallah's) close relationship with Ayatollah Khamenei.

62. In 2019, President Trump signed Executive Order 13876, blocking all property of the Supreme Leader and the SLO, explaining that the sanctions were justified "in light of the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East, promote international terrorism, and advance Iran's ballistic missile program, and Iran's irresponsible and provocative actions in and over international waters, including the targeting of United States military assets and civilian vessels." This Executive Order confirmed what everybody—including SCB—already knew: That the Supreme Leader and SLO were the nerve center for Iran's anti-American terrorism.

### 3. Foundation for the Oppressed (Bonyad Mostazafan)

63. The Foundation for the Oppressed, also known as the Bonyad Mostazafan, was the Iranian regime's oldest, largest, and most purpose-built terrorist external operations front for attacks targeting the United States outside of Iran. It was the first terrorist operations front established by Ayatollah Khomeini—predating even the IRGC in the terrorism machine—in 1979, and has supported terrorist operations ever since.

64. Iran's foundations (or bonyads) were not like charities in the United States. Instead, they were parastatal entities answerable only to the Supreme Leader that frequently owned and controlled profit-generating subsidiary companies, benefiting from favorable tax treatment and insulated from public scrutiny of their finances. These bonyads functioned as a hinge between commercial activities and terrorist operations, since the Supreme Leader controlled the use of the proceeds that flowed into them. Much of that money notoriously flowed into resources for terrorist proxies. As the BBC reported on March 27, 2001:

24

the Foundation for the Oppressed … is an organization that gives financial support to Iran's … acts of terrorism abroad. … The organization is supervised by … Ayatollah Khamene'i …and is a subsidiary of the IRGC [and its investments are] … under the control of Hezbollah like other large commercial enterprises in Iran. These are organizations operating under the supervision of the IRGC … [and are] engaged in controlling people visiting Iran, selecting and training people for Iran, financing pro-Iranian people and so on …[,] under the guise of cultural centres and humanitarian structures.

65.     In 2002, the BBC reported that the Foundation was funding "increase[s] in Hezbollah's budget" and "establishments like … [the] 'Mostaza'fin' (Foundation for the Oppressed) give every month vast amounts of financial aid to the families of Hezbollah's martyrs, injured and handicapped members." That statement accurately described the Foundation's custom and practice with respect to Hizballah-related attacks at all relevant times.

66.     The U.S. Congress, in the Iran and Libya Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541, has singled out the "Foundation for the Oppressed and Disabled," *id*. § 14(12)(G), along with the IRGC and its Qods Force, as among Iran's top governmental or quasi-governmental institutions that the regime "use[s]" to "promote acts of international terrorism."

67.     Similarly, the Department of Defense explained in 2011:

The IRGC's overt activity in the Iranian economy is only one of the Pasdaran's [IRGC's] tools for implementing the economic instrument of power. The IRGC influences or controls a vast network of bonyads, or foundations though which it exerts its economic and social influence. These foundations account for 20% of Iran's Gross Domestic Product. In the regime's post revolutionary consolidation, it assumed control of the multiple foundations the Shah had established as informal and extra-legal networks. While officially a non-governmental organization, the Foundation for the Oppressed, Bonyad Mostazafan, is the nation's largest and is chaired by Mohammad Forouzandeh, a former IRGC officer. This massive foundation has over 350 subordinate companies and is diversified throughout the agricultural, transportation, tourism, and industrial sectors of the economy.

25

68.     The Foundation for the Oppressed was Iran's most notorious bonyad, and as State publicly warned in a report to Congress on March 1, 2007, "Bonyads have been involved in funding terrorist organizations and serving as fronts for the procurement of nuclear capacity and prohibited weapons and technology." Senior Treasury counterterrorism official Pat O'Brien similarly publicly testified in 2006 that Iran "actively sponsors terrorism and violence across the Middle East" through the IRGC, where the "money flows … draw[] upon a large network of state-owned banks and parastatal companies," *i.e.*, the bonyads.

69.     When Ali Khamenei, Mohsen Rafiqdoost (a co-founder of the IRGC), and Mohsen Rezai (who would be commander in chief of the IRGC) created the Foundation for the Oppressed in 1979, they did so by seizing the Pahlavi Foundation and immediately converting it into one of the Qods Force's primary transnational funding and logistics fronts: a custom-built foundation specifically designed to provide funding, weapons, intelligence support, logistical aid, and a vast transnational footprint of corporate fronts, shell companies, and real estate to the Qods Force and Hizballah.[6] This was part of the IRGC's early efforts to build the financial and logistical networks needed to export the Islamic Revolution through IRGC-funded terrorist attacks targeting the United States and its allies, including Israel. Such terrorists controlled the Foundation for the Oppressed for the same primary purpose: to help the Qods Force, Hizballah,

---

[6] For the avoidance of all doubt, the Qods Force and Hizballah did not gradually take control of the Foundation, nor was the Foundation originally a noble charity that these FTOs corrupted. Instead, the Foundation was purpose-built to enable Qods Force and Hizballah acts of terrorism targeting the United States. Accordingly, from day one—and ever since—the Qods Force has structured the Foundation to operate as the Qods Force's and Hizballah's transnational terrorist operations slush fund. To that end, the Foundation had a wide global footprint (which facilitated movement of goods and personnel across borders), thousands of real estate holdings (which provided safe houses and logistics sites), hundreds of corporate holdings (which offered cover and concealment for Qods Force and Hizballah operatives and transactions), and a presence in every strategic industry relevant to the Qods Force's and Hizballah's transnational jihadist mission to "export the Islamic Revolution" by sponsoring attacks targeting the United States.

26

and such FTOs' proxies acquire funds, weapons (including weapons components), intelligence, cover, concealment, and logistical aid so that such terrorists could commit terrorist attacks, enabled by the global resources and charity-cover provided by the Foundation.

70.     From 1979 through at least 2019, the Foundation for the Oppressed was always the most important global operations front in the world for the Qods Force. The Foundation was always operated for the primary purpose of providing financial, logistical, cover, concealment, intelligence, and safe haven/ratline support for Iran's external terrorist operatives, including, but not limited to, the IRGC-QF (inclusive of its predecessor, the Office of Liberation Movements).

71.     From 1982 through at least 2019, the Foundation for the Oppressed was also a front for Hizballah, serving as one of Hizballah's most important global operations nodes throughout the world, including, but not limited to, in Lebanon, the Palestinian territories, Iraq, Syria and everywhere else the Foundation had an outpost. Once Hizballah established itself as the Terrorist Sponsors' lead external terrorist proxy, Khamenei, Rafiqdoost, Rezai, and others further embedded Hizballah operatives, finances, logistics, and arms supply in the Foundation— on its organization chart, in its warehouses, at its ports, on its ships, and in its bank accounts.

72.     The Foundation for the Oppressed was unique amongst all Qods Force and Hizballah operations fronts for at least four reasons. *First*, the Foundation had an unrivaled global footprint, and no other bonyad had a comparable international presence from the 1990s through 2020. *Second*, the Foundation was purpose-built by Ali Khamenei and his allies, including Mohsen Rafiqdoost and Mohsen Rezai, to serve as the regime's operations front for its attacks outside Iran. That was not just a historical fact: it meant that the Foundation systemtically leveraged the relationships, services, and networks of Qods Force and Hizballah operatives. *Third*, the Foundation was (and is) the personal bonyad for, and most closely associated with

27

Ayatollah Khamenei, the Supreme Commander of Hizballah and the IRGC, and Supreme Leader of the Islamic Revolution. That imprimatur alone afforded unique advantages to the Foundation, as did its ability to leverage the Supreme Leader and the power of the SLO, to facilitate Foundation activities. *Fourth*, the Foundation had the most extensive, oldest, most developed, and most networked role of any bonyad with respect to terrorist attack payments—most of all martyr, disability, and orphan payments. This status derives from the fact that part of the Foundation's core operations-facing role has always been to make, facilitate, finance, and promote, such payments as a fundamental part of how the IRGC and Hizballah sought to leverage the unique power of martyrdom to overcome their substantial overall violence deficit vis-à-vis the U.S. and Israeli militaries, which the Foundation was purpose-built to help the Terrorist Sponsors attack. Over time, the Terrorist Sponsors built out a network of other attack-payment-related bonyads linked to the Foundation, including, but not limited to, the Imam Khomeini Relief charities, inclusive of its Lebanese branch, a designated SDGT, and Martyr's Foundation. That organizational expansion was a response to the Terrorist Sponsors' vast financial and logistical requirements for administering their complex attack payment system, which effectively amounted to the largest expenditure each group had, and one for which their entire sales pitch is, in sum and substance, "if you are martyred, we guarantee your family will be compensated."

73.     From at least 2005 through 2025, the Foundation for the Oppressed was inextricably intertwined with the SLO (since at least 2005), Mojtaba Khamenei (since at least 2005), and Gholam-Ali Haddad-Adel (since at least in or about 2008), among others, in the Khamenei Cell, via the on-paper application of roles played by each with respect to one another. Among other ways, the SLO had complete authority over, discretion over how to distribute, and

28

ability to issue rulings governing, the Foundation for the Oppressed and all matters concerning any Foundation-related person or entity, and such authority was exercised by, among others, Mojtaba and Haddad-Adel during the periods identified above.

74.     The Executive and Congress have spoken with one voice in finding that Khamenei's Foundation for the Oppressed has been an essential component of the Iranian regime's terrorist infrastructure. Since 1996, Congress has singled out the Foundation for the Oppressed (along with the IRGC and its Qods Force) as among the top governmental or quasi-governmental institutions that Iran "use[s]" to "promote acts of international terrorism." Iran and Libya Sanctions Act of 1996, Pub. L. 104-172, 110 Stat. 1541, §§ 2(3), 14(11) (1996) (findings of fact). On December 28, 2012, Congress found that the "IRGC's Qods Force stations operatives in … *charities, and religious and cultural institutions*"—the largest of which were always the Foundation for the Oppressed and SLO—"to foster relationships, often building on existing socioeconomic ties with the well established Shia Diaspora." Countering Iran in the Western Hemisphere Act of 2012, 22 U.S.C. § 8701, Pub. L. 112-220, § 2, 126 Stat. 1596 (Dec. 28, 2012) (findings). On November 18, 2020, Treasury imposed antiterrorism sanctions on the Foundation, explaining that it performed little legitimate charitable work, devoting just seven percent of its substantial budget to charity, and served primarily to reward the terrorist operatives in Khamenei's inner circle and "persecute the regime's enemies."

75.     Public decrees by Ayatollah Khamenei confirmed that the Foundation for the Oppressed served as a front for Hizballah and the Qods Force. For example, in 1989, 2012, and other occasions when he appointed a new executive director of the Foundation, the Ayatollah publicly touted how the Foundation promoted "resistance," supported "martyrs," and helped

29

liberate the "oppressed"—which were all infamous euphemisms for IRGC-sponsored attacks targeting America.

76.    The vital, direct, role that the Foundation for the Oppressed played in funding, arming, and supporting IRGC and Hizballah attacks has been well known for decades. A wide array of media reports (often quoting U.S. officials) tied the Foundation to IRGC and Hizballah attacks through illicit arms, procurement, and sanctions evasion efforts since the 1990s. For example, Dr. Mark D. Silinsky, Adjunct Professor at the U.S. Army War College and former DoD Military Intelligence Analyst, observed about the Terrorist Sponsors' custom and practice in 2021, has observed that the specific purpose for which the Iranian regime ordinarily used "bonyads" under the Terrorist Sponsors' custom and practice was to "acquir[e] and distribut[e] wealth to the Guards" and, therefore, "[s]enior [bonyads] personnel are adept at transferring funds from one element to another to subvert U.S. sanctions and channel funds toward terrorist operations [attacks]"—including "[t]he largest bonyad" (*i.e.*, the Foundation for the Oppressed), which "funds Hezbollah and operates in Europe and Asia." Likewise, Mehran Riazaty—who served the U.S. military as an Iran Analyst attached to Multi-National Forces, Iraq—observed that "[t]actically, Bonyads are often connected to the Iranian Revolutionary Guard Corps [and] Operatives from the IRGC [*i.e.*, IRGC-IO], along with members of Al-Qods [*i.e.*, Qods Force] and Hezbollah, and often go undercover, representing themselves as employees or officials of trading companies, banks, and cultural centers, or as representatives of the Bonyad of the Oppressed and Dispossessed," *i.e.*, the Foundation for the Oppressed.

77. The Foundation for the Oppressed also acted as a transnational broker for Iranian state-owned firms in significant economic sectors. For example, as Iranian expatriate media outlet Iran News Update reported in 2020, the "Mostazafan Foundation Brokers for the IRGC."

78. Decades of other reports and statements by myriad authorities likewise confirmed that the bonyads, and particularly the Foundation for the Oppressed, played an integral role in the Terrorist Sponsors' attacks. These included, but were not limited to, reports published by the *Montreal Gazette* (June 4, 1992); *Christian Science Monitor* (Feb. 1, 1995); *Newsday* (May 28, 1995 and Dec. 8, 1998); *Financial Times Mandate* (Apr. 23, 1996 and July 17, 1997); *BBC* (June 14, 2002); *Forbes* (July 21, 2003); *Newsmax* (June 3, 2009); Kerry Patton (Combat-Disabled Veteran; Senior Analyst, *Wikistrat*) (Jan. 2, 2012); Dr. Hesam Forozan (Middle East Scholar) (2015); and Cyrus Yaqubi (Iran Scholar) (Jan. 24, 2021).

79. Among other forms of support, the Foundation for the Oppressed openly used the resources it siphoned from its subsidiary businesses to make martyr payments, disability payments, and orphan payments as incentives to commit terrorist attacks. Thus, the Foundation long stated that one of its main lines of effort was to finance payments to honor Hizballah, Hamas, PIJ, JAM, and IRGC martyrs and their families. Similarly, the Foundation referenced the fact that it provided comprehensive support to Resistance fighters and their families, or similar such concepts, where the language used, and context of the statements, compelled the conclusion that the Foundation was describing, at least, Hizballah, Hamas, PIJ, and IRGC martyrs and disabled terrorists. On information and belief, the Foundation also paid for terrorists' salaries and paid bounties for successful attacks. Plaintiffs believe this to be true because, although the Foundation never directly admitted that it provided such payments, from the 1980s through 2024, government investigations, NGOs, whistleblowers, and press reports regularly confirmed that the Foundation played a key role in the network of Iranian Terrorist Sponsors that coordinated their efforts to meet the enormous financial burden that such attack incentive and reward payments imposed each year.

31

80. In addition to making the martyr, disability, orphan, and similar attack payments to FTOs like Hizballah and Hamas directly, the Foundation for the Oppressed also financed such attack payments through its programmatic financing of fronts for such payments by its proxies, including Hizballah, Hamas, and PIJ, among others.

81. In addition to those payments, from at least 1979 (in the case of the IRGC), 1982 (in the case of Hizballah), and 1990 (in the case of the SLO), the Qods Force, Hizballah, and the SLO have jointly used the Foundation for the Oppressed to fund, logistically arm, source intelligence for, and provide cover to, terrorist attacks—including attacks in Israel that were committed by Hizballah, Hamas, and PIJ, and funded and supplied by the Qods Force, and attacks in Iraq that were committed by Hizballah and JAM and funded and supplied by Hizballah and the Qods Force.

### 4.    Hizballah

82. In 1982, the IRGC and the Foundation for the Oppressed established Hizballah (Arabic for "Party of God"), which the Iranians called the "Organization for the Oppressed." Ever since, Hizballah has served as the IRGC's most important terrorist proxy, as well as a conduit for terrorist support to other proxies. Hizballah has been an FTO since 1997.

83. From 1982 through 1989, Hizballah members swore loyalty to Ayatollah Khomeini. Ever since, Hizballah members have sworn their loyalty to Ayatollah Khamenei.

84. In 1985, Hizballah published what it entitled an "Open Letter Addressed by Hizballah to the Oppressed in Lebanon and the World," which is commonly referred to as Hizballah's Manifesto. In it, Hizballah announced, among other things:

a. "We, the sons of Hizballah's nation, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single, wise, and just command represented by the guardianship of the jurisprudent (*vali-e faqih*), currently embodied in the supreme Ayatollah … Khomeini."

b.  "No one can imagine the importance of our military potential as our military apparatus is not separate from our overall social fabric."

c.  "[The] first root of vice is America. … Imam Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."

After this, the group primarily called itself Hizballah, although it also continued to call itself the Organization for the Oppressed as well as the Islamic Resistance, among other euphemisms.

85.  In 2011, Hizballah General Secretary Hassan Nasrallah publicly directed Hizballah and Hizballah's proxies, including Hamas, PIJ, and JAM: "We must not confuse the enemy with the friend. The enemy is the U.S. administration, and Zionist regime is its tool in the Middle East. … [T]he regional resistance movements [including Hizballah] and deterrent states such [as] Iran … stopped the U.S. government plan for creating a new Middle East."

86.  Hizballah, like its IRGC patrons, viewed attacks targeting Israel and Israeli civilians as inextricably connected to its efforts to target the United States to withdraw from the Middle East. Among other reasons, Hizballah believed that America controlled Israel, that the U.S. could be punished, in effect, through attacks against its ally, and that—as Khomeini and Khamenei both emphasized—Israel comprised the "Little Satan" to America's "Great Satan."

87.  The IRGC has long coordinated its attacks so closely with Hizballah that Hizballah is functionally an IRGC division. As IRGC General Amir Hajizadeh admitted to IRGC-run *Fars*, "The IRGC and Hizballah are a single apparatus jointed together."[7]

88.  Hizballah General Secretary Nasrallah has publicly admitted, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." As the U.N. Security Council's panel of experts reported on December 30, 2016: "In a televised speech broadcast by Al-Manar television on 24 June 2016,

---

[7] U.S. Dep't of State, *Country Reports on Terrorism 2014* at 1774 (June 2015).

33

the Secretary-General of Hizbullah [Hassan Nasrallah] stated that the budget of Hizbullah, its salaries, expenses, weapons and missiles all came from the Islamic Republic of Iran. … [T]hat statement … suggests that transfers of arms and related materiel from the Islamic Republic of Iran to Hizbullah may have been undertaken."

89.    On December 28, 2012, Congress found that "officials from" the "Islamic Revolutionary Guard Corps (IRGC) Qods Force have been *working in concert* with Hezbollah for many years." Countering Iran in the Western Hemisphere Act of 2012, 22 U.S.C. § 8701, Pub. L. 112-220, § 2, 126 Stat. 1596 (Dec. 28, 2012) (findings).

90.    On April 24, 2024, Congress enacted a law that formally recognized "*Hezbollah*" and "any other proxy group that furthers Iran's national security objectives" as "Iran-aligned entit[ies]" that are "*controlled or significantly influenced by*," and receive "material or financial support from," the Government of Iran. 22 U.S.C. § 9424.

91.    Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were vital to financing Hizballah's attacks. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress as follows:

> Iran is the *'central banker' of terrorism* and a primary funding source for Hizballah. Because *money is a terrorist group's oxygen, attacking terrorist financing is an essential element to combating terrorism*. In that regard, we have made progress in impeding Iran's financial support for Hizballah and in undermining Hizballah's own financial network. …

> The USG has long assessed that Iran provides technological, operational, and financial support and guidance to Lebanese Hizballah. The Iranian regime has for 27 years used its connections and influence with terrorist groups to combat U.S. interests … at odds with its own, and Hizballah has acted as a willing partner.

92.    On May 27, 2009, Treasury imposed sanctions targeting Hizballah and confirmed the Iranian regime's, including the IRGC's, continued key role in financing Hizballah attacks:

34

Treasury [] designated … supporters of … Hizballah …, under E.O. 13224. E.O. 13224 targets terrorists and those providing support to terrorists or acts of terrorism by … prohibiting U.S. persons from engaging in any transactions with them. "We will continue to take steps to protect the financial system from the threat posed by Hizballah and those who support it," said Under Secretary for Terrorism … Stuart Levey. … Iran … provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization. In turn, Hizballah is closely allied with and has an allegiance to [Iran]. Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran. Iran provides hundreds of millions of dollars per year to Hizballah.

93.     The IRGC, Foundation for the Oppressed, and SLO provided most of Hizballah's budget, and directly financed Hizballah attacks through a range of vehicles, including salary and bonus payment to Hizballah leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hizballah terrorists. From 2007 through 2020, the Iranian regime did so by collectively routing at least $200-$300 million per year—and sometimes much more than that—to Hizballah, most of which flowed through the above organs.

94.     Hizballah's various subunits were closely interconnected, worked in tandem, shared common sources of financing, and were run by the same people. There was never any meaningful firewall between the intertwined components of Hizballah. As Hizballah spokesman Ibrahim Mussawi publicly stated in 2013: "Hezbollah is a single large organization, we have no wings that are separate from one another."

95.     Hizballah and Muqtada al-Sadr also established Jaysh al-Mahdi (JAM) in 2003 to serve as Hizballah's "striking arm in Iraq" (as Sadr put it) and provide an Iraqi face to Hizballah-directed terrorist attacks targeting Americans there. JAM served as Hizballah's notorious terrorist agent in Iraq. JAM terrorists publicly swore fealty to Hizballah in two marches in Baghdad in 2006, during both of which thousands of JAM fighters publicly marched under Hizballah's banners and photos of Hizballah General Secretary Nasrallah while loudly chanting

35

"We are Hizballah" and "Jaysh al-Mahdi and Hizballah are one." Sadr's decree that JAM was Hizballah's "striking arm" and the two JAM marches described above were widely covered, in real-time, by the media.

96. JAM jointly committed some attacks alongside Hizballah, like the one that killed **Dr. Everhart** (a decedent in this case). It did so as part of joint Hizballah-JAM cells in Iraq, which were directly funded by Hizballah and the Qods Force.

97. Hizballah also ordinarily acted as the IRGC's interlocutor with its terrorist proxies, including Hamas and PIJ in Israel and JAM in Iraq. Hizballah provided expert training, technical assistance, and in-country support, often through joint cells co-located with Hamas and PIJ (in Gaza, Lebanon, and Syria, among other places) and with JAM (in Baghdad and Basra, among other places).

98. Hizballah, the IRGC, and their proxies followed a joint cell model of terrorism in which two or more groups collaborated together at the operational level. U.S. government reports to Congress, publications, and studies confirmed Hizballah's, the IRGC's, and their proxies' programmatic reliance on the joint cell model of terrorism. Nowhere was this warning more appropriate than with respect to Hizballah. In 2019, for example, Colonel Joel D. Rayburn (U.S. Army, ret.) and Colonel Frank K. Sobchak (U.S. Army, ret.), published the official DoD history of the U.S. Army's experiences in Iraq, which observed: "The Qods Force used members of Lebanese Hizballah, the Badr Corps, and, later, Jaysh al-Mahdi to establish Iranian surrogate military cells throughout Iraq that could increase or reduce violent attacks against the coalition on order." In 2019, similarly, Marine Corps University published Dr. Mark D. Silinsky's observation that the "Qods Force maintains a joint command-and-control structure with Hezbollah, in which Hezbollah assists the Qods Force in its program to advise, support, and train

36

other Shia militia groups." In 2023, likewise, State reported to Congress that Hizballah was "responsible for multiple large-scale terrorist attacks, including" throughout the period from 2003 through 2023 when "Hizballah assisted Iraqi Shia militant and terrorist groups in Iraq," during which time Hizballah notoriously sponsored the "killing" of "American soldiers" there. U.N. Security Council reports also confirmed Iran's Terrorist Sponsors' emphasis on using joint cells to manage terrorist operations. In 2016, for example, the Council's Panel of Experts reported that "an Iranian news agency reproduced photographs showing the Commander of the Quds Force … Qasem Soleimani in a joint cell's "'Fallujah operations room' in Iraq" in which triple-hatted IRGC, Hizballah, and JAM (Kataib Hizballah) terrorist operative "Abu Mahdi al-Muhandis … appeared in the same photograph."

99.    Hizballah pioneered several signature attacks, including kidnapping, roadside bomb attacks using sophisticated devices known as explosively formed penetrators ("EFPs"), and rocket attacks using 107mm rockets. The IRGC relied upon Hizballah's experience and technical expertise to train other proxies, including Hamas, PIJ, and JAM, with respect to how to effectively conduct such attacks.

100.    Hizballah played a vital planning role for IRGC proxies, including Hamas and JAM. Hizballah had vast experience that the other groups lacked, and it drew on such experience to help such groups devise specific attack types, locations, and tactics. For example, Hizballah taught Hamas, PIJ, and JAM how to effectively kidnap targets.

**B.    The Terrorist Sponsors' Control Over Iran's Oil and Gas Sector**

101.    Iran's economy is largely state-owned. Since the Islamic Revolution, all significant commercial enterprises have been under government control. Beginning in the early 2000s, however, Iran began to "privatize" state-owned businesses. But at the behest of Ayatollah

37

Khamenei and the IRGC, these businesses were not placed in truly private hands. Instead, control of entire sectors of the economy was transferred through formal and informal means from state institutions to parastatal organizations that were under the direct or indirect purview of Ayatollah Khamenei and the IRGC. In some cases, companies were placed into the hands of trusted individuals who were members or associates of the IRGC; in other cases, such individuals were put in charge of state enterprises and their many subsidiaries; in still other cases, entities owned by the IRGC and Khamenei's close circle were given exclusive contracts or placed atop existing structures to siphon off their spoils. These transformations redirected the flow of profits in such "privatized" industries from Iran's general budget to the organizations in Iran with a single-minded focus on advancing Iran's terrorist aims: the Terrorist Sponsors.

102. Iran's Terrorist Sponsors notoriously controlled over half of the entire Iranian economy; most estimates ranged from 50%-60%; some estimates ranged as high as 85%, with the general consensus being that Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, and SLO controlled at least more than half of all economic value and associated transactions. A Department of Defense analysis published on October 12, 2011 cited the IRGC's "dominant role in Iran's economy," showing that the IRGC had "systematically militarized rather than privatized the Iranian economy" by "diligently expand[ing] its business holdings." Indeed, Treasury observed in 2021 that the Supreme Leader's and IRGC's collaborative post-2007 economic takeover alerted banks like SCB that Iran's Terrorist Sponsors were collectively "said to control more than half of the Iranian economy." As the *Christian Science Monitor* reported in 2009, "The result has been a 'very deep and symbiotic relationship with the supreme leader, and [the IRGC] have used the Ahmadinejad administration to not just solidify their hold on power, but to enrich themselves at the same time,' says [Alireza] Nader of RAND." Others reported similar

findings. As the *Economist* alerted SCB in 2011, "Iran's economy" was "[a]lmost entirely reliant on oil receipts, unproductive and monopolistic" at the same time "the Revolutionary Guard's commercial divisions [took] over ever larger bits of the economy."

103.    The Terrorist Sponsor takeover of the economy was well underway by 2005, as the influence of the IRGC, the SLO, and the Foundation for the Oppressed (already a large economic conglomerate) grew. As the United States increased its sanctions pressure on Iran's economy in the years after 2005, Ayatollah Khamenei responded in a series of moves intended to ensure that terrorists were always paid first. As Deputy Secretary of the Treasury Wally Adeyemo explained on April 9, 2024, "what we've seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people." That was precisely Khamenei's purpose in restructuring Iran's economy to place entire sectors under the control of the IRGC. As the economic pie shrunk, the IRGC was given a larger share to ensure that the regime could continue to fund its terrorism.

104.    From 2007 through 2009, the Foundation, SLO, and IRGC rapidly seized monopolies over key Iranian economic sectors, which seizures were all complete by late 2009.

105.    U.S. government-published statements alerted SCB to such risks in real time. Dr. Katzman's July 26, 2006 testimony before Congress confirmed that "key [Iranian] leaders and factions have gained a substantial measure of control over major segments of the Iranian economy, avoiding virtually any official transparency or accountability," which allowed "Iran's leaders … to steer the proceeds of parts of the economy to provide patronage." In 2009, similarly, seven (U.S. government-funded) RAND Corporation Iran scholars publicly observed "the IRGC's … monopolization of key business sectors" in Iran. Likewise, a 2009 State report

about Iran warned that its "hard-line clerical establishment … grew wealthy through its control of bonyads … that monopolize[d] many sectors of [Iran's] economy."

106.    Such real-time warnings also directly warned SCB that the IRGC's ability to leverage its control of entire sectors of Iran's economy directly funded IRGC-sponsored terrorist attacks committed by Hizballah, Hamas, and other IRGC proxies. On October 6, 2009, for example, Treasury Under Secretary Stuart Levey testified before Congress:

> In the name of privatization, the ***IRGC has taken over broad swaths of the Iranian economy***. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects …. Furthermore, the ***IRGC seeks to monopolize*** black-market trade of popular items, ***funneling the proceeds from these transactions through a patronage system and using them to help subsidize the government's support for terrorist groups***.

On June 22, 2010, Levey testified before Congress that "the Revolutionary Guards … has provided material support to … Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and others," the needed funding for which compelled the IRGC to "***assume[] control over broad areas of the Iranian economy***."

107.    Despite the substantial nature of the IRGC's and SLO's involvement throughout Iran's economy from 2007 through present, Plaintiffs do not allege that the Terrorist Sponsors monopolized every—or even most—segments of Iran's economy. For example, the Terrorist Sponsors exercised influence but ***did not*** have a monopoly in, *inter alia*: (1) Accounting; (2) Agriculture; (3) Domestic Retail; (4) Foodstuffs and Groceries; (5) Legal Services; (6) Music; (7) Publishing; (8) Real Estate; (9) Restaurants; (10) Textiles; and (11) Utilities. Instead, the Terrorist Sponsors' strategy for monopolization focused on profitable sectors that could underwrite the IRGC's sponsorship of anti-American attacks. Consequently, from 2007 through 2020, the IRGC notoriously exercised a monopoly over certain IRGC "exclusive sectors" of Iran's economy, including most importantly Iran's oil and gas sector and its financial sector. The

IRGC's monopolization of those sectors was so comprehensive that its official budget hardly mattered. As Dr. Michael Rubin testified on April 19, 2016, even if Iran's President "were to take the IRGC's official budget to zero, it would be facing less of a budget cutback proportionately than the U.S. military has through sequestration." According to Dr. Rubin, it is "essential to recognize the depth of IRGC involvement in almost every sector to which U.S. and European firms might consider investing."

108.    Most relevant for this case, the Terrorist Sponsors exercised complete control over the proceeds of oil and gas sales by no later than 2008, and near-complete control over many of Iran's major financial institutions by the end of 2007.

### 1.    The Oil and Gas Sector

109.    The most important sector generating proceeds for the Terrorist Sponsors was the oil and gas sector. Since 1979, the Terrorist Sponsors have exercised a series of monopolies with respect to various aspects of the Iranian regime's monopoly on petroleum products. While the rationale remained constant throughout—*i.e.*, use profits, resources, facilities, personnel, and intelligence from monopolies on key economic nodes to facilitate IRGC-sponsored terrorist attacks—the details grew over time.

110.    Since 1979, the IRGC has always been the primary organization responsible for protecting (including with missiles, rockets, and bunkers), physically securing, and coordinating intelligence, logistics, and operations conducted from all Iranian state-owned petroleum firms, including the National Iranian Oil Company ("NIOC") and its affiliates.

111.    Since 1979, the Minister of Petroleum and Chairman of NIOC (which were usually the same person) have been IRGC members or supporters:

a.    **Ali Akbar Moinfar**. In late 1979, the Revolutionary Counsil that served Ruhollah Khomeini and was directed in substantial part by Ali Khamenei selected Ali Akbar

41

Moinfar to serve as the Islamic Revolution's first Minister of Petroleum while the newly established regime was actively engaged in its hostage crisis with the United States. In December 1979, Petroleum Minister Moinfar infamously attempted to publicly negotiate hostage-taking terms with of President Jimmy Carter through the media. As the *Boston Globe* reported in December 1979: "If President Jimmy Carter wants to get the American hostages in Tehran released, Iranian Oil Minister Ali Akbar Moinfar says he can tell him how to do it. 'The only way to change the atmosphere is for the US government to admit the wrongdoing of overthrowing (Mohammed) Mossadegh 25 years ago, and so (admit) repentance for its wrongdoing,' Moinfar … said last week at the Hotel Tamanaco, where the Organization of Petroleum Exporting Countries (OPEC) held its semiannual pricing conference. 'The US government has to admit it imposed the shah on us. It owes this to us, to the US people and to the whole world,' he said, very emotionally. Moinfar, who is second secretary on Ayatollah Ruhollah Khomeini's ruling Revolutionary Council, was referring to the CIA-sponsored overthrow of Mossadegh in 1953, two years after he was elected Iran's prime minister, and to the subsequent placement of the shah into power. 'We can tell the students to follow the iman (Khomeini, if he orders them to release the hostages), but not until the atmosphere is improved. … described the students as 'representing the whole nation of Iran.' … Three weeks before the shah's overthrow last February, Moinfar was appointed by Khomeini, whom he met in 1963, to be a member of a three-man committee that ran the nationwide strike Khomeini had called to shut down Iran's economy. … Moinfar also insisted Zionists were plotting against Iran."

b.   **Gholam Reza Aghazadeh.** In the mid-to-late 1980s, Petroleum Minister Gholam Reza Aghazadeh infamously participated in arms-for-hostages negotiations with intermediaries for the U.S. government during the Iran Contra scandal, in which rogue elements of the Reagan Administration approved a swap of arms for American hostages held by Hizballah.  The Iran Contra scandal was one of the biggest news events of the 1980s and 1990s, and highlighted the terrorist operational role played by the Minister of Petroleum.

c.   **Mohammed Gharazi.** In 1983, Petroleum Minister Mohammed Gharazi participated in an Iranian public campaign calling for Muslim nations to band together and use their combined petroleum resources as a weapon to target the United States for its support of Israel. As the *Philadelphia Daily News* reported in 1983: "Iran, in a preliminary salvo before the OPEC ministerial conference, today demanded that oil be used as a weapon against the United States and its allies. … OPEC officials and industry observers said Iran stands little chance of forcing through its radical policies …. In Tehran, [iconic IRGC Commander] Akbar Hashemi Rafsanjani, [and] speaker of Iran's parliament, said Muslim nations should 'use oil as a weapon to pressure the U.S. and its allies to abandon support for the Zionist (Israeli) regime.' Iranian Oil Minister Mohammed Gharazi said Iran wants OPEC to increase the price of oil from the current $29-a-barrel base price to the $34-a-barrel price of March."

d.   **Bijan Zanganeh.** From 1997 through 2005, and again more than a decade later, Bijan Zanganeh served as Petroleum Minister. In such role, he openly sponsored measures to target the United States and Israel. For example, as Reuters reported in April 2002, "Iran's Oil Minister Bijan Zanganeh on Tuesday repeated his country's call for Islamic states to impose an oil embargo on Israel and its allies in support of the Palestinians," according to a report from IRGC media arm  IRNA, which "quoted Zanganeh as saying in an interview that 'an embargo against Israel and its allies can be effective in stopping

42

the continuation of the Zionist regime's criminal operations against the oppressed Palestinian nation.'" Treasury has found that Zanganeh directly served the Qods Force to help them finance terrorist attacks through illicit petroleum transactions, and sanctioned him as a Specially Designated Global Terrorist on October 26, 2020 upon finding that "Minister of Petroleum Bijan Zanganeh" was among those at the Ministry of Petroleum who helped the "regime in Iran use[] the petroleum sector to fund the destabilizing activities of the IRGC-QF."

e. **Kazem Vaziri-Hamaneh.** In 2006, after Iranian President and committed IRGC member Mahmoud Ahmadinejad appointed Kazem Vaziri-Hamaneh as Minister of Petroleum, Vaziri-Hamaneh quickly moved to call for the use of oil as a weapon to target the United States and Israel. For example, as *Iran Press News* reported on December 28, 2006, "Kazem Vaziri-Hamaneh, the Islamic regime's oil minister said: 'Due to pressures from the U.S. many oil companies are severing ties with the regime in Tehran and are refusing to invest in Iran.' … On the possibility of using oil as a weapon against western countries Vaziri-Hamaneh said: 'the decision of the Islamic regime is not to be pressured or forced into anything and if necessary, we will use every weapon at our disposal.'"

112. Since 1979, the Foundation for the Oppressed has effectively had a monopoly on a particular role vital to the Terrorist Sponsors' ability to maximize the value they could flow to the attacks they sponsored from commercial transactions between Iran and foreign counterparties: the Foundation's decades-long status as the exclusive Iranian parastatal front responsible for serving as the Supreme Leader's "broker" specifically tasked with brokering all Iranian state-owned firm's external transactions in sensitive sectors where the Supreme Leader desired to exercise substantial influence, including petroleum, including the ability to veto projects sought by Iranian state-owned firms for which they are brokering.

113. Under custom and practice, each Terrorist Sponsor has played a structural role within the Foundation from, at least 1979 through 2020, the Foundation has ordinarily served in the above-described broker role in all or nearly all material cross-border transactions involving Iranian state-owned firms and Ministries and foreign counterparties in sectors that were critical to the Terrorist Sponsors' ability to execute attacks, which always described the Ministry of Petroleum, NIOC, and Caspian Petrochemical FZE any time the transaction fit the above criteria.

43

In its broker role, the Foundation served as international broker for its Iranian state-owned firm client—and their ultimate beneficial owners—including, but not limited to, NIOC and Caspian Petrochemical, by helping such client identify, diligence, network with, negotiate with, transact with, finance with, and collaborate with, foreign partners, as well as expand into new markets, source new products, and a host of other technical competencies.

114.    The Foundation's exclusive broker role for the subset of Iranian transactions described herein (state-owned firm, international transaction or market), including the Ministry of Petroleum, NIOC, and Caspian Petrochemical FZE, among others, endured at all relevant times.

115.    Plaintiffs do not allege that the Foundation was the only Iranian entity that helped Iranian state-owned firms market and transact internationally; the Qods Force-dominated Iranian Foreign Ministry did as well. Nor do Plaintiffs allege that Iranian state-owned firms lacked their own networks, marketing departments, and the like. The Foundation, however, was different because it supplied uniquely valuable IRGC and Hizballah leaders and operatives embedded throughout the Foundation, as well as the Foundation's (and the above described IRGC and Hizballah operatives') skills, networks, relationships, and technical competencies to the Iranian state-owned firms/terrorist fronts for whom the Foundation served as broker—including the Ministry of Petroleum, NIOC, and Caspian Petrochemical. The Foundation also operated under unique Iranian authorities and branding that leveraged the Supreme Leader and SLO. Accordingly, under the ordinary operation of the Foundation's mandate, and the custom and

44

practice of the Terrorist Sponsors with respect to the Foundation, the Foundation ordinarily served in its broker role as the default in transactions fitting the parameters described herein.

116.    The Foundation's role was both an outgrowth and reflection of the Foundation's status as one of the most important Qods Force and Hizballah external operations, logistics, arms, intelligence, and financial fronts. For every such lane in which the IRGC-QF and Hizballah were embedded into, and relied upon, the Foundation, the Terrorist Sponsors had mission-specific reasons for embedding the Foundation in all major Iranian state-owned cross-border transactions. *First*, such transactions represented unique, and tremendous, risk and reward for the Terrorist Sponsors. On the risk side, such transactions could be vehicles for U.S. intelligence activity targeting Ali Khamenei, the IRGC, or Hizballah, but on the reward side, such Terrorist Sponsors could comprehensively use the cover of such transactions to source, transfer, recruit, develop, or otherwise improve key assets (financial, material, and operatives alike) needed for the attacks they sought to commit. The broker role addressed both risk and reward concerns. *Second*, for IRGC and Hizballah operatives, the Foundation offered unparalleled structure and logistics for intelligence gathering and recruitment outside of Iran, and the IRGC and Hizballah leveraged their involvement as broker to gather vital intelligence from their involvement as broker. Such intelligence comprised one of the core means through which IRGC and Hizballah operatives inside the Foundation directly supported attacks, because the intelligence they supplied often assisted in the preparation of things like targeting packages, or the sourcing of dual-use items needed by Iranian-state-owned firm, IRGC, and Hizballah alike.

117.    At all relevant times, the Foundation for the Oppressed extracted substantial income, resources, data, intelligence, and other things of value to the commission of terrorist

45

attacks, from the Foundation's programmatic role as broker for Iranian-state owned firms in the specific context as described above.

118.     Under the custom and practice of the Foundation, the Foundation ordinarily profited from a substantial fixed percentage of the profits of each cross-border transaction for which it served as a broker. Ordinarily, that percentage ranged from at least five percent (5%) of transaction-related profits to twenty percent (20%) or more.

119.     Independent of the Foundation's persistent, longstanding role as a broker in petroleum transactions, the Terrorist Sponsors took additional overt steps to seize control of Iran's oil and gas sector.

120.     Beginning in 2006, the Terrorist Sponsors formalized and consolidated their control over Iran's oil and gas sector in a series of moves designed to enhance the flow of Iran's oil and gas profits into terrorist operations. As a U.S. government-published analysis of the IRGC later warned, "[b]y far, the IRGC's greatest economic instrument is its influence over the energy sector, which accounts for over 80% of the regime's revenue." A 2019 Treasury designation further explained that "***Iran's exportation of oil directly funds acts of terrorism by Iranian proxies***" including "Hizballah" because "[t]he IRGC-QF's officials have long overseen exports of Iranian oil, often masking its origins and sending it to … IRGC-QF proxies across the region," including "Hizballah," such that "***those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force***."

121.     *First*, In June 2006, the Supreme Leader and the IRGC effectively announced their intention to monopolize Iran's energy sector when they caused the awarding of the largest energy project in Iranian history—its South Pars field, which connected to Caspian routes via pipeline—to notorious IRGC firm Khatam al-Anbiya ("KAA").

46

122.    Ayatollah Khamenei created KAA, whose name translates to "Seal of the Prophet," in 1990 to serve as a vehicle for the IRGC, Hizballah, and their proxies. Per its charter, KAA's purpose was to "efficiently utilize the available construction and economic resources, capacities and talents of the IRGC to continue the Islamic Revolution"—*i.e.*, IRGC-sponsored acts of terrorism targeting the United States. A steady drumbeat of government findings (typically accompanying sanctions), including releases on October 25, 2007 (from the United States), June 24, 2008 (European Union), July 27, 2010 (European Union), March 28, 2012 (United States), May 31, 2013 (United States), November 17, 2017 (United States), June 7, 2019 (United States), July 6, 2022 (United States), September 15, 2023 (United States) all confirmed that KAA and its affiliates were controlled by the IRGC, and were facilitating terrorism and weapons proliferation. For example, the March 28, 2012 announcement explained that the United States was issuing sanctions "to target the Iranian regime and specifically the IRGC as it attempts to continue its nefarious infiltration of the Iranian economy," and further explained that "[t]he IRGC has continued to expand its control over the Iranian economy," including in the "oil and gas" industry, "subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct," including "support for terrorism."

123.    Indeed, an IRGC general signed for the cameras on behalf of Khatam al-Anbiya, which photo was then circulated throughout global media by the IRGC's *Mehr News Agency*:



47

124.     That an IRGC General was willing to preen for the cameras while signing the South Pars contract was a clarion signal to Iranian market participants, including SCB, that the IRGC was seizing the sector. Indeed, U.S. government sanctions warnings emphasized the IRGC's use of fronts because, as a Member of Congress publicly noted in 2016, normally "[y]ou are not going to have a Revolutionary Guard Corps general show up to broker the deals." Here, the IRGC's takeover was so audacious that it was even dropping some of the normal pretenses.

125.     Public testimony by U.S. officials confirmed that the IRGC seized South Pars as part of its plan to monopolize Iran's oil sector. On July 26, 2006, for example, Dr. Kenneth Katzman, a Middle East Specialist at the Congressional Research Service, testified before Congress that:

> [T]he Revolutionary Guard['s] … motivations for expanding its economic role are apparently to provide rewards for senior officers, and to generate revenue to supplement the budget allocated to the Guard by the government. The Guard has formed contracting firms to bid on government projects, using its strong political influence to win business. In one recent example, one of the firms owned by the Guard, called 'Ghorb,' [*i.e.*, Khatam al-Anbiya] is being awarded a $2.3 billion deal to develop two phases of Iran's large South Pars gas field. Most of the other phases have been awarded to well-known multi-national energy firms, and the work given to Ghorb [KAA] had originally been awarded to Norway's Aker Kvaerner, but was re-tendered. This suggests that the Guard exerted political influence to win the [South Pars] contract and take it away from what most industry experts would consider a more capable firm.

126.     In 2007, Rostam Qasemi, a long-time IRGC-QF commander and member of the Khamenei Cell, was named chair of KAA.

127.     *Second*, by no later than 2007, the IRGC seized NIOC, which was the umbrella entity overseeing much of Iran's oil and gas sector and the main entity responsible for exploring and exporting Iran's oil. This effectively put the IRGC in control of the entire oil and gas sector, as NIOC exercised a monopoly over the petroleum trade in Iran and with respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas). NIOC had affiliates, including the

Naftiran Intertrade Company Ltd. ("NICO"), to handle much of its overseas trade. The IRGC's seizure of NIOC converted it to an IRGC front. Since the IRGC seized NIOC, NIOC's purpose has always been to source funds and weapons (including weapons components) for Hizballah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. Indeed, as early as 2004, news stories surfaced showing that bogus NIOC contracts were being used to conceal IRGC arms shipments.

128.    On February 23, 2007, Gholam-Hossein Nozari, Deputy Minister of Petroleum and Chairman of NIOC, publicly announced in a media interview published by BBC that, with respect to the recent rush of IRGC contract awards in Iran's oil and gas sector, "the contracts awarded to the IRGC have all gone through the legal bidding process, and the IRGC-affiliated companies, including the Qurab Company under the supervision of the Khatam al-Anbiyah base . . . ." He explained that "by relying on these domestic [IRGC] contractors and the new type of contracts for foreign companies, it is possible to overcome the pressure from the United States and its allies." In so doing, NIOC's then-Chairman publicly admitted that NIOC and the Ministry of Petroleum intended to aggressively leverage the IRGC to defeat applicable U.S. sanctions.

129.    On November 26, 2008, Treasury singled out NIOC as the first non-financial institution to be designated as an entity owned and controlled by the Government of Iran. That designation effectively prohibited U.S. persons from engaging in transactions involving NIOC and its subsidiaries. Treasury emphasized that "[m]ost transactions with any branches or subsidiaries of these entities are also prohibited, regardless of where such branches or subsidiaries are located and incorporated."

130.    NIOC was a notorious front for Hizballah and the Qods Force, which relied upon NIOC to help finance acts of terrorism committed by Hizballah, Hamas, PIJ, and other IRGC

49

proxies. As an illustrative example, high profile news reports surfaced that in 2009, Thai authorities seized a shipment of 35 tons of explosives and weapons destined for Hizballah, Hamas, and PIJ, which the IRGC had bartered from North Korea using NIOC oil, and was transporting under the false cover of a NIOC end user.

131.    On November 15, 2011, terrorism experts from United Against Nuclear Iran ("UANI") testified to Congress that "NIOC operates as the ultimate front company obscuring the role of the IRGC in the oil trade," and warned of deepening ties between NIOC and the IRGC. UANI wrote that "working with NIOC and the IRGC" would "directly contribut[e] to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs"—for example, by bankrolling "groups in Iraq … that execute attacks against American and NATO servicemen" while "being actively supported by Iran." The United States responded by increasing sanctions pressure on the IRGC to prevent the IRGC from using oil revenues to support terrorism.

132.    In August 2012, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012, Section 312 of which directed Treasury to determine whether NIOC was acting as an agent or affiliate of the IRGC. A month later, Treasury publicly announced that the answer was "yes." This finding triggered additional comprehensive sanctions against NIOC. As the Foundation for Defense of Democracies explained on September 23, 2012 after Treasury's determination, "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization."

133.    In another designation of NIOC and its subsidiaries in 2020, Treasury confirmed that "coordination between NIOC and the Central Bank of Iran" had "facilitate[d] the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF" and

that the transport of oil by a NIOC subsidiary and its front companies had "played a significant role in oil deals used to generate revenue for the IRGC-QF and Hezbollah."

134.    *Third*, having placed the IRGC in effective control of the oil and gas industry, the Iranian Minister of Petroleum announced in June 2008 that the Foundation for the Oppressed was empowered as the sole private seller of Iranian oil, petroleum products, and petrochemical products. This arrangement was publicly announced in June 2008 as encompassing twelve areas of cooperation between NIOC, and the Foundation for the Oppressed—including crude oil, petroleum products, and petrochemical products. The arrangement was also widely covered by international trade press; the English-language outlet *MEED* reported in September 2008 that, under this arrangement, the Foundation would "purchase oil from the Petroleum Ministry at a discount, reaping strong profits."

135.    The effect of this arrangement was that as of June 2008, all Iranian petroleum exports were handled either by NIOC (which had been seized by the IRGC) or by the Foundation for the Oppressed, a known front for Hizballah and the Qods Force. In other words, the Terrorist Sponsors had a monopoly over petroleum exports, and made that monopoly even more effective at financing terrorism by giving the Foundation for the Oppressed a nearly unfettered ability to tap Iran's petroleum reserves, sell those natural resources, and keep the resulting proceeds to use as it saw fit. This ensured that export proceeds would be routed—in whatever amounts the Terrorist Sponsors wished—to the Foundation controlled by Khamenei and his inner circle, which guaranteed that the first dollar from every oil sale could be used for terrorist attacks before any other purpose.

136.    *Fourth*, Khamenei issued a decree on March 10, 2011 to consolidate control of the oil and gas sector into the hands of a small group of the most committed terrorists within his

inner circle. Khamenei's own Supreme Leader's Office created a new entity, Petro Nahad, operated jointly by, and for the benefit of, the SLO and the IRGC, including Khamenei Cell leaders like Commander of the Qods Force Qasem Soleimani (who received a direct cut of SLO/IRGC oil profits) and Commander of the IRGC Mohammad Ali Jafari (who was a direct, and publicly identified, beneficiary of SLO/IRGC oil profits derived from trades routed through the UAE). Khamenei's decree mandated that all oil and gas contracts would be awarded by this new Petro Nahad entity that his inner circle of Terrorist Sponsors controlled. With complete authority over all energy projects, deals, companies, and decisions in Iran, Petro Nahad officially consolidated the Terrorist Sponsors' monopoly on the Iranian oil and gas sector, under the SLO.

137.    *Fifth*, as the capstone to the Terrorist Sponsors' consolidation of the sector, long-time IRGC-QF commander Rostam Qasemi, who had run KAA since 2007, was appointed Minister of Petroleum in 2011, with official responsibility over Iran's entire petroleum sector. As Treasury Under Secretary David S. Cohen explained, Qasemi's appointment "was applauded by the IRGC, which characterized Ghasemi's role as a 'meaningful and critical response to the attacks against the [IRGC] from the west[]…. '" This reaction made it clear that, with Qasemi's appointment, the purpose of the Terrorist Sponsors' open control over the oil sector was to empower the IRGC in its "resistance" to the west.

138.    Upon his appointment, media sources reported multiple public pronouncements by Qasemi confirming that Iran's oil and gas sector was being weaponized against the United States and its allies. Thus, on August 7, 2011 (four days after taking office), Qasemi announced that KAA would displace foreign corporations' roles in Iranian projects, explaining that progress demanded "working with jihadist and revolutionary spirit." Later that month, Qasemi declared that "Support for Palestinians in the campaign against Tel-Aviv will continue until annihilation

52

of the Zionist regime." In November 2011, Qasemi threatened that "Iran will use its oil as a political tool, if necessary," and as European sanctions mounted in 2012, Qasemi took part in a daylong conference regarding mobilizing the resistance economy to defeat sanctions. Publicly, Qasemi announced that western sanctions had been ineffective, and that "All possible options have been planned in government to counter sanctions." On August 3, 2012, Qasemi gave interviews explaining that the oil industry was participating in the resistance economy. And on September 24, 2012, Treasury confirmed that "the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions," including through NIOC, which Treasury contemporaneously designated an agent or affiliate of the IRGC. In sum and substance, these pronouncements made it clear that the IRGC was using Iran's oil, and sanctions evasion relating to Iran's oil, to finance its ongoing terrorist operations.

139.    Through their various means of seizing state-owned businesses, the Terrorist Sponsors came to control all energy firms and projects in Iran and transformed them into terrorist fronts. One of those significant front companies was **Caspian Petrochemical FZE**, which shipped and facilitated the sale of petroleum products, including especially liquified petroleum gas (LPG), that IRGC energy fronts like KAA extracted from IRGC-controlled areas, including the IRGC's South Pars field and the IRGC's energy claims in the Caspian Sea, and sold for the benefit of the IRGC and the Foundation for the Oppressed. (Unless otherwise indicated, all references to Caspian Petrochemical in this Complaint are inclusive of its predecessor entity before the IRGC rebranded it as "Caspian Petrochemical" in 2011.)

140.    By no later than 2007, Caspian Petrochemical was beneficially owned by the IRGC; and by no later than 2008, it was generating revenue directly for the Foundation for the Oppressed by exporting petroleum products sold by the Foundation. In 2011, Caspian

53

Petrochemical came under the additional ownership and control of the SLO via Petro Nahad, and handled much of the regime's overseas oil and gas shipments.[8] Treasury designated Caspian Petrochemical and its affiliates on April 22, 2025, confirming that Caspian Petrochemical and its affiliates are "responsible for shipping hundreds of millions of dollars' worth of Iranian LPG and crude oil to foreign markets," and that the proceeds of these sales "***fund Iran's … advanced conventional weapons programs, as well as regional proxy groups and partners such as Hizballah, the Houthis, and Hamas***." The designation was pursuant to E.O. 13902, which found "that Iran continues to be the world's leading sponsor of terrorism," and accordingly sought "to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and proxy networks, and malign regional influence."

141.    Caspian Petrochemical was never a normal company. By no later than 2007, it functioned as an IRGC front completely under the IRGC's control. Since being seized by the IRGC, Caspian Petrochemical's purpose has always been to generate funds for Hizballah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. From 2007 onwards, Caspian Petrochemical was a known front for Hizballah and the Qods Force (given Caspian Petrochemical's responsibility for shipping the IRGC's most lucrative financial asset). Hizballah and the Qods Force relied upon Caspian Petrochemical to help finance acts of terrorism committed by Hizballah, Hamas, and other IRGC proxies.

142.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's petroleum sector and used such monopoly to fund terrorist attacks by

---

[8] Such control was in addition to the previously described role played by the Foundation for the Oppressed from 2008 onward, and was consistent with Ayatollah Khamenei's custom and practice of embedding multiple control points in key institutions of the terrorist machine he built.

IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13,846, which imposed sector-wide sanctions targeting the energy sector in Iran based on a formal finding that revenue generated by Iran's petroleum industry funded Iranian regime-sponsored terrorist attacks committed by IRGC proxies in the Middle East.

143.     In 2019, Mahnaz Zahirinejad (Director of Center for Middle Eastern Studies, University of Warsaw) reported that the Foundation for the Oppressed was already enmeshed in Iranian petroleum exports well before the IRGC completed seizing the entire oil and gas sector:

> In 2005 the United States and UN imposed a new embargo on Iranian oil and gas sector. As the result, European companies, … abandoned several multibillion-dollar projects in the oil sector. This coincided with Mahmoud Ahmadinejad's presidency (2005-2013). Following this the Islamic Revolutionary Guard Corps (IRGC) was awarded state projects in strategic sectors, including oil and gas. …
>
> The appointment of senior IRGC officer, Rostam Ghasemi (2011-2013) to the oil ministry coincided with the new round of oil and financial sanctions imposed by the US and the international community that targeted Iran's exports of crude oil and refined oil and gas products. …
>
> As a result of these sanctions, oil income declined and government deficits increased. The government was not able to sell the oil so the Revolutionary Guard and the private sector - including independent individuals or those operating within organisations - started to do this job for the government. …
>
> … [S]ome foundations, such as Bonyad-e Mostazafan, were also already involved in selling oil [before the IRGC seized the sector]. Although the agreements between the oil ministry and these companies were signed within the framework of privatisation of the oil sector, the participation of the Bonyad-e Mostazafan as a non-private sector organisation in the NIOC cannot be considered as a step towards privatisation of the oil industry. In fact, it could only be seen as recognition of interference by Bonyad-e Mostazafan, which is under the control of the Supreme Leader and it is not a private and independent foundation.

144.     The Terrorist Sponsors' takeover of the oil and gas sector has long been public knowledge. Since at least 2006, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted SCB that its energy sector-related transactions concerning an Iranian deal, project, and/or counterparty (including oil,

55

gas, and associated financing, construction, shipping, and logistics) that participated in the IRGC's monopoly over the oil and gas sector, including South Pars, supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's monopoly on the sector. Some of the public sources reciting these facts included articles in Iranian newspaper *Shara* (2006); the *Inter Press Service* (2009); *Economist Intelligence Unit* (2010); *APS Diplomat News Service* (2012); *Australian* (2014); *Iran Briefing* (2014); and *APS Review Downstream Trends* (2014).

145.    Looking back on this era in 2019, Iran scholar Khosrow Semnani observed that Khamenei's sponsored "power and money grab by the … IRGC" was completed by "2009":

> Under the guise of evading sanctions, an oil mafia with ties to the IRGC, and acting with the blessing of Iran's supreme leader, consolidated its grip over the Iranian state. Billions in no-bid contracts were awarded to the IRGC by the Petroleum Council … established in the Oil Ministry in 2006. Yet, despite the significance, scale and volume of these contracts, Iran's oil and gas sector operated as a closed and incestuous system rigged in favor of insiders. Under the guise of 'destroying Israel' …, IRGC cronies positioned themselves to benefit from sanctions. All they had to do was to sell Iran's oil, in unknown quantities, at a discount and pocket the difference by importing goods at a premium. For these thieves of state, … the shadow of sanctions … served as both the excuse and opportunity for pillaging Iran's oil sector.

### 2.    The Financial Sector

146.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's financial sector, which comprised Iranian banks, currency exchanges, and hawalas, operationalized through Iran's Terrorist Sponsors. These entities collectively owned and/or exercised direct or indirect control over all banks, currency exchanges, and hawalas in Iran.

147.    Even well before 2007, Iran's major financial institutions—including SCB's customers CBI/Markazi, Bank Saderat, and Bank Melli—played essential roles in facilitating the IRGC's support to terrorist groups including but not limited to Hizballah, Hamas, PIJ, and JAM.

148.    Indeed, that is why these institutions were sanctioned by the United States in 2007. As Treasury found in 2007, Bank Saderat "has been used by the Government of Iran to channel funds to terrorist organizations, *including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad*." Treasury thus found that "from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran … to its branch in Beirut *for the benefit of Hizballah fronts in Lebanon that support acts of violence*," and "Hizballah uses Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas," which itself "had substantial assets deposited in Bank Saderat." The same notice found that Bank Melli "provides banking services to the IRGC and the Qods Force," and "was used to send at least $100 million to the Qods Force" from 2002 to 2006, employing "deceptive banking practices to obscure its involvement from the international banking system," including by "request[ing] that its name be removed from financial transactions."

149.    As for CBI/Markazi, longstanding terrorist financing concerns about the bank reached a fevered pitch in 2007 and 2008—with the Secretary of the Treasury warning that "the Central Bank of Iran was sending money through Bank Saderat to Hizballah" (*CQ-RollCall Political Transcriptions*, 2007), more than 25 members of Congress calling for the bank's designation as a "terrorist entity" (*U.S. Congressional News*, 2008), and others in Congress calling it the "central bank of terrorism" (*Reuters News*, 2008) that was "heavily involved in the funding of terrorism" (*Congressional News*, 2008).

150.    On December 31, 2011, Congress in the 2012 National Defense Authorization Act blacklisted CBI/Markazi. Congress also, with limited exceptions, subjected to sanctions foreign financial institutions doing any significant financial transactions with CBI/Markazi, as

57

well as several other IRGC-affiliated financial institutions. These sanctions were imposed because CBI/Markazi—a principal repository of Iranian oil revenue—was participating actively in the IRGC's illicit transactions, including transferring funds used to support IRGC-backed terrorism. Through this legislation, Congress reaffirmed the connection between Iranian oil revenue and IRGC terrorism.

151.    Over time, the IRGC's influence over Iran's financial sector only grew in parallel with the IRGC's increasingly strong hold over the economy.

152.    On February 14, 2024, Treasury imposed additional counterterrorism sanctions against CBI/Markazi pursuant to E.O. 13324, and confirmed, *inter alia*:

> OFAC … sanctioned a procurement network responsible for facilitating the illegal export of goods and technology from over two dozen U.S. companies to end-users in Iran, including the Central Bank of Iran (CBI), which is designated for its role in providing financial support to the … [Qods Force] and Hizballah. …

> "The Central Bank of Iran has played a critical role in providing financial support to the IRGC-QF and Hizballah, two key actors intent on further destabilizing the Middle East," said Under Secretary of the Treasury for Terrorism and Financial Intelligence Brian E. Nelson. "The United States will continue to use all available means to disrupt the Iranian regime's illicit attempts to procure sensitive U.S. technology and critical inputs."

153.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's banks and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13,846 based upon the Executive branch's finding that U.S. dollar-denominated transactions with any person supervised by "the Central Bank of Iran"—Iran's financial regulator, which always controlled all Iranian banks—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates." 83 Fed. Reg. 38939. Then, on September

20, 2019, Treasury sanctioned the Central Bank of Iran, and confirmed its findings that the Qods Force and Hizballah controlled CBI and used it to finance their attacks as well as those of their proxies, including Hamas and PIJ. The press release explained that the Qods Force was using CBI "to move Iran's foreign currency reserves for terrorist proxies." 84 Fed. Reg. 50884.

**C.      The Terrorist Sponsors' Tools for Siphoning Value from the Economy**

154.    In addition to owning and/or controlling the oil and gas sector (and the financial conduits related to that sector), Iran's Terrorist Sponsors employed several mechanisms to ensure that funds and resources from oil and gas businesses under the IRGC's control would systematically flow to the Terrorist Sponsors' proxies.

**1.      Ownership and Control**

155.    Most obviously and directly, when the Terrorist Sponsors owned businesses, in whole or in part, they received the profits to do with as they pleased. Independent of profits, the Terrorist Sponsors had access to those businesses' resources including personnel, technology, and other assets, which they frequently bent to terrorist purposes. This ensured that any meaningful economy activity in the oil and gas sector benefited the Terrorist Sponsors first.

156.    Even when the Terrorist Sponsors did not own a business, they could still siphon value from the business by controlling it (or key players within it), or by controlling adjacent entities. For example, the Terrorist Sponsors used their control over oil and gas policy to steer lucrative contracts to their preferred fronts; they used their influence over NIOC to smuggle weapons and barter oil for weapons; and they controlled key businesses and government offices in the sector (*e.g.*, the Ministry of Petroleum) by placing IRGC officials, answerable to the Terrorist Sponsors, in charge of them.

59

## 2.    The Logistics Policy Directive

157.    On June 8, 2003, the Iranian regime published an official directive ordering the IRGC to dedicate the profits it earned from its commercial fronts to its core mission, *i.e.*, protecting and exporting the Islamic Revolution through acts of terrorism ("Logistics Policy Directive"). The Logistics Policy Directive provided that with respect to the profits derived whenever "any unit" of "the Islamic Revolutionary Guard Corps … and related organizations … sign[ed] contract agreements for civil projects," "[t]he monies received from any [such IRGC-related] contract … shall be deposited to the Chancery, and its equivalent shall be placed at authority of the [IRGC] from the credit determined in the annual budget, so that it would be used for the costs related to the [IRGC-related] contract, also the strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for its operations, *i.e.*, terrorism. Moreover, under the Directive, the IRGC "can, proportionally to [the IRGC's] needs, exchange or sell excess material, and equipment and machinery" to finance IRGC operations.

158.    The Logistics Policy Directive established that the IRGC was authorized and encouraged to act as contractors in development schemes, subject to the requirement that any profit would be used to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, the IRGC's central anti-American terrorist mission. As a result, IRGC profits were required under Iranian law to be reinvested in the IRGC's specific lanes of activity that supported terrorism. The Logistics Policy Directive, in effect, mandated that IRGC profits derived from IRGC fronts be used primarily to enable IRGC-sponsored terrorism by providing off-the-books funding sources for key IRGC weapons programs.

159.    SCB knew about the Logistics Policy Directive. *First*, SCB's employees and agents in Iran, the U.K., and U.A.E., among other places, knew about the Directive, and their

60

knowledge is imputed to SCB. *Second*, SCB carefully reviewed all potentially applicable Iranian laws, rules, and regulations; SCB necessarily learned of the Directive when doing so. *Third*, in addition to reviewing official Iranian pronouncements (which alerted SCB to the Directive), SCB also comprehensively reviewed media reports and scholarly analyses when conducting its diligence, which necessarily alerted SCB to the Directive given the litany of public reports that flagged it in the years after the Government of Iran announced and published the Directive in 2003.

160.    Think tanks, terrorism scholars, and Iranian media outlets all published warnings about the Logistics Policy Directive in real-time. In 2007, for example, the American Enterprise Institute ("AEI") published a white paper by Iran scholar Ali Alfoneh—titled *How Intertwined Are the Revolutionary Guards in Iran's Economy?*—which publicly warned about the IRGC's use of economic resources to finance its attacks and, in that context, also warned about the Directive, which was intended to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, IRGC-sponsored terrorist attacks targeting the United States. Similar warnings were published in later years. In 2010, likewise, *Peyk-e Iran* reported (as translated from Farsi) that "the IRGC … gradually expanded its power and influence since 1979" through fronts "reflecting Iranian economy's dominance by a military-mafia institution," for which "the Logistics Directive" served "as a component of this expansion" because the Directive was an "'order that all IRGC units … must participate in civil projects as contractors,'" upon which the IRGC relied to assert the "IRGC's dominance in security … institutions, and IRGC companies' influence" through "IRGC-controlled companies."

61

### 3.    Mandatory Donations (*Khums*)

161.    The IRGC also siphoned resources from the Iranian economy by levying mandatory donations, or *khums* (*khoms*), comprising 20% of all income, which flowed up to Ayatollah Khamenei and then down to IRGC proxies to finance terrorist attacks.

162.    Shiite theological traditions call for donations (*khums*), usually equal to 20% of a person's income on every transaction, to support the cause. The IRGC, however, has twisted this religious tradition into something far different. Under the IRGC's approach to *khums*, the IRGC emphasized simplicity in terms of percentages, analogous to terrorist flat taxes. Under IRGC doctrine, *khums* are mandatory on all transactions by regime supporters (including IRGC members and companies)—without exception—all of which ultimately flow back to fund the IRGC, including Hizballah and the Qods Force. Thus, 20% of regime supporters' income is donated back to the IRGC, and 20% of income that flows through an IRGC-controlled front to IRGC shareholders is then donated back to the IRGC and its proxies. So, for example, if SCB flowed through $100 million to regime supporters and the IRGC, they would, in turn, donate approximately 20%—$20 million—to Hizballah and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

163.    The universal practice of tithing a portion of each regime supporter's and IRGC member's income back to the leadership of the IRGC was under the direct, public, widely known, edict of Ayatollah Khomeini. For example, in Ayatollah Khomeini's seminal 1975 instruction-manual-for-terror titled *Velayat-e Faqeeh*—the foundation of all IRGC doctrine—the Ayatollah decreed that "khums is a huge source of income that accrues to the treasury" and required all to "pay one-fifth of their surplus income, after customary expenses are deducted, to the Islamic ruler."

164.    Ayatollah Khomeini specifically decreed that *khums* were mandatory on any and all petroleum-related profits. Per Khomeini: "***Those who work in oil deposits … must pay the khoms*** to the Islamic Treasury if the profit made by him from such activities." By "Islamic Treasury," Khomeini meant the funds he and his successor Khamenei personally controlled as Supreme Leader of Islamic Revolution, from which they always financed terrorist attacks.

### 4.    Financial Auditors and Aggregators

165.    Ayatollah Khamenei, the SLO, the IRGC, and Hizballah exercised programmatic control over the profits generated by their stake in terrorist fronts, which the Terrorist Sponsors used to maximize the IRGC's ability to enable acts of terrorism targeting the United States. Thus, as *Radio Free Europe* reported on September 18, 2009, "all the IRGC's economic activities are monitored only by internal IRGC auditors."

166.    By conducting thorough internal audits, the Terrorist Sponsors were comporting with a terrorist version of best financial practices. As FATF reported in 2015:

> Terrorist financial management requires planning and accounting for all resources and assets that the group controls, as well as its liabilities. Analysis of publicly-available financial documents originally from a variety of terrorist organisations demonstrates that financial management practices (such as documenting revenue levels and sources, expenditure reporting, accounting) are particularly important for terrorist groups with advanced capabilities, and particularly those that are territorially based. Large terrorist groups will often rely on terrorist financial managers to accumulate revenue, establish financial shelters (such as bank accounts, front and holding entities), and oversee financial disbursements. Their activities also include provisioning funds to the group's leadership, members, and operators and considering opportunities to invest any excess capital. Groups… have actively recruited … accountants, and other financial professionals, specifically to monitor the activities of financial entities within their areas of control in order to better manage revenues and minimise losses.

167.    Accordingly, FATF concluded that an "area of focus" for counterterrorism practitioners "could include identifying and targeting financial collection/aggregation/accounting points within a terrorist organisation."

168.     The use of these internal auditing mechanisms simultaneously shielded flows of funds from outside scrutiny, but also ensured that they went where the Terrorist Sponsors wished—which was to their terrorist proxies.

**5.     Barter Trade for Weapons, Training, and Logistical Support**

169.     Control over the oil and gas sector also enabled Iran's Terrorist Sponsors to barter oil and petroleum products to other pariah regimes in exchange for weapons, training, and logistical support. In this regard, the Terrorist Sponsors' largest trading partner was North Korea's Reconaissance General Bureau ("RGB").

170.     From the early 1980s through at least 2019, the Foundation for the Oppressed always helped coordinate the Terrorist Sponsors' decades long partnership with RGB, including through the efforts of Foundation leaders Mohsen Rafiqdoost and Parviz Fattah, among others. Throughout, the Terrorist Sponsors and their RGB allies engaged in a consistent custom and practice, and used the same general tactics, techniques, and procedures. In sum and substance, the Terrorist Sponsors ordinarily traded (as barter) their NIOC-supplied, Foundation-financed, SLO-supervised, Hizballah and Qods Force-smuggled, petroleum products to the RGB and, in exchange, the RGB provided the following to Hizballah, Hamas, PIJ, and JAM:

a.     **weapons**, including, but not limited to, rockets, missiles, mortars, explosives, small arms, and communications equipment;

b.     **terrorist training and equipment maintenance services**, including, but not limited to, services provided in the country in which the terrorist group was based (*e.g.*, Lebanon for Hizballah), in addition to related training and technical support services provided at the Joint Logistics Cell locations in North Korea, Iran, and Syria; and

c.     **construction of state-of-the-art, military-grade, attack tunnels** modeled after the RGB's tunnel network adjacent to the DPRK's border with South Korea.

This shared logistics partnership began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars *per year* in bartered oil-for-weapons,

64

services, and tunnels that the Terrorist Sponsors caused to flow through to Hizballah, Hamas, PIJ, and JAM to directly enable such groups' attacks.

171. Since the 1980s, NIOC has been notoriously close to its North Korean customer and strategic partner. On January 15, 1980, for example, the *Associated Press* reported that "North Korea's vice-premier Kong Chin-Tai" was "in Iran with an economic delegation," where he "met Iranian Oil Minister Ali Akbar Moinfar" and confirmed that "National Iranian Oil Co." was "ready to supply part of North Korea's oil requirements." On April 11, 1989, similarly, *Reuters* reported that "National Iranian Oil Co [] has close relations with North Korea."

172. Indeed, the U.S. government directly warned banks—including, on information and belief, SCB—that Iran-facing sanctions violations foreseeably enabled IRGC-sponsored arms purchases from North Korea. In 2005 and 2006, for example, media outlets in the United States (*e.g.*, *New York Times*) and Asia (*e.g.*, *Xinhua*), reported that U.S. officials had met with foreign bankers to warn them about the related risks posed by the IRGC and North Korea.

173. Those warnings were well founded: RGB-supplied weapons and services comprised a substantial percentage of all weapons that Iran's Terrorist Sponsors delivered to Hizballah, Hamas, PIJ, and JAM throughout this period. Numerous high-profile weapons seizures and intelligence reports since the early 2000s confirmed that the Terrorist Sponsors used their oil-for-barter deals with the RGB (sometimes directly, sometimes routed through China) to pay for around half of all weapons and technical training they provided to Hizballah, Hamas, and PIJ, which services were ordinarily coordinated with the Qods Force and Hizballah, paid for by oil-based barter trading, and complementary to previous training supplied by the IRGC. Indeed, much of IRGC field tactics and tradecraft, and therefore the tactics that govern Hizballah, Hamas, and PIJ doctrine, were ripped straight from the RGB's playbook, which had decades of

relevant operational experience that it eagerly shared with the IRGC and Hizballah as such organizations grew.

174.    From 2009 through 2019, Iran's Terrorist Sponsors engaged in more than $1 billion per year in oil-for-weapons, services, and tunnels trades on behalf of themselves, their fronts, and their terrorist proxies. From 2009 through 2019, Iran's Terrorist Sponsors engaged in more than $1 billion per year in oil-for-weapons, services, and tunnels trades on behalf of themselves, their fronts, and their terrorist proxies. Indeed, some estimates place the Hizballah- and Hamas-related oil-for-weapons expenditures at several billion per year (which was primarily conducted through the oil-for-guns barter arrangement rather than cash).

### D.    The Terrorist Sponsors' Proxies

175.    The Terrorist Sponsors' oil and gas money flowed inexorably to their terrorist proxies: Hizballah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi. It flowed in the form of money—much of which was earmarked for specific violent purposes, including carrying out attacks, purchasing arms, or paying martyr payments. It also flowed in the form of arms, training, and other logistical support that was tailored to violent terrorism (as opposed to innocent uses). Accordingly, there is a straight line from enabling Iran's Terrorist Sponsors to access oil revenue, on the one hand, and terrorist violence by Hizballah, Hamas, PIJ, and JAM, on the other. Indeed, in 2019, Treasury confirmed in no uncertain terms what had already been clear for over a decade: that "Iran's exportation of oil directly funds acts of terrorism by Iranian proxies."

176.    Since 1979, the IRGC has led an alliance of anti-American terrorist organizations, united by their shared mission of conducting terrorist attacks targeting the United States— directly, by targeting Americans, or indirectly, by targeting United States allies—to coerce U.S.

66

government decisionmakers in Washington, D.C. and elsewhere to choose to withdraw from the Middle East. Since 1990, that effort has been directly assisted by the SLO.

177.    Since 2003, this terrorist alliance has proudly called itself the "Axis of Resistance." According to the Defense Intelligence Agency ("DIA"):

> Throughout its 40-year history, the Islamic Republic of Iran has remained implacably opposed to the United States [and] our presence in the Middle East … Tehran has committed itself to becoming the dominant power in the turbulent and strategic Middle East. … It leads a cohesive if informal bloc of Shia and Alawi state and nonstate actors—its 'Axis of Resistance' against the West.

178.    Ayatollah Khamenei was a direct—and key—financial sponsor of each Axis of Resistance member. As he publicly stated in 2015, "we will never stop supporting our friends in the region and the people of Palestine, Yemen, Syria, Iraq, Bahrain, and Lebanon." "Basically," Congressman Duncan observed on May 12, 2016, Khamenei meant IRGC proxies including "Hezbollah" and "Hamas."

179.    The Axis of Resistance was not merely a slogan: it had nearly every jihadist function that would parallel a western alliance, including joint attacks—which the terrorists, U.S., U.N., and E.U. all called "operations"—that were committed by joint cells involving two or more FTOs supported by joint training, procurement, financial support, logistics, basing, and intelligence. In Iran, for example, the regime maintained multiple complexes in which the IRGC, Qods Force, Hizballah, Hamas, PIJ, and JAM trained, studied, and plotted together as one coordinated syndicate of terrorists targeting the United States and seeking to coerce the U.S. government into withdrawing from the Middle East.

180.    Notably, the name "Axis of Resistance" itself targeted the United States because its members "resist" the U.S. presence in the Middle East. Part of this "resistance" included sponsoring waves of terrorist attacks against Israelis. But even that targeted the United States

67

because the terrorists believed Israel to be an agent of America and believed that the United States was key to whether they could overthrow the Israeli government and replace it with their shared goal of an Islamic caliphate that governed Jerusalem, which they called "Qods."

181.    On August 2, 2017, Congress enacted a statute recognizing that "***Iran's asymmetric activities*** in the region, … including [Iranian] funding, lethal and nonlethal contributions, and training, provided to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East" comprise "asymmetric Iranian activities and threats" (*i.e.*, terrorism) that "***directly threaten the United States and key allies*** in the Middle East, North Africa, and beyond." 22 U.S.C. § 9402.

182.    Each Plaintiff was injured in an attack that was funded by the Terrorist Sponsors, and committed, planned, or authorized by Hizballah, Hamas, PIJ, and/or JAM. Some attacks were committed jointly by Hizballah and/or Hamas and/or PIJ (in Israel), or by Hizballah and JAM (in Iraq).

### 1.    Hizballah

183.    As described *supra*, Hizballah was created by the IRGC, and its members swear fealty to the Supreme Leader. Hizballah has been a designated FTO since 1997.

184.    As described *supra*, Hizballah plays multiple roles with Iran's terrorist infrastructure, including carrying out attacks on its own or in conjunction with other proxies; providing training, technical assistance, and weaponry; and pioneering and planning effective attacks on Americans.

185.    As described *supra*, Hizballah has long been closely intertwined with Iran's oil business, and receives almost all of its budget—hundreds of millions of dollars each year—from the other Terrorist Sponsors. As Treasury explained in 2019, "[t]he IRGC-QF also relies heavily

68

on Hizballah officials and front companies to broker associated contracts" to sell Iranian oil, thus "leveraging a terrorist organization as its chief conduit for obfuscating and selling hundreds of millions of dollars of illicit oil to fuel its nefarious agenda." Although the government made those observations in 2019, they were true—and generally known in the region—throughout the period relevant to this case.

### 2. Hamas

186.    Hamas established itself in or about 1989 as a violent, global, Sunni Islamist group dedicated to destroying Israel and killing every Jewish person there. Hamas has been designated an FTO since 1997.

187.    In or about 1990, Khamenei, the IRGC, and Foundation for the Oppressed cemented a deep bond with Hamas. Ever since, Hamas has been the IRGC's second most notorious proxy, behind only Hizballah. In *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020), which addressed Iran's liability for some of the attacks at issue here,[9] the court found as a matter of fact that "there is near-universal agreement that Iran has provided 'critical' material support—in the form of cash, weapons, and training, for Hamas terrorists since at least the mid-1990s," and that this support has been "repeatedly acknowledged" by "[b]oth Hamas and Iran." *Id*. at 338. Thus "during the years leading up to and surrounding the attacks at issue, Iran provided tens—if not hundreds—of millions of dollars' worth of currency to Hamas and PIJ. Iran also provided substantial operational capacity to both groups, including rockets and other weapons, weapons technology, and training of operatives." *Id*. at 364-65 (citation omitted).

---

[9] The overlapping attacks on August 19, 2011, October 13, 2015, January 27, 2016, and March 8, 2016—all of which the court in *Force* found to be committed by Hamas and supported by Iran—as well as the October 29, 2014 attack, which the court in *Force* found to be committed by PIJ and supported by Iran.

188. Hamas, like Hizballah, viewed the United States and Israel as two inextricably connected enemies. For example, Hamas leaders regularly blamed Israeli counterterrorism operations targeting Hamas on the United States by pointing out that Israel buys most of its advanced weapons from America.

189. Hamas needed money to conduct the attacks alleged herein. As a Hamas financial appeal in 2019 admitted: "The reality of jihad is the expenditure of effort and energy, and money is the backbone of war."

190. The IRGC, Foundation for the Oppressed, and SLO provided most of Hamas's budget, and directly financed Hamas attacks through a range of vehicles, including salary and bonus payments to Hamas leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hamas terrorists.

191. Iran's Terrorist Sponsors funded acts of terrorism committed by Hamas through an array of channels, including the Qods Force, Hizballah, Foundation for the Oppressed, SLO, and Bank Saderat. From 2007 through 2020, the Terrorist Sponsors did so by collectively routing between $50 million and $250 million per year to Hamas through the above organs.

192. The Terrorist Sponsors' financial support was vital to Hamas's ability to conduct terrorist attacks. In 2007, for example, former Treasury official Dr. Matthew Levitt observed that "Hamas … is also a massive beneficiary of support from … Iran, [which] provide[s] direct state funding" to "sponsor" "terrorism" committed by Hamas. He continued:

> Iran is described by the CIA as "the foremost state sponsor of terrorism" and is Hamas' most important and explicit state sponsor. Israeli, British, Canadian, and Palestinian intelligence all concur with the U.S. conclusion that Iran directly aids Hamas with money, training camps, and logistical support. Estimates of Iran's financial assistance to Hamas vary, but there is unanimity on one score: the sum is significant.

193.    Senior U.S. officials confirmed that the IRGC, Foundation for the Oppressed, SLO, and Hizballah were all vital to financing Hamas's attacks—with the IRGC, Foundation, and SLO usually routing their aid to Hamas through their most trusted proxy, Hizballah. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress that "Hizballah supports … Palestinian terrorist organizations … [through] the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support … since at least 2000 … Hizballah actively foments terrorist activity that directly undermines [the peace process]."

194.    In 2006, after Hamas won a plurality of seats in the Palestinian parliament, Iran's support increased "exponentially." *Force*, 464 F. Supp. 3d at 339. This relationship only grew deeper after Hamas took control of the Gaza Strip in 2007. And the Terrorist Sponsors provided continuous support to Hamas throughout the entire period relevant to this case.

195.    That support was not generic or untethered from attacks. On the contrary, the IRGC, Foundation for the Oppressed, SLO, and Hizballah had a famous "pay for performance" approach with Hamas, under which the Terrorist Sponsors would ramp up their financial support to reward successful attacks while incentivizing future attacks. As Dr. Levitt noted in 2007, "the specific sum [] fluctuates given circumstances on the ground; Iran is known to employ a performance-based approach to determining the level of funding it is willing to provide terrorist groups."

196.    When the IRGC, Foundation for the Oppressed, SLO, and Hizballah (with the IRGC's, Foundation's, and SLO's money) funded Hamas, each earmarked the money they provided for use by Hamas's attack cells as a common tactic, technique, and procedure. In this way, the Terrorist Sponsors' money to Hamas was uniquely lethal. As Dr. Levitt noted in 2007:

71

Unlike much of the [non-Iranian sources of Hamas] financing …, Iranian funding of Hamas is generally … ***directed straight to operational units***. According to a December 2000 Palestinian intelligence report confiscated by Israeli authorities, Iran had transferred $400,000 directly to Hamas' Qassam Brigades to specifically support "the Hamas military arm in Israel and encouraging suicide operations," and another $700,000 to other Islamic organizations opposed to the PA.

According to a former Jordanian prime minister, "grassroots fundraising is really not enough for big Hamas operations. Most of the support [for such operations] is from Iran. Iran's money is more influential." A senior Fatah official and member of the Palestinian Legislative Council offered a similar assessment, saying that while "some of Tehran's money over the past three years [2001- 2004] may go to supporting health and humanitarian services in Gaza," the bottom line is that the "money from Tehran that goes to Hamas is for the political leaders of Hamas and for the bombings, not for the Palestinians."

197.    The IRGC and Hizballah also provided vital training to Hamas, with the IRGC often using both Hizballah and the Qods Force to provide extensive, multi-month, multi-location training to Hamas operatives, and Hizballah also providing training to Hamas in Lebanon and elsewhere outside Iran. The IRGC's and Hizballah's provision of training to Hamas made Hamas more lethal and had a direct impact on Hamas's ability to conduct attacks in Israel.

198.    The IRGC, Foundation for the Oppressed, and Hizballah were also Hamas's most important source of weapons, for which the IRGC and Foundation usually used Hizballah as their interlocutor. For example, Hizballah smuggled IRGC-supplied and Foundation-financed weapons to Hamas and trained Hamas terrorists how to use them. The IRGC's, Foundation's, and Hizballah's provision of arms to Hamas made Hamas more lethal and had a direct impact on Hamas's ability to conduct attacks in Israel. For example, starting after 2007, when Hamas took control of Gaza, Iranian officials claimed that they provided Hamas with the technical expertise to produce rockets in large quantities, as well as providing the weapons themselves. *See Force*, 464 F. Supp. 3d at 339. This support was directly instrumental to the rocket attacks in this case.

199.    Hamas and Hizballah have long cooperated on shared operations. Hamas jointly planned some attacks with Hizballah. For example, Hamas heavily leveraged Hizballah's technical skills, experience, training, and in-country operatives to plan and execute its kidnapping operations.

200.    Terrorism scholars concurred. As Dr. Matthew Levitt summed-up in 2007, "Hamas has long cooperated with Hezbollah operationally."

201.    The Terrorist Sponsors have spent decades promoting the close collaboration between Hizballah, Hamas, and PIJ. In 1993, for example, State reported to Congress: "Iran was the principal sponsor of extremist Islamic and Palestinian groups. Besides providing funding, training, and weapons to groups that conduct terrorist acts, Iran also hosted a series of high-profile meetings with Hizballah and HAMAS that had the stated goal of coordinating efforts against Israel and bringing the Arab-Israeli peace process to a halt." In 1998, likewise, State reported to Congress:

> Iran continued to provide support—in the form of training, money, and/or weapons—to a variety of terrorist groups, such as Lebanese Hizballah, HAMAS, and the PIJ. The Iranian Government continues to oppose recognition of Israel and to encourage violent rejection of the Middle East Peace Process. In the fall of 1997, Tehran hosted numerous representatives of terrorist groups—including HAMAS, Lebanese Hizballah, [and] the PIJ…—at a conference of "Liberation Movements." Participants reportedly discussed the jihad, establishing greater coordination between certain groups, and an increase in support for some groups.

202.    On September 19, 2006, Under Secretary of State R. Nicholas Burns testified to Congress: "We have no illusions about the nature and objectives of the Iranian regime. … In their foreign policy, they are pursuing a course of aggressive behavior from their arming of Hizballah with long-range rockets to strike Israel to their work to create a nexus of terrorism encompassing Hizballah, Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine General Command, and Syria."

203.     Like its IRGC patron, Hamas regularly violated the laws of war when it committed its barbaric attacks. As Hamas scholar Jonathan Schanzer observed in 2021: "Hamas was a brutal enemy" that routinely engaged in "'extra-judicial and willful killing,' including incidents in which Hamas fighters pushed [captured rivals] off tall buildings."

### 3.     Palestinian Islamic Jihad

204.     Palestinian Islamic Jihad established itself in 1979 as a violent, global, Sunni Islamist group dedicated to destroying Israel. PIJ has been a designated FTO since 1997.

205.     In or about 1990, Khamenei and the IRGC cemented a deep bond with PIJ. Ever since, PIJ has been one of the IRGC's most notorious proxies, and was regularly mentioned by U.S. and Israeli officials alongside Hamas as a well-known IRGC proxy. Thus, "Iran has been funding PIJ since as early as 1993, but Iran's support of PIJ increased as PIJ carried out more successful attacks in the early 2000s." *Force*, 464 F. Supp. 3d at 340 (citation omitted). This support included "weapons, training, and funding." *Id*.

206.     The Iranian regime's relationship with PIJ was substantially like its relationship with Hamas. In short, anything the Iranian regime did for Hamas, it likewise did for PIJ. Accordingly, and as SCB knew, the United States regularly described Iranian support for Hamas and PIJ in the same public warnings, and often collectively referred to both as "Palestinian terrorist groups" or something similar. Accordingly, the foregoing allegations about Hamas, *supra* ¶¶188-193, apply equally to PIJ.[10]

207.     As with Hamas, the Terrorist Sponsors had a famous "pay for performance" approach with PIJ. The court in *Force*, for example, credited testimony that "Tehran instituted an

---

[10] The Terrorist Sponsors provided less aggregate money to PIJ than to Hizballah and Hamas. But the disparate funding levels were simply because PIJ was substantially smaller than Hizballah and Hamas.

incentive system in which millions of dollars in cash bonuses are conferred to [PIJ] for successful attacks." 464 F. Supp. 3d at 340.

208.    The IRGC also provided vital training to PIJ, often using both Hizballah and the Qods Force to provide extensive, multi-month, multi-location training to PIJ operatives. The IRGC's and Hizballah's provision of training to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel. Furthermore, mere weeks before the October 29, 2014 Assassination Attack against Plaintiffs, *infra*, a PIJ leader "traveled to Tehran to meet with a series of high-ranking Iranian officials, including Supreme Leader Khamenei," where the talks "focused on the need for PIJ to expand into the West Bank." *Force*, 464 F. Supp. 3d at 340.

209.    The IRGC, Foundation for the Oppressed, and Hizballah were also PIJ's most important source of weapons, for which the IRGC and Foundation usually used Hizballah as its interlocutor with PIJ. For example, Hizballah smuggled IRGC-supplied and Foundation-financed weapons to PIJ and trained PIJ terrorists how to use them. The IRGC's and Hizballah's provision of weapons to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel. Indeed, a PIJ spokesman acknowledged that "[a]ll of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ." *Force*, 464 F. Supp. 3d at 340.

210.    PIJ and Hizballah have long cooperated on shared operations.

211.    Like its IRGC patron, PIJ regularly violated the laws of war when it committed its barbaric attacks.

### 4.    Jaysh al-Mahdi

212.    As explained *supra* ¶¶95-97, Hizballah and Muqtada al-Sadr established JAM in 2003 to serve as Hizballah's "striking arm in Iraq" (as Sadr put it) and provide an Iraqi face to

75

Hizballah-directed terrorist attacks targeting Americans there. In that role, JAM jointly committed attacks alongside Hizballah as part of joint cells in Iraq, directly funded by Hizballah and the Qods Force's access to Iranian oil revenue.

213.   On July 2, 2009, Treasury designated JAM Special Group Kataib Hizballah as an FTO, and "under Executive Order (E.O.) 13438, which targets insurgent and militia groups and their supporters," upon the United States finding, *inter alia*, that:

a.   "Kata'ib Hizballah ha[s] committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces and as a result [is] designated [under E.O. 13438]."

b.   This designation plays a "critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence."

c.   "[T]he IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition … Forces."

d.   "Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran."

e.   "As of early 2007, … [Hizballah established] [c]ertain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces ... received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hizballah instructors.

This July 2009 designation by the United States was widely reported throughout the world.

214.   On January 3, 2020, the United States designated JAM Special Group Asa'ib Ahl al-Haq as an FTO, designated two of its leaders as SDGTs, and published detailed findings confirming AAH's close operational relationship with Hizballah and the Qods Force.

76

E.    **The Mechanics of the Terrorist Sponsors' Support to Their Proxies**

215.    Iran's Terrorist Sponsors built a highly efficient terrorism machine that effectively converted money from Iran's economy into terrorist attacks by proxy groups. Several key points illustrate how this support worked in practice. *First*, Iran's Terrorist Sponsors spent *most* of the money they received to enable attacks by their proxies. This means, quite simply, that the more money the Terrorist Sponsors extracted from commercial activities, the more terrorist violence they facilitated. *Second*, Iran's Terrorist Sponsors generally focused on attack modalities that were extremely cost-efficient—meaning that small amounts of money could produce large amounts of violence. *Third*, the support the Terrorist Sponsors provided was tailored to produce terrorist violence. It included money earmarked for specific terrorist purposes such as martyr payments, bounty payments, terrorist salaries and similar support as well as non-monetary support to directly enable attacks, such as weapons, training, and tunnels—and Hizballah and Hamas *launched* rocket attacks from inside tunnels, making such terror tunnels part of the attack site itself. The support that flowed from the Terrorist Sponsors to their proxies was not simply generic fungible cash, but instead resources earmarked for terrorism—a fact that made terrorist attacks eminently foreseeable. *Fourth*, the Terrorist Sponsors maintained a Joint Logistics Cell to facilitate the flow of support to their proxies and ensure that the support proxies received would be used for terrorist attacks.

1.    **Iran's Terrorist Sponsors Spent Most of the Money They Received to Enable Attacks by Their Terrorist Proxies**

216.    Ayatollah Khamenei, the SLO, IRGC, Hizballah, and Foundation for the Oppressed spent most of the profits that SCB helped them generate to directly or indirectly sponsor terrorist attacks targeting the United States and its allies in the Middle East. For the avoidance of all doubt, Plaintiffs do not allege that a small percentage of such profits flowed

through to the Terrorist Sponsors and their proxies. Plaintiffs allege that more than half of all such dollars foreseeably enabled Iranian-sponsored attacks.

217.    Even if it is difficult to ascertain whether, or how much, regime profit flowed through SCB and onto support terrorist violence, such considerations have no relevance with respect to Foundation for the Oppressed and SLO's profits, given the Foundation's role as the Iranian regime's first purpose-bult terrorist operations front, and Khamenei's history, custom, and practice of using the SLO to coordinate his personal support for attacks alongside the Foundation. The U.S. government issued a finding effectively confirming the Foundation's role as a terrorist operations front on November 18, 2020, in which it explained that most of the Foundation's profits flowed to Khamenei's most important inner circle allies—a direct and unmistakable reference to the Iranian regime's programmatic use of the Foundation's profits to finance the Khamenei Cell's terrorist operations.

218.    Terrorism scholars have confirmed the same. In 2018, for example, Dr. Farhad Rezaei, of the Association for the Study of the Middle East and Africa, observed:

> Iran would use the influx of capital … from the sanction relief to *invest in what is known as 'revolutionary export," that is a program to destabilize neighboring countries through direct or proxy involvement in … terror activities.* … [T]here are indications that the regime has spent part of it on its foreign adventurism, … [and] that the regime has *spent some money on other proxies like … Hezbollah in Lebanon and Hamas in Gaza strip, to expand its Shiite influence. …* Some of the money comes from … *foundations like Bonyad-e Mostazafan-e [Foundation for the Oppressed]. ... However, the evidence supports the [] concern that Iran would utilize the money it had received from the sanctions relief to sponsor terrorism* … Iran has been using the influx of capital which it has received … to invest in what is known as 'revolutionary export,' a code name for spreading the ideology of [Iran] in the region.

219.    In 2015, Representative Eliot Engel confirmed that:

> logic says that if the goal of the Iranian regime, the Revolutionary Guards and the entire regime, is to sponsor terrorism to destabilize the region, now that they have money and it is not going to be a sacrifice, they are going to use it for terrorism.

78

When the Rial, their currency was in the toilet, when their people clamored for more freedoms or more things that they needed, Iran, the government, the regime didn't care. The regime made sure, though, that groups like Hezbollah and even Hamas, which of course is the other side of the Sunni-Shia spectrum, had enough money. So now that Iran has money and it is not going to be so painful, … it is very easy to imagine, and it is not imagination, that [the IRGC] will have more money to support more terrorism.

220.    In 2015, Representative Ileana Ros-Lehtinen confirmed that "the IRGC is one of the major actors in the Iranian economy with a presence in nearly every sector" and given the IRGC's anti-American mission, the IRGC "will use the" money "it gets …. for its terror activities, instead of [choosing] that the [IRGC's additional] money will be used to shore up a failing Iranian economy." Representative Ros-Lehtinen continued:

[W]hen you think about … whether or not the Iranian Government is going to take [new money it earns] … and direct it into the IRGC[,] … think … about the fact that after the negotiations began in 2014, the IRGC budget went up …, and this was just in anticipation of sanctions relief. This was publicly stated. This was publicly declared. So … if you are asking yourself how the [IRGC] [is] going to spend [new] money [it earns], [the IRGC] ha[s] already been very clear in indicating it. [And remember that] … it is cheap to pull off a terrorist attack.

221.    In 2015, Ali Alfoneh (Senior Fellow, Foundation for Defense of Democracies), testified before Congress that when complex Iranian transactions produce substantial value transfers to fronts owned or controlled by the IRGC, "[m]uch of the money … is going to be channeled … directly to the military budget of the Revolutionary Guards … [while] … the … Revolutionary Guard is pursuing policy objectives in the Middle East region which are … totally opposed to U.S. objectives."

222.    When the U.S. government announced new counterterrorism sanctions against the IRGC on May 1, 2020, Treasury Secretary Mnuchin confirmed that "[t]he Iranian regime and its supporters continue to prioritize the funding of international terrorist organizations over the health and well-being of the Iranian people."

223.    The United States government has found—on a bipartisan basis—that the Iranian regime used *most* of the profits resulting from the lack of application of sanctions to sponsor terrorism. Such statements and reports included, but were not limited to:

a.    Amb. Nathan Sales (Coordinator for Counterterrorism, State), November 13, 2018: "The resources Iran uses to fund its global terrorist campaign come directly out of the pockets of ordinary Iranians. The regime robs its own citizens to pay its proxies abroad. Tehran's *priorities* are clear. It doesn't seek to boost economic growth at home, or to improve Iranian living standards. It doesn't seek to reduce Iran's growing unemployment. *What the regime prioritizes, despite the country's increasing economic distress, is buying guns and bombs for foreign terrorists*. Tragically, this vast waste of the Iranian people's assets has resulted in bloodshed and instability across the globe."

b.    Treasury, November 20, 2018: "'The Iranian regime continues to *prioritize spending money on fomenting terror over supporting its own people*,' said Undersecretary for Terrorism and Financial Intelligence, Sigal Mandelker. 'This is *yet another example of the regime using the proceeds of millions of barrels of its oil to fund terrorists* and the murderous Assad regime to the detriment of its own people.'"

c.    Treasury (Wally Adeyemo, Deputy Secretary of the Treasury), April 9, 2024: "Senator, *you're right that in democracy, money is fungible. But what we've seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people*. That's partially why almost none of the humanitarian money has been used for humanitarian purposes is because they don't care about getting food and drugs for their people but the difference is the United States of American has made, as a values proposition, that we are always going to provide humanitarian relief for people. And that's what we said is the only purpose for this money. *So while in our country money is fungible, in Iran, they've proven that any dollar they get that they have direct access to in the country will be used for the IRGC before it's ever used for their people.*"

d.    U.S. Senate Committee on Banking, Housing, and Urban Affairs (Minority Staff), April 12, 2024: "After … Treasury Deputy Secretary Wally Adeyemo admitted in testimony that any dollar Iran has access to funds terrorism, Ranking Member Tim Scott (R-S.C.) continues to press the Biden administration on U.S. enabled payments to Iran. In a letter to Treasury Secretary Janet Yellen, Ranking Member Scott … wrote, 'As we have previously discussed, I have serious concerns with U.S.-enabled efforts that increase Iran's *access to sanctioned funds—funds that directly support Iran's terror proxies throughout the Middle East*. … Given the proven track-record Iran has on redirecting so-called humanitarian assistance to 'violent activity,' as characterized by Treasury, *we must operate under the assumption that every dollar made available to Iran is another dollar that will be used to put U.S. servicemembers in harm's way* or threaten our allies, especially Israel.…[A]ny money to Iran supports terrorism.'"

80

### 2. Iran's Terrorist Sponsors Focused on Cost-Effective Terrorism Strategies

224. Iran's Terrorist Sponsors ensured that small amounts of financial support would produce large amounts of terrorist violence. As Dr. Daniel Byman of Georgetown University observed in 2005, an "advantage of terrorism over conventional force is that it is cheap. Small numbers of terrorists can wreak havoc." Studies consistently confirmed that the cost of nearly all attacks in by terrorist groups in the Middle East in the post-9/11 era ranged from around $2,000 per attack to around $20,000 per attack, mostly on the low end of that spectrum. IEDs, for example, usually cost around $100 per bomb. Generally, Hamas and Hizballah fighters were paid around $200 per month, while leaders were paid around $400. As terrorism scholars Jessica Stern and J. M. Berger explained in 2016:

> Asymmetrical warfare is defined by asymmetry. Any terrorist ideology that can attract five recruits and the contents of their checking accounts can make headlines for months. *A terrorist group with twenty willing recruits and half a million dollars can make headlines for years*.

225. At those rates, even a single transaction that flowed $5,000 to Hizballah or Hamas would have financed substantial terrorist violence. At the time, a $5,000 payment would have put 10 terrorists (at $200 per fighter) and two commanders (at $400 per commander) in the field for a month and with about 20 IEDs. Or the terrorists could have spent the $5,000 to purchase dozens of bomb components or to finance multiple complex attacks.

226. U.S. government studies confirmed the dramatic impact of even marginal financial contributions to Islamists operating in the Middle East. For example, one DoD study of al-Qaeda-in-Iraq—which followed a substantially similar organizational approach as Hizballah, Hamas, and PIJ when it came to attack logistics—found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror

81

attack in Iraq required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in terrorist funds corresponded with a statistically significant reduction in terrorist violence. The converse was also true. Every $2,700 (or its rough equivalent) that flowed to the IRGC, Hizballah, Hamas, and JAM financed roughly one new terrorist attack.

227.    This effect was linear. Simply put, more money equaled more terrorist attacks. As Dr. Margaret Sankey of the U.S. Naval Institute and Air University, concluded in 2022:

> With the caveat and reminder that operations don't cost a large amount in proportion to sustainment, VNSAs [Violent Non-State Actors] whose budgets have been reduced have to make hard decisions about maintaining their capabilities. In some cases, *there's a clear pattern that more money means more attacks, with al-Qaeda in Iraq consistently increasing by one attack for every $2,700 sent* by the central leadership to sectors. Mustafa Abu al-Yazid, an al-Qaeda financing chief, put it starkly: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. *So funding is the mainstay of jihad.*"

### 3.    Iran's Terrorist Sponsors Provided Support to Their Proxies Earmarked for Terrorism

228.    From 2000 through at least 2019, Ayatollah Khamenei, the SLO, the IRGC, and Hizballah always relied on at least two key types of aid to sponsor attacks committed by Hizballah, Hamas, PIJ, and JAM targeting the United States in the Middle East, including in Israel and Iraq: (1) attack incentive and reward payments directly to terrorist operatives, or their families, responsible for attacks; and (2) weapons, training, logistics, and tunnel payments. Such support was not the same as generally fungible cash, as it was either a payment for violent purposes (*e.g.*, martyr payments), or only useful for violent purposes (*e.g.*, weapons).

### i.    Attack Incentive and Reward Payments to Hizballah, Hamas, PIJ, and JAM

229.    From 2000 through at least 2019, Iran's Terrorist Sponsors relied on income generated by schemes like the one in this case to fund at least five distinct categories of U.S.

82

dollar-denominated attack payments that notoriously and empirically incentivized attacks, including, but not limited to:

a. **U.S. dollar-denominated salary payments** to finance attacks by Hizballah's, Hamas's, PIJ's, and JAM's relevant attack-related operations, intelligence, logistics, and leadership cell operatives, including Khamenei Cell members, including such groups' attacks against Plaintiffs, which salaries were usually around $200 per month for rank-and-file fighters and $400 per month for cell leaders;[11]

b. **U.S. dollar-denominated martyr payments** to the families of martyrs in attacks targeting the United States in which the attacker died (*i.e.*, was "martyred", including their attacks against Plaintiffs, which always included a lump sum bonus payment to the martyr's family, usually in amounts like $3,000, $5,000, or $7,000 (depending on the group and year for the martyr), and smaller payments thereafter to the martyr's spouse and parents;

c. **U.S. dollar-denominated bounty payments** to Hizballah, Hamas, PIJ, JAM, or IRGC terrorist operatives for successful attacks targeting the United States or its allies in the Middle East, including Israel. The payments were usually in amounts ranging from $2,000 to $20,000, with most payments being less than $10,000, and calibrated to especially promote such attacks through larger bounties awarded for successful attacks killing, injuring, or capturing a U.S. victim as compared to non-U.S.-victims;

d. **U.S. dollar-denominated disability payments** to Hizballah, Hamas, PIJ, JAM, or IRGC operatives, and their families, if such operatives were injured while supporting a terrorist attack committed by such group, which often cost at least several thousand U.S. dollars per year, and were thus about as costly as martyr payments in terms of per-capita spend;

e. **U.S. dollar-denominated orphan payments** to the caretakers of the children of Hizballah, Hamas, PIJ, or JAM operatives who were killed while supporting a terrorist attack committed by such group, which carried a similar cost as martyr and disability payments in terms of per capita spend, and were made to reward and incentivize terrorist attacks (by ensuring that the operative's child will be looked after by the terrorist group), and enable recruitment of child terrorists by all such groups, all of which recruit and deploy children aged 8-17 to commit attacks.

---

[11] For the avoidance of all doubt, while Plaintiffs' salary numbers are applicable to Hizballah, Hamas, PIJ, and JAM personnel in general, the 25-30 terrorists who comprise the membership of the Khamenei Cell were paid salaries that were orders of magnitude higher than the sums paid to everyone else in such groups. For example, Ayatollah Khamenei, the SLO, IRGC, Hizballah, and the Foundation for the Oppressed likely paid key Khamenei assets like Hassan Nasrallah and Abu Mahdi al-Muhandis salaries of at least several thousand U.S. dollars per month.

230. Iran's Terrorist Sponsors financed each of these types of attack incentive and reward payments to support attacks by Hizballah, Hamas, PIJ, and JAM through means that were both direct (*e.g.*, sponsor-to-terrorist) and indirect (*e.g.*, sponsor-to-Hizballah-to-terrorist). Throughout this period, all five types of attack incentive and reward payments were notorious, intended to promote terrorist attacks, and did, in fact, promote such attacks.

> ii. **Weapons, Training, Logistics, and Tunnel Payments to North Korea's RGB on Behalf of Hizballah, Hamas, PIJ, and JAM**

231. In addition to the monetary support described *supra*, the Terrorist Sponsors provided non-monetary aid that amplified the killing power of Hizballah's, Hamas's, and PIJ's attacks against Plaintiffs.

232. *First*, Iran's Terrorist Sponsors supplied weapons to their terrorist proxies—often paid for by barter using oil shipments to North Korea. Simply put, a single oil tanker shipped to North Korea produced enough economic value to finance thousands of attacks. These weapons included guns and rockets, often accompanied by training from the RGB to enhance the potency, accuracy, reliability, and range of Hamas's and PIJ's rocket arsenals—directly increasing the lethality of their attacks against Plaintiffs.

233. *Second,* oil proceeds paid for RGB tunnel experts to build terrorist attack tunnels for Hamas, which amplified the effectiveness of every Hamas attack, and were widely viewed as Hamas's single most important terrorist weapon.

234. Contemporaneous reports confirm the above points. On July 27, 2014, for example, the *Telegraph*, a U.K. newspaper, reported as follows:

> "Hamas is looking for ways to replenish its stocks of missiles because of the large numbers it has fired at Israel in recent weeks," said a security official. "North Korea is an obvious place to seek supplies because Pyongyang already has close ties with a number of militant Islamist groups in the Middle East."

Using intermediaries based in Lebanon, Hamas officials are said to be intensifying their efforts to sign a new agreement with Pyongyang to provide hundreds of missiles together with communications equipment that will improve the ability of Hamas fighters to coordinate operations against Israeli forces.

Like other Islamist terrorist groups in the region such as Hezbollah, Hamas has forged close links with North Korea, which is keen to support groups opposed to Western interests in the region.

The relationship between Hamas and North Korea first became public in 2009 when 35 tons of arms, including surface-to-surface missiles and rocket-propelled grenades, were seized after a cargo plane carrying the equipment was forced to make an emergency landing at Bangkok airport. Investigators later confirmed that the arms had been destined for Iran, which then planned to smuggle them to Hezbollah in Lebanon and Hamas in Gaza.

Israeli military commanders supervising operations against Gaza believe North Korean experts have given Hamas advice on building the extensive network of tunnels in Gaza that has enabled fighters to move weapons without detection by Israeli drones.

The North Koreans have one of the world's most sophisticated network of tunnels beneath the demilitarized zone with South Korea, and Israeli commanders believe Hamas has used this expertise to improve their own.

The Hamas arsenal has become increasingly sophisticated with foreign assistance and now boasts five variants of rockets and missiles.

235.    On March 11, 2016 , similarly, the *Jerusalem Post* reported:

In 2014, North Korea and Hamas struck a deal for the sale of 107-mm. and 102-mm. multiple rocket launchers. Hamas installed some of these systems on pickup trucks. "The tunnels that Hamas dug under Gaza into Israel—the concrete reinforcements—those are North Korean characteristics. I don't know whether North Korea got people into Gaza and trained them, or whether that training occurred in Lebanon. But it is a North Korean modus operandi," [Korea scholar Bruce] Bechtol said. The pattern repeats itself all over the region. In Iran, on a much grander scale, North Korea constructed underground nuclear facilities that can withstand bunker- busting bombs. "They built them in such a way that only a suicide commando mission could get to them," the professor said.

85

**4.      The Joint Logistics Cell Ensured the Use of Support for Terrorist Attacks**

236.    From 2000 through at least 2020, the IRGC, Hizballah, Hamas, PIJ, JAM, and North Korea's RGB maintained a "Joint Logistics Cell" that coordinated the development, distribution, testing, and training of the common terrorist weapons, tactics, and objectives that united the Axis of Resistance, including, but not limited to: (1) rocket and missile research, development, and deployment; (2) specialized training by the RGB to the other Axis members concerning kidnapping, rocket attacks, and tunnel attacks—three of the RGB's signature attack types; (3) shared ratlines, safehouses, and sites for meetings and operational planning; and (4) collaboration to promote weapons-related interoperability between all the members of the Axis of Resistance. Each of these features benefited all members of the Joint Logistics Cell.

237.    The IRGC, Hizballah, Hamas, PIJ, JAM, and North Korea's RGB Joint Logistics Cell had at least the following locations:

a.      **Iran.** The Joint Logistics Cell operates in Tehran out of a massive, multi-building complex that Iranian regime built out to promote cross-pollination amongst allies and logistics cooperation at a vast scale. Indeed, the RGB deployed up to 1,000 people at a time to the Joint Logistics Cell in Tehran—so many North Korean terrorists were on site that the Iranian regime at one point elected to procure ***an entire resort on the Caspian Sea*** to accommodate them all.

b.      **North Korea.** The Joint Logistics Cell's oldest site in Pyongyang, which has hosted trilateral logistics and training efforts with the Hizballah, the IRGC, and the RGB for decades. Prior to 2024, Hizballah's top leadership trained there, including Hassan Nasrallah.

c.      **Syria.** The Joint Logistics Cell's newest location is in Syria, near the Syrian/Iraqi border. While the other two locations primarily emphasize logistics cooperation and training, the Joint Logistics Cell's Syria location also served as a key transit node for Axis terrorists seeking to travel to, or from, Lebanon, Gaza, and Iraq, because the Syrian site was ideally located for all such uses. Moreover, Axis terrorists sometimes launched rocket attacks directly from the Joint Logistics Cell location, as the IRGC-QF did in 2018, when they fired rockets at Israel from Syria.

86

d.      **Egypt.** The Joint Logistics Cell leveraged the RGB's long-standing presence in Egypt, which allowed Hizballah to flow funds and weapons to Hizballah and Hamas operations cells in Gaza.

238.    The Joint Logistics Cell reflected a simple truth: terrorists cannot kill people without a robust logistics network behind them. In 2005, for example, Dr. Daniel Byman, or Georgetown University, explained how logistics drive lethality:

> A successful terrorist act is often the culmination of months, at times even years, of planning and preparation. For understandable reasons, the world focuses on the man who seizes a hostage or the woman who plants a bomb. These people, however, are often only part of a larger organization. Such operatives are often supported by a vast apparatus of people who are false documents, run safe houses, offer training on explosives and procure surveillance, and take care of the terrorist's family should they die or go to prison. Indeed, the actual attacker may be far more replaceable than the other specialized cogs in the terrorist group's machine. As Colonel Yves Godard … contended, "the man who places the bomb is but an arm that tomorrow will be replaced by another arm." Shattering this logistics organization is often vital to successful counterterrorism. … Bruce Hoffman and Kim Cragin, in their summary of successful counterterrorism practices, emphasized the importance of stopping logistics. French officials found that only by going after logistics networks were they able to … [achieve] the successful prevention of attacks in the long term. Simply put, it is far harder for the terrorist group to replace logisticians than operatives.

239.    In 2019, an analysis authored by a U.S. Army officer and published by DoD's Joint Special Operations University observed:

> The 9/11 attacks could never have been executed without the logistical assistance of a sophisticated and well-entrenched support network. … Accordingly, an individual, group, or state that provides funds, travel documents, training, or other support for terrorist activity is no less important to a terrorist network than the operative who executes the attack. A key lesson learned from 9/11 is that counterterrorism efforts must target financial and logistical cells with the same vigor as operational cells.

240.    Indeed, logistics are an area where state sponsorship has an outsized impact on the lethality of terrorist attacks. As Dr. Byman explained in 2005: "States can also help a group conduct operations indirectly through logistical assistance" by "fund[ing] front companies or

87

non-government organizations that offer jobs and legitimate documentation for terrorists masquerading as employees."

241. The Joint Logistics Cell was a decades-long construct reported in the media as early as the 1990s. In 1993, for example, the *Washington Post* reported: "Across from the Foreign Ministry in north Tehran is an old government building housing protocol offices for foreign diplomats and branch offices for two radical Islamic movements—Hezbollah, from Lebanon, and Hamas, from the Israeli-occupied West Bank and Gaza Strip."

242. Such practices endured throughout the relevant period. In 2008, for example, Treasury reported substantial activities at the Joint Logistics Cell's site in Tehran: "Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups."

243. On information and belief, the Joint Logistics Cell played a direct role in every attack against Plaintiffs, each of which featured one or both of (a) weapons that were likely supplied by the RGB to Hamas and/or PIJ (*e.g.*, rockets); and/or (b) an attack that was directly or indirectly enabled by RGB-construction terror tunnels for Hamas and PIJ in Gaza and Hizballah in South Lebanon.

## II.    The U.S. Government Imposed Counterterrorism Controls To Prevent The U.S. Financial System From Being Used To Finance Iranian Terrorism And Repeatedly Warned That Financial Services To Iranian Oil And Gas Fronts Would Facilitate Terrorist Attacks

244. Acutely aware of the danger Iran's Terrorist Sponsors posed to the safety of the United States and U.S. nationals, the U.S. government imposed strict counterterrorism controls to prevent the U.S. financial system from being used to finance Iranian terrorism, and also

warned financial institutions—in no uncertain terms—that providing financial services to Iranian oil and gas fronts would facilitate terrorist attacks by the Iranian Terrorist Sponsors' proxies.

### A.    The U.S. Government's Counterterrorism Controls

245.    The U.S. government's counterterrorism controls in the banking system included three key elements: (1) economic sanctions that prohibited certain transactions at high risk for terrorism financing; (2) review and reporting of suspicious transactions by financial institutions; and (3) direct monitoring of transactions by the government.

#### 1.    OFAC's Iran Sanctions

246.    Financial transactions with Iran have been subject to U.S. economic sanctions since 1979. The U.S. government's sanctions regime aims to identify and block those who attempt to use the U.S. financial system in contravention of U.S. foreign policy, as well as foreign countries, entities, and individuals who may present a threat to national security. In particular, the sanctions are intended to prevent U.S. dollars from being used to finance terrorist organizations, proliferators of weapons of mass destruction, drug traffickers, and other hostile enterprises. With respect to Iran, these measures were strengthened in 1995 when President Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat." Through the issuance of Executive Order 12957 in March 1995, 60 Fed. Reg 14615, and Executive Order 12959 in May 1995, 60 Fed. Reg. 24757, the President imposed comprehensive trade and financial sanctions on Iran.

247.    A key purpose of these sanctions was to prevent Iran from using its petroleum resources to fund terrorism. As President Clinton explained to Congress on September 18, 1995, "I issued Executive Order 12957 … to prohibit the financing, management, or supervision by

89

United States persons of the development of Iranian petroleum resources. This action was in response to actions and policies of the Government of Iran, including support for international terrorism, efforts to undermine the Middle East peace process, and the acquisition of weapons of mass destruction and the means to deliver them." However, "[f]ollowing the imposition of these restrictions with regard to the development of Iranian petroleum resources, Iran continued to engage in activities that represent a threat to the peace and security of all nations, including Iran's continuing support for international terrorism." To "further respond to the Iranian threat," President Clinton explained that he issued Executive Order 12959, which imposed comprehensive sanctions prohibiting exportation from the United States to Iran or to the Government of Iran of goods, technology, or services, as well as prohibiting transactions by United States persons in goods and services of Iranian origin or owned or controlled by the Government of Iran. These comprehensive sanctions were intended in part to limit the flow of funds to terrorism, and thus in the President's words, "advance[d] important objectives in promoting the nonproliferation and antiterrorism policies of the United States."

248.   In a subsequent message to Congress on August 19, 1997, President Clinton explained that he was issuing another Executive Order (E.O. 13059) to "confirm[] that United States persons are prohibited from engaging in any trade- or investment-related activities with Iran." He added, "I want to make clear that this means all direct or indirect involvement in such activities wherever those activities occur."

249.   The United States sanctions regime is primarily administered by OFAC, which implemented the President's Executive Orders through its Iran Transaction Regulations (ITRs) and related guidance. Until November 2008, OFAC rules permitted U.S. financial institutions, under limited circumstances and with close regulatory supervision, to process certain

90

transactions for Iranian banks, individuals, and other entities These were called "U-Turn" transactions because such transactions originated and terminated with foreign banks, passing through U.S. banks or branches as part of the clearing process. U-Turn clearing transactions, although not categorically prohibited by OFAC's regulations, posed an exceedingly high risk that required stringent scrutiny under applicable regulatory standards. For example, OFAC regulations required that "[b]efore a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part." And beyond OFAC, other regulations required heightened due diligence and reporting of suspicious transactions as part of a bank's Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) program.  The obligation to determine that a U-Turn complied with U.S. law, and to review and report suspicious U-Turn transactions to the government, thus fell squarely on U.S. clearing banks and U.S.-based compliance personnel. In satisfying this obligation, U.S. clearing banks and U.S.-based compliance personnel relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches.

250.    Recognizing that the U-Turn exception was being abused by an Iranian regime whose support to terrorist groups was pervasive, OFAC revoked the U-turn exception for Bank Saderat on September 7, 2006, effectively prohibiting all transactions, directly or indirectly, involving the bank. 71 Fed. Reg. 53569. In announcing this action, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained, "The bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A

91

notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001." Although Treasury acknowledged that Bank Saderat was one of the largest Iranian-owned banks, the bank had been so permeated by terrorist financing and illicit activity that all transactions with the bank were prohibited. As Levey explained, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

251.    The action against Bank Saderat followed a long campaign by the U.S. government and international partners to shine a spotlight on the terrorism risks of doing business with Iran's banks. As former Treasury Assistant Secretary for Terrorist Financing and Financial Crimes Juan C. Zarate explained in his 2013 memoir, *Treasury's War*, Treasury had begun a "Bad Bank Initiative" in early 2003 to target banks that were serving as nodes of illicit financing and to send "a clear message to others in the banking world." "In 2003," Zarate explains, "we identified Bank Saderat as a principal target in our Bad Bank Initiative." At that time, there was "direct and convincing evidence that Bank Saderat was being used as the bank of choice for transactions taking place between Iran and Hezbollah, with the branch in Beirut serving as the central conduit for support to Hezbollah's activities in Lebanon." Those activities were well-known outside of Treasury.[12] And as part of its Bad Bank Initiative, Treasury sounded the alarm to other financial institutions, including on information and belief, SCB. As Zarate explains, "[a]n argument would be made directly to banks and companies around the world that

---

[12] As Zarate explains in his 2013 memoir, "We were not the only ones to focus on Bank Saderat—this was a bank that Israel would consider bombing during its war with Hezbollah in 2006, considering its central importance to Hezbollah's financing."

it was too risky to do business with Iran, since no one really knew who was lurking behind corporate veils, pulling the strings, and accessing bank accounts and funding in Tehran."

252. Treasury's Bad Bank Initiative also included Banks Melli, Mellat, and Sepah, as well as CBI/Markazi, which "would begin to look like a commercial bank for Iranian interests, and it, too, was willing to serve as a banking hub for Iranian illicit activity."

253. What remained of the U-Turn exception did not permit U-Turn transactions involving entities or individuals that had been designated by OFAC. As relevant here, OFAC designated numerous Iranian entities on October 25, 2007, for supporting terrorism and proliferation: the IRGC; the IRGC's Qods Force; the MODAFL; nine IRGC-affiliated firms involving the IRGC in an array of activities, including in the petroleum and construction sectors; five IRGC leaders; and three Iranian banks—Bank Saderat, Bank Mellat, and Bank Melli.

254. A fact sheet accompanying Treasury's October 25, 2007, designations contained detailed information about Iran's use of IRGC-affiliated entities and banks to finance terrorism and other illicit activity. According to the fact sheet, "FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards." Bank Melli, Bank Saderat, along with various IRGC-affiliated entities and individuals were designated under Executive Order 13382. 72 Fed. Reg. 62520. Bank Melli was cited as using deceptive banking practices to provide banking services for the IRGC, IRGC-QF, as well as entities owned or controlled by them. Bank Saderat was identified as being used by Hizballah "to send money to other terrorist organizations," as well as being used by the Iranian government to "channel funds to terrorist organizations." The IRGC "has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial

93

sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country." Although OFAC did not formally designate CBI/Markazi until September 20, 2019, Treasury warned in the 2007 fact sheet (and would continue to warn) that CBI/Markazi was facilitating terrorist financing: "For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence."

255.    On November 6, 2008, Treasury revoked authorization for U-Turn transactions in their entirety, and warned in a fact sheet that the United States was "revoking the U-turn general license today to protect U.S. financial institutions individually, and the U.S. financial system as a whole, from the significant terrorist financing and proliferation risks posed by Iran. This regulatory action will close the last general entry point for Iran to the U.S. financial system."

256.    Treasury's November 6, 2008 fact sheet provided a detailed explanation and warning about how Iran and the IRGC were using the international financial system to evade counterterrorism controls and finance acts of terrorism by their proxies in the Middle East:

> Iran's ***access to the international financial system enables the Iranian regime to facilitate its support for terrorism*** and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions….
>
> **Iran Misuses the International Financial System to Support Terrorism**
>
> Iran is the world's most active state sponsor of terror. The ***support provided by the regime to terrorist groups includes financing that is routed through the international financial system***, especially through Iranian state-owned banks.
>
> • **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the

listed state sponsors of terrorism, ***routinely providing substantial resources and guidance to multiple terrorist organizations***. For example, ***Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups***.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups.** Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America. The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to … terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: ***Lebanese Hizballah; Palestinian terrorists; certain Iraqi Shi'a militant groups***; … and elsewhere. The Qods Force is especially active in the Levant, providing Lebanese Hizballah with funding, weapons and training. It has a long history of supporting Hizballah's … terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. …

• **Iran Uses its Banks to Finance Terrorism.** In a number of cases, Iran has used its state-owned banks to ***channel funds to terrorist organizations***. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut ***for the benefit of Hizballah fronts that support acts of violence***. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat as of early 2005. The Treasury Department designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ. Australia has also designated Bank Saderat. Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

257. Treasury's November 6, 2008 fact sheet also provided an additional explanation

and warning about how Iran was seeking to evade counterterrorism controls:

**<u>Iran Uses Deceptive Financial Practices to Evade Sanctions</u>**

• **Iranian Commercial Banks.** It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. For example, Bank Sepah has requested that its name be removed from transactions in order to make it more difficult for intermediary financial institutions to determine the true parties to a transaction. Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Bank Sepah in transactions. Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC. In addition,

95

when Iranian assets were targeted in Europe, branches of Iranian state-owned banks in Europe took steps to disguise ownership of assets on their books in order to protect assets from future actions.

• **Central Bank of Iran.** The Central Bank of Iran (CBI), the sole Iranian entity that regulates all Iranian banks, has not only engaged in deceptive practices itself—such as asking for its name to be removed from transactions—but has also encouraged such practices among Iran's state-owned banks. For example, prior to EU and UN sanctions, the CBI attempted to help Banks Sepah and Melli protect their assets from being frozen. Later, the CBI instructed non-sanctioned Iranian state-owned banks to issue payment instructions on behalf of Sepah in order to circumvent sanctions. In the case of Bank Melli, the CBI provided substantive assistance to minimize the impact of sanctions. In fact, between January and March 2008, the CBI handled tens of millions of dollars in transactions to and from the accounts of U.S.- and UN-designated banks held at the CBI.

• **Use of Front Companies and Misuse of Bank Accounts.** Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its [weapons] programs. Iranian entities form front companies outside of Iran for the sole purpose of exporting dual-use items to Iran that can be used in these programs. These front companies enable the regime to obtain materials that the country of origin would typically prohibit from being exported to Iran. Iran also has a history of using accounts set up for one purpose to facilitate activities with designated entities.

258.    In remarks accompanying the revocation of the U-Turn exception, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained that the action was the culmination of a campaign that had been launched in November 2006 "to warn the world about how Iran's threat to our security also posed a threat to the integrity of the international financial system." Since that time, he explained, "we have shared information with foreign governments and financial institutions about how Iran is using its banks to finance … terrorist groups. We have provided reliable information to back up our words, demonstrating that even seemingly benign business with Iran should be cause for concern." Levey went on to explain that most financial institutions had heeded the warnings:

At the same time, many private financial institutions and companies worldwide have voluntarily shunned business with Iran. Banks see Iran's behavior as posing an unacceptable risk to their reputations, and they would rather forgo the business

96

and preserve their integrity[.] Back in September 2006, I could count on one hand the major banks that had cut off or dramatically reduced their business with Iran. Now, there are *only a few that have not done so*.

There is now a *global consensus that Iran poses an unacceptable threat to the international financial system*. The Financial Action Task Force (FATF), which has members representing 32 jurisdictions and is the world's premier standard-setting body on combating money laundering and terrorist financing, issued its fourth warning on Iran last month, calling for countries worldwide to strengthen measures to protect their financial sectors from this threat….

As members of the FATF, we are fulfilling our obligation to strengthen measures to protect our financial sector from those risks. Therefore, today we are revoking the U-turn license for Iran, thus terminating the last general entry point for Iranian banks—both state-owned and private—to the U.S. financial system. U-turn transactions allowed U.S. banks to indirectly process payments involving Iran if they began and ended with a non-Iranian foreign bank. Given Iran's conduct, it is necessary to close even this indirect access.

In recent months, many U.S. institutions have refused to host these U-turn transactions for Iran. Still, the exemption was used by Iran as a hook to solicit foreign banks to process transactions through the United States on its behalf, sometimes with requests to substitute another bank or code word for the Iranian institution. With today's action, Iran's potential to manipulate U.S. financial institutions has been significantly curtailed.

259.    The sum and substance of this avalanche of sanctions was simple: the entire landscape of U.S. policy towards Iran was transformed through a series of actions that sought to isolate Iran and its terrorist financing from the U.S. and international financial system.

### 2.    Transaction Review and Reporting

260.    Separate and apart from sanctions, U.S. banks and foreign banks with U.S. branches are subject to an additional set of regulations under the BSA and state and federal banking laws to prevent money laundering and the financing of terrorism. These Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) regulations are administered by Treasury's Financial Crimes Enforcement Network (FinCEN), along with the banking regulators. At the heart of these regulations is an obligation by financial institutions to carefully review the

transactions they process, and to promptly report suspicious activity—including terrorist financing—to FinCEN, which disseminates these reports to law enforcement agencies and the intelligence community.

261. The critical importance of BSA reporting as a counterterrorism control was confirmed in findings Congress made when it bolstered BSA requirements in the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, part of the USA PATRIOT Act. In the Act, Congress found that "money laundering, and the defects in financial transparency on which money launderers rely, are ***critical to the financing of global terrorism and the provision of funds for terrorist attacks***." Such money launderers "subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the ***financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens*** and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend." And in particular, "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions."

262. Among other things, the Act amended the BSA's declaration of purpose (31 U.S.C. 5311) to emphasize counterterrorism: "It is the purpose of this subchapter (except section 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, ***to protect against international terrorism***." Congress also added language in another section (31 U.S.C. 5319) making clear that BSA reports shall be made available to any "United States intelligence agency."

263.    To underscore the importance of BSA reporting in countering terrorist attacks, President George W. Bush visited FinCEN on November 7, 2001, and gave a speech to "put the world's financial institutions on notice." He explained that the War on Terrorism was "not a war just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained how certain terrorist financiers "present[ed] themselves as legitimate businesses. But they *skim money from every transaction, for the benefit of terrorist organizations*. They enable the proceeds of crime *in one country to be transferred to pay for terrorist acts in another*." President Bush did not mince words in delivering his "clear message to global financial institutions": "you are with us or you are with the terrorists. And if you're with the terrorists, you will face the consequences."

264.    FinCEN explains on its website that BSA reports have "proven to be of considerable value in money laundering, terrorist financing and other financial crimes investigations by law enforcement."

265.    BSA requirements and regulatory expectations are summarized in the Federal Financial Institutions Examination Council (FFIEC) *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual* (FFIEC Manual), which was developed by federal and state banking agencies, FinCEN, and OFAC to provide guidance to banks and their examiners, and to ensure consistency in the application of BSA/AML requirements. The FFIEC Manual was first released in 2005, but it summarized requirements and expectations in effect since before 2001. The FFIEC Manual was commonly regarded by U.S. bank personnel as an authoritative source of guidance on BSA compliance.

99

266.    BSA compliance required two principal components. First, banks had to establish and maintain an effective AML/CFT program that assessed the banks' AML/CFT risk and monitored transactions for suspicious activity. Second, banks had to investigate transactions for potential illicit activity and report suspicious transactions to FinCEN.

267.    As part of a bank's risk assessment, according to the FFIEC Manual, a bank had to "first, identify the specific risk categories (*i.e.*, products, services, customers, entities, and geographic locations) unique to the bank; and second, conduct a more detailed analysis of the data identified to better assess the risk within these categories." The FFIEC Manual explained that high-risk products and services included the following:

- funds transfers
- electronic banking
- foreign correspondent accounts
- trade finance

High-risk customers and entities included the following:

- foreign financial institutions
- foreign individuals
- foreign corporations

High-risk geographic locations included the following:

- countries subject to OFAC sanctions, including state sponsors of terrorism
- countries identified as supporting international terrorism under section 6(j) of the Export Administration Act of 1979
- jurisdictions determined to be "of primary money laundering concern" by the Secretary of the Treasury, and jurisdictions subject to special measures imposed by

the Secretary of the Treasury, through FinCEN, pursuant to section 311 of the Patriot Act

- jurisdictions or countries identified as non-cooperative by the Financial Action Task Force on Money Laundering (FATF)

268. The second step of the risk assessment required considering more specific data regarding the purpose of an account, actual or anticipated activity in the account, the nature of the customer's business, the customer's location, and the types of products and services used by the customer, with the bank's Customer Due Diligence (CDD) information having an important role in the process.

269. The FFIEC Manual further explained that the risk assessment process needed to be "an ongoing process, not a one-time exercise." Banks were expected to update their risk assessments to identify changes in the bank's risk profile, and this required banks to continually monitor information from a variety of sources. The FFIEC Manual included a list of sources, including U.S. Government threat assessments, FinCEN guidance, and FATF publications.

270. A bank's risk assessment was expected to inform its reporting obligations: "For example, the bank's monitoring systems to identify, research, and report suspicious activity should be risk-based, with particular emphasis on high-risk products, services, customers, and geographic locations as identified by the bank's BSA/AML risk assessment."

271. The next step was to establish a set of internal controls reasonably designed to ensure ongoing compliance with BSA requirements. The FFIEC Manual explained that a bank's "board of directors, acting through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting," and the "board of directors and management should create a

culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes."

272.   The FFIEC Manual explained that the "cornerstone of a strong BSA/AML compliance program is the adoption and implementation of comprehensive CDD policies, procedures, and processes for all customers, particularly those that present a high risk for money laundering and terrorist financing." The FFIEC Manual explained that CDD policies, procedures and processes "provide the critical framework that enables the bank to comply with regulatory requirements and to report suspicious activity," as well as aiding the bank in "[a]voiding criminal exposure from persons who use or attempt to use the bank's products and services for illicit purposes." Where customers pose high risk, the FFIEC Manual contemplates an intensive review of relevant customer information, including:

- Purpose of the account.

- Source of funds and wealth.

- Beneficial owners of the accounts, if applicable.

- Customer's (or beneficial owner's) occupation or type of business.

- Financial statements.

- Banking references.

- Domicile (where the business is organized).

- Proximity of the customer's residence, place of employment, or place of business to the bank.

- Description of the customer's primary trade area and whether international transactions are expected to be routine.

- Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers.

- Explanations for changes in account activity

273.    The final element of BSA compliance, and the culmination of a bank's AML/CFT controls, was suspicious activity reporting, which the FFIEC Manual explained was "critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering, and other financial crimes." Under BSA regulations, banks were required to file a Suspicious Activity Report (SAR) for any transaction conducted or attempted by, at, or through the bank (or an affiliate) and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to suspect that the transaction involves money laundering or illegal activity. The FFIEC Manual specified that this included any suspected "terrorism financing." Indeed, although SARs were normally required to be filed no more than 60 days after the date of initial detection, the FFIEC Manual instructed banks to act immediately upon any suspected link between a customer and terrorist activity:

> If a bank knows, suspects, or has reason to suspect that a customer may be linked to terrorist activity against the United States, the bank should immediately call FinCEN's Financial Institutions Terrorist Hotline at the toll-free number: 866-556-3974…. [T]he bank must also file a SAR.

274.    Under BSA regulations, SARs are highly confidential. No bank, and no director, officer, employee, or agent of a bank, that reports a suspicious transaction may notify any person involved in the transaction that the transaction has been reported.

275.    More generally with respect to terrorist financing, the FFIEC Manual contained an appendix entitled "Money Laundering and Terrorist Financing 'Red Flags,'" wherein examples of potentially suspicious activity that may indicate terrorist financing were listed. The examples included:

103

- Funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from high-risk countries (*e.g.*, countries designated by national authorities and FATF as non-cooperative countries and territories).

- Funds transfers do not include information on the originator, or the person on whose behalf the transaction is conducted, when the inclusion of such information would be expected.

- Banks from high-risk locations open accounts.

- Funds are sent or received via international transfers from or to high-risk locations.

In explaining these red flags, the FFIEC Manual referenced Guidance for Financial Institutions in Detecting Terrorist Financing that had previously been issued in 2002 by the Financial Action Task Force (FATF) and listed similar red flags.

276. The FFIEC Manual also explained that terrorist financing can happen through legitimate business activity, even where the transactional activity itself contains no red flags: "Other legitimate sources have also been found to provide terrorist organizations with funding; these legitimate funding sources are a key difference between terrorist financiers and traditional criminal organizations. In addition to charitable donations, legitimate sources include foreign government sponsors, business ownership, and personal employment."

277. FATF issued a report on Terrorist Financing in February 2008 specifically explaining that "[d]etecting terrorist involvement in otherwise legitimate financial activity requires financial institutions to implement the FATF standards through strong application of the 'know your customer' principle and of customer due diligence (CDD) policies and procedures." This report also clearly stated that "financial information" including "suspicious transaction reporting … has a central role in identifying terrorist financing and the movement of terrorist funds through the financial system."

### 3.   The Terrorist Finance Tracking Program

278.   A third key counterterrorism control was the U.S. government's ongoing monitoring of payment messages sent through the Society for Worldwide Interbank Financial Telecommunication (SWIFT) system. The SWIFT system was the primary means by which payments were processed through the international banking system. At all relevant times beginning in 2001, the Treasury Department monitored SWIFT payment messages through the Terrorist Finance Tracking Program (TFTP).

279.   Treasury explains the history and importance of this program on its website: "After the terrorist attacks on September 11, 2001, the United States Department of the Treasury (Treasury) initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists—such as Al-Qaida, Hizballah, HAMAS and their networks. This was an important part of Treasury's larger effort to track terrorist money flows and assist in broader U.S. government efforts to uncover terrorist cells and map terrorist networks here at home and around the world."

280.   Since the start of the program in 2001, Treasury's website reports that "the TFTP has provided hundreds of thousands of valuable leads to U.S. government agencies and other governments that have aided in the prevention or investigation of many of the most visible and violent terrorist attacks and attempted attacks of the past decade…. SWIFT information greatly enhances our ability to map out terrorist networks, often filling in missing links in an investigative chain…. By following the money, the TFTP has allowed the United States and our allies to identify and locate operatives and their financiers, chart terrorist networks, and help keep money out of their hands."

281.   Although the Terrorist Finance Tracking Program began as a covert program, it was revealed and widely publicized by the press in June 2006, including in a *New York Times*

article by Eric Lichtblau and James Risen. The following month, Treasury Under Secretary

Levey confirmed and explained the importance of the program in testimony before the House

Financial Services Subcommittee on Oversight and Investigations:

> As this Committee knows well, ***tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the world from terrorist attacks***. This is true for two main reasons. First, when we block the assets of a terrorist front company, arrest a donor, or shut down a corrupt charity, we deter other donors, restrict the flow of funds to terrorist groups and shift their focus from planning attacks to worrying about their own needs. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons, and stage attacks. ***Disrupting money flows stresses terrorist networks and undermines their operations***. In recent months, we have seen at least one instance of what we look for most - a terrorist organization indicating that it cannot pursue sophisticated attacks because it lacks adequate funding.

> Second, "following the money" is one of the most valuable sources of information that we have to identify and locate the networks of terrorists and their supporters. If a terrorist associate whom we are watching sends or receives money from another person, we know that there's a link between the two individuals. And, while terrorist supporters may use code names on the phone, when they send or receive money through the banking system, they often provide information that yields the kind of concrete leads that can advance an investigation. For these reasons, ***counter-terrorism officials place a heavy premium on financial intelligence***….

> The Terrorist Finance Tracking Program has been a key part of these overall efforts…. I have on my staff a group of intelligence analysts who spend their days in a secure room poring over information to unmask the key funders and facilitators of terrorist groups. If you spoke with them, they would point to this program as one of the most important and powerful tools they have to follow the money.

**B.      The U.S. and European Governments' Warnings That Iran's Oil and Gas Transactions Caused Terrorist Attacks**

282.    Throughout the relevant period, U.S. government officials issued a deafening

chorus of warnings to banks—including SCB—that providing financial services to the Iran

Terrorist Sponsors' oil and gas fronts would cause terrorist attacks. This chorus reached a

106

crescendo during the U.S. government's "financial pressure campaign" to warn banks about Iran's funding of terrorism between 2006 and 2008.

283.    In his memoir of the period, Treasury's former Assistant Secretary for Terrorist Financing and Financial Crimes Juan Zarate explained that the "cornerstone" of the financial pressure campaign was to share information about "Iran's own conduct" with the private sector. Because Iran's economy had become so intertwined with its terrorist activity and other malign conduct, knowledge of that state of affairs would "spur the private sector to stop doing business with Iran." In the U.S. government's estimation, "No reputable bank would want to be caught … helping [Iran] make payments to Hezbollah terrorist cells around the world." The fact that Iran often used front companies and layers of entities to accomplish these goals would only make things worse, as "[t]he more the Iranians tried to hide their identities or evade sanctions, the more suspect their transactions would appear and the riskier it would become for banks and other financial institutions to deal with them."

284.    Zarate elaborated on the intertwined state of Iran's economic and terrorist activity in 2006:

> [The Iranians] were blending legitimate business transactions with illicit ones by funneling them through similar conduits. The Iranian regime often tried to hide the nature of its transactions and the identities of the Iranian government entities involved. Importantly, the predominant economic player was Iran's Islamic Revolutionary Guard Corps (IRGC), the elite … security unit founded in 1979. The IRGC had gained more power and influence over time as the protector and exporter of the revolution and reported directly to … Ayatollah Ali Khamenei.
>
> The IRGC—with its vast network—had embedded itself into more industries within Iran, ultimately building what has been called a veritable business empire…. The IRGC is an economic juggernaut, with responsibilities relating to the development of weapons of mass destruction, missile systems, and overseas operations. It is deeply involved in the Iranian nuclear program, and its international arm, the Qods Force (IRGC-QF), is responsible for providing support for terrorist proxies and exporting the Iranian Revolution….

From Treasury's perspective, this blend of activities created the ultimate vulnerability, particularly the blurred lines between legitimate industry and support for Iran's nuclear program and terrorist groups. ***The nefarious nature of the activities, tied with the IRGC's attempts to hide its hand in many of its economic dealings and operations, made Iran's financial activity inherently suspect.***

285.    The fundamental message of the U.S. government's financial pressure campaign could thus be summed up: If you do business with Iranian companies in sectors controlled by the IRGC—even ostensibly legitimate transactions with business entities—terrorist attacks by IRGC-funded proxies are a foreseeable result. That sharp warning was emphasized and reiterated by the U.S. government throughout the financial pressure campaign.

286.    As a European bank with a major presence in Dubai and a history of serving Iranian clients, SCB was a prime target of the U.S. government's financial pressure campaign, during which SCB received warnings through a variety of means, including public statements by U.S. officials and regulatory agencies and private outreach directly to SCB.

287.    On information and belief, the private warnings that SCB received were even more detailed and urgent than the public ones, and included direct warnings to SCB, including the NY Branch and SCB Dubai, that transacting with Iranian banks, Iranian fronts, or companies in Iran's oil sector would facilitate IRGC-sponsored acts of terrorism committed by Hizballah, Hamas, and Iraqi Shiite terrorist groups. Although Plaintiffs expect discovery to reveal more about these private warnings, Zarate's memoir explains the form they took:

> Treasury—led by [Under Secretary for Terrorism and Financial Intelligence] Levey—would launch the financial pressure campaign … in large part by demonstrating to CEOs and compliance officers around the world that the risk of doing business with Iran was too high. Iranian obfuscation was too ubiquitous to be handled through normal compliance efforts…. It was better to stop doing business with Iran altogether than to risk facilitating Iran's support for terror or its development of a nuclear program….

108

Levey began his meetings with bank officials around the world with a briefing on Iranian illicit activity and how it coursed through the international financial system. He would take this argument from board room to board room, often meeting with bank CEOs before and after meeting with foreign government counterparts. Steve Hadley called it the 'whisper campaign,' because the mission entailed meeting quietly with bank executives to explain the risks of doing business with Iran. At the heart of these meetings was a presentation on what Iran was doing with front companies and layered financial transactions to facilitate activity that was considered either illegal or risky….

Levey would meet over one hundred times with bank officials around the world. At each stop, he made the case that doing business with Iran was too risky— because the banks could not be sure they knew who they were doing business with…. For each country and institution, the Treasury team would provide specific tidbits of data about Iranian transactions through a bank. The briefing packets would have general information about the Iranian economy, structure, and financial system. The packets would contain information about how the Iranian government and the IRGC used front companies and obfuscation to finance and acquire what they needed for their military … apparatus. The briefing would conclude with an explanation of what was happening in the bank and how the Iranians were hiding their activity. This would inevitably be a surprise to any bank CEO, though some banks would be caught later trying to hide transactions with Iran.

288.    Treasury Secretary Paulson increased the prominence of the warnings by emphasizing them in his own private meetings with bank executives:

The former Wall Street executive could convincingly make a case to fellow bankers about the danger of doing business with Iran. When Paulson talked, financial leaders around the world listened…. [Paulson] made a point of putting the issue of Iran's suspect financial activity on the agenda of his meetings with foreign government officials and banking friends with whom he met…. One would expect such talk from the director of the CIA or FBI, but to hear this coming from the former CEO of Goldman Sachs and the treasury secretary caused officials to take notice. The treasury secretary was speaking a new language of national security that resonated with the CEOs of the world's biggest banks and businesses.

289.    Publicly available warnings were also numerous, even well before the financial pressure campaign began. Decades of U.S. government statements confirmed the tight nexus between transacting with Iranian fronts and IRGC-sponsored acts of international terrorism targeting the United States. In particular, decades of public U.S. government findings, reports,

109

statements, and warnings (often, all four in one item) alerted SCB that: (1) the Government of Iran was a prolific funder and supporter of terrorist attacks against Americans; (2) Iran's Terrorist Sponsors facilitated terrorist attacks by fronts and proxies, including the Qods Force, Hizballah, Hamas, PIJ, and JAM; (3) the Government of Iran systematically used a large proportion of its profits from ostensibly ordinary business transactions, especially in its oil sector, to fund those terrorist attacks; (4) the Government of Iran routinely used front companies and layered financial transactions to do so while evading sanctions; and (5) by at least 2006, the IRGC's control and influence over key industries meant that any significant transaction with an Iranian front company, especially in the oil sector, would foreseeably fund those terrorist attacks. The U.S. government's voluminous warnings made explicit what its comprehensive sanctions implied: No country in the world had a major economy as saturated with terrorist finance as Iran.

290.    From 1990 through 2015, such U.S. government findings, reports, statements, and warnings included, but were not limited to:

a.    State, 1990: "In its various forms -- direct involvement, instigation and encouragement, support to terrorist groups through provision of safehaven, financial resources, arms, technical expertise, and documentation -- state sponsorship makes a *significant contribution to international terrorism*. … Support in its various forms enhances the capabilities of a … radical Shia groups throughout Western Europe, the Middle East, and Africa; … Iran was the most active state sponsor … The United States … designat[ed] … [Iran] … as [a] state supporter[] of terrorism … pursuant to Section 6 (j) of the Export Administration Act of 1979, which imposes certain trading restrictions on countries determined by the Secretary of State to have *repeatedly provided support for acts of international terrorism*."

b.    President Clinton, 1995: "From the beginning of our administration, we have moved to counter Iran's support of international terrorism and in particular its backing for *violent opponents of peace in the Middle East* [*i.e.*, the then-existing, U.S.-led, Israeli-Palestinian peace process]. … Our policy has helped to make Iran pay a price for its actions. The nation has effectively been cut off from receiving credit from international financial institutions. … Even as prospects for the peace in the Middle East have grown, Iran has broadened its role as an inspiration and *paymaster to terrorists*. … I am convinced that instituting a trade embargo with Iran is the most effective way our Nation can help to curb that nation's drive to acquire devastating weapons and its continued

110

support for terrorism … It would be wrong to stand pat in the face of overwhelming evidence of Tehran's support for terrorists that would threaten the dawn of peace."

c. State, 1998: "The Secretary of State has designated [the Iranian] government[] as [a] state sponsor[] of terrorism … by providing arms, training, safehaven, diplomatic facilities, financial backing, logistic and/or other support to terrorists. The ***US policy of bringing maximum pressure*** to bear on state sponsors of terrorism and encouraging other countries to do likewise … [depends upon] [a] broad range of bilateral and multilateral sanctions [that] serves to discourage state sponsors of terrorism from continuing their ***support for international acts of terrorism***, but continued pressure is essential. ... Iran remains the most active state sponsor of terrorism … Iran continues both to provide significant support to terrorist organizations."

d. White House, *National Strategy for Combating Terrorism*, September 2006: "***State sponsors are a critical resource for our terrorist enemies,*** often providing funds, weapons, training, safe passage, and sanctuary. Some of these countries have developed or have the capability to develop WMD and other destabilizing technologies that could fall into the hands of terrorists. The United States currently designates [Iran as a] state sponsor[] of terrorism … We will maintain sanctions against [Iran] and promote [the Iranian regime's] international isolation until they end their support for terrorists …. To further isolate these regimes and persuade other states not to sponsor terror, we will use a range of tools and efforts to delegitimate terrorism as an instrument of statecraft. Any act of international terrorism, whether committed by a state or individual, is reprehensible, a threat to international peace and security, and should be unequivocally and uniformly rejected. Similarly, states that harbor and assist terrorists are as guilty as the terrorists, and they will be held to account. Iran remains the most active state sponsor of international terrorism. Through its Islamic Revolutionary Guard Corps …, the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah, Hamas, and [PIJ[…. Most troubling is the potential WMD-terrorism nexus that emanates from Tehran. … We will continue to stand with the people of Iran … against the regime[] that oppress[es] them at home and sponsor[s] terror abroad."

e. Treasury (OFAC), September 2006: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence []. Bank Saderat is one of the largest Iranian-owned banks, with roughly 3400 branch offices. The bank is ***used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the [PFLP-GC] and Palestinian Islamic Jihad.*** A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001. … By prohibiting U-turn and all other transactions with Bank Saderat, the bank is denied all direct and indirect access to the U.S. financial system."

f. Treasury (Under Secretary Levey), March 2007: "Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a `train and equip program' for terrorist organizations like Hizballah, …. The IRGC's control and influence in the Iranian

111

economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. ***When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism***…. ***Iran sends hundreds of millions of dollars each year to terrorist groups like Hizballah and other organizations***. … ***Corporations are in the process of reconsidering their investments in Iran because they do not want revenue generated from their projects diverted towards … terrorism.***"

g.    Treasury (Secretary Paulson), June 2007: "It is well known that Iran is pursuing nuclear weapons in violation of international agreements and channeling hundreds of millions of dollars to terrorist groups…. We explained how Iran uses front companies and other mechanisms that make it difficult, if not impossible, for businesses dealing with Iran to 'know their customer' or counterparty. We also explained how the Iranian regime uses its state-owned banks to pursue its missile procurement and nuclear programs, as well as fund terrorism. Repeatedly, state-owned Iranian banks, including the Central Bank of Iran, ask other financial institutions to remove their names from global transactions…. To those banks that have decided to stop dollar-based business, but continue to transact Iran's business in other currencies, I would say that the risk of transacting Iran's business is present in every currency…. The IRGC … has been ***directly involved in the planning and support of terrorist acts, as well as funding and training other terrorist groups*** to pursue the military objectives of the regime…. ***The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC***."

h.    Treasury (OFAC), October 2007: "The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. … Bank Melli also provides banking services to the IRGC and the Qods Force. … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions. … ***The IRGC has significant political and economic power in Iran***, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, ***including petroleum production and major construction projects across the country***. In 2006, [IRGC firm] ***Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors***, among others…. Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic

112

Jihad. For example, *from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas.*"

i.  Treasury (Secretary Paulson), October 2007: "*Iran also funnels hundreds of millions of dollars each year through the international financial system to terrorists*…. We are also designating the Islamic Revolutionary Guard Corps for proliferation activities and its Qods Force for providing material support to the Taliban and other terrorist organizations. *The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are doing business with the IRGC.* We call on responsible banks and companies around the world to terminate any business with Bank Melli, Bank Mellat, Bank Saderat, and all companies and entities of the IRGC. As awareness of Iran's deceptive behavior has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be bankers to this dangerous regime."

j.  Treasury (FinCEN), October 2007: "The Financial Crimes Enforcement Network is issuing this *advisory to U.S. financial institutions so that they may guard against threats of illicit Iranian activity related to money laundering, terrorist financing* and weapons of mass destruction proliferation financing…. [F]inancial institutions should be particularly aware that there may be an increased effort by Iranian entities to circumvent international sanctions and related financial community scrutiny through the use of deceptive practices involving shell companies and other intermediaries or requests that identifying information be removed from transactions. Such efforts may originate in Iran or Iranian free trade zones subject to separate regulatory and supervisory controls, including Kish Island. Such efforts may also originate wholly outside of Iran at the request of Iranian-controlled entities."

k.  Treasury (FinCEN), March 2008: "The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on serious deficiencies present in the anti-money laundering systems of the Islamic Republic of Iran…. *Iran's AML/CFT deficiencies are exacerbated by the Government of Iran's continued … terrorist financing*."

l.  Treasury (Assistant Secretary Glaser), April 2008: "[The] Threat of Iran's Support of Terrorism … [includes] its provision of financial and material support to terrorist groups. Iran has long been a state sponsor of terrorism and continues to support an *unparalleled range of terrorist activities*. For example, *Tehran arms, funds, and advises Hizballah, an organization that has killed more Americans than any terrorist network except for al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guard Corps*. *In addition, Iran provides extensive support to Palestinian terrorist organizations, including the Palestinian Islamic Jihad (PIJ) and*

113

*Hamas*. In the case of PIJ, Iran's financial *support has been contingent upon the terrorist group carrying out attacks against Israel*. And *we are all familiar with Iran's funding, training, and equipping of select Shi'a extremist groups in Iraq,* …. *resulting in deaths of Americans.* … Iran *utilizes the international financial system as a vehicle to fund these terrorist organizations*. As Under Secretary Levey has previously testified, the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism. … Iran uses its global financial ties to *pursue [] the threat of terrorism … through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community*. Iran uses its state-owned banks for … for financing terrorism. … [One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system. This practice is intended to elude the controls put in place by responsible financial institutions and has the effect of potentially involving those institution [sic] in transactions they would never engage in if they knew who, or what, was really involved. This practice allows Iran's banks to remain undetected as they move money through the international financial system to *pay for the Iranian regime's … terrorist-related activities*."

m.  Treasury (OFAC), November 2008: "*Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism* and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. … Iran is the world's most active state sponsor of terror. … Elements of Iran's [IRGC] have been *directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East*, Europe and Central Asia, and Latin America. … In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. … It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. … Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its nuclear or missile programs."

n.  Treasury (FinCEN), July 2009: "On June 26, 2009 the Financial Action Task Force (FATF) issued a statement concerning these jurisdictions that reiterates previous FATF concerns and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website…. '*The FATF remains particularly concerned about Iran's failure to address the risk of terrorist financing* and the serious threat this poses to the integrity of the international financial system…. The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

114

o.   Treasury (Under Secretary Levey), October 2009: "[T]he international private sector has amplified the impact of [U.S., U.N., and E.U.] government actions, as ***banks and companies around the world have come to understand that, if they are dealing with Iran, it is nearly impossible to protect themselves against becoming entangled in [the IRGC]'s illicit conduct*** … [because] [IRGC] companies, some of which have been designated by the United States and the UN Security Council …, operate under names that obscure their IRGC affiliation, so many unwitting non-Iranians are in fact doing business with the IRGC. In the name of privatization, ***the IRGC has taken over broad swaths of the Iranian economy***. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects …There is ***broad acknowledgment*** that the Iranian government engages in a range of deceptive financial and commercial conduct in order to obscure … and ***facilitate its support for terrorism***. International understanding of these practices—underscored by the UN Security Council resolutions on Iran and six warnings issued by the [FATF] about the risks Iran poses to the financial system—has been brought about in part by our efforts to share information about Iran's deception with governments and the private sector around the world. These deceptive practices ***taint all Iranian business because they make it difficult to determine whether any Iranian transaction is licit***. Iranian banks request that their names be removed from transactions so that their involvement cannot be detected; the government uses front[s] … and intermediaries to engage in ostensibly innocent commercial business to obtain prohibited … goods … To a greater extent than ever, private companies across industries are now alert to these kinds of risks. Banks worldwide have been repeatedly warned by regulatory and standard-setting bodies to regard Iranian transactions with caution. Traders and shippers know that transactions with innocent-sounding Iranian counterparts can expose them to risk—both reputational and legal. Energy companies have put Iranian investments on indefinite hold, cautious of the political risk of investing too heavily in Iran. And exporters of sensitive and dual-use technologies know that supplying Iran can lead to severe sanctions and even prosecution. ***Across the board, then, transactions with Iran are already handled differently than transactions with any other country*** … engendering either heightened suspicion or outright refusal to engage in them."

p.   Treasury (FinCEN), October 2009: "On October 16, 2009, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website…. 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to ***give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.***'"

q.   Treasury (Under Secretary Levey), June 2010: "Because … [t]he ***IRGC plays a key role in Iran's … support for terrorism*** and [the IRGC] has ***taken over broad portions of the Iranian economy***, … [n]o IRGC entity should have any place in the world's legitimate financial system."

115

r.  Treasury (FinCEN), March 2011: "On February 25, 2011, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website…. 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to *give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions*.'"

s.  Treasury (OFAC), February 2012: "What activities by foreign financial institutions can subject them to CISADA sanctions? As described in the Iranian Financial Sanctions Regulations, the *sanctionable activities of a foreign financial institution are: Facilitating the efforts of the Government of Iran (GOI) to* acquire or develop Weapons of Mass Destruction (WMD) or delivery systems for WMD or to *provide support for* terrorist organizations or *acts of international terrorism*; Facilitating the activities of a person subject to financial sanctions pursuant to UNSCRs 1737, 1747, 1803, or 1929, or any other Security Council resolution that imposes sanctions with respect to Iran; *Engaging in money laundering, or facilitating efforts by the Central Bank of Iran or any other Iranian financial institution, to carry out either of the facilitating activities described above*; or Facilitating a significant transaction or transactions or providing significant financial services for: (i) the Islamic Revolutionary Guard Corps or any of its agents or affiliates whose property and interests in property are blocked pursuant to the International Emergency Economic Powers Act (IEEPA), or (ii) a financial institution whose property and interests in property are blocked pursuant to IEEPA in connection with Iran's proliferation of WMD, Iran's proliferation of delivery systems for WMD, or Iran's support for international terrorism."

t.  State, April 2014: "In 2013, Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) … and Tehran's ally Hizballah, which remained a significant threat to the stability of Lebanon and the broader region. *The U.S. government continued efforts to counter Iranian and proxy support for terrorist operations via sanctions and other legal tools*. The United States also welcomed the EU's July 2013 designation of Hizballah's military wing as a terrorist organization. … Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity, *including support for Palestinian terrorist groups in Gaza, and for Hizballah*. … Iran used the [Qods Force] and its regional proxy groups to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is the regime's primary mechanism for cultivating and supporting terrorists abroad."

u.  Representative Ted Poe (Chairman of the House Subcommittee on Terrorism, Non-Proliferation and Trade), October 2015: "[The] *Islamic Revolutionary Guard Corps (IRGC) has funded, planned and executed terrorist attacks against the United States … for decades* … Treasury … has repeatedly cited the IRGC's support for terrorism and destabilizing activity throughout the Middle East and beyond. …There is also growing concern that the IRGC is engaging in financial evasion practices that erode the efficacy of the sanctions currently in place. Treasury currently sanctions companies that are 50%

116

owned or controlled by the Iranian government or in which Iran wields a controlling interest. However, through control of a company's board of directors, the IRGC can exercise the same level of power over a company without meeting Treasury's designation trigger. By exploiting this … legal loophole, the IRGC has managed to become so deeply entrenched in the Iranian economy to the point that, as former Treasury Secretary Henry Paulson pointed out, *'it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC.'*"

291.    On November 25, 2011, Treasury took official action to determine that Iran was a Jurisdiction of Primary Money Laundering Concern. This determination summarized the message that had been delivered to banks throughout the financial pressure campaign and represented the United States' formal finding that it was impossible for any bank, including SCB, to conduct any Iran-related financial transaction without running a substantial risk of financing IRGC-sponsored terrorist attacks committed by Hizballah, Hamas, or other proxies of the Terrorist Sponsors. Among other things, Treasury's finding alerted SCB that:

a.    "In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for terrorism …. This illicit conduct by Iranian banks and companies has been highlighted in a series of … UN Security Council … resolutions related to Iranian proliferation sensitive activities. [FATF] has also warned publicly of the risks that Iran's deficiencies in countering money laundering and, particularly, terrorism finance …. FinCEN has reason to believe that Iran directly supports terrorism … and uses deceptive financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities."

b.    "**Support for Terrorism**: … *Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas and the Palestinian Islamic Jihad ("PIJ"). In fact, Hamas, PIJ, and Hizballah have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.*"

"Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external threats. Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure. *In*

117

*addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.*"

"In particular, Iran has used the IRGC-Qods Force ('Qods Force') to cultivate and support terrorists and militant groups abroad. *The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's … terrorist activities*, and provides Hizballah with as much as $200 million in funding per year. … [O]n October 11, 2011, the Department of Justice charged two individuals for their ... participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States. …"

"Finally, *Iran is known to have used state-owned banks to facilitate terrorist financing.* In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its [10] financial support of terrorist organizations, noting that *from 2001 to 2006 Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.*"

c.    "As a result of the strengthened U.S. sanctions and similar measures taken by the [U.N.] and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. *This conduct puts any financial institution involved with Iranian entities at risk of [] facilitating transactions related to terrorism* …".

d.    "**The IRGC**: The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007, owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy. For example, *the IRGC established Khatam al-Anbiya, the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company working on civilian projects.*"

e.    "*The IRGC has continued to expand its control over commercial enterprises within Iran. … [T]he IRGC and the IRGC-QF engage in seemingly legitimate activities that ... support terrorist groups such as Hizballah [and] Hamas …*".

f.    "Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ('AML/CFT') controls has long been highlighted by numerous international bodies and government agencies."

292.    On November 28, 2011, Treasury published its proposed special measure under Section 311 of the USA PATRIOT Act, in which it found that a complete U.S. prohibition on all Iranian banks' correspondent account access to the U.S. financial system was necessary to

118

protect the United States from IRGC-sponsored terrorist violence, including attacks committed by Hizballah, Hamas, PIJ, and other IRGC proxies:

a.   "The Effect of the Proposed Action on United States National Security …[.] The exclusion from the U.S. financial system of jurisdictions that *serve as conduits for … the financing of terrorism … enhances U.S. national security by making it more difficult for terrorists … to access the substantial resources of the U.S. financial system*. To the extent that this action serves as an additional tool in preventing Iran from accessing the U.S. financial system, the proposed action supports and upholds U.S. national security … goals. More generally, the imposition of the fifth special measure would complement the U.S. Government's worldwide efforts to expose and disrupt international … terrorist financing."

b.   "The fifth special measure sought to be imposed by this rulemaking would prohibit covered financial institutions from opening and maintaining correspondent accounts for, or on behalf of, Iranian banking institutions. As a corollary to this measure, covered financial institutions also would be required to take reasonable steps to apply special due diligence … to all of their correspondent accounts to help ensure that no such account is being used indirectly to provide services to an Iranian banking institution. FinCEN does not expect the burden associated with these requirements to be significant given that U.S. financial institutions have long been subject to sanctions regulations prohibiting the provision of correspondent account services for banking institutions in Iran."

293.   Moreover, decades of reports published and re-published throughout the United States, Europe, and the Middle East by media outlets, scholars, NGOs, and IRGC victims themselves confirmed the tight nexus between IRGC-facing sanctions violations and IRGC-sponsored acts of international terrorism targeting the United States. Such reports included, but were not limited to:

a.   *Cleveland Plain Dealer*, May 23, 1996: "Secretary of State Warren Christopher is publicly flaying U.S. allies for not doing enough to isolate Tehran. … In preparation for [a] … meeting of the 'Group of Seven' …, Christopher … urged Congress to tighten economic sanctions against Iran, charging Tehran's ayatollahs are *behind the terrorist attacks in the Middle East*. 'The United States believes Iran will change its behavior when the world makes it pay a sufficiently high … economic price,' Christopher said."

b.   *Independent*, October 26, 2007: "Washington justified the new sanctions by accusing the elite Quds division of the Revolutionary Guard Corps of the devastating campaign of roadside bombs by Shia militias against its troops in Iraq [and] supporting [JAM] in Iraq and [other] terrorist[] [groups] in … Lebanon and the Palestinian territories, and denying the existence of a fellow member of the United Nations, threatening to wipe Israel off the

119

map. … The sweeping new US sanctions affect Iranian banks, companies, officials and government agencies which the White House says … ***support[ed] acts of terrorism abroad***. The sanctions specifically targeted [IRGC] finances and eight affiliated companies. They also named five [IRGC] officials as well as the Quds Force …. The US hopes to cripple Iranian trade by isolating the banks from the world financial system."

c.   <u>Prof. Raymond Tanter (University of Michigan), December 6, 2007</u>: "I strongly concur in the sanctioning for proliferation activities of IRGC-affiliated entities and individuals as derivatives of the IRGC … The raison d'etre of the Islamic Revolutionary Guards Corps is to … ***export the regime's revolutionary ideology via acts of terrorism*** … [through] the Islamic Revolutionary Guards Corps."

d.   <u>Danny Eisen (Canadian Coalition Against Terror), February 10, 2010</u>: "[T]he IRGC is anything but a normal military body or state entity. The IRGC is hardly a conventional branch of the military. … [T]he IRGC's primary constitutional duty is not to protect Iran from conventional military threats but to 'protect the revolution and its ideals.' This amorphous and borderless mandate allows the IRGC to take on any … terrorist role [] that is required to ensure the continued export of Khomeini's Islamic revolution. Given its unconventional mandate and its extraordinary level of operational independence from government hierarchy, the Guards are too autonomous to be []considered a normal state agency. It therefore can and must be held accountable for its own actions like any other terrorist body that ***commits acts of terrorism on its own initiative*** … [and there was no] doubt as to the value of sanctioning the IRGC [to prevent acts of terrorism]."

294.   SCB also knew about U.N. and E.U. sanctions targeting the IRGC, and knew that such sanctions were designed to, and did, prevent IRGC-sponsored violence by impeding the IRGC's ability to develop, sell, and deploy sophisticated weapons like missiles, rockets, drones, and next-generation RPGs. For example, the United Nations, European Union, and their member states sanctioned the IRGC and KAA from 2007 through 2024. Examples of reports of such sanctions included, but were not limited to:

a.   <u>U.K. House of Commons, October 13, 2010</u>: "[O]n 24 March 2007 the Security Council broadened the sanctions. It imposed an embargo on all of Iranian arms exports and an asset freeze and travel ban on further people it considered to be involved in the nuclear programme, including top members of the [IRGC], listed in an annex to the Resolution. … On 9 June 2010, the UN Security Council passed Resolution 1929 imposing a fourth round of sanctions on Iran. … The Resolution decides that: … • All states shall prevent the supply, sale or transfer to Iran of battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems. • States will take all necessary measures to prevent the transfer to Iran of technology or technical assistance related to ballistic missiles capable of delivering

120

nuclear weapons. • Steps will be taken to block Iran's use of the international financial system, particularly its banks when they may be used to fund proliferation and nuclear activities. …. At least 15 of the companies and groups named in the new sanctions list are linked to the [IRGC]. Most of the remainder are associated with the nuclear and ballistic missile programmes, which are directly controlled by the Revolutionary Guard. … EU sanctions[:] Some UN sanctions against Iran are partly implemented through EU law. Like the US, however, the EU went further than the latest Security Council resolution demanded. … On 26 July [2010], the new [E.U. Iran-related sanctions] measures were announced. They consisted of: … [inter alia] restrictions in the financial sector, including additional asset freezes against banks and restrictions on banking and insurance …[;] trade restrictions, including a broad-ranging ban on dual use goods … [;] [and] new visa bans and asset freezes, especially on the [IRGC]."

b.  U.N. Security Council, June 4, 2012: "[A] number of key [IRGC] figures have been identified by the Security Council as involved in … missile programmes and are subject to asset freeze[s] … Activities related to the [IRGC] are also made subject to vigilance exercised by States and their nationals, persons and firms if they have information that provides reasonable grounds to believe that such business could contribute to the [Iranian regime]'s proliferation-sensitive … activities … Such vigilance over business activities extends to entities and individuals acting on behalf of the [IRGC] or at its direction, and entities owned or controlled by it, including through illicit means."

c.  U.K. House of Commons, December 8, 2020: "Although no part of the IRGC has been proscribed under this Act, its members and activities have more broadly been the targets of UK and EU sanctions. Qasem Soleimani was designated under the terrorism and terrorist financing regime and, as the Minister for the Middle East and North Africa noted in correspondence to us, there are more than 200 sanctions in place through the EU targeting Iran's ballistic missiles and nuclear activities, many of which cover the activities of the IRGC."

295.    As contemporaneous reports by the government, media, terrorism scholars, and others warned, SCB knew that the IRGC's use of front companies and layered transactions, and its pervasive role in major sectors of the Iranian economy, made it impossible to determine with any confidence that an Iranian company in one of those sectors was not funding the IRGC's terrorist activities. Under these circumstances, SCB knew that customer due diligence focused on the company's nominal owners and formal corporate structure would provide no more than a pretext of deniability. It could not provide any reasonable assurance that the company's transactions were insulated from terrorism.

III.     **SCB Knowingly Provided Substantial Assistance By Covertly And Unlawfully Helping Iran's Terrorist Sponsors Extract Billions Of Dollars From Iran's Oil And Gas Industry To Enable Their Terrorist Attacks**

A.     **Determined to Serve Iran's Oil and Gas Sector in Flagrant Defiance of U.S. Counterterrorism Controls and Warnings, SCB Provided Extraordinary, Illegal Services for NIOC and Other Iranian Customers**

296.     While other financial institutions saw the terrorist financing risks inherent in processing oil and gas transactions for Iran's Terrorist Sponsors and their fronts and therefore refused to take on those customers, SCB saw a business opportunity.

297.     Indeed, only a few weeks after President Clinton sounded the alarm about Iran's funding of terrorism in 1995, SCB's General Counsel strategized with SCB's compliance staff about how to evade the new sanctions, advising, "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCBLondons [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY." Recognizing the illicit nature of this scheme, he instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."[13]

298.     SCB implemented exactly that strategy and maintained it for years. Thus, in 2001, CBI/Markazi asked SCB to act as its correspondent bank with respect to international U.S.-dollar payments, including relating to oil sales by NIOC. At that time, the CEO of SCB's Iran representative office advocated expanding the CBI account, noting that "[t]o be the bank

---

[13] 2012 NYDFS Consent Order ¶ 20.

handling Iran's oil receipts would be very prestigious for SCB. In essence, SCB would be acting as Treasurer to the CBI/the country."[14] SCB decided to accept this business in 2001.

299.    SCB determined that OFAC's U-turn exception would generally enable SCB to clear CBI/Markazi's U.S.-dollar transactions through its NY Branch without violating OFAC sanctions, but SCB knew that the U.S. government's counterterrorism controls posed a greater obstacle. Not only did U-turn transactions need to be reviewed to ensure that they complied with the U-turn exception, but the NY Branch also had an obligation under the BSA to review and report suspicious transactions. SCB knew that acting as a correspondent bank for an Iranian bank would be viewed by U.S. regulators as entailing an extraordinarily high risk of terrorist financing, which would necessitate intensive review by BSA compliance personnel in the NY Branch. SCB and its Iranian clients also knew that SCB's NY Branch would be required to report suspicious terrorist financing activity to FinCEN for dissemination to law enforcement and the intelligence community.

300.    Those counterterrorism controls had at least two distinct problems from the perspective of SCB and CBI/Markazi.

301.    The first problem was the potential for delay. A "critical component" of the deal between SCB and CBI/Markazi was the timing  of $500 million in daily U.S. dollar payments. A senior manager of SCB's Iranian business noted that "the most important aspect to CBI/Markazi of this relationship with SCB" was SCB's "willingness to pay away funds in advance of receipts (intraday of up to USD 200m)."  He stressed that providing rapid U.S. dollar payments for CBI/Markazi "could lead to increased business activity with [other Iranian] banks."[15]

---

[14] 2012 DPA Factual Statement ¶ 22.
[15] 2012 NYDFS Consent Order ¶ 23.

302.     But the second problem was that CBI/Markazi was unwilling to allow its suspicious activity to be reported to U.S. authorities. The CEO of SCB's Iran representative office, Mohammed Sarrafzadeh, explained in an interview with federal and state law enforcement authorities that *he believed the Iranians' real concern was that the U.S. government would gain information about the Iranians' business dealings* if the payments were transparent to the NY Branch.[16] In other words, the U.S. government would gain information about how the IRGC's oil business and other activities were funding terrorist attacks. And CBI/Markazi left no doubt that this was of paramount importance to the bank, making clear to SCB that payment processing that showed CBI/Markazi's involvement in the transaction was not an option if SCB was to receive the business.[17] As one SCB employee wrote about the CBI/Markazi account, "*this account must remain completely secret to the U.S.*"[18]

303.     SCB decided to oblige. It conspired with CBI/Markazi to route U.S. dollar payments through the NY Branch after first stripping data from SWIFT wire transfer messages used to identify sanctioned countries, individuals, and entities—a practice known as "wire stripping."[19]

304.     SCB ensured the anonymity of its U.S. dollar clearing activities for Iran's Terrorist Sponsors through the NY Branch by falsifying SWIFT wire payment directions. SCB would have employees at SCB London review transactions involving Iranian counterparties,

---

[16] 2012 DPA Factual Statement ¶ 23.

[17] 2012 DPA Factual Statement ¶ 23.

[18] 2012 DPA Factual Statement ¶ 23.

[19] 2012 NYDFS Consent Order ¶ 3. According to SCB's independent consultant, this figure represents about 30,000 messages that were sent to the NY Branch by SCB's London office, mainly on behalf of state-owned Iranian banks, and approximately 30,000 messages from SCB Dubai to the NY Branch on behalf of Iranian-owned banks, corporations and other unknown entities. *Id.* n.2.

124

stripping the message of unwanted identifying data and replacing it with false entries or returning the payment message to the Iranian Bank for wire stripping and resubmission—a process that SCB, conscious of its illegality, euphemistically called "repairing" the wire.

305.    SCB utilized such schemes to keep SCB NY in the dark about the true nature of the U.S. dollar clearing transactions, so that SCB NY would not scrutinize or report these transactions as suspicious activity.

306.    In March 2001, SCB's Group Legal Advisor counseled several of SCB's officers that "our payment instructions [for Iranian Banks] should not identify the client or the purpose of the payment."[20]

307.    SCB went to great lengths to manipulate the SWIFT system to deceive payment message recipients in New York. SCB instructed CBI/Markazi to "send in their MT 202's"—a standardized SWIFT payment message for transfers between banks—"with a [SCB London's business identifier code] as this is what we required them to do in the initial set up of the account.  Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank." SCB also accomplished this subterfuge by: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of requested information that would identify the Iranian Banks; and (c) employing a system known as SCB's "repair procedure," whereby SCB overseas employees screened payment messages—before they were communicated to its NY branch—to ascertain whether any messages contained information that identified the Iranian Banks, and if so, remove it.[21]

---

[20] 2012 NYDFS Consent Order ¶ 24.
[21] 2012 NYDFS Consent Order ¶ 27.

308.    SCB understood that simply omitting Iranian client information on SWIFT MT-202 payment messages going to New York was insufficient because the electronic payment system would automatically fill in blank data fields, identifying the Iranian Bank.  Consequently, to disguise the transactions effectively and thereby avoid regulatory scrutiny, SCB deliberately made false and misleading entries in SWIFT "field 52," a data field that would otherwise identify the Iranian party.[22]

309.    SCB documents show that its attorney in charge of BSA and anti-money laundering compliance knew that "the process for effecting Bank Markazi's "payment instructions" was deceptive wire stripping. He was told specifically that "field 52 (ordering institution) is quoted by Bank Markazi in their MT202  as [SCB London]" or SCB would manually "repair" or "over-type field 52 as [SCB London]."  He knew that these actions would leave "no reference to Bank Markazi," and would  thus "send[] incorrect information."[23]

310.    Senior SCB management memorialized many of these procedures in formal operating manuals. One such manual entitled *Quality Operating Procedure Iranian Bank Processing* directed SCB's London-based employees to "repair payment[s] by making appropriate changes" to transacting party codes. It provided step-by-step wire stripping instructions for any payment messages containing information that would identify the Iranian Banks. An example directive read:  "[e]nsure that if the field 52 of the payment is blank or displays [sic] any  SWIFT code that it is overtyped at the repair stage to a '.'  This will change the outgoing field 52 on the MT103 to a field 52D of '.'  Or, in the case of a 'normal MT202 instruction change the field 52 on the outgoing MT202 to [SCB's NY Branch] to a '.' (Note: if

---

[22] 2012 NYDFS Consent Order ¶ 28.
[23] 2012 NYDFS Consent Order ¶ 29.

this is not done then the Iranian Bank SWIFT code may appear—depending on routing—on the payment message being sent to [the NY Branch]).”[24]

311.    The chief lawyer in charge of Legal & Compliance for SCB's Wholesale Bank division commented to other senior legal and compliance staff that the document, “read in isolation, is clearly … designed to hide, deliberately, the Iranian connection of payments.”[25]

312.    These masking procedures evolved to meet SCB's growing volume demands. When SCB anticipated that its business with the Iranian Banks would grow too large for SCB employees to “repair” manually the instructions for New York bound wire transfers, SCB automated the process by building an electronic repair system with “specific repair queues” for each Iranian client.[26]

313.    As SCB vigorously cultivated U.S. dollar clearing business from the Iranian Banks, SCB's outside counsel continuously admonished SCB to not evade regulatory requirements.  In 2003, one of SCB's outside legal counsel in the U.S. warned that the bank's system for executing U-Turns anonymously through the NY Branch did “not comport with the law or the spirit of OFAC rules, which lay out explicit details on how such transactions are to be conducted.”  She further instructed that “OFAC insists on full disclosure of all parties in transactions to ensure that transactions meet the terms of the rule.”[27]

314.    SCB also acutely understood how its wire stripping practices made it impossible for the bank to carry out its AML/CFT obligations to report suspicious activity. In fact, in November 2003, SCB's New York banking regulators conducted an examination of this very

---

[24] 2012 NYDFS Consent Order ¶ 30 (brackets in original).
[25] 2012 NYDFS Consent Order ¶ 31.
[26] 2012 NYDFS Consent Order ¶ 32.
[27] 2012 NYDFS Consent Order ¶ 33.

matter, in which they concluded that SCB NY's "monitoring of funds transfer activity was found to be ineffective against safeguarding against legal, reputational and compliance risks associated with suspicious and unusual activity in U.S. dollar funds transfer." The regulators warned that the "identification and control of risk exposures is lacking, and considered far below the level expected for a high-risk profile institution such as SCNY."[28]

315.    SCB's external counsel provided a similar warning: "I should point out that permissible U-Turn transactions should be done on a fully disclosed basis, that is, SCB (London) … should disclose all details of the transaction. Not to do so could place SCB (New York) seriously in harm's way under the law and should be a condition for moving forward with any transaction."[29]

316.    SCB promised its New York regulators in a written agreement that it would correct its AML/CFT compliance failures by "enhanc[ing] due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks" and "implementing industry sound practices designed to identify and effectively manage risks."[30] SCB's CEO and the CEO of SCB Americas signed this written agreement. But the promise was false. As an internal SCB memorandum about its Iran business noted, the agreement to correct AML/CFT compliance failures created negative "implications for [SCB's] growth ambition and strategic freedom that [went] way beyond just the U.S."[31] It stood as a significant obstacle to SCB's growth and evolving business strategies.

---

[28] 2012 DPA Factual Statement ¶ 74.
[29] 2012 DPA Factual Statement ¶ 31.
[30] 2012 DPA Factual Statement ¶ 75.
[31] 2012 NYDFS Consent Order ¶ 42.

317.    Beginning in 2003, other banks with significant Iran portfolios began exiting the U-Turn business. For instance, SCB's business managers learned that Lloyds TSB London was "withdrawing their services" with one of its Iranian client banks "primarily for reputational risk reasons."[28] Rather than follow suit, and despite concerns regarding the terrorist financing risk, SCB positioned itself to take the abandoned market share.[32] It sought to pick up this business and add U.S. dollar accounts for five Iranian banks at SCB London: Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.[33]

318.    As described in a December 2005 internal memorandum written by the CEO of SCB's United Arab Emirates region and the Group Head of Compliance and Regulatory Risk, SCB's "short to medium term strategy [was] to grow the wholesale business by growing [its] wallet share from existing relationships with Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."[34] That memorandum, entitled *Project Gazelle, Report on Iranian Business*, was circulated among SCB's key legal, compliance, and Iranian client business managers.

319.    As with CBI/Markazi, the other Iranian banks objected to transparency in payment messages sent to the United States.[35] The CEO of SCB Americas expressed concern, explaining, "it is my understanding that we must cease and desist all these current transactions with Iranian customers that don't fully disclose the remitter and beneficiary since it's not a question of interpretation but rather is clearly the law as regards these types of transactions."[36]

---

[32] 2012 NYDFS Consent Order ¶ 35.
[33] 2012 DPA Factual Statement ¶ 30.
[34] 2012 NYDFS Consent Order ¶ 36.
[35] 2012 DPA Factual Statement ¶ 30.
[36] 2012 DPA Factual Statement ¶ 32.

But SCB's business personnel pushed back, and Mohammed Sarrafzadeh, CEO of SCB's Iran representative office, explained that transparency "will be a deal breaker" to the Iranian banks.[37]

320.    To avoid such deal-breakers, SCB instituted a system of so-called "offshore OFAC due diligence."  The entire enterprise was a sham. Although SCB's offshore operation could do minimal OFAC compliance, it could not substitute for the most critical counterterrorism controls, which were the AML/CFT compliance and suspicious activity reporting that the BSA required SCB's NY Branch to perform. Thus, the true objective and effect of SCB's offshore scheme was not to relocate meaningful terrorism risk compliance, but to *disable* it. Consistent with the wishes of SCB's Iranian clients, SCB's offshore scheme continued its practice of depriving U.S. personnel responsible for suspicious activity reporting of key data they needed.

321.    SCB's overseas due diligence staff members were responsible for both SCB's U-Turn "repair procedures" and OFAC "compliance"—a paradoxical task to say the least. SCB personnel did not know the elements of a lawful U-Turn transaction other than that the payment "had to be offshore to offshore," and they were not trained to determine whether the underlying transactions were valid according to the Iranian Trade Regulations. Nor were they trained to conduct BSA due diligence and report suspicious activity. In fact, as late as August 2006, SCB's operations staff still "resolve[d] 'hits' on sanctioned names *directly with the customer*"—a method designed to facilitate, not prevent, client misconduct.[38]

322.    Senior SCB management knowingly embraced the bank's fraudulent U-Turn procedures with full awareness that (as one internal report put it) "the current process under which some SWIFT messages are manually 'repaired' to remove reference to Iran could … be

---

[37] 2012 DPA Factual Statement ¶ 33.
[38] 2012 NYDFS Consent Order ¶ 39.

perceived by OFAC as a measure to conceal the Iranian connections from [the NY Branch], and therefore evade their controls for filtering Iranian related payments. Unless transactions are repaired they face delays caused by investigations in the U.S. banking system, subjecting SCB to interest claims."[39]  An SCB executive described SCB's repair procedures as a "process to check that a payment is, prima facie, an acceptable U-turn transaction (*i.e.* offshore to offshore)," and fully acknowledged that  "they do not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions."[40]

323.    One of the most pointed internal concerns came from SCB's CEO for the Americas in October 2006. As reported by NYDFS, that executive "sent a panicked message to the Group Executive Director in London" urging the bank to reconsider the Iranian business in light of "the potential to cause *very serious or even catastrophic reputational damage* to the Group," and to subject "management in US and London (*e.g.* you and I) and elsewhere to personal reputational damages and/or *serious criminal liability*."[41] The Group Executive Director responded by belittling the concern and displaying "obvious contempt for U.S. banking regulations," saying in a meeting: "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."[42]

324.    These candid statements are exceptional because people working in banks and in-house legal departments are trained not to leave paper trails admitting wrongdoing. Thus, when executives and attorneys speak in anodyne terms about potential "risk," it is a fair inference that they privately know to a high degree of certainty that their conduct is unlawful. When they spell

---

[39] 2012 NYDFS Consent Order ¶ 21.
[40] 2012 NYDFS Consent Order ¶ 21 (emphasis removed).
[41] 2012 NYDFS Consent Order ¶ 7 (emphasis in the original).
[42] 2012 NYDFS Consent Order ¶ 8.

out, in such stark terms, that they face catastrophic risk and serious criminal liability, the inference is inescapable. Accordingly, SCB's senior executives were aware, as of October 2006 (and likely earlier), that the bank was playing a role in very serious unlawful activities on behalf of its Iranian customers.

325.    The American executive's concern proved true. Multiple regulatory and law enforcement agencies concluded that SCB's conduct posed serious sanctions risks, interfered with its ability to perform effective safety and soundness examinations, and prevented it from identifying suspicious activity that could assist them in effectively supervising other licensed institutions and from assisting other law enforcement authorities.

326.    SCB's systemic misconduct was the basis for the violations of law set forth in SCB's 2012 DPA with DOJ and the 2012 NYDFS Consent Order—in connection with which SCB paid more than $550 million in penalties and forfeitures.

327.    SCB was found by regulatory and law enforcement agencies to have processed $23 million in transactions for Iranian customers from 2001 through 2007 that violated OFAC's U-turn rules. No less troubling, however, was the larger bulk of transactions SCB unlawfully processed through New York for Iranian banks and other Iranian customers with fraudulent and misleading SWIFT messages. Between 2001 and 2007, these transactions included more than $32 billion and at least 2,684 SWIFT messages for CBI/Markazi; more than $79 billion and at least 5,189 SWIFT messages for the five other Iranian banks; and more than $3.9 billion for other Iranian clients of SCB's Dubai Branch.

328.    SCB's deliberately fraudulent and misleading SWIFT messages impeded critical counterterrorism controls by depriving the U.S. government of important information about the transactions, just as SCB's Iranian clients wanted. SCB's scheme made it impossible for SCB's

132

AML/CFT compliance staff in the United States to effectively flag and investigate suspicious activity in these transactions, and then to report terrorist financing concerns to the government. SCB's scheme also impeded the effectiveness of the U.S. government's own monitoring of the SWIFT system to track terrorist financing through the TFTP program.

329. As NYDFS concluded: "SCB acted for at least ten years *without any regard* for the legal, reputational, and *national security consequences* of its flagrantly deceptive actions. Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran—*dealings that indisputably helped sustain a global threat to peace and stability*."[43] In particular, "[b]ecause SCB regularly concealed the names of [its] high risk clients, it could not accurately track and evaluate their risk levels. Nor could SCB effectively screen for suspicious activity and financial transactions—monitoring that is essential to any institution's BSA/AML program. *Perhaps worst of all, SCB's actions prevented regulators from doing their job in detecting potential* threats to the U.S. financial system and other *national security breaches*."[44] SCB's actions "*left the U.S. financial system vulnerable to terrorists*, weapons dealers, drug kingpins and corrupt regimes, *and deprived law enforcement investigators of crucial information* used to track all manner of criminal activity."[45]

330. In the settlement agreements that resolved investigations into SCB's rampant wire stripping and evasions of Iran sanctions, SCB represented that it had exited its Iran business as of 2007. In its 2012 DPA with DOJ, for example, SCB professed that, given the potential for "very serious or even catastrophic reputational damage" "and/or serious criminal liability," SCB "made

---

[43] 2012 NYDFS Consent Order at 22 ("Conclusion").
[44] 2012 NYDFS Consent Order ¶ 51.
[45] 2012 NYDFS Consent Order at 1.

the decision to ***exit the Iranian business***" in October 2006.[46] SCB claimed to have "ended" its "U.S.-dollar clearing activity for all the Iranian banks" by March 2007.[47] And SCB claimed that "[f]rom August 2007, SCB ***suspended*** all new Iranian business in any currency."[48]

331.    Not only that, but SCB also claimed that as part of its efforts to remediate its decade-long sanctions evasion, SCB had also "taken voluntary steps to enhance and optimize its sanctions compliance programs"—including by "***[t]erminating relationships with sanctioned banks and entities*** and closing its Iranian representative office and branch," "[s]ubstantially increasing personnel and resources devoted to sanctions compliance," and "[e]nhancing its global sanctions compliance policies and procedures, including a ***general prohibition*** on new transactions on behalf of U.S. designated terrorists … or WMD proliferators in all currencies."[49]

332.    Criminal and regulatory investigations—by DOJ, OFAC, NYDFS, and the U.K. FCA—revealed that SCB's stated commitment to winding-down its Iran business in 2007 was a lie. Instead of shutting down the Iran business, SCB shifted almost all of that business to its Dubai branch. SCB knew that Dubai was a hotbed of IRGC sanctions evasion and terrorist financing. It was well known in the financial industry that Dubai front companies were a primary means for Iran to access the global financial system, and the fronts were often readily apparent to locals on the ground. In the words of the Chairman of the American Business Council of the Gulf Countries, as reported by *Forbes Global* on April 19, 2004, "[w]hen you blow off the dust, the Dubai region sometimes means Iran and Libya." The *New York Post* on February 21, 2006, noted a "white-hot spotlight on the UAE, a country long considered the arms-smuggling and money-

---

[46] Deferred Prosecution Agreement ¶¶ 101-102, *U.S. v. Standard Chartered Bank*, No. 12-cr-262 (D.D.C. Dec. 10, 2012), ECF 2 (hereinafter, "2012 DPA").
[47] 2012 DPA ¶ 103.
[48] 2012 DPA ¶ 104.
[49] 2012 DPA ¶ 107.

laundering capital of the Middle East," with "[t]ens of billions of dollars … laundered every year through [its] banks" and a "shady" record in the war on terrorism, according to U.S. officials. As the *Wall Street Journal* reported on February 23, 2006, Dubai was "the most free-wheeling of the Emirates," and "Iran uses Dubai to evade U.S. economic sanctions."

333.    SCB was aware of these and other warnings highlighting the terrorist financing risks in Dubai—but SCB's London leadership internally viewed these sharp warnings as an "annoyance," according to a July 20, 2007, article from *The Guardian*. Notwithstanding the risks, SCB said it "wanted to develop its Dubai office into a regional hub," according to a June 1, 2007, article from *Dow Jones International News*.

334.    SCB Dubai's rank-and-file understood that the bank's revenue took precedence over counterterrorism concerns. Accordingly, several SCB Dubai employees worked closely with Iran's Terrorist Sponsors and fronts to help them evade U.S. counterterrorism controls. SCB Dubai employees coached SCB's customers on how to avoid suspicion, lied to compliance officials and other banks about the fronts' Iran connections, and even helped open new accounts to help fronts for the Qods Force, Hizballah, and their proxies escape detection.

335.    As a whistleblower who had worked in SCB's Dubai branch explained in an interview with federal and state law enforcement authorities, SCB's internal document system contained information about a secret project staffed out of Dubai and overseen in London that had been given the codename "Project Green." Multiple SCB Dubai employees explained to the whistleblower in 2009 and 2010 that the purpose of "Project Green" was to "navigate clients around" sanctions, and that it involved visits by SCB Dubai employees to Iran and to Iranian financial institutions in Dubai. The whistleblower was told that SCB Dubai employees were "very actively opening Iranian accounts in 2009" for which Mohammed Sarrafzadeh, the CEO of

135

SCB's Iran representative office, would have been listed as the account representative. The whistleblower also shared SCB files, including spreadsheets containing a December 2008 list of "hot" "targets" for SCB's sales team to solicit. The list included the Iranian banks Bank Saderat, Bank Mellat, Bank Melli, Bank Sepah, and Bank Tejarat. Similar lists dated December 2007 and February 2008 also included Bank Saderat and Bank Melli as "prospective clients."[50]

336.    From 2008 through at least 2014 or early 2015, SCB *continued* to actively move money for individuals and entities connected to Iran—including agents and fronts for the IRGC—while continuing to engage in wire stripping and other tactics to help its Iranian clients evade counterterrorism controls. SCB's culpable assistance to the IRGC lasted until at least late 2014 or early 2015, from which the Qods Force, Hizballah, and their shared proxies Hamas and JAM continued to finance their attacks through at least 2019.

337.    In direct contradiction of its claim to have exited the Iran business, SCB Dubai maintained "at least nine Eurodollar bank accounts for CBI" and processed "at least two trade finance transactions for [C]BI worth a total SCB profit value of $50,679.00 U.S. dollars between

---

[50] FBI Report of Interview with Julian Knight, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. March 8, 2021), ECF 87-1. Allegations from other whistleblowers further undercut SCB's representations that it had exited its Iran business in 2007. *See* Decl. of Robert G. Marcellus ¶ 21 ("Marcellus Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-1; *see id.* ¶ 17 (describing post-2007 invitations from SCB Dubai employees to "meet[] some of SCB's Iranian customers … in Iran"); *id.* ¶¶ 25-26 (identifying an "enormous volume of transactions by SCB with Iranian persons after 2007" on SCB transaction spreadsheets). SCB's own presentation to regulators also acknowledged that, even after SCB stopped processing U.S. dollar transactions for certain Iranian clients through its NY Branch, it did not stop serving those clients and profiting from the relationships it had developed over the years. SCB did not cease business conducted in other currencies for Iranian clients, and in fact invited clients to open accounts in alternative currencies, conducting foreign exchange transactions to convert their U.S. dollar balances to those alternative currencies.

December 1, 2009 and December 31, 2009."[51] SCB thus continued to serve CBI/Bank Markazi despite ample public warnings of the terrorist financing risk inherent in doing so.

338.   SCB also continued to serve Bank Saderat—a Specially Designated Global Terrorist and notorious financier of attacks by the IRGC Quds Force, Hizballah, and Hamas front and direct conduit of funding for anti-American terrorism throughout the Middle East—which enjoyed full "always execute" access to SCB's online currency trading platform at least through 2008 and beginning again in April 2013.[52]

339.   Indeed, as one whistleblower put it, SCB's "representations denying Iranian business to the US authorities in 2012 were likely completely false."[53]

### B.   SCB Provided Extraordinary, Illegal Services to IRGC Front Caspian Petrochemical FZE

340.   SCB Dubai "process[ed] a significant volume of [U.S. dollar] payments" for "a front company for a prohibited Iranian entity"—an "Iranian petrochemical company in the business of shipping liquefied petroleum gas."[54] That "Iranian petrochemical company" was Caspian Petrochemical FZE, a front for Iran's Terrorist Sponsors as explained *supra* ¶¶139-141.[55]

---

[51] Decl. of David J. Scantling ¶¶ 115-16 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104. Plaintiffs expect discovery to shed more light on these and other SCB transactions identified in the *Brutus Trading* litigation about which complete information is not currently available to Plaintiffs. The Times Media Limited filed a motion in that case for the court to unseal the SCB spreadsheets filed as exhibits by the Relators; SCB opposed that motion, which is currently pending before the court as of the date of this filing (Dkt. No. 146).

[52] Decl. of Julian Knight ¶ 71, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-11117 (S.D.N.Y. Jan. 10, 2020), ECF 48-2.

[53] Marcellus Decl. ¶ 21.

[54] 2019 NYDFS Consent Order ¶ 30.

[55] As noted *supra*, all references to Caspian Petrochemical in this Complaint are inclusive of its predecessor entity before its name was changed to "Caspian Petrochemical" in 2011.

341.    NYDFS discovered that, between November 2008 and June 2012, SCB "processed more than $150 million in incoming and outgoing [U.S. dollar] transactions" for Caspian Petrochemical. The "majority" of those transactions "were transmitted through the [NY] Branch."[56] OFAC's investigation confirmed those findings.[57]

342.    SCB Dubai willfully helped Caspian Petrochemical conduct "prohibited business" through both active assistance and "glaring compliance deficiencies."[58]

343.    SCB Dubai opened a U.S. dollar denominated account for Caspian Petrochemical in May 2005.[59] By at least October 2007, SCB knew that Caspian Petrochemical was a front company owned by the Government of Iran. Although documents provided to SCB Dubai purported to show that the company was located and operated in the Dubai Airport Free Zone, SCB Dubai's customer due diligence documents for Caspian Petrochemical at that time, upon which SCB Dubai relied heavily, were marked "YES" in answer to the following questions:

- Is the client a sanctioned country government (anywhere in the world)?

- Is the client a sanctioned country **government-owned bank or other enterprise** (anywhere in the world), including subsidiaries, branches and offices thereof?

The identification of Caspian Petrochemical as a "government-owned enterprise" likely meant the company was an official or unofficial subsidiary of NIOC, which oversaw state-owned oil

---

[56] 2019 NYDFS Consent Order ¶ 31.

[57] 2019 OFAC Settlement ¶7 ("SCB Dubai maintained an account for the petrochemical company, a company owned by an Iranian national ordinarily resident in Iran, which engaged in the sale of petroleum products to, from, or through Iran. Following OFAC's revocation of the U-Tum authorization on November 10, 2008, SCB, beginning no later than June 27, 2009, and, continuing through June 24, 2012, processed 190 transactions totaling $151,269,725 to or through the United States that were for or on behalf of the petrochemical company—the benefit of which services were received in Iran—in apparent violation of § 560.204 of the [Iranian Transactions and Sanctions Regulations].").

[58] 2019 NYDFS Consent Order ¶¶ 32-33, 37.

[59] 2019 OFAC Settlement ¶ 10.

and gas enterprises. The IRGC took over NIOC by 2007. *See supra* ¶¶127-133. Thus, by 2007, Caspian Petrochemical was under the control of the IRGC; by 2008, it was facilitating oil and gas exports for the Foundation for the Oppressed; and by 2011, it was under the control of the SLO via Petro Nahad. *See supra* ¶¶134-145.

344. SCB's customer due diligence documents identified a single individual, using the name Seyed Asadollah Ememjome, as the company's "sole owner"—*i.e.*, the sole nominal owner of an enterprise beneficially owned by the Government of Iran.[60] SCB Dubai's customer due diligence documents identified this individual as "resident in a [high risk jurisdiction]—Iran."[61] SCB's records listed both Iranian and Dubai contact information for the individual, including Iranian fax and phone numbers. SCB's records also contained an Iranian passport purportedly for the individual. Indeed, SCB Dubai had a deep and longstanding relationship with this individual: The bank opened a U.S. dollar account for him in 2002 with a permanent address in Iran, and SCB's Iran representative office had multiple meetings with him in person in Iran.[62] After an SCB Dubai Relationship Manager met with him in 2005, SCB Dubai opened an account for the petrochemical company he controlled.[63]

345. After opening the account, "personnel at SCB Dubai and SCB Tehran received emails, trade proposals, and other documentation over the course of the next several years demonstrating the petrochemical company's ties to, and business activities with, Iran."[64] In July 2006, an SCB Dubai sales employee obtained from Caspian Petrochemical's owner an organizational chart that "listed the petrochemical company as part of a group of seven

---

[60] 2019 OFAC Settlement ¶ 13.
[61] 2019 OFAC Settlement ¶ 13.
[62] 2019 OFAC Settlement ¶¶ 9-10.
[63] 2019 OFAC Settlement ¶ 10.
[64] 2019 OFAC Settlement ¶ 11.

companies—three of which were incorporated and located in Iran"—and which included

"background information on the petrochemical company group."[65]

346. Although the organizational chart and detailed background materials in SCB's

possession since 2006 are not publicly available to Plaintiffs, *Lloyd's List* issued an April 22,

2025, report about the petrochemical company group, showing Caspian Petrochemical's owner

and his son at the top of a sprawling network of Iranian gas and shipping companies, including

Caspian Petrochemical FZE, that controlled a fleet of ships exporting Iranian gas and petroleum

products to foreign markets:



On information and belief, the material in SCB's possession since 2006 similarly indicated that

Caspian Petrochemical was part of a large network that played a significant role in Iran's oil and

gas industry.

347. Shortly after OFAC revoked its U-Turn exception in November 2008 and warned

in urgent detail about the IRGC's funding of terrorism and its frequent use of front companies,

---

[65] 2019 OFAC Settlement ¶ 11.

SCB Dubai orchestrated a scheme to help Caspian Petrochemical evade counterterrorism controls, while continuing to clear its U.S. dollar transactions through SCB's NY Branch. To this end, SCB provided a variety of illicit and atypical banking services to Caspian Petrochemical between 2009 and 2011.

348.    First, in 2009, SCB Dubai altered the company's customer due diligence file to hide its Iranian beneficial ownership and connections to Iran. Where SCB's records had previously answered "YES" to questions about whether Caspian Petrochemical FZE was owned by the Government of Iran, as well as other questions about its presence in Iran, SCB Dubai changed the "YES" to "NO."[66]

349.    Second, SCB Dubai continued the wire stripping tactic SCB had pioneered since 2001 to help its Iranian customers evade due diligence and suspicious activity reporting. The payment messages for Caspian Petrochemical omitted all references to Iran, the company's Iranian ownership, or any affiliated Iranian entities. As a result of SCB Dubai's transmission of stripped or misleading payment messages, "[m]ost of the transactions originated by SCB Dubai on behalf of the petrochemical company were processed successfully and reached their intended beneficiary."[67]

350.    Third, in April 2010, when a U.S. bank rejected a large U.S. dollar payment originated by SCB for Caspian Petrochemical, *SCB lied to OFAC* to hide the source of the funds. The U.S. bank told SCB's New York compliance staff that it found the front company to be an Iranian entity and warned that it had "contacted OFAC, and was advised by OFAC to reject [USD] payments" for it.[68] These warnings were transmitted to SCB's senior U.K.

---

[66] 2019 OFAC Settlement ¶ 16.
[67] 2019 OFAC Settlement ¶ 16.
[68] 2019 NYDFS Settlement ¶ 32 (brackets in original); *see* 2019 OFAC Settlement ¶ 18.

sanctions officer immediately, who did nothing.[69] SCB's compliance staff in Dubai and New York then found numerous obvious reasons to believe Caspian Petrochemical was an Iranian front, including: (i) a simple Google search showed that a company with the same name and email address on file with SCB was "Iranian"; (ii) the identified owner was an Iranian national; (iii) his UAE visa had expired two years earlier; and (iv) a document in the company's account file from 2008 revealed its representative office was located in Tehran.[70] These obvious Iran links caused SCB Dubai's operational risk manager to warn SCB Dubai's senior AML officer that he "strongly believe[d] that the subject customer is an Iranian."[71] The senior AML officer, in turn, escalated the findings to the senior U.K. sanctions officer, who "rejected this warning" and "allow[ed] the payment to be made by relying on an undocumented" denial of any link between the company and Iran, purportedly obtained from the customer by SCB Dubai's Relationship Manager.[72] The U.K. sanctions officer also ignored a fax communication located in Caspian Petrochemical's account file that contained correspondence from Iran. The fax, sent to the Bank in September 2011, bore Iran's country prefix (+98).[73]

351.    Despite the mountain of evidence to the contrary, SCB proceeded to explain to OFAC that the account was used for petroleum purchases from Turkmenistan and sales to Armenia, Pakistan, and Iraq, and to falsely and confidently represent to OFAC that Caspian Petrochemical had "no direct or indirect involvement with Iran."[74] SCB's Relationship Manager knew the representation about no involvement with Iran was false; he would later admit in his

---

[69] 2019 NYDFS Settlement ¶ 32.
[70] 2019 NYDFS Settlement ¶ 32; 2019 OFAC Settlement ¶¶ 20, 23.
[71] 2019 NYDFS Settlement ¶ 32.
[72] 2019 NYDFS Settlement ¶ 32.
[73] 2019 NYDFS Settlement ¶ 32.
[74] 2019 OFAC Settlement ¶ 24.

own criminal prosecution that he knew Caspian Petrochemical "either operated from Iran, or transacted USD business with Iranian entities."[75] And SCB's senior management in the U.K. was all too willing to rely on the Relationship Manager's dubious and unverified representations in the face of much contrary evidence. SCB's senior U.K. sanctions officer thus "inexplicably" gave Caspian Petrochemical the "benefit of the doubt" and "allowed it to continue conducting business through the Bank—including transactions processed through the New York Branch."[76]

352.    Despite the numerous payments rejected by other U.S. financial institutions involving Caspian Petrochemical, as well as the concerns raised internally within SCB regarding its Iranian ownership and connections, "both SCB Dubai and SCB NY continued to process [U.S. dollar] payments on the company's behalf."[77] In total, following SCB's lie to OFAC, "SCB Dubai and SCB NY processed 133 funds transfers totaling $140,310,539 that were for or on behalf of the petrochemical company to or through the United States in apparent violation of the [Iranian Transactions and Sanctions Regulations]."[78]

353.    Fourth, after the name of the petrochemical company had proven too easy to identify as Iranian through a Google search, another relationship manager advised it to evade detection by changing its name: "*if you change the company name then we can reopen another account with Standard Chartered.*"[79]

354.    On information and belief, the IRGC took SCB's advice and reincorporated the company on November 15, 2011, as a new company named Caspian Petrochemical FZE, which

---

[75] Statement of Offense ¶ 11, *U.S. v. Mobeen Ahmed*, No. 17-cr-190 (D.D.C. Oct. 26, 2017), ECF 12 (hereinafter, "Ahmed Statement of Offense").
[76] 2019 NYDFS Settlement ¶ 32.
[77] 2019 OFAC Settlement ¶ 25.
[78] 2019 OFAC Settlement ¶ 25.
[79] 2019 NYDFS Consent Order ¶ 37.

it registered in Dubai and London that same day by using cut-outs who incorporated Caspian Petrochemical.[80] The company's corporate filings publicly identified the "Objects of the company" as "Trade of gas, oil and petrochemicals" and listed its officers as Phati Sebua and Seyedasadoollah Emamjomeh (a/k/a Seyed Asadollah Ememjome), who was identified as its Chairman.

355.    As SCB knew from its presence in Iran, the surname "Emamjome" is a religious title in Iran referring to an imam appointed by the Supreme Leader to lead Tehran's Friday prayers, which regularly included slogans condemning the United States, Israel, and other enemies of the Ayatollah's regime. "Seyed" and "Asadollah" are also common religious honorific titles in Iran translating to "Descendant of Prophet Mohammed—Lion of God." The subsequent sanctions designation of Caspian Petrochemical FZE explained that Emamjomeh is a "liquified petroleum gas (LPG) magnate," that his "corporate network" was "collectively responsible for shipping hundreds of millions of dollars' worth of Iranian LPG and crude oil to foreign markets" to "evade U.S. sanctions and generate revenue for Iran," and that the revenues from LPG generated by Caspian Petrochemical and its affiliates "***fund Iran's … regional proxy groups and partners such as Hizballah … and Hamas***."

356.    The timing of SCB's decision to help its IRGC customer change its name—and SCB's continuing maintenance of accounts for Caspian Petrochemical and/or its affiliates through at least June 2012—was particularly notable in light of the dramatic intensification of

---

[80] Plaintiffs expect discovery to shed further light on the name used by the petrochemical company and its ownership structure, the precise nature of the entity's relationship with the successor entity incorporated as Caspian Petrochemical FZE, and any subsequent transactions SCB may have processed for that entity after November 15, 2011. Although it has not disclosed the name of the Iranian petrochemical company that was the subject of its enforcement actions against SCB, the government has acknowledged that the name of the company or a corporate affiliate is "somewhat similar" to "Caspian Chemical."

U.S. sanctions on Iran and the IRGC between November 2011 and March 2012. Starting around November 8, 2011, when the International Atomic Energy Agency ("IAEA") published a bombshell report exposing the Iranian regime's comprehensive nuclear weapons program, the international community, including the United States, Israel, and European allies, signaled that they would impose harsh new sanctions on Iran. Iran and Hizballah contemporaneously threatened retaliation. Against the backdrop of high-profile statements emphasizing the importance of sanctions, countered by threats of war, SCB assisted the petrochemical company in rebranding itself to Caspian Petrochemical FZE so that it could continue evading sanctions and supplying funds to the IRGC. SCB thus intentionally aided the IRGC in evading counter-terrorism sanctions at the very moment the global community was emphasizing the grave terrorism and national security threats posed by sanctions evasion.

357.    SCB's transactions for Caspian Petrochemical FZE (and its predecessor) directly and indirectly flowed at least tens of millions of dollars each year to the Qods Force, Hizballah, Hamas, PIJ, and JAM.

358.    SCB's decision to continue to process payments for Caspian Petrochemical was a "significant compliance failure" by SCB that directly assisted the IRGC and its proxies; as NYDFS found, however, "this series of events was not isolated."[81]

## IV.    SCB's Services For NIOC And Caspian Petrochemical FZE Substantially Assisted The Terrorist Attacks That Injured Plaintiffs

359.    As described *supra*, Iran's Terrorist Sponsors created a terrorism machine that systematically converted proceeds from Iran's oil and gas sector into terrorist attacks by Iran's proxies. Money from oil and gas sales flowed to fronts controlled by the Terrorist Sponsors and

---

[81] 2019 NYDFS Settlement ¶ 33.

the Khamenei Cell, including the Foundation for the Oppressed and the SLO, where the money was then used to provide several types of vital support for terrorist attacks by proxies like Hizballah, Hamas, PIJ, and JAM, including martyr and bounty payments, weapons, training, and tunnels which the attacks on Plaintiffs depended on.

360.    As explained in detail below, the conversion of oil and gas proceeds into terrorist attacks did not occur through happenstance and did not depend on the fungibility of money within the Iranian regime. To the contrary, several features of the structures Ayatollah Khamenei openly put in place by no later than 2007 guaranteed that oil and gas money flowing into the Terrorist Sponsors' fronts would be spent on terrorist attacks before anything else. *First*, a key purpose of the IRGC's takeover of the oil and gas industry was to directly connect the fronts that the IRGC used to fund terrorist operations, including the Foundation for the Oppressed and the SLO, with the oil and gas businesses that financed them. *Second*, with oil and gas proceeds flowing directly into the IRGC's terrorist operations budget maintained by those entities, mechanisms like the Logistics Policy Directive and *khums* ensured that the proceeds would be used for terrorist purposes. *Third*, by placing this budget under the control of the Khamenei Cell and the SLO—the inner circle of IRGC operatives most committed to advancing and executing Khamenei's terrorist aims—and enlisting a bevy of auditors and aggregators to oversee the spending, Khamenei further ensured that the oil and gas money flowing into the IRGC's coffers would be immediately at the disposal of its terrorist leaders and would be put to use to enable attacks by their proxies.

361.    Those structures made it easily foreseeable—indeed, all but certain—that SCB's oil and gas transactions generating substantial funds for fronts controlled by Iran's Terrorist Sponsors would contribute to terrorist attacks like those that injured Plaintiffs, and in fact did so.

146

**A.      SCB's Transactions Flowed Billions of Dollars to the Terrorist Sponsors for Terrorist Attacks**

362.    The first phase of SCB's culpable conduct, which involved helping CBI/Markazi, Bank Saderat, and Bank Melli covertly move hundreds of billions of dollars—much of which constituted the proceeds of NIOC oil sales—substantially enriched Iran's Terrorist Sponsors, providing them with the resources they needed to provide extensive and long-lasting support to their terrorist proxies. The gargantuan amounts generated for NIOC between 2001 and 2008 not only provided vast sums that the Terrorist Sponsors used to support their proxies during that period, but also financed major oil and gas projects and infrastructure development that enabled Iran's Terrorist Sponsors to extract more money from the oil and gas industry after the IRGC's full takeover in 2007. SCB's services provided long-lasting financial benefits to Iran's Terrorist Sponsors, even years after SCB stopped providing them.

363.    The second phase of SCB's misconduct flowed tens of millions of dollars directly to the Foundation for the Oppressed and the SLO. As a substantial exporter of liquified petroleum gas (LPG), Caspian Petrochemical FZE played a key role in the Iranian regime's efforts to generate oil and gas revenue for terrorism. As the U.S. government confirmed in its designation of the company, "LPG continues to be a major source of revenue for the Iranian regime." That was all the more so when SCB provided its services to the company between 2007 and 2012. During that period, LPG exports spiked from 51,480 barrels per day in 2007 to 63,590 barrels per day in 2013. At all relevant times, the average price for LPG ranged between $600 and $1,200 per ton.

364.    The more than $150 million in transactions SCB processed for Caspian Petrochemical between 2008 and 2012 mostly facilitated the company's shipment of LPG from Iran to foreign purchasers. Because the Foundation for the Oppressed received the proceeds from

147

all sales of LPG beginning in 2008, it was the direct beneficiary of SCB's transactions with Caspian Petrochemical facilitating those sales. The IRGC (through the Foundation for the Oppressed) typically kept around 75% of the price of each LPG sale for itself, with the remainder going to facilitators and intermediaries. Accordingly, SCB caused at least tens of millions of dollars in proceeds from the sale of LPG to flow directly to the Foundation. Moreover, even if these proceeds first flowed to IRGC-controlled NIOC or its subsidiaries, the destination was the same: the *khums* that all regime supporters—which included Caspian Petrochemical's leaders and employees—were obligated to pay on oil proceeds ensured that, at very least, 20% of the proceeds were received by the SLO and/or Foundation for the Oppressed.

365. SCB's willingness to give Caspian Petrochemical covert access to the U.S. financial system made those profits for the Terrorist Sponsors possible. Access to the U.S. financial system was essential to the Terrorist Sponsors' ability to profit from their oil and gas sales because nearly all oil and gas transactions were denominated in U.S. dollars. Similarly, giving Caspian Petrochemical access to New York banks allowed it to maintain its cover as a front because transacting through New York imbued it with legitimacy.

366. As explained *supra*, Iran's Terrorist Sponsors used funds received by the Foundation for the Oppressed and other IRGC fronts systematically and predominantly to support attacks. As the U.S. government has specifically confirmed with respect to Caspian Petrochemical's LPG exports, they "provide[d] the Iranian regime with the funding it needs to further its destabilizing activities," including "funding regional proxy groups and partners such as Hizballah, the Houthis, and Hamas."

367. That occurred through specific mechanisms. The Logistics Policy Directive— which required a percentage of IRGC revenues to be dedicated to "operations," a known

148

euphemism for terrorism—ensured that once money reached the IRGC's coffers it would be used systematically for IRGC terrorism and not diverted for other government purposes. *Khums* likewise ensured that the IRGC received additional funds for operations out of the profits made by its members; they could not line their own pockets without also funding attacks.

368.    Most obvious of all, the specific entities that received the oil and gas proceeds— *i.e.*, the Foundation for the Oppressed, the SLO, and later, Petro Nahad—were under the direct control of Khamenei's inner circle and existed and operated for the purpose of spending oil and gas proceeds on IRGC-sponsored terrorism, as explained below.

**B.    The Terrorist Sponsors Dedicated Most of the Money They Received Through their Fronts' Transactions with SCB to Support Terrorist Attacks by Hizballah, Hamas, PIJ, and JAM in Israel and Iraq**

369.    The U.S. government has confirmed, as a core tenet of counterterrorism policy, that terrorists "often cannot carry out their operations [*i.e.*, attacks] without assistance from foreign companies and financial networks."[82] The members of the Khamenei Cell knew they needed such assistance to advance the terrorist attacks carried out by their FTO proxies, and they operated their fronts to maximize its effect.

**1.    The Khamenei Cell Ensured that Proceeds from SCB's Transactions Were Spent on Hizballah-Sponsored Terrorist Attacks by Hamas, PIJ, and JAM in Israel and Iraq**

370.    The Foundation for the Oppressed was purpose-built specifically to finance Hizballah and the Qods Force by providing a transnational funding, asset, real estate, corporate, and personnel structure that was tailor-made to access U.S. banks, markets, and institutions and purpose-built to enable acts of terrorism by Hizballah, the Qods Force, and allied proxies like

---

[82] U.S. Dep't of Justice, *Focus, Fairness, and Efficiency in the Fight Against White-Collar Crime*, 3 (May 12, 2025).

Hamas throughout the footprint of both Hizballah's and the Qods Force's shared, interlocking, complex, global, terrorist enterprise. The Foundation for the Oppressed was also designed to provide complete financial, logistical, and operational sustenance and cover to the Hizballah and Qods Force operatives who were embedded inside it by supporting, among other things, the Khamenei Cell, which included key Qods Force leaders like Qasem Soleimani and Abu Mahdi al-Muhandis, and key Hizballah leaders like Hassan Nasrallah, as well as Hizballah's top attack planners, *e.g.*, Imad Mugniyeh, a Khamenei Cell member from 1983 until he was killed in 2008.

371.    Accordingly, from 1979 through at least 2019, whenever a bank, including SCB, directly or indirectly routed substantial value to the Foundation for the Oppressed, such value flowed through the Foundation (including, if necessary, through applicable Hizballah or IRGC fronts, agents, and "orbits") to ultimately reach, among others, the Khamenei Cell. Indeed, such an outcome was the entire reason the IRGC seized the Pahlavi Foundation in 1979 and converted its assets into the Foundation. Accordingly, value transfers to the Foundation ultimately flowed through to, and were deployed by, among others: (1) Ali Khamenei; (2) Qasem Soleimani; (3) Hassan Nasrallah; (4) Rostam Qasemi; (5) Mojtaba Khamenei; (6) Gholam-Ali Hadad-Adel; (7) Mohsen Rafiqdoost; (8) Mohsen Rezai; (9) Mohammad Forouzandeh; and (10) Parviz Fattah.

372.    From 2011 through at least 2020, the same was true of Petro Nahad, which concentrated power over the petroleum sector in the hands of a small group of Khamenei Cell insiders. Throughout this period, whenever a bank, including SCB, directly or indirectly routed substantial value to Petro Nahad, such value flowed through Petro Nahad to the Khamenei Cell.

373.    Caspian Petrochemical FZE programmatically flowed funds to IRGC and Hizballah attacks sponsored by the above-identified Khamenei Cell members with respect to the Foundation for the Oppressed (from 2006 through 2020) and Petro Nahad (from 2011 through

150

2020). Accordingly, given IRGC custom and practice, a substantial share of Caspian Petrochemical resources flowed to the same terrorists identified in the preceding paragraphs during the same period and for the same purpose.

374.    Under decades of IRGC, Hizballah, Foundation, and SLO custom and practice, the Terrorist Sponsors ordinarily transferred a fixed percentage of the petroleum profits they received on all transactions to Hizballah. Numerous accounts, reports, and analyses, in real-time and thereafter, confirmed the gist of this practice. In 2009, for example, long-time Middle East analyst Ken Timmerman confirmed the sum and substance of the above: "Once Iran created Hezbollah in 1983, Mousavi coordinated the financing for it as the head of the Bonyad Mostazafan, which he chaired as prime minister. 'For example, working with Mehdi Hashemian, a deputy oil minister, Mousavi set up a scheme so that Hezbollah would get a share of Iranian oil sales,' Mesbahi said. … Under the scheme, Hashemian established front companies for the oil transactions in France, Germany, and Cyprus, 'and the banks would do the rest, putting commissions into the Hezbollah accounts under fictitious names,' [former Iranian intelligence officer, Abdolghassem] Mesbahi said."

375.    When SCB's transactions generated proceeds for those IRGC fronts, the proceeds flowing to those fronts were immediately at the disposal of key Khamenei Cell members who controlled them and operationalized the Khamenei-directed terrorist campaigns, most iconic of all being those in Israel and Iraq during the 2000s and 2010s. These were the same individuals— all senior IRGC and Hizballah leaders—who directed the Terrorist Sponsors' involvement in, and aid to, terrorist attacks in Israel and Iraq. Representative examples are set forth below.

376.    **Ali Khamenei.** Ali Khamenei was a lifelong IRGC member and operations leader, as well as Hizbalah's commander and most important financial, logistical, and weapons

151

sponsor. Congress has found that the "Supreme Leader is the leader of the 'Axis of Resistance,' which is a network of Tehran's terror proxy and partner militias materially supported by the Islamic Revolutionary Guard Corps that targets the United States as well as its allies and partners." Mahsa Amini Human Rights and Security Accountability Act, Pub. L. 118-50, Div. L, § 2(a)(9) (Findings), 138 Stat. 976 (Apr. 24, 2024).

377.    Ali Khamenei's terrorist attack-linked roles included, but were not limited to, serving as: (1) Supreme Commander for All Hizballah and IRGC Members from 1989 through 2025, each of whom swore a religious oath personally to Khamenei, and IRGC Brigadier General from 1979 until he ascended to his Supreme Commander role in 1989; (2) widely recognized leader of the Axis of Resistance from 1989 through 2025; (3) the overall controller of, and an ultimate financial beneficiary of, the Foundation for the Oppressed—which he personally helped create and operationalize as one of the IRGC's, and later Hizballah's, premier global operations fronts—from 1979 through 2025, (4) the overall controller of, and an ultimate financial beneficiary of, the SLO—which Ali Khamenei personally expanded and consolidated to optimize resource flow to promote terrorist attacks—from 1989 through 2025; (4) the overall controller of, and an ultimate financial beneficiary of, Petro Nahad—which Khamenei installed his son, Mojtaba Kjamenei, and his relative (Mojtaba's father-in-law, and key IRGC and Hizballah leader in his own right, Gholam-Ali Haddad-Adel from 2011 through 2025; (5) the overall controller of, and an ultimate financial beneficiary of, Caspian Petrochemical FZE from at least 2007 through 2020; (6) the Leader of, overall controller of, and an ultimate financial beneficiary of, Tehran's Friday Prayers Organization and Tehran Friday Prayers (*emamjomeh*) from 1989 through 2025.

378.    As the Supreme Commander of both Hizballah and the IRGC, Khamenei played an essential role in the operations of the Khamenei Cell, consistent with the widely recognized fact that, as Dr. Colin Clarke observed in 2015, terrorist leadership cells can function as the "mechanism by which insurgent groups plan, coordinate, and execute attacks." As former U.S. counterterrorism official Michael Rubin observed in 2008, "[t]hroughout its existence, the IRGC has had remarkably stable leadership." That was no accident: at all times since its creation in 1979, the IRGC has effectively been a transnational terrorist mafia dominated by a few dozen individuals, nearly all of whom played key roles from 1979 all the way through 2022. Indeed, terrorism scholars Dr. Saeid Golkar and Kasra Aarabi observed in 2021, with respect to "the IRGC's senior commanders": "42 years after the Guard's establishment, all top commanders belong to the first generation, which is regarded as the most ideologically zealous cohort."

379.    Through members of the Khamenei Cell, Ali Khamenei ensured that his share of the funds generated by SCB's illicit schemes flowed to Khamenei's top priority—sponsoring terrorist attacks targeting the Great Satan in the Middle East. Notably, Khamenei's lieutenants described below were each amongst the most extreme end of the IRGC and/or Hizballah (ideologically and operationally), and leaders of the Terrorist Sponsors' key financial, logistics, weapons, intelligence, and operations lanes. Each prioritized exporting the revolution through terrorist violence above all other considerations because they were loyal adjutants to Khamenei's edicts, history, and custom and practice to that effect. Each Khamenei Cell member and key terrorist operations leader below was a direct or indirect beneficiary of the Terrorist Sponsors with whom SCB directly transacted by doing business with their fronts, which are the same as the terrorist organization, prior to attacks against Plaintiffs.

153

380.    Separate from each Khamenei Cell member's direct share of the Terrorist Sponsors' assets as described below, each also received a second stream through SCB's misconduct, which generated massive sums of US. dollar cash flow to Ali Khamenei, who programmatically channeled most such sums back out to the key terrorist leaders who were executing his vision. Such transfers were centralized to, and primarily for the benefit of, meeting the financial, operational, and logistics needs of the Khamenei Cell members below.

381.    Accordingly, given Ali Khamenei's, IRGC's, the Foundation's, and SLO's custom and practice, Khamenei's terrorist contributions were routed primarily through one or more of the IRGC and Hizballah terrorists below—who collectively comprised nearly all his key financial and operations inner circle directly responsible for coordinating support for, and commission of, attacks in Israel and Iraq—by ordinarily using the financial resources of the Foundation for the Oppressed, SLO, and other fronts described herein given such Terrorist Sponsors' respective custom and practice, and terrorist tactics, techniques, and procedures.

382.    The custom and practice of each respective Terrorist Sponsor, and such terrorists' tactics, techniques, and procedures, when combined with the above context, meant that, for the Terrorist Sponsors, specific Khamenei Cell terrorists identified herein, including, but not limited to, those below, and specific operational context of Khamenei Cell-sponsored terrorist attacks in Israel and Iraq during the 2000s and 2010s, the hundreds of millions of U.S. dollars that SCB culpably flowed to the Terrorist Sponsors from at least 2001 through 2012 would have ordinarily flowed up and down the financial and logistical spines of the Terrorists Sponsors' terrorism machine, reaching, and benefiting, each IRGC and Hizballah terrorist through an array of separate channels, as described below. And each such IRGC and Hizballah terrorist, in turn, ordinarily spent most of their SCB-generated dollars they received to sponsor terrorist violence.

154

Critically, any contrary conclusion requires the impossibly dubious assumption that the senior-most members of Khamenei's operations-focused inner circle who most zealously follow him would disobey his rules, processes, and requirements, and fail to deliver desired attacks because, among other reasons, if such traits were present the terrorist in question would not have had the position they had, or likely even been alive.[83]

383.    Given the above, and other contextual factors, the most likely outcome attendant to most of SCB's illicit transactions and schemes alleged herein was to directly fund, and operationally support through concealment of vital network intelligence information (*see infra*), was that a large percentage of such money ultimately reached the terrorists below, who, in turn, used such funds to help Hizballah, Hamas, PIJ, and JAM conduct attacks in Israel and Iraq, including those against Plaintiffs or their loved ones.

384.    Given each Terrorist Sponsor's unique context, history, personalities, leaders, tactics techniques, and procedures, and custom and practice—all of which compel the conclusion that Plaintiffs' allegations above simply restate the ordinary practice and default setting that the Terrorist Sponsors and individual terrorists applied to transactions like those for which SCB conducted. Accordingly, any conclusion or inference that a large percentage of SCB's financial and operational support to the Terrorist Sponsors and specific terrorists herein did ***not*** flow to support their sponsored attacks in Israel and Iraq ***requires*** the dramatic conclusion—directly

---

[83] As is common with FTOs, the top leader in the organization (here, FTOs Hizballah and the IRGC) had a history and custom and practice of murdering or imprisoning nearly any senior Iranian leader who was a potential threat to him. And given Khamenei's approach, any member of his inner circle with the resources and attack power supplied by such status who was not loyal to him would have definitionally been an extremely unacceptable security risk for a terrorist who had been previously injured in an assassination attempt himself and was impossibly-to-overstate paranoid about the risk of IRGC defectors (*i.e.*, IRGC leaders who back another Supreme Leader) assassinating him or his son, and hoped for successor, Mojtaba.

contrary to the above context, history, tactics, techniques, and procedures, relationships, and custom and practice—that Khamenei and his inner circle Khamenei Cell members secretly deviated in a comprehensive—and forbidden/heretical (*haram*) manner by defying basic religious edicts of their Supreme Hizballah and IRGC Commander Ayatollah Ali Khamenei, and his predecessor, Supreme Hizballah and IRGC Commander Ayatollah Ruhollah Khomeini, many of which are identified with precision herein, as well as other directives to the IRGC, including, but not limited to, the Logistics Policy Directive.

385.    Given these unique contextual facts about the structure, relationships, history, ideology, operational context, and the like, each Khamenei Cell member below was a devoted follower of IRGC and/or Hizballah doctrine, Khamenei's edicts, and fulfilling the Terrorist Sponsors' core mission: export the revolution through anti-American attacks in the Middle East.

386.    DoD-published analyses confirmed in real-time that financial transactions that benefited Khamenei Cell members directly financed anti-American terrorist attacks. In 2011, for example, DoD published an analysis by Colonel Sean J. Corrigan (U.S. Army), titled *Exploitable Vulnerabilities of Iran's Islamic Revolutionary Guard Corps*, which concluded:

> As state sponsors of terrorism in accordance with the IRGC's asymmetric warfare doctrine, Iran's diplomatic instrument of national power is extremely vulnerable. The US and other nations should continue to condemn the support of terrorist organizations and discourage any other nation from entering into bilateral agreements with the terrorist state of Iran. … A tangible first step is to continue to indict key IRGC leaders, restrict their international travel, and seize their assets held abroad … [including] **IRGC senior officers** like ***[Mohammed Ali] Jafari***, [Ahmed] Vahidi, ***[Rostam] Ghasemi***, and ***[Qasem] Soleimani***.

387.    At all relevant times, the attacks sponsored by Ali Khamenei (inclusive of his agents) and committed by Hizballah, Hamas, PIJ, and JAM received cross-cutting support by the custom and practice of extracting substantial resources, funds, data, goods, systems, operatives, networks, intelligence, and logistical aid through transactions via the IRGC's and Hizballah's

156

commercial and bonyad fronts, including the Foundation for the Oppressed, NIOC, Caspian Petrochemical FZE, and the Ministry of Petroleum, among others, and from the *khums* Ali Khamenei and his agents universally collected from all members of the IRGC and Hizballah, as well as the same *khums* from any other pious (consistent with the Supreme Leader's doctrine) person of the Shi'a faith in Iran and other financial centers where IRGC operatives and allies were present and conducted business in large numbers, *e.g.*, Dubai.

388.    At all relevant times, Ali Khamenei effectively wielded commercial profits to finance unprecedented Hizballah-led, Qods Force-powered, Foundation- and SLO-funded, proxy violence targeting the United States and its allies throughout the Middle East. With respect to the terrorist attack value extracted by Khamenei, the IRGC, Foundation, and SLO from Iranian transactions involving sectors and firms seized by the Terrorist Sponsors, the funds, data, operatives, intelligence, and logistical aid supplied specifically by Khamenei and the Khamenei Cell through such means materially strengthened the effectiveness of the attacks facilitated by Terrorist Sponsors and committed by Hizballah, Hamas, PIJ, and JAM in Israel and Iraq by, among other ways, supplying more resources to improve the odds that each related proxy attack targeting the United States there is more effective, lethal, efficient, and frequent.

389.    Targeting the Khamenei Cell, the United States has singled out Khamenei and his inner circle, including the SLO and Foundation for the Oppressed, for sanctions in light of the regime's actions to "destabilize the Middle East" and "promote international terrorism." E.O. 13876. On November 4, 2009, the United States imposed counterterrorism sanctioned targeting Ali Khamenei and key Khamenei Cell members upon finding that the Khamenei Cell was "responsible for advancing Iran's radical agenda" through "a shadow network" of "advisors who

157

have for decades … exported terrorism … around the world" and enabled "the Supreme Leader's ability to execute his agenda of terror."[84]

390.　On November 4, 2009, the White House held a press briefing to confirm the Executive's rationale for its counterterrorism sanctions targeting Ali Khamenei and other members of the Khamenei Cell by emphasizing that the custom and practice of Khamenei, the IRGC, and the other sanctioned Khamenei Cell members—each of whom had been a committed IRGC terrorist since 1979—meant that substantial resources that flowed to such persons ordinarily enabled IRGC-backed proxy attacks in the Middle East:

> Treasury today took action against nine appointees and representative of Ali Khamenei, the Iran regime Supreme Leader ….
>
> … [O]ur action is specifically focused on further targeting ***the financial assets of the Supreme Leader's inner circle of military and foreign affairs advisors***. I think we all know that the power in Iran is not held by elected officials …. The power lies in the hands of the Supreme Leader, Khamenei, and his shadow network of corrupt appointees, who are … particularly exploiting, in this case, financial resources that should rightly belong to the Iranian people.
>
> ***For more than 40 years***, these privileged, unelected, self-enriching so-called revolutionaries have … exported their radical terrorist agenda across the region, ***which is why we are now today targeting them***. …
>
> … [W]e are sanctioning, today, ***Mojtaba Khamenei***, the second son of the Supreme Leader. He ***works closely with Qasem Soleimani***, the Commander of the Quds Forces, ***as well with the Basij, to advance his father's destabilizing agenda around the region***. And the list goes on and on. ...
>
> So today's anniversary [40 years after the U.S. Embassy was seized] is a stark reminder that ***we are dealing with, today, the same regime that sprung up 40 years*** ago; the same regime that remains committed to violence and hostage taking that our diplomats encountered so long ago.
>
> And again, as the Treasury joins in this fight, we will ***constrict the Supreme Leader's ability to visit his violence*** and to visit his ***malign agenda on the world***.

---

[84] U.S. Dep't of Treas., *Treasury Designates Supreme Leader of Iran's Inner Circle Responsible for Advancing Regime's Domestic and Foreign Oppression* (Nov. 4, 2019).

391.   **Qasem Soleimani.** Qasem Soleimani was a member of the Khamenei Cell from 1989 until his death in 2020. In or about 1989, Khamenei appointed Soleimani to a senior role in the newly created Qods Force, which the Iranian regime established to replace the Office of Liberation Movements as the IRGC's primary external operations, Hizballah-support, arm. In 1997, Khamenei named Soleimani the Commander of the IRGC Qods Force, which status endured through Soleimani's death in 2020. In 1997, Soleimani was appointed the Commander (*i.e.*, the leader) of the Qods Force (subordinate only to the Ayatollah), which role Soleimani always served until his death in a U.S. counterterrorism strike in Baghdad on January 3, 2020.

392.   Qasem Soleimani's terrorist attack-linked roles included, but were not limited to, serving as: (1) Overall Commander for IRGC Qods Force from 1997 until 2020; (2) the top ultimate financial beneficiary of the Foundation for the Oppressed from at least 1997 through 2020, inclusive of financial support directly to Soleimani through the Foundation supplied by other Khamenei Cell members including, but not limited to, donations to Soleimani through the Foundation by Ali Khamenei, Mojtaba Khamenei, Gholam-Ali Haddad-Adel, Mohammad Mokhber; Rostam Qasemi, Mohammad Ali Jafari, Mohsen Rezai, and Mohsen Rafiqdoost; (3) an ultimate financial beneficiary of the SLO from at least 1997 through 2020; (4) an ultimate financial beneficiary of Petro Nahad from at least 2011 through 2020; and (5) an ultimate financial beneficiary of Caspian Petrochemical FZE from at least 2007 through 2020.

393.   Qasem Soleimani was a hands-on micromanager, famous for his constant travels to, and coordination of, attacks by Hizballah and, through Hizballah, Hamas, PIJ, and JAM. As senior State official Brian Hook observed on April 8, 2019, "Qasem Soleimani said in March 2009, 'The battlefield is mankind's lost paradise.'" From 2006 through 2019, when every Plaintiff or their loved one was attacked in Iraq and Israel, Qasem Soleimani played a vital role

coordinating Iranian support to such attacks as routed through Hizballah and his long-time

Hizballah allies, many of whom were members of the Khamenei Cell. For example, as *Arab Press Service* reported in 2017, with respect to the "advisory roles" that were "being assumed by specialists from" the "IRGC's external arms - the Quds Force (QF) of Maj-Gen Qassem Suleimani and Lebanon's Hizbullah" in "Iraq, Lebanon, Syria and Yemen where they pose[d] as 'advisers'" and, in Soleimani's own words, such IRGC-QF and Hizballah operatives' roles in these countries was to serve as, per Soleimani, "the Iranian counterpart to the [U.S.] Central Command which [sic] is in charge of the Greater Middle East [] and the Horn of Africa." Likewise, as the DIA reported to Congress in 2018:

> As commander of the IRGC-QF, IRGC Major General Qasem Soleimani is a key architect and chief executor of Iran's foreign policy in … Afghanistan, Iraq, the Levant [*i.e.*, Lebanon, Jordan, Syria, and the Palestinian territories], and Yemen. He is one of the most recognized and popular military leaders in Iran and wields significant influence in Iranian foreign policy decisionmaking. His close relationship with Khamenei allows him to often directly advise and receive orders outside the traditional chain of command.

394.     From 2007 through 2020, Qasem Soleimani served as the ultimate decider of how, and where, the Khamenei Cell would deploy its resources to sponsor attacks led by Hizballah. Simply put, Soleimani effectively controlled all or nearly all the profits generated by the Khamenei Cell from 2007 until his death in 2020, and the Terrorists Sponsors' custom and practice meant that they programmatically managed such profits to ensure they ultimately flowed to Soleimani to spend on terrorist attacks by Hizballah, the IRGC (including the Qods Force and IRGC Intelligence Organization), JAM, Hamas, PIJ, and other Palestinian terrorists, among other FTOs. As Secretary of State Pompeo confirmed in his public warning on May 21, 2018 when he announced the full re-imposition of sanctions under the U.S. government's "Maximum Pressure" campaign, "Qasem Soleimani" ultimately controlled all or nearly all the profits generated by

160

"companies" that did "business with the Islamic Republic of Iran" in violation of U.S. sanctions because the Terrorist Sponsors' roles, customs and practices, networks, and structures ensured that,"*[a]t the end of the day, this money has flowed to him*," *i.e.*, Soleimani.

395. Qasem Soleimani was always a key supporter of the Terrorist Sponsor's programmatic emphasis on martyrdom and martyr payments, which Soleimani viewed (correctly) as the most important doctrinal and operational item to maximize the potency and lethality of IRGC attacks. Per Dr. Silinsky's analysis published by Marine Corps University in 2019: "By his own account, Soleimani yearns for martyrdom: 'In light of the prestige earned by the martyrs, I pray to God for my own end to be martyrdom as well, and that He will not deny me this mighty blessing granted to outstanding individuals.'"

396. Qasem Soleimani famously published a statement, which he caused to be transmitted through intermediaries to General David Petraeus, that admitted:

> *I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan.* And indeed, the ambassador in Baghdad is a Qods Force member. The individual who's going to replace him is a Qods Force member.

Thereafter, Soleimani's 2008 admission to General Petraeus was widely reported upon, and republished, by governmental and media outlets in the U.S., Europe, and the Middle East, as well as by General Petraeus and the IRGC.

397. From the early 2000s through 2020, Qasem Soleimani programmatically directed the profits he controlled to Hizballah, Hamas, PIJ, and JAM attacks in Israel and Iraq, among other places. Statements by United States, Iran, and media reports confirm it. In 2018, for example, Secretary of State confirmed Soleimani's programmatic control of all profits, in effect, to channel such funds towards terrorist attacks. In 2022, similarly, *Radio Free Europe* published a leaked recording of a conversation between IRGC Commander-in-Chief Mohammad Ali Jafari

161

and a top IRGC financier, the gist of which confirmed, according to *Radio Free Europe*, that Khamenei Cell members like "Mohammad Ali Jafari," "Qasem Soleimani," and "Hossein Taeb," were part of IRGC "mafia networks" and "systematic corruption" who were direct financial beneficiaries of the IRGC profits they programmatically controlled and used such profits to "funnel revenue to groups that support the regime, including mercenaries working closely with the IRGC's Quds Force … for military operations abroad" and "support[] the activities of the so-called Resistance Front—a term used by Iranian officials and media to refer to an anti-Israel alliance including Iran, Lebanese Hizballah, Syria, and Palestinian groups." Terrorism scholars also confirmed the point, as did Iranian statements after Soleimani was killed in 2020.

398.    Qasem Soleimani leveraged such IRGC and Foundation resources to serve as a key sponsor of Hizballah attacks in the Middle East, including Hizballah proxy attacks through Hamas and PIJ in Israel and JAM in Iraq, for all of which Soleimani supplied key funds, recruits, logistics, and intelligence support. For example, Secretary of State Pompeo confirmed in 2018 with respect to Soleimani, "[w]ealth created by the West has fueled his campaigns," and "[a]t the end of the day, this money" from economic activity such as oil and gas exports "has flowed to him." In 2019, likewise, Secretary Pompeo reiterated that the monetary flows from commercial profits to Qasem Soleimani personally were programmatic and further explained that because the "Iranian regime not only supports terrorist groups, but engages in terrorism itself," United States policy sought to "bring[] unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani" who "dole[d] out the regime's profits to terrorist groups across the region and around the world." Mainstream media outlets, likewise, reported that Soleimani managed commercial profits to fund attacks in Israel and Iraq. In 2015, for example, *Reuters* reported that "IRGC companies" that were "able to 'move money through

global banks" and "obtain and extend credit" by "get[ting] the backing of European export[ers]" could enable "IRGC entities such as the elite Quds force, which carries out overseas operations" (*i.e.*, attacks) through IRGC terrorists, "[a]mong them, Quds commander Qasem Soleimani," who "had a high-profile role in advising Shi'ite militia leaders in Iraq." [85]

399.    Reports and statements by IRGC outlets and Qasem Soleimani himself confirmed Soleimani's ability to directly support Hizballah, Hamas, and PIJ attacks in Israel depended upon the economic resources available to him through the various fronts and fundings sources upon which he relied. In 2016, for example, IRGC media arm *Mehr* reported on "General Qassem Soleimani's meeting with Palestinian Hamas leaders" when "Soleimani … had met with a delegation of Hamas where he promised further support for [Hamas] 'even in the face of more crushing sanctions by the west against Iran'" and "Soleimani … criticizes some circles who held that Iran was seeking 'national interests' in its support for Palestine" to which Soleimani replied:

> This is an inaccuracy and the Islamic Republic of Iran has not such a policy or thinking behind its support for Palestine since the Revolution. I would be pleased to have you ***inform our brethren in Gaza and elsewhere that our support for you is unconditional and something agreed upon with God. However, this support might have been less in some times which has been due to the economy and has had nothing to do with policy changes***.

400.    Israeli officials confirmed, with detailed presentations, the direct role that Qasem Soleimani personally paid in funding, arming, and directing Hizballah, Hamas, and PIJ attacks in Israel, including rocket, hostage-taking, and assassination attacks. In 2018, for example, Israeli media outlet Yedioth Ahronoth reported on an interview in which Israeli Intelligence Minister Yisrael Katz "iterated his belief that Iran was behind the most recent round of hostilities" and

---

[85] As *republished in* El Economista (Spain) and translated via Google.

publicly confirmed that Qasem Soleimani had played a direct role instigating terrorist attacks against Israel. In the same interview with Yedioth Ahronoth, Katz publicly confirmed:

> The tunnel (which was destroyed []) was targeted to preserve deterrence [against] … the salvos of rockets [used to attack Israel in 2017] …

> We know Iran is stirring the pot in Gaza. Hamas leader (in Gaza) Yahya Sinwar gave an interview to Arab media last week and extolled his relationship with (Quds Force commander) Qasem Soleimani, the Revolutionary Guard, Quds Force and Hezbollah. They are receiving funding from them. Iran is working to envelop Israel in fronts. To wit, Iranian rockets were fired in the last 24 hours.

401.    Qasem Soleimani personally directed all IRGC-QF involvement in attacks targeting America in the Middle East. Indeed, Soleimani admitted it in his infamous letter to General Petraeus. A litany of other reports during that period also confirmed the point. In 2018, for example, Iran scholar Nader Uskowi testified before Congress that "Quds Force commander, General Qasem Soleimani, frequently meets with the Hezbollah's leader, Hassan Nasrallah, and his senior aides"—*i.e.*, the other Hizballah members of the Khamenei Cell—and ensured that "Quds Force senior officers also participate[d] in Hezbollah's decision-making process at its highest levels regarding all … terrorist operations carried out by" Hizballah "as part of Quds Force's larger campaigns," which was pursuant to the Terrorist Sponsors' decades-long "practice" that "began in the first days of the founding of Hezbollah" of executing Khamenei- and IRGC-sponsored attacks through a "joint command-and-control structure" operated by the "Qods Force" and "Hezbollah." Testifying before Congress in 2017, Dr. Mara Karlin observed that "Qassem Soleimani is the decider now of Hizballah's future not Hassan Nasrallah" such that it "is now clear that Soleimani says jump and Hizballah asks how high" and, accordingly, "Iran is willing to fight to the last Hizballah member" and "it appears Hizballah is, too."

164

402.    In 2020, the U.K. government published an analysis confirming that "Soleimani was one of the architects of Iran's policy of projecting power across the region by arming proxies such as Hezbollah." As terrorism scholar Barbara A. Leaf observed before Congress in 2020:

> Both architect and orchestrator of Iran's destructive regional policies in Syria, Lebanon, Iraq, Yemen and Bahrain, Soleimani had achieved a singular stature in Iran and in the wider Middle East by dint of his own extraordinary media profile and the multiple successes he claimed on behalf of Tehran: … [including] for his ***unmatched role as kingmaker or breaker in Iraq, in no small part through the network of militias he had created, groomed, trained and resourced*** from the early months after the 2003 invasion of Iraq. As my colleague, Phillip Smyth, has neatly put it, 'Iran's Shia militia network are their true nuclear program and one that has achieved measurably huge results for Tehran' in the region. At the time of his death Soleimani thus appeared to be a Colossus bestride the region.

403.    Qasem Soleimani was always a key sponsor of attacks by Hizballah, Hamas, PIJ, and other Axis proxies in Israel, for which he supplied key funds, recruits, logistics, and intelligence support. Among other ways, Soleimani organized meetings in Iran, Lebanon, and Syria, in which IRGC, Hizballah, and above Palestinian terrorist fighters or supporters coordinated their sponsorship of Hizballah, Hamas, PIJ, and other attacks in Israel to optimize the terrorists' efficiency (more attacks working), lethality (when attacks work, more killings), and operations tempo (more attacks at a quicker clip).

404.    Reports and statements published by the terrorists themselves confirmed both (a) Soleimani's direct, and difference-making, role in facilitating Hizballah, Hamas, and PIJ attacks in Israel; and (b) Soleimani's devotion to sponsoring such attacks. In 2014, for example, IRGC media arm *Fars* reported that "Qassem Soleimani reiterated Iran's call for supplying … Hamas and its affiliated brigades with more weapons to defend … against the Israeli army" and Soleimani "expressed hope that" Hamas "would turn land and sky into hell for the Zionists soon through its massive defensive operations." In 2017, likewise, "Hamas leader"—and operations mastermind—"Yahya Sinwar boasted of his contact with Qassem Suleimani, head of the Iranian

Revolutionary Guard's Quds Force, and of Suleimani's pledges of support," as reported by former U.S. official Elliott Abrams in 2018.

405.    Reports published by terrorism scholars, NGOs, and news organizations also confirmed that Soleimani's assistance played a pivotal role in the success and scale of Hizballah's, Hamas's, and PIJ's attacks (and campaigns of attacks) in Israel. For example, writing in *Israel National News* in 2019 after Soleimani's sponsorship of waves of Hamas and PIJ attacks in Israel for more than two decades, one Israeli analyst ruefully observed: "The two Palestinian terrorist groups in Gaza [*i.e.*, Hamas and PIJ] are now taking their orders from Qassem Soleimani, the shrewd commander of the Quds Force of the IRGC, and abusing the current unofficial ceasefire with Israel to further build-up their military apparatus. The two Iranian proxies [*i.e.*, Hamas and PIJ] are not interested in improving the dire living conditions in Gaza with the money they receive from … Iran."

406.    Qasem Soleimani was always a key sponsor of EFP attacks by Hizballah and JAM targeting the United States in Iraq. Indeed, EFPs were Soleimani's iconic attack role targeting the United States, and the one for which Soleimani helped kill hundreds of Americans in Iraq from 2005 through 2011—more Americans than anything else Soleimani was known for. Soleimani personally sponsored EFP attacks by Hizballah and JAM in Iraq, including the June 23, 2011 EFP attack that killed **Dr. Stephen Everhart**, whose family are Plaintiffs, for which Soleimani personally directed Hizballah's flow of key funds, recruits, logistics, and intelligence support to the specific joint Hizballah/JAM cell in Baghdad that committed the June 23, 2011 attack. Among other ways, Soleimani: (1) personally channeled funds to senior leaders of Hizballah and JAM who facilitated the attack, including but not limited to, Hassan Nasrallah, Hizballah's in-country Iraq terrorist leadership, and JAM leaders in Iraq; (2) coordinated

166

Hizballah's procurement, smuggling, safekeeping, and deployment of EFPs in Iraq; (3) coordinated Hizballah's training of JAM fighters in EFP-specific tactics, techniques, and procedures; (4) personally promoted martyrdom indoctrination campaigns that spurred more effective, and lethal, Hizballah and JAM recruits in Iraq in particular; and (5) personally developed, along with Hizballah, intelligence networks in Baghdad that supplied pre-attack intelligence that was essential to the success of any EFP attack targeting Americans in the most heavily-secured city in Iraq.

407.    DoD-published analyses confirm that Qasem Soleimani directly played a vital role propagating lethal attacks targeting Americans in Iraq. In 2011, for example, DoD published an analysis that concluded that "Qods Force Commander Soleimani" was reportedly "the most powerful man in Iraq, without question" and observed that, "[i]n reference to the significant casualties US Forces sustained in June 2011,"—when Dr. Everhart was murdered—"the Director General of the intelligence division in Iraq's Ministry of Interior, Hussein Kamal assessed, 'It is clear that the al-Quds Force is responsible. There has been a systematic flow of weapons into Iraq for the past eight years. Of course they try to say it is not state-sponsored. But when weapons are flowing from the borders of a sovereign state, it is very clear where the blame lies. They are destructive weapons and they cannot deny the responsibility for them.'" The "weapons" Kamal described were EFPs and modified 107mm rockets called, both of which Soleimani coordinated with Hizballah and JAM to unleash on Americans in Baghdad that month.

408.    Soleimani's Shia terrorist proxies in Iraq have confirmed his vital role. In 2020, for example, as an "Iraqi militia commander" explained to the *Daily Mail* that "Soleimani has taught us that death is the beginning of life, not the end of life."

409.     After the United States killed Qasem Soleimani in January 2020, U.S. government leaders confirmed at the time that Qasem Soleimani was a uniquely effective terrorist mastermind personally responsible for the murder of at least hundreds of Americans and, by any measure, more American terrorist attack victims than any other single terrorist after 9/11. For example, the below U.S. leaders made the following statements on January 2-3, 2020:

a.      President Donald J. Trump observed that "Qassem Soleimani" was "the number one terrorist anywhere in the world," and "directly and indirectly responsible for the death of millions of people" from his organization of terrorist violence by Axis proxies throughout the Middle East, through which "Soleimani has killed or badly wounded thousands of Americans over an extended period of time, and was plotting to kill many more."

b.      Senator Elizabeth Warren observed that "Soleimani was a murderer, responsible for the deaths of thousands, including hundreds of Americans."

c.      Senator Lindsey Graham observed that "Soleimani was one of the most ruthless and vicious members of the Ayatollah's regime. He had American blood on his hands." He also observed: "We killed the most powerful man in Iran short of the Ayatollah." Referencing Soleimani's direct, personal role leading Khamenei Cell-backed attacks, Senator Graham stated: "He was the right fist of the Ayatollah and we took the Ayatollah's arm off. … [Soliemani was] the guy who is spreading terror throughout the world. When you say that Iran is the largest state sponsor of terrorism, the question is who leads that effort? It was Soleimani."

410.     Qasem Soleimani was a U.S.-listed Specially Designated Global Terrorist from October 17, 2011 until his death in 2020. He was also a U.N.-sanctioned proliferator who violated embargoes meant to stop the "IRGC" from enabling "violence" from weapons like "missiles" from March 24, 2007 until his death in 2020. For example, when the U.N. Security Council designated "Qasem Soleimani (Commander of Qods force)" in 2007, it did so upon finding that his conduct was "clearly a grave threat" to civilians in "a region that had known too much … violence" by enabling IRGC "development of sensitive technologies" like "missiles or missile systems" and "unmanned aerial vehicles (UAVs))," which the "IRGC" had "boasted of using" as "part of its asymmetric warfare doctrine."

168

411.    **Rostam Qasemi.** Rostam Qasemi was a member of the Khamenei Cell from, at least, 2007 through his death in 2022. Throughout, Qasemi served as an active sponsor of Hizballah and member of the IRGC Qods Force with the rank of Deputy Commander, and the specific lane of helping coordinate sanctions evasion with Hizballah to support Hizballah attacks. In such capacity, Qasemi served as Minister of Petroleum and/or de facto leader of Qods Force and Hizballah petroleum smuggling from 2011 through 2020, which were designed to, and did in fact, directly enable terrorist attacks by Hizballah in Israel and Iraq.

412.    Rostam Qasemi's terrorist attack-linked roles included, but were not limited to, serving as: (1) Deputy Commander of IRGC Qods Force from 1997 until 2020; (2) Commander of IRGC-run operations and logistics powerhouse firm Khatam al-Anbiya from 2007 until 2011, for which he was always an ultimate financial beneficiary; (3) Minister of Petroleum from August 2011 until 2013; (3) an ultimate financial beneficiary of the Foundation for the Oppressed from at least 1997 through 2020, (3) an ultimate financial beneficiary of the SLO from at least 1997 through 2020; (4) an ultimate financial beneficiary of Petro Nahad from at least 2011 through 2020; and (5) an ultimate financial beneficiary of Caspian Petrochemical FZE from at least 2007 through 2020.

413.    A fanatical IRGC Qods Force leader and follower of Khamenei and Khomeini, Rostam Qasemi publicly pledged to sponsor attacks targeting the United States through its allies and interests in the Middle East. For example, on August 26, 2011—the same month he became Minister of Petroleum—IRGC media arm IRNA reported (in English), which BBC re-reported, that Iran's new "Oil Minister" was among a "number of Iranian top officials" who "voice[d] support for Palestinians," and "condemn[ed] Israel" and held an organized media event to

169

"announce[] their strong backing for the initiative of … the late Imam Khomeyni, in designating the last Friday of the fasting month of Ramadan as the World Quds Day" including:

> Oil Minister Rostam Qasemi: ***"Support for Palestinians in the campaign against Tel-Aviv will continue until annihilation of the Zionist regime."***

414.    In January 2012, likewise, Rostam Qasemi (inclusive of his agents) publicly threatened to help the IRGC conduct attacks in the Middle East specifically designed to threaten the United States, including threats to conduct attacks in the Strait of Hormuz.

415.    Rostam Qasemi programmatically converted the profits he managed and received through SCB's scheme into attacks targeting the United States. Most importantly, Qasemi was a fanatical disciple of Khamenei and Soleimani, both of whom prioritized exporting the revolution through terrorist attacks above all else. Accordingly, Qasemi necessarily followed Khamenei's, Soleimani's, and the IRGC's ordinary custom and practice of dedicating most of the resources he controlled to sponsoring terrorist violence. Any other conclusion would contradict decades of the relevant actors' custom and practice, ideology, relationships, and statements, including those referenced herein. Moreover, Qasemi openly threatened to use oil as a "weapon" to target the United States. For example, he did so during an interview with regime media in November 2011, which was reported in Iranian media, and re-reported by BBC, in real-time.

416.    Reports published by NGOs and terrorism scholars confirmed in real-time, and alerted SCB, that Rostam Qasemi was a key IRGC Qods Force operations-facing leader who would be expected to programmatically channel resources he could access through his role in an IRGC-held monopoly to Hizballah and the Qods Force to facilitate terrorist attacks. On April 3, 2012, for example, *Business Wire* published a release by United Against Nuclear Iran (UANI), in which UANI's CEO, Ambassador Mark D. Wallace, observed that the "IRGC" was "the brutal and corrupt apparatus in Iran that directs the regime's… terrorist activities across the globe" and

in a context in which "the IRGC commander, Rostam Ghasemi, currently holds a position" on the Board of a sanctioned entity, consistent with the IRGC custom and practice in which, "[t]hrough its control" of "major manufacturers, the Iranian regime and the IRGC hold an effective and lucrative monopoly on [a key economic] sector." Accordingly, UANI and Ambassador Wallace confirmed (and warned multinational firms, including SCB): "By partnering with the Iranian regime, [such firm] is supplying the technology and funds necessary for the IRGC to perpetuate this monopoly, continue its dominance over large swaths of the Iranian economy and fund its efforts" to "sponsor terrorism around the globe" as "the world's number one state sponsor of terror."

417. On September 4, 2019, Treasury designated Rostam Qasemi as a Specially Designated Global Terrorist for supporting terrorist attacks by Hizballah, the Qods Force, and their proxies throughout the Middle East, and specifically "linked" him to Qasem Soleimani ("SOLEIMANI, Qasem") and the IRGC-QF ("QODS FORCE") in the text of OFAC's designation itself. In the accompanying release, Treasury confirmed that "Senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi oversees [the IRGC-QF's and Hizballah's] sprawling network, which features dozens of ship managers, vessels, and facilitators" that "is directed by and financially supports the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy Hizballah" and "directly funds acts of terrorism by Iranian proxies" through the long standing IRGC custom and practice under which "[t]he IRGC-QF's highest-ranking officials have long overseen exports of Iranian oil, often masking its origins and sending it to … IRGC-QF proxies across the region" and in which "IRGC-QF Commander Qasem Soleimani (Soleimani) supervises fellow IRGC-QF official Rostam Qasemi, who has continued taking advantage of his domestic and international connections in the energy

industry since his tenure as Iran's Minister of Petroleum from 2011 to 2013" and in which "IRGC-QF official Rostam Qasemi … manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil," for which "the IRGC-QF" sold petroleum products "worth hundreds of millions of dollars or more through this network for the benefit of … Hizballah, and other illicit [Axis proxy] actors." The United States designated Rostam Qasemi based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by him that enabled terrorist proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

418. **Mojtaba Khamenei.** Mojtaba Khamenei was a member of the Khamenei Cell from 1989 through 2024. Ayatollah Khamenei's son, and widely assumed heir, always served as de facto leader of the SLO and IRGC Intelligence Organization, Khamenei's gatekeeper, and one of Khamenei's coordinators with Hizballah, the IRGC, Hamas, PIJ, and JAM, including such groups' terrorists who served in the Khamenei Cell.

419. Mojtaba Khamenei was such a hardened IRGC terrorist that he was widely viewed as even more extreme than even his father. In 2009, for example, *Radio Free Europe* reported that "Mojtaba Khamenei … is said to be more hard-line than his father," and the U.K.'s *Guardian* reported that "Mojtaba Khamenei … is an austere figure, generally seen as more hardline than his father." In 2017, likewise, *Al Arabiya* reported that "Mojtaba Khamenei … greatly influences the Revolutionary Guards and is believed to be close to extremist fundamentalists" and was known for "working with the Revolutionary Guards to violently" target perceived regime enemies. As UANI explained in 2021, "Mojtaba's close ties with the

172

IRGC" enabled him to "install allies and influence in the extraterritorial Quds Force," and IRGC "Intelligence Organization," among other IRGC components to which Mojtaba was closely tied.

420. In 2005, Mojtaba Khamenei assumed a dramatically elevated position of prominence in Iran and amongst Khamenei's inner circle and effectively assumed his status as proxy for Ali Khamenei and leader of the Supreme Leaders's Office. Mojtaba fully assumed the roles he has held ever since: Ali Khamenei's chief of staff, gatekeeper, interlocutor with terrorist leaders and proxies, enforcer, and financial manager, among other roles. For example, in June 2025 *Reuters* reported that "[o]ver the past 20 years, Mojtaba has built close ties with the Guards, giving him added leverage across Iran's political and security apparatus." Other reports, likewise, trace Mojtaba's emergence to in or about 2005.

421. From in or about 2005 through present, Mojtaba Khamenei has served as the primary gatekeeper to, and liaison between, among others, (1) the SLO and IRGC; and (2) Ali Khamenei and key terrorist leaders, including many members of the Khamenei Cell. In 2009, for example, *Radio Free Europe* reported that "Mojtaba Khamenei has a powerful unofficial position as the gatekeeper for *all* who want to contact his father. His role is reported to include acting as an interface between his father and the Office of the Supreme Leader." In 2009, similarly, the U.K.'s *Guardian* reported that "Mojtaba Khamenei, … has become a gatekeeper for access to the beit-e-rahbari [SLO], the supreme leader's home, and the supreme leader himself." In 2009, *Newsweek* reported that the "Supreme Leader … began turning" to "Mojtaba Khamenei, as his agent and enforcer" during the mid-2000s and, as of 2009, "Mojtaba" was "the Supreme Leader's main conduit to the outside world." In 2014, likewise, *Iran Briefing* reported that "Mujtaba is the main link between [Ali Khamenei's] office [*i.e.*, SLO] and the IRGC, as

well as dozens of Khamenei's advisors and [SLO] staff." And in 2018, *Fair Observer* reported that the "IRGC …is directly run by Ayatollah Khamenei and his son, Mojtaba Khamenei."

422.    Mojtaba Khamenei's inner circle essentially mirrored that of Ali Khamenei, and accordingly, Mojtaba was inextricably connected to, among others, his close, decades-long allies in the Khamenei Cell, including, but not limited to, Hizballah Secretary General Hassan Nasrallah, IRGC Qods Force Commander Qasem Soleimani, IRGC Commander-in-Chief Mohammed Ali Jafari, and IRGC Intelligence Organization Commander Hossein Taeb. In 2009, for example, the *Washington Post* reported that a "second generation of revolutionaries, called princip[a]lists, who have wrested control of the security instruments" [*i.e.*, IRGC] … includes Mojtaba Khamenei, the supreme leader's son and chief of staff; … Major Gen. Mohammad Ali Jafari …; [and] [C]ommander Hasan Taeb… [among others]." In 2022, likewise, Jason Brodsky of UANI, as published by the Middle East Institute, observed that "Mojtaba [Khamenei] has also maintained an expansive reach in Iran's security institutions, most especially in the IRGC." According to Brodsky, "Mojtaba has long been known for his personal association with [IRGC-IO Commander Hossein] Taeb," his "close links to" and "connection" with the "Quds Force," and Mojtaba's "U.S. sanctions designation noted his close work with the commanders of the IRGC's Quds Force and the Basij, and that's not to mention the sprawling network of key deputies he built across other components of the IRGC, like the IRGC-IO."

423.    Mojtaba Khamenei played a vital leadership role over Hizballah and the IRGC, through both his status as proxy for Ali Khamenei, Supreme Commander of Hizballah and the IRGC alike, and through Mojtaba's own deep relationships with the top leaders of both groups. In 2010, Iason Athanasiadis, a writer who lived in Iran from 2004 to 2007, explained that "Ali Khamenei … seeks to retain a measure of control over the Islamic Revolutionary Guard Corps

174

through his son Mojtaba Khamenei, the product of a clerical-military environment" because "Ali Khamenei lacks the religious authority of his predecessor and founder of the Islamic Republic, Ruhollah Khomeini." As IRGC scholars Ramin Parham and Saeed Ghasseminejad summarized in 2014, "it is no secret that Mojtaba's most valuable credentials are his close ties with the IRGC and its related security apparatus." As *Reuters* reported in 2025, "Mojtaba Khamenei is one of the most influential figures in the Iranian clerical establishment headed by his father, Supreme Leader Ayatollah Ali Khamenei," and "a hardliner with close ties to the Revolutionary Guards." In a 2024 profile of Mojtaba, likewise, Lebanese outlet *This is Beirut* reported: "Since the early 2000s, Mojtaba Khamenei has become a powerful behind-the-scenes figure in Iranian politics."

424.    From 2005 through 2025, as effective head of the SLO, Mojtaba Khamenei was always inextricably connected to both SLO resources and the resources of the subset of Iranian firms and foundations (bonyads) directly controlled by Ali Khamenei, for which the Foundation for the Oppressed always comprised the crown jewel of SLO resources. That was because the SLO, led by Mojtaba in his role as proxy for his father, had comprehensive supervisory authority over all aspects of the Foundation's management, finances, operations, and decision-making. In so doing, Ali Khamenei and Mojtaba Khamenei effectively guaranteed that Foundation resources always flowed to support both such terrorist's top overall objective of sponsoring terrorist attacks targeting the United States to export the revolution, while also ensuring that Ali Khamenei, Mojtaba Khamenei, and their Khamenei Cell allies maintained an ironclad grip on Foundation and SLO resources to ensure reliable, robust, and resilient financial support to their Qods Force-sponsored attacks by Hizballah, Hamas, PIJ, and JAM in the region.

425.    From in or about 2005 through 2025, Mojtaba Khamenei directly benefited from any resources that flowed to Ali Khamenei, which Mojtaba functionally controlled.[86] As Hoover Institution Iran scholars Sanam Vakil and Hossein Rassam observed in 2020: "Mojtaba Khamenei's role is also important to consider. Mojtaba plays the role of gatekeeper for his father, protecting his resources, reputation, and network. This position is readily apparent in the howzeh (seminary), where a cleric's son or close family member becomes a close, trusted interlocutor for his father or relative."

426.    According to an analysis published by the award-winning Iranian diaspora media outlet *Tehran Bureau* in 2021, in the context of an Iranian economy dominated by "the 'vertical and horizontal monopolies' controlled by major bonyads" that extracted "revenue from multiple strategic economic sectors" through "a form of institutionalized corruption designed to divert public funds into the bank accounts of elite businesses and individuals" from "a chosen circle of individuals," Mojtaba Khamenei's oversight role of bonyads under his father's jurisdiction (which always included the Foundation for the Oppressed) ensured Ali Khamenei's and Mojtaba Khamenei's shared ability to optimize the flow the funds they controlled to the ends they sought:

> Untaxed and unaccountable to the government, bonyads are allocated trillions of dollars in state benefits. The only institution with any oversight over their opaque finances is the Office of the Supreme Leader (Beyt-e Rahbari). As the bonyads under its purview expanded their portfolios, the office staff has grown to thousands of employees under the leadership of Ayatollah Khamenei's son Mojtaba, who acts as its chief of staff. Whoever oversees the bonyads wields power over Iran's economy ….
>
> The largest bonyads are managed by leading clerics, politicians, and [IRGC] generals, while members of the Islamic Revolutionary Guard Corps (IRGC) sit on the boards of important bonyad-run companies in nearly all

---

[86] Also in 2005, Mojtaba Khamenei was widely credited (correctly) with leading the effort, alongside the IRGC, to rig Iran's presidential election so that Mahmoud Ahmadinejad, an IRGC member and ally of Ali Khamenei and Mojtaba Khamenei, could win. This was broadly viewed as a seminal moment that announced Mojtaba's ascension into IRGC leaders' inner circle.

176

economic sectors. Selecting people close to him to run the bonyads … is Khamenei's way of ensuring that Iran's wealth remains in its current hands.

427.    Mojtaba Khamenei's terrorist attack-linked roles included, but were not limited to, serving as: (1) an IRGC member and leader since the 1980s; (2) widely recognized proxy for, interlocutor for, and gatekeeper to, Ali Khamenei and nexus point between Khamenei and the terrorist operatives he directly sponsor, *e.g.*, Qasem Soleimani and Hassan Nasraallah, through the Foundation for the Oppressed and Supreme Leader Office resources Mojtaba Khamenei controlled from at least 2005 through 2020; (3) as Ali Khamenei's proxy and gatekeeper, the effective overall controller of, and an ultimate financial beneficiary of, the Foundation for the Oppressed—which he comprehensively supervised, and benefited from, given the SLO's oversight role, and financial nexus with, the Foundation, from at least 2005 through 2020, (4) as Ali Khamenei's proxy and gatekeeper, the effective overall controller of, and an ultimate financial beneficiary of, the SLO—which Ali Khamenei personally expanded and consolidated to optimize resource flow to promote terrorist attacks—from 1989 through 2025; (4) as Ali Khamenei's proxy and gatekeeper, one of the two effective overall controller of, and an ultimate financial beneficiary of, Petro Nahad—which Mojtaba led alongside his father-in-law, and IRGC terrorist leader, Gholam-Ali Haddad-Adel, *infra*—from 2011 through 2025; (5) as Ali Khamenei's proxy and gatekeeper, the effective overall controller of, and an ultimate financial beneficiary of, one of two effective overall controllers of, and an ultimate financial beneficiary of, Caspian Petrochemical FZE a/k/a Iranian Petrochemical Company from at least 2007 through 2020 (alongside Gholam-Ali Haddad-Adel, *infra*); (6) as Ali Khamenei's proxy and gatekeeper, the effective manager of a substantial percentage of the resources generated by Tehran's Friday Prayers Organization and Tehran Friday Prayers (*emamjomeh*) from at least 2005 through 2020.

177

428.    Mojtaba Khamenei was inextricably connected to attacks sponsored by Hizballah and the Qods Force in the Middle East. Among other reasons, Mojtaba—following Ali Khamenei's decades-long custom and practice—channeled his financial resources directly to the key operations leaders who supported terrorist attacks, including, but not limited to, Hizballah Secretary General Hassan Nasrallah, IRGC Qods Force Commander Qasem Soleimani, IRGC Commander-in-Chief Mohammed Ali Jafari, and IRGC Intelligence Organization Commander Hossein Taeb. From 2005 through 2025, Mojtaba Khamenei programmatically directed the profits he controlled on behalf of Ali Khamenei, the SLO, Foundation for the Oppressed, Petro Nahad, and Caspian Petrochemical, among other sources, to the Qods Force and Hizballah, among others, for the specific purpose of facilitating IRGC- and Hizballah-backed attacks by Hizballah, Hamas, PIJ, and JAM in Israel and Iraq, among other places. Findings and statements by the United States confirm Plaintiffs' allegations. In 2019, for example, Treasury and the White House both confirmed that the United States sanctioned Mojtaba based on a similar finding, *infra*.

429.    Like his father, Mojtaba Khamenei prioritized sponsoring proxy attacks in Israel, by Hizballah, Hamas, and PIJ, as a requirement of exporting the revolution.

430.    Mojtaba Khamenei has admitted that he sought (and seeks) to destroy Israel through catastrophic terrorist attacks. For example, as Fox News reported in 2020, Mojtaba stated during an interview in 2018 with the Al-Ayam TV: "Israel this 'cancerous tumor' will be eradicated in a few years."

431.    Reports by mainstream media outlets and terrorism scholars confirmed that Mojtaba Khamenei channeled the resources he managed to sponsor proxy terrorist attacks throughout the region. On June 25, 2009, for example, the *Los Angeles Times* reported that

178

"Mojtaba Khamenei" had elevated his "influence" in "2005" and served as Khamenei's proxy who "operate[d]" in "an overlapping world that stretche[d] from Iran's Revolutionary Guard [C]orps" to the SLO in which Mojtaba ensured that the resources that flowed to the key entities he controlled—which always included the SLO and Foundation for the Oppressed given the SLO's command position over it—were directed to the use that was always Ali Khamenei's top priority: terrorist attacks to export the revolution. In the same report, Iran scholar Said Idriss confirmed that Mojtaba managed the process through which the Terrorist Sponsors programmatically channeled the off-books IRGC- and Khamenei-linked resources that Mojtaba controlled into proxy attacks, explaining that "Mojtaba's hands are well into the [Revolutionary Guard] hierarchy," and "the financial management" practiced by the Iranian regime entailed Mojtaba and his IRGC allies channeling "billions of dollars" to terrorist ends to be "use[d] to support their regional political agenda," *i.e.*, Terrorist Sponsors' facilitation of proxy attacks targeting the United States in Israel and Iraq, among other places in the region.

432.    IRGC scholars Ramin Parham and Saeed Ghasseminejad, likewise, observed in 2014 that "the IRGC" included "a vast paramilitary branch, a well trained internal and extraterritorial intelligence apparatus and a vast ***military-industrial complex controlling the most important sectors of Iran's economy***" for which "Mojtaba Khamenei" comported with Ali Khamenei's custom and practice of programmatically channeling resources of his "astronomic ***network of financial firepower***" to Qasem Soleimani, the IRGC-QF and IRGC-IO:

> Following in his father's footsteps, Mojtaba Khamenei is personally involved in military programs and intelligence affairs. Also well known are the strong bonds between Mojtaba and Qasem Soleimani – the commander of the IRGC's Qods Force and the most powerful operative in the Middle East.

433.    Mojtaba Khamenei played an irreplaceable, direct, role in financing terrorist attacks in the Middle East that provided unparalleled support to Axis of Resistance attacks, on

179

the financial side comparable to the unparalleled operational role played by Qasem Soleimani. In 2025, for example, former U.S. counterterrorism official Michael Rubin explained, as published by the American Enterprise Institute, as follows:

> Mojtaba essentially runs the supreme leader's offices. He controls access to his father and manages the supreme leader's multibillion-dollar business empire. He has long been Khamenei's hatchet man to ensure that only loyalists survive. He also handles the day-to-day business of repression, passing messages to hanging judges and ensuring that, behind the scenes, there is no dissent. Any interaction between Khamenei and the Islamic Revolutionary Guard Corps and scientists running Iran's covert nuclear and missile programs passes through Mojtaba. [Mojtaba] is also the liaison in the supreme leader's office for the regime's support of proxies, from Hamas to Hezbollah to the Houthis.
>
> … Mojtaba … is the node that controls and can contact the various compartmentalized security forces [IRGC]. …
>
> Accordingly, … the United States or Israel should make Mojtaba their top target …[b]ecause Mojtaba alone understands the supreme leader's financial empire and where its offshore accounts lie.

434. Similarly, Lebanese outlet *This is Beirut* reported in a profile of Mojtaba published in 2024 that: "Since the early 2000s, Mojtaba Khamenei has become a powerful behind-the-scenes figure in Iranian politics," is accused of "directly leading the Basij, the IRGC's internal security branch, to crush dissent" by killing regime enemies in 2009 while, "[s]imultaneously, Mojtaba is believed to have controlled vast financial assets," during the same period "he has deepened his connections with Shiite militias across the region, particularly in Iraq and Syria, playing a key role in expanding Iran's influence in the Middle East."

435. On November 4, 2019, the United States designated Mojtaba Khamenei under the Executive's counterterrorism authorities under E.O. 13876 upon finding that Mojtaba supported Khamenei-backed terrorist attacks by Hizballah, the Qods Force, and their proxies throughout the Middle East. That same day, Treasury explained that "Mojtaba Khamenei, the second son of the Supreme Leader, is designated today for representing the Supreme Leader in an official

180

capacity" and found that the "Supreme Leader has delegated a part of his leadership responsibilities to Mojataba [sic] Khamenei, who worked closely with the commander of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) [Qasem Soleimani]" to "advance his father's destabilizing regional ambitions" and the White House confirmed that "Mojtaba Khamenei" ordinarily "works closely with Qasem Soleimani … to advance his father's destabilizing agenda around the region," *i.e.*, proxy attacks, U.S. policy recognized that "the financial assets" of "Mojtaba Khamenei" and the other Khamenei inner circle allies sanctioned alongside Mojtaba financed attacks and, therefore, U.S. policy recognizes the need to "constrict the Supreme Leader's ability to visit his violence and to visit his malign agenda on the world." The opposite was also true: more resources available to Mojtaba Khamenei and the other Khamenei Cell members would, and did in the case of SCB's conduct here, enlarge Ali Khamenei's ability to sponsor attacks in the Middle East. The United States designated Mojtaba Khamenei based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by Mojtaba that enabled terrorist proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

436.    **<u>Gholam-Ali Hadad-Adel</u>**. Gholam-Ali Hadad-Adel was a member of the Khamenei Cell from, at least, 2004 through 2024. Hadad-Adel was also Mojtaba's father-in-law, key Khamenei gatekeeper, and general "fixer" for Khamenei with his allies.

437.    Gholam-Ali Hadad-Adel's terrorist attack-linked roles included, but were not limited to, serving as: (1) an IRGC member and leader since the 1980s; (2) a widely recognized proxy for, and interlocutor for, Ali Khamenei (and Mojtaba Khamenei, his son-in-law), and

181

nexus point between Khamenei and the terrorist operatives he directly sponsor, *e.g.*, Qasem Soleimani and Hassan Nasraallah, through the Foundation for the Oppressed and Supreme Leader Office resources Gholam-Ali Hadad-Adel effectively controlled alongside Mojtaba Khamenei from at least 2009 through 2020; (3) as Ali Khamenei's proxy and interlocutor, one of the effective overall controllers of, and an ultimate financial beneficiary of, the Foundation for the Oppressed—which he comprehensively supervised, and benefited from, given the SLO's oversight role, and financial nexus with, the Foundation, from at least 2009 through 2020; (4) as Ali Khamenei's proxy and interlocutor, one of the effective overall controllers of, and an ultimate financial beneficiary of, the SLO from at least 2009 through 2020; (4) as Ali Khamenei's proxy and gatekeeper, one of the two effective overall controller of, and an ultimate financial beneficiary of, Petro Nahad—which Mojtaba led alongside his father-in-law, and IRGC terrorist leader, Gholam-Ali Haddad-Adel, *infra*—from 2011 through 2025; (5) as Ali Khamenei's proxy and gatekeeper, the effective overall controller of, and an ultimate financial beneficiary of, one of two effective overall controllers of, and an ultimate financial beneficiary of, Caspian Petrochemical FZE a/k/a Iranian Petrochemical Company from at least 2007 through 2020 (alongside Gholam-Ali Haddad-Adel, *infra*); (6) as Ali Khamenei's proxy and gatekeeper, the effective manager of a substantial percentage of the resources generated by Tehran's Friday Prayers Organization and Tehran Friday Prayers (*emamjomeh*) from at least 2005 through 2020.

438.    Gholam-Ali Hadad-Adel's profile, role, history, motivation, conduct, and relationships were substantially similar to those of Mojtaba Khamenei, and played a similarly consequential role in the attacks against Plaintiffs for substantially similar reasons.

439.    From at least 2004 through 2025, reports and findings published by the United States, IRGC media arms, mainstream western media, and terrorism scholars confirmed the gist

182

of Plaintiffs' allegations about Gholam-Ali Haddad-Adel's key role in facilitating Khamenei Cell-backed attacks and fanatical hatred of the United States and Israel. Such reports and statements included those quoted herein, and an array of others, including, but not limited to:

a. IRIB (republished by BBC), August 31, 2005: "In a meeting with Ramadan Abdallah, the secretary-general of the Islamic Jihad of Palestine [*i.e.*, PIJ], Majlis Speaker [*i.e.*, Gholam Haddad-Adel] offered his congratulations on the occasion of the victory of Palestine's Islamic resistance in forcing out the Zionist occupiers from Gaza and described this victory as a victory for all Muslims."

b. IRNA (republished by BBC), January 29, 2006: "Gholamali Haddad-Adel said Sunday [29 January] that landslide victory of Palestinian resistance movement, Hamas, in Palestine's legislative election is considered a step towards freedom and liberation of the Palestinian territories. 'We regard Hamas victory as a victory for Palestine's cause given the stance adopted by Hamas towards liberating Palestine', Haddad-Adel said in his address to lawmakers in Majlis open session. … Haddad-Adel said[:] 'Today, it is not the Americans who draw up road map peace plan for the Palestinians, rather it is the Palestinian people themselves that draw road map for the Americans.' The Palestinians are now telling the US to give up support for Israel and let the Palestinian people decide their own fate, the Speaker said. 'We urge the Islamic and Arab governments to well understand the direction on which masses in the world of Islam are moving and to cooperate with Hamas[.]'"

c. IRNA (republished by BBC), April 16, 2006: "Gholamali Haddad-Adel said … 'Resistance' [is] only way to fight Israel[:] … He said that resistance based on the Islamic faith to the usurper regime of Israel is the only way to end the Zionists' occupation of Palestinian territories. …'It will not be an exaggeration to say that the occupation of Palestine is the 'untangled knot' in relations between the West and the Islamic world,' the [Hadad-Adel] pointed out. … Criticizing Western and American false propaganda in favour of the Zionist regime, Haddad-Adel said: 'Now is the time for all government of the Islamic world to support, especially financially, the Palestinian government under Hamas.'"

d. IRNA (republished by BBC), April 16, 2006: "Answering a question on the plea made by head of Hamas Political Bureau Khalid Mesha'al for Iran's financial assistance, Haddad-Adel said 'It is natural that Hamas expects all of us to offer financial aid.['] 'And it is also natural that when others halt their financial assistance we should help them (Palestinians),' [Hadad-Adel] added. … Asked what else could be done to support the Palestinian nation besides providing financial support, Haddad-Adel said that supporting Palestinians should not be limited to financial aid but political assistance [in context, weapons and training] should also be extended to them. 'Israel and the US must feel that there is an all-out support for the cause of Palestine,' added [Hadad-Adel]. … He added that all these made it necessary to the Islamic world to show high degree of sensitivity

towards Palestine,' said [Hadad-Adel]. Haddad-Adel stressed that attention paid by the Islamic world to Palestine indicated their awakened conscious."

e. IRNA (republished by BBC), June 11, 2006: "Gholamali Haddad-Adel renewed support for the Hamas-led government of Palestine and said that … 'Palestine has its place in the hearts of Iranian nation so that under leadership of the Supreme Leader of the Islamic Revolution Ayatollah Seyyed Ali Khamene'i, the great Iran will always support Palestinians,' [Haddad-Adel] said. … Haddad-Adel said that landslide votes in favour of Hamas in the parliamentary election was a great victory and he appreciated Hamas position not to recognize the occupying regime of Israel. Haddad-Adel also praised the initiative of [Hamas] Prime Minister Ismail Haniya … and said that the prime minister [Ismail Haniya] has done the best job for administering the state of Palestine. [Hamas operative, Foreign Minister [Hamas operative] Mahmud Al-Zahar thanked Iran for its support and brotherly assistance to Palestinian nation and government. He said that Palestinian public opinion calls for resistance to occupation.

f. Xinhua, July 18, 2006: "Iran warned on Tuesday that every part of Israel's territory could be attacked during its battle with Lebanese Hezbollah. 'No part of Israel will be safe, the towns you built in northern Palestine (Israel) are within the range of the brave Lebanese children,' … Gholam Ali Haddad Adel told thousands of Tehranis attending an anti-Israel rally in Palestine Square. He said that Lebanese and Palestinians have their rights to fight against Israel, because the country detained a lot of Lebanese and Palestinians in its prisons. [Hadad-Adel] also warned the United States against support for Israel anymore. 'You must suspend your support for Israel, or you don't expect peace and compromise with the world,' he said. Meanwhile, [Hadad] Adel praised Hezbollah leader Hassan Nasrallah, hailing him as a 'courageous lion.'

g. Mehr (republished by BBC), June 26, 2007: "Gholamali Haddad-Adel said on Tuesday [26 June 2007] that the Hamas government demonstrates the will of Palestinians and since we support the Palestinian people we also support the government of Hamas. … The Palestinian cause is the cause of the Islamic world and the liberation of Qods from Zionist occupation is the will of all Muslim nations, [Hadad-Adel] noted. [Hadad-Adel] said Iran has always expressed its full support to the Palestinian people and insisted on the need for unity between Palestinian groups.

h. Mehr (republished by BBC), September 10, 2007: "The Islamic Revolutionary Guards Corps is an example of Iran's power and glory, … Gholamali Haddad-Adel said [] on Monday. The IRGC reminds one of faith in God and upholding morality and justice, Haddad-Adel told the general assembly of IRGC commanders and officials. … He said the United States efforts to designate the IRGC as a terrorist group show that Washington is afraid that the IRGC's ideology will spread across the world. The Islamic Revolution Guards Corps ideology is obviously not appealing to the powers that are seeking to dominate Islamic countries, he added. The West is worried that the Islamic world will follow the example of the Islamic Republics defensive and cultural policy, he observed.

184

i.  Jomhuri-ye Eslami (republished by BBC), February 21, 2008: "Report citing [IRGC media arm] Fars News: 'Majlis Speaker: Countdown for collapse of Israel has started'; the item quotes remarks by [] Gholamali Haddad-Adel, in ceremonies to commemorate 'Martyr' [Hizballah operations mastermind and Khamenei Cell member] Imad Mughniyah, who [Hadad-Adel] said that his [Mugniyeh's] assassination was the start of a countdown for the collapse of Israel and regarded Palestinian Hamas and Lebanese Islamic Resistance [Hizballah] movements as symbols of awareness that would answer martyrdom of Mughniyah and his successors."

j.  Jomhuri-ye Eslami (republished by BBC), February 25, 2008: "[Gholam-Ali Hadad-Adel] emphasized: [']This hatred that the people feel for America today is because of its lies and treason regarding the occupied lands.['] Referring to America's negative propaganda against Iran due to its assertion to be confronting terrorism, [Hadad-Adel] stated: [']They support a regime which formally has on its agenda the assassination of Hamas leaders and leaders of other resistance forces.['] Explaining that from the very beginning Israel was founded on assassinations and killings, Haddad Adel said: [']Hamas achieved power through democracy, but it is under pressure from America and its allies.['] He added: [']In every opinion poll taken amongst freedom-seeking people, America is hated.['] [Hadad-Adel] pointed to the wave of awakening in Lebanon and regarded Hezbollah's actions as a cause of pride for all Moslems and Arabs and said: [']After six consecutive defeats in the war with Israel, the Arab world took great pride in the actions of the resistance forces.['] He referred to Israel's admission of defeat in the 33-day war and said: Israel does not dare attack Lebanon again because it knows that weapons and armies are useless and provide no defence against people who regard dying in the way of God as a blessing. He added: [']The Israelis can be sure that a force has appeared in the Islamic world which is not afraid of death and sees martyrdom as a blessing.['] Explaining that the countdown for the decline of Israel had started, Haddad Adel said: [']If Imad Mughniyah was martyred at the hands of the Zionists, from his blood hundreds of Imad Mughniyahs will arise and enter the fray.['] [Hadad-Adel] referred to recent assassinations and the blood which has been spilt saying this blood would nourish the tree of struggle.

k.  Press TV (republished by BBC), June 7, 2011: "A senior advisor to the Leader of the Islamic Revolution has reiterated Iran's support for Lebanon's Hezbollah and the Palestinian Hamas movement. Iranian Leader's advisor voices support for Hezbollah, Hamas[.] Iran pledges full support for the Lebanese and Palestinian resistance movements, IRNA quoted Gholamali Haddad-Adel as saying upon a visit to southern Lebanon on Monday [6 June]."

440.   On November 4, 2019, Treasury designated Gholam-Ali Haddad-Adel under the Executive's counterterrorism authorities under E.O. 13876 after finding that Haddad-Adel supported Khamenei-backed terrorist attacks by Hizballah, the Qods Force, and their proxies throughout the Middle East. Treasury explained, ""The abuse of Bonyad Mostazafan's assets

also benefits the Supreme Leader's inner circle. Gholam-Ali Haddad-Adel, a Khamenei confidant and the father-in-law of his son Mojtaba Khamenei, occupies Foundation property worth some $100 million, paying rent far below market rates. A member of Iran's Expediency Council, Haddad-Adel, was designated pursuant to E.O. 13876 in November 2019. Mojtaba Khamenei was simultaneously designated pursuant to E.O. 13876 alongside Haddad-Adel." The United States designated Haddad-Adel based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by him that enabled terrorist proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

441.    **Mohammad Mokhber**. Mohammad Mokhber has been a notorious terrorist since the 1970s, and was a key supporter of the IRGC and Hizballah, including while he served as Vice President of the Foundation for the Oppressed. "Prior to the 1979 Islamic Revolution," observed Iran scholar Saeed Ghasseminejad, "Mokhber" came "from a clerical family" and "was a member of Mansouroun, an Islamist terror group that also incubated a number of figures who rose to the top ranks of the Islamic Republic including … Mohsen Rezaei, Ministers of Defense Ali Shamkhani and Mohammad Forouzandeh," among others.176 In May 2024, Voice of America and the Associated Press reported that Mokhber has been an IRGC Commander since the 1980s, when he "served as an officer."

442.    Since the 1990s, Mokhber has always been a key member of Ayatollah Khamenei's inner circle and sponsor of IRGC and Hizballah attacks. From the 1990s through 2025, Mokhber always provided direct financial, logistical, and operational support to the IRGC, Qods Force, and Hizballah by helping secure funds, arms, and recruits through an array of

186

organizations that Mokhber controlled or influenced, including, but not limited to, the Foundation for the Oppressed and the SLO. Throughout, Mokhber worked closely with IRGC members who leveraged commercial entities to finance Qods Force and Hizballah operations. In May 2024, *Voice of America* and the *Associated Press* reported that Mokhber has been described in Iranian media as "crucial in Iranian efforts to bypass Western sanctions."

443.    Sanctions findings have confirmed Mokhber's key role in sponsoring Hizballah-led attacks targeting the United States (including through its allies) in the Greater Middle East. In 2010, for example, the E.U. sanctioned "Mohammad Mokhber" upon finding that he managed "an investment fund linked to Ali Khameneï" that enabled Iranian "ballistic missiles activities." Also in 2010, while Mokhber was helping lead the Imam Khomeini Relief Committee ("IKRC"), the United States designated the IKRC's branch in Lebanon as an SDGT pursuant to E.O. 13224 upon finding that the "IKRC in Lebanon is a Hizballah social service organization that was created by the Government of Iran" and was "directed and run by Hizballah members or cadre," while "Iran … provided millions of dollars to the Hizballah-run branch" that "helped fund and operate Hizballah youth training camps, which have been used to recruit future Hizballah members and operatives" for which "Nasrallah … acknowledged" that "the IKRC" was "one of Hizballah's openly-functioning institutions linked to and funded by Iran."

444.    In 2021, likewise, Treasury sanctioned Mokhber under its counterterrorism authorities "pursuant to E.O. 13876," which was adopted in 2019 to protect the United States from "violence, sabotage, and terrorism" sponsored by "the actions" of "Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East" and "promote international terrorism" through means that "include[d] the targeting of United States military assets and civilian vessels." 84 Fed. Reg. 30,573. Pursuant to E.O. 13876, Treasury sanctioned Mokhber

upon finding that he was responsible for ensuring that Iranian commercial "assets" were "used by the Supreme Leader Ali Khamenei to enrich his office, reward his political allies, and persecute the regime's perceived enemies" by managing a "business juggernaut under the direct supervision of … Khamenei that has a stake in nearly every sector of the Iranian economy," including "telecommunications, and financial services" while he was "tasked by the Supreme Leader to implement a 'resistance economy.'" The United States designated Mokhber based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by him that enabled proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

445.   **Mohammad Ali Jafari.** From 2009 through April 2019, Mohammad Ali Jafari served IRGC Commander-in-Chief. While in such role, Jafari was the equal to Qods Force Commander Qasem Soleimani and reported directly to Ayatollah Khamenei. From the late 1990s until 2020, Jafari was always part of the Khamenei Cell.

446.   As IRGC Commander-in-Chief, Mohammad Ali Jafari was always a rabid anti-American terrorist—an extremist even amongst the hard core—and directly involved in promoting attacks targeting the United States. In July 2005, as Mehran Riazaty (Former Iran Analyst, Multi-National Forces, Iraq), noted in his 2016 book, "IRGC chief Jafari, told a hard-line weekly close to Ahmadinejad that the [IRGC's] new 'Lovers of Martyrdom Garrison' (*Gharargahe Asheghane Shahadat*) would begin recruiting individuals willing to carry out suicide operations against Western targets." In August 2005, as recounted in an analysis published by DOD in 2011, "when he was the commander of the IRGC Center for Strategy, Major General Jafari stated, 'As the enemy [*i.e.*, United States] is far more advanced

technologically than we are, we have been using what is called asymmetric warfare methods," *i.e.*, IRGC-sponsored terrorist attacks targeting America, for which, according to the DoD-published analysis, "[t]he tenets of this doctrine include, but are not limited to … incorporation of … terrorism." In February 2006, according to Mehran Riazaty's detailed 2016 account, "the chief of the IRGC, Jafari, proclaimed to a group of martyrdom seekers, 'Now that America is after gaining friends against the Iran and wants to attack our belief system, members of the [IRGC and Hizballah] martyrdom-seeking garrisons across the world have been put on alert so that if the our country is attacked, the American and Israeli strategic interests will be burnt down everywhere.'" In 2017, IRGC media arm IRIB quoted Jafari, and others, to "warn[] the US that" the American military would have to "first close its regional military bases in a radius of 1,000 km away from Iran," if the United States "insist[ed]" on "imposing sanctions on the IRGC" because such choice "pose[d] a major risk to the US, its bases and forces deployed in the region," even though the "Islamic Republic of Iran's missile power is defensive."

447.   Analyses published by the United States, media, and terrorism scholars confirmed, and alerted SCB in real-time, that financial transactions that benefited IRGC Commander-in-Chief Mohammad Ali Jafari—necessarily including, but not limited to, transactions that ultimately benefited Petro Nahad—directly financed IRGC-backed anti-American terrorist attacks in the Middle East. In 2010, for example, Mark Dubowitz and Emanuele Ottolenghi publicly warned that "the IRGC's Commander in Chief, currently Major General Mohammad Ali Jafari," programmatically leveraged that "[m]any IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends" and therefore "[a]ny company that does business in Iran risks becoming an unwitting accomplice to the IRGC's

189

nefarious activities, … including arming and training Hezbollah." In 2011, likewise, DoD published a declassified analysis about the IRGC and its proxies that warned multinational firms and banks, including SCB, that: "The terrorism pillar of [IRGC Commander-in-Chief Mohammad Ali] Jafari's strategy"—who, along with Qods Force leader Qasem Soleimani, led the IRGC's terrorist enterprise from 2007 through 2020—"relies on intimidating potential adversaries and their supporters through the threat of terrorist activities against non-military targets in their territories" through "an attack" committed by IRGC proxy "[t]errorist organizations" like "Lebanese Hezballah" and "Khattab Hezballah [*i.e.*, Kataib Hizballah] in Iraq," which "act[ed] on behalf of Iran's interests."

448.    On November 17, 2017, Treasury designated Jafari as a SDGT, along with the entire IRGC. 82 Fed. Reg. 54,467. The United States designated Jafari as an SDGT based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by him that enabled proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

449.    **Mohsen Rezai.** Mohsen Rezai was a member of the Khamenei Cell from 1989 through 2024. Rezai was part of Khamenei's inner-circle since 1979, founded the IRGC Intelligence Bureau, *i.e.*, the predecessor to IRGC Intelligence Organization (in 1979), co-founded Hizballah (in 1982), served as IRGC Commander-in-Chief (from 1981 through 1999), and served for decades thereafter as a senior "security" advisor to Khamenei and the SLO. Rezai was exceptionally brutal, even by IRGC standards. For example, he spearheaded the use of children during the Iran-Iraq war (alongside Khamenei and Rafiqdoost), and he was publicly credited with organizing the mass killing of 30,000 political prisoners during the 1980s. Rezai

190

was also widely suspected of orchestrating the murder of his own son, Ahmed, for defecting to America. Since 2007, Rezai has been subject to international arrest pursuant to a Red Notice issued by INTERPOL.

450.    From 1979 through 2024, Mohsen Rezai was one of the IRGC's most important transnational terrorist intelligence and logistics leaders, among its most important and prolific overall fundraisers, and one of the IRGC's four most publicly facing and notoriously violent terrorists of all time (alongside Soleimani, Rafiqdoost, and Muhandis).

451.    In addition to being a member of Khamenei's inner circle, Mohsen Rezai was also a member of the inner circles of other key sponsors of Hizballah-backed attacks, including, but not limited to, Qasem Soleimani, Mohsen Rafiqdoost, Hassan Nasrallah, and Abu Mahdi al-Muhandis. For example, Iran scholar Ali Alfoneh reported on March 3, 2011 that "Mohsen Rezai" was part of Qasem "Suleimani's Network within the IRGC" as demonstrated by Soleimani's signature in a public letter of protest on Rezai's behalf in which Soleimani "thank[ed] God for having had the opportunity to 'soldier and study' with Rezai 'for almost two decades,' and stress[ed] that Rezai was liked both by Khomeini and Khamenei."

452.    Mohsen Rezai was also a key aggregator for the Terrorist Sponsors' money and ensured that the SCB's profits fueled violence. Indeed, Rezai was known as one of the intellectual fathers of Iran's Logistics Policy Directive that ensured that profits realized by the Foundation for the Oppressed, SLO, and IRGC-controlled companies—including Caspian Petrochemical—programmatically flowed back into the IRGC to enable IRGC-sponsored operations by funding Hizballah and IRGC weapons and logistics, among other means. In 2015, for example, Suzanne Maloney of the Brookings Institution explained that about half a decade after the enactment of Logistics Policy Directive in 2003, "the Guards' economic role

191

commanded influential support, based on claims of constitutionality, ideology, national security, and economic efficiency" because "Mohsen Rezaei" persuaded other Iranian leaders "that the Constitution stipulated the use of the military for development projects during peacetime, according to Rezaei, adding that" such IRGC deals generated value to the IRGC equal to, in Rezai's own words as quoted by Maloney, "'a large amount of the country's budget,'" which benefits the IRGC could not extract "if these institutions," *i.e.*, IRGC fronts like Caspian Petrochemical "did not take part" in lucrative profit-generating commercial transactions. Other reports confirmed Rezai's key role coordinating and aggregating terrorist funds raised by the Terrorist Sponsors, including reports by the Joint History Office of the Joint Chiefs of Staff of the U.S. Armed Forces in 2019, *Jewish Press* in 2022, and *New York Post* in 2022.

453.    Mohsen Rezai was always a key sponsor of Hizballah attacks worldwide, for which he supplied key funds, recruits, logistics, and intelligence support. Mohsen Rezai co-founded Hizballah (alongside Rafiqdoost) and was a notorious Hizballah sponsor from 1982 through 2024. Rezai planned Hizballah's hostage-taking attacks in Lebanon in the 1980s and was one of the masterminds of Hizballah's 1994 attack in Argentina, for which Rezai was—and remains—the subject of an INTERPOL Red Notice. As U.S.-funded *Radio Free Europe/Radio Liberty* reported on June 1, 2013, "former chief of the Islamic Revolutionary Guards Corps (IRGC) Mohsen Rezaei" was listed on an Interpol arrest warrant for being directly involved in IRGC/Hizballah 1994 attack in Argentina. IRGC-controlled media touted Rezai's close relationship with Hizballah terrorists and key role in Hizballah operations. On August 27, 2014, for example, IRGC- and SLO-controlled IRIB reported that "Head of Lebanese Hezbollah Bureau in Tehran Seyed Abdullah Safioddin" met with Mohsen Rezai, at which he "conveyed the appreciation of Hizbullah Secretary General Seyed Hassan Nasrallah for Iran's support of

192

resistance" and "Mohsen Rezaei underlined the necessity of strengthening resistance in Lebanon and other resistance groups in the region" and "Safioddin, for his part, presented a report" on "the promotion of resistance position in the region," in which "he lauded Iran's help and support for Hezbollah." As Rezai himself explained during an interview with IRGC media arm *Fars* on October 6, 2006:

> Iran has shared [its] experiences with other[s] … such as the Lebanese, the Iraqis, Afghans … in the form of training contacts and military training. Hizballah's military operations in Lebanon are similar to the kind of war that we fought against the Iraqi military. In fact, these experiences were transferred to Lebanon, were transferred to the front in northern Afghanistan, and were transferred to the Badr Army in Iraq…. We can see two influences at work here; one is the spirit and spiritual qualities that our Hizballah brothers have adopted from our warriors. They display the same human characteristics that existed among our warriors at that time, the same trust, the same sense of brotherhood, and the same spirit for seeking martyrdom. The other has to do with military tactics and the defense-related rules and principles that they have received in training.

454.    The United States confirmed that Mohsen Rezai played a key role sponsoring Iranian proxy terrorist attacks in Israel and Iraq. On January 10, 2020, Treasury sanctioned "Mohsen Reza'i" (*i.e.*, Mohsen Rezai) for helping supply "sources of revenue used by the Iranian regime" (including the SLO) "to fund and support its nuclear program, missile development, terrorism and terrorist proxy networks." The United States designated Rezai based on his key role enabling Khamenei Cell-backed attacks sponsored by the Terrorist Sponsors and directed by the Qods Force and Hizballah throughout the relevant period, based on a long pattern of conduct by him that enabled proxy attacks targeting the United States in the Middle East, and therefore Treasury's findings further confirm the plausibility of Plaintiffs' nexus allegations.

455.    **Mohsen Rafiqdoost.** Mohsen Rafiqdoost was a member of the Khamenei Cell from 1989 through 2024. Rafiqdoost was the former personal bodyguard and driver of Khomeini; presided over the largest *bazaari* network in Iran, Iraq, Lebanon, and Syria; founded

193

the IRGC in 1979; co-founded Hizballah in 1982; masterminded (alongside Imad Mugniyeh) Hizballah's 1983 attacks targeting the United States in Lebanon, which killed hundreds of Americans; and served as de-facto leader of the Foundation for the Oppressed from 1989 through 2024.

456.    Regardless of title, Mohsen Rafiqdoost always served as one of Khamenei's key inner circle operatives responsible for securing weapons for Hizballah, the IRGC, Hamas, PIJ, and JAM, which included acquisitions secured through Iranian arms, training, and tunnel purchases supplied by North Korea's RGB, *and* via Iranian-developed weapons built by firms controlled by the Foundation for the Oppressed, IRGC, and SLO. For both lanes of Hizballah, Hamas, PIJ, and JAM weapons acquisition, Rafiqdoost sat at the intersection of relationships (*i.e.*, he knew the key players in North Korea, Lebanon, Iraq, and the Palestinian territories), transportation (*i.e.*, he knew how to move weapons from North Korea to places like the Palestinian territories), and logistics (*i.e.*, he knew how to distribute such weapons in a methodical way once they were in-country in order to maximize killing power).

457.    **Mohammad Forouzandeh.** Mohammad Forouzandeh was a terrorist who served as an IRGC Commander from 1979 through the present, through which he directly enabled Hizballah-led terrorist attacks targeting the United States, including from 1999 through 2014 when he enabled IRGC and Hizballah attacks through his position leading the Foundation for the Oppressed alongside Rafiqdoost and other Khamenei inner circle members. As *Iran News Update* observed in 2020, "Mohammad Foruzandeh" was a "senior commander[] of the Islamic Revolutionary Guard Corps (IRGC)," who was among the IRGC's most important operations-facing leaders. Indeed, IRGC media arm ISNA reported in 2013 that "Mohammad Forouzandeh" was "an IRGC member." As *Agence France Presse* reported in 1999, "Forouzandeh" was known

194

for being "a staunch conservative" who "was part of the official 'welcoming committee'" for Ayatollah Khomeini. As an IRGC Founding Father, *Reuters* reported in 1999, Forouzandeh was infamous for his "impeccable revolutionary credentials." According to a report by *Agence France Presse* in 1999, Forouzandeh notoriously "played a key role" in "the organization of the fight against counter-revolutionary groups" (*i.e.*, IRGC terrorist attacks against Iranian regime enemies) and "in the reorganization of the Revolutionary Guards by giving them, from 1986, a military structure independent of the regular army."

458. As one of the IRGC's public faces for decades, Forouzandeh had a long history of threatening the United States. In 1996, for example, Forouzandeh publicly threatened, inter alia, that: (1) "Iran will make the appropriate response to any American aggression"; (2) "American aggression against Iran is loud and clear -- and the announcement of those lies is part of the propaganda campaign"; (3) American claims of Iranian sponsorship of terrorism were "American propaganda against Iran" that "Iran has officially denied and rebutted"; and (4) while "Iran" was "seeking stability" in the Middle East and had no intention of developing long-range missiles, "the propaganda war" was "coming from the side of America, which aims to sell weapons to the Gulf and justify its presence there."

459. Forouzandeh was always one of the IRGC's most important terrorists ensuring a nexus between logistics and finance, on the one hand, and IRGC-sponsored acts of terrorism, on the other, through his direct involvement in the IRGC's key operations-facing nodes, including the Foundation for the Oppressed. An analysis published by DOD in 2011 confirmed that "Forouzandeh['s]" terrorist resume included "Director of the Mostazafan and Janbazan Foundation; Head of the IRGC General Headquarters; [and] Assistant Commander-in-Chief of the IRGC in Reorganizing the IRGC's three Naval, Air, and Ground Units." As *Reuters* reported

195

in 2013, the fact that "Forouzandeh" had served "as head of the Supreme National Security Council," a senior "Revolutionary Guard" officer, "former defence minister," a "member of Iran's [Supreme National] Security Council," and a leader of "the Foundation for the Oppressed … implie[d] that Forouzandeh" had "the backing of Supreme Leader Ayatollah Khamenei."

460. Forouzandeh was always a key link between funding, logistics, and IRGC- and Hizballah-sponsored attacks. According a Congressional Research Service scholar's 2006 testimony, "Forouzandeh[]" was "the chief of staff of the Revolutionary Guard in the late 1980s and later Defense Minister" and was infamous as one of the key Iranian "hardliners and former officials of the Revolutionary Guard" who helped the IRGC use the Foundation for the Oppressed as a front to illicitly source arms through U.A.E. transactions in which "Foundation employees were present in significant numbers in Dubai, holding large quantities of cash which they were using to procure [weapons-related] technology" from "arms and technology brokers in the emirate." As a DOD-funded study in 2009 observed, it was "important to note that the IRGC's expansion into the business sector harnessed the informal social networks that had developed among veterans and former officials" and, "[t]hus, when we describe the IRGC's economic influence, we use a very broad definition that captures the informality of its reach" through the IRGC's "model of a shadow economy and the creation of networks of patronage and clientage," which was demonstrated by the fact that "Mostazafan" (*i.e.*, the Foundation) was connected to "Mohammad Forouzandeh, the former head of [MODAFL] and a former IRGC officer." The same study observed that the Foundation "was created in 1979 under the leadership of Mohammad Forouzandeh" and, as such, comprised an Iranian "business organization[]" that was "[a]ffiliated with the IRGC or influenced by IRGC personnel."

196

461.    As Iran scholar Dr. Emanuele Ottolenghi observed in 2011, "Forouzandeh" was a "former IRGC officer" who enabled the "IRGC['s] indirect[] control[]" of "the Foundation of the Oppressed" to power IRGC-sponsored attacks through the role of "the Foundation" as "an independent financial body traditionally run by a retired IRGC commander and used by the state as a proxy to fund off-the-books IRGC operations." Similarly, as Iran scholar Dr. Hesam Forozan noted in 2015, "Forouzandeh" came "from the ranks of former Sepah [IRGC] officers" and was a key part of the "Sepah's [IRGC's] Intelligence Security apparatus and networks" who helped ensure that the Foundation for the Oppressed was "a generous supporter and active political patron of the Lebanese terrorist organisation Hezbollah." In 2016, likewise, Iran-facing NGO IFMAT identified him as an "important Revolutionary Guards" who helped ensure that the "Bonyad e-Mostazafan Foundation [Foundation for the Oppressed] is controlled by the Islamic Revolutionary Guards Corps (IRGC)[] and Supreme Leader of Iran" and helped the "Mostazafan Foundation ma[ke] deals with the terrorist organization IRGC" that helped the IRGC provide "planning and support for terrorist acts" to proxies.

462.    **Hassan Nasrallah.** Hassan Nasrallah was a member of the Khamenei Cell from around 1992 until his death in 2024. Khamenei appointed Nasrallah as Secretary General of Hizballah in 1992, which title directly acknowledged Khamenei's direct supervisory role over Nasrallah and, by extension, Hizballah. Throughout, Nasrallah was always one of Hizballah most senior Khamenei-facing, operations-related, liaisons tasked with Hizballah's direction of attacks targeting the United States in Iraq, Israel, Syria, Lebanon, Yemen, and elsewhere. For example, as the U.S. Office of the Director of National Intelligence and National Counterterrorism Center confirmed in 2022, "Hassan Nasrallah" was always one of Hizballah's "KEY LEADERS" and

197

was always a "charismatic leader who" had "overseen all sectors of Hizballah's operations since" when Ayatollah Khamenei named him "Secretary General" of Hizballah in "1992."

463.    Along with Ayatollah Khamenei, Hassan Nasrallah was the face of the "Resistance" targeting the United States, which status Nasrallah leveraged to source funds and recruits to enable attacks by the Khamenei Cell through the high-profile multi-channel Hizballah fundraising and recruitment campaigns that he led—which always targeted the Great Satan (America) and the Little Satan (Israel). In 2011, for example, Nasrallah publicly stated: "The enemy is the U.S. administration, and Zionist regime is its tool in the Middle East. … [T]he regional resistance movements [including Hizballah] and deterrent states such [as] Iran … stopped the U.S. government plan for creating a new Middle East." On October 1, 2019, likewise, he publicly declared that "the main problem is the United States."

### 2.    The Structure of the Terrorist Sponsors' Fronts Ensured that the Proceeds of SCB's Transactions Were Spent on Terrorist Attacks

464.    Iran's Terrorist Sponsors programmatically financed attacks principally through "off-book" or "off-budget" sources as a matter of custom and practice, and terrorist tactics, techniques, and procedures for which, in short, the most violent and risky things the IRGC and Hizballah did—at the very top of the list was always attacks targeting the United States in places like Iraq and Israel—were typically funded though off-book parastatal sources rather than on-book sources, *e.g.*, public budgetary sources from allocations by the government through appropriations.

465.    U.S. government statements confirming the Foundation for the Oppressed's and SLO's direct connection to IRGC- and Hizballah-sponsored, proxy-committed, terrorist attacks targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme. These sources show that the Foundation for the Oppressed and

198

SLO were closely intertwined with terrorist violence because the Qods Force and Hizballah used Foundation and SLO profits to fund attacks. SCB's transactions directly enabled the terrorist attacks that killed or injured Plaintiffs. Among other reasons, the Foundation's and SLO's profits, assets, data, real estate, and operatives supplied Hizballah, Hamas, PIJ, and JAM the violent instruments such terrorists needed to commit its attacks, including, but not limited to: (1) key, off-the-books financing for terrorist operations, *supra*; (2) a transnational logistics infrastructure, including in Iraq, Lebanon, the Palestinian territories, and Syria; and (3) the mechanisms by which Hizballah and the Qods Force routed attack-related payments that, by their very nature, had a direct connection to each attack against Plaintiffs.

466. Accordingly, SCB's vast direct and indirect financial assistance that flowed through the Foundation for the Oppressed and SLO (including Petro Nahad), necessarily including Caspian Petrochemical, ultimately reached Hizballah's, Hamas's, PIJ's, and JAM's operations cells, including the ones that committed the attacks in this case.

467. Reports and findings by U.S. and E.U. counterterrorism officials confirm Plaintiffs' allegations. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien publicly testified that "Iran [] actively sponsors terrorism and violence across the Middle East … [through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf" as IRGC proxy "terrorist … groups in Lebanon, the Palestinian territories, and Iraq," which "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of support that fuel terrorist activities" for which the IRGC's "***money flows … draw[]***

199

*upon a large network of state-owned banks and parastatal companies*," *i.e.*, bonyads—of which the largest and most notorious was always the Foundation for the Oppressed.

468.   On July 27, 2010, the E.U. found that, *inter alia*: (i) "Bonyad-e Mostazafan" (Foundation for the Oppressed) was among the IRGC fronts that "contributes to the financing of the strategic interests of the regime and of the Iranian parallel State"; and (ii) the Iranian regime pursued such strategic interests through IRGC-sponsored terrorist attacks targeting the United States: "[The] … Qods Force is responsible for operations outside Iran and is Tehran's principal foreign policy tool for special operations and support to terrorists and Islamic militants abroad. Hizballah used Qods Force-supplied rockets, anti-ship cruise missiles (ASCMs), man-portable air defense systems (MANPADS), and unmanned aerial vehicles (UAVs) in the 2006 attacks on Israel and benefited from Qods Force training on these systems, according to press reporting. According to a variety of reporting, the Qods Force continues to re-supply and train Hizballah on advanced weaponry, anti-aircraft missiles, and long-range rockets."

469.   Former senior U.S. officials confirmed that the Foundation's profits financed IRGC-sponsored proxy attacks. In 2022, for example, Gabriel Noronha, Former Special Advisor for Iran at the State Department, publicly observed: "[S]anctions on some of the regime's worst terrorists … [included] sanctions on *Khamenei's personal slush funds known as 'bonyads,' including … [s]anctions … on Bonyad Mostazafan [Foundation for the Oppressed]*, a massive conglomerate that … is *enmeshed with the IRGC and is a corruption network used to enrich top Iranian terrorists.* … [State] lawyers were clear when we released this [Executive Order sanctioning entities like the Foundation for the Oppressed in November 2020]: it was a *response to actions by Iran & its proxies to …. promote international terrorism … [and sponsor] attack[s] against US military* assets [and] civilian vehicles."

200

470.    In 2015, likewise, Scott Modell (Managing Director, Rapidan Group), confirmed the inextricable connection between funds, data, intelligence, operatives, and logistical resources sourced by Hizballah and IRGC through commercial and charitable fronts, including bonyads, the largest of which was always the Foundation for the Oppressed, one the one hand, and fronts and the Terrorist Sponsor attacks and proxy attacks targeting the United States that the Qods Force, Hizballah, and their proxies committed with such commercial and bonyad-sourced aid:

> The IRGC is also working very closely with Lebanese Hezbollah to build a global commercial apparatus that is designed to acquire new technologies, assist with covert action programs [i.e., terrorist attacks], create new sources of revenue, and actually add to Iran's existing threat facilitation networks. The importance of covert action to Iran's revolutionary export strategy has been clear from day one, particularly in the last 4 years.
>      Since May 11, [2015] there have been dozens of terrorist plots attributed to Iran, from an attempt to murder the Saudi Ambassador in the U.S., to a foiled bomb plot in Kenya, covert action continues to remain a key tool of Iranian foreign policy.
>      The Quds Force is engaged in various nonkinetic activities, as I said, and they will continue to play a role in its external resistance mission, whether it is front companies religious foundations [i.e., bonyads], cultural centers, and so on.

471.    In 2018, likewise, Nader Uskowi—who served the United States in Iraq as Senior Civilian Policy Advisor to U.S. Central Command in Iraq—published a book focused on the IRGC, in which he observed that "commercial companies" that were "own[ed]" by "[t]he Mostazafan Foundation" and "office of the Supreme Leader" were a vital financial, logistical, and operational sponsor of acts of international terrorism committed by Hizballah and Iran's proxies in Israel, Iraq, and elsewhere:

> The Quds Force [] requires funding for its significant … efforts in Iraq, including financing operations and military equipment for some of the largest Shia militia groups in [Iraq]. … In Lebanon, as the chief of Hezbollah has said, Iran provides nearly all [Hezbollah]'s budget, which is estimated to be close to $1 billion annually. … The cost of these operations are all shouldered by the Quds Force.
>
> Outside … Syria, Iraq, Yemen, Lebanon, and Afghanistan, the Quds Force … maintains a vast network of associates across the globe.

201

Iran not only finances these projects, it has to pay for the majority of these expenses in hard currency …, a major expenditure for a country facing an economic crisis of its own.

It is not entirely clear how Iran finances its Quds Force-led projects, but the bulk of its military involvement in the region could be funded by the business empire run by the IRGC and the Office of the Supreme Leader. Between the two, they control a dozen major foundations, which in turn control more than five hundred companies and enterprises.

A 2017 report by the Iranian opposition has revealed the extensive business empire behind the extra-budgetary funding. An understanding of the extent to which the country's leader [Khamenei] and … the IRGC[] control the Iranian economy is key to understanding the Quds Force-led projects. …

The IRGC and the Office of the Supreme Leader are estimated to control about 50 percent of the Iranian economy through the mega-foundations outlined above [*e.g.*, the Foundation for the Oppressed]. Such massive economic control creates both opportunities and constraints for the Quds Force.

The IRGC's business empire provides the Quds Force with a secure source of funding even if the government budget is cut due to competing priorities at home. The foundations controlled by the IRGC and the Office of the Supreme Leader are both exempt from taxes and are off official records, making them especially suitable as emergency funding for Quds Force [] efforts without any scrutiny … The Quds Force also has established its own businesses in the [Middle East] region, partly through the IRGC-controlled foundations operating in the near abroad [*i.e.*, the Middle East]. Access to those funds, coupled with its vast network of Shia militant groups and associates and its arms caches across the region, would enable the Quds Force for continue its operations as the headquarters of the Shia militance in the Middle East, albeit at a diminished level, in case of an emergency in Tehran.

472.    Moreover, Mr. Uskowi confirmed, in the same 2018 book, that income that flowed through to the Foundation for the Oppressed and SLO supplied the IRGC with vital "off-the-books" money that comprised an especially potent form of direct aid to attacks by Hizballah and Iran's proxies throughout the Middle East:

The Quds Force receives off-budget revenues from the Office of the Supreme Leader, which in turns receives off-budget revenues from a business network under its control, including major foundations … and … their associated companies. The IRGC also provides the Quds Force with off-budget funding from

202

the revenues of its own business enterprises inside Iran, which include companies in major economic sectors, including oil and gas, construction, telecommunications, transportation, and banking.

The Quds Force's own business network outside Iran provides extra-budgetary revenues; the income from these businesses is estimated to be around $3 billion annually.

These nongovernmental sources of funding, coupled with the decentralized financial structure of the off-budget and extra-budgetary funding of the Quds Force, reflect its mission to sustain activities even in a post-Islamic Republic era.

The current economic … sanctions inhibiting foreign investment in [Iran], negatively affect … the revenues of the foundations controlled by the supreme leader and the IRGC. … The foundations are generally behind the Quds Force-controlled economic enterprises outside the border. Drops in [IRGC] revenues and the foundations' profits have immediate effects on Quds Force funding.

The resulting decrease in revenues could directly affect Quds Force operations in the region, including its ability to pay full salaries … Any cut … could adversely affect Hezbollah's ability to pay salaries and overall costs of deployment. Likewise, other Shia militia groups would be affected. Iran pays the salaries and cost of operations for all its Afghan and Pakistani militias. It covers the budget of major Iraqi Shia militias.

473.    The uniquely tight nexus between "off-books" Foundation, IRGC, and SLO profits and Hamas and Hizballah attacks in Israel and Iraq meant that funds and resources flowing to the Foundation, IRGC, and SLO were inextricably tied to terrorist violence.

> **3.      The Terrorist Sponsors Provided Vital Support to Hizballah, Hamas, PIJ, and JAM Terrorist Attacks in Israel and Iraq**

474.    **<u>Israel</u>.** The IRGC, SLO, Hizballah, and Foundation for the Oppressed collectively provided most of Hamas's and PIJ's budget, and directly financed Hamas and PIJ attacks through a range of vehicles, including salary and bonus payments to leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead terrorists. From 2007 through 2024, they did so by routing at least tens of millions per year to Hamas and PIJ through the above organs.

475.    U.S. government reports and statements confirmed that the IRGC supplied key support to attacks by Hizballah, Hamas, and PIJ in Israel. As the White House explained in the *National Strategy for Combating Terrorism* on September 1, 2006: "[T]he regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah, Hamas, and Palestine Islamic Jihad (PIJ)." On August 3, 2010, likewise, Treasury imposed counterterrorism sanctions targeting Hizballah and the Qods Force based upon Treasury's finding that "the IRGC-QF continues to support designated terrorist groups" like "Hamas" through Qods Force-funded, Hizballah-supplied, "training, weapons, and money to Hamas, bolstering the group's ability to maintain its armed resistance." On June 1, 2011, the White House declared in America's *National Strategy for Counterterrorism* that "Hizballah" and "HAMAS" receive key support from "Iran," which remained an "active sponsor[] of terrorism," for which the United States was "committed to opposing the support" that Iran "provide[d] to groups pursuing terrorist attacks" in Israel and the Palestinian territories.

476.    Reports to Congress by State regularly confirmed that the IRGC and Hizballah directly enabled attacks by Hamas, and PIJ in Israel. In 2006, for example, senior State official Frank C. Urbancic testified that "Hizballah supports … Palestinian terrorist organizations" through "the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support" since "at least 2000." Likewise, in 2009, State reported to Congress that the "Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups."

477.    Treasury similarly confirmed that Iran provided key material support for Hamas and PIJ attacks in Israel. In 2008, senior Treasury official Daniel Glaser testified before Congress: "In the case of PIJ, Iran's financial support has been contingent upon the terrorist

group carrying out attacks against Israel." In 2010, senior Treasury official Stuart Levey testified that "Iranian support"—usually routed through the Foundation for the Oppressed, Hizballah, or Bank Saderat—"to Palestinian terrorist groups like Hamas" and "the Palestinian Islamic Jihad" was "significant" to Hamas's and PIJ's ability to conduct attacks. Similarly, in 2015, Treasury's *National Terrorist Financing Risk Assessment* informed Congress: "As with Hizballah, state sponsorship has played a significant role in Hamas' financing. Historically, Hamas has received funding, weapons, and training from Iran."

478.    Terrorism scholars publicly confirmed that Terrorist Sponsors' aid was pivotal to attacks by Hamas and PIJ. In 2007, for example, former Treasury official Dr. Matthew Levitt observed that "Hamas" was "also a massive beneficiary of support from … Iran," which "provide[d] direct state funding" to "sponsor" "terrorism" committed by Hamas. Per Dr. Levitt, "Israeli, British, Canadian, and Palestinian intelligence all concur[red] with the U.S. conclusion that Iran directly aid[ed] Hamas with money, training camps, and logistical support. Estimates of Iran's financial assistance to Hamas var[ied], but there [was] unanimity on one score: the sum [was] significant." Likewise, in 2011, Iran scholar Dr. Ronen Bergman wrote:

> How much has Iran helped Palestinian terror groups? The full answer is: A great deal. Often, it came in the form of direct assistance to terrorist cells. But it has also come indirectly, in the form of intelligence sharing. For the most part, Iran has worked through Hizballah.

479.    Similarly, in 2014, Jonathan Schanzer, the Vice President of Research at the Foundation for Defense of Democracies, testified to Congress that "[t]he Bonyad-e Mostazafan"—*i.e.*, Foundation for the Oppressed—was "a splinter of Iran's IRGC" and had "reportedly opened its coffers to Hamas, providing critical financial support." Dr. Levitt also confirmed that "in September 2015, media reports revealed that over the previous two months 'Iran has sent suitcases of cash—literally—to Hamas's military wing in Gaza.' In retaliation for

205

Hamas political leader Khaled Mashal's summer 2015 visit to Saudi Arabia, Iran bypassed Mashal and the Hamas political leadership and sent couriers to deliver the suitcases 'directly to the leaders of the group's military wing in the Gaza Strip.'"[87]

480. European officials reported similar conclusions. On July 30, 2006, for example E.U. parliamentarian Struan Stevenson observed: "Without the backing of Tehran, Hamas … would wither and die."

481. The IRGC provided vital training to Hamas and PIJ, often using both Hizballah and the Qods Force to provide extensive, multi-month, multi-location training to Hamas and PIJ operatives, including members of Hamas's and PIJ's respective leadership, operations, logistics, intelligence, and financial cells. The IRGC's and Hizballah's provision of training to Hamas and PIJ made those groups **_more lethal_** and enhanced their ability to commit attacks in Israel. As described by Dr. Levitt:

> [A] senior commander in the Qassam Brigades [Hamas's military wing] told the Sunday Times that "300 of the group's 'best brains' had been secretly sent to Tehran," learning how to build stronger explosives, rockets, and how to commit sniper and tunnel attacks. "Iran is our mother," the commander said. "She gives us information, military supplies and financial support." The commander explained that Qassam fighters study in Tehran for up to six months "at a closed military base under the command of the elite Revolutionary Guard force."[88]

482. Such IRGC sponsored, Hizballah-led, training of Hamas and PIJ greatly—and notoriously—amplified the lethality of attacks by both groups. In 2009, for example, terrorism scholar Yossef Bodansky reported how Hamas terrorists "have benefitted from"—per Hamas—"Iranian-style VIP protection tactics and skills." In 2014, likewise, Iran scholar Ronen Bergman reported that Hamas "learned lessons and acted on them" by mandating that all or nearly all of

---

[87] Decl. of Dr. Matthew Levitt, _Force v. Islamic Republic of Iran_, No. 16-cv-1468 (D.D.C. Feb. 28, 2018), ECF 31 at 42-43 ("Levitt Decl.").
[88] Levitt Decl., _supra_ note 87, at 35-36.

206

Hamas's "battalion commanders" to have "undergone training in Lebanon or Iran" by Hizballah and the IRGC, which afforded Hamas "major advances" in its ability to launch attacks in Israel.

483.     Hamas's and PIJ's Iran-funded, Hizballah-led, North Korean RGB-built, attack tunnels notoriously powered Hizballah-enabled Hamas and PIJ attacks. In 2015, for example, the *Times of Israel* reported that "Iran is financing Hamas' building of new underground tunnels to attack Israel," and Representative Lois Frankel, likewise, warned: "New reports indicate that Iran is funding the rebuilding of Hamas' sophisticated tunnel network to attack Israeli civilians." In 2017, the *Jerusalem Post* reported that Israelis had "discovered" at least "32" Hamas and PIJ "tunnels" during such FTOs' attacks in 2014, "including 14 that extended into Israel" and "Hamas and [Palestinian] Islamic Jihad have made no secret of the fact that the ongoing construction of new attack tunnels remains one of their top priorities with massive financial and manpower resources channeled to such projects." In 2018, similarly, *Reuters* reported that "Israel" had "target[ed] 'Hezbollah Attack Tunnels'" because "Israel's vulnerability to tunnels was laid bare" through "Hamas" attacks "in Gaza in 2014, when Palestinian militants used dozens of secret passages dug from Gaza into Israel to carry out ambushes."

484.     In 2003, State reported to Congress: "Iran provided Lebanese Hizballah and Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command—with funding, safe-haven, training, and weapons" and "encouraged Hizballah and the Palestinian rejectionist groups to coordinate their planning and to escalate their terrorist activities." In 2004, State reported to Congress, "Iranian support for Hizballah activities in southern Lebanon, as well as training and assistance to Palestinian rejectionist groups, help promote an environment where terrorist elements flourish."

207

485.    When Terrorist Sponsors financed Hamas and PIJ, they earmarked their money for use by Hamas's and PIJ's attack cells, which made their funds uniquely lethal. As Dr. Levitt noted in 2007:

> Unlike much of the [non-Iranian sources of Hamas] financing …, Iranian funding of Hamas is generally … ***directed straight to operational units***. According to a December 2000 Palestinian intelligence report confiscated by Israeli authorities, Iran had transferred $400,000 directly to Hamas' Qassam Brigades to specifically support "the Hamas military arm in Israel and encouraging suicide operations," and another $700,000 to other Islamic organizations opposed to the PA.

> According to a former Jordanian prime minister, "grassroots fundraising is really not enough for big Hamas operations. Most of the support [for such operations] is from Iran. Iran's money is more influential." A senior Fatah official and member of the Palestinian Legislative Council offered a similar assessment, saying that while "some of Tehran's money over the past three years [2001- 2004] may go to supporting health and humanitarian services in Gaza," the bottom line is that the "money from Tehran that goes to Hamas is for the political leaders of Hamas and for the bombings, not for the Palestinians."

486.    Dr. Levitt also explained that these attacks by Hamas and PIJ had a low marginal cost, such that the significant amount of money provided by SCB's transactions could fund many such attacks in Israel: "in a 2002 interview, Salah Shehada, the founder of [Hamas's] Izz al-Din al-Qassam Brigades, claimed an operation could cost from $3,500 to $50,000. A Hezbollah member has put the figure of a terror attack at $665-$1,105 …. Another terrorist from Palestinian Islamic Jihad, Ahmad Sari Hussein, received $2,210 … for his terrorist activity, while Wael Ghanam, a Tanzim activist from the Tulkarem refugee camp, said he received $7,000 to manufacture explosive charges."[89]

487.    These Hamas attacks were part of an overall campaign orchestrated by Hizballah and the IRGC, including, but not limited to, Khamenei Cell members Ali Khamenei, Qasem

---

[89] Levitt Decl., *supra* note 87, at 23.

Soleimani, Hassan Nasrallah, Gholam-Ali Hadad-Adel, and Mohammad Ali-Jafari. For example, as IRGC media arm *Fars News Agency* reported in 2014:

> Qassem Soleimani reiterated Iran's call for **supplying the Palestinian Resistance Movement of Hamas and its affiliated brigades with more weapons** to [use] … against the Israeli army. [Soleimani] underlined that confronting the Zionist enemy is a necessity, and expressed hope that the Palestinian resistance movement would **turn land and sky into hell for the Zionists soon through its massive … operations.** He further rooted out the issue of preventing the Palestinians from receiving weapons and ammunitions, and said, **"Disarmament of resistance is daydream that will only come true in the graveyard (for the Zionists)."**

488.   This public call to supply Hamas and PIJ with funds and weapons with which to attack Israel was widely documented by media outlets in real-time, including, inter alia, separate reports published by the BBC (republishing *Fars*), *Agence France Presse English Wire*, and *Israel National News* in 2014, and by the *Times of Israel* and IRGC media arm *Mehr* in 2016.

489.   In 2015, *Reuters* also reported that Ali Khamenei had publicly announced "that Iran would support the Palestinian uprising against Israel 'in any way we can.'" As Dr. Levitt explained:

> Over the course of many years, Iran has provided significant financial and material support to both Hamas and PIJ, among other groups, without which neither group could not have carried the kind of sophisticated and effective terrorist attacks for which they have become known. **This support enables these groups to carry out a wide range of attacks from shootings and stabbings and bombings, to kidnappings and car rammings and rocket attacks**. These attacks sometimes target soldiers but often civilians, in an effort to terrorize the Israeli population and seek the establishment of an Islamic state in the place of Israel. While Iranian support for Hamas and PIJ has fluctuated, it has never fully ceased. Without Iran's support—including funding, weapons and more—groups like Hamas and PIJ would **never be able to carry out the scale and scope of incitement and terrorism** for which they have become famous.[90]

490.   **Iraq.** As discussed *supra*, the IRGC and Foundation for the Oppressed relied upon Hizballah to provide Jaysh al-Mahdi the weapons it used to attack Americans in Iraq,

---

[90] Levitt Decl., *supra* note 87, at 67.

including, but not limited to, EFPs, which were uniquely suited for terrorist attacks on U.S. forces and civilian convoys in Iraq. Hizballah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks. Hizballah also used funds provided by the IRGC to purchase weapons for Jaysh al-Mahdi terrorist attacks. According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to" both "Lebanese Hizballah" and "Iraq-based militants." As a scholar summarized in the 2010 journal published by the Combating Terrorism Center at West Point, "it is clear that Iran has a proven ability to commission violence inside Iraq" because "Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate [that] Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."

491.    On July 2, 2009, the United States formally recognized the links between Hizballah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi commander Abu Mahdi al-Muhandis as a SDGT. The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces." According to the press release, these Jaysh al-Mahdi cells "received training in … explosives" from Hizballah instructors.

**C.    The Terrorist Attacks on Plaintiffs Benefitted from the Support SCB Financed**

492.    To facilitate terrorist attacks by their proxies in Israel and Iraq, the Terrorist Sponsors used proceeds from Iran's oil and gas industry, including proceeds received by the

210

Foundation for the Oppressed and the IRGC's other fronts from SCB's transactions, to provide a variety of specific types of lethal and long-lasting support for terrorist attacks. From 2001 through 2024, those forms of support were provided by Iran's Terrorist Sponsors to Hizballah, Hamas, and PIJ for attacks targeting Americans in Israel and to Hizballah and JAM for attacks targeting Americans in Iraq. As explained below, each of the specific attacks on Plaintiffs benefited in multiple ways from the support SCB financed.

493.  **Rocket Attacks in Israel.** Certain plaintiffs were injured and killed in rocket attacks in Israel. The first attack occurred on August 19, 2011, when a joint cell comprised of Hizballah and Hamas committed a rocket attack in Ashdod and severely injured **Shmuel Brauner**, a civilian attending Synagogue. The second took place on May 5, 2019, when a joint cell comprised of Hizballah, Hamas, and PIJ committed a rocket attack in Ashdod, killing **Pinchas Przewozman**. The Terrorist Sponsors used funds from the Foundation for the Oppressed and their other fronts to provide support that contributed to these attacks.

494.  In *Force*, the court found that Iran's provision of rockets and other support to Hamas proximately caused the August 19, 2011 rocket attack that injured **Shmuel Brauner**. *See* 364 F. Supp. 3d at 368. The same reasoning dictates the same conclusion vis-à-vis the 2019 rocket attack.

495.  Iran's Terrorist Sponsors were the source of rockets and rocket-related knowhow (*e.g.*, training) for Hamas, providing critical resources enabling those specific attacks. It would have been impossible for Hamas to fire thousands of rockets into Israel (as it did) without the backing of Iran's Terrorist Sponsors and the oil-funded resources they provided. This support began in the 1990s, accelerated dramatically in 2008, and continued throughout the relevant period. *See Force*, 464 F. Supp. 3d at 339.

496.    Both the Terrorist Sponsors and their proxies not only admitted that they provided critical support to Hamas rocket attacks—they bragged about it. Following a rocket attack in November 2012, PIJ Secretary-General Ramadan Abdullah told *Al Jazeera*, "Iran has given us all the support, the arms that serve the resistance—all the world knows that its principal source is Iran, or weaponry that has arrived with Iranian financing ... and this will continue for the future too." Contemporaneously, on November 20, 2012, Ziad al-Nakhla, deputy head of PIJ, told the pro-Hizballah Lebanese Al Manar television station, "[t]he arms of the resistance, including those of Hamas, are Iranian, from the bullet to the missile." And IRGC commander Mohammad Ali Jafari proclaimed at the same time that missile technology "has been transferred to the resistance, and an unlimited number of these missiles are being built."

497.    Media reports confirmed the crucial role of Iran's Terrorist Sponsors in providing rockets for terrorist attacks by Hamas. In 2012, the *Associated Press* reported that "Hamas' leader-in-exile Khaled Mashaal" gave "a very public thanks to Iran for standing by Gaza with crucial military assistance" while its "[f]ighters in Gaza also hailed the new reach of their arsenal, with Iranian-designed Fajr-5 rattling … Tel Aviv and Jerusalem." In 2014, the *Chicago Tribune* reported that "senior Iranian officials said [] that Tehran has supplied missile technology to Hamas in its fight against Israel. … Mohsen Rezaei, a senior adviser to Iran's supreme leader, Ayatollah Ali Khamenei, said Tehran had already provided Hamas with missile-building technology."

498.    Iran's provision of rockets to Hamas was confirmed by reports to Congress. In 2015, House Committee on Foreign Affairs Chair Ed Royce publicly observed:

> [A]ccording to… Western Intelligence, Iran's Revolutionary Guards, during the past few months, have transferred tens of millions of dollars to Hamas' brigades. Intelligence reports show that the funds have been transferred on the direct order of the commander of the Revolutionary Guard's Elite Kurds [sic] Force [*i.e.*,

212

Qods Force], who also dedicated an annual budget to finance Hamas' military operations. The funds, according to the intelligence report, are being used primarily to help Hamas rebuild the network of tunnels that were destroyed. And apart from using Iranian aid to rebuild the tunnel network, the brigades are also replenishing their depleted stocks of medium range missiles according to officials.

499.    On July 27, 2012, Congress adopted the "findings" that "*[o]ver the past several years*, with the assistance of the Governments of the Islamic Republic of Iran and Syria, Hizbollah and Hamas have *increased their stockpile of rockets*, with more than 60,000 now ready to be fired at Israel" and "*[a]s a result*, Israel is facing a fundamentally altered strategic environment." 22 U.S.C. § 8601(6)-(7).

500.    Khamenei, Soleimani, and the other Khamenei Cell terrorists paid by the Foundation for the Oppressed and the Terrorist Sponsors' fronts participated in Hizballah's, Hamas's, and PIJ's rocket attacks in Israel from 2010-2019 by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hizballah's, Hamas's, PIJ's and JAM's terms for de-escalation; (3) facilitate the regular re-supply of the rockets from Iran and North Korea's RGB; (4) approve and fund attack incentive and reward payments including, but not limited to, martyr payments and salary payments; and (5) coordinate Hizballah's, Hamas's, and PIJ's rocket operations, through Qasem Soleimani's in-person leadership role.

501.    This Khamenei Cell support included targeting specific geographies in Israel where Hamas and PIJ were encouraged to attack with rockets; providing technical assistance to Hamas and PIJ with respect to rocket schematics and concepts; providing training and expertise to help Hizballah, Hamas, and PIJ build their own rockets, and assemble rockets from parts supplied by Hizballah, the IRGC, or North Korea's RGB; training senior Hamas and PIJ terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the rocket, from design, to

213

manufacture, to transportation, to attack strategy; and training lower-level Hamas and PIJ members in those same camps with respect to rocket tactics.

502.    **<u>Knife & Vehicle Ramming Attacks in Israel</u>.** Plaintiffs were injured in five Hamas stabbing attacks and two Hamas vehicle attacks. One vehicle attack took place in Jerusalem on October 22, 2014, killing three-month old **Chaya Braun** and injuring her parents, **Samuel Braun** and **Chana Braun**. The second vehicle attack took place in Jerusalem on December 14, 2015, severely injuring **Yoav Golan** and **Noam Shamba**, who were waiting for a bus at the time of the attack. On December 18, 2010, Palestinian extremists authorized and incited to act by Hamas committed a stabbing attack that killed **Kristine Luken**, who was hiking in Jerusalem. The second Hamas shooting and stabbing attack took place on October 13, 2015, on a bus in Jerusalem, killing **Richard Lakin**. The third stabbing attack occurred on January 27, 2016 on the West Bank, where **Menachem Rivkin** was stabbed in the neck while walking to a restaurant. The fourth occurred in Tel Aviv on March 8, 2016, where **Taylor Force**, an American student visiting Israel was stabbed and killed. The fifth occurred on December 23, 2016 in the West Bank, where **Raphael Lisker** was stabbed in the neck while walking home after Sabbath services. The Terrorist Sponsors used funds from the Foundation for the Oppressed and their other fronts to provide support that contributed to these attacks.

503.    These attacks were part of strategic campaign by Hamas, coordinated with the Khamenei Cell, to encourage and facilitate a variety of violent attacks in different places within Israel and the West Bank, which was funded and supported by the IRGC-QF, the Foundation for the Oppressed, and Hizballah. The seemingly random and unpredictable nature of these attacks was intended to create fear and chaos among civilians in Israel. In 2015, the *Washington Post* reported that these attacks were part of a "storm of violence" and included "attacks carried out by

214

assailants wielding knives or using their cars to ram into Israeli soldiers and civilians" and that "Hamas has been egging on violence resistance on its Web sites and via the media but has been careful not to have its leaders at the forefront." In 2017, the *Washington Post* reported that the December 18, 2010 attack against Plaintiff **Kristine Luken** was "carried out by a group in retaliation for the assassination of a top Hamas operative in Dubai that January."

504.     Specifically addressing the October 13, 2015, January 27, 2016, and March 8, 2016 attacks, the court explained in *Force* that an element of Iran's proxy strategy has been to "encourage[] individuals sharing Iran's goals of destroying the state of Israel to conduct 'lone wolf' attacks and has offered money to the families of suicide bombers who terrorize Israeli civilians." 464 F. Supp. 3d at 338 (cleaned up). All of the knife and vehicle ramming attacks in this case were part of that same campaign—an organized strategy by Hamas, with support from the Terrorist Sponsors, to intimidate the United States by instilling terror in its close ally, Israel.

505.     To effectuate such attacks, Hamas would issue calls to its operatives and sympathizers to use whatever weapons were close to hand—including knives and vehicles—to carry out acts of terror. This approach surged in prominence in 2014, when Hamas began describing this wave of violence as "the Al-Qods intifada," or uprising. Hamas used its media outlets, including radio, television, newspapers, and websites—all of which received funding from the Terrorist Sponsors—to call for the attacks and praise the attackers.

506.     To commit these attacks, Hamas also depended upon Iran-funded tunnels. As the *Jerusalem Post* reported in 2017, for example, Israelis had "discovered" at least "32" Hamas and PIJ "tunnels" used for attacks in 2014, "including 14 that extended into Israel." These attack tunnels, built over many years with funds from the Terrorist Sponsors, enabled Hamas fighters to

215

freely enter Israel to plan and assist the vehicle and stabbing attacks, and to smuggle arms including knives into Israel that might otherwise have been detected at Israeli checkpoints.

507.    This wave of Hamas violence also depended upon the guarantee that the terrorists who committed them—or their families if the terrorist died—would receive attack incentive or martyr payments, financed in substantial part from the Terrorist Sponsors' oil revenues at the Foundation for the Oppressed and other fronts. The prospect of receiving these payments constituted a key incentive to carry out the attacks.

508.    In 2016, for example, *Deutsche Presse-Agentur* reported on how the Iranian regime intensified its support for such payments to accelerate Hamas's and PIJ's "knife intifada":

> Iran's ambassador to Lebanon announced … that the families of every Palestinian knife attacker shot dead by Israeli security forces will receive financial assistance from Tehran. "Based on the principles of the Islamic republic and its support of the Palestinian people ... it has been decided to give the families of each martyr 7,000 US dollars," Mohammed Fathali said during a press conference. … Fathali's statement was condemned by Israel, saying it "demonstrates again Iran's role in encouraging terror." "Following the nuclear agreement, Iran continues being a major player in international terror," Israeli Foreign Ministry spokesman Emmanuel Nahshon said in a statement. Palestinians have launched scores of knife attacks against Israelis since early October, … Israel has blamed the wave of violence on inflammatory rhetoric by radical Muslim leaders who "brainwash" youths and "glorify martyrdom."

509.    The United States has confirmed the inextricable connection between martyr payments and attacks. In 2015, for example, Treasury reported to Congress that "financial aid specifically for families related to well-known Hamas operatives who had been killed or jailed … … effectively rewarded past and encouraged future terrorist activities." In *Country Reports on Terrorism 2020*, State similarly explained that "transfers to" the "families of terrorists who died in attacks," *i.e.*, "prisoner and 'martyr' payments," "incentivize and reward terrorism."

216

510.    Iran-financed martyr payments assisted vehicle ramming attacks committed by Hamas and PIJ. In 2016, for example, the *Jerusalem Post* reported that the Iranian regime encouraged "car-ramming attacks against Israelis in recent months" when "Iran … offered financial assistance to the families of Palestinian terrorists involved in" such "attacks."

511.    Khamenei, Soleimani, and the other Khamenei Cell terrorists paid by the Foundation for the Oppressed and the Terrorist Sponsors' other fronts participated in Hizballah's, Hamas's, and PIJ's knife and vehicle ramming attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) launch and promote the attacks in the first instance; (2) help Hizballah's, Hamas's, PIJ's, and JAM's terms for de-escalation; and (3) regularly issue calls for additional martyrs and support for the knife and vehicle intifadas; and (4) approve and fund attack incentive and reward payments including but not limited to martyr and salary payments.

512.    **<u>Small Arms/Assassination Attacks in Israel</u>.** On October 29, 2014, PIJ committed an assassination attack in Jerusalem on **Yehudah Glick**, who was packing up his car after giving a speech and was shot four times. The attack was jointly planned by Hizballah and PIJ. On November 6, 2015, Hamas committed a sniper attack on **Ronen Borochov** and his sons, **Eli Borochov** and **Josef Borochov**, at the Cave of Patriarchs, a sacred Jewish site in the West Bank city of Hebron. The attack was jointly planned by Hizballah and Hamas. The Terrorist Sponsors used funds from the Foundation for the Oppressed and their other fronts to provide support that contributed to these attacks.

513.    In *Force*, the court found that "PIJ carried out the October 28, 2014 shooting of Yehuda Glick, resulting in his severe physical injuries." 464 F. Supp. 3d at 337. The court noted that "[i]n 2014, Israel authorities intercepted a ship carrying mortars, bullets, and rockets

217

destined for Hamas and PIJ and Gaza that were packed in containers featuring seals of the Iranian postal company." *Id.* at 340 (quotation omitted). Per Dr. Levitt's corroborating findings, "PIJ's own spokesman[] acknowledg[ed] that '[a]ll of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ.'" *Id*. The court found that in mid-October 2014, a PIJ leader met with senior Iranian officials in Iran, including Khamenei and other members of the Khamenei Cell, and that these meetings, "which took place just two weeks before the shooting of Plaintiff Yehuda Glick in Jerusalem by a PIJ member, focused on the need for PIJ to expand into the West Bank." *Id.* at 341.

514.    These shooting attacks depended on both weapons and operational support from Iran's Terrorist Sponsors. In addition to the weapons themselves, Hamas and PIJ operatives received weapons training through joint operations cells coordinated by Hizballah with support form the Foundation for the Oppressed and the Terrorist Sponsors' fronts. Money provided by the Terrorist Sponsors, through the Foundation, to Hamas and PIJ also covered things like pre-attack lodging, salary payments to operations and intelligence cell operatives, and bounty payments that incentivized small arms and assassination attacks in Israel. These attacks also depended on the guarantee of martyr payments, as explained above.

515.    This financial and weapons support from the Terrorist Sponsors to Hamas and JAM was publicly known, as discussed *supra*. As Dr. Matthew Levitt reported in his 2007 book on Hamas, "Tehran instituted an incentive system in which millions of dollars in cash bonuses … were conferred … for successful attacks." Additionally, on June 1, 2015, the U.N. Security Council "note[d] media reports pointing to [Iran's] continuing military support and alleged arms transfers to" "Hizbullah and Hamas," among others, and "further note[d]" that "Iranian officials" were "not denying" that they supplied "military support" to those FTOs.

218

516.    Khamenei, Soleimani, and the other Khamenei Cell terrorists paid by the Foundation for the Oppressed and the Terrorist Sponsors' other fronts participated in Hizballah's, Hamas's, and PIJ's small arms/assassination attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hizballah's, Hamas's, PIJ's and JAM's terms for de-escalation; and (3) facilitate the regular re-supply of the small arms, sniper rifles, and ammunition from Iran and North Korea's RGB; (4) train senior Hamas and PIJ terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of small arms, mass shooting, and assassination attack logistics, training, doctrine, and strategy; (5) train lower-level Hamas and PIJ members in those camps with respect to small arms, mass shooting, and assassination tactics; and (6) approve and fund the attack incentive and reward payments including but not limited to martyr and salary payments.

517.    **<u>Kidnapping Attack in Israel</u>.** Hamas and Hizballah, acting together in a joint cell, committed a kidnapping attack in the West Bank in Gush Etzion on June 12, 2014, in which **Yaakov Fraenkel** was abducted and killed. The Terrorist Sponsors used funds from the Foundation for the Oppressed and their other fronts to provide support that enabled the attack.

518.    This attack was part of a West Bank infiltration campaign by Hamas and Hizballah acting together in a joint cell. This attack was funded by the Terrorist Sponsors, with the Foundation for the Oppressed providing funding to Hizballah to be used in this joint cell. Dr. Matthew Levitt confirmed that the kidnapping attack on June 12, 2014 was carried out by Hamas operatives.[91]

---

[91] Levitt Decl., *supra* note 87, at 11.

519. Hamas and Hizballah have long cooperated on shared operations. Hamas heavily leveraged Hizballah's technical skills, experience, training, and in-country operatives—all funded by the Terrorist Sponsors—to plan and execute its kidnapping operations.

520. As explained *supra*, this attack depended upon martyr payments, tunnels, and other forms of support supplied by the Terrorist Sponsors.

521. Khamenei, Soleimani, and the other Khamenei Cell terrorists paid by the Foundation for the Oppressed and the Terrorist Sponsors' other fronts participated in Hizballah's, Hamas's, and PIJ's kidnapping attacks in Israel from 2010-2019, by ordering or authorizing the decision to: (1) continue seeking to kidnap American and Israeli hostages; (2) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments; and (3) coordinate the Hizballah's, Hamas's, and PIJ's kidnapping operations, through Qasem Soleimani's in-person leadership role.

522. **EFP Attack in Iraq.** On June 23, 2011, a joint cell comprised of Hizballah and Jaysh al-Mahdi committed an EFP attack in Baghdad, Iraq, killing U.S. Agency for International Development consultant **Dr. Stephen Everhart**. The Terrorist Sponsors used funds from the Foundation for the Oppressed and their fronts to provide support that enabled this attack.

523. In 2004, Hizballah first "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before"—the EFP, as reported by *Time*'s celebrated Iraq embed Michael Ware in 2005. Throughout the period from the mid-2000s to 2011, Hizballah trained JAM operatives in the deployment of EFPs and supplied key components, which were expressly designed to penetrate American armor. Hizballah was essential to those EFP training efforts because Hizballah fighters had direct experience using EFPs against Israeli armor in Lebanon. During this period, Hizballah was the world's foremost expert on EFPs. Hizballah also imparted

to JAM the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon, Hizballah instructed JAM to use EFPs against American soldiers. As the *New York Times* reported in 2013, "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."

524.    On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, was built using the EFP technology that Hizballah had provided to Jaysh al-Mahdi. As a declassified British intelligence report concluded, EFPs used in Iraq were "***exclusively associated with Hizballah***."

525.    Hizballah could not have committed, planned, and authorized the June 23, 2011 terrorist attack in this case without the Terrorist Sponsors' funds and logistical support. For example, as celebrated journalist Michael R. Gordon reported in 2007: "All source reporting since 2004 indicates that Iran's Islamic Revolutionary Corps-Quds Force is providing professionally-built EFPs and components to Iraqi Shia militants" in Iraq. Additionally, in a 2007 interview published by the *Independent*, a JAM member told an interviewer that "[w]e learned [from Hizballah] how to take advantage of an armored vehicle's weakness"—referring to the use of EFPs—"and how to wait and kill the soldiers who try to escape."

526.    Those funds components for EFPs continued to be supplied by the Terrorist Sponsors through 2011. For example, U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Iraq, many of which bore markings of Iranian origin, and all of which, on information and belief, were smuggled into Iraq by Hizballah. Coalition forces regularly recovered weapons caches from Iranian proxies that were replete with newly manufactured weapons often stamped "Made in Iran." According to an analysis by Dr. Michael Knights published by West Point's Combatting Terrorism Center in 2010, examples include a

221

massive seizure of a Joint Cell terrorist weapons cache near Basra in 2010, which seized "76 rockets, 15 tons of TNT and significant amounts of bomb-making material," and "41 magnets for making under-vehicle IEDs and silenced weapons." Indeed, the same analysis noted, "[t]he Iranian government does not appear to be unduly concerned about plausible deniability, deploying new Iranian-produced 'signature' weapons across Iraq. The U.S. government has released many photographic slideshows of newly-produced weapons systems in Iraq that are known to be manufactured by Iran."

527.    The Foundation for the Oppressed, SLO, and IRGC paid for, and sourced, key components necessary for Hizballah to build, each EFP used by the Joint Cells, all of which were constructed by Hizballah based upon Hizballah designs. Hizballah then provided such EFPs to the Joint Cells at the instruction of the IRGC, for the Joint Cells to use to attack Americans in Iraq. As a Jaysh al-Mahdi commander told *McClatchy* in 2007, "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."

528.    Khamenei, Soleimani, and the Khamenei Cell terrorists paid by the Foundation for the Oppressed and the Terrorist Sponsors' fronts participated in Hizballah's and JAM's EFP attacks in Iraq in 2011 by ordering or authorizing the decision to: (1) launch the attacks in the first instance; (2) help Hizballah's, Hamas's, PIJ's and JAM's terms for de-escalation; (3) approve, and fund, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments; and (4) coordinate Hizballah's and JAM's EFP attacks, through Qasem Soleimani's in-person leadership role.

**D.      The Executive's and Congress's Findings from 1996 through 2024 Confirm That SCB's Services Enabled Attacks by Hizballah, Hamas, PIJ, and JAM**

529.   From 2017 through 2024, the U.S. government explicitly confirmed that sanctions-busting transactions like those of SCB directly financed Iranian-sponsored terrorist attacks committed by Hizballah, Hamas, PIJ, and JAM from 2006 through 2020.

530.   Official U.S. sanctions announcements, legislative findings enshrined by Congress in the U.S. Code, and Executive Branch reports to Congress under penalty of perjury operated as one-way ratchet with respect to the plausibility of Plaintiffs' allegations. Such official reports and findings are made conservatively, and only after all of the relevant facts can be proven conclusively to the government's satisfaction. Accordingly, when the government makes such a report or finding, it should be regarded as very strong evidence of the finding's truth. On the other hand, the absence of a finding does not support a negative inference, because many factors may prevent such findings from issuing.

531.   This one-way-ratchet existed for at least four reasons. *First*, to impose sanctions, the Executive Branch follows a standard that is effectively more demanding than a simple "more likely than not" analysis. Accordingly, the mere fact that a person or entity is more likely than not a terrorist is not, on its own, usually enough to cause the U.S. to impose sanctions. *Second*, given the extensive U.S. government interagency process that the United States follows every time it imposes sanctions—which ordinarily takes at least several years, and often longer—U.S. sanctions announcements often reflect a multi-year time-lag as compared to then-publicly known facts about terrorists and associated terrorist finance. *Third*, the U.S. government sometimes makes diplomatic decisions to hold off announcing sanctions or avoid imposing sanctions at all. *Fourth*, Plaintiffs are aware of no reported instance or credible allegation that any U.S. counterterrorism sanctions were imposed for pretextual purposes.

532.    **Foundation for the Oppressed.** Since 1996, Congress has recognized the finding, in the Iran Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541, that the "Foundation for the Oppressed and Disabled," *id*. § 14(12)(G), was among the top twelve Iranian governmental or quasi-governmental institutions that Iran "use[s]" to "promote acts of international terrorism."

533.    On September 25, 2018, President Trump told the U.N. General Assembly in a globally televised address that "Iran's leaders sow chaos, death, and destruction" by "plunder[ing] the nation's resources to enrich themselves and to spread mayhem across the Middle East and far beyond," "seiz[ing] valuable portions of the economy, and loot[ing" the people's religious endowments"—the largest of which was the Foundation for the Oppressed— "all to line their own pockets and send their proxies to wage war."

534.    On November 18, 2020, the United States designated the Foundation for the Oppressed, confirmed that it served as a "bridge to the IRGC," and announced:

> OFAC … act[ed] … against a key patronage network for the Supreme Leader of Iran, the … Bonyad Mostazafan [Foundation for the Oppressed] … While Bonyad Mostazafan is *ostensibly* a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to … enrich his office, reward his political allies, and persecute the regime's enemies. … "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the pretense of charity," said Secretary Steven T. Mnuchin. …
>
> **PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
> Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah. Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously …. served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah. Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials. According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or

224

deportation…. The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

535. In the same designation, Treasury confirmed that the Foundation for the Oppressed performs virtually no legitimate charitable work: "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

536. On January 13, 2021, Treasury imposed additional sanctions on Iranian bonyads, and again noted the Foundation for the Oppressed's direct role in IRGC-sponsored terrorism:

> [P]urportedly charitable organizations (bonyads) …control large swaths of the Iranian economy … to the benefit of Supreme Leader Ali Khamenei and senior Iranian … officials. Alongside the previously designated Bonyad Mostazafan, itself controlled by the Supreme Leader, and the IRGC-owned Khatam al-Anbiya, bonyads are said to control more than half of the Iranian economy.
>
> "These institutions enable Iran's elite to sustain a corrupt system of ownership over large parts of Iran's economy," said Secretary Steven T. Mnuchin. "The United States will continue to target those who enrich themselves while claiming to help the Iranian people." …
>
> This action follows Treasury's November 2020 designation of the Bonyad Mostazafan [Foundation for the Oppressed], an immense conglomerate with holdings in key sectors of Iran's economy. … Bonyad Mostazafan has been the beneficiary of favorable treatment by Iran's corrupt leadership, and its assets have been used by the ***Supreme Leader Ali Khamenei to enrich his office, reward his political allies, and persecute the regime's perceived enemies***.
>
> **IRANIAN BONYADS**
>
> Bonyads are opaque, quasi-official organizations generally controlled by current and former government officials and clerics that report directly to the Supreme Leader. Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly approved. This lack of accountability has enabled the bonyads to expand their economic activities far beyond their original remit and has led to the accumulation of vast amounts of wealth without …benefit to the people of Iran.

537.     The U.S. government statements confirming the Foundation for the Oppressed's

direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United

States described a consistent pattern of conduct that existed at all relevant times throughout

SCB's scheme with the IRGC and Hizballah. These sources show that the Foundation was

closely intertwined with terrorist violence because the Qods Force and Hizballah used

Foundation revenues to finance terrorist attacks.

538.     **Supreme Leader's Office.** On June 26, 2019, the United States issued Executive

Order 13876, which formally found that the SLO directly facilitated IRGC-sponsored acts of

"international terrorism committed by "Iranian-backed proxies" in the "Middle East."

539.     On November 5, 2019, the United States imposed IRGC counterterrorism-related

sanctions against the SLO to target its sponsorship of terrorist attacks committed by the Qods

Force, Hizballah, and their proxies, based upon findings that included as follows:

> OFAC … act[ed] … against … individuals who are appointees of, or have acted
> for or on behalf of, Ali Khamenei, the Iranian regime's unelected Supreme Leader
> whose office is responsible for advancing Iran's radical agenda. This action seeks
> to block funds from flowing to a ***shadow network of Ali Khamenei's military and
> foreign affairs advisors who have for decades oppressed the Iranian people,
> exported terrorism, and advanced destabilizing policies around the world***.
> Specifically, the action targets Ali Khamenei's appointees in the Office of the
> Supreme Leader ….

> "Today the Treasury Department is targeting the unelected officials who surround
> Iran's Supreme Leader, Ayatollah Khamenei, and implement his destabilizing
> policies," said Treasury Secretary Steven T. Mnuchin. "***These individuals [in the
> SLO] are linked to a wide range of malign behaviors by the regime, including
> bombings of the U.S. Marine Barracks in Beirut in 1983 and the Argentine
> Israelite Mutual Association in 1994, as well as torture, extrajudicial killings,
> and repression of civilians. This action further constricts the Supreme Leader's
> ability to execute his agenda of terror and oppression.***"

> This action is being taken pursuant to President Donald J. Trump's Executive
> Order (E.O.) 13876, signed on June 24, 2019. The E.O. imposed sanctions on the
> Supreme Leader of the Islamic Republic of Iran and the Supreme Leader's Office

(SLO), and authorized sanctions on others associated with the Supreme Leader or the SLO. …

Mojtaba Khamenei, the second son of [Khamenei], is designated today for representing the Supreme Leader in an official capacity despite never being elected or appointed to a government position aside from work in the office of his father. The Supreme Leader has delegated a part of his leadership responsibilities to *Mojataba [sic] Khamenei, who worked closely with the commander of the … Qods Force [i.e., Qasem Soleimani] … to advance [Ayatollah Khamenei]'s destabilizing regional ambitions* ….

Also designated today is Gholam-Ali Hadad-Adel, father-in-law of Mojtaba Khamenei, a member of the Expediency Council and also an advisor to Ali Khamenei. Hadad-Adel is known to be among those in the Supreme Leader's inner circle. … Gholam-Ali Hadad-Adel is being designated [pursuant to E.O. 13876] for having acted or purported to act for or on behalf of, directly or indirectly, the Supreme Leader of Iran.

540.    Notably, Mojtaba Khamenei and Gholam-Ali Hadad-Adel (aka Gholamali Haddadadel) both operated through Petro Nahad, and thus, the above findings also confirm the tight nexus between Petro Nahad and Qods Force-sponsored attacks supported by Qasem Soleimani—which describes every attack against Plaintiffs and their loved ones.

541.    On November 3, 2022, the United States imposed additional IRGC counterterrorism-related sanctions against the SLO to target its direct and indirect sponsorship of acts of terrorism committed by the Qods Force, Hizballah, and their proxies, based upon findings that included as follows:

[OFAC] designated members of an international oil smuggling network that facilitated *oil trades and generated revenue for Hizballah and the … Qods Force … in support of Hizballah and the IRGC-QF*.

"The individuals running this illicit network use a web of shell companies and fraudulent tactics including document falsification to obfuscate the origins of Iranian oil, sell it on the international market, and evade sanctions," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "Market participants should be vigilant of Hizballah and the IRGC-QF's attempts to *generate revenue from oil smuggling to enable their terrorist activities around the world*." …

[An] Iranian national … oversaw … the network's illegal … exportation of Iranian oil in support of Hizballah and the IRGC-QF … [and] received orders from high-ranking Iranian officials associated with the U.S.-designated [] Supreme Leader's Office to **direct the network's oil smuggling operation profits to companies and bank accounts associated with Hizballah and the IRGC-QF**.

542.    That same day, Secretary of State Antony J. Blinken confirmed that the U.S. had sanctioned this SLO-directed, Hizballah- and Qods Force-operated "sanctions evasion network" and "11 vessels" because the United States determined that they "provid[ed] support to Hizballah and the Islamic Revolutionary Guard Corps-Qods Force" when they "facilitate[d] the **sale of hundreds of millions of dollars' worth of oil** for these organizations [*i.e.*, Hizballah and the Qods Force]" through the use of "shell and front companies established to facilitate the illegal blending and exportation of Iranian oil around the world," which the United States determined "**provid[ed] support to terrorists or acts of terrorism**" by Hizballah and the Qods Force.

543.    From at least 2021 through 2024, the United States publicly sanctioned "Ali Husseini Khamenei, Supreme Leader, for support of the IRGC, a Foreign Terrorist Organization," and "Mojtaba Khamenei, son of Supreme Leader," which identified Ayatollah Khamenei and Mojtaba Khamenei as persons whom the U.S. had sanctioned pursuant to "Section 221 of the Iran Threat Reduction and Syria Human Rights Act of 2012, Public Law 112-158 (TRA), enacted on August 10, 2012, codified at 22 U.S.C. 8727, requires the President to publish a list of individuals that the President has determined are senior officials of the Government of Iran, as defined in the statute, that are involved in Iran's … support for international terrorism."

544.    The U.S. government statements confirming the SLO's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout SCB's scheme with the IRGC and

Hizballah. These sources show that the SLO was closely intertwined with terrorist violence because the Qods Force and Hizballah used the SLO's profits to finance terrorist attacks.

545.   **IRGC.** On July 17, 2017, the Executive announced new IRGC-related sanctions, and confirmed that the "Islamic Revolutionary Guard Corps (IRGC)" enables "Iran's malign activities across the Middle East" by "continu[ing] to support terrorist groups such as Hizballah."

546.   On August 2, 2017, Congress enacted, and the President signed, the Countering America's Adversaries Through Sanctions Act, which codified that "Congress makes the following findings: ... (2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the ''IRGC–QF'') … support[s] terrorist and insurgent groups [by] … provid[ing] material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia"; and "(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of … *support for acts of international terrorism* …." § 105, 22 U.S.C. § 9404, Pub. L. No. 115-44, 131 Stat. 892 (2017). Moreover, the updated U.S. Code noted "the IRGC, including the Quds Force … [provided] support, including funding, lethal and nonlethal contributions, and training, … to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East." § 103(b)(5), 22 U.S.C. § 9402, Pub. L. No. 115-44, 131 Stat. 889 (2017).

547.   On October 13, 2017, the United States designated the entirety of the IRGC as a Specially Designated Global Terrorist, and stated, in part, as follows:

a.   Treasury: "OFAC … designated [the] Islamic Revolutionary Guard Corps (IRGC) pursuant to the global terrorism Executive Order (E.O.) 13224 and consistent with the Countering America's Adversaries Through Sanctions Act. OFAC designated the IRGC today for its activities in support of the IRGC-Qods Force (IRGC-QF), which was designated pursuant to E.O. 13224 on October 25, 2007, for providing support to a number of terrorist groups, including Hizballah and Hamas …. The IRGC has provided material support to the IRGC-QF, including by providing training, personnel, and military equipment."

229

b.  Treasury: "'The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. … Treasury will continue using its authorities to disrupt the IRGC's destructive activities,' said Treasury Secretary Steven T. Mnuchin. 'We are designating the IRGC for providing support to the IRGC-QF, the key Iranian entity enabling … the lethal activities of Hizballah, Hamas, and other terrorist groups. We urge the private sector to recognize that the IRGC permeates much of the Iranian economy, and those who transact with IRGC-controlled companies do so at great risk.'"

c.  Treasury: "The IRGC was designated today for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."

d.  White House: "[T]he Iranian regime continues to fuel … terror … throughout the Middle East and beyond" through "[t]he Revolutionary Guard['s]" deployment as "the Iranian Supreme Leader's corrupt personal terror force."

e.  White House: "In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to … Hezbollah, Hamas, and other terrorist networks."

f.  White House: "The Revolutionary Guard … has hijacked large portions of Iran's economy and seized massive religious endowments [*i.e.*, bonyads or foundations, *e.g.*, the Foundation for the Oppressed] to fund … terror abroad. This includes … supplying proxies and partners with missiles and weapons to attack civilians in the region[] and even plotting to bomb a popular restaurant right here in Washington, D.C."

g.  White House: "I am authorizing … Treasury … to further sanction the entire [IRGC] for its support for terrorism and to apply sanctions to its officials, agents, and affiliates."

548.    On October 16, 2017, Treasury Under Secretary Sigal Mandelker publicly

confirmed how the entire IRGC was involved in supporting terrorist attacks in the Middle East

committed by Hizballah, Hamas, PIJ, and JAM:

a.  "[T]here are few more pressing national security concerns for the United States and the international community right now than the growing threat posed by … [t]he Iranian regime," which was "wreaking havoc on the Middle East and beyond" and providing "state support of terrorism" that was "second-to-none" by "financ[ing] and support[ing] Hizballah, Hamas, and … Iraqi … militant groups" by "seed[ing] these terror groups with increasingly destructive weapons as they try to establish footholds from Iran to Lebanon and Syria" and such "aid [was] primarily delivered by … the IRGC[] and its Quds Force, which … [existed as] vehicles to cultivate and support terrorists abroad."

b.  "The IRGC has even threatened terrorist attacks right here in the United States, plotting the murder of Saudi Arabia's Ambassador to the United States on American soil in 2011.

230

Such an attack—if not thwarted by our terrific law enforcement and intelligence officers—would have not only killed a Saudi diplomat, but likely innocent bystanders here in Washington, DC."

c.     "[The United States's] Iran strategy … is designed to neutralize Iran's destabilizing influence and support for terrorists and militants. It includes four strategic objectives: First, we must neutralize Iran's destabilizing activities and constrain Iran's aggression, particularly its support for terrorism and militants with a focus on its activities in the Middle East …[,] includ[ing] its actions in Syria, which threatens Israel, and its support to terrorism through groups like Hizballah, Hamas, Iraqi Shia militant groups and others. Second, we must work to deny Iran and especially the IRGC funding for its malign activities, including its funding for terrorists and militant proxies …"

d.     "On [October 13, 2017], OFAC designated the IRGC for support to terrorism under Executive Order 13224, consistent with section 105 of the Countering America's Adversaries Through Sanctions Act passed in August. The President also authorized us to take additional action against the IRGC's officials, agents, and affiliates later this month. The IRGC designation … further increases the pressure on the IRGC. It also highlights the nefarious nature of the organization. Beyond being a proliferator of weapons and a supplier of militants and military equipment—actions for which it has been previously sanctioned by the United States—the IRGC has helped make Iran the world's leading state sponsors of terrorism."

e.     "The IRGC provides the organizational structure that allows them to export their militant extremism across the globe. It has been the Iranian regime's main weapon in pursuit of its radical goals and is a lifeline for Hizballah, … Shia militant groups in Iraq, and others. The IRGC's control over large portions of the Iranian economy furthers its ability to support these groups and enrich its members. In order to deny the IRGC the resources and financing it needs to spread instability, we must and we have been engaging our allies and partners, including those in the private sector."

f.     "[T]o deny the IRGC the resources and financing it needs to spread instability, we … have been engaging … the private sector. We have consistently raised concerns regarding the IRGC's malign behavior, the IRGC's level of involvement in the Iranian economy, and its lack of transparency. We have pointed out that the IRGC continues to be an integral part of the Iranian economy, including in the energy, construction, mining, and defense sectors. And as we have urged the private sector to recognize that the IRGC permeates much of the Iranian economy, we have told them that those who transact with IRGC-controlled entities do so at their own risk."

549.    On May 8, 2018, the United States announced new sanctions against the IRGC

confirming:

The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles … and supports terrorist proxies and militias such as Hezbollah [and] Hamas …. Over the years, [the IRGC] and its proxies have bombed American

231

embassies and military installations, murdered hundreds of American servicemembers, and kidnapped, imprisoned, and tortured American citizens. The Iranian regime has funded [the IRGC's] long reign of chaos and terror by plundering the wealth of its own people.

550.    On October 1, 2018, the United States published its counterterrorism strategy, confirming that the IRGC continued to seek to leverage its global networks of financiers, logisticians, and recruits, including persons in the United States, to sponsor acts of terrorism targeting the United States:

Iran remains the most prominent state sponsor of terrorism, supporting militant and terrorist groups across the Middle East and cultivating a network of operatives that pose a threat in the United States and globally. These groups, most notably Lebanese Hizballah (Hizballah), use terrorism … in partnership with Iran to expand their influence in Iraq, Lebanon, [and] the Palestinian territories …. Hizballah fields powerful military and intelligence elements, possesses large stocks of sophisticated arms, and maintains extensive networks of operatives and sympathizers overseas, including individuals in the [United States] homeland.

551.    On October 11, 2018, FinCEN published its *Advisory On The Iranian Regime's Illicit And Malign Activities And Attempts To Exploit The Financial System*, in which FinCEN warned multinational firms and banks, including SCB, that whenever a company or bank enables the IRGC's "Abuse of the International Financial System … to access the financial system through covert means and to further [the IRGC's] malign activities [by] … misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, … *[o]ften, these efforts serve to fund the regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), as well to Lebanese Hizballah, … and other [IRGC proxy] terrorist groups.*" Treasury's rollout confirmed, *inter alia*:

a.    "[T]he Iranian regime has masked illicit transactions using senior officials of the CBI, who used their official capacity to procure hard currency and conduct transactions for the

232

benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised to exercise appropriate due diligence when dealing with transactions involving exchange houses that may have exposure to the Iranian regime and/or designated Iranian persons, and the advisory details examples of exchange house-related schemes. Iran-related actors use front and shell companies around the world in procurement networks through which the Iranian regime has gained goods and services related to currency counterfeiting, dual-use equipment, and the commercial aviation industry."

b.    "In order to help financial institutions identify deceptive activity potentially linked to the Iranian regime, FinCEN has included red flags in its advisory. For example, CBI officials' routing transactions to personal accounts rather than central bank or government-owned accounts, and individuals or entities with no central bank or government affiliation withdrawing funds from such accounts, may be a red flag for financial institutions to investigate. Similarly, wire transfers or deposits that do not contain any information on the source of funds, contain incomplete information about the source of funds, do not match the customer's line of business, or that involve jurisdictions where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions."

552.    On April 8, 2019, the United States announced its intention to formally designate the entire IRGC—including regular IRGC, the Qods Force, and the Basij—as an FTO, which the U.S. did on April 15, 2019. During the rollout, U.S. officials warned, in part, as follows:

a.    President Donald J. Trump, April 2019: "Today, I am formally announcing my Administration's plan to designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act. This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign. This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. … If you are doing business with the IRGC, you will be bankrolling terrorism."

b.    Secretary of State Michael R. Pompeo, April 2019: "I'm here to make an important foreign policy announcement concerning the Islamic Republic of Iran. Today the United States is continuing to build its maximum pressure campaign against the Iranian regime. I am announcing our intent to designate the Islamic Revolutionary Guard Corps, including its Qods Force, as a foreign terrorist organization in accordance with Section 219 of the Immigration and Nationality Act. … This is the first time that the United States has designated a part of another government as an FTO. We're doing because the Iranian

233

regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government. This historic step will deprive the world's leading state sponsor of terror the financial means to spread misery and death around the world. … Our [IRGC FTO] designation makes clear to the world that Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. He is the commander of the Qods Force and oversees Iran's forces deployed to advance the Islamic Revolution through terrorism and other forms of violence. He doles out the regime's profits to terrorist groups across the region and around the world. … [T]he mission of this [U.S.] designation [of the IRGC as a Foreign Terrorist Organization is] … to achieve the outcomes that we laid out back in May [2018] to … [stop the IRGC from] … risking American lives each and every day."

c.   State, April 2019: "The IRGC—primarily through its Qods Force—is the primary arm of the Iranian government that carries out and directs Tehran's dangerous and destabilizing global terrorist campaign. The IRGC provides funding, equipment, training and logistical support to a broad range of terrorist and militant organizations, totaling approximately one billion dollars annually in assistance. The IRGC has also been directly involved in terrorist plotting and related activity in many countries … The IRGC is integrally woven into the Iranian economy, operating front companies and institutions around the world that engage in both licit and illicit business activity. The profits from what appear to be legitimate business deals could end up … supporting Iran's terrorist agenda."

553.   On April 15, 2019, the United States designated the entire IRGC, including regular IRGC, the Qods Force, and the Basij, as an FTO for, *inter alia*, "provid[ing] financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, … and other terrorist group[s]…." In support, State concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Announcing the designation, Secretary of State Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks … alongside the terror group it midwifed, Lebanese Hizballah." Secretary

234

Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors." As State reported to Congress in 2020, its "designat[ion]" of the "IRGC as an FTO in April 2019" was a "historic action" and "unprecedented step," which "reflected the Iranian regime's unique place among the governments of the world in its use of terrorism as a central tool of its statecraft."

554.    On January 14, 2020, President Trump implemented Executive Order 13,902, which imposed additional counterterrorism sanctions on the IRGC, and found, *inter alia*:

a.    "[The President] find[s] that Iran continues to be the world's leading sponsor of terrorism and that Iran has threatened United States military assets and civilians through the use of military force and support to Iranian-backed militia groups. It remains the policy of the United States to …counter the totality of Iran's malign influence in the region. In furtherance of these objectives, it is the policy of the United States to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and terrorist proxy networks …."

b.    "[The President] hereby determine[s] that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair the President's ability to deal with the national emergency declared in Executive Order 12957 [*i.e.*, the IRGC's sponsorship of acts of terrorism targeting the United States]."

555.    On March 26, 2020, Treasury announced new counterterrorism sanctions against the IRGC pursuant to E.O. 13,324 and reported findings as follows:

a.    "OFAC … today designated 20 Iran- and Iraq-based front companies, senior officials, and business associates that provide support to or act for or on behalf of the Islamic Revolutionary Guards Corps-Qods Force (IRGC-QF) in addition to transferring lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah (KH) and Asa'ib Ahl al-Haq (AAH). Among other malign activities, these entities and individuals perpetrated or supported: smuggling through the Iraqi port of Umm Qasr; money laundering through Iraqi front companies; selling Iranian oil to the Syrian regime; smuggling weapons to Iraq …; promoting propaganda efforts in Iraq on behalf of the IRGC-QF and its terrorist militias …. The terrorist militias supported by the Iranian regime such as KH and AAH have continued to engage in attacks on U.S. and Coalition forces in Iraq."

235

b.        "'Iran employs a web of front companies to fund terrorist groups across the region, siphoning resources away from the Iranian people and prioritizing terrorist proxies over the basic needs of its people,' said Treasury Secretary Steven T. Mnuchin."

556.    On May 1, 2020, the United States announced new counterterrorism sanctions against the IRGC and confirmed that "senior officials of [the] Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)" were "involved in IRGC-QF efforts to generate revenue and smuggle weapons abroad" through an IRGC front "company owned, controlled, or directed by" an IRGC member, thereby "violat[ing] [U.S.] sanctions and money laundering laws" by committing "crimes" that caused valuable "assets" to flow to "a foreign terrorist organization."

557.    On June 1, 2023, the United States imposed counterterrorism sanctions pursuant to E.O. 13224 against numerous "members and affiliates of" the "IRGC-QF" and "IRGC-IO" based on Treasury's determination that such persons "participated in a series of terrorist plots including assassination plots targeting former United States government officials, dual U.S. and Iranian nationals, and Iranian dissidents"; with respect to IRGC-IO, Treasury "target[ed] … two senior officials of the IRGC's Intelligence Organization (IRGC-IO)[] who have been involved in plotting [such collaborative IRGC-QF/IRGC-IO] external lethal operations against [U.S. national] civilians including journalists and activists." In the same finding, Treasury also observed: "Treasury has consistently acted to address external terrorist plotting by the IRGC-QF and Iran's intelligence service," *i.e.*, IRGC-IO.

558.    An enforcement action taken by the United States against another European bank, BNP Paribas S.A., which in 2014 pleaded guilty to criminal sanctions violations based, in part, on serving the *same* Caspian Petrochemical FZE at issue here, also confirms the connection between that conduct and terrorist attacks. At the time, DOJ explained that by "providing dollar clearing services to individuals and entities associated" with "Iran" in "clear violation of U.S.

236

law," the bank "helped [Iran] gain illegal access to the U.S. financial system," and in "doing so," the bank "deliberately disregarded U.S. law of which it was well aware, and placed its financial network at the services of rogue nations" through its "***criminal support of countries and entities engaged in acts of terrorism and other atrocities***." More recently, Judge Clarke in this Court held that plaintiffs suing BNP Paribas for JASTA violations stated a claim based on the same type of illicit transactions for the Caspian Petrochemical. *See Moses*, 2025 WL 2780803, at \*14-15.

**E.      SCB Supplied Long-Lasting Assistance that Continued Aiding Terrorist Attacks Through at Least 2019**

559.    SCB's conduct supplied unusually long-lasting assistance to attacks committed by Hizballah, Hamas, PIJ, and Jaysh al-Mahdi in at least five ways.

560.    *First*, the uniquely long "tail" of petroleum industry investments ensured that business and contractual relationships that SCB helped the Terrorist Sponsors secure through 2012 continued flowing profits to fund attacks for years thereafter.

561.    *Second*, SCB's assistance allowed key terrorists who sponsored the attacks against Plaintiffs to enhance the personal jihad networks upon which they relied to maximize the power of their attacks. For example, when Qasem Soleimani had more money, he could pay more people to assist on matters like intelligence, logistics, and recruitment. The larger the operatives' network, the more lethal their attacks.

562.    *Third*, SCB's conduct helped Hizballah, Hamas, PIJ, and JAM stockpile weapons for future attacks years later. Consistent with IRGC and Hizballah practice, Hizballah, Hamas, PIJ, and JAM all emphasized long-term logistical planning, and massing weapons stockpiles.

563.    *Fourth*, SCB's conduct helped the Terrorist Sponsors finance the construction of a latticework of terrorist attack tunnels in Gaza and southern Lebanon, which led to a

corresponding increase in terrorist attacks. Among other things, the tunnels facilitated rocket attacks because terrorists fired rockets from inside purpose-bult tunnels, thus maintaining cover, and the tunnel network allowed terrorists to continuously change the location from which they fired, which increased the survivability (for the terrorists) and therefore led to more attacks.

564.    *Fifth*, SCB supplied the terrorists with very large sums. At such amounts, the financial windfall SCB bestowed upon Hizballah, Hamas, PIJ, and JAM (via the Terrorist Sponsors) continued powering attacks for many years after SCB stopped its conduct.

## V.    SCB Knew That Providing Financial Services To NIOC And Caspian Petrochemical FZE Would Enable Hamas, Hizballah, Palestinian Islamic Jihad, And Jaysh al-Mahdi Terrorist Attacks

565.    The fact that the Caspian Petrochemical FZE was a government-owned oil and gas company—a fact SCB recorded in its customer due diligence files as of 2007—was all SCB needed to know to see clearly that Caspian Petrochemical was a conduit for funding attacks. The same was true for NIOC and the Iranian banks. This was made inescapably clear to SCB in a series of events and warnings over many years relating to Iran's oil and gas industry, of which SCB was aware. These events and warnings included: (1) Iran's own statements about its policy to fund attacks with oil and gas revenue and its own well-publicized actions demonstrating it was doing so; (2) public reports of how the Iranian government was enshrining its terrorist-financing policy in the structure of the institutions that controlled its oil and gas industry; and (3) numerous warnings from the U.S. government and others specifically singling out Iran's oil and gas industry as a primary source of its terrorist financing.

566.    SCB's knew the facts embodied in these sources—and more—for multiple reasons. *First*, as a major financial institution, SCB used state-of-the-art tools for customer diligence and economic intelligence, which allowed it to understand the nature of the markets

where it operated and its customers. SCB had abundant incentives to employ these tools to their fullest effect—including regulatory requirements, best-practices guidance, and business imperatives to know its customers' business. These tools alerted SCB to public reports discussing its customers and the sectors in which they operated, as well as non-public information that SCB gathered about its customers while trying to earn and maintain their business.

567.    *Second*, SCB communicated with other banks and regulators, who shared private information with SCB about its customers and the jurisdictions where they operated. For example, NYDFS's 2012 resolution with SCB found its misconduct "especially egregious" because it occurred when "SCB's New York branch was subject to a formal supervisory action" for other money-laundering and sanctions-related violations—meaning SCB was in routine and direct contact with regulators throughout the relevant period. News reports also revealed that in the years after 9/11, Treasury officials conducted road shows to major global banks where they explained the risks of taking on customers from jurisdictions like Iran, including explaining that it was highly likely that firms in sectors that had been taken over by the Terrorist Sponsors were contributing to their terrorist-support mechanisms. SCB was the beneficiary of such briefings. Additionally, when other banks were asked to process transactions for an SCB customer, they would analyze the transaction and, if it raised issues, explain those issues to SCB, providing SCB with further intelligence about its customers and the nature of their transactions.

568.    *Third*, the customers SCB served through its evasion schemes were not individuals with small, simple checking accounts; they were large entities moving millions upon millions of dollars each and every year, paying hefty commissions to SCB in the process. Banks like SCB get to know such customers—including learning the identities of their beneficial

owners and knowing the true nature of their businesses. Thus, banks, including SCB, assign relationship managers to learn about the customers and assess how the bank can best serve them. They gather and monitor data about their customers and find opportunities to expand the banking relationship. They strive to know, at a deep and fundamental level, what the customer wants from the relationship. When, as here, the customer wants to obscure its identity and covertly move money for Iran's Terrorist Sponsors, SCB would learn that fact through its relationship with the customer. Indeed, SCB chose to satisfy those illicit needs.

569.    *Fourth*, SCB had a physical presence in Iran through its office in Tehran, which remained open until May 2012, just before U.S. authorities' first enforcement actions against SCB became public. Through this office, as well as its branch in nearby Dubai, SCB employees and agents observed firsthand major developments in the Iranian economy, including the IRGC's overt and public takeover of key sectors that SCB wanted to serve, which began as early as 2005. The pervasive role that the Terrorist Sponsors and their fronts played in the Iranian economy was a matter of common knowledge within Iran and Dubai, and therefore known to SCB, which was present there. The bank's presence in Iran and Dubai also created many opportunities for IRGC officers and fronts to interface directly with SCB, without oversight from Western regulators.

570.    Based on these and other inputs, SCB either knew or was willfully blind to the fact that by providing services for NIOC, Caspian Petrochemical, and other fronts for the Terrorist Sponsors, it was enabling attacks on Americans by Hizballah, Hamas, and PIJ.

### A.    Iran's Own Statements and Actions

571.    Although Iran's general statements of support for terrorism were frequent (and are discussed elsewhere, Iranian leaders publicly explained with great specificity how Iran's most valuable economic resources would be used to finance the Ayatollah's most steadfast objective

240

to "export the Islamic Revolution" through IRGC-sponsored acts of terrorism committed by IRGC proxies. From those statements, SCB knew that Ayatollah Khamenei and the IRGC followed a pattern and practice of earmarking a certain percentage of *all* Iran's oil revenue for redistribution to IRGC proxies, including Hizballah, Hamas, and JAM. From 2000 through 2020, Ayatollah Khamenei regularly publicly touted his and the IRGC's effective monopoly over Iran's oil and gas sector—and attendant lucrative export base—and that this control comprised one of the Ayatollah's and IRGC's greatest strategic weapons. In this context, Iran's Terrorist Sponsors, and Iranian officials who had to toe their line, always treated all Iran-based oil and gas revenues uniquely amongst all Iranian industry sectors by specifically earmarking a fixed percentage of revenue from *every* oil- and gas-related transaction in Iran to directly flow to Hizballah, Hamas, and the IRGC's other proxies in the Middle East.

572.    SCB knew this for a host of reasons, including, but not limited to, because SCB employees and agents in Iran were aware of such facts and because media outlets reported on them. For example, a *Reuters* report published on May 30, 2006—after Hamas seized control of the Gaza Strip—alerted SCB that former Iranian President Khatami publicly called for every petroleum-producing Muslim government to follow Iran's lead and earmark for Hamas a fixed percentage of every petro dollar that their regime's own respective oil resources generated, which the Iranians would help ensure reached Hamas notwithstanding U.S. counterterrorism sanctions seeking to deprive Hamas of the funds to pay for attacks:

> Former Iranian President Mohammad Khatami called on Muslim oil-producing countries to *give 1 percent of their oil revenues to the cash-strapped Palestinian government led by Hamas*. …

> Hamas … is cash-strapped because the United States and its allies have cut off aid to the body to pressure Hamas to renounce violence and recognise Israel. Hamas's charter calls for the destruction of the Jewish state.

241

*"Given the rise in oil prices the producer countries should expect to deposit 1 percent of their oil revenues," Khatami said. Iran [is among the countries that] … have pledged funds totalling more than $200 million.*

573.    On December 20, 2006, similarly, Iranian President Ahmadinejad—whom SCB knew was an outspoken supporter of Hamas's terrorist attacks in Israel—gave a speech broadcast on Iranian state TV, which BBC then annotated as follows: "[Mahmoud Ahmadinejad:] The believers and worshippers of God, who are in charge of the oil resources, put aside their own personal needs, to *present and donate their assets in order to help others*, to elevate society and to bring comfort to other people who share their faith [[BBC:] presumably, he is trying to *justify donating Iran's oil money to the Palestinians and the Lebanese Hezbollah*]."

574.    Iran's words were confirmed by vivid public reports of its deeds. As just one example, on October 17, 2006, the *Wall Street Journal* reported that "the potent political forces that roil Iranian business, including the heavy hand of elements close to Iran's hard-line president," were exposed when the IRGC—"in a scene like something you … see only on television"—raided a Romanian drilling rig off the coast of Iran in August and seized control of the company that holds the rig's lease, Oriental Oil. The *Wall Steet Journal* reported that this seizure was emblematic of the IRGC's "aggressive push into the backbone of Iran's economy, its oil and gas fields." The *Wall Street Journal* also reminded its readers in the global business community, including SCB, of the obvious connection between the IRGC's role as "an active player in business" in the oil sector and its sponsorship of terrorist attacks throughout the region:

> The Guard has a long history of activity abroad, having helped set up Lebanon's Hezbollah militia in the early 1980s. More recently, it has reached into neighboring Iraq. There, according to a senior Israeli security official, its quest for influence is spearheaded by a special unit of the Guard called the Ramadan Headquarters, which trains and funds Iraq Shiite fighters.
>
> The Guard's business activities include engineering, media, trading and energy. 'They are taking positions everywhere,' says Mohsen Sazegara, a former aide to

242

the late Ayatollah Khomeini and a founder of the paramilitary force in 1979. The Guard, says Mr. Sazegara, who broke with Iran's regime a few years ago and now lives in the U.S., is a 'unique organization in the world: a political body, a military force and big, complex company.'

## B.        Iran's Government Structure

575.    SCB knew that the elements of Iran's government responsible for facilitating terrorist attacks by the IRGC's proxies—including the IRGC, SLO, and Foundation for the Oppressed—were formalizing and institutionalizing their control over petroleum industry profits.

576.    SCB knew that IRGC front KAA had been awarded multi-billion-dollar contracts to develop South Pars in June 2006.

577.    SCB knew that the Supreme Leader ordered that the Foundation for the Oppressed be given a substantial role in the negotiation for, and receipt of payment relating to, Iranian oil exports in 2008. This further alerted SCB that any Iran-related energy transactions directly aided the Qods Force, Hizballah, Hamas, PIJ, and JAM, because the Supreme Leader's decision inextricably connected the Foundation to Iran's oil sector. SCB knew about the Supreme Leader's decision for several reasons, including its knowledge derived from SCB's Iran branch and contemporaneous media reports that discussed the decision and its implications. On April 30, 2010, for example, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported that the "political influence" of the "Bonyad-e Mostazafan (Foundation of the Oppressed)" "among [Iranian] decision-makers" who were "accountable only to the Supreme Leader" was "exemplified by the extension of a lucrative privilege to this entity: the Minister of Petroleum announced in June 2008 Bonyad-e Mostazafan's newly acquired right as Iran's oil seller on international markets."

578.    SCB knew that Ayatollah Khamenei decreed in March 2011 that all oil and gas contracts would be awarded to Petro Nahad, an entity established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC.

579.    SCB knew that IRGC commander Rostam Qasemi was appointed in August 2011 to be Minister of Petroleum, with control of the agency that controls NIOC. Public sources reported that Qasemi, speaking in parliament in 2011, described himself as a "soldier[] of the Islamic Republic's Revolutionary Guards." President Ahmadinejad similarly described Qasemi in 2011 as a "child of the revolution," who would "transform" the oil industry "in line with national interests."

C.    **Warnings by the U.S. Government, Foreign Governments, Media Outlets, and Others**

580.    In the fact sheet accompanying OFAC's October 25, 2007, designation of the IRGC and its Qods Force, OFAC warned that they used the oil industry to finance terrorism. The fact sheet alerted SCB that the IRGC and its Qods Force provided "material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." The fact sheet also explained that the IRGC "had a long history of supporting Hizballah's … terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming." The fact sheet also specifically alerted SCB that this support contributed to attacks on civilians in Iraq: "In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and

244

Iraqi forces and innocent Iraqi civilians." At the same time, the fact sheet alerted SCB to how the IRGC used Iran's oil industry to fund its operations: "It … has numerous economic interests involving … the oil industry…. The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others." OFAC designated several companies, including Oriental Oil Kish, "on the basis of their relationship with the IRGC."

581.   In speeches and meetings with government officials during the U.S. government's financial pressure campaign, discussed *supra*, officials routinely emphasized how Iran's oil industry funded terrorism.

582.   Under Secretary of State Nicholas Burns, for example, in testimony to Congress, in 2007, explained: "In recent weeks, we have engaged relevant companies and countries about their potential investment in Iran's oil and gas sector," and we have been "making clear our opposition to such deals." Burns emphasized that "[n]o discussion of Iran would be complete without mentioning the regime's record of supporting terrorism." He added, that "Tehran has long been the world's leading state sponsor of terrorism," who is "responsible for the deaths of scores of Americans," that Iran was seeking to "rearm Hizballah," and that "[r]ecognizing Iran's role as the central banker of global terrorism, the Departments of State and the Treasury have enlisted foreign support in efforts to deny suspect Iranian individuals and entities access to the international financial system."

245

583.    Over the course of 2010 and 2011, the U.S. government issued a clarion call consisting of at least fifteen events that warned SCB specifically about Iran's oil sector, its use of fronts, the dominance of the IRGC, and its funding of terrorism. These 2010-2011 warnings are especially notable because they accompanied the most active period of SCB's assistance to Caspian Petrochemical FZE, as documented in the government's later enforcement actions. More than $140 million of the approximately $151 million and fully 133 of the 190 transactions SCB processed for Caspian Petrochemical between 2009 and 2012 were processed after the events of May 2010—when Caspian Petrochemical was flagged by other banks, was brought to the attention of SCB's senior management, and was the subject of SCB's lie to OFAC that the company had "no direct or indirect involvement with Iran."[92] Thus, at the same time as they were alerted to specific concerns about Caspian Petrochemical from other banks and their own compliance staff, SCB's senior management was also receiving some of the sharpest and most sustained warnings from the U.S. government about Iran, and specifically about *the IRGC's use of front companies in the petrochemical sector to fund terrorism*. SCB's response was to ignore the warnings and to continue processing the bulk of its transactions for Caspian Petrochemical over the ensuing two years.

584.    SCB received the first of these warnings on February 10, 2010, when OFAC designated IRGC General Rostam Qasemi and four companies associated with KAA, explaining:

> As the *IRGC consolidates control* over *broad swaths* of the Iranian economy, displacing ordinary Iranian businessmen in favor of a *select group of insiders*, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world, said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities ….

---

[92] 2019 OFAC Settlement ¶¶ 7, 25.

246

> The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and *oil industries*, controlling billions of dollars of business. The *profits from these activities* are available to support the full range of the IRGC's illicit activities, including WMD proliferation and *support for terrorism*.

OFAC also reiterated that the Qods Force had previously been designated in 2007 for "terrorism support activities," as described *supra*.

585.    SCB received the second warning on June 16, 2010, when OFAC designated numerous entities and individuals associated with the IRGC and identified 20 companies and 98 vessels in the shipping and petrochemical industries as fronts for the Iranian government. Several entities were located and/or incorporated outside of Iran, including in Dubai, and many used a variety of names to evade scrutiny. Of the vessels, 71 had also changed their names to avoid scrutiny. For example, OFAC identified a petrochemical company owned by NIOC, and warned about the IRGC's "significant political and economic power," including its "growing presence in Iran's financial and commercial sectors," including "the oil industry."

586.    In announcing OFAC's action, Treasury Secretary Timothy Geithner personally delivered the clarion call, emphasizing the IRGC's support for terrorism and sanctions evasion:

> Our actions today are *designed to deter* other governments and *foreign financial institutions* from dealing with these entities and thereby supporting Iran's illicit activities.…
>
> [W]e are adding two individuals and four entities that are part of Iran's Revolutionary Guard, which plays a key role in Iran's missile programs and support for terrorism.…
>
> [W]e are identifying [] *petroleum … companies—located inside and outside Iran—that are owned or controlled by the Iranian government*.…
>
> In the coming weeks, we will continue to increase the financial pressure on Iran.
>
> *We will continue to target Iran's support for terrorist organizations.*
>
> *We will continue to focus on Iran's Revolutionary Guard.*

And we will continue to expose Iran's efforts to evade international sanctions… .

When major international institutions find out they're actually working with a company that supports Iran's nuclear or missile programs, they realize it's not worth the risk.

They cut off their business.

And over the years, this has made a major difference in limiting Iran's ability to use the global financial system to pursue illicit activities.

We have made important progress. But we cannot stop. Iran will never cease looking for new ways to evade our sanctions. So our efforts must be ongoing and unrelenting.

We will keep working to intensify financial pressure on Iran.

587.    Under Secretary Levey delivered a similarly pointed warning on the same day:

Third, we are taking further action against the IRGC, or Islamic Revolutionary Guards Corps. *The IRGC plays a key role in Iran's* missile program and *support for terrorism and it has taken over broad portions of the Iranian economy*, to the detriment of the Iranian people. With today's designations, we have now sanctioned 26 entities and individuals connected to the IRGC, and we will continue to do so. *No IRGC entity should have any place in the world's legitimate financial system*….

Finally, we are identifying [] *petroleum … companies owned or controlled by the Government of Iran, including [many firms] located outside Iran and many that are not easily identifiable as Iranian*. Americans have long been forbidden to do business with Iranian entities. Companies around the world are increasingly deciding not to do business with the government of Iran because of its illicit conduct and because, as President Obama said last week, it is a government that brutally suppressed dissent and murdered the innocent….

We know that officials in Iran have been anxious about this new round of sanctions. If the Iranian Government holds true to form, it will scramble to identify work-arounds—hiding behind front companies, doctoring wire transfers, falsifying shipping documents. *We will continue to expose this deception thereby reinforcing the very reasons why the private sector is increasingly shunning Iran.*

588.    SCB received its third warning on June 22, 2010, when Treasury Under Secretary

Levey and State Under Secretary Burns testified before Congress. Under Secretary Levey noted

248

that the U.S. government's strategy for addressing "the Iranian threat," including Iran's "support for terrorism" and "abuse of the financial system," was at an "inflection point." He explained:

> The steps private sector firms around the world have taken in recent years to protect themselves from Iran's illicit and deceptive activity are extremely important. We have found that when we use reliable financial intelligence to build cases against Iranian actors engaged in illicit conduct, many members of the private sector go beyond their legal requirements regarding their interactions with these and other Iranian actors because they do not want to risk handling illicit business. This behavior is a product of good corporate citizenship and a desire to protect their institutions' reputations. The end result is that the voluntary actions of the private sector amplify the effectiveness of government-imposed measures. Thus, as we have taken action to target illicit Iranian conduct, we have shared some of the information that forms the basis for our actions with our partners in the private sector and, in response, virtually all major financial institutions have either completely cut off or dramatically reduced their ties with Iran. We are now starting to see companies across a range of sectors, including insurance, consulting, *energy*, and manufacturing, make similar decisions. Once some in the private sector decide to cut off ties to Iran, it becomes an even greater reputational risk for others not to follow, and so they often do….

589. At the same time as Levey and Burns testified in Congress, SCB received a fourth warning in the form of a June 22, 2010, advisory from FinCEN amplifying the U.S. government's message and directly advising banks about the need for extreme caution in the face of the "serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran." The advisory described a recent UN Security Council resolution regarding Iran and emphasized "the increasing risk to the integrity of the international financial system posed by … commercial enterprises that are owned or controlled by the IRGC." The advisory explained:

> Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian banks, leaving Iran's financial institutions increasingly isolated. Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally…. FinCEN continues to advise all U.S. financial

249

institutions to take commensurate risk-mitigation measures to diminish threats emanating from Iran….

As required under 31 CFR § 103.176(a), covered financial institutions [including U.S. branches of foreign banks] should ensure that their due diligence programs, which address correspondent accounts maintained for foreign financial institutions, include appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to detect and report known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered, or managed in the United States.

With respect to correspondent accounts held with financial institutions that maintain relationships with Iran, FinCEN reminds institutions of the ***increasing likelihood that Iran will use its existing correspondent relationships to hide illicit conduct in an attempt to circumvent existing sanctions***. ***Financial institutions should be vigilant in dealing with banks that might have a connection to Iran***….

The increasing infiltration of Iran's legitimate economy by designated entities, including especially the IRGC, exposes … international financial institutions and companies to entities owned, controlled, or otherwise affiliated with the IRGC and other designated entities….

Additionally, as required under 31 CFR §§ 103.15 - 103.21, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or another violation or attempted violation of law or regulation, the financial institution shall then file a Suspicious Activity Report.

590.    SCB received its fifth warning on July 1, 2010, when President Obama signed into law the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA), Pub. L. 111-195, which passed unanimously in the Senate and near-unanimously in the House (408-8). CISADA reauthorized the Iran Sanctions Act of 1996, which had passed unanimously in both houses of Congress, and in which Congress found that Iran's "***support for acts of international terrorism*** endanger the national security and foreign policy interests of the United States" and declared it "the policy of the United States to ***deny Iran the ability to support acts of international terrorism … by limiting the ability to explore for, extract, refine, or***

250

***transport by pipeline petroleum resources of Iran***." 110 Stat. 1541 (codified as amended at 22 U.S.C. § 8512). In CISADA, Congress added a number of new provisions targeting Iran's energy sector and made additional findings that Iran's "support for international terrorism" is "a threat to the security of the United States" and that Iran was engaged in "ongoing arms exports to, and support for, terrorists." 124 Stat. 1312, 113-14. It also noted "the involvement of Iran's Revolutionary Guard Corps in … international terrorism." *Id.* at 1315.

591.    Upon CISADA's signing, Treasury Secretary Geithner issued a statement emphasizing "Iran's continued … support for terrorists" and explaining that the new law would "strengthen Treasury's ongoing efforts to protect the international financial system from abuse." To underscore the message even more, Treasury issued guidance—a sixth warning to SCB— summarizing the new Iran sanctions in *five* languages, including Arabic. The guidance explained that the new law

> strengthened existing U.S. sanctions with respect to the Iranian energy industry, and adds the potential for the imposition of serious limits on foreign financial institutions' access to the U.S. financial system if they engage in certain transactions involving Iran. CISADA is consistent with the global consensus regarding Iranian behavior and is in line with the U.S. Government's core role of protecting its domestic financial system from exposure to Iran's illicit and deceptive financial practices.

592.    In a seventh warning, on July 26, 2010, the European Union and Canada adopted new sanctions against Iran, including measures targeting its trade and energy sectors, as well as the IRGC. According to the entry in the Official Journal of the European Union announcing the E.U. sanctions, among other prohibitions, "Member States should prohibit the sale, supply or, transfer to Iran of key equipment and technology as well as related technical and financial assistance, which could be used in key sectors in the oil and natural gas industries. Moreover, Member States should prohibit any new investment in these sectors in Iran." Canadian Minister

of Foreign Affairs Lawrence Cannon similarly announced that the Canadian sanctions were "aimed at Iran's irresponsible and aggressive government" and "prohibit any new investment in Iran's oil and gas sector." In response, Treasury Secretary Geithner and Secretary of State Clinton announced that they welcomed those steps to restrict Iran's ability to use its "*energy proceeds*" to support its illicit activities, and they observed that "companies around the world refuse to do business with Iran rather than risk becoming involved in" those activities.

593.    An eighth warning arrived on August 3, 2010, when OFAC issued a set of designations "targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah, Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine-General Command (PFLP-GC) and the Taliban." The accompanying fact sheet warned that "Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism." It explained how Iran uses "*its state apparatus— including the Islamic Revolutionary Guard Corps-Qods Force—and state-run social service organizations to support terrorism under the guise* of providing reconstruction and economic development assistance or social services." It also explained that the IRGC's Qods Force was "the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups" and was providing "material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia."

594.    Also on August 3, 2010, SCB received a ninth warning when OFAC identified another 21 entities in various economic sectors, often located or incorporated outside Iran, that were Iranian fronts. The purpose of identifying these entities, according to the announcement, was to make people "better able to identify Iranian Government entities and protect themselves against the risks posed by such entities." Under Secretary Levey also warned: "As its isolation

252

from the international financial and commercial systems increases, the Government of Iran will continue efforts to evade sanctions, including using government-owned entities around the world that are not easily identifiable as Iranian to facilitate transactions in support of their illicit activities …."

595.    A tenth warning alerted SCB to the urgency when OFAC announced its regulations implementing CISADA on August 16, 2010. Treasury's announcement emphasized that CISADA "buil[t] on continued efforts by the United States and our allies to protect the international financial system from abuse by Iran. We are already seeing the private sector adjusting business practices in response to CISADA in order to ensure that their access to the U.S. financial system is not put at risk."

596.    An eleventh warning, an August 16, 2010, op-ed by Under Secretary Levey in the Financial Times, reminded SCB that "[s]ubstantial attention has already been paid to sanctions in Iran's **banking and energy sector**," while the latest round of measures focused on shipping. Levey also emphasized that the "broader private sector is restricting business with Iran, rather than risk facilitating Iran's illicit activities."

597.    On information and belief, SCB received a twelfth warning (and likely more) during a three-week August campaign by senior Treasury officials. A Treasury summary published on August 20, 2010, reported that Treasury's three "leading officials on U.S. sanctions crisscrossed the globe" for three weeks to conduct "face-to-face global engagement on Iran with governments and the private sectors" in a number of countries, including the UAE. The officials highlighted the impact of the latest financial pressure on Iran's ability to "***develop its oil and gas fields, acquire financial services and maintain financial relationships with the international community***." The report added:

253

At roundtable discussions with banking associations, Treasury continued its dialogue with the private sector on the need for enhanced vigilance with respect to Iran's continued efforts to engage in a range of deceptive measures to conduct illicit transactions and evade sanctions. U.S. officials also highlighted the need for ***intense scrutiny*** from both regulators and financial institutions of all transactions involving Iran to combat attempts by Iran to establish new and expand existing financial relationships as sanctions tighten.

598.    SCB received a thirteenth warning on December 21, 2010, when OFAC announced yet another round of designations targeting the IRGC, and again warned: "With the IRGC's expanding influence and control over broader segments of the Iranian economy—including the defense production, construction, and ***oil and gas industries—increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella*** and identified with its illicit conduct." OFAC identified Pars Oil & Gas Company as an entity controlled by the government of Iran and again highlighted the IRGC's role in development of the South Pars gas field.

599.    SCB received a fourteenth warning on June 20, 2011, when OFAC designated ten shipping companies, including several based in the UAE, highlighting "Iran's continued efforts to evade sanctions and its ongoing creation and use of new front companies, subsidiaries, and affiliates." An accompanying announcement by New York District Attorney Cyrus R. Vance, Jr. explained that, as part of investigations into "the misuse of banks in Manhattan by those seeking to evade sanctions to support terrorism," eleven corporations and five individuals had been indicted for using "alias names and corporate alter egos," including in the UAE, to obscure the Iranian government's involvement in shipping companies.

600.    SCB received a fifteenth warning on November 21, 2011, when OFAC announced expanded sanctions on the development of Iran's petroleum resources and its petrochemical industry, along with Treasury's finding that Iran was a jurisdiction of primary money laundering concern (discussed *supra*).

254

601.    In sum, over the course of 2010 and 2011—as SCB was receiving no less than fifteen different warnings about the IRGC's use of front companies in the petrochemical sector to fund terrorism—SCB was regularly processing approximately 130 funds transfers amounting to about $140 million in transactions for a petrochemical company it knew to be an IRGC front.

602.    In addition, decades of other reports and statements by the United States, terrorists, media outlets, scholars, and ordinary citizens alerted SCB that every time it provided illicit financial services to any customer in connection with Iranian oil- or gas-related transaction, it ran an extreme risk that the other side was funding the Qods Force, Hizballah, Hamas, and JAM and, moreover, even if such person was not, the end revenues would likely flow to such terrorists, given the Iranian regime's long-standing and unique treatment of the revenues it realized from its oil and gas monopoly. Such reports included, but were not limited to:

a.    *Agence France Presse English Wire*, February 6, 2006: "Iran … formally notified the [IAEA] of its decision to restart sensitive nuclear work at the centre of concerns the hardline regime could acquire nuclear weapons. Senior [Iranian] officials also played down the threat of sanctions … emphasising [Iran]'s vast oil wealth. … [I]n an interview with *Handelsblatt*, US Defence Secretary Donald Rumsfeld said the United States does not rule out using military force against Iran. 'All options, including the military one, are on the table,' Rumsfeld [said], repeating his fears that weapons of mass destruction could fall into the hands of terrorists and branding Iran 'the main sponsor of terrorist organisations such as Hezbollah and Hamas.' But [regime spokesman Gholam Hossein] Elham said oil-rich Iran still had the upper hand when it came to enduring any eventual sanctions. … 'Any decision in this regard [*i.e.*, for the United States to impose sanctions targeting the IRGC, responsible for Iran's nuclear program] will not hurt us. It will hurt the consumers and not the producers. We are in a position of power when it comes to energy, and it will not have any affect [sic] on our budget,' he said."

b.    White House Press Secretary Scott McClellan, February 22, 2006: "[Reporter:] Iran, as you probably know, has now said that it would help fund Hamas, has said that its oil revenues ... will help amply pay for Hamas as needed. What's the U.S. reaction? And does this undercut any sanctions against Iran? [McClellan:] Well, … the regime in Iran … [has] been a destabilizing force in the … Middle East. Our views are very clear when it comes to the regime. ... And in terms of Hamas, ... we've made it very clear that ... they continue to engage in terrorism and continue to advocate the destruction of Israel."

c.  President of Israel Shimon Peres, March 18, 2008: "Iranian oil money is funding world terror, including Hamas and Hezbollah terror."

d.  *Agence France Presse English Wire*, March 18, 2008: "After meeting [German Chancellor Angela] Merkel, [Israeli President Shimon] Peres stressed that … 'the money earned from oil enables Iran to finance international terrorism, particularly the terrorism of Hezbollah and Hamas.'"

e.  *Jerusalem Post*, March 19, 2008: "German Chancellor Angela Merkel told the Knesset ... 'I say it in a clear voice - the [Hamas and PIJ] Kassam [rocket] fire [targeting Israeli civilians] must stop,' Merkel said. 'Terror attacks are a crime, and do not resolve political disputes.' Prime Minister Ehud Olmert praised Merkel's 'strong and determined position against the horrific calls from the president of Iran to wipe Israel off the map ….' ... Merkel, … also met with President Shimon Peres, who said … that Iranian oil revenue was funding world terrorism - including Hamas and Hizbullah."

f.  *Reuters*, May 5, 2008: "Israeli President Shimon Peres … said … 'Oil ... is [] promoting terror,' said the 84-year-old Nobel Peace Prize winner … Peres argued that manifold increases in oil prices in recent years had contributed to a rise in financing for terrorism in the Middle East … Peres took particular aim at Iran, repeating recent comments that Tehran's nuclear programme and its rhetoric against Israel may pose a greater threat than the Nazis in the 1930s and 40s. Israel accuses Iran, a major oil and gas producer, of financing Hezbollah, the Lebanese guerrilla movement, and Hamas, which controls the Palestinian Gaza Strip, both of which are sworn enemies of Israel."

g.  *Joplin Globe*, January 17, 2009: "Make no mistake; Iran is a strong and tenacious adversary. Fueled with petro dollars from their abundance of oil reserves, Iran supports strong anti-Israeli and anti-Western militias such as Hamas and Hezbollah. Iran is responsible for many thousands of American and Iraqi deaths."

h.  Senator John Kerry, May 12, 2009: "[A] massive continuous transfer of American wealth to oil exporting nations ... [flowed] revenues and power and sustained … global terror funded indirectly by our expenditures on oil … Too often the presence of oil multiplies threats ... Iran uses petrol dollars to fund Hamas and Hezbollah ...."

i.  *Newsweek*, June 29, 2009: "In 2005 … Khamenei backed Ahmadinejad …, a veteran of the … Revolutionary Guards and willing to kiss the Supreme Leader's feet. Ahmadinejad won. In the four years since, taking advantage of billions in windfall revenues from high oil prices, Iran has … funded Hamas as it took over Gaza, and supported and armed Lebanon's Hizbullah in its 2006 war with Israel."

j.  *APS Review Oil Market Trends*, April 5, 2010: "Without money from oil, [Israeli Infrastructure Minister Uzi] Landau argued, Iran would fade as a regional power and 'terror groups' such as Hamas … and Hizbullah … would cease to exist."

k.  Dr. Abdallah al-Nafisi (Academic; *Al Jazeera* Commentator), June 16, 2010: "Iran gets on every boat to reach power and influence in the Arab region. A country very rich with

… oil revenues, Iran uses its establishment of and support for Hezbollah … and its support for Hamas and … as bridges to get to its objectives. What harms Iran if it gives Hamas $23 million monthly to run things in Gaza? What harms Iran if it gives the Islamic Jihad $5 million or so to maintain the Palestinian gun? But in return, Iran gains much. It is as if Iran is telling Israel: My border is in Gaza, not in Tehran, and my border is in Al-Urqub [in south Lebanon] through Hezbollah, not in Tehran. So, Iran is gaining a great deal of ... physical influence through its support for Hezbollah and Hamas. ... We welcome Iran's support for [Hezbollah] and its support for Hamas and others."

l.   Elliot Bartky and Allon Friedman (Jewish American Affairs Committee of Indiana), August 1, 2011: "[D]eprive Iran of the oil revenue they've used to support terrorist groups such as Hezbollah and Hamas, … and … kill American troops in Iraq."

603.   Decades of government reports and speeches published by the United States, United Kingdom, European Union, and United Nations confirmed that Iran's oil industry was inextricably connected with IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hizballah, Hamas, and JAM. Such U.S., U.K., E.U., and/or U.N. government findings, reports, statements, and warnings included, but were not limited to:

a.   Treasury, June 16, 2010: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b.   State, April 8, 2011: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c.   Treasury, March 28, 2012: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy—in particular in the … oil and gas industries—subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

257

d.     <u>State, May 24, 2012</u>: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

604.     Terrorism scholars also confirmed that KAA-related directly financed IRGC-sponsored attacks committed by IRGC proxies, including Hizballah, Hamas, and PIJ, and alerted SCB to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele Ottolenghi publicly warned:

> [KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. …

> Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC en
> s some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …

> [B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence.

> No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. … And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad.

> The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

**D.     Other Evidence**

605.     **<u>South Pars Project</u>.** In addition to the foregoing evidence, SCB Dubai also received organization charts and other customer due diligence information about Caspian

258

Petrochemical FZE's corporate structure, affiliates, facilities, offices, business activities, personnel, and organization. On information and belief, SCB knew based on this material and its knowledge from public sources that Caspian Petrochemical was directly connected to South Pars, NIOC, and/or NITC.

606.    On information and belief, SCB knew that Caspian Petrochemical's transactions concerned, among other things, petroleum deals relating to the South Pars project, because South Pars is Iran's largest producer of liquified petroleum gas, and a major line of Caspian Petrochemical's business was the exportation of that same commodity.

607.    SCB knew that the South Pars project was controlled by the IRGC and a direct funding source for Hizballah, Hamas, PIJ, and JAM. Terrorism scholars warned that facilitating transactions for Iranians that involved South Pars directly financed IRGC-sponsored terrorist attacks committed by Hizballah, Hamas, and JAM. On March 15, 2007, for example, former Treasury official Dr. Matthew Levitt testified before Congress that:

> [T]he IRGC is precisely the element within Iran that should be targeted. … The IRGC is … responsible for providing funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq. …

> [T]he IRGC's business and industrial activities -- especially those connected to the oil and gas industries -- are heavily dependent on the international financial system. Consider, for example, the $2.09 billion contract to develop parts of the South Pars natural-gas field, or the $1.3 billion contract to build parts of a pipeline, both meted out to the IRGC's engineering arm, the Khatam-ol-Anbia. …

608.    Public admissions by IRGC leaders confirm the key role that funding from fronts like Caspian Petrochemical played in the South Pars project. On December 22, 2009, for example, an IRGC-controlled news agency reported (as summarized by the BBC):

> [IRGC] Commander of Khatam al-Anbia base informed about the delay in completing phases 15 and 16 of South Pars oil field …

259

Commenting on the latest updates on the development of phases 15 and 16 of common South Pars field, Islamic Revolution Guards Corps [IRGC] General Rostam Qasemi said that the level of progress in both phases in the sea and land is about 43 per cents. He added: Inability of the Ministry of Oil in providing necessary financial resources in proper time was one of the most important difficulties faced with regard to phases of South Pars field. Expressing hopes for rapid resolution of the project's financial troubles, he clarified: Employer (Pars Oil and Gas Company) has not succeeded in injecting financial resources to the project in accordance with its pace. …

According to [IRGC-controlled] *Mehr* news agency, at the moment the construction of five phases of South Pars - 12, 15, 16, 17 and 18 - are in progress and due to lack of financial resources, the operation has been delayed.

609.    On August 6, 2011, similarly, *Reuters* reported that:

Iran will need some $40 billion this year to spur the development of oil and gas fields it shares with neighbouring countries, Oil Minister Rostam Qasemi said in his first interview since being appointed …

Qasemi, a Revolutionary Guards commander … vow[ed] to prioritise jointly owned fields, notably the giant South Pars gas reservoir …

"In order to launch the announced development plans (on the joint fields) there is need for more than $40 billion in investment in the current (Iranian) year (ending late March 2012)," Qasemi said in an interview with *Iran*, a state-owned daily newspaper.

While Iran might seek foreign capital to finance energy projects, it did not need foreign know-how, he said.

"There are currently very competent contractors domestically on which we can rely for the development of oil and gas can be done ... For the development of oil and gas fields we don't need foreign contractors."

One of those domestic companies is Khatam al-Anbia itself, which took over parts of the South Pars development when European firms Royal Dutch Shell and Total SA pulled out due to sanctions on Iran.

Both Khatam al-Anbia and Qasemi himself are under U.S. and European Union sanctions …

Qasemi said Iran would seek foreign capital … for the energy projects, as well as tapping … Iranian banks …

"We will be pursuing an active diplomacy to absorb foreign capital as they form part of the required financial resources for the projects to be developed," Qasemi said.

610.    Media reports about South Pars alerted SCB that U.S. sanctions were crushing the IRGC's ability to maximize the cash flow the IRGC received from South Pars and alerted SCB that South Pars-related sanctions evasion directly aided IRGC efforts to raise money to finance IRGC operations. On June 29, 2006, for example, *Reuters* reported that while "Iran ha[d] awarded the Revolutionary Guards corps a contract to develop two phases of the … giant South Pars gas field," industry analysts confirmed that the Iranian regime could not "develop" its "oil and gas industry," including at South Pars, "without foreign companies' help." Moreover, on May 28, 2010, *Agence France Presse* reported:

> Iran [] awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field …
>
> Guards unit Khatam al-Anbiya would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. … [P]hases 22, 23 and 24 were [also] to be awarded to Khatam al-Anbiya. …
>
> The development of the giant offshore field has been delayed amid a lack of investment …
>
> Khatam al-Anbiya … is under US and UN sanctions related to Iran's refusal to abide by UN Security Council resolutions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] ….

611.    From 2005 through 2020, reports by the United States, terrorists, media outlets, due diligence resources, terrorism scholars, and ordinary citizens alerted SCB that the IRGC had seized control of Iran's interests in South Pars petroleum and that everything relating to any Iran-related party's direct or indirect involvement there was inextricably connected to, and ultimately financially benefited, the IRGC. Such reports included, but were not limited to:

261

a.   *Islamic Republic News Agency*, January 5, 2005: "A consortium … has won the tender for Phases 15 and 16 of the giant South Pars gas field development project, … [which] consortium [] includes Sadra and Khatam ol-Anbiya … companies of Iran."

b.   *Agence France Presse*, June 27, 2006: "[T]he Revolutionary Guards ... is set to enter the oil and gas sectors in a move that would increase their stake in [Iran]'s economy. 'The Revolutionary Guards have obtained the contract to develop phases 15 and 16 of South Pars,' … General Abdolreza Abed said in an interview with the Shargh newspaper. Abed, who heads up [KAA], said the contract was worth 2.09 billion dollars. The deal would be a major boost to the operations of the [IRGC] .... It comes on the back of a string of advances into Iran's economy: several weeks ago ... the [IRGC] ... were awarded a 1.3-billion-dollar contract to construct a 900-kilometre (570-mile) pipeline between South Pars and southeastern Iran. In both South Pars cases, the projects were awarded after the usual tendering process was abandoned. For the South Pars development deal, the [IRGC] -- under the name of their economic nerve centre of [KAA] -- entered a partnership with [a] Norwegian firm …, although this firm subsequently pulled out. The oil ministry then moved to open another tender process, but this was cut short. ... For many observers, the wave of lucrative deals going to the [IRGC] is connected to last year's shock presidential election win by hardliner Mahmoud Ahmadinejad -- a veteran of the [IRGC] -- who promised to favour domestic entrepreneurs. ... [IRGC] General Abed [head of KAA] told the centrist Shargh newspaper that there was nothing wrong with the [IRGC] … branching out. 'Since when do the [IRGC] have to stick to building roads, dams, small tunnels or short pipelines?" he argued. "If we take on big projects we can put small entrepreneurs to work.' ... [W]ith foreign investment in the oil sector limited, the Guards appear ready to shift into top gear by filling the gap -- with General Abed also revealing [the IRGC]'s involvement in a new petrochemical port. 'Thirty percent of the [IRGC]'s engineering capacity is dedicated to economic activities, and 70 percent to military,' [IRGC General Abed] said."

c.   *Reuters*, June 29, 2006: "Iran has awarded the Revolutionary Guards corps a contract to develop two phases of [Iran]'s giant South Pars gas field … The two phases were originally awarded to a consortium of international and domestic companies led by Norway's Aker Kvaerner, which quit the deal in May 2005. 'It is a $2.09 billion contract. Phases 15 and 16 will produce 56.6 million cubic meters of natural gas,' state radio said. … Khatam al-Anbia firm, the engineering arm of the [IRGC], will take charge of the onshore work for the two phases. Iran is in dispute with the international community over its nuclear programme and Tehran could face United Nations sanctions, which would make operating there even more difficult for foreign companies. Signing big contracts with foreign firms is politically toxic in Iran, which sits on the world's second largest reserves of natural gas but has been slow to develop it for export. … Earlier this month, the [IRGC] won a $1.3 billion project to build a … pipeline from South Pars to the eastern province of Sistan-Baluchestan, the route for Iran's gas export to Pakistan."

d.   *Economist Intelligence Unit*, July 21, 2006: "The engineering arm of the … IRGC … has made further inroads into the oil and gas sector, having been selected as the main contractor for the development of Phases 15 and 16 of the South Pars gas scheme. Sharg,

262

a local newspaper, quoted General Abdolreza Abed, head of the IRGC's [KAA], as saying that the order will be worth some US$2bn. The order follows a US$1.3bn contract to build a … pipeline linking South Pars fields to southeastern Iran. … IRGC will be working with local partners on the two South Pars phases, which envisage production of some 1.8bn cu ft/day of natural gas, 1m tonnes/year of liquefied petroleum gas, a similar quantity of ethane and 80,000 barrels/day of condensates. … Much of the work in Iran's oil and gas sector is now being allocated to local firms, because of the difficulty facing foreign companies in concluding financial and commercial terms."

e.  *Economist Intelligence Unit*, August 3, 2006: "Evidence of any direct consequences of the changed political and economic environment on the amount of foreign trade and investment in Iran is hard to come by. The re-awarding of contracts such as those related to the giant South Pars gasfield … [by] the Revolutionary Guards … ha[s] undoubtedly made foreign companies cautious. … [T]here have been reports in the Western press that four European banks, under pressure from the US government, have reduced their presence in Iran (May 2006, Foreign trade and payments) … It is expected that bank charges for doing business in or with Iran will have risen, possibly in response to a perceived increase in the complications of doing trade."

f.  *Economist Intelligence Unit*, August 3, 2006: "Mahmoud Ahmadinejad … appears to be increasingly favouring domestic companies when awarding government contracts, and giving a growing role to those linked to the … IRGC … in particular. In June a US$1.3bn contract for a gas pipeline linking Assalouyeh, Bandar Abbas and Iranshah was awarded to the [KAA]. The pipeline is to supply gas from the South Pars field to Sistan-Baluchestan, Hormuzgan and Kerman, and the contract was signed in the uniformed presence of Major-General Yahya Rahim-Safavi, the IRGC's commander. In June the IRGC also scooped the main exploration contract for phases 15 and 16 of South Pars. The deal was originally made in January 2005 with a consortium of Aker Kvaerner (Norway), Sadra (Iran) and the [IRGC]. It now seems—the news emerged from an interview given by General Abdolreza Abed to Shargh, a reformist daily, before a signing ceremony at South Pars—that the IRGC has edged out Aker Kvaerner. [KAA] will lead a local consortium that includes Saaf Offshore, Isolco (the Iran Shipbuilding and Offshore Industries Company) and IOEC (the Iran Offshore Engineering and Construction Company). Phases 15 and 16 are scheduled to involve the production of 50m cu metres/day of treated gas for domestic use, 1m tonnes/year (t/y) of liquefied petroleum gas for export, 80,000 barrels/day (b/d) of condensates for export and 1m t/y of ethane for domestic petrochemical works. The news prompted fears among local contractors that the government would award other contracts to [KAA]."

g.  *Investor's Business Daily*, November 8, 2006: "Mahmoud Ahmadinejad's terrorist regime needs billions in foreign investment in the coming years to compete with other OPEC countries. That means serious international sanctions can be a powerful weapon. The Islamofascists … have repeatedly made it clear they're … the backers of terrorist outfits like Hezbollah …. Iran may have lots of oil and natural gas in the ground, but if it doesn't get ahold of tens of billions of dollars in outside capital in the years ahead, it won't be able to extract and refine those commodities. … The world has plenty of

leverage available: … European and Asian companies run gas and petrochemical plants in South Pars …, the largest natural gas field in the world. Shut all that down, along with all energy-related exports and imports, and Ahmadinejad and supreme leader Ayatollah Ali Khamenei just might find themselves fighting for survival."

h.   *Washington Times*, August 16, 2007: "The [U.S.] … decision to designate [the] … IRGC [Qods Force] … as a 'specially designated global terrorist' (SDGT) organization strikes a huge blow against one of the world's most deadly jihadist groups. The IRGC, through its longstanding relationship with Hezbollah, has the blood of hundreds of Americans on its hands … Earlier this year, [Dr.] Matthew Levitt … (a former deputy assistant secretary of the treasury specializing in terrorism-finance issues) wrote in *The] Washington Times* that … 'the IRGC's business and industrial activities - especially those connected to the oil and gas industries - are heavily dependent on the international financial system.' In other words, these are precisely the kind of projects where Iranian regime elites are vulnerable to American and international economic pressure. These [IRGC] projects include a contract worth $1.3 billion to build parts of a pipeline and another worth more than $2 billion to develop part of [] South Pars …. [R]ecently, the IRGC - and in particular, a section known as the Quds Force - has been heavily involved in aiding Hezbollah, as well as … Hamas …. At a press conference last month, U.S. military officials in Iraq said that the Quds Force is bringing groups of up to 60 Iraqi insurgents at a time to training facilities near Tehran, where they are taught how to carry out kidnappings and use rockets and improvised explosive devices to kill and maim American troops. American officials also say that the IRGC is responsible for smuggling explosively formed penetrators (EFPs) into Iraq. The EFPs, which can penetrate the armor of a Humvee and are used almost exclusively by Shi'ite militias, accounted for one-third of the combat deaths suffered by coalition forces last month. The 99 strikes that occurred with EFPs in July were the highest total since the war began. Earlier this year, Mr. Khamenei vowed to hit back at U.S. interests worldwide if Iran were attacked. … By hitting the Revolutionary Guards with sanctions, the Bush administration is weakening their capacity to finance more terror, and clearly it hopes to shame the Europeans and the Japanese in cutting their financial ties to these serial killers of Americans."

i.   *Washington Times*, August 16, 2007: "[The] Revolutionary Guard Corps, which faces the prospect of severe U.S. financial sanctions as a 'terrorist organization,' represents a tempting target given its multibillion-dollar commercial empire ranging from oil fields to honeybee farms. … The U.S. terrorist designation would freeze any U.S. assets of the IRGC, but financial analysts say its greater practical effect would be to discourage companies and banks from other nations from working with the corps' various subsidiaries. … the IRGC's financial scope has expanded dramatically with the election of Islamic hard-liner Mahmoud Ahmadinejad as president in 2005. According to a survey by the … International Crisis Group, [KAA] won a string of major contracts from the Ahmadinejad government, including … a $1.3 billion oil pipeline contract, and a no-bid $2.09 billion commission to develop parts of the vast South Pars natural gas field. … U.S. officials say such profits matter because it is IRGC's foreign military arm, known as the Quds Force, that is suspected of providing funds, training and equipment to anti-U.S. forces in Iraq, … Lebanon and the Palestinian territories."

264

j.   *Christian Science Monitor*, August 6, 2009: "The Bush administration regularly accused the Guards of supplying advanced explosives to insurgents in Iraq … In a rare disclosure, businesses were put at 30 percent of IRGC 'capacities' in a 2006 interview by Brig. Gen. Abdol-Reza Abed, an IRGC deputy commander and head of Khatam-ol-Anbia, one of its many companies. The IRGC's economic role has clearly increased with projects awarded by Ahmadinejad. Within a year of his taking office, [KAA] won a $1.3 billion contract for a gas pipeline …, and … for developing part of the South Pars gas field."

k.   *Economist Intelligence Unit*, August 19, 2009: "The [Iranian regime] has approved an additional US$1bn investment to be allocated to [KAA], a company owned by the [IRGC], to develop Phases 15 and 16 of the giant South Pars gasfield. … Total said in 2008 that it could not proceed …, in the face of increased costs and the tense international situation over Iran."

l.   Rasool Nafisi (IRGC Scholar and Author), September 18, 2009: "Symbiotic Relationship[:] Upon becoming president, Ahmadinejad wasted no time in awarding the juiciest government contracts to the IRGC. [KAA], the industrial and construction wing of the IRGC, was given no-bid contracts to develop the 15th and 16th phases of the South Pars Gas Field, and to build a … pipeline to Pakistan and India. It was also allowed to take over the Kish Oil Company. These deals turned the already massive [KAA] into one of the largest conglomerates in the Middle East."

m.   *Mehr News Agency*, April 18, 2010: "[A]n all-Iranian consortium will be vested with developing the South Pars … phases 22-24. … The consortium is consisted of [KAA], Industrial Development and Renovation Organization of Iran (IDRO), and some offshore contractors such as Iran Shipbuilding & Offshore Industries Complex Co (ISOICO), Sadaf, Sadra, and Iranian Offshore Engineering and Construction Company … Iran, having the world's second largest gas reserves and third largest oil reserves, is trying to play a more active role in oil and petrochemical transactions in international markets."

n.   *Agence France Presse*, May 28, 2010: "Iran has awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field, the *Mehr* news agency … Guards unit [KAA] would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. He also confirmed reports earlier this week that phases 22, 23 and 24 were to be awarded to [KAA]. … The development of the giant offshore field has been delayed amid a lack of investment in a country faced with severe gas needs of its own and because of difficulties in procuring the technology to develop these fields. [KAA] … is under US and UN sanctions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] …."

o.   *Agence France Presse*, June 15, 2010: "Iran … signed contracts worth 21 billion dollars with local firms to develop six gas fields, some of them awarded to the [IRGC], state media reported. The state television website said the 'contracts to develop the South Pars gas fields -- phases 13, 14, 19, 22, 23 and 24 -- were inked with three consortia including [KAA],' the [IRGC's] industrial conglomerate. … Iran previously discussed handing

265

over phases 13 and 14 to Royal Dutch-Shell and Spain's Repsol YPF, but the two giants held off on a final decision as new UN sanctions loomed against Tehran … The [IRGC] … has been targeted in the fresh UN sanctions … Last month the [IRGC] said it was ready to take over energy projects in Iran if Western firms stayed away …."

612.    On information and belief, SCB knew that Caspian Petrochemical's transactions concerned NIOC. Media reports alerted SCB to the key role that funding from fronts like Caspian Petrochemical played in facilitating NIOC's activities. On April 26, 2010, for example, *IHS Global Insight* reported that IRGC companies were "increasingly being awarded tenders by NIOC and its subsidiaries … creating potential significant problems for … foreign firms" dealing with NIOC and its subsidiaries "given the specific international sanctions against dealing with Revolutionary Guards affiliates and the U.S. classification of the outfit as a terrorist organisation."

613.    **Congressional Testimony**. Congressional testimony confirmed the well-known fact that NIOC-related transactions directly enabled IRGC-sponsored terrorist attacks. On November 15, 2011, for example, Mark Dubowitz, president of the Foundation for Defense of Democracies, testified in front of the House Subcommittee on National Security, Homeland Defense, and Foreign Operations. Dubowitz advocated for stronger sanctions against Iran, specifically targeting the IRGC's control of the oil industry. Dubowitz testified that the IRGC was "unquestionably the dominant force throughout Iran's energy sector, including the sale of Iran's oil," and that "the United States should also consider designating Iran's state-owned National Iranian Oil Company (NIOC). NIOC is a party to every Iranian oil transaction. Leveraging its position as a state-owned institution, NIOC operates as the ultimate front company in obscuring the role of the IRGC in the oil trade." Dubowitz further testified that "[t]he Central Bank of Iran, like the National Iranian Oil Company, and other IRGC entities

266

discussed above—are critical links in the IRGC-dominated oil supply chain and key enablers of the IRGC's proliferation activities, terrorist operations and human rights abuses."

614.    **NGO Campaigns.** NGO public pressure campaigns also alerted SCB that its NIOC-related transactions enabled IRGC-sponsored attacks. In November 2011, for example, UANI publicly called on Italian energy company Edison SpA to stop doing business in Iran, and stated that "[t]he IRGC is a known terrorist entity in control of Iran's oil, gas, and petrochemical sectors…. The IRGC also 'bankrolls' groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen…. By working with NIOC and the IRGC to develop Iran's oil sector, Edison is directly contributing to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs."

615.    **Events of November 2011.** SCB's advice to change the petrochemical company's name, and the company's decision to do so by creating a new entity on November 15, 2011 (on information and belief, Caspian Petrochemical FZE) shows SCB's awareness that it was an IRGC front because it followed on the heels of twelve events over six days from November 8, 2011 through November 14, 2011, that alerted SCB (and its IRGC front customers) that the United States, United Kingdom, United Nations, and European Union would imminently impose major new sanctions targeting the Iranian regime's use of Iranian fronts and banks to finance IRGC operations.

616.    On November 8, 2011, the IAEA published a bombshell report exposing the Iranian regime's comprehensive nuclear weapons program, including its lies and cheating while promising that such program was peaceful. In the days that followed, the Israeli government publicly threatened military action, the United States and European governments publicly threatened (and then imposed) increased sanctions, and the Iranian government and Hizballah

267

publicly threatened violent retaliation. Media outlets widely reported each of these events in real-time.

617.     SCB—and its terrorist-sponsor customer, Caspian Petrochemical—knew about all the above. Among other reasons, each event from November 8 to 14, 2011 received widespread, real-time coverage in the global media, including in the United States, Europe, and the Middle East. Yet, upon the culmination all these dramatic developments, SCB's response was not to cease assisting Caspian Petrochemical, but rather to help it evade the tightening vise of U.S. sanctions yet again by telling it to change its name. SCB then continued to help the company access the U.S. financial system until at least June 2012.

618.     SCB knew that providing illegal atypical banking services to Caspian Petrochemical would directly facilitate terrorist attacks funded, supplied, and encouraged by the SLO and IRGC, including attacks by Hizballah, Hamas, PIJ, and JAM; SCB knew that its Caspian Petrochemical transactions flowed funds to the SLO and IRGC, and that the SLO and the IRGC used such funds to sponsor attacks by Hizballah, Hamas, PIJ, and JAM.

## VI.     SCB Provided Pervasive, Systemic, And Culpable Assistance Over More Than A Decade To Help The Terrorist Sponsors Conceal Their Financial Infrastructure From The U.S. Government

619.     For over a decade, SCB and the Terrorist Sponsors were engaged in a common enterprise to thwart U.S. counterterrorism controls by shielding their transactions from the systems used by the U.S. government to collect vital intelligence on terrorist financing.

620.     As explained above, SCB understood that its Iranian customers who were controlled by the Terrorist Sponsors wanted to maintain a shroud of secrecy around their financial transactions. SCB also knew that such secrecy enabled terrorism, and that intelligence collected from surveillance of SWIFT messages through the TFTP program and reported to the

U.S. government under the BSA was viewed by the U.S. government as an essential tool for mapping terrorist networks and preventing terrorist attacks. SCB knew that its Iranian customers wanted secrecy because they were engaged in the very type of terrorist financing activity that the U.S. government was actively seeking to monitor and interdict.

621.    SCB nevertheless intended to aid the Terrorist Sponsors in their objective of shielding their financial infrastructure from the U.S. government, in flagrant violation of the BSA and the U.S. government's increasing emphasis on financial intelligence after 9/11. Through more than a decade of pervasive and systemic wire stripping practices intended to obscure the nature of SCB's billions of dollars in transactions for Iranian customers and to disable U.S. compliance functions designed to report suspicious activity, SCB gave the Terrorist Sponsors an incalculably significant counterintelligence benefit. That benefit made it easier for the Terrorist Sponsors to finance and execute every one of their terrorist attacks because it helped to obscure the interrelated web of connections between individuals and entities in Iran's terrorist infrastructure that the U.S. government was seeking to disrupt.

622.    Indeed, SCB went far beyond wire stripping for the Terrorist Sponsors. As explained above, SCB coached IRGC fronts like Caspian Petrochemical on how to maintain secrecy, for example, by changing its name. And when the U.S. government focused scrutiny directly on that very company, SCB protected the Terrorist Sponsors' operational cover by falsifying SCB's own internal diligence documents and brazenly lying to OFAC about the terrorist front's operations, which likely helped the front and its network of affiliates to continue to finance attacks by Hizballah, Hamas, PIJ, and JAM in the shadows for years thereafter.

623.    Moreover, after being ordered by NYDFS in 2003 to improve its AML/CFT practices with respect to foreign bank correspondent accounts, SCB agreed to improve its

269

compliance and to hire an independent consultant to conduct a retrospective transaction review for suspicious activity involving the NY Branch.[93] SCB "vowed to regulators" that it would "comply" with that agreement and retained Deloitte & Touche, LLP ("Deloitte") to perform an independent review of suspicious activity and report its findings to NYDFS.[94] But SCB then skewed Deloitte's nominally independent investigation, pressuring Deloitte to hide from regulators any references that "could ultimately reveal SCB's Iranian U-Turn practices"—*i.e.*, once again shielding its transactions for Iranian customers.[95] Deloitte succumbed to SCB's pressure, and ultimately submitted a "***watered-down***" report to NYDFS.[96]

624.    Around that same time, SCB's CEO of the Americas failed to disclose SCB's wire stripping to the NYDFS Deputy Superintendent for Foreign Banks. Instead, SCB "lied" to NYDFS and claimed that the "bank was compliant in all matters related to Iran."[97]

625.    In September 2006, NYDFS requested from SCB statistics on Iranian U-Turns, including the number and dollar volume of such transactions for a 12-month period.[98] In response, SCB searched its records for 2005 and 2006, and uncovered 2,626 transactions totaling over $16 billion.[99] SCB's Head of Compliance at the NY Branch provided the data to SCB's CEO for the Americas, who in turn sent it to the SCB Group Executive Director in London. In his memorandum to the Executive Director, the CEO expressed concern that this data would be the "wildcard entrant" in the ongoing review of U-Turns by regulators and could lead to

---

[93] 2012 NYDFS Consent Order ¶ 41.
[94] 2012 NYDFS Consent Order ¶¶ 43, 50.
[95] 2012 NYDFS Consent Order ¶ 45.
[96] 2012 NYDFS Consent Order ¶ 45.
[97] 2012 NYDFS Consent Order ¶ 46.
[98] 2012 NYDFS Consent Order ¶ 48.
[99] 2012 NYDFS Consent Order ¶ 48.

270

"catastrophic reputational damage to the [bank]."[100] SCB's Head of Compliance in New York

ultimately provided only ***four days*** of data to regulators.[101]

626.    The combined effect of SCB's deceptive acts—a watered-down report from

Deloitte, lying about their compliance with Iran regulations, and misleading data—ultimately

convinced NYDFS to lift the Written Agreement in 2007.[102] Years later, in the 2012 Consent

Order, NYDFS excoriated SCB for its deception. According to NYDFS, "SCB successfully

misled New York regulators to believe that it had corrected serious flaws" in its AML/CFT

program.[103] In reality, however, "the opposite was true." "SCB's actions prevented regulators

from doing their job in detecting potential threats to the U.S. financial system and other national

security interests."[104] Had NYDFS known the truth—*i.e.*, "had SCB not meticulously disguised

its willful misconduct"—NYDFS "would have kept the Written Agreement rigidly in place."[105]

627.    SCB also misled NYDFS about the quality of its sanctions compliance efforts.

SCB engaged Promontory Financial Group LLC ("Promontory"), to analyze historical

transaction records with sanctioned countries and persons and submit reports to financial

regulators.[106] However, SCB's in-house and outside counsel and other SCB employees provided

extensive markups and comments on Promontory's draft reports to: (i) make categories of illegal

transactions appear more innocuous; (ii) conceal willful compliance failures (such as when

SCB's sanctions filters correctly identified illegal transactions that SCB processed anyway);

(iii) remove branch-identifying information concerning the illegal transactions; (iv) selectively

---

[100] 2012 NYDFS Consent Order ¶ 48.
[101] 2012 NYDFS Consent Order ¶ 48.
[102] 2012 NYDFS Consent Order ¶ 50.
[103] 2012 NYDFS Consent Order ¶ 50.
[104] 2012 NYDFS Consent Order ¶ 51.
[105] 2012 NYDFS Consent Order ¶ 52.
[106] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 2-3, 5.

remove certain timelines showing increases in violations during the relevant period at some branches while keeping in others that portrayed SCB in a more positive light; and (v) minimize the number of "violations" reported.[107]

628.    Promontory implemented all SCB's comments—whitewashing SCB's bad behavior, and in effect, serving as a *de facto* advocate for SCB's interests with regulatory authorities—even though Promontory was expected to exercise "independent judgment" reporting SCB's behavior to authorities.[108] This hid from NYDFS the true extent of SCB's illegal Iran-related transactions.[109]

629.    SCB's repeated willingness over many years to mislead financial regulators and falsify documents on behalf of its Iranian customers further confirms that SCB intended to aid Iran's Terrorist Sponsors and fronts when it provided atypical, illegal banking services to them.

630.    SCB's conduct inhibited the United States' ability to develop actionable plans to effectively learn about, penetrate, disrupt, and target the overlapping fronts, individuals terrorists, and networks upon which the Terrorist Sponsors' transactions with SCB—and attacks against Plaintiffs—relied. Indeed, SCB engaged in its scheme while the United States was loudly warning banks, including SCB, that their compliance with their terrorism-related reporting duties was essential to enabling the United States to prevent attacks.

631.    United States counterterrorism strategy after 9/11 through 2022 always depended upon the key role that the National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial

---

[107] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.
[108] NYDFS, *Report on Investigation of Promontory Financial Group LLC* (Aug. 2015) at 5-14.
[109] NYDFS, Agreement, *In the Matter of Promontory Financial Group, LLC* (Aug. 18, 2015). Promontory paid a $15 million penalty to NYDFS for its role in hiding SCB's malfeasance. *Id.*

Intelligence, and State Department Bureau of Counterterrorism each played—individually, and as part of the post-9/11 "whole-of-government" counterterrorism strategy in response to the IRGC, Hizballah, and their proxies—with respect to developing actionable intelligence that enabled whole-of-U.S.-government efforts to more effectively interdict terrorist finance, disrupt terrorist networks, and impair terrorist logistics and thus prevent acts of international terrorism.

632.    From 2003 through 2012, the U.S. government published reports and made multiple public statements that similarly alerted SCB that its provision of cover and concealment to global terrorist threats like the IRGC, Hizballah, and their proxies foreseeably aided such groups' ability to attack Americans in Israel and Iraq. Examples include, but are not limited to:

a.    In November 2004, Assistant Treasury Secretary Juan Zarate testified before Congress that focusing on the sources and movement of monies used to fund terrorist groups in Iraq was critical to effective counter-terrorism policy in Iraq. Zarate further testified that the United States depended upon a coordinated interagency approach to that very issue, which employs robust information sharing across various components of Treasury, DOJ, State, DoD, the Intelligence Community, among others—which SCB obstructed by were concealing material financial network information that SCB was duty-bound to disclose to U.S. government.

b.    In February 2005, Mr. Zarate publicly emphasized the importance of collaboration and data sharing between major players from the international private sector like SCB and the U.S. government in gathering the intelligence needed to "triumph over a wide array of terrorist financing" in the Middle East, including Iraq, and stressed that "[e]very day it becomes more apparent that following dirty money and attacking its illicit sources is an essential part of winning the financial war on terrorism."

c.    In April 2008, Treasury's Under Secretary for Terrorism and Financial Intelligence observed how terrorists "rely on financial support networks," which were "not only a rich source of intelligence [for U.S. counterterrorism efforts] but also … a vulnerability we can exploit" against global terrorist organizations and "the Iraqi insurgency" and emphasized how the U.S. government's receipt of accurate real-time information from private sector actors about terrorists' fast-evolving financial networks was critical to "better understand the relationship among [terrorists' financing nodes] and identify potential vulnerabilities … [and] sources and conduits of illicit finance"—the cornerstone of U.S. strategy to prevent terrorist attacks after 9/11.

d.    In September 2011, Assistant Treasury Secretary of Counter-Terrorist Finance Daniel Glaser testified to Congress that terrorists' constant need for funding underscored the

273

importance to counterterrorism efforts of receiving information and intelligence "to identify sources of illicit finance [for terrorists] and those individuals and entities that comprise [their] illicit finance networks." This financial intelligence allows counterterrorist efforts to identify vulnerable points in terrorist finance networks that are susceptible to disruption, including those related to terrorist groups' increasing use of criminal activity to raise money. Secretary Glaser also explained how "[f]ollowing the money can often yield valuable insights into a terrorist organization and help discover previously unidentified leadership and support nodes."

633.    SCB knew about these warnings because it carefully followed Treasury pronouncements. It defied them anyways and, in so doing, serially obstructed U.S. counterterrorism operations targeting the IRGC, Hizballah, Hamas, PIJ, and JAM, and specifically conducted for the primary purpose of preventing such groups' terrorist attacks targeting the United States in Israel and Iraq, among other places, since 9/11.

634.    Indeed, the United States has formally found that there is an inextricable nexus between U.S. government access to data about terrorist financial networks, on the one hand, and the likelihood of terrorist attacks targeting the United States, on the other, such that depriving the U.S. of actionable financial network data significantly increases the risk of a terrorist attack. On December 17, 2004, for example, Congress enacted the 9/11 Commission Implementation Act of 2004, in which "Congress makes the following findings: … The United States Government has *rightly recognized that information about terrorist money helps in understanding terror networks, searching them out, and disrupting their operations* [*i.e.*, attacks]." 22 U.S.C. § 2656, Pub. L. 108-458, Title VII, § 7118, 118 Stat. 377 (Dec. 17, 2004).

635.    The Financial Action Task Force (FATF)—which the Executive and Congress have each identified as the gold standard for counterterrorism[110]—has publicly confirmed the

---

[110] *See*, *e.g.*, 9/11 Commission Implementation Act of 2004, 31 U.S.C. § 5311 Note, Pub. L. 108-458, Title VII, § 7701(a), 118 Stat. 377 (Dec. 17, 2004) ("findings" that "(1) The global war on terrorism and cutting off terrorist financing is a policy priority for the United States and its

inextricable nexus between SCB's concealment of network data from counterterrorism authorities and attacks by the terrorists for whose networks SCB's conduct provided operational cover from prying U.S. counterterrorism operatives in Treasury, DOJ, DoD, and the Intelligence Community, among others. In 2016, for example, then-FATF President Je-Yoon Shin gave public remarks that FATF then republished as FATF guidance, which confirmed that:

> *financial intelligence can reveal the structure of terrorist groups, the activities of individual terrorists, and their logistics and facilitation networks*.
>
> The *value of these measures is clear*:
>
> The FATF held a meeting … of operational experts from Financial Intelligence Units, Law Enforcement, and Security and Intelligence Agencies. They explained how *financial intelligence from the private sector* has helped track down the terrorists behind recent attacks and therefore *prevented further attacks*.

636.    Terrorism scholars have confirmed that network intelligence plays a vital role in preventing IRGC-backed attacks by Hizballah, Hamas, and PIJ in Israel because Iranian support depended upon a complex latticework of networks for which actionable data by counterterrorism fighters was vital to preventing Hamas and PIJ attacks in Israel. In 2023, for example, Joseph Rozen (CEO, Solaris Global Partners) publicly observed that with respect to U.S.-backed Israeli counterterrorism operations "against Hamas" in the context of "the possibility of another front in the North against Hezbollah, [while] Iran continues to actively advance its objectives in the Middle East, including undermining Israel and the United States, across multiple domains":

> The Islamic Republic's disruptive activities, spearheaded by the [IRGC], extend far beyond the region. *Iran's ability to advance its activities* around the world is *due to a complex network of private entities* that provide the necessary

partners, working bilaterally and multilaterally through … [*inter alia*] the Financial Action Task Force (FATF) …. (2) … The Financial Action Task Force has focused on the new threat posed by terrorist financing to the international financial system, resulting in the establishment of the FATF's Eight Special Recommendations on Terrorist Financing as the international standard on combating terrorist financing. … (3) FATF's Forty Recommendations … are the recognized global standards for fighting money laundering and terrorist financing.").

infrastructure for financing terrorism, circumventing international sanctions, and supporting various activities related to terror.

While Rozen was addressing the aftermath of Hamas's October 7, 2023 attack in Israel, the same networks, and associated U.S. intelligence need, flourished throughout the period when SCB obstructed U.S. efforts to gather intelligence on such terrorist network threats.

637.    When SCB provided operational cover to Hizballah and IRGC-linked terrorist operations networks, including those relating to the Foundation for the Oppressed, SLO, and Caspian Petrochemical FZE, SCB directly powered Hizballah- and IRGC-supported attacks sponsored by the terrorists and groups associated with those same networks, including their proxies, because SCB deprived the United States of the lawfully-required data upon which American counterterror agencies and professionals relied to prevent attacks by Hizballah and their proxies in Israel and Iraq, and save American lives, including those of Plaintiffs. For example, in 2016, Adam J. Szubin, acting Under Secretary for Terrorism and Financial Intelligence publicly confirmed how "Hizballah relies upon accomplices in the business community to place, manage, and launder its terrorist funds," explaining that by "***exposing and disrupting these networks***," the Government sought "to pressure Hizballah's finances and ***degrade its ability to foment violence in Lebanon, Syria, and across the region***."

## VII.    SCB Engaged In Other Misconduct That Assisted The Attacks Against Plaintiffs

638.    SCB engaged in additional misconduct that assisted the attacks in this case. This included further illicit transactions on behalf of IRGC-controlled customers, as well as known supporters for Hizballah. Moreover, SCB exhibited a general culture of noncompliance and defiance vis-à-vis U.S. anti-terrorism controls that corroborates SCB's culpable intent and makes it highly likely that discovery will reveal additional support for the Terrorist Sponsors that flowed through to attacks.

**A.      SCB Facilitated Sanctions Evasion for Likely IRGC Agent Mahmoud Reza Elyassi**

639.      SCB knowingly provided banking services to Iran's Terrorist Sponsors by assisting an Iranian national—and likely IRGC agent—named Mahmoud Reza Elyassi. Elyassi was indicted by the DOJ in 2019 for evading sanctions on Iran, aided by SCB Dubai employees.[111] Since Elyassi's indictment, he has escaped prosecution.

640.      From late 2006 through at least September 2011, Elyassi controlled multiple companies that held accounts with SCB Dubai. The Amended DPA and Elyassi's indictment highlight two such companies, identified by the United States as Company C-1 and Company C-2.[112] Plaintiffs adopt the government's terminology.

641.      Company C-1 and Company C-2 were "general trading companies" that were used as "fronts" for a "money exchange business located in Mashhad, Iran," in order to "provide services to Iranian individuals and companies seeking to conduct U.S. dollar transactions through the United States in violation of U.S. economic sanctions."[113]

642.      Between November 2007 and August 2011, SCB "willfully" and illegally processed approximately 9,500 dollar-denominated transactions through the United States, including through the NY Branch, for Company C-1 and Company C-2.[114] Those transactions totaled approximately $240 million.[115]

---

[111] *See generally* Indictment, *U.S. v. Elyassi*, No. 19-cr-117 (D.D.C. Apr. 5, 2019), available at: https://www.justice.gov/d9/press-releases/attachments/ 2019/04/11/elyassi_indictment_filed_0.pdf ("Elyassi Indictment").
[112] SOF ¶ 10; Elyassi Indictment ¶ 1. These companies are referred to as Company A and Company B, respectively, in the 2019 OFAC Settlement. *See* 2019 OFAC Settlement ¶ 31.
[113] Elyassi Indictment ¶ 12.
[114] SOF ¶ 31.
[115] SOF ¶ 31.

643. SCB employees helped Elyassi consummate these illegal transactions. At all relevant times, at least two SCB Dubai employees—a Relationship Manager (Person A) and a Treasury Sales Manager (Person B)—worked closely with Elyassi to provide him access to the U.S. financial system and U.S. dollars.[116] At all relevant times, these employees were acting within the scope of their employment for SCB, *i.e.*, performing the role they were hired to perform, for the type of customer SCB Dubai was happy to have.[117]

644. SCB knew that Elyassi and his companies were linked to Iran and operated in industries dominated by Iran's Terrorist Sponsors. SCB's records were replete with evidence that confirmed the connection: (a) SCB's banking system listed Elyassi as an Iranian person and contained telephone and fax numbers that began with Iran's country code prefix (+98); (b) SCB's records contained a copy of Elyassi's Iranian passport; (c) SCB's records contained a Know Your Customer ("KYC") form for Company C-1 from 2007 stating that the company had a facility in Iran and exported materials from Iran to various countries; (d) contact information for Company C-1 in SCB's records included at least two Iranian phone numbers (as evidenced by +98 country code prefix); and (e) SCB Dubai personnel recorded phone calls in 2008 between Elyassi and his Treasury Sales Manager at SCB (Person B), during which Elyassi admitted that he was based in Iran and invited the Treasury Sales Manager to visit him there.[118]

645. Elyassi's IRGC connections were likewise apparent, as his companies operated in sectors known to be dominated by the IRGC, *e.g.*, finance (money exchange), and they transacted in such high volumes ($240 million from 2007 to 2011) that they could not plausibly

---

[116] Amended DPA ¶¶ 8-9 (referring to Relationship Manager as "Person A" and Treasury Sales Manager as "Person B"); *see also* Elyassi Indictment ¶¶ 3-4.
[117] SOF ¶ 30.
[118] SOF ¶ 24; *see* 2019 OFAC Settlement ¶¶ 34-35.

have done so without the participation of the Terrorist Sponsors, who had control over the sector during the relevant period. Put simply, the Terrorist Sponsors did not allow unaffiliated Iranians to launder vast sums of U.S. dollars for such prolonged periods of time without Qods Force involvement. Thus, as U.S. officials stated in the press release accompanying the indictment, "Allowing hostile nations access to our economy is dangerous business." "SCB and the individuals whose charges were unsealed today … harmed our national security by deliberately providing Iranians with coveted access to the U.S. economy."

646.    Beneficiary and correspondent banks rejected several outgoing payments made from Company C-1 in 2008, 2010, and 2011 (which SCB did not block) due to Company C-1's Iranian connections.[119] SCB did not respond to this information by severing its relationship with Elyassi and his companies. Instead, SCB employees also ***actively facilitated*** Elyassi's malfeasance by showing him how to navigate the bank's processes to avoid further detection. Thus, SCB Dubai employees executed illicit U.S. dollar transactions for Elyassi's companies by providing "false and misleading information" to "disguise [Elyassi's] Iranian connections."[120]

647.    In August 2008, for example, in response to an internal compliance inquiry, the Relationship Manager (Person A) falsely stated that Company C-1 operated exclusively in the UAE—even though that was materially false, and even though SCB's KYC form confirmed that Company C-1 operated out of Iran.[121] And when "other financial institutions rejected payment requests from SCB on behalf of Company C-1 and Company C-2," the Relationship Manager

---

[119] SOF ¶ 25; 2019 OFAC Settlement ¶ 33 ("Several U.S. banks rejected or returned payments initiated from Company A's account with SCB Dubai as early as July 2008.").
[120] SOF ¶ 26.
[121] SOF ¶ 26.

(Person A) and the Treasury Sales Manager (Person B) helped "conceal the transactions' Iranian connections through lies and omissions."[122]

648. In December 2010, after "numerous payment requests" involving Company C-1 were "stopped" due to "Iranian sanctions concerns," SCB decided to exit its banking relationship with Company C-1.[123]

649. But before Company C-1's accounts were closed, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "helped [Elyassi] open a new business account under a new name, Company C-2, so that [Elyassi] could continue conducting U.S. dollar transactions through the United States without suffering similar rejections."[124]

650. SCB Dubai employees thus "knew" that Elyassi controlled Company C-2 in all meaningful respects, even though "a non-Iranian co-conspirator of [Elyassi] was the nominal owner."[125] Indeed, SCB's account records for Company C-2 identified Elyassi "as an authorized signatory/dealer on Company C-2's account," and "[d]ocuments contained in SCB's records also show[ed] that much of the contact information (telephone number, mobile phone number, fax number, and mailing address) for Company C-2 was the same as Company C-1."[126]

651. SCB thus ensured that Elyassi had unfettered access to SCB-facilitated U.S. dollar transactions: Company C-2's account with SCB Dubai was opened "on or about February 14, 2011, and Company C-1's account with SCB Dubai was closed on or about February 13, 2011."[127]

---

[122] SOF ¶ 26.
[123] SOF ¶ 27.
[124] SOF ¶ 27.
[125] SOF ¶ 27.
[126] SOF ¶ 27.
[127] SOF ¶ 27.

652.    After opening Company C-2's account, SCB Dubai employees coached Elyassi "on how to structure financial transactions that would not raise suspicion of an Iranian connection or other illegality."[128]

653.    On or about March 9, 2011, for example, in a telephone call recorded by SCB Dubai, the Relationship Manager (Person A) told Elyassi "not to send payments to Iranian individuals directly from Company C-2's account, but rather, to have a co-conspirator transfer the funds from Company C-2's account to his personal account at SCB Dubai and then send the payments to the Iranian individuals in order to avoid having Company C-2's account closed."[129] The Amended DPA reflects the following transcribed conversation between Elyassi (Person C) and the Relationship Manager (Person A):

> Person A:  "I am telling you once these go there will be no next time then you'll come back and they will say we will need to close the account [be]cause now even one payment is going [to an individual who] is Iranian."
>
> Person C:  "Mm"
>
> Person A:  "[The payment] will be stuck.  And once it is stuck … then you will come to me when no no don't close the account then nothing left and I am telling you."
>
> Person C:  "Mm"
>
> Person A:  "[The second individual payee] is Iranian, I know [the third individual payee] is Iranian, [and the first individual payee] is Iranian."
>
> Person C: "Mmm how we can do this?"

---

[128] SOF ¶ 27; *see* 2019 OFAC Settlement ¶ 41 ("In or around this time, the [Relationship Manager] held several phone calls with [Elyassi] regarding these transactions. The [Relationship Manager] appears to have referenced prior discussions in which he had coached [Elyassi] how to process certain types of transactions.").

[129] SOF ¶ 28.

Person A: "I am telling you, ask ask [co-conspirator] to transfer funds from [Company C-2's account at SCB-Dubai] to his personal account [at SCB-Dubai]. From [his] personal account he can make these five payments."[130]

654.    It was not until September 2011 that SCB Dubai closed Company C-2's account "due to sanctions concerns."[131] Before closing the account, however, SCB Dubai "processed 210 [U.S. dollar]-denominated funds transfers to or through the United States based on payment instructions it received from Iran."[132]

655.    At all times, the Relationship Manager (Person A) and the Treasury Sales Manager (Person B) "willfully engaged in this misconduct knowing that it was in violation of U.S. law"—all to "generate revenue for SCB."[133] At all times, these SCB employees acted within the scope of their employment as they served Elyassi and his companies.

656.    The massive volume of Elyassi's sanctions evasion caused at least millions of dollars to flow through to the Terrorist Sponsors, and from them on to their proxies Hizballah, Hamas, PIJ, and JAM.

### B.    SCB Facilitated Hizballah Financing Through Schemes in Gambia

657.    SCB Dubai and SCB Gambia knowingly moved millions of dollars for Hizballah financiers operating in and through Gambia until at least 2012.[134] These funds flowed to Hizballah in the Middle East, where it used them to finance attacks on Americans.

658.    Gambia is a small country in Western Africa with a population of approximately 1.7 million. Gambia has a well-established Lebanese diaspora community. Hizballah has

---

[130] SOF ¶ 28.
[131] SOF ¶ 28.
[132] 2019 OFAC Settlement ¶ 42.
[133] SOF ¶ 30.
[134] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

notoriously leveraged this community to obtain resources necessary to facilitate its attacks on Americans. This fact was confirmed by U.S. government officials and NGO experts, and was widely reported in news media, including local media reports in Gambia.

659.    In a 2003 paper, Dr. Matthew Levitt described a "consensus among intelligence professionals" that Hizballah had "global reach" and conducted "extensive fundraising operations in Africa" through "illicit diamonds" and "the local Shi'a expatriate community."

660.    On April 9, 2004, State publicly summarized congressional testimony from investigative journalist Douglas Farah citing voluminous evidence that "Hezbollah has operated in West Africa since its inception in the early 1980s" due to "the hundreds of thousands of Lebanese living in the region, 'the vast majority being Shiite Muslims.'" Farah explained that Hizballah "'collects donations from businesses, runs shakedown operations, operates front companies and is also deeply involved in the 'blood diamond' trade." All of these activities were prevalent in Gambia at the time.

661.    SCB maintained a longstanding and deep presence in Gambia. It operated in Gambia for decades, even playing "the Central Bank role at one point."[135] SCB Gambia's management was therefore knowledgeable about the local culture, dialect, market conditions, and politics, and knew the extent to which Hizballah had penetrated the Gambian economy. Armed with this knowledge, SCB willfully facilitated Hizballah's terrorist financing activities.

### 1.    SCB Gambia Helped Hizballah's Bazzi Network Access the U.S. Financial System to Finance Terrorist Attacks

662.    After helping overthrow the sitting government of Gambia in 1994, Yahya A.J.J. Jammeh became President in November 1996, remaining in that post until January 2017. For

---

[135] https://www.sc.com/gm/about-us/.

over twenty years, Jammeh's corruption and willingness to steal state resources facilitated the diversion of millions of dollars from the Gambian economy to Hizballah. Indeed, as early as December 8, 2005, African news outlets described Jammeh's regime as an organized crime enterprise, referring to Jammeh and his close associates as a "mafia."

663.    One of Jammeh's closest business partners—who banked with SCB—was Hizballah financier **Mohammad Bazzi**. In 2018, Treasury designated Bazzi and his business enterprises as Specially Designated Global Terrorists, describing Bazzi as "a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities," including in "West Africa." Treasury Secretary Mnuchin stated that "Hizballah uses financiers like Bazzi who are tied to drug dealers, and who launder money to fund terrorism." He further described Bazzi as "one of Hizballah's most prominent financiers," engaged in "savage and depraved acts."

664.    In 2019, the Organized Crime and Corruption Reporting Project ("OCCRP") described Bazzi as Jammeh's "consigliere" as Jammeh ran Gambia "like an organised crime syndicate" while Bazzi was "by far the most influential businessman" in Jammeh's inner circle.

665.    As high-profile public figures, both Bazzi and Jammeh were known to SCB. Additionally, by the mid-2000s, both Bazzi and Jammeh were notorious, as they were reportedly involved in illegal enterprises that directly supported Hizballah including drug trafficking, arms sales, and blood diamonds. In addition to direct financial support for Hizballah, Bazzi also reportedly assisted Jammeh in trading girls from refugee camps for funds to assist Hizballah.

666.    Bazzi and Jammeh's ties to Hizballah were well-known, including by SCB. In December 2006, Gambia (headed by President Jammeh) and Iran publicly issued a joint statement on mutual cooperation, including support for Hizballah. In 2007, the globally

284

syndicated Gambian newspaper *Freedom* reported that Gambia was "no longer in the hands of the Gambians but Lebanese," that the state's telecom company and energy firms had been "hijacked" by Bazzi, that Hizballah money was used to purchase the companies from the state, and that profits from these firms were "wired through the Standard Chartered Bank Banjul Branch [in Gambia] to Arab countries." Additional media reports in 2006 and 2007 named Bazzi as a Hizballah financier, and noted that Jammeh's personal security force was covertly receiving weapons and training from the IRGC. Another *Freedom* newspaper report in 2008 noted that Jammeh's Government "has been linked to welcoming Hezbollah terrorists into the country."

667.    In 2011, the Gatestone Institute, citing earlier local media reports, reported that Gambia was procuring weapons from Iran and selling them to Hizballah, as well as selling drugs through Hizballah: "President Jammeh is colluding with Lebanese businessman Mohammad Bazzi, Gambia's Consul General to Lebanon, to buy weapons from Iran to sell to Hezbollah." These and other reports alerted SCB that Bazzi was arming Hizballah terrorists. According to numerous news reports and U.S. government statements, in 2010, Qods Force Deputy Commander Esmail Ghani used Qods Force agents in West Africa to transfer over 240 tons of weapons, including small arms, large-caliber artillery shells, and Katyusha rockets to Hizballah and Hamas. The weapons were intercepted in Nigeria awaiting shipment to Gambia.

668.    Against the backdrop of these reports, Jammeh and his associates—including Bazzi and his network—robbed the state of at least hundreds of millions of dollars. OCCRP reported that they used the Gambian Central Bank as their "personal slush fund," looting $363.9 million from the state telecommunications company, $60 million from its pension fund, and $55.2 million from the state-run oil company.

669. A substantial portion of the looted funds flowed through to Hizballah. Jammeh, working with Bazzi and others, turned Gambia and its banking system into a Hizballah laundromat in exchange for multi-million-dollar bribes. Specifically, through the companies in his **Euro African Group Ltd. ("EAGL")**, Bazzi paid bribes to Jammeh in exchange for sham privatizations and government contracts being routed to companies that Bazzi and other known Hizballah financiers and commanders controlled.

670. EAGL's many transactions with Jammeh and his henchmen provided Hizballah with tremendous political influence in Gambia, making it a safe haven for Hizballah's terrorist operations. This enabled Hizballah to profit from other illicit activities in Gambia, without interference from the country's (corrupted) legal and intelligence officials. For example, in 2004, Bazzi and other Hizballah financiers bribed the country's Director of National Intelligence, who, like Bazzi, banked with SCB. Another Bazzi counterparty was regime official Baba Jobe, who trafficked arms and diamonds in collaboration with another notorious SCB client, Victor Bout. The illicit trade in diamonds was primarily conducted by Lebanese traders, who paid 'taxes' and provided raw gems to Hizballah in such great quantities that the 2006 war with Israel caused the global price of diamonds to collapse. Hizballah also extorted legitimate Lebanese diaspora businesses. U.S. government, U.N., and expert reports published well before 2008 indicate that Gambia served as a critical node in Hizballah's diamond and drug smuggling operations, which were used to fund its terrorist attacks on Americans.

671. SCB played an important role in Jammeh and Bazzi's schemes. OCCRP found that SCB "approved transactions for what would turn out to be Jammeh's seizure of state funds." And whistleblower accounts state that SCB Gambia, between 2008 and 2012, "maintained USD and GMD denominated bank accounts for Euro African Group LTD, identified by SCB group ID

number "*****7340", and processed funds transfers worth millions of U.S. dollars through SWIFT's data center in Virginia, CHIPS in New York, and SCB New York [for Euro African Group LTD]. Further, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "*****7701."[136] Because SCB provided services to both the Bazzi network and state agencies it was pillaging, it had a unique, comprehensive view of the totality of the Jammeh-Hizballah organized crime enterprise. Jammeh and Bazzi's corrupt schemes were *exclusively* located in SCB branch buildings. Co-locating with SCB gave the network the same benefits that using the bank's services did: it afforded legitimacy, efficiency, and revenue generation opportunities which would have been unavailable otherwise.

672.     EAGL and SCB Gambia had an intimate relationship. As early as 2004, EAGL gave its address as the second floor of the SCB building in Banjul, Gambia. EAGL also listed SCB Gambia as its principal banker. EAGL gave the same address at Standard Chartered for Petroleum Storage Facility, an affiliated firm of EAGL. In 2018, OFAC designated Bazzi and EAGL, listing its Gambian address as "Standard Chartered House," and its energy-focused subsidiary, Global Trading Group (GTG)'s location as the second floor of the "Standard Chartered Bank Building." Bazzi and his son conspired to evade those sanctions, and, in 2019, OFAC designated multiple GTG successor entities at the same "Standard Chartered Bank Building" address.

673.     Jammeh and Bazzi's corrupt schemes were literally being carried out under SCB's nose. According to the Gambian commission that investigated Jammeh and Bazzi's

---

[136] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

corrupt enterprises, Jammeh's umbrella holding company and many of his enterprises were co-located with Bazzi's in Standard Chartered House. These companies were entirely dependent on the circular flow of bribes, stolen public assets, and illegal contracts and therefore shared both space and leadership: the managing director of EAGL, Ahmad Hodroj, was simultaneously a signatory on Jammeh's companies' bank accounts. Bazzi and high-ranking regime officials used Standard Chartered House to hold meetings in furtherance of their conspiracy to convert Gambian public property into private wealth and Hizballah assets.

674.    Similarly, Bazzi took over the state water and electricity company (NAWEC) by inducing Jammeh to contract with a Bazzi-controlled company to oversee it. Bazzi then purged NAWEC's top leadership. He then called a management meeting at Standard Chartered House to intimidate its remaining leaders. Thereafter, Bazzi forced NAWEC's nominal managers to shuttle between his office at Standard Chartered House and their headquarters—about 3 kilometers away—multiple times each day. Bazzi and his co-conspirators thus ensured an uninterrupted flow of NAWEC's funds into the coffers of EAGL's monopolies on fuel and electricity generators.

675.    Indeed, Standard Chartered House as such owes its very existence to SCB's knowing collusion with the Jammeh-Bazzi criminal network. SCB does not own the building, and thus, on information and belief, SCB made regular rent and naming-rights payments. In exchange, SCB received the use of a sparkling, modern location situated on a 27,000 square-foot lot of prime real estate on Gambia's highest-value commercial thoroughfare. SCB, of course, sought the highest possible return on this investment in visibility. Consequently, the OFAC-designated headquarters of one of the 21st century's most destructive state-sponsored crime and

288

terrorist finance syndicates bears a huge sign: "STANDARD CHARTERED HOUSE." The

slogan on banner reads "You believe—we achieve."[137]



676.    In the ordinary course of business, a sophisticated multinational bank with

knowledgeable local managers would not open a branch without performing thorough diligence

on the location and its owners. But this was an extraordinary lease: SCB negotiated to create a

location on the Gambian equivalent of Wall Street that would literally and figuratively bear its

name, and to share said building with its owners—landlords who were, not coincidentally, the

most powerful and dangerous actors in Gambia—and, simultaneously, high-value SCB clients.

677.    Standard Chartered House is a monument to the synergy of organized crime,

torture, and terrorist finance. It does not have a typical numbered street address because it was

built on Jammeh illegally converted public parkland. According to the Gambian commission,

Jammeh forced the property's prior owner to "sell" the property to Jammeh—and then leased the

property to EAGL's co-owner, Jammeh regime official Amadou Samba. Samba, in turn,

developed the property. It is therefore unsurprising that EAGL and the president's own

---

[137] https://maps.app.goo.gl/aoiJFBqzSnpnGyUB9 (June 2007).

companies were headquartered there, and inconceivable that SCB was unaware of the constant stream of corrupt officials and their victims meeting with their landlord and client, Bazzi.

678. True to its signage, SCB did, indeed, help the Bazzi network "achieve." Fully half of its Gambian branch locations housed Bazzi network offices. SCB Gambia, for use as EAGL's headquarters. But the building was named "STANDARD CHARTERED HOUSE," and contained an SCB Gambia branch office, indicating a very close relationship between SCB and EAGL—as well as likely substantial rent payments flowing from SCB to EAGL despite evidence of EAGL's complicity in terrorist finance.

679. Bazzi was also one of the owners and founders of Prime Bank in Gambia. Treasury's February 10, 2011 press release identifying Lebanese Canadian Bank SAL ("LCB") as a financial institution of primary money laundering concern stated that: "LCB's other links to Hizballah include LCB's subsidiary, Gambia-based Prime Bank, which is partially owned by a Lebanese individual known to be a supporter of Hizballah." Local and international media confirmed in real-time that this partial owner was Bazzi. The corporate records used in these reports were accessible to SCB at least as early as 2009. LCB was also identified as "the sole correspondent bank for Prime Bank," and SCB served as a U.S. correspondent bank for LCB.

680. SCB not only ignored the lack of oversight and counterterrorism controls imposed by the government in Gambia; it actively assisted Bazzi and his business interests by conducting financial transactions worth millions of dollars through the United States so that Bazzi could provide funds to Hizballah for terrorist attacks. SCB provided accounts and transactional support for Bazzi and his companies so that they could continue to funnel money to Hizballah, even though Bazzi's Hizballah connections were known at the time.

681. Plaintiffs' allegations about Bazzi's activities were confirmed by the U.S. Government when it designated and prosecuted Bazzi and his network. In addition to the 2018 designation of Bazzi, which identified him as "a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities," Treasury also designated Bazzi's co-conspirator in Gambia, Charara, and his telecommunications enterprise as SDGTs on January 7, 2016. That designation said that Charara "has received millions of dollars from Hizballah to invest in commercial projects that financially support the group," including "extensive business interests in the telecommunications industry in West Africa." Adam J. Szubin, acting Under Secretary for Terrorism and Financial Intelligence described how "Hizballah relies upon accomplices in the business community to place, manage, and launder its terrorist funds," explaining that by "exposing and disrupting these networks," the Government sought "to pressure Hizballah's finances and degrade its ability to foment violence in Lebanon, Syria, and across the region."

682. Bazzi, EAGL, and other companies connected to Bazzi were designated SDGTs on May 17, 2018 (and OFAC listed their Standard Chartered building addresses). OFAC said that the designation showed the "convergence of Iran's support for terrorism with many facets of illicit criminal activity, including narcotics trafficking. Treasury's designation added that Bazzi had "business ties to the Ayman Joumaa Drug Trafficking and Money Laundering Organization," and that Abdallah Safi-al-Din, Hizballah's highest-ranking representative to Iran, personally "worked with Bazzi to reestablish a political relationship between The Gambia and Iran." "Bazzi and Safi-Al-Din previously worked with the Central Bank of Iran" to "expand banking access between Iran and Lebanon."

291

683. The upshot is that, for years, SCB, through its Gambia branch, knowingly assisted Bazzi and his confederates as they corruptly extracted millions of dollars from the Gambian state to raise and transfer money for Hizballah's violent activities. Those funds flowed through Hizballah's leadership to finance attacks most important to Hizballah leaders, including those it jointly committed in Israel and Iraq.

### 2. SCB Dubai Helped Hizballah Front Tajco Ltd. Access the U.S. Financial System to Finance Terrorist Attacks

684. SCB Gambia and SCB Dubai helped Hizballah front Tajco Ltd. access the international financial system to finance terrorist attacks. Treasury identified Tajco Ltd. as a "multipurpose, multinational business venture involved in international trade as well as real estate and presided over by Ali, Husayn and Kassim Tajideen. As of February 2007, Kassim Tajideen owned Tajco and *used proceeds from this business to provide millions of dollars in financial support to Hizballah*."

685. SCB Gambia and SCB Dubai maintained relationships with Tajco Ltd. knowing it was co-owned by the Tajideen brothers, who had multiple businesses acting as fronts to provide funding and resources to Hizballah. Despite overwhelming evidence that Tajideen's African enterprises were providing enduring infrastructure for Hizballah's terrorist operations, until at least 2010, "SCB Gambia maintained U.S. dollar ('USD') and Gambian dalasi ('GMD') denominated bank accounts for Tajco LTD, identified by SCB group ID number '*****7865', and processed funds transfers worth millions of U.S. dollars [for Tajco LTD] through SWIFT's Viriginia data center, CHIPS in New York, and SCB New York. Further, in August 2010, SCB

292

Dubai processed a foreign exchange transaction worth a total of $290,803.56 U.S. dollars for the benefit of Tajco's transactional account, number '*****9201.'"[138]

686.   Tajco's high-profile connections to Hizballah were known to SCB. In May 2009, the United States designated Kassim Tajideen under Executive Order 13224 for supporting Hizballah, 74 Fed. Reg. 26475, with Treasury explaining in the sanctions announcement that "Kassim Tajideen is an ***important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa***. He has contributed tens of millions of dollars to Hizballah through his brother, a ***Hizballah commander in Lebanon***. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa."

687.   According to Treasury in 2010, Ali Tajideen, one of Tajco's co-owners, provided cash "in tranches as large as $1 million" to Hizballah and was a "major player" in Jihad al-Bina, a Lebanon-based Hizballah-run construction company designated by Treasury in February 2007.

688.   Evidence of the Tajideen family's connections to terrorism was public well before these designations. On February 26, 2007, *The Times (London)*, reported that Ali Tajideen's "connections to Hezbollah are well known in south Lebanon" and that Ali was purchasing land in Lebanon for Hizballah, and further highlighted that a member of his family was charged with using West African diamonds to launder money for Hizballah. In its designation of the Tajideen family network, OFAC confirmed that their firms were trading diamonds.

689.   Investigative journalist Douglas Farah's reporting on Hizballah's use of diamonds to finance terrorist violence was cited in African media and research reports available to all SCB branches, including in Gambia. Most pointedly, in 2002, the *Concord Times* covered a widely

---

[138] Decl. of David J. Scantling ¶ 40 ("Scantling Decl."), *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,* No. 18-cv-11117 (S.D.N.Y. May 31, 2024), ECF 104.

cited paper noting Farah's reports linking Lebanese diamond traders in West Africa—"especially The Gambia" which was "enmeshed in the diamond syndicate—to Hizballah's attacks on "US installations." Likewise, in a 2004 paper, Farah highlighted that "Hezbollah has also been using diamonds from West Africa to finance its activities," becoming sophisticated in its "exploitation of 'grey areas' where states are weak, corruption is rampant, and the rule of law is nonexistent." Farah thus explained that "over the course of more than twenty years," Hizballah had "successfully embedded its financial structure within the diamond trade." Newspapers published op-eds by Farah and co-authors reiterating these lessons.

690.    Media sources also confirmed the Tajideen family's status as Hizballah financiers. In 2007, the *Sunday Telegraph* reported that Tajideen used the money he earned in Africa to acquire huge amounts of land in Lebanon, for the purpose of replacing communities opposed to Hizballah with pro-Hizballah Shia. The IRGC and Tajideen's construction company were so successful in this enterprise that Lebanese politicians warned that there was "an extraordinary demographic shift taking place" pursuant to "Hezbollah's plan to create a state within a state." Tajideen, in his role as "a major player" in Jihad al-Bina provided Hizballah with control of strategic valleys along the Litani River, which borders Israel. This territory was "ideal terrain" for Hizballah's guerilla tactics and fell outside of U.N. monitors' jurisdiction. This was part of a "a grand scheme to create a strip of Shia-controlled land connecting the south to Hizballah's other power centre in Lebanon, the Bekaa Valley."

691.    Tajideen's land acquisitions and property developments provided Hizballah with fortified bases co-located with civilian housing, removed its opponents from strategic areas, and enabled it to covertly build secure command, control, and communications infrastructure directly connected with Syrian and Iranian systems. Discovered in 2008, this was declared Hizballah's

294

"No. 1 weapon" by its leader Hassan Nasrallah. When Lebanon's Prime Minister demanded its removal, Hizballah launched an all-out assault on Beirut, overthrew the government, and replaced it with a Hizballah-controlled coalition.

692.    On information and belief, SCB's industry-standard due diligence, which involved Know Your Customer investigations, flagged Tajco's co-owners and alerted SCB to public reports discussing Tajco and its owners. Despite these warnings, SCB chose to process dollar transactions for these known Hizballah financiers through at least August 2010—*i.e.*, even after Kasim Tajideen was sanctioned by the United States. Not only did SCB maintain accounts in Gambia and process transactions in Dubai, but SCB also enabled these Hizballah fundraisers to access U.S. dollars through SCB New York.

### C.    SCB's Culture of Defiance Suggests That Additional Violations Occurred

693.    SCB's misconduct extended beyond the specific examples discussed above. Documents that resolved investigations into SCB either state directly or permit the reasonable inference that SCB Dubai employees helped Iran Terrorist Sponsors and fronts to evade U.S. sanctions in other ways.

694.    It is clear SCB's bad behavior is broader than alleged here, and that its tactics extended beyond wire stripping, name-changes, and false customer due diligence documents. As NYDFS found, for example, SCB Dubai employees warned "*another* Iranian front company's owner" to close its account before SCB reported it as suspicious: "before [the Bank] report[s] to [the local bank regulator] ... please can you send me a closure notice before [the Bank] raise question on you?"[139] Indeed, NYDFS concluded that "during the period November 2008 through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of sanctioned

---

[139] 2019 NYDFS Consent Order ¶ 36 (emphasis modified).

Iranian parties, totaling more than $600 million," a "majority" of which "flowed through the New York Branch."[140]

695.    Separately, according to public reports, a whistleblower who was employed at SCB from 2009 to 2011 claims to have identified many billions of dollars in additional transactions occurring from 2008 to 2012. According to the whistleblower, data hidden in 53 spreadsheets reveals that SCB processed at least 500,000 additional transactions, adding up to billions of dollars, for what SCB called its "Iran Group," which included front companies for the IRGC, Hamas, and Hizballah, as well as other Iran-related entities.

696.    Throughout the relevant period, SCB had—as the U.K. FCA put it—a "culture" problem, where SCB Dubai employees were "colluding to evade controls and knowledge by other [SCB] employees of accounts operated for financial sanctions evasion."[141] SCB Dubai's "compliance infrastructure" was "woefully inadequate" and "no match for even unsophisticated evasion efforts."[142]

697.    SCB admitted as part of the 2019 Amended DPA that multiple SCB Dubai employees "willfully conspired with *several people and entities* to help Iran-connected customers of SCB Dubai conduct U.S. dollar transactions and cause U.S. financial services to be exported to Iran through SCB."[143] That included assisting "Iranian nationals located in Dubai" who were opening "commercial bank accounts" for "commercial entities" that "were fronts for Iranian businesses."[144]

---

[140] 2019 NYDFS Consent Order ¶ 38.
[141] 2019 U.K. FCA Decision Notice § 5.16.
[142] 2019 NYDFS Consent Order ¶ 43.
[143] SOF ¶ 22.
[144] SOF ¶ 22.

698.    OFAC, similarly, explained that, in "*several instances* two employees within SCB Dubai—including a Relationship Manager associated with *several general trading company accounts*—actively worked with the account holders to obfuscate the sanctions nexus associated with the parties and/or their transactions …."[145] Those SCB Dubai employees "conspired with other Iran-connected individuals and business organizations during their employment with SCB Dubai during much of the same period and using many of the same tactics as they used with [Elyassi]."[146]

699.    The U.K. FCA echoed that conclusion: "Two employees in SCB's UAE branches had, in fact, colluded with customers in order to evade financial sanctions against Iran,"[147] and other "SCB employees in the UAE were aware that accounts were opened for financial sanctions evasion purposes."[148]

700.    As another example, similar to SCB's "wire stripping" tactic, SCB also used temporary holding or error accounts—referred to as "sundry accounts"—to book revenues for illegal transactions involving Iranian individuals and entities instead of SCB's account in the Iranian client's name. In SCB's regular course of business, sundry accounts would typically be used to book transactions for which the true counterparty had not been identified. But for SCB's illegal Iran-linked U.S. dollar-denominated transactions, SCB had identified the correct counterparty but instead intentionally dropped a word or changed a letter from that party's name to prevent the transactions from being booked to the correct client account where it could be detected by SCB's NY Branch or by U.S. law enforcement personnel. Instead, the transaction

---

[145] 2019 OFAC Settlement ¶ 31.
[146] SOF ¶ 29.
[147] 2019 U.K. FCA Decision Notice § 4.84.
[148] 2019 U.K. FCA Decision Notice § 4.84.

would go to the sundry account where it could no longer be discovered by a computer search performed by regulators and correspondents involved in the dollar clearing process. One experienced banker described this practice as "highly irregular" and noted that it appeared to him that this flaw was "purposefully designed and intended to facilitate evasion by SCB of U.S. sanctions on transactions with certain Iran-related persons."[149] This practice made it nearly impossible to determine whether SCB was transacting with individuals or entities designed by OFAC. A whistleblower who suffered retaliation for providing data about the sundry account alleged that "the revenues derived from SCB's scheme to evade U.S. sanctions contributed to funds made available to Iran-related parties and ultimately used to support terrorist activities that killed and wounded soldiers serving in the U.S.-led coalition and many innocent civilians."[150]

701.    In addition to these examples, the enforcement actions discovered that SCB Dubai allowed Iranian customers to use two systems—a wire-by-fax system called "Right Fax," and an online banking platform—to make wire and funds transfers in violation of sanctions for years, even though SCB Dubai's staff knew that these violations were taking place, and easily could have stopped them. Through these channels, SCB facilitated tens of millions of dollars in sanctions violations.

702.    Finally, SCB both enabled and concealed its ongoing sanctions evasion by maintaining a deliberately ineffective compliance regime. This was not merely a function of SCB "failing to do more" to stop Iranian entities, including terrorist fronts and financiers, from accessing and misusing its services. SCB, particularly SCB Dubai, wanted to have its cake—*i.e.*, lucrative banking relationships with Iranian customers, including sanctioned ones—and eat it

---

[149] Marcellus Decl. ¶ 22.
[150] Decl. of Anshuman Chandra ¶ 8, *U.S. ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, No. 18-cv-1111 (S.D.N.Y. Jan. 10, 2020), ECF 48-3.

too—*i.e.*, by avoiding any resulting regulatory or law enforcement consequences. To achieve that result, SCB established a built-to-fail system that ensured it remained willfully blind about its highest-risk customers, in one of its highest-risk geographies for terrorist finance. Put another way, SCB's management unlawfully enabled its employees to pursue lucrative-but-illegal business with terrorist customers that no responsible bank would have served.

703.    SCB Dubai's flagrant Iran-related misconduct permeated SCB's provision of financial services in Dubai from at least the early 2000s through at least late 2014 or early 2015. SCB Dubai helped one or more of Iran's Terrorist Sponsors launder at least several million dollars on behalf of IRGC and SLO money through at least late 2014 or early 2015, including in connection with oil trades.

704.    Thus, throughout the relevant period, there was a pattern of malfeasance at SCB Dubai. And SCB Dubai employees knew at the time of their misconduct that they were violating U.S. and U.N. sanctions, and other laws, that were specifically designed to thwart violent IRGC-sponsored terrorist attacks—all while acting within the scope of their employment for SCB.[151]

**D.      SCB Promoted a Culture of Illegality by Retaliating Against Whistleblowers**

705.    SCB promoted a culture of illegality throughout the institution. Not only did SCB "fail[] to take reasonable steps to ensure a positive culture towards AML compliance was embedded" throughout the Bank,[152] but SCB also retaliated against multiple employees who tried to blow the whistle on SCB's illegal provision of financial services to customers affiliated with the IRGC and other terrorist groups.

---

[151] SOF ¶ 30.
[152] 2019 U.K. FCA Decision Notice § 5.16.

706.    Between 2011 and 2016, two SCB employees reported to U.S. and New York State authorities that, based on their own observations and experience and informed by reams of SCB transaction data: (i) SCB was facilitating U.S. dollar-denominated transactions for Iranian customers suspected of funding terrorist groups; and (ii) when it was under investigation, SCB drastically underreported the volume of illegal Iran-linked transactions it facilitated.[153]

707.    The first whistleblower was Julian Knight, SCB's Global Head of Transaction Banking Foreign Exchange Sales for SCB Dubai and SCB's branches in Singapore. Knight internally reported concerns about SCB's Iranian transactions and proposed reforms to remedy them. SCB responded by terminating him. Subsequently, after Knight reported his concerns to NYDFS and other government regulators, SCB embarked on a retaliatory smear campaign against him that essentially led to Knight being blacklisted in the financial services industry.[154]

708.    The second whistleblower was Anshuman Chandra, who worked for SCB in Dubai as the head of eCommerce Client Services, Financial Markets for the MENA region. After Chandra reported concerns about SCB's post-2013 Iran-related transactions to U.S. authorities through an intermediary, SCB retaliated against him at work via harassing conduct, followed by a layoff, and then harsher treatment of Chandra than other laid off employees who had not engaged in whistleblowing.[155]

---

[153] First Am. Compl. ¶¶ 9-13, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

[154] First Am. Compl. ¶¶ 43-46, 78-93, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

[155] First Am. Compl. ¶¶ 47-59, 64-77, *Chandra, et al. v. Standard Chartered Bank, et al.*, No. 19-cv-11739 (S.D.N.Y. May 26, 2020), ECF 21.

709.   SCB's willingness to retaliate against whistleblowers in an effort to conceal the true scope of its transactions with Iran's Terrorist Sponsors and fronts is further evidence that SCB's *hundreds of millions* in transactions with those entities was both conscious and culpable.

## VIII.   Plaintiffs' Claims Are Timely

710.   The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all ATA claims, including claims for aiding and abetting, which were not cognizable before JASTA was enacted and made those claims available retroactively. JASTA was enacted on September 28, 2016. Accordingly, Plaintiffs' claims could not have accrued before that date, and Plaintiffs' claims are all timely because they are being brought within 10 years after September 28, 2016, the earliest date they could have accrued.

711.   If the Court concludes that Plaintiffs' causes of action accrued earlier (*e.g.*, on the date of the terrorist attacks that injured them), and to the extent tolling is required for any particular Plaintiff's claim, Plaintiffs are entitled to tolling because SCB fraudulently concealed its misconduct, and no plaintiff exercising reasonable diligence could have discovered that misconduct prior to April 9, 2019, when the United States publicly filed the Amended DPA that revealed SCB's knowing and willful processing of U.S. dollar transactions for Iran's Terrorist Sponsors and fronts from 2007 to 2011.

712.   SCB's misconduct—which involved providing Iran's Terrorist Sponsors and fronts back-door access to the U.S. financial system, while deceiving financial regulators and financial institutions—was inherently self-concealing. Indeed, the entire point of SCB's misconduct was to help the Terrorist Sponsors and fronts transact in U.S. dollars, through U.S.

301

banks, in ways that would not reveal those entities' connections to the IRGC or Iran. None of the transactions were visible to third parties, let alone to persons in Plaintiffs' position.

713.    SCB went to extreme lengths to conceal its wrongdoing. Among other things, SCB misled several financial regulators and law enforcement agencies about its sanctions compliance and AML practices, lied to other financial institutions for its IRGC-connected clients, and retaliated against whistleblowers who threatened to reveal the bank's misconduct.

714.    Accordingly, to the extent the statute of limitations began running before April 9, 2019, it must be tolled prior to that date because no plaintiff exercising diligence could have uncovered SCB's support for terrorists prior to that date.

## IX.    Plaintiffs And Their Family Members Were Killed Or Injured In Terrorist Acts Committed, Planned, Or Authorized By Iran-Sponsored Foreign Terrorist Organizations

### A.    The December 18, 2010 Stabbing Attack in Israel (Luken Family)

715.    On December 18, 2010, Palestinian extremists committed a stabbing attack in Jerusalem, Israel (the "December 18, 2010 Attack"). The attack was authorized by Hamas, with authorization consisting of programmatic offers for bounty, martyr, and other incentive payments intended to incite violent attacks on Americans and Israelis.

716.    The December 18, 2010 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from Hamas. All such payments were designed to, and did, incentivize successful attacks, including the December 18, 2010 Attack.

717.    The December 18, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither

302

wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

718.    **Kristine Luken** was in Israel, as a civilian, hiking at the time of attack. Kristine Luken was injured in the December 18, 2010 Attack. She died on December 18, 2010, as a result of injuries sustained during the attack.

719.    Kristine Luken was a U.S. national at the time of the attack and her death.

720.    Plaintiff Kathleen Alt is the twin sister of Kristine Luken and a U.S. national. She brings claims in both her personal and representative capacity on behalf of Kristine Luken's estate.

721.    Plaintiff Lawrence Luken is the father of Kristine Luken and a U.S. national.

722.    Plaintiff Gerald Luken is the brother of Kristine Luken and a U.S. national.

723.    Plaintiff Margaret Luken is the stepmother of Kristine Luken and a U.S. national. Ms. Luken lived in the same household as Kristine Luken for a substantial period of time and considered Kristine Luken the functional equivalent of a biological daughter.

724.    As a result of the December 18, 2010 Attack and Kristine Luken's injuries and death, each member of the Luken family has experienced severe mental anguish, emotional pain and suffering, and the loss of Kristine Luken's society, companionship, and counsel.

725.    As a result of the December 18, 2010 Attack, Kristine Luken was injured in her person and/or property. The Plaintiff members of the Luken Family are the survivors and/or heirs of Kristine Luken and are entitled to recover for the damages Kristine Luken sustained.

### B.    The August 19, 2011 Rocket Attack in Israel (Brauner Family)

726.    On August 19, 2011, a joint cell comprised of Hizballah and Hamas committed a rocket attack in Ashdod, Israel, in which a Hamas terrorist detonated a rocket supplied by the

IRGC for which Hamas was trained and directed to attack by Hizballah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "August 19, 2011 Attack").

727.   On information and belief, the Joint Logistics Cell furnished the rockets and tunnels used in the August 19, 2011 Attack.

728.   The August 19, 2011 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the August 19, 2011 Attack.

729.   The August 19, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

730.   **Shmuel Brauner** was a citizen living in Israel attending Synagogue during the August 19, 2011 Attack. The attack severely wounded Shmuel Brauner, who suffered from shrapnel to his back and stomach, loss of a kidney, loss of partial small intestine, and is permanently disabled.

731.   As a result of the August 19, 2011 Attack and his injuries, Shmuel Brauner has experienced severe physical and emotional pain and suffering.

732.   Plaintiff Shmuel Brauner was a U.S. national at the time of the attack and remains one today.

304

733.    Plaintiff Nechama Brauner is the wife of Shmuel Brauner and a U.S. national.

734.    Plaintiff C.B., by and through his next friend Shmuel Brauner, is the minor son of Shmuel Brauner and an Israeli national.

735.    Plaintiff Esther Brauner is the mother of Shmuel Brauner and a U.S. national.

736.    Plaintiff Mordechai Brauner is the father Shmuel Brauner and a U.S. national.

737.    As a result of the August 19, 2011 Attack and Shmuel Brauner's injuries, the Plaintiff members of the Brauner family have experienced severe mental anguish as well as emotional pain and suffering.

**C.      The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family)**

738.    On June 12, 2014, a joint cell comprised of Hizballah and Hamas committed a kidnapping attack in Gush Etzion, Israel, in which Hamas managed the abduction, which was jointly planned by Hamas and Hizballah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "June 12, 2014 Attack").

739.    On information and belief, the Joint Logistics Cell furnished the tunnels that facilitated the June 12, 2014 Attack.

740.    The June 12, 2014 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the June 12, 2014 Attack.

741.    The June 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not

305

taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

742. Sixteen-year-old **Yaakov Fraenkel** was traveling with two other teenaged friends in Gush Etzion in the West Bank of Israel when all three were abducted during the June 12, 2014 Attack. Yaakov Fraenkel's remains were discovered on June 30, 2014, and it was determined that he was murdered shortly after abduction.

743. Yaakov Fraenkel was a U.S. national at the time of the attack and his death.

744. Plaintiff Abraham Fraenkel is the father of Yaakov Fraenkel and an Israeli national. He brings claims in both his personal capacity and representative capacity on behalf of Yaakov Fraenkel's estate.

745. Plaintiff Rachelle Fraenkel is the mother of Yaakov Fraenkel and a U.S. national.

746. Plaintiff Avigail Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

747. Plaintiff Ayala Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

748. Plaintiff N.F., by and through her next friend Abraham Fraenkel, is the minor sister of Yaakov Fraenkel. She is a U.S. national.

749. Plaintiff Noga Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

750. Plaintiff S.F., by and through his next friend Abraham Fraenkel, is the minor brother of Yaakov Fraenkel. He is a U.S. national.

751. Plaintiff Tzvi Fraenkel is the brother of Yaakov Fraenkel and a U.S. national.

752. As a result of the June 12, 2014 Attack and Yaakov Fraenkel's injuries and death, each member of the Fraenkel Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Yaakov Fraenkel's society, companionship, and counsel.

306

753.    As a result of the June 12, 2014 Attack, Yaakov Fraenkel was injured in his person and/or property. The Plaintiff members of the Fraenkel Family are the survivors and/or heirs of Yaakov Fraenkel and are entitled to recover for the damages Yaakov Fraenkel sustained.

**D.    The October 22, 2014 Vehicle Attack in Israel (Braun Family)**

754.    On October 22, 2014 Hamas committed a vehicle attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "October 22, 2014 Attack").

755.    The October 22, 2014 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the October 22, 2014 Attack.

756.    The October 22, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

757.    Three-month-old **Chaya Braun** was traveling in Israel with her parents during the October 22, 2014 Attack. Chaya Braun was injured in the October 22, 2014 Attack. Chaya Braun died on October 22, 2014 as a result of injuries sustained during the attack.

758.    Chaya Braun was a U.S. national at the time of the attack and her death.

307

759.    Plaintiff Samuel Braun is the father of Chaya Braun and a U.S. national. He brings claims in both his personal capacity and co-representative capacity, with Chana Braun, on behalf of Chaya Braun's estate.

760.    Plaintiff Chana Braun is the mother of Chaya Braun and a U.S. national. She brings claims in both her personal capacity and co-representative capacity, with Sameul Braun, on behalf of Chaya Braun's estate.

761.    As a result of the October 22, 2014 Attack and Chaya Braun's injuries and death, each member of the Braun Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Chaya Braun's society, companionship, and counsel.

762.    As a result of the October 22, 2014 Attack, Chaya Braun was injured in her person and/or property. The Plaintiff members of the Braun Family are the survivors and/or heirs of Chaya Braun and are entitled to recover for the damages Chaya Braun sustained.

763.    **Samuel Braun** was traveling in Israel with his wife and baby daughter during the October 22, 2014 Attack. The attack severely wounded Mr. Braun who suffered from broken ribs and a torn ligament in his knee. Mr. Braun's knee continues to be painful to this day.

764.    Plaintiff Samuel Braun was a U.S. national at the time of the attack and remains one today.

765.    Plaintiff Chana Braun is the wife of Mr. Braun and a U.S. national.

766.    Plaintiff Esther Braun is the mother of Mr. Braun and a U.S. national.

767.    Plaintiff Murray Braun is the father of Mr. Braun and a U.S. national.

768.    As a result of the October 22, 2014 Attack and Mr. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

308

769.    **Chana Braun** was traveling in Israel with her husband and baby daughter during the October 22, 2014 Attack. The attack severely wounded Ms. Braun who suffered from severe psychological and emotional trauma.

770.    Plaintiff Chana Braun was a U.S. national at the time of the attack and remains one today.

771.    Plaintiff Samuel Braun is the husband of Ms. Braun and a U.S. national.

772.    Plaintiff Sara Halperin is the mother of Ms. Braun and a U.S. national.

773.    Plaintiff Shimshon Halperin is the father of Ms. Braun and a U.S. national.

774.    As a result of the October 22, 2014 Attack and Ms. Braun's injuries, each member of the Braun family has experienced severe mental anguish as well as emotional pain and suffering.

**E.      The October 29, 2014 Assassination Attack in Israel (Glick Family)**

775.    On October 29, 2014, PIJ committed an assassination attack in Jerusalem, Israel, which was jointly planned by Hizballah and PIJ, for which PIJ was trained and directed to attack by Hizballah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "October 29, 2014 Assassination Attack").

776.    On information and belief, the Joint Logistics Cell furnished the small arms and ammunition used in the October 29, 2014 Assassination Attack.

777.    The October 29, 2014 Assassination Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the October 29, 2014 Assassination Attack.

778.    The October 29, 2014 Assassination Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

779.    **Yehudah Glick** was packing up his car after giving a speech at the time of the October 29, 2014 Assassination Attack. Yehudah Glick was shot four times during this attack. The attack severely wounded Yehudah Glick, who suffered from gunshot wounds injuring his chest, including his throat, lung, and causing multiple broken ribs. Gunshot wounds also injured his liver, spine, one hand, and both intestines.

780.    As a result of the October 29, 2014 Assassination Attack and his injuries, Yehudah Glick has experienced severe physical and emotional pain and suffering.

781.    Plaintiff Yehudah Glick was a U.S. national at the time of the attack. He brings claims in his individual capacity and in his representative capacity on behalf of Yaffa Glick's estate. Yaffa Glick is the deceased wife of Yehudah Glick and was an Israeli national at the time of the attack and her death.

782.    Plaintiff Hallel Glick is the son of Yehudah Glick and a U.S. national.

783.    Plaintiff Neria Glick is the son of Yehudah Glick and a U.S. national.

784.    Plaintiff Shahar Glick is the son of Yehudah Glick and a U.S. national.

785.    Plaintiff Shlomo Glick is the son of Yehudah Glick and a U.S. national.

786.    Plaintiff Rachel Glick is the foster daughter of Yehudah Glick and an Israeli national. Rachel Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

787.     Plaintiff Tatiana Glick is the foster daughter of Yehudah Glick and an Israeli national. Tatiana Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

788.     Plaintiff Avital Breuer is the stepdaughter of Yehudah Glick and an Israeli national. Avital Breuer lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

789.     As a result of the October 29, 2014 Assassination Attack and Yehudah Glick's injuries, the Plaintiff members of the Glick family have experienced severe mental anguish as well as emotional pain and suffering.

**F.      The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family)**

790.     On October 13, 2015, Hamas committed a shooting and stabbing attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "October 13, 2015 Attack").

791.     The October 13, 2015 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the October 13, 2015 Attack.

792.     The October 13, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

311

793.    **Richard Lakin** was riding a bus in Israel returning from a doctor's appointment during the October 13, 2015 Attack. Mr. Lakin was shot and stabbed during the October 13, 2015 Attack, which resulted in a series of invasive surgeries. Mr. Lakin died on October 27, 2015 as a result of injuries sustained during the attack.

794.    Mr. Lakin was a U.S. national at the time of the attack and his death.

795.    Plaintiff Micah Lakin is the son of Mr. Lakin and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Lakin's estate.

796.    Plaintiff Manya Lakin is the daughter of Mr. Lakin and a U.S. national.

797.    As a result of the October 13, 2015 Attack and Mr. Lakin's injuries and death, each member of the Lakin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Lakin's society, companionship, and counsel.

798.    As a result of the October 13, 2015 Attack, Mr. Lakin was injured in his person and/or property. The Plaintiff members of the Lakin Family are the survivors and/or heirs of Mr. Lakin and are entitled to recover for the damages Mr. Lakin sustained.

### G.    The November 6, 2015 Sniper Attack in Israel (Borochov Family)

799.    On November 6, 2015, Hamas committed a sniper attack in Me'arat Hamachpelah, Israel, which was jointly planned by Hizballah and Hamas, for which Hamas was trained and directed to attack by Hizballah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "November 6, 2015 Attack").

800.    On information and belief, the Joint Logistics Cell furnished the small arms and ammunition used in the November 6, 2015 Attack.

801. The November 6, 2015 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the November 6, 2015 Attack.

802. The November 6, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

803. **Mr. Ronen Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack caused Mr. Borochov to fear for his life as well as his sons' lives. Mr. Borochov suffers from psychological and emotional trauma as a result of the November 6, 2015 Attack.

804. Plaintiff Ronen Borochov was a U.S. national at the time of the attack and remains one today.

805. Plaintiff Devora Borochov is the wife of Mr. Borochov and a U.S. national.

806. Plaintiff Josef Borochov is the son of Mr. Borochov and U.S. national.

807. Plaintiff Eli Borochov is the son of Mr. Borochov and a U.S. national.

808. Plaintiff Avraham Borochov is the son of Mr. Borochov and a U.S. national.

809. Plaintiff Shira Borochov is the daughter of Mr. Borochov and a U.S. national.

810. As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

811. **Mr. Eli Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr. Borochov who suffered from gunshot wounds to the thigh and testicles, which resulted in surgery and months of severe pain. Mr. Borochov also suffers from psychological trauma and nightmares as a result of the November 6, 2015 Attack.

812. Plaintiff Eli Borochov was a U.S. national at the time of the attack and remains one today.

813. Plaintiff Shari Borochov is the wife of Mr. Borochov and a U.S. national.

814. Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

815. Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

816. Plaintiff Josef Borochov is the brother of Mr. Borochov and U.S. national.

817. Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

818. Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

819. As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

820. **Mr. Josef Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Mr. Borochov who suffers from severe psychological and emotional trauma. Mr. Borochov was only sixteen years old at the time of the attack.

314

821. Plaintiff Josef Borochov was a U.S. national at the time of the attack and remains one today.

822. Plaintiff Ronen Borochov is the father of Mr. Borochov and a U.S. national.

823. Plaintiff Devora Borochov is the mother of Mr. Borochov and a U.S. national.

824. Plaintiff Eli Borochov is the brother of Mr. Borochov and U.S. national.

825. Plaintiff Avraham Borochov is the brother of Mr. Borochov and a U.S. national.

826. Plaintiff Shira Borochov is the sister of Mr. Borochov and a U.S. national.

827. As a result of the November 6, 2015 Attack and Mr. Borochov's injuries, each member of the Borochov Family has experienced severe mental anguish as well as emotional pain and suffering.

**H.     The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families)**

828. On December 14, 2015, Hamas committed a vehicle attack in Jerusalem, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "December 14, 2015 Attack").

829. The December 14, 2015 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the December 14, 2015 Attack.

830. The December 14, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither

wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

831. **Mr. Yoav Golan** was waiting at a bus stop in Israel at the time of the December 14, 2015 Attack. The attack severely wounded Mr. Golan who suffered injuries to his leg and shoulder. The leg injury caused him to be wheelchair-bound for a substantial period after the attack. Mr. Golan continues to suffer from psychological and emotional trauma as a result of the December 14, 2015 Attack.

832. Plaintiff Yoav Golan was a U.S. national at the time of the attack and remains one today.

833. Plaintiff Rotem Golan is the wife of Mr. Golan and an Israeli national.

834. Plaintiff Yehudit Green-Golan is the mother of Mr. Golan and a U.S. national.

835. Plaintiff Raphael Golan is the father of Mr. Golan and an Israeli national.

836. Plaintiff Matan Golan is the brother of Mr. Golan and a U.S. national.

837. As a result of the December 14, 2015 Attack and Mr. Golan's injuries, each member of the Golan Family has experienced severe mental anguish as well as emotional pain and suffering.

838. **Noam Shamba** was waiting at a bus stop in Jerusalem, Israel at the time of the December 14, 2015 Attack. The attack severely wounded Noam Shamba, who suffered from severe pains in his chest. He was taken to the hospital and diagnosed as having a massive heart attack. His doctors concluded that it was a result of the terror attack, as he was only 32 years old and had no prior health conditions.

839. As a result of the December 14, 2015 Attack and his injuries, Noam Shamba has experienced severe physical and emotional pain and suffering.

840.    Plaintiff Noam Shamba was a U.S. national at the time of the attack and remains one today.

841.    Plaintiff Yana Shamba is the wife of Noam Shamba and a U.S. national.

842.    Plaintiff Hadar Shamba is the daughter of Noam Shamba and a U.S. national.

843.    Plaintiff M.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

844.    Plaintiff N.E.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

845.    Plaintiff N.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

846.    Plaintiff O.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

847.    Plaintiff T.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

848.    As a result of the December 14, 2015 Attack and Noam Shamba's injuries, the Plaintiff members of the Shamba family have experienced severe mental anguish as well as emotional pain and suffering.

**I.      The January 27, 2016 Stabbing Attack in Israel (Rivkin Family)**

849.    On January 27, 2016, Hamas committed a stabbing attack in Givat Ze'ev, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "January 27, 2016 Attack").

850.    The January 27, 2016 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO,

and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the January 27, 2016 Attack.

851. The January 27, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

852. **Menachem Rivkin** was walking to a restaurant in Givat Ze'ev, Israel during the January 27, 2016 Attack. The attack severely wounded Mr. Rivkin who suffered from a stab wound to his neck.

853. Plaintiff Menachem Rivkin was a U.S. national at the time of the attack and remains one today.

854. Plaintiff Bracha Rivkin is the wife of Mr. Rivkin and an Israeli national.

855. Plaintiff Malka Rivkin is the daughter of Mr. Rivkin. She is a U.S. national.

856. Plaintiff R.R., by and through her next friend Menachem Rivkin, is the minor daughter of Mr. Rivkin. She is a U.S. national.

857. Plaintiff S.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

858. Plaintiff S.Z.R., by and through his next friend Menachem Rivkin, is the minor son of Mr. Rivkin. He is a U.S. national.

859. Plaintiff Sterna Rivkin is the daughter of Mr. Rivkin and a U.S. national.

318

860. As a result of the January 27, 2016 Attack and Mr. Rivkin's injuries, each member of the Rivkin Family has experienced severe mental anguish as well as emotional pain and suffering.

**J.      The March 8, 2016 Stabbing Attack in Israel (Force Family)**

861. On March 8, 2016, Hamas committed a stabbing attack in Tel Aviv, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "March 8, 2016 Attack").

862. The March 8, 2016 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the March 8, 2016 Attack.

863. The March 8, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

864. **Taylor Force** was in Israel for a graduate school trip through Vanderbilt University. Mr. Force was injured in the March 8, 2016 Attack. Mr. Force died on March 8, 2016, resulting from injuries sustained during the attack.

865. Mr. Force was a U.S. national at the time of the attack and his death.

866. Plaintiff Stuart Force Jr. is the father of Mr. Force and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Mr. Force's estate.

319

867.    Plaintiff Robbi Force is the mother of Mr. Force and a U.S. national.

868.    Plaintiff Kristen Boswell is the sister of Mr. Force and a U.S. national.

869.    As a result of the March 8, 2016 Attack and Mr. Force's injuries and death, each member of the Force Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Force's society, companionship, and counsel.

870.    As a result of the March 8, 2016 Attack, Mr. Force was injured in his person and/or property. The Plaintiff members of the Force Family are the survivors and/or heirs of Mr. Force and are entitled to recover for the damages Mr. Force sustained.

**K.    The December 23, 2016 Stabbing Attack in Israel (Lisker Family)**

871.    On December 23, 2016, Hamas committed a stabbing attack in Efrat, Israel, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "December 23, 2016 Attack").

872.    The December 23, 2016 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the December 23, 2016 Attack.

873.    The December 23, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

320

874.     **Raphael Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Mr. Lisker who suffered from stab wounds to his neck.

875.     Plaintiff Raphael Lisker was a U.S. national at the time of the attack and remains one today.

876.     Plaintiff Shoshana Lisker is the wife of Mr. Lisker and a U.S. national.

877.     Plaintiff Tamar Gutman is the daughter of Mr. Lisker and a U.S. national.

878.     Plaintiff Avital Lejzor is the daughter of Mr. Lisker and a U.S. national.

879.     Plaintiff Daniel Lisker is the son of Mr. Lisker and a U.S. national.

880.     Plaintiff Jonathan Lisker is the son of Mr. Lisker and a U.S. national.

881.     As a result of the December 23, 2016 Attack and Mr. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

882.     **Shoshana Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Ms. Lisker who suffers from severe emotional and psychological trauma.

883.     Plaintiff Shoshana Lisker was a U.S. national at the time of the attack and remains one today.

884.     Plaintiff Raphael Lisker is the husband of Ms. Lisker and a U.S. national.

885.     Plaintiff Tamar Gutman is the daughter of Ms. Lisker and a U.S. national.

886.     Plaintiff Avital Lejzor is the daughter of Ms. Lisker and a U.S. national.

887.     Plaintiff Daniel Lisker is the son of Ms. Lisker and a U.S. national.

888.     Plaintiff Jonathan Lisker is the son of Ms. Lisker and a U.S. national.

321

889.    As a result of the December 23, 2016 Attack and Ms. Lisker's injuries, each member of the Lisker Family has experienced severe mental anguish as well as emotional pain and suffering.

### L.    The May 5, 2019 Rocket Attack in Israel (Przewozman Family)

890.    On May 5, 2019, a joint cell comprised of Hizballah, Hamas, and PIJ committed a rocket attack in Ashdod, Israel, in which Hamas and PIJ terrorists detonated a rocket supplied by the IRGC for which Hamas and PIJ were trained and directed to attack by Hizballah, and funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "May 5, 2019 Attack").

891.    The May 5, 2019 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, Hamas, and PIJ; all such payments were designed to, and did, incentivize Hizballah's, Hamas's, and PIJ's successful attacks, including the May 5, 2019 Attack.

892.    On information and belief, the Joint Logistics Cell furnished the rockets and tunnels used in the May 5, 2019 Attack.

893.    The May 5, 2019 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

894.    **Pinchas Przewozman** was a civilian living in Israel who was attempting to get to the bomb shelter in his apartment building in Ashdod, Israel at the time of the attack. Pinchas

322

Przewozman paused to allow others to enter the shelter ahead of him when the rocket struck. Pinchas Przewozman was injured in the May 5, 2019 Attack. He died on May 5, 2019, as a result of injuries sustained during the attack.

895.    Pinchas Przewozman was a U.S. national at the time of the attack and his death.

896.    Plaintiff Hadassah Przewozman is the widow of Pinchas Przewozman and an Israeli national. She brings claims in both her personal capacity and representative capacity on behalf of Pinchas Przewozman's estate.

897.    Plaintiff Y.P., by and through his next friend Hadassah Przewozman, is the minor son of Pinchas Przewozman. He is a U.S. national.

898.    Plaintiff Chaim Przewozman is the father of Pinchas Przewozman and a U.S. national.

899.    Plaintiff Chaya Przewozman is the mother of Pinchas Przewozman and an Israeli national.

900.    Plaintiff Avraohom Przewozman is the brother of Pinchas Przewozman and a U.S. national.

901.    Plaintiff F.P., by and through her next friend Chaim Przewozman, is the minor sister of Pinchas Przewozman. She is a U.S. national.

902.    Plaintiff Zvi Przewozman is the brother of Pinchas Przewozman and a U.S. national.

903.    Plaintiff Sara Rozenbaum is the sister of Pinchas Przewozman and a U.S. national.

904.    Plaintiff Yafa Shechter is the sister of Pinchas Przewozman and a U.S. national.

323

905.    As a result of the May 5, 2019 Attack and Pinchas Przewozman's injuries and death, the Plaintiff members of the Przewozman family have experienced severe mental anguish, emotional pain and suffering, and the loss of Pinchas Przewozman's society, companionship, and counsel.

906.    As a result of the May 5, 2019 Attack, Pinchas Przewozman was injured in his person and/or property. The Plaintiff survivors and/or heirs of Pinchas Przewozman are entitled to recover for the damages Pinchas Przewozman sustained.

**M.    The June 23, 2011 EFP Attack in Iraq (Everhart/Zobay Family)**

907.    On June 23, 2011, a joint cell comprised of Hizballah and Jaysh al-Mahdi committed an EFP attack in Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hizballah, which was funded by the Khamenei Cell, Foundation for the Oppressed, and Hizballah with money supplied by the SLO and IRGC (the "June 23, 2011 Attack").

908.    The June 23, 2011 Attack was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Foundation for the Oppressed, IRGC, Hizballah, and SLO, and supplied by the Terrorist Sponsors to operatives from the IRGC, Hizballah, and Jaysh al-Mahdi; all such payments were designed to, and did, incentivize Hizballah's and Jaysh al-Mahdi's successful attacks, including the June 23, 2011 Attack.

909.    The June 23, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

324

910.    **Dr. Stephen Everhart** was in Iraq on a short-term consultancy to the U.S. Agency for International Development, introducing entrepreneurship education in schools of business and commerce at Iraqi universities. Dr. Everhart was injured in the June 23, 2011 Attack. Dr. Everhart died on June 23, 2011, resulting from injuries sustained during the attack.

911.    Dr. Everhart was a U.S. national at the time of the attack and his death.

912.    Plaintiff Stephanie Zobay is the widow of Dr. Everhart and a U.S. national. She brings claims in both her personal capacity and representative capacity on behalf of Dr. Everhart's estate.

913.    Plaintiff Hannah Everhart is the daughter of Dr. Everhart and a U.S. national.

914.    Plaintiff Lindsay Everhart is the daughter of Dr. Everhart and a U.S. national.

915.    Plaintiff Hayden Everhart is the son of Dr. Everhart and a U.S. national.

916.    As a result of the June 23, 2011 Attack and Dr. Everhart's injuries and death, each member of the Everhart Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

917.    As a result of the June 23, 2011 Attack, Dr. Everhart was injured in his person and/or property. The Plaintiff members of the Everhart Family are the survivors and/or heirs of Dr. Everhart and are entitled to recover for the damages Dr. Everhart sustained.

## CLAIM FOR RELIEF

### Aiding and Abetting Under the Anti-Terrorism Act
### 18 U.S.C. § 2333(d)(2)

918.    Plaintiffs incorporate their factual allegations above.

919.    To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that SCB was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that SCB knowingly provided substantial assistance.

920.    Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

921.    The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a.    the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

b.      the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence the policy of the U.S., Israeli, Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Israeli, Iraqi, and other governments by mass destruction, assassination, and kidnapping; and

c.      the attacks occurred primarily outside the territorial jurisdiction of the United States, in Israel.

922.    Each attack was committed, planned, or authorized by one or more FTOs. Every attack was committed by one or more of Hizballah, Hamas, and PIJ, all of which were FTOs at all relevant times.

923.    Every attack, regardless of who committed it, was planned or authorized by Hizballah and/or Hamas and/or PIJ, each of which was always an FTO.

924.    SCB was generally aware that it was playing a role in illegal activity. SCB knew at all relevant times that it was helping its Iranian customers evade U.S. counterterrorism controls by omitting or falsifying information regarding Iran transactions that SCB processed through the U.S. financial system, in violation of New York state law, the Bank Secrecy Act, and U.S. banking laws that required the transmittal of accurate business records to U.S. branches and correspondent banks, customer due diligence, and suspicious activity reporting. In many cases, SCB also violated U.S. sanctions laws. SCB further knew that those laws were in place precisely to deprive Iran's Terrorist Sponsors of the secrecy and resources they systematically used to support terrorist attacks by their proxies. During the relevant period, SCB was also aware that Iran's Terrorist Sponsors were exerting greater, and then comprehensive, control over Iran's oil

327

and gas revenues, such that any assistance to that sector would necessarily facilitate terrorist attacks by the Terrorist Sponsors' proxies.

925.    SCB provided assistance knowingly, and not innocently or inadvertently. SCB's conduct was part of a deliberate, years-long scheme to court Iran's oil and gas business, despite SCB's acute knowledge that this sector was captured by the Terrorist Sponsors, who were specifically using the revenues generated from oil and gas to support their terrorist proxies.

926.    In no situation did SCB merely engage in passive nonfeasance or routine banking transactions. Instead, it actively sought out business from Iran's oil and gas sector; catered to that business by offering to provide extraordinary, illegal services (including special treatment affording illicit bank secrecy designed to facilitate evasion of counterterrorism controls); all while deceiving law enforcement and counterterrorism authorities about its transactions for Iran's Terrorist Sponsors. At all times, SCB exhibited contempt for U.S. counterterrorism rules and warnings that were intended to protect Americans targeted by Iranian terrorism, choosing instead to prioritize its business with the Terrorist Sponsors' fronts over the lives of the Terrorist Sponsors' victims. SCB did all of this with knowledge that it was aiding terrorist organizations carrying out attacks on Americans.

927.    SCB's assistance was substantial. The acts assisted—evasion of counterterrorism controls, terrorist finance, and terrorist attacks—were particularly heinous, especially for a financial institution that knew the key role it played in preventing terrorists' access to financial resources through the international financial system. The amount of assistance—comprising covert, illegal access to hundreds of billions of dollars over more than a decade to businesses controlled by the Terrorist Sponsors in violation of U.S. counterterrorism controls—was critical to the ability of the Terrorist Sponsors' proxies to access resources that were earmarked for and

328

designed to facilitate the specific attacks in this case. SCB was also present in the region, providing indispensable financial support to the Terrorist Sponsors. SCB's state of mind was highly culpable, consisting of prolonged, willful misconduct accompanied by systematic deception. Despite specific warnings from the U.S. government, SCB took deliberate steps to enable its customers to evade detection, and provided extraordinary financial services in an unusual, dangerous way. And the duration of its support lasted for over a decade. Collectively, these factors easily make SCB's support for the attacks substantial.

928.    The attacks that injured plaintiffs were a foreseeable risk of the illegal acts that SCB assisted. SCB's efforts to conceal transactions and facilitate illegitimate transactions; the direct and indirect warnings of the concentration of front companies in the oil and gas industries; and SCB's continued services for companies in that industry despite those warnings make it reasonably foreseeable that SCB was facilitating acts of terror. Indeed, a litany of authoritative sources established, at all relevant times, that facilitating transactions for Iran's oil and gas business would cause terrorist attacks by the Terrorist Sponsors' proxies. SCB was aware of these sources, and could easily foresee that its illegal acts would result in the attacks in this case—but persisted anyway.

929.    The attacks were also foreseeable because SCB knew that the Terrorist Sponsors did not merely provide their proxies with fungible resources. Instead, SCB helped the Terrorist Sponsors provide resources that were specifically earmarked for and designed to cause terrorist attacks on Americans. This included attack incentive payments (*e.g.*, martyr payments), and in-kind support (*e.g.*, weapons, training and tunnels) that were specific to terrorist violence. SCB also knew that the Terrorist Sponsors conditioned their support on success in terrorist attacks, so that the natural and foreseeable consequence of enabling greater support would be more attacks.

329

930.    SCB's assistance was pervasive, systemic, and culpable, involving the highest levels of SCB's management, years of willful misconduct, tremendous sums of money that provided critically important assistance to Iran's Terrorist Sponsors and their terrorist proxies, and direct operational support, cover, and concealment by SCB to the Terrorist Sponsors through SCB's obstruction of U.S. counterterrorism operations, intelligence gathering, and investigations.

931.    As a result of SCB's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

932.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

933.    Wherefore, Plaintiffs pray this Court:

    a.   Enter judgment against SCB finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

    b.   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

    c.   Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

    d.   Award Plaintiffs prejudgment interest; and

    e.   Award Plaintiffs any such further relief the Court deems just and proper.

Dated: October 27, 2025

Respectfully submitted,

SPARACINO PLLC

*/s/ Adam J. Goldstein*

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Geoffrey P. Eaton (*pro hac vice*)
Tejinder Singh
Jacob R. Loshin (*pro hac vice*)
Stacey L. Wilson (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
tejinder.singh@sparacinopllc.com
jacob.loshin@sparacinopllc.com
stacey.wilson@sparacinopllc.com
matt.fisher@sparacinopllc.com

*Counsel for Plaintiffs*

331