# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRAHAM FRAENKEL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STANDARD CHARTERED BANK, <br><br> Defendant. | Case No.: 24-cv-4484 (MMG) (RWL) |
| SHMUEL BRAUNER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STANDARD CHARTERED BANK, <br><br> Defendant. | Case No.: 24-cv-5788 (MMG) (RWL) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Tejinder Singh
Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

February 10, 2026                                    *Counsel for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ................................................................................................................ 1

PLAINTIFFS' ALLEGATIONS .......................................................................................... 6

LEGAL STANDARD .......................................................................................................... 16

ARGUMENT ....................................................................................................................... 16

I.      Plaintiffs State a JASTA Aiding-Abetting Claim.......................................................16

      A.      Plaintiffs Plausibly Allege SCB's Knowing and Substantial Assistance to the Attacks. ...................................................................................................16

            1.      The SAC Alleges a Concrete Nexus Between SCB's Assistance and the Attacks That Injured Plaintiffs. ........................................... 17

            2.      The SAC Alleges Pervasive and Systemic Assistance............................. 24

            3.      The SAC Alleges Conscious and Culpable Conduct ............................... 25

      B.      Plaintiffs Plausibly Allege SCB's General Awareness..........................................27

II.     All Of Plaintiffs' Claims Are Timely. ................................................................30

III.    SCB Is Subject to Personal Jurisdiction..............................................................32

CONCLUSION....................................................................................................................... 34

CERTIFICATE OF COMPLIANCE....................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 16

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025) .......................................................... 2, 17, 18, 20, 23

*Atchley v. AstraZeneca UK Ltd.*,
  2026 WL 184415 (D.C. Cir. Jan. 23, 2026) .......................................... 4, 5, 17, 20, 22

*Berk v. Choy*,
  2026 WL 135974 (U.S. Jan. 20, 2026) ................................................................... 16

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) ......................................................................... 22, 30

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ................................................................................. 21

*Cabrera v. Black & Veatch Special Proj. Corp.*,
  2024 WL 1435146 (D.D.C. Mar. 28, 2024) ............................................................ 31

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ............................................................................................... 31

*Dos Santos v. Assurant, Inc.*,
  625 F. Supp. 3d 121 (S.D.N.Y. 2022) .................................................................... 32

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*,
  2025 WL 622546 (E.D.N.Y. Feb. 26, 2025) ............................................................. 5

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020) .................................................................... 21

*Force v. Islamic Republic of Iran*,
  464 F. Supp. 3d 323 (D.D.C. May 31, 2020) ..................................................... 12, 13

*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025) ........................................................................................ 22, 32, 33

*Gucci Am., Inc. v. Weixing Li*,
  135 F. Supp. 3d 87 (S.D.N.Y. 2015) ...................................................................... 33

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ............................................................................... 16

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) .................................................................................... 27, 30

*In re Penn Cent. Transp. Co.*,
  944 F.2d 164 (3d Cir. 1991) ......................................................................................... 31

*Kaplan v. Lebanese Canadian Bank SAL*,
  999 F.3d 842 (2d Cir. 2021) ............................................................................. 18, 27, 29

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ....................................................................................... 16, 34

*Moses v. BNP Paribas S.A.*,
  802 F. Supp. 3d 567 (S.D.N.Y. 2025) ............................................ 4, 17, 22, 27, 28, 29, 31, 34

*SEC v. Power*,
  525 F. Supp. 2d 415 (S.D.N.Y. 2007) ........................................................................... 32

*Siegel v. HSBC N. Am. Holdings*,
  933 F.3d 217 (2d Cir. 2019) ....................................................................................... 22, 30

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) .......................................................................... 4, 16, 17, 24, 27

*United States v. George*,
  779 F.3d 113 (2d Cir. 2015) ......................................................................................... 28

*United States v. Sunoco, Inc.*,
  644 F. Supp. 2d 566 (E.D. Pa. 2009) ........................................................................... 31

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ........................................................................... 34

*Zobay v. MTN Grp. Ltd.*,
  695 F. Supp. 3d 301 (E.D.N.Y. 2023) ................................................................. 5, 22, 29, 30, 34

**Statutes**

18 U.S.C. § 2334(a) ........................................................................................................... 32

18 U.S.C. § 2335(a) ........................................................................................................... 31

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016)

    § 2(a)(3) .................................................................................................................. 20

    § 2(a)(6) .............................................................................................................. 20, 33

    § 7 .......................................................................................................................... 31

National Defense Authorization Act for Fiscal Year 2013,
    Pub. L. No. 112-239, 126 Stat. 2017 ....................................................................... 31

**Other Authorities**

S. Rep. No. 102-342 (1992) ............................................................................................... 20

# INTRODUCTION[1]

Plaintiffs are victims of terrorist attacks in Israel and Iraq, all of which were financed and supported by certain elements of the Iranian regime—the IRGC, the Foundation for the Oppressed, and the Supreme Leader's Office (Iran's Terrorist Sponsors)—that programmatically used commercial fronts in Iran's oil and gas industry to pay for the terrorist attacks they sponsored. Plaintiffs include a family traveling with their baby daughter, a teenager out with friends, and others going about their lives when they were brutally kidnapped, shot, stabbed, rammed with vehicles, shattered by rockets, or blasted by a roadside bomb. ¶¶715-917.

In 2024, Plaintiffs filed two JASTA actions alleging that Standard Chartered Bank (SCB) aided and abetted these attacks by moving hundreds of millions of dollars for the Terrorist Sponsors' oil and gas fronts while flagrantly violating sanctions and disabling counterterrorism controls that sought to prevent those fronts from funding terrorist violence. These actions were consolidated through the pleading stage. On September 26, 2025, the Court granted SCB's motion to dismiss. Doc. 60. The Court recognized that SCB engaged in "deplorable conduct with regard to evasion and undermining of sanctions regimes," but held that Plaintiffs did not plead a "concrete nexus" between SCB's misconduct and the terrorist attacks that injured Plaintiffs. *Id*. at 20, 22 n.8. The Court perceived the complaint's "primary theory of nexus" to be "based on money's fungibility"—*i.e.*, that SCB served customers with only "an apparent or possible connection to terrorists," and that SCB's services to their oil and gas fronts merely "freed up" other money that could "have gone to the terrorists' violent activities." *Id*. at 20 (quoting *Ashley v. Deutsche Bank*

---

[1] Unless otherwise noted, internal quotation marks, emphases, citations, footnotes, and other markup are omitted from quoted materials. All paragraph citations are to the Second Amended Complaint (SAC). Doc. 61. Defined terms have the meaning given in the SAC. And unless otherwise noted, all citations to court filings correspond to the docket in *Fraenkel*.

*Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2025)). The Court also determined that Plaintiffs had not alleged "pervasive, systemic, and culpable" assistance. *Id*. The Court permitted Plaintiffs to amend, and Plaintiffs filed the SAC on October 27, 2025.

The SAC now explains in detail "[t]he nexus between SCB's misconduct and the terrorist attacks that killed or injured Plaintiffs and their loved ones." ¶19. Indeed, Parts I, II.B, IV, V, and VII of the SAC—collectively almost two thirds of the allegations—all focus on the ways that SCB's assistance enabled the attacks. In summary, the SAC alleges that SCB's Iranian oil and gas customers were "fronts owned or controlled by Iran's Terrorist Sponsors," who exploited their monopoly control over the oil and gas sector to support "terrorist proxies including the specific groups that attacked Plaintiffs and their loved ones." ¶19; *see also* ¶¶44-100 (describing the Terrorist Sponsors); ¶¶101-53 (describing the Terrorist Sponsors' monopoly over the oil and gas sector and related financial conduits); ¶¶154-82 (describing how the Terrorist Sponsors programmatically converted financial resources into terrorism); ¶¶183-214 (describing the Terrorist Sponsors' relationship with their proxies). "SCB's customers" financed the supply of "money, arms, training, technology and safe haven to [the Terrorist Sponsors'] proxy FTOs, who used that support to attack Americans in Israel and Iraq." ¶20. This support was "not simply generic fungible cash, but instead resources earmarked for terrorism." ¶215. Several mechanisms catalogued in detail in the SAC guaranteed that the oil and gas money SCB helped its customers generate would be spent on terrorism first and not diverted to anything else. ¶¶109-45, 155-56, 368-473 (Terrorist Sponsors' structural control of oil and gas fronts); ¶¶157-60, 367 (Logistics Policy Directive); ¶¶161-64, 367 (*khums*); ¶¶165-68 (auditors). Those funds were earmarked to pay for "terrorist salaries, attack bounties, and martyr compensation that powerfully incentivized and enabled proxy groups to commit attacks," as well as "weapons and materiel, attack-specific

2

training, and resources for Hamas tunnels." ¶20; *see also* ¶¶215-43. In the alternative, SCB's assistance—billions of dollars of illicit, covert transactions over a decade, performed with knowledge of how the money would be used—was so pervasive, systemic, and culpable that it would support liability even absent any concrete nexus. ¶¶619-37.

Of course, the Court must credit Plaintiffs' nexus allegations as true at the pleading stage. But in this case, they have been corroborated by knowledgeable authorities. For example, in a 2012 enforcement action arising from some of the transactions in this case, NYDFS concluded that SCB's "prohibited dealings with Iran … indisputably helped sustain a global threat to peace and stability" and "left the U.S. financial system vulnerable to terrorists." ¶329. A congresswoman recently urged, in reference to IRGC-backed attacks sponsored by Hizballah, that SCB's "illicit payments to known terrorists" presented "immediate national security risks," including "the grave risk of additional funds being funneled to terrorist organizations that endanger the United States and the American people." ¶23. And just last year, the government confirmed that liquid petroleum gas exports by SCB customer Caspian Petrochemical FZE and its network "continue[d] to be a major source of revenue for the Iranian regime, the proceeds of which fund Iran's … regional proxy groups and partners such as Hizballah … and Hamas." ¶140. More broadly, the SAC is replete with allegations documenting warnings from governments, experts, and the media that enabling oil and gas companies controlled by Iran's Terrorist Sponsors to covertly access the global financial system was tantamount to funding the very FTOs that committed the attacks in this case. *See, e.g.*, ¶¶282-95, 571-618. SCB's attempt (at 12) to characterize this nexus as somehow obtuse or "indiscernible" trivializes those authoritative conclusions.

Legal developments since this Court's previous decision likewise warrant a reassessment. This Court (Judge Clarke) recently sustained a complaint against another European bank based

3

principally on its assistance to Caspian Petrochemical—the same entity that SCB assisted to the tune of $150 million (¶¶14, 341, 364-65). *See Moses v. BNP Paribas S.A.*, 802 F. Supp. 3d 567 (S.D.N.Y. 2025). The Court explained that where the bank knew that its customer was "intertwined with the Terrorist Sponsors" and provided financial services "despite a wealth of information linking FTOs to front companies in the oil and gas sector," that "constitutes the very kind of culpable conduct contemplated by aiding-and-abetting liability." *Id*. at 585, 588. *Moses* is plainly on point—and SCB does not argue otherwise.

In addition, the D.C. Circuit recently decided *Atchley v. AstraZeneca UK Ltd.*, 2026 WL 184415 (D.C. Cir. Jan. 23, 2026) (*Atchley II*), sustaining a complaint against companies that provided financial assistance to terrorists via payments to the Iraqi Ministry of Health and its procurement arm, the Iraqi state-owned monopoly Kimadia. The court acknowledged that there was no direct nexus between the defendants' assistance and the attacks, but held that no such nexus was required under *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). *Atchley*, 2026 WL 184415, at *9. Instead, it was enough to allege that Iran-backed terrorists seized a medical sector monopoly through their control of the Ministry and Kimadia, and that the defendants' bribes to those commercial entities "enabled" the terrorists who controlled them "to purchase arms and ammunition, pay … terrorist fighters …, and plan attacks that would go on to kill or injure thousands of Americans, including the victims in this case." *Id*. at *8. The court stressed that the defendants engaged in "affirmative assistance" by paying bribes, as opposed to "silence and inaction," and it was a "reasonable inference[] that defendants knew their ongoing dealings with the Ministry of Health materially supported terrorist attacks against Americans." *Id*. at *10-11. The "unusual" nature of the transactions, combined with the defendants' "voluntary, tailored relationship" with a commercial entity controlled by terrorists, plus "the scale of the aid defendants

4

allegedly provided and the duration for which they provided it," plausibly stated an aiding-abetting claim. *Id*. at *12-13.

The SAC resembles the complaint in *Atchley*. Both cases feature terrorists' open and unusual seizure of a monopoly over a swath of commercial activity, with the terrorists repurposing the commercial entities they controlled to fund their attacks. Like the Ministry and Kimadia in *Atchley*, the oil and gas fronts SCB served were known conduits for terrorist financing; like the illegal bribes in *Atchley*, the illicit financial services SCB provided helped pay for the weapons, salaries, and training that enabled terrorist attacks; and like the defendants in *Atchley*, SCB's conduct was unusual and highly culpable, abusing its privilege as a bank with access to the U.S. financial system to help terrorist fronts thwart the controls designed to prevent just such terrorist financing.

Although *Moses* and *Atchley* are not binding here, they are fully consistent with Second Circuit precedent, as well as the prevailing trend in post-*Twitter* jurisprudence, which holds that when defendants enable terrorist attacks through their illicit business with terrorist-controlled commercial entities, a claim for aiding-and-abetting will lie. *See Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 346 (E.D.N.Y. 2023) (plaintiffs stated claim against telecom company that violated U.S. law to do business with IRGC-controlled telecom company); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, 2025 WL 622546, at *4 (E.D.N.Y. Feb. 26, 2025) (plaintiffs stated claim when they alleged that bank "had a close relationship with entities known as conduits for Hamas"). Such activity stand in contrast with that found lacking in cases like *Ashley*, where the banks' customers were not terrorist-controlled, and where those customers obtained funds for myriad non-terrorist purposes with no discernable nexus, other than the fungibility of money, between the defendants' transactions and terrorist attacks.

In light of the SAC's robust and specific factual allegations and post-*Twitter* JASTA jurisprudence, the Court should permit Plaintiffs to test their claims in discovery. SCB's renewed motion to dismiss should be denied.

**PLAINTIFFS' ALLEGATIONS**

The SAC tells a straightforward story: Starting in the early 2000s, Iran's Terrorist Sponsors notoriously monopolized Iran's oil and gas sector, controlled the companies in that sector, and earmarked their profits for proxy terrorism in the Middle East—and from 2001 until at least 2012, SCB deliberately gave its customers in that sector illicit and covert access to the global financial system, playing a vital role in supplying the funds needed for terrorist attacks on Americans, including Plaintiffs.

In more detail: Iran's Terrorist Sponsors (¶¶44-46)—which included the IRGC (Iran's principal terrorist organization) (¶¶47-52, 545-58), key individuals in Ayatollah Khamenei's inner circle, including the Supreme Leader's Office (SLO) (¶¶53-62, 538-44), and the Foundation for the Oppressed (Iran's primary terrorist financing and martyr-payment vehicle) (¶¶63-81, 532-37)—seized control of Iran's oil and gas sector, using its assets to fund terrorism. ¶¶101-45. The Terrorist Sponsors' influence was evident as early as 1979, when the Foundation for the Oppressed began playing the role of broker for petroleum transactions, ¶¶112-18, claiming a share of the profits (up to 20%) for itself, ¶118. But the Terrorist Sponsors' takeover accelerated in the early 2000s, ¶101, "was well underway by 2005," ¶103, and was complete no later than 2009, ¶104. Thus, "the Terrorist Sponsors exercised complete control over the proceeds of oil and gas sales by no later than 2008, and near-complete control over many of Iran's major financial institutions by the end of 2007." ¶108.

The Terrorist Sponsors used oil and gas revenues to fund their proxy FTOs. ¶¶175-82.

6

These included Hizballah in Iraq, and Hizballah, Hamas, and Palestinian Islamic Jihad (PIJ) in Israel. ¶¶183-214. As numerous government officials and terrorism scholars have confirmed, *most* of the revenue generated through the Terrorist Sponsors' control of Iran's oil and gas sector was spent on terrorism. ¶¶216-23, 464-73. This was due not to the fungibility of money, but instead to a systematic effort to earmark oil profits for terrorism. As one Treasury official explained: "[I]n democracy, money is fungible. But what we've seen time and time [again] from the Iranian Regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people. … So while in our country money is fungible, in Iran, they've proven that any dollar they get that they have direct access to in the country will be used for the IRGC before it's ever used for their people." ¶223(c). Another official confirmed that "[w]hat the regime prioritizes, despite the country's increasing economic distress, is buying guns and bombs for foreign terrorists," and those "priorities are clear." ¶223(a). Yet another official underscored that Iran's prioritization specifically included "using the proceeds of millions of barrels of its oil to fund terrorists." ¶223(b). The oil and gas sector, which "accounts for over 80% of the regime's revenue," was "by far, the IRGC's greatest economic instrument." ¶120. These were just some of the warnings—before and after the transactions in this case— showing the risks of doing business with the Terrorist Sponsors' oil and gas fronts. *See* ¶¶244-95 (cataloguing U.S. warnings). SCB's peers in the global financial system heeded these warnings, and thus avoided doing business with Iran's oil and gas sector because it would finance Iran's terrorism. ¶5.

SCB, on the other hand, pursued that business wholeheartedly. ¶¶6-8. SCB began, in 2001, with the aim of becoming the main bank facilitating Iran's oil exports. ¶¶7, 296-98. To win that business, which involved processing U.S. dollar transactions through the United States, SCB

willfully hid its transactions for Iranian customers from the U.S. government, flagrantly violating its legal obligations to report suspicious activity and prevent terrorist financing. ¶¶9-10, 297, 302-24. This misconduct ultimately led to multiple government enforcement actions against SCB, the first of which became public in 2012. ¶¶11-12, 326-29. In resolving those actions, SCB promised that it had closed its Iranian business in 2007. This was false. ¶¶13, 330-32. In fact, SCB continued assisting the Terrorist Sponsors' oil and gas fronts for years as the Terrorist Sponsors used oil and gas money to fund terrorist attacks in Israel and Iraq, going to elaborate lengths to hide these customers from the U.S. government. ¶¶14, 332-39. These transactions led to follow-on enforcement actions that resulted in SCB paying ten-figure penalties in 2019. ¶15.

Plaintiffs' amended allegations focus on SCB's services for Caspian Petrochemical FZE, a terrorist front with terrorist aims. By no later than 2007, Caspian Petrochemical was owned and completely controlled by the IRGC, and its purpose was to facilitate the sale of petroleum products for the benefit of the IRGC's terrorist attacks. ¶¶139-41. With SCB's assistance, including illegally moving over $150 million through the U.S. financial system between 2008 and 2012, Caspian Petrochemical accomplished its purpose. ¶¶340-41. As the U.S. government has confirmed, Caspian Petrochemical and its affiliates were "responsible for shipping hundreds of millions of dollars' worth of Iranian LPG and crude oil to foreign markets" to "evade U.S. sanctions and generate revenue" that was used to "fund Iran's … regional proxy groups and partners such as Hizballah … and Hamas." ¶355.

Plaintiffs' allegations also focus on SCB's services for the National Iranian Oil Company (NIOC), which has long been the "ultimate" IRGC front, supporting the IRGC for years even before the IRGC formalized and consolidated its control of the industry. ¶¶110-18, 127, 132. Although SCB emphasizes the absence of an allegation that NIOC itself was an SCB customer

8

(MTD 8), this technicality is immaterial. SCB was asked in 2001 to serve as the correspondent bank for "oil sales by NIOC"; believed that "handling Iran's oil receipts would be very prestigious for SCB"; and sought this opportunity to facilitate Iran's oil sales by maintaining correspondent accounts for Iranian banks as other Western banks declined to do so. ¶¶296-98. As with Caspian Petrochemical, the U.S. government specifically confirmed that "coordination between NIOC and the Central Bank of Iran"—the very arrangement SCB enabled—"facilitate[d] the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF" (*i.e.*, the IRGC's terrorist operations) and "played a significant role in oil deals used to generate revenue for the IRGC-QF and Hezbollah." ¶133.

SCB's transactions for Caspian Petrochemical and NIOC assisted terrorist attacks, including the attacks that injured Plaintiffs. This was not based on money's fungibility—with oil money received by the Iranian regime supposedly allowing other money to be "freed up" elsewhere for terrorism. Instead, and crucially, the Terrorist Sponsors' commercial fronts gave the Terrorist Sponsors a dedicated "off-budget" source of revenue for what amounted to a terrorism "slush fund" that was not comingled with the revenue the regime used for legitimate governmental purposes. ¶¶464-73. This ensured that *the oil money itself* would be spent on terrorism as its first use. ¶215; *see also* ¶175 (U.S. Treasury finding that "Iran's exportation of oil directly funds acts of terrorism by Iranian proxies").

In addition to the Terrorist Sponsors' direct receipt of the oil and gas profits, three specific mechanisms ensured that they would always fund terrorism first. Throughout the relevant period, an Iranian government directive required the proceeds from the IRGC's commercial monopolies to be used for "strengthening of the [IRGC], and replacing [IRGC] equipment" needed for terrorist attacks. ¶¶157-60 (describing Logistics Policy Directive). In addition, Khamenei mandated

9

donations (*khums*) be made to the SLO, usually 20% on all IRGC transactions, to support terrorist activities. ¶¶161-64. This ensured that a fixed minimum percentage of the profits from the IRGC's oil and gas enterprises—at least twenty cents of *every dollar*—would support terrorist attacks. ¶¶364, 367. The Terrorist Sponsors even used auditors to further ensure that funds from their oil and gas fronts were spent on terrorism. ¶¶165-68. Furthermore, specific individuals responsible for orchestrating terrorist attacks were embedded in the commercial infrastructure, leaving no doubt how profits would be used. These included members of the Khamenei Cell, the regime's chief terrorist leadership cell, which used *khums* to finance attacks in which cell members, such as IRGC-QF leader Qasem Soleimani and Hizballah leader Hassan Nasrallah, directly participated (¶¶370-463), as well as Rostam Qasemi, a senior IRGC-QF leader, Khamenei Cell member, and Specially Designated Global Terrorist (SDGT) who also served as Minister of Oil (¶¶411-17, 126, 137-38, 579, 584, 608-09). These interlocking and mutually reinforcing mechanisms were "designed to siphon money directly and inexorably from the commercial activities [the Terrorist Sponsors] controlled to the terrorist operations they led and enabled. In its scale, efficiency, and deadly consequences, it amounted to a terrorism machine." ¶4.

The Terrorist Sponsors used profits generated by Caspian Petrochemical and NIOC to provide vital, tailored support for terrorist attacks. ¶¶216-23. First, the Terrorist Sponsors employed a systematic "pay for performance" approach with their proxies, ramping up financial support to reward successful attacks. ¶¶195, 207. This system depended on oil and gas profits collected by the Foundation for the Oppressed and then distributed to terrorists or their families as salary, bounty, martyr, disability, and orphan payments. ¶¶79, 229-30. These payments incentivized each attack. ¶¶20, 195-96, 229. Second, oil and gas transactions funded weapons, training, and tunnels the terrorists needed to commit attacks. ¶¶231-35. Third, oil and gas profits

10

collected by the SLO were distributed to key terrorist operatives in the Khamenei Cell, which played a direct role in terrorist attacks (¶¶370-463), and Joint Logistics Cells, which coordinated the infrastructure for the attacks (¶¶236-243). Through these cells, the individuals involved in financing terrorism from commercial transactions were also responsible for planning, authorizing, and committing the terrorist attacks at issue here. ¶¶376-473.

SCB's assistance had a readily discernible connection to the specific terrorist attacks that injured Plaintiffs. These attacks occurred from 2010 to 2019, and most before 2016, with twelve in Israel and one in Iraq. ¶¶715-917. Each attack depended on the specific types of support that the Terrorist Sponsors provided to their proxies, bankrolled by the oil and gas profits SCB enabled. Indeed, the SAC provides granular nexus allegations specific to rocket attacks (¶¶493-501), knife and vehicle attacks (¶¶502-11), small arms and assassination attacks (¶¶512-16), kidnappings (¶¶517-21), and the 2011 EFP attack in Iraq (¶522-28). These allegations show how the Terrorist Sponsors' oil and gas revenue was critical to their proxies' ability to access the weapons, technology, training, logistical means, and incentive cash to commit each of these attacks. Most of the attacks in this case were committed, planned, or authorized by Hamas, ¶¶715, 754, 790, 799, 828, 849, 861, 871, or a combination of Hamas and Hizballah, ¶726, 738, 890. The Terrorist Sponsors' support was key to these attacks.

The U.S. government, scholars, journalists, courts, and the terrorists themselves have overwhelmingly documented that concrete nexus. In 2006, for example, the Iranian regime publicly announced that Iran funneled a fixed percentage of all Iranian oil profits to support attacks by Hamas and PIJ in Israel, and encouraged other oil producers to do the same by directing "1 percent" of their oil income to Hamas. ¶¶571-73. The Foundation for the Oppressed also "opened its coffers to Hamas," and such financial support "played a significant role" in Hamas terrorist

11

attacks during the relevant period. ¶¶477, 479. Indeed, Congress confirmed the Foundation's role as early as 1996, when it singled out the Foundation as among the top institutions Iran "use[s] to "promote acts of international terrorism." ¶66. IRGC-QF leader Soleimani has similarly explained to Hamas leaders that the IRGC's "support for you is unconditional and something agreed upon with God." ¶399. While "this support might have been less in some times," he explained, it "has been due to the economy and has had nothing to do with policy changes." ¶399. In other words, the amount of the IRGC's support to Hamas fluctuated with the profits from its economic activity, not with "policy" decisions about how to allocate the regime's budget. As others have observed, this support was so essential that Hamas "would wither and die" without it. ¶¶480, 485. And in the words of a Hamas commander, "Iran is our mother. She gives us information, military supplies, and financial support." ¶481. The support focused directly on financing terrorist operations, with funding from the Terrorist Sponsors "directed straight to operational units," ¶485, and even "suitcases of cash" delivered from the Terrorist Sponsors "to Hamas's military wing in Gaza," ¶479. The same was true for PIJ (responsible for two of the attacks, ¶¶775, 890), for whom such support was "significant" to its ability to conduct attacks. ¶477. That extensive support was confirmed in *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. May 31, 2020), which involved several of the attacks in this case. *Id.* at 364-65. The Terrorist Sponsors' support for Hizballah and JAM is similarly well-documented. ¶¶87-100, 185, 212-14.

This support to Iran's proxies was earmarked for specific terrorist purposes. For example, with respect to each of the twelve attacks in Israel, oil and gas money provided by the Foundation for the Oppressed supplied the key incentive to carry them out by guaranteeing that families of terrorists martyred in the attacks would be paid. This was critical for the six knife and vehicle attacks committed between 2010 and 2016 as part of a strategic Hamas campaign in coordination

with the Khamenei Cell. ¶¶503, 507. An Iranian official publicly confirmed in 2016 that "the families of every Palestinian knife attacker shot dead by Israeli security forces will receive financial assistance" from Iran. ¶¶508, 210. That guarantee, which according to the U.S. government "effectively rewarded past and encouraged future terrorist activities," was made possible by the Terrorist Sponsors' oil and gas revenue. ¶¶507, 509.

The Hamas and PIJ attacks in Israel also depended on attack tunnels built with the Terrorist Sponsors' oil and gas money. Multiple observers confirmed that the "massive financial and manpower resources" needed to construct and maintain this tunnel network came from the Terrorist Sponsors. ¶483. These tunnels were essential to carrying out ambushes in Israel, especially the six knife and vehicle attacks. ¶¶483, 506.

With respect to the two rocket attacks and the four small arms attacks in Israel, oil and gas money from the Terrorist Sponsors was the key source of operational funding, weapons, and training that Hamas, PIJ, and Hizballah needed to carry out the attacks. In addition to paying terrorist operatives and guaranteeing martyr payments, the Terrorist Sponsors used their oil and gas money to supply weapons, including rockets and small arms. ¶¶494-98, 513-15. Indeed, with respect to the August 19, 2011, rocket attack and the October 29, 2014, small arms attack, a court has already determined that support from Iran's Terrorist Sponsors was their proximate cause. *See Force*, 464 F. Supp. 3d at 349, 351-52, 368. Congress found in 2012 that Hamas and Hizballah had "increased their stockpile of rockets" with "the assistance of the Islamic Republic of Iran." ¶499. That support continued for years. As PIJ leaders acknowledged in 2012, "the arms that serve the resistance—all the world knows that its principal source is Iran, or weaponry that has arrived with Iranian financing … and this will continue for the future too"—"from the bullet to the missile."

¶496. And as Qassem Soleimani "reiterated" in an IRGC media outlet in 2014, Iran's Terrorist Sponsors were "supplying … Hamas and its affiliated brigades with more weapons." ¶487.

With respect to Hizballah and JAM's 2011 attack in Iraq, oil and gas money from Iran's Terrorist Sponsors played an essential role. ¶525. This attack involved the use of a particularly deadly roadside bomb designed to pierce American armor known as an Explosively Formed Penetrator, which required specialized knowledge and skill to make and deploy. ¶523. With funds from the Foundation for the Oppressed, Hizballah trained JAM operatives and supplied key components for these bombs. ¶523. Indeed, caches of bomb components seized in Iraq often bore markings of Iranian origin, and a JAM commander acknowledged that "[a]ll of" their weapons (except AK-47 rifles) "come from Iran." ¶¶526-27.

Independent of its oil and gas-related misconduct, SCB supported Hizballah through other means: Hizballah financiers Muhammad Bazzi and his company, EAGL—which looted the Gambian treasury, laundered the money through SCB, and spent it to support Hizballah, ¶¶662-83—as well as Tajco, Ltd. and its owners, the Tajideen brothers, who were SCB customers until at least 2010, even though they were designated by the United States for their support to Hizballah in May 2009, ¶¶684-92. These transactions and relationships independently assisted Hizballah, as confirmed by U.S. government prosecutions and designations, ¶¶681-83 (Bazzi); ¶¶684-87 (Tajco).

As a major multinational financial institution with many channels for acquiring information (including an office in Tehran, troves of data from its customers, and a universe of public and commercial intelligence sources), SCB knew all of the foregoing, and more, about the nature of its customers and the risks of its transactions. ¶¶566-70. Throughout the relevant period, SCB received dozens of specific, direct, and increasingly dire warnings from the U.S. government and

others, making clear that transactions with customers like Caspian Petrochemical and NIOC would reliably fund attacks like those that killed or injured Plaintiffs (¶¶571-618). Indeed, SCB was a prime target of an intense and unprecedented "financial pressure campaign" by the U.S. government to warn banks about the Iranian terrorism machine. ¶¶282-94. The "cornerstone" of the campaign was to "spur the private sector to stop doing business with Iran," as "[n]o reputable bank would want to be caught" facilitating terrorism. ¶283. The warnings were detailed and direct: SCB received them through in-person meetings with senior U.S. government officials, as well as frequent government statements. ¶¶282-94, 580-604.

SCB also knew that Iran was subject to comprehensive sanctions, largely to starve the Terrorist Sponsors of the funds they needed for their FTO proxies (¶¶246-59); and SCB knew that critical counterterrorism controls depended on banks sending accurate payment messages through the U.S. financial system (¶¶260-81). Between 2006 and 2011, the U.S. government specifically and repeatedly warned that Iran's oil and gas sector was controlled by the IRGC and that financial services to this sector enabled terrorist attacks by Hizballah, Hamas, PIJ, and other FTO proxies. ¶¶289, 580-604. SCB's own U.S. compliance staff voiced similar warnings, fearing "*very serious or even catastrophic reputational damage*" to the bank if they were ignored. ¶323. Yet SCB prioritized profits over American lives. ¶¶8-14. The response from one of SCB's most senior UK-based executives said it all: "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians." ¶12. And so SCB did, with eyes wide open to the deadly consequences. Indeed, the SAC details SCB's real-time awareness of the terrorism machine as it took innocent American lives in Israel and Iraq. *See, e.g.*, ¶¶76, 125-42, 144, 146-53, 256, 282-95, 332-35, 467-70, 560, 571-604, 607-17.

**LEGAL STANDARD**

To state a claim, a complaint need only "contain sufficient factual matter, accepted as true," that would permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is improper to demand proof of well-pleaded factual allegations before discovery. Indeed, a complaint "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable. By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery." *Berk v. Choy*, 2026 WL 135974, at *4 (U.S. Jan. 20, 2026).

To plead personal jurisdiction, Plaintiffs need only "make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

**ARGUMENT**

I.   **Plaintiffs State a JASTA Aiding-Abetting Claim.**

SCB does not dispute that Plaintiffs' injuries arise from acts of international terrorism committed, planned, or authorized by FTOs. Instead, SCB disputes whether it was (1) "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance" and that it (2) "knowingly and substantially assist[ed] the principal violation." *Twitter*, 598 U.S. at 486 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Because this Court's prior order and SCB's motion focus on nexus—part of the "knowing and substantial assistance" element—we begin there.

A.   **Plaintiffs Plausibly Allege SCB's Knowing and Substantial Assistance to the Attacks.**

Plaintiffs plausibly allege that SCB provided "knowing and substantial assistance" to the attacks that injured them. *Twitter*, 598 U.S. at 497. As the Supreme Court and Second Circuit

16

emphasize, this analysis is not governed by "inflexible codes," but instead must proceed "in a typical common-law fashion" with particular attention "to the facts before us" in light of the "basic thrust" of precedent. *Twitter*, 598 U.S. at 487-88. It "is highly fact intensive; the analysis differs on a case-by-case basis." *Ashley*, 144 F.4th at 443. That is because the "twin requirements of knowing and substantial assistance are part of a single inquiry designed to capture conscious and culpable conduct. Both considerations work in tandem—a lesser showing of one demands a greater showing of the other." *Id*. at 438.

The concept of nexus also "operates on a sliding scale." *Atchley II*, 2026 WL 184415, at *7. At one extreme, when a "strict" or "direct" nexus exists, even a weak showing of culpability suffices. *See id.* At the other extreme, with "a 'lack of any concrete nexus between defendants' services' and the act of terrorism, plaintiffs must prove defendants provided such 'systemic[ ] and pervasive[ ]' assistance to a terrorist group that they could be said to aid and abet every act of terrorism the group commits as part of a common enterprise." *Id*. (quoting *Twitter*, 598 U.S. at 501). This case lies "[b]etween those two extremes, situations involving 'more remote support'" than the most direct nexus, but which "can still constitute aiding and abetting in the right case.'" *Id*. (quoting *Twitter*, 598 U.S. at 496); *see also Moses*, 802 F. Supp. 3d at 585.

1.      **The SAC Alleges a Concrete Nexus Between SCB's Assistance and the Attacks That Injured Plaintiffs.**

SCB's nexus argument rests on an aggressively overbroad reading of the Second Circuit's decision in *Ashley*, and an explicit plea for the Court to ignore the SAC's specific allegations. In *Ashley*, the Second Circuit held that banks' alleged assistance to several "large-scale" money-laundering operations had "no discernable nexus" to attacks committed by a "Syndicate" of al-Qaeda and Taliban terrorists in Afghanistan. 144 F.4th at 427, 444. The money laundering operations involved banks in Estonia, Russia, and Pakistan that were "not themselves Syndicate

17

entities" and laundered money for myriad non-terrorist customers, such that "the endpoint of the laundered money was entirely amorphous." *Id.* at 430-32, 444-45. Against that backdrop, the court explained that the plaintiffs' theory was "based on money's fungibility: because Defendants engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money [freed up by these activities] must have gone to the terrorists' violent activities." *Id.* at 444. But the court explained that fungibility alone cannot provide an adequate nexus in most cases. *See id.* Instead, the court elaborated that "[a] central tenet of JASTA aiding-and-abetting liability is the foreseeability principle—that the defendant is not liable for the principal's wrongs without understanding, to some extent, the foreseeable consequences of the defendant's actions." *Id*. The "fungibility theory" advanced in *Ashley* "would evade that principle entirely" because money obtained for one purpose can free up money for any number of other unforeseeable purposes. *Id*.

Yet *Ashley* in no way held that a defendant's assistance must be directly traced to an attack for the attack to be foreseeable, and the court even cautioned against assuming that "money laundering can never form the basis of a JASTA claim." 144 F.4th at 445. As an example, it pointed to *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842 (2d Cir. 2021). There, the defendant bank's clients included a Hizballah-controlled bank, investment company, and foundation that paid the families of suicide bombers, most of which had not been sanctioned prior to defendant's interactions with them. 999 F.3d at 849-50. The Second Circuit held that the bank could be liable for Hizballah rocket attacks when it gave these customers "special treatment" by allowing them to "deposit large sums … without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity…." *Id*. at 866. *Kaplan* did not require tracing the bank's transactions to the rocket attacks because aiding fronts dedicated to financing Hizballah terrorism

18

made it foreseeable that the bank was playing a role. *Ashley* reaffirmed *Kaplan*'s holding that when a bank's clients are more closely connected to terrorism in this way than the assorted criminals in *Ashley*, and "the bank violated sanctions laws and granted exemptions to obscure the substance of deposits," a JASTA claim based on that misconduct may proceed. 144 F.4th at 445 (citing *Kaplan*, 999 F.3d at 858, 865).

Here, Plaintiffs emphatically do not rely on a "fungibility theory" like the one in *Ashley* to establish a foreseeable nexus, and the SAC expressly disclaims that theory. *See* ¶¶20, 215, 223(c), 228, 360, 929. Instead, Plaintiffs' allegations far more closely resemble *Kaplan*. SCB's customers Caspian Petrochemical and NIOC were not independent intermediaries serving myriad non-terrorist beneficiaries like the money laundering operations in *Ashley*; they were fronts controlled by the Terrorist Sponsors. ¶¶141-44, 577-612. Nor was terrorist financing a minor or incidental part of their operations; their overriding and primary purpose, like the entities in *Kaplan* and unlike the assorted criminals in *Ashley*, was to generate money to fund terrorist attacks. ¶¶215-43, 360. And like in *Kaplan*, SCB gave these customers special treatment, helping them thwart counterterrorism controls. *E.g.*, ¶926. Moreover, the terrorist proxies that committed the attacks here were not distantly or only possibly associated with SCB's customers; instead, these proxies were—and at all relevant times were known to be—dependent on funding from the Terrorist Sponsors and their oil and gas money, and were actively collaborating with the Terrorist Sponsors to plan and commit attacks. *E.g.*, ¶¶120, 122, 219-21 (reports that oil and gas sales funded proxy terrorism); ¶¶127, 130-33 (NIOC links to proxy terrorism); ¶¶139-41 (Caspian Petrochemical links to proxy terrorism); *see also* ¶¶87-100 (Hizballah's reliance on Iranian oil money and joint planning with Terrorist Sponsors); ¶¶189-203 (similar for Hamas); ¶¶205-10 (similar for PIJ).

19

Indeed, the nexus alleged here is *more discernable* than the nexus in *Kaplan*. In *Kaplan*, there was no allegation that the money the bank allowed its customers to access played any role in any specific attack. The customer with the clearest connection to terrorism, the martyrs' foundation, paid money to the families of suicide bombers. But the attacks in *Kaplan* were *rocket attacks*, not suicide bombings. Nevertheless, the Second Circuit in *Ashley* had "no doubt" that the conclusion in *Kaplan* was "entirely consistent with *Twitter*'s command." 144 F.4th at 437. Here, by contrast, Plaintiffs allege that SCB's assistance paid for the very types of support—including martyr payments, terrorist salaries, bounties, weapons, training, and tunnels—that were indispensable to carrying out the specific attacks that injured Plaintiffs.

Instead of grappling with those specific allegations, SCB appears to misread *Ashley* as establishing an inflexible rule with breathtaking implications. Under SCB's apparent view, the specifics do not matter because the problem is the basic "theory of nexus" itself—whereby terrorist financiers like the Terrorist Sponsors act as intermediaries between the defendant and the terrorist attackers. MTD 13-14. SCB's position is flatly contrary to JASTA, which as *Ashley* recognized, "permits recovery against those who aid and abet international terrorism 'directly *or indirectly*.'" 144 F.4th at 437 (emphasis added) (quoting JASTA § 2(a)(6)). Indeed, JASTA targeted the specific problem of FTOs that "raise significant funds" by "acting through affiliated groups or individuals." JASTA § 2(a)(3); *see also* S. Rep. No. 102-342, at 22 (1992) (explaining that imposing "liability at any point along the causal chain of terrorism" was intended to "interrupt, or at least imperil, the flow of money" to terrorists). SCB's misreading of *Ashley* would render JASTA a dead letter against financial supporters of terrorism—*the* primary evil the statute was enacted to remedy—who routinely act as intermediaries amassing funds for the attackers. *See Ashley*, 144 F.4th at 437; *see also, e.g.*, *Atchley II*, 2026 WL 184415, at *9 ("overly rigid nexus is especially inappropriate"

20

for "financial assistance" because it is "inconsistent with Congress's intent in enacting the JASTA"); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701-02 (7th Cir. 2008) (en banc) (holding that requiring directness or tracing "would be to invite money laundering" and render the ATA "a dead letter"); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 158 (E.D.N.Y. 2020) (holding that JASTA does not "relieve a financial institution of liability for aiding and abetting … simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front").

*Kaplan* recognized as much. So SCB shrinks it to irrelevance. The terrorist-financing entities in *Kaplan*, SCB suggests, were integral parts of Hizballah while SCB's own customers were not themselves FTOs. MTD 2, 4. But this distinction is trivial and arbitrary in light of Plaintiffs' allegations (*supra* at 19) showing the tight relationship between the Terrorist Sponsors, their oil and gas fronts, and their terrorist proxies. That relationship made the Terrorist Sponsors the principal fundraising arm of the FTOs, and thus an integral part of their terrorist operations. SCB's position appears to make a funder of an FTO liable only when the FTO does its own fundraising. That quaint vision of terrorist finance defies common sense when applied to Iran's terrorist infrastructure, which depends on generating large amounts of money from the Terrorist Sponsors' oil and gas monopoly to sustain the terrorist violence committed by the Terrorist Sponsors' FTO proxies. The distributed nature of this system was precisely why it was so deadly and effective: Hizballah, Hamas, and PIJ could hardly sell Iranian oil themselves; and Iran's Terrorist Sponsors could not carry out terrorist attacks alone with the scale and frequency they wanted outside Iran. Only by creating this system of generating oil and gas money in Tehran to reliably pay for terrorist attacks in Baghdad and Tel Aviv were Iran's Terrorist Sponsors able to kill and injure so many Americans. Perversely, SCB's approach would transform the very features

21

that have made Iran the world's leading sponsor of terrorism into a liability shield for its financiers. The Justice Against *Sponsors* of Terrorism Act would be rendered meaningless, which is of course the point behind SCB's statute-killing argument.

SCB's argument also defies the trend in post-*Twitter* JASTA jurisprudence, in which plaintiffs have prevailed by alleging that defendants knew terrorists had seized control of commercial entities to fund attacks, but nevertheless routed millions of dollars to the terrorists through their transactions with such companies. *See Atchley II*, 2026 WL 184415, at *9 (stressing that defendants' payments coincided with terrorists' control of the Ministry and Kimadia); *Moses*, 802 F. Supp. 3d at 588 (finding adequate nexus when plaintiffs alleged the "funding and the use of front companies by the Terrorist Sponsors was integral to their terrorist scheme"); *Zobay*, 695 F. Supp. 3d at 342 (finding that defendant's transactions with Iranian telecom company that "was itself a front for a terrorist group" distinguished *Atchley* and *Kaplan* from cases like *Siegel v. HSBC North America Holdings*, 933 F.3d 217 (2d Cir. 2019) and *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022), where bank customers were not "alleged to be controlled by or a front for terrorists").

Finally, SCB's position requires this Court to disregard as "indiscernible" a nexus that Congress and the Executive have consistently found between supporting IRGC-controlled oil and gas fronts and Iran-backed proxy attacks. *E.g.*, ¶¶246-47, 254-59, 261-63, 277, 279-95, 580-603, 632-37. As the Supreme Court recently explained, "'Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not,'" and courts should not "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 19, 22 (2025). Congress and the Executive have singled out

the Foundation for the Oppressed—which directed profits from the oil and gas fronts in this case toward martyr payments, terrorist salary payments, and other payments earmarked for terrorism—as an institution used to "promote acts of international terrorism." ¶¶66; *see also* ¶¶67-68, 74, 217; 532, 534-36. Congress and the Executive have determined that the IRGC plays an indispensable role in promoting proxy terrorism against Americans, using its control over commercial activity, including oil and gas, to do so. ¶¶52, 89, 120, 290(f), 290(h), 290(i), 290(l), 291, 376, 475, 538, 545-58. Congress and the Executive have determined that revenue from Iran's oil and gas sector directly funds proxy terrorism. ¶¶44, 112, 142, 176, 247, 541-42, 590, 598. The Executive, acting on direction from Congress, determined that NIOC is an agent or affiliate of the IRGC. ¶132-33. The Executive also found that SCB customer Caspian Petrochemical and its affiliates fund Iran's "regional proxy groups and partners such as Hizballah … and Hamas." ¶140. And Congress and the Executive have spoken with one voice condemning banks that willfully transact with the Terrorist Sponsors, and especially foreign banks that help the Terrorist Sponsors violate U.S. sanctions and evade counterterrorism controls. ¶¶153, 290-92. SCB's sweeping nexus rule would place the Court at odds with decades of bipartisan findings by the political branches in a manner the Supreme Court expressly warned against.

Ultimately, SCB's rigid analysis loses sight of JASTA's "central tenet"—foreseeability. *Ashley*, 144 F.4th at 444. Based on the SAC's well-pleaded allegations, SCB engaged in misconduct from which the attacks that injured Plaintiffs were eminently foreseeable because the support SCB provided was earmarked by the Terrorist Sponsors specifically to aid these types of attacks, in these geographies, by these specific proxy FTOs. At the pleading stage, SCB has no credible counterargument.

23

### 2.    The SAC Alleges Pervasive and Systemic Assistance

The SAC independently satisfies *Twitter*'s alternative test by alleging pervasive and systemic assistance. *Twitter* recognized that a "defendant's role in an illicit enterprise can be so systemic that [it] is aiding and abetting every wrongful act committed by that enterprise," regardless of any nexus. 598 U.S. at 496. *Twitter* explained that although "the facts of *Halberstam* are not totemic," they are "useful" when determining whether the defendant provided pervasive and systemic assistance. *Id*. In *Halberstam*, Linda Hamilton did not participate in Welch's burglaries. She "was not on the scene for the burglary of Halberstam's house and did not lend any specific support to Halberstam's murder." *Id*. at 495. But she did the "bookkeeping work for Welch's 'business,'" thereby "facilitating the sale of [his] stolen goods" by collecting his checks, falsifying tax returns, and keeping the records of his payments. *Id*. at 486. This "assistance to Welch was so intentional and systematic that [Hamilton] assisted each and every burglary" he committed; any time he "left the house to burglarize, he would have relied on Hamilton's assistance in laundering the stolen goods and transforming them into usable wealth." *Id*. at 495. Hamilton was thus liable for Halberstam's murder during one of Welch's burglaries. *Id*.

As most banks exited the Iranian oil market due to the Terrorist Sponsors' pervasive illicit behavior, SCB chose to process billions of dollars in transactions through the U.S. financial system over the course of a decade in flagrant violation of U.S. laws designed to "protect [Americans] and other innocents around the world from terrorist attacks" by "restrict[ing] the flow of funds to terrorist groups." ¶281; *see* ¶¶297-318, 333-58. In the words of its own senior executive, SCB believed that "handling Iran's oil receipts would be very prestigious," and it sought, "[i]n essence" to act "as Treasurer to the [Central Bank of Iran]/the country." ¶298. After SCB's illicit business was discovered, it falsely claimed to have exited that business in 2007, but continued to covertly process many millions of dollars for Iranian oil and gas customers like Caspian Petrochemical.

24

SCB's role was integral to the Terrorist Sponsors' entire oil and gas monopoly because the Terrorist Sponsors could not easily monetize their oil and gas resources without covert access to the U.S. financial system, and they could not obtain such access without a Western bank willing to violate its regulatory obligations and lie on their behalf.  ¶¶7-9. SCB served as that crucial link between Iran and the international oil and gas market. Accordingly, SCB not only allowed the Terrorist Sponsors to access *billions* of dollars over a period of more than a decade; it also furnished them with illegal cover and concealment, stymying ongoing efforts to detect and stop Iran's Terrorist Sponsors. ¶¶9-10, 327-29, 619-37. Like Hamilton, whose back-office bookkeeping enabled her partner to continue his burglary spree, SCB enabled the Terrorist Sponsors to continue their proxy attacks.

### 3.     The SAC Alleges Conscious and Culpable Conduct

SCB's conduct not only had a concrete nexus to the attacks but was also highly conscious and culpable. As explained (*supra* at 11-12, 14-15), SCB received numerous warnings through multiple sources and its own diligence. Based on those sources catalogued in detail in the SAC, SCB knew: (1) the Terrorist Sponsors had systematically monopolized Iran's oil and gas sector to fund their proxy terrorism through Hizballah and Hamas (¶¶109-45); (2) Caspian Petrochemical was an Iranian-government owned business operating in that sector, making it a front for the Terrorist Sponsors (¶¶340-58); and (3) the Terrorist Sponsors directed a substantial part of profits from such fronts to fund terrorist attacks by Hizballah, Hamas, PIJ, and JAM (¶¶359-473). Yet SCB moved money, lied to the U.S. government, and thwarted counterterrorism controls on Caspian Petrochemical's behalf. So too with SCB's other Iran customers and its Hizballah-financier customers in Gambia.

SCB argues (MTD 14-16) that the SAC fails to allege that SCB "knew or intended" that Iran's FTO proxies would receive the funds it generated. Not so. SCB simply ignores the above

25

allegations that it knew Iran's Terrorist Sponsors were using its transactions to fund their proxies. SCB likewise aims to minimize its culpability by waiving away its conduct as mere "sanctions violations." MTD 6-7. But this seriously understates it. SCB was a crucial gatekeeper in a financial system that made the detection and reporting of money laundering, terrorist financing, and illicit activity one of the bank's highest legal obligations. ¶¶245-81. But SCB instead switched sides and intentionally *became the money launderer* for Iran's Terrorist Sponsors. As SCB's Iran office CEO admitted, the Iranians' concern was that the U.S. government would learn about the Iranians' illicit business dealings if the payments were transparent. ¶302. So SCB used its privileged position as a trusted Western bank to sabotage U.S. counterterrorism controls, including by falsifying or omitting key information from SWIFT payment messages, falsifying documents, lying to regulators, and advising clients on how to evade detection. ¶¶348-53.

In doing so, SCB intended to aid the Iranian regime's illicit enterprise, which SCB knew required secrecy. SCB knew that these tactics would provide concealment from U.S. government monitoring and reporting measures—which are some of "the most important and powerful tools" to "identify and locate the networks of terrorists and their supporters," and that play a "central role in identifying terrorist financing and the movement of terrorist funds through the financial system." ¶¶277, 281; *see* ¶¶260-281. This "operational cover" was not incidental to SCB's banking services—it was the *essence* of what made SCB valuable to the Terrorist Sponsors. U.S. officials have confirmed that "financial intelligence can reveal the structure of terrorist groups, the activities of individual terrorist[s], and their logistics and facilitation networks." ¶635. SCB not only provided an "incalculably significant counterintelligence benefit" to the Terrorist Sponsors; it also provided them with legitimacy, essential for them to access international financial markets. ¶621;

26

*see* ¶365, 622, 671. This "constitutes the very kind of culpable conduct contemplated by aiding-and-abetting liability." *Moses*, 802 F. Supp. 3d at 588.

### B.        Plaintiffs Plausibly Allege SCB's General Awareness.

To satisfy the general awareness element, "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021) (emphasis in original). It is enough that defendants "knew they were playing *some sort of role* in" such an illegal or tortious enterprise. *Twitter*, 598 U.S. at 497 (emphasis added). In the Second Circuit, the general awareness inquiry has been deemed satisfied by allegations permitting an inference that the defendant knew its illegal conduct benefited persons or entities that were closely intertwined with terrorists' violent activities. *See Kaplan*, 999 F.3d at 860. As Judge Clarke found on similar facts and this Court did not question in its previous order, Plaintiffs satisfy the general awareness standard here. *See Moses*, 802 F. Supp. 3d at 585-86.

With respect to Caspian Petrochemical, Judge Clarke correctly considered it a "reasonable inference" based on the plaintiffs' allegations that the bank in that case "was aware" Caspian Petrochemical was "intertwined" with the Terrorist Sponsors. *Id.* at 585. Those allegations included numerous "direct and public warnings elucidating" the "intricate nature of the terrorism machine," its "use of front companies to fund terrorist activities," and the fact that "every company in the oil and gas industries" during the relevant period "had a direct tie to at least one Terrorist Sponsor." *Id.* at 585-86. As Caspian was "part of a network of eight companies comprising an Iranian energy group" and listed an officer with a name that referred to the Ayatollah, the plaintiffs plausibly alleged the bank's awareness that Caspian Petrochemical was one of those front

27

companies. *Id*. at 586. Plaintiffs' allegations against SCB in this case share every one of those features.  ¶¶343-55.

And here there is even more. SCB recorded *in its own files* that Caspian Petrochemical was owned by the Iranian government, dispelling any doubt that it operated under the Terrorist Sponsors' monopolistic control. ¶¶343, 565. SCB had also maintained a deep and longstanding relationship with the company's chairman, an Iranian liquified petroleum gas "magnate" (¶355), dating back to 2002. ¶344. SCB's Iran and Dubai personnel had met with him multiple times in Iran, and they obtained an organizational chart and other extensive documentation about the company's activities there. ¶¶244-46. While the U.S. government did not publicly announce Caspian Petrochemical's role in "generat[ing] revenue" to "fund Iran's … regional proxy groups" until 2025, SCB was intimately aware of its customer's activities long before then. ¶¶344, 355. Indeed, SCB helped keep the U.S. government in the dark about them. When OFAC inquired specifically about Caspian Petrochemical's transactions in 2010, SCB assured OFAC that this company had "no direct or indirect involvement with Iran"—a statement an SCB employee has admitted he knew was false when made. ¶¶350-51. Then, as sanctions pressure mounted and the IRGC and Hizballah threatened violence in response, SCB advised its customer to "change the company name" and "reopen another account" to evade detection. ¶¶353-56. SCB's stunning cover-up is strong support for the inference that it was aware of the magnitude of its crime. *See, e.g.*, *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015) (holding that a "factfinder could … infer consciousness of guilt" from a defendant's "obstruction" and "lying").

SCB's awareness of NIOC's role as a front for the Terrorist Sponsors was also clear. NIOC was a government entity under the IRGC-controlled Ministry of Petroleum, and official

28

announcements warning that Iran's oil and gas revenue paid for its terrorism appeared as early as the 1990s and became more forceful over time. ¶¶3, 44, 127-33, 247-48, 290, 565-618.

SCB's arguments to the contrary ignore or mischaracterize the SAC. The fact that fronts like Caspian Petrochemical had not specifically been singled out in a sanctions designation at the time of SCB's transactions (MTD 22-23) misses the entire context. It would "defy common sense" to hold that knowledge of an entity's ties to terrorists "could be gained in no other way." *Kaplan*, 999 F.3d at 864; *see also Zobay*, 695 F. Supp. 3d at 340. The U.S. government warnings often spoke in broad and general terms because the Terrorist Sponsors' monopolization and weaponization of key industries occurred *en masse*. From broad warnings that the IRGC-monopolized oil and gas sector was funding terrorist attacks, the inference was obvious that a major Iranian company in that industry was, too. It is thus enough to allege "a wealth of public materials connecting the Terrorist Sponsors to the oil and gas industries," and to "situate[] Caspian … in that context." *Moses*, 802 F. Supp. 3d at 586. And in any event, OFAC *did* single out Caspian Petrochemical for specific concern at the time SCB was serving the company, only to have SCB lie to them. It is breathtaking for a bank to become intimately familiar with a customer like Caspian Petrochemical, to lie and obfuscate to OFAC for years on its behalf, and then to claim that the bank lacked sufficiently specific OFAC designations about it. SCB (at 23) even calls it "crucial[]" that the OFAC notice "makes no finding that Caspian" is "owned by the Iranian government"—a risible argument when SCB recorded that very fact *in its own files* in 2007. ¶343.

SCB claims that the many warnings it received did not connect its customers "to the FTOs" that injured Plaintiffs. MTD 19. But again, SCB ignores obvious context. Many of the warnings plainly connected the oil and gas industry in which SCB's customers were situated to the funding of Hizballah, Hamas, and PIJ. ¶¶281, 290-91, 593, 602-03. SCB also incorrectly suggests some

29

warnings "postdate SCB's provision of services." MTD 19. The events and warnings cited above—and many more cited in the SAC—pre-dated all or at least some of SCB's business with the Iranian Banks, NIOC, and Caspian Petrochemical. ¶583. Indeed, the SAC details "a clarion call" over the course of 2010 and 2011 "consisting of at least fifteen events that warned SCB specifically about Iran's oil sector, its use of fronts, the dominance of the IRGC, and its funding of terrorism," which "accompanied the most active period of SCB's assistance to Caspian Petrochemical." ¶¶583, 584-601.

SCB argues that its flagrant violations of U.S. sanctions are "insufficient to satisfy the general awareness requirement." MTD 20. This is a straw man, as Plaintiffs allege far more. Nor is this case like those that SCB cites. In *Honickman*, the bank's customers were three charities that "maintained a 'cover' in public" and whose support for Hamas was only revealed in a Treasury investigation announced *after* the relevant assistance. 6 F.4th at 502. In *Siegel*, the defendant's customer was a "large [Saudi] bank with vast operations" that was "believed by some" to have a few customers with links to terrorism, though not "most, or even many." 933 F.3d at 224. In *Bernhardt*, allegations of Iran's general support for terrorism through *Hizballah* did not demonstrate HSBC's awareness that transacting with Iranian banks engaged in many "legitimate" activities would support attacks by *al-Qaeda*. 47 F.4th at 868. Here, by contrast, SCB's own files identified SCB's customer as an Iranian front and its support for terrorist attacks by FTOs was obvious from contemporaneous events and warnings. *Cf. Zobay*, 695 F. Supp. 3d at 342-43 (distinguishing *Siegel* and *Bernhardt* on similar grounds).

## II.     All Of Plaintiffs' Claims Are Timely.

SCB argues that claims based on three attacks are untimely, but SCB is wrong for two independent reasons.

*First*, SCB misreads JASTA's statute of limitations. Claims must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335(a). It is axiomatic that "a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 811 (2024). Courts have thus consistently recognized that "[a] claim deriving from a statute cannot accrue before the statute [creating the cause of action] has been enacted." *United States v. Sunoco, Inc.*, 644 F. Supp. 2d 566, 571 (E.D. Pa. 2009); *see also, e.g.*, *In re Penn Cent. Transp. Co.*, 944 F.2d 164, 168 (3d Cir. 1991) (same).

Courts that have decided the question have uniformly held that JASTA claims cannot accrue before Congress enacted JASTA in 2016. *See Moses*, 802 F. Supp. 3d at 579; *Cabrera v. Black & Veatch Special Proj. Corp.*, 2024 WL 1435146, at *5 (D.D.C. Mar. 28, 2024). Although SCB argues that these cases were wrongly decided, and cites cases for the unremarkable proposition that claims *existing at the time of an injury* typically accrue upon the injury's discovery (MTD 27), SCB cites no authority for its mystifying premise that a statutory claim can accrue before it exists. We are aware of none.

Moreover, JASTA is expressly retroactive to actions arising from injuries occurring on or after September 11, 2001 (JASTA § 7), which "makes clear that within ten years of its enactment, a plaintiff can bring suit under JASTA for any relevant injury that occurred on or after September 11, 2001." *Moses*, 802 F. Supp. 3d at 580. SCB's reliance on the "special rule" (MTD 27-28) created under § 1251(c) of the 2013 National Defense Authorization Act ("NDAA"), Pub. L. No. 112-239, 126 Stat. 2017, is fruitless. That special rule gave plaintiffs injured on or after September 11, 2001 additional time to sue after the NDAA extended the ATA's statute of limitations from four to ten years. This special rule has no relevance to claims under JASTA that did not exist until

31

JASTA was enacted in 2016. If anything, it demonstrates Congress's desire to afford ample time for claims to be filed after significant legislative changes occur. The fact that Congress did not create a new special rule when it enacted JASTA in 2016 confirms its expectation that the ordinary accrual rule would afford ten years under the statute of limitations at that time.

*Second*, even if JASTA claims could somehow accrue before they exist, the statute of limitations was equitably tolled until April 9, 2019, when the 2019 DPA first revealed that SCB had provided financial services to Caspian Petrochemical and other fronts through at least 2014. ¶711. Moreover, SCB actively concealed its ongoing misconduct through an elaborate scheme of deception (¶¶623-29, 712-14) and falsely represented in the 2012 resolution of its initial enforcement actions that it had "made the decision to exit the Iranian business" in October 2006 and had "ended" its "U.S.-dollar clearing activity for all the Iranian banks" by March 2007. ¶¶330-31. "Tolling lasts so long as the fraud is effective," *Dos Santos v. Assurant, Inc.*, 625 F. Supp. 3d 121, 133 (S.D.N.Y. 2022) (quotation omitted), and allegations of affirmative acts of fraudulent concealment "suffice[] to satisfy the diligence requirement" for equitable tolling, *SEC v. Power*, 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007). SCB faults Plaintiffs for "waiting over twelve years" from its 2012 DPA and points to other actions against SCB filed by other plaintiffs in 2014 and 2017, but fails to mention the 2019 DPA that is at the heart of Plaintiffs' claims. MTD 29. Plaintiffs had no way of knowing about the misconduct that SCB successfully concealed until 2019, and the 2012 DPA *affirmatively misled* them to believe that SCB had come clean.

## III.    SCB Is Subject to Personal Jurisdiction.

SCB's personal jurisdiction argument challenges whether it has minimum contacts. This argument is irrelevant and insufficient. It is irrelevant because SCB is subject to jurisdiction under the ATA's nationwide service of process provision, 18 U.S.C. § 2334(a), because it was served here. ¶39. The Supreme Court held in *Fuld* that when Congress establishes jurisdiction in this

manner, the "minimum contacts standard" applicable to states under the Fourteenth Amendment does not apply. 606 U.S. at 16. The standard applicable to Congress when federal law confers jurisdiction over a foreign defendant is "more flexible," and is satisfied when, as here, the federal government has a "strong interest in permitting American victims of international terror to pursue justice in domestic courts" and the statute is "suitably limited to those ends." *Id*. at 16, 19-21. Congress found in JASTA that those who "knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States … necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6). That finding supports the exercise of jurisdiction here under *Fuld* regardless of SCB's "minimum contacts," and SCB does not argue that it would be unreasonable, unduly burdensome, or unfair for it to litigate here.

In any event, SCB's minimum contacts argument fails. Plaintiffs' allegations center around U.S. dollar transactions SCB performed for its Iranian customers via SCB's New York branch or another New York correspondent bank, as well as SCB's misleading of New York and federal regulators and stripping wires to mislead its own New York compliance team and New York correspondent banks. ¶¶12, 28, 32, 38, 302-16, 327, 340-41, 671, 685, 694, 706. The core of SCB's misconduct was thus aimed directly at the United States and New York. These allegations, which SCB does not factually dispute, show that SCB "deliberately directed its conduct at the forum" and that the controversy is "related to [SCB's] in-forum conduct," thus establishing "minimum contacts." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 97 (S.D.N.Y. 2015). SCB's "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged

33

wrongs" also suffices. *Licci*, 732 F.3d at 171; *see also, e.g.*, *Zobay*, 695 F. Supp. 3d at 331. Plaintiffs' allegations here "support[] a reasonable inference that terrorist transactions occurred repeatedly through Defendant's New York branch, even though no specific transactions have been identified" at this stage. *Moses*, 802 F. Supp. 3d at 590. SCB's only remaining argument, that certain of the unlawful acts alleged in the complaint (transactions involving EAGL and Tajco) do not relate to New York, fails because once a defendant has sufficient suit-related contacts, not every act supporting liability need relate to the forum. *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 281-82 (E.D.N.Y. 2016).

**CONCLUSION**

SCB's motion to dismiss should be denied.


Dated: February 10, 2026

Respectfully submitted,

*/s/ Tejinder Singh*

Tejinder Singh
Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

*Counsel for Plaintiffs*

34

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word-count limitations contained in the Court's November 6, 2025 Order (ECF No. 64) and Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York because, excluding the parts of the document exempted by those rules, it contains 10730 words, as calculated by Microsoft Word.

Dated: February 10, 2026

Respectfully submitted,

/s/ Tejinder Singh

Tejinder Singh
Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Jacob R. Loshin (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

*Counsel for Plaintiffs*